# Exhibit 8_G

Before: CALABRESI and KATZMANN, Circuit Judges, and KAPLAN, District Judge. *

Opinion

KATZMANN, Circuit Judge:

This action was brought by the Attorney General of Canada ("Canada") on behalf of the government of Canada for damages based on lost tax revenue and additional law enforcement costs. Canada alleges that these damages resulted from a scheme facilitated by defendants to avoid various Canadian cigarette taxes by smuggling cigarettes across the United States Canadian border for sale on the Canadian black market. Under the Racketeer Influenced and Corrupt Organizations Act **106** ("RICO"), 18 U.S.C. § 1961 *et seq.,* Canada seeks revenue that it lost "from the evasion of tobacco duties and taxes," and from "[d]efendants' conduct [that] compelled [Canada] to rollback duties and taxes," as well as monies spent "seeking to stop the smuggling and catch the wrongdoers."

 [1]    This case involves the construction of RICO in light of the common law doctrine known as the "revenue rule," a long established feature of the law of the United States and other nations including Canada, which holds that the courts of one sovereign will not enforce the tax judgments or claims of another sovereign. RICO broadly created a civil treble damages remedy for any person injured in its business or property by reason of a violation of the statute. Canada's action proceeds on the premise that the taxes it allegedly lost as a result of defendants' alleged RICO violations fall within RICO's damages provision. As the relief Canada seeks would be foreclosed by the revenue rule in the absence of RICO, and as there is no indication that Congress intended RICO to abrogate the revenue rule with respect to claims brought by foreign sovereigns under the statute, we have no choice but to conclude that RICO may not be used by Canada to seek recovery of lost tax revenues and tax enforcement costs as RICO damages. We therefore affirm. Although the judiciary can do no more, we note that Canada can seek recourse through the political branches—the executive and Congress.

## Background

Unless otherwise noted, the facts that follow are drawn from the complaint and Civil RICO Statement, the latter filed pursuant to Local Rule 9.2 of the Northern District of New York. On a motion to dismiss, the court must accept as true all of the factual allegations in the complaint, make inferences from those allegations in the light most favorable to plaintiff, and liberally construe the complaint. *See, e.g., Gregory v. Daly,* 243 F.3d 687, 691 (2d Cir.2001).

Defendants RJR–McDonald ("RJR MacDonald"), a Canadian company, and American companies R.J. Reynolds Tobacco Holdings, Inc. ("Holdings"), Northern Brands International, Inc. ("NBI"), R.J. Reynolds Tobacco Company ("RJR US"), R.J. Reynolds Tobacco International, Inc. ("International"), and R.J. Reynolds Tobacco Company PR ("RJR PR") (collectively "defendants") manufactured and distributed cigarettes during the period relevant to this action. Defendant Canadian Tobacco Manufacturers Council is a trade association to which RJR–MacDonald belongs.

In 1991, Canada doubled its cigarette taxes, raising the average price of a carton of cigarettes from $26 (Canadian) in 1989 to $48 (Canadian) in 1991. After this tax increase, RJR–MacDonald's sales and market share declined. In order to decrease sales prices and increase consumption, defendants developed a scheme to avoid paying Canadian cigarette taxes. They exported cigarettes from Canada to the United States, and RJR–MacDonald falsely declared to Canadian officials that the cigarettes were not for consumption in Canada. Defendants then sold the cigarettes to distributors, whom defendants knew were smugglers, who resold the cigarettes to Canadian black-market distributors. At least some of the smuggling was conducted by selling the Canadian cigarettes to residents of the St. Regis/Akwesasne Indian Reservation ("Reservation") on the New York–Canadian border. The scheme was then refined to take advantage of the Foreign Trade Zones ("FTZs") in upstate New York. Defendants exported Canadian cigarettes from Canada to the **107** FTZs, where they were delivered to distributors who shipped the cigarettes to the Reservation. The distributors then smuggled the cigarettes back into Canada.

In 1992, Canada imposed a tax of $8 (Canadian) on each carton of exported cigarettes. To avoid this tax, defendants shipped raw Canadian tobacco to Puerto Rico, where RJR PR manufactured Canadian-style cigarettes made to look as if they had been made by RJR–MacDonald in Canada. These cigarettes were delivered directly or through Caribbean intermediaries to FTZs in New York, then brought to the Reservation to be smuggled into and sold in Canada. In 1992 and 1993, RJR PR manufactured approximately one billion

Canadian-style cigarettes each year. RJR–MacDonald also employed Standard Commercial in North Carolina to process Canadian tobacco and package it as an RJR–MacDonald product. The tobacco was then smuggled into Canada for sale on the black market.

In 1993, in an effort to conceal their relationship with smugglers, defendants created NBI and directed their Canadian sales through it. Defendants' Canadian sales increased, and defendants made several hundred million dollars in profit. In 1994, Canada lowered its cigarette taxes. NBI liquidated its inventory at the FTZs by selling the cigarettes at low prices. Defendants continued their smuggling scheme at low levels between 1995 and 1998.

In conducting this scheme, defendants used the United States mails and wires to make payments and to place and receive orders. In 1997 and 1998, the United States indicted NBI and 21 individuals in connection with these smuggling activities. In 1998, NBI pled guilty to aiding and abetting the introduction of merchandise into the United States by means of false and fraudulent practices. Several individuals involved in the scheme pled guilty to crimes such as wire fraud, aiding and abetting smuggling, conspiring to defraud the United States, currency violations, money laundering and criminal RICO violations.

 [2]    In the present action, Canada brings claims against defendants under RICO's civil enforcement provision. RICO is a broadly worded statute that "has as its purpose the elimination of the infiltration of organized crime and racketeering into legitimate organizations operating in interstate commerce." S.Rep. No. 91–617, at 76 (1969)S.Rep. No. 91–617, at 76 (1969); *see* Statement of Findings and Purpose, Organized Crime Control Act of 1970, Pub.L. 91–452, 84 Stat. 922, 922–23 (1970). "RICO provides that '[a]ny person injured in his business or property by reason of' a RICO violation may bring a civil action to recover treble damages." *Metromedia Co. v. Fugazy,* 983 F.2d 350, 368 (2d Cir.1992) (quoting 18 U.S.C. § 1964(c)), *cert. denied,* 508 U.S. 952, 113 S.Ct. 2445, 124 L.Ed.2d 662 (1993). "To establish a RICO claim, a plaintiff must show: (1) a violation of the RICO statute ...; (2) an injury to business or property; and (3) that the injury was caused by the violation of [RICO]." *De Falco v. Bernas,* 244 F.3d 286, 305 (2d Cir.2001) (internal quotation marks and citation omitted), *cert. denied,* 534 U.S. 891, 122 S.Ct. 207, 151L.Ed.2d 147 (2001). Canada alleges that defendants violated RICO by

"conduct [ing] or participat[ing] ... in the conduct of [an] enterprise's affairs through a pattern of racketeering activity," namely repeated instances of mail fraud, 18 U.S.C. § 1341, and wire fraud, 18 U.S.C. § 1343, in violation of 18 U.S.C. § 1962(c). Second, Canada alleges a conspiracy, in violation of 18 U.S.C. § 1962(d), to violate subsections (a), (b) *108 and (c) of section 1962. [1] Canada explains that these RICO violations were the proximate cause of injury to its "property" because it was deprived of revenue from tobacco duties and taxes and was forced to spend money to stop defendants' illegal activity.

Defendants moved to dismiss the complaint pursuant to Federal Rule of Civil Procedure 12(b)(6). In a thorough and thoughtful opinion, the district court rejected some of the grounds of defendants' motion, finding that Canada is a "person" entitled to bring a RICO action and refusing to dismiss the action under the act-of-state and political-question doctrines. *See Attorney General of Canada v. RJ Reynolds Tobacco Holdings, Inc.,* 103 F.Supp.2d 134, 144–50 (N.D.N.Y.2000). Nonetheless, the district court granted the motion to dismiss because it held that Canada's lost revenue claims were barred by the revenue rule; that a government's claim for damages based on increased law enforcement and related costs does not satisfy civil RICO's requirement that the plaintiff suffer an injury to its commercial interests; and that RICO does not provide for the disgorgement and other equitable relief requested by Canada. *See id.* at 140–44, 150–55. With regard to the revenue rule, the district court explained:

Recognizing the existence of the Revenue Rule ... only begs the impending question—whether the instant civil RICO claim commenced by Canada is precluded by that rule.

\* \* \* \* \* \*

The problem arises when we look back to the standing and recovery requirements of a claim under 18 U.S.C. § 1964(c) and, in particular, the requirement that a civil RICO plaintiff allege injury to business or property.

\* \* \* \* \* \*

Again, to have standing and to recover, Canada must allege injury in fact, which ultimately obligates it to prove that some act or acts in furtherance of the scheme caused it to sustain injury.

* * * * * *

Certain of the types of injuries alleged by Canada, namely lost revenues resulting from the evasion of duties and taxes, require it to show that the scheme utilizing the mails and wire communications to defraud it out of tax revenue was successful (at least, in part, insofar as it actually evaded Canadian tax laws thereby causing Canada to lose revenue).... Thus, to pursue its claim for damages relating to lost tax revenue, Canada will have to prove, and the Court will have to pass on, the validity of the Canadian revenue laws and their applicability hereto and the Court would be, in essence, enforcing Canadian revenue laws. Enforcing foreign revenue laws is precisely the type of meddling in foreign affairs the Revenue Rule forbids.

* * * * * *

The fact that the executive branch of the United States Government has seen fit to enter into treaties with Canada with respect to the recognition and enforcement of certain tax liabilities, to delineate the extent to which one country's revenue claims may be enforced in the other, and to limit such enforcement to "finally determined" revenue claims, strongly suggests that Canada's RICO claim would draw this Court's "inquiry into forbidden waters reserved exclusively to the legislative and executive **\*109** branches of our government." As long as the Revenue Rule prevails (as evidenced by Second Circuit precedent and the Treaty), this Court is precluded from affording the Canadian government an alternative mechanism not expressly authorized by the legislative and/or executive branches of government—those branches particularly responsible for establishing and conducting international relations—by which it may recoup lost tax revenues in the courts of the United States.

*Id.* at 141–44 (internal citations and footnote omitted).

Canada appeals the dismissal, arguing that the revenue rule is inapplicable, that it adequately pled the elements of a civil RICO cause of action and is not required to show a commercial injury, and that equitable relief is available, particularly where, as here, the amount of damages may be difficult to prove. Defendants oppose the appeal, arguing that the revenue rule precludes an action for the enforcement of foreign tax claims, that the political-question doctrine bars this action, that Canada failed to plead the commercial injury required by RICO and is not a "person" under RICO

entitled to bring the action, and that equitable remedies are unavailable in a civil RICO suit such as this. *Amicus curiae* the European Community urges reversal of the district court, primarily on the ground that the revenue rule is inapplicable and inconsistent with the goals of RICO. *Amici curiae* the National Association of Manufacturers and the United States Chamber of Commerce advocate affirmance, arguing that the revenue rule requires the Court to limit foreign governments' use of United States courts for tax collections, which, if unrestricted, would be harmful to American business interests.

We find that the present case falls within the revenue rule's proscriptions. Moreover, we have found no evidence that Congress intended to limit the revenue rule when it enacted RICO. Canada requests that a United States court enforce Canadian tax laws on its behalf. This we cannot do, notwithstanding our deep respect for Canada's views. Accordingly, we hold that the revenue rule bars Canada's action in its entirety and affirm the judgment of the district court.

### Discussion

### I. The Vitality of the Revenue Rule

The revenue rule is a longstanding common law doctrine providing that courts of one sovereign will not enforce final tax judgments or unadjudicated tax claims of other sovereigns. It has been defended on several grounds, including respect for sovereignty, concern for judicial role and competence, and separation of powers. Examination of both the policies underlying the revenue rule, and the rule's congruence with the international tax policies pursued by the political branches of our government, supports the conclusion that the revenue rule is applicable to the particular facts of the case at hand.

Although the United States Supreme Court and this Circuit have not ruled on the precise scope of the rule, they have acknowledged its continuing vitality in the international context. *See* *Sun Oil Co. v. Wortman,* 486 U.S. 717, 740 n. 3, 108 S.Ct. 2117, 100 L.Ed.2d 743 (1988) (Brennan, J., concurring) (noting the rule's continued existence in the nation-to-nation setting); *Banco Nacional de Cuba v. Sabbatino,* 376 U.S. 398, 413–14, 84 S.Ct. 923, 11 L.Ed.2d 804 (1964) (noting the view that many courts in the United

RICO Bus.Disp.Guide 10,172

States have adhered to the principle that "a court need not give effect to the penal or revenue laws of foreign countries");

*Oklahoma v. Gulf,* **\*110** *Colo. & Santa Fe Ry. Co.,* 220 U.S. 290, 299, 31 S.Ct. 437, 55 L.Ed. 469 (1911) ("The rule that the courts of no country execute the penal laws of another applies not only to prosecutions and sentences for crimes and misdemeanors, but to all suits in favor of the state for the recovery of pecuniary penalties for any violation of statutes for the protection of its revenue or other municipal laws, and to all judgments for such penalties.")

(quoting *Wisconsin v. Pelican Ins. Co. of New Orleans,* 127 U.S. 265, 290, 8 S.Ct. 1370, 32 L.Ed. 239 (1888), *overruled in part by* *Milwaukee County v. M.E. White Co.,* 296 U.S. 268, 278, 56 S.Ct. 229, 80 L.Ed. 220 (1935));

*United States v. First Nat'l City Bank,* 321 F.2d 14, 23–24 (2d Cir.1963) ("It has long been a general rule that one sovereignty may not maintain an action in the courts of another state for the collection of a tax claim."), *rev'd on other grounds,* 379 U.S. 378, 85 S.Ct. 528, 13 L.Ed.2d 365 (1965); *cf.* *United States v. Trapilo,* 130 F.3d 547, 551–53 (2d Cir.1997) (appearing to recognize the endurance of the revenue rule in the international context but finding it "inapplicable to the instant case"), *cert. denied,* 525 U.S. 812, 119 S.Ct. 45, 142 L.Ed.2d 35 (1998); *United States v. Pierce,* 224 F.3d 158, 167 (2d Cir.2000) (describing this aspect of *Trapilo* ).

The rule has its origin in eighteenth-century English court decisions seeking to protect British trade from the oppressiveness of foreign customs.[2] In *Boucher v. Lawson,* 95 Eng. Rep. 53 (K.B.1734) (Lord Hardwicke, C.J.), the court specifically acknowledged that its concerns with promoting British trade led it to uphold a transaction that violated Portuguese export laws. Chief Justice Lord Hardwicke stated that to do otherwise "would cut off all benefit of such trade from this kingdom, which would be of very bad consequence to the principal and most beneficial branches of our trade." *Id.* at 56.[3] Since then, the rule has entered United States common law, international law and the national law of other common law jurisdictions.[4] We note **\*111** that the international acceptance of the revenue rule extends to Canada's Supreme Court and provincial courts.[5]

## A. Respect for Sovereignty

Tax laws embody a sovereign's political will. They create property rights and affect each individual's relationship to his or her sovereign. They mirror the moral and social sensibilities of a society. Sales taxes, for example, may enforce political and moral judgments about certain products. Import and export taxes may reflect a country's ideological leanings and the political goals of its commercial relationships with other nations.

In defense of the revenue rule, some courts have observed that the rule prevents foreign sovereigns from asserting their sovereignty within the borders of other nations, thereby helping nations maintain their mutual respect and security.[6] *See* **\*112** *Sabbatino,* 376 U.S. at 448, 84 S.Ct. 923 (White, J., dissenting on other grounds) ("Our courts customarily refuse to enforce the revenue and penal laws of a foreign state, since no country has an obligation to further the governmental interests of a foreign sovereign"); *see generally* F.A. Mann, *Prerogative Rights of Foreign States & the Conflict of Laws, in* Studies in International Law, 492–514 (1973).

Other courts have suggested that it is too sensitive and difficult for courts to determine whether such foreign revenue laws should be enforced by another sovereign. More than seventy years ago, a judge of this court, Learned Hand, offered a rationale in support of the revenue rule that still has resonance today:

> [A] court will not recognize those [liabilities] arising in a foreign state, if they run counter to the 'settled public policy' of its own. Thus a scrutiny of the liability is necessarily always in reserve, and the possibility that it will be found not to accord with the policy of the domestic state.... No court ought to undertake an inquiry which it cannot prosecute without determining whether those laws are consonant with its own notions of what is proper.

*Moore v. Mitchell,* 30 F.2d 600, 604 (2d Cir.1929) (L.Hand, J., concurring), *aff'd on other grounds,* 281 U.S. 18, 50 S.Ct. 175, 74 L.Ed. 673 (1930). In part, the reluctance of courts to delve into such matters is based on the "desire to avoid embarrassing another state by scrutinizing its penal and revenue laws." *Sabbatino,* 376 U.S. at 437, 84 S.Ct. 923; *see United States v. Boots,* 80 F.3d 580, 587 (1st Cir.), *cert. denied,* 519 U.S. 905, 117 S.Ct. 263, 136 L.Ed.2d 188 (1996). Similarly, in *Peter Buchanan L.D. v. McVey,* [1955] A.C. 516, 529 (Ir.H.Ct.1950H.Ct.1950), *aff'd,* [1955] A.C. 530 (Ir.S.Ct.1951), relied on by the United States Supreme Court in *Sabbatino,* 376 U.S. at 437–38, 84 S.Ct. 923, the Irish High Court noted that courts had traditionally exercised the right to reject foreign law that conflicted with the public policy or morality of the domestic court, and stated:

> [M]odern history [is not] without examples of revenue laws used for purposes which would not only affront the strongest feelings of neighbouring communities but would run counter to their political aims and vital interests.... So long as these possibilities exist it would be equally unwise for the courts to permit the enforcement of the revenue claims of foreign States or to attempt to discriminate between those claims which they would and those which they would not enforce. Safety lies only in universal rejection.

**\*113** The case before us illustrates the point. Canada asserts that the revenue laws at issue were the product of an assessment of its public health priorities. In its complaint, Canada alleged:

> To protect its youth from the health hazards of smoking, and to implement anti-tobacco programs and other public benefits, Canada doubled tobacco duties and taxes in February 1991. Tobacco duty and tax increases,

and the resulting higher tobacco prices, held the promise of deterring young people from becoming addicted to a harmful drug. Tobacco duty and tax increases also held the promise of encouraging established smokers to quit.

The tenor of the times, at least among many people in the states of this judicial circuit, is anti-smoking. It is unlikely that enforcing a foreign tax regime aimed at deterring smoking would offend most citizens of New York, Connecticut or Vermont, whatever our personal habits or vices. (Of course, citizens of United States tobacco-growing states might vehemently object to Canada's taxation scheme.) But consider, for example, other possibilities involving a foreign sovereign's taxes. How would we respond if a foreign sovereign asked us to help enforce a tax designed to render it very expensive to sell United States newspapers in that nation? Or to make the inclusion of United States-made content in machinery built in that foreign country prohibitively expensive? Suppose it were a tax that had been raised to deter the sale of United States pharmaceuticals in that country? Or if a foreign nation imposed an immigration tax on members of a particular religious group or racial minority? It is much less likely that United States citizens would be kindly disposed towards tolerating such taxes, let alone providing judicial resources to enforce them. These hypotheticals—and we do not suggest that they are anything but hypotheticals—demonstrate the sensitive nature of the issues that can be raised through a foreign sovereign's exercise of its taxation powers. *See* Stoel, *supra* note 2, at 678 ("[T]he tax judgments of one nation may be used to attain what other nations consider odious ends...."). Addressing the public policy concerns raised by the imposition of such foreign taxes could embroil United States courts in delicate issues in which they have little expertise or capacity.

**[3]** We do not suggest that the revenue rule always bars United States courts from furthering the tax policies of foreign sovereigns. This circuit has held the revenue rule "inapplicable" to a United States criminal action premised on violations of foreign tax laws. *United States v. Trapilo,* 130 F.3d 547, 551 (2d Cir.1997), *cert. denied,* 525 U.S. 812, 119 S.Ct. 45, 142 L.Ed.2d 35 (1998); *see also United States v. Pierce,* 224 F.3d 158 (2d Cir.2000). These concerns about sovereignty and extraterritorially are therefore not

absolute, and are not implicated in every case involving foreign tax laws. However, as explained below in Section I.B, the particular facts of this case—most notably, the fact that a foreign sovereign plaintiff is directly seeking to enforce its tax law, and that our government has negotiated and signed a treaty with this sovereign providing for limited extraterritorial tax enforcement assistance but stopping well short of the assistance requested here—lead us to be wary in this instance of becoming the enforcer of foreign tax policy.

### B. Judicial Role and Competence

#### 1. General Principles

Concern about institutional role and competence provides particularly compelling support for the application of the revenue rule in this particular case. Our **\*114** Constitution provides the framework for interaction and dialogue among the branches of our government. [7] "The conduct of foreign relations is committed largely to the Executive Branch, with power in the Legislative Branch to, *inter alia,* ratify treaties with foreign sovereigns. The doctrine of separation of powers prohibits the federal courts from excursions into areas committed to the Executive Branch or the Legislative Branch." *In re Austrian and German Holocaust Litig.,* 250 F.3d 156, 163–64 (2d Cir.2001) (per curiam). The legitimacy of our courts depends in no small measure on exercising authority only in those areas entrusted to the courts. "The establishment of political or economic policies is not for the courts. Such action would be an abuse of judicial power." *National City Bank v. Republic of China,* 348 U.S. 356, 371, 75 S.Ct. 423, 99 L.Ed. 389 (1955) (Reed, J., dissenting). [8]

Extraterritorial tax enforcement directly implicates relations between our country and other sovereign nations. When a foreign nation appears as a plaintiff in our courts seeking enforcement of its revenue laws, the judiciary risks being drawn into issues and disputes of foreign relations policy that are assigned to—and better handled by—the political branches of government. [9] *See INS v. Aguirre–Aguirre,* 526 U.S. 415, 425, 119 S.Ct. 1439, 143 L.Ed.2d 590 (1999) ("The judiciary is not well positioned to shoulder primary responsibility for assessing the likelihood and importance of ... diplomatic repercussions" caused by the exercise of sensitive political functions that implicate foreign relations.). Again, Judge Hand put it well:

To pass [judgment] upon the provisions for the public order of another state is, or at any rate should be, beyond the powers of a court; it involves the relations between the states themselves, with which courts are incompetent to deal, and which are intrusted to other authorities.... Revenue laws fall within the same reasoning; they affect a state in matters as vital to its existence as its criminal laws.

*Moore,* 30 F.2d at 604 (L.Hand, J., concurring); *see also* Smith, *supra* note 2, at 257 ("[T]he possibility of a court engendering ill will and hindering the conduct of foreign relations by refusing to enforce a particular tax claim or judgment ... is very real in the international context."); Stoel, *supra* note 2, at 678 ("[A]pplication of forum public policy to revenue laws may be offensive to the plaintiff State and have undesirable foreign relations consequences for the forum State."); *cf. Boots,* 80 F.3d at 587–88 (dismissing a criminal RICO action based on wire and mail fraud in connection with smuggling over the Canadian border on the ground that the action was barred by the revenue rule and the rule's foreign affairs rationale); Alan R. Johnson, *Systems for Tax Enforcement Treaties: The Choice Between Administrative Assessments & Court Judgments,* 10 Harv. Int'l L.J. 263, 264 (1969) (noting that many commentators dissatisfied with the revenue rule "view executive action by treaty as a preferable means of reform" because **\*115** of "the supposed foreign relations consequences").

#### 2. The Leading Role of the Political Branches

Indeed, with regard to the domestic collection of foreign taxes and the enforcement of United States taxes abroad, the political branches of our government have consistently acted on behalf of the United States in establishing and managing the nation's relationships with other countries. As this Court stated in 1963:

> The nations of the world have only recently begun to deal with the problem of extra-territorial collection of tax revenues through the medium of negotiated tax treaties providing for mutual cooperation. Absent an explicit indication to the contrary, there should not be attributed to Congress an intent to give the courts of this nation, in this highly sensitive area of

intergovernmental relations, the power to affect rights to property wherever located in the world. The apparent necessity of tax treaties underscores the conclusion that Congress has seen fit to handle this problem in another manner.

*United States v. First Nat'l City Bank,* 321 F.2d 14, 24 (2d Cir.1963) (citation omitted), *rev'd on other grounds,* 379 U.S. 378, 85 S.Ct. 528, 13 L.Ed.2d 365 (1965); *see Her Majesty the Queen in Right of the Province of British Columbia v. Gilbertson,* 597 F.2d 1161, 1165 (9th Cir.1979) (considering United States–Canadian tax treaties, and stating "[e]ven though the political branches of the two countries could have abolished the revenue rule between themselves at the time they entered into the treaties, they did not"). The concerns expressed in *First National City Bank* and *Gilbertson* remain relevant today. [10]

We believe that the political branches of our government have clearly expressed their intention to define and limit the parameters of any assistance given with regard to the extraterritorial enforcement of a foreign sovereign's tax laws. Thus, that version of the revenue rule under which United States courts abstain from assisting foreign sovereign plaintiffs with extraterritorial tax enforcement is fully consistent with our broader legal, political and institutional framework.

The parties have pointed us to, and we have been able to confirm the existence of, only five countries with which the United States has entered into income tax treaties under which the contracting parties have agreed to provide general assistance in collecting tax judgments. [11] The treaties *116 with four of these countries—Denmark, France, Sweden and the Netherlands—providing extraterritorial tax collection assistance were first signed and ratified in the late 1930s and 1940s. [12] Relatively soon thereafter, the United States Senate sought to limit the extent to which United States courts and agencies would be obligated to render foreign tax collection assistance. In the words of a member of the Senate Foreign Relations Committee, in 1947 attention was focused on the mutual collection assistance provisions of the treaty with France, and the Committee

discovered that there had been developed ... a number of objections as to the way by which, under the convention, our country undertook to collect taxes for the government of France. This matter was of such concern that we held a number of hearings [and recommended consultation between individuals, businesses and interest groups concerned about the treaty and State Department representatives]. We discovered that there had been embodied in the convention certain methods of collection of taxes which we as a subcommittee felt were not desirable, and at our request the whole matter was reviewed again by the State Department representatives.

Staff of the Joint Comm. on Internal Revenue Taxation, 1 *Legislative History of United States Tax Conventions* 1152 (1962) [hereinafter "Legislative History Vol. 1"] (floor statement of Sen. Smith on June 2, 1948). A compromise was embodied in a 1948 Supplementary Protocol, ratified by the full Senate, which provided that collection assistance under the original treaty with France would not be given with respect to taxpayers of the requested state. *See* Supplementary Protocol to the Convention About Double Taxation and Fiscal Assistance, May 17, 1948, U.S.-France, art. I, T.I.A.S. No.1982 (entered into force Oct. 17, 1949), *available at Legislative History Vol. 1,* at 1191.

Next, "in 1951, the Senate considered income tax treaties for Greece, Norway, and South Africa which, as originally submitted to the Senate, would have obligated the treaty countries to provide broad tax collection assistance to each other." Staff of the Joint Comm. on Taxation, 104th Cong., *Explanation of Proposed Protocol to the Income Tax Treaty Between the United States & Canada* 43 n. 52 (Joint Comm. Print 1995) [hereinafter "Taxation Comm. Staff Explanation of Canada U.S. Protocol"]. Specifically, the treaties provided that "finally determined" revenue claims would be accepted for enforcement by the other contracting state and collected *117 as though they were domestic tax claims, but that such assistance would not be accorded with regard to citizens, corporations or other entities of the state to which application for collection assistance was made. [13]

The limitation of collection assistance in these treaties in accordance with the Senate policy of the 1948 U.S.-France protocol was apparently not sufficient. A report was issued by the Senate Foreign Relations Committee concluding that:

> [T]he committee believes that the collection provisions of the South

African, and Norwegian income-tax conventions are too broad, and it repeats that, as a general rule, it is not believed wise to have one government collect the taxes which are due to another government.... Thus, the committee recommends the acceptance of the collection provisions ... subject to the understanding that each of the governments may collect the other's tax solely in order to insure that the exemptions or reduced rates of tax provided under the respective conventions will not be enjoyed by persons not entitled to such benefits.

S. Ex. Rep. No. 1, at 21 (1951), *available at Legislative History Vol. 1,* at 605. A senator who was very involved in the ratification process explained further:

It is the opinion of the subcommittee and of the whole committee that the [mutual collection assistance provisions are] too broad. As a general rule it is not believed wise to have one government collect the taxes which are due to another government. Therefore the committee recommends that these provisions be eliminated from the pending conventions.... [T]his was the view taken by the committee with respect to all these assistance provisions. It was simply deemed unwise ... to obligate our country to undertake the collection in our own courts of taxes due to the foreign countries dealt with in these conventions. It will be recalled that in many instances, or perhaps all, the courts would be called upon to enforce very harsh civil penalties, and it was not deemed wise for our courts to undertake that particular job.

*Legislative History Vol. 1,* at 1377 (floor statement of Sen. George on Sept. 17, 1951).

In accordance with these views, "[t]he Senate gave its advice and consent to those treaties subject to an understanding that the countries would only provide such collection assistance as would be necessary to ensure that the exemption or reduced rate of tax granted by the treaties would not be enjoyed by persons not entitled to those benefits." *Taxation Comm. Staff Explanation of Canada U.S. Protocol,* at 43 n. 52 (discussing Sept. 17, 1951 Senate vote); *see generally* Smith, *supra* note 2, at 261–62. This Senate policy was also implemented through an analogous narrowing of the collection assistance provision when the Netherlands tax convention, **\*118** whose broad collection assistance provisions had been negotiated before the September 17, 1951 Senate vote, *see Legislative History Vol. 2,* at 1667, was extended to cover the Netherlands Antilles. *See id.* at 1678, 1680–82.

In transmitting future tax conventions to the Senate, the State Department often noted that the mutual collection assistance provisions were narrowed to bring them into harmony with the Senate's expressed policy. *See, e.g.,* Letter from Secretary of State John Foster Dulles to the President of Apr. 18, 1955 (concerning U.S.-Italy convention), *available at Legislative History Vol. 2,* at 1659; Letter from Under Secretary of State Walter B. Smith to the President of June 1, 1953 (concerning U.S.-Australia convention), *available at Legislative History Vol. 1,* at 74–75; Letter from Secretary of State Dean Acheson to the President of Jan. 6, 1953 (concerning U.S.-Belgium convention), *available at Legislative History Vol. 1,* at 258.

This general policy on extraterritorial collection assistance still prevails. For example, the United States Department of Treasury has released the United States Model Income Tax Convention of September 20, 1996 ("1996 Model Convention"). The 1996 Model Convention contains no general provision assisting or allowing the enforcement of foreign tax judgments or claims. Instead, Article 26 of the Convention ("Exchange of Information and Administrative Assistance") provides that "a Contracting State will endeavor to collect on behalf of the other State only those amounts necessary to ensure that any exemption or reduced rate of tax at source granted under the Convention by that other State is not enjoyed by persons not entitled to those benefits." 1996 Model Convention Technical Explanation (2001) (explaining Article 26 ¶ 4). [14]

Our government's continuing policy preference against enforcing foreign tax laws is further revealed by the fact that in negotiating and ratifying the OECD [15] Convention on Mutual Administrative Assistance in Tax Matters, Treaty Doc. 101–6, the executive branch recommended and the Senate adopted a reservation to the treaty's reciprocal collection assistance provisions. *See* Brian J. Arnold, *New Protocol to Canada–U.S. Tax Treaty Addresses Estate Tax Issues, Limitations on Benefits, & Mutual Assistance,* 9 Tax Notes Int'l 859, 862 (1994) ("Although the United States has ratified the OECD Convention ... it reserved its position with respect to the provisions dealing with collections."); 136 Cong. Rec. S13295 (Sept. 18, 1990) (detailing the vote on the reservation); *see also* 136 Cong. Rec. S13294 (statement of **\*119** Sen. Pell) (Sept. 18, 1990) ("The administration stated, and the Committee on Foreign Relations concurred, that it did not believe it appropriate, at this time, to participate in other aspects of the convention, that is cooperation in tax collection efforts ...."); *see generally Taxation Comm. Staff Explanation of Canada–U.S. Protocol,* at 42–43 (discussing the reservation).

Consistent with this continuing policy, the United States has over the years entered into a number of tax treaties with foreign sovereigns that provide for information exchange and, sometimes, limited collection assistance, but notably fail to make any provision for general enforcement of foreign tax judgments or claims. [16] It seems to us that the usual absence in our negotiated tax conventions of any provision for the extraterritorial enforcement of a sovereign's tax judgments or claims cannot be not accidental, but instead must reflect the considered policy of the political branches of our government. Thus, the political branches of our government have clearly expressed their intention to define and strictly limit the parameters of any assistance given with regard to the extraterritorial enforcement of a foreign sovereign's tax laws. In this area of foreign relations policy where the political branches have primacy, courts must be wary of intruding in a way that undermines carefully conceived and negotiated policy choices. Accordingly, as a general matter, that version of the revenue rule under which United States courts abstain from assisting foreign sovereign plaintiffs with extraterritorial tax enforcement is fully consistent with our broader legal, diplomatic, and institutional framework.

**3. The United States–Canada Treaty Framework**
Significantly, we have fairly recently negotiated a tax convention with Canada providing for assistance with the enforcement of certain fully adjudicated foreign tax judgments. *See* Canada–U.S.1995 Protocol, *supra* note 11, art. 15. Prior to 1995, the U.S.-Canada tax convention was similar with respect to collection assistance to the United States Model Convention and the bilateral income tax treaties negotiated subsequent to the 1951 Senate action. *See Taxation Comm. Staff Explanation of Canada–U.S. Protocol,* at 41 n. 49. The Canada–U.S. treaty prior to 1995 provided for exchange of information between the **\*120** tax authorities of the contracting states, and also for minimal mutual collection assistance—limited to that assistance necessary to ensure that the exemptions, reduced rates or other benefits provided in the treaty would not be enjoyed by persons not entitled to those benefits. *See* Convention With Respect to Taxes on Income and on Capital, Mar. 28, 1984, U.S.-Canada, arts. XXVI & XXVII, T.I.A.S. No. 11087 (entered into force Aug. 16, 1984); *see also Taxation Comm. Staff Explanation of Canada–U.S. Protocol,* at 41–42.

There are several notable features of the 1995 amendments. First, the expanded mutual collection assistance provision "appl[ies] to all categories of taxes collected by or on behalf of the Government of a Contracting State." Canada–U.S.1995 Protocol, *supra* note 11, art. 15 (adding Article XXVI A, ¶ 9 to the treaty); *see Taxation Comm. Staff Explanation of Canada–U.S. Protocol,* at 41 ("The proposed protocol provides that the countries are to undertake to lend assistance to each other in collecting all categories of taxes collected by or on behalf of the government of each country."). Thus, this treaty provision is intended by both governments to set the parameters for mutual collection assistance with regard to every kind of tax, including the taxes at issue in this case. [17]

Second, the 1995 amendments bar assistance with the collection of any revenue claim arising during the time an individual or corporation was a citizen of or incorporated in, respectively, the "requested State." Canada–U.S.1995 Protocol, *supra* note 11, art. 15, ¶ 8. Thus, paragraph 8 bars Canada from asking the United States for collection assistance with regard to a Canadian revenue claim arising when a person was a United States citizen or corporation, [18] which includes many of the defendants and revenue claims in this case.

Third, the 1995 protocol provides that a finally determined revenue claim "*may* be accepted for collection" by the other sovereign. *Id.,* ¶ 3 (emphasis added). "Paragraph 3 ... clarifies that the Contracting State from which assistance was requested ... has discretion as to whether to accept a particular

application for collection assistance." U.S. Treasury Dep't Technical Explanation, Canada–U.S.1995 Protocol (released June 13, 1995) (discussing art. 15 of the 1995 protocol), *available at* 95 Tax Notes Int'l 115–38 [hereinafter "Treasury Technical Explanation"]. Thus, our government has deemed it advisable to allow the executive branch to consider and determine, in each instance, whether a particular Canadian tax liability should be enforced by the United States.

Fourth, the 1995 protocol requires that a state seeking collection assistance certify that the revenue claim has been "finally determined." Canada–U.S.1995 Protocol, *supra* note 11, art. 15, ¶ 2. A claim has been "finally determined" when "the applicant State has the right under its internal law to collect the revenue claim and all administrative and judicial rights of the taxpayer to restrain collection in the applicant State have lapsed or been exhausted." *Id.* Accordingly, the treaty does not abrogate the rule that courts of one nation should not adjudicate the unresolved tax claims of another. That is particularly significant, because in this case Canada is not asking for the enforcement of a fully **\*121** adjudicated Canadian tax judgment, but rather for a United States court to assess and adjudicate the application of Canadian tax laws to the wrongdoing alleged in its complaint. [19]

We do not believe that the United States–Canada treaty (allowing collection of certain fully-adjudicated tax judgments) should be broadly construed to suggest a change in attitude toward the involvement of United States courts in adjudicating foreign tax claims that have not been first reduced to judgment. In fact, allowing assistance with collecting fully-adjudicated judgments was "a departure from U.S. treaty policy of recent years." *Taxation Comm. Staff Explanation of Canada–U.S. Protocol,* at 7. It seems clear that the extent of such policy change is a sensitive question implicating diverse considerations better handled by the political branches. *See id.* at 43 (noting that in future treaties "consideration may need to be given as to whether it is appropriate for the United States to assist in the collection of another government's taxes. This analysis may involve an evaluation of both the substantive and procedural elements of the other government's taxes, as well as an analysis of broader policy issues, such as the relative compatibility of the other government's legal systems and individual protections with those of the United States."). Before entering the 1995 Canada–U.S. Protocol, our government carefully considered whether and to what extent extraterritorial tax enforcement was advisable:

[T]he ultimate decision of the U.S. and Canadian negotiators to add the collection assistance article was attributable to the confluence of several unusual factors. Of critical importance was the similarity between the laws of the United States and Canada. The Internal Revenue Service, the Justice Department, and other U.S. negotiators were reassured by the close similarity of the legal and procedural protections afforded by the Contracting States to their citizens and residents and by the fact that these protections apply to the tax collection procedures used by each State. In addition, the U.S. negotiators were confident, given their extensive experience in working with their Canadian counterparts, that the agreed procedures could be administered appropriately, effectively, and efficiently. Finally, given the close cooperation already developed between the United States and Canada in the exchange of tax information, the U.S. and Canadian negotiators concluded that the potential benefits to both countries of obtaining such assistance would be immediate and substantial and would far outweigh any cost involved.

*Treasury Technical Explanation* (discussing art. 15). In this area, it is not the courts' role to press ahead further and faster than the political branches have deemed it wise to travel after careful deliberation.

A final aspect of the 1995 protocol we find noteworthy is the provision that the contracting states shall agree "to ensure comparable levels of assistance to each" other with regard to extraterritorial tax collection. Canada–U.S.1995 Protocol, *supra* note 11, art. 15 (adding Article XXVI A, ¶ 11 to the treaty). In other words, both governments have expressed a policy preference for reciprocity in the level of enforcement of each other's tax judgments **\*122** and claims. [20] *See*

*generally* Arnold, *supra*, 9 Tax Notes Int'l at 863 (discussing the reciprocity required by the U.S.-Canada treaty). In light of this, the fact that Canada's courts have repeatedly reaffirmed the vitality of the revenue rule, *see supra* note 5, becomes significant. Declining to apply the revenue rule in this case would arguably undermine the considered policy judgment of our political branches.[21] Moreover, it would potentially allow Canada to obtain assistance it has not negotiated for[22] and that would be greater than the assistance our government would likely receive as a litigant in Canada's courts.

In sum, the provisions of the 1995 protocol indicate that the political branches of the two countries intended that the type of taxes involved in this case would be covered by the treaty's collection assistance provisions, yet negotiated for limitations on collection assistance that specifically exclude the type of assistance Canada seeks in this case. By permitting such a claim to go forward, we would be ignoring and undermining the treaty negotiation process and the clearly expressed views of the political branches of the United States government and instead engaging in *ad hoc* judicial policymaking in the delicate realm of foreign affairs.[23]

**4. The Significance of the Identity of the Plaintiff**

In *United States v. Boots,* 80 F.3d 580 (1st Cir.), *cert. denied,* 519 U.S. 905, 117 S.Ct. 263, 136 L.Ed.2d 188 (1996), one of the few recent cases dealing with the revenue rule in a similar context, the First Circuit relied in part on similar reasoning to dismiss an indictment for a cross-border smuggling scheme designed to avoid Canadian **\*123** taxes.

*See* *id.* at 587 ("[F]or our courts effectively to pass on [foreign revenue] laws raises issues of foreign relations which are assigned to and better handled by the legislative and executive branches of government."), and *id.* at 587–88 ("Of particular concern is the principle of noninterference by the federal courts in the legislative and executive branches' exercise of their foreign policymaking powers."). This Circuit has disagreed with *Boots* to the extent it applied the revenue rule in a criminal action, *see* *United States v. Trapilo,* 130 F.3d 547, 549 (2d Cir.1997), *cert. denied,* 525 U.S. 812, 119 S.Ct. 45, 142 L.Ed.2d 35 (1998); *United States v. Pierce,* 224 F.3d 158 (2d Cir.2000), but we find the *Boots* reasoning persuasive with respect to the present civil suit. This approach is consistent with our precedent because, with regard to the revenue rule, there is a critical difference between this civil suit brought by a foreign sovereign and the criminal actions

previously considered by panels of this court.[24] In *Trapilo* and *Pierce* (and in *Boots* ), the executive branch of the United States brought the case, while here, Canada is the plaintiff. When the United States prosecutes a criminal action, the United States Attorney acts in the interest of the United States, and his or her conduct is subject to the oversight of the executive branch. Thus, the foreign relations interests of the United States may be accommodated throughout the litigation.[25] In contrast, a civil RICO case brought to recover tax revenues by a foreign sovereign to further its own interests, may be, but is not necessarily, consistent with the policies and interests of the United States.[26]

**\*124** *Trapilo* and *Pierce* are not controlling here. The court in *Trapilo* considered whether the prosecution of a money laundering scheme was barred by the revenue rule, and held that it was not because "[a]t the heart of this indictment is the misuse of the wires in furtherance of a scheme to defraud the Canadian government of tax revenue, not the validity of a foreign sovereign's revenue laws." *Trapilo,* 130 F.3d at 552. In *Pierce,* the court reversed the convictions of two of the *Trapilo* defendants on the ground that the government had failed to establish that the defendants could have deprived anyone of an interest in property when it failed to offer proof of the existence and applicability of Canada's tax laws that the defendants had intended to circumvent.[27] *See* *Pierce,* 224 F.3d at 167–68. Taken together, these two cases stand for the proposition that a scheme to defraud a foreign nation of its right to impose taxes may be punished under appropriate circumstances by the United States government, in United States courts, using United States penal laws; they do not hold that United States courts, in a civil case, may determine the validity of a foreign tax law or the extent of liability thereunder and award that amount to a foreign sovereign. As we have outlined, the political branches have repeatedly expressed their intention to handle the issue of extraterritorial tax enforcement by a foreign sovereign through the treaty process. This case, unlike *Trapilo* and *Pierce,* involves a request for extraterritorial tax enforcement by a foreign sovereign. The treaty between Canada and the United States confirms that Canada has other, more appropriate, avenues by which to pursue its unadjudicated tax claims—specifically by negotiating for greater assistance with the political branches acting on behalf of the United States.

### C. Criticisms of the Revenue Rule

Before considering the interaction between the revenue rule and RICO in this case, we pause to acknowledge the criticism to which the revenue rule has been subject and to consider additional arguments against the rule advanced by Canada in this case.

In academic literature, there is a long history of criticism of the revenue rule as creating improper incentives for moral and commercial conduct. *See, e.g.,* Joseph Story, *Commentaries on the Conflict of Laws* 338–39 (Melville M. Bigelow ed., 8th ed. 1883) (the revenue rule is "inconsistent with good faith and moral duties of nations"); 3 J. Kent, *Commentaries on American Law* 265 (O.W. Holmes, Jr., ed., 12th ed., John M. Gould ed., 14th ed., 1896) (criticizing the broad application of the revenue rule as "laying down an exceedingly lax morality"); *see generally* ALI, **\*125** *United States Income Tax Treaties, supra* note 15, at 122–25 (criticizing the revenue rule and recommending that United States tax treaties allow the enforcement of foreign tax judgments in United States courts). The most recent Restatement of the Law of Foreign Relations states that "[i]n an age when ... instantaneous transfer of assets can be easily arranged, the rationale for not recognizing or enforcing tax judgments is largely obsolete." Restatement (Third) of the Law of Foreign Relations § 483, Reporter's Note 2 (1987) (cited in *Trapilo,* 130 F.3d at 550 n. 4, and *Pierce,* 224 F.3d at 163 n. 3). The analytical underpinnings of the rule have been criticized. *See, e.g.,* Stoel, *supra* note 2, at 668–69 (noting that "it is not clear why difficulties in proving or interpreting foreign law would be any greater [with revenue laws] than in other civil suits involving foreign law" and "[i]n any case, the principle of *forum non conveniens,* normally used to take account of these difficulties ... would remain applicable"). Various other criticisms of the revenue rule have been advanced. For example, it has been noted that the early British cases contain scanty reasoning justifying the rule's emergence. Nor did the revenue rule provide the basis of decision in those early British cases. The analogy of revenue enactments to penal laws has been criticized as inconsistent with the modern recognition that the obligation to pay taxes is not penal. [28] While conceding the force of many of these points, we nevertheless decide that, in the specific context of this case—in particular, where the two sovereigns concerned have recognized the vitality of the revenue rule and have a well-established treaty process that has strictly limited the extent to which each government can pursue its tax claims using the other's domestic administrative and judicial processes—the foreign affairs and separation of powers rationales for the revenue have substantial continuing force.

**[4]** Canada also argues that the revenue rule conflicts with the act-of-state doctrine and therefore should not be applied. *See* *Banco Nacional de Cuba v. Sabbatino,* 376 U.S. 398, 450 n. 11, 84 S.Ct. 923, 11 L.Ed.2d 804 (1964) (White, J., dissenting on other grounds) (observing the seeming inconsistency between the act-of-state doctrine and the revenue rule approach to the validity of foreign laws). Under the act-of-state doctrine, a court presumes the validity of a foreign state's laws within that state's territory. *See* *Galu v. Swissair,* 873 F.2d 650, 653 (2d Cir.1989). In contrast, the revenue rule presumes the extraterritorial unenforceability of a foreign sovereign's tax laws. Defendants contend that the rules are consistent and "represent two different ways in which courts steer clear of foreign affairs in different contexts."

Despite the seeming inconsistency, we believe that defendants have the better argument. In *Sabbatino,* the Supreme Court explained the "constitutional underpinnings" of the act-of-state doctrine:

> It arises out of the basic relationships between branches of government in a system of separation of powers. It concerns the competency of dissimilar institutions to make and implement particular kinds of decisions in the area of international relations. The doctrine as formulated in past decisions expresses the strong sense of the Judicial Branch that its engagement in the task of passing on the validity of foreign acts of state may hinder rather than further this country's pursuit of goals both for **\*126** itself and for the community of nations as a whole in the international sphere.

*Sabbatino,* 376 U.S. at 423, 84 S.Ct. 923. The revenue rule appears to share these underpinnings. Under the act-of-state doctrine, the assessment of the validity of a foreign law

is limited to its application within the sovereign's territory; under the revenue rule, United States courts avoid the application of a foreign sovereign's tax laws in the United States. Both approaches enable courts to avoid entanglement with questions about the underlying validity of a foreign sovereign's laws.

In sum, as this case demonstrates, sound policy considerations, including international comity, the proper exercise of sovereign powers, institutional competence and separation of powers, and recognition of the U.S.-Canada tax treaty relationship, support the continuing viability and application of the revenue rule to this case.

## II. RICO and the Revenue Rule

[5]    Canada argues that the revenue rule is not relevant here because it brings this action under a United States statute—civil RICO—rather than under Canadian tax law. Canada challenges the district court's decision dismissing its complaint, stating that

> [the dismissal] violates the fundamental principle that a court must carefully examine a statute's structure, purpose, and policies before applying common law rules to restrict or modify a congressionally created private remedy.... At the time Congress enacted RICO, no court had applied the common law revenue rule to bar a claim of a foreign sovereign to enforce a United States statute.... Congress could not have foreseen that a court later would limit RICO by extending the common law revenue rule.

Because we find that the revenue rule is a doctrine with continuing force in the particular context of this case, Canada cannot succeed unless it can show that RICO bars the application of the revenue rule. We ultimately conclude that Canada's arguments, though ably made, are unavailing.

Notwithstanding Canada's assertion that Congress was not aware of the broad scope of the revenue rule at the time of RICO's enactment, it is clear that the revenue rule was

well established by that date. Therefore, as explained below, Congress is presumed to have legislated with knowledge of the rule. Approximately thirty-five years before RICO's enactment, the United States Supreme Court acknowledged the broad scope of the revenue rule. *See Milwaukee County v. M.E. White Co.,* 296 U.S. 268, 275, 56 S.Ct. 229, 80 L.Ed. 220 (1935). [29] In addition to the authorities cited in Section I, *supra,* numerous courts and commentators professed the vitality of the revenue rule in the years leading up to the enactment of RICO. [30] It was against **\*127** this understanding of the common law that in 1970 Congress enacted RICO.

We do not simply presume congressional awareness of relevant judicial decisions, although we could do so. The Senate itself has, through its actions, shown respect for the revenue rule. *See Section I.B.2, supra.* [31]

[6]    [7]    Principles of statutory construction require that we construe RICO in a manner that preserves the revenue rule absent clear evidence of congressional intent to abrogate it. [32] "[W]here a common-law principle is well established ... the courts may take it as given that Congress has legislated with an expectation that the principle will apply except when a statutory purpose to the contrary is evident." *Astoria Fed. Sav. & Loan Ass'n v. Solimino,* 501 U.S. 104, 108, 111 S.Ct. 2166, 115 L.Ed.2d 96 (1991) (internal quotation marks and citation omitted). " 'Statutes which invade the common law ... are to be read with a presumption favoring the retention of long-established and familiar principles, except when a statutory purpose to the contrary is evident.' " *In re Chateaugay Corp.,* 94 F.3d 772, 779 (2d Cir.1996) (quoting *Isbrandtsen Co. v. Johnson,* 343 U.S. 779, 783, 72 S.Ct. 1011, 96 L.Ed. 1294 (1952)). "In such cases, Congress does not write upon a clean slate." **\*128** *United States v. Texas,* 507 U.S. 529, 534, 113 S.Ct. 1631, 123 L.Ed.2d 245 (1993). As discussed above, there can be no question that the version of the revenue rule under which United States courts abstain from assisting foreign sovereign plaintiffs with extraterritorial tax enforcement is a well-established part of the common law and fully consistent with our broader legal, diplomatic, and institutional framework.

[8]    "In order to abrogate a common-law principle, the statute must 'speak directly' to the question addressed by the common law." *Id.; see also id.* at 540–41, 113 S.Ct. 1631

(Stevens, J., dissenting) (disagreeing as to the state of the common law, but stating that "[w]e presume that Congress understands the legal terrain in which it operates ... and we therefore expect Congress to state clearly any intent to reshape that terrain"); *Goodkin v. United States,* 773 F.2d 19, 23 (2d Cir.1985) (applying canon and stating that "[t]he no-fault law is a statute in derogation of the common law and, thus, must be strictly construed"). When a statute is as expansive as RICO, a court must be particularly careful to assure itself that Congress intended to abrogate the common law by enacting it. *Cf. Beck v. Prupis,* 529 U.S. 494, 504, 120 S.Ct. 1608, 146 L.Ed.2d 561 (2000) ("We presume, therefore, that when Congress established in RICO a civil cause of action ..., it meant to adopt ... well-established common-law civil conspiracy principles."); *Neder v. United States,* 527 U.S. 1, 21–23, 119 S.Ct. 1827, 144 L.Ed.2d 35 (1999) (Court would interpret federal criminal statutes which are common RICO predicate offenses to include common law limitations "unless the statute otherwise dictates" (internal quotation marks omitted)). [33]

Moreover, when an interpretation of a broad, general statute would implicate foreign relations, the Supreme Court has proceeded cautiously and looked for a clear expression of congressional intent as to the statute's scope. For example, in *McCulloch v. Sociedad Nacional de Marineros de Honduras,* 372 U.S. 10, 83 S.Ct. 671, 9 L.Ed.2d 547 (1963), a case about the National Labor Relations Board's assertion of jurisdiction over foreign seamen, the Court declined to read the National Labor Relations Act in a manner that would raise a serious question of separation of powers, which would in turn implicate sensitive issues of the authority of the executive over relations with foreign nations. It stated that before approving the Board's exercise of jurisdiction "there must be present the affirmative intention of the Congress clearly expressed." *Id.* at 21–22, 83 S.Ct. 671 (citation omitted). Adherence to this principle will ensure that the courts interpret RICO consistently with international law. United States courts " 'are not to read general words ... without regard to the limitations customarily observed by nations upon the exercise of their powers.' " *In re Maxwell Communication Corp.,* 93 F.3d 1036, 1047 (2d Cir.1996) (quoting *United States v. Aluminum Co. of Am.,* 148 F.2d 416, 443 (2d Cir.1945)). [34]

***129** **[9]** Applying these rules of construction, Canada's contention that RICO abrogates the revenue rule fails. "A party contending that legislative action changed settled law has the burden of showing that the legislature intended such a change." *Green v. Bock Laundry Mach. Co.,* 490 U.S. 504, 521, 109 S.Ct. 1981, 104 L.Ed.2d 557 (1989); *see Tome v. United States,* 513 U.S. 150, 163, 115 S.Ct. 696, 130 L.Ed.2d 574 (1995) (plurality opinion) (quoting *Green* ). We respectfully conclude that Canada has not carried this burden. The language and structure of RICO and its legislative history offer no hint that Congress intended the statute to afford a civil remedy to foreign nations for the evasion of foreign taxes. [35] Moreover, there is no language in RICO or in its legislative history that demonstrates any intent by Congress to abrogate the revenue rule. [36] For the statute to change such a time-honored common law prudential rule, it must "speak directly" to the matter; yet it does not. Absent such indication, we must presume Congress understood the common law against which it legislated and intended that this common law doctrine should co-exist with the RICO statute.

Legislation passed since RICO's 1970 enactment reinforces our conclusion that Congress did not intend to reach foreign tax law violations and thereby abrogate the revenue rule through civil RICO. In 1978, Congress outlawed trafficking in contraband cigarettes with the aim of reducing evasion of state cigarette taxes, and amended RICO to include such trafficking as a predicate offense. *See* 18 U.S.C. §§ 1961(1)(B), 2341–2346. Although Congress knew that the "purchase of cigarettes through tax-free outlets include[d] cigarettes obtained from three primary sources: international points of entry, military post exchanges, and Indian reservations," S. Rep. 95–962, at *6 (1978), *reprinted in* 1978 U.S.C.C.A.N. 5518, 5520, and that "[t]here [was] widespread traffic in cigarettes moving in or otherwise affecting interstate or foreign commerce," H.R. Conf. Rep. 95–1778, at *7 (1978), *reprinted in* 1978 U.S.C.C.A.N. 5535, 5536, Congress did not prohibit smuggling between countries or in violation of foreign tax laws. *See* 18 U.S.C. §§ 2341(2), (4).

We are aware that RICO is a broad statute, and that the Supreme Court has often rejected attempts to limit the reach of its provisions through judicially-created narrowing constructions. *See Sedima, S.P.R.L. v. Imrex Co.,* 473 U.S. 479, 499, 105 S.Ct. 3275, 87 L.Ed.2d 346 (1985) (" '[T]he

fact that RICO has been applied in situations not expressly anticipated by Congress does not demonstrate ambiguity. **\*130** It demonstrates breadth.' ") (citation omitted). One key difference in the instant case is that we are emphatically *not* dealing here with a situation "not ... anticipated by Congress." As we have demonstrated, Congress was and is aware of the revenue rule, the precise extent of extraterritorial enforcement assistance available under our tax treaties, and the existence of cigarette smuggling in violation of foreign tax laws. In spite of the extensive Congressional attention to these areas, we are not cognizant of any manifestation of Congressional intent that civil RICO and the United States courts should be available to a foreign sovereign seeking to recover lost tax revenues.

### III. Direct and Indirect Enforcement under the Revenue Rule

 **[10]**    As an initial matter, we note again that Canada is not asking for the enforcement of a final, fully adjudicated Canadian tax judgment, but rather, for a United States court to assess and adjudicate the application of Canadian tax laws to the wrongdoing alleged in its complaint. When presented with such a request which potentially implicates the revenue rule, a court must examine whether the substance of the claim is, either directly or indirectly, one for tax revenues. [37] What matters is not the form of the action, but the substance of the claim. [38] For example, in *United States v. Harden,* [1963] S.C.R. **\*131** 366, 371 (Can.), the Canadian Supreme Court rejected the enforcement of a stipulation of settlement of a tax case as barred by the revenue rule, stating that "[n]either the foreign judgment nor the agreement does more than make certain the fact and the amount of the respondent's liability to the appellant. The nature of the liability is not altered. It is a liability to pay income tax." The Court concluded: " 'For the purpose of this case it is sufficient to say that when it appears to the court that the whole object of the suit is to collect tax for a foreign revenue, and that this will be the sole result of a decision in favour of the plaintiff, then a court is entitled to reject the claim by refusing jurisdiction.' " *Id.* at 372–73 (quoting *Peter Buchanan,* [1955] A.C. at 529).

Canada argues to this Court that "[n]othing in the revenue rule, ... prohibits a foreign nation from bringing a suit in the United States to enforce rights established *under United States law.* This is not an attempt by Canada to assert its sovereignty extraterritorially; it is not a claim to enforce

Canadian tax law or any other Canadian law." We are not persuaded by Canada's arguments that this is an action brought solely under United States law, and not a claim for Canadian taxes. On the contrary, Canada seeks to use the United States law to enforce, both directly and indirectly, its tax laws. [39]

As to direct enforcement, Canada alleges that "[d]efendants evaded the payment of customs and excise tax and duty owed directly to Canada. This evasion was a direct cause of lost revenue to Canada.... Defendants' conduct forced Canada to roll back tobacco taxes in 1994, resulting in lost revenue into the future." As the Canadian Supreme Court said in *Harden,* we must look to the "object" of the claim. When we do so, we see that, at bottom, Canada would have a United States court require defendants to reimburse Canada for its unpaid taxes, plus a significant penalty due to RICO's treble damages provision. Thus, Canada's object is clearly to recover allegedly unpaid taxes.

We also conclude that Canada's claim for damages based on law enforcement costs is in essence an indirect attempt to have a United States court enforce Canadian revenue laws, an exercise barred by the revenue rule. *See* 1 Dicey & Morris, *The Conflict of Laws* 91 (13th ed. 2000) ("Indirect enforcement occurs where a foreign State (or its nominee) in form seeks a remedy, not based on the foreign rule in question, but which in substance is designed to give it extra-territorial effect...."). As to law enforcement costs, Canada states:

> Defendants' role in smuggling caused Canada to increase enforcement and investigative resources. But for Defendants' active involvement in smuggling, Canada would not have had to dedicate as many resources to combat smuggling. The predictable outcome of Defendants' evasion of United States and Canadian laws, and concealment of such evasion, was to cause Canada to spend further resources attempting to discover the culprits of its injury.

Canada attempts to analogize its injury of additional law enforcement costs incurred to the harms suffered by private victims of RICO schemes: "Canada incurred specific

additional law enforcement costs not as **132** part of its normal policing, but in self-defense because it was under direct attack by defendants.... No different result should obtain merely because the RICO scheme was more ambitious and the intended victim was a sovereign nation that was forced to combat the illegal conduct with special enforcement resources."

We disagree. The primary purpose identified by Canada for using its police forces to stop the smuggling was to enforce its customs and excise taxes. In effect, Canada is requesting that defendants pay the salary of the tax enforcers; such police costs are thus derivative of the taxes Canada sought to enforce. We do not believe that the mechanism for the enforcement of a tax law can be so easily separated from the tax law itself. It would certainly be anomalous for the Court to permit the collection of the law enforcement costs while holding that the object of those law enforcement efforts was uncollectable. Particularly in light of the separation of powers and foreign relations concerns discussed above, we must decline to allow Canada to indirectly enforce its revenue laws simply by pleading tort damages based on the costs of enforcing those laws.

Canada's argument depends on the contention that the expenditure of resources by a private individual can be equated with the expenditures of a nation.[40] By their very nature, sovereigns, unlike individuals, have at their disposal state-funded and state-maintained resources—such as the services of the Canadian Attorney General and the Royal Canadian Mounted Police—to combat a RICO scheme. The sovereign has a legal monopoly on the use of this type of coercive power. *See generally* Max Weber, *The Theory of Social & Economic Organization* 156 (Talcott Parsons ed., 1947). Law enforcement costs incurred to secure taxes for the sovereign are qualitatively different from the damages suffered by a private individual; they fall within the class of acts that are "*jure imperii,*" that is, that are expressions of a foreign sovereign's will or are carried out by virtue of that sovereign authority. *See Attorney General of New Zealand v. Ortiz,* [1984] A.C. 1, 20–21 (H.L.). United States courts have traditionally been reluctant to enforce foreign laws that are "*jure imperii.*"[41]

**133** Additional considerations reinforce our determination that Canada's claim for law enforcement costs must be dismissed. To proceed with the law enforcement costs claim, we would have to examine the tax laws at issue in order to assess the causation aspect of this claim. For example,

we would have to assess whether the law enforcement costs were in fact spent on achieving the cessation of cigarette smuggling. So doing, we would have to examine whether, when and to what extent the smuggling existed, which would require a determination that tax laws were applicable to defendants. These inquiries could draw the courts into troubled waters.

Canada emphasizes that recent thinking with regard to the revenue rule has admitted a distinction between the "enforcement" and the "recognition" of revenue laws, and argues that it seeks only recognition, not enforcement, of its laws. In particular, Canada asserts that the revenue rule may prohibit the enforcement of Canadian tax laws, but not their recognition in order to calculate damages. *See* 1 Dicey & Morris at 90 (revenue rule "relates only to *enforcement,* but it does not prevent *recognition* of a foreign [revenue] law.") (emphasis in original). Canada relies on two pairs of cases to support this position. First, Canada draws a parallel between the present case and those in which United States courts calculating sentences have considered foreign sovereigns' lost tax duties as a measure of damages caused by criminal activity. *See, e.g., United States v. Chmielewski,* 218 F.3d 840, 843 (8th Cir.2000). This argument is unavailing. As explained above, *see* Section I.B.4, *supra,* criminal cases do not raise the same issues as those implicated by the instant civil suit by Canada.

Second, Canada cites in *In re State of Norway's Application (Nos. 1 and 2),* [1990] A.C. 723, 724 (H.L.), in which an English court held that the revenue rule did not bar an application by Norway to gather evidence in England for use in tax proceedings in Norway, and *Regazzoni v. K.C. Sethia (1944) Ltd.,* [1956] 2 Q.B. 490, 515–16 (C.A.), *aff'd,* [1957] 3 All E.R. 287 (H.L.), where an English court held that the rule against enforcing foreign political laws did not require it to enforce a contract that violated Indian laws against export to South Africa.[42] In both of these **134** cases, the court permitted recognition but not enforcement of foreign revenue laws. However, in neither *Norway* nor *K.C. Sethia* was the British court called upon to allow damages that would serve as a substitute for previously unpaid taxes to be paid in the United Kingdom to a foreign sovereign. Moreover, in the *K.C. Sethia* case, a foreign sovereign did not come to Britain for relief; rather, private parties sought the court's assistance to resolve a commercial dispute, as the House of Lords noted when Viscount Simonds stated that "in consideration of this matter I deem it of the utmost importance to bear in mind that we are not here concerned with a suit by a foreign

state to enforce its laws." *K.C. Sethia,* [1957] 3 All E.R. at 289.[43] In the present case, the taxes would be enforced by a United States court if Canada were successful. Similarly, in *In re Reid,* [1970] D.L.R.3d 199, 205 (B.C.Ct.App.), the Canadian court relied on the distinction between recognition and enforcement when it allowed the trustee of an estate to be indemnified for having paid a foreign tax claim out of the estate, stating:

> In every one of the cases ... referred to, success would have enriched the treasury of the interested State. In the case at bar, whether or not the trustee is indemnified cannot affect to the slightest degree the amount of estate duty collected in England.... Here the United Kingdom has nothing whatever to do with the respondent's claim to be indemnified.

Accordingly, the cases cited by Canada are inapposite and do not undermine our conclusion that all of Canada's claims are barred by the revenue rule.

### Conclusion

To the extent that the allegations set forth in Canada's complaint are correct, we understand Canada's frustration that it cannot recoup its lost revenue and law enforcement costs against defendants that allegedly committed most of their wrongdoing on our side of the common border with Canada. No court wishes to find itself in the position of being unable to right an alleged wrong. *See Loucks v. Standard Oil Co. of New York,* 224 N.Y. 99, 111, 120 N.E. 198 (1918) (Cardozo, J.). Nonetheless, we are without license to abandon unilaterally the centuries-old, albeit sharply-attacked, revenue rule. "The hard fact is that sometimes we must make **\*135** decisions we do not like" because the laws "compel the result." *Texas v. Johnson,* 491 U.S. 397, 420–21, 109 S.Ct. 2533, 105 L.Ed.2d 342 (1989) (Kennedy, J., concurring). "When and if the [revenue] rule is changed, it is a more proper function of the policy-making branches of our government to make such a change." *Her Majesty the Queen in Right of the Province of British Columbia v. Gilbertson,* 597 F.2d 1161, 1166 (9th Cir.1979). Recourse, to the degree it is warranted and available, lies with the executive and legislature.

Because the judgment is affirmed based on the revenue rule, we need not address the other grounds discussed by the district court or raised by the parties on appeal.[44]

CALABRESI, Circuit Judge (dissenting).

On its face, and despite the considerable confusion created by defendants' able arguments, the revenue rule has nothing to do with this case. As described by the relevant Restatement, the rule provides only that "[c]ourts in the United States are not required to recognize or to enforce judgments for the collection of taxes, fines, or penalties rendered by the courts of other states." Restatement (Third) of Foreign Relations Law § 483 (1987). The majority describes the rule in a similar fashion: "The revenue rule is a longstanding common law doctrine providing that courts of one sovereign will not enforce final tax judgments or unadjudicated tax claims of other sovereigns." Majority Op. at 109. It is manifest that the suit before us in no way requires our courts to enforce foreign judgments or claims; it simply is an action for damages provided for and brought under federal law. Nevertheless, the majority invokes the revenue rule to bar the suit. Because I do not think the rule applies and because none of the possible rationales for the rule supports its extension to the facts in this case, I respectfully dissent.

The majority's description of Canada's suit makes clear that this action arises from a violation of a United States statute, namely the civil enforcement provision of RICO, 18 U.S.C. § 1964(c), which itself creates the cause of action. "Canada alleges that defendants violated RICO by ... repeated instances of mail fraud, 18 U.S.C. § 1341, and wire fraud, 18 U.S.C. § 1962(c). Second, Canada alleges a conspiracy, in violation of 18 U.S.C. § 1962(d), to violate subsections (a), (b) and (c) of section 1962." Majority Op. at 107–08 (footnote omitted). The Canadian tax laws come into play only indirectly, as a factor to be used in the calculation of damages, and do so entirely because the RICO statute itself makes the Canadian laws relevant to that calculation. Thus RICO states that, in the calculation of damages, "any person injured in his business or property by reason of a violation of section 1962 of this chapter may sue therefor in any appropriate United States district court and shall recover threefold the damages he sustains and the cost of the suit...." 18 U.S.C. § 1964(c). It follows that Canada, in suing for damages resulting from the violation of a United States statute, neither is seeking to have non-Canadian courts enforce Canadian judgments, laws, or policies, nor is basing this action on the violation of the Canadian statute.

Undaunted by this fact, the majority seeks to justify its position by undertaking an extended examination of the supposed **\*136** functions served by the revenue rule, with the result that the rule is greatly expanded in its scope, and, indeed, would seemingly be applicable whenever a foreign country seeks to recover government funds.[1] But in fact, the functions of the revenue rule either are not served at all by foreclosing this action or are furthered in ways that this Circuit has already held do not justify application of the revenue rule. *See* United States v. Pierce, 224 F.3d 158, 167 (2d Cir.2000); United States v. Trapilo, 130 F.3d 547, 552–53 (2d Cir.1997).

The majority cites three major bases for the revenue rule, each of which I shall examine in the context of the case before us.

### I

The first argument has to do with a reluctance to permit, much less promote, extraterritorial effect of foreign laws. In this view, the revenue rule acts as a bar against the assertion of foreign sovereignty within domestic borders. This position probably represents the original basis for the rule.[2] It is also the rationale given by Justice White dissenting in *Banco Nacional de Cuba v. Sabbatino,* 376 U.S. 398, 84 S.Ct. 923, 11 L.Ed.2d 804 (1964), in which he explained that "no country has an obligation to further the governmental interests of a foreign sovereign." *Id.* at 448, 84 S.Ct. 923.

I have no argument with Justice White, and agree (a) that no country has this obligation and (b) that the determination of such an obligation (should this country desire to advance foreign interests) is not for the courts but for the legislative and executive branches. This concern for extra-territoriality, however, has no meaning whatever when what is enforced by imposing damages or penalties is, in fact, a domestic law, that is, a law enacted by the legislative and executive branches of our country.[3] And, what Canada alleges in this suit is a violation of the RICO statute.

As a court, we have no obligation to further Canada's sovereign interests. But we do have an obligation to further America's sovereign interests. That is, we are bound to entertain suits brought under federal statutes, and to award the damages that such statutes establish. In enacting RICO and its civil enforcement provision, Congress chose to create this action. It follows that, by enacting RICO, our government has determined that this suit advances *our own* interests, and any collateral effect furthering the governmental interests of a foreign sovereign is, therefore, necessarily incidental. *See* Trapilo, 130 F.3d at 553 ("Whether our decision today indirectly assists our Canadian neighbors in keeping smugglers at bay or assists them in the collections of taxes, is not our Court's concern.")

### II

The majority's second argument supporting the rule relates to separation of **\*137** powers, foreign policy, and court competency concerns. It focuses on the idea that enforcement of particular foreign laws by American courts may not reflect United States policy—and, in any event, does not represent that policy as formulated by an appropriate branch of government. But this concern is once again misplaced whenever the legislative and executive branches have created the cause of action. Under the circumstances, the courts cannot be said to be formulating foreign policy, they are simply implementing the policy established by the other branches.

An analogy to the enforcement of foreign judgments is apt. Generally speaking, foreign judgments are not directly enforceable in United States courts because of foreign policy and separation of powers concerns. *See, e.g.,* Moore v. Mitchell, 30 F.2d 600, 604 (2d Cir.1929) (Hand, J., concurring). But, the moment treaties or laws are enacted that provide for the enforcement of certain foreign judgments, the situation changes. United States courts can thereafter enforce these judgments and must do so regardless of whether our foreign policy favors or disfavors the specific judgment before the court. Similarly, though foreign tax laws cannot be enforced directly, when American law renders an action—including the violations of foreign tax laws—an American tort or crime, the issues of whether our foreign policy favors or disfavors the particular form of taxation involved or the choice of items to be taxed must disappear. As the Supreme Court has explained, the purpose of civil RICO is "not merely to compensate victims but to turn them into prosecutors, "private attorneys general," dedicated to eliminating racketeering activity." Rotella v. Wood, 528 U.S. 549, 557, 120 S.Ct. 1075, 145 L.Ed.2d 1047 (2000). "The aim is to divest the association of the fruits of its ill-

gotten gains." *United States v. Turkette*, 452 U.S. 576, 585, 101 S.Ct. 2524, 69 L.Ed.2d 246 (1981). To reject the application of civil RICO to the case at hand is to hamper this congressional objective.

III

The third argument relied on by the majority, is to my way of thinking, the only one that is at all germane. It was suggested by Judge Learned Hand in *Moore*, 30 F.2d at 604, and is based on the alleged difficulty involved in figuring out the meaning and significance of some foreign laws—especially foreign tax laws. As such, it is directly relevant to this suit, given the fact that, in the instant case, the damages to be assessed under RICO are to be calculated on the basis of the revenue that Canada has lost.

This rationale suggests that we should try to avoid determining the degree to which certain foreign laws have been violated. And, in this view, statutory interpretation of foreign laws is beyond the purview of the courts of this country—not because such interpretation involves extraterritoriality or because it infringes on the domain of other governmental bodies, but for the pragmatic reason that it is very complicated. This concern, in other words, suggests a practical obstacle to the suit before us because the suit, to calculate damages, requires just such an analysis. *Cf. id.*

Whatever the possible merits of this argument,[4] this Circuit has rejected it. At **\*138** least that is the lesson that I draw from *United States v. Trapilo*, 130 F.3d 547 (2d Cir.1997), and *United States v. Pierce*, 224 F.3d 158 (2d Cir.2000). *Trapilo* presented the question of whether a scheme (essentially identical to the one before us) to defraud the Canadian government of tax revenue is cognizable under the federal wire fraud statute, 18 U.S.C. § 1343. *Trapilo*, 130 F.3d at 548. We there held that "[t]he statute neither expressly, nor impliedly, precludes the prosecution of a scheme to defraud a foreign government of tax revenue, and the common law revenue rule, inapplicable to the instant case, provides no justification for departing from the plain meaning of the statute." *Id.* at 551. But in *Trapilo*, because the statute prohibited schemes to defraud regardless of their success, we assumed that we could find a violation without

delving into the intricacies of Canadian law. *Id.* at 552–53. As a result, we avoided confronting Judge Hand's concerns.

In *Pierce,* however, a case involving essentially the same question, we addressed those concerns and necessarily rejected them. The *Pierce* court held that "[t]o prove the existence of a scheme to defraud the Canadian government the prosecution had to prove the existence of [the property] right." *Pierce,* 224 F.3d at 165. That is, the court held that the prosecution had to prove the existence of a duty imposed by the Canadian government so that there would be a "property right—a right to revenue—of which the Canadian government could be defrauded." *Id.* at 166. What is more, if a conviction is obtained—as *Pierce* clearly allows—the sentencing guidelines require that the sentence imposed be based on the amount of tax revenue lost.[5] In other words, the guidelines make necessary precisely the same degree of involvement with, and interpretation of, Canadian law that the case before us entails. *Pierce, Trapilo,* and the guidelines mandate this degree of involvement in order to determine the existence of a RICO crime and the proper sentence for that crime (i.e., the criminal penalty). The instant case does so in order to determine the existence of a RICO civil action and to calculate the proper damages under that action (i.e., the civil penalty).

As a result, I must conclude that the rationale for the revenue rule that is based on the desire to avoid analysis of foreign statutes has been effectively rejected by our court. *Trapilo* permitted a criminal charge to be brought for the very same underlying behavior as is involved in the case before us. *Pierce* required that we know in detail the nature of the foreign tax laws to make out that criminal charge. And, the sentencing guidelines make necessary that, after a conviction for actions like those charged here, the amount of revenue lost be calculated. If American courts can look to and examine the foreign **\*139** statute for criminal RICO purposes, there is no reason why the same courts must be deemed incompetent to undertake an identical analysis in civil RICO cases. It follows that the majority's third rationale for the revenue rule cannot, at least in this Circuit, provide support for applying the rule to this case.

In light of *Pierce* and *Trapilo,* the majority, understandably, tries to assert differences between civil and criminal RICO actions. But this approach founders in the face of the Supreme Court's consistent refusal to treat criminal and civil RICO actions differently.[6] It also fails because there is no basis in

Attorney General of Canada v. R.J. Reynolds Tobacco Holdings, Inc., 268 F.3d 103 (2001)
RICO Bus.Disp.Guide 10,172

the revenue rule itself for treating criminal and civil cases differently.

Surprisingly, in trying to make a distinction between civil and criminal RICO cases, for revenue rule purposes, the majority states that it finds the First Circuit's reasoning in *United States v. Boots,* 80 F.3d 580 (1996) "persuasive with respect to the present civil suit." Majority Op. at 123. But in *Boots,* the First Circuit held that the revenue rule barred a *criminal* action involving deprivation of the tax revenue of a foreign nation. And, in its holding, the *Boots* court derided the civil-criminal distinction (purportedly based on the existence of prosecutorial discretion) that the majority seeks to use in this case. The *Boots* court noted that "[p]rosecutors, who operate within the executive branch, might of course be expected not to pursue wire fraud prosecutions based on smuggling schemes aimed at blatantly hostile countries, but whether conduct is criminal cannot be a determination left solely to prosecutorial discretion." *Boots,* 80 F.3d at 588. No, *Boots* did not, and could not, rest on a civil-criminal distinction (based on prosecutorial discretion) that the Supreme Court has uniformly rejected. It relied, instead, for its prohibition of criminal RICO actions, on the very same Learned Hand rationale that we rejected in *Pierce* and *Trapilo,* two cases which, moreover, in rejecting **\*140** that rationale, self-consciously declined to follow *Boots. Pierce,* 224 F.3d at 164; *Trapilo,* 130 F.3d at 549.

IV

In the end, all the arguments based on the revenue rule's functions apply, if at all, with equal force in both the criminal and civil context. The first two have no meaning when the cause of action—whether criminal or civil—is based on American laws. The third—the desire to avoid interpretation of complex foreign laws—has little merit in the complex global economy. And it has, in any event, effectively been rejected in this circuit by *Trapilo* and *Pierce* because its rationale would as fully preclude criminal convictions

followed by sentences based on Canada's revenue losses, as it would civil suit damage awards that use those losses as the basis for calculating the civil sanctions. [7]

All that being said, I fully share the majority's concerns that applying civil RICO to violations of foreign tax laws may be harmful to American trade interests and to American companies doing business abroad. And, I do not deny that the absence in civil cases of prosecutorial discretion removes one possible means by which such American companies can avoid domestic sanctions for some foreign misdeeds that many here might not wish to punish. But, this problem is in no way limited to, or especially severe with respect to, behavior that might be insulated from punishment through a revivification and expansion of the revenue rule. The problem derives, instead, from the extraordinary scope of the RICO statute (the wisdom of whose breadth one may well doubt), [8] and from the Supreme Court's repeated unwillingness to distinguish between civil and criminal RICO, thereby declining to make use of prosecutorial discretion as a way of limiting RICO's breadth.

In this respect, I note my own discomfort with various aspects of RICO, and especially of civil RICO. I would not be displeased if the Supreme Court, faced with the possible effects of civil RICO in a case like this one, were to retreat from its insistence on an identical scope for civil and criminal RICO. Similarly, I would welcome a reconsideration by Congress of how far civil RICO ought to go. [9] As a Court of Appeals judge, I cannot, however, join an opinion that applies an old and dubious common law rule, in ways that have nothing to do with its roots or rationales, in order to limit an act of Congress that the Supreme Court has repeatedly applied in the broadest possible ways. [10]

**\*141** For these reasons, I, regretfully and respectfully, dissent.

**All Citations**

268 F.3d 103, RICO Bus.Disp.Guide 10,172

**Footnotes**

\*    The Honorable Lewis A. Kaplan of the United States District Court for the Southern District of New York, sitting by designation.

1    Subsection (a) bars the use or investment of racketeering-derived funds in an enterprise engaged in or affecting interstate or foreign commerce, while subsection (b) bars the acquisition or maintenance of an interest in such an enterprise through racketeering.

2    *See, e.g.,* J.-G. Castel, *Canadian Conflict of Laws* 63 (1975) (noting that the revenue rule was first formulated "in an era of virulent commercial rivalry"); Richard E. Smith, *The Nonrecognition of Foreign Tax Judgments: International Tax Evasion,* 1981 U. Ill. L.Rev. 241, 246 ("Judicial reluctance to recognize a foreign tax claim or judgment originated in the decisions of the early eighteenth century English courts in an era of intense commercial competition."); *see also* Hans W. Baade, *The Operation of Foreign Public Law,* 30 Tex. Int'l L.J. 429, 438 (1995); Thomas B. Stoel, Jr., *The Enforcement of Foreign Non-criminal Penal & Revenue Judgments in England & the United States,* 16 Int'l & Comp. L.Q. 663, 671 (1967).

3    *See also Holman v. Johnson,* 98 Eng. Rep. 1120, 1121 (K.B.1775) (Lord Mansfield) ("For no country ever takes notice of the revenue laws of another."); *Planche v. Fletcher,* 99 Eng. Rep. 164, 165 (K.B.1779) (Lord Mansfield) ("One nation does not take notice of the revenue laws of another.").

4    *See, e.g., Aetna Ins. Co. v. Robertson,* 127 Miss. 440, 90 So. 120, 126 (1921) (Ethridge, J., dissenting) ("[I]t is a familiar principle of law that one state or country will not aid another state or country in giving effect to judgments enforcing its penal laws, or in collecting its revenues."); *Henry v. Sargeant,* 13 N.H. 321, 1843 WL 2069 (1843) (collecting cases that support the principle that penal and revenue laws are "strictly local" and are not enforced by foreign states); *State of Colorado v. Harbeck,* 232 N.Y. 71, 85, 133 N.E. 357 (1921) ("The rule [of "private international law"] is universally recognized that the revenue laws of one state have no force in another."); *Williams & Humbert Ltd. v. W & H Trade Marks (Jersey) Ltd.,* [1986] 1 All E.R. 129, 133–34 (H.L.) (Although the "revenue laws may in the future be modified by international convention or by the laws of the European Economic Community [,] ... at present the international rule with regard to the non-enforcement of revenue and penal laws is absolute."); *Peter Buchanan L.D. v. McVey,* [1955] A.C. 516, 524–28 (Ir.H.Ct.1950 H.Ct.1950) (surveying application of the revenue rule by United Kingdom courts), *aff'd,* [1955] A.C. 530 (Ir.S.C.1951); *Government of India v. Taylor,* [1955] A.C. 491, 508 (H.L.) (denying claim of Indian government for unpaid taxes against company in liquidation in Britain because British courts would not enforce Indian revenue laws, stating "[w]e proceed upon the assumption that there is a rule of the common law that our courts will not regard the revenue laws of other countries: it is sometimes, not happily perhaps, called a rule of private international law: it is at least a rule which is enforced with the knowledge that in foreign countries the same rule is observed"); *see also* William S. Dodge, *Antitrust & the Draft Hague Judgments Convention,* 32 Law & Pol'y Int'l Bus. 363, 373 n. 43 (2001) (discussing the application of the revenue rule in both common law and civil law countries); Stoel, *supra* note 2, at 671–74 (discussing the application of the revenue rule in commonwealth countries).

5    A leading Canadian treatise on the conflict of laws noted:

> As evidenced by a more recent decision of the Supreme Court of Canada [*United States v. Harden,* [1963] S.C.R. 366, 371 (Can.) ], this judicial doctrine [the revenue rule] is still vigorous in this country in spite of the modern spirit of international co-operation in the field of taxation. In the absence of specific treaty provisions, no matter how conscious and deliberate the tax evasion, there are no judicial or administrative remedies available to the defrauded state or province outside its territorial jurisdiction.

J.-G. Castel, *supra* note 2, at 63–64; *see United States v. Harden,* [1963] S.C.R. 366, 371 (Can.) (rejecting the enforcement of a stipulation of settlement of a tax case based on "the special principle that foreign States cannot directly or indirectly enforce their tax claims [in our courts]") (quoting *Government of India v. Taylor,* [1955] A.C. 491, 515 (H.L.)); *Stringam v. Dubois,* [1993] 3 W.W.R. 273, 282–83 (Alta.Ct.App.) (barring claim of estate executor to compel sale of Canadian property because sale proceeds would be used to satisfy American estate taxes); Felix D. Strebel, *The Enforcement of Foreign Judgments & Foreign Public Law,* 21 Loy. L.A. Int'l & Comp. L.J. 55, 75 (1999) (reviewing Canadian cases which hold that "it is a well-established

rule of public policy that Canadian law forbids a foreign state from suing, either directly or indirectly, in Canada for taxes alleged to be due to the state").

6    As Lord Denning explained in *Attorney General of New Zealand v. Ortiz,* [1984] A.C. 1 (H.L.):

> [T]he class of laws which will be enforced are those laws which are an exercise by the sovereign government of its sovereign authority over property within its territory or over its subjects wherever they may be. But other laws will not be enforced. By international law every sovereign state has no sovereignty beyond its own frontiers. The courts of other countries will not allow it to go beyond the bounds. They will not enforce any of its laws which purport to exercise sovereignty beyond the limits of its authority.

*Id.* at 21; *see also* *Her Majesty the Queen in Right of the Province of British Columbia v. Gilbertson,* 597 F.2d 1161, 1165 (9th Cir.1979) ( "[I]f the court below was compelled to recognize the tax judgment from a foreign nation, it would have the effect of furthering the governmental interests of a foreign country, something which our courts customarily refuse to do."); *Banco Frances e Brasileiro S.A. v. Doe,* 36 N.Y.2d 592, 601–02, 370 N.Y.S.2d 534, 331 N.E.2d 502 (1975) (Wachtler, J., dissenting) ("Under the principle of territorial supremacy, fundamental to the community of nations, courts refuse to enforce any claim which in their view is a manifestation of a foreign State's sovereign authority."); *QRS 1 APS v. Frandsen,* [1999] 3 All E.R. 289, 294–97 (C.A.) (denying letters rogatory in connection with a tax claim under the revenue rule because "[i]t may be considered that this line of thinking is obsolete, but it still remains anchored within us that we will not permit the presence in our country of foreign tax men, even if represented by intermediaries; we do not tolerate that any help may be given to them" (quoting Professor Mazeaud's commentary on the French court decision *Bemberg v. Fisc de la Provincia de Buenos Aires* (Feb. 24, 1949) (unreported) (internal quotation marks omitted)); *Taylor,* [1955] A.C. at 511 ("[A] claim for taxes is but an extension of the sovereign power which imposed the taxes, and ... an assertion of sovereign authority by one State within the territory of another ... is (treaty or convention apart) contrary to all concepts of independent sovereignties.")); *see also* *In re Guyana Dev. Corp.,* 201 B.R. 462, 473–74 & n. 4 (Bankr.S.D.Tx.1996) (describing difficulty encountered by estate trustee in obtaining property overseas because foreign countries perceived trustee as IRS surrogate).

7    *See generally A Question of Balance: The President, the Congress & Foreign Policy* (Thomas E. Mann ed., 1990); Louis Fisher, *Constitutional Dialogues: Interpretation as Political Process* (1988).

8    *See generally* Louis Henkin, *The Courts in Foreign Affairs, in Foreign Affairs & the United States Constitution* 131–48 (2d ed.1996).

9    The role of courts may vary depending on the nature of the foreign policy interest involved. *See* Harold Koh, *The National Security Constitution* 134–49 (1990). Our focus here is on the extraterritorial collection of taxes by a foreign sovereign, where we believe that the arguments for judicial reserve are quite strong.

10   *See generally* Dennis D. Curtin, *Exchange of Information Under the United States Income Tax Treaties,* 12 Brook. J. Int'l L. 35, 35 (1986) ("There is a generally recognized international principle that one sovereign will not aid another in the enforcement of its revenue laws.... To circumvent the application of this principle, many countries have entered into bilateral income tax treaties."); Stoel, *supra* note 2, at 679 (arguing that foreign relations concerns suggest that it is "preferable that enforcement of foreign-country tax judgments be accomplished by treaty rather than by judicial initiative").

11   The most recent versions of these treaty provisions are the following: Revised Protocol Amending the Convention With Respect to Taxes on Income and on Capital of September 26, 1980, Mar. 17, 1995, U.S.-Canada, art. 15, S. Treaty Doc. No. 104–4 (entered into force Nov. 9, 1995) [hereinafter Canada–U.S.1995 Protocol]; Convention for the Avoidance of Double Taxation and the Prevention of Fiscal Evasion With Respect to Taxes on Income, Aug. 19, 1999, U.S.-Denmark, art. 27, S. Treaty Doc. No. 106–12 (entered into force Mar. 31, 2000); Convention for the Avoidance of Double Taxation and the Prevention of Fiscal Evasion With Respect to Taxes on Income and Capital, Aug. 31, 1994, U.S.-France, art. 28, S. Treaty Doc. No. 103–32 (entered into force Dec. 30, 1995); Convention for the Avoidance of Double Taxation and the Prevention of Fiscal Evasion With Respect to Taxes on Income, Dec. 18, 1992, U.S.-Netherlands, art. 31, S. Treaty Doc. No. 103–6 (entered into force Dec. 31, 1993); Convention for the Avoidance of Double Taxation

and the Prevention of Fiscal Evasion With Respect to Taxes on Income, Sept. 1, 1994, U.S.-Sweden, art. 27, S. Treaty Doc. No. 103–29 (entered into force Oct. 26, 1995). Apparently, mutual collection assistance provisions are more common in United States estate tax conventions, where different issues are at stake. *See* U.S. Treasury Dep't Technical Explanation, Canada–U.S.1995 Protocol (released June 13, 1995) (discussing art. 15 of the Canada–U.S.1995 Protocol), *available at* 95 Tax Notes Int'l 115–38.

12    *See* Staff of the Joint Comm. on Internal Revenue Taxation, 1 *Legislative History of United States Tax Conventions* 707, 719 (1962) (U.S.-Denmark convention); *id.* at 905, 922–23, (U.S.-France conventions); Staff of the Joint Comm. on Internal Revenue Taxation, 2 *Legislative History of United States Tax Conventions* 1890, 1932 (1962) (U.S.-Netherlands convention); *id.* at 2355, 2369–70 (U.S.-Sweden convention). The fifth such treaty, recently negotiated with Canada, is discussed *infra,* Section I.B.3.

13    *See* Convention for Avoidance of Double Taxation and Prevention of Fiscal Evasion With Respect to Taxes On Income, Feb. 20, 1950, U.S.-Greece, art. XIX, T.I.A.S. No. 2902 (entered into force Dec. 30, 1953), *available at Legislative History Vol. 1,* at 1419–21; Convention on Double Taxation, June 13, 1949, U.S.-Norway, art. XVII, T.I.A.S. No. 2357 (entered into force Dec. 11, 1951), *available at Legislative History Vol. 2,* at 2114; Convention For the Avoidance of Double Taxation and For Establishing Rules of Reciprocal Administrative Assistance With Respect to Taxes On Income, Dec. 13, 1946, U.S.-South Africa, art. XV, T.I.A.S. No. 2510 (entered into force July 15, 1952), *available at Legislative History Vol. 2,* at 2511; Supplementary Protocol, July 14, 1950, U.S.-South Africa, art. VII, T.I.A.S. No. 2510, *available at Legislative History Vol. 2,* at 2529.

14    The limited assistance offered in Article 26 of the Model Convention is specifically qualified: "[Paragraph 4] shall not impose upon either of the Contracting States the obligation to carry out administrative measures that would be contrary to its sovereignty, security, or public policy." 1996 Model Convention, Art. 26 ¶ 4.

15    The Organization for Economic Cooperation and Development ("OECD") was established in Paris in December 1960. *See United States v. A.L. Burbank & Co.,* 525 F.2d 9, 15 (2d Cir.1975). The OECD is an organization which provides its 30 member states "a setting in which to discuss, develop and perfect economic and social policy." OECD Online, What is OECD?, *available at* http://www.oecd.org/about/general/index.htm (last modified Aug. 2, 2001). The United States, Canada, and many of the world's developed, democratic, market-oriented states are members. *See id.* In the realm of international taxation, the OECD's model convention "has almost acquired the status of a multilateral instrument" because of the reliance placed on it by many countries in negotiating bilateral tax conventions. American Law Institute, *International Aspects of United States Income Taxation II: United States Income Tax Treaties* 3 (1992).

16    *See, e.g.,* Convention for the Avoidance of Double Taxation and the Prevention of Fiscal Evasion With Respect to Taxes on Income, Jan. 25, 1998, U.S.-Estonia, art. 26, S. Treaty Doc. No. 105–55 (entered into force Dec. 30, 1999); Convention for the Avoidance of Double Taxation and the Prevention of Fiscal Evasion With Respect to Taxes on Income and Capital Gains, July 28, 1997, U.S.-Ireland, art. 27, S. Treaty Doc. No. 105–31 (entered into force Dec. 17, 1997); Convention for the Avoidance of Double Taxation and the Prevention of Fiscal Evasion With Respect to Taxes on Income and Capital, June 17, 1992, U.S.-Russian Fed., art. 25, S. Treaty Doc. No. 102–39 (entered into force Dec. 16, 1993); Convention for the Avoidance of Double Taxation and the Prevention of Fiscal Evasion With Respect to Taxes on Income, July 11, 1988, U.S.-Indonesia, arts. 26, 29, T.I.A.S. No. 11593 (entered into force Dec. 30, 1990); Agreement for the Exchange of Information With Respect to Taxes, Sept. 27, 1990, U.S.-Honduras, art. 4, T.I.A.S. No. 11745 (entered into force Oct. 11, 1991); Agreement for the Exchange of Information With Respect to Taxes, Feb. 15, 1990, U.S.-Peru, art. 4, T.I.A.S. No. 12060 (entered into force Mar. 31, 1993); Convention for the Avoidance of Double Taxation and the Prevention of Fiscal Evasion With Respect to Taxes on Income, Sept. 18, 1992, U.S.-Mexico, art. 27, S. Treaty Doc. No. 103–07 (entered into force Dec. 28, 1993); Agreement for the Exchange of Information With Respect to Taxes, Nov. 9, 1989, U.S.-Mexico, art. 4, T.I.A.S. No. 12404 (entered into force Jan. 18, 1990). We note that these tax treaties concern primarily income and capital taxes, rather than customs duties.

RICO Bus.Disp.Guide 10,172

17    See Joseph B. McFarland, *The U.S.-Canada Income Tax Treaty: The Revised Protocol,* 69 Fla. B.J. 62, 64 (July–Aug.1995) (noting that the mutual collection assistance provision covers all taxes including customs and excise taxes).

18    See Arnold, *supra,* 9 Tax Notes Int'l at 863 (discussing this provision).

19    Because the United States has negotiated for certain reciprocal assistance with respect to unadjudicated tax claims with at least one other nation, *see* Tax Convention With France, *supra* note 11, art. 28 ¶ 4, the lack of any United States Canada tax treaty with such a provision is telling.

20    United States anti-smuggling laws also require reciprocity before allowing American courts to take notice of foreign revenue laws. *See* 18 U.S.C. § 546; 19 U.S.C. §§ 1701–1711. For example, outbound smuggling is banned only to the extent the receiving sovereign has banned similar smuggling into the United States. *See* 18 U.S.C. § 546; *Boots,* 80 F.3d at 588.

21    Cf. *Estados Unidos Mexicanos v. DeCoster,* 229 F.3d 332, 340 (1st Cir.2000) ("Care should be taken not to impinge on the Executive's treaty-making prerogatives.... The Executive often requires, before extending rights to foreign nations, that there be agreements providing for reciprocal protection of American interests. The ability of the other branches to secure such reciprocity could be undermined if the Judiciary did not adhere to the principal of non-interference.").

22    We recognize the give-and-take of policy priorities involved in the negotiating of tax treaties and are therefore reluctant to upset the balance negotiated between our two governments. *See generally* Testimony of Leslie B. Samuels, Ass't Sec'y for Tax Policy, U.S. Treasury Dep't, before the Senate Comm. on Foreign Relations, June 13, 1995, *available through* Federal News Service (noting that "[o]btaining the agreement of our [tax] treaty partners ... sometimes requires concessions on our part. Similarly, other countries sometimes must make concessions to obtain our agreement on issues that are critical to them. The give and take that is inherent in the negotiating process leading to a treaty is not unlike the process that results in legislation in [the Senate]."); Tsilly Dagan, *The Tax Treaties Myth,* 32 N.Y.U.J. Int'l L. & Pol. 939, 949 (2000) (describing the "strategic policy choices" involved in the creation of international tax regimes); John F. Avery Jones, *Are Tax Treaties Necessary?,* 53 Tax L.Rev. 1, 3 (1999) (describing how countries use domestic legislative changes to "preserve [their] negotiating position" in international tax treaties).

23    Courts must be cognizant of the limited role they play in formulating policy and the fact that "[i]t is crucial to the efficient execution of the Nation's foreign policy that the Federal Government ... speak with one voice when regulating commercial relations with foreign governments." *South–Central Timber Dev., Inc. v. Wunnicke,* 467 U.S. 82, 99, 104 S.Ct. 2237, 81 L.Ed.2d 71 (1984) (quoting *Michelin Tire Corp. v. Wages,* 423 U.S. 276, 285, 96 S.Ct. 535, 46 L.Ed.2d 495 (1976)).

24    Our dissenting colleague characterizes the distinction we make as one between criminal and civil RICO. We, however, distinguish between (criminal) actions prosecuted by the United States, on the one hand, and (civil) actions prosecuted by a foreign sovereign, on the other.

25    In some cases in which foreign relations matters within the executive's control were involved, courts have allowed litigation to proceed when the executive branch expressed its consent to adjudication by the courts.

      See *First Nat'l City Bank v. Banco Nacional de Cuba,* 406 U.S. 759, 768–70, 92 S.Ct. 1808, 32 L.Ed.2d 466 (1972) (holding that where "the branch of the government responsible for the conduct of ... foreign relations" has advised the court that adjudication of a case will not "frustrate the conduct of this country's foreign relations," the act-of-state doctrine need not be applied because "[i]t would be wholly illogical to insist that such a rule, fashioned because of fear that adjudication would interfere with the conduct of foreign relations, be applied in the face of an assurance from that branch of the Federal Government that conducts foreign relations that such a result would not obtain"); *National Petrochemical Co. of Iran v. M/T Stolt Sheaf,* 860 F.2d 551, 555–56 (2d Cir.1988), *cert. denied,* 489 U.S. 1081, 109 S.Ct. 1535, 103 L.Ed.2d 840 (1989) (despite lack of formal diplomatic recognition of a foreign sovereign, wholly owned corporation of that foreign government could bring suit in federal courts in light of executive branch's willingness to allow that nation to

litigate its contract and tort claims within United States forum). There has been no such expression of consent or approval in the case at bar.

26    In its brief in opposition to defendant's petition for certiorari in *Pierce v. United States,* the Solicitor General, on behalf of the United States, distinguished between Canada and the United States bringing a case in the United States against cross-border tobacco smuggling:

> This case does not implicate either the revenue rule itself or the rationale on which it is based. It is not an action brought by the government of Canada to enforce a Canadian tax judgment. It is, instead, an action brought by the United States government to enforce its own criminal laws against money laundering and wire fraud committed in this country.

Brief for Respondent at 8, *Pierce v. United States,* Nos. 97–1792, 97–8964 (U.S.1997). The United States also stated: "It is thus evident that domestic criminal prosecutions such as this one do not present the concerns that, as explained by Judge Hand in *Moore v. Mitchell,* motivated the adoption of the revenue rule in the different context of civil suits by foreign governments to enforce their own tax judgments." *Id.* at 11.

27    In *Pierce,* the defendants were "not accused of scheming to defraud the Canadian government of its property, but of its *right* to obtain property, its *right* to be paid money." *Pierce,* 224 F.3d at 165. The court assumed that such a right could constitute "property" for the purpose of RICO. *See id.* at 165–66; *see also Illinois Dep't of Revenue v. Phillips,* 771 F.2d 312, 317 (7th Cir.1985) (reluctantly allowing a state to pursue a RICO claim based on tax fraud). These decisions predate *Cleveland v. United States,* 531 U.S. 12, 121 S.Ct. 365, 368, 148 L.Ed.2d 221 (2000), in which the Supreme Court held that an unissued video poker license held by the state did not constitute "property" for the purposes of the mail fraud statute. Given that we decide this case based on the revenue rule, it is unnecessary for us to visit the issue of what constitutes "property" under RICO in light of *Cleveland.*

28    For a thoughtful discussion of these points, *see European Community v. RJR Nabisco, Inc.,* 150 F.Supp.2d 456 (E.D.N.Y.2001).

29    In *Milwaukee County,* the Supreme Court held that under the Full Faith and Credit Clause each American state must enforce a tax judgment entered in any other state of the union if requested to do so. The Court distinguished the obligations of the states of the union from those of independent foreign sovereigns, which are not bound by the Full Faith and Credit Clause and which are "free to ignore obligations created under the laws or by the judicial proceedings of the others." 296 U.S. at 277, 56 S.Ct. 229.

30    *See, e.g., Carl Zeiss Stiftung v. V.E.B. Carl Zeiss Jena,* 293 F.Supp. 892, 913 (S.D.N.Y.1968) (recognizing the revenue rule), *modified on other grounds,* 433 F.2d 686 (2d Cir.1970); *Newcomb v. Comm. of Internal Revenue,* 23 T.C. 954, 960, 1955 WL 703 (U.S. Tax Ct.1955) ("It is generally recognized that courts as a matter of policy decline to enforce the penal or revenue laws of a foreign jurisdiction."); *Banco Do Brasil, S.A. v. A.C. Israel Commodity Co.,* 12 N.Y.2d 371, 376–77, 239 N.Y.S.2d 872, 190 N.E.2d 235 (1963) (dismissing an action under an American statute brought by foreign government-owned bank to sue for damages allegedly caused by violation of Brazilian currency control laws); *De Sayve v. De La Valdene,* 124 N.Y.S.2d 143, 153 (N.Y.Sup.Ct.1953) (referring to "the rule that the courts of one State do not enforce the revenue laws of another"); *Cermak v. Bata Akciova Spolecnost,* 80 N.Y.S.2d 782, 785 (N.Y.Sup.Ct.1948) (same), *aff'd,* 275 A.D. 919, 90 N.Y.S.2d 680 (1st Dep't 1949); *Bowles v. Barde Steel Co.,* 177 Or. 421, 441, 164 P.2d 692 (1945) ("It is held that ordinarily a state court will not enforce the revenue laws of another ... country."); *Hearings Before Sen. Comm. on Foreign Relations, Subcomm. on Double Tax Conventions,* 82nd Cong., 1st Sess., at 69 (1951) (statement of Eldon King, Special Deputy Commissioner, Bureau of Internal Revenue) ("The point that under existing international law and rules of comity, fortified by court decisions, foreign and domestic, the United States cannot collect a tax imposed by a foreign government is readily conceded. Thus, to do so, it is necessary to incorporate collection aid in a treaty."), *available at Legislative History Vol. 1,* at 577; Alan R. Johnson, *Systems for Tax Enforcement, Treaties: The Choice Between*

*Administrative Assessments & Court Judgments,* 10 Harv. Int'l L.J. 263, 263 (1969) ("Absent special treaty provisions, extraterritorial enforcement [of taxes] remains foreclosed by the venerable, though criticized, doctrine that one nation will not enforce the revenue laws or judgments of another."); Case Note, *Canadian Court Will Not Entertain Suit to Enforce United States Tax Judgment,* 77 Harv. L.Rev. 1327, 1327 (1964) (referring to "the traditional rule that the courts of one government will not enforce either the penal or the revenue claims of another"); Note, *International Enforcement of Tax Claims,* 50 Colum. L.Rev. 490, 491 (1950) ("[T]he judiciaries of the United States, England, and continental Europe have held that one sovereign state may not maintain an action in the courts of another for the collection of a tax claim."); Note, *Extrastate Enforcement of Penal & Revenue Claims,* 46 Harv. L.Rev. 192, 222 (1932) (discussing revenue rule).

31    Today, Congress remains alert to the revenue rule. For example, the pending Bankruptcy Reform Act of 2001 provides that the access of foreign creditors to domestic bankruptcy proceedings "does not change or codify present law as to the allowability of foreign revenue claims or other foreign public law claims in a proceeding under [the Bankruptcy Code]." 147 Cong. Rec. S2511 (March 19, 2001) (referring to S. 420).

32    The dissent focuses principally on whether the justifications for the revenue rule are currently tenable. Although, as discussed *supra,* we believe that they remain so in certain significant respects, that is not the most important issue. Rather, the fundamental question in this case is whether Congress intended to abrogate this long-standing, albeit criticized, common law rule in enacting RICO.

33    *See generally* 📖 *United States v. Bestfoods,* 524 U.S. 51, 62–63, 118 S.Ct. 1876, 141 L.Ed.2d 43 (1998) (Comprehensive Environmental Response, Compensation and Liability Act ("CERCLA") cannot be read to abrogate state corporation law unless it speaks directly to the issue, which it does not); 📖 *Imbler v. Pachtman,* 424 U.S. 409, 417–18, 96 S.Ct. 984, 47 L.Ed.2d 128 (1976) (federal civil rights statute did not abrogate general tort immunities; instead, it must be interpreted in light of the immunities); 📖 *In re Chateaugay Corp.,* 94 F.3d at 779 (tax intercept statute did not abrogate common law right of setoff).

34    *Cf.* 📖 *Havana Club Holding, S.A. v. Galleon S.A.,* 203 F.3d 116, 124 (2d Cir.), *cert. denied,* 531 U.S. 918, 121 S.Ct. 277, 148 L.Ed.2d 201 (2000) (a treaty will not be deemed to be abrogated unless Congress has made a clear expression that it intends to override its protections); 📖 *Maxwell Communication,* 93 F.3d at 1047 (" '[A] statute ought never to be construed to violate the law of nations, if any other possible construction remains.' ") (quoting 📖 *Murray v. The Charming Betsy,* 6 U.S. (2 Cranch) 64, 118, 2 L.Ed. 208 (1804) (Marshall, C.J.)).

35    Congress could have chosen to afford a remedy for this conduct with RICO, had it so desired. At the time of RICO's passage, it was well known that organized crime organizations engaged in tax evasion and smuggling. *See, e.g.,* Thomas Svogun, *Cigarette Bootlegging: The Problem, Civil & Criminal Remedies,* in 1 Materials on RICO 241, 245–54 (G. Robert Blakey ed., 1980) (describing reports of cigarette smuggling in 1960s and 1970s).

36    Neither the parties nor the dissent have cited, and our research has not revealed, any statements about the revenue rule in RICO's extensive legislative record. *Cf.* 📖 *Illinois Dep't of Revenue v. Phillips,* 771 F.2d 312, 317 (7th Cir.1985) (noting that RICO's legislative history is "silent" on whether a state department of revenue can use RICO to punish tax evasion).

37    *See* 📖 *Banco Frances e Brasileiro S.A. v. Doe,* 36 N.Y.2d 592, 601–02, 370 N.Y.S.2d 534, 331 N.E.2d 502 (1975) (Wachtler, J., dissenting) ("Accordingly, the result is not determined by the threshold appearance of the particular law sought to be enforced or whether such law be denominated by the foreign government as a penal law or revenue law or otherwise. The bottom line is that the courts of one country will not enforce the laws adopted by another country in the exercise of its sovereign capacity for the purpose of fiscal regulation and management."); *see generally* F.A. Mann, *Prerogative Rights of Foreign States & the Conflict of Laws, in Studies in International Law* 502 (1973) ("It is equally certain that in ... matters [of prerogative rights] the court will not allow itself to be misled by appearances: on the contrary, it will investigate whether what the plaintiff asserts is in substance a prerogative right the direct or indirect enforcement of which is being sought.").

38    In *Peter Buchanan,* the Irish High Court explained:

> Those cases on penalties would seem to establish that it is not the form of the action ... that must be considered, but the substance of the right sought to be enforced; and that if the enforcement of such right would even indirectly involve the execution of the penal law of another State, then the claim must be refused. I cannot see why the same rule should not prevail where it appears that the enforcement of the right claimed would indirectly involve the execution of the revenue law of another State, and serve a revenue demand.... In each case it is sought to enforce a personal right, but as that right is being enforced at the instigation of a foreign authority, and would indirectly serve claims of that foreign authority of such a nature as are not enforceable in the courts of this country, relief cannot be given.

*Peter Buchanan L.D. v. McVey,* [1955] A.C. 516, 527 (Ir.H.Ct.1950H.Ct.1950), *aff'd,* [1955] A.C. 530 (Ir.S.C.1951); *see Sydney Municipal Counsel v. Bull,* [1909] 1 K.B. 7, 12 (quoted in *Peter Buchanan,* [1955] A.C. at 525) ("Some limit must be placed upon the available means of enforcing the sumptuary laws enacted by foreign States for their own municipal purposes.... The action is in the nature of an action for a penalty to recover a tax; it is analogous to an action brought in one country to enforce the revenue laws of another. In such cases it has always been held that an action will not lie outside the confines of the last-mentioned State."); *QRS 1 APS v. Frandsen,* [1999] 3 All E.R. 289, 291 (C.A.) ("It is a fundamental principle of English law that our courts will not directly or indirectly enforce the penal, revenue or other public laws of another country. On the English authorities it is clear that the present action falls foul of that rule: in substance it involves the indirect enforcement of Denmark's revenue law." (internal citation omitted)).

39    In any event, we do not understand how a formalistic distinction between an action based explicitly and entirely on Canadian law and one which, in effect, pleads violations of Canadian law through the medium of a United States statute, is a response to the concerns outlined above about, *inter alia,* judicial non-interference with international tax policy-making by the political branches.

40    The district court held that the law enforcement costs were barred under *Town of West Hartford v. Operation Rescue,* 915 F.2d 92, 104 (1990), which stated in dicta that a government's additional law enforcement costs were not recoverable under RICO. *See Attorney General of Canada v. RJ Reynolds Tobacco Holdings, Inc.,* 103 F.Supp.2d 134, 151–55 (N.D.N.Y.2000); *see generally* Anne Giddings Kimball & Sarah L. Olson, *Municipal Firearm Litigation: Ill Conceived from Any Angle,* 32 Conn. L.Rev. 1277, 1296–1301 (2000) (describing the municipal cost recovery rule which precludes government's recovery in a civil action for the cost of public services); *City of Philadelphia v. Beretta U.S.A. Corp.,* 126 F.Supp.2d 882, 894–95 (E.D.Pa.2000) (same). Canada distinguishes the present case from *Town of West Hartford* on the ground that in this case, Canada was the intended victim of defendants' scheme, while in *Town of West Hartford,* the town was not the defendants' target, but instead used its police to aid the abortion clinic that was the defendants' target. We need not address this issue on appeal, and do not decide whether, under different circumstances, such costs would be available to a government that was the intended victim of a RICO scheme.

41    Under international law, a sovereign's acts may be classified in two groups. "One class comprises those acts which are done by a sovereign 'jure imperii,' that is, by virtue of his sovereign authority. The others are those which are done by him 'jure gestionis,' that is, which obtain their validity by virtue of his performance of them." *Ortiz,* [1984] A.C. at 20–21; *see Saudi Arabia v. Nelson,* 507 U.S. 349, 359–60, 113 S.Ct. 1471, 123 L.Ed.2d 47 (1993) (noting that under the restrictive theory of absolute immunity, "a state is immune from the jurisdiction of foreign courts as to its sovereign or public acts (*jure imperii* ), but not as to those that are private or commercial in character (*jure gestionis* )"); *Alfred Dunhill of London, Inc. v. Republic of Cuba,* 425 U.S. 682, 711, 96 S.Ct. 1854, 48 L.Ed.2d 301 (1976) (same). An example of a private, "*jure gestionis* " act is operating a business. In addition to the enforcement of revenue laws, a classic example of "*jure imperii* " acts is the enforcement of penal laws. *See Nelson,* 507 U.S. at 361, 113 S.Ct. 1471 ("a foreign state's exercise of the power of its police has long been understood ... as particularly sovereign in nature"). As with revenue

rules, American courts have generally refrained from enforcing the penal laws of foreign sovereigns. *See Huntington v. Attrill,* 146 U.S. 657, 673–74, 13 S.Ct. 224, 36 L.Ed. 1123 (1892) ("The question whether a statute of one state, which in some aspects may be called penal, is a penal law, in the international sense, so that it cannot be enforced in the courts of another state, depends upon the question whether its purpose is to punish an offense against the public justice of the state, or to afford a private remedy to a person injured by the wrongful act."); *The Antelope,* 23 U.S. (10 Wheat.) 66, 123, 6 L.Ed. 268 (1825) (Marshall, C.J.) ("The Courts of no country execute the penal laws of another...."). Thus, the bar on the extra-national enforcement of revenue laws is just one aspect of a cautionary approach of domestic courts to enforcing foreign laws that are "*jure imperii.*"

42    Lord Denning explained:

These courts will not enforce [revenue or penal] laws at the instance of a foreign country. It is quite another matter to say that we will take no notice of them. It seems to me that we should take notice of the laws of a friendly country, even if they are revenue laws or penal laws or political laws, ... at least to this extent, that if two people knowingly agree to break the laws of a friendly country or to procure some one else to break them or assist them in the doing of it, then they cannot ask this court to give its aid to the enforcement of their agreement.

*K.C. Sethia,* [1956] 2 Q.B. at 515. We note that the *K.C. Sethia* case involved a political law, not a revenue law, and thus presented different considerations than the present case does. *See Banco Nacional de Cuba v. Sabbatino,* 376 U.S. 398, 414 & n. 16, 84 S.Ct. 923, 11 L.Ed.2d 804 (1964) (noting that doctrine against applying public laws other than revenue and penal laws "may have a broader reach in Great Britain" than in the United States).

43    It seems clear the House of Lords recognized a difference between enforcement by a foreign sovereign as compared to private claims brought by individuals affected by tax laws, as Lord Denning stated in *K.C. Sethia:*

It seems to me that Lord Mansfield [in *Holman v. Johnson* ] goes too far when he says that these courts will *take no notice* of such [penal or revenue] laws. It is perfectly true that the courts of this country will not enforce the revenue laws or the criminal laws of another country at the suit of that country, either directly or indirectly. These courts do not sit to collect taxes for another country or to inflict punishments for it.... These courts will not enforce such laws at the instance of the foreign country.

*K.C. Sethia,* [1956] 2 Q.B. at 515.

44    We express our appreciation for the excellent submissions made by the parties and *amici curiae.*

1     The majority appears to accept the district court's conclusion that Canada has standing to bring a civil RICO suit. Given that the result of such a suit would be money damages, which would provide income for the foreign government, one wonders whether, under the majority's reasoning, any suit brought by Canada would be permissible under the revenue rule. And yet, if Congress intended Canada to have standing to bring a civil RICO suit, then it must not have understood the revenue rule to bar all such actions.

2     *See* Majority Op. at 111–12.

3     It is unlikely that the rationale applies even when the domestic law is a domestic common law rule—i.e. state common law fraud. It certainly does not apply when the domestic law being enforced by our courts is both statutory and federal.

4     The argument is, to put it mildly, dubious in a global economy, which requires a great amount of interpretation of foreign laws. *E.g., Trapilo,* 130 F.3d at 550 n. 4 ("In an age when virtually all states impose and collect taxes and when instantaneous transfer of assets can be easily arranged, the rationale for not recognizing or enforcing tax judgments is largely obsolete." (quoting Restatement § 483)); *Banco Frances e Brasileiro S.A. v. Doe,* 36 N.Y.2d 592, 370 N.Y.S.2d 534, 538, 331 N.E.2d 502 (1975) (commenting that "much doubt has been expressed that the reasons advanced for the rule, if ever valid, remain so ... in light of the economic interdependence of all nations ....") *cert. denied,* 423 U.S. 867, 96 S.Ct. 129, 46 L.Ed.2d 96 (1975). *See also* Roger J. Miner, *The Reception of Foreign Law in the U.S. Federal Courts,* 43 Am. J. Comp. L. 581, 586 (1995) (decrying the reluctance of federal courts to interpret foreign law in a global economy and stating that

"federal courts have shown a commendable ability to get their hands around foreign law when fully briefed on the issues").

5    Under the sentencing guidelines, the offense level will usually be determined by the offense level of the underlying conduct. U.S.S.G. § 2E1.1. If, as here, the underlying conduct is wire fraud, the offense level increases based on the amount of money lost. U.S.S.G. § 2F1.1.

6    The Court made clear that it would not interpret civil RICO narrowly in *Sedima, S.P.R.L. v. Imrex Co.,* 473 U.S. 479, 105 S.Ct. 3275, 87 L.Ed.2d 346 (1985). The Court noted that its broad interpretation of civil RICO "is amply supported by our prior cases and the general principles surrounding the statute.... This is the lesson not only of Congress's self-consciously expansive language and overall approach, ... but also of its express admonition that RICO is to 'be literally construed to effectuate its remedial purposes.' " *Id.* at 497–98, 105 S.Ct. 3275 (citation omitted) (quoting Pub.L. 91–452 § 904(a), 84 Stat. 947). The Court further explained: "The statute's 'remedial purposes' are nowhere more evident than in the provision of a private action for those injured by racketeering activity.... RICO was an aggressive initiative to supplement old remedies and develop new methods for fighting crime.... While few of the legislative statements about novel remedies and attacking crime on all fronts ... were made with direct reference to § 1964(c), it is in this spirit that all of the Act's provisions should be read." *Id.* at 498, 105 S.Ct. 3275 (citations omitted). The Court noted the concern of the Court of Appeals over the uses to which civil RICO was being put but explained that these uses are "hardly a sufficient reason for assuming that the provision is being misconstrued." *Id.* at 499, 105 S.Ct. 3275The Court stressed the expansive take it had on civil RICO by noting: " '[T]he fact that RICO has been applied in situations not expressly anticipated by Congress does not demonstrate ambiguity. It demonstrates breadth.' " *Id.* (quoting *Haroco, Inc. v. Am. Nat'l Bank & Trust Co. of Chi.,* 747 F.2d 384, 398 (7th Cir.1984) (alteration in original)). *See also, e.g.,* *H.J. Inc. v. Northwestern Bell Tel., Co.,* 492 U.S. 229, 236, 109 S.Ct. 2893, 106 L.Ed.2d 195 (1989) (commenting that the breadth of the predicate offenses and Congress's failure to interpret the term "pattern" in the statute applies to criminal and civil applications of the Act); *Sedima,* 473 U.S. at 493, 105 S.Ct. 3275 (rejecting a restrictive interpretation of § 1964(c) that would have made a criminal conviction a prerequisite for a civil RICO suit).

7    Notably in both the civil and criminal context, the lost tax revenue does not itself constitute the penalty exacted. Instead, the fine, jail time, or damages assessed simply use the lost revenue as a factor to be employed— after appropriate multiplication, etc.—to determine the size of the civil or criminal penalties to be imposed.

8    As the Supreme Court has noted, the civil and criminal remedies taken together mean that "RICO provides for drastic remedies." *H.J. Inc.,* 492 U.S. at 233, 109 S.Ct. 2893.

9    In support of its holding that civil RICO suits against "legitimate" business enterprises were permissible in addition to those brought against organized crime organizations, the Supreme Court stated: "Yet this defect —if defect it is—is inherent in the statute as written, and its correction must lie with Congress. It is not for the judiciary to eliminate the private action in situations where Congress has provided it...." *Sedima,* 473 U.S. at 499–500, 105 S.Ct. 3275.

10   The majority characterizes the issue in this case as whether Congress intended to abrogate the revenue rule when it passed RICO. As is apparent from my dissent, I view the issue differently. For me, the question is whether Congress, in RICO, created a cause of action giving rise to damages, and did so without regard to the existence of the revenue rule.

**End of Document**                           © 2021 Thomson Reuters. No claim to original U.S. Government Works.

# Exhibit 23

```
 1            IN THE SUPREME COURT OF THE UNITED STATES

 2   - - - - - - - - - - - - - - - x

 3   DAVID B. PASQUANTINO,            :

 4   CARL J. PASQUANTINO, AND         :

 5   ARTHUR HILTS,                    :

 6            Petitioners             :

 7      v.                            :   No. 03-725

 8   UNITED STATES OF AMERICA,        :

 9            Respondent.             :

10   - - - - - - - - - - - - - - - x

11                        Washington, D.C.

12                        Tuesday, November 9, 2004

13         The above-entitled matter came on for oral

14   argument before the Supreme Court of the United States at

15   11:13 a.m.

16   APPEARANCES:

17   LAURA W. BRILL, ESQUIRE, ESQ., Los Angeles; on behalf of

18      the Petitioners.

19   MICHAEL R. DREEBEN, ESQ., Deputy Solicitor General,

20      Department of Justice, Washington, D.C.; on behalf

21      of the Respondent.

22

23

24

25
```

1

1                        C O N T E N T S

2     ORAL ARGUMENT OF                                       PAGE

3     LAURA W. BRILL, ESQ.

4          On behalf of the Petitioners                        3

5     ORAL ARGUMENT OF

6     MICHAEL R. DREEBEN, ESQ.

7          On behalf of the Respondent                        22

8     REBUTTAL ARGUMENT OF

9     LAURA W. BRILL, ESQ.

10         On behalf of the Petitioners                       48

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1111 14th Street, NW Suite 400          Alderson Reporting Company          Washington, DC 20005
                                        1-800-FOR-DEPO

```
 1                   P R O C E E D I N G S
 2                                        [11:13 a.m.]
 3            JUSTICE STEVENS:  We'll hear argument in the
 4   case of Pasquantino against the United States.
 5            Ms. Brill.
 6              ORAL ARGUMENT OF LAURA W. BRILL
 7                 ON BEHALF OF PETITIONERS
 8            MS. BRILL:  Justice Stevens, and may it please
 9   the Court:
10            There are five primary reasons why this
11   prosecution is outside the scope of anything Congress has
12   authorized.  First, the government's interpretation of the
13   wire fraud statute is inconsistent with the revenue rule.
14   Second, it turns the rule of lenity on its head by
15   allowing the Government to incarcerate petitioners for 57
16   months for conduct that has never given rise to civil
17   liability in this country.  Third, this prosecution
18   contravenes our national policy of demanding reciprocity
19   in matters of international tax enforcement.  Fourth, the
20   Government acknowledged below that it cannot bring this
21   prosecution without disregarding another act of Congress,
22   the Mandatory Victims Restitution Act, which is, as the
23   name specifies, mandatory.  And, fifth, under this Court's
24   decisions in McNally and Cleveland, the wire fraud statute
25   applies only to schemes aimed at defrauding a victim into
```

3

1    relinquishing something that it holds as money or

2    property.  A sovereign's interest in an unassessed tax

3    claim is neither money nor property.

4            JUSTICE O'CONNOR:  Well, can you look at the

5    interest of the Government as one of not allowing U.S.

6    territory to be used to carry out a smuggling scheme?  I

7    mean, why does it have to be viewed as one of trying to

8    enforce some other nation's tax laws?

9            MS. BRILL:  Justice O'Connor, the government's

10   interest in prosecuting somebody does not define the scope

11   of what the statute at issue proscribes.

12           JUSTICE O'CONNOR:  It's a wire fraud statute

13   dealing with the use of communications capacity in this

14   country to carry out a scheme designed to enable smuggling

15   of goods.

16           MS. BRILL:  Well, if the -- if the statute was

17   not written as it is -- the statute, as written, uses the

18   words "defraud" and the word -- the word "property," and

19   both of those terms are terms that this Court has defined

20   very narrowly.  In Nader, it defined a "fraud" as --

21           JUSTICE SCALIA:  Ms. Brill, I thought your brief

22   said that we have an anti-smuggling statute, which is

23   directed precisely against smugglers, but it only applies

24   to those countries that have similar protection for us.

25           MS. BRILL:  Yes, Justice --

4

```
1              JUSTICE SCALIA:  And Canada does not.

2              MS. BRILL:  Yes, Justice Scalia, that's exactly

3    correct.

4              JUSTICE SCALIA:  The existence of that

5    statute would seem to suggest -- and a statute which is

6    limited to countries that will do the same for us -- would

7    seem to suggest that we don't want to do this for Canada.

8              MS. BRILL:   Yes, that's exactly -- that's

9    exactly right, Your Honor.  There --

10             JUSTICE GINSBURG:  But it's also limited to

11   vessels.  It's smuggling by water, not smuggling by --

12             MS. BRILL:  By automobile.

13             JUSTICE GINSBURG:  -- vehicles, as was done here,

14   so that we don't have any statute that covers smuggling on

15   land.

16             MS. BRILL:  Right.  Yes, Your Honor, that's

17   correct.

18             JUSTICE SCALIA:  Is there something better about

19   reciprocity for vessels and not reciprocity for land

20   smuggling?

21             MS. BRILL:  I think it just evinces what

22   Congress was concerned about most at the time, Justice

23   Scalia, but it was -- it is certainly the case that in any

24   -- any time that this country has endeavored to deal with

25   matters of international tax enforcement, it has always
```

5

1  demanded reciprocity.  It has done so through the

2  smuggling statute, it has done so through the numerous tax

3  treaties that the Second Circuit's RJR decision discusses

4  at length.

5          And one of the points the RJR decision makes is

6  that, in 1951, at the very time that Congress was looking

7  at the wire fraud statute and enacting it, the Senate was,

8  at the same time, becoming concerned that this country had

9  gone too far in extending reciprocity in connection with

10  its tax treaties and was actually evincing a policy of

11  cutting back on the degree to which we would assist other

12  countries in tax enforcement.

13          And so the issue is to look at -- that the

14  revenue rule must be used as a background principle of

15  common law against which -- against which the revenue --

16  excuse me, against which the wire fraud statute is --

17          JUSTICE O'CONNOR:  Well, if we don't view

18  this case as involving some attempt to indirectly enforce

19  Canada's tax laws -- suppose we don't view it with that

20  lens -- then does that put it outside the so-called

21  revenue --

22          MS. BRILL:  Well, if it were not -- if it did

23  not serve the function -- it doesn't matter what the

24  government's intent is and what is in the mind of the

25  prosecutor, but if it did not have any effect of enforcing

6

1    a foreign government's revenue rule, then, yes, it would

2    be outside; but there are numerous ways in which this

3    prosecution does enforce a foreign government's revenue

4    rule.  Certainly, it deters future violations.  The

5    sentence was based on the -- an estimate of the intended

6    loss, and there was no assessment or an adjudication in

7    Canada to determine what the amount was that was owed.

8    And so the District Court became, essentially, part of the

9    tax enforcement apparatus of the Government of Canada by

10   performing that assessment in the first instance.

11        And so anytime that we impose criminal or civil

12   liability in a manner that affects the tax policies of

13   another country, we are enforcing that rule.  If we --

14   whether we're requiring compliance with the -- with the

15   tax rule of a foreign country or punishing noncompliance.

16   All of those --

17        JUSTICE KENNEDY:  Is the rationale for the rule

18   that enforcement of taxes is so unpopular that we want to

19   minimize the exposure to -- of our judges so that they --

20   the only thing they have to do is enforce taxes that --

21   that are paid to our own Government?  I'm serious about

22   that.  Is that the rationale?

23        MS. BRILL:  Well, I think there's a certain

24   amount of self-protection in some of the decision --

25   decisions, surely; but the real -- the underlying purpose

7

1    of the revenue rule is a recognition that foreign -- that

2    taxes, in general, are a matter of policy.  They're

3    inherently policy-based; they're not based on contract or

4    other kinds of commerce.  They do not -- they do not

5    assist in resolving disputes between private parties.  And

6    often they're imposed -- especially customs duties, are

7    imposed to disadvantage other countries, and so the courts

8    have said these are a peculiar type of law, they serve

9    only the interest of the -- of the foreign sovereign, and

10   there's a particular -- there's been a particular

11   sensitivity about scrutinizing those foreign laws,

12   potentially declaring them invalid under the foreign

13   governments' own laws or pursuant to our own Constitution.

14   And so revenue rules have historically been a categorical

15   exclusion to general principles of comity through which we

16   might otherwise recognize foreign laws or foreign

17   judgments.

18              And the rule has come to be so entrenched, and

19   has been so well established, that there's a whole body of

20   background law in the tax treatise of our country, and of

21   many other countries, that is based on our non-recognition

22   and our non-enforcement of foreign revenue laws.  So --

23              JUSTICE GINSBURG:  But if we did -- if we did

24   enforce even a tax judgment of another country, there

25   would be no U.S. law that would be violated.  You're

8

1    talking about a common law, no country enforces the taxes

2    of another.  But, at least in the Restatement of Foreign

3    Relations now, that's put in terms of -- there's no

4    requirement that any country enforce the tax claims or

5    judgments of another; but neither is there any

6    prohibition.

7             MS. BRILL:  Well, Justice Ginsburg, the current

8    restatement is worded in -- addresses judgment

9    specifically.  It does not -- it doesn't address un-

10   adjudicated tax codes.  But there's always been a much

11   greater suspicion, a much greater reluctance, to get into

12   enforcing a claim brought by a foreign country, where that

13   country's own processes have not been allowed to run their

14   course and to have the initial determination.

15            There -- the restate -- the second Restatement

16   of Foreign Relations law, which is -- was -- came out in

17   1965 and is closer to reflecting what the law was at the

18   time Congress enacted the wire fraud statute, says, in

19   Section 41, Comment L, "Under the -- under the foreign

20   relations law of the United States, courts in the United

21   States will generally refrain from taking action to give

22   effect to the penal or revenue laws of other states,

23   except as provided by international agreement."  And so

24   that -- that was a statement by the -- by the propounders

25   of the -- of the Restatement of what they -- what they

1    believed the law was at the time.

2            To the extent it's qualified, I think it's

3    just to leave room for the fact that the Senate can

4    promulgate treaties, or Congress can, by statute, command

5    that courts recognize these laws.  But it's --

6            JUSTICE SCALIA:  You don't -- you don't assert

7    that this -- that it -- that this couldn't be done.

8    You just --

9            MS. BRILL:  Not that --

10           JUSTICE SCALIA:  -- assert that we shouldn't

11    interpret this statute to have done it.

12           MS. BRILL:  Exactly, Justice Scalia.  If

13    Congress had written a different wire fraud statute that

14    had said, "You can't have a scheme to defraud the revenue,

15    whether foreign or domestic," that would have been a clear

16    statement abrogating the revenue rule.  But we don't have

17    any such clear statement, and the terms -- the terms

18    "defraud" and the terms "property" have to be read with

19    the background rule in mind.

20           JUSTICE GINSBURG:  May I --

21           JUSTICE KENNEDY:  But you would come to that

22    conclusion even if we had a reciprocal enforcement

23    agreement.  If this were Country X, where we did have a

24    reciprocal enforcement agreement, you'd come to the same

25    conclusion, no prosecution under this statute.

1111 14th Street, NW Suite 400        Alderson Reporting Company        Washington, DC 20005
                                      1-800-FOR-DEPO

1          MS. BRILL:  Correct, Your Honor, because there

2     wouldn't -- this statute wouldn't have been written to

3     take that into account.  This --

4          JUSTICE KENNEDY:  So, in a sense, the revenue

5     position is irrelevant to your -- to your secondary or

6     your -- or your independent argument on statutory

7     construction.  The revenue rule is irrelevant to it.

8          MS. BRILL:  As to just whether an unassessed tax

9     claim --

10          JUSTICE KENNEDY:  Yes.

11          MS. BRILL:  -- is property, the revenue rule --

12     the revenue rule adds a boost to it, but there are two --

13     there are two dimensions to the property element.  One is

14     that, as I said -- and if a -- if a tax claim is not --

15     has not been subject to an assessment, that whatever

16     interest the Government may have in that is not in the

17     nature of property; it is simply in the nature of law-

18     enforcement power to collect.  They -- some of these

19     revenue rule cases talk about the power to --

20          JUSTICE O'CONNOR:  So tax revenues are not

21     property, in your view?

22          MS. BRILL:  Once a tax is collected, once the

23     Government actually has money in its hands, and if there's

24     a scheme to, let's say, obtain an illegal refund through a

25     tax and -- that would be a scheme to deprive a government

1    body of money.  But a scheme to merely evade paying a tax

2    is not something that falls within the statute, separate

3    and apart from the revenue rule.  But the revenue rule --

4    as a result of the revenue rule, it is also the case that

5    no state court would have recognized any property interest

6    in a foreign sovereign, even if it had reached the point

7    of a judgment.  And so it works in both ways.  The --

8              JUSTICE GINSBURG:  May I ask you, Ms. Brill,

9    something that puzzled me about this case?  It is a rather

10   peculiar use of our wire fraud statute.  Are there any

11   proceedings going on in Canada?  Has there been any

12   attempt to extradite these people?

13             MS. BRILL:  Justice Ginsburg, there was an

14   indictment that Canada issued against the Petitioners.  It

15   has charges under -- for smuggling, under Canadian law,

16   which is Customs Act, Section 159.  It charges unlawful

17   possession of imported spirits under Excise Act 163(1)(b),

18   disposing of goods illegally imported, in violation of

19   Customs Act, Section 155.  So Canada has its own process.

20             There has -- there has not been, to my

21   knowledge, any request by Canada for extradition, but the

22   treaty between the United States and Canada does include

23   revenue violations, and --

24             JUSTICE SCALIA:  Presumably, if we punish this

25   person this way, Canada wouldn't -- there's no double

12

1    jeopardy, right?

2              MS. BRILL:  That's correct.

3              JUSTICE SCALIA:  So we'd be punishing this

4    person for violating Canadian law, and then Canada would

5    punish this person for violating Canadian law.

6              MS. BRILL:  Yes, I haven't looked in detail at

7    the statute of limitations provisions, but that could be

8    the effect.  And we could be punishing them much more

9    severely than Canada would be.  They have their own means

10   of balancing what they think the appropriate balance is

11   for these things, and certainly the wire fraud statute, 57

12   months in our --

13             JUSTICE KENNEDY:  Well, I think the Government

14   has an interest in saying, "Look, if you're going to

15   smuggle, have your scheme up there in Canada; don't use

16   our wire systems for fraudulent purposes.  We don't like

17   that here."

18             MS. BRILL:  And if they want to pass a law that

19   says that, because of the -- because there's a domestic --

20             JUSTICE KENNEDY:  Well, they -- of course, they

21   say that this covers it, and it seems to me that really

22   the -- that turns on the definition of "property" --

23             MS. BRILL:  Okay.

24             JUSTICE KENNEDY:  -- which is an arguable point.

25             JUSTICE STEVENS:  What if the -- instead of a

13

1    wire fraud case, it was assault and battery?  Supposing

2    the Canadian revenue agent got inside of New York and one

3    of your clients beat him up, would we have -- solely

4    because he was mad at him for trying to interfere with his

5    attempt to smuggle into Canada -- would we have to say

6    that you can't do that, we have no jurisdiction over the

7    assault and battery?

8            MS. BRILL:  No, Justice Stevens.  It's -- the

9    question is whether you're --

10           JUSTICE STEVENS:  The only purpose would be just

11   what the purpose is here, they're trying to facilitate the

12   smuggling operation.

13           MS. BRILL:  Well, the assault and battery --

14   whatever the assault and battery provisions are, you would

15   be bringing the prosecution solely for that purpose; it

16   does not have any -- the effect of applying the assault

17   and battery statute, if there was one --

18           JUSTICE STEVENS:  Is to interfere with Canadian's

19   collection of their taxes.  That's the only reason for it.

20           MS. BRILL:  Well, I think it -- in that case, it

21   would be -- it would be far too attenuated to reach that

22   conclusion.  There could be -- the motive of a person --

23           JUSTICE STEVENS:  Why is that any more

24   attenuated than a conspiracy carried out down here in

25   Maryland using American assets to do the evil deed in

14

1    Canada?

2          MS. BRILL:  Well, the motive of the person

3    performing the assault and battery would be irrelevant to

4    the prosecution.  It's whether they intended to do the

5    improper touching and, in fact, carried it out.

6          JUSTICE KENNEDY:  Well, why isn't the motive

7    irrelevant here?  We don't want our facilities to be used

8    for criminal activity.

9          MS. BRILL:  The question is whether --

10          JUSTICE KENNEDY: Any more than in the -- in

11    the hypothetical we don't want citizens beaten up on our

12    soil.

13          MS. BRILL:  Justice Kennedy, the issue is

14    whether -- is what Congress had in mind in enacting the

15    wire fraud statute.  And, in general, we presume that

16    Congress had domestic concerns in mind, not that we have

17    incorporated vast bodies of --

18          JUSTICE O'CONNOR:  Well, but it used broad

19    language, "Any scheme to defraud by means of wire

20    communications in interstate or foreign commerce."

21          MS. BRILL:  The wire -- it is -- the wire

22    communications may be an interstate or foreign commerce,

23    the word "any" modifies "any scheme or artifice to

24    defraud" --

25          JUSTICE SCALIA:  This statute applied against

15

1    people who defraud the United States Government in taxes?

2        MS. BRILL:  Your Honor, the government's

3    position on that, I believe, is somewhat inconsistent.

4    The tax -- the tax division and the Department of Justice

5    U.S. Attorneys manual specifies that it is -- they believe

6    it is the intent of Congress that tax matters will be

7    dealt with through the internal revenue code, not through

8    other means.

9        There are -- there have been some prosecutions

10   brought in the case of an illegal -- an illegal tax

11   shelter, where there is truly an -- a private party who is

12   defrauded into giving up money in connection with --

13        JUSTICE SCALIA:  But you don't -- you don't know

14   of any prosecutions under this fraud statute for depriving

15   the Federal Government of property.

16        MS. BRILL:  Well, the Henderson case, which we

17   have cited in our reply brief, is one from the Southern

18   District of New York, where Judge Weinfeld said, when

19   faced with a mail fraud prosecution of that type, this is

20   outside the scope of anything that Congress intended.

21        The -- I would like to get back to the issue of

22   money or property so that it -- to have it conceptually

23   why an unassessed tax claim is not money or property.

24   There is no allegation that -- in the indictment or

25   anywhere -- that the petitioners took any money out of

16

```
 1   Canada's treasury.  So money is not an issue.  At most, it
 2   was an effort to evade Canada's right to collect money,
 3   not any money it had --
 4            JUSTICE KENNEDY: You could say the same
 5   thing if it were a building fraud.  Suppose there were
 6   contractors building a Canadian building for the Canadian
 7   Government and they had a big fraud scheme down here, and
 8   it was to deprive the Canadian Government of money?  I
 9   think the statute would clearly apply.
10            MS. BRILL:  The statute only applies -- what
11   McNally said is, any assistance a governmental body
12   obtains from the statute must be in the capacity of
13   property-holder.  And so the -- a scheme to defraud
14   somebody out of their -- out of a building, that's
15   traditional property.  There's not -- it is not the same
16   thing.
17            Let's have an -- let's take an example of an
18   interference with prospective economic advantage.  So
19   there is a defendant who says to somebody else who's about
20   to get a contract -- I know my competitor is about to get
21   a contract, and I say, "Why don't you go out of town?
22   There's a -- there's a much bigger contract that you can
23   get if you fly to Michigan."  And, meanwhile, I go in, and
24   I usurp the contract and take it for my own purposes.
25   Well, I've interfered with that person's prospective
```

17

1    economic advantage, and so there would be a tort, and the

2    person could collect from me.  But I have not taken any

3    money or property from that person that was in his

4    possession.

5            And what McNally and Cleveland point us to is

6    whether there was money or property in the hands of the --

7    of the victim.  And Canada's interest -- until there has

8    been an assessment, Canada's interest is purely that of a

9    -- of a sovereign.  It is -- it does not have a claim to

10   any money that is in the bank account of somebody who owes

11   it a debt.

12           And the Johnston case, which we've cited in our

13   reply brief, Your Honor, talks about -- this Court talked

14   about a statute in which there was a boxing promoter who

15   collected fees for the boxing match and also collected

16   taxes at the same time.  And the U.S. Government could not

17   bring an embezzlement action against that person for not

18   paying the taxes, because those taxes were not -- were not

19   yet anything that qualified as governmental property.

20           JUSTICE STEVENS:  Ms. Brill, in the Court of

21   Appeals, they treated the argument that this was not

22   property as entirely separate from the revenue rule

23   question.  And I thought your petition for cert was

24   confined to the first question.

25           MS. BRILL:  Well, Your Honor -- no, Your Honor,

18

1   we talked about both in the petition for cert.  And in

2   the question --

3           JUSTICE STEVENS:  But the question, itself,

4   doesn't refer to the property issue.

5           MS. BRILL:  It talks about the --

6           JUSTICE SCALIA:  Was it -- was it phrased the

7   same way it is in your brief, in the petition?

8           MS. BRILL:  Yes.  Yes, the --

9           JUSTICE SCALIA:  Well, then the last part of it

10  --

11          MS. BRILL:  Right, but --

12          JUSTICE SCALIA:  -- obviously covers it.

13          MS. BRILL:  Yes, the last part talks about --

14          JUSTICE STEVENS:  Oh, I see.  I'm sorry, you're

15  right.  Yeah.

16          MS. BRILL:  Yes, okay.

17          But to return -- to return to the revenue rule

18  -- and thank you, Justice Stevens, for bringing me back to

19  that -- the Government has acknowledged that there can be

20  no restitution here.  And that's in -- that's in the joint

21  appendix, at page 106.  They expressly waived it.  They

22  said that even if there was a foreign judgment that

23  Canada was trying to bring here, that would be

24  unenforceable.  There could be no RICO actions, because

25  that's unenforceable; and no proxy suits on behalf of a

1111 14th Street, NW Suite 400        Alderson Reporting Company        Washington, DC 20005
1-800-FOR-DEPO

1    foreign government.  And so the only thing that they say

2    is, beyond -- is not included -- the only act of

3    enforcement which they say is not included is, somehow,

4    criminal enforcement.

5            And under Section 14 of the -- excuse me, under

6    the Fourteenth Amendment of the United States

7    Constitution, Congress has power to enforce that

8    amendment, and it has done so both in enacting statutes

9    for civil recovery, as well as criminal recovery --

10   criminal punishment, excuse me.  And so it's -- the notion

11   that somehow incarcerating someone is not -- is not

12   punishment is not something that makes much sense in that

13   context.

14           The decisions of this Court have held that

15   penalties are -- monetary penalties count as punishment,

16   and also that injunctions are -- fall within the scope of

17   the revenue rule.  That's in the Wisconsin versus Pelican

18   Insurance case, which actually addresses the penal -- the

19   penal rule, which is the close corollary.

20           JUSTICE GINSBURG:  May I ask you, when -- now

21   that we're getting into money, one of the things that the

22   sentencing court had to do was to find out how much of a

23   loss there was, and that involved determining what taxes

24   would be due under Canadian law.  And did that increase

25   the sentence?  Did the -- did the sentence vary with the

                                20

1  amount of taxes that they -- we found due?

2          MS. BRILL:  Yes, Justice Ginsburg, it very much

3  did.  The loss calculation was based on intended loss, and

4  so they -- what the District Court judge did was estimated

5  the number of cases of liquor that were intended to be

6  brought into Canada, and applied that number to the amount

7  of the tax that Canada, he believed, would have applied to

8  that -- to that amount.  And that ended up changing the

9  sentence from six months to, in the case of the

10  Pasquantino brothers, 57 months, and the -- and, in the

11  case of Mr. Hilts, 21 months.  So the bulk of the sentence

12  was based on the Canadian tax law and our courts making

13  that assessment.

14          JUSTICE GINSBURG:  A judge making that

15  assessment.

16          MS. BRILL:  The judge made the sentence -- made

17  the assessment at sentencing, yes.  What the -- what the

18  -- what the Government did in this case was to submit,

19  very self-consciously, all of the issues of Canadian tax

20  law to the jury.  And the Assistant U.S. Attorney said

21  this to the Fourth Circuit en banc panel several times,

22  that they were presenting these matters of Canadian tax

23  law as factual issues for the jury to find.  But,

24  ultimately, in sentencing, it was -- it was the court that

25  ended up imposing and elevating that sentence.

21

1          If there aren't further questions, I'd like to

2     reserve the balance of my time.

3          JUSTICE STEVENS:  Mr. Dreeben.

4          ORAL ARGUMENT OF MICHAEL R. DREEBEN

5               ON BEHALF OF RESPONDENT

6          MR. DREEBEN:  Justice Stevens, and may it please

7     the Court:

8          A prosecution for wire fraud based on defrauding

9     a foreign government of taxes serves at least four

10    distinct United States prosecutorial interests.

11         The first is that the creation of schemes to

12    defraud frequently spawns collateral criminal conduct in

13    the United States above and beyond the fraudulent scheme

14    itself.  Here, for example, one of the defendants was

15    charged in the indictment with using a gun in relation to

16    the charged wire fraud scheme.

17         Second --

18         JUSTICE GINSBURG:  Where?  Using a gun where?

19         MR. DREEBEN:  In the United States, Justice

20    Ginsburg.

21         JUSTICE SCALIA:  Well, why didn't you prosecute

22    him for that?

23         MR. DREEBEN:  That crime depended upon the

24    validity of the wire fraud charges, because the crime was

25    use of a gun during in relation to this wire fraud

22

1    scheme.

2          JUSTICE SOUTER:  But that really doesn't get you

3    anywhere, does it?  I mean, if the United States says, "We

4    don't want this gun offense to be prosecuted unless

5    there's a wire fraud prosecution," that doesn't tell you

6    anything as to whether there ought to be a wire fraud

7    prosecution.

8          MR. DREEBEN:  Well, what it tells you, Justice

9    Souter, is why the United States has an interest in

10   enforcing a law that facially is written to cover schemes

11   to defraud that are carried out using the United States

12   wires.

13         JUSTICE SCALIA:  But that's -- but that's a

14   reason for extending the statute to everything, to

15   everything --

16         MR. DREEBEN:  No, Justice Scalia --

17         JUSTICE SCALIA:  -- reading "property" to mean

18   anything at all.  I mean, what you're saying is, the broader

19   you read this statute, the more bad guys we're going to

20   catch.  I'll stipulate that.  Of course it's true.

21         MR. DREEBEN:  Well, Justice Scalia, I'm starting

22   from the proposition that the language of the wire fraud

23   statute textually applies to this scheme, and Petitioner's

24   argument is that, because of the common law revenue rule,

25   the statute should be read to exclude schemes to defraud a

23

1    foreign government of tax revenue.  And the fact that a

2    foreign government is defrauded of tax revenue does not

3    mean that the United States does not have an independent

4    interest in rooting out that scheme and prosecuting it.

5           In addition to the collateral criminal conduct

6    that such schemes can spawn, the creation of such schemes

7    indicates a criminal mind and a criminal group that can

8    turn its techniques for used -- using to smuggle into

9    Canada, also to smuggle back into the United States or to

10   victimize other victims in the United States.

11          JUSTICE SCALIA:  What about evading a Cuban tax

12   law that we think -- that many people would think is an

13   unjust tax law?  I mean, one of the things I'm worried

14   about is that this gets us into foreign policy.  Are you

15   sure that we always want to enforce the tax laws of

16   foreign countries through this fraud statute, no matter

17   what those tax laws happen to be?

18          MR. DREEBEN:  The United States has

19   prosecutorial discretion to determine when to invoke the

20   statute and in what interests it should be served.

21          JUSTICE SCALIA:  It may well, but when it comes

22   here, this Court is going to have to decide -- we'll just

23   approve whatever you want to prosecute and let you not

24   prosecute whatever you want?

25          MR. DREEBEN:  There is no provision in the

24

1    statute, Justice Scalia, for this Court to second-guess

2    foreign-policy determinations that are made --

3           JUSTICE BREYER:  Well, not just foreign policy.

4    The White Russians come here because they don't want to

5    pay Lenin's taxes designed to equalize all individuals, in

6    terms of property.  Country A has a tax law that makes

7    everybody a criminal because nobody really ever pays all

8    the taxes.  Country C has a set of laws that tax bibles.

9    Country D has a -- I mean, you know, we can spin out the

10   examples endlessly, and they're not farfetched.

11          So take all the arguments from last week, called

12   "any court arguments," cross- -- or two days ago -- just

13   let's cross-reference them.  The problem is complexity of

14   tax law.  The problem is many, many, many would be

15   contrary to American policy.  And the problem is, nobody

16   really knows what they are; indeed, they don't even know

17   what American tax law is, no single individual, I suspect.

18   Let's put in Italy, France, Byelorussia, Belarus, Ukraine,

19   Saudi Arabia, and 35,000 others.  Everybody becomes a

20   criminal.  And then we say, "Don't worry, we'll only

21   prosecute the real bad ones."  That's the argument, I

22   think, on the other side, and I'd like to hear your

23   response.

24          MR. DREEBEN:  Justice Breyer, I don't think

25   there's any reason to assume that everyone becomes a

1111 14th Street, NW Suite 400       Alderson Reporting Company       Washington, DC 20005
1-800-FOR-DEPO

```
 1   criminal.  What this --
 2            JUSTICE BREYER:  No, only people who come over
 3   here because they don't want to pay taxes in those
 4   countries.  Sometimes we would agree with them --
 5            MR. DREEBEN:  Justice Breyer, in order to
 6   violate the wire fraud statute, you have to use deception
 7   in order to deprive another --
 8            JUSTICE BREYER:  Yes, they don't tell Lenin that
 9   they're coming --
10            MR. DREEBEN:  Well, that wouldn't involve the
11   use of the United States wires --
12            JUSTICE BREYER:  -- and they write to each
13   other.  They have a cousin, in Brooklyn, who forwards them
14   the money to get out.
15            MR. DREEBEN:  Justice Breyer, if one stipulates
16   that that violates the wire fraud statute or that there's
17   enough conduct that does, the question still comes down to
18   whether the United States chooses to prosecute that case.
19   This is not a --
20            JUSTICE SCALIA:  The question comes down to
21   whether this statute, which doesn't have to be read that
22   way, ought to be read that way, whether it makes sense to
23   read it that way.  What about -- does Canada have an
24   income tax?
25            MR. DREEBEN:  I'm not sure of Canadian tax law.
```

26

1              JUSTICE SCALIA:  Well, let's assume --

2              MR. DREEBEN:  In the context of this case --

3              JUSTICE SCALIA:  -- Canada has an income tax.

4     Would you -- would you prosecute a Canadian who files a

5     deceptive Canadian income tax return?

6              MR. DREEBEN:  Not for using Canadian facilities

7     to do so.

8              JUSTICE SCALIA:  No, no, no, from this country.

9     He's -- you know, he's a snow goose and is in Florida when

10    he files his return.

11             JUSTICE SOUTER:  He files it electronically.

12             JUSTICE SCALIA:  Yeah.

13             MR. DREEBEN:  The wire fraud statute is

14    applicable to schemes to defraud, generally speaking.  The

15    questions in this case are whether there is a common law

16    rule that should be read to provide background.

17             JUSTICE BREYER:  One reason for it -- I just --

18    you don't seem to know completely about Canadian law.  How

19    much do you know about the tax law of Vietnam?  Because

20    Los Angeles is filled with Vietnamese refugees, many

21    communities of such people in the United States.  Do we

22    know how many of them perhaps might owe taxes under the

23    law of Vietnam, and maybe are talking to each other about

24    whether they really want to pay it?

25             MR. DREEBEN:  I don't think this is a realistic

27

1    problem, Justice Breyer, that should require the Court not

2    to read a statute whose language --

3           JUSTICE BREYER:  Well, what about the wealth tax

4    in France?

5           MR. DREEBEN:  There are a variety of taxing

6    schemes all across the world.  The question that the

7    United States has to make when it determines whether to

8    prosecute a wire fraud scheme is whether it's in interest

9    -- in the interest --

10          JUSTICE STEVENS:  Mr. Dreeben, at the beginning

11   of your argument, you said there were four federal

12   interests you were going to identify.  You've been able to

13   identify one.  You don't want them running around with guns.

14   What are the other three?

15          MR. DREEBEN:  The other three are --

16          MR. DREEBEN:  The second one, which I began to

17   allude to before hearing some questions about -- foreign

18   government.

19          JUSTICE STEVENS: Before you were asked a brief

20   question.

21          MR. DREEBEN:  -- are that people who engage in

22   schemes in this country are capable of then using the same

23   techniques against victims in this country.  The third

24   reason is that the creation of international schemes to

25   defraud, like the smuggling scheme in this case, poses

28

1     independent threats to the United States Government

2     because international criminal organizations are

3     particularly difficult for the United States to deal with.

4     And the fourth reason is that it is an offense to a

5     foreign government, the United States Executive Branch may

6     conclude, to allow our soil and our wires to be used to

7     perpetrate a smuggling scheme against a foreign government

8     with the United States doing nothing about it.

9          JUSTICE GINSBURG:  Well, if we're concerned

10    about offending the foreign country, then isn't the way to

11    go, in fact, the way Congress has gone in this area, we

12    negotiate treaties?  I mean, one of the reasons why we go

13    the treaty route are the kind of problems that Justice

14    Breyer brought up, we want to have reciprocal treaties.

15    We want two things.  We want to make sure that it's a

16    basically fair system that we're dealing with.  On the

17    other hand, we want to say, "If we do anything with

18    respect to your taxes, we want to make sure that we get

19    the same benefit from you with respect to ours."

20          So never mind the revenue rule, isn't it

21    pervasive that -- when it comes to enforcing tax claims,

22    that the route that Congress has chosen to go, and the

23    Executive, as well, has been the treaty route?

24          MR. DREEBEN:  Justice Ginsburg, those are tax

25    treaties designed to mutually assist the countries to

29

1    collect taxes.  This is a prosecution directed at fraud.

2    The collection of taxes in a cooperative, reciprocal

3    manner between governments implicates very different

4    interests than the United States has when it seeks to

5    combat people who have intended to devise, or have

6    devised, a scheme to defraud in the --

7              JUSTICE GINSBURG:  One of --

8              MR. DREEBEN:  -- United States.

9              JUSTICE GINSBURG:  -- one of -- one of the last

10   interests that you mentioned, about offending foreign

11   governments, well, on the face of this, it would seem, the

12   one that -- the country that's been done out of taxes is

13   Canada, not the United States.  So, we should help Canada,

14   if it's interested in collecting revenue from these people

15   or trying them for a criminal offense, to do that.  It --

16   I asked Ms. Brill, Have they been indicted in Canada?  She

17   said yes, but she said it's -- they had not -- there has

18   not been a request for extradition.  Is that -- is that --

19             MR. DREEBEN:  That's my understanding, as well,

20   Justice Ginsburg.  And the pursuit of this prosecution by

21   the United States reflects that when United States

22   citizens engage in fraudulent conduct on our soil, our

23   Government has a distinct interest, from Canada's

24   interest, in pursuing the prosecution of this case.

25             JUSTICE SCALIA:  How long has this statute been

                              30

1    on the books, this wire fraud statute?  Pretty old

2    statute.

3              MR. DREEBEN:  1952.  And its antecedents are the

4    mail fraud statute, which was enacted in 1872.

5              JUSTICE SCALIA:  How many prosecutions like this

6    have there been?  When was the first one?

7              MR. DREEBEN:  This --

8              JUSTICE SCALIA:  For, you know, using the mails

9    or interstate commerce to defraud a foreign government of

10   taxes?

11             MR. DREEBEN:  This type of prosecution became

12   more common in the 1980s when Canada greatly increased its

13   taxes on importation of tobacco and alcohol.

14             JUSTICE SCALIA:  More common, or didn't exist at

15   all before the 19- -- do you know of any case before --

16             MR. DREEBEN:  No, I'm not aware of any case

17   before --

18             JUSTICE SCALIA:  -- before the 1980s?

19             MR. DREEBEN:  That's right.

20             JUSTICE SCALIA:  Doesn't that suggest to you

21   that the statute isn't naturally read to cover stuff like

22   that?

23             MR. DREEBEN:  No, I think the statute --

24             JUSTICE SCALIA:  We didn't have smugglers before

25   then?

31

1          MR. DREEBEN:  No, of course there were smugglers

2     before then, but the statute, on its face, is broad.  And

3     the only justification -- the only two justifications for

4     seeking to read it narrowly are, first, that there's a

5     common law revenue rule that forms a backdrop for the

6     construction of the statute.  That is wrong, the

7     Government submits, because there is no common law revenue

8     rule that has ever been articulated that says one country

9     cannot prosecute people in that country for defrauding a

10    foreign government of tax --

11          JUSTICE SCALIA:  What's the second reason?

12          MR. DREEBEN:  The second reason is the claim

13    that to deprive a foreign government of money by not

14    paying tax revenues is not common law fraud.

15          JUSTICE SCALIA:  Okay.  Well, and you have

16    arguments against both of those two.  Which arguments

17    are at least -- at least -- arguable?  What about a

18    third rule, the rule of lenity?

19          MR. DREEBEN:  Well, Justice Scalia --

20          JUSTICE SCALIA:  If we -- if we are unsure, if

21    it's a close question whether it's property, if it's a

22    close question whether we're enforcing the tax laws of

23    Canada by prosecuting somebody for violating the tax laws

24    of Canada, if that's a closed question, why doesn't the

25    rule of lenity apply?

32

1    MR. DREEBEN:  Well, if the Court concluded that

2    the question was not susceptible of resolution by resort

3    to the usual tools of statutory construction, then you

4    would apply the rule of lenity.  But it's our submission

5    that neither of these two theories --

6    JUSTICE STEVENS:  But may I ask this question?

7    I think you have conceded, in a footnote -- and maybe

8    you're -- almost conceded -- that if this were a RICO

9    case, a civil RICO case, that the Congress enacted the

10   RICO statute against this background rule and that perhaps

11   the RICO case could not go forward.  What if it were a

12   federal RICO case and -- the same facts -- would the RICO

13   statute be qualified by the revenue rule?

14   MR. DREEBEN:  No, it would not, Justice Stevens,

15   and that's because of the precise distinction that I drew

16   in response to Justice Scalia's question.  This is a suit

17   by the United States Government, as Plaintiff, not by a

18   foreign government, as Plaintiff or prosecutor.  The

19   revenue rule essentially concerned with interests of

20   sovereignty.  One foreign government should not be able to

21   come into our courts and enforce its sovereign power by

22   using our courts to collect taxes from our citizens.

23   JUSTICE BREYER:  What about the other reasons

24   underlying it, which is what I was trying to get at

25   before?  I see, literally, that the common law -- you

33

1    know, the enforcement rule, this is not literally

2    enforcement.  But what I was driving at with my questions

3    is, even though literally it's not, the problems of

4    complexity, the problems of knowability, and the problems

5    of there being so many, many foreign tax laws that we

6    might think are basically unfair, that those

7    considerations apply here, just as they do with the

8    enforcement rule, and then add the fact that turning

9    people into criminals under threat of prosecution by the

10   Federal Government is really very much equivalent to

11   enforcing the foreign rule in a court.  I mean, that's the

12   whole thing spelled out.  And I meant it seriously, though

13   I used foreign examples to, sort of, drive the point home.

14           What is your response to that?

15           MR. DREEBEN:  Well, Justice Breyer, first of

16   all, the complexity of foreign tax law is something that

17   would defeat a federal prosecution in which we need to

18   show specific intent to defraud if the law were not

19   sufficiently clear for us to be able to meet that burden.

20   This case illustrates the kind of prosecution that will be

21   brought.  There are taxes that are due upon the

22   importation of alcohol.  The Petitioners arranged, through

23   the wires, to bring alcohol from Maryland up to New York,

24   and then they got it across the border by not answering

25   questions when asked by customs officials and by not going

1    to secondary inspection when they were asked.  In order to

2    bring a criminal prosecution that requires specific intent

3    to defraud, the government is not going to be relying on

4    obscure systems.

5            As to the concern about the enforcement of tax

6    systems that the United States may believe are -- is

7    unfair, that is the prerogative of the Executive Branch to

8    determine in deciding whether a prosecution should be

9    brought in a particular case.  This Court has repeatedly

10   recognized that the Executive Branch is the preeminent

11   branch in the area of foreign affairs --

12           JUSTICE GINSBURG:  To go to one more aspect of

13   the statute which I don't think you've addressed, Congress

14   said that -- with respect to the wire fraud and mail fraud

15   and, I think, other things -- that restitution to the

16   victim is mandatory, that it's not left up to the

17   government to decide restitution or not.  Except here

18   restitution sounds very much like enforcing Canada's

19   taxes, so you have conceded no restitution.  But it seems

20   to me that Congress thought of the wire/mail fraud

21   statutes as cases in which there would be restitution, and

22   that suggests that they didn't envision foreign taxes to

23   be the object of the scheme to defraud.

24           MR. DREEBEN:  Justice Ginsburg, the syllogism

25   doesn't track, because the entire scope of the revenue

35

1    rule, as defined in the common law cases that can be

2    pointed to as the background principle, has to do with a

3    foreign government, or someone acting on its behalf,

4    coming into this country's courts to enforce its tax

5    rules.  Here what you have is the United States Government

6    determining that it is in the interest of the United

7    States to bring a criminal prosecution.

8         Now, in this case, the prosecutor did concede

9    below that restitution was not appropriately ordered.

10   That's not the position of the United States.  The

11   position of the United States is that restitution under

12   the mandatory statute should be ordered and it does not

13   infringe the revenue rule.  But there are --

14        JUSTICE GINSBURG:  Now, how could that be,

15   because restitution is to the victim?  The victim is

16   Canada.  You collect Congress -- or Canada's tax, and you

17   give it to Canada.  Is there any other kind of

18   restitution?

19        MR. DREEBEN:  No, there isn't, Justice Ginsburg,

20   but the revenue rule isn't of such a broad scope that it

21   applies to efforts by the United States Government to

22   secure punishment by -- for a criminal conviction.

23        But, Justice Ginsburg, if the Court were to

24   disagree with that and were to believe that restitution,

25   even when it's been sought by the United States -- not by

36

1  a foreign government, in its own right, with the power to

2  instigate a lawsuit -- but that even when the United

3  States does it, that somehow falls within the parameters

4  of the common law revenue rule, then the answer to that

5  problem would be to interpret the restitution statute

6  against the background of the revenue rule, not to

7  interpret the wire fraud statute against the background of

8  the revenue rule and hold that a prosecution by the United

9  States is wholly barred.

10         The Petitioner's submission here is really

11  rather extraordinary --

12         JUSTICE SCALIA:  The restitution statute is not

13  ambiguous at all; whereas, this statute has a number of

14  ambiguities in it.  And if I had to find my way out of the

15  restitution problem, I would pick the ambiguous statute to

16  get out, rather than simply saying, "Well, though this

17  restitution statute says this categorically, we will

18  ignore it, because if we didn't ignore it, we would be

19  enforcing the revenue laws of another country."  There's

20  nothing against enforcing the revenue laws of another

21  country, if we want to; this is just a question of

22  statutory interpretation.  Should this ambiguous statute

23  be interpreted that way?  If Congress said, "We're going

24  to enforce Canada's tax laws," there's nothing wrong with

25  that.  But --

```
 1              MR. DREEBEN:  Justice Scalia --

 2              JUSTICE SCALIA:  So you have two statutes.  One

 3    of them seems to be quite ambiguous.  The other one is

 4    categorical, you get restitution in all cases.  Now, how

 5    do I wiggle out of it?

 6              MR. DREEBEN:  There's a difference --

 7              JUSTICE SCALIA:  Obviously, I wiggle out of

 8    it with the ambiguous statute.

 9              MR. DREEBEN:   -- there's a difference, Justice

10    Scalia, between an ambiguous statute and a broad statute.

11    The wire fraud statute is unequivocally broad, and it has

12    been so interpreted.  It's not ambiguous on the question

13    of whether it applies to schemes to defraud that may

14    involve foreign victims; it says "any scheme to defraud."

15    And I think, as Justice Kennedy's questions pointed out

16    earlier, if there were a scheme to defraud a foreign

17    business interest in Canada or a foreign governmental

18    interest in Canada relating to some commercial venture,

19    the wire fraud statute would apply, and --

20              JUSTICE BREYER:  What about -- what about a

21    scheme --

22              JUSTICE SCALIA:  But you haven't told me -- you

23    haven't told me how you get out of the restitution

24    statute.  There's no ambiguity there, and it is not a rule

25    of law that you can't -- it's unconstitutional to enforce
```

38

1    the tax laws of Canada.  Since it's entirely feasible, and

2    since the text is categorical, how do you get out of the

3    restitution statute?

4              MR. DREEBEN:  Here is how I get out of it,

5    Justice Scalia.  If you think, as I do not, that the

6    revenue rule would bar restitution at the behest of the

7    United States in a criminal prosecution, there is a

8    background principle that says when there is an

9    established rule of the common law, Congress legislates

10   against that background, and unless it makes its intent

11   clear and unequivocal to overcome that background rule of

12   the common law, then the statute will not be interpreted

13   to be in derogation of it.  It was that principle that

14   formed the basis for the government's view that Canada

15   cannot come in under the RICO statute --

16             JUSTICE GINSBURG:  Well, that view is in --

17   somewhat in tension with your view that the common law

18   revenue rule doesn't stand in the way of this prosecution.

19   If you have to interpret the statute in light of the

20   general rule that one country doesn't mess with another

21   country's taxes, absent a treaty.

22             MR. DREEBEN:  Well, Justice Ginsburg, there is

23   no common law rule that one country doesn't mess with

24   another country's taxes.  What there are, are a set of

25   cases that deal with specific problems in which foreign

39

1    taxes were at issue.  And in all of the 20th century

2    versions of this problem, what you had is a foreign

3    government or an entity, acting at the behest of a foreign

4    government, coming into another country seeking to use

5    that country's courts to enforce its own tax rules.  And

6    in that context, the justifications for saying that one

7    country will not enforce another country's revenue laws

8    have to do with the sovereignty interests of the host

9    country.

10           One country, when it seeks to obtain revenue to

11   carry out its own governmental policies, is doing

12   something fundamental to its sovereign existence, and

13   there's no obligation of the United States to assist the

14   foreign government in using its court system to achieve

15   those independent sovereign aims, no prohibition on it,

16   either.  As Justice Scalia pointed out, it's not

17   unconstitutional, if Congress wanted to allow it.  But

18   countries, historically, have not.  And that principle

19   does form an important backdrop --

20           JUSTICE BREYER:  Have countries also -- just --

21   here, I don't know, in respect to the principle -- would

22   it have been viewed as contrary to the principle if a

23   country were to pass a law -- say, England were to pass a

24   law saying it is a crime in England not to pay French

25   taxes?  I'm not saying they couldn't do it; I'm just

40

1    saying, would a law like that, saying it is a crime in

2    England not to pay French taxes -- would it have been

3    viewed as contrary to an abrogation of -- or a -- you

4    know, whatever you call it -- a derogation from the common

5    law revenue rule?

6              MR. DREEBEN:  I think that that's essentially

7    the same question in this case, with the one significant

8    difference that here there is a domestic --

9              JUSTICE BREYER:  But do you see why I want to

10   characterize it?  I mean, would you characterize -- my

11   criminal statute's absolutely clear -- the clear is, it is

12   a crime in England not to pay French taxes.  Now, would

13   you, or would scholars, or whoever, knew about the common

14   law revenue rule, would they have said, "There is a

15   derogation from the common law revenue rule," or would

16   they have said, "It has nothing to do with it"?

17             MR. DREEBEN:  Well, I don't know what scholars

18   would have said about it --

19             JUSTICE BREYER:  No, what would you have said?

20             MR. DREEBEN:  This is what I would say

21   about it.

22             JUSTICE BREYER:  Yeah.

23             MR. DREEBEN:  When you're dealing with the

24   principle that a statute of the United States will not be

25   construed to be in derogation of a common law unless it's

41

1    clear that that's its purpose, the Court should be very

2    careful in defining what the parameters of the common law

3    are.  The Court should not take a common law rule and

4    treat it as some dynamic entity that has capability of

5    growing a dimension that is not consistent with its

6    purposes and that it had never assumed in any decided case

7    as a means of telling Congress, "You can't do what you

8    have done."

9         So I would say, Justice Breyer --

10        JUSTICE SCALIA:  We haven't told -- no, no, no,

11   no, no, no, we're not telling Congress, "You can't do what

12   you have done."  We're saying, "Congress hasn't done

13   this."

14        MR. DREEBEN:  Well, the only reason you would

15   say that Congress hasn't done it, Justice Scalia, is if

16   you concluded that -- and I would ask Petitioners what

17   their best citations are, because I have not been able to

18   find them -- what cases indicate that a country cannot

19   bring the kind of prosecution that the United States did

20   here to vindicate its own independent sovereign --

21        JUSTICE BREYER:  Nobody says they can't do it.

22   That's why I asked you my question.  My question is simply

23   whether you would consider an absolutely clear law -- we

24   will -- we -- it is a crime not to pay your French taxes.

25   I'm asking whether you would consider that -- I'm not

42

1    saying they can't do it; I just want to know -- would it

2    be in derogation of the common law principle?

3              MR. DREEBEN:  It would probably be in derogation

4    of a more --

5              JUSTICE BREYER:  That's what --

6              MR. DREEBEN:  -- fundamental principle.

7              MR. DREEBEN:  Not the revenue rule --

8              JUSTICE BREYER:  Not the --

9              MR. DREEBEN:  -- but a more fundamental

10   principle that one country usually does not legislate with

11   respect to extraterritorial acts.

12             JUSTICE BREYER:  That would be another one, too.

13             MR. DREEBEN:  But if you --

14             JUSTICE BREYER:  Suppose they -- I -- that's why

15   I want to know --

16             MR. DREEBEN:  But that's not applicable here,

17   either, Justice Breyer, because the crime involves wire

18   fraud in the United States.

19             JUSTICE SOUTER:  Yeah, but why isn't it applicable

20   to the extent that there seems to be a mandatory obligation

21   to order restitution?  And it seems to me that the

22   restitution that would be ordered would be just as much in

23   derogation of the common law principle as the out-and-out

24   collection in Justice Breyer's example.

25             MR. DREEBEN:  Justice Souter, again, to say that

43

1      it's in derogation of the common law principle assumes

2      that the common law principle has applicability to one

3      country seeking to vindicate interests of its --

4              JUSTICE SOUTER:  Well, but I -- a moment ago,

5      you said, "Okay, we'll assume that there would be some

6      derogation," in Justice Breyer's example.  I don't see why

7      you don't come to the same conclusion with respect to the

8      restitution aspect here.

9              MR. DREEBEN:  Because the derogation that I was

10     talking about with respect to Justice Breyer is punishing

11     conduct that occurs entirely extraterritorially.  This is

12     not conduct that occurs entirely --

13             JUSTICE SOUTER:  Yeah, but the revenue -- the

14     revenue rule does not rest simply on the rationale of non-

15     extraterritorial enforcement.  It has -- it has other

16     rationales: difficulty of understanding what the revenue

17     rule is; the -- you know, the problems of policy; there

18     are lots of revenue rules in foreign countries that we

19     certainly wouldn't want to enforce, and so on.  It's not

20     just extraterritoriality.  And those -- those policies

21     would be just as much implicated by the -- by the

22     restitution as by the out-and-out enforcement in Justice

23     Breyer's example.

24             MR. DREEBEN:  Well, Justice Souter, I think that

25     the policies underlying the revenue rule are narrower than

1111 14th Street, NW Suite 400          Alderson Reporting Company          Washington, DC 20005
                                        1-800-FOR-DEPO

1    the ones that you have articulated; but, even more to the

2    point, they are not justifications that found their way

3    into any holdings that would lead a reasonable legislator

4    in 1952, when the wire fraud statute was enacted, to

5    conclude that this is a rule that I'm going to have to

6    specifically --

7            JUSTICE SOUTER:  Well, perhaps --

8            JUSTICE SCALIA:  Well -- I'm sorry.

9            JUSTICE SOUTER:  No, go on.

10           JUSTICE SCALIA:  No, you.

11           JUSTICE SOUTER:  I was going to say, perhaps

12   there were no specific holdings, because it would have

13   been regarded as, kind of, a bizarre derogation of the

14   rule in the first place.  Nobody had dreamed up this

15   scheme earlier.

16           JUSTICE SCALIA:  I was about to say the same --

17   the same thing.  You keep saying there are no cases that

18   do this.  Are there -- are there -- are there cases,

19   before 1980, which do what you want to do -- that is, to

20   use our fraud law, or something, to effectively enforce

21   Canada's -- or some foreign country's tax law?

22           MR. DREEBEN:  No, but what I would say about --

23           JUSTICE SCALIA:  No.

24           MR. DREEBEN:  -- the revenue rule is that it is

25   a shrinking principle of the common law, not one that has

45

1  been growing.  It originally started out as a principle

2  that allowed countries to avoid invalidating contracts

3  that they believed were in furtherance of commerce.  It

4  gradually came under attack, because what it said is that

5  the United States will not notice that a foreign country's

6  laws have been violated in the formation of a contract,

7  and so the contract will be enforced.  Commentators

8  recognized that that was contrary to principles of comity

9  and recognition that each country does have a reciprocal

10  interest in acknowledging each other's laws.

11      In the 20th century, those contract cases

12  completely drop out of the picture, and what becomes left

13  are sovereignty cases where a country is seeking to exert

14  its sovereign power inside the United States or inside a

15  foreign country -- the United States, itself, tried it

16  once in Canada -- to collect taxes.  And countries said,

17  "We're not going to do that.  We're going to leave it to

18  the treaty process."

19      But the rationales that Justice Breyer and

20  Justice Souter have articulated, about complexity of

21  foreign law and odious foreign tax systems, have never

22  been the driving force behind the revenue rule.  It's been

23  --

24      JUSTICE BREYER:  I got your point.  I think it

25  is that -- in my answer to my clear example, you would

46

1   say no, that's not in derogation for the reason that

2   there's an independent local reason for doing it.  It's

3   not being done to -- whether it has that effect or not,

4   it's not being done in order to collect the foreign tax.

5           MR. DREEBEN:  That's right.

6           JUSTICE BREYER:  That's been your response

7   throughout.

8           MR. DREEBEN:  That is correct.

9           JUSTICE BREYER:  Okay, I --

10          MR. DREEBEN:  What you have instead is a law of

11  the United States that's enacted to serve perfectly valid

12  interests that the United States Government has in rooting

13  out fraud in this country and in dealing with schemes to

14  defraud that are created here.  And for the Court to say

15  that, "We don't like these kinds of prosecutions, because

16  we're concerned about really bad foreign tax systems, and

17  we're concerned about complicated law, and we're concerned

18  that some common law rule that had never actually assumed

19  the scope that Petitioners ascribed to it, should be

20  formed -- read as the background principle for the

21  interpretation of this statute" is not a principle that

22  finds any support in the construction of federal --

23          JUSTICE GINSBURG:  Mr. Dreeben, can I ask you --

24  this is such a curious case.  You were very candid in

25  telling us that when Canada put these astronomical taxes

47

1    on tobacco and alcohol, that was almost an invitation to

2    smugglers.  Did we have any discussions with Canada -- I

3    mean, they do have that border, which is rather easy to

4    cross -- about what we were going to do when they put the

5    taxes on liquor sky-high?

6            MR. DREEBEN:  I am not aware, Justice Ginsburg,

7    of what specific law enforcement conversations occurred,

8    but I can tell you that there is extensive law enforcement

9    cooperation with Canada, as a close neighbor, and that the

10   interests of the United States very much do favor our

11   policing against smuggling here, and Canada policing

12   against smuggling there.

13           Thank you.

14           JUSTICE STEVENS:  Thank you, Mr. Dreeben.

15           Ms. Brill, you have four-and-a-half minutes

16   left.

17             REBUTTAL ARGUMENT OF LAURA W. BRILL

18                  ON BEHALF OF PETITIONERS

19           MS. BRILL:  Thank you.

20           The common law cases universally say that it

21   does not matter who is bringing the claim.  It can be the

22   foreign government or it can be another person.

23           JUSTICE STEVENS:  Can I just ask you to tell us

24   what your strongest case is?  Because they did raise that

25   question.

1          MS. BRILL:  Sure.  On the -- on the issue of the

2     identity of the person bringing the claim, the contract

3     cases, Holman and Boucher, stand for that proposition, and

4     the Peter Buchanan case, which came down in 1950, just

5     before the wire fraud statute was enacted -- this was in

6     the Appellate Court in Ireland -- it says, "It is not a

7     question whether the plaintiff is a foreign state or the

8     representative of a foreign state or its revenue

9     authority.  In every case, the substance of a claim must

10    be scrutinized.  And if it then appears that it is really

11    a suit brought for the purpose of collecting the debts of

12    a foreign revenue, it must be rejected."  That's at 1955

13    A.C. 529.

14          And so with the -- with the Mandatory

15    Restitution Act, this clearly is something to collect the

16    debts of a foreign nation.  And the sentencing scheme that

17    Justice Ginsburg alluded to earlier, in which the

18    sentences were enhanced based on the intended loss,

19    demonstrate that this is an enforcement action.

20          Stringam versus Dubois, which is an Alberta

21    case from 1992, involving -- the plaintiff there was an

22    executor of a probate estate, and the court said, "The

23    identity of the plaintiff in the action is not vital if

24    the action indirectly has the effect of enforcing revenue

25    laws of a foreign country."  That's at 135 A.C. at page

1111 14th Street, NW Suite 400          Alderson Reporting Company          Washington, DC 20005
1-800-FOR-DEPO

1     70.

2             And the way the revenue rule has been cited

3     repeatedly is that it -- what it prevents is not just

4     direct enforcement, but direct or indirect enforcement.

5     And so it is -- the fact that there have not been criminal

6     prosecutions, it clearly would have been in derogation of

7     the common law for a -- for England to pass a statute

8     saying it is criminal in England to break the laws of

9     France.

10            JUSTICE BREYER:  See, he's saying it isn't, for

11    the reason that, he says, that if England did it for

12    independent reasons, it wasn't doing it because it wanted

13    to help France get it's money, that then it wouldn't have

14    been in derogation.  Of course, it would have been legal,

15    either way, but he says it wouldn't have been in

16    derogation, for that reason.

17            MS. BRILL:  Right.  Well, it clearly would have.

18    There was no common law practice -- we have -- we have not

19    found, in all the research -- and the Government has not

20    found -- any example of a criminal prosecution -- not just

21    in this country; anywhere in the world -- to -- deriving

22    from the violation of a foreign government's tax.  And so

23    --

24            JUSTICE SOUTER:  You're saying, in effect, that

25    derogation is an effects test, not an intent test.

50

 1                MS. BRILL:  Yes, Your Honor.  Yes, Justice

 2    Souter.

 3                And the -- in terms of what the government's

 4    interests are, there were no deceptive acts in this

 5    country.  The way the Government gets a material

 6    misstatement is by a failure to disclose at the Canadian

 7    border, which only -- even though they did not put in

 8    evidence of what the -- that Canada even had a law

 9    requiring disclosure, the only way there could have been

10    any kind of material misstatement would be if Canadian law

11    required it, not if -- not anything that happened in the

12    United States.

13                In Cleveland, the Court was very clear to point

14    out -- one of the reasons to adopt a rule of lenity in

15    interpreting the mail fraud statute and the wire fraud

16    statute is because violations serve as a predicate for

17    RICO actions and for money-laundering violations.  And so

18    what the government's position is, is that we should carve

19    out this ad-hoc exception and allow wire fraud

20    prosecution, even though we would not allow any kind of a

21    civil RICO action and even though we're going to have an

22    ad-hoc exception for the Mandatory Victims Restitution

23    Act.  But what the Court said in Cleveland is, the way we

24    should do this is by adopting a proper interpretation in

25    the first place, not by -- of the wire fraud statute --

                               51

1    not by having ad-hoc exceptions.

2          And the reference to prosecutorial discretion

3    that there should be faith that the Government will only

4    prosecute, I guess, what the Government regards as

5    exceptional cases is not something that can provide any

6    business involved in an international transaction with any

7    -- with any comfort.

8          And thank you very much.

9          JUSTICE STEVENS:   Thank you.   The case is

10   submitted.

11          (Whereupon, at 12:13 p.m., the case in the

12   above-entitled matter was submitted.)

13

14

15

16

17

18

19

20

21

22

23

24

25

# Exhibit 24

No. 01-1317

# In the Supreme Court of the United States

ATTORNEY GENERAL OF CANADA, PETITIONER

*v.*

R.J. REYNOLDS TOBACCO HOLDINGS, INC., ET AL.

*ON PETITION FOR A WRIT OF CERTIORARI
TO THE UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT*

## BRIEF FOR THE UNITED STATES
## AS AMICUS CURIAE

WILLIAM H. TAFT, IV
*Legal Advisor
Department of State
Washington, D.C. 20520*

GEORGE B. WOLFE
*Deputy General Counsel
Department of the Treasury
Washington, D.C. 20220*

LAWRENCE G. WALLACE
*Acting Solicitor General
Counsel of Record*

ROBERT D. McCALLUM, JR.
MICHAEL CHERTOFF
EILEEN J. O'CONNOR
*Assistant Attorneys General*

MICHAEL R. DREEBEN
*Deputy Solicitor General*

IRVING L. GORNSTEIN
*Assistant to the Solicitor
General*

MARK B. STERN
DOUGLAS HALLWARD-DRIEMEIER
*Attorneys*

*Department of Justice
Washington, D.C. 20530
(202) 514–2217*

## QUESTION PRESENTED

Whether the "revenue rule" precludes a foreign sovereign from bringing a civil RICO claim where the foreign sovereign's alleged injury is lost tax revenue and associated law enforcement costs.

(I)

## TABLE OF CONTENTS

|  | Page |
|---|---|
| Statement | 1 |
| Discussion | 6 |
| Conclusion | 17 |

## TABLE OF AUTHORITIES

Cases:

*Astoria Federal Sav. & Loan Ass'n* v. *Solimino*, 501
   U.S. 104 (1991) ........................................ 11

*Banco Do Brasil, S.A.* v. *A.C. Israel Commodity
   Co.*, 239 N.Y.S. 2d 872 (1963) ........................ 8, 12

*Banco Nacional de Cuba* v. *Sabbatino*, 376 U.S. 398
   (1964) ................................................ 8

*Boucher* v. *Lawson*, 95 Eng. Rep. 53 (K. B. 1734) ........... 7

*European Community* v. *RJR Nabisco, Inc.*, 150
   F. Supp. 2d 456 (E.D.N.Y. 2001) ...................... 15

*Her Majesty the Queen in Right of the Province of
   British Columbia* v. *Gilbertson*, 597 F.2d 1161 (9th
   Cir. 1979) ........................................... 8

*Holman* v. *Johnson*, 98 Eng. Rep. 1120 (1775) .............. 7-8

*Oklahoma* v. *Gulf, Colorado & Santa Fe Ry.*, 220
   U.S. 290 (1911) ...................................... 8

*Operation Rescue* v. *National Organization for
   Women, Inc.*, No. 01-1119 (Aug. 26, 2002)............. 15

*Peter Buchanan Ltd.* v. *McVey*, [1955] A.C. 516
   (Ir. H. Ct. 1950), aff'd, [1955] A.C. 530 (Ir. S. Ct.
   1951) ................................................ 8, 12, 16

*QRS 1 Aps* v. *Frandsen*, [1999] 3 All E.R. 289
   (C.A. 1999) .......................................... 8, 12

*Re Reid*, [1970] 17 D.L.R. (3d) 199 (B.C. Ct. App.) ........... 16

(III)

IV

Cases—Continued:                                          Page

   *Republic of Ecuador* v. *Philip Morris Cos*, 188
     F. Supp. 2d 1359 (S.D. Fla. 2002) ........................   15
   *Scheidler* v. *National Organization for Women, Inc.*,
     122 S. Ct. 1604 (2002) ..............................................   15
   *United States* v. *Boots*, 80 F.3d 580 (1st Cir.), cert.
     denied, 519 U.S. 905 (1996) ................................   17
   *United States* v. *Harden*, [1963] S.C.R. 366 (Sup.
     Ct. Can.) ........................................................   8, 12
   *United States* v. *Pierce*, 224 F.3d 158 (2d Cir.
     2000) ................................................................   16
   *United States* v. *Stuart*, 489 U.S. 353 (1989) ...................   9
   *United States* v. *Trapilo*, 130 F.3d 547 (2d Cir.
     1997), cert. denied, 525 U.S. 812 (1998) ............................   16
   *Wisconsin* v. *Pelican Ins. Co.*, 127 U.S. 265 (1888),
     overruled by *Milwaukee County* v. *M.E. White
     Co.*, 296 U.S. 268 (1935) ..............................................   8

Constitution and statutes:

   U.S. Const. Art. IV, § 1 (Full Faith and Credit
     Clause) ............................................................   8
   Racketeer Influenced and Corrupt Organizations Act,
     18 U.S.C. 1961 *et seq.* ..............................................   2
      18 U.S.C. 1964(c) ..............................................   3

Miscellaneous:

   S. Exec. Rep. No. 1, 82d Cong., 1st Sess. (1951) .................   9

# In the Supreme Court of the United States

---

No. 01-1317

ATTORNEY GENERAL OF CANADA, PETITIONER

*v.*

R.J. REYNOLDS TOBACCO HOLDINGS, INC., ET AL.

---

*ON PETITION FOR A WRIT OF CERTIORARI
TO THE UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT*

---

**BRIEF FOR THE UNITED STATES
AS AMICUS CURIAE**

---

This brief is submitted in response to the Court's order inviting the Solicitor General to express the views of the United States.

## STATEMENT

The Attorney General of Canada (petitioner) filed suit on behalf of the Government of Canada in the United States District Court for the Northern District of New York, alleging that RJ Reynolds Tobacco Holdings, Inc., RJ Reynolds Tobacco Company, RJ Reynolds Tobacco International Inc., RJR-McDonald, Inc., RJ Reynolds Tobacco Company, PR, Northern Brands International, Inc., and the Canadian Tobacco Manu-

(1)

2

facturers Council (respondents) engaged in a scheme to smuggle cigarettes across the United States-Canadian border in order to avoid the payment of Canadian taxes, in violation of the Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. 1961 *et seq.* Pet. App. A3. The district court dismissed petitioner's complaint. *Id.* at B1-B40. In reliance on the principle that a United States court will not enforce a foreign country's tax claims (the revenue rule), the court of appeals affirmed. *Id.* at A1-A56.

1. Petitioner's complaint makes the following allegations, which, on a motion to dismiss, must be accepted as true. In 1991, Canada doubled the taxes it imposed on tobacco products. Pet. App. A4. Respondents thereafter allegedly devised and implemented a scheme to avoid payment of the tax. *Ibid.* Respondents allegedly exported cigarettes from Canada and delivered them to distributers in Foreign Trade Zones in New York. *Id.* at A4-A5. The distributors then shipped the cigarettes to the St. Regis/Akwesasne Indian Reservation, which straddles the New York-Canadian border. *Ibid.* From there, distributors smuggled the cigarettes back into Canada for sale on the Canadian black market. *Ibid.*

In 1992, Canada imposed an export tax on cigarettes. In order to avoid that tax, respondents allegedly shipped raw tobacco from Canada to Puerto Rico where they manufactured cigarettes made to look like they had been manufactured in Canada. The cigarettes were then allegedly delivered to Foreign Trade Zones in New York, brought to the Reservation, and smuggled into Canada. Respondents also allegedly employed a company to process Canadian tobacco in North Carolina. The tobacco was then smuggled into Canada for sale on the black market. Pet. App. A5.

3

In conducting their scheme, respondents allegedly used United States mails and wires to make payments and to place and receive orders. Pet. App. A5-A6. Respondents allegedly made several million dollars in profits as a result of their scheme. *Id.* at A5.

Petitioner filed suit in federal district court, alleging that respondents had engaged in a pattern of racketeering in violation of RICO. Pet. App. A6. In particular, petitioner alleged that respondents' smuggling scheme involved repeated instances of mail fraud and wire fraud. *Ibid.* In order to recover under RICO, a civil plaintiff must establish that a RICO violation has caused injury to the plaintiff's "business or property." 18 U.S.C. 1964(c). In an attempt to satisfy that requirement, petitioner alleged that respondents' pattern of racketeering had caused injury to Canada's "property" in the form of lost tax revenue and increased law enforcement costs. Pet. App. A6-A7. As relief, petitioner sought treble damages for Canada's lost tax revenue and law enforcement costs, and various forms of equitable relief. *Id.* at A7.

The district court dismissed petitioner's claim under RICO for lost tax revenue based on the "revenue rule," Pet. App. B8-B17, under which courts of one sovereign will not enforce the tax judgments or unadjudicated tax claims of another sovereign. The district court dismissed petitioner's claim for increased law enforcement costs on the ground that such costs do not constitute an injury to "business or property" within the meaning of RICO. *Id.* at B31-B39. Finally, the district court dismissed petitioner's claims for equitable relief on the ground that RICO authorizes only the United States to seek equitable relief. *Id.* at B39-B40.

2. The court of appeals affirmed, Pet. App. A1-A67, holding that "the revenue rule bars [petitioner's] action

4

in its entirety," *id*. at A10. The court explained that the "revenue rule is a longstanding common law doctrine providing that courts of one sovereign will not enforce final tax judgments or unadjudicated tax claims of other sovereigns," and is justified by "respect for sovereignty, concern for judicial role and competence, and separation of powers." *Ibid.* In particular, "[w]hen a foreign nation appears as a plaintiff in our courts seeking enforcement of its revenue laws, the judiciary risks being drawn into issues and disputes of foreign relations policy that are assigned to—and better handled by—the political branches of government." *Id*. at A18-A19.

The court of appeals also noted that the United States has entered into treaties with foreign governments that have carefully limited the circumstances under which foreign governments may invoke the assistance of United States courts to enforce foreign tax liability. Pet. App. A27-A28. Against that background, the court of appeals explained, "courts must be wary of intruding in a way that undermines carefully conceived and negotiated policy choices." *Id*. at A28. The court of appeals found it particularly significant that a treaty between the United States and Canada bars assistance for claims against citizens of the host country, permits each party to determine whether a particular tax liability should be enforced, and requires the party requesting assistance to certify that the revenue claim has been finally determined. *Id*. at A29-A30. Because the Treaty "specifically exclude[s] the type of assistance Canada seeks in this case," the court concluded, permitting petitioner's claim to go forward would "ignor[e] and undermin[e] the treaty negotiation process and the clearly expressed views of the political branches of the United States." *Id*. at A34.

5

The court of appeals rejected petitioner's contention that the revenue rule is inapplicable because petitioner filed suit under RICO, and not under Canadian tax law. Pet. App. A40-A47. The court noted that under established principles of statutory construction, federal statutes are interpreted to preserve well-established common law rules except when a statutory purpose to the contrary is evident. *Id.* at A43. Applying that principle, the court found "no language in RICO or in its legislative history that demonstrates any intent by Congress to abrogate the revenue rule." *Id.* at A46. The court also rejected petitioner's characterization of its claim as one arising "solely" under United States law, concluding that "[o]n the contrary, Canada seeks to use the United States law to enforce, both directly and indirectly, its tax laws." *Id.* at A49. The court reasoned that because petitioner seeks through its RICO claim to "have a United States court require [respondents] to reimburse Canada for its unpaid taxes, plus a significant penalty due to RICO's treble damages provision, * * * Canada's object is clearly to recover allegedly unpaid taxes." *Id.* at A50. The court viewed petitioner's claim for law enforcement costs as "an indirect attempt to have a United States court enforce Canadian revenue laws," *ibid.*, because "[t]he primary purpose identified by Canada for using its police forces to stop smuggling was to enforce its customs and excise taxes." *Id.* at A51.

The court of appeals distinguished prior circuit precedent holding that the revenue rule does not apply to criminal prosecutions by the United States of schemes to defraud a foreign nation of taxes. Pet. App. A34-A37. The court explained that because such criminal prosecutions are brought to serve the interest of the United States, and are subject to Executive

6

Branch oversight, "the foreign relations interests of the United States may be accommodated throughout the litigation." *Id.* at A35. "In contrast," the court observed, "a civil RICO case brought to recover tax revenues by a foreign sovereign to further its own interests, may be, but is not necessarily, consistent with the policies and interests of the United States." *Id.* at A35-A36.

Judge Calabresi dissented from the panel's ruling. Pet. App. A56-A57. In his view, the revenue rule has no application to petitioner's suit, because "Canadian tax laws come into play only indirectly, as a factor to be used in the calculation of damages, and do so entirely because the RICO statute itself makes the Canadian laws relevant to that calculation." *Id.* at A57.

## DISCUSSION

This RICO action by the Attorney General of Canada to recover damages for illegal tobacco smuggling raises issues that are of importance to both Canada and the United States. The United States has a strong interest in combatting such cross-border illegal activity, as is demonstrated by the government's use of federal criminal law to prosecute schemes involving facts similar to those alleged here. Canada has a strong interest in recovering damages for financial injuries caused to it by fraud. And both countries have a mutual interest in collaborative efforts to prevent and deter such international smuggling schemes. Nevertheless, on the question presented in this case, the Second Circuit correctly held that the revenue rule precludes a foreign government from bringing a civil RICO claim where its alleged injury is lost tax revenue.

The revenue rule serves important separation-of-powers interests that transcend the particular context

7

of the present action by Canada. The rule avoids
involving the judiciary in making judgments about for-
eign tax policies and procedures and interwoven foreign
policy considerations, and it leaves the Executive
Branch and the Senate free to decide through the
treaty-making process the extent to which exceptions
to that principle should be recognized. The rule also
leaves the Executive Branch free to use federal
criminal law to protect against frauds based in the
United States that seek to avoid other countries' tax
laws. RICO was drafted against the backdrop of the
revenue rule, which has a long pedigree in this country
and abroad. There is no evidence that Congress
intended to displace the revenue rule in this context
and to permit civil damages actions by foreign
sovereigns to recover alleged tax losses. Because the
court of appeals correctly resolved the question before
it, because there is no conflict with a decision of any
other court of appeals, and because the application of
the revenue rule by the Second Circuit properly
respects the different roles of the courts and the
political branches in matters involving foreign taxes,
the petition for a writ of certiorari should be denied.

1. The revenue rule is a long established and widely
accepted principle of the common law under which
courts of one sovereign will not enforce the tax
judgments and unadjudicated tax claims of another
sovereign. Pet. App. A10. The rule can be traced to
the eighteenth century when British courts declined to
apply foreign revenue laws that would have hindered
trade in British goods. See *Boucher* v. *Lawson*, 95 Eng.
Rep. 53, 56 (K.B. 1734) (Lord Hardwicke, C.J.). In an
early case, Lord Mansfield stated the rule broadly as
providing that "no country ever takes notice of the
revenue laws of another." *Holman* v. *Johnson*, 98 Eng.

8

Rep. 1120, 1121 (1775).  Since then, numerous domestic and foreign courts have applied the rule to bar claims that, in substance, seek to enforce foreign revenue laws. See, *e.g.*, *QRS 1 Aps* v. *Frandsen*, [1999] 3 All E.R. 289 (C.A. 1999); *Her Majesty the Queen in Right of the Province of British Columbia* v. *Gilbertson,* 597 F.2d 1161 (9th Cir. 1979); *Banco Do Brasil, S.A.* v. *A.C. Israel Commodity Co.*, 239 N.Y.S.2d 872 (1963); *United States* v. *Harden,* [1963] S.C.R. 366 (Sup. Ct. Can.); *Peter Buchanan Ltd.* v. *McVey*, [1955] A.C. 516 (Ir. H. Ct. 1950), aff'd, [1955] A.C. 530 (Ir. S. C. 1951).

This Court has not had occasion to decide the extent to which the revenue rule binds courts of the United States.  But it has recognized that courts in this country and elsewhere have applied that rule to preclude one country from seeking to enforce its tax laws in the courts of another.  *Banco Nacional de Cuba* v. *Sabbatino*, 376 U.S. 398, 413-414 (1964) (recognizing the "principle enunciated in federal and state cases that a court need not give effect to the penal or revenue laws of foreign countries"); *Oklahoma* v. *Gulf, Colorado & Santa Fe Ry.*, 220 U.S. 290, 299 (1911) ("The rule that the courts of no country execute the penal laws of another applies not only to prosecutions and sentences for crimes and misdemeanors, but to all suits in favor of the State for the recovery of pecuniary penalties for any violation of statutes for the protection of its revenue or other municipal laws, and to all judgments for such penalties.") (emphasis deleted) (quoting *Wisconsin* v. *Pelican Insur. Co.*, 127 U.S. 265, 290 (1888), overruled by *Milwaukee County* v. *M.E. White Co.*, 296 U.S. 268, 278 (1935), to the extent that it held that States are not bound by the Full Faith and Credit Clause to enforce the tax judgments of other States).

9

The revenue rule is not only a well-established feature of the common law and of international law; it provides the background understanding against which the United States has entered into treaties that address the extent to which a foreign nation may seek assistance from the United States and its courts in enforcing its tax claims. In entering into those treaties, the United States has created carefully limited exceptions to the principle that a foreign country may not enforce its tax claims in United States courts. The recent treaty with Canada is illustrative. That treaty excludes claims against citizens or companies of the host country; it gives the government discretion to decline a particular application for assistance; and it provides only for the enforcement of finally adjudicated claims. Pet. App. A29-A30. No provision in the treaty authorizes either country to proceed directly in the other's courts to collect a tax claim; each government is instead to request assistance from the other government. See, e.g., *United States* v. *Stuart*, 489 U.S. 353 (1989) (enforcing IRS summons issued pursuant to treaty request in aid of Canadian tax investigation). Other treaties have limited the right to assistance still further—to assistance necessary "to [e]nsure that the exemptions or reduced rates of tax provided under the respective conventions will not be enjoyed by persons not entitled to such benefits." S. Exec. Rep. No. 1, 82d Cong., 1st Sess. 21 (1951).

While the revenue rule has been the subject of some judicial and scholarly criticism, it is supported by several related separation-of-powers considerations. First, courts lack the institutional competence to decide when it is in the interest of the United States to permit a foreign country to enforce its tax laws in United States courts. The court of appeals' hypothetical tax laws

(Pet. App. A17) illustrate the difficulties that can arise when a court is forced to make such judgments. For example, a court is not well-positioned to decide whether the interests of the United States are served by enforcing a tax that is designed to discourage the sale of a United States newspaper, or that makes it prohibitively expensive to use United States parts, or that is imposed on members of a particular race, nationality, or religion. More subtle judgments about tax rates or the fairness of an underlying collection regime also would inappropriately involve the courts in foreign relations matters. Nor do courts have the competence to decide which foreign countries should be able to use the courts of this country to collect tax revenue and which should not. Those judgments are more appropriately made by the Executive and Legislative Branches.

Second, when a court enforces a foreign tax claim, it cannot ensure that the United States will enjoy a reciprocal privilege in the foreign country's courts. Indeed, judicial enforcement of foreign tax claims would deprive the Executive Branch of leverage to secure such reciprocity through the negotiation of bilateral treaties.

Finally, judicial enforcement of foreign tax claims that are not authorized by treaty would intrude on the Executive Branch's treaty-making authority as well as the specific policy judgments reflected in particular treaties. Those considerations fully justify the continued application of the revenue rule.

2. The Attorney General of Canada does not challenge the general principle that courts may not enforce the tax claims of a foreign sovereign. He instead argues (Pet. 9-11) that the revenue rule is inapplicable in this case because his claim arises under

11

RICO, not under Canada's tax laws.  The reliance of the complaint on the RICO statute does not render the revenue rule inapplicable.

a. The RICO statute was drafted against the background of the common law principle that courts will not enforce the tax claims of a foreign sovereign.  When a common law principle is as well established as the revenue rule, "the courts may take it as given that Congress has legislated with an expectation that the principle will apply except 'when a statutory purpose to the contrary is evident.'" *Astoria Fed. Sav. & Loan Ass'n* v. *Solimino*, 501 U.S. 104, 108 (1991).

That principle has particular force here because the revenue rule has served as the foundation for United States tax treaties.  There is no indication in the text or history of the RICO statute that Congress intended to override the established principle that courts will not enforce a foreign sovereign's tax claims.  Nor is there any indication in the text or history of RICO that Congress intended to depart from the judgment of the political branches that exceptions to the revenue rule should be carefully limited and embodied in bilateral treaties.  Accordingly, RICO cannot properly be read to authorize a suit that would otherwise be barred by the revenue rule.

b. The revenue rule bars the instant claim.  Petitioner contends that Canada's claim arises under RICO, rather than Canadian tax law.  But, while petitioner has asserted a claim under RICO, the injury that petitioner asserts and the damages that petitioner seeks to collect depend on Canadian tax law.  In particular, petitioner asserts that Canada is injured in its property because respondents caused a loss of tax revenue, and petitioner seeks to collect as damages three times that revenue loss.  Petitioner's action is

12

therefore predicated on both RICO *and* Canadian tax law. Claims of that character have long been understood to fall within the prohibition of the revenue rule.

The revenue rule bars indirect as well as direct efforts to enforce foreign tax claims. *Harden*, [1963] S.C.R. at 371; *Banco Do Brasil, S.A.*, 239 N.Y.S.2d at 875; see also *QRS 1 Aps*, 3 All E.R. at 291, 293; *Peter Buchanan Ltd., supra*, [1955] A.C. at 529. A foreign sovereign's claim that relies on a domestic law of general application, but that seeks to recover tax loss as damages, necessarily reflects an effort to enforce a tax claim indirectly.

Decisions applying the revenue rule support that conclusion. For example, in *Harden*, the United States brought suit in Canada to recover for breach of a contract that settled a tax liability dispute. Although the suit was founded on private contract law, the Canadian Supreme Court held that the "the special principle that foreign States cannot directly or indirectly enforce their tax claims [in our courts]" barred the claim. [1963] S.C.R. at 371. The court reasoned that when "the whole object of the suit is to collect tax for a foreign revenue, and that this will be the sole result of a decision in favour of the plaintiff, then a court is entitled to reject the claim by refusing jurisdiction." *Id.* at 372-373. Similarly, in *Banco Do Brasil, S.A.*, the government of Brazil, through its central bank, brought suit in New York state court, alleging that a New York importer had committed fraud by conspiring with a Brazilian exporter to evade currency controls. 239 N.Y.S.2d at 873. The New York Court of Appeals held that the revenue rule precluded Brazil's suit. The court explained that Brazil "is seeking, by use of an action for conspiracy to defraud, to enforce what is clearly a revenue law." *Id.* at 875.

13

Those decisions reflect a sound application of the revenue rule. If foreign sovereigns could avoid the revenue rule by recharacterizing a foreign tax claim as a cause of action based on domestic law, such as common law fraud, or unjust enrichment, or breach of contract, or injury from a pattern of racketeering, the revenue rule would lose much of its force. Many, if not most, schemes to avoid the payment of taxes can be recharacterized in such terms.

c. Equally important, a foreign sovereign's claim that relies on a domestic law of general application, but that asserts tax loss as the basis for recovery, implicates the separation-of-powers concerns that underlie the revenue rule. Courts lack the institutional competence to determine whether enforcement of such claims would serve the interests of the United States; courts can provide no guarantee that the United States may enforce a similar claim in the courts of the foreign sovereign; and judicial enforcement of such a claim would intrude on the Executive Branch's treaty making authority and the policy judgments reflected in specific United States treaties.

The latter two considerations are strongly implicated in this case. The Canada Supreme Court's decision in *Harden* suggests that the United States would not be able to enforce a comparable claim in Canadian courts. And allowing Canada's suit to go forward would undermine specific policy judgments reflected in the United States' treaty with Canada, including the judgment that only finally adjudicated tax claims may be enforced in United States courts.

Petitioner argues (Reply Br. 6) that separation-of-powers concerns are inapplicable here because Congress has made the relevant policy judgment by authorizing any person to sue to recover damages for

14

an injury to property that is caused by a pattern of racketeering. But there is no evidence that when Congress enacted that general language, it intended to permit the enforcement of *any* tax claim by *any* foreign government, as long as the claim could be recharacterized as a violation of RICO. Nor is there evidence that Congress intended to permit the enforcement of such a claim without regard to whether the foreign country would permit the United States to enforce a comparable claim in its courts. And there is no indication that Congress intended to depart from the previous judgment of the political branches that exceptions to the revenue rule should be carefully limited and embodied in bilateral treaties. Indeed, if Canada's RICO suit were deemed permissible here, the doors to United States courts would also apparently be open to RICO treble damages actions by countries far less friendly to the United States, based on tax systems of questionable compatibility with our own, and perhaps against a background in which the political branches had rejected or been unable to secure any reciprocal treaty obligations to assist in tax collection efforts. The court of appeals therefore correctly concluded that a claim such as petitioner's RICO claim for tax loss is barred by the revenue rule.[1]

---

[1] In addition to seeking damages based on tax loss, petitioner also seeks damages for increased law enforcement costs and various forms of equitable relief. Petitioner does not contend that if his claim for tax loss is barred by the revenue rule, his other claims for relief would nonetheless fall outside the revenue rule. As the court of appeals explained (Pet. App. A50-A51), petitioner's increased law enforcement costs are directly associated with petitioner's effort to collect unpaid taxes. And petitioner's claims for equitable relief seek to vindicate the same interest in avoiding tax loss and increased law enforcement costs as do petitioner's

15

3. The court of appeals in this case is the first and only appellate court to resolve the question whether the revenue rule bars a foreign sovereign's claim under RICO for damages based on tax loss. There is therefore no conflict in the circuits on that question that would warrant this Court's review.[2]

Petitioner contends that review is warranted in this case, even absent such a conflict, because the court of appeals' decision undermines efforts to combat international smuggling (Pet. 12-15) and implicates the rights of a foreign sovereign (Pet. 16-17). Collaboration between the United States and Canada to deter and punish such smuggling is unquestionably an important objective. But the court of appeals expressly reaf-

---

claims for damages. In any event, because petitioner does not press any argument that is specific to his claims for law enforcement costs and equitable relief, the question whether those claims can be distinguished, for purposes of the revenue rule, from petitioner's claim for lost revenue, is not presented here.

The district court dismissed petitioner's claims for equitable relief on the ground that only the United States may seek equitable relief under RICO. Pet. App. B39-B40. This Court granted certiorari to resolve that issue in *Operation Rescue* v. *National Organization For Women, Inc.*, No. 01-1119, and *Scheidler* v. *National Organization For Women, Inc*, 122 S. Ct. 1604 (2002) (No. 01-1118). Because the court of appeals upheld dismissal of petitioner's claim for equitable relief on the basis of the revenue rule, and because the petition in this case does not raise the question presented in *Operation Rescue* and *Scheidler*, there is no reason to hold the petition in this case pending the decisions in those cases.

[2] There are at least two other cases pending in the lower courts that raise similar issues. *The European Community* v. *RJR Nabisco, Inc.*, 150 F. Supp. 2d 456 (E.D.N.Y. 2001); *The Republic of Ecuador* v. *Philip Morris Companies*, 188 F. Supp. 2d 1359 (S.D. Fla. 2002). But those cases have not yet produced appellate court decisions.

firmed its holdings in prior cases that the revenue rule does not bar a criminal prosecution by the United States of conduct that is designed to defraud a foreign country of tax revenue.    Pet. App. A34-A37 (reaffirming *United States* v. *Trapilo*, 130 F.3d 547, 549 (2d Cir. 1997), cert. denied, 525 U.S. 812 (1998); *United States* v. *Pierce*, 224 F.3d 158 (2d Cir. 2000)).    Such prosecutions do not implicate the revenue rule because that rule applies only when the plaintiff is a foreign government or someone acting on its behalf, and the plaintiff is seeking to vindicate a foreign government's interest in collecting taxes.    See *Re Reid*, [1970] 17 D.L.R. (3d) 199, 205 (B.C. Ct. App.) (noting that in all the cases where the revenue rule had been invoked "the foreign State was * * * the plaintiff, the claimant or the instigator of the proceedings"); *Peter Buchanan Ltd.*, [1955] A.C. at 527 (critical fact was "that right is being enforced at the instigation of a foreign authority").

The distinction between a criminal prosecution brought by the United States and a civil action for the recovery of tax revenue brought by a foreign sovereign is critical, and it precisely aligns with the policies underlying the revenue rule.    As the court of appeals explained, criminal prosecutions vindicate the interests of the United States, and they are subject to Executive Branch control.    Pet. App. A35.    In contrast, a foreign sovereign brings a civil RICO action to further its own interest in collecting taxes, and that interest is not in all circumstances necessarily consistent with the interests of the United States.    *Id.* at A35-A36.[3]

---

[3] For the reasons discussed above, the First and Fourth Circuits erred in holding that the revenue rule bars the United States from criminally prosecuting under the wire fraud statute a

17

Because the United States retains authority to prosecute international smugglers, the court of appeals' decision leaves intact a powerful means to deter and punish such conduct. At the same time, it properly reserves the decision whether to address, in a judicial forum, schemes involving foreign tax laws in the hands of the Executive Branch of our own government. Canada, for its part, has means to vindicate its interest in attacking international smuggling operations by filing suit to enforce its laws in Canadian courts and by requesting cooperation from the United States under mutual assistance treaties. A decision to authorize further judicial steps, such as treble damages actions against United States citizens, should await a clearer statement in a treaty or in legislation. The correct application of the revenue rule in this case does not call for this Court's intervention.

---

scheme that is designed to deprive a foreign sovereign of tax revenue. See *United States* v. *Boots*, 80 F.3d 580 (1st Cir.), cert. denied, 519 U.S. 905 (1996); *United States* v. *Pasquantino*, No. 01-4463, 2002 WL 31159094 (4th Cir. Sept. 30, 2002). The conflict in the circuits on that question is not at issue here.

18

## CONCLUSION

The petition for a writ of certiorari should be denied.

Respectfully submitted.

WILLIAM H. TAFT, IV
*Legal Advisor*
*Department of State*

GEORGE B. WOLFE
*Deputy General Counsel*[**]
*Department of the Treasury*

LAWRENCE G. WALLACE
*Acting Solicitor General*[*]

ROBERT D. MCCALLUM, JR.
MICHAEL CHERTOFF
EILEEN J. O'CONNOR
*Assistant Attorneys General*

MICHAEL R. DREEBEN
*Deputy Solicitor General*

IRVING L. GORNSTEIN
*Assistant to the Solicitor*
*General*

MARK B. STERN
DOUGLAS HALLWARD-DRIEMEIER
*Attorneys*

OCTOBER 2002

---

[*]  The Solicitor General is disqualified in this case.

[**] The General Counsel is recused in this case.

# Exhibit 25

394                              EUROPEAN TAXATION                              SEPTEMBER 2002

# OECD

# Towards a Better Exchange of Information

## Perla Gyöngyi Végh*

## 1. INTRODUCTION

It has been frequently observed that the liberalization of financial markets and the globalization of domestic economies has a great impact on the legal environment, including tax law. As globalization continues, governments are increasingly confronted by a new environment where the opportunities for capital flight and tax evasion and/or avoidance are expanding. As a result, tax authorities experience distortions in enforcing the law and erosions of the effective tax burden.[1] These tendencies are reinforced by tax haven jurisdictions and countries with preferable tax regimes, which create an additional incentive for capital flight.

In order to eliminate the harmful tax competition caused by these jurisdictions and regimes, the OECD initiated work to identify harmful tax practices. The 1998 OECD Report *Harmful Tax Competition: An Emerging Global Issue* identified the lack of effective exchange of information as one of the key criteria in determining harmful tax practices. Consequently, in April 2002, the OECD published its *Agreement on Exchange of Information in Tax Matters* (hereinafter: the OECD Agreement). The OECD Agreement is aimed at establishing the standard of what constitutes an effective exchange of information for the purposes of the OECD's initiative. This article discusses the main features of the OECD Agreement and compares it with other conventions on exchange of information.

## 2. LEGAL INSTRUMENTS

Exchange of information is the most immediate form of administrative assistance between tax authorities[2] and is important for ensuring the correct assessment of taxes and preventing tax evasion and fraud. Legal instruments, such as the current OECD Agreement, create a framework for the effective exchange of information and strengthen the possibilities for collaboration between tax authorities.

Currently, information exchange can be effected on the basis of a number of different legal instruments, including:
– tax treaties;
– bilateral agreements on mutual assistance;[3]
– the Mutual Assistance Directive[4] (hereinafter: EC Directive);
– the Joint Council of Europe and OECD Convention on Mutual Administrative Assistance in Tax Matters[5] (hereinafter: CE/OECD Convention); and
– the Nordic Convention on Mutual Assistance in Tax Matters[6] (hereinafter: Nordic Convention).

Generally, tax treaties include an exchange of information article, which is usually based on the OECD Model Tax Convention (the OECD Model). Article 26 of the OECD Model provides for information exchange for the purpose of securing the application of both the tax treaty provisions and the domestic law provisions of the contracting states.[7]

The multilateral conventions on information exchange have a more general purpose and provide for a more comprehensive set of rules than Art. 26 of the OECD Model.[8] The EC Directive provides for information exchange between EU Member States for the purpose of enabling a correct assessment of taxes on income and on capital, even if there is no tax treaty between the states. Under the CE/OECD Convention and the Nordic Convention, information can be exchanged in (all) tax matters.

In order to enhance the enforcement of domestic laws, countries can also enter into bilateral agreements. The purpose and the scope of these agreements depend on the economic and fiscal relationship between the contracting states and their mutual concerns.

The OECD Agreement will undoubtedly be added to the above list of legal instruments in the future. The OECD Agreement embodies actually two instruments since it is

---

\*    Research Associate, International Bureau of Fiscal Documentation.
1.    D.E. Spencer, "OECD information exchange recommendations are a significant first step in resolving tax evasion", 8 *Journal of International Taxation* 8 (1997), p. 353; and Vito Tanzi and Howell H. Zee, "Taxation in a Borderless World: The Role of Information Exchange", 28 *Intertax* 2 (2000), p. 58.
2.    OECD Report *Tax Information Exchange Between OECD Member Countries* (OECD, 1994). Information exchange is only one form of administrative assistance. Other forms include, e.g. assistance in recovery of tax claims, or in the service of documents. These other forms are not discussed in this article.
3.    Bilateral agreements on mutual assistance have been concluded between several countries, e.g. Belgium–Netherlands (25 September 1997), Canada–Netherlands (17 November 1997), Denmark–Italy (26 October 1984) and Germany–Netherlands (16 October 1997 and 21 May 1999).
4.    The Council of the European Communities adopted on 19 December 1977 a Directive 77/799/EEC on Mutual Assistance between the competent authorities of the Member States in the field of direct taxation. It was extended to value added tax by Directive 79/1070/EEC on 6 December 1979 and to excise duties by Directive 92/12/EEC on 25 February 1992.
5.    Multilateral Convention on Mutual Administrative Assistance in Tax Matters, which was opened for signature in 1988. The Convention entered into force on 1 April 1995 with respect to Denmark, Finland, Norway, Sweden and the United States, on 1 November 1996 with respect to Iceland, on 1 February 1997 with respect to the Netherlands, on 1 October 1997 with respect to Poland and on 1 December 2000 with respect to Belgium.
6.    The Nordic Convention on Mutual Assistance in Tax Matters was signed by Denmark, Finland, Iceland, Norway and Sweden on 7 December 1989 and entered into force on 9 May 1991. The Convention is extended also to the Faroe Islands and Greenland.
7.    This represents the "big information exchange clause" in contrast to the "small information exchange clause" which latter only covers exchange for tax treaty purposes.
8.    See note 2; and Vito Tanzi, "Taxation in a borderless world: the role of information exchange", 28 *Intertax* 2 (2000), p. 58.

—————— © 2002 International Bureau of Fiscal Documentation ——————

Exported / Printed on 16 Dec. 2021 by isabelle.farrar@ropesgray.com.

published in two versions, i.e. in a bilateral and a multilateral version. The bilateral version is more of a model and can be used as a basis for entering into bilateral agreements on exchange of information.

The multilateral version, according to the OECD's explanation, is not a "multilateral agreement" in the traditional sense.[9] Instead it provides the basis for an integrated bundle of bilateral treaties. A party to the multilateral agreement would only be bound by the agreement in respect of the specific parties with which it agrees to be bound. Accordingly, each party must specify in its instrument of ratification, approval or acceptance the party or parties with which it wishes to be bound. Rights and obligations under the multilateral agreement are established only between those parties that have mutually identified each other.

As regards the general purpose of the Agreement, both versions follow a broad approach to enabling assistance in the administration and enforcement of the domestic tax laws of the contracting states. More precisely, the OECD Agreement facilitates states receiving assistance for the determination, assessment and collection of taxes, the recovery and enforcement of tax claims and the investigation or prosecution of tax matters.[10]

## 3. THE NATURE OF THE INFORMATION

The OECD Agreement specifies the type of information that can be requested and exchanged. The term "information" is defined broadly and means "any fact, statement or record in any form whatever".[11] A limitation, however, applies that requires that the requested information be foreseeably relevant to the administration and enforcement of the laws of the applicant state (i.e. the state making the request) concerning the taxes covered by the Agreement.[12] This limitation includes two important criteria: the standard of "foreseeable relevance" and the "coverage of taxes" concerned in the matter.

The standard of "foreseeable relevance" means that the applicant state can only request the information if it can demonstrate that the information is likely relevant to the tax affairs of a given taxpayer. The OECD Agreement specifies the data that the applicant state must provide to the requested state in order to demonstrate the foreseeable relevance of the requested information.[13] Among others things, the applicant state must specify the identity of the person subject to investigation and the grounds on which it believes the information sought is in the requested state.

The standard of foreseeable relevance is used also in the CE/OECD Convention. This standard is aimed at preventing the contracting states from engaging in "fishing expeditions" or requesting information that is "unlikely to be relevant to the tax matters of a given taxpayer".[14] As a result, a state cannot randomly ask for information with the hope that there might be useful information in the other state (e.g. a request for information on any interest payments to residents of the applicant state). Thus, the standard of foreseeable relevance also serves the purpose of limiting requests to a level that is manageable for the requested state.

The second important criterion regarding the requested information is that it must concern taxes covered by the OECD Agreement. This is a generally applied criterion in conventions on exchange of information and may lead to some differences in their scope of application.

The multilateral version of the OECD Agreement applies to taxes on income or profits, taxes on capital, taxes on net wealth and estate, inheritance or gift taxes.[15] The contracting states may agree in their instrument of ratification to extend the scope to cover also (i) taxes imposed by or on behalf of political sub-divisions or local authorities and (ii) indirect taxes. The former definition of the scope (i.e. scope if no extension is agreed upon) can be regarded as a moderately wide scope in comparison to the other multilateral conventions. Though the EC Directive covers "only" direct taxes, the CE/OECD Convention[16] and the Nordic Convention apply to a wide range of taxes, contributions and duties, including taxes on income and capital, taxes on inheritances and gifts, general consumption and excise taxes and social security contributions.

In the bilateral version of the Agreement, both contracting states can determine the range of taxes covered by listing them directly in the actual agreement. It is interesting to note here that Art. 26 of the OECD Model is no longer limited in terms of the scope of taxes covered.[17]

Similar to the multilateral conventions on information exchange and Art. 26 of the OECD Model, the OECD Agreement also includes provisions for situations where a contracting state later modifies its tax system.[18] Accordingly, if this modification results in "identical taxes" being imposed in addition to or in place of the existing taxes after the date of entry into force, the Agreement automati-

---

9.   OECD Agreement, Introduction, point 5.
10.  Art. 1 OECD Agreement.
11.  Art. 4(1)(m) OECD Agreement.
12.  Art. 1 OECD Agreement.
13.  Art. 5(5) OECD Agreement: In order to demonstrate the foreseeable relevance of the requested information, the applicant state must provide the requested state (i.e. state receiving the request) with the following information when making the request:
–    the identity of the person under examination or investigation;
–    the information sought, including its nature and the form in which the applicant state wishes to receive it;
–    the tax purpose for which the information is sought;
–    the grounds for believing that the information is held by the requested party or by a person within its jurisdiction;
–    to the extent known, the name and the address of any person believed to be in possession of the requested information;
–    a statement that the request is in conformity with the laws and administrative practices of the applicant state, that had the requested information been within the jurisdiction of the applicant state the competent authority of the applicant state would have been able to obtain the information under the laws of the applicant party or in the normal course of the administrative practice and that it is in conformity with the Agreement; and
–    a statement that the applicant state has pursued all means available in its own territory to obtain the information, except those that would give rise to disproportionate difficulties.
14.  Art. 1, point 3 OECD Agreement.
15.  Art. 3 OECD Agreement.
16.  Potentially, states may make reservations upon accession.
17.  Before 2000, Art. 26(1) OECD Model only authorized the exchange of information in relation to taxes covered by the Convention under the general rules of Art. 2. See Art. 26(1), point 11.1 of the Commentary to the OECD Model.
18.  Art. 3(3) OECD Agreement.

Exported / Printed on 16 Dec. 2021 by isabelle.farrar@ropesgray.com.

Case 1:18-md-02865-LAK     Document 808-14     Filed 05/12/22     Page 110 of 231

cally applies to these new taxes. If, however, the modification results in "substantially similar taxes", these taxes will only be covered by the Agreement – unlike the above referred conventions – if the contracting states so agree.

With regard to the personal scope of the OECD Agreement, the Commentary specifies that neither the residence nor the nationality of a person is relevant for the purposes of the OECD Agreement.[19] This approach corresponds to the approach adopted in the multilateral conventions[20] and in Art. 26 of the OECD Model. The term "person" is defined in the same manner in the OECD Agreement as in the OECD Model.[21] As explained in the Commentary, the definition in the OECD Agreement is not exhaustive and is intended to cover all possible organizational structures.[22] Accordingly, it also covers trusts, foundations, *Anstalten*, partnerships and collective investment funds and schemes.

## 4. FORMS OF INFORMATION EXCHANGE

In general, the different forms of exchange of information include:
(1) exchange upon request: exchange of specifically requested information related to a particular case;
(2) automatic exchange of information: one state provides automatically information to the other state on certain categories of cases, as agreed upon in advance;
(3) spontaneous exchange of information: one state provides spontaneously information to the other state, because it assumes that the information may be relevant to the other state;
(4) tax examinations abroad: the representatives of one state are permitted to be present at (a certain part of) tax examinations of the other state, on the other state's territory;
(5) simultaneous tax examinations: two or more states carry out tax examinations in their own territories on a taxpayer in which they have a common interest; and
(6) industry-wide exchange of information: exchange of information concerning a whole economic sector.

The CE/OECD Convention and the Nordic Convention institute the first five forms of information exchange. The EC Directive includes the first four forms. Article 26 of the OECD Model provides primarily for the application of the first three forms, but the contracting states are free to also use other techniques to obtain relevant information.[23]

In this context, the OECD Agreement seems to adopt "only" a relatively narrow range of forms. It allows information exchange through two different forms: exchange upon request (No. 1.) and tax examinations abroad (No. 4.). This means that information is exchanged only if an official request is made by the applicant state. Though the OECD Agreement does not initially provide for an automatic or spontaneous exchange of information, the Commentary[24] adds that the contracting states may agree to do so.

An interesting element of the OECD Agreement is that it distinguishes between two types of "tax examinations abroad". The first is the traditional type, available also under other conventions, whereby the representatives of one contracting state are permitted to be present at tax examinations of the other contracting state upon request. The other type, unusual in conventions,[25] enables the applicant state (upon request) to interview individuals and examine records on the requested state's territory. The requested state must give its permission for the interview and examinations and determine the exact conditions and circumstances. The officials of the applicant state have no authority to compel disclosure of any information in these circumstances.[26]

## 5. LIMITATIONS TO INFORMATION EXCHANGE

The obligation to provide information is generally imposed by all conventions on information exchange. This general obligation is, however, subject to limitations since, under certain circumstances, an unlimited obligation to supply information can be contrary to the requested state's domestic legislation, interest or public policy. It is reasonable that a "contracting state is not bound to go beyond its own internal laws and administrative practice in putting information at the disposal of the other contracting state".[27] Accordingly, all of the conventions and bilateral agreements on information exchange include limitations to the general obligation to provide information. The limitations entitle the requested state to refuse the request in specific cases. The limitations never oblige the requested state to refuse a request; the decision to do so is entirely at the discretion of the requested state. The wording and the range of limitations vary in the different conventions. The OECD Agreement contains a wide range of limitations, which reflect, to a large extent, the limitations applied in other conventions.

Under the OECD Agreement, the requested state may refuse the request in the following cases:
(1) the applicant state would not be able to obtain the information under its own laws for purposes of the administration or enforcement of its own tax laws;
(2) the requested information would disclose a trade, business, industrial, commercial or professional secret or trade process;[28]
(3) the requested information would reveal confidential communications between a client and an attorney, solicitor or other admitted legal representative where

---

19. Art. 2, point 7 Commentary to the OECD Agreement.
20. The EC Directive and the Nordic Convention do not include an explicit rule on the personal scope, but it can be deduced from the context that residence or nationality is not decisive for the purposes of the conventions. The CE/OECD Convention and the OECD Model explicitly state that administrative assistance should be provided regardless of the residence or nationality of the person concerned.
21. Art. 3(1)(a) of the OECD Model and Art. 4(1)(c) of the OECD Agreement provide the following definition: "the term 'person' includes an individual, a company and any other body of persons".
22. Art. 4, point 16 Commentary to the OECD Agreement.
23. Art. 26(1), point 9.1 Commentary to the OECD Agreement.
24. Art. 5(1), point 39 Commentary to the OECD Agreement.
25. The IRS has practised this version of "tax examinations abroad" for a number of years, but it has not been mentioned in conventions on information exchange until now.
26. Art. 6(1), point 66 Commentary to the OECD Agreement.
27. Art. 26(2), point 14 Commentary to the OECD Agreement.
28. Art. 7(2) OECD Agreement; Art. 26(2)c) OECD Model; Art. 21(2)d) CE/OECD Convention; and Art. 8(2) EC Directive with the exception of trade processes.

Exported / Printed on 16 Dec. 2021 by isabelle.farrar@ropesgray.com.

such communications are produced for the purposes of seeking or providing legal advice or for the purposes of use in existing or contemplated legal proceedings;

(4) the disclosure of the requested information would be contrary to public policy;[29] and

(5) the requested information is to administer or enforce a tax law of the applicant state that discriminates against a national of the requested state as compared with a national of the applicant state in the same circumstances.

The first provision concerns the applicant state's ability to obtain the requested information under its domestic law. The Commentary to the OECD Agreement argues that the provision is intended to prevent the applicant state from circumventing its domestic law limitations by requesting the information from the other state. The wording of the OECD Agreement is quite precise and identifies the applicant state's "own laws" as the threshold for obtaining the information. This limitation is differently phrased in the other conventions on information exchange. The CE/OECD Convention and Art. 26 of the OECD Model refer to the "laws and administrative practice"[30] of the applicant state[31] as the decisive threshold for obtaining the information. The wording of the EC Directive is even more general in that it refers to any "practical and legal reasons".[32] In this context, the OECD Agreement has the narrowest scope. It not only refers to the applicant state's "own laws", but also the purpose for which the information is sought.

Conventions on information exchange usually also include a provision concerning the requested state's ability to obtain the information. As a result, the requested state's obligation to provide information is not only restricted by the domestic legislation of the applicant state, but also by its own domestic legislation.[33] Under the EC Directive, the CE/OECD Convention and Art. 26 of the OECD Model, no obligation to supply information is imposed if the information cannot be obtained under the laws or administrative practice of the requested state.[34] The OECD Agreement includes a similar provision, which is, however, not listed among the limitations to the general obligations to information exchange. For the purposes of the "object and scope of the OECD Agreement", it is stated that the rights and safeguards secured to persons by the laws or administrative practice of the requested state remain generally applicable.[35]

The OECD Agreement also contains a radically new element that represents a departure from the above general principle. It requires the contracting states to ensure that their competent authorities have the authority to obtain and provide (i) information held by financial institutions and any person acting in an agency or fiduciary capacity (including nominees and trustees); and (ii) information on ownership.[36] As a result, the supply of such information cannot be refused merely on the basis of the domestic law provisions (e.g. domestic bank secrecy rules). It may only be refused on the basis of the limitations to the general obligation of information exchange listed in the OECD Agreement, if they apply.

This new provision represents a very important development in the field of international exchange of information.

It will, however, only have effect in states that are prepared to amend their domestic law pursuant to the OECD Agreement. If implemented, it could constitute a milestone in eliminating harmful tax competition and restricting tax avoidance/evasion.

The second provision on trade secrets (etc.) is one of the most commonly applied limitations in all conventions on information exchange. It is primarily aimed at protecting the taxpayer's interest. The decision whether an information qualifies as a trade secret (etc.) is to be made by the requested state's authorities, but is subject to a restriction imposed by the OECD Agreement. Accordingly, information cannot be treated as a trade secret (etc.), merely because it is held by a bank or financial institution or merely because it is ownership information.[37] Where, under the domestic law of the requested state, such information is treated as secret, the OECD Agreement overrides the domestic law. As pointed out in the Commentary, the main application of the provision on trade secrets, etc. is in circumstances where the supply of information would reveal protected intellectual property.[38]

The third provision on the "attorney-client privilege" is aimed at protecting taxpayer rights. The explicit statement of this limitation is an innovative element of the convention and is not included in other conventions. As specified in the Commentary, the attorney-client privilege applies only if the attorney (solicitor or other legal representative) is admitted to practice law and to the extent that the attorney (etc.) acts in his capacity as attorney (etc.). The OECD Agreement sets out the purpose of the communications benefiting from the attorney-client privilege. Therefore documents that were not produced for the specified purposes are not subject to the privilege.

---

29. Art. 7(4) OECD Agreement; Art. 26(2)c) OECD Model; Art. 21(2)d) CE/OECD Convention; and Art. 8(2) EC Directive.

30. The precise wording of the OECD Model is slightly different, i.e. "...under the laws or in the normal course of administration".

31. Art. 7(1) OECD Agreement. Similar limitations can also be found in Art. 26(2)(b) of the OECD Model and Art. 21(2)(c) of the CE/OECD Convention.

32. Art. 8(3) EC Directive.

33. The restriction of the applicant state's domestic legislation does not allow an extension of its authority. The restriction on the requested state's domestic legislation requires it to observe its own legislation. These two restrictions constitute together the principle of reciprocity. As referred to in the Commentary to the CE/OECD Convention, it establishes a kind of minimum position that does not require the requested state to do more than the applicant state can do under its domestic law (Art. 21(2), points 195 and 196 Commentary to the CE/OECD Convention).

34. Art. 26(2)(b) OECD Model; Art. 21(2)(c) CE/OECD Convention; Art. 8(1) EC Directive.

35. Art. 1 OECD Agreement. For details, see 6. (Protection of taxpayers and confidentiality).

36. The "information on ownership" means information regarding the ownership of companies, partnerships, trusts, foundations, Anstalten and other persons, including, ownership information on all such persons in an ownership chain; with respect to trusts, information on settlors, trustees and beneficiaries; and in for foundations, information on founders, members of the foundation council and beneficiaries. The Agreement, however, does not impose an obligation on the contracting states to obtain or provide ownership information with respect to publicly traded companies or public collective investment funds or schemes unless such information can be obtained without giving rise to disproportionate difficulties (Art. 5(4) OECD Agreement).

37. Art. 7(2), point 82 Commentary to the OECD Agreement.

38. Art. 7, point 81 Commentary to the OECD Agreement.

Exported / Printed on 16 Dec. 2021 by isabelle.farrar@ropesgray.com.

Case 1:18-md-02865-LAK    Document 808-14    Filed 05/12/22    Page 112 of 231

The attorney-client privilege applies in conjunction with the domestic law provisions. If the domestic law of a contracting state provides for a narrower privilege than the one in the OECD Agreement, the requested state may not decline the request merely on the basis of the latter.[39]

The fourth provision on public policy is also a standard element of information exchange instruments. It protects the state's vital interest, but should only be invoked in extreme cases,[40] e.g. when the information includes state secrets.

The fifth provision provides the requested state with a possibility to refuse the supply of information where its use is related to discrimination against its own national. The provision applies both to procedural and substantive matters, but does not cover discrimination on the basis of residence.[41] A similar provision can also be found in the CE/OECD Convention.

Finally, the territorial scope of the OECD Agreement also limits the obligation to provide information. It is stated that the requested state "is not obliged to provide information which is neither held by its authorities nor in the possession or control of persons who are within its territorial jurisdiction".[42]

## 6. PROTECTION OF TAXPAYERS AND CONFIDENTIALITY

Global technical development enables tax authorities to collect, store and process an enormous amount of data. In doing so, tax authorities may be infringing taxpayers' right to privacy. In order to safeguard the right to privacy, states adopt legal guarantees and restrictions in their domestic legislation. These include, usually, the right of confidentiality and, occasionally, the right of notification, consultation, intervention.

These guarantees and restrictions are intended to establish a balance between the tax administrations' authority and the taxpayers' interest. The protection so provided is, however, only effective within the geographical boundaries of the state. Therefore additional measures are needed to protect taxpayer rights when information is handed over to another state in the context of an international exchange of information.

The limitations to the general obligation of information exchange can be regarded as the first line of protective measures provided in the conventions. This protection is, however, left to the discretion of the tax authorities. The conventions generally do not provide the taxpayer with a right to notification, consultation or intervention regarding the exchange of information. An exception can be found in the OECD Agreement in connection with tax examinations abroad. Accordingly, if the applicant state wishes to enter the territory of the requested state to interview individuals and examine records, the written consent of the persons concerned is required. In addition to the OECD Agreement, only the CE/OECD Convention contains a provision referring to taxpayer rights. The provision ensures the requested state's right, according to its domes-

tic legislation, to inform its resident or national before transmitting information.[43]

Though the conventions, generally, do not provide taxpayers with explicit rights, they ensure the applicability of the domestic law provisions. The OECD Agreement states that the rights and safeguards existing in the requested state continue to apply to the extent they do not unduly prevent or delay effective exchange of information.[44] Accordingly, domestic procedural rights (e.g. rights of notification) and safeguards (e.g. safeguards provided in international agreements on human rights) prevail over the OECD Agreement as long as they are duly applied.[45] The phrasing of this rule is intended to achieve a balance between the rights granted to taxpayers and the need for effective exchange of information, and thereby constitutes an innovative element of the OECD Agreement. The Commentary provides an example of the application of the rule. Where a bona fide procedural safeguard in the requested state applies, this may delay a response to an information request. Such a delay, however, should only be considered as "undue" if it calls into question the usefulness of the information exchange agreement for the applicant state.[46]

The second line of protection provided in conventions on information exchange, is the protection of confidentiality. In accordance with the generally adopted principle, the OECD Agreement also states that "any information received pursuant to the Agreement must be treated confidentially".[47]

The general principle of protection of confidentiality is, however, lifted under certain circumstances. The wording of the OECD Agreement is almost identical to the wording of Art. 26 of the OECD Model on the disclosure of information.[48] The main difference is that the OECD Agreement contains an additional sentence that also allows the disclosure of information in circumstances other than specified by the OECD Agreement, provided that the requested state has given its written consent to the disclosure. Similar provisions are also incorporated in the EC Directive and the CE/OECD Conventions; they both require the permission of the requested state in cases where the information is used for purposes other than those specified in the convention, or disclosed to a third party.[49] The requirement of the requested state's consent constitutes an additional safeguard to the taxpayer's right of confidentiality.

Generally, it can be concluded that the limitations to the general obligation of information exchange and the protection of confidentiality are regarded as sufficient protec-

---

39.   Art. 7(3), point 84 Commentary to the OECD Agreement.
40.   Art. 7(4), point 91 Commentary to the OECD Agreement.
41.   Art. 7(6), point 93 Commentary to the OECD Agreement.
42.   Art. 2 OECD Agreement.
43.   Art. 4(3) CE/OECD Convention.
44.   Art. 1 OECD Agreement.
45.   Art. 1, point 5 Commentary to the OECD Agreement.
46.   Art. 1, point 6 Commentary to the OECD Agreement.
47.   Art. 8 OECD Agreement. Similar statements can be found in Art.7(1) of the EC Directive; Art. 22(1) of the CE/OECD Convention; Art. 21 of the Nordic Convention; and Art. 26(1) of the OECD Model.
48.   Art. 8 OECD Agreement; and Art. 26(1) OECD Model.
49.   Art. 7(3) EC Directive; and Art. 7(2) CE/OECD.

© 2002 International Bureau of Fiscal Documentation

tion for the purposes of the international exchange of information.

## 7. THE REQUEST PROCEDURE

The OECD Agreement, as well as the other conventions, contain general rules on the information exchange procedure.[50] The contracting states can elaborate and agree on the further details of the procedure. Under the OECD Agreement, when the applicant state makes an official request, it has to provide the requested state with the data specified therein. The data must demonstrate the foreseeable relevance of the requested information to the tax matter in question.

The applicant state may request the information in a format that fulfils the evidentiary and other legal requirements of its domestic law (e.g. authenticated copies). This format, however, must be allowable under the laws of the requested party. If this is not the case the latter may refuse to provide the information in that specific form.

Upon receipt of the request, the requested state must take action to obtain the information. If the information possessed by the competent authority is not sufficient to satisfy the request, the requested state must use "all relevant information gathering measures" to provide the applicant state with the information requested. According to the Commentary to the OECD Agreement, an information-gathering measure is "relevant" if it is capable of obtaining the information requested by the applicant state.[51] The requested state determines which information-gathering measures are relevant in a particular case.

The requested state is expected to provide the information as promptly as possible to the applicant state. For this purpose the requested state must confirm the receipt of the request in writing and must notify the requesting state of any deficiencies in the request within 60 days of receipt of the request. The requested state may ask for additional information, but such a request may not delay a response to a proper information request. If the competent authority of the requested state is not able to provide the information within 90 days from receipt of the request,[52] it must immediately inform the applicant state and explain its reasons.[53]

With respect to the costs incurred in obtaining and providing the requested information, the Agreement does not include any specific rules. It only provides that the contracting states should agree upon the allocation of costs. The Commentary proposes that ordinary costs be borne by the requested state.[54] Ordinary costs refer to costs incurred in the ordinary course of administering the domestic tax laws of the requested state (e.g. obtaining and providing copies of documents). It is further noted that there are different methods for determining the allocation of costs (case-by-case arrangements, scale of fees, etc.); the contracting states should apply the most suitable method according to the particular circumstances (e.g. the likelihood of information flow and its direction).

## 8. IMPLEMENTATION

In order to enable an effective exchange of information, the OECD Agreement requires the contracting states to enact any legislation necessary to comply with and give effect to the terms of the Agreement.[55] Implicitly, it also requires the contracting states to refrain from introducing any new legislation contrary to their obligations under the Agreement.[56]

Both versions of the OECD Agreement suggest that the date of entering into force is, with regard to criminal tax matters, 1 January 2004 and with regard to all other tax matters, 1 January 2006.[57] Since the Agreement (in the case of both versions) is subject to ratification, acceptance or approval by the contracting states, the actual date of entering into force may differ from the above indicated dates.

For the purposes of the multilateral Agreement it is stated that any other possibilities of assistance in tax matters that are provided under existing international agreements, are not effected by the OECD Agreement, and vice versa.[58] As a result, the applicant state is able to choose the most appropriate instrument of assistance.

## 9. THE FUTURE

The OECD Agreement was initially drafted in order to combat harmful tax competition. Its application will probably be relevant in relationships with tax havens and low-tax jurisdictions.

Most of the OECD Member countries have already concluded tax treaties with each other that include an article on exchange of information. The article is usually based on Art. 26 of the OECD Model. Though treaty articles on information exchange tend to be less elaborate than the OECD Agreement, they provide for a similar framework of information exchange, sometimes even with a broader scope (e.g. taxes covered, forms of information exchange). The tax treaty articles on the exchange of information may therefore reduce the need for a separate agreement on information exchange.

The most ambitious goal of the OECD Agreement is to lift the domestic law limitations of bank secrecy and ownership information for the purposes of information exchange. The achievement of this goal, however, depends on the acceptance and cooperation of the states willing to adopt and apply the OECD Agreement. Past experience

---

50.  Art. 5 OECD Agreement. The rules on "tax examinations abroad" are not discussed here.
51.  Art. 5, point 42 Commentary to the OECD Agreement.
52.  The Commentary adds (Art. 5(6), point 65 Commentary to the OECD Agreement) that the 90-day period can be extended if required, e.g. because of the volume of the information requested.
53.  It should be noted that the setting of deadlines is unusual in conventions on information exchange. Its purpose is to ensure timely processing of the request and thus, an effective exchange of information.
54.  Art. 9, point 98 Commentary to the OECD Agreement.
55.  Art. 10 OECD Agreement.
56.  Art. 10, point 100 Commentary to the OECD Agreement.
57.  Art. 15 OECD Agreement.
58.  Art. 12 OECD Agreement.

© 2002 International Bureau of Fiscal Documentation

400    EUROPEAN TAXATION    SEPTEMBER 2002

has shown that "the more close the ties between the countries, the more alive is the cooperation".[59] Hopefully, the OECD Member countries are sufficiently connected with each other to ensure the success of the OECD Agreement.

59. "International mutual assistance through exchange of information", IFA, *Cahiers de droit fiscal international*, Vol. LXXVb (Deventer: Kluwer Law and Taxation Publishers, 1990), p. 55.

## INTERNATIONAL

# Compulsory Arbitration as a Last Resort in Resolving Tax Treaty Interpretation Problems

Dr Aurora Ribes Ribes*

## 1. THE INSUFFICIENCY OF THE MUTUAL AGREEMENT PROCEDURE

Notwithstanding the wide recognition of the mutual agreement procedure – envisaged in Art. 25(3) of the OECD Model Tax Convention[1] (OECD Model) – as an efficient and flexible instrument in the interpretation, application and development of tax treaties,[2] this mechanism has been extensively criticized in international tax legal scholarship.

The main inconveniences of the mutual agreement procedure, pointed out both by the commentators[3] and the international organizations,[4] in particular by the International Fiscal Association[5] (IFA), can be summarized as follows:
– the competent authorities have no obligation to reach an agreement but only to communicate with each other and negotiate in order to clarify the interpretative dispute. In other words, even though the purpose of the provision is to reach an agreement, a solution to the conflict is not guaranteed because the states are merely required to exercise their best efforts;[6]
– there are no time limits within which a solution is required to be found. This results in delays in the procedure, another important deficiency[7] of this mechanism.

   In fact, the settlement of the case may take several years because of differences in language, procedures and legal and accounting systems, as well the inability of the tax authorities to come to an agreement;[8]
– concerning the publication of the agreement, the criteria adopted are not homogeneous, which is obviously unsatisfactory; thus it depends on the discretion of each state whether the interpretative mutual agreements are eventually published. Considering that the first sentence of Art. 25(3) of the OECD Model, in contrast to the narrower procedure established in Art. 25(1), grants the power to seek a solution that has precedential value, i.e. that is not just binding in the specific case, the lack of uniformity in the publication of the agreement represents an even greater disadvantage of the "consultation procedure";

– the mechanism of the mutual agreement procedure does not oblige revenue authorities to implement the solution (if one is reached). On the contrary, more often than not the implementation of the agreement depends upon the domestic laws of the contracting parties, which leads consequently to divergent results in each state;
– to make matters worse, some countries tend to adopt a neutral attitude towards the mutual agreement procedure, i.e. they do not demonstrate any interest in using this dispute resolution mechanism, maybe because of the aforementioned deficiencies.

*    Professor of Tax, University of Alicante, Spain.
1.    Art. 25(3) of the current OECD Model (29 April 2000) states that: "The competent authorities of the Contracting States shall endeavour to resolve by mutual agreement any difficulties or doubts arising as to the interpretation or application of the Convention. They may also consult together for the elimination of double taxation in cases not provided for in the Convention".
2.    OECD 1984 Report on Mutual Agreement Procedure, Paras. 39 and 40.
3.    J.F. Avery Jones et al., "The legal nature of the mutual agreement under the OECD Model Convention" (I), *British Tax Review* (1979), p. 337; C. Palao Taboada, "El procedimiento amistoso en los convenios para evitar la doble imposición", 16 *Hacienda Pública Española* (1972), p. 327; S.H. Goldberg, "Competent Authority", 40 *Bulletin for International Fiscal Documentation* 10 (1986), p. 433; A.A. Skaar, "The legal nature of mutual agreements under tax treaties", 5 *Tax Notes International* 26 (1992), pp. 1441-1450; P. Baker, *Double taxation conventions and international tax law*, second edition (London: Sweet & Maxwell, 1994), p. 420; R. Casero Barrón, "La interpretación en Derecho español de los tratados internacionales para evitar la doble imposición. El papel del Consejo de Estado. Propuesta revitalizante o regeneracionista", (I), *Carta Tributaria* 288 (1998), p. 2; T. How Teck, "The 'Mutual Agreement Procedure' Article in tax treaties – Singapore's experience", *Intertax* 5 (2000), p. 210.
4.    For instance, the International Chamber of Commerce has also called for changes to be made to the existing mutual agreement procedure.
5.    See, in particular, IFA, *Cahiers de droit fiscal international*, Vol. LXVIa, "Mutual Agreement – Procedure and Practice" (Deventer: Kluwer Law and Taxation Publishers, 1981).
6.    As Maxime Chrétien declared, the competent authorities have "*la vie des conventions (...) entre leurs mains unies ou separées*" (the life of the conventions in their hands, whether united or divided). G. Gest, G. Tixier and J. Kerogues, *Droit Fiscal International* (Paris: Librairies Techniques, 1979), p. 190.
7.    In the same vein, Sivalingam affirms that the maxim "justice delayed is justice denied" is apparently ignored by the competent authorities in practice. See S. Sivalingam, "Tax Treaties – Do They Help?", 3 *Asia-Pacific Bulletin* 4 (1997), p. 116.
8.    M.P. Bricker, "Arbitration procedures in tax treaties. A first Israeli tax treaty includes an arbitration clause – But do such clauses really matter?", *Intertax* 3 (1998), p. 102.

© 2002 International Bureau of Fiscal Documentation

Exported / Printed on 16 Dec. 2021 by isabelle.farrar@ropesgray.com.

# Exhibit 26

Case 1:18-md-02865-LAK    Document 808-14    Filed 05/12/22    Page 116 of 231

Pasquantino v. U.S., 544 U.S. 349 (2005)
125 S.Ct. 1766, 161 L.Ed.2d 619, 96 A.F.T.R.2d 2005-5392, 73 USLW 4287...

KeyCite Yellow Flag - Negative Treatment
Grant of Post-Conviction Relief Affirmed by   U.S. v. Pasquantino,   4th Cir.
(Md.),   April 18, 2007

125 S.Ct. 1766
Supreme Court of the United States

David B. PASQUANTINO, Carl J.
Pasquantino, and Arthur Hilts, Petitioners,
v.
UNITED STATES.

No. 03–725.
|
Argued Nov. 9, 2004.
|
Decided April 26, 2005. Rehearing Denied June
20, 2005. See 545 U.S. 1135, 125 S.Ct. 2931.

Synopsis
**Background:** Defendants were convicted, in the United
States District Court for the District of Maryland, J. Frederick
Motz, J., of wire fraud, in connection with scheme to evade
Canadian liquor importation taxes. The Court of Appeals
initially reversed, 305 F.3d 291, but, on rehearing en
banc, 336 F.3d 321, affirmed. Certiorari was granted.

**Holdings:** The Supreme Court, Justice Thomas, held that:

[1] Canada's right to collect excise taxes on imported liquor
was "property" within meaning of wire fraud statute, and

[2] prosecution was not barred by common law revenue rule.

Affirmed.

Justice Ginsburg dissented and filed opinion in which Justice
Breyer joined, and in which Justices Scalia and Souter joined
in part.

West Headnotes (5)

[1]   **Telecommunications** 🔑 Nature of scheme or
device in general

Canada's right to collect excise taxes on
imported liquor, of which it was deprived by
defendants' smuggling scheme, was "property"
within meaning of federal wire fraud statute.

18 U.S.C.A. § 1343.

91 Cases that cite this headnote

[2]   **Telecommunications** 🔑 Nature of scheme or
device in general

Defendants' routine concealment of imported
liquor from Canadian officials and failure
to declare those goods on customs forms
constituted "scheme or artifice to defraud"
Canada of import tax revenues, within meaning
of federal wire fraud statute. 18 U.S.C.A. §
1343.

53 Cases that cite this headnote

[3]   **Statutes** 🔑 Common or civil law

Statutes that invade common law are to be read
with presumption favoring retention of long-
established and familiar principles, except where
contrary statutory purpose is evident.

16 Cases that cite this headnote

[4]   **Telecommunications** 🔑 Prosecutions

Common law revenue rule, which bars court
from enforcing foreign sovereign's tax laws,
did not preclude wire fraud prosecution of
defendants who were engaged in smuggling
scheme in order to evade Canadian liquor
importation taxes; any resulting enforcement
of foreign revenue law was mere collateral
consequence of government's independent
interest in punishing fraudulent domestic
criminal conduct. 18 U.S.C.A. § 1343.

Pasquantino v. U.S., 544 U.S. 349 (2005)

Case 1:18-md-02865-LAK    Document 808-14    Filed 05/12/22    Page 117 of 231

125 S.Ct. 1766, 161 L.Ed.2d 619, 96 A.F.T.R.2d 2005-5392, 73 USLW 4287...

55 Cases that cite this headnote

**[5]    Telecommunications ☞ Wire Fraud**

Application of wire fraud statute to defendants who were engaged in smuggling scheme in order to evade Canadian liquor importation taxes did not improperly give statute extraterritorial effect; offense was complete when defendants executed their scheme, intending to defraud Canada of tax revenues, inside United States. 18 U.S.C.A. § 1343.

77 Cases that cite this headnote

**\*\*1767    \*349    Syllabus** [\*]

Petitioners carried out a scheme to smuggle large quantities of liquor into Canada from the United States to evade Canada's heavy alcohol import taxes. They were convicted of violating the federal wire fraud statute, 18 U.S.C. § 1343, for doing so. That statute prohibits the use of interstate wires to effect "any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses." The Fourth Circuit affirmed their convictions, rejecting petitioners' argument that their prosecution contravened the common-law revenue rule, which bars courts from enforcing foreign sovereigns' tax laws. The Fourth Circuit also held that Canada's right to receive tax revenue was "money or property" within § 1343' s meaning.

*Held:* A plot to defraud a foreign government of tax revenue violates the federal wire fraud statute. Pp. 1771–1781.

(a)    Section 1343's plain terms criminalize a scheme such as petitioners'. Their smuggling operation satisfies both of the § 1343 elements that are in dispute here. First, Canada's right to uncollected excise taxes on the liquor petitioners imported into Canada is "property" within the statute's meaning. That right is an entitlement to collect money from petitioners, the possession of which is "something of value" to the Canadian Government. McNally v. United States, 483 U.S. 350, 358, 107 S.Ct. 2875, 97 L.Ed.2d 292. Such valuable entitlements are "property" as that term ordinarily

is employed. Second, petitioners' plot was a "scheme or artifice to defraud" Canada of its valuable entitlement to tax revenue, because petitioners routinely concealed imported liquor from Canadian officials and failed to declare those goods on customs forms. See Durland v. United States, 161 U.S. 306, 313, 16 S.Ct. 508, 40 L.Ed. 709. Pp. 1771–1773.

(b) The foregoing construction of § 1343 does not derogate from the common-law revenue rule. Pp. 1773–1781.

(1) Relying on the canon of construction that " '[s]tatutes which invade the common law ... are to be read with a presumption favoring the retention of long-established and familiar principles, except when a statutory purpose to the contrary is evident,' " United States v. Texas, 507 U.S. 529, 534, 113 S.Ct. 1631, 123 L.Ed.2d 245, petitioners argue that, to avoid reading § 1343 to derogate from the revenue rule, the Court should construe the otherwise-applicable statutory language to except frauds directed at \*350 evading foreign taxes. Whether § 1343 derogates from the revenue rule depends on whether reading the statute to reach this prosecution conflicts with a well-established revenue rule principle. See United States v. Craft, 535 U.S. 274, 276, 122 S.Ct. 1414, 152 L.Ed.2d 437. Thus, before concluding that Congress intended to exempt the present prosecution from § 1343's broad reach, the Court must find that the revenue rule clearly barred such a prosecution as of 1952, the year Congress enacted the wire fraud statute. See Neder v. United States, 527 U.S. 1, 22–23, 119 S.Ct. 1827, 144 L.Ed.2d 35. Pp. 1773–1774.

\*\*1768    (2) No common-law case decided as of 1952 clearly established that the revenue rule barred the United States from prosecuting a fraudulent scheme to evade foreign taxes. Pp. 1774–1779.

(i) The revenue rule has long been treated as a corollary of the rule that "[t]he Courts of no country execute the penal laws of another." The Antelope, 10 Wheat. 66, 123, 6 L.Ed. 268. It was first treated as such in cases prohibiting the enforcement of tax liabilities of one sovereign in the courts of another sovereign, such as suits to enforce tax judgments. The revenue rule's grounding in these cases shows that, at its core, it prohibited the collection of tax obligations of foreign nations. The present prosecution is unlike these classic examples of

Case 1:18-md-02865-LAK    Document 808-14    Filed 05/12/22    Page 118 of 231

Pasquantino v. U.S., 544 U.S. 349 (2005)
125 S.Ct. 1766, 161 L.Ed.2d 619, 96 A.F.T.R.2d 2005-5392, 73 USLW 4287...

actions traditionally barred by the revenue rule. It is not a suit that recovers a foreign tax liability, but is a criminal prosecution brought by the United States to punish domestic criminal conduct. Pp. 1774–1775.

(ii) Cases applying the revenue rule to bar indirect enforcement of foreign revenue laws, in contrast to the direct collection of a tax obligation, cannot bear the weight petitioners place on them. Many of them were decided after Congress passed the wire fraud statute. Others come from foreign courts. And, significantly, none involved a domestic sovereign acting pursuant to authority conferred by a criminal statute to enforce the sovereign's own penal law. Moreover, none of petitioners' cases barred an action that had as its primary object the deterrence and punishment of fraudulent conduct—a substantial domestic regulatory interest entirely independent of foreign tax enforcement. The main object of the action in each of them was the collection of money that would pay foreign tax claims. The absence of such an object here means that the link between this prosecution and foreign tax collection is incidental and attenuated at best. Thus, it cannot be said whether Congress in 1952 would have considered this prosecution within the revenue rule. Petitioners answer unpersuasively that the recovery of taxes is indeed the object of this suit because restitution of Canada's lost tax revenue is required under the federal Mandatory Victims Restitution Act of 1996. Whether restitution is mandatory is irrelevant here because 🟨 § 1343 advances the Government's independent interest in punishing fraudulent domestic criminal conduct. In any *351 event, if awarding restitution to foreign sovereigns were contrary to the revenue rule, the proper resolution would be to construe the later enacted restitution statute not to allow such awards, rather than to assume that it impliedly repealed 🟨 § 1343 as applied to this prosecution. Pp. 1775–1777.

(iii) Also unavailing is petitioners' argument that early English common-law cases holding unenforceable contracts executed to evade other nations' revenue laws demonstrate that "indirect" enforcement of such laws is at the very core of the revenue rule, rather than at its margins. Those early cases were driven by an interest in lessening the commercial disruption caused by high tariffs. By the mid–20th century, however, that rationale was supplanted, and courts began to apply the revenue rule to tax obligations on the strength of the analogy between a country's revenue laws and its penal ones. Because the early English cases rested on a far different foundation from that on which the revenue rule came to rest,

they say little about whether the wire fraud statute derogated from the revenue rule in its mid–20th–century form. Pp. 1777–1778.

(iv) Petitioners' criminal prosecution "enforces" Canadian revenue law in an attenuated sense, but not in a sense that **1769 clearly would contravene the revenue rule. That rule never proscribed all enforcement of foreign revenue law. For example, at the same time they were enforcing domestic contracts that had the purpose of violating foreign revenue law, English courts also considered void foreign contracts that lacked tax stamps required under foreign revenue law. The line the revenue rule draws between impermissible and permissible "enforcement" of foreign revenue law has therefore always been unclear. The uncertainty persisted in American cases, which demonstrate that the extent to which the revenue rule barred indirect recognition of foreign revenue laws was unsettled as of 1952. Pp. 1778–1779.

(3) The traditional rationales for the revenue rule do not plainly suggest that it barred this prosecution. First, this prosecution poses little risk of causing the principal evil against which the revenue rule was traditionally thought to guard: judicial evaluation of the revenue policies of foreign sovereigns. This action was brought by the Executive, "the sole organ of the federal government in the field of international relations," 🟦 United States v. Curtiss–Wright Export Corp., 299 U.S. 304, 320, 57 S.Ct. 216, 81 L.Ed. 255. Although a prosecution like this one requires a court to recognize foreign law to determine whether the defendant violated U.S. law, it may be assumed that by electing to prosecute, the Executive has assessed this prosecution's impact on this Nation's relationship with Canada, and concluded that it poses little danger of causing international friction. Petitioners' broader argument that the revenue rule avoids *352 giving domestic effect to politically sensitive and controversial policy decisions embodied in foreign revenue laws worries the Court little. The present prosecution, if authorized by the wire fraud statute, embodies the policy choice of the two political branches of Government— Congress and the Executive—to free the interstate wires from fraudulent use, irrespective of the object of the fraud. Such a reading of 🟨 § 1343 gives effect to that considered policy choice and therefore poses no risk of advancing Canadian policies illegitimately. Finally, petitioners' assertion that courts lack the competence to examine the validity of unfamiliar foreign tax schemes is not persuasive here. Foreign law posed no unmanageable complexity in this case, and

Case 1:18-md-02865-LAK    Document 808-14    Filed 05/12/22    Page 119 of 231

Pasquantino v. U.S., 544 U.S. 349 (2005)

125 S.Ct. 1766, 161 L.Ed.2d 619, 96 A.F.T.R.2d 2005-5392, 73 USLW 4287...

Federal Rule of Criminal Procedure 26.1 gives federal courts sufficient means to resolve any incidental foreign law issues that may arise in wire fraud prosecutions. Pp. 1779–1780.

(4) The Court's interpretation does not give § 1343 extraterritorial effect. Petitioners' offense was complete the moment they executed their scheme intending to defraud Canada of tax revenue inside the United States. See Durland, 161 U.S., at 313, 16 S.Ct. 508. Therefore, only domestic conduct is at issue here. In any event, because § 1343 punishes frauds executed "in interstate or foreign commerce," it is not a statute that involves only domestic concerns. Pp. 1780–1781.

336 F.3d 321, affirmed.

THOMAS, J., delivered the opinion of the Court, in which REHNQUIST, C. J., and STEVENS, O'CONNOR, and KENNEDY, JJ., joined. GINSBURG, J., filed a dissenting opinion, in which BREYER, J., joined, and in which SCALIA and SOUTER, JJ., joined as to Parts II and III, post, p. 1781.

**Attorneys and Law Firms**

Paul D. Clement, Acting Solicitor General, Counsel of Record, Christopher A. Wray, Assistant Attorney General, Michael R. Dreeben, Deputy Solicitor General, **1770 Irving L. Gornstein, Assistant to the Solicitor General, Kirby A. Heller, Attorney, Department of Justice, Washington, D.C., Brief for the United States.

Bruce R. Bryan, Syracuse, New York, Counsel for Petitioner Carl J. Pasquantino.

Jensen E. Barber, Jensen E. Barber & Assocs., Washington, DC, Counsel for Petitioner David B. Pasquantino.

Laura W. Brill, Counsel of Record, Christopher M. Newman, Alan J. Heinrich, Katherine Kraus, Peter Shimamoto, Irell & Manella, LLP, Los Angeles, California, Counsel for Petitioner Arthur Hilts.

**Opinion**

Justice THOMAS delivered the opinion of the Court.

At common law, the revenue rule generally barred courts from enforcing the tax laws of foreign sovereigns. The *353 question presented in this case is whether a plot to defraud

a foreign government of tax revenue violates the federal wire fraud statute, 18 U.S.C. § 1343 (2000 ed., Supp. II). Because the plain terms of § 1343 criminalize such a scheme, and because this construction of the wire fraud statute does not derogate from the common-law revenue rule, we hold that it does.

I

Petitioners Carl J. Pasquantino, David B. Pasquantino, and Arthur Hilts were indicted for and convicted of federal wire fraud for carrying out a scheme to smuggle large quantities of liquor into Canada from the United States. According to the evidence presented at trial, the Pasquantinos, while in New York, ordered liquor over the telephone from discount package stores in Maryland. See 336 F.3d 321, 325 (C.A.4 2003) (en banc). They employed Hilts and others to drive the liquor over the Canadian border, without paying the required excise taxes. Ibid. The drivers avoided paying taxes by hiding the liquor in their vehicles and failing to declare the goods to Canadian customs officials. Id., at 333. During the time of petitioners' smuggling operation, between 1996 and 2000, Canada heavily taxed the importation of alcoholic beverages. See 1997 S. C., ch. 36, §§ 21.1(1), 21.2(1); Excise Act Schedule 1.(1), R.S. C., ch. E–14 (1985); Excise Act 2001, Schedule 4, ch. 22, 2002 S.C. 239. Uncontested evidence at trial showed that Canadian taxes then due on alcohol purchased in the United States and transported to Canada were approximately double the liquor's purchase price. App. 65–66.

Before trial, petitioners moved to dismiss the indictment on the ground that it stated no wire fraud offense. The wire fraud statute prohibits the use of interstate wires to effect "any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises." 18 U.S.C. § 1343 (2000 ed., Supp. II). Petitioners contended that the Government lacked a *354 sufficient interest in enforcing the revenue laws of Canada, and therefore that they had not committed wire fraud. App. 48–57. The District Court denied the motion, and the case went to trial. The jury convicted petitioners of wire fraud.

Petitioners appealed their convictions to the United States Court of Appeals for the Fourth Circuit, again urging that the indictment failed to state a wire fraud offense. They argued that their prosecution contravened the common-law revenue

Case 1:18-md-02865-LAK    Document 808-14    Filed 05/12/22    Page 120 of 231

Pasquantino v. U.S., 544 U.S. 349 (2005)
125 S.Ct. 1766, 161 L.Ed.2d 619, 96 A.F.T.R.2d 2005-5392, 73 USLW 4287...

rule, because that required the court to take cognizance of the revenue laws of Canada. Over Judge Hamilton's dissent, the panel agreed and reversed the convictions. 305 F.3d 291, 295 (C.A.4 2002). Petitioners **1771 also argued that Canada's right to collect taxes from them was not "money or property" within the meaning of the wire fraud statute, but the panel unanimously rejected that argument. Id., at 294–295; id., at 299 (Hamilton, J., dissenting).

The Court of Appeals granted rehearing en banc, vacated the panel's decision, and affirmed petitioners' convictions. 336 F.3d 321 (C.A.4 2003). It concluded that the common-law revenue rule, rather than barring any recognition of foreign revenue law, simply allowed courts to refuse to enforce the tax judgments of foreign nations, and therefore did not preclude the Government from prosecuting petitioners. Id., at 327–329. The Court of Appeals held as well that Canada's right to receive tax revenue was "money or property" within the meaning of the wire fraud statute. Id., at 331–332.

We granted certiorari to resolve a conflict in the Courts of Appeals over whether a scheme to defraud a foreign government of tax revenue violates the wire fraud statute. 541 U.S. 972, 124 S.Ct. 1875, 158 L.Ed.2d 466 (2004). Compare United States v. Boots, 80 F.3d 580, 587 (C.A.1 1996) (holding that a scheme to defraud a foreign nation of tax revenue does not violate the wire fraud statute), with United States v. Trapilo, 130 F.3d 547, 552–553 (C.A.2 1997) (holding that a scheme to defraud a foreign nation of tax revenue violates the wire fraud statute). We *355 agree with the Court of Appeals that it does and therefore affirm the judgment below. [1]

## II

We first consider whether petitioners' conduct falls within the literal terms of the wire fraud statute. The statute prohibits using interstate wires to effect "any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises." 18 U.S.C. § 1343 (2000 ed., Supp. II). Two elements of this crime, and the only two that petitioners dispute here, are that the defendant engage in a "scheme or artifice to defraud," ibid., and that the "object of the fraud ... be '[money or] property' in the victim's hands," Cleveland v.

United States, 531 U.S. 12, 26, 121 S.Ct. 365, 148 L.Ed.2d 221 (2000). [2] Petitioners' smuggling operation satisfies both elements.

[1] Taking the latter element first, Canada's right to uncollected excise taxes on the liquor petitioners imported into Canada is "property" in its hands. This right is an entitlement to collect money from petitioners, the possession of which is "something of value" to the Government of Canada. McNally v. United States, 483 U.S. 350, 358, 107 S.Ct. 2875, 97 L.Ed.2d 292 (1987) (internal *356 quotation marks omitted). Valuable entitlements like these **1772 are "property" as that term ordinarily is employed. See Leocal v. Ashcroft, 543 U.S. 1, 9, 125 S.Ct. 377, 382, 160 L.Ed.2d 271 (2004) ("When interpreting a statute, we must give words their ordinary or natural meaning" (internal quotation marks omitted)); Black's Law Dictionary 1382 (4th ed.1951) (defining "property" as "extend[ing] to every species of valuable right and interest"). Had petitioners complied with this legal obligation, they would have paid money to Canada. Petitioners' tax evasion deprived Canada of that money, inflicting an economic injury no less than had they embezzled funds from the Canadian treasury. The object of petitioners' scheme was to deprive Canada of money legally due, and their scheme thereby had as its object the deprivation of Canada's "property."

The common law of fraud confirms this characterization of Canada's right to excise taxes. The right to be paid money has long been thought to be a species of property. See 3 W. Blackstone, Commentaries on the Laws of England 153–155 (1768) (classifying a right to sue on a debt as personal property); 2 J. Kent, Commentaries on American Law *351 (same). Consistent with that understanding, fraud at common law included a scheme to deprive a victim of his entitlement to money. For instance, a debtor who concealed his assets when settling debts with his creditors thereby committed common-law fraud. 1 J. Story, Equity Jurisprudence § 378 (I. Redfield 10th rev. ed. 1870); Chesterfield v. Janssen, 28 Eng. Rep. 82, 2 Ves. Sen. 125 (ch. 1750); 1 S. Rapalje & R. Lawrence, A Dictionary of American and English Law 546 (1883). That made sense given the economic equivalence between money in hand and money legally due. The fact that the victim of the fraud happens to be the government, rather than a private party, does not lessen the injury.

Our conclusion that the right to tax revenue is property in Canada's hands, contrary to petitioners' contentions, is

Case 1:18-md-02865-LAK    Document 808-14    Filed 05/12/22    Page 121 of 231

Pasquantino v. U.S., 544 U.S. 349 (2005)

125 S.Ct. 1766, 161 L.Ed.2d 619, 96 A.F.T.R.2d 2005-5392, 73 USLW 4287...

consistent with *Cleveland, supra.* In that case, the defendant, **\*357** *Cleveland,* had obtained a video poker license by making false statements on his license application. *Id., at 16–17, 121 S.Ct. 365.* We held that a State's interest in an unissued video poker license was not "property," because the interest in choosing particular licensees was " 'purely regulatory' " and "[could not] be economic." *Id., at 22–23, 121 S.Ct. 365.* We also noted that "the Government nowhere allege[d] that Cleveland defrauded the State of any money to which the State was entitled by law." *Ibid.*

*Cleveland* is different from this case. Unlike a State's interest in allocating a video poker license to particular applicants, Canada's entitlement to tax revenue is a straightforward "economic" interest. There was no suggestion in *Cleveland* that the defendant aimed at depriving the State of any money due under the license; quite the opposite, there was "no dispute that [the defendant's partnership] paid the State of Louisiana its proper share of revenue" due. *Id., at 22, 121 S.Ct. 365.* Here, by contrast, the Government alleged and proved that petitioners' scheme aimed at depriving Canada of money to which it was entitled by law. Canada could hardly have a more "economic" interest than in the receipt of tax revenue. *Cleveland* is therefore consistent with our conclusion that Canada's entitlement is "property" as that word is used in the wire fraud statute.

**[2]**    Turning to the second element at issue here, petitioners' plot was a "scheme or artifice to defraud" Canada of its valuable entitlement to tax revenue. The evidence showed that petitioners routinely concealed imported liquor from Canadian officials and failed to declare those goods on customs forms. See *336 F.3d, at 333.* **\*\*1773** By this conduct, they represented to Canadian customs officials that their drivers had no goods to declare. This, then, was a scheme "designed to defraud by representations," *Durland v. United States,* 161 U.S. 306, 313, 16 S.Ct. 508, 40 L.Ed. 709 (1896), and therefore a "scheme or artifice to defraud" Canada of taxes due on the smuggled goods.

**\*358** Neither the antismuggling statute, *18 U.S.C. § 546,* [3] nor U.S. tax treaties, see *Attorney General of Canada v. R.J. Reynolds Tobacco Holdings, Inc.,* 268 F.3d 103, 115–119 (C.A.2 2001), convince us that petitioners' scheme falls outside the terms of the wire fraud statute. [4] Unlike the treaties and the antismuggling statute, the wire fraud statute punishes fraudulent use of domestic wires, whether or not

such conduct constitutes smuggling, occurs aboard a vessel, or evades foreign taxes. See *post,* at 1786, n. 9 (GINSBURG, J., dissenting) (noting that the antismuggling statute does not apply to this prosecution). Petitioners would be equally liable if they had used interstate wires to defraud Canada not of taxes due, but of money from the Canadian treasury. The wire fraud statute "applies without differentiation" to these two categories of fraud. *Clark v. Martinez,* 543 U.S. 371, 378, 125 S.Ct. 716, 722–723, 160 L.Ed.2d 734 (2005). "To give these same words a different meaning **\*359** for each category would be to invent a statute rather than interpret one." *Ibid.* We therefore decline to "interpret [this] criminal statute more narrowly than it is written." *Brogan v. United States,* 522 U.S. 398, 406, 118 S.Ct. 805, 139 L.Ed.2d 830 (1998).

### III

**[3]**    We next consider petitioners' revenue rule argument. Petitioners argue that, to avoid reading *§ 1343* to derogate from the common-law revenue rule, we should construe the otherwise-applicable language of the wire fraud statute to except frauds directed at evading foreign taxes. Their argument relies on the canon of construction that "[s]tatutes which invade the common law ... are to be read with a presumption favoring the retention of long-established and familiar principles, except when a statutory purpose to the contrary is evident." *United States v. Texas,* 507 U.S. 529, 534, 113 S.Ct. 1631, 123 L.Ed.2d 245 (1993) (internal quotation marks omitted). This presumption is, however, no bar to a construction that conflicts with a common-law rule if the **\*\*1774** statute " 'speak[s] directly' to the question addressed by the common law." *Ibid.*

Whether the wire fraud statute derogates from the common-law revenue rule depends, in turn, on whether reading *§ 1343* to reach this prosecution conflicts with a well-established revenue rule principle. We clarified this constraint on the application of the nonderogation canon in *United States v. Craft,* 535 U.S. 274, 122 S.Ct. 1414, 152 L.Ed.2d 437 (2002). The issue in *Craft* was whether the property interest of a tenant by the entirety was exempt from a federal tax lien. *Id., at 276, 122 S.Ct. 1414.* We construed the federal tax lien statute to reach such a property interest, despite the tension between that construction and the common-law rule

Case 1:18-md-02865-LAK    Document 808-14    Filed 05/12/22    Page 122 of 231

Pasquantino v. U.S., 544 U.S. 349 (2005)

125 S.Ct. 1766, 161 L.Ed.2d 619, 96 A.F.T.R.2d 2005-5392, 73 USLW 4287...

that entireties property enjoys immunity from liens, because this "common-law rule was not so well established with respect to the application of a federal tax lien that we must assume that Congress considered the impact of its enactment on the question now before us." **\*360** *Id.,* at 288, 122 S.Ct. 1414. [5] So too here, before we may conclude that Congress intended to exempt the present prosecution from the broad reach of the wire fraud statute, we must find that the common-law revenue rule clearly barred such a prosecution. We examine the state of the common law as of 1952, the year Congress enacted the wire fraud statute. See *Neder v. United States,* 527 U.S. 1, 22–23, 119 S.Ct. 1827, 144 L.Ed.2d 35 (1999). [6]

[4]    The wire fraud statute derogates from no well-established revenue rule principle. We are aware of no common-law revenue rule case decided as of 1952 that held or clearly implied that the revenue rule barred the United States from prosecuting a fraudulent scheme to evade foreign taxes. The traditional rationales for the revenue rule, moreover, do not plainly suggest that it swept so broadly. We consider these two points in turn.

A

We first consider common-law revenue rule jurisprudence as it existed in 1952, the year Congress enacted § 1343. Since the late 19th and early 20th century, courts have treated the common-law revenue rule as a corollary of the **\*361** rule that, as Chief Justice Marshall put it, "[t]he Courts of no country execute the penal laws of another." *The Antelope,* 10 Wheat. 66, 123, 6 L.Ed. 268 (1825). The rule against the enforcement of foreign penal statutes, in turn, tracked the common-law principle that crimes could only be prosecuted in the country in which they were committed. See, *e.g.,* J. Story, Commentaries on the Conflict of Laws § 620, p. 840 (M. Bigelow **\*\*1775** ed. 8th ed. 1883). The basis for inferring the revenue rule from the rule against foreign penal enforcement was an analogy between foreign revenue laws and penal laws. See *Wisconsin v. Pelican Ins. Co.,* 127 U.S. 265, 290, 8 S.Ct. 1370, 32 L.Ed. 239 (1888); Leflar, Extrastate Enforcement of Penal and Governmental Claims, 46 Harv. L.Rev. 193, 219 (1932) (hereinafter Leflar).

Courts first drew that inference in a line of cases prohibiting the enforcement of tax liabilities of one sovereign in the

courts of another sovereign, such as a suit to enforce a tax judgment. [7] The revenue rule's grounding in these cases shows that, at its core, it prohibited the collection of tax obligations of foreign nations. Unsurprisingly, then, the revenue rule is often stated as prohibiting the collection of foreign tax claims. See Brief for Petitioners 16 (noting that "[t]he most straightforward application of the revenue rule arises when a foreign sovereign attempts to sue directly in its own right to enforce a tax judgment in the courts of another nation"). [8]

**\*362**    The present prosecution is unlike these classic examples of actions traditionally barred by the revenue rule. It is not a suit that recovers a foreign tax liability, like a suit to enforce a judgment. This is a criminal prosecution brought by the United States in its sovereign capacity to punish domestic criminal conduct. Petitioners nevertheless argue that common-law revenue rule jurisprudence as of 1952 prohibited such prosecutions. Revenue rule cases, however, do not establish that proposition, much less clearly so.

1

Petitioners first analogize the present action to several cases that have applied the revenue rule to bar indirect enforcement of foreign revenue laws, in contrast to the direct collection of a tax obligation. They cite, for example, a decision of an Irish trial court holding that a private liquidator could not recover assets unlawfully distributed and moved to Ireland by a corporate director, because the recovery would go to satisfy the company's Scottish tax obligations. *Peter Buchanan Ltd. v. McVey,* 1955 A.C. 516, 529–530 (Ir.H.Ct.1950)*Peter Buchanan Ltd. v. McVey,* 1955 A.C. 516, 529–530 (Ir.H.Ct.1950), app. dism'd, 1955 A.C. 530 (Ir.Sup.Ct.1951)1955 A.C. 530 (Ir.Sup.Ct.1951). [9] **\*363**    The court found that "the **\*\*1776** sole object of the liquidation proceedings in Scotland was to collect a revenue debt," because if the liquidator won, "every penny recovered after paying certain costs ... could be claimed by the Scottish Revenue." *Id.,* at 530. According to the *Buchanan* court, "[i]n every case the substance of the claim must be scrutinized, and if it then appears that it is really a suit brought for the purpose of collecting the debts of a foreign revenue it must be rejected." *Id.,* at 529.

*Buchanan* and the other cases on which petitioners rely cannot bear the weight petitioners place on them. Many of them were

Case 1:18-md-02865-LAK    Document 808-14    Filed 05/12/22    Page 123 of 231

Pasquantino v. U.S., 544 U.S. 349 (2005)
125 S.Ct. 1766, 161 L.Ed.2d 619, 96 A.F.T.R.2d 2005-5392, 73 USLW 4287...

decided after 1952, too late for the Congress that passed the wire fraud statute to have relied on them. Others come from foreign courts. Drawing sure inferences regarding Congress' intent from such foreign citations is perilous, as several of petitioners' cases illustrate. [10]

 **\*364**  More important, none of these cases clearly establishes that the revenue rule barred this prosecution. None involved a domestic sovereign acting pursuant to authority conferred by a criminal statute. The difference is significant. An action by a domestic sovereign enforces the sovereign's own penal law. A prohibition on the enforcement of *foreign* penal law does not plainly prevent the Government from enforcing a *domestic* criminal law. Such an extension, to our knowledge, is unprecedented in the long history of either the revenue rule or the rule against enforcement of penal laws.

Moreover, none of petitioners' cases (with the arguable exception of ☐ **\*\*1777** *Banco Do Brasil, S.A. v. A.C. Israel Commodity Co.,* 12 N.Y.2d 371, 239 N.Y.S.2d 872, 190 N.E.2d 235 (App.1963)) barred an action that had as its primary object the deterrence and punishment of fraudulent conduct—a substantial domestic regulatory interest entirely independent of foreign tax enforcement. The main object of the action in each of those cases was the collection of money that would pay foreign tax claims. The absence of such an object in this action means that the link between this prosecution and foreign tax collection is incidental and attenuated at best, making it not plainly one in which "the whole object of the suit is to collect tax for a foreign revenue." *Buchanan, supra,* at 529. Even those courts that as of 1952 had extended the revenue rule beyond its core prohibition had not faced a case closely **\*365** analogous to this one—and thus we cannot say with any reasonable certainty whether Congress in 1952 would have considered this prosecution within the revenue rule.

Petitioners answer that the recovery of taxes is indeed the object of this suit, because restitution of the lost tax revenue to Canada is required under the Mandatory Victims Restitution Act of 1996, ☐ 18 U.S.C. §§ 3663A– ☐ 3664 (2000 ed. and Supp. II). [11] We do not think it matters whether the provision of restitution is mandatory in this prosecution. Regardless, the wire fraud statute advances the Federal Government's independent interest in punishing fraudulent domestic criminal conduct, a significant feature absent from all of petitioners' revenue rule cases. The purpose of awarding

restitution in this action is not to collect a foreign tax, but to mete out appropriate criminal punishment for that conduct.

In any event, any conflict between mandatory restitution and the revenue rule would not change our holding today. If awarding restitution to foreign sovereigns were contrary to the revenue rule, the proper resolution would be to construe the Mandatory Victims Restitution Act not to allow such awards, rather than to assume that the later enacted restitution statute impliedly repealed ☐ § 1343 as applied to frauds against foreign sovereigns.


2

We are no more persuaded by a second line of cases on which petitioners rely. Petitioners analogize the present case to early English common-law cases from which the revenue rule originally derived. Those early cases involved contract law, and they held that contracts executed with the purpose of evading the revenue laws of other nations were enforceable, notwithstanding the rule against enforcing contracts **\*366** with illegal purposes. See *Boucher v. Lawson,* Cas. T. Hard. 85, 89–90, 95 Eng. Rep. 53, 55–56 (K.B.1734); *Planche v. Fletcher,* 1 Dougl. 251, 99 Eng. Rep. 164 (K.B.1779). Petitioners argue that these cases demonstrate that "indirect" enforcement of revenue laws is at the very core of the common-law revenue rule, rather than at its margins.

The argument is unavailing. By the mid–20th century, the revenue rule had developed into a doctrine very different from its original form. Early revenue rule cases were driven by the interest in lessening the commercial disruption caused by the high tariffs of the day. As Lord Hardwicke explained, if contracts that aimed at circumventing foreign revenue laws were unenforceable, "it would cut off all benefit of such trade from this kingdom, which would be of very bad consequence to the principal and most beneficial branches of **\*\*1778** our trade." *Boucher, supra,* at 89, 95 Eng. Rep., at 56. By the 20th century, however, that rationale for the revenue rule had been supplanted. By then, as we have explained, courts had begun to apply the revenue rule to tax obligations on the strength of the analogy between a country's revenue laws and its penal ones, see *supra,* at 1774–1775, superseding the original promotion-of-commerce rationale for the rule. Dodge, Breaking the Public Law Taboo, 43 Harv. Int'l L.J. 161, 178 (2002); *Buchanan,* 1955 A.C., at 522–524, 528–529. The early English cases rest on a far different foundation from that on which the revenue rule came to rest. They thus say

Case 1:18-md-02865-LAK    Document 808-14    Filed 05/12/22    Page 124 of 231

Pasquantino v. U.S., 544 U.S. 349 (2005)

125 S.Ct. 1766, 161 L.Ed.2d 619, 96 A.F.T.R.2d 2005-5392, 73 USLW 4287...

little about whether the wire fraud statute derogated from the revenue rule in its mid–20th–century form.


3

Granted, this criminal prosecution "enforces" Canadian revenue law in an attenuated sense, but not in a sense that clearly would contravene the revenue rule. From its earliest days, the revenue rule never proscribed all enforcement of foreign revenue law. For example, at the same time they were enforcing domestic contracts that had the purpose of **\*367** violating foreign revenue law, English courts also considered void foreign contracts that lacked tax stamps required under foreign revenue law. See *Alves v. Hodgson,* 7 T.R. 241, 243, 101 Eng. Rep. 953, 955 (K.B.1797); *Clegg v. Levy,* 3 Camp. 166, 167, 170 Eng. Rep. 1343 (N.P. 1812). Like the present prosecution, cases voiding foreign contracts under foreign law no doubt "enforced" foreign revenue law in the sense that they encouraged the payment of foreign taxes; yet they fell outside the revenue rule's scope. The line the revenue rule draws between impermissible and permissible "enforcement" of foreign revenue law has therefore always been unclear.

The uncertainty persisted in American courts that recognized the revenue rule. In one of the earliest appearances of the revenue rule in America, the Supreme Court of New Hampshire entertained an action that required extensive recognition of a sister State's revenue laws. *Henry v. Sargeant,* 13 N.H. 321 (1843). There, the plaintiff sought damages, alleging that a Vermont selectman had imposed an illegal tax on him. *Id.,* at 331. The court found that the revenue rule did not bar the action, *id.,* at 331–332, though the suit required the court to enforce the revenue laws of Vermont, see *id.,* at 335–338.

Likewise, in *In re Hollins,* 79 Misc. 200, 139 N.Y.S. 713 (Sur.Ct.), aff'd, 160 A.D. 886, 144 N.Y.S. 1121 (1913), aff'd, 212 N.Y. 567, 106 N.E. 1034 (App.1914) *(per curiam),* the court held that an estate executor could satisfy foreign taxes due on a decedent's estate out of property of the estate, notwithstanding a legatee's argument that the revenue rule barred authorizing such payments. 79 Misc., at 207–208, 139 N.Y.S., at 716–717. The court explained:

"While it is doubtless true that this court will not aid a foreign country in the enforcement of its revenue laws, it will not refuse to direct a just and equitable administration of that part of an estate within its jurisdiction

merely because such direction would result in the **\*368** enforcement of such revenue laws." *Id.,* at 208, 139 N.Y.S., at 717.

These cases demonstrate that the extent to which the revenue rule barred indirect recognition of foreign revenue laws was unsettled as of 1952. Following the reasoning of *In re Hollins,* for instance, Congress might well have thought that courts would enforce the wire fraud statute, even if doing so might incidentally recognize Canadian revenue law. The uncertainty highlights that "[i]ndirect enforcement is **\*\*1779** ... easier to describe than to define," and "it is sometimes difficult to draw the line between an issue involving merely recognition of a foreign law and indirect enforcement of it." 1 A. Dicey & J. Morris, Conflict of Laws 90 (L. Collins gen. ed. 13th ed.2000). Even if the present prosecution is analogous to the indirect enforcement cases on which petitioners rely, those cases do not yield a rule sufficiently well established to narrow the wire fraud statute in the context of this criminal prosecution.


B

Having concluded that revenue rule jurisprudence is no clear bar to this prosecution, we next turn to whether the purposes of the revenue rule, as articulated in the relevant authorities, suggest differently. They do not.

First, this prosecution poses little risk of causing the principal evil against which the revenue rule was traditionally thought to guard: judicial evaluation of the policy-laden enactments of other sovereigns. See, *e.g.,*  *Moore v. Mitchell,* 30 F.2d 600, 604 (C.A.2 1929) (L.Hand, J., concurring). As Judge Hand put it, allowing courts to enforce another country's revenue laws was thought to be a delicate inquiry

"when it concerns the relations between the foreign state and its own citizens .... To pass upon the provisions for the public order of another state is, or at any rate should be, beyond the powers of a court; it involves **\*369** the relations between the states themselves, with which courts are incompetent to deal, and which are intrusted to other authorities." *Ibid.*

The present prosecution creates little risk of causing international friction through judicial evaluation of the policies of foreign sovereigns. This action was brought by the Executive to enforce a statute passed by Congress.

Case 1:18-md-02865-LAK    Document 808-14    Filed 05/12/22    Page 125 of 231

Pasquantino v. U.S., 544 U.S. 349 (2005)

125 S.Ct. 1766, 161 L.Ed.2d 619, 96 A.F.T.R.2d 2005-5392, 73 USLW 4287...

In our system of government, the Executive is "the sole organ of the federal government in the field of international relations," *United States v. Curtiss–Wright Export Corp.,* 299 U.S. 304, 320, 57 S.Ct. 216, 81 L.Ed. 255 (1936), and has ample authority and competence to manage "the relations between the foreign state and its own citizens" and to avoid "embarass[ing] its neighbor[s]," *Moore, supra,* at 604 (L.Hand, J., concurring); see also *Chicago & Southern Air Lines, Inc. v. Waterman S.S. Corp.,* 333 U.S. 103, 111, 68 S.Ct. 431, 92 L.Ed. 568 (1948). True, a prosecution like this one requires a court to recognize foreign law to determine whether the defendant violated U.S. law. But we may assume that by electing to bring this prosecution, the Executive has assessed this prosecution's impact on this Nation's relationship with Canada, and concluded that it poses little danger of causing international friction. We know of no common-law court that has applied the revenue rule to bar an action accompanied by such a safeguard, and neither petitioners nor the dissent directs us to any. The greater danger, in fact, would lie in our judging this prosecution barred based on the foreign policy concerns animating the revenue rule, concerns that we have "neither aptitude, facilities nor responsibility" to evaluate. *Ibid.*

More broadly, petitioners argue that the revenue rule avoids giving domestic effect to politically sensitive and controversial policy decisions embodied in foreign revenue laws, regardless of whether courts need pass judgment on such laws. See *Banco Nacional de Cuba v. Sabbatino,* 376 U.S. 398, 448, 84 S.Ct. 923, 11 L.Ed.2d 804 (1964) (White, J., dissenting) ("[C]ourts customarily **\*370** refuse to enforce the revenue and penal laws of a foreign state, since no country has an obligation to further the governmental interests of a foreign sovereign" **\*\*1780** ). This worries us little here. The present prosecution, if authorized by the wire fraud statute, embodies the policy choice of the two political branches of our Government—Congress and the Executive—to free the interstate wires from fraudulent use, irrespective of the object of the fraud. Such a reading of the wire fraud statute gives effect to that considered policy choice. It therefore poses no risk of advancing the policies of Canada illegitimately.

Still a final revenue rule rationale petitioners urge is the concern that courts lack the competence to examine the validity of unfamiliar foreign tax schemes. See, *e.g.,* Leflar 218. Foreign law, of course, posed no unmanageable complexity in this case. The District Court had before it uncontroverted testimony of a Government witness that

petitioners' scheme aimed at violating Canadian tax law. See App. 65–66.

Nevertheless, Federal Rule of Criminal Procedure 26.1 addresses petitioners' concern by setting forth a procedure for interpreting foreign law that improves on those available at common law. Specifically, it permits a court, in deciding issues of foreign law, to consider "any relevant material or source—including testimony—without regard to the Federal Rules of Evidence." By contrast, common-law procedures for dealing with foreign law—those available to the courts that formulated the revenue rule—were more cumbersome. See Advisory Committee's Notes on Fed. Rule Crim. Proc. 26.1, 18 U.S.C. App., p. 1606 (noting that the rule improves on common-law procedures for proving foreign law). Rule 26.1 gives federal courts sufficient means to resolve the incidental foreign law issues they may encounter in wire fraud prosecutions.

## \*371 IV

[5]    Finally, our interpretation of the wire fraud statute does not give it "extraterritorial effect." [12]  *Post,* at 1784 (GINSBURG, J., dissenting). Petitioners used U.S. interstate wires to execute a scheme to defraud a foreign sovereign of tax revenue. Their offense was complete the moment they executed the scheme inside the United States; "[t]he wire fraud statute punishes the scheme, not its success." *United States v. Pierce,* 224 F.3d 158, 166 (C.A.2 2000) (internal quotation marks and brackets in original omitted); see *Durland,* 161 U.S., at 313, 16 S.Ct. 508 ("The significant fact is the intent and purpose"). This domestic element of petitioners' conduct is what the Government is punishing in this prosecution, no less than when it prosecutes a scheme to defraud a foreign individual or corporation, or a foreign government acting as a market participant. See *post,* at 1785, n. 8 (GINSBURG, J., dissenting) (noting that such prosecutions of foreign individuals, corporations, and governments are domestic applications of the wire fraud statute). [13]  In any event, **\*\*1781** the wire fraud statute punishes frauds executed "in interstate or foreign **\*372** commerce," 18 U.S.C. § 1343 (2000 ed., Supp. II), so this is surely not a statute in which Congress had only "domestic concerns in mind." *Small v. United States, ante,* 544 U.S., at 388, 125 S.Ct. 1752, 1755, 161 L.Ed.2d 651, 2005 WL 946620.

Case 1:18-md-02865-LAK    Document 808-14    Filed 05/12/22    Page 126 of 231

Pasquantino v. U.S., 544 U.S. 349 (2005)

125 S.Ct. 1766, 161 L.Ed.2d 619, 96 A.F.T.R.2d 2005-5392, 73 USLW 4287...

\* \* \*

It may seem an odd use of the Federal Government's resources to prosecute a U.S. citizen for smuggling cheap liquor into Canada. But the broad language of the wire fraud statute authorizes it to do so, and no canon of statutory construction permits us to read the statute more narrowly. The judgment of the Court of Appeals is affirmed. [14]

*It is so ordered.*

Justice GINSBURG, with whom Justice BREYER joins, and with whom Justice SCALIA and Justice SOUTER join as to Parts II and III, dissenting.

This case concerns extension of the "wire fraud" statute, 18 U.S.C. § 1343 (2000 ed., Supp. II), to a scenario extraterritorial in significant part: The Government invoked the statute to reach a scheme to smuggle liquor from the United States into Canada and thereby deprive Canada of revenues due under that nation's customs and tax laws. Silent on its application to activity culminating beyond our borders, the statute prohibits "any scheme" to defraud that employs in its execution communication through interstate or international **\*373** wires. A relevant background norm, known as the common-law revenue rule, bars suit in one country to enforce another country's tax laws.

The scheme at issue involves liquor purchased from discount sellers in Maryland, trucked to New York, then smuggled into Canada to evade Canada's hefty tax on imported alcohol. [1]

Defendants below, petitioners here, were indicted under § 1343 for devising a scheme "to defraud the governments of Canada and the Province of Ontario of excise duties and tax revenues relating to the importation and sale of liquor." App. to Pet. for Cert. 58a. Each of the six counts in question was based on telephone calls between New York and Maryland. *Id.,* at 60a–64a.

The Court today reads the wire fraud statute to draw into our courts, at the prosecutor's option, charges that another nation's revenue laws have been evaded. The common-law revenue rule does not stand in the way, the Court instructs, for that rule has no application to criminal prosecutions under the wire fraud statute.

**\*\*1782** As I see it, and as petitioners urged, Reply Brief 17–19, the Court has ascribed an exorbitant scope to the wire fraud statute, in disregard of our repeated recognition that "Congress legislates against the backdrop of the presumption against extraterritoriality." See *EEOC v. Arabian American Oil Co.,* 499 U.S. 244, 248, 111 S.Ct. 1227, 113 L.Ed.2d 274 (1991) (*Aramco*); *Small v. United States, ante,* 544 U.S., at 388–389, 125 S.Ct. 1752, 1755, 2005 WL 946620, at \*3 (The Court has "adopt[ed] the legal presumption that Congress ordinarily intends its statutes to have domestic, not extraterritorial, application."); Reply Brief 17, n. 23 ("This prosecution clearly gives the wire fraud statute extraterritorial effect in that '[t]he actions in [Canada] are ... most naturally understood as the kernel of' Petitioners' alleged fraud." (quoting *Sosa v. Alvarez–Machain,* 542 U.S. 692, 700–701, 124 S.Ct. 2739, 2748, 159 L.Ed.2d 718 (2004))). [2] Notably, when Congress explicitly addressed international smuggling, see 18 U.S.C. § 546, it provided for criminal enforcement of the customs laws of a foreign nation only when that nation has a reciprocal law criminalizing smuggling into the United States. Currently, Canada has no such reciprocal law.

Of overriding importance in this regard, tax collection internationally is an area in which treaties hold sway. See *Attorney General of Canada v. R.J. Reynolds Tobacco Holdings, Inc.,* 268 F.3d 103, 115–119 (C.A.2 2001) (referencing tax treaties to which the United States is a party). There is a treaty between the United States and Canada regarding the collection of taxes, but that accord requires certification by the taxing nation that the taxes owed have been "finally determined." See Protocol Amending the Convention with Respect to Taxes on Income and on Capital, Sept. 26, 1980, S. Treaty Doc. No. 104–4, 2030 U.N.T.S. 236, 245, Protocol Amending the Convention with Respect to Taxes on Income and on Capital, Sept. 26, 1980, S. Treaty Doc. No. 104–4, 2030 U.N.T.S. 236, 245, Art. 15, ¶ 2 (entered into force Nov. 9, 1995) (hereinafter Protocol). Moreover, the treaty is inapplicable to persons, like petitioners in this case, who are United States citizens at the time that the tax liability is incurred. *Id.,* at 246, Art. 15, ¶ 8.

**\*375** Today's novel decision is all the more troubling for its failure to take account of Canada's primary interest in the matter at stake. United States citizens who have committed criminal violations of Canadian tax law can be extradited to

Case 1:18-md-02865-LAK    Document 808-14    Filed 05/12/22    Page 127 of 231

Pasquantino v. U.S., 544 U.S. 349 (2005)

125 S.Ct. 1766, 161 L.Ed.2d 619, 96 A.F.T.R.2d 2005-5392, 73 USLW 4287...

stand trial in Canada.[3] Canadian courts are best positioned to decide "whether, and to what extent, the defendants have defrauded the **1783 governments of Canada and Ontario out of tax revenues owed pursuant to their own, sovereign, excise laws." 336 F.3d 321, 343 (C.A.4 2003) (en banc) (Gregory, J., dissenting).

## I

The Government's prosecution of David Pasquantino, Carl Pasquantino, and Arthur Hilts for wire fraud was grounded in Canadian customs and tax laws. The wire fraud statute, 18 U.S.C. § 1343, required the Government to allege and prove that the defendants engaged in a scheme to defraud a victim—here, the Canadian Government—of money or property. See *ante,* at 1772 (describing Canada as the "victim" of a scheme having "as its object the deprivation of Canada's 'property' "). To establish the fraudulent nature of the defendants' scheme and the Canadian Government's entitlement to the money withheld by the defendants, the United States offered proof at trial that Canada imposes import duties on liquor, and that the defendants intended to evade those duties. See App. to Pet. for Cert. 58a; App. 65–74. The defendants' convictions for wire fraud therefore resulted from, and could not have been obtained without proof of, their intent to violate Canadian revenue laws. See *United States v. Pierce,* 224 F.3d 158, 166–168 (C.A.2 2000) ("If no Canadian duty or tax actually existed, the [defendants] were no more guilty of wire fraud than they would have been had *376 they used the wires" to smuggle liquor into New York City, "in the sincere but mistaken belief that New York City imposes a duty on such ... shipments.").

The United States Government's reliance on Canadian customs and tax laws continued at sentencing. The United States Sentencing Guidelines mandated that the defendants be sentenced on the basis of, among other things, the amount by which the defendants defrauded the Canadian Government. See United States Sentencing Commission, Guidelines Manual § 2F1.1(b)(1) (Nov.2000). Accordingly, the District Court calculated the number of cases of liquor smuggled into Canada and the aggregate amount of import duties evaded by the defendants. The court concluded that the Pasquantinos avoided over $2.5 million in Canadian duties, and Hilts, over $1.1 million. See App. 97–101, 104–105.[4] The resulting offense-level increases yielded significantly *377 longer

sentences for the defendants.[5] As Judge Gregory **1784 stated in dissent below, the fact that "the bulk of the defendants' sentences were related, not to the American crime of wire fraud, but to the Canadian crime of tax evasion," shows that "this case was primarily about enforcing Canadian law." 336 F.3d, at 342–343.

Expansively interpreting the text of the wire fraud statute, which prohibits "any scheme or artifice to defraud, or for obtaining money or property by means of ... fraudulent pretenses," the Court today upholds the Government's deployment of § 1343 essentially to enforce foreign tax law. This Court has several times observed that the wire fraud statute has a long arm, extending to "everything designed to defraud by representations as to the past or present, or suggestions and promises as to the future." *Durland v. United States,* 161 U.S. 306, 313, 16 S.Ct. 508, 40 L.Ed. 709 (1896). But the Court has also recognized that incautious reading of the statute could dramatically expand the reach of federal criminal law, and we have refused to apply the proscription exorbitantly. See *McNally v. United States,* 483 U.S. 350, 360, 107 S.Ct. 2875, 97 L.Ed.2d 292 (1987) (refusing *378 to construe 18 U.S.C. § 1341, the mail fraud statute, to reach corruption in local government, stating: "[W]e read § 1341 as limited in scope to the protection of property rights. If Congress desires to go further, it must speak more clearly than it has."); see also *Cleveland v. United States,* 531 U.S. 12, 24–25, 121 S.Ct. 365, 148 L.Ed.2d 221 (2000) (holding that § 1341 does not reach schemes to make false statements on a state license application, in part based on reluctance to "approve a sweeping expansion of federal criminal jurisdiction in the absence of a clear statement by Congress").[6]

Construing § 1343 to encompass violations of foreign revenue laws, the Court ignores the absence of anything signaling Congress' intent to give the statute such an extraordinary extraterritorial effect.[7] "It is a longstanding principle of American law," *Aramco,* 499 U.S., at 248, 111 S.Ct. 1227, that Congress, in most of its legislative endeavors, "is primarily concerned with domestic conditions," *ibid.* (quoting *Foley Bros., Inc. v. Filardo,* 336 U.S. 281, 285, 69 S.Ct. 575, 93 L.Ed. 680 (1949)). See also **1785 *Small, ante,* 544 U.S., at 388, 125 S.Ct. 1752,

Case 1:18-md-02865-LAK    Document 808-14    Filed 05/12/22    Page 128 of 231

Pasquantino v. U.S., 544 U.S. 349 (2005)

125 S.Ct. 1766, 161 L.Ed.2d 619, 96 A.F.T.R.2d 2005-5392, 73 USLW 4287...

1755, 2005 WL 946620, at *3 (interpreting the phrase "convicted in any court," 18 U.S.C. § 922(g)(1), in light of the "commonsense notion" that Congress ordinarily intends statutes to have only domestic application (quoting *Smith v. United States,* 507 U.S. 197, 204, n. 5, 113 S.Ct. 1178, 122 L.Ed.2d 548 (1993))). Absent a clear statement of "the affirmative intention of the Congress," *Benz v. Compania Naviera Hidalgo, S.A.,* 353 U.S. 138, 147, 77 S.Ct. 699, 1 L.Ed.2d 709 (1957), this Court ordinarily does not read statutes to reach conduct that is "the primary concern of a foreign country," *Foley Bros.,* 336 U.S., at 286, 69 S.Ct. 575; cf. *F. Hoffmann–La Roche Ltd. v. Empagran* *379 S. A.,* 542 U.S. 155, 164, 124 S.Ct. 2359, 2366, 159 L.Ed.2d 226 (2004) (referring to presumption that "legislators take account of the legitimate sovereign interests of other nations when they write American laws").

Section 1343, which contains no reference to foreign law as an element of the domestic crime of wire fraud, contrasts with federal criminal statutes that chart the courts' course in this regard. See, *e.g.,* 18 U.S.C. § 1956(c)(1) (defendant must know that transaction involved the proceeds of activity "that constitutes a felony under State, Federal, or foreign law"); 16 U.S.C. § 3372(a)(2)(A) (banning importation of wildlife that has been "taken, possessed, transported, or sold in violation of any ... foreign law"). These statutes indicate that Congress, which has the sole authority to determine the extraterritorial reach of domestic laws, is fully capable of conveying its policy choice to the Executive and the courts. I would not assume from legislative silence that Congress left the matter to executive discretion.[8]

The presumption against extraterritoriality, which guides courts in the absence of congressional direction, provides ample cause to conclude that § 1343 does not extend to the instant scheme. Moreover, as to foreign customs and tax laws, there is scant room for doubt about Congress' general *380 perspective: Congress has actively indicated, through both domestic legislation and treaties, that it intends "strictly [to] limit the parameters of any assistance given" to foreign nations. *Attorney General of Canada v. R.J. Reynolds Tobacco Holdings, Inc.,* 268 F.3d, at 119; see also *United States v. Boots,* 80 F.3d 580, 588 (C.A.1 1996) ("National [foreign] policy judgments ... could be undermined if federal courts were to give general effect to wire fraud prosecutions for ... violating the revenue laws of any country.").

First, Congress has enacted a specific statute criminalizing offenses of the genre committed by the defendants here: 18 U.S.C. § 546 prohibits transporting goods "into the territory of any foreign government in violation of the laws there in force." Section 546's application, however, **1786 is expressly conditioned on the foreign government's enactment of reciprocal legislation prohibiting smuggling into the United States. See *ibid.* (prohibition applies "if under the laws of such foreign government any penalty or forfeiture is provided for violation of the customs revenue"). The reciprocity limitation reflects a legislative determination that this country should not provide other nations with greater enforcement assistance than they give to the United States. The limitation also cabins the Government's discretion as to which nation's customs laws to enforce, thereby avoiding the appearance of prosecutorial overreaching. See 305 F.3d 291, 297, n. 9 (C.A.4 2002) (Gregory, J.) ("Where do we draw the line as to which countries' laws we will help enforce?"), vacated and reh'g en banc granted, 2003 U.S. App. LEXIS 585, *1 (C.A.4, Jan. 14, 2003). Significantly, Canada has no statute criminalizing smuggling into the United States, rendering § 546 inapplicable to schemes resembling the one at issue here.[9]

*381 Second, the United States and Canada have negotiated, and the Senate has ratified, a comprehensive tax treaty, in which both nations have committed to providing collection assistance with respect to each other's tax claims. See Protocol Art. 15. Significantly, the Protocol does not call upon either nation to interpret or calculate liability under the other's tax statutes; it applies only to tax claims that have been fully and finally adjudicated under the law of the requesting nation. Further, the Protocol bars assistance in collecting any claim against a citizen or corporation of "the requested State." *Id.,* at 246, Art. 15, ¶ 8(a). These provisions would preclude Canada from obtaining United States assistance in enforcing its claims against the Pasquantinos and Hilts. I would not assume that Congress understood § 1343 to provide the assistance that the United States, in the considered foreign policy judgment of both political branches, has specifically declined to promise.

Case 1:18-md-02865-LAK    Document 808-14    Filed 05/12/22    Page 129 of 231

Pasquantino v. U.S., 544 U.S. 349 (2005)
125 S.Ct. 1766, 161 L.Ed.2d 619, 96 A.F.T.R.2d 2005-5392, 73 USLW 4287...

II

Complementing the principle that courts ordinarily should await congressional instruction before giving our laws extraterritorial thrust, the common-law revenue rule holds that one nation generally does not enforce another's tax laws.

See *Banco Nacional de Cuba v. Sabbatino,* 376 U.S. 398, 448, 84 S.Ct. 923, 11 L.Ed.2d 804 (1964) (White, J., dissenting) (noting that "our courts customarily refuse to enforce the revenue and penal laws of a foreign state"); cf. *Milwaukee County v. M.E. White Co.,* 296 U.S. 268, 275–276, 56 S.Ct. 229, 80 L.Ed. 220 (1935). The Government argues, and the Court accepts, that domestic wire fraud prosecutions premised on violations of foreign tax law do not implicate the revenue rule because the court, while it must "recognize foreign [revenue] law to determine whether the defendant violated U.S. law," *ante,* at 1779, need only "enforce" foreign law "in an attenuated sense." See *ante,* at 1778; Brief for United States 17–19. As discussed above, however, the defendants' conduct arguably fell within the scope of § 1343 only because **\*382** of their purpose to evade Canadian customs and tax laws; shorn of that purpose, no other aspect of their conduct was criminal in this country. See *supra,* at 1782–1784; *Boots,* 80 F.3d, at 587 ("[U]pholding defendants' section 1343 conviction would amount ... to penal enforcement of Canadian customs and tax laws."). It seems to me unavoidably obvious, therefore, that this prosecution directly implicates the revenue rule. It is equally **\*\*1787** plain that Congress did not endeavor, by enacting § 1343, to displace that rule.

The application of the Mandatory Victims Restitution Act of 1996, 18 U.S.C. § 3663A, to wire fraud offenses is corroborative. Section 3663A applies to all "offense[s] against property," § 3663A(c)(1)(A)(ii), and directs that "[n]otwithstanding any other provision of law ... the court *shall* order ... that the defendant make restitution to the victim of the offense," § 3663A(a)(1) (emphasis added). The Government acknowledges, however, that it "did not urge the district court to order restitution in this case on the theory that it was not 'appropriate ... since the victim is a foreign government and the loss derives from tax laws of the foreign government.' " Brief for United States 19–20 (quoting Letter from United States Attorney S. Schenning to

United States District Chief Judge J. Motz, Feb. 16, 2001, App. 106). The Government now disavows this concession. See Tr. of Oral Arg. 36 (While "the prosecutor did concede below that restitution was not appropriately ordered," it is in fact "[t]he position of the United States ... that restitution under the mandatory statute should be ordered and it does not infringe the revenue rule."). Nevertheless, the very fact that the Government effectively invited the District Court to overlook the mandatory restitution statute out of concern for the revenue rule is revealing. It further demonstrates that the Government's expansive reading of § 1343 warrants this Court's disapprobation.

Any tension between § 3663A and the wire fraud statute, the Government suggests and the Court accepts, would be **\*383** relieved if this Court construed § 3663A to exclude restitution that might encounter a revenue rule shoal. See *ante,* at 1777; Brief for United States 21. Congress, however, has expressed with notable clarity a policy of mandatory restitution in *all* wire fraud prosecutions. In contrast, Congress was "quite ambiguous" concerning § 1343's coverage of schemes to evade foreign taxes. Tr. of Oral Arg. 38. The Mandatory Victims Restitution Act, in my view, is an additional indicator that "Congress ... [did not] envision foreign taxes to be the object of [a] scheme to defraud," *id.,* at 35–36, and I would construe § 1343 accordingly.

III

Finally, the rule of lenity counsels against adopting the Court's interpretation of § 1343. It is a "close question" whether the wire fraud statute's prohibition of "any scheme ... to defraud" includes schemes directed solely at defrauding foreign governments of tax revenues. See *id.,* at 33. We have long held that, when confronted with "two rational readings of a criminal statute, one harsher than the other, we are to choose the harsher only when Congress has spoken in clear and definite language." *McNally,* 483 U.S., at 359–360, 107 S.Ct. 2875; see *United States v. Universal C.I.T. Credit Corp.,* 344 U.S. 218, 221–222, 73 S.Ct. 227, 97 L.Ed. 260 (1952).

This interpretive guide is particularly appropriate here. Wire fraud is a predicate offense under the Racketeer Influenced

and Corrupt Organizations Act (RICO), 18 U.S.C. § 1961(1) (2000 ed., Supp. II), and the money laundering statute, § 1956(c)(7)(A) (2000 ed.). See *Cleveland,* 531 U.S., at 25, 121 S.Ct. 365. A finding that particular conduct constitutes wire fraud therefore exposes certain defendants to the severe criminal penalties and forfeitures provided in both RICO, see § 1963 (2000 ed.), and the money laundering statute, § 1956(a), (b) (2000 ed. and Supp. II).

**1788 * * *

**\*384** For the reasons stated, I would hold that § 1343 does not extend to schemes to evade foreign tax and customs laws. I would therefore reverse the judgment of the Court of Appeals.

### All Citations

544 U.S. 349, 125 S.Ct. 1766, 161 L.Ed.2d 619, 96 A.F.T.R.2d 2005-5392, 73 USLW 4287, 05 Cal. Daily Op. Serv. 3482, 2005 Daily Journal D.A.R. 4705, 2005 Daily Journal D.A.R. 4712, 18 Fla. L. Weekly Fed. S 237, 4 A.L.R. Fed. 2d 747

### Footnotes

*   The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States v. Detroit Timber & Lumber Co.,* 200 U.S. 321, 337, 26 S.Ct. 282, 50 L.Ed. 499.

1   We express no view on the related question whether a foreign government, based on wire or mail fraud predicate offenses, may bring a civil action under the Racketeer Influenced and Corrupt Organizations Act (RICO) for a scheme to defraud it of taxes. See *Attorney General of Canada v. R.J. Reynolds Tobacco Holdings, Inc.,* 268 F.3d 103, 106 (C.A.2 2001) (holding that the Government of Canada cannot bring a civil RICO suit to recover for a scheme to defraud it of taxes); *Republic of Honduras v. Philip Morris Cos.,* 341 F.3d 1253, 1255 (C.A.11 2003) (same with respect to other foreign governments).

2   Although *Cleveland* interpreted the term "property" in the mail fraud statute, 18 U.S.C. § 1341 (2000 ed., Supp. II), we have construed identical language in the wire and mail fraud statutes *in pari materia.* See *Neder v. United States,* 527 U.S. 1, 20, 119 S.Ct. 1827, 144 L.Ed.2d 35 (1999) (" 'scheme or artifice to defraud' "); *Carpenter v. United States,* 484 U.S. 19, 25, and n. 6, 108 S.Ct. 316, 98 L.Ed.2d 275 (1987) ("scheme or artifice to defraud"; "money or property").

3   Section 546 provides:

> "Any person owning in whole or in part any vessel of the United States who employs, or participates in, or allows the employment of, such vessel for the purpose of smuggling, or attempting to smuggle, or assisting in smuggling, any merchandise into the territory of any foreign government in violation of the laws there in force, if under the laws of such foreign government any penalty or forfeiture is provided for violation of the laws of the United States respecting the customs revenue, and any citizen of, or person domiciled in, or any corporation incorporated in, the United States, controlling or substantially participating in the control of any such vessel, directly or indirectly, whether through ownership of corporate shares or otherwise, and allowing the employment of said vessel for any such purpose, and any person found, or discovered to have been, on board of any such vessel

Case 1:18-md-02865-LAK    Document 808-14    Filed 05/12/22    Page 131 of 231

Pasquantino v. U.S., 544 U.S. 349 (2005)

125 S.Ct. 1766, 161 L.Ed.2d 619, 96 A.F.T.R.2d 2005-5392, 73 USLW 4287...

so employed and participating or assisting in any such purpose, shall be fined under this title or imprisoned not more than two years, or both."

4    Any overlap between the antismuggling statute and the wire fraud statute is beside the point. The Federal Criminal Code is replete with provisions that criminalize overlapping conduct. See Stuntz, The Pathological Politics of Criminal Law, 100 Mich. L.Rev. 505, 518, and n. 62 (2002); *United States v. Wells,* 519 U.S. 482, 505–509, and nn. 8–10, 117 S.Ct. 921, 137 L.Ed.2d 107 (1997) (STEVENS, J., dissenting). The mere fact that two federal criminal statutes criminalize similar conduct says little about the scope of either.

5    See also *United States v. Texas,* 507 U.S. 529, 534, 113 S.Ct. 1631, 123 L.Ed.2d 245 (1993) (requiring the statute to " 'speak directly' to the question addressed by the common law"); *Astoria Fed. Sav. & Loan Assn. v. Solimino,* 501 U.S. 104, 108, 111 S.Ct. 2166, 115 L.Ed.2d 96 (1991) (stating that this presumption is applicable "where a common-law principle is well established"); *United States v. Turley,* 352 U.S. 407, 411, 77 S.Ct. 397, 1 L.Ed.2d 430 (1957) (declining to interpret the term " 'stolen' " in a federal criminal statute according to the common law because the term had "no accepted common-law meaning").

6    These principles convince us that much more than the summary conclusion that it is "unavoidably obvious ... that this prosecution directly implicates the revenue rule" and that this prosecution is " 'primarily about enforcing Canadian law,' " *post,* at 1784, 1786 (GINSBURG, J., dissenting), is required to demonstrate that a revenue rule principle firmly established as of 1952 bars this prosecution. That task requires inquiry into common-law revenue rule jurisprudence—an inquiry the dissent does not undertake.

7    See *Colorado v. Harbeck,* 232 N.Y. 71, 85, 133 N.E. 357, 360 (App.1921); *Maryland v. Turner,* 75 Misc. 9, 10–13, 132 N.Y.S. 173, 175 (Sup.Ct.1911); *Detroit v. Proctor,* 44 Del. 193, 200–202, 61 A.2d 412, 415–416 (Super.Ct.1948); *Moore v. Mitchell,* 30 F.2d 600, 603–604 (C.A.2 1929) (L.Hand, J., concurring) (citing cases), aff'd on other grounds, 281 U.S. 18, 50 S.Ct. 175, 74 L.Ed. 673 (1930); *Arkansas v. Bowen,* 20 D.C. 291, 295 (Sup.Ct.1891), aff'd, 3 App. D.C. 537 (1894); Leflar 216, n. 63 (citing cases).

8    See also *Her Majesty the Queen v. Gilbertson,* 597 F.2d 1161, 1163–1164 (C.A.9 1979) (stating the revenue rule as an exception to the rule that a State enforces foreign judgments, citing, *inter alia,* pre–1952 cases); *Peter Buchanan Ltd. v. McVey,* 1955 A.C. 516, 526 (Ir.H.Ct.1950)*Peter Buchanan Ltd. v. McVey,* 1955 A.C. 516, 526 (Ir.H.Ct.1950), app. dism'd, 1955 A.C. 530 (Ir.Sup.Ct.1951)1955 A.C. 530 (Ir.Sup.Ct.1951) (citing English revenue rule cases as "establish[ing] that the courts of our country will not enforce the revenue claims of a foreign country in a suit brought for the purpose by a foreign public authority"); Leflar 219 (stating the revenue rule as a prohibition on "extrastate actions for revenue collection"); *Moore, supra,* at 603 (L.Hand, J., concurring) (characterizing the revenue rule as an exception to the rule that a "liability arising under the law of a foreign state will be recognized by the courts of another"); *Harbeck, supra,* at 85, 133 N.E., at 360 (stating that the revenue rule "precludes one state from acting as a collector of taxes for a sister state"); cf. Restatement (Third) of Foreign Relations Law of the United States § 483 (1986) (stating that the rule does not require, but allows, courts to refuse enforcement of foreign tax judgments).

9    Petitioners also cite *QRS 1 Aps v. Frandsen,* [2000] Int'l Litig. Proc. 8, [1999] 3 All E.R. (App.) (holding that a liquidator was not entitled to recover corporate funds needed to pay foreign taxes); *Stringam v. Dubois,* [1993] 3 W.W.R. 273, 7 Alta. L.R. (3d) 120 (App.1992) (rejecting suit by the U.S. executor of a will to require the sale of real property in Canada to pay U.S. estate taxes); *Banco Do Brasil, S.A. v. A.C. Israel Commodity Co.,* 12 N.Y.2d 371, 377, 239 N.Y.S.2d 872, 190 N.E.2d 235, 237 (App.1963) (rejecting suit by instrumentality of Brazil to recover for a conspiracy to circumvent its foreign exchange regulations); *United States v. Harden,* [1963] 44 W.W.R. 630, 633, S.C.R. 366, 370–371 (Sup.Ct.Can.) (holding that a stipulated judgment to pay U.S. taxes was not enforceable in Canadian courts); *Attorney–General for Canada*

Pasquantino v. U.S., 544 U.S. 349 (2005)
125 S.Ct. 1766, 161 L.Ed.2d 619, 96 A.F.T.R.2d 2005-5392, 73 USLW 4287...

*v. Schulze,* [1901] 9 Scots Law Times 4, 4–5 (refusing to enforce judgment for court costs, where costs were incurred by a foreign state in defending the legality of its forfeiture of the defendant's goods as penalty for infraction of revenue laws); *Indian and General Investment Trust, Ltd. v. Borax Consolidated, Ltd.,* [1920] 1 K.B. 539, 550 (holding that a private debtor was not entitled to deduct U.S. income tax from its interest payments on loan due in England).

10    For example, in *Government of India v. Taylor,* 1955 A.C. 491 (H.L.).*Government of India v. Taylor,* 1955 A.C. 491 (H.L.), on which petitioners rely heavily, the court's application of the revenue rule rested in part on a ground peculiar to English law, namely, that an Act of Parliament had excluded tax judgments from a statute that provided for the enforcement of foreign judgments. That Act thus demonstrated that the revenue rule "appear[ed] to have been recognized by Parliament." *Id.,* at 506; see also *Borax, supra,* at 549 (holding that a private debtor was not entitled to deduct U.S. income tax from its interest payments on a loan, in part because "there [was] an express Act of Parliament which permits payment to the English Income Tax authorities to be a discharge pro tanto of the debt which a person owes in respect of yearly interest to another" while "[t]here [was] no Act of Parliament which allows payment of income tax to another country to be reckoned as discharge"); *Schulze, supra,* at 5 (holding that a foreign state could not recover court costs incurred in defending the legality of a tax forfeiture, in part because "in our [*i.e.,* Scottish] law, the expenses of an action have always been regarded as a mere accessory or incident of the principal claim"). In addition, as we explain below, features peculiar to the American system of separation of powers cast doubt on the notion that the revenue rule bars this prosecution. See *infra,* at 1779–1780.

11    See 18 U.S.C. § 3663A(c)(1)(A)(ii) ("This section shall apply in all sentencing proceedings for convictions of ... an offense against property under this title ... including any offense committed by fraud or deceit").

12    As some indication of the novelty of the dissent's "extraterritoriality" argument, we note that this argument was not pressed or passed upon below and was raised only as an afterthought in petitioners' reply brief, depriving the Government of a chance to respond. Reply Brief for Petitioners 17–18.

13    The dissent says that a scheme to defraud a foreign corporation or individual "does not necessarily depend on any determination of foreign law" and therefore "is of a different order." *Post,* at 1785, n. 8 (opinion of GINSBURG, J.). That is not so. Many such schemes will necessarily require interpretation of foreign law. Without proof of foreign law, it is impossible to tell whether the scheme had the purpose of depriving the foreign corporation or individual of valuable property interests as defined by foreign law. See *supra,* at 1771–1772;

*United States v. Pierce,* 224 F.3d 158, 165–168 (C.A.2 2000). The fact that a prosecution might involve foreign revenue law, rather than any other type of foreign law, is relevant to whether such a prosecution is in derogation of the revenue rule, see *supra,* at 1773–1780, not to whether it is "extraterritorial."

14    Petitioners argue in a footnote that their sentences should be vacated in light of *Blakely v. Washington,* 542 U.S. 296, 124 S.Ct. 2531, 159 L.Ed.2d 403 (2004). Brief for Petitioners 26, n. 29. Petitioners did not raise this claim before the Court of Appeals or in their petition for certiorari. We therefore decline to address it. See,

*e.g., Lopez v. Davis,* 531 U.S. 230, 244, n. 6, 121 S.Ct. 714, 148 L.Ed.2d 635 (2001) (declining to address

"matter ... not raised or decided below, or presented in the petition for certiorari"); *Whitfield v. United States,* 543 U.S. 209, 125 S.Ct. 687, 160 L.Ed.2d 611 (2005) (affirming federal convictions despite the imposition of sentence enhancements, see Brief for Petitioners therein, O.T.2004, No. 03–1293 etc., p. 7, n. 6).

1    The Government offered a Canadian customs officer's testimony at trial that if alcohol is purchased for $56 per case in the United States, the Canadian tax would be approximately $100 per case. App. 65–66; see *infra,* at 1783, n. 4.

2    Petitioners' reliance on the presumption against extraterritorial application of laws enacted with domestic concerns in mind was no mere afterthought. See *ante,* at 1780, n. 12. The presumption was explicitly featured in petitioners' reply brief. See Reply Brief 17–19, and n. 23 (observing, *inter alia,* that the presumption against extraterritoriality "is especially true when criminal liability is at stake"); see also Brief for Petitioners 40, n. 46.

Both parties ask us to determine the scope of § 1343, and the presumption against extraterritoriality is a

Case 1:18-md-02865-LAK    Document 808-14    Filed 05/12/22    Page 133 of 231

Pasquantino v. U.S., 544 U.S. 349 (2005)
125 S.Ct. 1766, 161 L.Ed.2d 619, 96 A.F.T.R.2d 2005-5392, 73 USLW 4287...

guide to interpretation of the kind courts ordinarily bring to bear in endeavoring to discern the meaning of a legislative text. Moreover, the Government's responses to petitioners' revenue rule arguments coincide with the Government's position on the presumption against extraterritoriality. Compare Brief for United States 22–26 with Tr. of Oral Arg. 35, 46–47 (responding to the Court's questions about extraterritoriality, counsel for the Government asserted that Congress left to executive discretion the determination whether "enforcement of [foreign] tax systems" is appropriate).

3    Indeed, the defendants have all been indicted in Canada for failing to report excise taxes and possession of unlawfully imported spirits, 336 F.3d 321, 343 (C.A.4 2003) (en banc) (Gregory, J., dissenting), but Canada has not requested their extradition, see Tr. of Oral Arg. 12–13, 30.

4    The casual manner in which the Government and the District Court reached these totals detracts from the Court's assertion that "[f]oreign law, of course, posed no unmanageable complexity in this case." *Ante,* at 1780. In making its sentencing recommendation to the court, the Government did not proffer evidence of the precise rate at which Canada taxes liquor imports, or reference any provisions of Canadian law. Rather, it relied on the trial testimony of an intelligence officer with Canadian Customs, who surmised, based on her experience in working at the border, that Canadian taxes on a $56 case of liquor would be approximately $100. See App. 104. The customs officer was not offered as an expert witness and "[t]he [D]istrict [C]ourt never determined whether [her] calculations were accurate as a matter of Canadian law." 336 F.3d, at 343 (Gregory, J., dissenting). Thus, if foreign law posed no complexity in this case, it is not because the parties and the court were easily able to interpret and apply Canadian law, but rather because the Government and the court made no serious attempt to do so. That no such effort was made here, in derogation of the Government's and the court's shared obligation to ensure that the calculations potentially affecting a defendant's sentence are as accurate as possible, is "deeply troubling," *ibid.*, and suggests that the Government was unprepared to grapple with the details of foreign revenue laws.

5    I note that petitioners' sentences were enhanced on the basis of judicial factfindings, in violation of the Sixth Amendment. See United States v. Booker, 543 U.S. 220, 230–234, 125 S.Ct. 738, 773–776, 160 L.Ed.2d 621 (2005) (STEVENS, J., for the Court); see also Blakely v. Washington, 542 U.S. 296, 124 S.Ct. 2531, 159 L.Ed.2d 403 (2004). Despite the Court's affirmance of their convictions, therefore, petitioners may be entitled to resentencing. See Booker, 543 U.S., at 268, 125 S.Ct., at 783–786 (BREYER, J., for the Court). The Court declines to address the defendants' plea for resentencing, stating that "[p]etitioners did not raise this claim before the Court of Appeals or in their petition for certiorari." See *ante,* at 1781, n. 14. This omission was no fault of the defendants, however, as the petition in this case was filed and granted well before the Court decided *Blakely.* Petitioners thus raised *Blakely* at the earliest possible point: in their merits briefing. The rule that we do not consider issues not raised in the petition is prudential, not jurisdictional, see Izumi Seimitsu Kogyo Kabushiki Kaisha v. U.S. Philips Corp., 510 U.S. 27, 32–33, 114 S.Ct. 425, 126 L.Ed.2d 396 (1993) (per curiam), and a remand on the Blakely–Booker question would neither prejudice the Government nor require this Court to delve into complex issues not passed on below.

6    I note that, on the Court's interpretation, federal prosecutors could resort to the wire and mail fraud statutes to reach schemes to evade not only foreign taxes, but state and local taxes as well.

7    I do not read into § 1343's coverage of frauds executed "in interstate or foreign commerce," *ante,* at 1781, congressional intent to give § 1343 extraterritorial effect. A statute's express application to acts committed in foreign commerce, the Court has repeatedly held, does not in itself indicate a congressional design to give the statute extraterritorial effect. See Aramco, 499 U.S. 244, 111 S.Ct. 1227, 113 L.Ed.2d 274 (1991).

8    The application of 18 U.S.C. § 1343 (2000 ed., Supp. II) to schemes to defraud a foreign individual or corporation, or even a foreign governmental entity acting as a market participant, is of a different order, and does not necessarily depend on any determination of foreign law. As the Court of Appeals observed in United States v. Boots, 80 F.3d 580, 587 (C.A.1 1996), upholding a defendant's wire fraud conviction in a

case like the one here presented "would amount functionally to penal enforcement of Canadian customs and tax laws." See also *ibid.* (noting that courts "will enforce foreign non-tax civil judgments unless due process, jurisdictional, or fundamental public policy considerations interfere" (citing Restatement (Third) of Foreign Relations Law of the United States § 483, and Reporters' Notes, n. 1 (1986)), but "[o]ur courts customarily refuse to enforce the revenue and penal laws of a foreign state, since no country has an obligation to further

the governmental interests of a foreign sovereign" (quoting ⚑ *Banco Nacional de Cuba v. Sabbatino,* 376 U.S. 398, 448, 84 S.Ct. 923, 11 L.Ed.2d 804 (1964) (White, J., dissenting))).

9    Section 546's requirement that a vessel have been used to transport the goods to the foreign country would render § 546 inapplicable to these defendants' conduct in any event.

---

**End of Document**                                    © 2021 Thomson Reuters. No claim to original U.S. Government Works.

# Exhibit 27

**Restatement (Fourth) of Foreign Relations Law § 489 (2018)**

Restatement of the Law - The Foreign Relations Law of the United States  |  October 2021 Update

Restatement (Fourth) of The Foreign Relations Law of the United States

Part IV. Jurisdiction, State Immunity, and Judgments

Chapter 8. Recognition and Enforcement of Foreign Judgments in the United States

# § 489 Tax and Penal Judgments

Comment:

Reporters' Notes

Case Citations - by Jurisdiction

> **Courts in the United States do not recognize or enforce judgments rendered by the courts of foreign states to the extent such judgments are for taxes, fines, or other penalties, unless authorized by a statute or an international agreement.**

**Comment:**

*a. Status in U.S. law.* The rules against enforcing foreign tax and penal judgments have long been accepted in both international and U.S. practice. They are related to the more general rules against enforcing foreign tax and penal laws. See Restatement Second, Conflict of Laws § 89. The 1962 Uniform Foreign Money-Judgments Recognition Act and the 2005 Uniform Foreign-Country Money Judgments Recognition Act exclude judgments for taxes, fines, and other penalties from their coverage. The rules precluding enforcement of tax and penal judgments are also widely followed in other legal systems but are not required by customary international law, and a U.S. statute authorizing the enforcement of a foreign tax or penal judgment would not violate international law.

*b. Penal judgments defined.* For the purposes of this Section, a penal judgment is one whose "purpose is to punish an offence against the public justice of the State" rather than "to afford a private remedy to a person injured by the wrongful act." Huntington v. Attrill, 146 U.S. 657, 673-674 (1892). Judgments for fines, penalties, and forfeitures are within this Section. So are qui tam actions, in which a private party brings suit on behalf of the government. However, a judgment in favor of a foreign state arising out of a contract, tort, loan guaranty, or similar civil controversy is not penal for the purposes of this Section. Nor is a judgment in favor of a foreign state awarding restitution for the benefit of private persons.

So long as the purpose of the judgment is to afford a private remedy, enforcement is not barred even if the law creating liability is a criminal statute or the judgment is rendered during the course of a criminal proceeding. Nor are judgments for multiple or punitive damages penal for the purposes of this Section.

*c. Tax judgments defined.* For the purposes of this Section, a tax judgment is a judgment in favor of a foreign state or one of its subdivisions based on a claim for an assessment of a tax, whether imposed in respect of income, property, transfer of wealth, or any other transaction.

*d. Mixed judgments.* This Section applies only "to the extent" a foreign judgment is a judgment for taxes, fines, or other penalties. Enforcement of a judgment affording a private remedy is not barred under this Section because it is joined with, or awarded in the same proceeding as, a judgment the enforcement of which would be barred under this Section.

*e. Indirect enforcement.* The rules stated in this Section bar both the direct and the indirect enforcement of judgments for taxes, fines, and other penalties. In applying the rules stated in this Section, courts look to the substance of the claim underlying the judgment rather than to the form of the action in which it was rendered.

*f. Taking account of foreign tax and penal judgments for other purposes.* Judgments not entitled to recognition and enforcement under this Section may nevertheless have other legal consequences. For instance, a foreign conviction may provide a basis for denying the convicted person a visa or naturalization or for the application of a repeat-offender statute.

## Reporters' Notes

*1. Evolution of the rules.* Although often treated together, the "revenue rule" barring enforcement of foreign tax laws and the prohibition against enforcing foreign penal laws developed independently.

The revenue rule originated in cases enforcing contracts that violated foreign tariff laws. See Pasquantino v. United States, 544 U.S. 349, 366 (2005) (citing Boucher v. Lawson, 95 Eng. Rep. 53 (KB 1734)). Lord Mansfield famously stated in Holman v. Johnson, 98 Eng. Rep. 1120, 1121 (KB 1775) that "no country ever takes notice of the revenue laws of another." In later cases, courts applied the revenue rule to dismiss actions brought by governmental authorities to enforce tax claims or foreign judgments based on tax claims. See, e.g., Mun. Council of Sydney v. Bull, [1909] 1 KB 7 (1908); Gov't of India v. Taylor, [1955] AC 491 (HL); United States v. Harden, 41 D.L.R. 2d 721 (S.C.C. 1963) (Can.); British Columbia v. Gilbertson, 597 F.2d 1161 (9th Cir. 1979); European Community v. RJR Nabisco, Inc., 424 F.3d 175 (2d Cir. 2005). In the meantime, courts stopped applying the revenue rule in contract cases, and courts today generally will excuse performance of contracts that violate foreign tax and export control laws. See, e.g., Regazzoni v. K.C. Sethia (1944) Ltd., [1956] 2 QB 490; Ralston Purina Co. v. McKendrick, 850 S.W.2d 629, 639 (Tex. App. 1993); Bhagwandas v. Brooks Exim Pte Ltd. [1994] 2 Sing. L. Rep. 431 (H. Ct.) (Sing.). The revenue rule prevailed in the United States with respect to sister-State tax judgments until 1935, when the Supreme Court held that the Full Faith and Credit Clause of the Constitution, U.S. Const. art. IV, § 1, and the Full Faith and Credit Act, 28 U.S.C. § 1738, require enforcement of such judgments. Milwaukee County v. M.E. White Co., 296 U.S. 268 (1935).

The prohibition against enforcing foreign penal laws was articulated in Folliott v. Ogden, 126 Eng. Rep. 75 (Ct Com Pl 1789), aff'd, Ogden v. Folliott, 100 Eng. Rep. 825 (Ch 1790), and Wolff v. Oxholm, 105 Eng. Rep. 1177 (KB 1817). Courts originally based this rule on the principle that "[c]rimes are in their nature local, and the jurisdiction of crimes is local." Rafael v. Verelst, 96 Eng. Rep. 621, 622 (KB 1776). In 1825, Chief Justice Marshall wrote in The Antelope, 23 U.S. 66, 123 (1825), that "[t]he Courts of no country execute the penal laws of another." The contours of the rule were outlined by the U.S. Supreme Court and the U.K. Privy Council toward the end of the 19th century in separate cases of the same name and arising from the same facts, which remain the leading expositions of the rule. See Huntington v. Attrill, 146 U.S. 657 (1892); Huntington v. Attrill, [1893] AC 150 (PC 1892) (appeal taken from Ont.).

*2. Rationales for the rules.* In modern times, three rationales have been advanced for the rules. See Pasquantino, 544 U.S. at 368-370. The first justification, given by some courts, has been the difficulty of determining and applying foreign tax law. See, e.g., *Taylor*, [1955] AC 491 at 514 (Lord Somervell of Harrow). This rationale has little force when a court is asked simply to enforce a foreign tax judgment rather than to determine the tax claim in the first instance. Cf. *Pasquantino, 544 U.S. at 370*

("Rule 26.1 gives federal courts sufficient means to resolve the incidental foreign law issues they may encounter in wire fraud prosecutions.").

A second justification is to avoid public-policy review of important foreign laws, and thus possible offense to foreign nations. See Moore v. Mitchell, 30 F.2d 600, 604 (2d Cir. 1929) (L. Hand, J., concurring) ("To pass upon the provisions for the public order of another state is, or at any rate should be, beyond the powers of a court … ."). Although the Supreme Court rejected this rationale in the context of sister-State tax judgments, see M.E. White Co., 296 U.S. at 277 ("We can perceive no greater possibility of embarrassment in litigating the validity of a judgment for taxes and enforcing it than any other for the payment of money… . [N]o state can be said to have a legitimate policy against payment of its neighbor's taxes … ."), both U.S. and foreign courts have invoked it in the international context. See, e.g., Peter Buchanan Ltd. v. McVey, [1955] AC 516, 528 (H. Ct. 1950) (Ir.), aff'd, [1954] AC 530 (SC 1951) (Ir.); Taylor, [1955] AC at 511 (Lord Keith of Avonholm); Harden, 41 D.L.R. 2d at 724-725; Gilbertson, 597 F.2d at 1164; Attorney General of Canada v. R.J. Reynolds Tobacco Holdings, Inc., 268 F.3d 103, 112 (2d Cir. 2001). In Pasquantino, the Supreme Court described public-policy review as "the principal evil against which the revenue rule was traditionally thought to guard." 544 U.S. at 368. Whether review is more offensive than a blanket refusal to enforce, however, is questionable.

A third justification is that courts should avoid furthering the governmental interests of a foreign sovereign. See id. at 369-370; see also Banco Nacional de Cuba v. Sabbatino, 376 U.S. 398, 448 (1964) (White, J., dissenting) ("courts customarily refuse to enforce the revenue and penal laws of a foreign state, since no country has an obligation to further the government interests of a foreign sovereign"). Given the possible gains from international cooperation to enforce foreign tax and penal laws, this rationale is most persuasive when joined with the need to ensure reciprocal treatment of U.S. judgments. See, e.g., R.J. Reynolds Tobacco Holdings, 268 F.3d at 122 ("Declining to apply the revenue rule in this case … would potentially allow Canada to obtain assistance it has not negotiated for and that would be greater than the assistance our government would likely receive as a litigant in Canada's courts.").

*3. Status of the rules in U.S. law.*The rules against enforcing foreign tax and penal laws developed at common law. They are reflected in the Uniform Acts. See 1962 Uniform Foreign Money-Judgments Recognition Act (1962 Uniform Act) § 1(2) (defining "foreign judgment" as a money judgment "other than a judgment for taxes, a fine or other penalty, or a judgment for support in matrimonial or family matters"); 2005 Uniform Foreign-Country Money Judgments Recognition Act (2005 Uniform Act) § 3(b) (providing that the act does not apply "to the extent that the judgment is: (1) a judgment for taxes; (2) a fine or other penalty; (3) a judgment for divorce, support, or maintenance, or other judgment rendered in connection with domestic relations").

A few decisions have treated the revenue rule as a rule of federal common law, see Republic of Honduras v. Philip Morris Companies, 341 F.3d 1253, 1256 (11th Cir. 2003) (adopting the revenue rule "as the rule of this circuit"); Republic of Ecuador v. Philip Morris Companies, Inc., 188 F. Supp. 2d 1359, 1366 (S.D. Fla. 2002) (referring to the revenue rule and noting that "the Florida legislature has no authority under the supremacy clause to eradicate a federal common law rule"); European Community v. Japan Tobacco, Inc., 186 F. Supp. 2d 231, 235 n.1 (E.D.N.Y. 2002) ("[T]his court understands the revenue rule to be a federal rule of common law… . The revenue rule thus preempts any conflicting state law."). But such treatment is in tension with the general rule that the recognition and enforcement of foreign judgments in the United States are generally governed by State law. See § 481, Comment a. If the rules against enforcing foreign tax and penal judgments are rules of State law, they would still be subject to preemption where federal law applies. See § 403, Comment d.

The rules stated in this Section are widely followed in other countries. See International Law Association, Report of International Committee on Transnational Recognition and Enforcement of Foreign Public Laws, in Report of the Sixty-Third Conference 719 (1988). These rules, however, are rules of municipal law not international law. "[T]here is no general rule of public international law prohibiting the transnational recognition or enforcement of foreign public laws as such." Id. at 751. References in some cases to these rules as rules of "international law," see, e.g., Huntington, 146 U.S. at 666; R.J. Reynolds Tobacco Holdings, Inc., 268 F.3d at 110, are references to private international law not public international law. A federal or State statute that authorized the enforcement of foreign tax or penal judgments would not violate any rule of public international law.

§ 489 Tax and Penal Judgments, Restatement (Fourth) of Foreign Relations Law §...

*4. Scope of the rules.* Although courts in the United States applying these rules frequently look to foreign practice, see, e.g., *Pasquantino*, 544 U.S. at 362-368, the character of a foreign judgment as a tax or penal judgment is a question of U.S. law. See *Huntington*, 146 U.S. at 683.

The Supreme Court defined the scope of the prohibition against enforcing foreign penal laws in *Huntington*. A penal judgment is one whose "purpose is to punish an offence against the public justice of the State" rather than "to afford a private remedy to a person injured by the wrongful act." Id. at 673-674. A judgment for a fine, penalty, or forfeiture is within this Section. See Wisconsin v. Pelican Ins. Co., 127 U.S. 265, 290 (1888) (noting that the rule "applies, not only to prosecutions and sentences for crimes and misdemeanors, but to all suits in favor of the State for the recovery of pecuniary penalties … and to all judgments for such penalties"). A civil judgment on an appearance bond against a criminal defendant has also been held to be penal. See United States v. Inkley, [1989] 1 QB 255 at 265 (CA 1988). Qui tam actions brought by a private party to recover penalties imposed by the state "stand on the same ground as suits brought for such a penalty in the name of the state or of its officers, because they are equally brought to enforce the criminal law of the state." *Huntington*, 146 U.S. at 673; see also id. at 667.

Courts have refused to enforce expropriations of property outside the territory of the expropriating state on the grounds that they were penal. See, e.g., Republic of Iraq v. First Nat'l City Bank, 241 F. Supp. 567, 574 (S.D.N.Y.), aff'd, 353 F.2d 47 (2d Cir. 1965); Banco de Vizcaya v. Don Alfonso de Borbon y Austria, [1935], 1 KB 140 at 144 (1934). The act state doctrine governs expropriations of property within the territory of the expropriating state, subject to superseding federal law. See § 441.

A judgment in favor of a foreign state arising out of a contract, tort, loan guaranty, or similar civil controversy is not subject to the prohibition in this Section. See *Pelican Ins. Co.*, 127 U.S. at 290 (noting that courts in the United States "have entertained suits by a foreign state … to enforce demands of a strictly civil nature"); Bullen v. United Kingdom, 553 So. 2d 1344, 1345 (Fla. Dist. Ct. App. 1989) (enforcing judgment for funds collected as value-added tax because "[t]he source of the money became irrelevant upon defalcation and the United Kingdom simply became a judgment creditor of the funds illicitly held by the appellants"); Gov't of the Islamic Republic of Iran v. Barakat Galleries Ltd., [2007] EWCA (Civ) 1374 [136] (Eng. & Wales) (enforcing Iranian law vesting ownership of antiquities in the state because "when a state owns property in the same way as a private citizen there is no impediment to recovery"); United States v. Ivey, 139 D.L.R. 4th 570, 574 (Can. Ont. C.A. 1996) (enforcing U.S. judgment in favor of the United States for cleanup costs under the Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA) because it "is so close to a common law claim for nuisance that it is, in substance, of a commercial or private law character"); Weir v. Lohr, 65 D.L.R. 2d 717, 720 (Can. Man. Q.B. 1967) (allowing government to recover hospital expenses as subrogee); Metal Indus. (Salvage) Ltd. v. Owners of the S.T. Harle, [1962] SLT 114 (Scot.) (Outer House) (allowing government to sue for loan repayment).

A judgment in favor of a foreign state awarding restitution for the benefit of private persons is not penal for the purposes of this Section. See U.S. Sec. Exch. Comm'n v. Manterfield, [2009] EWCA (Civ) 27 [24] (Eng. & Wales) ("The substance of what the SEC will seek to enforce (if they prevail in the action), and in relation to which they seek to preserve the assets, is the disgorgement of what they allege to be the proceeds of fraud."); Evans v European Bank Ltd, [2004] NSWCA 82 para 83 (Austl.) (enforcing U.S. judgment under Federal Trade Commission Act for disgorgement of credit-card fraud even though surplus might go to U.S. Treasury because "as a matter of substance, this is a proceeding designed to compensate persons who have been defrauded").

So long as the purpose of the action is to afford a private remedy, enforcement is not barred even if the law creating liability is a criminal statute, see Mexican Nat'l R.R. Co. v. Slater, 115 F. 593, 602-603 (5th Cir. 1902), aff'd, 194 U.S. 120 (1904), or the judgment is rendered during the course of a criminal proceeding, see Chase Manhattan Bank, N.A. v. Hoffman, 665 F. Supp. 73, 76 (D. Mass. 1987); Raulin v. Fischer, [1911] 2 KB 93. Judgments for multiple or punitive damages are not penal for the purposes of this Section. See *Huntington*, 146 U.S. at 667-668 (noting that claims for multiple damages had been held not to be penal); Old N. State Brewing Co. v. Newlands Servs. Inc., 58 B.C.L.R. 3d 144 (Can. B.C. C.A. 1998) (enforcing U.S. judgment for treble and punitive damages); S.A. Consortium General Textiles v. Sun & Sand Agencies, [1978] 1 QB 279 at 299-300 (CA) ("The word 'penalty' … means, I think, a sum payable to the state by way of punishment and not a sum payable to a private individual, even though it is payable by way of exemplary damages.").

The scope of the revenue rule seems to have caused little difficulty except with respect to foreign-exchange controls. Some courts have characterized such exchange controls as revenue laws. See, e.g., Banco do Brasil, S.A. v. A.C. Israel Commodity

§ 489 Tax and Penal Judgments, Restatement (Fourth) of Foreign Relations Law §...

Co., 190 N.E.2d 235, 237 (N.Y. 1963) (stating that Brazilian exchange-control law "is clearly a revenue law"). Irrespective of characterization, however, courts have treated exchange controls in the same way as revenue laws. They have declined to enforce them in suits brought by foreign governments, see, e.g., *Banco do Brasil*, 190 N.E.2d at 237; Camdex International Ltd. v. Bank of Zambia (No. 3), [1997] CLC 714 at 722-724 (EWCA); Re Lord Cable, [1977] 1 WLR 7 at 13 (Ch 1976) (Eng.), but have recognized them in suits between private parties, see, e.g., *Banco Frances e Brasileiro, S.A. v. Doe*, 331 N.E.2d 502 (N.Y. 1975); Kahler v. Midland Bank Ltd., [1950] AC 24, 46-47 (HL 1949) (U.K.); Re Helbert Wagg & Co., Ltd., [1956] Ch 323 at 353-354 (Eng.).

Although some authorities outside the United States have extended the rules against enforcing foreign tax and penal laws to other "public laws," see Dicey, Morris & Collins on the Conflict of Laws 107-108 (15th ed. 2012) (Rule 3: "English courts have no jurisdiction to entertain an action … for the enforcement, either directly or indirectly, of a penal, revenue or other public law of a foreign State"), no U.S. cases extend a rule of nonrecognition to public laws generally. But cf. *Reynolds Tobacco Holdings*, 268 F.3d at 132 (observing in dictum that "United States courts have traditionally been reluctant to enforce foreign laws that are 'jure imperii.'").

This Section applies only "to the extent" a foreign judgment is a judgment for taxes, fines, or other penalties. Thus, a mixed judgment combining enforceable and unenforceable parts may be enforced in part. See 2005 Uniform Act § 3, Comment 5 ("if a foreign-country money judgment is only partially within one of the excluded categories, the non-excluded portion will be subject to this Act"); see also U.S. Sec. Exch. Comm'n v. Cosby, [2000] Carswell B.C. 677, paras. 25-26 (B.C.S.C.) (Can.) (permitting enforcement of disgorgement but not civil penalties); Metal Indus. (Salvage) Ltd. [1962] SLT 114 (Scot.) (allowing government claim for loan repayment but not for taxes).

*5. Indirect enforcement.* The rules against enforcing foreign tax and penal laws apply to both direct and indirect enforcement. See *R.J. Reynolds Tobacco Holdings*, 268 F.3d at 130 ("a court must examine whether the substance of the claim is, either directly or indirectly, one for tax revenues"); QRS 1 APS v. Frandsen, [1999] 3 All ER 289, 291 (CA) ("our courts will not directly or indirectly enforce the penal, revenue or other public laws of another country"); *Inkley*, [1989] 1 QB at 265 (refusing to enforce civil judgment on appearance bond because "the whole purpose of the bond was to ensure, so far as it was possible, the presence of the executor of the bond to meet justice at the hands of the state in a criminal prosecution"); *McVey*, [1955] AC at 527 ("I cannot see why the same rule should not prevail where it appears that the enforcement of the right claimed would indirectly involve the execution of the revenue law of another State"). In applying the rules stated in this Section, courts look to the substance of the claim underlying the judgment rather than to the form of the action in which it was rendered. See *Philip Morris Companies*, 341 F.3d at 1256 ("it is the substance of a claim, not the form, that is important under the revenue rule"); *R.J. Reynolds Tobacco Holdings*, 268 F.3d at 130 ("What matters is not the form of the action but the substance of the claim."); *Evans*, [2004] NSWCA 82 para 45 (Austl.) ("Contemporary jurisprudence requires such issues to be determined in accordance with the substance and not the form of the proceedings."); *McVey*, [1955] AC at 527 ("it is not the form of the action … that must be considered, but the substance of the right sought to be enforced"). Thus, courts have denied enforcement of requests by liquidators to recover assets to satisfy tax claims. See, e.g., *Frandsen*, [1999] 3 All ER 289; *McVey*, [1955] AC 516. They have also denied claims for the costs of customs enforcement, see *R.J. Reynolds Tobacco Holdings*, 268 F.3d at 131-132 (2d Cir. 2001), and to judgments for such costs, see Attorney-General for Canada v. William Schulze & Co., [1901] 9 SLT 4 (Scot.). The rule against indirect enforcement does not extend, however, to criminal prosecutions brought by the United States for violations of U.S. law in schemes to defraud foreign governments of tax revenue. See *Pasquantino*, 544 U.S. 349.

*6. International agreements.* The United States has entered international agreements providing for the recognition and enforcement of some foreign tax and penal judgments. United States income-tax policy generally limits collection assistance to what is necessary to ensure that the relief granted by a tax treaty does not inure to the benefit of persons not entitled to it. See United States Model Income Tax Convention (2016) art. 26(7). The United States entered a reservation to Article 11 of the OECD Convention on Mutual Administrative Assistance in Tax Matters so that it would not be obligated to "take the necessary steps to recover tax claims of [other signatories] as if they were its own tax claims." See Staff of Joint Comm. on Taxation, 101st Cong., Explanation of Proposed Convention on Mutual Administrative Assistance in Tax Matters 8 (Comm. Print 1990). Nevertheless, tax treaties with Canada, Denmark, France, the Netherlands, and Sweden provide general collection assistance with respect to foreign tax claims. In most cases, the relevant provisions give the executive branch discretion whether to accept the foreign tax claim and treat the foreign claim as an assessment under U.S. laws only where the claim has been so accepted. See Protocol Amending the Convention with Respect to Taxes on Income and on Capital, U.S.-Can., art. 15, Mar. 17, 1995, S.

Treaty Doc. No. 104-4, 2030 U.N.T.S. 236 (adding art. XXVI A (3)-(4)); Convention for the Avoidance of Double Taxation and the Prevention of Fiscal Evasion with Respect to Taxes on Income, U.S.-Den., art. 27(3)-(4), Aug. 19, 1999, T.I.A.S. 13056, S. Treaty Doc. No. 106-12; Convention for the Avoidance of Double Taxation and the Prevention of Fiscal Evasion with Respect to Taxes on Income, U.S.-Neth., art. 31, Dec. 18, 1992, S. Treaty Doc. No. 103-6, 2291 U.N.T.S. 3; Convention for the Avoidance of Double Taxation and the Prevention of Fiscal Evasion with Respect to Taxes on Income, U.S.-Swed., art. 27, Sept. 1, 1994, S. Treaty Doc. No. 103-29; cf. Convention for the Avoidance of Double Taxation and the Prevention of Fiscal Evasion with Respect to Taxes on Income and Capital, U.S.-Fr., art. 28(2), Aug. 31, 1994, S. Treaty Doc. No. 103-32, 1963 U.N.T.S. 67 ("Revenue claims of each of the Contracting States which have been finally determined will be accepted for enforcement by the State to which application is made and collected in that State in accordance with the laws applicable to the enforcement and collection of its own taxes."); see also Federal Income Tax Project, International Aspects of United States Income Taxation II, at 124 (Am. Law Inst. 1992) (recommending that "[t]he United States should include in income tax treaties with selected treaty partners provisions authorizing reciprocal judicial recognition and enforcement of tax judgments rendered by courts of the treaty partner"). In practice, foreign tax claims are collected by the IRS through its tax-collecting procedures, not by foreign governments using courts. See Internal Revenue Manual § 5.21.7.4.

With respect to penal judgments, the United States has entered Mutual Legal Assistance Treaties (MLATs) with 38 countries providing for assistance in the collection of criminal forfeitures and fines: Antigua & Barbuda, Argentina, Austria, the Bahamas, Barbados, Belize, Brazil, Canada, Cyprus, Dominica, Egypt, Estonia, Germany, Greece, Grenada, Hungary, India, Jamaica, Latvia, Liechtenstein, Lithuania, Malaysia, Mexico, Nigeria, Panama, Philippines, Poland, Romania, Russia, St. Kitts & Nevis, St. Lucia, St. Vincent & the Grenadines, South Africa, Trinidad & Tobago, Ukraine, the United Kingdom, Uruguay, and Venezuela. MLATs with an additional 14 countries provide for assistance with the collection of criminal forfeitures but not fines: Australia, Belgium, Czech Republic, France, Hong Kong, Ireland, Israel, Japan, Jordan, Luxembourg, South Korea, Spain, Sweden, and Thailand. In most cases, the treaties also provide for assistance with restitution, which is not subject to the penal rule. See Reporters' Note 4; see, e.g., Treaty on Mutual Legal Assistance in Criminal Matters, U.S.-Can., art. XVII(2), Mar. 18, 1985, S. Treaty Doc. No. 100-14, 24 I.L.M. 1092 ("The Parties shall assist each other to the extent permitted by their respective laws in proceedings relating to the forfeiture of the proceeds of crime, restitution to the victims of crime, and the collection of fines imposed as a sentence in criminal prosecution."). In a few cases, the treaty language expressly calls for the enforcement of penal judgments. See Treaty on Mutual Legal Assistance in Criminal Matters, U.S.-Czech, art. 18(3), Feb. 4, 1998, S. Treaty Doc. No. 105-47 ("The Requested State may, to the extent permitted by its laws, give effect to any final legal determination given in the Requesting State forfeiting such proceeds or instrumentalities, or initiate its own legal action for the forfeiture of such assets."); Treaty on Mutual Legal Assistance in Criminal Matters, U.S.-Fr., art. 11(4), Dec. 10, 1998, S. Treaty Doc. No. 106-17 ("At the request of the Requesting State, the Requested State may execute a final decision of forfeiture pronounced by judicial authorities of the Requesting State."); Treaty on Mutual Legal Assistance in Criminal Matters, U.S.-H.K., art. 18(3), Apr. 15, 1997, S. Treaty Doc. No. 105-06 (providing that assistance "may include enforcing an order made by a court in the Requesting Party or initiating or assisting in proceedings in relation to the request"); Treaty on Mutual Legal Assistance in Criminal Matters, U.S.-Lux., art. 17(3), Mar. 13, 1997, S. Treaty Doc. No. 105-11 ("The Contracting Parties may assist each other to the extent permitted by their respective laws to give effect to final decisions rendered in either State forfeiting proceeds, objects, and instrumentalities of an offense, or may independently initiate legal action for the forfeiture of such assets."); Treaty on Mutual Legal Assistance in Criminal Matters, U.S.-Nigeria, art. XVII(2), Sept. 13, 1989, S. Treaty Doc. No. 102-26 (providing that assistance shall include "invoking the procedures of the Requested State for the recognition, confirmation, and enforcement of an order for the forfeiture of the proceeds or instrumentalities of criminal activities made by a court or other competent authority in the Requesting State."). In one case, the treaty expressly exempts the enforcement of judgments imposing criminal fines. See Treaty on Mutual Legal Assistance in Criminal Matters, U.S.-Isr., art. 17(4), Jan. 26, 1998, S. Treaty Doc. No. 105-40 ("However, the parties shall not be obligated to enforce orders of restitution or to collect fines or to enforce judgments imposing fines.").

The United States has also entered into multilateral and bilateral prisoner-transfer treaties that allow U.S. nationals convicted abroad to serve their sentences in the United States. See, e.g., Council of Europe Convention on the Transfer of Sentenced Persons, Mar. 21, 1983, 35 U.S.T. 2867, 22 I.L.M. 530; the Inter-American Convention on Serving Criminal Sentences Abroad, June 9, 1993, S. Treaty Doc. No. 104-35. Congress has provided for the implementation of prisoner-transfer treaties by legislation. See 18 U.S.C. §§ 4100-4115. Courts have upheld these agreements, including their bar on collateral attacks on the foreign sentence by the prisoner serving a sentence in the United States. Kass v. Reno, 83 F.3d 1186, 1189-1190 (10th Cir.

1996); Rosado v. Civiletti, 621 F.2d 1179, 1193-1198 (2d Cir. 1980); Pfeifer v. United States Bureau of Prisons, 615 F.2d 873, 876-877 (9th Cir. 1980).

*7. Role of the executive branch.* In holding that the revenue rule did not bar a prosecution under federal law for defrauding a foreign government of tax revenue, the Supreme Court relied in part on the fact that the prosecution had been brought by the executive branch. See *Pasquantino*, 544 U.S. at 369 ("we may assume that by electing to bring this prosecution, the Executive has assessed this prosecution's impact on this Nation's relationship with Canada, and concluded that it poses little danger of causing international friction"). The Second Circuit has subsequently suggested that the executive branch might waive the revenue rule on a case-by-case basis in suits between private parties. See *RJR Nabisco*, 424 F.3d at 181 (noting that "the executive branch has given us no signal that it consents to this litigation"). Although the President generally lacks authority to override State law, see Medellín v. Texas, 552 U.S. 491 (2008), certain treaties give the executive branch discretion to accept finally determined foreign tax claims, thereby entitling such claims to the same treatment as the United States' own tax claim. See, e.g., Protocol Amending the Convention with Respect to Taxes on Income and on Capital, U.S.-Can., art. 15, Mar. 17, 1995, S. Treaty Doc. No. 104-4, 2030 U.N.T.S. 236 (adding art. XXVI A (3), which provides that a foreign tax claim "that has been finally determined may be accepted for collection by the competent authority of the requested state"); see also Reporters' Note 6 (citing other tax treaties).

*8. Taking account of foreign tax and penal judgments for other purposes.* Judgments not entitled to recognition and enforcement under this Section may nevertheless be taken into account for other purposes. The Immigration and Nationality Act makes ineligible for a visa or admission any alien convicted of a crime of moral turpitude, or of two or more offenses regardless of moral turpitude, subject to certain exceptions. 8 U.S.C. § 1182(a)(2)(A) & (B). Some State repeat-offender statutes expressly require consideration of convictions in other countries. See Cal. Penal Code § 668; Fla. Stat. Ann. § 775.084(1)(e); La. Rev. Stat. Ann. § 15:529.1(A); 21 Okla. Stat. Ann. § 54; Tenn. Code Ann. § 40-35-106(b)(5); 13 Vt. Stat. Ann. § 11 & § 11a. In each case, the question is one of statutory interpretation. Compare Small v. United States, 544 U.S. 385 (2005) (holding that federal felon-in-possession-of-a-firearm statute does not apply to persons convicted in foreign courts), with Gwynne v. State, 499 So. 2d 802 (Ala. Crim. App. 1986) (holding the Alabama habitual-criminal-offender statute encompasses foreign convictions).

The prohibition against double jeopardy does not bar trial in the United States for a crime of which the accused has been convicted or acquitted in a foreign state. See United States v. Studabaker, 578 F.3d 423, 430 (6th Cir. 2009); United States v. Villanueva, 408 F.3d 193, 201 (5th Cir. 2005); United States v. Rezaq, 134 F.3d 1121, 1128 (D.C. Cir. 1998); see also United States v. Balsys, 524 U.S. 666, 673 (1998) (noting that the "defense against double jeopardy" is not "implicated except by action of the government that it binds"); § 428, Reporters' Note 4 (discussing principle of *non bis in idem* in extradition treaties). Some State double-jeopardy statutes apply to foreign convictions and acquittals. See Idaho Code Ann. § 19-315; Miss. Code Ann. § 99-11-27; N.D. Cent. Code Ann. § 29-03-13; Wash. Rev. Code Ann. § 10.43.040. In 2004, California amended its double-jeopardy statutes to eliminate foreign conviction or acquittal as a defense to trial but to give credit for time served abroad for the crime. See A.B. 1432, Stats. 2004, ch. 511, § 1, p. 4109 (codified at Cal. Penal Code §§ 656, 656.5, 656.6, 793, 793.5). Federal law provides that a prisoner transferred under a prisoner-transfer treaty shall not be retried for the same offense. See 18 U.S.C. § 4111.

*9. Previous Restatement.* Restatement Third, The Foreign Relations Law of the United States § 483 (Am. Law Inst. 1987), addressed the recognition and enforcement of tax and penal judgments in similar terms. This Section reflects Section 1(2) of the 1962 Uniform Act and Section 3(b) of the 2005 Uniform Act, as well as cases decided since publication of the Restatement Third.

**Case Citations** - by Jurisdiction

**Nev.**

**Nev.** 2020. Com. (d) cit. in sup.; Rptrs' Note 4 quot. in sup. Canadian securities commission filed a complaint against judgment debtor who was found to have perpetrated fraud against investors and was ordered to pay disgorgement and administrative penalties, seeking to enforce the disgorgement portion of the judgment after debtor left Canada and relocated to Nevada. The trial court granted summary judgment for commission, finding that the judgment was enforceable based on comity. This court affirmed, holding that the disgorgement portion of the judgment was remedial, rather than punitive or in the nature of a fine

or penalty, and thus could be enforced outside Canada. The court cited Restatement Fourth of Foreign Relations Law § 489 in noting that the character of a foreign judgment as penal was a question of U.S. law. Lathigee v. British Columbia Securities Commission, 477 P.3d 352, 355, 356.

Restatement of Foreign Relations Law © 1987-2021 American Law Institute.
Reproduced with permission. Other editorial enhancements © Thomson Reuters.

**End of Document**

© 2021 Thomson Reuters. No claim to original U.S. Government Works.

# Exhibit 28

# Chapter 5 - The Exclusion of Foreign Law

Dicey, Morris & Collins on the Conflict of Laws 15th Ed.

Mainwork

Volume 1

Part 1 - Preliminary Matters

Chapter 5 - The Exclusion of Foreign Law

## Rule 2

5R-001  English courts will not enforce or recognise a right, power, capacity, disability or legal relationship arising under the law of a foreign country, if the enforcement or recognition of such right, power, capacity, disability or legal relationship would be inconsistent with the fundamental public policy of English law.[1]

### Comment

5-002  Rule 2 expresses in very general terms the principle[2] that a foreign law, which is otherwise applicable according to the English rules of the conflict of laws, will not be applied or enforced in England if the law, or the result of its application, is contrary to public policy. "There is abundant authority that an English court will decline to recognise or apply what would otherwise be the appropriate foreign rule of law when to do so would be against English public policy."[3]

5-003  In English domestic law it is now well settled that the doctrine of public policy "should only be invoked in clear cases in which the harm to the public is substantially incontestable, and does not depend upon the idiosyncratic inferences of a few judicial minds."[4] In the conflict of laws it is even more necessary that the doctrine should be kept within proper limits, otherwise the whole basis of the system is liable to be frustrated. "The courts are not free to refuse to enforce a foreign right at the pleasure of the judges, to suit the individual notion of expediency or fairness. They do not close their doors unless help would violate some fundamental principle of justice, some prevalent conception of good morals, some deep-rooted tradition of the common weal."[5] As a result the courts will be slower to invoke public policy in cases involving a foreign element than when a purely municipal legal issue is involved.[6]

5-004  The doctrine of public policy has assumed far less prominence in the English conflict of laws than have corresponding doctrines in the laws of foreign countries, e.g. France and Germany. One reason for this may be that the courts invariably apply English domestic law in proceedings for divorce[7] and separation,[8] for the guardianship, custody[9] and adoption of minors,[10] and for the maintenance of wives and children.[11] Thus, foreign law is inapplicable in many important departments of family law in which, in foreign countries, its exclusion on grounds of public policy is of frequent occurrence. The doctrine of renvoi,[12] too, sometimes results in the application of English domestic law instead of foreign law; and it should be borne in mind that questions of procedure are governed by English domestic law as the lex fori,[13] though the reason for this is not policy but convenience.

5-005  A distinction should be drawn between the foreign law itself, on the one hand, and the effect of its application on the other.[14] There is, understandably, a reluctance to hold that a foreign law as such is contrary to public policy.[15] "An English court will refuse to apply a law which outrages its sense of justice or decency. But before it exercises such power it must consider the relevant foreign law as a whole."[16] In recent years, influenced by the impact of the European Convention on Human Rights, the House of Lords has indicated that a foreign law should be disregarded if it represents a serious infringement of human rights. In *Oppenheimer v Cattermole*[17] a majority expressed the view, obiter, that Nazi nationality decrees depriving absent German Jews of their nationality and confiscating their property fell within this category. As Lord

Cross put it, "a law of this sort constitutes so grave an infringement of human rights that the courts of this country ought to refuse to recognise it as a law at all."[18] In *Williams & Humbert Ltd v W&H Trade Marks (Jersey) Ltd*[19] it was accepted that in appropriate circumstances the court would disregard a foreign confiscatory decree which offended principles of human rights.

5-006    What is usually in question, however, is not the foreign law in the abstract, but the results of its enforcement or recognition in England in the concrete case. Thus, the courts may well regard a foreign law which permits polygamy, or the marriage of step-father and step-daughter, as unwise or even immoral. But if such a marriage has taken place under a foreign law according to which it is valid, and especially if children have been born, it may be better to recognise it than to disturb settled family relationships by holding the marriage invalid and the children illegitimate on grounds of public policy. Everything depends upon the nature of the question which arises. Thus, until 1972 no polygamously-married spouse could obtain a divorce from the courts;[20] but the spouses would be treated as married persons and thus incapable of contracting a valid marriage in England;[21] the children would be treated as legitimate;[22] and the wife would be entitled to assert rights of succession and other rights on the footing that she was a wife.[23] Again, to take an improbable but striking example, if a foreign law permitted a bachelor aged fifty to adopt a girl aged seventeen, the courts might hesitate to award the custody of the girl to her adoptive father: but that is no reason for not allowing her to succeed to his property as his "child" on his death intestate.[24] Public policy in such cases is not absolute but relative.

5-007    The doctrine of public policy may not only induce a court to refuse to enforce or recognise, for example, a contract or a marriage when it would be valid under the applicable foreign law. It may also produce the opposite effect and lead to the enforcement or recognition of, for example, a contract or a marriage which under the applicable foreign law would be invalid. Thus, foreign legislation which invalidates a contract or a marriage may be disregarded if it is penal,[25] or foreign exchange control legislation which affects a contract governed by foreign law, but which is passed, not with the genuine object of protecting the State's economy, but as an "instrument of oppression" may be disregarded on the ground of public policy,[26] and a contract not enforceable under its applicable law may as a result be enforceable in England. On the other hand, the effect of the doctrine of public policy always is to exclude the application of foreign law which would otherwise be applicable. In one case,[27] the doctrine was anomalously applied so as to invoke the application of a foreign law which would otherwise have been inapplicable; but this case has for long been the subject of criticism,[28] and has now been overruled.[29]

5-008    The reservation of public policy in conflict of laws cases is a necessary one, but "no attempt to define the limits of that reservation has ever succeeded."[30] All that can be done, therefore, is to enumerate the cases in which the recognition or enforcement of rights arising under foreign laws has been refused on this ground. It will be found that the doctrine has been principally invoked in two classes of case, namely (1) those involving foreign contracts, and (2) those involving a foreign status.

### (1) Contracts[31]

5-009    The effect of Art.21 of the Rome I Regulation on the Law Applicable to Contractual Obligations[32] is that the application of a rule of law of any country may be refused if its application is manifestly incompatible with English public policy. At common law English courts refused to enforce champertous contracts,[33] contracts in restraint of trade,[34] contracts entered into under duress or coercion,[35] or contracts involving collusive and corrupt arrangements for a divorce,[36] or trading with the enemy,[37] or breaking the laws of a friendly country,[38] even though such contracts were valid under their applicable law. On the other hand, they have enforced contracts for the loan of money to be spent on gambling abroad,[39] and for foreign loans which contravened the English Moneylenders Acts.[40] In general, it is certainly untrue that contracts governed by a foreign law will not be enforced in England if they are contrary to some rule of the common law which the parties to an English contract cannot disregard. Thus, a foreign contract made without consideration will be enforced in England.[41]

## (2) Status

**5-010**  Although those incidents of a foreign status which are relevant[42] to an issue before a court are normally recognised, an incapacity imposed for reasons which it would be contrary to public policy to enforce is disregarded as a penal incapacity. The courts have thus said or held that incapacities imposed on account of slavery,[43] religion or religious vocation,[44] alien nationality,[45] race,[46] divorce[47] and (perhaps unjustifiably) physical incompetence[48] and prodigality,[49] will be disregarded. Although incapacities imposed for these reasons have traditionally been described as "penal" incapacities, the description is somewhat misleading in that they are not necessarily imposed for a breach of the criminal law, i.e. of a "penal law" such as is referred to in Rule 3(1).[50] However, if this is appreciated, and if it is observed that the present context is one of recognition whilst that of Rule 3(1) is one of enforcement,[51] then no harm attends upon the use of the traditional term.

**5-011**  Public policy may require that a capacity existing under a foreign law should be disregarded in England[52]: but the circumstances would have to be extreme before such a course becomes justifiable. Thus, the courts recognise the validity of marriages within the prohibited degrees of English law[53] (provided they are valid under the applicable foreign law), but they might refuse to recognise a marriage between persons so closely related that sexual intercourse between them was incestuous by English criminal law,[54] or a marriage with a child below the age of puberty[55] or a marriage with a man suffering from autism and severe impairment of intellectual functioning.[56]

**5-012**  The mere fact that a foreign status or relationship is unknown to English domestic law is not a ground for refusing to recognise its incidents.[57] Thus, legitimation by subsequent marriage was recognised and given effect to in England long before it became part of English domestic law.[58] The recognition of polygamous marriages is another example.[59]

### Other cases

**5-013**  Apart from these two groups of cases, examples of the exclusion of foreign law on the ground of public policy are rare. It has been said that it is a principle of public policy that the courts should give effect to clearly established rules of international law.[60] It has been held that it is not contrary to public policy to recognise a decree of a foreign State expropriating property within its territory merely because it is "confiscatory," i.e. does not provide for compensation.[61] But it may be otherwise if the decree is penal or is discriminatory in such a way as to offend against public policy, or otherwise offends against the principles safeguarding human rights.[62] In *Kuwait Airways Corp v Iraqi Airways Co (Nos 4 and 5)*[63] the House of Lords decided that the court could disregard a foreign law which was plainly contrary to international law. In that case the breach of international law was flagrant, and its seriousness had been recognised by the international community, including the United Kingdom.

**5-014**  The recognition of a foreign decree of divorce[64] or nullity of marriage[65] or the enforcement of a foreign judgment in personam[66] may be refused on grounds of public policy, but reported instances are rare. There is no general principle that the application of a foreign law is contrary to public policy merely because it operates retrospectively.[67]

### Express provision

**5-015**  There are now many statutes, international conventions and European Union regulations in the field of the conflict of laws which provide for the application of public policy. Many[68] deal with foreign judgments or awards and allow for the non-recognition or non-enforcement on the ground that they are contrary to public policy,[69] or, in an expression originally derived from international conventions in the area, "manifestly" contrary to public policy.[70]

© 2021 Thomson Reuters.

Case 1:18-md-02865-LAK    Document 808-14    Filed 05/12/22    Page 148 of 231

**"Residual discretion"**

5-016    In some decisions the judges have stated that the courts possess a "residual discretion" to refuse to recognise a foreign status[71] conferred or imposed upon a person by the law of his domicile, or a foreign decree of divorce or nullity of marriage[72] granted by a foreign court, if the recognition would be improper or unjust or unconscionable in the circumstances of the particular case. In the first of the cases in which these statements were made it is probable that the court intended to do no more than call attention to the distinction between the recognition of a status and the recognition of its incidents.[73] In the later cases it may be that the courts intended to do no more than refer to the doctrine of public policy and to the analogous doctrine that foreign decrees of divorce and nullity will not be recognised in England if recognition would be contrary to natural justice.[74] But if the courts intended to reduce the whole of the conflict of laws, or even that part of it which is concerned with status, to the level of judicial discretion, it is submitted that this is contrary both to principle and to authority. For, as has been well said, "to state the law in terms of judicial discretion … is to admit that no certainty or predictability is attainable in this matter."[75] And again: "the courts might just as well abandon any attempt to formulate and apply defined rules of law if these can be overridden by an undefinable discretion."[76] And, as Lord Hodson said in *Boys v Chaplin*,[77] "rules of law should be defined and adhered to as closely as possible lest they lose themselves in a field of judicial discretion where no secure foothold is to be found by litigants or their advisers."

## Illustrations[78]

5-017    1.H, domiciled in South Africa, obtains a divorce from the South African court on the ground of W's adultery, and thereafter remains single. By Roman-Dutch law a decree of divorce does not permit an adulteress to contract another marriage until the remarriage of her husband. W acquires an English domicile and marries H2 in England. The marriage is valid, for although W's marital capacity depends upon the South African decree (for that was the only measure affecting her status as a married woman), the South African provision was penal.[79]

2.A, a French citizen domiciled in France, is a person of full age, but being of extravagant habits is, by a French court of competent jurisdiction, adjudged to be a "prodigal," and is placed under the control of a conseil judiciaire (legal adviser). He is, as a prodigal, incapable of receiving or giving a receipt for his movable property without the consent of such adviser. He becomes entitled to a fund in court in England. The status of a prodigal is unknown to English law. A has a right to receive the fund in court on his own receipt without the consent of his legal adviser because (inter alia) the incapacity is a penal one.[80]

3.A Roman Catholic priest is a citizen of, and domiciled in, a foreign country, under whose law he is, as a priest, incapable of marriage. He marries an English woman in England. The marriage is valid, i.e. English law does not recognise the disability as it is a penal one.[81]

4.A, a German Jew, emigrated to England in 1939 in order to escape persecution by the Nazis. In 1941 a German decree deprived absent Jews of their German nationality and their property. This deprivation would not be recognised in England.[82]

5-018    5.In 1954 W, a Belgian national domiciled in Belgium, goes through a ceremony of marriage in England with H1. The purpose of the marriage is to enable W to avoid being deported as a prostitute or undesirable alien, and H1 is induced to take part in the ceremony in return for a bribe of £50 and a ticket to South Africa. In March 1970 W goes through another ceremony of marriage with H2, one of the principals in the organisation which has been managing the activities

of W as a prostitute. At the wedding party H2 dies of a heart attack, leaving substantial property. Subsequently, W, anxious to establish that she is the widow of H2, petitions the English court for a declaration that her marriage to H1 was null and void on the false ground that she had not consented to it because she was ignorant of the true nature of the ceremony, and in 1971 the petition is dismissed on the ground that W knew the true nature of the ceremony. W goes back to Belgium and obtains a decree from the Belgian courts that the marriage to H1 is a nullity because it was a mock marriage. The Belgian courts decide that although W's plea of lack of consent is res judicata by virtue of the decision of the English court, the plea of mock marriage is not barred because it had not been argued in the English proceedings. In 1973 W petitions the English court for a declaration that the Belgian decree of nullity is entitled to recognition. The petition is dismissed because, among other reasons, the English rule that a marriage celebrated in order to acquire nationality is a valid marriage is a rule which reflects a public policy of giving effect to marriages conducted in accordance with the proper formalities whether or not the parties intend to live together; the Belgian judgment reflected a conflicting public policy to the same facts as were finally ascertained by the English court; in any event, public policy precluded recognition of the Belgian decree because it was obtained only after, and because, W's fraudulent petition had been dismissed by the English court.[83]

6.A, a 25-year-old man suffering from autism and severe impairment of intellectual functioning, takes part in a Muslim marriage ceremony to B by telephone while he is in England and B is in Bangladesh. The marriage will not be not recognised. It is inconsistent with English concepts of marriage and A's incapacity renders the marriage sufficiently offensive to the conscience of the English court that it will, on public policy grounds, refuse to recognise it.[84]

# Rule 3

**5R-019**    [85]—English courts have no jurisdiction to entertain an action: 1) for the enforcement, either directly or indirectly, of a penal,[86] revenue[87] or other public law[88] of a foreign State; or (2) founded upon an act of state.[89]

## Comment

### General

**5-020**    There is a well-established and almost universal principle that the courts of one country will not enforce the penal and revenue laws of another country.[90] Although the theoretical basis for the Rule is a matter of some controversy,[91] the best explanation, it is submitted, is that suggested by Lord Keith of Avonholm in *Government of India v Taylor*,[92] that enforcement of such claims is an extension of the sovereign power which imposed the taxes, and "an assertion of sovereign authority by one State within the territory of another, as distinct from a patrimonial claim by a foreign sovereign, is (treaty or convention apart) contrary to all concepts of independent sovereignties." Although it was not necessary to decide the precise theoretical basis for the rule, in *Re State of Norway's Application (Nos 1 and 2)*[93] Lord Goff of Chieveley was inclined to agree with this view. Clause (1) of Rule 3 describes those laws which a foreign State may seek to enforce solely as an exercise of sovereignty, and which "by the law of nations are exclusively assigned to their domestic forum."[94] Whether a foreign law falls within the categories of those laws which the English court will not enforce is a matter for English law. Thus whether the foreign law regards the law in question as a penal law[95] or a revenue law[96] or a public law[97] is irrelevant.

**5-021**

Rule 3 is framed in terms of lack of jurisdiction, and it has frequently been cited by the courts,[98] but claims made within the scope of the Rule have usually been dismissed on the merits or been struck out.[99] This was so even in *Huntington v Attrill*,[100] where the Privy Council used the terminology of jurisdiction, and which was the principal authority for Rule 3 when it was first formulated.[101] In the eleventh edition of this book it was suggested that it is the foreign State which has no international jurisdiction to enforce its law abroad, and the English court will not exercise its own jurisdiction in aid of an excess of jurisdiction by the foreign State. The substance of this view was adopted in *Re State of Norway's Application (Nos 1 and 2)*,[102] but in view of its wide acceptance in judicial decisions, Rule 3 has been retained in its traditional form.

5-022     This Rule is not affected by the Brussels I Regulation. In *QRS 1 ApS v Frandsen*[103] it was held that a claim by the liquidator of a Danish company against a shareholder in respect of the stripping of its assets was an unenforceable revenue claim, because the only creditors were the Danish tax authorities, who were funding the claim.[104] The claim was a revenue matter within the meaning of the Brussels Convention, and the rule that the English court would not directly or indirectly enforce the revenue laws of another country was not overridden by the Convention (or by the EC Treaty). It was also indicated (obiter) that if the Brussels Convention applied, then Rule 3 could not have applied because its effect would have been to impair the operation of the Convention. This suggestion is open to the criticism that Rule 3, as indicated above, is not really a rule of jurisdiction, but a substantive rule of law. In any event, the significance of Rule 3 in the European Union is much lessened by the effect of the EU Directives on mutual assistance between Member States for the recovery of claims relating to taxes, duties and other measure, the current one[105] of which is given effect by the Finance Act 2011.[106]

5-023     Direct enforcement occurs where a foreign State or its nominee seeks to obtain money or property, or other relief, in reliance on the foreign rule in question.[107] But indirect enforcement is also prohibited, for a foreign State cannot be allowed to do indirectly what it cannot do directly. Indirect enforcement is, however, easier to describe than to define. Rule 3(1) relates only to *enforcement*, but it does not prevent *recognition* of a foreign law of the type in question, and it is sometimes difficult to draw the line between an issue involving merely recognition of a foreign law and indirect enforcement of it.

5-024     Where direct or indirect enforcement does not arise, a foreign law of a type falling within Rule 3(1) will be recognised if it is relevant to the issue,[108] and provided it is not contrary to public policy.[109] For example, a contract invalid according to a penal or revenue law of its applicable law, or performance of which is prohibited by a penal law of the place of performance, may be held to be invalid or unenforceable;[110] and the English court will refuse to restrain trustees from acting in compliance with foreign fiscal legislation forming part of the proper law of the trust.[111] Likewise trustees will be entitled to be indemnified out of an estate in England in respect of such sums which they have been personally compelled to pay abroad in satisfaction of a foreign government's claim for estate duty upon that estate even though the claim would have been unenforceable in this country.[112]

5-025     Indirect enforcement occurs where the foreign State (or its nominee) in form seeks a remedy, not based on the foreign rule in question, but which in substance is designed to give it extra-territorial effect; or where a private party raises a defence based on the foreign law in order to vindicate or assert the right of the foreign State. An example of the former is the case of a foreign company in liquidation which seeks to recover from one of its directors assets under his control which the liquidator (appointed by the court at the instance of foreign revenue authorities) would use only for the purpose of satisfying the foreign State's unsatisfied claim for taxes due from the company.[113] On the other hand, in *Williams & Humbert Ltd v W&H Trade Marks (Jersey) Ltd*[114] the Spanish Government expropriated shares in various Spanish companies, and appointed new directors to those companies and their English subsidiaries. The new directors commenced actions in England in the name of their respective companies to recover assets in the hands of former shareholders and alleged to belong to the plaintiff companies. The House of Lords held that the action was not an indirect enforcement of the Spanish decree: it was designed to vindicate the rights of the plaintiff companies, and not to satisfy claims by the Spanish State. Nor, in *Re State of Norway's Application (Nos 1 and 2)*,[115] was it an exercise of extra-territorial sovereignty for a foreign State to seek the assistance of the English court to obtain evidence for the enforcement of its revenue laws in its own country.

5-026     Examples of cases where a private party raises a claim or defence in order to vindicate or assert the rights of a foreign State include the case of a bank which seeks delivery of securities owned by the former King of a foreign country and held by his agent in London in order to deliver them to the foreign State, which had declared all the ex-King's property forfeit

© 2021 Thomson Reuters.

on account of his alleged treason;[116] or the case of a debtor who seeks to defeat a claim against him by pleading that the debt has been attached through a garnishee order served by or on behalf of a foreign State in respect of tax liabilities;[117] or the case of a shipowner who refuses to hand over goods to their owner because it has received a notice of levy from a foreign government which under its own law has encumbered the goods with a lien in respect of unpaid tax.[118] Where, however, the foreign government has a patrimonial claim,[119] e.g. to the property of unsuccessful revolutionaries or former governments,[120] or where it claims or reclaims property which it has reduced into its possession,[121] the case is not one of enforcement of title, but of recognition, and the claim will be enforced. The foreign State may sue to prevent injury to its property, and in this context it was held in the 19th century that the Emperor of Austria could sue to restrain the manufacture of counterfeit bank notes,[122] and most recently that the Kingdom of Spain had an arguable case (on a striking-out application) that it could sue to restrain the use of forged export licences.[123]

### Penal laws

5-027    "The common law considers crimes as altogether local, and cognisable and punishable exclusively in the country where they are committed … Chief Justice Marshall, in delivering the opinion of the Supreme Court, said: 'The courts of no country execute the penal laws of another'."[124] In *Huntington v Attrill*[125] the Privy Council defined penal to include not only crimes in the strict sense, but "all breaches of public law punishable by pecuniary mulct or otherwise, at the instance of the state government, or someone representing the public" and (adopting the test laid down by the United States Supreme Court[126]) "all suits in favour of the state for the recovery of pecuniary penalties for any violation of statutes for the protection of its revenue or other municipal laws, and to all judgments for such penalties." Thus for this purpose a penal law is a law which punishes[127] or prevents[128] an offence. To come within this principle the law does not have to be part of the criminal code of the foreign country. Thus a law intended to protect the historic heritage of New Zealand by forfeiting historic articles illegally exported was held to be penal;[129] so also in Ireland it was held that the process of sequestration of assets of the National Union of Mineworkers after its civil contempt of court in England was penal in nature.[130] The penalty must normally be exigible by the State,[131] and therefore an action for punitive damages by a private person will not be regarded as penal.[132] But the mere fact that a law contains criminal penalties does not render penal all the other provisions of the law. In *Islamic Republic of Iran v Barakat Galleries Ltd* Iran was not debarred by the penal law rule from recovering ancient artefacts allegedly exported from Iran and belonging to the Iranian State. The Iranian law contained penalties for (inter alia) illegal export, but Iran was relying on provisions which vested title in the State, and these were not penal provisions.[133]

5-028    Since "the essential nature and real foundation of a cause of action are not changed by recovering judgment upon it,"[134] the English court will not enforce a foreign criminal judgment.[135]

### Revenue laws

5-029    "… [T]here is a well recognised rule, which has been enforced for at least 200 years or thereabouts, under which these courts will not collect the taxes of foreign states for the benefit of the sovereigns of those foreign states".[136] This is because "tax gathering is not a matter of contract but of authority and administration as between the State and those within its jurisdiction."[137] Accordingly, the courts do not enforce foreign revenue laws,nor judgments based on foreign revenue claims.[138] In *Government of India v Taylor*[139] Lord Keith of Avonholm accepted that this rule was subject to contrary agreement by treaty or convention, and it has been held that the State of Norway could seek the extradition of its national for offences of false accounting, forgery and theft which were connected with tax offences.[140] In addition, as indicated above,[141] very substantial inroads have been made on Rule 3 in relation to claims in England for the collection of taxes in European Union Member States by the EU Directives relating to mutual assistance in the recovery of taxes and duties.

5-030

The expression "revenue law" has not been defined, but certainly includes a rule requiring a non-contractual payment of money or kind in favour of central or local government. Thus rules imposing an income tax,[142] a capital gains tax,[143] a profits levy,[144] a succession duty,[145] a municipal contribution,[146] a compulsory state insurance scheme contribution,[147] and a customs duty[148] have been characterised as revenue laws; but rules under which a State can recover social security payments[149] or obtain legal aid contributions[150] have not been so characterised. The character to be given exchange control regulations is not clear. Although they may not be revenue laws,[151] it has been doubted (it is submitted, correctly) whether the courts would entertain proceedings under a foreign exchange control regulation for the repatriation of funds situate in England.[152]

5-031    Although it was once said that revenue laws are never recognised abroad,[153] this proposition had no justification and it is clear that a foreign revenue law which is part of the applicable law may be recognised.[154] Accordingly where no question of enforcement arises, foreign revenue laws are applied by the courts if they are relevant to an issue, although in individual cases such laws may (like any other foreign rule) have to be disregarded on grounds of public policy. Thus a contract which violates the customs regulations of the governing law will be treated as invalid in England.

### Public laws

5-032    As the authorities now stand, the prohibition on the enforce-ment of "other public law" extends to those laws (other than penal and revenue laws) which will not be enforced because the claim involves the exercise or the assertion of a sovereign right, or seeks to enforce governmental interests.[155] It was submitted in earlier editions of this work that the prohibitions on the enforcement of penal[156] and revenue laws are examples of a wider principle that a State cannot enforce its public law or its political or prerogative rights.[157] As Lord Keith of Avonholm put it in *Government of India v Taylor*,[158] an assertion of sovereign authority by one State within the territory of another is contrary to all concepts of independent sovereign authorities.

5-033    The prohibition on enforcement of public law has been the subject of two relatively recent decisions of the Court of Appeal,[159] but has not received the direct approval of the House of Lords or the Supreme Court.[160] Until these decisions there was very little authority which dealt directly with the general principle that foreign public laws will not be enforced in the English court. This is, at least partially, explained by the fact that States do not generally seek to enforce their public laws abroad and by the fact that it is often difficult to see to what cause of action such claims could give rise. Thus in *Re Lord Cable*[161] the Indian Government sought to be joined in proceedings for the execution of a will trust, in order that it might argue (inter alia) that the will trustees should remit funds to India in accordance with Indian exchange control legislation. Joinder was refused because, among other grounds, Slade J. was not satisfied that the English court would ever entertain proceedings by a foreign State of which the sole purpose was directly to enforce its exchange control regulations. In that case, the Indian Government sought to be joined so that it could oppose an application by beneficiaries to restrain the trustees from remitting funds to India. But if it had commenced an action itself to require remittance of the funds to India in accordance with the exchange control regulations, it is clear that there would have been no cause of action appropriate to the claim. It is not necessary to assimilate exchange control regulations to revenue laws to arrive at that conclusion. There are no principles of the conflict of laws which deal with public rights of that kind.

5-034    In *Att-Gen of New Zealand v Ortiz*[162] the New Zealand Government sought to recover a valuable Maori carving which had been illegally exported from New Zealand. The carving had been bought by Ortiz and was in the possession of Sotheby's, the auctioneers, for sale on behalf of Ortiz. Under a New Zealand statute historic articles exported without permission were forfeited to the Crown. The defendants resisted the action on two principal grounds, (a) that under New Zealand law the forfeiture was not automatic and did not take effect unless the goods were seized by the authorities (which they had not been), and (b) that the New Zealand statute could not be enforced because it was a penal or public law. Staughton J. decided in favour of the New Zealand Government on the basis that (a) under New Zealand law forfeiture was automatic, and (b) the law was not penal and there was no general category of non-enforceability of foreign public law. In the Court of Appeal his decision was reversed, (a) unanimously on the basis that forfeiture was not automatic, and (b) per Lord Denning M.R. on the basis that the statute was a public law which would not be enforced, and per Ackner and O'Connor L.JJ. on the basis

© 2021 Thomson Reuters.

that it was a penal law. The decision of the Court of Appeal was affirmed by the House of Lords solely on the ground that the New Zealand statute did not provide for automatic forfeiture, and the House of Lords pointed out that the views of the Court of Appeal on the applicability of the principle of nonenforceability of penal or public laws were obiter, and that the House, having heard no argument on this aspect, would not express any conclusion on the correctness of the opinions of the Court of Appeal. The view of Staughton J. on the relevant aspect was that the authorities did not support a general principle that public laws should not be enforced, and that the better approach was to consider in each individual case whether there was a special ground of public policy which required the law in question not to be enforced. Lord Denning M.R., after a review of the authorities,[163] adopted the view expressed in this work that foreign public laws are not enforceable in this country, because they are acts done in the exercise of sovereign authority which will not be enforced outside the territory of the foreign State. Ackner L.J. did not reach a concluded view, but indicated some support for Staughton J.'s conclusion.

### Claims to enforce governmental interests

5–035  The issue arose again in Australia and New Zealand in the extensive litigation by the British Government in which it sought to restrain the publication of Spycatcher, a book written by Peter Wright, a former member of the British security services. The claim was not directly based on public law. The British Government claimed that the book had drawn on confidential knowledge obtained by Wright while he was an officer of the security services, and that consequently the proposed publication was a breach of fiduciary duty, or a breach of an equitable or contractual obligation of confidence. The High Court of Australia[164] accepted that there was a principle that the court should not enforce foreign public laws, in the sense that the court would not allow the enforcement outside the territory of the foreign sovereign of claims based on or related to the exercise of foreign governmental power. The High Court recognised that it was difficult to identify the foreign laws or rights which fell within the general principle, and suggested that, rather than refer to "public laws" it would be more apt to refer to "public interests" or "governmental interests" to signify that the rule applies to claims enforcing the interests of a foreign sovereign which arise from the exercise of certain powers peculiar to government. Accordingly, the injunction was refused on the ground that the court would not enforce a claim arising out of acts of a foreign State in the exercise of such powers in the pursuit of its national security. The claim for relief arose out of, and was secured by, an exercise of the prerogative of the Crown, in the maintenance of national security, and the right or interest asserted was to be classified as a governmental interest, and not the vindication of private law obligations derived from the fiduciary and contractual relationship between Wright and the British Government. As a result, the action fell within the rule of international law which rendered the claim unenforceable.[165]

5–036  As already noted, in the Spycatcher litigation the claim of the British government was at least in form a private law claim for breach of confidence. So also the claims by the Government of Equatorial Guinea in England and in Guernsey arising out of an unsuccessful attempted coup in Equatorial Guinea, in which Simon Mann, a United Kingdom national, was allegedly involved, were based on private law. The President of Equatorial Guinea sued Simon Mann and his companies in England for damage caused by the unsuccessful attempt at revolution, and obtained orders in Guernsey for a bank to give information about the ownership of various companies and bank accounts which the Government had traced.

5–037  On an appeal from Guernsey in relation to an order for production of documents by a bank, the Privy Council decided that the order should be upheld, but (in an opinion written by Lord Bingham and Lord Hoffmann) expressed disquiet at the fact that no argument was addressed, whether to the courts in Guernsey or to the Privy Council, on the question whether the Guernsey court lacked jurisdiction to make the order which it did on the ground that it could be regarded as the enforcement, direct or indirect, of the public law of a foreign State. It was arguable that the claims which the Government said it wished to make in the English proceedings represented an exercise of sovereign authority, namely the preservation of the security of the State and its ruler. Because of its doubts about the justiciability of the claim, and since the same questions in relation to English law were likely to come before the English Court of Appeal, the Privy Council decided that the order should be suspended until the Court of Appeal had decided whether the Government had a cause of action enforceable in English law. In *Mbasogo v Logo Ltd*[166] the Court of Appeal held that the critical question was whether, in bringing a claim, the claimant was doing an act which was of a sovereign character or which was done by virtue of sovereign authority; and whether the claim involved the exercise or assertion of a sovereign right. The alleged losses arose as a result of decisions taken by the claimants to protect the State and citizens of Equatorial Guinea. The defence of a State and its subjects was a paradigm function of government. The special damages claimed by both claimants were in respect of losses incurred as a direct result of their response to the alleged conspiracy. The Court

© 2021 Thomson Reuters.

of Appeal said that the appeal could be resolved without adopting the "governmental interest" approach enunciated by the majority of the High Court of Australia in the *Spycatcher* case, and it was not necessary to express a view as to whether that decision would be correct as a matter of English law.

#### Enforcement of public laws

5-038   In the *Equatorial Guinea* case the Court of Appeal also held[167] that Rule 3(1) accurately reflected English law, including the reference to "other public laws." The question of the enforceability of foreign public laws arose for decision in *Islamic Republic of Iran v Barakat Galleries Ltd*[168] in which the Court of Appeal decided, on preliminary issues, that Iran was not debarred by the penal law/public law rule from recovering ancient artefacts allegedly exported from Iran and vested by legislation in the Iranian State. In the *Iran* decision the Court of Appeal said[169] that the *Equatorial Guinea* case was not in fact a case involving the attempted enforcement of foreign public law, and the ratio was that a claim involving the exercise or assertion of a sovereign right was not justiciable, and that was not far removed from the test adopted by the High Court of Australia in the *Spycatcher* case. The Court of Appeal held that the claim by Iran to the artefacts was a patrimonial claim, i.e. a claim based on its ownership of the artefacts, and not a claim to enforce a foreign public law or to assert sovereign rights.

5-039   The Court of Appeal also held, alternatively, that if the claim were to enforce foreign public law, there was no inflexible rule that the court would not entertain an action whose object was to enforce the public law of another State. There were positive reasons of policy why a claim by a State to recover antiquities which formed part of its national heritage and which otherwise complied with the requirements of private international law. There was international recognition that states should assist one another to prevent the unlawful removal of cultural objects including antiquities. There were a number of international instruments (to some of which the United Kingdom was party) which had the purpose of preventing unlawful dealing in property which was part of the cultural heritage of states.

5-040   The result of the authorities in the Court of Appeal is that the English court will not enforce a claim based on foreign public law if the claim involves the exercise or assertion of a sovereign right, unless it is contrary to public policy for the claim to be shut out.[170] In the *Iran* case the Court of Appeal also considered what types of public law would be likely to fall within the prohibition. It approved the test suggested by Lord Denning M.R. in *Att-Gen of New Zealand v Ortiz*[171] that the question depended on whether the claim involved acts done by a sovereign jure imperii, by virtue of sovereign authority. The Court of Appeal concluded that exchange control legislation,[172] and (perhaps) export restrictions[173] would so fall. In practice probably the most important rules falling within the category are those which authorise governmental interference with private property, whether in the form of requisition, nationalisation or confiscation.

5-041   Where the foreign state has acquired title under its law to property within its jurisdiction in cases not involving compulsory acquisition of title from private parties, there is no reason in principle why the English court should not recognise its title in accordance with the general principle.[174] But where the foreign state has sought to confiscate or attach private property, the state's title will only be recognised in England if it has reduced the property to possession. In *Williams & Humbert Ltd v W & H Trade Marks (Jersey) Ltd* Lord Templeman said that the principle was that "an English court will recognise the compulsory acquisition law of a foreign state and will recognise the change of title to property which has come under the control of the foreign state and will recognise the consequences of that change of title."[175]

5-042   Consequently, the distinction between the two categories of cases, those where the foreign state will be able to claim its property in England even if it has not reduced it into its possession, and those where it may not claim unless it has reduced the property into its possession, depends on the way in which it has acquired ownership. If it has acquired title under public law by confiscation or compulsory process from the former owner then it will not be able to claim the property in England from the former owner or his successors in title unless it has had possession. If it has taken the property into its possession then its claim will be treated as depending on recognition; if it has not had possession it will be seeking to exercise its sovereign authority.[176]

**Act of State**

5-043    It has been held that the courts will not investigate the propriety of an act of the Crown performed in the course of its relations with a foreign State,[177] or enforce any right alleged to have been created by such an act unless that right has been incorporated into English domestic law.[178] Such acts are "acts of state," which, it has been said, "cannot be challenged, controlled or interfered with by municipal courts."[179] This proposition does not mean that an act of state is not recognised by the courts or that it cannot affect private rights existing prior to its commission.[180] Nor does it mean that areas which were once thought to be exclusively within the prerogative power of the Crown in the exercise of foreign relations, such as the exercise of diplomatic protection, cannot be the subject of judicial review.[181]

5-044    The expression "act of state" is also used to describe executive acts which are authorised or ratified by the Crown in the exercise of sovereign power.[182] The victim of such an act is in some circumstances denied any redress against the actor because the act, once it has been identified as an act of state, is one which the court has no jurisdiction to examine.[183] The defence can be raised in regard to an act performed outside the United Kingdom and its colonies against the person or property of an alien[184] and is also available in regard to the deportation[185] or internment[186] of an alien of enemy nationality. The defence is probably not available in regard to acts affecting the property in the United Kingdom of a non-resident alien.[187] It is an open question whether the defence can apply to acts performed outside the United Kingdom and its colonies against the person or property of a British citizen.[188] The defence is inapplicable to an act performed within the United Kingdom and its colonies against the person or property of a British citizen[189] or of a non-enemy alien present here.[190]

5-045    The expression "act of state" is also used in connection with the executive and legislative acts of foreign States. The expression is found in several contexts, and it may not be possible to extract a general principle which will apply to all of them. One line of authorities (concerning the rights of inhabitants of ceded territory) indicates that the English courts will not investigate the propriety of an act of a foreign government performed in the course of its relations with another State or to enforce any right alleged to have been created by such an act.[191]

5-046    In the 19th century[192] it was held that the court could not enquire into a sovereign act done within the territory of the foreign State, and this principle was expressed by the United States Supreme Court[193] in a much quoted dictum which was in turn adopted by the Court of Appeal in England[194]:

"Every sovereign State is bound to respect the independence of every other sovereign State, and the courts of one country will not sit in judgment on the acts of the government of another done within its own territory."

5-047    This principle is sometimes used as an alternative ground for a result which can also be reached by the application of the ordinary rules of the conflict of laws. Thus the executive seizure of property by a foreign sovereign within its territory will not give rise to an action in tort in England, either on the basis of this general principle, or because the act was lawful by the law of the place where it was committed and thus afforded a defence under the second rule in *Phillips v Eyre*.[195] Nor can a former owner challenge title to property acquired from a foreign government which had been confiscated within its own territory, again either on the basis of the general principle or on the basis of the rule that the validity of a confiscatory transfer of title depends on the lex situs.[196]

5-048    The general principle, however, is not an absolute one. In the first place, the foreign legislative act may be disregarded if it is not applicable under the normal principles of the conflict of laws[197] or if it is contrary to public policy in England.[198] Secondly, there may be circumstances in which foreign legislation may be held by the English court to be unconstitutional under the foreign law. But the court will not entertain an action the object of which is to obtain a determination of the constitutionality of the foreign legislation.[199] Thirdly, the act of state doctrine has no application when it is clear that the relevant acts were done outside the foreign sovereign's territory.[200] Fourthly, it has no application in cases where a statute

requires investigation of the propriety or the validity of foreign acts of state.[201] Fifthly, it does not apply to all official acts of a foreign State, and in particular it does not apply to acts of officials granting or registering intellectual property rights.[202]

5-049    But although the English court may consider the expressed intention of the foreign legislation and the circumstances in which it was enacted, it will be slow to investigate the motives of the foreign legislator and to question its good faith.[203]

5-050    The extent to which foreign legislation which would otherwise be regarded as valid and applicable may be disregarded on the ground that it is contrary to public international law has been a controversial question. The point first arose in connection with the expropriation of foreign-owned property by States, when the original owners sought to recover their property after it had left the territory of the confiscating State. As more fully developed in Chapter 25, there are differing views. In *The Rose Mary*[204] the Anglo-Iranian Oil Company (later British Petroleum), represented by Sir Hartley Shawcross (former Attorney-General) persuaded the Supreme Court of Aden to hold that the Iranian Government's nationalisation of Anglo-Iranian's oil was invalid by international law. The decision was criticised in England,[205] and the United States Supreme Court decided in *Banco Nacional de Cuba v Sabbatino*[206] that the United States courts would not question the validity of a taking of property by a foreign government within its own territory, in the absence of a treaty or other unambiguous agreement, even if were alleged that the taking violated customary international law.

5-051    In *Buttes Gas and Oil Co v Hammer (Nos 2 and 3)*[207] the House of Lords held that the act of state cases are part of a "more general principle that the courts will not adjudicate on the transactions of foreign sovereign states." This principle, it was said, was not a variety of "act of state" but one of "judicial restraint or abstention" which was not one of discretion but was "inherent in the very nature of the judicial process." In that case the House of Lords stayed claims and counterclaims between two oil companies for defamation and conspiracy because the heart of the case concerned a question of title to a portion of continental shelf in the Middle East to which there were rival claims by the two rulers who had granted the oil companies their respective concessions. It was held that there were no judicial or manageable standards by which the issues could be judged.

5-052    The principle stated by Lord Wilberforce was very wide in potential scope,[208] and has been relied upon by litigants in many reported cases. Although the principle has been recognised in many such cases, the principle (or a related principle)[209] has only very rarely been applied[210] so as to render a claim non-justiciable. In *Kuwait Airways Corp v Iraqi Airways Co (Nos 4 and 5)*[211] it was held that a claim for wrongful interference with aircraft in the course of the Iraqi invasion of Kuwait was justiciable notwithstanding that the claim proceeded on the basis that the invasion was contrary to international law: the United Nations Security Council had declared the invasion illegal, called on all Member States not to recognise the invasion, and demanded that Iraq rescind its actions purporting to annex Kuwait. It would be contrary to the international obligations of the United Kingdom were its courts to adopt an approach which was inconsistent with its duty under the United Nations Charter and under the relevant Security Council resolutions. It was held by the House of Lords that the non-justiciability principle did not mean that the judiciary must shut its eyes to a breach of an established principle of international law committed by one State against another when the breach was plain. The standard being applied by the court was clear and manageable. The non-justiciability principle did not mean that the judiciary must shut its eyes to a breach of an established principle of international law committed by one State against another when the breach was plain and acknowledged. In such a case the adjudication problems confronting the English court in *Buttes Gas & Oil Co v Hammer* did not arise. The standard being applied by the court was clear and manageable, and the outcome not in doubt.[212] The English court should give effect to clearly established rules of international law. As nations became ever more interdependent, the need to recognise and adhere to standards of conduct set by international law became ever more important. A breach of international law of such seriousness was a matter of deep concern to the world-wide community of nations. Enforcement or recognition would also be contrary to the United Kingdom's obligations under the United Nations Charter. Enforcement or recognition of the Iraqi law would be manifestly contrary to the public policy of English law.[213] A legislative act by a foreign State which was in flagrant breach of clearly established rules of international law ought not to be recognised as forming part of the lex situs of that State.[214]

5-053    In *Lucasfilm Ltd v Ainsworth*[215] the Supreme Court left open the question whether, in the light of the ruling of the European Court in *Owusu v Jackson*[216] that what is now Art.2 of the Brussels I Regulation[217] is mandatory in nature, the non-

justiciability principle could be applied in a claim against a defendant domiciled in the United Kingdom, or whether that ruling required that there be a remedy in England. It is suggested that the principle in *Owusu v Jackson* does not affect the rules relating to matters which have hitherto been regarded as non-justiciable, such as "the transactions of foreign sovereign states" which were held to be non-justiciable in *Buttes Gas and Oil Co v Hammer (No.3)*; and that to require the English court to so adjudicate might put the United Kingdom in breach of international law.

## Illustrations

### (1) Penal Laws

5-054

1.X incurs a penalty of £100 for the infringement of the law of a foreign country prohibiting the sale of spirits. The penalty is recoverable in the courts of the foreign country in an action for debt brought by an official of the foreign government. X is in England. The proper official brings an action in the High Court for the recovery of the £100. The claim cannot be maintained.[218]

2.Under the law of New York, the director of a trading corporation, who signs certain certificates with regard to the affairs of the corporation knowing such certificates to be false, becomes personally liable for the debts of the corporation. Under this law X, a director of a New York company, becomes liable to A, a creditor, for a debt due from the company. X is in England. A brings an action against X for the debt. Semble, X may be made liable.[219]

3.The circumstances are the same as in Illustration 2, except that A has recovered judgment in the court of New York for the debt, and brings an action against X in England on the judgment. Semble, the judgment is enforceable.[220]

4.The King of Spain deposits securities with the Westminster Bank in London to the order of a Spanish bank as his agents. A decree by the Constituent Cortes of Spain declares the King to be guilty of treason, and all his assets are ordered to be seized for its own benefit by the Spanish State. The court will not order the delivery up of the securities deposited in England to a nominee of the Spanish Republic.[221]

5.X, a British subject, is charged with fraud in the United States, and is released on bail, on condition that he enters into an "appearance bond" in the sum of $48,000. He is allowed by the United States court to go back to England for a month, but he does not return to the United States, and the United States Government obtains a civil judgment in the United States federal court in Florida on the bond. No action on the Florida judgment can be brought in England because the purpose of the bond was to ensure the presence of X for a criminal prosecution and to exact pecuniary penalties for non-attendance.[222]

### (2) Revenue Laws

5-055

6.Under an Act of Parliament of New South Wales the municipality of Sydney is authorised to carry out improvements in the city and to charge the cost to the owners of the property affected. X, an owner of property affected, is resident in England. The council of the municipality brings an action against X for the sum due from him under the New South Wales Act. The claim cannot be maintained.[223]

7.A company registered in England carries on business in India, where it becomes liable to capital gains tax on a sale of its undertaking. The company is wound up in England and the Indian Government lodges a claim in respect of the unpaid tax. The liquidator is justified in rejecting the proof because only liabilities which could have been enforced

© 2021 Thomson Reuters.

against the company in England are receivable, and the court would not have enforced the Indian Government's claim.[224]

8.X is the personal representative in England of a Dutch national domiciled at his death in Holland. Under Dutch law duties are payable in respect of his estate. An action is brought by the Queen of Holland against X to recover the sum due. The action fails.[225]

9.X Co is a Canadian insurance company with a branch in Egypt, which issues policies to A, under which money is due to A. X Co is served with a garnishee order by the Egyptian revenue authorities in respect of tax allegedly due by A to the Egyptian Government. The garnishee order does not afford X Co a defence in proceedings in England to recover the debt, since recognition of the order would constitute indirect enforcement of a foreign revenue law.[226]

10.T dies domiciled in South Africa leaving property in England and South Africa. A is his English executor. X is his South African executor. After payment of United Kingdom duties and debts there is a surplus of assets in A's hands. There are insufficient assets in South Africa to pay South African death duties. A seeks the direction of the court on how to dispose of the assets in his hands. Because the South African Government would be unable to enforce its claim for duties in England, it is A's duty to remit the surplus assets direct to the legatees and not to X.[227]

11.The circumstances are the same as in Illustration 10, except that some of the legatees reside in South Africa, and if these legatees are paid their legacies, they will be answerable to the South African Government to the extent of their legacies for duty on the whole estate. A's duty is to remit the surplus assets to X.[228]

12.X and Y, United States citizens, send some furniture by sea to Z, their son-in-law, who is living in London. The United States Government claim that X and Y owe the United States Treasury money for taxes, and while the ship is on the high seas the United States Treasury serves a notice of levy on the shipowners in respect of unpaid tax demanding surrender of all property belonging to X and Y. The property is not reduced into the possession of the United States Treasury, and Z is entitled to claim the furniture from the shipowners, because to give effect to the claim of the United States Government would be indirect enforcement of a revenue law.[229]

**(3) Other Public Laws**

5-056

13.The government of a foreign State passes a decree expropriating certain jewellery belonging to X which is situate within that State at the time of the decree. X brings the jewellery to London, where it is claimed by the foreign government. Semble, the claim fails.[230]

14.In furtherance of their agreement for the establishment of an international monopoly, an English company is assigned certain American patents by an American corporation. The United States Government claims the cancellation of the assignment under the Sherman Anti-Trust Act. The claim fails.[231]

15.X bring manuscripts to England from Italy despite a decree of the Italian Government forbidding their export. The decree also grants the Italian State a first option to purchase the manuscripts. X seeks to dispose of them to Y in London, and the Italian Government claims an injunction to prevent such a disposal. Semble, the court will not grant an injunction.[232]

16.X brings an ancient Maori carving from New Zealand to England in contravention of a New Zealand statute which provides that historic articles illegally exported shall be forfeited to the Crown. The New Zealand Government brings an action in England against X for the return and delivery up of the carving. The action fails because the Crown has not acquired title under New Zealand law, but also, per Lord Denning M.R., because the New Zealand statute is a public law, or, per Ackner and O'Connor L.JJ., because it is a penal law.[233]

Case 1:18-md-02865-LAK    Document 808-14    Filed 05/12/22    Page 159 of 231

17.X is a German national resident in France. A state of war exists between Germany and France. The French custodian of enemy property duly appointed under French law, who is entitled thereunder to the control of all X's property, claims the payment to him of a dividend on shares held by X in an English company. Semble, the court will not order payment.[234]

18.X is a former member of the British security services, and Y is a publisher. X writes a book about his experiences, and proposes to publish it in (among other countries) Australia. The British Government seeks an injunction against X and Y in Australia to restrain publication. An injunction is refused because the purpose of the action by the British Government is to enforce a governmental interest, namely to protect the efficiency of its security service.[235]

19.A & Co obtains a judgment in England against the Bank of Zambia. It seeks a garnishee order absolute in respect of funds held in London by X & Co, the biggest copper producer in Zambia. Under Zambian exchange control law, X & Co is bound to transfer a proportion of the funds to the Bank of Zambia. The garnishee order nisi is set aside. Even if the obligation of X & Co to the Bank of Zambia were a debt (which it is not) attachment of such a debt would be the enforcement of Zambian public law.[236]

20.The United States Securities and Exchange Commission brings proceedings in the United States District Court in Massachusetts, alleging that X and Y fraudulently induced Taiwanese investors to invest approximately $34 million in a fund, and that they misappropriated millions of dollars, withdrawing $8 million of which it was alleged X received $2.35 million. The SEC makes an application to the English court for interim freezing orders in support of its proceedings in Massachusetts. The freezing orders are upheld because the US proceedings are for the disgorgement of the proceeds of fraud, and their return to the investors, and consequently a judgment in those proceedings would not be a penal judgment, or otherwise unenforceable under Rule 3.[237]

21.The head of state of a mineral-rich African republic and the State itself, bring proceedings against X and Y for, inter alia, conspiracy and intentional infliction of harm by unlawful means, alleging that X and Y had conspired in England and elsewhere to overthrow the State's government and seize power by means of a coup which ultimately failed. The claimants claim damages for damage to the State's commercial interests and infrastructure and for costs incurred in investigating the conspiracy, detaining and prosecuting suspects, and increasing security. The head of state also claims general damages for serious anxiety, distress and disruption to his personal life and work. The claims are not justiciable because they are in respect of losses which arose as a result of decisions taken by the claimants to protect the State and its citizens, which could only have been suffered by the governing body of the State, and the claims amount to the exercise of its sovereign power within the jurisdiction of the English court.[238]

### (4) Acts of State

5-057

22.A obtains the right to work minerals in the territory of a foreign State from the government of that State. The territory of the foreign State is annexed by the Crown. A claims a declaration that the Crown must respect the concession. The court will not grant such a declaration.[239]

23.X, an officer of the Crown, duly authorised, destroys property of A, a Spanish subject, at a place outside the United Kingdom and Colonies. Spain and the United Kingdom are at peace, and X's act is tortious by the law of the place where it is committed. X's act is an act of state, and the court will not entertain an action by A against X.[240]

24.X is the bodyguard of Y, a foreign potentate, who is on a State visit to England. While attending a civic ceremony Y misunderstands the enthusiasm of the spectators and orders X to shoot at them. X does so, and injures A, who is an innocent bystander. In an action by A, X may not plead act of State.

25.The Sheikh of Araby promulgates a decree which has the effect of depriving X of the right to exploit an oil-rich area and of giving that right to A. X says the decree was "cooked up" by A. A's action for slander is met by a defence of justification and a counterclaim for conspiracy. The claim and the counterclaim will be stayed because the pleadings involve the adjudication of the transactions of foreign States and the issues raised are non-justiciable.[241]

26.A & Co seek to enforce a Swiss arbitration award against AOI, an international organisation formed in 1975 by a treaty between Egypt, Saudi Arabia, Qatar and the United Arab Emirates, with its headquarters and operations in Egypt. After the peace treaty between Egypt and Israel in 1979, the three Member States other than Egypt purport to suspend the operations of AOI and to set up a liquidation committee. Egypt passes legislation reconstituting the management of AOI. An issue arises as to whether the management appointed pursuant to the Egyptian legislation is properly authorised to represent the AOI. The constitution of AOI is governed by international law, and the authority of the management depended on whether the Egyptian legislation was a justifiable countermeasure in international law, which in turn depended on the issue whether the three States had acted in breach of the treaty setting up the AOI. That was a non-justiciable issue, because it was not open to the English court to determine whether a foreign sovereign State had broken or terminated a treaty.[242] Consequently, the Egyptian-appointed management is not able to adduce proof that it is properly authorised.

27.Iraq invades Kuwait in August 1990, and civil aircraft belonging to Kuwait Airways are seized and removed to Iraq. Iraqi legislation is enacted purporting to dissolve Kuwait Airways and to transfer its assets to Iraqi Airways, which then incorporates the aircraft in its fleet and makes use of them. In an action in England by Kuwait Airways against Iraqi Airways for wrongful interference, it is held that the Iraqi legislation is not capable of recognition in England, because it was exorbitant and contrary to international law.[243]

## Footnotes

1    Kahn-Freund, Selected Writings (1978), Ch.9; Lloyd, Public Policy (1953), Ch.5; Sammartano and Morse, Public Policy in Transnational Relationships (1992); *Paulsen and Sovern (1956) 56 Col. L.R. 969*; *Carter (1984) 55 B.Y.I.L. 111*, *(1993) 42 I.C.L.Q. 1*; *Bucher (1993) Recueil des Cours, II, p.9*; *Leslie, 1995 Jur. Rev. 477*; *Enonchong (1996) 45 I.C.L.Q. 633*; *Meidanis (2005) Eur. L.R. 95*; *Mills (2008) 4 J. Priv. Int. L. 201*.

2    See *Guardianship Convention Case (Netherlands v Sweden ) 1958 I.C.J. Rep. 53*, at pp.90–95, per Judge Lauterpacht, for a valuable discussion of the role of public policy, and for the conclusion that it is a general principle of law in the field of the conflict of laws.

3    Vervaeke v Smith [1983] 1 A.C. 145, 164, per Lord Simon of Glaisdale.

4    Fender v St John-Mildmay [1938] A.C. 1, 12.

5    Loucks v Standard Oil Co, 224 N.Y. 99, 111, 120 N.E. 198, 202 (1918). See *Kuwait Airways Corp v Iraqi Airways Co (Nos 4 and 5) [2002] UKHL 19, [2002] 2 A.C. 883*, at [16], per Lord

6    Vervaeke v Smith [1983] 1 A.C. 145, 164; *Kuwait Airways Corp v Iraqi Airways Co (Nos 4 and 5) [2002] UKHL 19, [2002] 2 A.C. 883*, at [114], per Lord Steyn.

7    Rule 85(1).

8    ibid.

9    Rule 106(4).

10   See below, para.20-106.

11   Rule 89(7).

12   Rule 1.

13   Rule 19. Dicey regarded this rule also as an example of public policy (3rd ed., p.37), but it too is better regarded as a fixed rule of law.

14   cf. Regulation (EC) 593/2008 of the European Parliament and of the Council on the law applicable to contractual obligations (Rome I), Art.21 (application of foreign law manifestly incompatible with public policy).

15   See, e.g. *Luther v Sagor [1921] 3 K.B. 532, 559 (CA)*; *Oppenheimer v Cattermole [1976] A.C. 249, 277–278*; *The Playa Larga [1983] 2 Lloyd's Rep. 171, 190 (CA)*.

16   In the Estate of Fuld (No.3) [1968] P. 675, 698. See also *Winkworth v Christie, Manson and Woods Ltd [1980] Ch. 496, 514*. On foreign laws licensing prostitution or slavery see *Robinson v Bland (1760) 2 Burr. 1077, 1084*; *Regazzoni v KC Sethia Ltd [1956] 2 Q.B. 490, 524 (CA)*; affirmed *[1958] A.C. 301*. Contrast *Santos v Illidge (1860) 8 C.B. (N.S.) 861*.

17   [1976] A.C. 249.

18   At p.278. See also p.283, per Lord Salmon. It is not likely that the suggestion in *Frankfurther v WL Exner Ltd [1947] Ch. 629, 644*, that Nazi decrees relating to property in Austria would be recognised, would be followed today.

19   [1986] A.C. 368, 428, per Lord Templeman. See also *The Playa Larga [1983] 2 Lloyd's Rep. 171, 190 (CA)*; *Settebello Ltd v Banco Totta and Acores [1985] 1 W.L.R. 1050, 1056 (CA)*.

20   Hyde v Hyde (1866) L.R. 1 P.&D. 130; see now Matrimonial Causes Act 1973, s.47(1), and Rule 82.

21   Baindail v Baindail [1946] P. 122 (CA); see below, para.17-191.

22   Bamgbose v Daniel [1955] A.C. 107 (PC); see below, para.17-193.

23   Coleman v Shang [1961] A.C. 481 (PC); *Shahnaz v Rizwan [1965] 1 Q.B. 390*; *Re Sehota [1978] 1 W.L.R. 1506*; see below, paras 17-197 et seq.

24   See para.20-133, below.

25   See paras 17-084; 32-157, below.

26   Re Helbert Wagg & Co Ltd [1956] Ch. 323, 351. See also *The Playa Larga [1983] 2 Lloyd's Rep. 171, 190 (CA)*, and *Carter (1983) 54 B.Y.I.L. 297*.

27   Lorentzen v Lydden & Co Ltd [1942] 2 K.B. 202.

28   Bank voor Handel en Scheepvaart v Slatford [1953] 1 Q.B. 248, 263–264.

29   Peer International Corp v Termidor Music Publishers Ltd [2003] EWCA Civ 1156, [2004] Ch. 212.

30   Westlake, p.51.

31   For detailed discussion, see Rule 229.

32   Regulation (EC) 593/2008 of the European Parliament and of the Council.

33   Grell v Levy (1864) 10 C.B. (N.S.) 73. In this case the litigation was to take place in England. cf. *Trendtex Trading Corp v Credit Suisse [1980] Q.B. 629, affirmed [1982] A.C. 679*. See also *Fraser v Buckle [1996] 2 I.L.R.M. 34*. The principle would not apply to a champertous contract relating to litigation in France or the United States, where champerty is lawful: *Re Trepca Mines Ltd (No.2) [1963] Ch. 199, 218 (CA)*. cf. *National Surety Co v Larsen [1929] 4 D.L.R. 918 (BCCA)*, where a contract to indemnify bail, valid by the law of Washington where the litigation was pending, was upheld in British Columbia, though such contracts were illegal by British Columbia law.

34   Rousillon v Rousillon (1880) 14 Ch.D. 351; but the case does not amount to a decision on the point. Contrast *Apple Corps Ltd v Apple Computer Inc [1992] F.S.R. 431* (foreign law on restraint of trade not applicable if contract governed by English law). cf. *Duarte v Black and Decker Corp [2007] EWHC 2720 (Q.B.), [2008] 1 All E.R. (Comm.) 401* (a case on Rome Convention, Art.16).

35   Kaufman v Gerson [1904] 1 K.B. 591 (CA); but see below, para.32-187.

36   Hope v Hope (1857) 8 De G.M.&G. 731. In this case the divorce was to take place in England. Would the principle apply to a contract to procure a divorce abroad? See *Addison v Brown [1954] 1 W.L.R. 779*.

37   Dynamit AG v Rio Tinto Co [1918] A.C. 260.

38   De Wütz v Hendricks (1824) 2 Bing. 314; *Foster v Driscoll [1929] 1 K.B. 470 (CA)*; *Regazzoni v KC Sethia Ltd [1958] A.C. 301*. However, in these cases the contract was governed by English law. See also *Royal Boskalis Westminster NV v Mountain [1999] Q.B. 674, 692 (CA)*; *Soleimany v Soleimany [1999] Q.B. 785, 794 (CA)*.

39   Saxby v Fulton [1909] 2 K.B. 208 (CA).

40   Shrichand v Lacon (1906) 22 T.L.R. 245.

41   Re Bonacina [1912] 2 Ch. 394 (CA). As to statutory rules, see above, paras 1-036 et seq.

42   That is to say, indicated as relevant by an English choice of law rule. Since those rules always refer to a territorial system of law, rules existing under, e.g. a person's religious discipline are immaterial unless they are incorporated into the appropriate territorial law: *Re De Wilton [1900] 2 Ch. 481*; *Chetti v Chetti [1909] P. 67, 78*; *R. v Hammersmith Superintendent Registrar of Marriages [1917] 1 K.B. 634, 643*; *Preger v Preger (1926) 42 T.L.R. 281*; *Papadopoulos v Papadopoulos [1930] P. 55, 64*; *MacDougall v Chitnavis, 1937 S.C. 390, 398, 403, 407*. cf. *Re Alison's Trusts (1874) 31 L.T. 638*; *Har-Shefi v Har-Shefi (No.2) [1953] P. 220*; *Cheni v Cheni [1965] P. 85*; *Qureshi v Qureshi [1972] Fam. 173*.

43   Smith v Browne & Cooper (1701) Holt K.B. 495; *Shanley v Harvey (1762) 2 Eden. 126*; *Sommersett's Case (1771) 20 St. Tr. 1*; *Chamberline v Harvey (1796) 5 Mod. 182*; *Forbes v Cochrane (1824) 2 B.&C. 448*. cf. *The Slave Grace*

*(1827) 2 Hag.Adm. 94*; *Stewart v Garnett (1830) 3 Sim. 398*; *Ex p. Rucker (1834) 3 L.J. Bk. 104*; *Santos v Illidge (1860) 8 C.B. (N.S.) 861*.

44   Re Metcalfe's Trusts (1864) 2 De G.J.&S. 122; *Stuart v Prentiss (1861) 20 U.C.R. 513*. cf. *Von Lorang v Administrator of Austrian Property [1927] A.C. 641, 653*.

45   Wolff v Oxholm (1817) 6 M.&S. 92; *Re Fried Krupp AG [1917] 2 Ch. 188*; *Re Askew [1930] 2 Ch. 259, 275*; *Re Helbert Wagg & Co Ltd [1956] Ch. 323, 345–346*.

46   Oppenheimer v Cattermole [1976] A.C. 249, 265, 276–278, 282–283. In *Oppenheimer v Louis Rosenthal Co [1937] 1 All E.R. 23 (CA)* and *Ellinger v Guinness Mahon & Co [1939] 4 All E.R. 16*, the incapacities of Jews in Nazi Germany were taken into account in ordering service out of the jurisdiction under what is now CPR, PD6B, para.3.1. See also *Frankfurther v WL Exner Ltd [1947] Ch. 629, 636–637*; *Novello & Co v Hinrichsen Edition Ltd [1951] Ch. 595, 604, affirmed on other grounds [1951] Ch. 1026 (CA)*.

47   Scott v Att-Gen (1886) 11 P.D. 128; *Lundgren v O'Brien (No.2) [1921] V.L.R. 361*; *Pezet v Pezet (1947) 47 S.R. (N.S.W.) 45, 74*. cf. *R. v Brentwood Superintendent Registrar of Marriages [1968] 2 Q.B. 956*, where an inability to remarry was recognised on the basis that an unattractive difference from English law did not make the disability a penal incapacity. A fortiori where the foreign prohibition is analogous to an English rule: *Warter v Warter (1890) 15 P.D. 152*; *Le Mesurier v Le Mesurier (1930) 46 T.L.R. 203*. See also *Miller v Teale (1954) 92 C.L.R. 406*; *Hellens v Densmore (1957) 10 D.L.R. (2d) 561 (Sup Ct Can)*. Distinguish *Buckle v Buckle [1956] P.181*, which was decided on different grounds. See below, paras 17-084 et seq.; 18-142.

48   Re Langley's Settlement Trusts [1962] Ch. 541, 556–557 (CA); criticised by *Grodecki (1962) 11 I.C.L.Q. 578*; *Collier [1962] C.L.J. 36*.

49   Worms v De Valdor (1880) 49 L.J. Ch. 261; *Re Selot's Trusts [1902] 1 Ch. 488*. Compare the continental practice: Rabel, Vol.1, p.190.

50   Infamy is normally a consequence of criminal conviction and there are several American cases where foreign incapacities consequent upon infamy have not been recognised, see Beale, Vol.2, p.657.

51   As to this distinction see *Re Helbert Wagg & Co Ltd [1956] Ch. 323, 345*.

52   Cheni v Cheni [1965] P. 85, 98.

53   Re Bozzelli's Settlement [1902] 1 Ch. 751 (marriage in 1880 with deceased brother's widow); *Re Pozot's Settlement [1952] 1 All E.R. 1107, 1109* (marriage with step-daughter); *Cheni v Cheni [1965] P. 85* (marriage between uncle and niece).

54   See *Brook v Brook (1861) 9 H.L.C. 193, 227–228*; *Cheni v Cheni*, above, at p.97.

55   In *Mohamed v Knott [1969] 1 Q.B. 1*, a marriage with a girl of 13, valid by Nigerian law, was recognised as valid in England.

56   Westminster CC v C [2008] EWCA Civ 198, [2009] Fam. 11.

57   Phrantzes v Argenti [1960] 2 Q.B. 19; *Shahnaz v Rizwan [1965] 1 Q.B. 390, 401*.

58   Rule 116.

59   Baindail v Baindail [1946] P. 122 (CA); Rule 80.

60   Re Helbert Wagg & Co Ltd [1956] Ch. 323, 349; *Oppenheimer v Cattermole [1976] A.C. 249, 278*; *Kuwait Airways Corp v Iraqi Airways Co (Nos 4 and 5) [2002] UKHL 19, [2002] 2 A.C. 883*, at [28], per Lord Nicholls of Birkenhead.

61   Cases at para.5-005, above, and *Luther v Sagor [1921] 3 K.B. 532, 559 (CA)*; *Princess Paley Olga v Weisz [1929] 1 K.B. 718 (CA)*; cf. *Williams & Humbert Ltd v W&H Trade Marks (Jersey) Ltd [1986] A.C. 368, 427–428*.

62   See especially *Re Helbert Wagg & Co Ltd*, above; *Oppenheimer v Cattermole*, above; *Williams & Humbert Ltd v W&H Trade Marks (Jersey) Ltd*, above; *The Playa Larga [1983] 2 Lloyd's Rep. 171, 189–190 (CA)*, and see below, para.25-009, text at n.51.

63   [2002] UKHL 19, [2002] 2 A.C. 883, below, para.5-052.

64   See below, paras 18-125 et seq.

65   ibid.

66   See Rule 51, below.

67   See above, para.3-026.

68   For exceptions see Foreign Limitation Periods Act 1984, s.2; Regulation (EC) 593/2008 of the European Parliament and of the Council on the law applicable to contractual obligations (Rome I), Art.21; Regulation (EC) 864/2007 of the European Parliament and of the Council on the law applicable to non-contractual obligations (Rome II), Art.26.

69   Administration of Justice Act 1920, s.9(2)(f); Foreign Judgments (Reciprocal Enforcement) Act 1933, s.4(1)(a)(v); Arbitration Act 1950, s.37(1); Arbitration Act 1996, s.103(3); Adoption and Children Act 2002, s.89(1); Children and Adoption Act 2006, s.9(1).

70    Family Law Act 1986, s.51(3)(c); State Immunity Act 1978, s.19(1)(a); Civil Aviation Act 1982, s.74A; Civil Partnership Act 2004, s.218; Rome I Regulation, above, Art.21; Rome II Regulation, above, Art.26; Council Regulation (EC) 1346/2000 on Insolvency Proceedings, Art.26; Council Regulation (EC) 44/2001 on jurisdiction and the recognition and enforcement of judgments in civil and commercial matters (the Brussels I Regulation), Art.34; Council Regulation (EC) 2201/2003 concerning jurisdiction and the recognition and enforcement of judgments in matrimonial matters and in matters of parental responsibility (Brussels IIa), Art.22; Council Regulation (EC) 4/2009 on jurisdiction, applicable law, recognition and enforcement of decisions and co-operation in matter relating to maintenance obligations, Art.24; Council Regulation (EU) 1259/2010 implementing enhanced co-operation in the area of the law applicable to divorce and legal separation, Art.12.

71    Re Langley's Settlement [1962] Ch. 541, 555, 557–558 (CA); Russ v Russ [1963] P. 87, 100; [1964] P. 315, 327–328, 334, 335 (CA); Cheni v Cheni [1965] P. 85, 98; Qureshi v Qureshi [1972] Fam. 173, 201.

72    Gray v Formosa [1963] P. 259, 269, 270, 271 (CA); Lepre v Lepre [1965] P. 52, 63. As to divorce, see now Family Law Act 1986, s.51(3)(c); Kendall v Kendall [1977] Fam. 208; Chaudhary v Chaudhary [1985] Fam. 19 (Wood J. and CA), and see below, para.18-125.

73    Re Langley's Settlement [1962] Ch. 541, 554–555 (CA). As to this distinction, see also Baindail v Baindail [1946] P. 122, 128 (CA).

74    See below, para.18-125.

75    Grodecki (1962) 11 I.C.L.Q. 578, 582.

76    Nygh (1964) 13 I.C.L.Q. 39, 51.

77    [1971] A.C. 356, 378.

78    For Illustrations concerning contracts, see below, paras 32-194 et seq.

79    Scott v Att-Gen (1886) 11 P.D. 128, as explained in Warter v Warter (1890) 15 P.D. 152, 155.

80    Re Selot's Trusts [1902] 1 Ch. 488; also Worms v De Valdor (1880) 49 L.J. Ch. 261. These cases are apparently based on the (untenable) ground that there had been no change of status ([1902] 1 Ch. 492; 49 L.J. Ch. 262), and the penal nature of the French incapacity is a minor ground of decision. In both cases the issue would seem to have been governed by English domestic law; in Worms v De Valdor the question was as to the plaintiff's ability to bring an action, which is a question of procedure to be resolved by the lex fori; while in Re Selot's Trusts the question was capacity to take under the will of a testator who presumably died domiciled in England. In Re Langley's Settlement Trusts [1962] Ch. 541, 557, Lord Evershed M.R. declined "to express any final view upon whether all that was said in the two cases … was justified."

81    The marriage would also be valid under the rule in Sottomayor v De Barros (No.2) (1879) 5 P.D. 94; see Rule 74, Exception 3, below.

82    Oppenheimer v Cattermole [1976] A.C. 249, 265, 276–278, 282–283. It is submitted that the suggestion in Frankfurther v WL Exner Ltd [1947] Ch. 629, 644, that such legislation would be recognised as effective with regard to property in the legislating State would not be followed today: see n.18, above.

83    Vervaeke v Smith [1983] 1 A.C. 145.

84    Westminster CC v C [2008] EWCA Civ 198, [2009] Fam. 11.

85    F.A. Mann, Foreign Affairs in English Courts (1986), Chs 9 and 10; Collins (2007) 326 Recueil des Cours 11; Baade, in Lipstein (ed.), International Encyclopedia of Comparative Law, Vol.III. Ch.12 (1990). See generally The activities of national judges and the international relations of their State (Conforti, Rapporteur), Ann. de l' Institut de droit international, Vol.65–I, p.327 (1993).

86    Folliott v Ogden (1789) 1 H.B1. 123, affirmed sub nom. Ogden v Folliott (1790) 3 T.R. 326; Lynch v Provisional Government of Paraguay (1871) L.R. 2 P & D. 268, 272; Huntington v Attrill [1893] A.C. 150 (PC); Att-Gen for Canada v Schulze, (1901) 9 S.L.T. 4; Raulin v Fischer [1911] 2 K.B. 93; Banco de Vizcaya v Don Alfonso de Borbon y Austria [1935] 1 K.B. 140; Frankfurther v WL Exner Ltd [1947] Ch. 629; Novello & Co v Hinrichsen Edition Ltd [1951] Ch. 595, affirmed on different grounds [1951] Ch. 1026 (CA); Re Helbert Wagg & Co Ltd [1956] Ch. 323, 345; Schemmer v Property Resources Ltd [1975] Ch. 273, 288; Att-Gen of New Zealand v Ortiz [1984] A.C. 1, 32, 35 (CA), affirmed by HL on different grounds; Williams & Humbert Ltd v W&H Trade Marks (Jersey) Ltd [1986] A.C. 368, 428; US v Inkley [1989] Q.B. 255, 264; Islamic Republic of Iran v Barakat Galleries Ltd [2007] EWCA Civ 1374, [2009] Q.B. 22; Pocket Kings Ltd v Safenames Ltd [2009] EWHC 2529 (Ch.), [2010] Ch. 438. Larkins v NUM [1985] I.R. 671; Bank of Ireland v Meeneghan [1994] 3 I.R. 111; Gersten v Law Society of New South Wales [2002] NSWCA 344; Jamieson v Commissioner for Internal Revenue [2007] NSWSC 324; Restatement, s.89.

87    Municipal Council of Sydney v Bull [1909] 1 K.B. 7; Cotton v R. [1914] A.C. 176, 195; Indian and General Investment Trust Ltd v Borax Consolidated Ltd [1920] 1 K.B. 539, 549; King of the Hellenes v Brostrom (1923) 16 Ll.L.R. 167, 190; Re Visser [1928] Ch. 877; Re Cohen [1950] 2 All E.R. 36, 39 (CA); Peter Buchanan Ltd v McVey [1954] I.R. 89, [1955] A.C. 516n.; Government of India v Taylor [1955] A.C. 491; Metal Industries (Salvage) Ltd v Owners of ST "Harle",

*1962 S.L.T. 114*; *Rossano v Manufacturers' Life Insurance Co [1963] 2 Q.B. 352, 376–378*; *Brokaw v Seatrain UK Ltd [1971] 2 Q.B. 476 (CA)*; *Re Lord Cable [1977] 1 W.L.R. 7, 13*; *Re State of Norway's Application (Nos 1 and 2) [1990] 1 A.C. 723, 807–809*; *QRS 1 ApS v Frandsen [1999] 1 W.L.R. 2169 (CA)*; *USA v Harden (1963) 41 D.L.R. (2d) 721 (Sup Ct Can)*; *Stringham v Dubois [1993] 3 W.W.R. 273 (Alta Ca)*; *Commissioner of Taxes v McFarland, 1965 (1) S.A. 470*; *Priestley v Clegg, 1985 (3) S.A. 955*; M. Mann (1954) 3 I.C.L.Q. 465, (1955) 4 I.C.L.Q. 564; Castel (1964) 42 Can. Bar Rev. 277; Smart (1986) 35 I.C.L.Q. 704; Briggs [2001] Sing.J.L.S. 280; Basedow, et al. (2004) 6 Yb. P.I.L. 1. For developments in the United States see *Attorney General of Canada v RJ Reynolds Tobacco Holdings, Inc, 268 F.3d 103 (2d Cir. 2001)* (RICO action by the Canadian Government against American and Canadian tobacco companies for damages based on lost revenues as a result of their participation in schemes to avoid taxes by smuggling cigarettes across the Canadian border: complaint was dismissed because the action was barred by the revenue rule); *Pasquantino v United States, 544 U.S. 349 (2005)* (conviction for federal wire fraud for scheme to smuggle alcohol into Canada from the United States: by a 5:4 majority, held that the conviction was not barred by revenue rule); *European Community v RJR Nabisco, Inc, 424 F.3d 175 (2d Cir. 2005)*, cert. den *546 U.S. 1092 (2006)* (RICO action by the European Community, Member States, and Colombia against tobacco companies barred by revenue rule notwithstanding decision of the United States Supreme Court in *Pasquantino v United States*, above).

88    Emperor of Austria v Day (1861) 3 De G.&F. J. 217, 232, 238, 251; *Huntington v Attrill [1893] A.C. 150, 156 (PC)*; *Government of India v Taylor [1955] A.C. 491, 511*; *R. v Governor of Pentonville Prison, ex p. Budlong [1980] 1 W.L.R. 1110, 1125 (DC)*; *Att-Gen of New Zealand v Ortiz [1984] A.C. 1, 20–21 (CA)*, per Lord Denning M.R.; *US v Inkley [1989] Q.B. 255, 264 (CA)*; *Camdex International Ltd v Bank of Zambia (No.2) [1997] C.L.C. 714, 723–724, 736 (CA)*; *Equatorial Guinea v Bank of Scotland International [2006] UKPC 7*; *Mbasogo v Logo Ltd [2006] EWCA Civ 1370, [2007] Q.B. 846*; *Islamic Republic of Iran v Barakat Galleries Ltd [2007] EWCA Civ 1374, [2009] Q.B. 22*; *United States Securities and Exchange Commission v Manterfield [2009] EWCA Civ 27, [2009] 2 All E.R. 1009*; *Pocket Kings Ltd v Safenames Ltd [2009] EWHC 2529 (Ch.), [2010] Ch. 438*; *Carey Group Plc v AIB Group (UK) Plc [2011] EWHC 567 (Ch.)*; *Att-Gen (UK) v Heinemann Publishers Australia Pty Ltd (1988) 165 C.L.R. 30, 41–43*; F.A. Mann, Studies in International Law (1973), p.492; *(1962) 11 I.C.L.Q. 481*; *(1971) Recueil des Cours, I, p.107, at pp.178–180*; Further Studies in International Law (1990), pp.355 and 389; *Carter [1989] C.L.J. 417*; Collins, Essays, 118–129; Collins, in Mélanges Lalive (1993), pp.221–230; Verhoeven, ibid., pp.359–373; *Collins (2007) 326 Recueil des Cours 11*.

89    Holdsworth, History of English Law, Vol.14, pp.33–52; Harrison Moore, Act of State in English Law (1906); *E.C.S. Wade (1934) 15 B.Y.I.L. 98*; *Gilmour, 1967 Jur. Rev. 149*, *[1970] Public Law 120*; *Collier [1968] C.L.J. 102*; F.A. Mann, Studies in International Law (1973), p.420; *(1971) Recueil des Cours, I, p.107, at pp.145–156*; *Singer (1981) 75 A.J.I.L. 283*; Oppenheim, International Law (9th ed. Jennings and Watts, 1992), Vol.1, pp.365–376.

90    *Williams & Humbert Ltd v W&H Trade Marks (Jersey) Ltd [1986] A.C. 368, 428*, per Lord Templeman; *Derby & Co Ltd v Weldon (No.6) [1990] 1 W.L.R. 1139 (CA)*, at 1154, per Staughton L.J.

91    See F.A. Mann, Studies in International Law (1973), pp.495–499.

92    [1955] A.C. 491, 511. cf. *Att-Gen of New Zealand v Ortiz [1984] A.C. 1 (CA)*, at pp.20–21, per Lord Denning M.R., at p.32, per Ackner L.J.

93    [1990] 1 A.C. 723, 808. cf. *Att-Gen (UK) v Heinemann Publishers Australia Pty Ltd (1988) 165 C.L.R. 30, 40–44*.

94    Huntington v Attrill [1893] A.C. 150, 156 (PC).

95    ibid.; *Att-Gen of New Zealand v Ortiz [1984] A.C. 1, 32 (CA)*, affirmed by HL on different grounds; *US v Inkley [1989] Q.B. 255, 265 (CA)*; *Islamic Republic of Iran v Barakat Galleries Ltd [2007] EWCA Civ 1374, [2009] Q.B. 22, [106]*.

96    Metal Industries (Salvage) Ltd v Owners of ST "Harle", 1962 S.L.T. 114, 116.

97    Att-Gen (UK) v Heinemann Publishers Australia Pty Ltd (1988) 165 C.L.R. 30, 46.

98    See, e.g. *Re Visser, [1928] Ch. 877, 882*; *Government of India v Taylor [1955] A.C. 491, 507*; *Att-Gen of New Zealand v Ortiz [1984] A.C. 1, 20 (CA)*; *Williams & Humbert Ltd v W&H Trade Marks (Jersey) Ltd [1986] A.C. 368, 437*.

99    See, e.g. *Re Visser*, above; *Att-Gen of New Zealand v Ortiz*, above; *Mbasogo v Logo Ltd*, above.

100    [1893] A.C. 150 (PC).

101    At p.155. See 1st ed., p.220.

102    [1990] 1 A.C. 723, 808. See also *Tasarruf Mevduati Sigorta Fonu v Demirel [2006] EWHC 3354 (Ch.), [2007] 2 All E.R. 815, affd. on other grounds [2007] EWCA Civ 799, [2007] 1 W.L.R. 2508*; *Islamic Republic of Iran v Barakat Galleries Ltd [2007] EWCA Civ 1374, [2009] Q.B. 22, [97]*.

103    [1999] 1 W.L.R. 2169 (CA).

104    See below, text at n.113. It is not easy to justify this result from the point of view of policy. See *Briggs (1999) 70 B.Y.I.L. 341*; *Smart (2000) 116 L.Q.R. 360* for criticism. See also *Case C–406/09 Realchemie Nederland BV v Bayer Crop Science AG [2012] I.L.Pr. 17* (Brussels I Regulation applies to fine payable to the State for breach of injunction in favour of private party in a civil and commercial matter).

© 2021 Thomson Reuters.

105    Council Directive 2010/24/EU.

106    s.87, and Sch.25.

107    Brokaw v Seatrain UK Ltd [1971] 2 Q.B. 476, 483 (CA); *Att-Gen of New Zealand v Ortiz [1984] A.C. 1, 32 (CA)*, per Ackner L.J., affirmed on different grounds: *Williams & Humbert Ltd v W&H Trade Marks (Jersey) Ltd [1986] A.C. 368, 437*.

108    Re Emery's Investment Trusts [1959] Ch. 410; *Regazzoni v KC Sethia Ltd [1956] 2 Q.B. 490, 515 (CA), affirmed [1958] A.C. 301, 322, 324, 328, 330*; *Att-Gen of New Zealand v Ortiz [1984] A.C. 1, 20 (CA)*, per Lord Denning M.R.

109    Re Helbert Wagg & Co Ltd [1956] Ch. 323, 345–349.

110    See, e.g. *Foster v Driscoll [1929] 1 K.B. 470 (CA)*; *Regazzoni v KC Sethia Ltd*, above. See also, below, Rule 229.

111    Re Lord Cable [1977] 1 W.L.R. 7, 24–25. cf. *Scottish National Orchestra Society Ltd v Thomson's Executor, 1969 S.L.T. 325*; *Bath v British and Malayan Trustees Ltd [1969] 2 N.S.W.R. 114*; *Jones v Borland, 1969(4) S.A. 29.*

112    Re Lord Cable [1977] 1 W.L.R. 7, 15; *Re Reid (1970) 17 D.L.R. (3d) 199 (BCCA)* (not followed in *Stringham v Dubois [1993] 3 W.W.R. 273 (Alta CA)*).

113    Peter Buchanan Ltd v McVey [1954] I.R. 89, [1955] A.C. 516n. (as explained in *Williams & Humbert Trade Marks (Jersey) Ltd [1986] A.C. 368*), distinguished in *Ayres v Evans (1981) 39 A.L.R. 129*; *QRS 1 ApS v Frandsen [1999] 1 W.L.R. 2169 (CA)* (criticised *Briggs (1999) 70 B.Y.I.L. 341*; *Smart (2000) 116 L.Q.R. 360*); *Priestley v Clegg, 1985(3) S.A. 955*; *Re Tucker [1988] L.R.C. (Comm.) 995 (Isle of Man)*.

114    [1986] A.C. 368 criticised by F.A. Mann, Further Studies in International Law (1990), p.389. See also *Air India Ltd v Caribjet Inc [2002] 1 Lloyd's Rep. 314*. cf. *Bank of Ethiopia v National Bank of Egypt and Liguori [1937] 1 Ch. 513*; *Banco de Bilbao v Sancha and Rey [1938] 2 K.B. 176*; *Brown, Gow, Wilson v Beleggings-Societeit NV (1961) 29 D.L.R. (2d) 673 (Ont)*.

115    [1990] 1 A.C. 723, 809.

116    Banco de Vizcaya v Don Alfonso de Borbon y Austria [1935] 1 K.B. 140. Contrast *Kahler v Midland Bank [1950] A.C. 24*, criticised by F.A. Mann, Studies in International Law (1973), pp.506–508. Contrast *Carey Group Plc v AIB Group (UK) Plc [2011] EWHC 567 (Ch.)*, at [61]–[62] (no injunction to restrain voluntary compliance with Irish public law relating to nationalisation of bank assets), distinguishing *Pocket Kings Ltd v Safenames Ltd [2009] EWHC 2529 (Ch.), [2010] Ch. 438*.

117    Rossano v Manufacturers' Life Insurance Co [1963] 2 Q.B. 352. cf. *Van de Mark v Toronto-Dominion Bank (1989) 68 O.R. (2d) 379.*

118    Brokaw v Seatrain UK Ltd [1971] 2 Q.B. 476 (CA), where on an interpleader the US Government argued unsuccessfully that the effect of the notice of levy should be recognised on the basis that the rule as to non-enforcement of revenue claims applied only to direct actions in courts of law. cf. *Bank of Ireland v Menneghan [1994] 3 I.R. 111.*

119    Government of India v Taylor [1955] A.C. 491, 511, per Lord Keith of Avonholm; *Islamic Republic of Iran v Barakat Galleries Ltd [2007] EWCA Civ 1374, [2009] Q.B. 22, [133]–[136].*

120    e.g. *King of Two Sicilies v Willcox (1851) 1 Sim.(N.S.) 301*; *USA v Prioleau (1865) 2 H.&M. 559*; *USA v McRae (1867) L.R. 3 Ch.App. 79*; *USSR v Belaiew (1925) 42 T.L.R. 21.*

121    Islamic Republic of Iran v Barakat Galleries Ltd [2007] EWCA Civ 1374, [2009] Q.B. 22, [143]–[148].

122    Emperor of Austria v Day (1861) 3 De G.F. & J. 217, 253–254.

123    Kingdom of Spain v Christie, Manson & Woods Ltd [1986] 1 W.L.R. 1120 (discussed in *Associated Newspapers Group Plc v Insert Media Ltd [1988] 1 W.L.R. 509, 512–513*). On the question whether a foreign State may seek to recover assets taken by former rulers or officials see Collins, in Mélanges Lalive (1993), pp.221–230; and cf. *Republic of the Philippines v Marcos, 862 F. 2d 1355 (9th Cir.), cert. den. 490 U.S. 1035 (1988)* (where such a claim was permitted) with *Duvalier v Etat haïtien, Cour de cassation, France, 1990, in 1991 Clunet 137* (where the claim was disallowed). The point was not taken in *Republic of Haiti v Duvalier [1990] 1 Q.B. 202 (CA).*

124    Story, ss.620–621, citing *The Antelope (1825) 10 Wheat. 66, 123.* See also *Folliott v Ogden (1789) 1 H.Bl. 123, 135*, per Lord Loughborough; *Ogden v Folliott (1790) 3 T.R. 726, 733*, per Buller J.

125    [1893] A.C. 150, 156 (PC).

126    Wisconsin v Pelican Insurance Co, 127 U.S. 265, 292 (1888).

127    Huntington v Attrill [1893] A.C. 150 (PC).

128    Schemmer v Property Resources Ltd [1975] Ch. 273, 288.

129    Att-Gen of New Zealand v Ortiz [1984] A.C. 1, 34–35 (CA), per Ackner and O'Connor L.JJ., affirmed by HL on different grounds.

130    Larkins v NUM [1985] I.R. 671.

131    Huntington v Attrill [1893] A.C. 150, 157–158.

© 2021 Thomson Reuters.

132    SA Consortium General Textiles v Sun and Sand Agencies Ltd [1978] Q.B. 279, 299–300, 305–306 (CA). But an action for treble damages under United States anti-trust law may be an action for a penalty, since the right to treble damages is granted so that private parties may act as "private attorneys-general" to vindicate the anti-trust law: see below, paras 14-022; 14-272 et seq. In *Old North State Brewing Co v Newlands Services Inc [1999] 4 W.W.R. 573 (BCCA)* a North Carolina judgment contained an award of treble damages on the basis that the judgment debtor had been found to have committed unfair and deceptive trade practices, and included an award for punitive damages. It was held that the trebling of damages could be equated to exemplary damages under Canadian law, and enforcement of the judgment was not contrary to public policy.

133    [2007] EWCA Civ 1374, [2009] Q.B. 22, at [111], disapproving *Schemmer v Property Resources Ltd [1975] Ch. 273* on this point.

134    Wisconsin v Pelican Insurance Co, 127 U.S. 265, 292 (1888).

135    Rule 42, below.

136    Re Visser [1928] Ch. 877, 884, per Tomlin J. See also *King of the Hellenes v Brostrom (1923) 16 Ll.L.R. 167, 190* at p.193.

137    Government of India v Taylor [1955] A.C. 491, 514.

138    On such judgments see, below, Rules 42(1) and 54; *Government of India v Taylor [1955] A.C. 491, 506; USA v Harden (1963) 41 D.L.R. (2d) 721 (Sup Ct Can); Commissioner of Taxes v MacFarland, 1965 (1) S.A. 470.* cf. *Att-Gen for Canada v Schulze (1901) 9 S.L.T. 4* (foreign judgment for costs awarded in revenue case). See *Stoel (1967) 16 I.C.L.Q. 663.*

139    [1955] A.C. 491, 511.

140    R. v Chief Metropolitan Stipendiary Magistrate, Ex p. Secretary of State for the Home Department [1988] 1 W.L.R. 1204 (DC).

141    para.5-022.

142    Indian and General Investment Trust Co Ltd v Borax Consolidated Ltd [1920] 1 K.B. 539, 550; *USA v Harden (1963) 41 D.L.R. (2d) 721 (Sup Ct Can).*

143    Government of India v Taylor [1955] A.C. 491.

144    Peter Buchanan Ltd v McVey [1954] I.R. 89, [1955] A.C. 516n.

145    Cotton v R. [1914] A.C. 176, 195 (PC); *Re Visser [1928] Ch. 877; Re Lord Cable [1977] 1 W.L.R. 7, 13; Bath v British and Malayan Trustees Ltd [1969] 2 N.S.W.R. 114; Re Dwelle Estate (1969) 69 W.W.R. 212 (Alta); Jones v Borland, 1969 (4) S.A. 29.*

146    Municipal Council of Sydney v Bull [1909] 1 K.B. 7, 12.

147    Metal Industries (Salvage) Ltd v Owners of ST "Harle", 1962 S.L.T. 114. The point seems to have been overlooked in *The Acrux [1965] P. 391.*

148    Holman v Johnson (1775) 1 Cowp. 341, 343; cf. *Att-Gen for Canada v Schulze, (1901) 9 S.L.T. 4; King of the Hellenes v Brostrom (1923) 16 Ll.L.R. 167, 190; Regazzoni v KC Sethia Ltd [1958] A.C. 301, 330.*

149    Weir v Lohr (1967) 65 D.L.R. (2d) 717 (Man.). See also *Case C–271/00 Gemeent Steenbergen v Baten [2002] E.C.R. I–10489*: right to recover social assistance payments a "civil matter" under Brussels Convention, Art.1, and not within the scope of "social security" for the purposes of the exclusion in Art.1(3).

150    Connor v Connor [1974] 1 N.Z.L.R. 632. In this case, and in *Weir v Lohr*, above, proceedings by private plaintiffs were held to be maintainable notwithstanding that the fruits of their litigation would be claimed by a foreign State which had paid social security claims or legal aid contributions and of which it was entitled to reimbursement. A direct claim by a foreign State for reimbursement would not be maintainable, it seems, unless it had a contractual or quasicontractual character: see *F.A. Mann (1971) Recueil des Cours, I, p.107, at pp.173–175.*

151    Frankman v Prague Credit Bank [1948] 1 K.B. 730, 746; *Kahler v Midland Bank [1950] A.C. 24, 46–47, 57.* But export regulations designed to protect foreign exchange were treated as revenue laws in *King of the Hellenes v Brostrom*, above.

152    Re Lord Cable [1977] 1 W.L.R. 7, 13. See also *Camdex International Ltd v Bank of Zambia (No.2) [1997] C.L.C. 714 (CA).* cf. *Banco do Brasil v AC Israel Commodity Co, 12 N.Y. 2d 371, 190 N.E. 2d 235 (1963), cert. den. 376 U.S. 906 (1964);* contrast *Banco Frances e Brasileiro v Doe, 36 N.Y. 2d 592, 331 N.E. 2d 502, cert. den. 423 U.S. 867 (1975).*

153    See, e.g. *Holman v Johnson (1775) 1 Cowp. 341, 342.* Foreign rules requiring documents to be stamped as a prerequisite of validity have long been recognised: *Alves v Hodgson (1797) 7 T.R. 241, 243; Clegg v Levy (1812) 3 Camp. 166; Bristow v Sequeville (1850) 5 Exch. 275.* Contrast *James v Catherwood (1823) 3 Dow. & Ry. (K.B.) 190.*

154    See *Re Visser [1928] 1 Ch. 877; Government of India v Taylor [1955] A.C. 491, 505, 513; Regazzoni v KC Sethia Ltd [1956] 2 Q.B. 490, 515 (CA); affirmed [1958] A.C. 301, 322, 324, 328, 330.*

155    Islamic Republic of Iran v Barakat Galleries Ltd [2007] EWCA Civ 1374, [2009] Q.B. 22, [114]–[126]. That part of Rule 3(1) referring to "other public law" has its origin in the 4th edition (1927), Rule 54, p.224, when it appeared as

"political law," citing *Emperor of Austria v Day and Kossuth (1861) 3 De G.F. & J. 217* and distinguishing proprietary rights from claims to enforce political laws. The expression "political law" was replaced by "other public law" in the 7th edition (1958), Rule 21, p.159. This was in response (it seems) to criticism of the expression "political law" by *F.A. Mann (1954) 40 Tr. Gro. Soc. 25*, reprinted in F. A. Mann, Studies in International Law (1973), p.492 (see at p.500), and by Parker L.J. in *Regazzoni v KC Sethia (1944) Ltd [1956] 2 Q.B. 490, 524*. The expression "public law", was intended to be equivalent to "prerogative right", the term used by Dr Mann: see 7th ed., p.162, n.60.

156    Which were defined in *Huntington v Attrill [1893] A.C. 150, 156 (PC)* to include all breaches of "public law" punishable by fine or otherwise.

157    A submission which was approved in *United States v Inkley [1989] Q.B. 255, 264 (CA)*.

158    [1955] A.C. 491, 511, quoted above, para.5-20.

159    Mbasogo v Logo Ltd [2006] EWCA Civ 1370, [2007] Q.B. 846; *Islamic Republic of Iran v Barakat Galleries Ltd [2007] EWCA Civ 1374, [2009] Q.B. 22.*

160    The House of Lords gave leave to appeal in *Mbasogo v Logo Ltd*, above, but the appeal was withdrawn when the proceedings were settled in the course of the hearing. Leave to appeal was refused in *Islamic Republic of Iran v Barakat Galleries Ltd*, above.

161    [1977] 1 W.L.R. 7.

162    [1982] Q.B. 349, reversed *[1984] A.C. 1 (CA and HL)*.

163    Those which were said to support the general rule include *Don Alonso v Cornero (1613) Hob. 212* (where it was held that the English court would not enforce a Spanish decree of forfeiture; but the decree was penal and the property concerned was forfeited when it was outside Spain); *King of Italy v De Medici (1918) 34 T.L.R. 623* (where the court refused to grant an interlocutory injunction at the instance of the Italian Government in respect of the Medici family papers said to have been illegally exported; but the grounds of the decision are not clear). In *Williams & Humbert Ltd v W&H Trade Marks (Jersey) Ltd [1986] A.C. 368* the defendants to claims by Spanish companies whose shares had been expropriated by the Spanish State sought to resist the claims on the ground (inter alia) that the proceedings were an attempt to enforce a foreign law which was penal or otherwise ought not to be enforced by the court, i.e. that the action was an attempted enforcement of a foreign public law and contrary to public policy. The House of Lords upheld the striking out of this defence on the basis that the action did not amount to enforcement, direct or indirect, of the Spanish decree. For criticism of this decision see F.A. Mann, Further Studies in International Law (1990), p.389. For a decision in a related action in the United States see *Williams & Humbert Ltd v W&H Trade Marks (Jersey) Ltd, 840 F. 2d 73 (DC Cir. 1988)*. See also *US v Inkley [1989] Q.B. 255 (CA); Camdex International Ltd v Bank of Zambia (No.2) [1997] C.L.C. 714 (CA)*.

164    Att-Gen (UK) v Heinemann Publishers Australia Pty Ltd (1988) 165 C.L.R. 30, 42–43. Brennan J. agreed with the result, but on the narrow basis that it was contrary to public policy to enforce an obligation of confidence in an action brought for the purpose of protecting the intelligence secrets and political information of a foreign government. In the NSWCA, Street C.J. and Kirby P. accepted that there was a third residual category, but Street C.J. dissented on the basis that such an action should be allowed if the local sovereign supported the claim of the foreign sovereign on the ground that disclosure would harm the public interest: *(1987) 10 N.S.W.L.R. 86*. For criticism see *F.A. Mann (1988) 104 L.Q.R. 497*; see also *Collier [1989] C.L.J. 33*. See also *Evans v European Bank Ltd [2004] NSWCA 82, (2004) 61 N.S.W.L.R. 75*: a receiver appointed by the United States Federal Trade Commission could sue in New South Wales to recover the proceeds of a credit card fraud; the proceedings were not to be characterised as proceedings to secure a governmental interest; *United States Securities and Exchange Commission v Manterfield [2009] EWCA Civ 27, [2010] 1 W.L.R. 172* (US judgment in favour of SEC for disgorgement of proceeds of fraud enforceable in England). cf. *Republic of Haiti v Duvalier 1991 Rev. Crit. 386*.

165    In New Zealand the Court of Appeal refused an injunction because the material in the book had already entered the public domain, and because it was in the New Zealand public interest that it should be published. Cooke P. seems to have accepted the residual category of "public laws," but considered that the secret service agent's duty of confidentiality should be enforced, at any rate if the local sovereign supported the claim: *Att-Gen (UK) v Wellington Newspapers Ltd [1988] 1 N.Z.L.R. 129, 173–175*. For Canada see *United States v Levy (1999) 45 O.R. (3d) 129; United States v Yemec (2010) 320 D.L.R. (4th) 96 (Ont. CA)* (US laws regulating sale of lottery tickets). Whether there is a special rule relating to foreign public law was left open by the United States Supreme Court in *Banco Nacional de Cuba v Sabbatino, 376 U.S. 398, 414 (1964)*, and see also *Attorney General of Canada v RJ Reynolds Tobacco Holdings, Inc, 268 F.3d 103, 134 (2d Cir. 2001)*.

166    [2006] EWCA Civ 1370, [2007] Q.B. 846. Contrast *Tasarruf Mevduati Sigorta Fonu v Demirel [2006] EWHC 3354 (Ch.), [2007] 2 All E.R. 815 (affd. on other grounds [2007] EWCA Civ 799, [2007] 1 W.L.R. 2508)*: claim by State-owned bank as successor to private banks was not a public law claim.

167    At [51].

168    [2007] EWCA Civ 1374, [2009] Q.B. 22.

169    At [123].

170    At [125], [154].

171    [1984] A.C. 1, 20–21.

172    Re Lord Cable [1977] 1 W.L.R. 7 and *Camdex International Ltd v Bank of Zambia [1997] C.L.C. 714, 724* (Simon Brown L.J.), 734 (Phillips L.J.).

173    cf. *King of Italy v de Medici (1918) 34 T.L.R. 623* (claim to Medici archive) and *Spain v Christie Manson & Woods Ltd [1986] 1 W.L.R. 1120* (claim to painting by Goya), each of which might have raised the question, but did not. See now *Council Directive 93/7/EEC of March 15, 1993 on the return of cultural objects unlawfully removed from the territory of a Member State*, and *SI 1994/501*, as amended.

174    cf. *King of Italy v de Medici (1918) 34 T.L.R. 623* (archive belonging to Italy); *Gotha City v Sotheby's (No.2), The Times, October 8, 1998* (Federal Republic of Germany entitled to recover painting originally owned and possessed by the Duke of Saxe-Coburg-Gotha Foundation for Art and Science, and which had been looted); and cases involving claims to assets held by predecessor or revolutionary governments: *King of the Two Sicilies v Willcox (1851) 1 Sim. (N.S.) 301*; *USA v Prioleau (1865) 2 H.&M. 559*; *USSR v Belaiew (1925) 42 T.L.R. 21*; *British Arab Commercial Bank Plc v National Transitional Council of the State of Libya [2011] EWHC 2274 (Comm.)*. See also *Brunei Investment Agency v Fidelis Nominees Ltd [2008] JRC 152 (Royal Court, Jersey)*. See generally, on recovery of assets by States, *Collins (2007) 326 Recueil des Cours 11*.

175    [1986] A.C. 368, 431; and see *Luther v Sagor [1921] 3 K.B. 532 (CA)*; *Princess Paley Olga v Weisz [1929] 1 K.B. 718 (CA)* (in each of which the property had been reduced to possession by the Soviet authorities; and contrast *Brokaw v Seatrain UK Ltd [1971] 2 Q.B. 476, 483 (CA)* (revenue claim: notice of levy ineffective because goods not reduced into possession). See F.A. Mann, Studies in International Law (1973), pp.503–504.

176    [2009] Q.B. at [148].

177    Secretary of State in Council of India v Kamachee Boye Sahaba (1859) 13 Moo. *P.C. 22, 75*; *Cook v Sprigg [1899] A.C. 572, 578 (PC)*; *Salaman v Secretary of State for India [1906] 1 K.B. 613 (CA)*; *Johnstone v Pedlar [1921] 2 A.C. 262, 290*; *Secretary of State for India v Sardar Rustam Khan [1941] A.C. 356, 372 (PC)*. cf. *R. v Secretary of State for Foreign and Commonwealth Affairs, ex p. Pirbai, The Times, October 17, 1985 (CA)*; *Ex p. Molyneux [1986] 1 W.L.R. 331*; *JH Rayner (Mincing Lane) Ltd v Department of Trade and Industry [1990] 2 A.C. 418, 499*; *R. v Secretary of State for Home Affairs, ex p. Rees-Mogg [1994] Q.B. 552*.

178    Nabob of the Carnatic v East India Co (1793) 2 Ves. 56, 60; *Cook v Sprigg [1899] A.C. 572, 578 (PC)*; *West Rand Central Gold Mining Co Ltd v R. [1905] 2 K.B. 391*; *Vajesingji v Secretary of State for India (1924) L.R. 51 I.A. 357, 360 (PC)*; *Hoani Te Heuheu Tukino v Aotea District Maori Land Board [1941] A.C. 308 (PC)*. See also *Rustomjee v R. (1876) 2 Q.B.D. 69, 73*; *Civilian War Claimants' Association v R. [1932] A.C. 14*; *Republic of Italy v Hambros Bank [1950] Ch. 314*; *Winfat Ltd v Att-Gen of Hong Kong [1985] A.C. 733 (PC)*; *JH Rayner (Mincing Lane) Ltd v Department of Trade and Industry [1990] 2 A.C. 418*; *Re International Tin Council [1989] Ch. 309 (CA)*; *Arab Monetary Fund v Hashim (No.3) [1991] 2 A.C. 114*; *Littrell v Government of the United States (No.2) [1995] 1 W.L.R. 82 (CA)*; *Philipp Brothers v Republic of Sierra Leone [1995] 1 Lloyd's Rep. 289 (CA)*; *Lonrho Exports Ltd v Export Credits Guarantee Dept [1999] Ch. 158*.

179    Salaman v Secretary of State for India [1906] 1 K.B. 613, 639 (CA).

180    ibid. at p.640. For example, under the former practice relating to recognition of governments (see below, para.25-004); acceptance by the court of recognition of a foreign régime which had changed the law of the foreign country could have involved an alteration in the court's attitude to private rights existing under the old law: *Luther v Sagor [1921] 3 K.B. 532 (CA)*. On the effect of executive statements see *Republic of Somalia v Woodhouse Drake and Carey (Suisse) SA [1993] Q.B. 54*; *Sierra Leone Telecommunications Co Ltd v Barclays Bank Plc [1998] 2 All E.R. 821*; *Kuwait Airways Corp v Iraqi Airways Co (Nos 4 and 5) [2002] UKHL 19, [2002] 2 A.C. 883*; *R. (on the application of Kibris Turk Hava Yollari) v Secretary of State for Transport [2009] EWHC 1918 (Admin), [2010] 1 All E.R. (Comm.) 253*; *British Arab Commercial Bank Plc v National Transitional Council of the State of Libya [2011] EWHC 2274 (Comm.)*. See also *Christian v R. [2006] UKPC 47, [2007] 2 A.C. 400* (executive's statement that a territory is a British colony conclusive); *R. (on the application of HRH Sultan of Pahang) v Secretary of State for the Home Department [2011] EWCA Civ 616* (executive statement that the Sultan not a head of state); *Att-Gen for Fiji v Robert Jones House Ltd [1989] 2 N.Z.L.R. 69*; and *Warbrick (1986) 35 I.C.L.Q. 138*; *Wilmshurst (1986) 35 I.C.L.Q. 157*; and on recognition of States see *Gur Corp v Trust Bank of Africa Ltd [1987] Q.B. 559 (CA)*. See generally Lauterpacht, Recognition in International Law (1947); Talmon, Recognition of Governments in International Law (1998).

181    R. (on the application of Abassi) v Secretary of State for Foreign and Commonwealth Affairs [2002] EWCA Civ 1598, [2003] U.K.H.R.R. 76.

182    Nissan v Att-Gen [1970] A.C. 179, 218, 238.

© 2021 Thomson Reuters.

183  The Rolla (1807) 6 C.Rob. 364, 366; *Buron v Denman (1848) 2 Exch. 167*; *R. v Crewe, ex p. Sekgome [1910] 2 K.B. 576, 606, 624, 628 (CA)*; *Sobhuza II v Miller [1926] A.C. 518 (PC)*; *Nissan v Att-Gen [1970] A.C. 179, 216*; *Buttes Gas & Oil Co v Hammer (Nos 2 and 3) [1982] A.C. 888, 930–931*.

184  Buron v Denman (1848) 2 Exch. 167.

185  Netz v Ede [1946] Ch. 224. For the deportation of aliens of non-enemy nationality see Immigration Act 1971, s.3(5), as amended by Immigration and Asylum Act 1999.

186  R. v Bottrill, ex p. Kuechenmeister [1947] K.B. 41 (CA).

187  cf. *Commercial and Estates Company of Egypt v Board of Trade [1925] 1 K.B. 271, 290 (CA)*; *Buttes Gas & Oil Co v Hammer [1975] Q.B. 557, 573 (CA), reversed on other grounds [1982] A.C. 888.* It is probable that the Human Rights Act 1998 has removed any doubt. cf. *R. (on the application of Al-Skeini) v Secretary of State for Defence [2005] EWCA Civ 1609.*

188  This point was left open by the majority of the House of Lords in *Nissan v Att-Gen [1970] A.C. 179, 221, 226–227, 236 and 240.* Lord Reid (at p.213) thought the defence could never apply in regard to a British subject "at least if he is also a citizen of the United Kingdom and Colonies." This category has now been replaced by British citizenship, British Overseas Territories citizenship and British Overseas citizenship and the status of British National Overseas: British Nationality Act 1981, as amended. In *Buttes Gas & Oil Co v Hammer [1975] Q.B. 557, 573 (reversed on other grounds [1982] A.C. 888)* Lord Denning M.R. thought the defence is "probably not available" in the case of a "British subject". In *Al-Jedda v Secretary of State for Defence [2010] EWCA Civ 758, [2011] 2 W.L.R. 225* (a case involving the internment in Iraq of a British national by the British forces acting under a UN Security Council resolution) Arden L.J. was of the view that the defence applied to British nationals (at [108] et seq.); Elias L.J. was of the contrary view (at [192] et seq.); Sir John Dyson expressed no view. See also *Collier [1968] C.L.J. 102, 115–117*; *Polack (1963) 26 M.L.R. 138*; *Kato [1969] Public Law 219*; *Perreau-Saussine (2007) 78 B.Y.I.L. 176.*

189  Walker v Baird [1892] A.C. 491 (PC).

190  Johnstone v Pedlar [1921] 2 A.C. 262.

191  Cook v Sprigg [1899] A.C. 572, 578 (PC); *Vajesingji v Secretary of State for India (1924) L.R. 51 I.A. 357, 360 (PC)*; cf. *Johnstone v Pedlar [1921] 2 A.C. 262, 290.*

192  Duke of Brunswick v King of Hanover (1844) 6 Beav. 1, 57–58; affirmed (1848) 2 H.L.C. 1, 17, 19, 21, 22, 24, 27. See also *Blad's Case (1673) 3 Swan. 603 (PC)*, and *Blad v Bamfield (1674) 3 Swan. 604*; *Carr v Fracis Times & Co [1902] A.C. 176, 179–180*; *Johnstone v Pedlar [1921] 2 A.C. 262, 290.* See F.A. Mann, Studies in International Law (1973), p.420; *(1971) Recueil des Cours, I, p.107, at pp.148–149*; *Singer (1981) 75 A.J.I.L. 283*; *Staker (1987) 58 B.Y.I.L. 151, 234–250*; *Collins (1995–96) 6 King's Coll. L.J. 20.*

193  Underhill v Hernandez, 168 U.S. 250, 252 (1897), affirming (1895) 65 F. 577; *Oetjen v Central Leather Co, 246 U.S. 297, 304 (1918).* See now *Banco Nacional de Cuba v Sabbatino, 376 U.S. 398 (1964)*; *First National City Bank v Banco Nacional de Cuba, 406 U.S. 759 (1972)*; *Alfred Dunhill of London Inc v Republic of Cuba, 425 U.S. 682 (1976)*; Restatement Third, Foreign Relations Law of the United States (1987), s.443. In *Kirkpatrick & Co Inc v Environmental Tectonics Corp International, 493 U.S. 400 (1990)*, noted by *F.A. Mann (1990) 106 L.Q.R. 352*, the US Supreme Court held that the act of state doctrine was concerned only with questions involving the validity of acts of foreign sovereigns in their own territory. This decision was applied in *A Ltd v B Bank [1997] I.L.Pr. 586 (CA)*.

194  Luther v Sagor [1921] 3 K.B. 532, 548 (CA); *Princess Paley Olga v Weisz [1929] 1 K.B. 718, 724–725 (CA)*; cf. *Oppenheimer v Cattermole [1976] A.C. 249, 282*; *Att-Gen (UK) v Heinemann Publishers Australia Pty Ltd (1988) 165 C.L.R. 30, 40–41.*

195  Carr v Fracis Times & Co, above. See below, para.35-006.

196  Luther v Sagor; *Princess Paley Olga v Weisz*, above. See Rule 137.

197  e.g. as in *Bank voor Handel en Scheepvaart NV v Slatford [1953] 1 Q.B. 248*; *Peer International Corp v Termidor Music Publishers Ltd [2003] EWCA Civ 1156, [2004] Ch. 212.* See also *Moti v R. [2011] HCA 50, [46]–[52].*

198  Re Helbert Wagg & Co Ltd [1956] Ch. 323; *Oppenheimer v Cattermole [1976] A.C. 249.*

199  cf. *A/S Tallinna Laevauhisus v Estonian State SS Line (1947) 80 Ll.L.R. 99 (CA)*; *Buck v Att-Gen [1965] Ch. 745 (CA)*; *Nuova Safim SpA v Sakura Bank Ltd [1998] C.L.C. 306, affirmed [1999] C.L.C. 1830 (CA)*; *Fitzgibbon v Att-Gen [2005] EWHC 114 (Ch.)*; *Hunt v T&N Plc (1993) 109 D.L.R. (4th) 16 (Sup Ct Can)*; and F.A. Mann, Studies in International Law (1973), p.442; *(1965) 14 I.C.L.Q. 985 (1971) Recueil des Cours, I, p.107, at pp.147–149*; Kahn-Freund, in Festschrift für F.A. Mann (1977), p.207. The statement in the text was approved in *Dubai Bank Ltd v Galadari (No.5), The Times, June 26, 1990.* Contrast *Al-Jedda v Secretary of State for Defence [2010] EWCA Civ 758, [2011] 2 W.L.R. 758*, at [74], [189] (incidental interpretation and application of foreign constitution not barred). cf. *Total E&P Soudan v Edmonds [2006] EWHC 1136 (Comm.), affd. [2007] EWCA Civ 50, [2007] C.P. Rep. 20.*

200  The Playa Larga [1983] 2 Lloyd's Rep. 171, 194 (CA).

© 2021 Thomson Reuters.

201   R. v Bow Street Magistrate, Ex p. Pinochet [2000] 1 A.C. 61, 106. This decision was subsequently set aside: *[2000] 1 A.C. 119*. For the final decision see *R. v Bow Street Magistrate, ex p. Pinochet (No.3) [2000] 1 A.C. 147*.

202   *Lucasfilm Ltd v Ainsworth [2011] UKSC 39, [2011] 3 W.L.R. 487*, [81]–[86], per Lord Walker of Gestingthorpe and Lord Collins of Mapesbury.

203   In *Settebello v Banco Totta and Acores [1985] 1 W.L.R. 1050 (CA)* it was held that the English court would not issue letters rogatory to a foreign court for the purpose of taking evidence on the motives of the Portuguese legislature because it would be contrary to "judicial comity." cf. *Marubeni Hong Kong and South China Ltd v Government of Mongolia [2004] EWHC 472 (Comm.), [2004] 2 Lloyd's Rep. 198, affirmed [2005] EWCA Civ 395, [2005] 1 W.L.R. 2497*.

204   [1953] 1 W.L.R. 246.

205   Re Helbert Wagg & Co Ltd [1956] Ch. 323, 352. See also *Regazzoni v KC Sethia Ltd [1956] 2 Q.B. 490, 500, affirmed [1958] A.C. 301, 326*; *The Playa Larga [1983] 2 Lloyd's Rep. 171, 190 (CA)*; *Williams & Humbert Ltd v W&H Trade Marks (Jersey) Ltd [1986] A.C. 368, 436*; *Kuwait Airways Corp v Iraqi Airways Co [1995] 1 W.L.R. 1147, 1166 (HL)*; *Empresa Nacional de Telecomunicaciones SA v Deutsche Bank AG [2009] EWHC 2579 (QB), [2010] 1 All E.R. (Comm.) 649*.

206   376 U.S. 398 (1964).

207   [1982] A.C. 888.

208   See *Collins (2002) 51 I.C.L.Q. 485*, at 506–508; F.A. Mann, Foreign Affairs in English Courts (1986), Ch.4 (whose view, expressed in a handwritten note on his copy of the book, was that "it was the House of Lords which lacked 'judicial restraint'!").

209   Cases in which *Buttes Gas* was cited, and which the principle, or related principles, were applied include *Westland Helicopters Ltd v Arab Organisation for Industrialisation [1995] Q.B. 282*; *JH Rayner (Mincing Lane) Ltd v Department of Trade and Industry [1990] 2 A.C. 418*; *R. (on the application of Al-Haq) v Secretary of State for Foreign and Commonwealth Affairs [2009] EWHC 1910* (Admin.); *JSC BTA Bank v Ablyazov (No.4) [2011] EWHC 202 (Comm.), [2011] 2 All E.R. (Comm.) 10*; *Wells Fargo Bank Northwest National Assn v Victoria Aircraft Leasing Ltd (No.2) [2004] VSC 341*; *Petrotimor Companhia de Petroleos SARL v Commonwealth of Australia (2003) 197 F.L.R. 461 (Full Ct)*; *Air New Zealand Ltd v Director of Civil Aviation [2002] 3 N.Z.L.R. 796 (CA)*. cf. *Settebello v Banco Totta y Acores, The Times, August 4, 1984, affirmed [1985] 1 W.L.R. 1050*; *R. (on the Application of Abassi) v Secretary of State for Foreign and Commonwealth Affairs [2002] EWCA Civ. 1598, [2003] U.K.H.R.R. 76*. *Tajik Aluminium Plant v Ermatov [2006] EWHC 2374 (Comm.)*; *Republic of Serbia v ImageSat International NV [2009] EWHC 2853 (Comm.), [2010] 1 Lloyd's Rep. 324*.

210   It was not applied in *Fayed v Al Tajir [1988] Q.B. 712, 725 (CA)*; *Kuwait Airways Corp v Iraqi Airways, Financial Times, July 17, 1992*; *Arab Monetary Fund v Hashim [1993] 1 Lloyd's Rep. 543, 572, affirmed on this aspect [1996] 1 Lloyd's Rep. 589, 596 (CA)*; *A Ltd v B Bank [1997] I.L.Pr. 586 (CA)*; *R. v Home Secretary, Ex p. Launder (No.2) [1998] Q.B. 994*; *R. v Home Secretary, Ex p. Johnson [1999] Q.B. 1174*; *Re Banco Nacional de Cuba [2001] 1 W.L.R. 2039*; *Mamidoil-Jetoil Greek Petroleum Co SA v Okta Crude Oil Refinery (No.2) [2003] 2 Lloyd's Rep. 635*; *Republic of Ecuador v Occidental Exploration and Production Co [2005] EWCA Civ 1116, [2006] Q.B. 432*; *Re AY Bank Ltd [2006] EWHC 830 (Ch.), [2006] 2 All E.R. (Comm.) 463*; *Korea National Insurance Corp v Allianz Global Corporate and Speciality AG [2008] EWCA Civ 1355, [2008] 2 C.L.C. 837*; *Croatia v Serbia [2009] EWHC 1559 (Ch.), [2010] Ch. 200*; *Yukos Capital SARL v OJSC Rosneft Oil Co [2011] EWHC 1461 (Comm.), [2011] 2 C.L.C. 129*; *Berezovsky v Abramovich [2011] EWCA Civ 153, [2011] 1 C.L.C. 359*; *Att-Gen for England and Wales v R. [2002] 2 N.Z.L.R. 91 (CA)*, affirmed sub. nom. *R. v Her Majesty's Att-Gen for England and Wales [2003] UKPC 22, [2004] 2 N.Z.L.R. 577*.

211   [2002] UKHL 19, [2002] 2 A.C. 883. See also *R. (on the Application of Abassi) v Secretary of State for Foreign and Commonwealth Affairs [2002] EWCA Civ 1598, [2003] U.K.H.R.R. 76*.

212   At [25]–[26].

213   Lord Nicholls of Birkenhead, at [26] et seq., Lord Steyn, at [113] et seq., Lord Hope of Craighead, at [146] et seq.

214   Lord Hope of Craighead, at [148]–[149], approving *F.A. Mann (1954) 70 L.Q.R. 181*; also in Further Studies in International Law, pp.177–183.

215   [2011] UKSC 39, [2011] 3 W.L.R. 487, at [112]–[114]. See also *Scott (2007) 3 J. Priv. Int. L. 309*.

216   Case C–281/02 [2005] ECR I–1383, [2005] Q.B. 801, para.12-019, below.

217   Domicile as the primary rule of jurisdiction.

218   cf. *Huntington v Attrill [1893] A.C. 150 (PC)*.

219   cf. *Huntington v Attrill*, above.

220   Huntington v Attrill, above.

221   Banco de Vizcaya v Don Alfonso de Borbon y Austria [1935] 1 K.B. 140.

222   US v Inkley [1989] Q.B. 255 (CA).

223    Municipal Council of Sydney v Bull [1909] 1 K.B. 7.

224    Government of India v Taylor [1955] A.C. 491. It is immaterial where the company is incorporated.

225    Re Visser [1928] Ch. 877.

226    Rossano v Manufacturers' Life Insurance Co [1963] 2 Q.B. 352.

227    cf. Jones v Borland, 1969 (4) S.A. 29.

228    cf. Scottish National Orchestra Society Ltd v Thomson's Executor, 1969 S.L.T. 325.

229    Brokaw v Seatrain UK Ltd [1971] 2 Q.B. 476 (CA).

230    Suggested by Don Alonso v Cornero (1613) Hob. 212; and Princess Paley Olga v Weisz [1929] 1 K.B. 718 (CA).

231    Suggested by British Nylon Spinners Ltd v ICI Ltd [1953] Ch. 19 (CA); [1955] Ch. 37.

232    cf. King of Italy v De Medici (1918) 34 T.L.R. 623.

233    Att-Gen of New Zealand v Ortiz [1984] A.C. 1 (CA and HL).

234    Based on the facts of Lepage v San Paulo Copper Estates Ltd [1917] W.N. 216, which, it is submitted, was wrongly decided.

235    Att-Gen (UK) v Heinemann Publishers Australia Pty Ltd (1988) 165 C.L.R. 30.

236    cf. Camdex International Ltd v Bank of Zambia (No.2) [1997] C.L.C. 714 (CA).

237    United States Securities and Exchange Commission v Manterfield [2009] EWCA Civ 27, [2010] 1 W.L.R. 172.

238    Mbasogo v Logo Ltd [2006] EWCA Civ 1370, [2007] Q.B. 846.

239    Cook v Sprigg [1899] A.C. 572 (PC). See Crown Proceedings Act 1947, s.11(1).

240    Buron v Denman (1848) 2 Exch. 167. See Crown Proceedings Act 1947, ss.2(1) and 11(1).

241    Buttes Gas & Oil Co v Hammer (Nos 2 and 3) [1982] A.C. 888.

242    Westland Helicopters Ltd v Arab Organisation for Industrialisation [1995] Q.B. 282.

243    Kuwait Airways Corp v Iraqi Airways Co (Nos 4 and 5) [2002] UKHL 19, [2002] 2 A.C. 883.

**End of Document**                              © 2021 Sweet & Maxwell

# Exhibit 29

¶114.7. Refunds

Bittker & Lokken: Federal Taxation of Income, Estates, and Gifts (WG&L)

# ¶ 114.7 Refunds

## ¶ 114.7.1 Introductory

Taxpayers may overpay their taxes by excessive withholding from wages, inflated declarations of estimated tax, or arithmetic or substantive errors on returns, and they may sustain net operating losses in later years that generate carrybacks that in turn create overpayments in the carryback years. Many overpayments are conceded by the IRS and either credited or refunded automatically, such as overpayments attributable to excessive withholding or estimated tax payments and arithmetic errors, although these credits and refunds are provisional because the IRS may find on auditing the return that the credit or refund created or increased a deficiency. 1 Credits and refunds are also noncontroversial if they result from shifting items from one taxable year to another on audit and the taxpayer agrees with the adjustment. The IRS's authority to allow these voluntary credits and refunds (with interest), provided the applicable statute of limitations has not run, derives from § 6402(a) . 2

If the taxpayer discovers an error on a previously filed return or believes that the government's determination of an overpayment is too niggardly, the stage is set for a claim for credit or refund. Refund claims have a dual function. The claim sets in motion the IRS's administrative procedure for an examination of the taxpayer's case, and, by virtue of § 7422(a) , it is a prerequisite to a judicial proceeding by the taxpayer if the IRS refuses to credit or refund the amount claimed. Because of the latter function, a refund claim often serves as a preliminary complaint in an embryonic judicial proceeding. As will be seen, this sharply distinguishes refund claims from protests and other documents filed with the IRS in deficiency cases. 3

Even if the taxpayer decides in advance not to pursue a claim beyond the IRS because, for example, the amount in controversy does not warrant the expense of litigation, a refund claim is a precondition to IRS consideration of the matter. This is not because the Code or regulations specify any formal steps as a prerequisite to IRS action; indeed, they only state that overpayments cannot be credited or refunded after the applicable statute of limitations has run unless a claim was filed within the period. 4 As a matter of internal IRS housekeeping, however, a refund claim must be filed to set the administrative machinery in motion. 5 Moreover, a protracted series of oral conversations between the taxpayer and the IRS might obscure whether a claim for credit or refund has been made within the limitations period prescribed by § 6511(a) , while the filing of a document ordinarily establishes this crucial fact with precision. 6

To be entitled to a refund of an admitted overpayment, the taxpayer must show that he is the person

who made the overpayment. 7 On the other hand, persons who pay taxes owed by other taxpayers are sometimes denied refunds because they are mere volunteers, raising the possibility that an overpayment made by a person other than the taxpayer may not be recoverable by anyone. 8 However, in *United States v. Williams*, 9 the Supreme Court held that a person who had paid another person's tax under protest in order to remove a lien from her property could sue for a refund of the tax under 28 USC § 1346(a)(1), which waives sovereign immunity from suit "for the recovery of any internal-revenue tax alleged to have been erroneously or illegally assessed or collected." The Court found that a contrary conclusion would, under the law then existing, have left the payor with no remedy and that the lack of other remedy implies that Congress did not intend to limit § 1346(a)(1) to taxpayers. Moreover, the Court concluded, the principle that generally bars a person from challenging a tax liability of another person should yield in this situation because the payor's principal challenge was to the lien on her property, not the underlying tax. In response to *Williams*, Congress enacted provisions providing administrative and judicial remedies for owners of property seeking relief from liens for taxes owed by others. 10 According to the IRS, these procedures are exclusive, and a taxpayer in the situation of the taxpayer in *Williams* thus can no longer bring an action under 28 USC § 1346(a)(1), whether or not he or she follows those procedures. 11 The *Williams* opinion may have ongoing relevance in other contexts, 12 but probably only where Congress has provided no statutory remedy. For example, the Court held that the statutory provisions enacted in response to *Williams* provide an exclusive remedy for third-party wrongful levy claims. 13

Spouses filing a joint return have separate interests in any overpayment of tax shown on the return; "Overpayments by married spouses are apportionable to each spouse to the extent that he or she contributed to the overpayment." 14 If a taxpayer becomes bankrupt, the entitlement to a credit or refund usually becomes part of the bankruptcy estate. 15 Refund claims cannot be assigned. 16

In response to claims by some of the states that unclaimed overpayments of federal taxes escheated to them, Congress enacted **§ 6408** in 1987, providing that a taxpayer's entitlement to a refund (including interest on the overpayment) is canceled if the refund would otherwise escheat to a state under any state law relating to abandoned or unclaimed property. **Section 6408** also bars payment of a refund to a decedent's estate "unless it is affirmatively shown that such amount will not escheat to a State."

If a tax is erroneously refunded, suit for recovery of the erroneous refund may be brought in the name of the United States under **§ 7405** . Such a suit must begin within two years after the refund is made (five years if the refund was induced by fraud or misrepresentation). 17 Several courts have held, however, that **§ 7405** is not an exclusive remedy and that suit for recovery of a refund induced by fraud can be brought at any time under **§ 6501(c)** , which lifts all statutes of limitations in cases of fraud and willful attempts to evade tax. 18

## ¶ 114.7.2 Form and Content of Refund Claims

The form for claiming a credit or refund of an overpayment is the tax return for the pertinent taxable year

if the overpayment is shown on the return itself (e.g., excessive withholding or estimated tax) or an amended return if the return as filed did not disclose the overpayment (e.g., overpayment resulting from after-discovered error). 19 Under a long line of cases, however, letters, marginal notations on tax returns for related later years, and other informal statements have been accepted as claims for refund despite their formal inadequacies if they are timely and adequately advise the IRS of the taxpayer's demand. 20 The Supreme Court said in 1941,

> [A] notice fairly advising the Commissioner of the nature of the taxpayer's claim, which the Commissioner could reject because too general or because it does not comply with formal requirements of the statute and regulations, will nevertheless be treated as a claim, where formal defects and lack of specificity have been remedied by the amendment after the lapse of the statutory period. 21

The Court of Appeals for the Seventh Circuit stated in a 1985 decision:

> a general notice advising the government that the taxpayer believes his taxes have been erroneously assessed, requesting a refund and indicating that the basis of the refund is in litigation, is sufficient to constitute an "informal" refund claim which may be perfected by the filing of a formal refund claim after the refund claim limitations period has expired. 22

This leniency, however, is not without limit. According to the Tax Court, "To make an informal claim for refund a taxpayer not only must assert his right to a refund for a year, but he must describe the legal and factual basis of the claim." 23 Many taxpayers relying on informal communications to establish refund claims have been disappointed. 24 Moreover, bureaucracies being what they are, taxpayers wanting prompt review of their claims will use the prescribed form.

Even if the claim is submitted on the proper form, it will not be considered "for any purpose as a claim for refund or credit," according to the regulations, unless it sets forth in detail each ground on which the credit or refund is claimed, with facts sufficient to apprise the IRS of the exact basis thereof, and unless it is verified by a written declaration that it is made under the penalties of perjury. 25 Until the statute of limitations runs, these requirements are innocuous because a claim that is unverified, imprecise, or inadequately documented can be amended or, if beyond repair, replaced by a better-prepared claim, somewhat as a complaint in a lawsuit is amended to conform to the proof.

Once the statute of limitations has run, however, the taxpayer is bound-shackled may be a more descriptive term-by the claim because the regulations state that no refund or credit will be allowed after the statutory period except on one or more of the grounds set forth in a claim filed before the expiration of the period. 26 The statute of limitations for credits and refunds requires that a "claim" be filed within the prescribed period, without defining this term or requiring specificity, 27 but the decisional law amply supports the regulations in defining "claim" as a document adequately notifying the IRS of the grounds on which the taxpayer's request is based. 28 Not surprisingly, the courts have likened refund claims to

pleadings, but with the caveat that "the analogy to pleading at law is not to be so slavishly followed as to ignore the necessities and realities of administrative practice." **29** Moreover, claims can state alternative and inconsistent grounds. **30**

The requirement of specificity is mitigated by (1) the possibility of waiver by the IRS if it proceeds to investigate the taxpayer's claim and thereby learns more about its basis and (2) the taxpayer's right to amend the claim to make it more specific, even after the statutory period for filing an original claim has expired. The waiver-amendment area was summarized by the Supreme Court in *United States v. Andrews*, decided in 1938, as follows:

> Where a claim which the Commissioner could have rejected as too general, and as omitting to specify the matters needing investigation, has not misled him but has been the basis of an investigation which disclosed facts necessary to his action in making a refund, an amendment which merely makes more definite the matters already within his knowledge, or which, in the course of his investigation, he would naturally have ascertained, is permissible. On the other hand, a claim which demands relief upon one asserted fact situation, and asks an investigation of the elements appropriate to the requested relief, cannot be amended to discard that basis and invoke action requiring examination of other matters not germane to the first claim. **31**

Under these principles, amendments frequently salvage vague or imprecise claims and cure variances, but the "metamorphosis" must not be too complete. **32** Moreover, if the claim is rejected, it cannot be amended after the statute of limitations has run even if an amendment before rejection would have been permissible. **33**

**Section 7422(a)** forbids judicial proceedings for the recovery of taxes "until a claim for refund or credit has been duly filed" with the IRS in accordance with the applicable regulations. Although the IRS may have the authority to establish separate channels for claims submitted solely for administrative consideration and those that the taxpayer may wish to pursue in court if satisfaction is not obtained at the administrative level, such a dual-channel system would be confusing and unnecessary. Moreover, the only way to determine whether a claim rejected by the IRS for vagueness or other inadequacies is valid is to sue for a refund under **§ 7422(a)** . For these reasons, all claims move through a single channel, commencing with IRS examination and ending, if the taxpayer is not satisfied with the outcome at the administrative level, in court. The specificity, waiver-amendment, and other principles determining adequacy of a refund claim thus are the same under both **§§ 6511(b)** and **7422** .

## ¶ 114.7.3 Time for Filing Claims

To be considered administratively or used as the basis of judicial proceedings, a refund claim must ordinarily be filed within the period prescribed by **§ 6511(a)** -three years from the time the return was filed or two years from the time the tax was paid, whichever is later. **34** Returns filed early are treated as filed on the due date (determined without regard to extensions), but in the case of late returns, the actual

filing date controls. 35 Normally, the three-year period begins with the filing of the return originally filed, even if the tax is paid with an amended return. 36 If no return was filed, the governing period is two years from the time the tax was paid. 37

Although timely claims can be amended after the statutory period to correct deficiencies under the waiver-amendment principles discussed above, 38 an untimely claim is not revived by IRS consideration of its merits. 39 Moreover, under § 6514(a)(1) , a credit allowed on the basis of a barred claim is void, and if a refund is made, it can be recovered by the government by suit under § 7405 . 40

A claim filed within the prescribed period does not necessarily entitle the taxpayer to a credit or refund for the entire overpayment, because § 6511(b)(2) imposes secondary limits on the amount recoverable. First, if the claim is filed within three years after the return was filed but more than two years after the tax was paid, the credit or refund may not exceed the amount paid during a period preceding the filing of the claim equal to the sum of three years and the length of any extension of time for filing the return. 41 Second, if the claim is filed within two years after a tax payment but more than three years after the return was filed, the recovery is limited to the amount paid during the two years preceding the filing of the claim. 42 If a refund or credit is made without a claim being filed, the maximum amount is the amount that could have been refunded under a claim filed on the date the refund or credit is allowed.

The dependency of these rules on the date of payment has led many taxpayers to argue that remittances to the IRS were deposits, not payments, until the IRS applied them in satisfaction of tax liabilities. 43 In *Rosenman v. US*, which involved a "payment on account of the Federal Estate tax," which the IRS placed in a "suspense account" pending the filing of a return, the Supreme Court held that the payment was a deposit and that tax was therefore paid only when the deposit was applied in payment of tax. 44 Some cases have implied that a preassessment remittance is, as a matter of law, a deposit until tax is assessed 45 or until the parties treat the deposit as a tax payment. 46 Most of the recent decisions have considered several factors, including the taxpayer's intentions, how the IRS treats the payment, and when the tax is assessed, in determining whether a payment is a tax payment or a deposit. 47 Several courts of appeal have held that a payment with a request for an automatic extension of a return's due date is, as a matter of law, a tax payment, not a deposit. 48

Under §§ 6513(b)(1) and 6513(b)(2) , estimated tax payments are deemed paid on the return's due date (without regard to extension), and tax withheld from wages during any calendar year is deemed paid on April 15 of the next year, whether or not the return is due on that date. The Supreme Court construed the words "deemed to have been paid" in these provisions to require that withholding and estimated tax payments be considered payments on that date, not deposits until applied in satisfaction of tax assessments. 49 Assume $5,000 was withheld from a taxpayer's wages during 2006, and the taxpayer filed a delinquent 2006 return on April 30, 2009, together with an additional payment of $3,000. A meritorious refund claim filed on April 15, 2012, could result in a maximum recovery of only $3,000 because the $5,000 withheld from the taxpayer's wages during 2006 is treated as paid on April 15, 2007-outside the three-year period covered by the 2012 refund claim. 50 In reaching this conclusion, the Court was skeptical of the idea that pre-assessment remittances should generally be considered

deposits, rather than tax payments:

> Baral's position-to the extent he submits that payment occurs only at the Service's assessment-would work to the detriment of taxpayers who timely file their returns and claim a refund or credit as compensation for an overpayment. The Service will not always assess the taxpayer's liability immediately upon receiving the return; the Service generally has three years in which to do so. . . . The Code does allow for payment of interest to the taxpayer on overpayments once the return has been filed and the tax paid, . . . but under Baral's view no interest could accrue during the time between the filing of the return and the Service's assessment. Fortunately for the timely taxpayer, the Code definitively rejects Baral's position in this setting. **Section 6611(d)** . . . explains that the date of payment is determined according to the provisions of **§ 6513** , which, as noted, . . . plainly set a deemed date of payment for remittances of withholding and estimated income tax on the April 15 following the relevant taxable year. **51**

The Supreme Court held in 1997 that the statute of limitations on refunds was not equitably tolled by senility, alcoholism, or other disability. **52** Congress responded in 1998 with the enactment of **§ 6511(h)** , which suspends the running of the limitations periods on refunds and refund claims for an individual taxpayer while the taxpayer is "financially disabled." **53** An individual is financially disabled while the person is "unable to manage his financial affairs by reason of medically determinable physical or mental impairment . . . which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." **54** Proof of financial disability must be supplied to the IRS "in such form and manner" as it "may require." **55** According to the legislative history, **§ 6511(h)** does not apply if a financially disabled person's "spouse or another person is authorized to act on the taxpayer's behalf in financial matters." **56** Also, if a financially disabled person dies, the suspension ends at death.

The two-year and three-year periods prescribed by **§ 6511(a)** for claiming refunds and credits are modified or displaced by several special provisions establishing longer periods for claims based on specified events, usually because it is difficult or impossible to ascertain the pertinent facts within the normal period. The most important of these provisions are:

> 1. For taxes subject to an extension of the time for assessment under **§ 6501(c)(4)** , the time for claiming refunds and credits may not expire earlier than six months after the expiration of the extended period for assessments. **57**
> 2. For claims for refund or credit relating to the deductibility of bad debts or losses on the worthlessness of securities, the normal three-year period is extended to seven years from the due date of the return. **58**
> 3. Special limitations periods are provided for claims relating to net operating loss or capital loss carrybacks, **59** foreign tax credits, **60** and carrybacks of the general business credit. **61**
> 4. Adjustments under **§§ 1311** through 1315, mitigating the statutes of limitations in certain cases of inconsistent positions by the IRS or the taxpayer, are also subject to special rules. **62**
> 5. Refunds attributable to partnership items are governed by the partnership audit rules. **63**

6. Refunds attributable to a retroactive reduction of military retirement pay resulting from an award of disability compensation. [64]

When making a retroactive change in the law favorable to taxpayers, Congress sometimes permits refund claims to be pursued for a specified period after the change, regardless of the normal statutes of limitations. [65] In the absence of a statutory grace period for these claims, however, the usual statutes of limitations continue in force, [66] with the result that taxpayers who filed their returns or paid their taxes late sometimes reap a benefit from the retroactive amendment that is denied to those who filed and paid on the due date.

## ¶ 114.7.4 IRS Procedure in Refund Cases

On receiving a claim for refund or credit, the IRS follows substantially the same procedure as when returns are audited, including the administrative appeal rights accorded to taxpayers. [67] Since the entire return is examined, not merely the claim for credit or refund, taxpayers sometimes refrain from pressing debatable claims, lest the potential refund turn into a deficiency by the time the case emerges from the administrative pipeline. Moreover, even if a refund or credit is allowed, [68] the assertion of a deficiency at a later time is not barred until the limitations period on assessments expires, [69] and the government can also sue to recover an erroneous refund. [70]

Refunds and credits in excess of $2 million, or $5 million in the case of a C corporation, must be reported to the Joint Committee on Taxation and usually cannot be made until 30 days after the report is submitted. [71] The refund can be made before the report is submitted, however, if it results from the carryback of a net operating loss or from an election to deduct a disaster loss for the taxable year preceding the year of the disaster.

If a claim is disallowed, the IRS usually asks the taxpayer to waive a formal notice of claim disallowance under § 6532(a)(3) . [72] If executed, the waiver permits the taxpayer to bring a judicial proceeding for a refund immediately, and the two-year statute of limitations on such actions starts to run at the same time. [73]

## ¶ 114.7.5 Interception of Refunds to Pay Nontax Claims and State Income Tax Obligations

The IRS must sometimes divert federal tax refunds to satisfy delinquent child support obligations, past-due obligations to other federal agencies, past-due state income tax liabilities, and unemployment compensation debts. [74]

Under § 6402(c) , an overpayment by a person who is delinquent in making child support payments is diverted to satisfy the past-due support obligation if the IRS has been notified of the obligation by a state government under § 464 of the Social Security Act. [75] The IRS pays the diverted overpayment to the

state that is collecting the support, but it must notify the taxpayer of the diversion. The diversion rule applies even if the taxpayer has directed that the overpayment be applied against a future tax liability (e.g., credited to the next year's estimated tax) rather than refunded to the taxpayer. Substantial litigation has arisen concerning the constitutional sufficiency of procedures used in the various states for implementing **§ 6402(c)** . **76**

Under **§ 6402(d)** , an overpayment may be used to pay a debt the taxpayer owes to an agency of the federal government other than the IRS. **77** "[U]pon receiving notice" from another federal agency that the taxpayer "owes a past-due legally enforceable debt" to the agency, the IRS "shall" reduce the refund by the amount of the debt. **78** This amount is paid to the creditor agency, **79** and the IRS must notify the taxpayer of what has happened. **80** The provision is probably used most often to recover defaulted student loans acquired by the Education Department pursuant to federal guarantees. **81 Section 6402(d)** can also be used to recover an overpayment of benefits under Title II of the Social Security Act (OASDI benefits).

When recovery of an overpayment is sought from an individual who filed a return with his or her spouse, the portion of the tax refund belonging to the spouse (the "injured spouse") can be insulated from the interception. **82** The injured spouse claims the refund by filing Form 8379, Injured Spouse Allocation.

A federal agency's claim under **§ 6402(d)** is subordinate to the diversion for past-due child support under **§ 6402(c)** , but it takes precedence over the taxpayer's direction that the overpayment be credited against another year's liability (e.g., estimated tax for the following year). If more than one federal agency makes a claim against the refund, the claims are satisfied from the refund in the order in which they accrued. Courts have disagreed over the application of various statutes of limitations to an agency's right to an offset under **§ 6402(d)** . **83**

Under **§ 6402(e)** , the IRS must sometimes divert federal tax refunds to satisfy state tax liabilities. It generally applies if the IRS receives notice from a state tax authority that a "named person" has a "past-due, legally enforceable State income tax obligation" and that person's address, as shown on the federal return for the year of the overpayment, is in the taxing state. **84** Before giving notice to the IRS, the state agency must notify the taxpayer of its intention to take this action, allow the taxpayer at least 60 days "to present evidence that all or part of such liability is not past-due or not legally enforceable," and determine that the tax is past-due and legally enforceable after "consider[ing] any evidence presented by such person." **85** The state is entitled only to the portion of the overpayment that remains after the person's existing federal tax liabilities, past-due support, and past-due obligations to other federal agencies have been satisfied from the overpayment, although an intercept under this rule has priority over a credit of the overpayment against future federal tax liabilities. **86** Upon making such an intercept, the IRS must notify the state of the person's name, taxpayer identification number, address, and the amount intercepted. It must also notify the person to whom the overpayment is payable.

Congress added **§ 6402(f)** in 2008 **86.1** to allow the IRS to reduce any overpayment payable to a "named person" by the amount of a "covered unemployment compensation debt" to a state. **86.2** "Covered unemployment compensation debt" is past-due debt for either "erroneous payment of

unemployment compensation due to fraud" or failure to report earnings that has become final under state law (certified by the Secretary of Labor) and is uncollected. 86.3 The debt also includes contributions due to the state unemployment fund, plus interest and penalties on the debt. The state must give notice and consider evidence generally under the same rules as for state income tax obligations. 86.4 The offset has a lower priority than tax liabilities, past-due support, and past-due debt owed to a federal agency. 86.5 If there is more than one unemployment compensation debt or state income tax obligation, any overpayment is applied in the order in which the debts accrued.

A person whose refund is intercepted under § 6402(c) , § 6402(d) , § 6402(e) , or § 6402(f) has no remedy within or against the IRS, but must seek relief from an erroneous interception from the state or federal agency to which the refund is paid. 87 This rule deprives the taxpayer of any right to an administrative hearing in the IRS on the interception and bars all federal courts from restraining or reviewing the interception. Moreover, a suit to recover the intercepted amount is not considered a suit for refund of a tax. 88

1 See Beer v. CIR, 45 TCM (CCH) 401 (1982) , aff'd, 733 F2d 435 (6th Cir. 1984) ( § 7405(b) , providing for suit to recover erroneous refund, does not preclude use of deficiency procedures); Krantz v. CIR, 115 TCM (CCH) 1064 (2018) (IRS may issue notice of deficiency even after accepting return and issuing refund).

Taxpayers entitled to a refund for one year may elect to have the overpayment instead credited against estimated tax for the following year. IRC § 6402(b) . This election is irrevocable and cannot be changed by filing an amended return demanding a refund of the overpayment. IRC § 6513(d) ; Georges v. IRS, 916 F2d 1520 (11th Cir. 1990) . See Blackston v. US, 778 F. Supp. 244 (D. Md. 1991) (when IRS fails to comply with § 6303(a) , requiring that notice of assessment be given to taxpayer within 60 days, it loses "its awesome nonjudicial collection powers," but taxpayer is not entitled to refund of payment of assessment). See generally Jones, Resolving Interest Disputes With the Service: Often a Question of Which Court and When, 93 J. Tax'n 346 (2000).

For statistics on refunds, see Internal Revenue Service Data Book, 2020, at Tables 7, 8.

2 See US v. Ryan, 64 F3d 1516 (11th Cir. 1995) (IRS discretion to credit overpayment to liability for another year is not restricted by voluntary payment rule, which normally allows taxpayer to direct disposition of voluntary payments to IRS); Acker v. US, 519 F. Supp. 178 (ND Ohio 1981) ( § 6402(a) permits but does not require IRS to credit overpayment towards tax liability of another year; if IRS does not do so, taxpayer's only remedy is a timely claim for refund). See also IRC § 6512(b) (credit or refund of overpayment determined by Tax Court).

According to the IRS, § 6402(a) allows it to credit an overpayment against unassessed tax liabilities that the IRS has determined in a notice of deficiency sent to the taxpayer. For example, if a taxpayer files a return claiming a refund of $500 and the IRS, after receiving the return but before acting on the refund claim, sends a notice of deficiency to the taxpayer for a different year for $1,000, the IRS may,

instead of refunding the $500, credit it against the $1,000 asserted deficiency. **Rev. Rul. 2007-51, 2007-37 IRB 573** ; **Reg. § 1.6411-3(d)** . See **Williams v. CIR, 114 TCM (CCH) 325 (2017)** (IRS applied refund from 2013 return against unpaid tax liability from 2011 and later proposed deficiency for 2013; amount applied to 2011 taxes unavailable to offset 2013 deficiency); **Perry v. CIR, 100 TCM (CCH) 321 (2010)** (individual taxpayer's refund from 2007 applied against proposed but unassessed deficiency for 2002). See also Horwitz & Coder, Ensuring Due Process in IRS Credits, 148 Tax Notes 885 (Aug. 24, 2015); Stamper & Young, Debate Rages Over Refund Offset Revenue Ruling, 117 Tax Notes 123 (Oct. 8, 2007) (discussing concerns that IRS exercise of this power might inappropriately harm low-income taxpayers).

**Section 6402(a)** states that the IRS "may credit" an overpayment against any tax liability of the person who made the overpayment and "shall" refund any remainder of overpayment. The Tax Court construes this language to mean that a taxpayer may not compel the IRS to credit an overpayment against a particular liability and that the possibility of a credit for an overpayment is not a defense against IRS efforts to collect a tax liability. **Weber v. CIR, 138 TC 348 (2012)** . But see **Laird v. US, 2019-2 USTC ¶ 50,268 (5th Cir. 2019)** ( **§ 6402(a)** does not allow IRS to offset one person's tax debt with another person's payments). **Section 7811** authorizes the IRS to issue a refund of an overpayment instead of crediting it against other tax liability if the taxpayer is suffering, or about to suffer, a significant hardship. This "offset bypass refund" generally must be issued before the overpayment has been offset, although there is an exception in the case of clerical error. IRM 21.4.6.5.11.1(7) (Nov. 8, 2017); PMTA 2013-13 (June 11, 2013). A taxpayer whose return shows an overpayment may elect to have the overpayment applied against estimated taxes for the following year. **Reg. § 301.6402-3(a)(5)** . This election is not, however, binding on the IRS, which may apply the overpayment against some other tax. **Reg. § 301.6402-3(a)(6)** . See Treasury Inspector General for Tax Administration, Controls Over Offset Bypass Refunds Processed by the Taxpayer Advocate Service Should Be Improved to Reduce the Risk of Abuse and Allow for More Consistent Treatment of Taxpayers (Sept. 9, 2020).

If the IRS applies an overpayment to a particular tax, that tax is deemed paid when the credit is made. **IRC § 7422(d)** . A taxpayer may dispute the appropriateness of the credit by claiming a refund of the tax paid by the credit. **Greene-Thapedi v. US, 549 F3d 530 (7th Cir. 2008)** . See **Recchie v. US, 1 Cl. Ct. 726, 83-1 USTC ¶ 9312 (1983)** (1981 income tax overpayment applied in 1982 to 1975 tax deficiency was 1975 tax paid in 1982 for purposes of statutes of limitations).

If an overpayment and an underpayment are simultaneously outstanding for a substantial period of time, the taxpayer is usually advantaged by a crediting of the overpayment against the underpayment because the interest rate on underpayments is higher than the rate on overpayments. See **Winn-Dixie Stores, Inc. v. CIR, 110 TC 291 (1998)** (where crediting would produce overpayment, Tax Court's overpayment jurisdiction extends to this item); see discussion infra **¶ 118.3.1** .

For misdirected direct deposit refunds, see **§ 6402(n)** and **Reg. § 301.6402-2(g)** . Where a taxpayer made payments on an offer in compromise that had been rejected due to an IRS error, the IRS cannot

refund the payments because there is no "overpayment." Chief Couns. Adv. 202019002. See also Treasury Inspector for Tax Administration, Processes Exist to Assist Taxpayers With Misdirected Refunds, but Additional Controls Could Further Help to Prevent Them (Jan. 13, 2021).

3 See infra ¶ 114.7.2 .

4 IRC § 6511(b)(1) ; Reg. §§ 301.6402-2(a)(1) , 301.6402-2(b)(1) . See RH Donnelley Corp. v. US, 641 F3d 70 (4th Cir. 2011) ("the IRS can recalculate tax liability for a year beyond the statute of limitations in order to determine whether excess tax credits can be carried back to previous years to support a refund"). For the statute of limitations, see infra ¶ 114.7.3 .

5 Reg. § 601.105(e) . See reports from Treasury Inspector General for Tax Administration: Improvements Are Necessary to Ensure That Individual Amended Returns With Claims for Refunds and Abatements of Taxes Are Properly Reviewed (May 17, 2016); Insufficient and Inexperienced Staff Could Reduce the Ability to Detect and Stop Fraudulent Refunds (Jan. 8, 2010).

6 See Wrightsman Petroleum Co. v. US, 35 F. Supp. 86 (Ct. Cl. 1940) (written claim required because of frequent shifts of personnel in government offices and memory lapses; deficiency not remedied by revenue agent's report that oral claim had been made).

7 See IRC § 6402(a) (refund goes to "person who made the overpayment"); Reg. § 301.6402-2(f)(1) ; Delaune's Est. v. US, 143 F3d 995, 1006 (5th Cir. 1998) ("standing is limited to the party or parties who have at least arguably or derivatively made an actual overpayment, such that they have a financial interest in the litigation"); Fink's Est. v. US, 852 F2d 153 (6th Cir. 1988) (two other individuals carried on business in taxpayer's name and paid portion of taxpayer's tax that resulted from including income of business in taxpayer's returns; held, taxpayer is not person who made overpayment); Bruce v. US, 759 F2d 755 (9th Cir. 1985) (taxpayer has no right to refund of tax paid on his behalf by his attorney unless taxpayer is obligated to repay attorney); Thompson v. US, 429 F. Supp. 13 (ED Pa. 1977) (taxpayer entitled to refund of taxes paid with funds seized by government in airport search, although taxpayer was carrying the funds as courier for "Joe," whom taxpayer did not see or hear from after seizure; infra ¶ 118.7 (proper person to sue for refund).

8 See McGraw-Hill, Inc. v. US, 623 F2d 700 (Ct. Cl. 1980) ("fatal category" of volunteers who pay taxes of other persons cannot obtain refunds; on facts, taxpayer not volunteer); Busse v. US, 542 F2d 421 (7th Cir. 1976) (divorced wife not proper party to sue for refund of husband's taxes paid by her to avoid seizure of her property to satisfy transferee liability; extensive analysis of suits by "third parties"); Snodgrass v. US, 834 F2d 537 (5th Cir. 1988) (Busse followed on substantially identical facts); Collins v. US, 532 F2d 1344 (Ct. Cl. 1976) (sole shareholder who paid corporate income taxes cannot sue for refund unless payment was induced by IRS duress). But see Martin v. US, 895

F2d 992, 994 (4th Cir. 1990) (plaintiff had standing to sue for recovery of former husband's taxes where lien for taxes was erroneously filed against property awarded plaintiff in divorce settlement and portions of proceeds of plaintiff's later sale of property were applied in payment of taxes to clear title for buyer; "although the statute is silent as to who can bring the action, implicit in its language is that one against whom the tax was erroneously assessed *or* collected has standing to do so"); Schoenherr v. US, 566 F. Supp. 1365 (ED Wis. 1983) (on facts, plaintiff, receiver for one corporation and owner of another, who paid corporate taxes was entitled to sue for refund; payment was made because plaintiff reasonably believed that he was personally liable and did not intend to benefit corporations); David v. US, 551 F. Supp. 850 (CD Cal. 1982) (allowing refund suit by corporate officer who paid tax liability of corporation in mistaken belief that he was liable as responsible person under § 6672 ); Hodges v. US, 423 F. Supp. 754 (ED La. 1976) , aff'd on another issue, 597 F2d 1014 (5th Cir. 1979) (transferee paying before final assessment of transferee liability is proper party to refund action).

9 US v. Williams, 514 US 527 (1995) .

10 These provisions (1) allow an owner of property subject to a federal tax lien for tax owed by another person to obtain a discharge of the lien by depositing cash or furnishing a bond, (2) require the IRS to refund the deposit or release the bond, to the extent it determines that the tax can be satisfied from other sources or that its interest in the property is less than it had previously determined, and (3) permit the owner to bring an action in district court challenging the IRS's determinations in response to the deposit or bond. IRC §§ 6325(b) , 7426(a)(4) .

11 Rev. Rul. 2005-50, 2005-30 IRB 124 .

12 See St. Joe Title Servs., Inc. v. US, 2001-2 USTC ¶ 50,598 (MD Fla. 2001) (not officially reported) (allowing real estate closing agent refund of excess payment to IRS, which resulted from typographical error understating share of refinancing proceeds going to bank and overstating share to be paid to IRS for homeowner's tax liabilities).

13 EC Term of Years Trust v. US, 550 US 429 (2007) ("a precisely drawn, detailed statute pre-empts more general remedies"). See First Am. Title Ins. Co. v. US, 520 F3d 1051 (9th Cir. 2008) ( § 7426(c) , which precludes review of validity of assessment in § 7426 proceedings, cannot be circumvented by bringing third-party claim under 28 USC § 1346(a)(1); although *EC Term of Years Trust*, Court's holding also applies to claims involving liens).

14 US v. MacPhail, 313 F. Supp. 2d 729, 734 (SD Ohio 2004) , aff'd by unpublished opinion, 2005-2 USTC ¶ 50,564 (6th Cir. 2005) . See US v. Elam, 112 F3d 1036 (9th Cir. 1997) (although prenuptial agreement is not binding on IRS, it may be relevant to determining spouse's ownership

interest in overpayment); **Gens v. US, 673 F2d 366 (Ct. Cl. 1982)** (interest in overpayment not established by showing contribution to joint taxable income; must contribute to overpayment of tax); **Rev. Rul. 87-52, 1987-1 CB 347** (allocation of earned income credit in determining spouses' shares of overpayment); **Rev. Rul. 86-57, 1986-1 CB 362** (divorced taxpayers' rights to overpayment resulting from carryback of one spouse's separate net operating loss to joint return year); **Rev. Rul. 85-70, 1985-1 CB 361** (credit of overpayment on joint return against separate liability of spouses residing in community property state); **Rev. Rul. 80-8, 1980-1 CB 296** (credit or refund of overpayment on joint return when claim is filed by one spouse after divorce); **Rev. Rul. 80-7, 1980-1 CB 298** (credit of overpayment of tax on joint return against spouse's separate tax liability for prior year); **Rev. Rul. 80-6, 1980-1 CB 295** (determining spouse's refund if net operating loss is carried from separate-return year to joint-return year); **Rev. Rul. 74-611, 1974-2 CB 399** (overpayment on joint return, resulting from wife's payment, cannot be credited against husband's liability on separate return filed for prior year). See infra **¶ 114.7.5** for injured spouse relief.

**15** See **Kokoszka v. Belford, 417 US 642 (1974)** (right to wage-based tax refund, attributable to withheld taxes, passed to taxpayer's trustee in bankruptcy); **Segal v. Rochelle, 382 US 375 (1966)** (refund claim based on loss carryback passed to trustee in bankruptcy); **In re Searles, 445 F. Supp. 749 (D. Conn. 1978)** (contra as to refund based on earned income credit because it is subsidy to low-income taxpayers). See also **US v. Norton, 717 F2d 767 (3d Cir. 1983)** (IRS may not credit overpayment of debtor in bankruptcy proceeding against tax owing for earlier taxable year because credit would be setoff prohibited by automatic stay provisions of **§ 362** of Bankruptcy Code). See also **Capital Bancshares, Inc. v. Federal Deposit Ins. Corp., 957 F2d 203 (5th Cir. 1992)** (refund of tax paid by affiliated group of corporations resulting from carryback of losses of failed bank subsidiary belonged to subsidiary, not to parent; although agreement among corporations on allocation of refund would be binding, they made no such agreement).

**16** 31 USC § 3727; **Knight v. US, 596 F. Supp. 540 (MD Ga. 1984)** , aff'd without opinion, 762 F2d 1022 (11th Cir. 1985) (not officially reported) (31 USC § 3727, "unambiguously excuses the United States from purported private assignments of income tax refunds prior to submission of the tax return"; IRS agents cannot bind government by waiver of this provision); **Rev. Rul. 86-55, 1986-1 CB 373** (assignment of refund to preparer "not valid against the United States"; if IRS "determines that the address shown on the return is not the taxpayer's address, any refund checks may be mailed directly to the taxpayer and not to the preparer"). See also **US v. Murph, 707 F2d 895 (6th Cir. 1983)** (defendant took false return to "tax return discounter," who paid defendant 50 percent of amount of refund shown as due and filed return with instructions that refund be sent to discounter; held, defendant properly convicted under 18 USC § 287 of willfully causing presentation of fraudulent claim). But see **Rev. Rul. 54-17, 1954-1 CB 160** (transfer of claim by operation of law from merged to successor corporation).

**17 IRC § 6532(b)** . See **US v. Wurts, 303 US 414 (1938)** (refund is "made" when taxpayer receives

check, not when check is cashed); US v. Carter, 906 F2d 1375 (9th Cir. 1990) (same); US v. Bruce, 642 F. Supp. 120 (SD Tex. 1986) (same). See Schuster v. CIR, 121 AFTR2d 1228 (11th Cir. 2018) (not officially reported) (where credit applied in error to taxpayer's tax due and taxpayer applied credit to payments in subsequent years, not subject to § 7405 ; erroneous credit is not erroneous refund); Blizerian v. US, 86 F3d 1067 (11th Cir. 1996) (acq.) (where IRS sued under § 7405 to recover erroneous refund, it could not file valid lien against taxpayer until judgment in suit because payment extinguished original assessment); O'Gilvie v. US, 519 US 79 (1996) (for this purpose, refund is "made" when received by taxpayer, not when mailed by IRS). See also US v. Northern Trust Co., 372 F3d 886, 889-890 (7th Cir. 2004) ("One way to understand § 6532(b) as a whole might be that, when the return discloses enough that all the IRS has to do is check the calculations and apply the law, then the period of limitations is two years; but if the IRS must independently discover facts that contradict the return, then it has an extra three years to do the legwork"); Lane v. US, 286 F3d 723, 731, 732 (4th Cir. 2002) ("misrepresentation" need not be intentional or knowing; since "fraud requires an intentional or knowing misrepresentation . . . , to construe the word 'misrepresentation' as limited to intentional or knowing misrepresentations would render that statutory term superfluous"; representations in refund claim were "grossly negligent at best and almost certainly reckless"); Starr Int'l Co., Inc. v. US, 121 AFTR2d 620 (DCDC 2018) (claim of government filed four years after erroneous refund paid was untimely; court found no taxpayer misrepresentations in claiming it was due a refund of $21 million, not informing U.S. competent authority of refund claim, or failing to advise IRS it did not have jurisdiction to overturn competent authority determination); Black Prince Distillery, Inc. v. US, 586 F. Supp. 1169, 1174 (DNJ 1984) (" section 6532(b) does not require willfulness"; suggesting that the five-year limitations period could be triggered "by a grossly negligent misrepresentation"); Merlin v. Sanders, 144 F. Supp. 541, 543 (ND Ga. 1956) , aff'd, 243 F2d 821 (5th Cir. 1957) ("wilful misrepresentation is not required"). But see US v. Northern Trust Co., 93 F. Supp. 2d 903 (ND Ill. 2000) (requiring misrepresentation to be intentional or knowing). See also Camp, The Mysteries of Erroneous Refunds, 114 Tax Notes 231 (Jan. 15, 2007). Even if the IRS erroneously denies a refund claim as untimely, payment of the refund after the period for filing a refund suit has expired is an erroneous refund and thus cannot be paid. Chief Couns. Adv. 202125017.

18 See, e.g., Black Prince Distillery, Inc. v. US, 586 F. Supp. 1169 (DNJ 1984) . See Purcella v. US, 92-1 USTC ¶ 50,083 (D. Colo. 1992) (six-year limitations period provided by § 6502(a) for suit to collect assessed tax does not apply to suit to recover erroneous refund unless timely assessment of tax was made after it was erroneously refunded).

19 Reg. § 301.6402-3 ; Reg. § 601.105(e) . See Rev. Rul. 65-34, 1965-1 CB 86 (return showing current overpayment viewed as refund claim); Rev. Rul. 57-601, 1957-2 CB 614 (same for amended returns). For returns filed by agents and fiduciaries, see Reg. § 301.6402-2(e) ; Rev. Proc. 2010-27, 2010-31 IRB 183 , modified by Announcement 2011-7, 2011-21 IRB 874 (procedures for refund claims filed by bankruptcy trustees and debtors in possession). When used as refund claims,

amended tax returns are obviously not subject to the holding in Koch v. Alexander, 561 F2d 1115 (4th Cir. 1977) , that the acceptance of amended returns is discretionary with the IRS. See generally Brennan, The Uncertain Status of Amended Tax Returns: Their Varying Impact on Tax Deficiencies, Tax Elections, and the Statute of Limitations on Civil Tax Fraud, 7 Rev. Tax'n Individuals 235 (1983). See Levitsky v. US, 27 Fed. Cl. 235, 93-1 USTC ¶ 50,011 (1992) (amended return was claim for refund).

Until 1976, the IRS provided Form 843, Claim for Refund and Request for Abatement, which could be used as an alternative to an original or amended return to make refund claims. Form 843 is now reserved for claims for refunds of estate, gift, and other non-income taxes. Reg. § 301.6402-2(c) . Claims for refund are generally required to be filed with the IRS Service Center at which the taxpayer would be currently required to file a tax return of the type of tax to which the claim relates, regardless of where the taxpayer paid the tax or filed the return, or "via the appropriate electronic portal." Reg. § 301.6402-2(a)(2) . If, however, a taxpayer is required to file a particular form, filing must be as required for that form, and if a taxpayer files a claim "in response to an IRS notice or correspondence," the claim must be filed in accordance with instructions therein. A separate claim must be made for each "return for each taxable period." Reg. § 301.6204-2(d). See Cash v. US, 121 AFTR2d 711 (3d Cir. 2018) (not officially reported), vacating and remanding 2017-2 USTC ¶ 50,156 (MD Pa. 2017) (taxpayers filed Form 843 for refund of shared responsibility payment (SRP) for failure to maintain health insurance coverage; held: Form 843 is appropriate form even though mechanism to collect is through Form 1040).

20 See Linton v. US, 123 AFTR2d 787 (10th Cir. 2019) (written response to IRS notice of failure to file tax return is not a refund claim); Goulding v. US, 929 F2d 329 (7th Cir. 1991) (refund claim seemingly complaining only of lack of valid notice of deficiency was sufficient to put merits of assessment before court in refund suit because IRS was aware from prior partnership audits and litigation with taxpayer's son of issues involved and waived issue of sufficiency of refund claim by not raising it in denial of refund claim or in refund suit until two years after claim filed); Hale's Est. v. US, 876 F2d 1258 (6th Cir. 1989) (where gift tax liability depended on litigation over whether donor ever owned property purportedly transferred by gift, informal claim for refund made by (1) request for extension of time for payment of gift tax until litigation resolved, which IRS denied, and (2) Tax Court petition in related estate tax case turning on same issue); Furst v. US, 678 F2d 147 (Ct. Cl. 1982) (amended return, formally for one year, referred also to two subsequent years; held, adequate "informal claim" with respect to latter two years; government interpleader in related case showed that IRS was informed and thought that taxpayer had made claims for all three years); Appelbaum v. US, 122 AFTR2d 5369 (WDNC 2018) (claim for refund made in counterclaim that was dismissed for lack of jurisdiction sufficient to constitute informal claim); Silipigno v. US, 120 AFTR2d 5161 (NDNY 2017) , aff'd, 123 AFTR2d 583 (2d Cir. 2019) (application for tentative refund on Form 1045 not an informal claim); Kearney v. A'Hearn, 210 F. Supp. 10 (SDNY 1961) , aff'd per curiam, 309 F2d 487 (2d Cir. 1962) (letter); Chief Couns. Adv. 201921013 (IRS Forms 4549 and 982 were informal claims for refund). See also Combs v. US, 490 F. Supp. 19 (ED Ky. 1979) (not officially reported), aff'd, 655 F2d

90 (6th Cir. 1981) (amendment to complaint in refund action, claiming benefit of income averaging, allowed). See generally Neilson, Informal Claims for Refund-A Winding Road, 26 Akron Tax J. 147 (2011). See also IRM 4.90.7.1(4) (May 9, 2013) ("[c]laims for refunds can be either formal or informal").

See Kaffenberger v. US, 314 F3d 944, 956 (8th Cir. 2003) (acq. on this issue) (affirming jury verdict "apparently" finding that claim for refund was made by direction on return that "prior credit" in amount equal to claimed refund be applied against tax liability for later year; "In these unique factual circumstances, we cannot say that any error by the district court in entering judgment based on the jury's special verdict was obvious"); Johnson v. US, 2015-2 USTC ¶ 50,372 (WD Wash. 2015) (protest letters to IRS from taxpayers' representatives regarding flow-through loss adjustments from S corporation were sufficient for fair notice); Wu v. US, 2015-1 USTC ¶ 50,336 (ND Ill. 2015) (although "protective claim" is "not provided for in Internal Revenue Code," informal claims are; letter requesting waiver of penalties was not informal claim but letter setting forth in detail request for refund of penalties was).

21 US v. Kales, 314 US 186, 194 (1941) (letter stating that taxpayer "will claim the right to a refund" in specified circumstances tolled statute of limitations and could be amended by filing formal claim after lapse of normal statutory period).

22 O'Brien v. US, 766 F2d 1038, 1041 n.3 (7th Cir. 1985) . See US v. Commercial Nat'l Bank, 874 F2d 1165, 1171 (7th Cir. 1989) (informal claim may not be wholly oral and must have a "written component"); England v. US, 90-2 USTC ¶ 50,590 (D. Kan. 1990) ("the written component of a valid informal refund claim must give the IRS adequate notice that a refund of the tax is sought for certain years and the basis of the claim").

The O'Brien and Commercial National Bank cases involved refund claims that depended on the resolution of an interconnected dispute between the IRS and another taxpayer. The latter case, for example, involved an estate beneficiary's liability for tax on gain on the disposition of property whose basis depended on the value of the property for estate tax purposes, a matter that was not resolved until the statute of limitations on the beneficiary's claim had expired. Although the beneficiary was found to have made a sufficient informal claim for refund, the court warned:

[T]axpayers faced with similar situations [should] file conditional or protective claims or requests for an extension of time if the nature or amount of their refund likely will remain unsettled until after the limitations period has expired. A decision to rely upon a "general notice" or "informal refund claim" to toll the statute of limitations may prove unwise unless the case involves extremely special facts and circumstances such as are involved here.

US v. Commercial Nat'l Bank, 874 F2d 1165, 1176 (7th Cir. 1989) . See Vintilla v. US, 931 F2d 1444 (11th Cir. 1991) (refund claim must have written component; discussions with IRS not

sufficient).

**23** **Sumrall v. CIR, 83 TCM (CCH) 1405, 1409 (2002)** . See **UKP Holdings, Inc. v. US, 2018-1 USTC ¶ 50,207 (EDNY 2018)** (correspondence and Form 1139 not informal claim where taxpayer never advised IRS that it was seeking refund for a particular year); **Wilshire's Est. v. US, 2008-2 USTC ¶ 60,569 (SD Ohio 2008)** (holding that "repeated oral and written communications" between executor and IRS were valid informal claim; "An informal claim exists where the facts and circumstances demonstrate the IRS was on notice the taxpayer was asserting a right with respect to an overpayment of tax").

**24** See **Beckwith Realty, Inc. v. US, 896 F2d 860, 864 (4th Cir. 1990)** (amended return in which taxpayer stated it did not agree with revenue agent's report asserting accumulated earnings tax; not sufficient because it "did not contain all the facts necessary for a consideration of the merits of the dispute"); **D'Amelio v. US, 679 F2d 313 (3d Cir. 1982)** (letter requesting accounting was not claim for refund but at most notice that claim for refund might someday be filed); **Tobin v. Tomlinson, 310 F2d 648 (5th Cir. 1962)** (letter); **Disabled Am. Veterans v. US, 650 F2d 1178 (Ct. Cl. 1981)** , aff'd, **704 F2d 1570 (Fed. Cir. 1983)** (oral claim); **Rosengarten v. US, 181 F. Supp. 275 (Ct. Cl. 1960)** (formal claim for prior year and claim by taxpayer's partner); **Lincoln Cotton Mill Co. v. US, 53 F. Supp. 309 (Ct. Cl. 1944)** (notation on return "paid under protest and refund demanded"); **Wrightsman Petroleum Co. v. US, 35 F. Supp. 86 (Ct. Cl. 1940)** (oral claim); **Benenson v. US, 257 F. Supp. 101 (SDNY 1966)** , aff'd without discussion of this issue, **385 F2d 26 (2d Cir. 1967)** (execution of waiver of restrictions on assessment and statement to revenue agent reserving right to claim refund). See **BCS Fin. Corp. v. US, 118 F3d 522 (7th Cir. 1997)** ("One office of the judge-made informal-claim doctrine is to . . . excus[e] harmless noncompliance with the formalities prescribed for refund claims by the Treasury regulation"); **Miller v. US, 949 F2d 708 (4th Cir. 1991)** (in order for there to be effective informal refund claim, "the taxpayer must have presented some type of written notice to the IRS [and] the notice must have been sufficient to apprise the IRS that a tax refund is sought and to focus attention on the merits of the dispute"; "it is insufficient . . . that the IRS possessed information from which it could deduce that the taxpayer is entitled to or desires a refund"); **New Eng. Elec. Sys. v. US, 32 Fed. Cl. 636, 95-1 USTC ¶ 50,069 (1995)** (informal claim must include something in writing, but writing need not include all elements necessary for effective informal claim). See also **Simmons v. US, 29 Fed. Cl. 136, 94-1 USTC ¶ 50,106 (1993)** (although return usually qualifies as refund claim, return prepared by IRS for nonfiling taxpayer is not formal or informal refund claim).

**25** **Reg. § 301.6402-2(b)(1)** . The IRS cannot refund on "equitable grounds." **Reg. § 301.6402-2(b)(2)** . See **Borgeson v. US, 84-2 USTC ¶ 9573 (D. Colo. 1984)** (not officially reported), aff'd, **757 F2d 1071 (10th Cir. 1985)** (Form 1040 with stricken jurat is not valid claim for refund because it is not made under penalties for perjury); **Boyd v. US, 762 F2d 1369 (9th Cir. 1985)** (claim based on deductibility of gambling losses not sufficient to raise deductibility of tips and other

expenses); **Clark v. US, 149 Fed. Cl. 409, 2020-2 USTC ¶ 50,156 (2020)** (refund action dismissed because amended return not signed by taxpayer); **Dixon v. US, 147 Fed. Cl. 469, 2020 USTC ¶ 50,122 (2020)** (return not duly filed where return preparer signed amended return but no power of attorney accompanied return); **Kiselis v. US, 131 Fed. Cl. 54, 119 AFTR2d 1181 (2017)** (taxpayer did not report amounts reported by third parties on Forms 1099; return was not valid refund claim since taxpayer "failed to exhibit an honest and reasonable intent to provide the requisite information").

**26 Reg. § 301.6402-2(b)(1)** . See generally Wilson, The Variance Doctrine: No Forks in the Road to Refunds, 55 Tax Law. 605 (2002). See also Elite Oil Field Enters., Inc. v. US, 127 AFTR2d 2314 (D. Colo. 2021) (substantial-variance rule prohibited taxpayer from taking net operating loss carryback based on law passed after it appealed IRS's determination).

**27 IRC § 6511(b)(1)** .

**28** See, e.g., **Angelus Milling Co. v. CIR, 325 US 293 (1945)** (refund suit dismissed because refund claim was defective in form); **US v. Felt & Tarrant Mfg. Co., 283 US 269 (1931)** (claim filed "to protect all possible legal rights of the taxpayer" insufficient); **Belt Ry. Co. v. US, 567 F2d 717, 719 (7th Cir. 1977)** (claim stated that tax was incorrectly computed, "including but not limited to applying" provision relating to taxation of terminal railroad corporations; held, insufficient; IRS "is not required to be able to divine" what taxpayer claims; alternative holding); **Sanders v. US, 564 F. Supp. 70 (MD Ala. 1983)** , aff'd, **740 F2d 886 (11th Cir. 1984)** (factual allegations in refund claim insufficient to support claim for refund under **§ 1237** ; mere mention of Code section insufficient); **Fearis v. CIR, 548 F. Supp. 408 (ND Tex. 1982)** (taxpayer paid deficiency determined on audit and filed amended return, reducing income from amount "originally reported or adjusted" and noting that IRS erred on audit in increasing income; held, amended return, viewed as claim for refund, was too vague to put IRS on notice of issues to be investigated).

**29 US v. Andrews, 302 US 517, 524 (1938)** .

**30** See generally **US v. Kales, 314 US 186 (1941)** (contingent and alternative grounds); **US v. Pierotti, 154 F2d 758 (9th Cir. 1946)** (alternative grounds supplied by timely amendment). Compare **Sun Chem. Corp. v. US, 78-2 USTC ¶ 9790 (Ct. Cl. 1978)** (not officially reported), aff'd, **698 F2d 1203 (Fed. Cir. 1983)** (protective claim for refund based on erroneous inclusion of item in gross income in earlier year was conditioned on disallowance of deduction of item in later year; since deduction was not disallowed, claim for refund was insufficient to support refund suit).

**31 US v. Andrews, 302 US 517, 524 (1938)** . For a review of later cases in this area, see **Union Pac. RR v. US, 389 F2d 437 (Ct. Cl. 1968)** .

**32 US v. Henry Prentiss & Co., 288 US 73, 84 (1933)** . See Harper v. US, 127 AFTR2d 1027 (9th Cir. 2021) (IRS waived specificity requirement where it had targeted investigation and made final determination demonstrating it understood taxpayer's claims); **Deluxe Check Printers, Inc. v. US, 15 Cl. Ct. 175, 88-2 USTC ¶ 9426 (1988)** , aff'd and rev'd on other issues, **885 F2d 848 (Fed. Cir. 1989)** (claim for refund of tax, with no mention of interest, was sufficient to raise taxpayer's claim that tax, even if due, was penalty not bearing interest); **Payne v. US, 500 F. Supp. 571 (D. Colo. 1980)** (claim for refund of penalty under **§ 6672** for willful failure by "responsible person" to see that withheld tax is remitted to IRS; held, because claim alleged only lack of willfulness, later claim that taxpayer was not responsible person could not be raised); **Sturdivant v. US, 80-1 USTC ¶ 9422 (DVI 1980)** (not officially reported) (refund claim based on right to foreign tax credit did not include claim of exemption based on Puerto Rico residence).

**33 US v. Memphis Cotton Oil Co., 288 US 62 (1933)** ; **Tobin v. Tomlinson, 310 F2d 648 (5th Cir. 1962)** (alternative ground).

**34** See **US v. Clintwood Elkhorn Mining Co., 553 US 1, 7, 13 (2008)** ( **§ 6511(a)** applies to taxes levied in violation of export clause of Constitution, even if "there are 'no circumstances' under which the tax imposed could be held valid"); **Computervision Corp. v. US, 445 F3d 1355 (Fed. Cir. 2005)** (statute of limitations on refund claims); **Wachovia Bank v. US, 455 F3d 1261, 1262 (11th Cir. 2006)** ( **§ 6511(a)** applies to refund claims made by persons who "mistakenly filed a return and paid tax when they were not actually required to file a tax return"; trust, which qualified as charitable remainder trust but filed returns as taxable entity, barred by **§ 6511(a)** from obtaining refund of taxes erroneously paid with returns); **Little People's Sch., Inc. v. US, 842 F2d 570 (1st Cir. 1988)** (same for exempt school that filed and paid taxes as taxable entity). See also **US v. Clintwood Elkhorn Mining Co., 553 US 1 (2008)** (rejecting contention that six-year limitations period under Tucker Act applies to tax refund suit); Gustafson, An "Outside Limit" for Refund Suits: The Case Against the Tax Exception to the Six-Year Bar on Claims Against the Government, 90 Or. L. Rev. 191 (2011).

**35 IRC § 6513(a)** ; **Reg. § 301.6513-1** . The three-year limitations period applies whether or not a return is timely. See **Omohundro v. US, 300 F3d 1065, 1069 (9th Cir. 2002)** ("a taxpayer's claim for credit or a refund is timely if it is filed within three years from the date his income tax return is filed, regardless of when the return is filed"); **Weisbart v. US, 222 F3d 93, 95 (2d Cir. 2000)** ("a central aim of **section 6511(a)** is not to bar stale refund claims, but to ensure that a taxpayer gives the IRS notice of such claims before suing in federal court," which policy does not require limiting rule to timely filed returns); **Webb v. US, 66 F3d 691, 700 (4th Cir. 1995)** ; **Richards v. CIR, 37 F3d 587, 589 (10th Cir. 1994)** ; **Tedokon v. CIR, 84 TCM (CCH) 657 (2002)** ; **Rev. Rul. 76-511, 1976-2 CB 428** . See generally Lederman, Delinquent Returns and Credit-Elect Overpayments: A Procedural Tangle, 104 Tax Notes 831 (Aug. 23, 2004).

If the last day for filing a return or performing any other act is a Saturday, Sunday, or legal holiday, the

act is timely if performed on the next day that is not a Saturday, Sunday, or legal holiday. **IRC § 7503** . However, with respect to a return filed before the due date, the three-year period under **§ 6513(a)** begins on the actual due date (e.g., April 15), even if that day is Saturday, Sunday, or legal holiday, not the next day that is not Saturday, Sunday, or legal holiday. For example, if April 15, year 2, is a Saturday but *T* filed her year 1 return on March 1, year 2, the three-year period for the year return expires on April 15, year 5, even though the return would have been timely if filed on Monday, April 17, year 2. On the other hand, if *T* had filed her year 1 return on April 16 or April 17, the three-year period would have run from the day of filing. **Rev. Rul. 2003-41, 2003-17 IRB 814** . An extension of time under **§ 7503** applies only when the taxpayer actually files a return on the succeeding day that is not a Saturday, Sunday, or holiday. **Rev. Rul. 2003-41** , supra; Khafra v. IRS, 122 AFTR2d 6610 (D. Md. 2018) .

36 **Kaltreider Constr., Inc. v. US, 303 F2d 366 (3d Cir. 1962)** . However, in **Greene v. US, 191 F3d 1341 (Fed. Cir. 1999)** , the court held that an amended return started a new three-year period with respect to tax paid on the amended return where this tax resulted from events occurring after the close of the taxable year. The taxpayer in *Greene* filed an amended return to comply with a rule requiring a life insurance company to include its "policyholders surplus account" in income for a particular year if it failed to qualify as a life insurance company for either of the succeeding two years. "In this case, where the events giving rise to the tax necessarily took place after the taxable year, the return that starts the running of the statute is the return in which the taxpayer is required to or does report the income." 191 F3d at 1343. If a superseding return is filed, the period runs from the filing of the original return. **Chief Couns. Adv. 202026002** .

37 See **Zeier's Est. v. US, 80 F3d 1360 (9th Cir. 1996)** (estate tax return based on estimated values and with no schedules was "return" for purposes of **§ 6511(a)** because it stated enough for IRS to compute tax); **Healer v. CIR, 115 TC 316 (2000)** (substitute return filed by IRS under **§ 6020(b)** , discussed supra ¶ **111.1.10** , is not "return" for this purpose); **Galuska v. CIR, 98 TC 661, 670 (1992)** , aff'd on another issue, **5 F3d 195 (7th Cir. 1993)** (requests for extension of time to file are not returns for this purpose, even if tax payment is included with extension request, because request forms "do not contain sufficient data with which to calculate petitioner's tax liability"). See also **CIR v. Lundy, 516 US 235 (1996)** (two-year limitation applied where taxpayer filed return after IRS sent notice of deficiency), discussed infra ¶ **118.2.3** ; **Kuznitsky v. US, 17 F3d 1029 (7th Cir. 1994)** (claim for refund of penalty imposed by **§ 6672** (infra ¶ **117.8** ) on responsible person for failure to pay over withholding taxes must be made within two years of payment because there is no return for penalty; employer's return not relevant for responsible person).

38 See supra ¶ **114.7.2** . See also **Mutual Assurance, Inc. v. US, 56 F3d 1353 (11th Cir. 1995)** (timely claim can be amended after statute has run, even if IRS paid original claim before taxpayer filed amendment).

**39** Kearney v. A'Hearn, 210 F. Supp. 10 (SDNY 1961) , aff'd per curiam, **309 F2d 487 (2d Cir. 1962)** . See **Brady v. CIR, 136 TC 422 (2011)** (limitations period not extended by administrative reconsideration of denial of refund claim or by erroneous statement in IRS letter denying refund after reconsideration that taxpayer had two years from date of letter to bring suit); **Hollie v. CIR, 73 TC 1198 (1980)** (time not extended by IRS procedural errors); Chief Couns. Adv. 201719026 (IRS prohibited from crediting or refunding overpayment from one year to penalty or tax in different year in offshore voluntary disclosure program unless timely claim for refund filed).

**40** For **§ 7405** , see supra ¶ **114.7.1** .

**41** The timely mailed, timely filed rule of **§ 7502(a)** applies in determining when a refund claim is filed. **Reg. § 301.7502-1(e)(2)** . See Reg. § 301.7502-1(e)(3) Ex. See supra ¶ **110.7.2** .

Normally, the timely mailed, timely filed rule only applies if "the postmark date falls within the prescribed period or on or before the prescribed date." **IRC § 7502(a)(2)(A)** . However, under regulations adopted in 2001, the rule applies to a refund claim made by a return mailed after its due date if the postmark date is within three years (plus the period of any extensions of the filing date) after the date the tax was paid or deemed to have been paid (normally, the original filing date), and when this rule applies, the late return is also deemed filed on the postmark date. **Reg. § 301.7502-1(f)** . For example, if a taxpayer mails his or her return for 2001 to the IRS on April 15, 2005, and, by the return, claims a refund of taxes withheld from wages, the return is deemed filed on the postmark date, even if it is actually received on April 18, 2005, because the postmark date is within three years after the withholding taxes are deemed to have been paid (April 15, 2002). **Reg. § 301.7502-1(f)(3)** Ex. See Jones, IRS Reverses Its Position on Late Returns and Refund Claims: The Mailbox Rule Will Apply, 94 J. Tax'n 81 (2001).

**42** See **Allstate Ins. Co. v. US, 550 F2d 629 (Ct. Cl. 1977)** (method of marshaling taxes and claims when two-year and three-year periods apply to different refund claims).

**43** For various situations raising the issue of when a tax is "paid," see **Moran v. US, 63 F3d 663 (7th Cir. 1995)** (amount paid during pendency of Tax Court proceeding, and designated as payment of tax at issue in proceeding, was tax payment, not deposit); **Sly v. US, 836 F2d 1310 (11th Cir. 1988)** (where IRS seizes taxpayer's property, payment occurs when property is sold pursuant to seizure); **Nesmith v. CIR, 42 TCM (CCH) 1269 (1981)** , rev'd on other grounds, **699 F2d 712 (5th Cir. 1983)** (tax remitted with amended return and held as cash bond was "paid" when assessed). See also **Republic Petroleum Corp. v. US, 613 F2d 518 (5th Cir. 1980)** (claims for several years cannot be amalgamated in determining when taxes were paid).

**44** **Rosenman v. US, 323 US 658 (1945)** .

45 US v. Dubuque Packing Co., 233 F2d 453 (8th Cir. 1956) ; Thomas v. Mercantile Nat'l Bank, 204 F2d 943 (5th Cir. 1953) . See Blatt v. US, 34 F3d 252, 255 (4th Cir. 1994) ("the essence of the distinction between a deposit and a payment of taxes is [that] the former . . . is *paid to be held in escrow* and . . . the latter is *paid to discharge an existing obligation*").

46 Essex v. Vinal, 499 F2d 226 (8th Cir. 1974) .

47 Moran v. US, 63 F3d 663 (7th Cir. 1995) ; Blatt v. US, 34 F3d 252 (4th Cir. 1994) ; Cohen v. US, 995 F2d 205 (Fed. Cir. 1993) ; Ford v. US, 618 F2d 357 (5th Cir. 1980) . See Ewing v. US, 914 F2d 499 (4th Cir. 1990) (taxpayer signed forms conceding IRS claim for additional tax and paid amount claimed, but IRS failed to assess additional tax before expiration of statute of limitations on assessment; held, payment was tax and thus was not recoverable more than two years after payment made).

48 Ertman v. US, 165 F3d 204 (2d Cir. 1999) ; Ott v. US, 141 F3d 1306 (9th Cir. 1998) ; Gabelman v. CIR, 86 F3d 609 (6th Cir. 1996) ; Weigand v. US, 760 F2d 1072 (10th Cir. 1985) .

The Tax Court held that where such a payment was not based on a good faith and reasonable estimate of tax liability, the extension was not valid, and the payment was a deposit, not a payment of tax, until the IRS applied it in payment of some tax. Risman v. CIR, 100 TC 191 (1993) (nonacq.). See also Deaton v. CIR, 89 TCM (CCH) 643 (2005) , aff'd, 440 F3d 223 (5th Cir. 2006) (declining to review *Risman* because, based on facts and circumstances, taxpayer's remittance was payment, not deposit).

49 Baral v. US, 528 US 431 (2000) . See Jones, The Supreme Court Clarifies the Role of Assessments in Tax Controversies, 92 J. Tax'n 275 (2000).

50 For a variation on the example, see Rev. Rul. 76-511, 1976-2 CB 428 .

51 Baral v. US, 528 US 431, 438-439 (2000) . However, the Court noted, "We need not address the proper treatment under § 6511 of remittances that, unlike withholding and estimated income tax, are not governed by a 'deemed paid' provision akin to § 6513(b) ." Id. at 439 n.2.

52 US v. Brockamp, 519 US 347 (1997) . See RHI Holdings, Inc. v. US, 142 F3d 1459 (Fed. Cir. 1998) (under *Brockamp*, no equitable tolling of two-year period under § 6532(a) for bringing refund suit after administrative denial of claim). See also Camp, New Thinking About Jurisdictional Time Periods in the Tax Code, 73 Tax Law. 1 (2019); Camp, Equitable Principles and Jurisdictional Time Periods, 156 Tax Notes 1397 (Sept. 11, 2017), 159 Tax Notes 1581 (June 11, 2018); Greenhouse,

Roberson & Vouri, Equitable Tolling and Tax Refund Suits, 148 Tax Notes 767 (Aug. 17, 2015). See supra ¶ 113.12 for equitable tolling of statute of limitations for wrongful levy under § 6532(c) ).

The Supreme Court had earlier held in another context that statutes of limitations on suits against the government are presumed to be subject to equitable tolling. Irwin v. Dep't of Veterans Affairs, 498 US 89, 94-96 (1990) . However, the *Brockamp* Court found persuasive reasons for believing that Congress did not intend to allow equitable tolling in the tax refund situation:

> Section 6511 's detail, its technical language, the iteration of the limitations in both procedural and substantive forms, and the explicit listing of exceptions, taken together indicate to us that Congress did not intend courts to read other unmentioned, open-ended, "equitable" exceptions into the statute. . . . Tax law, after all, is not normally characterized by case-specific exceptions reflecting individualized equities. . . . To read an "equitable tolling" exception into § 6511 could create serious administrative problems by forcing the IRS to respond to, and perhaps litigate, large numbers of late claims, accompanied by requests for "equitable tolling" which, upon close inspection, might turn out to lack sufficient equitable justification.

US v. Brockamp, 519 US 347, 352 (1997) .

Since *Brockamp*, the Supreme Court has held that *Irwin*'s presumption does not apply to "deadlines that are 'jurisdictional'" and Congress must provide a "clear statement" before a filing deadline is considered jurisdictional. Sebelius v. Auburn Reg'l Med. Ctr., 568 US 145 (2013) .

53 Section 6511(h) applies to any claim for credit or refund that was not barred by a statute of limitations, the doctrine of res judicata, or any other "rule of law" on July 21, 1998. Pub. L. No. 105-206, § 3202, 112 Stat. 685 (1998) . The period of suspension may have begun or occurred wholly before July 22, 1998. See generally McGovern, The New Provision for Tolling the Limitations Periods for Seeking Tax Refunds: Its History, Operation and Policy, and Suggestions for Reform, 65 Mo. L. Rev. 797 (2000). See also McAllister v. US, 125 Fed. Cl. 167, 2016-1 USTC ¶ 50,193 (2016) ( § 6511(h) applies only to §§ 6511(a) , 6511(b) , and 6511(c) , and not to § 172(b)(1)(H) (before repeal in 2014)); Carter v. US, 124 AFTR2d 5467 (ND Ala. 2019) (estates are not "individuals" that can use § 6511(h) ).

54 IRC § 6511(h)(2)(A) . An individual is not treated as financially disabled during the period that any person is authorized to act on behalf of the individual in financial matters. IRC § 6511(h)(2)(B) . See Stauffer v. IRS, 939 F3d 1 (1st Cir. 2019) (limitations period is not tolled during period taxpayer's son had durable power of attorney).

See also Brosi v. CIR, 120 TC 5 (2003) ("the physical or mental impairment must be that of the taxpayer, not of some third person"; taxpayer's "care-giving responsibilities . . . to his mother and his contemporaneous employment as an airline pilot" did not toll statute); Perkins v. CIR, 95 TCM (CCH)

1396 (2008) ("whether petitioner was financially disabled on the date the return was due, and whether petitioner's spouse could have filed a timely return," are not relevant to the application of **§ 6511(h)** ).

55 The IRS requires a physician's written statement of a "medical opinion" on the issue of disability. **Rev. Proc. 99-21, 1999-1 CB 960** . See **Stauffer v. IRS, 285 F. Supp. 3d 474 (D. Mass. 2017)** (even though psychologist not included within definition of "physician" in **Rev. Proc. 99-21** , court held IRS failed to establish that definition was product of reasoned decision-making as required by Administrative Procedure Act); **Kirsch's Est. v. US, 2017-2 USTC ¶ 50,319 (WDNY 2017)** (where no specific time period of impairment stated, procedure requirements not met); Milton v. US, 2017-2 USTC ¶ 50,279 (WD Wash. 2017) (designation of MA, LMHC, and MAC did not qualify as "physician").

56 HR Rep. No. 599, 105th Cong., 2d Sess. 74 (Conf. Rep. 1998). The IRS requires a written statement by the person filing the refund claim that no person, including the taxpayer's spouse, was authorized to act for the taxpayer during the period of disability. **Rev. Proc. 99-21, 1999-1 CB 960** .

57 IRC **§ 6511(c)** . The refund or credit allowable under this rule is restricted to the amount refundable under **§ 6511(b)(2)** when the extension agreement was made plus tax paid thereafter. The rule does not apply if a refund claim was made before the extension agreement was made or is made more than six months after expiration of the extended period for assessments. See **Wadlow v. CIR, 112 TC 247 (1999)** ( **§ 6511(c)** applies to taxpayers electing under **§ 183(e)** (supra **¶ 22.5.5** ), which defers determination of whether activity is carried on for profit and correspondingly extends period for determining deficiencies, even though this extension is not by agreement).

58 IRC **§ 6511(d)(1)** . See **Indiana Nat'l Corp. v. US, 980 F2d 1098, 1103 (7th Cir. 1992)** (requirement of **§ 6511(d)(1)** that overpayment be "on account" of bad debt deduction is met only to extent overpayment results from "an increased or newly discovered bad debt deduction"); **Armstrong v. US, 681 F2d 774 (Ct. Cl. 1982)** (taxpayer claimed bad debt deduction on timely return but failed to claim refund arising from net operating loss carryback to prior year until after expiration of limitations period for claims based on carryback; held, longer limitations period for claim arising from bad debt does not apply because bad debt deduction was taken on original return for loss year).

59 IRC **§ 6511(d)(2)** (three-year period for refund or credit resulting from carryback normally runs from due date (taking extensions into account) of return for loss year, not from filing date of return for carryback year). See **Sachs v. US, 941 F2d 464 (6th Cir. 1991)** ( **§ 6511(d)(2)** provides exclusive limitations period for refunds resulting from carryback of net operating loss; if return for loss year is more than three years late, limitations period for carryback refunds has already expired when return is filed; not relevant that tax for carryback year was paid within two years of filing refund claim because **§ 6511(d)(2)** supersedes normal limitations rule of **§ 6511(a)** . See also **Glenwood Coop., Inc. v. US,**

**73 F3d 344 (Fed. Cir. 1996)** (if net operating loss is carried forward, limitations period is three years from due date of return for loss year, not year to which loss is carried). For net operating loss carrybacks, see supra **¶ 25.10.3** . For capital loss carrybacks (allowable only to corporations), see supra **¶ 46.3.2** .

**60** The limitations period for a claim based on a credit for foreign income taxes is 10 years from the due date of the taxpayer's "return for the year in which such taxes were actually paid or accrued." **IRC § 6511(d)(3)(A)** . Before 1997, the period was 10 years from the return due date "for the year with respect to which the claim is made." Under the pre-1997 statute, courts disagreed about whether, for a taxpayer using the credit carryback/carryover rule of **§ 904(c)** , the language quoted in the preceding sentence referred to the year during which the foreign income taxes were paid or the year to which they were carried. See **Chrysler Corp. v. CIR, 436 F3d 644 (6th Cir. 2006)** (year during which taxes were paid); **Ampex Corp. v. US, 620 F2d 853, 857 (Ct. Cl. 1980)** (year to which taxes were carried); **Albemarle Corp. v. US, 118 Fed. Cl. 549, 2014-2 USTC ¶ 50,479 (2014)** , aff'd, **797 F3d 1011 (Fed. Cir. 2015)** , reh'g denied, **805 F3d 1060 (Fed. Cir. 2015)** (original year for which taxpayer was seeking refund under both the pre- and post-1997 statute). See also Schaeffler v. US, 259 F. Supp. 3d (ND Tex. 2017) , aff'd, **889 F3d 238 (5th Cir. 2018)** ( **§ 6511(d)(3)(A)** not applicable where overpayment attributable to minimum tax credit carryforward and not foreign tax credit adjustment); **Trusted Media Brands, Inc. v. US, 899 F3d 175 (2d Cir. 2018)** (10-year statute of limitations does not apply to foreign tax deduction, even if eligible to elect credit). For foreign tax credits, see supra **¶ 72.1** .

**61 IRC § 6511(d)(4)** (ordinarily, three years from the due date, including extensions, of the return for the year generating the loss or credit). For the general business credit, see supra **¶ 27.1.2** .

**62 IRC § 1314(b)** (one year from date of "determination" giving rise to the adjustment), discussed infra **¶ 115.9** .

**63 IRC § 6511(g)** , referring to statutes of limitations in partnership audit rules for returns for tax years before 2018, discussed supra **¶ 114.4.11** .

**64 IRC § 6511(d)(8)** . This rule applies to refund claims filed after June 17, 2008. Pub. L. No. 100-246, § 106, 122 Stat. 1624 (2008).

**65** For example, **§ 6404(e)** , allowing the IRS to abate interest on deficiencies and erroneous refunds when IRS delay caused interest to pile up unnecessarily, was enacted in 1986 but applies for all taxable years after 1978. See infra **¶ 116.1.3** .

**66 US v. Zacks, 375 US 59 (1963)** .

**67 Reg. § 601.105(e)(2)** . A refund or credit is considered allowed when the IRS "authorizes the scheduling of an overassessment." **IRC § 6407** . This is done by the "certifying officer . . . signing a schedule of overassessments identifying the taxpayer and the amount of the overassessment." **Rev. Rul. 2001-40, 2001-38 IRB 276** . See IRM 8.7.7.11.2 (Oct. 16, 2014) for appeals after mailing statutory claim disallowance letter.

**68** See IRM 4.10.8.9.2 (June 10, 2005) (claims allowed in full).

**69 Burnet v. Porter, 283 US 230 (1931)** ; **Shumaker v. CIR, 648 F2d 1198 (9th Cir. 1981)** (informal acceptance of amended return and adjustment of tax accordingly does not preclude later determination of deficiency); **Milleg v. CIR, 19 TC 395 (1952)** .

**70 IRC § 7405** , discussed supra ¶ **114.7.1** .

**71 IRC § 6405** . **Section 6405** was amended to increase the threshold for requiring reports to the Joint Committee from $1 million to $2 million for all taxpayers, effective with respect to reports made after December 20, 2000. **Pub. L. No. 106-554, § 305 (2000)** . In 2014, the $5 million threshold for C corporations was added, effective with respect to reports made after December 18, 2014. Pub. L. No. 113-295, § 301. See **Oxford Life Ins. Co. v. US, 574 F. Supp. 1417 (D. Ariz. 1983)** , aff'd and rev'd on other issues, **790 F2d 1370 (9th Cir. 1986)** (court cannot rule on whether refund was erroneous until IRS complies with **§ 6405** by submitting report to Joint Committee on Taxation); **Rev. Rul. 81-77, 1981-1 CB 582** (merged corporation's deficiency for premerger year cannot be applied to offset overpayment by acquired corporation for same year in determining whether refund is reportable to Joint Committee on Taxation). See Erbsen, The Joint Tax Committee Refund Review Function: Is It "Worth a Damn"? 72 Tax Notes 227 (July 8, 1996); Grewal, The Congressional Revenue Service, U. III. L. Rev. (2014); Treasury Inspector General for Tax Administration, Large Dollar Refunds Are Not Always Examined and Sent to the Joint Committee on Taxation (June 3, 2020); Wood, Large IRS Refunds via Joint Committe on Taxation, 151 Tax Notes 1271 (May 30, 2016). For Joint Committee review procedures, see IRM 4.36.1 (Sept. 21, 2015) and Staff of the Joint Comm. on Tax'n, Tax Refund Claims: An Overview of the Joint Committee on Taxation's Review Process (Jan. 2019).

**72** IRM 4.10.8.10.4 (June 10, 2005).

**73** For refund suits, see infra ¶ **118.7** . See **Ohio Nat'l Life Ins. Co. v. US, 922 F2d 320 (6th Cir. 1990)** (where filing date of waiver is not established and IRS sends notice of denial, two-year period runs from date of notice). See **Hull v. US, 146 F3d 235 (4th Cir. 1998)** (waiver is filed, thereby starting running of two-year limitations period, when IRS receives it, not when it comes into possession of IRS employee dealing with case or when IRS sends written acknowledgment of

receipt). Section 6402(l) (formerly § 6402(j) ), added in 1998, requires that the IRS "provide the taxpayer with an explanation for [its] disallowance" of a refund claim. See Pub. L. No. 105-206, § 3505, 112 Stat. 685 (1998) .

74 See U.S. Dep't of the Treasury, Fiscal Year 2018 Report to the Congress, U.S. Government Receivables and Debt Collection Activities of Federal Agencies, Appendix IV (Aug. 2019)(during FY 2018, tax refunds were diverted in amounts aggregating $3.256.4 billion for federal non-tax debt and $2615.7 billion for state debt; similar statistics provided for FY 2014-FY 2017). See also Treasury Inspector General for Tax Administration, Revising Tax Debt Identification Programming and Correcting Procedural Errors Could Improve the Tax Refund Offset Program (Mar. 31, 2016).

Economic Impact Payment (EIP) refunds issued under § 6428(f) can only be offset by past-due support under § 6402(c) ; Recovery Rebate Credits are subject to the regular offset rules. Pub. L. No. 116-136 , Div. A, § 2201(d) , 134 Stat. 281 (2020), as amended by Pub. L. No. 116-260 , Div. N, § 273(c), 134 Stat. 1182 (2020). EIP refunds issued under § 6428A(f) are not subject to reduction. Pub. L. No. 116-260 , Div. N, § 272(d), 134 Stat. 1182 (2020).

75 See Sorenson v. Secretary of the Treasury, 752 F2d 1433 (9th Cir. 1985) , aff'd on other issues, 475 US 851 (1986) (IRS can reach obligated spouse's half of refund under community property laws, regardless of state laws limiting right of separate creditor to attach debtor's interest in community property; notice must be given to nonobligated spouse of procedures for recovering nonobligated spouse's half of refund); Enfinger v. Enfinger, 452 F. Supp. 553 (MD Ga. 1978) (federal income tax refund not subject to garnishment under state law for alimony and child support arrears). See also See U.S. Dep't of the Treasury, Fiscal Year 2018 Report to the Congress, U.S. Government Receivables and Debt Collection Activities of Federal Agencies, Appendix IV (Aug. 2019)(during FY 2018, IRS diverted refunds in amounts aggregating approximately $1.8 billion under this program).

76 See Anderson v. White, 888 F2d 985 (3d Cir. 1989) (state's notice to taxpayers whose refunds are subject to interception need only state this fact and that administrative review of referral for interception is available; notice need not provide list of common defenses or detailed explanation of procedures for contesting interception); McClelland v. Massinga, 786 F2d 1205 (4th Cir. 1986) (preintercept administrative review, coupled with opportunity for full administrative review after refund intercepted by state, is sufficient to satisfy due process); Kandlbinder v. Reagan, 713 F. Supp. 337 (WD Mo. 1989) (same; notice need not include list of defenses; "better procedure" is "to notify the obligor of the pending interception, the availability of a pre-intercept hearing, and the procedures necessary to obtain such a hearing"); Nelson v. Regan, 560 F. Supp. 1101 (D. Conn. 1983) , aff'd, 731 F2d 105 (2d Cir. 1984) (requiring state welfare department and IRS to provide notice to persons whose refunds might be intercepted; notice must specify defenses that might be available and explain procedures for asserting defenses or otherwise challenging offset; state welfare department must

provide administrative review for removing names from list certified to IRS); **Marcello v. Regan, 574 F. Supp. 586 (DRI 1983)** (imposing similar requirements). See generally Vogel & Davis, Federal Tax Intercept Program, 13 Rev. Tax'n Individuals 169 (1989).

77 See **Donahue v. US, 33 Fed. Cl. 600, 95-2 USTC ¶ 50,390 (1995)** (IRS is not "any Federal agency" within meaning of **§ 6402(d)** ). This program is known as the Treasury Offset Program (TOP). See 31 USC § 3720A.

78 See **Terry v. CIR, 111 TCM (CCH) 1397 (2016)** (IRS is "legally required" to make offset and cannot reverse proper offset for unpaid tax liabilities).

79 The IRS subtracts an administration fee from the amount otherwise payable to the other agency. **Reg. § 301.6402-6(k)** .

80 See **Terry v. CIR, 91 TC 85 (1988)** (interception of refund does not preclude subsequent notice of deficiency even if refund would have covered all of asserted deficiency; taxpayer not being required to pay tax twice because refund applied against another obligation of taxpayer).

81 See Note, Third Party Assignment, Statutes of Limitation, and the Tax Refund Offset Program: Breathe a Little Easier Student Deadbeats, the Fifth Circuit Is on Your Side, 46 Vand. L. Rev. 443 (1993).

82 IRC **§ 6402(d)(3)(B)** (OASDI); **31 CFR § 285.2(f)** (nontax debt of federal agency). See **Gorski v. US, 94 Fed. Cl. 253, 2010-2 USTC ¶ 50,598 (2010)** ; Glaubke v. US, 41 AFTR2d 759 (ED Va. 1978) ; Treasury Inspector General for Tax Administration, Injured Spouse Cases Were Not Always Timely Resolved, Resulting in the Unnecessary Payment of Interest (May 19, 2016). For discussion of separate interests in overpayments of spouses filing joint returns, see supra **¶ 114.7.1** .

83 See **Grider v. Cavazos, 911 F2d 1158 (5th Cir. 1990)** (10-year limitations period for suits on educational loans runs from date "the debt becomes delinquent in the hands of the [Education Department's] assignor," typically, bank that made student loan); **Jones v. Cavazos, 889 F2d 1043 (11th Cir. 1989)** (10-year period runs from date of assignment of loan to Department of Education, not 10 years from default); **Thomas v. Bennett, 856 F2d 1165 (8th Cir. 1988)** (although applicable only to a "past-due legally enforceable debt," **§ 6402(d)** can be utilized even if agency would be barred by statute of limitations from bringing suit on claim; statute of limitations merely bars remedy and does not eliminate debt).

84 A state tax obligation is past-due and legally enforceable only if it (1) is established by a court

judgment or administrative determination that is no longer subject to judicial review or (2) has been assessed but not collected, is not subject to redetermination, and has not been delinquent for more than 10 years. **IRC § 6402(e)(5)** .

**85 IRC § 6402(e)(4)** .

**86 IRC § 6402(e)(3)** .

**86.1 Pub. L. No. 110-328, § 3(a), 122 Stat. 3567 (2008)** .

**86.2 IRC § 6402(f)(1)** .

**86.3 IRC § 6402(f)(4)** .

**86.4** IRC §§ 6042(e)(4), 6042(f)(3).

**86.5** IRC § 6042(f)(2).

**87 IRC § 6402(g)** . However, when a refund on a joint return is intercepted to pay a debt of one spouse, the Treasury must notify the other spouse of steps that can be taken to obtain this spouse's share of the refund and must pay this share if those steps are taken. 42 USC § 664(a). One court has concluded that a nondebtor spouse's suit for refund is not barred by **§ 6402(g)** . **Oatman v. Department of Treasury, 34 F3d 787 (9th Cir. 1994)** . See also Blue v. Department of Treasury, 125 AFTR2d 310 (ND Ohio 2019) (district court has no jurisdiction to review Treasury Department's offset of tax refund for child support).

**88** See **Rev. Proc. 92-36, 1992-1 CB 791** ("requirements and conditions for filing pre-offset address request, annual certification, weekly update and agency address records for federal debts that are eligible for the Federal Income Tax Refund Offset Program" under **§§ 6402(c)** and **6402(d)** ).

© 2021 Thomson Reuters/Tax & Accounting. All Rights Reserved.

Checkpoint Contents
  Federal Library
    Federal Editorial Materials
      WG&L Federal Treatises
        Individual and General Federal Taxation
          Bittker & Lokken: Federal Taxation of Income, Estates, and Gifts
            Part 9 Foreign Income and Foreign Taxpayers
              Chapter 67: Nonresident Aliens, Foreign Corporations, and Other Foreign Persons
                ¶67.4. Withholding of Tax at Source

# ¶ 67.4 Withholding of Tax at Source

# ¶ 67.4.1 Introductory

The 30 percent tax imposed by §§ 871(a)(1) and 881(a) is almost entirely enforced by withholding at source. [1] Under §§ 1441(a) and 1442(a) , tax must be withheld and remitted to the IRS by any person, including a lessee, mortgagee, employer, or fiduciary, having "control, receipt, custody, disposal, or payment" of income subject to the tax. [2] A person obligated to withhold is called a withholding agent. [2.1] The withholding agent is usually the person in the United States who last handles the item before it is remitted to the taxpayer or a foreign intermediary. Assume a nonresident alien beneficially owns shares of a domestic corporation's stock. If the individual's foreign address is listed in the corporation's stock records, the corporation must withhold tax from dividends on the stock. If the stock is held in street name by a U.S. broker, the corporation usually has no way of knowing the beneficial owner is foreign and does not withhold, but the broker must withhold tax from dividends on the shares.

The tax withheld is in payment of tax imposed on the beneficial owner of the payment by § 871(a)(1) or § 881(a) . Because the amount withheld is generally the amount of the tax, the beneficial owner is often not required to file a U.S. tax return. If the amount withheld exceeds the tax liability, the beneficial owner may obtain a refund. [2.2]

The withholding obligation is worked out in great detail in the regulations, [3] which were promulgated in 1997 and generally apply to all payments made after 2000. [4] The regulations on withholding tax from foreign persons are integrated with information reporting and backup withholding rules applied to similar payments to U.S. persons. [5] For example, a payor of dividends must determine whether the beneficial owner of the dividends is a U.S. person or a foreign person, relying either on documents supplied by the payee or a presumption applied in the absence of documentation. If the beneficial owner is foreign, tax must be withheld from the dividends under § 1441 or § 1442 . If the beneficial owner is a U.S. person, the corporation may be required to report the dividends on a Form 1099 and if the payee fails to disclose his or her TIN, the dividends may be subject to backup withholding under § 3406 . Generally, Form 1099

reporting and backup withholding apply to all U.S. persons other than corporations, tax-exempt organizations, governments, and a few other types of entities. **6** Because a taxpayer's status is determined once for purposes of both of these systems, one or the other of the systems necessarily applies to the dividends.

A withholding agent normally determines a person's status from a "withholding certificate" filed by or for the person. **7** Foreign persons normally provide this certificate on Form 8233 (personal services income) or Form W-8 (all other income), and U.S. persons do so on Form W-9.

According to the regulations, a "withholding agent" must withhold tax under **§ 1441** or **§ 1442** from any payment of "an amount subject to withholding" to a "payee" that is a "foreign person" unless (1) the withholding agent "can reliably associate the payment with documentation upon which it can rely to treat the payment as made to a beneficial owner that is a U.S. person or…a foreign person entitled to a reduced rate of withholding" or (2) the foreign person assumes responsibility for withholding as a "qualified intermediary," U.S. branch of a foreign bank or insurance company, "withholding foreign partnership," or "authorized foreign agent." **8** The meanings of some of the terms quoted in the preceding sentence are discussed immediately below, and the remaining terms are discussed later in this section. **9**

> 1. *Withholding agent.* A withholding agent is a person having "control, receipt, custody, disposal, or payment" of an income item subject to withholding. **10** A withholding agent may be a U.S. person or a foreign person, but the withholding obligation usually falls on a person acting within the United States. **11**
>
> If a withholding agent delegates some or all of its responsibilities to an agent, the agent's acts "are imputed to the withholding agent on whose behalf it is acting." **12** A U.S. withholding agent may use a foreign agent only if the person is an "authorized foreign agent," a status that must be memorialized in a written agreement and a notice to the IRS of the agency. **13** The books, records, and "relevant personnel" of an authorized foreign agent must be available "for examination by the IRS," and the withholding agent must be liable for the foreign agent's acts. "A withholding agent acting through an authorized foreign agent is liable for any failure of the agent…in the same manner and to the same extent as if the agent's failure had been the failure of the U.S. withholding agent." **14**
>
> 2. *Payee.* Generally, a "payee" is the person to whom a payment is made, regardless of whether the person beneficially owns the payment. **15** However, an intermediary is a payee only if it is a qualified intermediary assuming primary withholding responsibility, and a "flow-through entity" is a payee only with respect to income that is or is deemed to be effectively connected with U.S. trade or business. **16** Also, if a withholding agent has actual knowledge that a U.S. payee receives a payment "as agent of a foreign person," it must treat the payment as made to the foreign person unless the payee is a financial institution and the withholding agent "has no reason to believe that [it] will not comply with its obligation to withhold." **17** For example, a corporation paying dividends to a reputable U.S. securities firm

on shares held in street name need not withhold because the obligation to withhold tax from any portion of the dividends allocable to foreign beneficial owners rests with the securities firm.

Also, if an entity with one owner is disregarded for U.S. tax purposes, a withholding agent must treat payments to the entity as made to the owner. **18** For example, a payment to a one-owner LLC is treated as a payment to the owner unless the LLC has elected to be treated as a corporation for U.S. tax purposes. Thus, in the absence of such an election, if the LLC is domestic but the owner is a foreign person, it may not file a Form W-9 representing that it is a U.S. person, but it must instead file a Form W-8 identifying its foreign owner. Conversely, if the LLC is foreign and its owner is a U.S. person, it may not claim treaty benefits.

3. *Foreign persons.* The withholding obligation only applies to payments to foreign persons. **19** The term "foreign person" includes (1) nonresident alien individuals; (2) foreign corporations, partnerships, trusts, and estates; (3) governments of foreign countries, including their political subdivisions, agencies, and instrumentalities; and (4) foreign branches of U.S. persons furnishing qualified intermediary withholding certificates. **20** A payment to a U.S. branch of a foreign person is normally considered a payment to the foreign person, but a withholding agent may make an agreement to treat a U.S. branch of a foreign bank or insurance company as a U.S. person for purposes of payments to the U.S. branch of types of income specified in the agreement. **21**

4. *Beneficial owner.* Generally, a withholding agent must withhold at 30 percent from a payment to a foreign person unless the beneficial owner of the payment is a U.S. person or a foreign person eligible for reduced withholding under an income tax treaty. **22** A payment's beneficial owner is the person who, under "U.S. tax principles," is required to recognize the payment as gross income. **23** A person who receives income as a nominee, agent, or custodian is not the beneficial owner, and neither is a conduit disregarded under the regulations under **§ 7701(*l*)** . **24** A person making a payment to a disregarded conduit entity must withhold as if the payment were made to the person identified as the recipient under the conduit rules. **25**

5. *Reliably associating payments with documentation.* A withholding agent's obligation often depends on whether it "can reliably associate [a] payment with documentation upon which it can rely to treat the payment as made to a [particular] beneficial owner…." **26** According to the regulations:

Generally, a withholding agent can reliably associate a payment with valid documentation if, prior to the payment, it holds valid documentation (either directly or through an agent), it can reliably determine how much of the payment relates to the valid documentation, and it has no actual knowledge or reason to know that any of the information, certifications, or statements in, or associated with the documentation are incorrect. **27**

6. *U.S. persons.* Tax need not be withheld under **§ 1441** or **§ 1442** from payments to U.S. persons. **28** A withholding agent may consider a payee to be a U.S. person if the payee must furnish a Form W-9 in order to avoid backup withholding under **§ 3406** and does so. **29** The

backup withholding rules apply to dividends, interest, royalties, compensation for services performed as independent contractor, and a few other items payable to U.S. persons other than corporations, tax-exempt entities, units of government, and a few other exempted entities. 30 A withholding agent may also rely on a Form W-9 certifying U.S. status filed by a payee not subject to backup withholding if the form is signed by the payee under penalties of perjury and a few other requirements are observed. 31 Moreover, a payment is deemed beneficially owned by a U.S. person if the withholding agent can reliably associate it with a Form W-9 attached to a valid intermediary, flow-through, or U.S. branch withholding certificate. 32 However, in all of the foregoing cases, a withholding agent may not treat a payee or beneficial owner as a U.S. person if it has "actual knowledge or reason to know" that the person is foreign. 33

## ¶ 67.4.2 Amounts Subject to Withholding

A payment is subject to withholding if it is (1) fixed or determinable annual or periodical income from sources within the United States; (2) U.S. source gain on a disposition of standing timber or a coal or iron ore deposit in which the seller retains an economic interest; or (3) gain on a contingent-price sale of a U.S. patent, copyright, or similar intangible property. 34 Fixed or determinable annual or periodical income includes all items of gross income, except gains on sales of property (including market discount on bonds and option premiums). 35 Income is treated as from U.S. sources for this purpose if "the source of the amount cannot be determined at the time of payment." 36

Generally, an item is not subject to withholding if it is excluded from the gross incomes of all taxpayers, regardless of status (e.g., interest on obligations of the U.S. states and their political subdivisions), 37 but in some situations described below, amounts exceeding gross income may be subject to withholding because the amount of gross income cannot be determined at the time of withholding.

1. *Payment.* Withholding must usually occur when an item subject to withholding is paid. However, an amount is deemed paid when it is included in the beneficial owner's gross income under the cash method of accounting, "whether or not such income results from an actual transfer of cash or other property." 38 For example, forgiveness of a debt results in cancellation of indebtedness income to the debtor, which is deemed paid to the debtor at the time of the forgiveness. 39 Dividends are considered paid on the payment date, not the record date. 40 A payment to an agent or other intermediary is deemed made to the beneficial owner, as is a payment is made to a creditor in satisfaction of a liability of the beneficial owner. 41 It does not matter whether the payment is in U.S. dollars or some other medium. 42

Reallocations among related persons under § 482 may result in income subject to withholding. 43 For example, if a foreign corporation loans funds to a U.S. subsidiary at a below-market rate, additional interest income may be imputed to the parent under § 482 . Income resulting from a § 482 allocation is deemed paid on the last day of the taxable year during which the relevant transactions occur.

2. *Measurement of amounts subject to withholding*. The amount subject to withholding is usually the amount of the gross income, unreduced by any deductions. [44] However, in several situations described below, tax may be withheld from amounts exceeding the beneficial owner's gross income. Also, rules are provided for measuring the amount subject to withholding where payment is not in U.S. dollars.

*Interest*. The gross amount of interest paid on an obligation is subject to withholding (absent an exception such as the portfolio interest rule), even though, for some holders, portions of the interest may be returns of capital. [45] For example, for a holder who purchased an obligation at a premium, a portion of each interest payment is a recovery of the premium. Also, a portion of the first interest payment received by a holder who purchased between interest payment dates is a recovery of the portion of the purchase price allocable to accrued interest. The excess withholding from such a holder can be corrected by a refund or adjustment. [46]

When a debt instrument is sold between interest payment dates, the portion of the selling price representing accrued interest is interest income to the seller, [47] but this interest income is not subject to withholding unless the sale is "part of a plan the principal purpose of which is to avoid tax by selling and repurchasing securities" and the withholding agent knows or has reason to know of this plan. [48]

*OID*. If a debt instrument was issued at a substantial discount from its face amount, each holder of the instrument has discount (OID) income computed on an accrual basis that spreads the income on a constant interest basis over the instrument's term. [49] OID accruals are subject to withholding if stated interest on the same obligation would be subject to withholding, but they are taxed only when a discount obligation is sold or exchanged or a payment of interest or principal is made on the obligation, [50] and on a sale of the obligation to any person other than the issuer, withholding is required only "to the extent the withholding agent has actual knowledge or reason to know that the sale or exchange is part of a plan the principal purpose of which is to avoid tax." [51] The taxable amount is the OID accrued under the instrument from the date of the taxpayer's purchase to the date of the taxable event, less any amount taxed on an earlier receipt of payment, except that on receipt of a payment under the instrument, the tax on accrued OID may not exceed the excess of the payment over the tax on any interest included in the payment. [52]

*Corporate distributions*. Generally, the entire amount of a corporate distribution to shareholders is subject to withholding, [53] even though any amount by which the distribution exceeds corporate earnings and profits is excluded from gross income as a recovery of basis or is treated as gain on a sale of the shares, rather than as a dividend. [54] Because a distribution is a dividend to the extent of current earnings and profits, which are determined as of the end of the year of distribution, it may not be possible to know at the time of distribution just what portion of a corporate distribution may be a dividend. Because withholding must usually occur, if at all, before the withholding agent disburses the funds, the regulations

generally subject the entire amount of a corporate distribution to withholding.

However, a withholding agent may elect not to withhold tax from a distribution to the extent it exceeds a "reasonable estimate" of earnings and profits made by the distributing corporation "at a time reasonably close to the date of payment." 55 This reasonable estimate must include accumulated earnings and profits to the date of distribution and estimated earnings and profits for all of the current year, taking into account prior distributions and "all other relevant facts and circumstances." If actual earnings and profits turn out to be more than estimated earnings and profits, a withholding agent relying on the estimate, whether it be the distributing corporation or an intermediary, is usually liable for any resulting underwithholding. 56 However, the corporation, rather than an intermediary relying on the corporation's estimate, is liable if underwithholding results from the corporation's failure to estimate reasonably or "to properly communicate the information to the withholding agent." 57 Also, a withholding agent other than the distributing corporation need not accept the corporation's estimate and may withhold from the entire distribution, even if the corporation, for shareholders for which it acts as withholding agent, withholds only from the estimated dividend. 58

Also, a withholding agent may elect not to withhold from (1) a nontaxable distribution of stock or stock rights; (2) a distribution "in part or full payment in exchange for stock"; (3) a capital gains or exempt interest dividend by a mutual fund or other regulated investment company; and (4) a distribution subject to withholding under § 1445 , which applies to dispositions of interests in U.S. real property holding corporations. 59

*Taxable amount undetermined.* In any other situation where the withholding agent cannot determine the amount subject to withholding because the source or amount of the gross income "depends on facts that are not known at the time of payment," the withholding agent may withhold an amount, not greater than 30 percent of the payment, that will "assure" against underwithholding. 60 Alternatively, the withholding agent may withhold based on a "reasonable estimate" of the taxable amount and hold an additional amount "in escrow" until the taxable amount is finally determined. Uncertainty as to the amount subject to withholding does not relieve the withholding agent from personal liability for the amount of tax ultimately determined.

*Payment not in U.S. dollars.* If a taxable item is paid in a medium other than U.S. dollars, the amount subject to withholding is the fair market value of the transferred property or services. 61 If the item is paid in a currency other than the U.S. dollar, the amount paid is translated into dollars at the spot rate on the date of payment. 62 Because withholding tax must always be paid in U.S. dollars, a withholding agent may "liquidate the property" before making payment. 63 However, the withholding obligation "is not deferred even if no alternative source can be located." If a withholding agent pays the tax from its own funds, this payment may be additional income subject to withholding. 64

3. *Withholding agent without access to funds or knowledge.* A withholding agent is usually

obligated to withhold only if it has (1) "control over or custody of money or property owned by the recipient or beneficial owner from which to withhold" and (2) "knowledge of the facts that give rise to the payment." 65 For example, a creditor forgiving a debt is not obligated to withhold tax on the resulting cancellation of indebtedness income of the debtor unless it has custody or control over money or property of the debtor. 66 This control or custody and knowledge must exist when the obligation to withhold otherwise accrues or at some subsequent time not later than the due date (with extensions) of the withholding tax return for the year.

However, a withholding obligation attaches, notwithstanding the withholding agent's lack of control, custody, or knowledge, (1) "to distributions with respect to stock," (2) if the withholding agent is related to the payee or beneficial owner, or (3) if the lack of control or custody "is part of a pre-arranged plan known to the withholding agent to avoid withholding.…" 67 As an example of item (2), income allocated among related persons under § 482 may be subject to withholding, even if the withholding agent does not have custody or control of money or property of the payee.

4. *Withholding agent's payment of tax from its own funds.* If a withholding agent fails to withhold and pays the withholding tax from its own funds, the tax payment is either additional income to the beneficial owner or an advance of funds, depending on the contractual arrangement between the parties and "applicable laws governing the transaction." 68 For example, if a withholding agent is required by contract to make specified income payments to a beneficial owner without deduction and to absorb any withholding tax that may be imposed on the payments, the withholding agent's tax payments are additional income to the beneficial owner and also subject to withholding. If a withholding agent's tax payment is additional income, the total amount subject to withholding is the amount of the payment before withholding, divided by the excess of one over the tax rate (expressed as a decimal). 69 Assume a U.S. college grants a scholarship to a foreign student, of which $8,600 (amounts covering room and board and travel costs) is taxable and subject to withholding at 14 percent under § 1441(b) . If the college agrees to pay the tax, the amount subject to withholding is $10,000 (the pretax amount of $8,600, divided by (1 # 0.14)), and the tax is $1,400. 70

If a withholding agent's payment of tax is an advance to a beneficial owner, no tax consequence normally flows from the tax payment or the beneficial owner's reimbursement of the withholding agent. However, a beneficial owner failing to repay such an advance may have cancellation of indebtedness income, which is subject to withholding if, at any time between the time of the cancellation and the due date of the withholding tax return for the year, the withholding agent has money or property of the beneficial owner from which the tax can be withheld. 71

# ¶ 67.4.3 Amounts Not Subject to Withholding or Subject to Withholding at Reduced Rates

If a withholding agent determines that an item payable to a foreign person is of a type normally subject to withholding, it must determine whether the payee is entitled to an exemption from withholding or to a reduced rate of withholding tax. 72 Statutory exemptions and reduced rates are described immediately below. Exemptions and reduced rates under treaties are discussed in the next section.

Several statutory exemptions from withholding under §§ 1441 and 1442 may be allowed by a withholding agent, even if it has no documentation on the identity or status of the beneficial owner:

1. Income from sources outside the United States. 73

2. Interest on deposits with banks, insurance companies, and some other financial institutions. 74

3. Interest and OID on instruments issued for terms of 183 days or less. 75

4. Dividends from a domestic corporation deriving at least 80 percent of its gross income from trades or businesses actively carried on outside the United States, but only to the extent the dividends are ratably allocable to gross income of those trades or businesses. 76

5. Dividends paid by a foreign corporation out of earnings and profits for a year the corporation was subject to the branch profits tax. 77

6. Payments under notional principal contracts. 78

7. Per diem subsistence allowances paid by the U.S. government to nonresident aliens "engaged in any program of training in the United States under the Mutual Security Act of 1954." 79

8. Gambling winnings if they are exempt from the 30 percent tax under § 871(j) , which applies to winnings from "blackjack, baccarat, craps, roulette, and big-6 wheel." 80

However, without documents establishing foreign status or providing a TIN, these items may be subject to information reporting or backup withholding. 81

Other exemptions from withholding under §§ 1441 and 1442 and rate reductions may be allowed only with documentation: 82

1. *Portfolio interest.* Portfolio interest is exempt from the taxes imposed by §§ 871(a) and 881(a) and thus is not subject to withholding under § 1441 or § 1442 . 83 A withholding agent may allow the exemption for interest on registered instruments if it has documents allowing it to treat the payee as a foreign person and does not have actual knowledge or reason to know that the beneficial owner is a U.S. person. 84 No documentation is required for portfolio interest on bearer instruments or for interest on foreign-targeted registered obligation if the registered owner is a financial institution that certifies the beneficial owners to be foreign. 85

2. *Effectively connected income.* Income that is or is deemed to be effectively connected with a foreign person's conduct of a trade or business in the United States is not subject to withholding if it is currently included in the beneficial owner's gross income. 86 Effectively connected income is not covered by this rule if the beneficial owner claims exemption from U.S. tax under treaty on the ground that income is not attributable to a permanent establishment in the United States. 87 This rule is also inapplicable to compensation for

personal services, which is governed by rules discussed immediately below. Generally, a withholding agent may recognize the exemption for effectively connected income only if, at the time of payment, it can reliably associate the payment with a Form W-8 that permits the withholding agent to treat the payment as made to a foreign beneficial owner, provides the beneficial owner's TIN (e.g., employer identification number), and "represents, under penalties of perjury," that the income is effectively connected income includable in the beneficial owner's gross income. 88 However, if a withholding agent has made an agreement with a U.S. branch of a foreign bank, insurance company, or other financial institution to treat the branch as a U.S. person for withholding tax purposes, a payment to the branch is deemed to be effectively connected income unless the branch provides a withholding certificate representing otherwise. 89

3. *Compensation for personal services.* Compensation for an individual's personal services is often subject to wage withholding, rather than withholding under § 1441 . 90 Such compensation is also exempted from § 1441 withholding, whether the services are performed as employee or independent contractor, if (1) it would be subject to wage withholding, except for an exemption in the wage withholding rules; (2) the taxpayer is a resident of Canada or Mexico "who enters and leaves the United States at frequent intervals"; or (3) the compensation is exempt from U.S. tax by statute or treaty. 91 A withholding agent may recognize a treaty exemption only if (1) the employee or other services performer claims the exemption on a Form 8233 filed with the employer; (2) the withholding agent has no knowledge or reason to know that any facts stated in the Form are false or "that the eligibility of the individual's compensation for the exemption cannot be readily determined"; (3) the withholding agent certifies on the form that it "is satisfied that an exemption from withholding is warranted"; (4) the form is submitted to the IRS; and (5) the IRS registers no objection within 10 days of the form's submission. 92

The IRS may make an agreement with a nonresident alien individual exempting U.S. source nonemployee compensation from withholding or specifying amounts to be withheld from the compensation. 93 Also, the last payment of nonemployee compensation during a year is exempt from withholding, in whole or in part, if the services performer applies to the local IRS district office for this exemption and the IRS issues a letter to the withholding agent specifying the final payment amount that can be exempted. 94

4. *Qualified plan distributions.* Annuities under qualified pension, profit-sharing, stock bonus, and annuity plans are exempt from the tax imposed by § 871(a)(1) and therefore from withholding under § 1441(a) . 95 This exemption is allowed only if the beneficial owner submits a withholding certificate on Form W-8 claiming foreign status and providing his or her TIN. 96

5. *Scholarships and grants to foreign students and researchers.* Section 1441(b) requires withholding at 14 percent on taxable scholarships and grants received by nonresident aliens temporarily present in the United States under nonimmigrant visas under § 101(a)(15)(F), § 101(a)(15)(J), § 101(a)(15)(M), or § 101(a)(15)(Q) of the Immigration and Nationality Act,

which are issued to students, researchers, and visiting teachers. 97 If such an individual receives a scholarship from U.S. sources that is only partially excluded from gross income under § 117(a) , 14 percent withholding applies to the taxable portion of the scholarship. 98 Very generally, scholarships are excludable from gross income only to the extent of the student's tuition and related expenses, not including living expenses. 99 If a student's scholarship covers living expenses as well as tuition and incidental expenses, the amount for living expenses is thus taxable. If the student is a nonresident alien present in the United States under a student visa, the taxable amount is subject to withholding at 14 percent.

Also, if a nonresident alien present in the United States on an F, J, M, or Q visa is not a candidate for a degree at an educational institution, the 14 percent withholding tax applies to grants received from (1) an educational or charitable organization that is exempt from tax under § 501(c)(3) ; (2) the government of a foreign country, the United States, or one of the U.S. states; (3) an agency or instrumentality of the federal or a state or local government; or (4) an international organization. 100

A withholding agent may allow the 14 percent rate only if it has documentation that the payee is a nonresident alien. 101 Any portion of the scholarship or grant that is compensation for services is subject to wage withholding, not 14 percent withholding under § 1441(b) .

6. *Foreign governments, central banks of issue, and international organizations.* The exemption under § 892(a) for payments to foreign governments may be allowed only with a Form W-8 representing that the beneficial owner is a foreign government, indicating whether it is an integral part of a foreign government or a controlled entity, and certifying that the income is exempt under § 892 . 102 Similarly, the exemption under § 895 for interest paid to a foreign central bank of issue or the Bank for International Settlements must be established by a Form W-8 certifying that the beneficial owner is a bank entitled to the exemption and that it will not hold obligations or bank deposits covered by the form in connection with the conduct of a commercial banking function or other commercial activity. 103 However, the exemption under § 892(b) for U.S. source investment income of international organizations may be allowed without documentation if "the name of the payee and other facts surrounding the payment reasonably indicate" that the payment is beneficially owned by an international organization. 104

7. *Foreign tax-exempt organizations.* A foreign tax-exempt organization is usually exempt from withholding with respect to income not included in the organization's taxable income from an unrelated trade or business. 105 An organization establishes its entitlement to this exemption by providing the withholding agent with a Form W-8 stating the organization's TIN and certifying that it has obtained an IRS ruling recognizing its exemption under § 501(c) or an opinion of a U.S. lawyer that the organization is exempt. 106 Amounts included in determining unrelated business taxable income are subject to withholding to the same extent as they would be if the organization were not exempt. 107 Typically, with appropriate documentation, such amounts are exempted from withholding as effectively connected income.

If a foreign tax-exempt organization is or is treated as a private foundation, a 4 percent tax, withheld at source, is imposed on U.S. source interest, dividends, rents, payments with respect to securities loans, and royalties. **108**

# ¶ 67.4.4 Treaty Benefits

Withholding may be reduced or eliminated by an income tax treaty between the United States and the country of the beneficial owner's residence, **109** but documentation is required to establish entitlement to treaty benefits. **110** A withholding agent may "rely" on a beneficial owner's claim of a treaty benefit if (1) the claim is made on a beneficial owner withholding certificate or other documentation sufficient to establish foreign status, (2) the certificate or document includes the beneficial owner's TIN (if required) and represents that the beneficial owner satisfies any applicable limitation of benefits article in the treaty, and (3) the withholding agent, at the time of payment, does not know or have reason to know that the claim is false and can reliably associate the payment with the certificate. **111** If a payment is made to joint owners, the withholding agent must receive documentation from all of the owners, and if the same withholding rate does not apply to all of them (e.g., because they reside in different countries), withholding must be at the "highest applicable rate." **112** A different procedure applies to nonresident alien individuals claiming treaty exemption from withholding on compensation for services. **113**

Special rules apply for (1) dividends and interest on actively traded securities; (2) dividends on redeemable securities of investment companies registered under the Investment Company Act of 1940 (mutual funds); (3) dividends, interest, and royalties on publicly offered units of beneficial interest in a unit investment trust if the offering was registered under the Securities Act of 1933; and (4) amounts received by a lender of publicly traded securities in substitution for dividends or interest on the securities. **114** A beneficial owner's TIN need not appear on a withholding certificate claiming treaty benefits for such income, and if the income is paid to an offshore account, the withholding agent may accept, in lieu of a withholding certificate, a "certificate of residence" or other approved alternative documentation. **115** A certificate of residence is "a certification issued by an appropriate tax official of the treaty country…that the taxpayer has filed its most recent income tax return as a resident of that country (within the meaning of the applicable tax treaty)." **116** For individuals, alternative documentation may consist of the original or a certified copy of any official document issued by an authorized governmental body that includes the individual's name, address, and photograph (e.g., a driver's license). **117** For an entity, alternative documentation is acceptable only if it is an official document issued by an authorized governmental body that includes the entity's name and the address of its principal office in the treaty country and the entity represents in writing that (1) it qualifies for treaty benefits under the treaty's limitation of benefits clause and (2) any income for which it claims treaty benefits "will properly be treated as derived by itself as a resident of the applicable treaty jurisdiction within the meaning of **section 894** and the regulations thereunder." **118**

Also, in very limited circumstances, a withholding agent may rely on a beneficial owner withholding

certificate lacking a TIN in allowing treaty benefits with respect to an "unexpected payment" made to a person without a TIN on a day the IRS is not issuing TINs. Specifically, a beneficial owner's TIN is not required if (1) the withholding agent is an "acceptance agent," a person that has made an agreement with the IRS authorizing it to act on behalf of taxpayers in seeking TINs from the IRS, (2) the withholding agent's acceptance agreement allows it to request individual tax identification numbers (ITINs) "on an expedited basis," (3) the payment to the foreign beneficial owner is "unexpected," (4) the beneficial owner does not have an ITIN, (5) the IRS is not issuing ITINs at any time after the payor learns of the payment and before the time of payment, (6) the payment cannot "reasonably" be delayed long enough to allow an ITIN to be obtained before the payment, and (7) the payor applies for an ITIN for the beneficial owner on the day following the date of payment. [119] A payment is unexpected if, "because of the nature of the payment or the circumstances in which it is made, could not reasonably have been anticipated by the payor or beneficial owner during a time when the payor or beneficial owner could obtain an ITIN from the IRS." [120] A beneficial owner who might be covered by this rule is a resident of a country having an income tax treaty with the United States exempting U.S. source gambling winnings from U.S. tax, who wins $5,000 by playing slot machines on a Sunday. If the individual does not have an ITIN, the casino may, on satisfying the conditions described above, rely on a withholding certificate without an ITIN because the IRS does not issue ITINs on Sunday. [121] In contrast, if the individual visits the casino on a Monday (not a holiday), the casino must obtain an ITIN before making payment because the IRS issues ITINs on an expedited basis on a working day. [122] Similarly, if the individual requests payment 15 minutes before the IRS ITIN operation opens on a particular day, the casino must delay the payment until the IRS opens. [123]

A resident of a treaty country holding an interest in an entity that is considered "fiscally transparent" under the tax laws of that country is entitled to treaty benefits with respect to the resident's share of the entity's U.S. source income. [124] For example, if *T*, a resident of country *X*, owns an interest in an LLC that is treated as a flow-through entity under *X*'s tax laws, *T* is entitled to the benefits of the U.S.-country *X* tax treaty with respect to her share of any U.S. source income of the entity. When such an interest holder claims treaty benefits, the entity may provide to the withholding agent a flow-through withholding certificate to which is attached the beneficial owner withholding certificate or other documentation from the interest holder. [125]

If an entity is a taxable entity under the laws of its residence country, but one or more of its interest holders reside in another foreign country that treats it as fiscally transparent, the entity may provide its own beneficial owner withholding certificate with respect to the portion of the income that is not allocable to interest holders resident in countries treating the entity as fiscally transparent. [126] If the claims pertain to separate shares of the income and do not overlap, the withholding agent may honor all of the claims, even though the result is to treat the entity "differently with respect to different portions of the same payment," or it may treat the entity as beneficial owner of the entire payment. [127] Assume entity *E* is a resident of country *Y* and is not fiscally transparent under the laws of that country, but one of its interest holders is a resident of country *Z*, which considers *E* to be fiscally transparent for purposes of its tax laws. [128] *E*, on receiving royalties from U.S. sources, presents to the withholding agent (1) a

flow-thorough withholding certificate to which it attaches a beneficial owner certificate of the country $Z$ resident claiming zero withholding on that owner's share of the royalties under the U.S.-country $Z$ treaty and (2) a beneficial owner withholding certificate claiming 5 percent withholding under the U.S.-country $Y$ treaty on the portion of the royalty not allocable to the country $Z$ interest holder. The withholding agent may either withhold in accordance with the certificates or withhold at 5 percent from all of the royalties. If the claims by the entity and its owners overlap, the withholding agent may reject all claims and request new documentation, or it may "choose which claim to apply." **129** Any overwithholding in such situations may be corrected by refund claims.

## ¶ 67.4.5 Payments to Partnerships, Trusts, and Estates

1. *Domestic partnerships.* A domestic partnership is considered the "payee" of amounts it receives. **130** Since U.S. payees are not subject to withholding under **§ 1441** or **§ 1442** , a withholding agent need not withhold from a payment that it can reliably associate with a Form W-9 provided (directly or through an intermediary) by a U.S. partnership. **131** This exemption from withholding applies even if some or all of the partners are foreign.

A domestic partnership having income subject to withholding must withhold tax from any portion of the income that is included in the distributive share of a foreign partner. **132** The withholding obligation normally attaches when the partnership supplies Forms K-1 reporting the distributive shares to its partners (or, if earlier, on the due date of the K-1s), but if the income is distributed during the year it is received, withholding must occur at the time of distribution. Tax on income effectively connected with a U.S. trade or business of the partnership withheld under **§ 1446** , not **§ 1441** or **§ 1442** . **133**

A payee on which a withholding agent has no valid documentation is presumed to be a partnership if there are no "reliable indications that the payee is an individual, estate, or trust" and the payee is not presumed to be a corporation or other type or organization (e.g., because of an indication of corporate status in its name). **134** A presumed partnership is presumed to be a domestic partnership "unless there are indicia of foreign status," in which case the withholding agent "may presume the partnership to be foreign." **135** Indications of foreign status include (1) an employer identification number of the partnership, known to the withholding agent, beginning with the digits 98; (2) communications by the withholding agent to the partnership addressed to a foreign country; and (3) payment outside the United States.

2. *Foreign partnerships.* **Section 1441(a)** requires a payor to withhold tax from an item subject to withholding that is paid to a foreign partnership. **136** However, the regulations, which distinguish between withholding foreign partnerships (partnerships that have made withholding agreements with the IRS) and other partnerships (nonwithholding foreign partnerships), require that withholding on payments to the former type usually be done by the partnership, not the persons making payment to the partnership.

*Nonwithholding foreign partnerships.* The partners of a foreign partnership are considered the

beneficial owners of the partnership's income, and if the partnership is a nonwithholding foreign partnership, the partners are also the payees of payments to the partnership. 137 In a tiered situation, the payees and beneficial owners are the ultimate partners. For example, if foreign partnership *UT* is a partner in foreign partnership *LT*, the partners of *UT* are the beneficial owners of *UT*'s distributive share of the income of *LT*, except that if one or more of *UT*'s partners is a partnership, the search for beneficial owners proceeds upward through the chain until the distributive share is attributed to a partner that is not a partnership. If *UT* and *LT* are nonwithholding foreign partnerships, the same approach determines the payees of payments to *LT*. 138 On the other hand, if *UT* is a domestic partnership, it, not its partners, is the payee of its distributive share of *LT*'s income because a U.S. partnership, unlike a foreign partnership, is a payee. 139

A nonwithholding foreign partnership should provide a nonwithholding foreign partnership certificate with respect to any reportable amount it receives. 140 This certificate must be on Form W-8 or an acceptable substitute, be signed under penalties of perjury by an authorized partner, not have expired, state the partnership's name, permanent address, employer identification number, and country of organization, certify that it is a foreign partnership, and certify whether the income is effectively connected with a U.S. trade or business of the partnership. 141 Unless the income is certified to be effectively connected income, the certificate must be accompanied by a withholding statement that, among other things, allocates the payment among the partners. 142 A withholding agent receiving a nonwithholding foreign partnership certificate may treat the person making the certificate as a nonwithholding foreign partnership. 143 The partnership is not required to withhold or report to the IRS if it has provided a valid certificate and withholding statement and does not know or have reason to know that all other withholding agents have failed to withhold.

A nonwithholding foreign partnership certificate is usually used to transmit withholding certificates for the partners. 144 A withholding agent making payment to a nonwithholding foreign partnership may honor a claim for reduced withholding with respect to a portion of the payment if, at the time of payment, it can reliably associate this portion with a withholding certificate from a partner justifying the claim. 145 It can treat a partner as a U.S. payee, exempt from withholding under **§§ 1441** and **1442** , if it can reliably associate the partner's distributive share with a valid Form W-9 or as a foreign beneficial owner if the distributive share can be reliably associated with a valid Form W-8. 146 The rules for payments to intermediaries, U.S. branches of foreign financial institutions, or withholding foreign partnerships apply if an intermediary withholding certificate, U.S. branch certificate, or withholding foreign partnership certificate is filed with respect to a partner's share. 147 However, a foreign partnership, not its partners, is deemed to be the payee of a payment if the partnership's certificate certifies that the income is effectively connected with a U.S. trade or business of the partnership or if the withholding agent is otherwise permitted to treat the income as effectively connected income. 148 A partnership representing a payment to be

effectively connected income need not identify any partner's distributive share of the payment. 149

If a partnership furnishes a nonwithholding foreign partnership certificate but the withholding agent cannot reliably associate some portion of its payment to the partnership with valid documentation from a partner, this portion is deemed included in the distributive share of a foreign partner subject to withholding at 30 percent. 150 Also, if a withholding agent lacks valid documentation from a payee that the withholding agent is required to treat as a foreign partnership, the payment is deemed made to a nonwithholding foreign partnership and allocable to foreign partners entitled to no reduction of withholding. 151

*Withholding foreign partnerships.* A withholding foreign partnership is a partnership that has made a withholding agreement with the IRS. By such an agreement, a foreign partnership assumes the withholding and reporting responsibilities of a withholding agent, except as these responsibilities are limited by the agreement, and agrees to procedures by which the IRS may audit its books and records. 152 The agreement may also allow the partnership to accept and file its partner's applications for IRS individual taxpayer identification numbers (ITINs) and to file claims for refunds of overwithheld amounts. 153 "[I]n appropriate circumstances," the IRS may permit the partnership to act as a qualified intermediary for its partners. 154

A withholding foreign partnership "must assume primary withholding responsibility under [ §§ 1441 - 1446 ]" and is "responsible" for all attendant reporting requirements. 155 It must use the procedures outlined above for U.S. partnerships in determining the amounts to be withheld and times when withholding must occur. 156 A withholding agent may treat a payment as made to a withholding foreign partnership if it can reliably associate the payment with a withholding foreign partnership certificate from the partnership, 157 and given this certificate, the withholding agent is not required to withhold "unless it has actual knowledge or reason to know that the foreign partnership is not a withholding foreign partnership." 158 A withholding foreign partnership certificate must be on Form W-8, be signed under penalties of perjury, not have expired, certify that the partnership is a withholding foreign partnership, and state the partnership's name, permanent address, employer identification number, country of organization, and other information required by its agreement with the IRS. 159 A withholding foreign partnership's agreement with the IRS normally requires that the partnership obtain withholding certificates from its partners, but the partnership is usually not required to transmit the partners' certificates to persons making payments to it. 160

3. *Domestic trusts.* A domestic trust or estate is considered the "payee" of amounts it receives. 161 Since tax need not be withheld under § 1441 or § 1442 from payments to U.S. payees, a withholding agent is not required to withhold from a payment that it can reliably associate with a Form W-9 provided (directly or through an intermediary) by a domestic trust or estate, even if the trust or estate has foreign owners or beneficiaries. 162

A domestic simple trust with income subject to withholding must withhold from any portion of

the income that is included in the gross income of a foreign beneficiary. 163 A trust is simple if it is required to distribute all of its income currently. 164 Whenever it makes a distribution to a foreign beneficiary, a domestic simple trust must "make a reasonable estimate of the portion of the distribution that constitutes distributable net income consisting of an amount subject to withholding and apply the appropriate rate of withholding to the estimated amount." 165 If the amounts so withheld during a year are less than the tax due on the income subject to withholding, the trust is liable for the shortfall, but it incurs no penalties if its estimates were reasonable and the shortfall is paid by the due date of the withholding tax return for the year. Withholding tax on amounts required to be but not distributed during the year is also due on the due date of the return (without extensions).

A domestic complex trust must withhold from amounts distributed (or required to be distributed) to a foreign beneficiary to the extent the trustee reasonably estimates that the distribution includes distributable net income of types subject to withholding. 166 Withholding should occur at the time of distribution or, in the case of amounts required to be but not distributed, on the due date (without extensions) of the withholding tax return. Since a complex trust is taxed on income not currently distributed or required to be distributed, amounts accumulated for future distribution to beneficiaries, U.S. or foreign, are taxed to the trust, not the beneficiaries.

A domestic grantor trust must withhold tax from income subject to withholding that is included in the gross income of a foreign person who is considered owner of the trust under the grantor trust rules. 167 "The withholding must occur at the time the income is received by, or credited to, the trust."

4. *Foreign trusts.* A trust is a foreign trust unless a U.S. court "is able to exercise primary supervision over the administration of the trust" and U.S. persons have "authority to control all substantial decisions of the trust," and an estate is foreign if its connections with the United States do not go beyond those of a mere sojourner in the country. 168 A withholding agent having no documentation for a payee must presume that the payee is a trust if it "appears to be such person (e.g., based on the payee's name or other indications)." 169 A presumed trust is presumed to be a domestic trust "unless there are indicia of foreign status, in which case the trust or estate shall be presumed to be foreign." 170

The rules distinguish between simple, grantor, and complex trusts. A grantor trust is one whose income is taxed to its grantor or to some other person with great control over the trust. 171 A simple trust is a trust that is not a grantor trust but is required to distribute all of its income currently. 172 A trust that is neither a simple trust nor a grantor trust is a complex trust. 173 As discussed in more detail below, a person making a payment to a trust of income subject to withholding must treat the trust as beneficial owner and payee of the income if the trust is complex, but in the case of a payment to a simple or grantor trust, the withholding agent must withhold treating the beneficiaries or owners of the trust as the beneficial owners

and payees of the payment. An entity presumed to be a foreign trust is presumed to be a complex trust, as is an entity for which the withholding agent has documentary evidence establishing that the entity is a foreign trust but not indicating whether it is a simple, complex, or grantor trust. **174**

*Foreign estates and complex trusts.* A foreign complex trust (a trust that is neither a simple trust nor a grantor trust) is beneficial owner of its income, as is a foreign estate, **175** and a person paying income subject to withholding to such a trust or estate must therefore withhold tax from the payment. If the trust is taxed on a residence basis by a foreign country, it is entitled, with proper documentation, to the benefits of a treaty between the United States and that country. **176** A withholding agent may treat a payment as made to a foreign estate or complex trust if it can reliably associate the payment with a beneficial owner withholding certificate establishing the estate's or trust's "status as a beneficial owner." **177**

*Foreign simple and grantor trusts.* The beneficial owners of income of a foreign simple trust are the beneficiaries in whose gross incomes the income is included for U.S. tax purposes. **178** The beneficial owner of income of a foreign grantor trust is the person treated as owner of the trust under **§§ 671** through **679** . The beneficial owners of income of a foreign simple or grantor trust are also considered the payees of the income if they "provide documentation supporting their status as the beneficial owners." **179** A payee of such income is a U.S. person, exempt from withholding under **§§ 1441** and **1442** but possibly subject to Form 1099 reporting, if the withholding agent can reliably associate the payment with a Form W-9 from the beneficiary or owner. A payee is a foreign beneficial owner, subject to withholding under **§ 1441** or **§ 1442** but possibly eligible for reduced withholding under treaty, if the withholding agent can reliably associate the payment with a Form W-8 from the beneficiary or owner. The rules for intermediaries, U.S. branches of foreign financial institutions, or foreign partnerships apply to a payment that the withholding agent can reliably associate with an intermediary, branch, or partnership withholding certificate. The trust rules apply successively to a payment reliably associated with a withholding certificate from a trust that is a beneficiary of the trust receiving the payment. A foreign simple or grantor trust is treated as the payee of income it receives, and the income is exempt from withholding, if, by a valid withholding certificate, it represents that the income is effectively connected with a U.S. trade or business of the trust or the withholding agent is entitled to presume that the income is effectively connected income. **180**

Before receiving payment of income subject to withholding, a foreign simple or grantor trust should present to the withholding agent its Form W-8, which must be signed under penalties of perjury by a person authorized to act for the trust, not have expired, state the trust's name, permanent address, and employer identification number (if required), identify the country under whose laws it was created, and certify that it is a foreign simple or grantor trust. **181** Unless it represents the income to be effectively connected with a U.S. trade or business of the trust, the trust's withholding certificate should be submitted together with withholding

certificates for the beneficiaries or owners. **182** If the trust has more than one beneficiary or owner, it should also provide a withholding statement allocating the payment among the beneficiaries and owners and providing other information about the payees. **183**

A withholding agent receiving a foreign simple or grantor trust certificate may treat the entity furnishing the certificate as a foreign simple or grantor trust. **184** The withholding agent may accept a beneficiary's or owner's claim for reduced withholding only if, when it makes payment, it can reliably associate the payment, or a specified portion thereof, with a valid withholding certificate of the beneficiary or owner. **185** A beneficiary's or owner's claim for reduced withholding under treaty should be made by a Form W-8 that complies with the rules for claiming treaty benefits. **186** A claim for exemption on the ground that the beneficiary or owner is a U.S. person should be made on Form W-9. If a withholding agent receives a foreign simple or grantor trust certificate but cannot reliably associate all of the income with valid certificates from beneficiaries and owners, any portion of the payment for which documentation is lacking is presumed made to a foreign payee subject to withholding at 30 percent. **187**

## ¶ 67.4.6 Withholding Certificates and Other Documentation of Foreign Beneficial Ownership

A withholding agent usually "may rely on information or certifications contained in, or associated with, a withholding certificate or other documentation furnished by or for a beneficial owner or payee." **188** However, a withholding agent may not rely on such information or certifications if it "has actual knowledge or reason to know that the information or certifications are not incorrect or unreliable" and the facts that the withholding agent knows or has reason to know indicate a withholding tax liability greater than the tax based on the withholding certificate. A withholding agent has "reason to know if its knowledge of relevant facts or of statements contained in the withholding certificates or other documentation is such that a reasonably prudent person in the position of the withholding agent would question the claims made." **189** A foreign person's withholding certificate should be on Form 8233 (compensation for personal services) or Form W-8 (all other income). **190**

1. *Withholding certificates from beneficial owners.* "Absent actual knowledge or reason to know" otherwise, a withholding agent may consider a payment to be beneficially owned by a foreign person if it can reliably associate the payment with a beneficial owner withholding certificate furnished by the person. **191** A beneficial owner withholding certificate is a statement by which a beneficial owner represents that it is a foreign person and may claim a withholding exemption or reduced rate. **192** The certificate must be on Form W-8 (Form 8233 for personal services income), signed by the beneficial owner under penalties of perjury, and contain all of the information required by the form (including name, permanent address in the beneficial owner's country of residence, and, for entities, place of organization and entity classification). **193** The form's "validity period" must not have expired. **194**

A beneficial owner withholding certificate must state the beneficial owner's U.S. TIN if it claims a reduced rate or exemption under an income tax treaty or if it claims that the income is effectively connected with a U.S. business or that the beneficial owner is a tax-exempt organization or private foundation. 195 A TIN is an ITIN, employer identification number, or social security number. ITINs are issued by the IRS to nonresident alien individuals who are not eligible to obtain social security numbers. 196

2. *Intermediary withholding certificates.* An intermediary withholding certificate, which is a Form W-8 by which a payee represents that it is a foreign person receiving payments as intermediary, not as beneficial owner, 197 is used by foreign custodians, brokers, nominees, and other agents. 198 An intermediary may be either qualified or nonqualified. 198.1 A qualified intermediary (QI) is a foreign financial institution or clearing organization that has made a withholding agreement with the IRS. 199

Generally, a QI is a foreign financial institution that collects withholding documentation from its direct customers and presents a single QI certificate to the U.S. withholding agent for each account (including omnibus accounts) it maintains with the U.S. withholding agent. The premise underlying the QI regime is that beneficial owner documentation will be collected more regularly for accounts kept at foreign financial institutions, and that documentation will be more reliable, because of the QI's knowledge of its customer's ownership status, residence information and, where relevant, entity classification. The fact that the QI must agree to subject its documentation, collection and maintenance procedures to an audit is expected to further increase the documentation's reliability. 200

*Qualified intermediaries.* A withholding agent's responsibilities are reduced with respect to payments to a qualified intermediary. 201 If a qualified intermediary assumes "primary withholding responsibility," U.S. persons making payments to it need not withhold tax or collect information about the beneficial owners of the payments. 202 If it does not assume primary withholding responsibility, U.S. payors to the intermediary must withhold but can rely on representations made in the intermediary withholding certificate, based on beneficial owner and intermediary certificates held by the qualified intermediary but not transmitted to the payors. 203

A qualified intermediary agreement subjects the intermediary to all withholding and reporting provisions of the Code, except as the agreement limits these responsibilities. 204 It specifies the certification and documentation upon which the qualified intermediary can rely to determine the nationality, residence, and treaty eligibility of beneficial owners and U.S. payees for whom the qualified intermediary collects payments. 205 The agreement must also spell out how the IRS will verify compliance, which may take the form of reliance on the intermediary's independent auditor (possibly coupled with IRS audits of the auditor's records). 206 It can allow the intermediary to satisfy U.S. reporting requirements without disclosing the identity of its customers, but the IRS may require the intermediary to provide the names and addresses of customers claiming treaty benefits, which it is especially likely to do if the treaty contains a

limitation of benefits clause. 207 A qualified intermediary may also agree to act as an "acceptance agent"-a person who obtains ITINs from the IRS on behalf of nonresident alien individuals. 208

A qualified intermediary may assume primary responsibility for withholding tax under §§ 1441 and 1442 only if its agreement with the IRS allows it to do so. 209 An agreement authorizing primary withholding responsibility delineates procedures for the qualified intermediary to deposit withheld taxes and provides for assessment and collection of any tax the intermediary fails to withhold or remit to the IRS. 210

A qualified intermediary must provide a qualified intermediary withholding certificate to each person from whom it receives "reportable amounts." 211 Such a certificate must be on Form W-8 or an acceptable substitute, state the intermediary's TIN, be signed by an officer authorized to act for it, not have expired, and contain a variety of information, statements, and certifications. 212 The intermediary must also provide a "written statement" to the withholding agent that (1) identifies the accounts for which it acts as qualified intermediary; (2) designates the accounts for which it assumes primary withholding responsibility under §§ 1441 through 1446 and the accounts for which it assumes primary responsibility for information reporting and backup withholding on amounts beneficially owned by U.S. persons subject to such reporting and withholding (U.S. nonexempt recipients); and (3) describes the applicable "withholding rate pools." 213 A withholding rate pool is "a single type of income…subject to a single rate of withholding." 214 A withholding agent may consider a payment as made to foreign persons if it can reliably associate the payment with a valid qualified intermediary withholding certificate and the accompanying withholding statement does not allocate it to a withholding rate pool for U.S. nonexempt recipients. 215

*Nonqualified intermediaries.* A nonqualified intermediary is an intermediary that is not a qualified intermediary or is a qualified intermediary not acting in that capacity in receiving a particular payment. 216 It must provide a nonqualified intermediary withholding certificate for "reportable amounts" that it receives. 217 The certificate must be on Form W-8 or an acceptable substitute, state the intermediary's name and address, identify its home country, certify that the intermediary is not acting for its own account, be signed under penalties of perjury by an authorized person, and not have expired. 218 It may, but need not, be accompanied by beneficial owner certificates and other documents establishing whether the beneficial owner or other person for whom the intermediary collects the payment is a U.S. or foreign person. If the intermediary collects the payment for another intermediary or a flow-through entity, its withholding certificate may be accompanied by withholding certificates of the other intermediary or flow-through entity, to which may be attached beneficial owner certificates or additional intermediary or flow-through certificates. The intermediary may transmit copies of all of these documents, but if it does, it must retain the originals for as long as they may be relevant to withholding tax liability.

A nonqualified intermediary withholding certificate that transmits withholding certificates or other documentation for more than one person must be accompanied by a "withholding statement." 219 The statement, which is "an integral part of the withholding certificate" to which the certificate's jurat applies, 220 must (1) state the name, address, TIN (if any), and type of documentation for each person for whom the intermediary has received documentation; (2) allocate each payment among the payees for whom documentation is provided; (3) specify the withholding rate for each foreign payee; and (4) provide other information reasonably requested by the withholding agent. 221

Generally, a nonqualified intermediary need not "disclose information regarding persons for whom it collects reportable amounts," although, by not providing documenting beneficial ownership, it deprives beneficial owners of any withholding exemption or reduced rate for which they might otherwise qualify. 222 However, if the intermediary "has actual knowledge" that a person for whom it acts is "a U.S. non-exempt recipient" (a U.S. person subject to information reporting and backup withholding), it must provide information on these recipients "irrespective of any requirement under foreign law that prohibits the disclosure of the identity of an account holder…or financial information relating to such account holder." Moreover, if a nonqualified intermediary does not provide information sufficient to allow another withholding agent to report a payment on Form 1042-S or 1099, it is subject to penalties unless it files an information return and provides payee statements.

The regulations generally require foreign intermediaries to withhold unless another withholding agent has withheld the required amount. However, because U.S. persons making payments to a nonqualified intermediary are required to withhold, the intermediary need not withhold if it has provided a valid nonqualified intermediary withholding certificate and has no reason to know that tax has not been withheld by another withholding agent. 223

*Rules for payments to foreign intermediaries not assuming primary withholding responsibility.* If a withholding agent makes a payment to a nonqualified intermediary or to a qualified intermediary not assuming primary withholding and Form 1099 reporting responsibility, it can reliably associate the payment with valid documentation only to the extent that, when the payment is made, it can reliably determine how much of the payment relates to valid documentation provided by a "payee." 224 The payee of a payment to a foreign intermediary is the person for whom the intermediary collects the payment, except that a qualified intermediary is considered the payee of a payment as to which it assumes primary withholding responsibility. 225 For example, if a nonqualified intermediary collects a payment for a foreign beneficial owner, the beneficial owner is the payee, and the person making the payment to the intermediary (the withholding agent) can reliably associate the payment with valid documentation only if the intermediary withholding certificate is accompanied by a beneficial owner withholding certificate of the beneficial owner.

A payment to a foreign intermediary is "presumed made to an unknown, undocumented

foreign payee," requiring the withholding agent to withhold tax of 30 percent from the payment, unless (1) the withholding agent can reliably associate it with valid documentation under the rules described in the preceding paragraph or (2) the intermediary is qualified and assumes primary withholding responsibility. 226 If the intermediary withholding certificate indicates that the payment is collected on behalf of another intermediary or a flow-through entity, the foregoing rule applies as though the payment were made directly to the other intermediary or flow-through entity.

This rule applies regardless of a withholding agent's actual knowledge. 227 For example, if a nonqualified intermediary does not provide a Form W-9 for an account holder that is a U.S. person exempt from information reporting and backup withholding, the withholding agent must withhold as though the beneficial owner were a foreign person, even if it has actual knowledge that the recipient is a U.S. person.

3. *Withholding certificates from U.S. branches of foreign banks and insurance companies.* A withholding agent may make an agreement to treat a U.S. branch of a foreign bank or insurance company as a U.S. person for purposes of payments to the U.S. branch of types of income specified in the agreement. 228 If such an agreement is made, the payor normally does not withhold tax from payments to the U.S. branch that the payor can reliably associate with withholding certificates furnished by the branch under the agreement, and the branch is the withholding agent with respect to these items.

A U.S. branch withholding certificate is a Form W-8 provided by a U.S. branch that is not beneficial owner of "reportable amounts" covered by the certificate. 229 The certificate must either transmit documentation for persons for which the branch collects the payments or "be provided as evidence of its agreement with the withholding agent to be treated as a U.S. person with respect to any payment associated with the certificate. 230 It must state that the income is not effectively connected with the branch's U.S. trade or business, be signed by an authorized person under penalties of perjury, not have expired, and contain a variety of information, statements, and certifications. 231

A payment to a U.S. branch not covered by a withholding certificate is treated as a payment to a foreign person of income effectively connected with a U.S. trade or business, 232 a characterization that relieves the payor of any obligation to withhold. 233 Any withholding obligation with respect to such a payment falls on the U.S. branch.

4. *Others recognized as foreign beneficial owners.* "Absent actual knowledge or reason to know otherwise," 234 a withholding agent may treat a payment as beneficially owned by a foreign person in each of the following cases:

    a. The payment is made outside the United States with respect to an offshore account and the withholding agent can reliably associate the payment with a certificate of residence, documents establishing residence in a treaty country, or other "documentary evidence sufficient to establish the identity of the payee" and that the payee is a foreign

person. 235
    b. The payee is an international organization identified as such by executive order or a wholly owned agency of such an organization. 236
    c. The income is interest from bankers' acceptances and the payee is a foreign central bank of issue. 237

5. *Documentation requirements.* A bank, mutual fund, broker, or other financial institution must usually obtain a separate withholding certificate for each account of each customer, but aggregations are allowed in various circumstances. 238 For example, one withholding certificate may suffice for a beneficial owner's shares in several mutual funds having a single investment adviser or principal underwriter. With respect to payments on a "readily tradable instrument," a withholding agent may rely on a U.S. broker's certification that the broker holds a valid beneficial owner withholding certificate. 239

Generally, a withholding certificate or other document furnished under these rules expires at the end of the third calendar year following the year in which it is signed or created or, if earlier, on the occurrence of "a change in circumstance [that] makes any information on the certificate or document incorrect." 240 For example, absent a change in circumstances, a certificate signed on September 30, 2001, is valid through 2004. However, with respect to income not claimed to be exempt from withholding as effectively connected income, a beneficial owner withholding certificate containing the beneficial owner's TIN remains valid indefinitely as long as the withholding agent reports at least one payment annually to the beneficial owner. 241 The following types of withholding certificates are valid as long as the status of the person providing the certificate remains unchanged:

    a. A certificate from a qualified intermediary or withholding foreign partnership. 242
    b. A certificate from a nonqualified intermediary, U.S. branch of a foreign financial institution, foreign simple trust, foreign grantor trust, or foreign partnership other than a withholding foreign partnership, but the three-year rule applies to certificates and other documents accompanying the certificate of the intermediary, branch, trust, or partnership unless another exception applies. 243
    c. A certificate from a person claiming to be an integral part of a foreign government or foreign central bank of issue. 244

If a change in circumstances makes any information incorrect, "the person whose name is on the certificate or other documentation must inform the withholding agent within 30 days of the change and furnish a new certificate or new documentation." 245 The certificate or document generally becomes invalid "with respect to the information that is no longer reliable" as soon as the withholding agent "knows or has reason to know that circumstances affecting the correctness of the certificate or documentation have changed." 246 If a foreign intermediary or flow-through entity becomes aware that information in a certificate or document it has furnished to a withholding agent is no longer correct, it must notify the withholding agent and obtain a replacement certificate or document. A change of address is not a change in circumstance if it is within the same country or if, in the case of a beneficial owner certificate

claiming foreign status only, it is to any country other than the United States.

Generally, a withholding agent is protected in relying on information and certifications stated in an unexpired withholding certificate and need not "inquire into the truthfulness of this information or certification, unless it has actual knowledge or reason to know that [particular information or certifications are] untrue." 247 For example, a withholding agent receiving a beneficial owner certificate from a foreign financial institution may treat the institution as beneficial owner, not as an intermediary, unless it has contradictory information in its records or "the certificate contains information that is not consistent with beneficial owner status (e.g., sub-account numbers or names)." 248 However, if an entity's name "indicates" that it is of a type always classified for U.S. tax purposes as a corporation, a withholding agent may accept a claim that the entity is not a corporation only if its certificate represents that the entity is exempted from corporate status by a grandfather rule in the entity classification rules. 249

Withholding certificates and other documentation required by the foregoing rules must be retained "for as long as it may be relevant to the determination of the withholding agent's tax liability under section 1461 ." 250

6. *Actual knowledge and reason to know.* Generally, a withholding agent has reason to know that a withholding certificate or other document is unreliable "if its knowledge of relevant facts or of statements contained in the withholding certificate or other documentation is such that a reasonably prudent person in the position of the withholding agent would question the claims made." 251 For a financial institution receiving documentation from a payee through a nonqualified intermediary, flow-through entity, or U.S. branch of a foreign financial institution or insurance company, "[t]his standard requires, but is not limited to" the following:

  a. It "may not rely on information in" a withholding statement from the intermediary, entity, or branch "to the extent that" it "does not support the claims made for any payee." 252

  b. It may not recognize foreign status for a person for which it is furnished an address in the United States and may not allow treaty benefits for a person for which it is given an address outside of the treaty country unless it receives a "reasonable" written explanation of the discrepancy. 253

  c. It must verify that information on the withholding certificates is "consistent" with that in the withholding statement. 254

  d. It must determine whether documentary evidence received from the intermediary, entity, or branch provides an "obvious indication" that the payee is a U.S. person not exempt from information reporting and backup withholding or fail to establish the identity of the person who supplied the documentation. 255

Special rules apply to a financial institution (including a mutual fund) having "a direct account relationship with a beneficial owner" to which it pays dividends or interest on "actively traded" securities, dividends on redeemable mutual fund shares, or dividends, interest, or royalties on publicly offered and registered units in a unit investment trust. 256 With respect to such

income, a financial institution has reason to know that documentation provided by the direct account holder is unreliable or incorrect only in the following circumstances:

a. A beneficial owner withholding certificate is unreliable or incorrect if it is "incomplete with respect to any item on the certificate that is relevant to the claims made by the direct account holder,…contains any information that is inconsistent with the direct account holder's claim,…or lacks information necessary to establish entitlement to a reduced rate of withholding." 257

b. Such a certificate is also unreliable or incorrect if the owner's "name" on the certificate "is not consistent with" the classification (individual, corporation, partnership, etc.) claimed by the beneficial owner, and this classification affects the withholding rate or the reporting of the payment. 258

c. A beneficial owner withholding certificate or other documentary evidence is usually not reliable and correct in establishing foreign status for a direct account holder if it shows a residence or mailing address in the United States or the account holder notifies the financial institution of a new address in the United States. 259

d. Documentary evidence is not sufficient to establish foreign status if the withholding agent has only an address at a financial institution acting as intermediary, "an in-care-of-address, or a P.O. box." 260

e. A beneficial owner withholding certificate or documentary evidence is ineffective to establish foreign status for an offshore account if direct account holder has "standing instructions directing the withholding agent to pay amounts from its account to an address or an account maintained in the United States." 261

f. A withholding certificate or documentary evidence is usually not sufficient to establish residence in a treaty country in three circumstances:

i. The certificate shows a permanent address (or the account holder notifies the withholding agent of a permanent address) outside that country, 262 or in the case of documentary evidence, the mailing or residence address in the withholding agent's records is outside the treaty country or is a P.O. box, in-care-of-address, or the address of a financial institution acting as intermediary. 263

ii. The permanent address shown on the certificate is in the treaty country, but a mailing address in another country is found either in the certificate or the withholding agent's records. 264

iii. The direct account holder has given "standing instructions" to the withholding agent directing payments from its account to an address or account outside the treaty country. 265

g. Documentary evidence is not "valid" if it "does not reasonably establish the identity of the person presenting the documentary evidence" (e.g., a document with a picture or signature presented in person by an individual whose "appearance or signature" fails to "match" the picture or signature on the document). 266

If a withholding agent receives IRS notice that a claim of rate reduction or U.S. status is not

correct, it has "actual knowledge" of this fact beginning 30 calendar days after it receives the notice. 267

# ¶ 67.4.7 Withholding in the Absence of Documentation

1. *Classifying payees without documentation.* If a withholding agent cannot associate a payment with documents establishing the payee's status, it may rely on the following presumptions: 268

a. A payee is presumed to be an individual, trust, or estate if, from "the payee's name or other indications," the payee "appears to be" an individual, trust, or estate. 269

b. A payee is presumed to be a corporation if its name "contains an unambiguous expression of corporate status" (e.g., "Incorporated, Inc., Corporation, Corp., P.C., (but not Company or Co.)") or if its name indicates that it is a foreign organization of a type that the regulations always classify as corporations for U.S. tax purposes. 270

c. An entity is presumed to be a tax-exempt organization if its name is included in the IRS's list of charitable organizations, 271 and a payee is presumed to be a foreign government if "its name reasonably indicates that it is a foreign government." 272 The regulations also permit several other categories of organizational status to be recognized without documentation. 273

d. A payee is presumed to be a partnership if there are no "reliable indications that the payee is an individual, trust, or estate" and the payee is not presumed to be a corporation or other type or organization. 274

An entity presumed to be a corporation, partnership, tax-exempt organization, government, or other specified type is presumed to be a foreign person in four situations:

a. Its employer identification number is known to the withholding agent and begins with "98."

b. The withholding agent's communications with the payee are mailed to an address in a foreign country.

c. The payee's name indicates that it is a foreign entity of a type per se classified as a corporation.

d. Payment is made outside the United States. 275

The following presumptions are made in determining whether other persons are U.S. or foreign:

a. A recipient of a taxable scholarship or fellowship grant is presumed to be a nonresident alien if the payment is not compensation for services and "the withholding agent has a record that the payee has a U.S. visa that is not an immigrant visa." 276

b. A recipient of payments from a qualified pension, profit-sharing, stock bonus, or annuity plan, a tax-deferred annuity, or individual retirement account is presumed to be a nonresident alien unless the withholding agent (1) has a social security number for the payee and (2) for tax reporting purposes and "otherwise communicating with the payee,"

uses an address that is in the United States or a country with which the United States has an income tax treaty that exempts such payments from tax. **277**

c. A payment made outside the United States to an offshore account is presumed made to a foreign person if "the withholding agent does not have actual knowledge that the payee is a U.S. person." **278**

d. Joint payees are presumed to be "unidentified" U.S. persons if the withholding agent cannot reliably associate the payment with documentation covering all of them. **279**

e. A payment to an individual for services is presumed made to a foreign person if (1) the withholding agent does not know, or have reason to know, that the payee is a U.S. citizen or resident or that the income is or may be effectively connected with a U.S. trade or business and (2) the payee performed all of the services for which the payment is made outside of the United States. **279.1**

f. All other payees are presumed to be U.S. persons. **280**

In each of these cases, a payee or beneficial owner may rebut the presumption by providing reliable documentation to the withholding agent or (in connection with a refund claim) the IRS. **281**

A withholding agent may not rely on a presumption if (1) it knows or has reason to know that the presumption contradicts the payee's or beneficial owner's actual status and (2) withholding based on the actual status is greater than that resulting from the presumption. **282** In these cases, withholding must be based on the actual knowledge or the facts the withholding agent has reason to know. For example, if a withholding agent knows that *X*, Inc., presumed to be domestic, is foreign, the withholding agent must withhold under **§ 1442** , based on actual knowledge, because U.S. status results in no withholding. **283**

In any other case, a withholding agent acting on actual knowledge, rather than an applicable presumption, is liable for withholding tax based on the presumption, together with interest and penalties thereon, unless it can establish the correctness of the actual knowledge. **284** Assume a dividend paid to *X*, Inc., at a foreign address. **285** Because of its name and foreign address, *X* is presumed to be a foreign corporation. If, relying on actual knowledge that *X* is a domestic corporation, the withholding agent does not withhold, it is liable for withholding tax under **§ 1442** unless it can prove that *X* is a domestic corporation.

2. *Payees presumed to be U.S. persons*. A presumption that a payee is a U.S. person is not necessarily advantageous because it may subject the payee to wage withholding ( **§ 3402** ), withholding from pension payments ( **§ 3405** ), or backup withholding ( **§ 3406** ). **286** Generally, backup withholding applies to interest and dividends paid to persons (other than corporations, tax-exempt organizations, governments, and a few other types of entities) failing to provide payors with their tax identification numbers. **287** If a withholding agent, relying on a presumption that a payee is a U.S. person, withholds tax under **§ 3402** , **§ 3405** , or **§ 3406** , it is generally not liable for withholding under **§ 1441** or **§ 1442** , even if it is ultimately established that the beneficial owner is a foreign person. **288**

During a grace period of up to 90 days, a withholding agent may (but need not) treat a payee as a foreign person, even if the payee is presumed to be a U.S. person, with respect to dividends or interest on "actively traded" securities, dividends on redeemable mutual fund shares, dividends, interest, and royalties on publicly offered and registered units in a unit, and compensation for services. 289 During the grace period, the withholding agent may withhold under § 1441 or § 1442 , rather than § 3406 , and may allow reduced withholding at any rate justified by a faxed, but complete, withholding certificate. The grace period begins when the withholding agent credits any amount to a new account or credits an amount after an existing certificate is no longer reliable. It ends 90 days later or, if earlier, when the needed documentation is provided or the account balance falls below 31 percent of the sum of the amounts credited the account during the grace period that are potentially subject backup withholding. If documentation establishing foreign status is not submitted during the grace period, the presumption of U.S. status takes effect at the end of the grace period, and backup withholding may apply to all amounts credited during the grace period.

3. *Payees presumed foreign.* If a payee is presumed to be a foreign person, tax must usually be withheld at 30 percent from the payment, without reduction under any treaty or any statutory provision that does not apply to all foreign payees. 290 More completely, a withholding agent is liable for a tax of 30 percent of a payment, even if it did not withhold or withheld at a lesser rate, unless (1) a withholding agent can reliably associate the payment with documentation justifying no or lesser withholding; (2) the withholding agent may presume the payee to be a U.S. person or the payment to be effectively connected income of the payee; (3) the withholding agent "can demonstrate to the satisfaction of the [IRS] that the proper amount of tax, if any, was in fact paid to the IRS" (e.g., by the payee); or (4) the payment qualifies for reduced withholding without documentation. 291

A withholding certificate or other documentation received after a payment is made may be used to establish that the correct amount has been withheld. 292 However, with respect to payments made before 2001, if a reduced rate or withholding exemption is not justified by documents in hand at the time of payment or by a presumption, the withholding agent is liable for interest and penalties on the amount that should have been withheld, even if the underlying tax liability is not greater than the amount withheld. 293 Interest accrues from the due date of the withholding tax return until the withholding tax is paid or the withholding agent receives documentation justifying the amount withheld.

Assume domestic corporation *D*, which pays interest on a post-1984 obligation to a foreign corporation on June 15 of year 1, treats the interest as portfolio interest and withholds no tax, but it does not receive a valid Form W-8 justifying this treatment until September 30 of year 3. 294 Although the Form W-8 relieves *D* of liability for withholding tax, *D* owes the IRS interest on 30 percent of the payment from March 15 of year 2 (the due date for the withholding tax return covering the year 1 payment) to September 30 of year 3 (when *D* receives the needed documentation). 295

Generally, if a withholding agent withholds tax under § 1441 or § 1442 in reliance on a presumption that a payee is a foreign person, it is not liable for withholding under the rules for wage withholding ( § 3402 ), withholding from pension payments ( § 3405 ), or backup withholding on interest and dividends ( § 3406 ), even if it is ultimately established that the beneficial owner is a U.S. person. 296

## ¶ 67.4.8 Payments and Returns

A withholding agent is personally liable for any amount required to be withheld under §§ 1441 through 1446 , whether or not the tax is actually withheld. 297 If the tax is paid by the beneficial owner, the withholding agent is relieved of liability for the tax, but it remains liable for interest and penalties. 298 A withholding agent is "indemnified against the claims and demands of any person for the amount of" tax withheld under §§ 1441 through 1446 if it withholds "based on a reasonable belief" that withholding is required. 299

A withholding agent must deposit tax withheld under §§ 1441 through 1446 with a federal reserve bank or other authorized financial institution. 300 For each calendar year, the withholding agent must prepare a Form 1042-S reporting the amounts subject to withholding paid to or for each beneficial owner and, not later than March 15 of the following year, it must file these forms with a return on Form 1042. 301 The Form 1042 is due even if no tax was required to be withheld from the items paid during the year (e.g., because of treaty exemptions).

If a withholding agent withholds and deposits more than the amount required, it may pay the amount overwithheld to the beneficial owner or other payee and recoup this amount by reducing a subsequent deposit of tax withheld. 302 Alternatively, the withholding agent may credit the amount overwithheld against the amount required to be withheld from a subsequent payment to or for the same beneficial owner if that payment is made not later than the due date of the Form 1042-S for the year of the overwithholding. 303 Assume a payor withholds tax at 30 percent from a U.S. source dividend of $100 and deposits the amount withheld in due course, but the beneficial owner (*BO*) subsequently provides a Form W-8 establishing a right to a treaty reduction of the withholding rate to 15 percent. 304 Within the time limits described, the withholding agent may either reimburse *BO* for the $15 of excess withholding and recoup the $15 from a subsequent deposit, or it may reduce by $15 the amount withheld from a subsequent payment to *BO*.

If a withholding agent withholds too little, it may recoup the underwithholding by withholding more from a subsequent payment to or for the beneficial owner, or it may satisfy the withholding obligation from property of the beneficial owner held by the withholding agent. 305

1 See generally Bousquet, A Guide to U.S. Withholding on Non-U.S. Vendor Payments, 119 Tax Notes 713 (May 19, 2008), reprinted in 51 Tax Notes Int'l 255 (July 21, 2008); Burke, Tax Information Reporting and Compliance in the Cross-Border Context, 26 Va. Tax Rev. 399 (2007); Dale,