# Exhibit 8_H

Withholding Tax on Payments to Foreign Persons, 36 Tax L. Rev. 49 (1980). See also Lederman & Hirsh, IRS Ramps up Audit Initiative on Withholding From Foreigners, 109 J. Tax'n 350 (2008); Rocen, Clarke & Fenton, The U.S. Payer's Guide to Cross-Border Withholding and Reporting, 36 Int'l Tax J. 29 (Jan.-Feb. 2010).

**2** See Ku, Treaties as Laws: A Defense of the Last in Time Rule for Treaties and Federal Statutes, 80 Indiana L. Rev. 319 (2005); Sachs, Is the 19th Century Doctrine of Treaty Override Good Law for Modern Day Tax Treaties? 47 Tax Law. 867 (1994); Wolff, Congressional Unilateral Tax Treaty Overrides: The "Latter in Time Doctrine" Is out of Time! 9 Fla. Tax Rev. 699 (2009). See also Infanti, Curtailing Tax Treaty Overrides: A Call to Action, 62 U. Pitt. L. Rev. 677 (2001), reprinted in abridged form as Curtailing Tax Treaty Overrides: An Argument, 23 Tax Notes Int'l 747 (Aug. 6, 2001).

**2.1** A withholding agent is required to file Form 1042S reporting withholding payments to each recipient and Form 1042 summarizing all of its Forms 1042S. Both forms must be filed with the IRS for each calendar year by March 15 of the following year, and copies of Forms 1042S must be provided to the recipients by the same date. Most withholding agents must make their filings with the IRS electronically and deposit withheld amounts as often as four times each month. See Industry Directive on Examinations of Forms 1042 (Oct. 31, 2003), available at http://www.irs.gov/businesses/article/0,,id=171428,00.html; Hatten-Boyd, Manning, Friedman & Blasdel, U.S. Withholding Agent Examinations on the Rise, 59 Tax Notes Int'l 357 (Aug. 2, 2010).

**2.2 Reg. § 1.1464-1(a)** . The Treasury intends to amend the regulations to provide that withholding in excess of the beneficial owner's tax liability may be refunded or credited to the owner "only to the extent the relevant withholding agent has deposited (or otherwise paid to the Treasury Department) the amount withheld and such amount is in excess of the claimant's tax liability." **Notice 2015-10, 2015-19 IRB 965, § III** . The IRS explained the reasons for the amendment as follows:

[Treasury is] aware that withholding agents may not always be compliant with the requirement to deposit amounts withheld . . . or reported as withheld on Form 1042-S. If a refund or credit is issued for an amount that has not been deposited, the IRS may not be able to recover that amount because the claimant and, in some cases the relevant withholding agent, may be outside the United States. The allowance of refunds or credits based on the amount reported as withheld on Form 1042-S subjects the Treasury Department to the risk that refunds or credits may be improperly granted for fictitious withholding or amounts that have not been deposited, for which collectability issues may arise.

**Notice 2015-10** , supra, § I.

**3** See Bennett, New Withholding Regs: Implications for Claiming U.S. Treaty Benefits, 16 Tax Notes Int'l 133 (Jan. 12, 1998), reprinted in 78 Tax Notes 465 (Jan. 26, 1998); Halphen, IRS Revises 1997

Withholding Regulations-A Race to the Finish? 20 Tax Notes Int'l 2599 (June 12, 2000); Heggy, Withholding Tax on Payments to Foreign Payees: A (Cargo) Pocket Guide to the New Regulations, 29 Tax Mgmt. Int'l J. 547 (2000); Klein & Renfroe, The Final Withholding Regulations: A Rube Goldberg Contraption-Will It Work? 27 Tax Mgmt. Int'l J. 67 (1998); Lederman & Hirsh, Final Regs. Revamp Withholding on Foreign Persons-Will the New Burdens Backfire? 88 J. Tax'n 112 (1998); McGill & Stephens, An Introduction to U.S. 1441 NRA Regulations, 21 Tax Notes Int'l 2821 (Dec. 18, 2000); Schler, Issuing Bonds to Non-U.S. Investors: Finding the Path Through the Tax Maze, 81 Tax Notes 1111 (Nov. 30, 1998), reprinted in 17 Tax Notes Int'l 1835 (Dec. 7, 1998). See also ABA Tax Section Comm. on U.S. Activities of Foreigners and Tax Treaties, Report on Consolidating and Simplifying the Withholding Rules and Procedures Under **Sections 1441** Through 1446, 47 Tax Law. 425 (1994); Blanchard, The Uncertain Withholding Tax Status of Foreign Investment Funds, 22 Tax Notes Int'l 321 (Jan. 15, 2001); VanderWolk, Offshore Funds and U.S. Withholding Tax: Navigating the New Regulations, 21 Tax Notes Int'l 611 (Aug. 7, 2000).

**4 Reg. §§ 1.1441-1(f)** , **1.1441-2(f)** , **1.1441-3(h)** , **1.1441-4(g)** , **1.1441-5(g)** , **1.1441-6(h)** , **1.1441-7(g)** , **1.1441-8(f)** , **1.1441-9(d)** , **1.1461-1(i)** . The regulations originally applied to payments after 1998, but the effective date was deferred for one year and then for another year because the regulations' substantial modifications of withholding procedures "require[d] significant changes to business practices and information systems," changes that withholding agents had to make as they were also coping with the year 2000 problem and effects of the introduction of the Euro by most members of the European Union. **Notice 99-25, 1999-1 CB 1070** ; **Notice 98-16, 1998-1 CB 847** . The second deferral was also motivated by a belief that foreign financial institutions (known as qualified intermediaries) could be brought into the system more completely with more time to accommodate. For qualified intermediaries, see infra **¶ 67.4.6** text accompanying notes 201-215.

The Treasury, in 2017, made significant changes in the withholding regulations. **TD 9808** , 82 Fed. Reg. 2046 (Jan. 6, 2017). These amendments, most of which are not yet reflected in this section of the treatise, generally apply to payments made after January 5, 2017. Many of the revised provisions are temporary; the temporary provisions expire on December 30, 2019. Prior temporary regulations, which expired on February 28, 2017, contained most of these amendments. **TD 9658** , 79 Fed. Reg. 12,726 (Mar. 6, 2014); **Notice 2014-59, 2014-44 IRB 747** (deferring effective date of some aspects of Temp. Reg. § 1.1441-7T(b)).

**5 TD 8734, 1997-2 CB 109, 109-111** .

**6** See infra **¶ 111.1.9** (Form 1099 reporting), **¶ 111.5.3** ( **§ 3406** ).

**7 Reg. § 1.1441-1(b)(2)(i)** . For withholding certificates, see infra **¶ 67.4.6** .

**8 Reg. § 1.1441-1(b)(1)** . See **Reg. § 1.1441-1(c)(1)** ("withholding" means to deduct tax from

payment at applicable rate).

**9** See infra ¶ **67.4.2** ("amount subject to withholding"), ¶ **67.4.6** text accompanying notes 201-215 (qualified intermediaries), ¶ **67.4.6** text accompanying notes 228-233 (U.S. branches of foreign banks and insurance companies), and ¶ **67.4.5** text accompanying notes 152- 160 (withholding foreign partnerships).

**10 Reg. § 1.1441-7(a)** .

**11** If a corporation's obligations are assumed in connection with a sale of the corporation's "property," the assuming party succeeds to the corporation's obligations as withholding agent. **Reg. § 1.1441-7(e)** .

**12 Reg. § 1.1441-7(c)(1)** .

**13 Reg. § 1.1441-7(c)(2)** . For the notice, see **Reg. § 1.1441-7(c)(3)** .

**14** Reg. § 1.1441-7(c)(4).

**15 Reg. § 1.1441-1(b)(2)(i)** .

**16 Reg. § 1.1441-1(c)(12)** .

**17 Reg. § 1.1441-1(b)(2)(ii)** . The term "financial institution" includes persons engaged in banking, financing, or similar businesses, brokers and dealers in securities, insurance companies, and persons whose primary business is rendering investment advice. It also includes finance companies whose business consists in substantial part of making loans, acquiring accounts receivable or notes or installment obligations arising in sales of tangible personal property or the performance of services, and servicing debt obligations. Reg. §§ 1.165-12(c)(1)(v), **1.1441-1(c)(5)** .

**18 Reg. § 1.1441-1(b)(2)(iii)** . For disregarded entities, see infra ¶ **85.4** .

**19 Reg. § 1.1441-1(b)(1)** .

**20 Reg. § 1.1441-1(c)(2)** . A nonresident alien individual is a natural person who is not a U.S. citizen and is not a resident of the United States under **§ 7701(b)** . **Reg. § 1.1441-1(c)(3)** . For **§ 7701(b)** , see supra ¶ **65.2** .

Generally, a foreign corporation is one organized under the laws of any jurisdiction other than the United States, one of its states, or the District of Columbia, but some corporations organized in Guam, the Commonwealth of Northern Mariana Islands, the U.S. Virgin Islands, and American Samoa are not foreign corporations for this purpose. **IRC § 881(b)** ; **Reg. § 1.1441-1(c)(4)** .

Payments to foreign governments and international organizations are treated as made to foreign corporations for purposes of the withholding rules. **Reg. § 1.1441-1(c)(4)** .

For qualified intermediary withholding certificates, see infra ¶ **67.4.6** text accompanying notes 201-215 .

**21 Reg. § 1.1441-1(b)(2)(iv)(A)** . For U.S. branches of foreign banks and insurance companies, see infra ¶ **67.4.6** text accompanying notes 228-233.

**22 Reg. § 1.1441-1(b)(1)** .

**23 Reg. § 1.1441-1(c)(6)(i)** (beneficial owner is "the person who is the owner of the income for tax purposes and who beneficially owns that income"). Beneficial ownership of a payment not included in gross income is determined "as if the amount was income." For example, a scholarship is beneficially owned by the student, even if **§ 117** excludes it from gross income.

**24** For the conduit regulations, see supra ¶ **67.3.2** .

**25 Reg. § 1.1441-3(g)** (applicable to payments made after September 10, 1995).

**26** See, e.g., **Reg. § 1.1441-1(b)(1)** .

**27 Reg. § 1.1441-1(b)(2)(vii)(A)** . For special rules applicable to withholding certificates from various types of payees, see **Reg. § 1.1441-1(b)(2)(vii)(B)** (nonqualified intermediaries and flow-through entities), **Reg. § 1.1441-1(b)(2)(vii)(C)** (qualified intermediaries not assuming primary withholding responsibility), **Reg. § 1.1441-1(b)(2)(vii)(D)** (qualified intermediaries assuming primary responsibility for withholding under **§§ 1441 - 1442** but not for Form 1099 reporting and backup withholding), **Reg. § 1.1441-1(b)(2)(vii)(E)** (qualified intermediaries assuming primary responsibility for Form 1099 reporting and backup withholding only), **Reg. § 1.1441-1(b)(2)(vii)(F)** (withholding foreign partnerships and qualified intermediaries assuming primary responsibility for Form 1099 reporting and **§§ 1441 - 1442** and backup withholding).

**28 Reg. § 1.1441-1(b)(1)** .

**29 Reg. § 1.1441-1(d)(2)** (since Form W-9 "serve[s] as a statement that the person…is a U.S. person…a foreign person…shall not provide a Form W-9"). See **Announcement 2001-91, 2001-2 CB 221** (payors may receive Form W-9 electronically from payee or investment adviser or introducing broker authorized to transmit form as payee's agent).

**30 IRC §§ 3406(b)** , **3406(g)** , discussed infra ¶ **111.5.3** . Backup withholding does not apply to any such item if withholding is required under any other regime (e.g., **§§ 1441** and **1442** ). See Neuenhaus, U.S. Tax and Reporting Obligations for Foreign Intermediaries' Non-U.S. Securities, 47 Tax Notes Int'l 913 (Sept. 3, 2007).

**31 Reg. § 1.1441-1(d)(3)** .

**32 Reg. § 1.1441-1(d)(4)** . For U.S. branches of foreign banks and insurance companies, see infra ¶ **67.4.6** text accompanying notes 228 -233.

**33 Reg. § 1.1441-1(d)(1)** .

**34 IRC §§ 871(a)(1)** , **882(a)** , **1441** , **1442** ; **Reg. §§ 1.1441-2(a)** , **1.1441-2(c)** . The withholding agent must withhold 30 percent of the gross proceeds of the transactions described in items (2) and (3) in text unless the withholding certificate states the beneficial owner's basis for the property. **Reg. § 1.1441-3(d)(2)** . The withholding agent may accept the basis amount given in the withholding certificate unless it has "actual knowledge or reason to know otherwise."

**35 Reg. §§ 1.1441-2(b)(1)(i)** , **1.1441-2(b)(2)** .

**36 Reg. § 1.1441-2(a)** . For the sources of income generally, see infra ¶ **73.1** .

**37 Reg. § 1.1441-2(b)(1)(i)** .

**38 Reg. § 1.1441-2(e)(1)** . See **Framatome Connectors USA, Inc. v. CIR, 118 TC 32 (2002)** , aff'd without published opinion, **2004-2 USTC ¶ 50,364 (2d Cir. 2004)** (withholding tax applied to constructive dividends resulting from domestic corporation's transfer to foreign parent of assets exceeding assets received in exchange). A payment blocked under executive authority (e.g., the president's emergency power under the Trading with the Enemy Act) is considered paid only when the restrictions are lifted. **Reg. § 1.1441-2(e)(3)** .

**39** However, this income is not subject to withholding unless the creditor has money or property of the

debtor from which tax can be withheld. **Reg. § 1.1441-2(d)(2)** . See **Reg. § 1.1441-2(d)(1)** , discussed infra text accompanying notes 65-67. For cancellation of indebtedness income, see supra **¶ 7.1** .

**40 Reg. § 1.1441-2(e)(4)** .

**41 Reg. § 1.1441-2(e)(1)** .

**42 Reg. § 1.1441-2(e)(6)** .

**43 Reg. § 1.1441-2(e)(2)** . See **Central de Gas de Chihuahua, SA v. CIR, 102 TC 515 (1994)** (taxpayer foreign corporation leased equipment to related foreign corporation for use in United States but collected no rent; held, rents imputed under **§ 482** are taxable under **§ 881(a)** ). For **§ 482** , see infra **¶ 79.1** .

If a secondary adjustment results in additional income, this income is also deemed paid. For secondary adjustments, see infra **¶ 79.11** .

**44 Reg. § 1.1441-3(a)** .

**45 Reg. § 1.1441-3(b)(1)** .

**46 Reg. §§ 1.1441-1(b)(8)** , **1.1461-2(b)** , discussed infra **¶ 67.4.8** .

**47 Reg. § 1.61-7(d)** .

**48 Reg. § 1.1441-3(b)(2)** . The IRS has proposed amending this regulation to require withholding with respect to interest accrued on the date of sale if "the withholding agent has knowledge of the amount paid as interest." **Prop. Reg. § 1.1441-3(b)(2)** . The knowledge rules of the OID provisions would be applied for this purpose.

**49** See supra **¶ 53.1** . OID accruals on many instruments may be determined from IRS Pub. No. 1212, List of Original Issue Discount Instruments.

**50 Reg. § 1.1441-2(b)(3)(i)** .

**51 Reg. § 1.1441-2(b)(3)(ii)** . A person other than an issuer or an issuer's agent is required to withhold from OID only with respect to obligations issued after 2000. **Reg. § 1.1441-2(b)(3)(iii)** .

**52 Reg. § 1.1441-2(b)(3)(i)** .

**53 Reg. § 1.1441-3(c)(1)** . For special rules for distributions by mutual funds and other regulated investment companies, see **Reg. § 1.1441-3(c)(3)** .

**54** See infra **¶ 92.1** .

**55 Reg. §§ 1.1441-3(c)(2)(i)** , **1.1441-3(c)(2)(ii)(A)** .

**56 Reg. § 1.1441-3(c)(2)(ii)(B)** . However, the withholding agent's payment of the withholding shortfall is not additional income subject to withholding unless the withholding agent agreed to bear the shareholder's entire withholding tax liability. Also, no penalties are imposed on the underwithholding if the corporation's estimate was reasonable and the tax is fully paid by the due date of the withholding tax return or, if later, within 60 days after the close of the taxable year of the distribution.

**57 Reg. § 1.1441-3(c)(2)(ii)(C)** .

**58 Reg. § 1.1441-3(c)(2)(i)** .

**59 Reg. § 1.1441-3(c)(2)(i)** . For rules coordinating withholding under **§§ 1441** and **1442** with withholding under **§ 1445** , see **Reg. § 1.1441-3(c)(4)** . For **§ 1445** , see infra **¶ 67.7.10** .

The Treasury has proposed regulations on withholding from distributions in redemption of corporate stock that is actively traded on an established financial market, providing an escrow procedure for withholding agents to apply pending determinations under **§ 302** of whether distributions to foreign shareholders are dividends subject to withholding or distributions in exchange for stock. REG-140206-06, 72 Fed. Reg. 58,781 (Oct. 17, 2007). See Hester, Tonkovich, Morris & Fox, Withholding Procedures for Certain **Section 302** Distributions Under Scrutiny in Newly Proposed Regulations, 9 Derivative 20 (Jan. 2008); Tanenbaum, **Section 1441** Again: Proposed Regulations on Distributions in Redemption of Stock, 37 Tax Mgmt. Int'l J. 108 (2008); Tillinghast, Further Thoughts on the Proposed Regulations Dealing With Public Self-Tender Transactions, 37 Tax Mgmt. Int'l J. 180 (2008).

**60 Reg. § 1.1441-3(d)(1)** .

**61 Reg. § 1.1441-3(e)(1)** .

**62 Reg. § 1.1441-3(e)(2)** . "A withholding agent making regular or frequent payments in foreign currency may use a month-end spot rate or a monthly average spot rate," or it may use the spot rate for the date on which the tax is deposited if it makes the deposit within seven days after paying the item subject to withholding. A withholding agent must use any such spot rate convention consistently for all non-dollar amounts withheld for the year it adopts the convention until it changes the convention with the IRS's consent. The beneficial owner of the item must treat the U.S. dollar amount so determined as the tax withheld for purposes of determining final U.S. tax liability and claiming a refund or credit of the tax. The "spot rate" is "a fair market rate of exchange available to the public for currency under a spot contract in a free market" in which "representative amounts" are traded. **Reg. § 1.988-1(d)(1)** . Quotation sources include International Financial Statistics of the International Monetary Fund, newspapers, financial journals, and electronic financial news services.

**63 Reg. § 1.1441-3(e)(1)** .

**64 Reg. § 1.1441-3(f)** , discussed infra text accompanying notes 68-71.

**65 Reg. § 1.1441-2(d)(1)** .

**66 Reg. § 1.1441-2(d)(2)** . A partial payment by the borrower is not considered property of the borrower.

**67 Reg. § 1.1441-2(d)(1)** . A withholding agent is related to a recipient or beneficial owner if transactions between them would be subject to adjustment under **§ 482** . See infra **¶ 79.2** .

**68 Reg. § 1.1441-2(d)(3)** .

**69 Reg. § 1.1441-3(f)(1)** .

**70 Reg. § 1.1441-3(f)(2) Ex.**

**71 Reg. § 1.1441-2(d)(3)** .

**72 Reg. § 1.1441-1(b)(4)** .

**73 Reg. § 1.1441-1(b)(4)(v)** .

**74 IRC §§ 871(i)** , **881(d)** , discussed supra **¶ 67.2.2** text accompanying note 63.

**75 IRC § 871(g)(1)(B)(i)** ; **Reg. §§ 1.1441-1(b)(4)(iv)** , **1.1441-2(a)(3)** .

**76 IRC §§ 861(c)** , **871(i)(2)(B)** , **871(d)** , discussed infra **¶ 73.2** text accompanying notes 7-15.

**77 IRC § 884(e)(3)** ; **Reg. § 1.1441-1(b)(4)(vii)** . For the branch profits tax, see infra **¶ 67.8.2** .

**78 Reg. § 1.1441-4(a)(3)** . For notional principal contracts, see supra **¶ 57.4** .

**79 Reg. §§ 1.1441-1(b)(4)(xviii)** , **1.1441-4(e)** .

**80 IRC § 1441(c)(11)** ; **Reg. §§ 1.1441-1(b)(4)(xx)** , **1.1441-2(a)(4)** . See supra **¶ 67.2.9** text accompanying notes 169-170 for **§ 871(j)** .

**81** For a list of items that may be exempted from information reporting and backup withholding on a showing that the payee is a foreign person, see **Reg. § 1.1441-1(b)(5)** .

**82** If withholding on a payment to joint owners can be only reduced with documentation, the withholding agent must usually withhold at 30 percent unless it has documents covering all of the joint owners. **Reg. § 1.1441-1(b)(9)** . However, such a payment is exempt from withholding if any one of the joint owners provides a Form W-9 certifying that it is a U.S. person or the withholding agent has a withholding certificate allowing it to treat the payment as beneficially owned by U.S. persons.

**83 IRC § 1441(c)(9)** ; **Reg. § 1.1441-1(b)(4)(i)** . For portfolio interest, see supra **¶ 67.2.2** text accompanying notes 23-62.

If a foreign person transfers a debt instrument in a securities lending or "sale-repurchase" transaction, payments received by that person in substitution for interest on the transferred instrument may also be portfolio interest. See supra **¶ 67.2.2** note 14.

**84 Reg. §§ 1.871-14(c)(2)** , **1.1441-1(b)(4)(i)** . This documentation must usually be (1) a withholding certificate from the beneficial owner, a qualified intermediary that has assumed primary withholding responsibility, a withholding foreign partnership, or a U.S. branch of a foreign financial institution, or (2) a statement from a securities clearing organization or financial institution that holds customers' securities in the ordinary course of business stating that the institution or another intermediary has received such a beneficial owner withholding certificate. **Reg. § 1.871-14(c)(2)** .

**85 Reg. §§ 1.871-14(e)** , **1.1441-2(a)(1)** . See **Reg. § 1.871-14(e)(2)** (defining "foreign-targeted

registered obligation"). Documents establishing foreign status may be necessary to avoid backup withholding.

**86 IRC § 1441(c)(1)** ; **Reg. § 1.1441-4(a)(1)** .

**87** A treaty exemption from withholding must instead be asserted under the rules described infra **¶ 67.4.4** .

**88 Reg. §§ 1.1441-1(b)(4)(viii)** , **1.1441-4(a)(2)(i)** .

**89 Reg. § 1.1441-4(a)(2)(ii)** . If the branch furnishes no withholding certificate but a payment is not effectively connected income, the branch must withhold from the payment whether the item is beneficially owned by the recipient or collected on behalf of another person. For U.S. branches of foreign banks and insurance companies, see infra **¶ 67.4.6** text accompanying notes 228 - 233.

**90 IRC § 1441(c)(4)** ; **Reg. §§ 1.1441-1(b)(4)(ix)** , **1.1441-4(b)** . Documentation is required under the wage withholding rules.

When an individual's services income is subject to withholding under **§ 1441** , the withholding agent may reduce the amount subject to withholding by 1/365 of one personal exemption for each day the individual is present in the United States for the performance of the services. **Reg. § 1.1441-4(b)(6)** . If the individual resides in Canada or Mexico, more than one exemption may be allowed, but the exemption or exemptions are apportioned on the same daily basis.

**91 Reg. §§ 1.1441-4(b)(1)(ii) - 1.1441-4(b)(1)(iv)** . Commissions and rebates paid by ship suppliers to a nonresident alien individual employed by a foreign operator of ships of foreign registry are also exempted from **§ 1441** withholding if these amounts are paid for placing orders with the suppliers for supplies to be used in the ships' operations. **Reg. § 1.1441-4(b)(1)(v)** .

**92 Reg. § 1.1441-4(b)(2)** .

**93 Reg. § 1.1441-4(b)(3)** .

**94 Reg. § 1.1441-4(b)(4)** . The tax determination made by the IRS is only tentative; the services performer must file a return making a final settlement of tax liability for the year. **Reg. § 1.1441-4(b)(5)** .

**95 IRC §§ 871(f)** , **1441(c)(7)** ; **Reg. § 1.1441-4(d)** .

**96 Reg. §§ 1.1441-1(b)(4)(x)** , **1.1441-4(d)** . If the beneficial owner has never been a U.S. citizen or resident, the TIN may be an individual taxpayer identification number (ITIN), which is a number issued by the IRS to nonresident alien individuals who are not eligible for social security numbers. **Reg. §§ 301.6109-1(d)(3)** , **301.6109-1(g)** , **301.6109-1(h)(1)** , discussed infra **¶ 111.1.10** note 184 and accompanying text.

**97 IRC § 1441(b)** . The income is deemed to be effectively connected with a U.S. trade or business, whether or not the recipient actually has such a trade or business. **IRC § 871(c)** . See **Rev. Proc. 88-24, 1988-1 CB 800** (withholding procedures for scholarships and grants paid to foreign students and grantees); Harding, Making Scholarship and Fellowship Payments to Foreign Students: An Overview of Tax Issues and Problems, 55 Tax Notes 533 (Apr. 27, 1992).

In lieu of withholding at 14 percent, the withholding agent may choose to withhold as though the income were wages subject to wage withholding. **Reg. § 1.1441-4(c)(2)** .

The IRS has instituted a Voluntary Compliance on Alien Withholding Program (VCAP) "to enhance voluntary compliance among public and other not-for-profit colleges and their affiliates." **Rev. Proc. 2001-20, 2001-1 CB 738** .

> Organizations that request consideration under VCAP agree to (1) identify those areas in which they are not in compliance with tax, withholding, and reporting obligations on payments to alien individuals; (2) compute and pay any tax due; and (3) institute procedures and policies which will assure compliance in the future with the organization's tax, withholding, and reporting obligations. Organizations will receive assurance that their proposed procedures and policies…are acceptable to the Service, and the Service generally will not impose penalties for identified underpayments or deficiencies, if the liability is due to reasonable cause.

**Id. § 1.04** . For the time being, the Program applies to submissions made during the period February 26, 2001, through February 28, 2002. **Id. § 6** .

**98 IRC § 1441(b)(1)** . For the source rules applicable to scholarships and fellowships, see infra **¶ 73.9** text accompanying notes 5 -8.

**99** See supra **¶ 11.2** .

**100 IRC § 1441(b)(2)** .

**101 Reg. §§ 1.1441-1(b)(4)(xvi)** , **1.1441-4(c)(1)** . If the recipient claims a lower rate or exemption under a treaty, this claim must be made under the procedures for treaty benefits. See IRS Pub. 519,

U.S. Tax Guide for Aliens Appendix A (statements nonresident alien students must file with Form 8233 to claim tax treaty exemption from withholding of tax on dependent personal services); infra ¶ **67.4.4** .

**102 Reg. §§ 1.1441-1(b)(4)(xi)** , **1.1441-8(b)** . These payments are also exempt from information reporting. For **§ 892** , see infra ¶ **67.10.1** .

**103 Reg. §§ 1.1441-1(b)(4)(xii)** , **1.1441-8(c)(1)** . No withholding certificate is required for bankers' acceptances "if the name of the payee and other facts surrounding the payment reasonably indicate that the payee or beneficial owner is a foreign central bank of issue." **Reg. § 1.1441-8(c)(2)** . For **§ 895** , see infra ¶ **67.10.2** .

**104 Reg. §§ 1.1441-1(b)(4)(xiv)** , **1.1441-8(d)** . These payments are also exempt from information reporting. For **§ 892(b)** , see infra ¶ **67.10.3** .

**105 Reg. § 1.1441-9(a)** . All payments to foreign tax-exempt organizations are exempt from information reporting. **Reg. § 1.1441-1(b)(4)(xvii)** .

**106 Reg. §§ 1.1441-1(b)(4)(xvii)** , **1.1441-9(b)(2)** . The certificate must also identify any portion of the amounts paid that will be included in determining unrelated business taxable income and indicate whether the organization is a private foundation. If the certification on unrelated business income or private foundation status is missing or not reliable, the withholding agent may accept the certificate and treat all payments as includable in unrelated business taxable income or treat the organization as a private foundation. **Reg. § 1.1441-9(b)(3)** .

**107 IRC § 1443(a)** ; **Reg. §§ 1.1441-1(b)(4)(xvii)** , **1.1443-1(a)** . See **Reg. § 1.1443-1(c)** ( **Reg. § 1.1443-1** applies to payments made after 2000).

**108 IRC §§ 1443(b)** , **4948(a)** ; **Reg. § 1.1443-1(b)** . Any such item is exempt from the 4 percent tax if it is included in unrelated business taxable income.

**109 Reg. § 1.1441-6(a)** . See **Reg. § 1.1441-6(e)** (regulations' procedures "may be modified" by agreements between competent authorities); Bennett, New Withholding Regs: Implications for Claiming U.S. Treaty Benefits, 16 Tax Notes Int'l 133 (Jan. 12, 1998), reprinted in 78 Tax Notes 465 (Jan. 26, 1998).

**110 Reg. § 1.1441-1(b)(4)(xv)** . By establishing foreign status, this documentation also exempts the item from information reporting and backup withholding.

On the rare occasions where U.S. persons benefit by treaty provisions reducing U.S. withholding

rates, the treaty benefit may be claimed by a Form W-9. **Reg. § 1.1441-6(b)(4)** .

**111 Reg. § 1.1441-6(b)(1)** . See **Reg. § 1.1441-6(g)(1)** (except as regulations otherwise provide, **Reg. § 1.1441-6(b)(1)** does not apply to withholding certificate not including beneficial owner's TIN). For withholding certificates, see infra **¶ 67.4.6** . For limitation of benefits articles, see supra **¶ 67.3.3** . If the beneficial owner is related to the withholding agent for purposes of **§ 482** , the withholding certificate must also represent that the beneficial owner will comply with the requirements of **§ 6114** for disclosing treaty positions. See infra **¶ 79.2** for relatedness under **§ 482** and supra **¶ 65.4.3** for **§ 6114** .

**112 Reg. § 1.1441-6(d)** .

**113 Reg. § 1.1441-4(b)(2)** , discussed supra **¶ 67.4.2** text accompanying note 92.

**114 Reg. § 1.1441-6(c)(2)** .

**115 Reg. § 1.1441-6(c)(1)** . An offshore account is an account maintained in a foreign country with an office or branch of a U.S. or foreign bank or other financial institution. **Reg. § 1.6049-5(c)(1)** .

**116 Reg. § 1.1441-6(c)(3)** . The certificate must have been issued within three years before it is presented to the withholding agent. The competent authorities of the United States and the other party to the treaty may agree on different procedures for certifying residence.

**117 Reg. § 1.1441-6(c)(4)(i)** . The document must usually have been issued during the three years preceding the date it is presented to the withholding agent, but an older document is acceptable as proof of residence "if it is accompanied by additional evidence of the person's residence in the treaty country (e.g., a bank statement, utility bills, or medical bills)."

**118 Reg. §§ 1.1441-6(c)(4)(ii)** , **1.1441-6(c)(5)** . For the regulations under **§ 894** , see supra **¶ 67.3.1** .

**119 Reg. §§ 1.1441-6(g)(2)** , **1.1441-6(g)(3)** . This rule applies to payment made after 2001. **Reg. § 1.1441-6(h)** .

**120 Reg. § 1.1441-6(g)(4)** (payor or beneficial owner does "not lack the requisite knowledge of the forthcoming payment solely because the amount of the payment is not fixed").

**121 Reg. § 1.1441-6(g)(5) Ex. 1** .

**122 Reg. § 1.1441-6(g)(5) Ex. 2** .

**123 Reg. § 1.1441-6(g)(5) Ex. 3** .

**124** See, e.g., **U.S. Model Income Tax Convention of September 20, 1996, art. 4(1)(d)** . See Reg. § 1.894-1(d)(4)(ii) (entity is fiscally transparent under country's tax laws "to the extent the jurisdiction requires interest holders in the entity to take into account separately on a current basis their respective shares of the items of income paid to the entity and to determine the character of such items as if such items were realized directly from the source from which realized by the entity…").

**125 Reg. § 1.1441-6(b)(2)(i)** . See **Reg. § 1.1441-1(e)(3)(i)** ("[a] flow-through withholding certificate is a Form W-8 used by a flow-through entity…").

If the fiscally transparent entity is also a qualified intermediary for purposes of claiming reduced withholding for interest holders, it may provide a single qualified intermediary withholding certificate for all amounts for which it claims treaty benefits for interest holders. **Reg. § 1.1441-6(b)(2)(ii)** .

**126 Reg. §§ 1.1441-6(b)(2)(i)** , **1.1441-6(b)(2)(iii)** .

**127 Reg. § 1.1441-6(b)(2)(iii)** .

**128 Reg. § 1.1441-6(b)(2)(iv) Ex. 2** .

**129 Reg. § 1.1441-6(b)(2)(iii)** .

**130 Reg. § 1.1441-1(b)(2)(i)** . A partnership is domestic if it is organized under the laws of one of the U.S. states or the District of Columbia. **IRC § 7701(a)(4)** . See supra **¶ 65.3.2** .

**131 Reg. § 1.1441-5(b)(1)** .

**132 Reg. § 1.1441-5(b)(i)(A)** . Any such income must be separately stated on the partnership's returns and in the allocations to the partners. See Blum, IRS Clarifies When to Report Tax Withheld by Domestic Partnerships With Foreign Partners on FDAP Income, 9 Derivatives 12 (Jan. 2008) (commenting on instructions to Form 1042).

**133 Reg. § 1.1441-5(b)(2)(i)(B)** . For **§ 1446** , see infra ¶ **67.6.8** . When withholding occurs under **§ 1446** , the partners are not required to provide withholding certificates claiming exemption from withholding under **§ 1441** or **§ 1442** .

**134 Reg. § 1.1441-1(b)(3)(ii)** .

**135 Reg. § 1.1441-5(d)(2)** .

**136** See **IRC § 7701(a)(4)** (foreign partnership is one not organized under laws of U.S. state or District of Columbia).

**137** Reg. §§ 1.1441-1(c)(6)(B), **1.1441-5(c)(1)(i)** .

**138** Reg. § 1.1441-5(c)(iv) Ex. 2.

**139** Reg. § 1.1441-5(c)(iv) Ex. 1.

**140 Reg. § 1.1441-5(c)(3)(iii)** . See **Reg. § 1.1441-1(e)(3)(vi)** (reportable amounts include amounts subject to withholding under **§ 1441** or **§ 1442** , interest on deposits with U.S. banks (excepting deposits for periods of two weeks or less), interest or OID on obligations of U.S. issuers maturing within one year of issue (excepting OID on obligations held for not more than two weeks)).

**141** A nonwithholding foreign partnership certificate expires only when relevant circumstances change, although certificates of partners transmitted with the partnership's certificate may expire at the end of the third year following the year in which the partners signed them. **Reg. § 1.1441-1(e)(4)(ii)(B)(6)** .

**142 Reg. § 1.1441-5(c)(3)(iv)** . For withholding statements, see **Reg. § 1.1441-1(e)(3)(iv)** , discussed infra ¶ **67.4.6** text accompanying notes 220- 223.

**143 Reg. § 1.1441-5(c)(3)(i)** .

**144 Reg. § 1.1441-5(c)(3)(iii)** (copies of partners' certificates may be transmitted, as long as partnership retains originals for as long as they may be relevant for withholding tax purposes).

**145 Reg. § 1.1441-5(c)(3)(ii)** .

**146 Reg. §§ 1.1441-5(c)(1)(i)(A)** , **1.1441-5(c)(1)(i)(B)** .

**147 Reg. §§ 1.1441-5(c)(1)(i)(C)** , **1.1441-5(c)(1)(i)(D)** .

**148 Reg. § 1.1441-5(c)(1)(ii)** . See Reg. § 1.1441-5(c)(iv) Ex. 4. For the exemption of effectively connected income from withholding, see supra **¶ 67.4.3** text accompanying notes 86-89.

**149 Reg. § 1.1441-5(c)(3)(ii)** .

**150 Reg. § 1.1441-5(d)(3)** .

**151 Reg. § 1.1441-5(c)(3)(i)** . For the circumstances under which a payment to an unidentified person is deemed made to a foreign partnership, see **Reg. § 1.1441-5(d)(2)** , discussed supra text accompanying note 135.

**152 Reg. § 1.1441-5(c)(2)(ii)** . See **Rev. Proc. 2017-21, 2017-6 IRB 791** (forms for withholding foreign partnership agreements and application procedures for making such agreements); **Rev. Proc. 2014-47, 2014-35 IRB 393** (prior versions of forms). See generally Neuenhaus, Inbound Investment Funds and Withholding Foreign Partnership Status, 127 Tax Notes 33 (Apr. 26, 2010).

**153** For ITINs, see **Reg. §§ 301.6109-1(d)(3)** , **301.6109-1(g)** , **301.6109-1(h)(1)** , discussed infra **¶ 111.1.10** note 184 and accompanying text.

**154 Reg. § 1.1441-5(c)(2)(i)** . For qualified intermediaries, see infra **¶ 67.4.6** text accompanying notes 201-215.

**155 Reg. § 1.1441-5(c)(2)(iii)** .

**156** For the rules for U.S. partnerships, see supra text accompanying notes 130-135. If a withholding foreign partnership lacks documentation on a partner, it must withhold assuming that the partner is a foreign person subject to withholding at 30 percent. **Reg. §§ 1.1441-5(d)(3)** , **1.1441-5(d)(4)** .

**157 Reg. § 1.1441-5(c)(2)(i)** .

**158 Reg. § 1.1441-5(c)(2)(iii)** .

**159 Reg. § 1.1441-5(c)(2)(iv)** . A withholding foreign partnership certificate expires only when relevant circumstances change. **Reg. § 1.1441-1(e)(4)(ii)(B)(5)** .

**160 Reg. § 1.1441-5(c)(2)(i)** .

**161 Reg. § 1.1441-1(b)(2)(i)** . A trust is domestic if a U.S. court "is able to exercise primary supervision over the administration of the trust" and U.S. persons have "authority to control all substantial decisions of the trust," and an estate is domestic if its connections with the United States go beyond those of a mere sojourner in the country. **IRC § 7701(a)(30)** . See supra **¶ 65.3** .

**162 Reg. § 1.1441-5(b)(1)** .

**163 Reg. § 1.1441-5(b)(2)(ii)** .

**164 IRC § 651(a)** ; **Reg. § 1.1441-1(c)(24)** . See infra **¶ 81.4.2** .

**165 Reg. § 1.1441-5(b)(2)(ii)** . For distributable net income, see infra **¶ 81.3** .

**166 Reg. § 1.1441-5(b)(2)(iii)** .

**167 Reg. § 1.1441-5(b)(2)(iv)** . For grantor trusts, see infra **¶ 80.1** .

**168 IRC § 7701(a)(30)** . See supra **¶ 65.3** .

**169 Reg. § 1.1441-1(b)(3)(ii)(B)** .

**170 Reg. § 1.1441-5(e)(6)(ii)** . Indexes of foreign status include an employer identification number, known to the withholding agent, beginning with the digits 98, communications by the withholding agent with the entity mailed to a foreign address, and payments made outside the United States.

**171** See infra **¶ 80.1.1** .

**172 IRC § 651(a)** ; **Reg. § 1.1441-1(c)(24)** . See infra **¶ 81.4.2** .

**173 Reg. § 1.1441-1(c)(25)** .

**174 Reg. § 1.1441-5(e)(6)(ii)** .

**175 Reg. § 1.1441-1(c)(6)(ii)(D)** .

**176** For documentation supporting claims of treaty benefits, see supra **¶ 67.4.4** .

**177 Reg. § 1.1441-5(e)(4)** .

**178 Reg. § 1.1441-1(c)(6)(ii)(C)** .

**179 Reg. § 1.1441-5(e)(3)(i)** .

**180 Reg. § 1.1441-5(e)(3)(i)** . For the exemption of effectively connected income from withholding, see supra **¶ 67.4.3** text accompanying notes 86-89.

**181 Reg. § 1.1441-5(e)(5)(iii)** . A trust's withholding certificate trust expires only when relevant circumstances change, although certificates of beneficiaries or owners transmitted with the trust's certificate may expire at the end of the third year following the year in which the beneficiaries or owners signed them. **Reg. § 1.1441-1(e)(4)(ii)(B)(8)** .

The IRS may make a withholding agreement with a foreign simple or grantor trust shifting withholding responsibility from persons making payments to the trust to the trust itself. See **Rev. Proc. 2017-21, 2017-6 IRB 791** (forms for withholding foreign trust agreements and application procedures for making such agreements); **Rev. Proc. 2014-47, 2014-35 IRB 393** (prior version of forms).

**182** The trust may submit only copies of the beneficiaries' or owners' certificates, but if it does so, the trust must retain the originals for as long as they may be relevant to withholding tax liability and must provide them to the withholding agent on request.

**183** For withholding statements, see **Reg. § 1.1441-1(e)(3)(iv)** , discussed infra **¶ 67.4.6** text accompanying notes 220-223.

**184 Reg. § 1.1441-5(e)(5)(i)** .

**185 Reg. § 1.1441-5(e)(5)(ii)** .

**186** See supra **¶ 67.4.4** .

**187 Reg. §§ 1.1441-5(e)(5)(i)** , **1.1441-5(e)(5)(iii)** .

**188 Reg. § 1.1441-7(b)(1)** . See Foley, Limits on Financial Institution Review of Client Tax Forms, 95 Tax Notes 930 (May 6, 2002).

**189 Reg. § 1.1441-7(b)(2)** .

**190 Reg. § 1.1441-1(c)(16)** . Withholding agents may substitute their own forms for Forms W-8 and 8233. **Reg. § 1.1441-1(e)(4)(vi)** .

**191 Reg. §§ 1.1441-1(e)(1)(i)** , **1.1441-1(e)(1)(ii)(A)(1)** . The withholding agent must hold all required documentation when the payment is made, comply with any applicable electronic confirmation procedures, and not have been notified by the IRS that any information on the certificate or other documentation is incorrect or unreliable. **Reg. § 1.1441-1(e)(1)(ii)(B)** .

**192 Reg. § 1.1441-1(e)(2)(i)** . A separate certificate is required for each withholding agent, and separate certificates may be required for various payments from one withholding agent (e.g., because the beneficial owner asserts that some, but not all, of the items paid by the withholding agent are effectively connected income).

**193 Reg. § 1.1441-1(e)(2)(ii)** . The address may not be a post office box or other address used only for mailing purposes and may not be that of a financial institution with which the beneficial owner has an account. The residence address must be in the country of which the person claims to be a resident for purposes of that country's income tax or, if the person is not resident in any country for tax purposes, the country where the person (if an individual) "normally resides" or (if an entity) "maintains its principal office."

**194** For a certificate's validity period, see **Reg. § 1.1441-1(e)(4)(ii)** , discussed infra text accompanying notes 240-246.

**195 Reg. § 1.1441-1(e)(4)(vii)** . A TIN is also required for a withholding certificate by which (1) a beneficial owner claims exemption from withholding under **§ 871(f)** (applicable to annuities under qualified plans) and (2) a payee claims to be a qualified intermediary, withholding foreign partnership, U.S. branch of a foreign bank or insurance company, or foreign grantor trust with not more than five grantors.

**196 Reg. §§ 301.6109-1(d)(3)** , **301.6109-1(g)** , **301.6109-1(h)(1)** . To obtain an ITIN, a nonresident

alien must file Form W-7 with the IRS and must include with the filing "the original, completed tax return for which the ITIN is needed, such as a Form 1040." The IRS warns that ITINs are "not intended to be used as proof of identity for nontax purposes (*e.g.*, to obtain a driver's license, to claim legal residency, to seek employment in the United States, or to apply for welfare and health benefits) and may not be reliable proof of an individual's identity for those purposes." **Notice 2004-1, 2004-2 IRB 268** . See generally Daftary & Wooten, Identifying the Path Forward With Foreign TIN Requirements, 157 Tax Notes 397 (Oct. 16, 2017).

**197 Reg. § 1.1441-1(e)(3)(i)** .

**198** See **Reg. § 1.1441-1(c)(13)** (intermediary is person who receives payment as custodian, broker, nominee, or "otherwise as an agent for another person" or as flow-through entity).

**198.1** The Obama administration has proposed statutory amendments designed to encourage more foreign financial institutions to become qualified intermediaries. See Morse, Qualified Intermediary or Bust? 124 Tax Notes 471 (Aug. 3, 2009).

**199 Reg. § 1.1441-1(e)(5)(ii)** . A foreign branch of a U.S. financial institution or clearing organization can also be a qualified intermediary, as can a foreign corporation claiming treaty benefits on behalf of its shareholders. **Reg. § 1.1441-1(c)(2)** . See **Notice 2006-35, 2006-14 IRB 708** (after 2006, branch of financial institution may not act as QI "in country that does not have approved know-your-customer (KYC) rules"). See generally Tanenbaum, In Defense of the Qualified Intermediary Program, 37 Tax Mgmt. Int'l J. 220 (2008); Zane, Note, Carrot or Stick?: The Balance of Values in Qualified Intermediary Reform, 33 BC Int'l & Comp. L. Rev. 357 (2010).

For procedures for applying for a QI agreement and the agreement form, see **Rev. Proc. 2014-39, 2014-29 IRB 150** ; for a proposed amended agreement, see **Notice 2016-42, 2016-28 IRB 67** . Originally, a QI was, in many circumstances, required to engage an external auditor to verify its compliance with the agreement, but the IRS, in 2014, replaced the external auditor requirement with an "internal compliance program." See **Rev. Proc. 2002-55, 2002-35 IRB 435** , revoked by **Rev. Proc. 2014-39** , supra.

**200** Shay, Morse & Peters, Qualified Intermediary Status, Act III: **Rev. Proc. 2000-12** 's Final Qualified Intermediary Agreement and Amendments to Final Withholding Rules, 29 Tax Mgmt. Int'l J. 403, 404 (2000). See **Rev. Proc. 2000-12, 2000-4 IRB 387** ("[t]he objective of the QI withholding agreement is to simplify withholding and reporting obligations with respect to payments…made to an account holder through one or more foreign intermediaries"). According to the IRS:

The QI system…represent[s] a paradigm shift to greater self-regulation. Treasury and the IRS believe that it is appropriate to allow the greatest self-regulation under circumstances in which Treasury and

the IRS have the greatest confidence such self-regulation will be effective.…Because Treasury and the IRS regard know-your-customer (KYC) rules as a vital component of adequate self-regulation, the IRS generally will not extend the QI system to any country that does not have KYC rules or has unacceptable KYC rules.…

Treasury and the IRS believe that self-regulation is most likely to be effective in jurisdictions that are characterized by adequate transparency and a willingness to provide tax information to the IRS. Accordingly, the IRS will apply more rigorous oversight to financial institutions or their branches in jurisdictions that are tax havens or bank secrecy jurisdictions and show an unwillingness to cooperate with the United States to reform their practices relating to transparency and the provision of tax information…

**Announcement 2000-48, 2000-23 IRB 1243** .

As used in the QI context, the term "know your customer" generally relates to the capacity of financial institutions to determine whether their customers are U.S. persons and, if their customers are non-U.S. persons claiming the benefits of an income tax treaty, whether these customers are residents of the applicable treaty country.

**Notice 2001-4, 2001-2 IRB 267, 272** . The IRS website has a list of countries that, in the IRS's opinion, have adequate know-your-customer rules. http://www.irs.gov/businesses/international/article/0,,id=96618,00.html.

**201** See generally Balaban, Connors, Marcovici, Michaels & O'Donnell, A Practical Guide for New QIs, 12 J. Int'l Tax'n 12 (Apr. 2001); Morse & Shay, Qualified Intermediary Status: A New U.S. Withholding Role for Foreign Financial Institutions Under Final U.S. Withholding Regulations, 27 Tax Mgmt. Int'l J. 331 (1998); Morse & Shay, Qualified Intermediary Status, Act II: **Notice 99-8** and the Role of a Qualified Intermediary, 28 Tax Mgmt. Int'l J. 259 (1999); Shay, Morse & Peters, Qualified Intermediary Status, Act III: **Rev. Proc. 2000-12** 's Final Qualified Intermediary Agreement and Amendments to Final Withholding Rules, 29 Tax Mgmt. Int'l J. 403 (2000) ; Tanenbaum, The Qualified Intermediary Program, 34 Tax Mgmt. Int'l J. 509 (2005). See also Tanenbaum, Qualified Intermediaries Under Attack, 37 Tax Mgmt. Int'l J. 746 (2008).

**202 Reg. § 1.1441-1(e)(5)(iv)** (if qualified intermediary represents that it has assumed primary withholding responsibility, withholding agent is not required to confirm that qualified intermediary agreement provides for such responsibility).

**203 Reg. § 1.1441-1(e)(5)(i)** . However, to the extent required by its agreement with the IRS, a qualified intermediary must disclose to a payor the names, addresses, and TINs (if known) of any U.S. person for whom it acts unless the person is exempt from information reporting and backup

withholding.

**204 Reg. § 1.1441-1(e)(5)(iii)(A)** . A withholding agreement may apply to the entity as a whole or to particular branches. It may allow the intermediary to adjust for underwithholding and overwithholding and to obtain refunds on behalf of its customers. See **Rev. Proc. 2017-15, 2017-3 IRB 437** (providing form for qualified intermediary agreement and application procedures, applicable from January 1, 2017); **Rev. Proc. 2014-39, 2014-29 IRB 150** (same for June 30, 2014, through December 31, 2016); **Rev. Proc. 2000-12, 2000-4 IRB 387** (same for prior periods); **Notice 2016-42, 2016-29 IRB 67** (proposing restatement of agreement and procedures, effective as of January 1, 2017); Hintzke & Cruze, The Impact of the Proposed U.S. QI Agreement, 83 Tax Notes Int'l 789 (Aug. 29, 2016).

**205 Reg. § 1.1441-1(e)(5)(iii)(B)** .

**206** See **Notice 2001-66, 2001-2 CB 396** (proposing guidance for external auditors).

**207** For limitation of benefits clauses, see supra **¶ 67.3.3** .

**208** For ITINs, see supra note 191 and accompanying text.

**209 Reg. § 1.1441-1(e)(5)(iv)** .

**210 Reg. § 1.1441-1(e)(5)(iii)(B)** .

**211 Reg. § 1.1441-1(e)(3)(ii)** . See **Reg. § 1.1441-1(e)(3)(vi)** (reportable amounts include amounts subject to withholding under **§ 1441** or **§ 1442** , interest on deposits with U.S. banks (excepting deposits for periods of two weeks or less), interest or OID on obligations of U.S. issuers maturing within one year of issue (excepting OID on obligations held for not more than two weeks)).

**212** An entity's TIN must be an employer identification number issued by the IRS. For a certificate's validity period, see **Reg. § 1.1441-1(e)(4)(ii)** , discussed infra text accompanying notes 240-246.

**213 Reg. § 1.1441-1(e)(5)(v)(B)** . The withholding statement is "an integral part of the qualified intermediary's qualified intermediary withholding certificate and the penalties of perjury statement provided on the withholding certificate shall apply to the withholding statement as well." **Reg. § 1.1441-1(e)(5)(v)(B)** . No particular form is required for the statement, and it may be transmitted electronically, given "adequate safeguards." The statement must be updated as necessary to allow the withholding agent to discharge its responsibilities.

**214 Reg. § 1.1441-1(e)(5)(v)(C)** . "A withholding rate pool may be established by any reasonable method on which the qualified intermediary and a withholding agent agree…" If the intermediary has not assumed primary responsibility for information reporting and backup withholding for nonexempt U.S. beneficial owners, payments for each such person must comprise a separate rate pool.

**215 Reg. § 1.1441-1(e)(1)(ii)(A)(3)** .

**216 Reg. § 1.1441-1(c)(14)** .

**217 Reg. § 1.1441-1(e)(3)(iii)** . See **Reg. § 1.1441-1(e)(3)(vi)** (reportable amounts include amounts subject to withholding under **§ 1441** or **§ 1442** , interest on deposits with U.S. banks (excepting deposits for periods of two weeks or less), interest or OID on obligations of U.S. issuers maturing within one year of issue (excepting OID on obligations held for not more than two weeks)).

**218** For a certificate's validity period, see **Reg. § 1.1441-1(e)(4)(ii)** , discussed infra text accompanying notes 240-246.

**219 Reg. § 1.1441-1(e)(3)(iii)(C)** .

**220 Reg. § 1.1441-1(e)(3)(iv)(B)** .

**221 Reg. § 1.1441-1(e)(3)(iv)(C)** . For an alternative to allocating each payment among payees, see **Reg. § 1.1441-1(e)(3)(iv)(D)** . See also **Notice 2001-43, 2001-2 CB 72** (transitional rules for applying **Reg. § 1.1441-1(e)(3)(iv)(D)** for payments to nonqualified intermediaries and foreign trusts during 2002).

**222 Reg. § 1.1441-1(e)(3)(iv)(A)** . See **Reg. § 1.1441-1(e)(3)(vi)** (reportable amounts include amounts subject to withholding under **§ 1441** or **§ 1442** , interest on deposits with U.S. banks (excepting deposits for periods of two weeks or less), interest or OID on obligations of U.S. issuers maturing within one year of issue (excepting OID on obligations held for not more than two weeks)).

**223 Reg. § 1.1441-1(b)(6)(i)** .

**224 Reg. §§ 1.1441-1(b)(2)(vii)(B)(1)** , **1.1441-1(b)(2)(vii)(C)(1)** .

**225 Reg. §§ 1.1441-1(b)(2)(v)(A)** , **1.1441-1(c)(12)** .

**226 Reg. § 1.1441-1(b)(3)(v)** .

**227 Reg. § 1.1441-1(e)(3)(iv)(A)** .

**228 Reg. § 1.1441-1(b)(2)(iv)** . The branch must be subject to banking or insurance regulation in the United States. A payment is considered made to a U.S. branch if it is credited to a U.S. account in the name of the U.S. branch or if it is made to an address in the United States where the branch is located and the branch's name appears on the relevant documents (e.g., check or covering letter).

A financial institution organized in a U.S. possession is treated as a U.S. branch for this purpose. **Reg. § 1.1441-1(b)(2)(iv)(A)** ; **Notice 2001-11, 2001-1 CB 464** . See **Reg. § 1.1441-1(c)(30)** (U.S. possessions are Guam, American Samoa, Northern Mariana Islands, Puerto Rico, and U.S. Virgin Islands).

**229 Reg. § 1.1441-1(e)(3)(v)** . See **Reg. § 1.1441-1(e)(3)(vi)** (reportable amounts include amounts subject to withholding under **§ 1441** or **§ 1442** , interest on deposits with U.S. banks (excepting deposits for periods of two weeks or less), interest or OID on obligations of U.S. issuers maturing within one year of issue (excepting OID on obligations held for not more than two weeks)).

**230** If the certificate transmits withholding certificates and other documentation of persons for whom payments are collected, it must include a withholding statement of the kind required of a nonqualified intermediary. See **Reg. § 1.1441-1(e)(3)(iv)** , discussed supra text accompanying notes 216-223.

**231** For a certificate's validity period, see **Reg. § 1.1441-1(e)(4)(ii)** , discussed infra text accompanying notes 240-246.

**232** See **Reg. §§ 1.1441-1(e)(1)(i)** , **1.1441-1(e)(1)(ii)(A)(5)** ("[a]bsent actual knowledge or reason to know otherwise," withholding agent may treat payment as effectively connected income beneficially owned by foreign person if it "identifies the payee as a U.S. branch").

**233** See supra **¶ 67.4.3** text accompanying .

**234 Reg. § 1.1441-1(e)(1)(i)** .

**235 Reg. § 1.1441-1(e)(1)(ii)(A)(2)** . An offshore account is an account maintained in a foreign country with an office or branch of a U.S. or foreign bank or other financial institution. **Reg. § 1.6049-5(c)(1)** .

**236 Reg. § 1.1441-1(e)(1)(ii)(A)(6)** . See **IRC § 7701(a)(18)** ("international organization" is public organization entitled to privileges, exemptions, and immunities provided by International Organizations Immunities Act).

**237 Reg. § 1.1441-1(e)(1)(ii)(A)(7)** .

**238 Reg. § 1.1441-1(e)(4)(ix)** .

**239 Reg. § 1.1441-1(e)(4)(ix)(C)** . The certificate may be in written or electronic form and must contain the information required of a nonqualified intermediary.

**240 Reg. § 1.1441-1(e)(4)(ii)(A)** .

**241 Reg. § 1.1441-1(e)(4)(ii)(B)(*1*)** , **1.1461-1(c)(2)(i)** . The three-year rule applies to income claimed to be effectively connected with a U.S. business. **Reg. § 1.1441-1(e)(4)(ii)(C)** .

**242 Reg. §§ 1.1441-1(e)(4)(ii)(B)(2)** , **1.1441-1(e)(4)(ii)(B)(5)** .

**243 Reg. §§ 1.1441-1(e)(4)(ii)(B)(3)** , **1.1441-1(e)(4)(ii)(B)(4)** , **1.1441-1(e)(4)(ii)(B)(6)** , **1.1441-1(e)(4)(ii)(B)(8)** .

**244 Reg. § 1.1441-1(e)(4)(ii)(B)(7)** .

**245 Reg. § 1.1441-1(e)(4)(ii)(D)** .

**246** However, on acquiring knowledge of a change of circumstances, the withholding agent may, instead of immediately considering the certificate invalid as to the changed information, continue to honor the certificate for 90 days "while awaiting a new certificate or documentation or while seeking information regarding changes, or suspected changes, in the person's circumstances." Any underwithholding during the 90-day grace period must eventually be made up. **Reg. § 1.1441-1(b)(3)(iv)** .

**247 Reg. § 1.1441-1(e)(4)(viii)** .

**248 Reg. § 1.1441-1(e)(4)(viii)(B)** .

**249 Reg. § 1.1441-1(e)(4)(viii)(A)** . For the entity classification rules, see infra **¶ 85.1** .

**250 Reg. § 1.1441-1(e)(4)(iii)** .

**251 Reg. § 1.1441-7(b)(2)** .

**252 Reg. § 1.1441-7(b)(10)(i)** .

**253 Reg. § 1.1441-7(b)(10)(i)** .

**254 Reg. § 1.1441-7(b)(10)(ii)** .

**255 Reg. § 1.1441-7(b)(10)(iii)** .

**256 Reg. §§ 1.1441-6(c)(2)** , **1.1441-7(b)(3)** .

**257 Reg. § 1.1441-7(b)(4)(i)** .

**258 Reg. § 1.1441-7(b)(4)(i)** .

**259 Reg. §§ 1.1441-7(b)(5)(i)** , **1.1441-7(b)(8)(ii)** . A financial institution may, however, treat an individual account holder as a foreign person in any of these situations if (1) it possesses documentary evidence that supports the claim of foreign status and shows an address outside the United States and the account holder provides a "reasonable" written explanation supporting the claim of foreign status or (2) the account is maintained at a foreign office, the withholding agent must report the income annually to the tax authorities of the country in which the office is located, and the United States has an income tax treaty with that country. Reg. §§ 1.1441-7(b)(4)(i)(A), **1.1441-7(b)(8)(ii)(A)** . If the direct account holder is an entity, the financial institution may treat it as a foreign person, notwithstanding a U.S. address, if (1) it neither knows nor has reason to know that the entity is a flow-through entity and (2) it either holds documents substantiating that the entity is organized under the laws of a foreign country or must report the income annually to the tax authorities of a foreign country (with which the United States has an income tax treaty) in which is located an office of the financial institution at which the account is maintained. Reg. §§ 1.1441-7(b)(4)(i)(B), **1.1441-7(b)(8)(ii)(B)** .

**260 Reg. § 1.1441-7(b)(8)(i)** . However, documentary evidence presented before 2001 may establish foreign status unless the withholding agent knows the account holder is a U.S. person or the mailing or residence address for the person in the withholding agent's records is in the United States.

**261 Reg. §§ 1.1441-7(b)(5)(ii)** , **1.1441-7(b)(8)(iii)** . An offshore account is an account maintained in a foreign country with an office or branch of a U.S. or foreign bank or other financial institution. **Reg. § 1.6049-5(c)(1)** .

**262 Reg. § 1.1441-7(b)(6)(i)** . The account holder can preserve treaty benefits in this situation by providing either a "reasonable explanation" of the discrepancy or documentary evidence of residence in the treaty country.

**263 Reg. § 1.1441-7(b)(9)(i)** . However, such an address does not preclude treaty benefits if the withholding agent (1) has additional documentary evidence that supports the claim of residence in the treaty country and does not exhibit the same defect; (2) possesses documentary evidence establishing that the account holder is an entity taxed by the treaty country as a resident company; or (3) obtains a valid beneficial owner withholding certificate giving a residence and mailing address in the treaty country.

**264 Reg. § 1.1441-7(b)(6)(ii)** . A withholding agent may allow treaty benefits in this situation if it (1) possesses "additional documentation" that supports the claim of residence in the treaty country and does not contain an address outside of that country; (2) has "documentation that establishes" the account holder to be an entity taxed by the treaty country as a resident company; (3) "knows" that the address outside of the treaty country is that of a branch of a bank or insurance company resident in that country; or (4) "obtains a written statement from the direct account holder that reasonably establishes entitlement to treaty benefits."

**265 Reg. §§ 1.1441-7(b)(6)(iii)** , **1.1441-7(b)(9)(ii)** . Treaty benefits may be allowed in this situation if the account holder "provides a reasonable explanation, in writing, establishing" residence in the treaty country.

**266 Reg. § 1.1441-7(b)(7)** .

**267 Reg. § 1.1441-7(b)(1)** .

**268 Reg. § 1.1441-1(b)(3)(i)** .

**269 Reg. § 1.1441-1(b)(3)(ii)(B)** .

**270 Reg. §§ 1.1441-1(b)(3)(ii)(B)** , **1.6049-4(c)(1)(ii)(A)(1)** . The types of foreign entities that are always corporations are listed in **Reg. § 301.7701-2(b)(8)(i)** , discussed infra **¶ 85.4** text accompanying notes 4-10.

If a withholding agent receives valid documentary evidence on an offshore account from an entity but the documents do not establish the entity's classification, the payee is presumed to be a corporation unless (1) another classification presumption applies; (2) the withholding agent knows or has reason to know that the entity is not a corporation for U.S. tax purposes; (3) the entity is presumed to be a U.S. person; or (4) "there are indicia of U.S. status" (e.g., payments are regularly made to an address in the United States). Given U.S. indexes, the withholding agent must treat the payments as made to a U.S. person subject to information reporting. **Reg. § 1.1441-1(b)(3)(ii)(C)** .

**271 Reg. § 1.6049-4(c)(1)(ii)(B)** .

**272 Reg. § 1.6049-4(c)(1)(ii)(F)** .

**273 Reg. §§ 1.1441-1(b)(3)(ii)(B)** , **1.6049-4(c)(1)(ii)(C)** - **1.6049-4(c)(1)(ii)(Q)** .

**274 Reg. § 1.1441-1(b)(3)(ii)(B)** .

**275 Reg. § 1.1441-1(b)(3)(iii)(A)** .

**276 Reg. § 1.1441-1(b)(3)(iii)(B)** .

**277 Reg. § 1.1441-1(b)(3)(iii)(C)** .

**278 Reg. § 1.1441-1(b)(3)(iii)(D)** . An offshore account is an account maintained in a foreign country with an office or branch of a U.S. or foreign bank or other financial institution. **Reg. § 1.6049-5(c)(1)** .

**279 Reg. § 1.1441-1(b)(3)(vii)** . This rule does not apply to a payment to an offshore account subject to the rule described in the text accompanying the previous note.

**279.1 Reg. § 1.1441-1(b)(3)(iii)(E)** . This regulation is effective as of March 14, 2006. **TD 9253** , 71 Fed. Reg. 13,003 (Mar. 14, 2006).

**280 Reg. § 1.1441-1(b)(3)(iii)** .

**281 Reg. § 1.1441-1(b)(3)(viii)** .

**282 Reg. § 1.1441-1(b)(3)(ix)(B)** .

**283 Reg. § 1.1441-1(b)(3)(x) Ex. 3** .

**284 Reg. § 1.1441-1(b)(3)(ix)(A)** .

**285 Reg. § 1.1441-1(b)(3)(x) Ex. 1** . See **Reg. § 1.1441-1(b)(3)(x) Ex. 2** (withholding agent acts on actual knowledge that individual, presumed to be U.S. person, is nonresident alien).

**286** See infra **¶ 111.5.2** for wage withholding and withholding on pensions.

**287** See infra **¶ 111.5.3** .

**288 Reg. § 1.1441-1(b)(3)(ix)(A)** .

**289 Reg. §§ 1.1441-1(b)(3)(iv)** , **1.1441-6(c)(2)** , **1.6049-5(d)(2)(ii)** . The grace period is available for joint payees only if one of these conditions holds for each of the payees. **Reg. § 1.1441-1(b)(3)(vii)** .

**290 Reg. § 1.1441-1(b)(3)(i)** .

**291 Reg. § 1.1441-1(b)(7)(i)** . Although the regulations generally apply to payment made after 2000, a withholding agent may elect to apply **Reg. § 1.1441-1(b)(7)** for all open tax years. Reg. § 1.1441-1(f)(2)(ii).

**292 Reg. § 1.1441-1(b)(7)(ii)** . The IRS "may require additional proof" if its delays in obtaining documentation "affect its reliability."

**293 Reg. § 1.1441-1(b)(7)(iii)** , before amendment by **TD 9323** , 72 Fed. Reg. 18,386 (Apr. 12, 2007). If the IRS collected interest from the beneficial owner of the payment, this interest is credited against the withholding agent's interest obligation. With respect to payments made after 2006, neither interest nor penalties based on underpayments of tax are imposed if "no tax has in fact been imposed." **Notice 2006-99, 2006-46 IRB 907** , **§ 5** .

**294 Reg. § 1.1441-1(b)(7)(v) Ex. 1** .

**295** If the payment were instead a dividend qualifying for reduced withholding at 15 percent under an income tax treaty, *D* would be liable for (1) the 15 percent tax; (2) interest on that tax from March 15 of year 2 until it is paid; and (3) interest on the remaining 15 percent that should have been withheld from

March 15 of year 2 until *D* receives the justifying documentation on September 30 of year 3. **Reg. § 1.1441-1(b)(7)(v) Ex. 2** .

**296 Reg. § 1.1441-1(b)(3)(ix)(A)** .

**297 IRC § 1461** . See **Casa de la Jolla Park, Inc. v. CIR, 94 TC 384 (1990)** (bank collected proceeds of sales made by taxpayer and used portions of proceeds to pay interest taxpayer owed to nonresident alien; held, taxpayer liable for withholding tax because bank received and disbursed funds at taxpayer's direction); **Fitzgerald v. CIR, 4 TC 494, 503 (1944)** (nonacq.) (grantor of alimony trust not liable for withholding tax, even though trust income was taxable to him, because he lacked ownership rights under local law; in using withholding as medium of collection, IRS "must be viewed purely as any other creditor").

**298 IRC § 1463** ; **Reg. §§ 1.1441-7(b)** , **1.1463-1(a)** . See Krebs, IRS Reverses Its Position and Decides to Penalize Withholding Agents for Understatements on Form 1042, 24 Tax Mgmt. Int'l J. 380 (1995).

However, "so as to avoid the imposition of a double interest charge," a withholding agent's liability for interest is "abated to [the] extent" of interest assessed against and collected from the beneficial owner. **Reg. § 1.1441-1(b)(7)(iii)** , as amended by **TD 9323** , 72 Fed. Reg. 18,386 (Apr. 12, 2007).

**299 Reg. § 1.1461-1(e)** .

**300 Reg. §§ 1.1461-1(a)** , **1.6302-2(a)** . The IRS adopted a **Section 1441** Voluntary Compliance Program to allow financial institutions and other withholding agents to "come forward to the IRS to disclose and resolve issues arising from" their efforts to implement the withholding regulations. The Program applied to submissions made during the period September 29, 2004, and March 31, 2005. Rev. Proc. 2005-71, 2005-47 IRB 985; **Rev. Proc. 2004-59, 2004-42 IRB 678** .

**301 Reg. § 1.1461-1(b)** . For extensions of the filing deadlines, see **Reg. § 1.1461-1(g)** . See **Northern Ind. Pub. Serv. Co. v. CIR, 101 TC 294 (1993)** (taxpayer filed Form 1042, reporting withholding under **§ 1441** , but omitted amounts subject to withholding exceeding 25 percent of amounts reported; held, deficiency subject to six-year statute of limitations under **§ 6501(e)(1)** , which applies if return improperly "omits from gross income" amounts exceeding 25 percent of reported gross income, even though omitted amounts were gross income of payees, not taxpayer).

**302 Reg. § 1.1461-2(a)(2)** . The deposit offset must usually occur within the same calendar year, but an offset may be made during next calendar year if proper disclosure is made on a timely filed Form 1042-S for the year of the overwithholding.

**303 Reg. § 1.1461-2(a)(3)** .

**304 Reg. § 1.1461-2(a)(4) Exs.**

**305 Reg. § 1.1461-2(b)** . Before 2001, the regulations did not address this issue, and one court held that a withholding agent that failed to withhold as required was not entitled to cover its liability for amounts not withheld by withholding extra amounts from later payments to the same person. **Amy Holding Co. v. Dasyure, Ltd., 2000-1 USTC ¶ 50,212 (ED La. 2000)** .

© 2021 Thomson Reuters/Tax & Accounting. All Rights Reserved.

# Exhibit 30

Bittker, McMahon & Zelenak: Federal Income Taxation of Individuals (WG&L)

# ¶ 47.01 Examination and Audit of Returns

# ¶ 47.01[1] Selection of Returns for Audit

After being filed with the Internal Revenue Service (IRS), tax returns are checked first for form, execution, and mathematical accuracy. **0.1** If there is a mathematical or clerical error, a correction notice is sent to the taxpayer with a demand for payment of the shortage or a refund of the overpayment; in the former case, remittance within ten days from the date of notice and demand is considered "timely." **1** The correction notice sets out "the error alleged and an explanation thereof" but is not considered a notice of deficiency for such purposes as petitioning the Tax Court. **2** A similar summary procedure is used by the IRS when the return is first processed to identify items that appear to be unallowable (e.g., the deduction of a loss on the sale of a personal residence or the cost of maternity clothing), which the IRS tries to correct by correspondence with the taxpayer. **3** Since these mistakes are not "mathematical or clerical errors," the taxpayer may refuse to accept the proposed adjustment and force the IRS to follow the normal audit and deficiency notice procedures. Nor is the failure to report wages that were shown on a Form W-2 attached to the return a "mathematical or clerical error." In such a case, the IRS must follow the normal deficiency procedures. **3.1**

Returns are then classified for audit at the IRS Service Center. Of the returns chosen for audit, many are selected pursuant to the discriminant function (DIF) selection process, a procedure employing mathematical formulas developed from intensive examination of returns selected at random to identify those with a high probability of error. **4** During the processing of returns at the service centers, significant items are weighted by the computer, resulting in an index score indicating a return's "audit potential"-the higher the score, the greater the probability of a significant tax change. The service centers also operate other programs that may result in the selection of a return for audit, based on matching information returns with the tax return, the coordinated examination of members of the same partnership and of taxpayers in the same industry, and other techniques. **5** For certain corporations, the IRS requires a schedule UTP, which is a disclosure of "uncertain tax positions" to be filed with the tax return for years beginning after December 15, 2009. **5.1** This schedule will require the taxpayer to furnish information regarding return positions that might be questioned by the IRS. **5.2** Audits may also be triggered by leads from disgruntled former employees, former spouses, and other acquaintances of the taxpayer who have reason to suspect an impropriety on the taxpayer's return and would be pleased to see the taxpayer suffer through an IRS audit. **6** In addition, the IRS often allocates resources to particular areas thought to entail special abuse, audit potential, or public interest. **7**

Taxpayers' complaints that audits of their tax returns are not warranted because other taxpayers whose returns present similar issues have escaped audit fall on deaf ears. The Tax Court responded to a taxpayer's claim that he was denied deductions that were allowed to similarly situated taxpayers by asserting that "mere selectivity in enforcement of the tax laws against petitioners while not against others is not a violation of their constitutional right to due process, unless such selectivity is based on an unjustifiable criterion such as race, religion, or expression of unpopular views." **8** The possibility of politically motivated audits is strongly discouraged by **§ 7217** , which makes it a felony for the president, vice president, or any cabinet-level officer (other than the attorney general, or the Secretary of the Treasury, as consequences of implementation of a change in tax policy) to request the IRS to audit or terminate an audit or other examination of any particular taxpayer. **9**

# ¶ 47.01[2] Office and Field Audits

**Section 7605(a)** provides that audits shall be conducted at a time and place selected by the IRS that "are reasonable under the circumstances." An audit may be conducted by correspondence, through an interview and examination of records at an IRS office, or by a field audit, which involves an examination of the taxpayer's books and records at the taxpayer's premises when a more thorough analysis is required. **10** In any case, the taxpayer may be represented by an attorney, certified public accountant (CPA), or other representative; **11** and if the taxpayer is represented by a qualified representative holding a proper power of attorney, the taxpayer is not required to be present. **12** If the taxpayer does attend an interview, **§ 7521(b)** requires the IRS agent to inform the taxpayer at the outset of his rights, including the right to be represented, and the IRS obligations during the audit (or collection) process. If the taxpayer clearly requests to consult with a representative at any time during an interview, the interview must be suspended, unless the interview is pursuant to an administrative summons or a criminal investigation. **13** In addition, on advance notice to the IRS, the taxpayer may make an audio recording of the interview, using his own equipment and at his own expense; the IRS may record the interview but must provide the taxpayer with a transcript at his request and expense. **14**

Generally, the IRS determines whether the examination will be an office or a field audit, and requests for changes are evaluated on a case-by-case basis. **15** Audits are conducted by correspondence "if the questioned items are susceptible to direct verification from records that could be easily submitted by mail, and there are clear indications…that the taxpayer can effectively communicate in writing with the Service." **16** Most other audits are conducted as office interviews. Returns are selected for an office interview audit if they contain issues that require an analytical approach and individual judgment in addition to direct verification of records, or if "needed to ensure the taxpayer's rights under the law." **17** Field audits usually involve business returns, and are conducted in cases involving voluminous records, complex accounting methods, substantial and material inventories, unusual issues, or complex and time consuming examination. **18** If the audit involves an engineering or appraisal problem, the revenue agent may call on an engineer agent. **19** The revenue agent may also refer a matter to the national office for technical advice. **20** Taxpayers may also initiate requests for technical advice "on the grounds that a lack

of uniformity exists as to the disposition of the issue, or that the issue is so unusual or complex as to warrant consideration by the National Office," and they may appeal to the Examination Division if the revenue agent declines to refer the matter to the Chief Counsel's national office. **21**

At the conclusion of either an office or a field audit, a taxpayer who agrees with the proposed adjustments will be asked to execute a waiver of restrictions on assessment and collection of the deficiency or an acceptance of the proposed overassessment (Form 870). **22** Agents are obligated to advise taxpayers of their right to appeal a proposed adjustment. **23** If the taxpayer disagrees with the proposed adjustments, he receives a so-called thirty-day letter, advising him of his appeal rights and stating that if he does not respond within thirty days a statutory notice of deficiency ("ninety-day letter") **24** will be issued or other definitive action (e.g., denial of a refund claim) will be taken. Along with the thirty-day letter, the IRS must provide the taxpayer with an explanation of the entire process, from examination through collection, including the assistance available from the National Taxpayer Advocate. **25** Agreement may be reached as to some issues but not others, in which event the agreed ones can be settled while the others are appealed. **26**

## ¶ 47.01[3] Unnecessary and Repetitive Examinations

**Section 7605(b)** provides that taxpayers shall not be subjected to "unnecessary examination or investigations" and that "only one inspection of a taxpayer's books of account shall be made for each taxable year" unless the taxpayer requests a reexamination or the IRS, "after investigation, notifies the taxpayer in writing that an additional inspection is necessary." **27 Section 7605(b)** applies only if the IRS seeks to inspect a taxpayer's records when auditing a tax liability for a given year when it has already inspected the records in auditing the taxpayer's liability for that same tax year. The provision does not apply when the IRS seeks to inspect again already-inspected records for an audit of a different tax year. **27.1** An additional examination by a special agent pursuant to a referral of the case to the criminal investigation division (CID) arising out of the civil audit is not a prohibited second inspection under **§ 7605(b)** . **28** Nor is **§ 7605(b)** violated by an inspection of the same books and records as they relate to a subsequent year, even though the second examination may result in a deficiency for the prior year. **29** Because it is concerned with duplicative inspections of the same taxpayer's books of account, **§ 7605(b)** is not violated by an inspection of a different person's records, even if the two are related. **30**

Since the IRS "may investigate merely on the suspicion that taxes are owed," the prohibition of "unnecessary" examinations is violated only by arbitrary or oppressive action. **31** Moreover, a violation of either aspect of **§ 7605(b)** probably does not undermine the validity of an ensuing notice of deficiency. **32**

As a matter of internal administration, the IRS has a policy of reopening closed cases to make an adjustment unfavorable to the taxpayer only if (1) there is evidence of fraud or similar misconduct; (2) the closing involved a substantial error based on an established IRS position; or (3) failure to reopen would otherwise be a serious administrative omission. **33**

# ¶ 47.01[4] IRS Appellate Procedure

A taxpayer who disagrees with an examining agent's proposed adjustments receives a copy of the agent's report with a thirty-day letter, which offers a second opportunity to accept the findings and sets out the taxpayer's right to appeal to the appeals division. **34** The thirty-day letter is a form letter that states the IRS's proposed determination and informs the taxpayer of the right to appeal if he disagrees; it is accompanied by a copy of the examiner's report explaining the basis of the proposed determination. **34.1** To obtain a conference with appeals, a written protest is required in any field audit case in which the proposed additional tax (including penalties) or the refund claimed exceeds $10,000 for any taxable year; and a "brief written statement of disputed issues" is required if the proposed additional tax (including penalties) or refund exceeds $2,500 (but does not exceed $10,000). In all other cases, an oral request for a conference suffices. **35** A taxpayer may request an early referral of an unresolved issue to the Appeals Division and the issue will be transferred if the particular issue is fully developed, other issues remain unresolved at audit, and the early referral will expedite resolution of the entire case. **36**

Proceedings before the Appeals Division are informal and the taxpayer may appear in person or by a qualified representative. **37** All aspects of the case can be explored; but the appellate conferee does not ordinarily gather new data or information. **38** Introduction of evidence at the appellate conference, however, is not rigidly prohibited; indeed, the IRS rules provide that matters "alleged as facts may be required to be submitted in the form of affidavits, or declared to be true under the penalties of perjury." **39** Conferees are instructed not to reopen previously agreed-on issues or to raise new issues "unless the ground for such action is a substantial one and the potential effect upon the tax liability is material." **40** Appellate conferees are affirmatively instructed by the IRS to be realistic:

> [The Appeals Division] will ordinarily give serious consideration to an offer to settle a tax controversy on a basis which fairly reflects the relative merits of the opposing views in light of the hazards which would exist if the case were litigated.…If the taxpayer makes an unacceptable proposal of settlement [in] good faith…the Appeals official generally should give an evaluation of the case in such a manner as to enable the taxpayer to ascertain the kind of settlement that would be recommended for acceptance. **41**

This extract reflects the official IRS position that the taxpayer must take the initiative to settle a case, but experienced negotiators can sense when the conferee is likely to respond favorably to a proposal.

The Appeals Division has sole jurisdiction over settlement proposals until the taxpayer files a petition in the Tax Court. When a case is docketed, the district counsel refers the case to appeals for settlement unless the deficiency notice was issued by appeals or district counsel determines the case cannot be settled in a reasonable period. If the case involves a deficiency of $10,000 or less, appeals retains jurisdiction for six months or until one month before the call of the calendar (fifteen days in small cases under **§ 7463** ). Larger cases are promptly returned to district counsel if no progress toward settlement is made at appeals. As long as a case referred to appeals has not been returned to district counsel,

appeals has sole settlement jurisdiction. When a case is returned to district counsel, sole settlement authority shifts to district counsel, unless appeals and district counsel agree otherwise. District counsel and appeals may agree that a docketed case already considered by appeals should be returned to appeals; and in appropriate cases (e.g., significant issues or large deficiencies), appeals and district counsel may work together. Whenever a case is referred from district counsel to appeals or from appeals to district counsel, the division receiving the case must promptly notify the taxpayer that it has acquired sole settlement authority. **42 Section 7123(b)(1)** requires the IRS to establish nonbinding mediation procedures that can be invoked by either the taxpayer or the IRS to deal with controversies that have not been settled at the appeals division. **Section 7123(b)(2)** requires the IRS to establish procedures for binding arbitration of disputes that have not been settled at the appeals division if both the IRS and taxpayer agree to arbitrate rather than litigate the controversy. **43** After conducting an arbitration program for over a decade, the IRS eliminated the Appeals arbitration program in 2015. **43.1** Although Appeals arbitration was eliminated, taxpayers still may request mediation for unresolved issues that remain after completion of settlement discussions in Appeals. **Section 7803(e)** , added to the Code by the Taxpayer First Act of 2019, established the "Internal Revenue Service Independent Office of Appeals" (IOA) as the replacement for the Office of Appeals. As described in the statute, the IOA closely resembles the former office; one might suspect the major purpose of the provision is to enable members of Congress to point out that independence is now built into the very name of the new office. The IOA is to be headed by a "Chief of Appeals," who reports directly to the Commissioner of Internal Revenue. The statutory purpose of the IOA is "to resolve Federal tax controversies without litigation on a basis which-(A) is fair and impartial to both the Government and the taxpayer, (B) promotes a consistent application of, and voluntary compliance with, the Federal tax laws, and (C) enhances public confidence in the integrity and efficiency of the Internal Revenue Service." Although the statute does not require the IRS to grant all taxpayer requests for referral to the IOA, it does require the IRS to provide any taxpayer whose request is denied a detailed explanation of the basis for the denial, and an opportunity to protest the denial. **43.2** In the case of a "specified taxpayer," the statute provides for taxpayer access to all nonprivileged portions of the case file; a "specified taxpayer" is an individual taxpayer with AGI of $400,000 or less in the year in dispute, or any other taxpayer with gross receipts of $5 million or less. **43.3**

# ¶ 47.01[5] Settlements-Form 870 and Closing Agreements

In the overwhelming majority of cases, tax returns are accepted as filed, and, although there is no legal barrier to the subsequent assertion of a deficiency until the statute of limitations has run, unexamined returns rarely see the light of day again unless the taxpayer goes on the offensive by claiming a refund. Returns that are examined and then accepted as filed are also ordinarily settled for practical purposes so far as the IRS is concerned. **44**

Less important so far as sheer numbers are concerned-but more important to the practitioner-are four formal ways of settling tax cases, each involving a different set of procedures and legal consequences:

(1) Form 870; (2) Form 870-AD; (3) closing agreements under **§ 7121** ; and (4) compromises under **§ 7122** . **45**

# ¶ 47.01[5][a] Form 870

To implement **§ 6213(d)** , permitting taxpayers to "waive the restrictions provided in [ **§ 6213(a)** ] on the assessment and collection" of deficiencies, Form 870 is used to settle cases, in whole or in part, at the examination level. By signing Form 870 (Waiver of Restrictions on Assessment and Collection of Deficiency in Tax and Acceptance of Overassessment), the taxpayer authorizes the IRS to assess the agreed deficiency and collect the resulting taxes without issuing a statutory notice of deficiency ("ninety-day letter") under **§ 6213(a)** . **46** Without a statutory notice, a taxpayer who later changes his mind about the deficiency cannot attack the assessment in the Tax Court but must instead pay the tax and seek a refund through the administrative process and suit in a district court or the claims court. **46.1** On the other hand, if notice and demand for payment are not made within thirty days after the taxpayer signs Form 870, the IRS cannot charge interest for the period between the end of the thirty-day period and the date of notice and demand. **47** Form 870 is effective when signed by the taxpayer; it does not require acceptance by the IRS, except when special conditions are added to the normal documents. **48**

# ¶ 47.01[5][b] Form 870-AD

To settle a nondocketed case in the Appeals Division, the IRS uses Form 870-AD. **49** Unlike Form 870, it is an "offer" by the taxpayer to waive the restrictions of **§ 6213(a)** and to consent to the assessment and collection of the agreed deficiency, and it is not effective unless and until accepted by the IRS. **50** Moreover, Form 870-AD provides that, on acceptance, "the case shall not be reopened in the absence of fraud, malfeasance, concealment or misrepresentation of material fact, an important mistake in mathematical calculation, or excessive tentative allowances of carrybacks…and no claim for refund or credit shall be filed or prosecuted for the year(s) [involved] other than for amounts attributed to carrybacks provided by law." **51** After this statement of quasi-finality, however, Form 870-AD goes on to state that it is not a final closing agreement under **§ 7121** .

The explicit renunciation in Form 870-AD of the status of a statutory closing agreement echoes the holding of the Supreme Court in *Botany Worsted Mills v. US* that the compromise procedure now embodied in **§ 7122** was, for the taxable years there involved, the exclusive method of settling a tax matter with finality. **52** While it does not preclude binding agreements by taxpayers, *Botany Worsted Mills v. US* has been construed to allow taxpayers as well as the IRS to repudiate an informal settlement unless estopped to do so. **53**

Since the IRS rarely repudiates a settlement incorporated in Form 870-AD, the issue of estoppel arises primarily when a taxpayer sues for a refund in violation of the commitment in Form 870-AD. The conditions necessary to estop the taxpayer, however, are hopelessly unclear. Some cases require the

IRS to establish the conventional elements of a common-law equitable estoppel-which are rarely present. **54** Other cases hold that the taxpayer is estopped if the suit for refund is brought after the statute of limitations bars the IRS from assessing the deficiency originally proposed by it, at least if only a single issue is involved or if the settlement involved two or more taxpayers. **55**

# ¶ 47.01[5][c] Closing Agreements

Most administrative settlements are evidenced by Form 870 or Form 870-AD, but greater finality can be achieved by a "closing agreement," sanctioned by **§ 7121** . **56** A closing agreement is an agreement between the IRS and the taxpayer "relating to the liability of such person…in respect of any internal revenue tax for any taxable period," which is "final and conclusive…except upon a showing of fraud or malfeasance, or misrepresentation of a material fact." **57** The regulations provide that closing agreements with respect to taxable periods ending after the date of the agreement are subject to any postagreement change in the law and that every closing agreement shall contain a recital to this effect. **58** Although a closing agreement is determinative with respect to the primary tax liability, **59** the execution of a closing agreement does not bar the IRS from subsequently assessing interest and penalties with respect to the tax liability determined in the closing agreement, unless the agreement so provides. **60**

Although the execution of closing agreements is discretionary with the IRS, the regulations provide that an agreement may be executed "in any case in which there appears to be an advantage [presumably to the IRS] in having the case permanently and conclusively closed, or if good and sufficient reasons are shown by the taxpayer for desiring a closing agreement and it is determined by the Commissioner that the United States will sustain no disadvantage through consummation of such an agreement." **61** Examples of "acceptable reasons" for entering into closing agreements include:

> 1. The taxpayer wishes to establish its tax liability to facilitate a transaction, such as a sale of stock or distribution of the assets of an estate or trust, or to satisfy a creditor's demands for evidence of the status of its tax liability.
> 2. The fiduciary of an estate desires a closing agreement so that he may be discharged by the court.
> 3. A taxpayer wishes assurance that a controversy with the IRS has been conclusively resolved. **62**

There are two types of closing agreements. One type of closing agreement is a final determination of a taxpayer's liability for a past taxable year or years, which is completed on Form 866, Agreement as to Final Determination of Tax Liability. **62.1** A second type of closing agreement, which is executed on Form 906, merely finally determines one or more separate items affecting the taxpayer's liability. **62.2** A closing agreement on Form 906, covering specific matters, is binding as to the matters agreed upon, but does not conclusively determine the taxpayer's tax liability for that year. **62.3** The IRS is not required to issue a statutory deficiency notice before assessing and proceeding to collect taxes if a taxpayer and the IRS enter into a closing agreement on Form 866, finally determining the taxpayer's liability for the year.

**62.4** But if a taxpayer and the IRS enter into a closing agreement on Form 906, merely finally determining one or more separate items affecting the taxpayer's liability, the IRS must issue a statutory notice of deficiency before proceeding to collect any deficiency. **62.5** In such a case, the taxpayer may challenge the IRS's determination of his tax liability for the year at issue on other grounds, but the taxpayer may not reopen or contest the treatment of the items subject to the closing agreement.

**Section 7123(b)(1)** requires the IRS to establish nonbinding mediation procedures that can be invoked by either the taxpayer or the IRS to resolve unsuccessful attempts to enter into closing agreements. **Section 7123(b)(2)** requires the IRS to establish procedures for voluntary binding arbitration of disputes with respect to which the IRS and taxpayer have unsuccessfully attempted to enter into a closing agreement if both the IRS and taxpayer agree to arbitration.

# ¶ 47.01[6] Statutory Notice of Deficiency ("Ninety-Day Letter")

If a disputed income tax case cannot be settled, the IRS issues, pursuant to **§ 6212** , a statutory notice of deficiency (ninety-day letter), which is a crucial document for the following intertwined reasons:

1. Without such a notice, the deficiency cannot be assessed or collected unless the taxpayer consents to assessment and collection under **§ 6213(d) 63** or the IRS closes the taxpayer's taxable year under **§ 6851** (relating to flight or concealment) or makes a jeopardy assessment under **§ 6861** . **64** (No deficiency notice is required, however, for a computational adjustment to a partner's return following a redetermination of the partner's distributive share of partnership income in a partnership level audit proceeding. **65** )

2. The notice is the taxpayer's "ticket to the Tax Court," permitting him to petition the Tax Court for a redetermination of the deficiency within ninety days after the notice is mailed (hence the term "ninety-day letter") or, if it is addressed to a person outside the United States, 150 days. **66**

3. **Section 6213(a)** prohibits assessment and collection of the deficiency until the expiration of the 90-day or 150-day period and, if a petition is filed, until the Tax Court's decision becomes final. **67**

4. The statute of limitations on assessment and collection is suspended during the 90-day or 150-day period, and during the Tax Court proceedings, but commences to run again 60 days thereafter. **68**

5. The deficiency asserted in the statutory notice is an administrative determination that is presumptively correct when challenged by the taxpayer in the Tax Court; **69** but if the IRS asserts an increased deficiency, it must bear the burden of proof with respect to the additional amount. **70**

A "deficiency," speaking generally, is the amount by which the tax imposed exceeds the excess of (1) the sum of (a) the amount shown as the tax on the taxpayer's return and (b) the amounts previously assessed (or collected without assessment) as a deficiency, over (2) the amount of rebates. **70.1** A

less-than-careful reading of **§ 6213(a)** might lead one to conclude that a taxpayer can recover in a refund action any taxes paid to the IRS following an assessment that is not supported by an earlier valid deficiency notice, but that is not always true. **Section 6213(a)** "does not broadly provide for a refund of amounts paid by the taxpayer after assessment or provide for a refund where the taxpayer voluntarily pays the assessment before collection proceedings are initiated." **70.2 Section 7522** requires that any deficiency notice describe the basis on which the IRS has assessed the deficiency, interest, penalties, or additions to tax; but an inadequate description does not invalidate the notice.

Because prepayment judicial review of a deficiency is foreclosed if the taxpayer fails to file a timely petition in the Tax Court, **§ 6213(a)** provides that a Tax Court petition is deemed to have been timely filed if it is filed on or before the date specified in the deficiency notice as the last day for filing a Tax Court petition, thereby motivating the IRS to include such a date in all deficiency notices. **71** Nevertheless, an otherwise valid deficiency notice that omits the last date for filing a Tax Court petition remains a valid deficiency notice. **72**

**Section 6212(b)(1)** requires that the ninety-day letter be mailed to the taxpayer's "last known address," **73** a phrase that has engendered a significant amount of judicial controversy. For a long time, the obligation was considered to have been fulfilled if the notice was sent to "the address which, in the light of [all relevant] circumstances, the [IRS] reasonably believes the taxpayer wishes to have the [IRS] use in sending mail to him." **74** In an important 1988 case, however, the Tax Court held that the taxpayer's last known address is the address that appears on the taxpayer's most recently filed return, unless the taxpayer has given the IRS clear and concise notice of a different address. **75** Several courts of appeals followed this rule but others did not. **76** Even this apparently bright-line rule left room for controversy regarding the adequacy of the notice and whether the IRS had processed quickly enough the change of address information it received. **77** In an attempt to reduce the amount of controversy in this regard, the Treasury promulgated regulations that define a taxpayer's "last known address" as the address that appears on the taxpayer's most recently filed and properly processed federal tax return, unless the taxpayer has given the IRS clear and concise notification of a different address. **78** If, however, the IRS obtains a different address through the U.S. Postal Service National Change of Address database, that will be the taxpayer's last known address, unless the taxpayer has given the IRS clear and concise notification of a different address. No other change of address notification to a third party is effective for purposes of § 7222. Notification to the IRS does not have to be in writing; it may be oral. **79** Finally, the IRS "cannot simply ignore that which it obviously knows;" if the IRS has knowledge of the taxpayer's address, however obtained, that is the address to which the statutory notice of deficiency must be sent. **79.1** These rules apply to determine the taxpayer's last known address not only for purposes of deficiency notices, but also for purposes of other notices, statements, and documents mailed by the IRS to a taxpayer's last known address pursuant to the Internal Revenue Code (the Code) or regulations. **80**

If sent to the taxpayer's last known address, a deficiency notice is valid even though never received. **80.1** Conversely, an erroneously addressed notice is valid if actually received. **81** The taxpayer can designate an attorney's address for IRS communications, in which event it will be treated as the taxpayer's last known address. **82** In the case of a joint return, a single joint notice is authorized by

**§ 6212(b)(2)** unless either spouse notifies the IRS that "separate residences have been established," in which event a duplicate original of the joint notice must be sent by certified or registered mail to each spouse at his last known address. **83**

The Tax Court has held that it lacks jurisdiction over a petition based on a ninety-day letter sent by regular mail, even if the taxpayer is willing to waive the defect. **84** The Tax Court's theory that certified or registered mail is mandatory is not universally accepted, however, and in jurisdictions rejecting it, a taxpayer may be told that a ninety-day letter sent by regular mail or by hand is effective if received. **85**

**Section 6212(d)** permits the IRS to rescind a deficiency notice if the taxpayer consents. This procedure can be used to renew efforts to settle a dispute administratively or to cure a deficiency notice resulting from an administrative error, such as a notice issued to the wrong taxpayer, for the wrong year, or without considering a properly executed waiver of the statute of limitations. **86** A deficiency notice will not be rescinded, however, if the statute of limitations has expired or will expire within ninety days, a Tax Court petition has been filed, or the time for filing a Tax Court petition has expired.

# ¶ 47.01[7] Partnership Audits

For certain partnerships and partners, **§§ 6221 through 6231** generally require the IRS to conduct audits and determine deficiencies at the partnership level, require consistency between the treatment of an item by the partnership and by its partners or an explanation of the inconsistency, set up an elaborate procedure for keeping the partners informed of the progress of an audit and the administrative and judicial actions taken at the partnership level, and permit judicial review of adjustments made at the partnership level. **87** These provisions were enacted in 1982 to cope with the administrative problems experienced by the IRS in auditing returns of partnerships, particularly tax shelter partnerships with numerous partners. Under the prior rules, partnership returns were audited only incident to audits of the returns of their partners. It was difficult for the IRS to coordinate or consolidate these independent proceedings, particularly if the partners lived in different Internal Revenue districts or used different taxable years. If, for example, the IRS could not complete the audit of a return of a 100-member partnership within the normal three-year period for assessments, additional time could be secured only by obtaining waivers of the statute of limitations from each of the 100 partners.

The partnership audit rules alleviate problems of this type by substantially unifying all the proceedings affecting a partnership return subject to these rules. **88** Partnerships subject to these rules must designate a "tax matters partner," who is responsible for notifying the other partners of the audit and the final partnership administrative adjustment, and for keeping all of the partners informed of the administrative and judicial proceedings with respect to the audit. **88.1** The IRS must offer to settle with all partners on consistent terms, and the tax matters partner generally can settle on behalf of non-notice partners. **88.2** The final partnership administrative adjustment is binding on all partners, subject to judicial review. When the partnership audit rules apply, if a partner reports a partnership item on his return consistently with the treatment of the item on the partnership's return, the IRS can adjust the item

only through a partnership-level proceeding. **89** Similarly, a partner may not contest partnership items in a nonpartnership proceeding. **90** Whether the IRS has issued a Notice of Final Partnership Administrative Adjustment (FPAA) prior to the expiration of the statue of limitations is a partnership item that must be challenged in a partnership-level proceeding; it cannot be asserted in a refund claim by an individual partner. **90.1** If a partnership item properly adjusted in a partnership-level proceeding affects a nonpartnership item (e.g., recomputation of the limitations on charitable contributions, passive activity losses, or net **§ 1231** gains or losses), the computational adjustments may be made and the additional tax may be assessed against the partner without the IRS issuing an additional deficiency notice. **91** However, the normal deficiency procedures apply to "affected items" requiring a factual determination at the individual partner level, such as assessment of a negligence penalty. **92** The disallowance at the partner level of passed-through partnership losses under the **§ 704(d)** limitation of partnership losses to the partner's basis in a partnership interest, the **§ 465** at-risk limitations, the **§ 469** passive loss limitations, and the **§ 1366(d)** loss limitations applicable to shareholders of an S corporation that is a partner, are all "affected items," because these items must be determined on the basis of factors that are unique to each partner. **92.1** A deficiency notice to a partner that is based on an "affected item" may not be validly issued prior to completion of the partnership-level audit. **93** While a partnership-level audit proceeding is pending, however, the statute of limitations with respect to affected items is suspended. **94** In some situations, partnership items are statutorily converted to nonpartnership items when proceedings at the individual partner level cannot wait for completion of the partnership-level proceedings; for example, if a partner dies and the deceased partner's estate files a request for prompt assessment, the deceased partner's partnership items become nonpartnership items. **95** Whether a partnership is a "sham" that will be disregarded is a partnership item. **95.1**

Penalties and any reasonable cause defenses raised by the partnership generally are determined at the partnership level. **95.2** A partner may contest the imposition of penalties, including under § 6230(c)(4) the assertion of partner-level defenses to penalties, in a refund claim. The regulations provide that partner-level defenses to penalties imposed at the partner level, including the reasonable cause exception of **§ 6664(c)** , can only be determined through separate refund actions. **95.3** **Section 6226(a)** authorizes the tax matters partner to seek judicial review in the Tax Court, the district court for the district in which the partnership's principal place of business is located, or the Court of Federal Claims. The judicial action must be commenced within ninety days of the mailing of the notice of the final partnership administrative adjustment (FPAA). If the tax matters partner does not so seek judicial review of the FPAA, **§ 6226(b)** authorizes certain other partners to seek judicial review. If the action seeking judicial review of the FPAA is filed in either the district court or the Court of Federal Claims, § 6226(e) requires the partner seeking review to deposit with the IRS the amount by which the partner's tax liability would be increased under the adjustments in the FPAA. **95.4**

Consonant with the origin of the unified partnership audit rules, they do not apply to partnerships with ten or fewer partners, as long as all of the partners are either individuals (other than nonresident aliens), estates of individuals, or C corporations, unless the partnership elects to have the partnership-level audit rules apply. **96** However, if any partner, regardless of the size of the partnership interest, is a pass-through entity (i.e., another partnership or an S corporation), the partnership audit rules apply;

there is no de minimis exception. **96.1**

The Bipartisan Budget Act of 2015 made sweeping changes to the partnership audit rules. The Act repealed the prior TEFRA and Electing Large Partnership rules (in §§ **6221 - 6231** ) and replaced them, in new §§ **6221 - 6223** , **6225 - 6227** , **6231 - 6235** , and **6241** , with an entity-level audit process that allows the IRS to assess and collect the taxes against the partnership unless the partnership properly elects out. **96.2** The tax rate applied to the underpayment will be the highest individual or corporate rate, **96.3** subject to modifications to reflect tax-exempt partners, potential favorable capital gains tax rates, and other considerations. **96.4** The new rules should significantly simplify the audits of large partnerships. As a result, the audit rate of partnerships might increase. The new rules will simplify the current complex procedures on determining who is authorized to settle on behalf of the partnership and also free the IRS from the obligation to send various notices to all of the partners. Although partnerships with 100 or fewer partners can elect out of the new rules under **§ 6221(b)** , such election is not available if there is another partnership as a partner. **96.5** For partnerships that elect out of the new rules, partnership audits will be much more complicated because the IRS will be required to deal separately with each partner. The new rules apply to partnership taxable years beginning after December 31, 2017.Legislation enacted in 2018 made significant technical corrections to the partnership audit rules of the Bipartisan Budget Act of 2015. Among the most significant is the clarification of the scope of the partnership audit rules; the 2018 legislation eliminates references to adjustments to partnership income, gain, loss, deduction, or credit, and instead refers more broadly to "partnership-related items," defined to include "any item or amount with respect to the partnership (without regard to whether or not such item or amount appears on the partnership's return and including an imputed underpayment and any item or amount relating to any transaction with, basis in, or liability of, the partnership) which is relevant . . . in determining the tax liability of any person under Chapter 1." **96.6** Another significant revision provides a method for partners (as contrasted with the partnership itself) to pay any tax resulting from the partnership audit without the need for the partners to file amended returns. **96.7**

# ¶ 47.01[8] Church Tax Inquiries and Examinations

Under **§ 7611** , an audit of an organization claiming to be a church may begin only after an appropriate high-level IRS official finds reasonable cause for the audit. **97** If the audit results in a determination adverse to the church, the IRS can act on it only if an IRS regional counsel approves it. This provision reflects Congress's attempt to protect churches from unduly intrusive tax proceedings, while preserving the integrity of the tax system, which has been challenged in recent years by individuals using organizations that are clothed in clerical garb but are in substance tax dodges. **98 Section 7611** does not apply, however, to criminal investigations, jeopardy and termination assessments, persons other than churches, and certain other matters. **99** In the event that the IRS fails to comply with the procedures under **§ 7611** , the church's available remedies are limited to the specific procedural remedies provided within **§ 7611(e)(1)** , and a revocation of a church's tax-exempt status by the IRS will not be overturned due to the IRS's failure to comply with the procedural requirements of **§ 7611** . **100**

# ¶ 47.01[9] Taxpayer Assistance Orders

**Section 7811** authorizes the Taxpayer Advocate to issue a "taxpayer assistance order" requiring the IRS to release a lien, take any action, or refrain from taking any action with respect to the taxpayer in certain regards to prevent a taxpayer from suffering a "significant hardship" as a result of the manner in which the internal revenue laws are being administered. **101** Any order issued under **§ 7811** applies to a private debt collection company acting under a **§ 6306** contract, to the same extent and in the same manner as it applies to the IRS. **101.1** The nonexhaustive list of "significant hardships" includes any threat of immediate adverse action, any delay of more than thirty days in resolving taxpayer account problems, incurrence of significant costs if relief is not granted, and any long-term adverse impact if relief is not granted. **102** Under these standards, there might be little that is not a "significant hardship." If appropriate, an order may be issued regarding certain aspects of the manner in which an audit investigation is being conducted. When an order is issued at the taxpayer's request, the statute of limitations will be suspended. **103** Taxpayer assistance orders may be modified or rescinded only by the Taxpayer Advocate, the Commissioner of Internal Revenue, or the Deputy Commissioner of Internal Revenue, and the modification or rescission must be accompanied by a written explanation.

**0.1** See also **Rev. Proc. 2016-30, 2016-21 IRB 981** (permitting taxpayer under jurisdiction of IRS Large and Mid-Size Business Division (LMSB) to enter into LMSB Pre-Filing Agreement (PFA), an agreement that determines certain issues before taxpayer files any return relating to those issues).

**1 Reg. § 301.6601-1(f)(4)** .

**2** See **IRC § 6213(b)(1)** . But see **IRC § 6213(b)(2)** (taxpayer may request abatement of assessment in notice within sixty days, thus bringing deficiency procedure into force).

**3** See Internal Revenue Manual (IRM) 4.1.5.9.1 (selection of returns for correspondence, office, or field audit), 4.1.5.9.2-4.1.5.9.26 (issue identification).

**3.1 Rev. Rul. 2005-51, 2005-2 CB 163** (IRS may not use summary assessment procedures under **§ 6213(b)** when taxpayer filed return reporting amount of wages and tax liability, but attached a Form W-2 reflecting different amount of wages; IRS must issue deficiency notice under **§ 6212(a)** ).

**4** IRM 4.1.5.1.1 (use of DIF), 4.1.3.1 (formulas are confidential), 4.1.3.1.2 (all individual returns are scored using DIF; score assigned to a return will not be disclosed). See also **Raheja v. CIR, 725 F2d 64 (7th Cir. 1984)** (rejecting taxpayers' argument that selection of returns for audit other than by computerized methods violated taxpayers' constitutional rights); **Small v. IRS, 820 F. Supp. 163 (DNJ 1992)** (DIF scores used to select returns for audit are exempt from disclosure under Freedom of

Information Act (FOIA) because disclosure would impair enforcement of revenue laws).

**5** See IRM 4.1.5.8 (information return matching); 4.45 (coordinated examination program). See also **Announcement 2010-9, 2010-1 CB 408** (IRS is considering requiring certain business taxpayers to disclose uncertain tax positions on their tax returns; schedule will require concise description of uncertain positions and maximum amount of potential federal tax liability attributable to each uncertain tax position if it was disallowed in its entirety; taxpayer will not be required to disclose risk assessment or tax reserve amounts; description must contain (1) Code sections potentially implicated by position; (2) description of taxable year or years to which position relates; (3) statement that position involves item of income, gain, loss, deduction, or credit against tax; (4) statement that position involves permanent inclusion or exclusion of any item, timing of that item, or both; (5) statement whether position involves determination of value of any property or right; and (6) statement whether position involves computation of basis).

**5.1 Announcement 2010-75, 2010-41 IRB 428** ; Prop. Reg. §§ 1.6012-2(a)(4), 1.6012-2(a)(5).

**5.2** Schedule UTP requires a corporation to rank all of the reported tax positions based on the federal income tax reserve (including interest and penalties) recorded for each position taken on the return, and to designate each tax position for which the reserve exceeds 10 percent of the aggregate amount of the reserves for all of the tax positions reported on the schedule.

**6** For a taxpayer who virtually invited an investigation, see **Olive v. CIR, ¶ 83,195 P-H Memo. TC (1983), aff'd by order, 749 F2d 32 (4th Cir. 1984)** (taxpayer told husband of woman he was dating that he pocketed cash fees without recording them and took funds to Costa Rica and Mexico; husband reported conversation to IRS). See also infra **¶ 47.02[1]** .

The IRS is required to include in IRS Pub. No. 1, Your Rights as a Taxpayer, an explanation of the various sources of information it may use to determine whether to audit a particular taxpayer. IRS Restructuring and Reform Act of 1998, Pub. L. No. 105-206, § 3503, 112 Stat. 685.

**7** See, e.g., **England v. CIR, 798 F2d 350 (9th Cir. 1986)** (taxpayer was identified as tax protester in IRS records maintained as part of Tax Protestor Program for screening all returns filed by tax protesters; held, procedure does not violate Privacy Act prohibition against government records "describing how any individual exercises rights guaranteed by the First Amendment"); **US v. Catlett, 584 F2d 864 (8th Cir. 1978)** (upholding alleged policy of prosecuting nonfiling war protesters whose objections were widely publicized, while using civil remedies against other unpublicized protesters).

**8 Ranheim v. CIR, ¶ 79,502 P-H Memo. TC (1979)** ; see also **Teague v. Alexander, 662 F2d 79, 83 (DC Cir. 1981)** (alleged discriminatory audit of Vietnam war protester not established, although

IRS unit "exhibited less than the careful concern for First Amendment interests required of the government"); **Penn-Field Indus., Inc. v. CIR, 74 TC 720, 724 (1980)** (taxpayer alleging invidious selection for audit of cases involving compensation paid by closely held corporations to shareholder-employees denied discovery of IRS audit data; given its limited resources, IRS must focus on "rationally classified problem areas"); **Karme v. CIR, 673 F2d 1062 (9th Cir. 1982)** (taxpayers maintained that they had been singled out for audit because of IRS investigation of their attorney; held, no impermissible selectivity, even if case is judged by arguably stricter criteria applied to claims of selective criminal prosecution).

**9** This prohibition does not extend to members of Congress, presumably either because members of Congress are too ethical to engage in such activities or because Congress believed it is appropriate for members of Congress to seek to influence IRS audit activities for political reasons. The legislative history of **§ 7217** is silent on this point. See S. Rep. No. 174, 105th Cong., 2d Sess. 33-34 (1998).

**10** Statement of Procedural Rules, 26 CFR § 601.105(b).

**11** Statement of Procedural Rules, 26 CFR § 601.105(b)(1).

**12 IRC § 7521(c)** . For taxpayer representatives, see supra ¶ **46.02[3]** .

**13** For administrative summonses and right to counsel in criminal tax investigations, see infra ¶¶ **47.02[2]** and **47.02[4][a]** , respectively.

**14 IRC § 7521(a)** .

**15 Reg. § 301.7605-1** . Office interviews generally are conducted at the IRS office for the IRS district in which the taxpayer resides. Field audits will not be conducted at the taxpayer's place of business if the business is so small that doing so would essentially require closing the business or would unduly disrupt business, unless a visit is necessary, for example, to verify inventories.

**16** IRM 4.1.5.9.1. For example, in a correspondence examination, the taxpayer may be asked for supporting material for a claimed deduction, which, if accepted by the IRS, can remove the need for personal contact.

**17** IRM 4.1.5.9.1. During an interview the taxpayer "has the right to point out to the examiner any amounts included in the return which are not taxable, or any deductions which the taxpayer failed to claim on the return." Statement of Procedural Rules, 26 CFR § 601.105(b)(2)(ii).

**18** IRM 4.1.5.1.19.

**19** Statement of Procedural Rules, 26 CFR § 601.105(b)(3).

**20** Statement of Procedural Rules, 26 CFR § 601.105(b)(5). Procedures for technical advice memoranda (TAMs) are promulgated annually as the second revenue procedure of the year. See, e.g., Rev. Proc. 2020-2, 2020-1 IRB 107.

**21** Statement of Procedural Rules, 26 CFR § 601.105(b)(5)(iii)(a); see also id., 26 CFR § 601.105(b)(5)(iv)(b).

**22** For the effect of an executed Form 870, see infra **¶ 47.01[5][a]** .

**23** IRM 4.2.1.6.3.

**24** For ninety-day letters, see infra **¶ 47.01[6]** . See also **Kramer v. CIR, ¶ 89,565 P-H Memo. TC (1989)** (deficiency notice is not invalidated by failure of IRS to send thirty-day letter or provide an administrative hearing).

**25** IRS Restructuring and Reform Act of 1998, Pub. L. No. 105-206, § 3504, 112 Stat. 685.

**26** For restricted consents, limited to specified issues, see infra **¶ 49.05** . For the possibility of reopening settled issues when the case goes to the Appeals Office, see Statement of Procedural Rules, 26 CFR § 601.106(d).

**27** For a detailed analysis of **§ 7605(b)** , see **US v. Hendrick, 518 F2d 842 (7th Cir.), cert. denied, 423 US 1016 (1975)** (original inspection not completed; provision does not prevent separate inspections regarding two different taxes); **US v. Silvestein, 668 F2d 1161 (10th Cir. 1982)** (asserted second inspection was part of continuing investigation; original inspection not terminated when original agent referred case to special agent; extensive citation of cases); **Action Recycling, Inc. v. US, 721 F3d 1142 (9th Cir. 2013)** (rejecting argument that IRS already "possesses" summonsed information simply because revenue agent has previously reviewed documents); see also **Zimmer v. Connett, 640 F2d 208 (9th Cir. 1981)** (taxpayer not entitled to hearing before notice of second inspection is issued).

**27.1 US v. Titan Int'l, Inc., 811 F3d 950 (7th Cir. 2016)** .

28 See **Spell v. US, 907 F2d 36 (4th Cir. 1990)** , and authorities cited therein.

29 **Digby v. CIR, 103 TC 441 (1994)** .

30 See **US v. Bass, 33 AFTR2d 74-1164 (MD Fla. 1974)** (corporation and controlling shareholder); **Grossman v. CIR, 74 TC 1147 (1980)** (inspection of taxpayer's return and schedules and of brother's records did not constitute two inspections of the same taxpayer); **US v. Lask, 703 F2d 293 (8th Cir.), cert. denied, 464 US 829 (1983)** (inspection of third party's record is not a second inspection of taxpayer's books and records).

31 **Collins v. CIR, 61 TC 693, 699 (1974)** .

32 See **Collins v. CIR, 61 TC 693, 700 n.4 (1974)** , citing cases. But see **Reineman v. US, 301 F2d 267 (7th Cir. 1962)** (deficiency assessment set aside).

33 See **Rev. Proc. 94-68, 1994-2 CB 803** . Judicial enforcement of this policy is unlikely unless the violation raises a due process issue. See **Collins v. CIR, 61 TC 693, 699 (1974)** , supra note 31; **US v. Clement, 668 F2d 1010 (8th Cir. 1982)** (summons enforced in reopened case; there was evidence of concealment of material fact or of collusion, and, because of large sum involved, not reopening would be serious administrative omission).

34 Statement of Procedural Rules, 26 CFR § 601.105(c). The failure of the IRS to afford the taxpayer an administrative review pursuant to the thirty-day letter, however, does not invalidate a subsequent deficiency notice. **Trueblood v. CIR, RIA TC Memo. ¶ 97,524 (1997)** (deficiency notices sent on thirtieth day after mailing of thirty-day letter crossed in the mail with taxpayer's request for appeals conference, which was denied on the grounds that the deficiency notice already had been issued) ; see **Ellis v. CIR, RIA TC Memo. ¶ 2007-207 (2007)** (failure of IRS to comply with Statement of Procedural Rules, **26 CFR § 601.105(d)(1)** , providing that "30-day letter" be sent to taxpayer, does not invalidate deficiency notice; Statement of Procedural Rules does not create procedural protections for taxpayers), rev'd in part on other issues, **346 Fed. Appx. 346 (10th Cir. 2009)** .

The IRS Restructuring and Reform Act of 1998, Pub. L. No. 105-206, § 1001(a), 112 Stat. 685, directed the IRS to reorganize in a manner that assures the independence of the Appeals Division, and to prohibit ex parte communications between appeals officers and other IRS employees that would compromise the Appeals Division's independence. See **Rev. Proc. 2012-18, 2012-10 IRB 455** (providing comprehensive guidance regarding ex parte communications between Appeals and other IRS functions); **Hinerfeld v. CIR, 139 TC 277 (2012)** (communications between employees of Office of Chief Counsel and Appeals to facilitate compliance with statutory mandate to consult Office of Chief Counsel in certain cases are not prohibited ex parte communications for purposes of RRA 1998,

§ 1001(a) , or **Rev. Proc. 2000-43** , supra).

**34.1** Statement of Procedural Rules, **26 CFR § 601.506(d)(1)** .

**35** Statement of Procedural Rules, 26 CFR §§ 601.105(d)(2), 601.106(a)(1)(iii).

**36 IRC § 7123(a)** . See **Rev. Proc. 99-28, 1999-2 CB 109** .

**37** Statement of Procedural Rules, 26 CFR § 601.106(c).

**38** Taxpayers offering new evidence may find their cases referred back to the district director for reconsideration. Statement of Procedural Rules, 26 CFR § 601.106(f)(6).

**39** Statement of Procedural Rules, 26 CFR § 601.106(c).

**40** Statement of Procedural Rules, 26 CFR § 601.106(d)(1).

**41** Statement of Procedural Rules, 26 CFR § 601.106(f)(2).

**42** Statement of Procedural Rules, 26 CFR § 601.106(d)(3); **Rev. Proc. 87-24, 1987-1 CB 720** ., superseded by **Rev. Proc. 2016-22, 2016-15 IRB 577** (practices for administrative appeals process in cases docketed in Tax Court).

**43 Rev. Proc. 2014-63, 2014-53 IRB 1014** (comprehensive rules governing arbitration availability and process; generally, arbitration is available for cases in which limited number of factual issues remain unresolved following settlement discussions in Appeals).

**43.1 Rev. Proc. 2015-44, 2015-38 IRB** 354, obsoleting **Rev. Proc. 2006-44, 2006-2 CB 800** .

**43.2 IRC § 7803(e)(5)** .

**43.3 IRC § 7803(e)(7)** .

**44** Statement of Procedural Rules, 26 CFR § 601.105(j); **Rev. Proc. 94-68, 1994-2 CB 803** (cases closed after examination in office of district director will be reopened to make adjustments unfavorable to taxpayer only if there is evidence of fraud or the like, the prior action involved substantial error based on established IRS policy, or failure to reopen would be serious administrative omission).

**45** See **Bear v. CIR, RIA TC Memo. ¶ 92,690 (1992), aff'd by order, 19 F3d 26 (9th Cir. 1994)** ( **§§ 7121** and **7122** are the exclusive methods for settling tax controversies; "accord and satisfaction" under state version of Uniform Commercial Code does not apply).

**46** Form 870 is also used to accept a proposed overassessment, in which case the refund will be processed without further formality. For an extended examination of the function of Form 870, see **US v. Price, 361 US 304 (1960)** (rejecting taxpayer's theory that Form 870 is valid only if executed after notice of deficiency).

**46.1** See **Nichols v. CIR, RIA TC Memo. ¶ 2007-5 (2007)** (taxpayer who agreed to compromise of deficiency for 1994 by signing Form 870 could not carryback NOLs incurred in 1995 that he did not discover until after Form 870 for 1994 had been signed); **Smith v. US, 328 F3d 760 (5th Cir. 2003)** (taxpayer, whose deficiency was determined in partnership-level proceeding (see infra **¶ 47.01[7]** ), could seek refund of penalties after executing Form 870 with phrase "Settlement Position" at top; although taxpayer clearly waived right to file Tax Court petition, neither Form 870 nor accompanying "penalty report," which taxpayer also signed, clearly indicated that taxpayer was waiving right to contest penalties by refund), reh'g denied, 71 Fed. Appx. 443 (5th Cir. 2003) .

**47 IRC § 6601(c)** .

**48** See, e.g., **Godchaux v. US, 102 F. Supp. 266 (ED La. 1952)** (time limit added to standard form); **Steiner v. Nelson, 259 F2d 853 (7th Cir. 1958)** (taxpayer agreed not to sue for refund); **Philadelphia & Reading Corp. v. Beck, 676 F2d 1159 (7th Cir. 1982)** (Form 870 to be effective only after report to Joint Committee on Taxation).

**49** Docketed cases are settled by filing a stipulation of the agreed deficiency or overpayment in the Tax Court, so as to obtain a judicial order terminating the case. See Statement of Procedural Rules, 26 CFR § 601.106(d)(3)(i).

**50 US v. Goldstein, 189 F2d 752 (1st Cir. 1951)** .

**51** Statement of Procedural Rules, 26 CFR § 601.106(h) contains similar provisions for nondocketed cases closed by the Appeals Office on the basis of reciprocal concessions. See also **Lowenstein v. US, 27 Fed. Cl. 38 (1992), aff'd by order, 6 F3d 786 (Fed. Cir. 1993)** (failure by IRS to follow previously agreed-on method of computing deficiency, which taxpayer did not notice before executing Form 870-AD, is not a mathematical error entitling taxpayer to reopen case).

**52 Botany Worsted Mills v. US, 278 US 282 (1929)** .

**53 Whitney v. US, 826 F2d 896 (9th Cir. 1987)** (because language of Form 870-AD is contradictory and should be construed against government, it does not automatically bar a refund suit; but taxpayer may be estopped if government failed to press portion of alleged deficiency in reliance on settlement).

**54 Lignos v. US, 439 F2d 1365, 1368 (2d Cir. 1971)** (elements necessary to establish estoppel); see also **McGraw-Hill, Inc. v. US, 44 AFTR2d 79-5463 (Ct. Cl. Trial J. Op. 1979)** (review of equitable estoppel theories), aff'd per curiam, 623 F2d 700 (Ct. Cl. 1980); **Largen v. US, 76 AFTR2d 95-5815 (MD Fla. 1995)** (all elements to estop taxpayer from repudiating Form 870-AD satisfied; taxpayer's failure to inform IRS before statute of limitations expired of his intent not to honor settlement was misleading silence that was a false representation of fact of which the government did not know, satisfying the first three elements; government's detrimental reliance was established by barred interest and penalties that could not be recovered through recoupment).

**55** See **Stair v. US, 516 F2d 560 (2d Cir. 1975)** , which cites and reviews the principal cases, affirming the summary dismissal of a refund action by a taxpayer who signed a Form 870-AD settling a single-issue case by a fifty-fifty compromise; the refund action was brought when the IRS could no longer assert the full amount of the original deficiency, so the taxpayer risked nothing by repudiating the settlement except counsel fees in the refund action; Carland, Inc. v. US, 61 AFTR2d 88-1022A (WD Mo. 1988) (execution of Form 870-AD estopped taxpayer from claiming refund because IRS allowed statute of limitations to expire); **Kmart Corp v. US, 31 Fed. Cl. 677 (1994)** (taxpayer was estopped from filing refund suit by settlement on Form 870-AD where issue was among those considered in settlement); see also **DecisionOne Holdings Corp. v. US, 78 AFTR2d 96-7537 (Fed. Cl. 1996)** (because taxpayer claimed settlement pursuant to Form 870-AD provided for $682,290 of interest and government claimed interest of $2,130,450, Form 870-AD did not reflect a meeting of the minds and taxpayer would not be equitably estopped from seeking refund of interest after payment); **Tyco Lab. v. US, 74 AFTR2d 94-5793 (DNH 1994)** (taxpayer is not estopped from seeking refund on a different issue than that settled by Form 870-AD where settlement was on a single issue).

**56** See Statement of Procedural Rules, 26 CFR § 601.202; see also **Dorl v. CIR, ¶ 73,145 P-H Memo. TC (1973), aff'd per curiam, 507 F2d 406 (2d Cir. 1974)** (letter signed by IRS official not entitled to execute closing agreements does not constitute such an agreement); **Shumaker v. CIR, 648 F2d 1198 (9th Cir. 1981)** (informal acceptance of amended return and adjustment of tax accordingly is not binding agreement); **Treaty Pines Partnership v. CIR, 967 F2d 206 (5th Cir. 1992)** (binding settlement agreement need not be executed by Form 906 if otherwise unconditional offer and acceptance establish terms).

**57** Ordinarily, contract-law principles govern the interpretation of closing agreements. **Rink v. CIR,**

**100 TC 319 (1993), aff'd, 47 F3d 168 (6th Cir. 1995)** ; **Goldman v. CIR, 39 F3d 402 (2d Cir. 1994)** (closing agreement with respect to 1981 was interpreted not to apply to subsequent years); **In re Hopkins, 146 F3d 729 (9th Cir. 1998)** (taxpayer who signed closing agreement could not thereafter assert innocent spouse defense to joint and several liability, discussed infra ¶ 48.09 ). For circumstances in which closing agreements have not been set aside, see **Rev. Rul. 72-486, 1972-2 CB 644** (fraud by officer against employer-corporation does not permit closing agreement between corporation and IRS to be set aside); **Rev. Rul. 72-487, 1972-2 CB 645** (unintentional error in revenue agent's report does not constitute misrepresentation of material fact); **Kercheval v. US, 172 F3d 863 (4th Cir. 1999)** (subsequent court of appeals decision deciding identical issue in favor of another taxpayer is not grounds for reopening a closing agreement entered into at a time when the issue had been decided against taxpayers in lower court decisions); see also **Overhauser v. US, 45 F3d 1085 (7th Cir. 1995)** (closing agreement cannot reopen years closed by statute of limitations).

See **S&O Liquidating Partnership v. CIR, 291 F3d 454 (7th Cir. 2002)** (unequivocal closing agreement signed with respect to docketed Tax Court case was binding notwithstanding letter from taxpayer's attorney stating that the closing agreement "must 'not be construed as waiver of any appellate rights;'" appeal dismissed as moot). See also **Johnston v. CIR, 461 F3d 1162 (9th Cir. 2006)** , aff'g **122 TC 124 (2004)** (amount agreed upon as settlement of deficiency in docketed Tax Court case cannot be reduced by **§ 172** NOL deduction that was not referenced in settlement).

**58 Reg. § 301.7121-1(c)** . For what constitutes a "change" in applicable law, see **Reg. § 301.7121-1(b)(4),** Ex. (closing agreement determining fair market value of stock on March 1, 1913, for basis purposes binding "unless or until the law is changed to require the use of some other factor to determine basis").

**59** If, however, the IRS fails to issue a timely assessment after the execution of a closing agreement, the taxpayer may obtain a refund for amounts paid after the statute of limitations has expired. See **Ewing v. US, 914 F2d 499 (4th Cir. 1990), cert. denied, 500 US 905 (1991)** , infra ¶ **49.02** note 13. See also **Diaz Del Castillo v. CIR, RIA TC Memo. ¶ 2006-165 (2006)** (taxpayer's payment of tentative deficiency asserted in thirty-day letter is not binding agreement regarding taxpayer's liability and does not bar subsequent statutory notice of deficiency for larger amount), aff'd per curiam, 252 Fed. Appx. 574 (4th Cir. 2007) .

**60 Smith v. US, 850 F2d 242 (5th Cir. 1988)** ; **Magarian v. CIR, 97 TC 1 (1991)** (closing agreement on Form 906 is final only as to matters specifically agreed on; assessment of additions to tax was not barred).

**61 Reg. § 301.7121-1(a)** ; Statement of Procedural Rules, 26 CFR § 601.202(a)(2).

**62 Rev. Proc. 68-16, 1968-1 CB 770, 773** , § 4.01, modified by **Rev. Proc. 94-67, 1994-2 CB 800** .

**62.1 Rev. Proc. 68-16, 1968-1 CB 770** ; **Zaentz v. CIR, 90 TC 753, 760-761 (1988)** .

**62.2** See Statement of Procedural Rules, **26 CFR § 601.202** ; **Urbano v. CIR, 122 TC 384 (2004)** .

**62.3 Estate of Magarian v. CIR, 97 TC 1 (1991)** (this type of closing agreement does not bar Commissioner from subsequently determining that taxpayer is liable for additions to tax).

**62.4 Marathon Oil Co. v. US, 42 Fed. Cl. 267 (1998)** , aff'd, 215 F3d 1343 (Fed. Cir. 1999) ; **Rev. Proc. 68-16, 1968-1 CB 770** , modified by **Rev. Proc. 94-67, 1994-2 CB 800** .

**62.5 Manko v. CIR, 126 TC 195 (2006)** .

**63** If a statutory notice is not sent as required by **§ 6213(a)** , the taxpayer can enjoin assessment or collection of the tax; see **IRC §§ 6213(a)** (last sentence), 7421(a). For the requirement that the IRS prove a deficiency notice was sent, see infra **¶ 51.03[2][b]** , note 73.

**Section 6212(a)** requires that a deficiency notice inform the taxpayer of the taxpayer's right to contact a local office of the National Taxpayer Advocate and provide the location and phone number of the appropriate office. See **John C. Hom & Assocs., Inc. v. CIR, 140 TC 210 (2013)** (statutory notice of deficiency that includes website address where address and telephone number of local office of National Taxpayer Advocate may be found, but which does not itself provide location and phone number of appropriate office, complies with **§ 6212(a)** ).

A deficiency notice is not required if the taxpayer has executed a closing agreement waiving a deficiency notice prior to settlement. See **Hempel v. US, 14 F3d 572 (11th Cir. 1994)** (taxpayers agreed that resolution of their case would be "piggybacked" on a Tax Court case involving another investor in the same tax shelter). But if the taxpayer has executed a closing agreement on Form 906, which only finally determines one or more separate items affecting the taxpayer's liability, the IRS must issue a statutory notice of deficiency before proceeding to collect any deficiency. **Manko v. CIR, 126 TC 195 (2006)** .

**64** For termination and jeopardy assessments, see infra **¶ 48.02[2]** .

**65 Brookes v. CIR, 108 TC 1 (1997)** , appeal dismissed, **163 F3d 1124 (9th Cir. 1998)** . For partnership-level proceedings, see infra **¶ 47.01[7]** .

**66** For lack of Tax Court jurisdiction in deficiency cases if a notice of deficiency has not been issued or if the petition is filed after the statutory 90-day or 150-day period, see infra ¶¶ 51.02[2][b] and

51.02[2][c] ; see also **Alford v. CIR, 800 F2d 987 (10th Cir. 1986)** (IRS letter to tax shelter investors stating that if advertised benefits are claimed, returns will be audited and claims disallowed, does not constitute deficiency notice), and cases cited there in.

**67** See **Johnson v. US, 990 F2d 41 (2d Cir. 1993), cert. denied, 516 US 880 (1995)** (assessment issued before expiration of ninety-day period to appeal a Tax Court decision is void even if the taxpayer does not appeal) ; **Freije v. CIR, 125 TC 14 (2005)** (the fact that taxpayer has opportunity to dispute underlying tax liability in appeal to Tax Court in **§ 6330** collection due process proceeding, discussed at **¶ 51.03** [6A], does not cure assessment made in derogation of taxpayer's rights under **§ 6213(a)** to deficiency proceeding in Tax Court).

**68** See infra **¶ 49.06** .

**69** But see IRC **§ 7491** , discussed infra **¶ 51.02** . See also **Diaz Del Castillo v. CIR, RIA TC Memo. ¶ 2006-165 (2006)** (statutory notice of deficiency, which is complete and clear on its face, is valid despite variance from earlier thirty-day letter), aff'd per curiam, 252 Fed. Appx. 574 (4th Cir. 2007) .

**70** See infra ¶ 50.02[3]. For the definition of "deficiency," see **IRC § 6211(a)** , discussed infra **¶ 51.03[2][a]** ; **Midland Mortgage Co. v. CIR, 73 TC 902, 907 (1980)** ("deficiency = correct tax # (tax assessed per return + proper additional assessments # rebates)"); see also **Llorente v. CIR, 649 F2d 152 (2d Cir. 1981)** (presumption of correctness evaporates if statutory notice of deficiency is shown to lack rational basis; notice held arbitrary in part); **Dellacroce v. CIR, 83 TC 269 (1984)** (same); **Roat v. CIR, 847 F2d 1379 (9th Cir. 1988)** (where taxpayer fails to file a return, IRS is not required to prepare substitute return before assessing deficiency).

**70.1 IRC § 6211(a)** ; see **Galloway v. CIR 149 TC 407 (2017)** (when refundable credit is disallowed on audit, rebate to taxpayer of refundable credit in excess of amount of tax shown on return increases "deficiency" within meaning of **§ 6211(a)** ).

**70.2 Bush v. US, 599 F3d 1352 (Fed. Cir. 2010)** (despite taxpayers not having received deficiency notice, had they not voluntarily paid tax they could have litigated their substantive liability in Tax Court simply by not paying asserted deficiency and seeking collection due process relief under **§ 6330** (see **¶¶ 48.04[5]** , **51.03[6A]** ) when IRS subsequently took actions to collect assessed taxes), vacated and reh'g en banc granted, **400 Fed. Appx. 556 (10th Cir. 2010)** .

**71** But see **Rochelle v. CIR, 116 TC 356 (2001)** (taxpayer's untimely petition, filed fifty-six days late, was dismissed; **§ 6213(a)** does not result in unlimited time to file a petition if no due date is specified). , aff'd per curiam, **293 F3d 740 (5th Cir. 2002)** .

**72** See **Smith v. CIR, 114 TC 489 (2000)** (a deficiency notice that omits the required notification of the due date for a Tax Court petition is nevertheless valid and sufficient to toll the statute of limitations if the taxpayer actually receives the notice and files a timely Tax Court petition), aff'd, **275 F3d 912 (10th Cir. 2001)** .

**73** See also **IRC § 6212(b)(1)** (in event fiduciary fails to give notice under **§ 6903** , notice to taxpayer's last known address is sufficient despite death, legal disability, or, in the case of corporations, dissolution); **Reg. § 301.6903-1(b)** (method of giving notice of fiduciary relationship and of termination thereof).

**74 Lifter v. CIR, 59 TC 818, 821 (1973)** , citing and summarizing numerous earlier cases in this area.

**75 Abeles v. CIR, 91 TC 1019 (1988)** (return is "filed" only after it has been properly processed by an IRS Service Center and the address is available through the IRS national computer system) (acq.); see **Monge v. CIR, 93 TC 22 (1989)** (different address shown on forms other than tax return filed with IRS subsequent to return for year in question is not sufficient notice of change of address); see also **Fuener v. CIR, RIA TC Memo. ¶ 91,644 (1991)** (correspondence bearing an address different from that on the most recent return does not by itself constitute clear and concise notice of a change of address); **Hamilton v. CIR, RIA TC Memo. ¶ 92,265 (1992)** (notice to Office of Chief Counsel is not notice to IRS).

**76** Compare **Pomeroy v. US, 864 F2d 1191 (5th Cir. 1989)** (where taxpayer moved in January 1985 and notified IRS of new address in March, but subsequently filed 1984 tax return using old address, notice mailed to old address was valid); **King v. CIR, 857 F2d 676 (9th Cir. 1988)** (last known address is most recent tax return even though protest letter received by IRS after filing of most recent tax return used old address, which was for year of tax return under audit) with **Teong-Chan Gaw v. CIR, 45 F3d 461 (DC Cir. 1995) (nonacq.)** (because IRS knew or had reason to believe that a deficiency notice sent to taxpayer's last known address would not reach him, and taxpayer had identified to IRS a person through whom he could be reached but did not specifically designate that person's address as taxpayer's address, IRS had an equitable obligation to contact the specified agent to ascertain taxpayer's address); **Mulder v. CIR, 855 F2d 208 (5th Cir. 1988)** (IRS did not use due diligence in ascertaining taxpayer's last known address where two notices to address in computer file were returned undelivered; IRS should have done more, "at the very least the tax-preparer should have been contacted").

**77** As to adequacy of the notice, see **Schaefer v. CIR, RIA TC Memo. ¶ 91,426 (1991)** (when IRS had actual notice of new address and revenue agent dealt with taxpayer using new address, deficiency notice sent to address on most recently filed tax return was not valid, even though taxpayer never formally notified IRS of new address); **Chase v. CIR, ¶ 90,139 P-H Memo. TC (1990)** (crossing

out preprinted address on estimated tax forms and handwriting new address for two consecutive filings was sufficient notice to IRS of new address).

As to processing, compare **Williams v. CIR, 935 F2d 1066 (9th Cir. 1991)** (seventeen-week delay in posting most recent tax return address to computer records was not unreasonable delay; notice sent to old address was valid); **Boumil v. CIR, ¶ 90,084 P-H Memo. TC (1990)** (taxpayer's address listed on 1984 tax return, dated April 13, 1985, was last known address as of May 2, 1986, even though IRS individual master file, national computer center transcript reflected prior address) with **Baptist v. CIR, ¶ 90,280 P-H Memo. TC (1990)** (notice sent to old address 67 days after IRS received tax return with new address, which was posted to computer 105 days after receipt, was not sent to last known address); **Powell v. CIR, 958 F2d 53 (4th Cir.), cert. denied, 506 US 965 (1992)** (nonacq.) (notice was insufficient where tax return with new address was filed eighteen days before deficiency notice was sent by certified mail, Postal Service returned notice of nondelivery to IRS, and IRS did not thereafter exercise reasonable diligence to ascertain proper address).

**78** Reg. § 1.6212-2. See **Rev. Proc. 2010-16, 2010-1 CB 664** (listing forms that are "returns" for this purpose and standards for determining when return has been processed; explaining how taxpayer is to inform IRS of change of address; clear and concise written notification signed by taxpayer and mailed to appropriate IRS address is required; in addition to new address, notification must contain taxpayer's full name and old address as well as taxpayer's social security number, individual taxpayer identification number, or employer identification number; for joint returns, both names, social security numbers, and signatures are required; Form 8822 is not mandatory). In a decision that effectively overrules its prior decisions to the contrary, the Tax Court has held that a power of attorney on Form 2848 submitted to the IRS with the taxpayer's new address does not provide the IRS with clear and concise notification of the new address and, consequently, a notice of deficiency mailed to the taxpayer's old address and received only after the ninety-day period for petitioning the Tax Court had expired, was valid. **Gregory v. CIR, 152 TC 129 (2019)** . In this same decision, the Tax Court held that a request for an extension of time to file a return on Form 4868 that contains the taxpayer's new address does not provide the IRS with clear and concise notification of the new address. The court's decision in *Gregory*, in which the taxpayers submitted Form 2848 and Form 4868, both of which reflected their new address, and yet lost the opportunity to contest an asserted deficiency in the Tax Court, illustrates the importance of notifying the IRS of a taxpayer's new address by filing a change of address form with the IRS.

**79 Rev. Proc. 2010-16, 2010-19 IRB 664** .

**79.1 US v. Navolio, 101 AFTR2d 2008-2600 (MD Fla. 2008)** (deficiency notice sent to three addresses in Florida was not sent to taxpayer's last known address when taxpayer was incarcerated in Nevada and, during time of his incarceration, taxpayer had testified as IRS witness on at least two occasions). See also **Terrell v. CIR, 625 F3d 254 (5th Cir. 2010)** (even if IRS has not received "clear

and concise notification" of taxpayer's change of address, "the IRS must use 'reasonable diligence' to determine the taxpayer's address in light of all relevant circumstances"; if IRS knows or should have known at time of mailing deficiency notice that taxpayer's address on file might no longer be valid, "reasonable diligence" requires further investigation; IRS may not rely on lack of notification once it is on notice that its address on file is incorrect; because three separate prior mailings to taxpayer's address on file with IRS had been returned as undeliverable, IRS should have known that taxpayer's address was incorrect).

**80** Reg. § 1.6212-2(c).

**80.1 Welch v. US, 678 F3d 1371 (Fed. Cir. 2012)** (IRS proved mailing of deficiency notice even though it did not have or introduce into evidence a Postal Service Form 3877; evidence corroborating actual timely mailing of deficiency notice may include documentary evidence as well as evidence of mailing practices corroborated by direct testimony).

**81 Zikria v. Williams, 535 F. Supp. 481 (WD Pa. 1982)** (notice of deficiency mailed to old address but promptly forwarded to new address; taxpayer did not claim certified letter at post office; proximate cause of lack of actual notice was not incorrect address but taxpayer's failure to claim certified letter; extensive discussion); **McKay v. CIR, 886 F2d 1237 (9th Cir. 1989)** (deficiency notice received by taxpayer's attorney who delivered copy to taxpayer in "ample time to file a timely petition for review"); **Miller v. CIR, 94 TC 316 (1990)** (improperly addressed deficiency notice is effective if taxpayer receives actual notice); **Payne v. CIR, RIA TC Memo. ¶ 92,022 (1992)** (deficiency notice received at taxpayer's actual address was valid, even though it was filed by an employee, and never seen by the taxpayer, and taxpayer had notified IRS to communicate through his CPA). But see **Sicker v. CIR, 815 F2d 1400 (11th Cir. 1987)** (statutory notice mailed to wrong address but actually received eighty-three days after mailing was not effective, because it accorded taxpayer insufficient time to prepare Tax Court petition); **Patmon & Young Prof'l Corp. v. CIR, 55 F3d 216 (6th Cir. 1995)** (deficiency notice sent by certified mail to taxpayer's post office box, delivery of which is refused by taxpayer, has been "actually received," and whether it was sent to taxpayer's "last known address" is irrelevant).

**82 Rev. Proc. 61-18, 1961-2 CB 550** ; see **Brzezinski v. CIR, 23 TC 192 (1954)** ; see also **McDonald v. CIR, 76 TC 750 (1981)** (Tax Court petition was time-barred by valid notice sent to taxpayers' proper address, despite failure to send copy to attorney as directed by power of attorney).

**83** For the "separate residence" requirement, see **Camous v. CIR, 67 TC 721 (1977)** (insufficient knowledge by IRS of separate residences); **Grafton v. US, 563 F. Supp. 39 (WD Mo. 1983)** (on facts, IRS had been notified that separate residences had been established; oral notice to agent assigned to case was sufficient); **Kirby v. CIR, ¶ 83,260 P-H Memo. TC (1983)** (letter from one

spouse stating that divorce had occurred was adequate notice that separate residences had been established). *Camous* also holds that the 150-day period is applicable to both spouses if either one is outside the United States.

**84** See **Williams v. CIR, 13 TC 257 (1949)** (use of regular mail is fatal). But see **Frieling v. CIR, 81 TC 42, 51 n.13 (1983)** (use of registered or certified mail is not mandatory; ordinary mail and "methods other than mailing" may be used).

**85** See **Boren v. Riddell, 241 F2d 670 (9th Cir. 1957)** (regular mail); **Tenzer v. CIR, 285 F2d 956 (9th Cir. 1960)** (hand delivery).

**86 Rev. Proc. 98-54, 1998-2 CB 531** .

**87** See also IRC §§ 6240 through 6242, which allow certain large partnerships to elect not to pass adjustments through to their partners, but instead to make partnership-level payments to satisfy any "imputed underpayments" of tax deficiencies by the partners.

**88** See **Chef's Choice Produce, Ltd. v. CIR, 95 TC 388 (1990)** (partnership audit procedures apply even if partnership has been dissolved between filing of return and audit; IRS can select and Tax Court can designate tax matters partner).

**88.1 IRC §§ 6223** , 6224(a). Generally, only partners with a profits interest of at least one percent are entitled to notice from the IRS and to participate in the audit.

**88.2** IRC §§ 6224(b), 6224(c). See also **In re Martinez, 382 BR 285 (ED La. 2007)** (consent to extend statute of limitations for partnership-level audit (see **¶ 47.01[7]** ) executed by tax matters partner was invalid with respect to taxpayer-partner, because tax matters partner was under criminal investigation with respect to partnership and thus had a disabling conflict of interest with other partners of which IRS was aware), rev'd on this issue, aff'd on other issues, **564 F3d 719 (5th Cir. 2009)** (tax matters partner did not act under disabling conflict of interest and thus extensions validly tolled the statute of limitations; there was no indication that IRS attempted to obtain extensions from other partners before turning to tax matters partner, or that partners were opposed to extensions; although tax matters partner had been under criminal investigation earlier, he was not under criminal investigation at time he executed extensions, and there was no indication that when he granted extensions he feared another criminal investigation; there was no evidence that tax matters partner had desire to "'ingratiate [himself] to the government'").

**89** Compare **Roberts v. CIR, 94 TC 853 (1990)** (where partner's "at risk" amount under **§ 465** (see

supra **¶ 19.04** ) turned on a "side agreement," determination of the at-risk amount was not a partnership item).

Compare **Gustin v. CIR, RIA TC Memo. ¶ 2002-64 (2002)** (a partner's basis in the partnership is not a partnership item; deficiency notice based on disallowing a portion of a partner's distributive share of losses under **§ 704(d)** was valid even though there had been no partnership-level proceeding).

**90** Temp. Reg. § 301.6221-1T(a).

**90.1 Keener v. US, 551 F3d 1358 (Fed. Cir. 2009)** (statute of limitations is "partnership item" as defined in **§ 6231(a)** , subject to determination in TEFRA proceeding; Court of Federal Claims lacked jurisdiction over refund claims), cert. denied, 558 US 825 (2009) .

**91** IRC § 6230(a)(1). See, e.g., **Cummings v. CIR, RIA TC Memo. ¶ 96,282 (1996)** (adjustment for reduced net operating loss (NOL) carryforward resulting from partnership-level audit is a computational adjustment, not an affected item requiring deficiency procedures).

**92** IRC § 6230(a)(2); see **Crowell v. CIR, 102 TC 683 (1994)** (in affected items proceeding, taxpayer may not raise defenses that properly should be raised in partnership-level proceeding); **Roberts v. CIR, 94 TC 853 (1990)** , supra note 89; **Olson v. CIR, RIA TC Memo. ¶ 96,384 (1996)** (partnership-level computations cannot be reexamined in an affected items proceeding with respect to negligence, even though negligence determination is affected by computations).See also **McNeill v. CIR, 148 TC 481 (2017)** (pursuant to **§ 6330(d)(1)** , Tax Court has jurisdiction to review IRS's CDP determination of **§ 6662** penalty that relates to adjustment to partnership item excluded from deficiency procedures by § 6230(a)(2)(A)(i), because it takes into account certain partner-level defenses).

**92.1 Ginsburg v. CIR, 127 TC 75 (2006)** (deficiency notice based on these items is valid even though no final partnership administrative adjustment (FPAA) was issued by IRS because it accepted partnership return as filed); **Meruelo v. CIR, 132 TC 355 (2009)** (applications to partner of loss limitation rules of **§§ 704(d)** and **465** are affected items requiring partner-level determinations; notice of deficiency based on applications of loss limitation rules of **§§ 704(d)** and **465** was valid, and Tax Court had jurisdiction, even though IRS had neither issued notice of final partnership administrative adjustment for partnership nor accepted partnership's return as filed for the year).

**93 GAF Corp. v. CIR, 114 TC 519 (2000)** (whether a transfer of property from the taxpayer to a putative partnership was a sale or a contribution depended on the partnership-level determination of the nature of the transaction).

**94** IRC §§ 6229(a), 6229(d); see **Estate of Quick v. CIR, 110 TC 172 (1998), reconsideration**

**denied, 110 TC 440 (1998)** (suspension of partnership losses at partner level under **§ 469** is an affected item even though not listed in **Reg. § 301.6231(a)(5)-1** ; list in regulations is not exhaustive) ; **Ginsburg v. CIR, 127 TC 75 (2006)** (pursuant to § 6229(a)(3), general consent to extend statute of limitations executed by partner pursuant to **§ 6501(c)(4)** (see ¶ **49.05** ) does not extend statute of limitations with respect to partnership affected items, even though no FPAA was issued by IRS because it accepted partnership return as filed, unless consent to extend statute of limitations specifically so provides).

**95** IRC §§ 6231(b)(1)(D), 6231(c)(1); **Reg. § 301.6231(c)-8** . See **Callaway v. CIR, 231 F3d 106 (2d Cir. 2000)** (deceased partner's estate's request for prompt assessment converted deceased spouse's partnership items into nonpartnership items with respect to both spouses when items were taken into account on a joint return).

**95.1 US v. Woods, 571 US 31 (2013)** (pursuant to § 6226(f), which provides that court in partnership-level TEFRA proceeding has jurisdiction to determine "the applicability of any penalty … which relates to an adjustment to a partnership item," applicability of **§ 6662(b)(3)** valuation overstatement penalty could be determined at partnership level).

**95.2 IRC § 6221** . See **American Boat Co., LLC v. US, 583 F3d 471 (7th Cir. 2009)** (in partnership-level proceeding, partnership can raise reasonable cause defense to asserted **§ 6662** penalty on behalf of all partners, based on conduct of its managing partner on behalf of partnership; partnership can raise reasonable cause defense based on facts and circumstances common to all partners when defense does not rely on either individual partner's tax return or partner's unique conduct). Compare **Malone v. CIR, 148 TC 372 (2017)** ( **§ 6662** penalty for failure to report partner's distributive share of partnership income shown on partnership return is not partnership item; there had been no adjustments to partnership items themselves).

**95.3 Reg. §§ 301.6221-1(c)** and **301.6221-1(d)** . See **Clearmeadow Invs., LLC v. US, 87 Fed. Cl. 509 (2009)** ( **§ 6664(c)(1)** reasonable cause defense to **§ 6662** accuracy-related penalties is partner-level defense not subject to court's jurisdiction in TEFRA partnership proceeding; **Reg. § 301.6221-1(d)** specifically states reasonable cause defense is partner-level defense that may not be asserted in partnership proceeding); **New Millennium Trading, LLC v. CIR, 131 TC 275 (2008)** (upholding validity of former Temp. Reg. §§ 301.6221-1T(c) and 301.6221-1T(d)).

**95.4 Kislev Partners, LP v. US, 84 Fed. Cl. 385 (2008)** (amount of deposit must reflect not only adjustments to year under consideration but also tax liability for years to which losses would be carried over), reconsideration denied, **84 Fed. Cl. 378 (2008)** .

**96** IRC § 6231(a)(1)(B). In counting the number of partners, husband and wife and their estates are

treated as one. See **Wadsworth v. CIR, RIA TC Memo. ¶ 2007-046 (2007)** (partnership did not elect to have unified partnership audit rules apply merely by designating a tax matters partner on its return; on same return, partnership checked box indicating that it was not subject to unified partnership audit rules, and partnership never filed an election statement).

**96.1 Brumbaugh v. CIR, RIA TC Memo. ¶ 2015-65 (2015)** (99.98 percent of partnership interests were held by individuals and only .02 of partnership was owned by another partnership; Tax Court lacked jurisdiction to redetermine partnership-level items pursuant to petition by individual partner whose claimed deductions that were disallowed were reported inconsistently with partnership return); **Seaview Trading LLC v. CIR, 858 F3d 1281 (9th Cir. 2017)** (partner-entities that are disregarded for federal tax purposes pursuant to **Reg. § 301.7701-3** (e.g., single-member LLCs) may nevertheless constitute pass-through partners under § 6231(a)(9); accordingly, small-partnership exception under **§ 6231** does not apply, and partnership is subject to TEFRA audit procedures); **Mellow Partners v. CIR, 890 F3d 1070 (DC Cir. 2018)** (same).

**96.2** However, if the adjustments involve a reallocation of distributive shares of a partnership item from one partner to another, the adjustments will not be netted-which would result in no additional tax due at the entity level-but rather any income or gain decreases will be ignored, as will any deduction, loss, or credit increases ( **IRC § 6225(b)** ), thus likely resulting in an imputed underpayment.

**96.3 IRC § 6225(b)(1)(A)** .

**96.4 IRC § 6225(c)** .

**96.5** See Reg. § 301.6621(b)-1 (providing rules regarding electing out of partnership audit regime).

**96.6 IRC § 6241(2)(B)** .

**96.7 IRC § 6225(c)(2)(B)** .

**97** See **US v. Church of Scientology of Boston, Inc., 933 F2d 1074, 1095 (1st Cir. 1991)** (statutory permission to examine church records only "to the extent necessary" to determine tax liability requires that the IRS demonstrate more than just "relevance" of records; summons was not enforced, because IRS did not demonstrate "how or why compliance is necessary"; lesser showing generally required under **US v. Powell, 379 US 48, 57-58 (1964),** infra note 120, does not apply to church audits); **US v. CE Hobbs Found. for Religious Training & Educ., Inc., 7 F3d 169 (9th Cir. 1993)** (subpoena of church records must be based on more than "relevance"; subpoena enforced because IRS needs only a "reasonable belief" that an investigation is warranted and it demonstrated

that the documents would "significantly further" the investigation) ; **US v. Bible Study Time, Inc., 295 F. Supp. 3d 606 (DSC 2018)** (Treasury Secretary delegated to Tax Exempt and Government Entities Division Commissioner authority to make **§ 7611** determination and such delegation was permitted by **§ 7611(h)(7)** , but Director of Exempt Organizations, who signed inquiry notice sent to exempt organization, held too low a rank to qualify as "appropriate high-level Treasury official" and summons enforcement had to be stayed to permit IRS to correct defect).

**98** For the intended scope of **§ 7611** , see HR Rep. No. 861, 98th Cong., 2d Sess., reprinted in 1984-3 CB (vol. 2) 365.

**99** See **US v. CE Hobbs Found. for Religious Training & Educ., Inc., 7 F3d 169 (9th Cir. 1993)** ( **§ 7611** does not apply to subpoena of church's bank records under **§ 7609** ; IRS needs only to demonstrate "relevance" of bank records); Holy Temple Church of God in Christ, Inc. v. US, 63 AFTR2d 88-921 (CD Cal. 1988) ( **§ 7611** does not apply to summons to bank for examination of records of church's account where object of investigation was not the church).

**100** See **Music Square Church v. US, 218 F3d 1367 (Fed. Cir. 2000)** ( **§ 7611(e)(2)** and legislative history make clear that **§ 7611(e)(1)** provides exclusive remedies; IRS revocation of church's tax-exempt status could not be overturned on the grounds that the audit took more than two years), cert. denied, 531 US 1013 (2000) .

**101** See **IRC § 7803(c)** , discussed supra **¶ 46.01** , for the Office of Taxpayer Advocate.

**101.1 IRC § 7811(g)** . For **§ 6306** , see **¶ 48.11** .

**102 IRC § 7811(b)** .

**103 IRC § 7811(d)** . For statutes of limitations, see infra Chapter 49.

© 2021 Thomson Reuters/Tax & Accounting. All Rights Reserved.

# Exhibit 31

# The David R. Tillinghast Lecture
# "What's Source Got to Do With It?"
# Source Rules and U.S.
# International Taxation

STEPHEN E. SHAY*
J. CLIFTON FLEMING, JR.**
and ROBERT J. PERONI***

TABLE OF CONTENTS

I. Introduction ............................................. 83
II. Is There a Normative Basis for Income Taxation of
Nonresidents?........................................... 88
   A. Do Political Realities Make a Normative Inquiry
Pointless? ........................................... 89
   B. The Benefits Rationale ............................. 90
   C. Charging for Nonresidents' Exploitation of the U.S.
Market............................................... 91
   D. Does the Geographical Limit on Taxation of
Nonresidents Foreclose a Fairness Justification for
Source Taxation? ................................... 93
   E. Would Fairness be Enhanced by Unilaterally
Abandoning Source Taxation? ...................... 96
   F. Should a Net Income Tax be Imposed for Access to
the U.S. Market? ................................... 98
      1. The Appropriate Charge for Access to the U.S.
Market by Businesses Without Positive U.S.
Source Taxable Income ......................... 99
      2. Flat Rate v. Progressive Rates ................. 102

* Partner, Ropes & Gray. The views expressed are those of the author and do not represent the views of Ropes & Gray or its clients. Mr. Shay delivered an earlier version of this Article, Limits of Sovereignty and U.S. International Income Taxation, as the David R. Tillinghast Lecture at NYU School of Law on November 13, 2001. The authors thank Alice Abreu, Joseph Andrus, Reuven Avi-Yonah, Deborah Geier, Martin McMahon, Jr., Julie Roin, and Alvin Warren, Jr. for helpful comments on earlier drafts of this Article.

** Associate Dean and Ernest L. Wilkinson Professor of Law, Brigham Young University.

*** Robert Kramer Research Professor of Law, The George Washington University, and J. Landis Martin Visiting Professor of Law and Business, Northwestern University.

81

                3.  Excessive Source Tax Rates ....................  104
        G.  Summary ..........................................  105
III.  What Criteria Should Guide the Structure of U.S.
      Taxation at Source? ...................................  106
        A.  U.S. International Tax Policy Objectives ............  106
        B.  U.S. Source Taxation, the Efficiency Criterion, and
            Inter-Nation Division of the Income Tax Base ......  107
        C.  Preserving the Legitimacy of Residence Taxation:
            Source Taxation and the Need for Perceived
            Parity ...........................................  111
        D.  Source Taxation and the Nondiscrimination
            Principle .........................................  112
        E.  Jurisdiction to Tax and Enforcement of Taxation at
            Source ...........................................  115
                1.  Jurisdiction to Prescribe Tax Laws ..............  116
                2.  Jurisdiction to Enforce Tax Laws ..............  117
                3.  Enforcing Exceptions to U.S. Withholding Tax
                    on U.S. Source Gross Income Payments to
                    Foreign Persons.................................  120
                4.  Enforcement of Net Basis Source Taxation in
                    the Absence of a Treaty ........................  128
                5.  Overcoming Limitations on Jurisdiction to
                    Enforce Tax Rules:  Bilateral or Multilateral Tax
                    Information Exchange Agreements .............  132
        F.  Summary of Criteria for U.S. Source Taxation ......  136
IV.   What is the Proper Role of Income Source in U.S.
      Source Taxation? .....................................  137
        A.  The Weakness of the Connection Between Income
            and Geographic Source ...........................  137
        B.  Distinguishing Source of Income and Jurisdiction to
            Tax ..............................................  138
        C.  U.S. Income Source Rules Should be Reexamined
            in Relation to Their Role in Source Taxation .......  139
                1.  Example: Source Rules for Personal Services
                    and Royalties ...................................  139
                2.  Example: Residence-Based Source Rule for
                    Stock Gains.....................................  143
        D.  Reexamining U.S. Source Taxation of Portfolio
            Interest, Gains From Sales of Substantial Stock
            Interests, and Remote Activity Directed at the U.S.
            Marketplace ......................................  144

Imaged with the Permission of N.Y.U. Tax Law Review

V. Outbound Taxation: Mitigating International Double Taxation Without Providing an Incentive for Foreign Investment .............................................. 146

VI. Conclusions ............................................ 154

## I. Introduction

Arguably, the largest problem in international income taxation is the proper treatment of income that is subject to the legitimate taxing claims of two or more countries.[1] A source country's jurisdiction to tax foreign persons is limited to income earned within the source country's borders. Under current international norms, however, the taxpayer's residence country is required to accommodate the source country's taxing right by employing a foreign tax credit or by exempting foreign source income. Thus, source taxation is at once geographically constrained, but also jurisdictionally superior to residence taxation.

These principles require that international income be divided and accounted for between countries according to criteria that relate income and deductions to geographic locations. To be specific, the consequence of geographically limited source taxation and overlapping, but secondary, residence taxation is that the source of income must be determined so that the right to tax can be assigned.[2] In this sense, the concept of "source" is at the heart of international taxation.

We argue in Section II that the right of source countries to tax foreign persons on their source country income has a robust normative foundation. By contrast, we find that source rules that serve as instruments for implementing source taxing jurisdiction and effecting residence country accommodation of source country taxation are surprisingly lacking in normative content. Thus, if timing of income and expense recognition is the Achilles heel of a purely domestic income tax system, the source of income and expense is an equally weak link in the international tax rules. Because no clear economic or equitable principles guide the formulation of rules to divide income and

---

[1] In using this formulation, we do not mean to ignore the existence of regimes that exempt foreign income from taxation.

[2] Hugh J. Ault & David F. Bradford, Taxing International Income: An Analysis of the U.S. System and Its Economic Premises, in Taxation in the Global Economy 11, 12-16 (Assaf Razin & Joel Slemrod eds., 1990). It should be clear from the text that we regard source taxation and sourcing rules as constituting a system for allocating income taxing rights between source countries and residence countries, but having little to do with defining income.

debt-equity restrictions apply in the domestic market,[110] this position is disingenuous and compromises the credibility of the United States as a treaty partner. In fact, § 163(j) imposes a tighter restriction than would apply in a typical domestic context. For example, related LBO fund debt-equity ratios of 3 to 1 generally are regarded as acceptable.[111] There is, however, a different line of analysis demonstrating that § 163(j) is, indeed, compliant with the nondiscrimination article. An analytical approach that considers the U.S. corporation and its foreign owners jointly instead of separately shows that a foreign-owned U.S. corporation is, in substance, differently positioned than a U.S.-owned domestic corporation. This is because a U.S.-owned domestic corporation cannot "earnings strip" to a foreign affiliate without running afoul of the Subpart F provisions but a foreign-owned U.S. corporation can. The § 163(j) earnings stripping rule constrains the excessive use of debt by a foreign-owned corporate group that otherwise could achieve a lower global tax rate on U.S. income initially earned by a domestic corporation than could be achieved if the same domestic corporation were owned by a U.S. group. A treaty nondiscrimination rule that does not accommodate the ability of a source country to address such matters not only will not be observed, but will lose its utility in the circumstances in which it should be applied.

The preceding analysis notwithstanding, the nondiscrimination principle should be employed in both the treaty and nontreaty contexts to restrict source taxation that systematically subjects a foreign investor to greater taxation than a domestic taxpayer who is truly similarly situated. But even under the more complete approach used above to assess whether taxpayers are similarly or dissimilarly situated in connection with § 163(j), the nondiscrimination principle should continue to play an important role in structuring U.S. source-based taxation because of the interests of the United States in free trade and in nondiscriminatory taxation of its residents by other countries.

### E. Jurisdiction to Tax and Enforcement of Taxation at Source

Taxation regimes should be efficacious and not merely symbolic. Therefore, a source tax on nonresidents must be capable of being administered and enforced. For this reason, the limits on a country's jurisdiction to tax play a central role in the design of the system of source taxation used by most countries.

---

[110] H.R. Conf. Rep. No. 101-386, at 569-70, reprinted in 1989-3 C.B. (vol. 5) 569-70 (§ 163(j) consistent with arm's length standard).

[111] See Jack S. Levin, Structuring Venture Capital, Private Equity and Entreprenurial Transactions ¶ 602.8.8.1 (2002).

*1. Jurisdiction to Prescribe Tax Laws*

A country may exercise the power to tax within accepted international norms.[112] A conventional statement of the U.S. view is that there is no limit on the jurisdiction of the United States to prescribe tax rules.[113] The ALI position is that a country may tax: (1) the worldwide income of a national or a resident natural or juridical person, (2) the income of a person present or doing business in the country that is derived from or associated with that presence or business, or (3) income derived from property located in the country.[114] This statement of standards parallels those implied in the OECD Model Treaty.[115]

The statement of generally accepted bases to tax (jurisdiction to prescribe), however, is incomplete without also taking into account the limits on jurisdiction to adjudicate and enforce.[116] A country cannot enforce an income tax in the absence of information and the ability to compel compliance.[117] The United States taxes the worldwide income of its residents and taxes certain income of foreign persons at source. In order to enforce an income tax imposed on nonresidents and on income earned outside the United States, it is necessary to

[112] International law governing the jurisdiction to prescribe underlies the accepted jurisdictional bases to tax income. Accepted international bases for the jurisdiction to prescribe are nationality and territoriality, subject to reasonableness criteria where the person or activity has connections with another state and the exercise of the jurisdiction would be unreasonable. 1 Restatement (Third), note 17, at §§ 402, 403. This Article does not consider the complex issue of the relationship of U.S. domestic law and international law. See id., introductory note to ch. 2, at 40–69 (noting that "the relation between international law and United States law raises complex conceptual issues that have important legal consequences" and discussing generally the status of international law and agreements in U.S. law); Ramon J. Jeffery, The Impact of State Sovereignty on Global Trade and International Taxation 36-42 (1999) (discussing relationship between international law and national law generally).

[113] Stanley S. Surrey, Current Issues in the Taxation of Corporate Foreign Investment, 56 Colum. L. Rev. 815, 817 (1956) ("The boundaries of the tax jurisdiction of the federal government are here not limited by any legal lines. Instead, the assertion of jurisdiction is essentially a matter of national policy and national attitudes as to the proper obligations of American citizens and corporations in meeting the costs of government." (footnote omitted)); see also Arnold, note 32, at 7; Sol Picciotto, Int'l Bus. Tax'n 307 (1992). But see Jeffery, note 112, at 43 (discussing view that there are international limits on fiscal jurisdiction).

[114] 1 Restatement (Third), note 17, at § 412(1).

[115] OECD Model Treaty, note 103, arts. 6, 7, and 21; see Nancy H. Kaufman, Fairness and the Taxation of International Income, 29 Law & Pol'y Int'l Bus. 145, 148 (1998) (suggesting that the accepted jurisdictional bases to impose income tax have acquired the status of customary international law). For purposes of this discussion, we need not consider whether these taxation standards have achieved the status of customary international law.

[116] Arnold, note 32, at 7 ("A country's legal authority to levy tax is effectively limited only by practical considerations of enforcement and collection.").

[117] Deterrence plays a critical role in tax compliance. It is a function of the perceived ability and will of the taxing state to compel compliance.

have sufficient information to determine whether the correct amount of income is subject to tax and to collect a tax judgment.[118] The scope of jurisdiction to enforce delineates a country's ability to compel production of information by imposing civil and criminal sanctions and to compel collection of tax obligations.

## 2. Jurisdiction to Enforce Tax Laws

If a country exercises its jurisdiction to prescribe a tax rule, it may employ judicial or nonjudicial measures to compel compliance or punish noncompliance.[119] Under U.S. law, court proceedings often are necessary to enforce an administrative summons; accordingly, these proceedings must satisfy criteria for jurisdiction to adjudicate.[120]

U.S. courts have exercised their jurisdiction to compel production of information of a U.S. resident held abroad, including information held by a subsidiary of a U.S. parent corporation[121] and information held by a foreign parent corporation of a domestic subsidiary (where the foreign parent corporation exposed itself to U.S. jurisdiction).[122] Section 6038A also provides a powerful inducement for foreign affiliates of a foreign-controlled domestic corporation to consent to U.S. jurisdiction for the limited purpose of the enforcement of an administrative summons. Absent an income tax convention or the application of § 6038A, however, it is difficult to obtain information located

---

[118] Even a country that only taxes income or transactions within its territory often needs to obtain information from a foreign location or be able to collect tax from a person resident in another country. Source taxation of income under an income tax and imported services taxed under a VAT on a reverse charge basis each involve taxation of a nonresident person. Even territorial countries, such as France and the Netherlands, have requested that the United States assist in obtaining information relating to their taxation of their residents. See Lidas, Inc. v. United States, 238 F.3d 1076 (9th Cir. 2001) (upholding U.S. summons to obtain bank records at request of France under U.S.–French treaty); United States v. Bache Halsey Stuart, Inc., 563 F. Supp. 898 (S.D.N.Y. 1982) (upholding U.S. summons to obtain financial records relating to a Swiss bank account at request of Netherlands under U.S.–Netherlands treaty).

[119] 1 Restatement (Third), note 17, at § 431(1). The Restatement provides that a country may employ enforcement measures against a person outside its territory if the person is given reasonable notice and the opportunity to be heard, and, in the case of judicial enforcement, the country has jurisdiction to adjudicate. Id. § 431(3).

[120] See id. § 431(3)(c).

[121] IRC § 7602; United States v. Vetco Inc., 691 F.2d 1281 (9th Cir. 1981) (parent corporation ordered to cause foreign subsidiary to produce records under balancing analysis that found U.S. interests outweighed Swiss confidentiality interests); see also Doe v. United States, 487 U.S. 201 (1988) (petitioner, who was target of grand jury investigation into unreported income, could not assert self-incrimination privilege as a basis for refusing government order to sign forms consenting to disclosure of bank records in the Bahamas and Cayman Islands).

[122] United States v. Toyota Motor Corp., 569 F. Supp. 1158, 1162-64 (C.D. Cal. 1983) (enforcing summons issued to foreign corporation with a U.S. subsidiary after applying balancing test relevant to foreign-located documents).

abroad where a U.S. court does not have jurisdiction over the person controlling the information.

Although the Service has authority to issue a summons outside the United States,[123] it will not be enforced unless the jurisdictional requirements, including service of process, are met. Under international law, a country may determine the conditions for service of process in its territory in aid of litigation in another country.[124] Extraterritorial service of an investigative summons by a country is an intrusion of its sovereign power into the other country and U.S. courts have declined to enforce such a summons unless served in a manner explicitly authorized by a U.S. statute or with evidence of the consent of the other country.[125]

With respect to nonresident taxpayers, the Service clearly may compel production of information held in the United States. It also may compel production of a nonresident's bank account information at a foreign branch of a U.S. bank if appropriate need is demonstrated.[126] These cases are important, particularly in a self-assessment system, for their deterrence value.[127] Notwithstanding these successes by the Service and Justice Department, it is very difficult to obtain foreign-located information that is not in the control of a person subject to in personam jurisdiction in the United States.

The Service has concluded that it may utilize the Hague Service Convention[128] to serve a summons on a U.S. citizen resident outside the United States.[129] If the requested country accepts this service, the U.S. District Court for the District of Columbia would have jurisdiction to enforce under § 7604, because § 7701(a)(39) deems U.S. citizens and residents residing abroad to be resident in the District of

---

[123] The Service can issue a summons to any "person the Secretary may deem proper" for ascertaining the correctness of any return and for determining the tax liability of any person, or to examine any records and to take testimony of any person. IRC § 7602. The Code does not restrict this power to the geographic boundaries of the United States.

[124] 1 Restatement (Third), note 17, at § 471(1).

[125] See FTC v. Compagnie de Saint-Gobain-Pont-A-Mousson, 636 F.2d 1300 (D.C. Cir. 1980) (refusing to uphold FTC service of subpoena on French company headquartered in Paris by registered mail).

[126] United States v. Chase Manhattan Bank, N.A., 584 F. Supp. 1080 (S.D.N.Y. 1984).

[127] Every international practitioner of any experience has been asked the question "Can the IRS find out?" In many cases the answer is "yes." In other cases, there are pragmatic reasons for compliance. Few foreign business executives would write off the future ability to sell into or operate in the U.S. market. In other cases, personal reasons dictate a desire to be able to return to the United States. Marc Rich seemingly was able to conduct his trading business successfully without coming to the United States; however, personal reasons apparently were the motive for seeking a Presidential pardon. See Alison Leigh Cowan, Plotting a Pardon, N.Y. Times, Apr. 11, 2001, at A1.

[128] Hague Convention on the Service Abroad of Judicial and Extrajudicial Documents in Civil or Commercial Matters, Nov. 15, 1965, 20 U.S.T. 1361, 658 U.N.T.S. 163 (1977).

[129] IRS Chief Counsel Advice 200143032 (Sept. 21, 2001).

Columbia for purposes of enforcing an administrative summons. In the absence of a treaty, there is no comparable basis to achieve extra-territorial jurisdiction over a non-U.S. person to enforce an IRS administrative summons. Even if jurisdiction is achieved, a taxpayer may decline to cooperate if there is no effective judicial sanction available. Although the Service may make a jeopardy assessment, if the taxpayer's assets are located abroad, collection of the assessment must surmount the "revenue rule."

In addition to jurisdictional limitations on the ability to obtain information to make an assessment, the so-called "revenue rule" holds that one country will not provide assistance to another country in collection of the other country's final revenue claim. This hoary and archaic common law doctrine dates back to 1775.[130] In 2001, the Second Circuit affirmed that the revenue rule is alive and well in the United States.[131] Although the court implicitly acknowledged that Canada had standing to pursue a RICO claim in U.S. federal courts,[132] it declined to permit a RICO action against R.J. Reynolds for lost sales tax revenues attributable to cigarette smuggling for which an R.J. Reynolds affiliate had been indicted.[133] The court held that the action was both a direct and indirect enforcement of a Canadian revenue claim.[134]

The Second Circuit noted pointedly that the plaintiff was Canada itself and concluded that the revenue rule barred an action that would indirectly enforce a Canadian revenue law.[135] The court supported application of the revenue rule to bar the claim on the grounds that: (1) the revenue rule is grounded in respect for sovereignty and avoids an inquiry whether the other country's penal and revenue laws are

---

[130] "No country ever takes notice of the revenue laws of another." Holman v. Johnson, 98 Eng. Rep. 1120, 1121 (1775).

[131] Att'y Gen. of Canada v. R.J. Reynolds Tobacco Holdings, Inc., 268 F.3d 103 (2d Cir. 2001), petition for cert. filed, 70 U.S.L.W. 3580 (U.S. Mar. 6, 2002) (No. 01-1317). The revenue rule is a discretionary, not a jurisdictional, limitation, European Community v. RJR Nabisco, Inc., 150 F. Supp. 2d 456, 476-77 (E.D.N.Y. 2001), but in the light of the breadth of its application, it has a similar effect.

[132] Id. at 107-09.

[133] Id. at 134-35.

[134] *R.J. Reynolds*, 268 F.3d at 130-32. The revenue rule also was applied to bar enforcement in a U.S. court of a Canadian province's final judgment against U.S. individuals for logging taxes. Her Majesty the Queen in Right of the Province of British Columbia v. Gilbertson, 597 F.2d 1161 (9th Cir. 1979). The Second Circuit in *R.J. Reynolds* noted that Canada, as well as other common law countries, observes the revenue rule. *R.J. Reynolds*, 268 F.3d at 110-11, citing United States v. Harden, [1963] S.C.R. 366 (Can.) (rejecting enforcement of a stipulated settlement of a tax case). But see *European Community*, 150 F. Supp. 2d at 471-86 (extensively discussing the revenue rule and refusing to invoke it as a basis for declining jurisdiction, although ultimately rejecting on other grounds European Community RICO damages claim based in part on lost taxes).

[135] *R.J. Reynolds*, 268 F.3d at 106.

consistent with the enforcing state's notion of what is proper, and (2) if the court acted, it might be encroaching on the political branches' authority, namely, the executive's foreign relations power and the legislature's policies on extraterritorial collection assistance as expressed in treaty reservations.[136]

Judge Calabresi, in dissent, pointed out that since the law in question (RICO) was a U.S. law, Congress passed the law and therefore its enforcement did not present separation of powers concerns.[137] Moreover, the U.S. courts were in fact capable, when properly briefed, of applying another country's revenue laws and indeed the Second Circuit had done so in a recent case.[138] Irrespective of whether one agrees with the decision in this particular case, it is clear that the revenue rule remains firmly entrenched in international law.[139]

The only way to overcome the revenue rule is to reciprocally agree by treaty to assist in collection.[140] In the absence of assistance from another country under a treaty (or a future domestic law provision), the United States will not be able to collect a tax judgment against a foreign person not physically present in the United States unless the foreign person holds assets in the United States and the United States acquires quasi in rem jurisdiction to collect against those assets.

In summary, the United States' ability to enforce its tax laws against foreign persons in the absence of a treaty relies on the presence in the United States of the foreign person (or their consent to U.S. jurisdiction) and either information sufficient to make a tax assessment against the foreign person or a U.S. person with such information. And if a judgment is rendered, absent a treaty that overcomes the revenue rule, collection requires assets in the United States. We discuss below the innovative use of qualified intermediaries to surmount these limitations on jurisdiction to enforce the withholding tax.[141]

### 3. Enforcing Exceptions to U.S. Withholding Tax on U.S. Source Gross Income Payments to Foreign Persons

The scope of jurisdiction to enforce plays a pivotal role in the extent to which the United States asserts jurisdiction to tax non-U.S. persons on U.S. source fixed and determinable annual and periodical income ("FDAP") that is not effectively connected with a U.S. trade or busi-

---

[136] Id. at 111-12, 119; see discussion of treaty collection articles in text accompanying notes 192-203.

[137] R.J. Reynolds, 268 F.3d at 136-37 (Calabresi, J., dissenting).

[138] Id. at 137-38 (Calabresi, J., dissenting) (citing United States v. Pierce, 224 F.3d 158, 165 (2d Cir. 2000)).

[139] See, e.g., United States v. Harden, [1963] S.C.R. 366, 369-70 (Can.).

[140] R.J. Reynolds, 268 F.3d at 118-23; see discussion in text accompanying notes 192–203.

[141] See text accompanying notes 160-76.

Imaged with the Permission of N.Y.U. Tax Law Review

ness.[142] The United States imposes a tax on the gross amount of such income and collects the tax through withholding at source.[143] This internationally accepted system of having the payor withhold a gross basis tax at source addresses directly the inability of the source country to collect the tax imposed on income of a nonresident. The joint and several liability of the withholding agent for the tax to be withheld enables the United States to enforce source taxation over payments to those outside its jurisdiction.[144]

In addition to providing a mechanism for collecting tax on payments of income to nonresidents, withholding tax at source also partially protects the residence tax base from erosion by residents who would avoid domestic information reporting and back-up withholding rules by masquerading as a foreign person and investing through a tax haven corporation in securities issued by U.S. residents.[145] A withholding tax collected on income paid to the tax haven corporation recovers some of the lost tax. The source tax, however, does not reach the tax evader who invests in securities of foreign issuers ("foreign securities"), including foreign securities denominated in dollars.

Withholding tax at source has the appearance of being a secure and reliable mechanism to assure payment of source tax on fixed and determinable income. In practice, however, the withholding tax regime has proven to be a blunt instrument. A withholding tax regime is easiest to administer and enforce if tax is withheld from the gross amount of every payment at the same rate. Yet, this has never been the case.[146] It is particularly difficult to administer exceptions to withholding and at the same time protect against the risks of both tax evasion by U.S. persons and granting treaty relief to foreign persons not eligible for treaty benefits. Because the U.S. withholding agent often is remote from the beneficial owner of the income, it cannot obtain information to evaluate self-certified claims of eligibility for relief from the tax.

---

[142] IRC §§ 871(a), 881(a).

[143] IRC §§ 1441, 1442.

[144] IRC § 1461.

[145] Domestically, the United States relies on comprehensive information reporting for payments of interest, dividends, and gross proceeds from the sale of securities to individuals and other nonexempt recipients.

[146] Under the Revenue Act of 1913, withholding agents were expected to withhold amounts sufficient to pay the net income tax on the item of income. Revenue Act of 1913, Pub. L. No. 63-16, § II(A)(2), 38 Stat. 114, 166. Fortunately for withholding agents, the government did not enforce this. A concerted attempt to enforce the law in 1934 resulted in retreat by the government and enactment in 1936 of gross withholding on payments of FDAP to nonresidents and foreign corporations. Pub. L. No. 74-740, §§ 143(b), 144, 211, 231, 49 Stat. 1648, 1701-02, 1714-15, 1717 (1936). Congress raised the rate to its current 30% level in 1942. Pub. L. No. 77-753, §§ 106-08, 56 Stat. 798, 807-08 (1942).

The withholding rules exclude several important items realized by nonresidents from U.S. investments. The most significant statutory exclusion from gross taxation at source is for gains from the sale of personal property, other than U.S. real property interests, that are not effectively connected with a U.S. business. This exclusion includes most gain from the sale of stocks and securities in a U.S. corporation (unless the corporation is a U.S. real property holding corporation) and intangible property (unless the consideration is contingent on use).[147]

The exception for gains is justified on the grounds that (1) the source country does not have a strong claim to tax the income, and (2) absent information regarding the taxpayer's basis, it is not feasible for the source country to determine the correct amount of net gain.[148] (A tax on the gross amount realized could result in a very high effective tax rate on the net gain.) If the market access rationale, however, is sufficient to support a source tax on dividend income derived from U.S. economic activity, as a matter of logic it should equally support a source tax on capital gains from the same instruments since the capital gain is essentially a market capitalization of future earnings.[149] Moreover, the failure to tax a nonresident's stock gains offers her an opportunity to completely avoid the shareholder tax on U.S. corporate income to the extent that the nonresident's capital gains are exempt in her residence country or she may successfully avoid residence country tax through use of a tax haven. U.S. residents are comparatively disadvantaged because they do not lawfully have this opportunity.[150] Accordingly, the decision not to tax capital gains at source would seem to rest largely on administrative and enforcement considerations and not on principles of substantive tax policy.[151]

There also is a statutory exclusion from source taxation for payments of bank deposit and portfolio interest.[152] The argument for ex-

---

[147] IRC § 897; Reg. 1.1441-2(b)(2)(i).

[148] See ALI International Project, note 17, at 110-14; Cynthia Blum, How the United States Should Tax Foreign Shareholders, 7 Va. Tax Rev. 583, 638 (1988) (withholding tax on stock gains raises issue of how to take account of and verify foreign person's stock basis).

[149] See Richard A. Brealey & Stewart C. Myers, Principles of Corporate Finance 72-73 (6th ed. 2000). We do not discuss here the overbreadth of the U.S. corporate income tax on foreign earnings beneficially owned by a foreign shareholder. See Fleming, Peroni & Shay, note 34, at 321-22.

[150] This advantage should translate into a pricing advantage for non-U.S. acquirors of U.S. businesses.

[151] Cynthia Blum has pointed out that many of these issues have been addressed in applying the § 1445 withholding tax to gains from the sale of stock in a U.S. corporation that is a U.S. real property holding corporation. Blum, note 148, at 643-51.

[152] IRC §§ 871(h), 881. The withholding tax on portfolio interest was repealed by the Deficit Reduction Act of 1984, Pub. L. No. 98-369, § 127(a)(1), 98 Stat. 494, 648. For back-

cluding these interest payments is that imposition of a withholding tax on the gross amount of interest income in a liquid capital market with ready alternative investments bearing the same risk/return characteristics results in the burden of the tax being borne by the borrower through higher interest rates. The ultimate effect of a tax on foreign persons not resident in treaty countries may not be so clear, because of the exemption available for treaty residents, but this is an issue for the economists.[153] Nevertheless, the concern that the debtor country will suffer costs attributable to decreased access to foreign capital that may outweigh the benefits from increased tax revenue reflects a widespread international reluctance to impose withholding tax on most interest from unrelated payors.[154]

In repealing the portfolio interest withholding tax, Congress was concerned about tax evasion by U.S. persons.[155] Significantly, eligibility for the exemption with respect to registered obligations rests on the beneficial owner providing a statement of eligibility to the withholding agent.[156] Enforcement of this exemption has been difficult.[157]

Under the U.S. regime for relief from withholding tax at source, as opposed to a refund system, a withholding agent generally withholds tax on a payment unless the foreign person evidences its eligibility for relief from the withholding tax.[158] Before adoption of the final § 1441 withholding regulations in 1997, there was no practical regime for a

---

ground on the enactment of the repeal of the withholding tax on portfolio interest, see James P. Holden, Note and Comment, Repeal of the Withholding Tax on Portfolio Debt Interest Paid to Foreigners: Tax and Fiscal Policies in the Context of Eurobond Financing, 5 Va. Tax Rev. 375, 389-94 (1985). For criticism of the repeal of the portfolio interest withholding tax and a proposal for reimposition of a tax, see Avi-Yonah, Globalization, note 72, at 1579-87, 1667-71 (2000).

[153] Charles McLure observes that the sharp reductions in taxation of capital in the Economic Recovery Tax Act of 1981, Pub. L. No. 97-34, 95 Stat. 172 (1981), may have increased the demand for foreign capital in a manner that increased interest rates sufficiently to attract foreign capital. Charles E. McLure Jr., International Considerations in United States Tax Reform, in Tax Differentials, note 17, at 1, 7-8. The repeal of the withholding tax on portfolio interest, see note 152, facilitated the financing of the current account deficit in the U.S. balance of payments by expanding the availability of the withholding exemption previously allowed to large corporate borrowers through the Netherlands Antilles finance company structure. The U.S. Treasury had not availed itself of the Netherlands Antilles Eurobond financing structure and was the largest borrower beneficiary of the repeal. Also benefited were those U.S. investment and commercial banks that did not have a strong European presence in the Eurobond market. Id. at 8-9.

[154] McLure, note 152, at 8.

[155] Joint Comm. on Tax'n, 98th Cong., General Explanations of the Revenue Provisions of the Deficit Reduction Act of 1984, at 393 (Comm. Print 1985).

[156] IRC § 871(h)(2)(B)(ii).

[157] Holden, note 152, at 394-404.

[158] IRC § 1441(a); Reg. § 1441-1(b). The possibility of a 30% withholding tax on a fixed income investment is more significant than for dividends, because interest generally is a larger portion of the return on a bond than dividends are of the return on an equity investment. The international market for bonds is largely a market for interest that is tax-free at

U.S. withholding agent to collect documentation from a foreign beneficial owner of income holding a security through a foreign financial institution. The final withholding regulations address this problem by (1) placing the burden of investigating beneficial ownership on foreign financial institutions rather than on U.S. custodians, and (2) providing clear rules requiring withholding in the absence of documentation (whether or not through the qualified intermediary structure).[159] The centerpiece of the final withholding regulations is the qualified intermediary ("QI") regime.[160]

Generally, a QI is a non-U.S. financial institution that is subject to know-your-customer rules that have been approved by the Service and has entered into a contractual agreement with the Service to report annually certain aggregate information concerning the beneficial owners of U.S. source payments and to make any necessary tax payments.[161] The QI must agree to engage an external auditor to verify that it is in compliance with the QI agreement.[162] In return, the QI avoids the burden and competitive drawback of forwarding documentation with respect to each customer that is a beneficial owner of U.S. income subject to withholding to a U.S. withholding agent in order to claim reductions in the U.S. withholding tax. The QI, however, must identify U.S. customers that hold accounts covered by the QI agreement.[163] A foreign financial institution that executes a QI agreement

---

source. Indeed, Avi-Yonah suggests that the interest is not only tax-free at source, but is tax-free in the residence country as well. Avi-Yonah, Globalization, note 72, at 1580-86.

[159] Reg. § 1.1441-1(d)(4), -1(e)(3), -1(e)(1)(ii)(B).

[160] Reg. § 1.1441-1(e)(5). The background to the development of the QI regime is instructive. Before the 1997 withholding regulations, the portfolio interest rules required that a Form W-8 be provided from the beneficial owner of the income. See Reg. § 35a.9999-5 (1997). A foreign financial institution acting for customers often would provide a single Form W-8 to its U.S. financial institution acting as custodian, where the foreign financial institution clearly was not the "beneficial owner" of the income. This situation was ignored for many years, in part because the U.S. custodian faced the unpalatable choice of either withholding a tax that in most cases would not be appropriate (because the vast preponderance of the foreign financial institution's customers were foreign) or losing the account to another custodian that would accept the Form W-8. See Stephen E. Shay, Leonard Terr, Thomas O'Donnell & Percy Woodard, Proposal: Alternative Portfolio Documentation Procedures 2-3 (July 8, 1992) (describing issues faced by U.S. custodial banks holding omnibus accounts for foreign financial institutions) (unpublished manuscript, on file with the Tax Law Review). The situation eventually became intolerable, even though the probability of attack by the Service was low, because the level of the tax risk to the custodians far exceeded profits from the business. Significantly, the final regulations eventually provided rules for nonqualified intermediaries to be able to supply the required documentation in a manner that did not expose foreign customers to back-up withholding if they did not disclose their identities. This significantly relaxed potential pressure on the intermediary financial institutions.

[161] Reg. § 1.1441-1(e)(5).

[162] See Rev. Proc. 2002-55, 2002-35 I.R.B. 435 (providing final audit guidelines for external audits of QI compliance with QI agreement documentation procedures).

[163] Rev. Proc. 2000-12, § 2 of Model Agreement, 2000-1 C.B. 387.

does not have to identify U.S. customers that hold accounts not covered by the QI agreement.[164] There are special rules permitting a QI that discovers a U.S. person in such an account to avoid disclosure of the person to the Service if back-up withholding is imposed with respect to the assets in the account (including on gross proceeds).[165]

The QI regime is an innovative development in the international withholding system. It essentially attempts to "privatize" foreign assistance in enforcement of reductions in source taxation. The fundamental exchange is that the foreign financial institution's customer is granted anonymity in relation to the U.S. tax authorities provided the foreign financial institution cooperates with the Service in prohibiting tax reduction benefits to U.S. investors and confirming treaty eligibility for non-U.S. investors. Under the withholding rules of the final regulations, the United States seeks to surmount the practical limitations on its enforcement jurisdiction without having to request foreign tax authorities to obtain or certify residence information from investors,[166] or implement a refund system as the mechanism to obtain the information.[167]

To avoid administrative burdens and excess withholding (and the consequent need for the foreign investor to file a U.S. tax return and claim a refund), the final withholding regulations contain at least three important concessions that limit the identification of beneficial owners and the reach of disclosure. These concessions reflect the strength of the tension between the need to assure eligibility for relief from the tax while not interfering with efficient operation of the capital markets.

First, the regulations treat a foreign corporation as the beneficial owner of its income, irrespective of whether it is located in a tax haven, and its owner(s) need not be identified.[168] Although this may seem a strange concept to many foreign bankers who view the shareholder as the beneficial owner under know-your-customer rules, it is

---

[164] Id. § 6.04.

[165] Id.

[166] By contrast, withholding regulations proposed in 1984 would have required Certificates of Residence from treaty partners. Withholding on Items of Income Covered by an Income Tax Convention, 49 Fed. Reg. 35511 (Sept. 10, 1984).

[167] After the repeal of the withholding tax on portfolio interest, Treasury and the Service determined that a refund system would not be feasible because there would be insufficient "float" to finance the costs of a refund system. It was believed that a refund system would require a new and separate processing center and there would not be sufficient interest income from the amounts withheld until repaid to foreign investors to pay for the costs of such an operation. See International Tax Evasion/Tax Treaty Issues: Hearing Before the House Commerce, Consumer, and Monetary Affairs Subcommittee of the Committee on Government Operations, 100th Cong. 12-13 (1987) (statement of Lawrence Gibbs, Commissioner of Internal Revenue).

[168] Reg. § 1.1441-1(c)(6).

Imaged with the Permission of N.Y.U. Tax Law Review

consistent with U.S. tax principles. This was a significant decision by the Service to limit the extent to which the withholding tax rules would be used as a means to catch U.S. tax evaders (or to obtain information that could be exchanged with treaty partners regarding their residents' investments in U.S. securities through offshore entities).

Second, the regulations employ so-called presumption rules to permit a withholding agent to presume that an investor is a foreign person and thereby avoid imposition of back-up withholding in the absence of documentation of foreign status.[169] This permits a presumptively foreign payee to accept a 30% withholding tax on income (instead of 30% withholding on gross proceeds) as the sole price for not providing withholding documentation.[170] The absence of exposure to back-up withholding is a significant structural element of the withholding rules. Non-U.S. investors seeking confidentiality (and presumably tax-evading U.S. investors as well) may use a foreign tax haven corporation as a private investment company to hold equity securities and thereby only suffer 30% withholding tax on dividends in order to avoid disclosure of their identities to the Service.[171] If the

---

[169] Reg. § 1.1441-1(b)(3)(iii)(D). The final withholding tax regulations have carefully avoided applying back-up withholding on gross proceeds in such a way as would compel disclosure of the identity of investors, whether U.S. or foreign, that are not direct payees. For example, if a Cayman Islands limited partnership provides a withholding exemption foreign partnership certificate (generally on a Form W-8IMY) to a U.S. withholding agent without documentation from its partners, the U.S. withholding agent must presume that the undocumented investors are non-U.S. payees and withhold 30% of income subject to withholding if paid to a foreign person. Reg. § 1.1441-5(d)(3). The non-U.S. payee presumption, however, insulates that investor from back-up withholding on gross proceeds, which does not apply to payments to foreign persons. See, e.g., Reg. § 1.6045-1(g)(1)(i) (and cross-references) for this conclusion. The U.S. withholding agent must report to the Service on Form 1042-S the amount paid to an undocumented foreign payee. Reg. § 1.1461-1(c). If a foreign partnership is organized in a tax haven and is not tax-resident in a country with a treaty with the United States, there is no way to relate the Form 1042-S information to the nondisclosed partners.

[170] IRC § 3406 (imposing 30% withholding tax, calculated with reference to § 1(c), adjusted for inflation under § 1(i)). Pursuant to the 2001 Act, the withholding rate declines from 30% in 2002-2003 to 29% in 2004-2005, and 28% in 2006 and thereafter. Pub. L. No. 107-16, § 101(a), 115 Stat. 38, 42. Under the sunset provision of the Act, the rate reverts to 31% in 2011 (its rate before the 2001 Act went into effect). Pub. L. No. 107-16, § 901, 115 Stat. 38, 150.

[171] A U.S. tax evader resident in the United States might arrange with a fiduciary in a country with confidentiality protections to organize a corporation to hold investment assets. Although a U.S. tax evader resident outside the United States might be presumed to avoid contacts with treaty countries that could (and would) exchange information with the United States if requested, it is not beyond imagination that a U.S. citizen resident, but not ordinarily resident, in the United Kingdom (and therefore taxed on a remittance basis) would hold investments, including U.S. securities, through a corporation organized in a tax haven. In this case, the United Kingdom would not have information in its files to exchange with the United States that would link the U.S. citizen with the investments.

Imaged with the Permission of N.Y.U. Tax Law Review

average dividend return on a broad range of equities is 3%, then the withholding tax is 90 basis points. The marginal cost of nondisclosure under these assumptions is only 45 basis points when the 30% withholding rate is compared with a treaty rate on dividends of 15%.[172] The calculus for the confidentiality-minded investor would be dramatically different if the threatened withholding were 30% of gross proceeds from the sale of securities.[173]

Third, as discussed above, the final withholding tax regulations provide that a foreign beneficial owner customer of a QI may claim exemption from withholding on interest without disclosing her identity to the Service (or the U.S. withholding agent).[174]

Notwithstanding these concessions, the new withholding regime for the first time holds at least a modest promise of defending against U.S. taxpayers taking advantage of source tax exemption—with a major exception for foreign-targeted bearer bonds.[175] In due course, if the QI system proves workable and even is adopted by other countries, these concessions should be re-examined.

In summary, the withholding mechanism works reasonably well for collecting tax but is an awkward mechanism for administering relief from or reductions in tax. A statutory exemption from withholding tax, as opposed to a treaty exemption, is particularly problematic to administer and enforce, because there is no mechanism, as there is in a treaty, to confirm the eligibility of the beneficial owner of the income for which the exemption is claimed.[176] In the case of portfolio interest, taxpayer-reported information provided to the withholding agent (or QI) is the only basis on which to confirm eligibility for the exemption from withholding tax notwithstanding the advances of the

---

[172] OECD Model Tax Convention, note 62, art. 10(2)(b), 1 Tax Treaties (CCH) ¶ 10,507.

[173] See note 170.

[174] See text accompanying notes 152-57.

[175] Since the repeal of the withholding tax on portfolio interest in 1984, corporate issuers of bonds, but not the U.S. Treasury, have been permitted to issue foreign-targeted bearer bonds. The procedures carry no meaningful protections against U.S. persons acquiring the bonds as beneficial owners in the secondary market. The bearer bond procedure in today's marketplace perpetuates an anachronism to allow investment bankers to say they offer bearer bonds when in fact almost no bonds are issued in physical security form anymore. The principal effect is to permit these bonds to be held outside the QI and nonqualified intermediary regimes and thereby facilitate tax evasion by U.S. as well as non-U.S. investors.

[176] If a U.S. citizen opens an account with a foreign financial institution using Liechtenstein documentation, there is no practical way to look behind the documentation provided to determine eligibility for the exemption. The audit guidelines for external auditors look to whether the QI followed acceptable process and procedures and do not separately scrutinize the eligibility for the exemption of an individual account holder or test eligibility against information obtained from third parties. The identity of account holders is not provided to the Service. See Rev. Proc. 2002-55, note 162.

new withholding regulations.[177] The significance of a treaty is that at the discretion of the treaty partner, it permits use of its compulsory process to obtain documentary and testimonial information. At a minimum, this prospect provides some level of deterrence against fraud and evasion. Under the current regulations, such deterrence is nonexistent in the case of foreign-targeted bearer obligations and remote in the case of a U.S. or non-U.S. payee of a U.S. withholding agent or a QI outside of a treaty jurisdiction.

### 4.  Enforcement of Net Basis Source Taxation in the Absence of a Treaty

The traditional view is that source taxation of active income is a sound if not a preferred basis on which to tax international income. An implicit assumption of a tax on net income is that if there is sufficient jurisdiction to tax the income, there will be in personam or in rem jurisdiction to compel production of requested information that is not provided voluntarily. Increasingly often, this is not true.

This was a limited concern when inbound activity consisted principally of direct taxpayer presence in the United States, either in the form of bricks and mortar production facilities or through a taxpayer's sales and distribution activity. The emergence of remote selling activity, seen in e-commerce, and direct sales of a variety of retail financial products such as insurance and financial services, foretell a future where this limited exposure may become substantially greater. Absent assistance under an income tax treaty, information exchange agreement, or other similar instrument, jurisdiction to prescribe a tax rule covers numerous cases where there is little practical ability to enforce the rule.[178] We consider below an example where a foreign person may be taxed on income connected with a U.S. business when the taxpayer is not physically present, but other examples could be used.[179]

The United States imposes net basis taxation under a "doing business" standard that does not require a physical presence of the tax-

---

[177] Those not eligible for the portfolio interest exemption are 10% shareholders of the issuer, foreign banks making a loan under a loan agreement, certain controlled foreign corporations, and U.S. persons who have not been identified in beneficial owners statements (with respect to whom information reporting and back-up withholding apply). IRC §§ 871(h)(3), 881(c)(1), (3).

[178] Enforcement of source taxation, like residence taxation, is vulnerable to taxpayer use of countries that will not share tax information in cases where the taxpayer does not have sufficient U.S. presence to afford enforcement jurisdiction over the taxpayer.

[179] An example not discussed in the text is enforcement of § 877 with respect to expatriated U.S. citizens or departed long-term residents who do not file a tax return with respect to income subject to tax under § 877.

payer itself, as opposed to its agents, in the territory. The general rule is that if a foreign person is engaged in a U.S. trade or business, her U.S source business income, except for periodical income or capital gains that are not derived from the trade or business, will be treated as effectively connected and therefore subject to U.S. taxation.[180]  At the margin, the amount of activity required for a foreign person to qualify as engaged in a U.S. trade or business often is unclear.[181]

Whether a foreign person is engaged in a U.S. trade or business is based on all the facts and circumstances.[182]  One of the challenges facing the Service is enforcing U.S. tax rules on a business carried on from an offshore location that is not a party to a tax treaty. The following hypothetical fact pattern illustrates this.[183]

---

[180] IRC § 864(c)(2), (c)(3) (the vestige of the force of attraction concept).  The general source rule for purchased inventory is that the source of income from the sale of inventory is based on where title to the property passes to the buyer.  Reg. § 1.861-7(c).  Even if title to inventory is transferred by a foreign person to the buyer outside the United States, the sale produces U.S. source income if the sale is attributable to a foreign office or fixed place of business of the foreign corporation, unless (1) the property is for use outside the United States, and (2) a foreign office or fixed place of business of the foreign corporation participates materially in the sale.  IRC § 865(e)(2).  The Code still provides that income from foreign sales attributable to a U.S. office constitutes U.S. source effectively connected income and thus is taxable in the United States if a foreign office does not participate materially in the sale.  IRC § 864(c)(4)(B)(iii).  Since 1986, this rule has been anachronistic because such a sale gives rise to U.S. source income under § 865(e)(2) and is effectively connected income unless the seller is a nonresident alien with a tax home in the United States.  See Gustafson, Peroni & Pugh, note 17, at 146.  Under this convoluted statutory structure, income from the sale of tangible inventory by a foreign person is not effectively connected income and is not subject to U.S. income tax if (1) title passes outside the United States and the sale is not attributable to a U.S. office or fixed place of business of the foreign corporation, or (2) even if the sale is attributable to a U.S. office or fixed place of business, the property is sold for use or consumption outside the United States and a foreign office participates materially in the sale.  For a path through the effectively connected income maze, see generally Dale, note 10.

[181] Richard Crawford Pugh, Policy Issues Relating to the U.S. Taxation of Foreign Persons Engaged in Business in the United States Through Agents: Some Proposals for Reform, 1 San Diego Int'l L.J. 1, 3 (2000).

[182] In one of the relatively few U.S. trade or business cases, a foreign individual inherited four parcels of improved commercial real property that were under long-term lease.  During the year, his agent sold one property to his lessee, and used the proceeds from the leases and some of the proceeds from the sale to acquire a residential property and an option to purchase another parcel of commercial real property.  The Tax Court held that the individual was engaged in a trade or business in the United States, since his activities went beyond mere ownership into "considerable, continuous, and regular" management for profit.  Lewenhaupt v. Commissioner, 20 T.C. 151, 163 (1953), aff'd, 221 F.2d 227, 227 (9th Cir. 1954).  For purposes of determining whether a foreign corporation is engaged in a U.S. trade or business, activities of an agent, apparently whether or not independent, are attributed to its principal.  Amodio v. Commissioner, 34 T.C. 894, 904 (1960), aff'd on other grounds, 299 F.2d 623, 625 (3d Cir. 1962); see Pugh, note 181, at 8.

[183] We have taken the fact pattern from Tillinghast, note 6, at 343-74, and modified it slightly to fit the needs of the illustration.

*SoftCo* is a software company of unknown ownership organized in the Bahamas[184] that contracts with *USCo* for rights to distribute software programs developed by *USCo*. *SoftCo* also contracts with software programmers to develop software programs for *SoftCo*. The programmers are independent contractors but act for *SoftCo* on an ongoing basis. *SoftCo* distributes the programs over the Internet to customers in the United States and abroad. *SoftCo* offers service support from employees in the Bahamas or from one or more of the independent contractors. The independent contractors may or may not be resident in the United States. Assume alternatively that *SoftCo* does not file an income tax return and that *SoftCo* files a protective income tax return to start the statute of limitations and to preserve its deductions.[185]

The first issue for the taxpayer is whether to file a return (assuming that there is a reporting position that the taxpayer is not engaged in a U.S. trade or business). This presents a classic dilemma for a taxpayer. Is it better to file a return in the event the taxpayer is found to be engaged in a U.S. trade or business to avoid a possible 35% tax on gross income plus penalties?[186] Or is the likelihood that the Service will audit the structure so remote in the absence of a return, that, notwithstanding the substantial downside risk, it would be irrational to file? In practice, notwithstanding the risk-adverse nature of the taxpayer's advisors, the sensible business judgment often is not to file. Absent a return, it would be extremely difficult for the Service to be aware that there might be an issue.

Assume that a protective return is filed or the Service otherwise has reason to determine whether *SoftCo* is engaged in a U.S. trade or business. The Service may request information from *USCo*, but *USCo* may not possess information relevant to determining what U.S. activities *SoftCo* carries on. *USCo* presumably would know the identity of the bank through which *SoftCo* makes payments to *USCo* and, if the bank has a U.S. presence, the Service could summons information regarding payments by *SoftCo* to other U.S. persons for services or other activities. If *SoftCo*'s payments to *USCo* are through a U.S. bank that has a correspondent relationship with *SoftCo*'s Bahamas bank, or are through a non-U.S. bank without a U.S. office, this avenue would be foreclosed.

---

[184] The Tillinghast hypothetical used an Irish public company that operated through a branch in Bermuda. Id. at 343. Both Ireland and Bermuda are parties to conventions with the United States under which tax information may be exchanged, so we move the place of organization and operation of the company to the Bahamas.

[185] IRC §§ 882(c)(2), 6501.

[186] IRC § 6651.

Next, assume that *SoftCo* does use a bank with a U.S. presence, that the Service issues a summons to the bank requesting *SoftCo*'s banking records from the Bahamas, and that *SoftCo* moves to quash the summons on the grounds that there is no factual basis for the inquiry. (Ironically, it would appear that *SoftCo* would be better off in this regard by not filing a protective income tax return, since a return would be a de facto admission of a potential U.S. tax presence.) Nevertheless, assume the summons is enforced and the bank turns over records that show payments to U.S. persons. Those persons provide information regarding the nature of their programming activities for *SoftCo*, their service support for *SoftCo* products, or both.

Turn now to the factual nature of the legal analysis required to determine whether the activities of these persons would cause *SoftCo* to be engaged in a U.S. business and, if so engaged, whether *SoftCo* has effectively connected income.[187] Without the ability to summons *SoftCo*'s employees or records, could the Service propose an adjustment? Could it collect the tax? Finally, how many IRS agents, with other presumably easier cases to pursue, would want to take on this quagmire? Notwithstanding the enforcement difficulties, in this example *SoftCo* clearly exploits the U.S. market.

What conclusions are to be drawn from the preceding discussion of the limits on jurisdiction to enforce and its implications for source taxation in the absence of a treaty? With respect to source taxation of nonresidents not engaged in a U.S. business, it is clear that withholding is an essential enforcement tool. From an administration and enforcement perspective, exceptions from withholding are extremely difficult to police and therefore expose the residence tax base to erosion. With respect to source taxation of U.S. business income, it is difficult to administer and enforce a net tax on income of a foreign person that does not have a physical presence in the United States. These are not surprising conclusions, but commentators do not appear to have highlighted them. As discussed in the next Subsection, the availability of an exchange of information provision in a treaty or a tax information agreement potentially improves the ability to obtain information both to police exemptions from source withholding and to administer a net tax on income from a U.S. business carried on from outside the United States.

---

[187] See Tillinghast, note 6, at 344-56. Tillinghast observes that the "seemingly simple question" whether income is effectively connected with a U.S. business "is one of Byzantine complexity." Id. at 348. The analysis requires determining (1) the character of the income from the transfer as a sale or royalty, (2) whether the source of the income is U.S. or foreign (or part U.S. and part foreign), and (3) whether the (U.S. or foreign) income is effectively connected income. Id. at 344, 353.

Imaged with the Permission of N.Y.U. Tax Law Review

5. *Overcoming Limitations on Jurisdiction to Enforce Tax Rules:*
   *Bilateral or Multilateral Tax Information Exchange*
   *Agreements*

Information outside the limits of a U.S. court's jurisdiction may be obtained with the assistance of the jurisdiction where the information is located. Because most countries have domestic law confidentiality or privacy protections for taxpayer information and banking information, generally the other country must undertake this assistance under the authorization of a treaty or other international agreement with the United States.

The United States is a party to over 64 bilateral income tax treaties, 14 tax information exchange agreements, and the Multilateral Convention for Mutual Assistance on Tax Matters, each of which provides for assistance in obtaining tax information.[188] These international agreements play an important role in overcoming limitations on U.S. jurisdiction to enforce. The *SoftCo* hypothetical discussed above illustrates the impact of an agreement.

An exchange-of-information agreement with the Bahamas in the *SoftCo* case would materially change the burden versus benefit calculus for the Service and the risk of enforcement calculus for *SoftCo*. Such an agreement would allow the Service to direct a request, through the Bahamas authorities, directly to *SoftCo* and its employees. IRS personnel could request copies of records and arrange interviews. Although an exchange-of-information request involves its own bureaucratic burdens and is dependent on the other country's authorities for success, it is a material improvement over the situation without a treaty relationship. The *SoftCo* example involves U.S. source-basis taxation of a foreign person; however, the availability of information exchange is, if anything, equally important for protecting residence-based taxation of U.S. persons both with respect to U.S. business and nonbusiness income.

Treaties are essentially reciprocal obligations. For treaty information exchange to work, the flow of information must be bilateral. Not only is this in the self-interest of each of the contracting countries, but the ability of countries to impose income taxes increasingly requires that countries have the ability to obtain information from outside their borders. Current U.S. tax policy decisions that in effect facilitate foreign investors in hiding their income from their home country tax authorities by avoiding routine exchange of information under treaties

---

[188] See Richard Gordon, John Venuti & Diane Renfroe, Current Status of U.S. Tax Treaties, 31 Tax Mgm't Int'l J. 266, 270 (2002); OECD Convention on Mutual Administrative Assistance on Tax Matters, Jan. 25, 1988, 1 Tax Treaties (CCH) ¶ 215.

regarding their investments in U.S. securities or banks may need to be revisited in the future. Two examples illustrate this point.

Generally, a U.S. withholding agent that makes payment of income subject to withholding to a foreign person reports the amount of the payment and the identity of the payee to the Service on a Form 1042-S attached to the withholding agent's own return on Form 1042. The information from Form 1042-S is one of the most important elements of information provided to certain treaty partners under the Service's program for routine exchange of information under income tax treaties.

Under the current QI regime, the QI does not pass on to the withholding agent the identity of beneficial owners claiming treaty relief but does retain the information. Assuming, as is the case most of the time, that the QI has not assumed withholding responsibility, the withholding agent makes payments to accounts grouped according to withholding pools and files a single Form 1042-S for the pool without identifying the individual payee. Thus, for example, the withholding agent files a single Form 1042-S for the pool of accounts eligible for the 15% treaty dividend rate. In this case, the identity of the payee remains unknown unless the Service makes a specific request for the identity of payees. The pooling approach, which is central to the efficiency and attractiveness of the QI regime to a foreign financial institution, cuts off the potential practical utility of pooled information for exchange under income tax treaties. This is because the information is not broken down by taxpayer and therefore is unsuitable for exchange with a treaty partner. Similarly, the United States for years limited its information exchange of bank deposit interest to accounts held by Canadians and, after strong lobbying by banks, recently proposed only a limited extension of collection of this information from foreign persons resident in a limited number of selected treaty countries.[189]

---

[189] Prop. Reg. § 1.6049-8(a). After strenuous lobbying by Florida banks in particular, prior proposed regulations that would have required reporting of interest paid to nonresidents irrespective of their country of residence were withdrawn and re-issued. Prop. Reg. § 1.6049-8(a), 62 Fed. Reg. 53387, 53491 (Oct. 14, 1997), Prop. Reg. § 1.6049-8(a), 66 Fed. Reg. 3925, 3928 (Jan. 17, 2001). The Florida International Bankers Association claimed that Florida banks would lose between $18 billion and $34 billion of deposits and that operating business profits in Florida alone would decline between $4.4 billion and $8.46 billion annually. Miriam Lopez, Alex Sanchez, Tom Dargan, David Konfino, Al Valdes, and Pat Roth, Bankers Associations Urge Withdrawal of Nonresident Reporting Requirements (Oct. 1, 2001) TNT 198-36, Oct. 12, 2001, available in LEXIS, TNT File. Governor Jeb Bush also wrote Secretary O'Neill and arranged for Florida bankers to meet with then Assistant Secretary of the Treasury for Tax Policy Mark Weinberger and a White House representative. Jeb Bush, Governor Bush urges the U.S. Treasury to Reconsider Proposed Regulations on Reporting Requirements (June 7, 2001), 2001 WTD 123-45, June 26, 2001, available in LEXIS, WTD File. In July, 2001, Florida Congressman Dave Weldon withdrew an appropriations bill amendment to block Treasury from using funds to implement

Why is this significant? Domestically, the United States relies on comprehensive information reporting for payments of interest, dividends, and gross proceeds from the sale of securities to individuals and other nonexempt recipients. If a taxpayer does not supply a correct taxpayer identification number, the threat of a back-up withholding tax on the payment, currently at a rate of 30%, provides a significant backstop to the information reporting rules.[190] The final withholding tax regulations integrate the domestic information reporting and back-up withholding rules with the Chapter 3 withholding rules so that payments to foreign intermediaries acting for U.S. persons are covered by the domestic information reporting system. There are limits on the reach of these rules, however. Generally, U.S. persons, controlled foreign corporations, and foreign corporations more than 50% of whose income is effectively connected with a U.S. trade of business must apply the information reporting and back-up withholding rules.[191] The QI regime also preserves Form 1099 reporting with respect to U.S. persons that are not exempt from information reporting under domestic rules.[192] As a practical matter, however, the comprehensive U.S. regime for enforcement of tax on income from capital stops at the water's edge.

If a long-term U.S. interest is to receive information from treaty partners that is usable and will assist enforcement of U.S. tax laws, it is necessary to achieve seamless information reporting so that adequate information can be routinely exchanged with a treaty partner regarding income paid to its residents so that it may process the information.[193] To be effective there cannot be wide gaps in the information collected. Acceptance of pooled QI reporting may be a reasonable decision today, because of the need to implement the QI system successfully. Moreover, currently most treaty partners have limited ability to process electronically information provided under routine exchange of information programs. In the not too distant future, how-

---

the regulation after House Ways and Means Committee Chairman William Thomas promised to hold hearings on the matter if the proposed regulations were adopted without modification. 147 Cong. Rec. H4592-H4593 (July 25, 2001); see generally Marshall J. Langer, New EU, U.K., and U.S. Reporting Rules on Bank Deposit Interest Paid to Nonresidents (Dec. 10, 2001), 2002 WTD 18-19, Jan. 28, 2002, available in LEXIS, WTD File.

[190] See note 170.

[191] The information reporting and back-up withholding rules are modified for application to foreign offices of U.S. financial institutions. Reg. § 1.6049-5(c).

[192] See Rev. Proc. 2000-12, note 163, § 8.01 (model QI agreement).

[193] It is well known to treaty administrators that critical to this objective is agreement on a numbering or processing system that will permit income information received from the other country to be related by the residence country to an individual taxpayer. This has been the subject of ongoing work at the OECD. OECD, Model Agreement on Exchange of Information in Tax Matters, available at http://www.oecd.org/pdf/M00028000/M00028528.pdf.

ever, it will be appropriate to re-visit the extent to which bank deposit and Form 1042-S information is collected for exchange with countries that are parties to treaties and, as appropriate, tax information exchange agreements with the United States.

Treaties also potentially serve another enforcement objective. As discussed above, the revenue rule is a barrier to assistance in collection of foreign tax claims in many countries. This limitation also may be overcome through agreement in a treaty to assist in the collection of the treaty partner's tax claim. The United States has a mixed history in its commitment to overcoming the revenue rule by treaty.

The United States has entered into five income tax treaties under which the contracting parties have agreed to provide general assistance in collecting tax judgments.[194]  The treaties with four of these countries—Denmark, France, Sweden, and the Netherlands—were first signed and ratified in the late 1930's and 1940's. In 1948, however, responding to complaints about French tax collection against U.S. persons, the Senate ratified a Supplementary Protocol providing that collection assistance under the treaty would not be given with respect to taxpayers of the requested state.[195]  In 1951 reservations to the collection provisions in treaties with Greece, Norway, and South Africa further restricted the U.S. position.[196]  Subsequent treaties have authorized collection assistance with respect to withholding taxes that were not correctly withheld at source.[197]

---

[194] Third Protocol to U.S.-Can. Income Tax Convention, Mar. 17, 1995, art. 15, 1 Tax Treaties (CCH) ¶ 1946 [hereinafter Canada-U.S. 1995 Protocol]; Income Tax Convention, Aug. 19, 1999, U.S.-Den., art. 27, 2 Tax Treaties (CCH) ¶ 2500.27; Income Tax Convention, Aug. 31, 1994, U.S.-Fr., art. 28, 2 Tax Treaties ¶ 3001.29; Income Tax Convention, Dec. 18, 1992, U.S.-Neth., art. 31, 3 Tax Treaties (CCH) ¶ 6103.33; Income Tax Convention, Sept. 1, 1994, U.S.-Swed., art. 27, 4 Tax Treaties (CCH) ¶ 8801.28.

[195] See Supplementary Protocol to U.S.-Fr. Income Tax Convention, May 17, 1948, art. I, reprinted in 1 Tax Conventions, note 19, at 1151, 1191.

[196] The Senate Foreign Relations Committee report stated in part:

> [T]he committee believes that the collection provisions of the South African, Greek, and Norwegian income-tax conventions are too broad, and it repeats that, as a general rule, it is not believed wise to have one government collect the taxes which are due to another government. . . . Thus, the committee recommends the acceptance of the collection provisions . . . subject to the understanding that each of the governments may collect the other's tax solely in order to insure that the exemptions or reduced rates of tax provided under the respective conventions will not be enjoyed by persons not entitled to such benefits.

S. Exec. Rep. No. 82-1, at 21 (1951), reprinted in 1 Tax Conventions, note 19, at 605.

[197] The broadest collection assistance provision in an existing U.S. treaty, the OECD Convention on Mutual Administrative Assistance in Tax Matters, note 188, is the subject of a reservation that is permitted under the terms of the treaty and may be withdrawn. In ratifying the OECD Mutual Administrative Assistance Convention, Treasury recommended, and the Senate adopted, a reservation to the treaty's reciprocal provisions for collection assistance (as well as service of process). 136 Cong. Rec. S13294 (daily ed. Sept.

The most recent broadly drafted collection provision was adopted in the 1995 Protocol to the Canadian treaty. The mutual collection assistance provision provides broad assistance for a revenue claim that has been certified by the applicant state as "finally determined."[198] A claim has been "finally determined" when "the applicant State has the right under its internal law to collect the revenue claim and all administrative and judicial rights of the taxpayer to restrain collection in the applicant State have lapsed or been exhausted" and the claim is not to be reexamined in the requested state.[199] The provision applies "to all categories of taxes collected by or on behalf of the Government of a Contracting State."[200] Thus, the collection provision applies to taxes that are not covered by the treaty, such as customs and excise taxes. The collection provision bars assistance with the collection of a revenue claim arising during the time an individual or corporation was a citizen of or incorporated in, respectively, the "requested State"[201] and provides that a finally determined revenue claim "may be accepted for collection."[202] This collection provision with our most important treaty partner is an important breakthrough and its use in practice will be watched carefully.[203]

### F.  Summary of Criteria for U.S. Source Taxation

We suggest that a parity or comparable taxation principle of source taxation requires that the level of effective source taxation be comparable to that imposed on residents carrying on the same activity. As a country whose residents invest abroad, the United States also has strong reasons to resist excessive or discriminatory taxation of nonresidents. Thus, we suggest that the United States adhere to the nondiscrimination principle in source taxation. In this regard, however, we suggest that the existing treaty concept of nondiscrimination be modified to take account of differential taxation of non-U.S. owners of U.S. business entities in evaluating whether a tax rule results in discrimina-

18, 1990) (statement of Sen. Pell) ("The administration stated, and the Committee on Foreign Relations concurred, that it did not believe it appropriate, at this time, to participate in the other aspects of the convention, that is cooperation in tax collection efforts . . . ."); see also 136 Cong. Rec. S13295 (daily ed. Sept. 18, 1990) (vote on the reservation).

[198] Canada-U.S. 1995 Protocol, note 194, art. 15, para. 2, 1 Tax Treaties (CCH) ¶ 1946.
[199] Id. art. 15, para. 3.
[200] Id. art. 15, para. 9.
[201] Id. art. 15, para. 8.
[202] "Paragraph 3 . . . clarifies that the Contracting State from which assistance was requested . . . has discretion as to whether to accept a particular application for collection assistance." Treas. Dep't, Technical Explanation of the Canada-U.S. 1995 Protocol, art. 15, 1 Tax Treaties (CCH) ¶ 1951 (released June 13, 1995).
[203] The OECD also recently proposed amendments to its model convention authorizing assistance in collection. OECD Model Treaty, note 103, art. 27 (proposed).

tion in fact. Finally, we conclude that administration of source taxation would be less burdensome and enforcement less problematic if exceptions from source taxation were adopted only by treaty. We also conclude that enforcement of net basis taxation at source on a remote seller (of goods, intangibles, or services) without a physical presence is extremely difficult in the absence of a treaty.

We turn next to a discussion of source rules using these criteria. What does source have to do with source taxation?

## IV. What Is the Proper Role of Income Source in U.S. Source Taxation?

### A. The Weakness of the Connection Between Income and Geographic Source

A fundamental reason for the difficulty in assigning income to a geographic source lies in the nature of the net income concept underlying the U.S. federal income tax. The idealized Schanz-Haig-Simons definition of income as equaling consumption, plus, or minus, the change in the taxpayer's wealth between the beginning and the end of a year[204] is an attribute of a person, not a place. Because a person is not divisible into geographic parts, the Schanz-Haig-Simons net income concept can describe only a taxpayer's worldwide income. It cannot allocate that worldwide income among the various countries whose legal and economic infrastructures may have contributed to the production of the income.[205] Nevertheless, an allocation must be made in order to apply the rule that gives source taxation primacy over residence taxation and also to sort out competing source tax claims. In this Section, we focus on the issue of resolving countries' conflicting assertions of source tax jurisdiction.

Where it is necessary to assign net income to specific time periods, the tax system relies on tax accounting methods, principally the cash and accrual methods. Unfortunately, there is no analogue to the cash

---

[204] Henry C. Simons, Personal Income Taxation 50 (1938); Robert M. Haig, The Concept of Income-Economic and Legal Aspects, in the Federal Income Tax 1, 7 (Robert M. Haig ed., 1921), reprinted in Am. Econ. Ass'n, Readings in the Economics of Taxation 54 (Richard A. Musgrave & Carl S. Shoup eds., 1959); Georg van Schanz, Der Einkommensbegriff und die Einkommensteuergesetze, 13 Finanz-Archiv 1-87 (1896). With respect to the relationship of the Schanz-Haig-Simons income definition to corporate income, see Fleming, Peroni & Shay, note 34, at 318-23.

[205] Ault & Bradford, note 2, at 30-32. Ault and Bradford also question whether reference to the idealized Schanz-Haig-Simons definition of income is useful as a tax policy guide because income actually is measured by reference to observable transactions. We address the fact that source rules also are related to transactions in the following text and consider illustrative cases in Subsection IV.C. We do not consider in this Article the question of when a person, corporate or individual, should be considered a tax resident in a country.

# Exhibit 32

**University of California, Hastings College of the Law**
**UC Hastings Scholarship Repository**

Faculty Scholarship

2002

# Breaking the Public Law Taboo

William S. Dodge
*UC Hastings College of the Law*, dodgew@uchastings.edu

Follow this and additional works at: http://repository.uchastings.edu/faculty_scholarship

 Part of the International Law Commons

Recommended Citation

William S. Dodge, *Breaking the Public Law Taboo*, 43 *Harv. Int'l L.J.* 161 (2002).
Available at: http://repository.uchastings.edu/faculty_scholarship/123

This Article is brought to you for free and open access by UC Hastings Scholarship Repository. It has been accepted for inclusion in Faculty Scholarship by an authorized administrator of UC Hastings Scholarship Repository. For more information, please contact marcusc@uchastings.edu.



UNIVERSITY OF CALIFORNIA
HASTINGS COLLEGE OF THE LAW

**Faculty Publications**
**UC Hastings College of the Law Library**

**Author:**      William S. Dodge

**Source:**      Harvard International Law Journal

**Citation:**    43 Harv. Int'l L.J. 161 (2002).

**Title:**       *Breaking the Public Law Taboo*

Originally published in HARVARD INTERNATIONAL LAW JOURNAL. This article is reprinted with
permission from HARVARD INTERNATIONAL LAW JOURNAL and Harvard Law School .

VOLUME 43, NUMBER 1, WINTER 2002

# Breaking the Public Law Taboo

William S. Dodge*

Why do courts refuse to enforce foreign public law when they routinely enforce foreign private law? It is common to find judges applying foreign tort law to decide a case,[1] or enforcing a foreign judgment for breach of contract.[2] However, when the foreign law at issue is public—criminal, tax, antitrust, or securities law, for example—courts will neither apply that law to decide a case nor enforce the decision of a foreign court applying that law.[3] The nonenforcement of foreign public law constitutes the "public law taboo."[4]

---

* Professor of Law, University of California, Hastings College of the Law. B.A., Yale College, 1986; J.D., Yale Law School, 1991. My thanks to Ash Bhagwat, Hannah Buxbaum, Andrew Guzman, Joel Paul, Mike Ramsey, Fred Tung, and two anonymous reviewers for comments on an earlier draft. Armand Roth and Susie Stevens provided valuable research assistance and Mark Sundahl translated the Latin in note 24.

1. *See, e.g.*, Spinozzi v. ITT Sheraton Corp., 174 F.3d 842 (7th Cir. 1999) (holding that Mexican law applied to suit for negligence); Ostroski v. Global Upholstery Co., [1995] CarswellOnt 874 (Ont. Gen. Div.) (holding that Pennsylvania law applied in a tort action); *see also* RESTATEMENT (SECOND) OF CONFLICTS OF LAW § 145(1) (1971) ("The rights and liabilities of the parties with respect to an issue in tort are determined by the local law of the state which, with respect to that issue, has the most significant relationship to the occurrence and the parties . . . ."); Private International Law (Miscellaneous Provisions) Act, 1995, c. 42, §§ 11–12 (Eng.) ("[T]he applicable law is the law of the country in which the events constituting the tort or delict in question occur" unless a comparison of connecting factors shows "that it is substantially more appropriate for the applicable law" to be the law of another country.).

2. *See, e.g.*, Manches & Co. v. Gilbey, 646 N.E.2d 86 (Mass. 1995) (enforcing English contract judgment); Moses v. Shore Boat Builders Ltd., 83 B.C.L.R.2d 177 (B.C.C.A. 1993) (Can.) (enforcing Alaska contract judgment); Israel Discount Bank v. Hadjipateras, [1983] 2 Lloyd's Rep. 490 (C.A.) (Eng.) (enforcing New York contract judgments); *see also* Unif. Foreign Money Judgments Recognition Act § 3, 13 U.L.A. 417, 420 (1986) [hereinafter Uniform Act] (providing that a foreign judgment "is enforceable in the same manner as the judgment of a sister state which is entitled to full faith and credit").

3. *See, e.g.*, The Antelope, 23 U.S. (1 Wheat.) 66, 123 (1825) ("The Courts of no country execute the penal laws of another . . . ."); Government of India v. Taylor, [1955] A.C. 491 (H.L.) (Eng.) (refusing to enforce foreign tax judgment); Capital Currency Exch., N.V. v. Nat'l Westminster Bank PLC, 155 F.3d 603, 609 (2d Cir. 1998) ("English courts will not enforce the Sherman Act."); Schemmer v. Prop. Res. Ltd., [1975] 1 Ch. 273, 288 (1974) ("The [Securities Exchange] Act of 1934 is, in my judgment, a penal law of the United States of America and, as such, unenforceable in our courts."). To complicate matters further, one sort of foreign "public" law—the expropriation by a foreign government of property within its own territory—*is* commonly recognized and enforced. *See, e.g.*, Banco Nacional de Cuba v. Sabbatino, 376 U.S. 398 (1964); Luther v. James Sagor & Co., [1921] 3 K.B. 532. For further discussion, see *infra* Part I.C.

4. The phrase is Andreas Lowenfeld's. *See* Andreas F. Lowenfeld, *Public Law in the International Arena: Conflict of Laws, International Law, and Some Suggestions for Their Interaction*, 163 RECUEIL DES COURS 311, 322–26 (1979-II). In a recent article, Philip McConnaughay argues that the taboo has two prongs: one forbidding the enforcement of foreign public law, and the other "forbidding the displacement of otherwise applicable forum public law." Philip J. McConnaughay, *Reviving the "Public Law Taboo" in International Conflict of Laws*, 35 STAN. J. INT'L L. 255, 283 (1999). Traditionally, the phrase "public law taboo"

Although the origins of the taboo are quite old,[5] courts continue to grapple with the enforceability of foreign public law today. Within just the past five years, U.S. and Canadian courts have considered whether a private party can enforce a U.S. antitrust judgment in Canada, whether the S.E.C. can enforce U.S. securities law judgments for disgorgement and civil penalties in Canada, and whether the Attorney General of Canada can bring a RICO suit in U.S. court to recover tax revenues lost to cigarette smuggling.[6] The real significance of the public law taboo, though, lies not in the outcomes of individual cases but in the limits it places on the ability of governments to regulate transnationally. If a foreign court will neither apply U.S. antitrust law nor enforce U.S. antitrust judgments, for example, then the effectiveness of U.S. antitrust regulation will depend on whether a U.S. court can obtain personal jurisdiction over the defendant and whether the defendant has assets in the United States against which a judgment may be enforced. If foreign courts were willing to apply U.S. antitrust law and enforce U.S. antitrust judgments, the effectiveness of transnational antitrust regulation would increase.[7] The public law taboo is an important part of what I call the "structural rules of transnational law": rules concerning prescriptive jurisdiction, judicial jurisdiction, and the enforcement of judgments that together determine the effectiveness of transnational regulation.[8]

---

has been used to refer only to the first prong. *See, e.g.,* Lowenfeld, *supra,* at 322–26; Felix D. Strebel, *The Enforcement of Foreign Judgments and Foreign Public Law,* 21 LOY. L.A. INT'L & COMP. L. REV. 55, 55 (1999) ("This general refusal to recognize foreign public law in enforcement proceedings has been described as the 'public law taboo.'"). The second prong is more commonly discussed under the heading of "mandatory rules." *See, e.g.,* Rome Convention on the Law Applicable to Contractual Obligations, June 19, 1980, art. 3(3), 19 I.L.M. 1492, 1493 (1980) (referring to "rules of . . . law . . . which cannot be derogated from by contract" as "mandatory rules"). *See generally* Trevor C. Hartley, *Mandatory Rules in International Contracts: The Common Law Approach,* 266 RECUEIL DES COURS 337 (1997). The wisdom of using the same phrase to refer to these two rules is questionable, for they are quite different in both their operations and their rationales. *Cf.* McConnaughay, *supra,* at 283 ("[T]he recognition of foreign public law claims by another nation's tribunal stands on entirely different footing from the displacement of forum public law."). Even if one accepts that the public law taboo has two prongs, the reader should understand that this Article focuses entirely on the first—the nonenforcement of foreign public law—while McConnaughay is arguing only for a revival of the second. *See id.* at 290–91 (acknowledging that arguments against displacing forum public law do not apply to the recognition of foreign public law).

5. *See infra* notes 15–59 and accompanying text.

6. *See* Old N. State Brewing Co. v. Newlands Services Inc., 58 B.C.L.R.3d 144 (B.C.C.A. 1998) (Can.) (enforcing private treble damages judgment under North Carolina unfair trade practices statute and stating in dictum that private antitrust judgment would also be enforceable); SEC v. Cosby, [2000] CarswellBC 677 (B.C.S.C.) (Can.) (enforcing judgment in favor of SEC for disgorgement but stating in dictum that judgment for civil penalties would not be enforceable); Att'y Gen. of Canada v. R.J. Reynolds Tobacco Holdings, Inc., 268 F.3d 103 (2d Cir. 2001) (dismissing a suit by Attorney General of Canada under the Racketeer Influenced and Corrupt Organization (RICO) statute to recover taxes). Part IV.D. explains why each of these cases was, in fact, correctly decided.

7. *See* William S. Dodge, *Antitrust and the Draft Hague Judgments Convention,* 32 LAW POL'Y & INT'L BUS. 363, 366 (2001) [hereinafter Dodge, *Hague*]. The same applies *a fortiori* to countries other than the United States. *See id.* at 381 ("A foreign defendant is likely to have more contacts with the United States on which personal jurisdiction might be based and more assets in the United States against which a judgment might be enforced than is the case with a smaller country.").

8. These *structural* rules must be distinguished from the *substantive* rules of transnational regulation. The structural rules are concerned only with whether transnational regulation is effective and not with

This Article argues that nations should break the public law because cooperation in the enforcement of public law would be mutually beneficial. The more difficult question is which institutions within each country should be responsible for breaking the taboo. With respect to governmental claims, which would include tax law, criminal prosecutions, and the government's civil enforcement of antitrust and securities laws, the political branches should provide for the reciprocal enforcement of foreign public law through treaties, and courts should not enforce foreign public law in suits by governments in the absence of such treaties, because courts are institutionally incapable of ensuring reciprocity. With respect to private claims for damages, however, fairness requires that courts enforce foreign public law for the same reasons they enforce foreign private law. This distinction between private and governmental claims already exists in case law. Indeed, a proper reading of the precedents would never have supported extending the public law taboo to private antitrust and securities claims in the first place. Nevertheless, courts have extended the taboo to prohibit the application of foreign antitrust and securities law in suits by private parties and to bar the enforcement of foreign antitrust and securities judgments in favor of private parties.[9] Courts should break the taboo in these cases.

Part I of this Article reviews the development of the public law taboo in common law courts.[10] The taboo rests upon two independently developed and distinct rules: (1) a prohibition against enforcing foreign penal laws; and

---

the substantive content of such regulation. These structural rules may be rules of customary international law, treaty law, national law, or subnational law. *See, e.g.*, The Case of the S.S. Lotus (Fr. v. Turk.), 1927 P.C.I.J. (ser. A) No. 10 (customary international law limitations on jurisdiction to prescribe); Convention on Jurisdiction and Enforcement of Judgments in Civil and Commercial Matters, 1990 O.J. (C 189) 1, 29 I.L.M. 1413 (1990) [hereinafter Brussels Convention] (European Community treaty on judicial jurisdiction and enforcement of judgments); E.E.O.C. v. Arabian Am. Oil Co., 499 U.S. 244, 248 (1991) (presumption against extraterritorial application of federal statutes); Uniform Act, *supra* note 2 (state law rules on enforcement of foreign money judgments).

9. A number of authors have written about various components of the public law taboo, such as the rule against enforcing foreign penal laws, *see, e.g.*, Peter B. Kutner, *Judicial Identification of "Penal Laws" in the Conflict of Laws*, 31 OKLA. L. REV. 590 (1978); Robert A. Leflar, *Extrastate Enforcement of Penal and Governmental Claims*, 46 HARV. L. REV. 193 (1932), and the rule against enforcing foreign revenue laws. *See, e.g.*, William J. Kovatch, Jr., *Recognizing Foreign Tax Judgments: An Argument for the Revocation of the Revenue Rule*, 22 HOUS. J. INT'L L. 265 (2000); Barbara A. Silver, *Modernizing the Revenue Rule: The Enforcement of Foreign Tax Judgments*, 22 GA. J. INT'L & COMP. L. 609 (1992); J.G. Castel, *Foreign Tax Claims and Judgments in Canadian Courts*, 42 CAN. B. REV. 277 (1964); A.R. Albrecht, *The Enforcement of Taxation Under International Law*, 1953 BRIT. Y.B. INT'L L. 454. Several authors have also written about the non-enforcement of foreign public law more generally. *See, e.g.*, Strebel, *supra* note 4; Hans W. Baade, *The Operation of Foreign Public Law*, 30 TEX. INT'L L.J. 429 (1995); P.B. Carter, *Transnational Recognition and Enforcement of Public Foreign Laws*, 48 CAMBRIDGE L.J. 417 (1989); F.A. Mann, *The International Enforcement of Public Rights*, 19 N.Y.U. J. INT'L L. & POL. 603 (1987) [hereinafter Mann, *International Enforcement*]; George A. Bermann, *Public Law in the Conflict of Laws*, 34 AM. J. COMP. L. (Supp.) 157 (1986); Kurt Lipstein, *Conflict of Public Laws—Visions and Realities, in* FESTSCHRIFT FÜR IMRE ZAJTAY 357 (1982); Lowenfeld, *supra* note 4; Thomas B. Stoel, Jr., *The Enforcement of Foreign Non-Criminal Penal and Revenue Judgments in England and the United States*, 16 INT'L & COMP. L.Q. 663 (1967).

10. For a discussion of the public law taboo in civil-law countries, see INT'L LAW ASS'N, *Report of International Committee on Transnational Recognition and Enforcement of Foreign Public Laws, in* REPORT OF THE SIXTY-THIRD CONFERENCE 719 (1988) [hereinafter ILA REPORT].

(2) the so-called "revenue rule" barring the enforcement of foreign revenue laws. Although originally based on the supposedly local nature of crimes and on a desire to promote the enforcement of contracts, respectively, these rules came to be justified during the twentieth century on some combination of three different arguments: (1) the difficulty of applying foreign law; (2) the fear of embarrassing foreign nations; and (3) the notion that the courts of one nation should not help to advance the interests of another. Part I also looks at the distinctive treatment of foreign expropriations and at how the public law taboo came to be applied incorrectly to antitrust and securities law.

Part II turns to the treatment of the public law taboo by the political branches of government. Statutes providing for the recognition of foreign judgments in the United States and the United Kingdom, as well as treaties like the Brussels Convention, typically have excluded penal and tax judgments explicitly and have left their application to "public law" judgments (such as antitrust) unclear. However, these enactments merely reflect the judicially developed rules and do not preclude courts from deciding to recognize such judgments in the future. Part II also examines the ways in which governments have recently chipped away at the public law taboo in tax treaties, prisoner exchange treaties, and treaties for mutual legal assistance in criminal matters, demonstrating that governments do cooperate in the enforcement of foreign public law when they think it is in their interests to do so.

Part III looks critically at the reasons advanced for the taboo. The supposed difficulty of applying foreign law cannot justify the taboo because public law is not inherently more difficult to apply than private law and because this argument cannot, in any event, explain the refusal to enforce foreign public-law *judgments*. The fear of offending foreign nations cannot justify the taboo because the selective enforcement of foreign public law is probably less offensive than a refusal to enforce all foreign law and because offense could be avoided at least as effectively with a rule *requiring* enforcement of foreign public law, similar to the rule that governs foreign expropriations. Finally, Part III examines the argument that courts should not further the governmental interests of foreign countries. Courts are not justified in refusing to advance other countries' interests as a way of protecting their own nationals or their country's sovereignty, but they may be justified in doing so to promote the reciprocal enforcement of their own laws through treaties.

Part IV focuses on this reciprocity argument in greater detail. Although reciprocal enforcement of foreign public law would benefit all nations, it is generally better for the political branches to achieve cooperation through treaties than for the courts to attempt it. Judges are trapped in a "prisoner's dilemma." They cannot ensure that other countries will cooperate and, if judges cooperate in the absence of a treaty, they will undercut the bargaining positions of their own governments. Judges should, however, enforce

foreign public law in suits by private parties because fairness requires that the interests of private parties in obtaining compensation not be held hostage to the government's interest in promoting reciprocity. Finally, Part IV applies these principles to some recent problems that have confronted U.S. and foreign courts,[11] attempting to distinguish in each case what judges should do from what the political branches should do.

## I. Judicial Development of the Public Law Taboo

The public law taboo was developed by courts,[12] and the purpose of this Part is to sketch its history, its scope, and the reasons that courts have given to support the taboo. The public law taboo developed from two rules that were quite distinct historically: (1) a rule against enforcing foreign penal laws; and (2) the "revenue rule" barring enforcement of foreign revenue laws. These rules have proved more durable than their rationales. They were originally based on the local nature of crimes and on a desire to enforce contracts that violated foreign customs laws, respectively, but they have been defended more recently with three new justifications: administrative difficulties, a fear of offending other nations, and sovereignty.[13]

It is also important to note that the scope of the public law taboo is limited. The prohibition against applying foreign penal law and (if it exists) the prohibition against applying foreign public law come into play only when a suit is brought by the government.[14] These prohibitions should not apply to private plaintiffs bringing suit under antitrust or securities laws to recover damages, even treble damages, although many courts mistakenly have extended the taboo to such cases.

### A. Penal Laws

In 1825, Chief Justice Marshall wrote in *The Antelope*: "The Courts of no country execute the penal laws of another . . . ."[15] This quotation has been the standard citation in both English[16] and American[17] cases ever since. *The Antelope* did not involve a criminal prosecution, but rather the question of whether slaves on ships seized by the United States should be returned to Spanish and Portuguese slave traders. It was in rejecting the argument that the Court should enforce the Spanish and Portuguese governments' declarations against the slave trade that Marshall made his famous statement.[18]

---

11. *See supra* note 6 and accompanying text.
12. The civil law systems of Continental Europe also experienced development of the taboo through the courts. Baade, *supra* note 9, at 482.
13. Part III critiques these reasons.
14. The revenue rule is also consistent with this line between public and private plaintiffs, since private parties do not enforce tax laws, at least not for their own benefit.
15. 23 U.S. (1 Wheat.) 66, 123 (1825).
16. *See, e.g.*, Huntington v. Attrill, [1893] A.C. 150, 156 (P.C. 1892).
17. *See, e.g.*, Huntington v. Attrill, 146 U.S. 657, 666 (1892).
18. For further discussion of *The Antelope*'s context, see Mark W. Janis, *The Recognition and Enforcement*

The prohibition against enforcing foreign penal law is older than *The Antelope*, however. Justice Story[19] traces the principle to Chief Justice De Grey's statement in *Rafael v. Verelst* that "[c]rimes are in their nature local, and the jurisdiction of crimes is local"[20] and the articulation of the prohibition to *Folliott v. Ogden*[21] and *Wolff v. Oxholm*.[22] At issue in both *Folliott* and *Wolff* were statutes (of New York and Denmark, respectively) confiscating the property of British subjects during wartime and the effect such statutes should have in subsequent civil suits between private parties. Though neither case involved a criminal prosecution, the opinions in *Folliott* and *Wolff* make clear that the decisions rest on the principle that the jurisdiction of crimes is local.[23]

### 1. Criminal Laws

The hard core of the "penal laws" prohibition is the notion that one nation will not enforce the criminal laws of another.[24] The reasons for this prohibition are largely historical, having to do with the medieval idea that a community was directly responsible for offenses committed within its borders and with the origin of the jury as a body of men who would decide cases on the basis of their knowledge of the facts and their sense of the community.[25] The prohibition against applying foreign criminal law has largely

---

*of Foreign Law:* The Antelope's *Penal Law Exception*, 20 INT'L LAW. 303 (1986).

19. *See* JOSEPH STORY, COMMENTARIES ON THE CONFLICT OF LAWS § 620 (1834).

20. 96 Eng. Rep. 621, 622 (K.B. 1776).

21. Folliott v. Ogden, 126 Eng. Rep. 75 (Ct. Com. Pl. 1789), *aff'd*, Ogden v. Folliott, 100 Eng. Rep. 825 (Ch. 1790).

22. Wolff v. Oxholm, 105 Eng. Rep. 1177 (K.B. 1817).

23. *See Folliott*, 126 Eng. Rep. at 82 ("The penal laws of foreign countries are strictly local, and affect nothing more than they can reach and can be seized by virtue of their authority . . . ."); *Wolff*, 105 Eng. Rep. at 1180 ("[N]o country regards the penal laws of another . . . . The penal laws of foreign countries are strictly local, and affect nothing more than they can reach and what can be seized by virtue of their authority . . . ."); *see also* Huntington v. Attrill, [1893] A.C. 150, 156 (P.C. 1892) ("The rule has its foundation in the well-recognized principle that crimes, including in that term all breaches of public law punishable by pecuniary mulct or otherwise, at the instance of the State Government, or of some one representing the public, are local in this sense, that they are only cognizable and punishable in the country where they were committed."); Huntington v. Attrill, 146 U.S. at 669 ("'Crimes are in their nature local, and the jurisdiction of crimes is local.'" (quoting Rafael v. Verelst, 96 Eng. Rep. 621, 622 (K.B. 1776)). Mark Janis views *Folliott* and *Wolff* as motivated by a selfish desire to protect local citizens, and therefore tries to distance Chief Justice Marshall's statement in *The Antelope* from them. *See* Janis, *supra* note 18, at 305–08. Justice Story, however, traces *The Antelope's* rule to *Folliott* and *Wolff*, *see* STORY, *supra* note 19, at §§ 620–21, and Justice Story was sitting on the Supreme Court when *The Antelope* was decided.

24. Even with respect to criminal law, some early writers held that "crimes committed in one state, may, if the criminal is found in another state, be upon demand punished there." STORY, *supra* note 19, at § 625 (citing Hertius and Paul Voet). Justice Story suggests that if a country were willing to punish offenses committed by foreigners in foreign countries, the law of the place of the offense should govern: *"Delicta puniuntur juxta mores loci commissi delicti, et non loci, ubi de crimine cognoscitur."* ("Crimes are punished in accordance with the customs of the place where the crime was committed, and not the place where the crime is tried."). *Id.*

25. Leflar, *supra* note 9, at 198; Albert Levitt, *Jurisdiction Over Crimes*, 16 J. CRIM. L. & CRIMINOLOGY 316, 326–27 (1925).

been unproblematic because of the possibility of extradition.[26] Rather than apply foreign criminal law, a nation may extradite the accused for trial and punishment in the nation where the crime occurred.

### 2. Civil "Penal" Laws

The prohibition against enforcing foreign penal laws has long been extended to civil sanctions deemed to be "penal." Indeed, none of the early cases that articulated the rule—*Folliott, Wolff, The Antelope*—involved a criminal prosecution.[27] Because extradition is not available for a civil suit, a defendant may escape liability under foreign law if that law is deemed penal.

It has been important, therefore, to determine which laws are "penal" and which are not. In *Wisconsin v. Pelican Insurance Co.*, the U.S. Supreme Court held that a state court judgment imposing penalties for not making returns to the Wisconsin insurance commissioner was penal and could not be enforced in federal court. Justice Gray wrote that the prohibition against enforcing foreign penal laws "applies, not only to prosecutions and sentences for crimes and misdemeanors, but to all suits in favor of the State for the recovery of pecuniary penalties for any violation of statutes for the protection of its revenue, or other municipal laws, and to all judgments for such penalties."[28] Five years later, in *Huntington v. Attrill*, the Court held that a New York judgment in favor of a corporation's creditor against one of its directors for filing a false certificate with the state was not penal and could therefore be enforced in Maryland.[29] Justice Gray acknowledged that the New York law might be considered "penal" in one sense because it "imposes a burdensome liability on the officers [of a corporation] for their wrongful act,"[30] but the critical question was whether a law "which in some aspects may be called penal, is a penal law *in the international sense*, so that it cannot be enforced in the courts of another State."[31] That, Gray concluded, depended on "whether its purpose is to punish an offense against the public justice of the State, or to afford a private remedy to a person injured by the wrongful act."[32] The New York statute was not penal but remedial because "it gives a civil remedy, at the private suit of the creditor only, and measured by the amount of his debt."[33]

---

26. *See* Leflar, *supra* note 9, at 200–01; *see also* Arthur T. von Mehren & Donald T. Trautman, *Recognition of Foreign Adjudications: A Survey and a Suggested Approach*, 81 HARV. L. REV. 1601, 1671 (1968).

27. *See supra* notes 15–23 and accompanying text.

28. Wisconsin v. Pelican Ins. Co., 127 U.S. 265, 290 (1888). One can see in Justice Gray's reference to "statutes for the protection of its revenue" a blending of the prohibition against enforcing penal laws and the prohibition against enforcing revenue laws, discussed below. *Id.*

29. 146 U.S. 657 (1892).

30. *Id.* at 676. For this reason, he suggested, the New York law might be strictly construed. *Id.*

31. *Id.* at 673 (emphasis added).

32. *Id.* at 673–74.

33. *Id.* at 676.

Thus, under *Huntington* and *Pelican Insurance*, an action or judgment would not be considered penal unless it was brought "in the name of the state,"[34] though "actions by a common informer . . . to recover a penalty . . . may stand on the same ground as suits brought for such a penalty in the name of the state."[35] Furthermore, to be penal, the purpose of the law would have to be "to punish an offence against the public justice of the state" rather than "to afford a private remedy to a person injured by the wrongful act."[36] Thus, even the state might not be barred from bringing suit "to enforce demands of a strictly civil nature."[37] Finally, an action by or judgment in favor of a private party would not be considered "penal" if it were "measured by the amount of his debt,"[38] although the Court noted with approval prior American decisions holding that double damages were not "penal,"[39] suggesting that judgments for multiple and punitive damages should be enforceable so long as they are recovered by the injured party.

The Judicial Committee of the Privy Council reached the same conclusions about the scope of the prohibition against enforcing penal laws in a case of the same name, which arose from Huntington's attempts to enforce his judgment in Ontario:

> A proceeding, in order to come within the scope of the rule, must be in the nature of a suit in favour of the State whose law has been infringed . . . . Penalties may be attached to [municipal statutes for the regulation of trade], but that circumstance will not bring them within the rule, except in cases where these penalties are recoverable at the instance of the State, or of an official duly authorized to prosecute on its behalf, or of a member of the public in the character of a common informer.[40]

Like Justice Gray, Lord Watson acknowledged that the provisions of the New York law might be considered penal because "[t]hey impose heavy liabilities upon directors, in respect of failure to observe statutory regulations for the protection of persons who have become or may become creditors of the corporation."[41] He went on to assert, however: "[I]n so far as they concern creditors, these provisions are in their nature protective and remedial."[42]

---

34. Wisconsin v. Pelican Ins. Co., 127 U.S. 265, 299 (1888).

35. Huntington v. Attrill, 146 U.S. 657, 673 (1892).

36. *Id.* at 673–74; *see also Pelican*, 127 U.S. at 299 (holding that a judgment was penal because "[t]he cause of action was not any private injury, but solely the offense committed against the state by violating her law").

37. *Pelican*, 127 U.S. at 290.

38. *Huntington*, 146 U.S. at 676.

39. *Id.* at 668.

40. Huntington v. Attrill, [1893] A.C. 150, 157–58 (P.C. 1892) (appeal taken from Ontario).

41. *Id.* at 159.

42. *Id.*

Over the last 100 years or so, courts in the United States, England, and other common law jurisdictions have tended to conform to the relatively narrow definition of the penal laws prohibition set forth in these cases.[43] So long as the plaintiff is a private party seeking damages for an injury, an action will not be barred as penal even if the statute creating the liability is a criminal statute[44] or if the damages are awarded to the plaintiff by a criminal court during the course of a criminal proceeding.[45] Similarly, the fact that the amount of liability may exceed the plaintiff's actual loss is not sufficient to make an action or judgment "penal." Thus, Death Acts that established liability not on the basis of the injury to the victim but in a fixed amount or based upon the culpability of the defendant have been held not to be penal.[46] Justice Gray's opinion in *Huntington* strongly suggested that multiple damages are not "penal,"[47] and subsequent cases have held that neither multiple nor punitive damages fall within the prohibition.[48] On the other hand, recent cases have reiterated that where the state—rather than a private plaintiff—brings a civil action for the purpose of punishment or to secure compliance with its criminal law, the judgment is penal and unenforceable. Thus, the Irish High Court in *Larkins v. National Union of Mine Workers* has refused to sequester the assets of a labor union held in civil contempt by an English court,[49] and an English court has held that the United States could not enforce a civil judgment on an appearance bond against a criminal defendant who fled to England.[50]

---

43. For previous discussions of cases applying the prohibition against enforcing penal laws, see generally Kutner, *supra* note 9; Leflar, *supra* note 9, at 197, 203–16.

44. Mexican Nat'l R.R. Co. v. Slater, 115 F. 593, 602–03 (5th Cir. 1902), *aff'd*, 194 U.S. 120 (1904) ("The statutes of Mexico creating the plaintiffs' right place the acts and omissions charged against the defendant to support their claim of right in the class of negligent crimes; but it cannot be contended that the act belongs to that class of criminal laws which can only be enforced by the courts of the country where the offense was committed, for it gives a civil action to recover damages for a civil injury.").

45. Raulin v. Fischer, [1911] 2 K.B. 93, 98–100 (holding that damages for criminal negligence awarded by a criminal court may be "separated from the rest of the judgment" and enforced); Chase Manhattan Bank v. Hoffman, 665 F. Supp. 73, 75–76 (D. Mass. 1987) (applying Massachusetts Uniform Foreign Money-Judgments Recognition Act, Mass. Gen. Laws ch. 235, § 23A (2000)) (holding that an award of civil damages was remedial despite the fact that the Belgian proceeding was primarily criminal).

46. *See* Atchison, Topeka & Sante Fe Ry. Co. v. Nichols, 264 U.S. 348 (1924) (holding that a New Mexico statute fixing liability of railroads for wrongful death at $5,000 was not penal); Loucks v. Standard Oil Co. of N.Y., 120 N.E. 198 (N.Y. 1918) (holding that a Massachusetts statute fixing liability for wrongful death at $500 to $10,000 depending on the defendant's culpability was not penal). For a more extensive discussion of the Death Acts, see Leflar, *supra* note 9, at 206–09.

47. Huntington v. Attrill, 146 U.S. 657, 668 (1892); *see supra* note 39 and accompanying text.

48. *See* Old N. State Brewing Co. v. Newlands Serv. Inc., 58 B.C.L.R.3d 144 (B.C.C.A. 1998) (Can.) (enforcing U.S. judgment for treble and punitive damages under North Carolina deceptive trade practices statute); S.A. Consortium Gen. Textiles v. Sun & Sand Agencies, [1978] 1 Q.B. 279, 299–300 (C.A.) (Lord Denning) ("The word 'penalty' in the [Foreign Judgments (Reciprocal Enforcement) Act] means, I think, a sum payable to the state by way of punishment and not a sum payable to a private individual, even though it is payable by way of exemplary damages."); Rosencrantz v. Union Contractors Ltd., 23 D.L.R.2d 473 (B.C.S.C. 1960) (Can.) (holding that Washington usury law providing for penalty of twice usurious interest rate was enforceable).

49. [1985] I.R. 671 (Ir. H. Ct.).

50. United States v. Inkley, [1989] 1 Q.B. 255, 265 (C.A. 1988) ("[T]he whole purpose of the bond

## B. *Revenue Laws*

The revenue rule, under which courts will refuse to enforce the revenue laws of another nation, is usually traced to Lord Mansfield's statement in *Holman v. Johnson* that "no country ever takes notice of the revenue laws of another."[51] The original purpose of the rule was to promote commerce by enforcing contracts that violated foreign customs laws. Although the verbal formulation of the revenue rule remained the same, the content of the rule changed dramatically during the twentieth century. Today it is applied to bar foreign governments from enforcing their tax laws and tax judgments, while contracts that violate foreign import and export restrictions are frequently declared void. The rationale for the rule also changed—from promoting commerce to some combination of sovereignty, avoiding offense to foreign nations, and administrative difficulties.

### 1. *Commercial Origins of the Revenue Rule*

The rule against enforcing foreign revenue laws developed in contract cases where the defendant raised foreign export, customs, or stamp laws as a defense. In *Holman*, for example, the plaintiff sold tea in France to the defendant, who intended to smuggle it into England. When the plaintiff sued for payment, the defendant argued that the contract was unenforceable because it violated the laws of England. Lord Mansfield held for the plaintiff, reasoning that the contract was governed by French law and that a French court would not allow a defense based on the English statute, "[f]or no country ever takes notice of the revenue laws of another."[52] Lord Mansfield repeated this phrase a few years later in rejecting an insurer's defense that a shipping declaration was fraudulently designed to avoid French taxes.[53]

The commercial origins of the revenue rule are even more apparent in an earlier case, *Boucher v. Lawson.*[54] The plaintiff contracted with the defendant to ship gold from Portugal to England in violation of Portuguese export

---

was to ensure, so far as it was possible, the presence of the executor of the bond to meet justice at the hands of the state in a criminal prosecution.").

51. 98 Eng. Rep. 1120, 1121 (K.B. 1775). *See, e.g.*, British Columbia v. Gilbertson, 597 F.2d 1161, 1164 (9th Cir. 1979) ("Lord Mansfield is generally credited as being the first to express the revenue rule.").

52. 98 Eng. Rep. at 1121.

53. Planche v. Fletcher, 99 Eng. Rep. 164, 165 (K.B. 1779) ("But, at any rate, this was no fraud in this country. One nation does not take notice of the revenue laws of another."). English courts soon recognized an exception to the revenue rule, holding that if, under the foreign law governing a contract, the contract required a stamp to be valid, the absence of a stamp would render the contract unenforceable in England. *See* Alves v. Hodgson, 101 Eng. Rep. 953 (K.B. 1797). *But see* Ludlow v. Van Rensselaer, 1 Johns. 94 (N.Y. 1806) (holding that French stamp not necessary for note to be enforceable in New York); Beadall v. Moore, 191 N.Y.S. 826 (N.Y. App. Div. 1922) (holding that promissory note was enforceable in New York court despite fact that English stamp tax not paid). However, the lack of a foreign stamp would not render evidence inadmissible, since matters of evidence were governed by the law of the forum. *See* James v. Catherwood, 3 Dowl. & Ry. 190 (K.B. 1823) (Eng.); Bristow v. Sequeville, 155 Eng. Rep. 118 (Ex. 1850).

54. 95 Eng. Rep. 53 (K.B. 1734).

HeinOnline -- 43 Harv. Int'l L.J. 170 2002

laws. The defendant refused to deliver up the gold in England and pleaded the Portuguese law as a defense, but Lord Hardwicke rejected the argument:

> But if it should be laid down, that because goods are prohibited to be exported by the laws of any foreign country from whence they are brought, therefore the parties should have no remedy or action here, it would cut off all benefit of such trade from this kingdom, which would be of very bad consequence to the principal and most beneficial branches of our trade . . . .[55]

At the time these cases were decided, most nations imposed export restrictions, customs laws, and stamp duties to further their mercantilist interests.[56] Although England itself imposed such taxes, invalidating contracts on the basis of similar foreign laws would have fallen particularly hard on a great trading nation like England. As Lord Chancellor Cottenham subsequently explained, "[d]uring the French war the greater part of the foreign trade of this country was carried on in despite of the fiscal regulations of other countries."[57]

Although the English refusal to void contracts on the basis of such laws may have been understandable, that did not immunize the practice from criticism. Discussing the revenue rule in his *Commentaries on the Conflict of Laws*, Justice Story wrote:

> Unfortunately, from a very questionable subserviency to mere commercial gains, it has become an established formulary of the jurisprudence of the common law, that no nation will regard or enforce the revenue laws of any other country; and that the contracts of its own subjects, made to evade or defraud the laws or just rights of foreign nations, may be enforced in its own tribunals. Sound morals would seem to point to a very different conclusion.[58]

---

55. *Id.* at 55–56.

56. *See* Bermann, *supra* note 9, at 181 (noting that "eighteenth-century English opinions reflect[ed] that period of intense commercial competition among nations"); Castel, *supra* note 9, at 277 (noting that *Holman* was decided "in an era of virulent commercial rivalry, political nationalism and international suspicion"); Recent Case, 77 Harv. L. Rev. 1327, 1328 (1964) ("The rule arose when revenue laws were considered inherently repressive and, in an age of intense commercial rivalry, the rule was employed to enforce private commerce contracts that foreign revenue provisions, were they applied, would render invalid.").

57. Sharp v. Taylor, 41 Eng. Rep. 1153, 1159 (Ch. 1849) (holding that the false registration of a ship under American law would not bar lawsuit in English court between two English partners).

58. Story, *supra* note 19, § 245 (citing *Boucher v. Lawson*). *See also* The Anne, 1 F. Cas. 955, 956 (C.C.D. Mass. 1818) (No. 412) (Story, J.) ("It has appeared to me more consonant with national comity, sound morals, and public justice, that courts of all countries should lend their aid to discountenance frauds upon the revenue laws of other countries, and decline to enforce any agreements entered into for the purpose of evading those laws.").

Story concluded, however, that the revenue rule seemed "firmly established in the actual practice of modern nations . . . too firmly, perhaps, to be shaken except by some Legislative Act abolishing it."[59]

### 2. Modern Application to Foreign Taxes

Application of the revenue rule to bar a foreign government from collecting its taxes occurred without much thought. The first such case was *Municipal Council of Sydney v. Bull*,[60] which rejected an attempt by Sydney, Australia to collect property tax assessments in an English court:

> The action is in the nature of an action for a penalty or to recover a tax; it is analogous to an action brought in one country to enforce the revenue laws of another. In such cases it has always been held that an action will not lie outside the confines of the last-mentioned State.[61]

In fact, it had *never* been held that one country could not use the courts of another to collect its taxes, but English courts reached the same result in subsequent cases, with reasoning that was similarly conclusory.[62]

At the same time, courts in the United States began to reject efforts by their sister states to collect taxes.[63] While they invoked the revenue rule, these courts reinforced the rule with two additional supports. The first was Justice Gray's dictum from *Pelican Insurance* linking the revenue rule to the well-established prohibition against enforcing foreign penal laws.[64] The second was the notion, taken from *Pennoyer v. Neff*,[65] that extraterritorial regulation violated the due process clause of the U.S. Constitution.[66] Beyond the

---

59. STORY, *supra* note 19, § 257.

60. [1909] 1 K.B. 7 (1908). Two earlier cases are sometimes cited. In *Attorney-General for Canada v. William Schulze & Co.*, 9 S.L.T. 4 (1901) (Scot.), Canada sought to recover a judgment for costs in a Canadian customs suit (but not for the customs duties themselves). In *Henry v. Sargeant*, 13 N.H. 321 (1843), the court suggested in dictum that New Hampshire would not allow Vermont to sue in its courts to collect taxes assessed in Vermont, but distinguished that situation from the case at the bar. *Id.* at 332. Another intriguing case that is often ignored is *Att'y Gen. v. Lutwydge*, 145 Eng. Rep. 674 (Ex. 1729), in which the government of the United Kingdom apparently sued to collect Scottish taxes in an English court. The court observed that "[b]efore the union [with Scotland] this court had no jurisdiction of the revenues in Scotland" but left open the question of whether the union had changed that jurisdiction. *Id.* at 674.

61. [1909] 1 K.B. at 12.

62. *See* King of the Hellenes v. Brostrom, 16 Lloyd's List L. Rep. 190, 193 (1923) (Eng.) ("It is perfectly elementary that a foreign government cannot come here—nor will the Courts of other countries allow our Government to go there—and sue a person found in that jurisdiction for taxes levied and which he is declared to be liable to in the country to which he belongs."); The Queen of Holland v. Drukker (*In re* Visser), [1928] 1 Ch. 877, 882 (Eng.) ("[S]ince the time of Lord Hardwicke, the judges have . . . repeatedly said that the Courts of this country do not take notice of the revenue laws of foreign States.").

63. *Maryland v. Turner*, 132 N.Y.S. 173 (Sup. Ct. 1911), appears to be the first such case, although *Colorado v. Harbeck*, 133 N.E. 357 (N.Y. 1921), soon became the leading one.

64. *See Turner*, 132 N.Y.S. at 175 (quoting Wisconsin v. Pelican Ins. Co., 127 U.S. 265, 290 (1888)).

65. 95 U.S. 714 (1877).

66. *See Harbeck*, 133 N.E. at 359.

citation of these authorities, no U.S. case tried to explain why the revenue rule should be extended to bar one state from collecting its taxes in the courts of another until Learned Hand's opinion in *Moore v. Mitchell*.[67]

Hand first noted the prohibition against enforcing foreign penal laws, which, "[i]n some few cases . . . has been extended to include revenue laws as well."[68] He then offered the following explanation of the rules for both penal and revenue laws:

> While the origin of the exception in the case of penal liabilities does not appear in the books, a sound basis for it exists, in my judgment, which includes liabilities for taxes as well. Even in the case of ordinary municipal liabilities, a court will not recognize those arising in a foreign state, if they run counter to the 'settled public policy' of its own. Thus a scrutiny of the liability is necessarily always in reserve, and the possibility that it will be found not to accord with the policy of the domestic state. This is not a troublesome or delicate inquiry when the question arises between private persons, but it takes on quite another face when it concerns the relations between the foreign state and its own citizens or even those who may be temporarily within its borders. To pass upon the provisions for the public order of another state is, or at any rate should be, beyond the powers of a court; it involves the relations between the states themselves, with which courts are incompetent to deal, and which are intrusted to other authorities. It may commit the domestic state to a position which would seriously embarrass its neighbor. Revenue laws fall within the same reasoning; they affect a state in matters as vital to its existence as its criminal laws. No court ought to undertake an inquiry which it cannot prosecute without determining whether those laws are consonant with its own notions of what is proper.[69]

In short, Hand thought it was safer to refuse enforcement of important foreign laws altogether than to risk having to declare them contrary to public policy, which might offend a foreign state. Deferring for the moment an evaluation of Hand's arguments,[70] one should note that his rationale differed completely from those on which the prohibitions against enforcing foreign penal and revenue laws had traditionally been based: that is, the local nature of criminal actions[71] and inconvenience of allowing foreign revenue laws to invalidate contracts.[72]

Within just a few years, the U.S. Supreme Court rejected Hand's argument in *Milwaukee County v. M.E. White Co.*, holding that states were

---

67. 30 F.2d 600, 603–04 (2d Cir. 1929) (L. Hand, J., concurring), *aff'd on other grounds*, 281 U.S. 18 (1930).

68. *Id.* at 603 (L. Hand, J., concurring).

69. *Id.* at 604 (L. Hand, J., concurring).

70. *See infra* Part III.B.

71. *See supra* notes 19–25 and accompanying text.

72. *See supra* notes 52–59 and accompanying text.

obliged by the Full Faith and Credit Clause of the Constitution to enforce each other's judgments for taxes.[73] Where Hand had feared that one state might have to declare another's tax laws contrary to its own public policy, Justice Stone declared that "no state can be said to have a legitimate policy against payment of its neighbor's taxes."[74] Although Justice Stone left open the question whether a state would be required to entertain an action to determine liability under another state's tax law, as opposed to merely enforcing another state's judgment for taxes,[75] a number of jurisdictions have followed the tenor of his decision and have permitted such actions.[76]

Despite this strong repudiation of Hand in the interstate context, his opinion in *Moore* has continued to find favor in the international context with Irish, English, Canadian, and even American courts. In *Peter Buchanan Ltd. v. McVey*, an Irish court rejected a suit by the liquidator of a Scottish company to recover taxes owed to the Scottish government, calling Hand's justification for the revenue rule "convincing and illuminating."[77] A few years later, in *Government of India v. Taylor*,[78] the House of Lords held that India could not enforce a judgment for capital gains taxes against the assets of a liquidated company in England. Viscount Simonds acknowledged that in *Holman*, "Lord Mansfield was not directly concerned with the case of a foreign power suing in an English court to recover revenue,"[79] but sustained the rule on the authority of Lord Mansfield and the various cases that had repeated his words ever since.[80] Lord Keith argued that there were, in fact, two justifications for the rule. The first was based on sovereignty: "that enforcement of a claim for taxes is but an extension of the sovereign power

---

73. 296 U.S. 268, 279 (1935). Justice Stone's opinion did not mention Hand by name, but it summarized his argument on which the appellee had apparently relied:

> But it is insisted that to this rule taxing statutes constitute an exception analogous to that relating to penal laws, because the courts of one state should not be called upon to scrutinize the relations of a foreign state with its own citizens, such as are involved in its revenue laws, and thus commit the state of the forum to positions which might be seriously embarrassing to itself or its neighbors.

*Id.* at 274–75 (citations and footnotes omitted).

74. *Id.* at 277.

75. *Id.* at 275.

76. *See, e.g.*, Oklahoma ex rel. Oklahoma Tax Comm'n v. Neely, 282 S.W.2d 150 (Ark. 1955); City of Detroit v. Gould, 146 N.E.2d 61 (Ill. 1957); Ohio ex rel. Duffy v. Arnett, 234 S.W.2d 722 (Ky. 1950); State ex rel. Oklahoma Tax Comm'n v. Rodgers, 193 S.W.2d 919 (Mo. Ct. App. 1946); State Tax Comm'n v. Cord, 404 P.2d 422 (Nev. 1965); Buckley v. Huston, 291 A.2d 129 (N.J. 1972); Nelson v. Minnesota Income Tax Div., 429 P.2d 324 (Wyo. 1967).

77. [1954] I.R. 89, 106 (Ir. H. Ct. 1950), *aff'd*, [1954] I.R. 110 (Ir. S.C. 1951). That the suit before the court was brought not by the Scottish government but by a liquidator made no difference.

> [E]nforcement must not depend merely on the form in which the claim is made . . . . In every case the substance of the claim must be scrutinised and if it then appears that it is really a suit brought for the purpose of collecting the debts of a foreign revenue it must be rejected.

*Id.* at 107.

78. [1955] A.C. 491 (H.L.).

79. *Id.* at 504 (Viscount Simonds); *see also* Comm'r of Taxes v. McFarland, [1965] 1 SA 470, 472 (Witwatersrand Local Div. 1964) (S. Afr.) (dismissing the revenue rule's commercial origin as "no more than an accident of birth").

80. *Taylor*, [1955] A.C. at 503–07 (Viscount Simonds).

which imposed the taxes, and that an assertion of sovereign authority by one State within the territory of another . . . is . . . contrary to all concepts of independent sovereignties."[81] The second justification was Judge Hand's explanation that scrutiny of a foreign revenue law might offend the foreign state.[82] To these, Lord Somervell added a third justification based on administrative burdens: "If one considers the initial stages of the process, which may . . . be intricate and prolonged, it would be remarkable comity if State B allowed the time of its courts to be expended in assisting in this regard the tax gatherers of State A."[83] Lord Somervell acknowledged that "[o]nce a judgment has been obtained and it is a question only of its enforcement the factor of time and expense will normally have disappeared."[84] Yet despite the fact that India was seeking only to enforce a judgment, Lord Somervell voted to deny the claim.[85] *Taylor* not only provided the House of Lords' stamp of approval to using the revenue rule to bar a foreign government from collecting its taxes, but also added two justifications for this prohibition (sovereignty and administrative difficulties) to the one already articulated by Hand.[86]

The Supreme Court of Canada followed the House of Lords' lead in *United States v. Harden*, refusing to enforce a U.S. tax judgment and relying on all three of the rationales (sovereignty, offense, and administrative difficulty) articulated in *Taylor*.[87] That same year, a South African court faced with a Rhodesian tax judgment reviewed the rationales more critically. In response to Judge Hand's argument, the court observed: "One would have thought that it is public policy that persons should pay their taxes and not evade such payment by escaping the country which imposed them."[88] In response to arguments about administrative difficulties, it noted that "[t]here may be difficulty in interpreting foreign revenue laws but such difficulties are met with in relation to other foreign laws with which the Courts have on occasion to grapple."[89] Lord Keith's sovereignty explanation, however, was "fundamental and unexceptionable":[90]

> Just as one State cannot send its police force into another State so also it cannot send its tax-gatherers. To allow a foreign State, whether directly or indirectly, to obtain a judgment for taxes . . . in the Courts of another country, would be a judicial intervention in direct derogation of

---

81. *Id.* at 511 (Lord Keith of Avonholm).
82. *Id.* (Lord Keith of Avonholm) (quoting Moore v. Mitchell, 30 F.2d 600, 604 (2d Cir. 1929) (L. Hand, J., concurring)).
83. *Id.* at 514 (Lord Somervell of Harrow).
84. *Id.* (Lord Somervell of Harrow).
85. *Id.* (Lord Somervell of Harrow) ("The principle remains. The claim is one for a tax.").
86. Part III considers each of these justifications.
87. 41 D.L.R.2d 721, 724–26 (Sup.Ct. 1963) (Can.).
88. Comm'r of Taxes v. McFarland, [1965] 1 SA 470, 473 (Witwatersrand Local Div. 1964) (S. Afr.).
89. *Id.*
90. *Id.*

that country's territorial supremacy. . . . [S]uch an inroad can only be justified by custom or by some special agreement. The latter is the function of the Executive power.[91]

When the question finally reached U.S. courts, the Ninth Circuit found that Judge Hand's opinion in *Moore* "best expressed the purpose behind the revenue rule" and rejected a Canadian attempt to enforce a tax judgment in *British Columbia v. Gilbertson*.[92] Judge Anderson also noted that enforcing the Canadian tax judgment "would have the effect of furthering the governmental interests of a foreign country, something which our courts customarily refuse to do,"[93] that the tax treaty between the United States and Canada did not abolish the revenue rule,[94] and that there would be a lack of reciprocity because Canadian courts had refused to enforce U.S. tax judgments.[95] Thus, it is well-established today that one nation may not enforce a tax claim or judgment directly in another nation's courts—because of a reluctance to scrutinize the foreign tax law, sovereignty concerns, administrative difficulties, or some combination of these reasons.

### 3. Indirect Enforcement of Tax Laws

Some interesting issues have arisen, however, in cases involving the *indirect* enforcement of foreign tax laws. We have already seen that the Irish court in *Peter Buchanan Ltd. v. McVey* denied enforcement in a suit brought not directly by the government but by a liquidator to recover assets to satisfy tax claims, reasoning that a court must look to the substance rather than the form of the claim.[96] Other courts have followed *Buchanan*.[97] Some courts have, however, been willing to disregard the revenue rule where applying it would subject a trustee to liability[98] or prejudice the rights of non-

---

91. *Id.* at 474.

92. 597 F.2d 1161, 1164 (9th Cir. 1979).

93. *Id.* at 1165.

94. *Id.* For more on the treatment of the revenue rule in tax treaties generally and Canada in particular, see *infra* Part II.C.

95. *Gilbertson*, 597 F.2d at 1166 (citing United States v. Harden, 41 D.L.R.2d 721 (Sup. Ct. 1963) (Can.)). Judge Anderson's points about furthering the governmental interests of foreign nations and reciprocity have much in common with Lord Keith's sovereignty argument. Part III.C. deals with all three arguments together.

96. [1954] I.R. 89, 107 (Ir. H. Ct. 1950), *aff'd*, [1954] I.R. 110 (Ir. S.C. 1951); *see supra* note 77.

97. *See* Qrs 1 Aps v. Fransden, [1999] 1 W.L.R. 2169 (C.A.) (Eng.) (denying request of Danish company in liquidation for restitution from former owner to be used to satisfy Danish tax claims); Re Reid, 17 D.L.R.3d 199, 205 (B.C.C.A. 1970) (Can.) (holding that executor who had paid English taxes on behalf of an estate was entitled to indemnification from assets of the estate in British Columbia. *But see* Stringam v. Dubois, 135 A.R. 64, ¶ 40 (Alta. C.A. 1992) (Can.) (disagreeing with *Reid* and refusing to enforce judgment for U.S. estate taxes on Canadian property, even though U.S. executor might otherwise be liable for them).

98. *See* Re Lord Cable, [1977] 1 W.L.R. 7, 23–26 (Ch. 1976) (Eng.) (refusing to enjoin trustees from remitting the proceeds of a trust to India in compliance with Indian exchange controls where failure to do so could result in serious penalties for the trustees); Bath v. British and Malayan Trustee Ltd. 90 N.S.W.W.N. (pt. 1) 44 (N.S.W. 1969) (Austl.) (appointing administrator to prevent transfer of assets out of Australia at the behest of the executor to satisfy Singapore taxes).

governmental creditors.[99] In a different sort of indirect enforcement action, where governments have attempted to levy a taxpayer's assets held by a third party, courts have applied the revenue rule and have ordered the third party to return the assets to the taxpayer.[100]

Finally, U.S. courts have recently had to face the question whether defendants allegedly involved in smuggling cigarettes into Canada could be tried or sued in U.S. court not under Canadian law but under U.S. law. In *United States v. Boots*[101] and *United States v. Trapilo*,[102] defendants were indicted under the federal wire fraud statute[103] for engaging in a scheme to defraud the Canadian government of tax revenue. The First Circuit applied the revenue rule and reversed the convictions, reasoning that the prosecution "would amount functionally to penal enforcement of Canadian customs and tax laws."[104] The Second Circuit, however, allowed similar prosecutions to go forward, reasoning that because the wire fraud statute punishes a scheme to defraud, not its success, "there is no obligation to pass on the validity of Canadian revenue law, and the common law revenue rule is not properly implicated."[105] In addition to these criminal cases, the Canadian Attorney General brought a civil RICO suit against a cigarette manufacturer for allegedly conspiring to smuggle cigarettes into Canada.[106] The Second Circuit held that this suit was barred by the revenue rule, reasoning that "Canada's object is clearly to recover allegedly unpaid taxes."[107] Today, therefore, the revenue rule appears to bar some, but not all, indirect enforcement of foreign taxes.

---

99. *See, e.g.*, Ayres v. Evans, 39 A.L.R. 129, 131, 140 (Fed. Ct. Austl. 1981) (Can.); [1985] 3 SA 955, 959 (Transvaal Prov. Div.); *see also* Re Sefel Geophysical Ltd., 54 (4th) 117, 126 (Alb. Q.B. 1988) (Can.) (rejecting *Taylor* as inconsistent with "present trends of international comity in the recognition of foreign bankruptcy proceedings" and holding that "foreign tax claims should be recognized in a Canadian liquidation setting . . . as long as they are of a type that accords with general Canadian concepts of fairness and decency in state imposed burdens").

100. *See* Brokaw v. Seatrain U.K. Ltd, [1971] 2 Q.B. 476 (Lord Denning) (ordering shipping company to return goods to taxpayers despite U.S. notice of levy against the goods); Van deMark v. Toronto Dominion Bank, [1989] O.R.2d 379 (Can.) (ordering Canadian branches of a bank to release funds to taxpayers despite U.S. notice of levy against the accounts served on U.S. branch).

101. 80 F.3d 580 (1st Cir. 1996), *cert. denied*, 519 U.S. 905 (1996).

102. 130 F.3d 547, 552–53 (2d Cir. 1997), *cert. denied sub nom.* Pierce v. U.S., 525 U.S. 812 (1998).

103. 18 U.S.C. § 1343 (1994).

104. *Boots*, 80 F.3d at 587.

105. *Trapilo*, 130 F.3d at 552–53.

106. Att'y Gen. of Can. v. R.J. Reynolds Tobacco Holdings, Inc., 268 F.3d 103 (2d Cir. 2001).

107. *Id.* at 131. The district court in *The European Community v. RJR Nabisco, Inc.*, 150 F. Supp. 2d 456 (E.D.N.Y. 2001), held that the revenue rule would not bar a civil RICO suit to recover tax revenues, *id.* at 483–85, but that the European Community lacked standing to bring such a suit. *Id.* at 500–02. The district court's holding on the revenue rule is presumably no longer good law after *Reynolds*.
The *Reynolds* court distinguished *Trapilo* on the ground that the United States government had initiated the prosecution in that case. *Reynolds*, 268 F.3d at 123. Part IV.D.3 discusses how these cases should be resolved.

### 4. *Contracts Cases Reconsidered*

While twentieth-century courts extended the revenue rule to modern taxes, they simultaneously withdrew the rule from contract cases similar to *Holman v. Johnson*[108] and *Boucher v. Lawson*.[109] Like *Holman*, *Foster v. Driscoll*[110] involved smuggling, this time a plot to transport whiskey into the United States in violation of U.S. prohibition laws. A divided Court of Appeals held that the contracts involving the sale and financing of the whiskey in England were not enforceable on grounds of illegality. While *Foster* attempted to distinguish *Holman*,[111] *Regazzoni v. K.C. Sethia (1944) Ltd.*[112] questioned whether the revenue rule was properly applied in contract cases at all. *Regazzoni*'s facts are strikingly similar to *Boucher*'s: in *Boucher* the court enforced a contract for the shipment of gold in violation of Portuguese export laws; but in *Regazzoni* the court denied enforcement of a contract on the ground that it violated Indian export laws.[113] Lord Denning wrote:

> It seems to me that Lord Mansfield goes too far when he says that these courts will take no notice of such laws. It is perfectly true that the courts of this country will not enforce the revenue laws or the criminal laws of another country at the suit of that other country, either directly or indirectly . . . . It is quite another matter to say that we will take no notice of them. It seems to me that we should take notice of the laws of a friendly country, even if they are revenue laws or penal laws or political laws, however they may be described, at least, to this extent, that if two people knowingly agree together to break the laws of a friendly country or to procure some one else to break them or to assist in the doing of it, then they cannot ask this court to give its aid to the enforcement of their agreement.[114]

Thus, the English cases have not only extended the revenue rule to governmental efforts to enforce tax claims, they have withdrawn the rule from private efforts to use foreign law as a contractual defense, which are now permitted.[115] Other jurisdictions have followed suit.[116]

---

108. 98 Eng. Rep. 1120 (K.B. 1775); *see supra* notes 51–52 and accompanying text.

109. 95 Eng. Rep. 53 (K.B. 1734); *see supra* notes 54–55 and accompanying text.

110. [1929] 1 K.B. 470.

111. Lord Justice Sankey distinguished *Holman* on two grounds: (1) that the prohibition laws were not revenue laws; and (2) that the seller in *Holman* took no active part in sending the tea to England. *Id.* at 518–19. Neither is convincing. It is true that U.S. prohibition laws were not designed to raise revenue, but they were *penal* laws and one would have thought that *Holman* would have applied with even greater force to such a case. As for the second, the report in *Holman* makes it clear that the seller in that case knew that the buyer intended to smuggle the tea into England. *See Holman*, 98 Eng. Rep. at 1120.

112. [1956] 2 Q.B. 490.

113. Indian law made it illegal to export jute bags when their ultimate destination was South Africa. The parties to the contract conspired to violate this law by shipping the jute bags through Italy. *Id.* at 511–12 (Denning, L.J.).

114. *Id.* at 515–16 (Denning, L.J.).

115. Courts have had some difficulty classifying foreign exchange regulations for the purposes of applying the revenue rule. Some courts have characterized such laws as revenue law, while other courts have

The revenue rule underwent a metamorphosis in the twentieth century. It changed from a rule for sustaining the validity of contracts that violate foreign law into a rule that bars foreign governments from collecting their taxes. Its original rationale of promoting trade was abandoned. Instead, we find today essentially three justifications for the revenue rule: (1) that enforcing foreign law is burdensome; (2) that scrutiny of foreign law might cause offense to foreign nations; and (3) that enforcing foreign law is a violation of the forum's sovereignty. Each of these justifications might also be applied to the prohibition against enforcing penal law[117] and to "public" law more generally. Before we look at whether the prohibitions against applying foreign penal and revenue laws can be generalized into a more general prohibition against applying foreign "public" law, it may be useful to look at a category of foreign public law that courts in England and the United States have treated quite differently—expropriations of property within the territory of the expropriating state.

---

distinguished them from revenue laws. *Compare* Banco do Brasil, S.A. v. A.C. Israel Commodity Co., 190 N.E.2d 235, 237 (N.Y. 1963) (stating that Brazilian exchange control law "is clearly a revenue law"); Rossano v. Manufacturers' Life Ins. Co., [1963] 2 Q.B. 352, 376 (stating that recognition of Egyptian exchange control law "would offend against the well-settled principle that the English court will not recognize or enforce directly or indirectly a foreign revenue law or claim"), *with* Kahler v. Midland Bank Ltd., [1950] A.C. 24, 46–47 (H.L.) (Lord Reid) (stating that Czechoslovak exchange control regulations "do not come within the category of confiscatory or fiscal legislation of a foreign country which English courts cannot recognize").

Nevertheless, courts seem to have treated exchange control legislation the same way as revenue laws. They have refused to enforce such laws where a foreign government (or an instrumentality thereof) sues for their enforcement. *See, e.g.*, *Banco do Brasil*, 190 N.E.2d at 237 ("Plaintiff is an instrumentality of the Government of Brazil and is seeking, by use of an action for conspiracy to defraud, to enforce what is clearly a revenue law."); Re Lord Cable [1977] 1 W.L.R. 7, 13 (Ch. 1976) ("I am not satisfied that the English court would ever entertain proceedings by the Union of India, or any other foreign government, of which the sole acknowledged purpose was directly to enforce its currency control regulations."); Bulgarian State v. Takvorian, 47 I.L.R 40, 44 (Swed. Sup. Ct. 1974) (stating that Bulgarian claims based on exchange control regulations must be rejected "as relating mainly to a foreign interest of a public law character"). But they have recognized them in suits between private parties in tort, *see, e.g.*, Banco Frances e Brasileiro S.A. v. Doe, 331 N.E.2d 502 (N.Y. 1975), and in contract where the law governing the contract was the law of the country that had adopted the exchange controls. *See, e.g.*, Kahler v. Midland Bank Ltd., [1950] A.C. 24, 46–47 (H.L. 1949) (recognizing Czechoslovak exchange controls where the contract was governed by Czechoslovak law); Helbert Wagg & Co. Ltd., [1956] Ch. 323, 353–54 (recognizing German exchange controls where the contract was governed by German law). *But see* Rossano v. Manufacturers Life Ins. Co., [1963] 2 Q.B. 352 (1962) (declining to recognize Egyptian exchange controls where the contract was governed by Ontario law). For further discussion of exchange control legislation, see RESTATEMENT (THIRD) OF FOREIGN RELATIONS LAW § 822 (1986).

116. *See, e.g.*, Bhagwandas v. Brooks Exim Pte Ltd., [1994] 2 Sing. L. Rep. 431 (H. Ct.) (Sing.) ("A contract which involves doing of an act in a foreign and friendly country in contravention of its revenue laws is void and unenforceable in Singapore on grounds of public policy, notwithstanding that it is valid under the proper law of the contract."); Ralston Purina Co. v. McKendrick, 850 S.W.2d 629, 639 (Tex. App. 1993) (holding that contract to import feed into Mexico without permits was void).

117. Recall that Judge Hand thought the second one did in *Moore v. Mitchell*, 30 F.2d 600, 604 (L. Hand, J., concurring).

### C. Foreign Expropriations Contrasted

The earliest English cases articulating the prohibition against enforcing foreign penal laws involved foreign statutes confiscating property.[118] In *Folliott v. Ogden*, the court refused to recognize a New York statute confiscating the defendant's property as a defense to the payment of a debt on the ground that the statute was penal.[119] In *Wolff v. Oxholm*, the court would not allow a debtor to raise in defense a Danish ordinance ordering that debts to British subjects be paid to the Danish treasury for the same reason.[120]

In the twentieth century, English and American courts often refused to enforce foreign laws expropriating property *outside* the territory of the expropriating country. Sometimes they based their refusal on the ground that the expropriation was penal[121] and sometimes on the ground that even if the expropriation was "not strictly penal," it was "confiscatory" and should be treated the same way.[122] With respect to property *within* the territory of the expropriating country, however, English and American courts have responded quite differently and have refused to question the validity of such expropriations.[123] American courts have even enforced foreign expropriations that were alleged to violate international law or clearly discriminated on the basis of religion.[124]

---

118. *See supra* notes 21–23 and accompanying text.

119. 126 Eng. Rep. 75, 82 (Ct. Com. Pl. 1789), *aff'd*, Ogden v. Folliott, 100 Eng. Rep. 825 (Ch. 1792).

120. 105 Eng. Rep. 1177, 1180 (K.B. 1817). In contrast to *Folliott*, in which the situs of the debt was New York (or perhaps New Jersey, but certainly not England), the situs of the debt in *Wolff* appears to have been in England. The situs of a debt has made a difference in the application of the act of state doctrine under American law. *Compare* Garcia v. Chase Manhattan Bank, N.A., 735 F.2d 645 (2d Cir. 1984), *with* Perez v. Chase Manhattan Bank, N.A., 463 N.E.2d 5 (N.Y. 1984).

121. *See, e.g.*, Banco de Vizcaya v. Don Alfonso de Borbon y Austria, [1935] 1 K.B. 140, 144 (1934) (characterizing as "penal" a Spanish decree declaring the former king guilty of treason and expropriating all of his property including securities located in England); Republic of Iraq v. First Nat'l City Bank, 241 F. Supp. 567, 574 (S.D.N.Y. 1965), *aff'd*, 353 F.2d 47 (2d Cir. 1965), *cert. denied*, 382 U.S. 1027 (1966) (characterizing as "penal" an Iraqi ordinance confiscating the property of the former king including bank accounts and securities located in New York).

122. Frankfurther v. W.L. Exner Ltd., [1947] 1 Ch. 629, 636–37 (refusing to enforce Nazi expropriation of Jewish business in Austria with respect to accounts in England); *see also* Novello v. Hinrichsen Edition Ltd., [1951] 1 Ch. 595, 604 (refusing to enforce German decree with respect to English copyright).

123. *See, e.g.*, Oetjen v. Cent. Leather Co., 246 U.S. 297, 303–04 (1918) (enforcing Mexican expropriation of hides in Mexico); Ricaud v. American Metal Co., 246 U.S. 304, 310 (1918) (enforcing Mexican expropriation of lead bullion in Mexico); A.M. Luther Co. v. James Sagor & Co., [1921] 3 K.B. 532, 544 (C.A.) (enforcing Russian expropriation of wood in Russia); Princess Paley Olga v. Weisz, [1929] 1 K.B. 718, 724–25 (C.A.) (enforcing Russian expropriation of furniture and art in Russia).

124. *See, e.g.*, Banco Nacional de Cuba v. Sabbatino, 376 U.S. 398, 428 (1964) (enforcing Cuban expropriation of sugar alleged to violate international law); Bernstein v. Van Heyghen Freres Societe Anonyme, 163 F.2d 246, 249–50 (2d Cir. 1947) (L. Hand, J.) (enforcing Nazi expropriation of assets of a Jewish-owned business). Bernstein was permitted to challenge other expropriations in a second suit, after the U.S. State Department wrote a letter expressing "'the policy of the Executive . . . to relieve American courts from any restraint upon the exercise of their jurisdiction to pass upon the validity of the acts of Nazi officials.'" Bernstein v. N.V. Nederlandsche-Amerikaansche, Stoomvaart-Maatschappij, 210 F.2d 375, 376 (2d Cir. 1954) (per curiam) (quoting letter of Jack B. Tate, Acting Legal Advisor, Department of State (Apr. 13, 1949)). English courts have recently expressed some willingness to question the valid-

The leading American case is, of course, *Banco Nacional de Cuba v. Sabbatino*,[125] which enforced a Cuban law expropriating the assets of American-owned businesses in Cuba, including the shipment of sugar that was at issue in the case. The Supreme Court held that under the "act of state doctrine," a U.S. court could not refuse to enforce Cuba's law, notwithstanding allegations that the expropriation violated international law.[126] Justice Harlan based his decision on separation of powers grounds,[127] reasoning that the Executive Branch was better equipped to secure compensation for those whose property had been expropriated through negotiations.[128] He feared that judicial scrutiny of foreign acts of state might interfere with such negotiations because declaring such acts invalid would "often be likely to give offense to the expropriating country."[129] One will note immediately the similarity between Justice Harlan's rationale for the act of state doctrine and Judge Hand's rationale for the prohibition against applying foreign penal and revenue laws.[130] Indeed, Justice Harlan noted that although "the rule against enforcement of foreign penal and revenue laws . . . presumes invalidity in the forum whereas the act of state principle presumes the contrary, the doctrines have a common rationale."[131]

If the rationale is the same, however, why is the rule completely different? Why are foreign penal and revenue laws always refused enforcement and foreign expropriations of property within foreign territory always enforced? Justice Harlan tried to distinguish act of state cases from penal and revenue cases on the ground that Cuba's act of state had been fully executed within Cuba.[132] However, Cuba's expropriation had not been "fully executed" in the

---

ity of expropriations in such extreme circumstances. *See* Kuwait Airways Corp. v. Iraq Airways Co., [2001] 1 All E.R. (Comm) 557 (C.A. 2000).

125. 376 U.S. 398 (1964).

126. *Id.* at 428. In 1964, Congress acted to modify *Sabbatino* by providing in the Second Hickenlooper Amendment that:

> [N]o court in the United States shall decline on the ground of the federal act of state doctrine to make a determination on the merits giving effect to the principles of international law in a case in which a claim of title or other right to property is asserted . . . based upon . . . a confiscation or other taking after January 1, 1959, by an act of that state in violation of the principles of international law.

22 U.S.C. § 2370(e)(2) (1994). However, the Second Circuit has interpreted the Second Hickenlooper Amendment to apply only when the property at issue is found in the United States. Banco Nacional de Cuba v. First Nat'l City Bank of New York, 431 F.2d 394, 399–402 (2d Cir. 1970), *rev'd on other grounds*, 406 U.S. 759 (1972). When the property at issue is not found in the United States, *Sabbatino* continues to govern.

127. 376 U.S. at 423.

128. *Id.* at 430–34.

129. *Id.* at 432.

130. *See* Moore v. Mitchell, 30 F.2d 600, 604 (L. Hand, J., concurring) ("To pass upon the provisions for the public order of another state is, or at any rate should be, beyond the powers of a court; it involves the relations between the states themselves, with which courts are incompetent to deal, and which are entrusted to other authorities. It may commit the domestic state to a position which would seriously embarrass its neighbor."); *supra* notes 68–70 and accompanying text.

131. *Sabbatino*, 376 U.S. at 437.

132. *Id.* at 414 ("[W]e have been referred to no authority which suggests that the doctrine reaches a public law which, as here, has been fully executed within the foreign state.").

sense that it had to ask an American court for an order enforcing that law in order to get its money. Once this is recognized, it becomes hard to distinguish enforcement of a foreign expropriatory law from the enforcement of a penal sanction for conduct performed within the territory of the foreign state or a judgment for taxes on income earned within the territory of the foreign state.[133] Nor can the different rule for expropriations be justified on the ground that jurisdiction over property is generally deemed to be territorial,[134] because that same ground has been used to justify the non-enforcement of foreign penal laws.[135]

If the point of the act of state doctrine is to avoid scrutiny of a foreign law for fear of offending a foreign government, that goal might be met equally well by a rule that always refused to enforce foreign expropriatory laws, as Judge Hand suggested in *Moore v. Mitchell*.[136] What seems to sway Justice Harlan in favor of enforcement is a fear that a contrary rule would encourage private parties to evade such laws by grabbing whatever assets they could, knowing that a foreign government could not bring suit against them, "something hardly conducive to a peaceful international order."[137] However, the prohibition against enforcing foreign penal and revenue laws encourages precisely the same sort of evasion, with defendants removing themselves and their property from the jurisdiction of the state whose law they wish to avoid. Why such evasion should be permissible in one area of the law and impermissible in another is not clear.[138]

In short, English and American courts have treated foreign expropriatory laws quite differently from foreign penal and revenue laws. They have en-

---

133. *See id.* at 450 n.11 (White, J., dissenting) ("[I]t is difficult, conceptually or otherwise, to distinguish between the situation where a tax judgment secured in a foreign country against one who is in the country at the time of judgment is presented to an American court and the situation where a confiscatory decree is sought to be enforced in American courts.").

134. *See id.* at 445 (White, J., dissenting) (observing that the act of state doctrine is "a corollary of the principle that ordinarily a state has jurisdiction to prescribe the rules governing the title to property within its territorial sovereignty.").

135. *See, e.g.,* Folliott v. Ogden, 126 Eng. Rep. 75, 82 (Ct. Com. Pl. 1789) ("The penal laws of foreign countries are strictly local, and affect nothing more than they can reach and can be seized by virtue of their authority . . . ."); Wolff v. Oxholm, 105 Eng. Rep. 1177, 1180 (K.B. 1817) ("[N]o country regards the penal laws of another . . . . The penal laws of foreign countries are strictly local, and affect nothing more than they can reach and what can be seized by virtue of their authority."). It is worth noting that Chief Justice de Grey expressly equates jurisdiction over crimes and jurisdiction over property in *Rafael v. Verelst*, 96 Eng. Rep. 621, 622 (K.B. 1776), the case to which Justice Story traced the territorial principle of criminal jurisdiction. *See id.* at 622 ("Crimes are in their nature local, and the jurisdiction of crimes is local. And so as to the rights of real property, the subject being fixed and immovable.").

136. *See supra* notes 68–70 and accompanying text.

137. *Banco Nacional de Cuba v. Sabbatino*, 376 U.S. 398, 438.

138. In fairness to Justice Harlan, one should note that English courts have done no better in explaining their different treatment of revenue and expropriation cases, generally contenting themselves with an *ipse dixit. See, e.g.,* Williams & Humbert Ltd. v. W. & H. Trade Marks (Jersey) Ltd., [1986] A.C. 368, 433 (H.L. 1985) ("The principle that a country cannot collect its taxes outside its territories cannot be used to frustrate or contradict the principle that the courts of this country will recognize the law of compulsory acquisition of a foreign country of assets within the foreign country and will accept and enforce the consequences of that compulsory acquisition.").

forced the former even if their validity seemed questionable and refused to enforce the latter even if their validity seemed beyond dispute.

### D. Other "Public Laws"

The most consistent advocate of generalizing the rules against enforcing penal and revenue laws into a prohibition against applying all foreign public law has been F. A. Mann.[139] He argues that it is an infringement of "sovereignty and, accordingly, of public international law" for one state "to invoke its sovereign rights within the territory" of another.[140] The leading English treatise on the Conflict of Laws, *Dicey & Morris on the Conflict of Laws*, also takes the position that "the prohibitions on the enforcement of penal and revenue laws are examples of a wider principle that a State cannot enforce its public law or its political or prerogative rights" within another state's territory.[141]

*Dicey & Morris* admits, however, that there is "very little authority which deals directly with the general principle."[142] One finds dicta in a few cases supporting the existence of "a third category described as 'other public law,'"[143] but these cases seem simply to have followed *Dicey & Morris* without any independent thought. Lord Denning's opinion in *Attorney General of New Zealand v. Ortiz* stated that the prohibition extended to "other public laws," including a New Zealand law providing for the forfeiture of illegally exported historic articles.[144] On appeal, however, the House of Lords went out of its way to indicate that Lord Denning's views were dicta.[145] In *Nanus Asia Co. & Anor v. Standard Chartered Bank*, the Hong Kong High Court refused to recognize an SEC proceeding for disgorgement on the ground that

---

139. *See* F.A. MANN, FURTHER STUDIES IN INTERNATIONAL LAW 355–76 (1990) [hereinafter MANN, FURTHER STUDIES]; F.A. MANN, STUDIES IN INTERNATIONAL LAW 492–514 (1973); F.A. Mann, *Conflict of Laws and Public Law*, 132 RECUEIL DES COURS 107, 166–81 (1971); Mann, *International Enforcement, supra* note 9; F. A. Mann, *Prerogative Rights of Foreign States and the Conflict of Laws*, 40 GROTIUS SOC'Y 25 (1955).

140. Mann, *International Enforcement, supra* note 9, at 608.

141. 1 DICEY & MORRIS ON THE CONFLICT OF LAWS 95 (Lawrence Collins ed., 13th ed. 2000) [hereinafter DICEY & MORRIS]. The first *Restatement of Conflict of Laws* similarly maintained that "no action can be maintained on a right created by the law of a foreign state as a method of furthering its own governmental interests." RESTATEMENT OF CONFLICT OF LAWS § 610 (1934). This provisions was dropped from the second *Restatement*, however, which confined itself to stating the prohibition against enforcing foreign penalties. *See* RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 89 (1971).

142. DICEY & MORRIS, *supra* note 141, at 95.

143. United States v. Inkley, [1989] Q.B. 255, 264 (Eng. C.A. 1988); *see also* Qrs 1 Aps v. Fransden, [1999] 1 W.L.R. 2169 (Eng. C.A.) ("It is a fundamental principle of English law that our courts will not directly or indirectly enforce the penal, revenue or other public laws of another country."); Trade Practices Commission v. Australia Meat Holdings Pty Ltd., 83 A.L.R. 299 (Fed. Ct. Austl. Gen. Div. 1988) ("[A] United Kingdom court will not enforce a 'public' or 'penal' law even against a resident of the relevant foreign State."); Regina v. Governor of Pentonville Prison ex parte Budlong [1980] 1 W.L.R. 1110, 1125 (Q.B. 1980) ("It is a well established rule that our courts will not enforce a foreign revenue, penal, or public law.").

144. [1984] A.C. 1, 20 (H.L.) (Lord Denning, M.R.).

145. *Id.* at 46 (H.L.) (Lord Brightman) ("I take the view that the opinions expressed by the learned Lords Justices on the second issue were, in truth, obiter.").

the insider trading statute was part of the United States' "public law."[146] The High Court of Australia also held that the rule against enforcement applies to public laws generally in *Attorney General (U.K.) v. Heinemann Publishers Australia Pty. Ltd.*,[147] a suit by the British government seeking to enjoin publication of the book *Spycatcher*.

However, a number of courts have expressed reservations about extending the prohibition to include public laws more generally. In a parallel *Spycatcher* case, the New Zealand Court of Appeals refused to bar the suit on the grounds that it involved enforcement of a "public" law, observing that "[i]t would seem anachronistic for the Courts to deny themselves any power to do what they can to safeguard the security of a friendly foreign State."[148] Moreover, in a suit by the EPA to enforce a default judgment for reimbursement of remedial costs under CERCLA,[149] both the Canadian trial court and the Ontario Court of Appeals concluded that the rule against enforcing foreign public laws rests on a "rather shaky foundation."[150]

Assuming that a category of nonenforceable "other public laws" exists, it is important to note the limitations that Mann places on that category, limitations parallel to those established by the *Huntington* cases for foreign penal laws.[151] First, a suit only falls within the public law prohibition "where the plaintiff is a state or a public authority or where the private plaintiff acts in the interest of or for the benefit of the state."[152] Thus, suits by private parties to recover damages for their own benefit would not fall within the public law prohibition even if the origin of the claim is statutory. The principle is nicely illustrated by U.S. cases applying foreign copyright law that express no reservations about applying foreign statutory law.[153] Second, "where the plaintiff is a foreign state or public authority that asserts a public right that in substance is so close to a private right . . . there should be no objection

---

146. [1988] H.K.C. 377, 397 (Hong Kong H. Ct.). For further discussion of the *Nanus Asia* case, see *infra* notes 184–187, 207–210 and accompanying text.

147. 165 C.L.R. 30, at ¶ 26 (1988) (Austl.).

148. Att'y Gen. for the U.K. v. Wellington Newspapers Ltd. [1988] 1 N.Z.L.R. 129, 174 (C.A.).

149. Comprehensive Environmental Response, Compensation, and Liability Act of 1980, 42 U.S.C. § 9620 (1994).

150. United States v. Ivey, 130 D.L.R.4th 674, 678 (Ont. Gen. Div. 1995); *see also* United States v. Ivey, 139 D.L.R.4th 570, 573 (Ont. C.A. 1996) (noting that the "public law exception . . . rests . . . on a shaky doctrinal foundation"). The Ontario Court of Appeals found it unnecessary to decide whether such an exception exists, however, because it found that the U.S. "cost recovery action, although asserted by a public authority, is so close to a common law claim for nuisance that it is, in substance, of a commercial or private law character." 139 D.L.R.4th at 574.

151. *See supra* notes 29–42 and accompanying text.

152. Mann, *International Enforcement*, *supra* note 9, at 620.

153. *See, e.g.*, Itar-Tass Russian News Agency v. Russian Kurier, Inc., 153 F.3d 82, 92–94 (2d Cir. 1998) (applying Russian law to determine questions of copyright ownership); *see also* Boosey & Hawkes Music Publishers, Ltd. v. Walt Disney Co., 145 F.3d 481, 491–92 (2d Cir. 1998) (reversing a dismissal made on grounds of forum non conveniens and directing the district court to hear copyright infringement claims under the laws of eighteen different foreign countries); London Film Productions, Ltd. v. Intercontinental Communications, Inc., 580 F. Supp. 47, 48–50 (S.D.N.Y. 1984) (refusing to dismiss copyright claims governed by British law on forum non conveniens grounds).

against its enforcement."[154] The Canadian decisions in *Ivey* illustrate this principle. The United States' action to recover its clean-up costs was so closely analogous to a common-law nuisance action that the Ontario Court of Appeals considered it to be in the nature of a private law claim.[155] Thus, courts have permitted governments to bring suit to enjoin counterfeiting on the ground that it damaged the property interests of the state and its citizens,[156] to recover money lent to a shipowner,[157] to recover the costs of hospital expenses as a subrogee of an injured insured,[158] and even to recover bribes paid to public officials.[159] Mann has argued that the British government should have been allowed to bring their *Spycatcher* cases on the ground that it was simply seeking to enforce the terms of an employment contract—a private law claim.[160] Thus, even if there is a more general prohibition against applying foreign public law, the scope of that prohibition is quite limited.

### E. Antitrust and Securities Law

How do the rules discussed above apply to antitrust and securities law? It is generally assumed that courts should neither entertain suits under foreign antitrust and securities laws nor enforce judgments rendered under those laws even when the plaintiff is a private party. In fact, however, the prohibition against enforcing foreign penal law and (if it exists) the prohibition against enforcing foreign public law apply only to government claims. Neither should prevent private parties from bringing suit under foreign antitrust law or from enforcing a foreign securities law judgment.

### 1. Antitrust

Both courts and commentators have typically assumed that the courts of one country would refuse to enforce the antitrust laws of another. No court appears to have held so directly, but several U.S. courts have expressed this view while ruling on forum non conveniens motions.[161] In *Industrial Invest-*

---

154. Mann, *International Enforcement, supra* note 9, at 617.

155. *See supra* note 150 and accompanying text.

156. Emperor of Aus. v. Day, 45 Eng. Rep. 861, 868 (Ch. 1861) ("I am clearly of opinion that the Plaintiff here states unlawful acts and intentions of the Defendants, by which, if not prevented, a damage will be done to the property of the Plaintiff as sovereign, and to the property of his subjects whom he has a right to represent in an English Court of Justice.").

157. Metal Indus. (Salvage) Ltd. v. Owners of the S.T. Harle, [1962] Scots L.T. 114 (Outer House). The same court denied the French government's claim to recover taxes, nicely illustrating the distinction between private and public claims. *Id.* at 115.

158. Weir v. Lohr, 65 D.L.R.2d 717, 720 (Man. Q.B. 1967).

159. Att'y Gen. for Hong Kong v. Reid, [1993] 3 W.L.R. 1143 (P.C.) (Eng.) (Hong Kong may bring suit in New Zealand to recover bribes paid to Hong Kong official); *see also* Sumitomo Bank Ltd. v. Thahir, [1993] 1 Sing. L. Rep. 735 (Sing.) (Indonesian state-owned company may bring suit in Singapore to recover bribes paid to company official).

160. *See* MANN, FURTHER STUDIES, *supra* note 139, at 358–59.

161. *See, e.g.,* Capital Currency Exch., N.V. v. Nat'l Westminster Bank PLC, 155 F.3d 603, 609 (2d

*ment Development Corporation v. Mitsui & Company*,[162] for example, the Fifth Circuit held that forum non conveniens dismissal was not appropriate in part because an Indonesian court would not enforce U.S. antitrust law. "Since it is a well-established principle of international law that '[t]he Courts of no country execute the penal laws of another,' . . . we have little doubt that the Indonesian courts would quite properly refuse to entertain plaintiffs' Sherman Act claim."[163] An Australian court has declined to void an acquisition that violated Australia's competition law on the ground that its order would not be enforceable in the United Kingdom.[164] The House of Lords seemed to confirm that British courts would not enforce foreign competition law in *British Airways Board v. Laker Airways Ltd.*,[165] where Lord Diplock said that "[t]he Clayton Act, which creates the civil remedy with threefold damages for criminal offences under the Sherman Act is, under English rules of conflict of laws, purely territorial in its application,"[166] and another English court expressed a similar view in the course of refusing to enforce a U.S. antitrust judgment.[167] Indeed, the only case expressing the contrary view seems to be a recent decision of the British Columbia Court of Appeals enforcing treble damages under North Carolina's deceptive trade practices statute, where the court states in dictum "that until the Attorney General of Canada invokes the provisions of the Foreign Extraterritorial Measures Act, treble damage awards based even on anti-trust laws are enforceable."[168]

---

Cir. 1998), *cert. denied*, 526 U.S. 1067 (1999) ("English courts will not enforce the Sherman Act."); Laker Airways Ltd. v. Pan Am. World Airways, 568 F. Supp. 811, 817 (D.D.C. 1983) ("British courts could not and would not enforce the American antitrust laws.").

 Whether antitrust suits are subject to dismissal on grounds of forum non conveniens is a question that has divided the circuits. The First and Second Circuits have held that the doctrine of forum non conveniens applies to antitrust suits. *See* Howe v. Goldcorp Inv., Ltd., 946 F.2d 944, 949 (1st Cir. 1991), *cert. denied*, 502 U.S. 1095 (1992); *Capital Currency Exch.*, 155 F.3d at 609. The Fifth Circuit has held that it does not. *See* Kempe v. Ocean Drilling & Exploration Co., 876 F.2d 1138, 1144 (5th Cir. 1989), *cert. denied*, 493 U.S. 918 (1989). *See generally* Lonny Sheinkopf Hoffman & Keith A. Rowley, *Forum Non Conveniens in Federal Statutory Cases*, 49 EMORY L.J. 1137 (2000).

 162. 671 F.2d 876 (5th Cir. 1982), *vacated on other grounds*, 460 U.S. 1007, *reaff'd on remand*, 704 F.2d 785 (5th Cir.) (per curiam), *cert. denied*, 464 U.S. 961 (1983).

 163. *Id.* at 891 (quoting The Antelope, 23 U.S. (1 Wheat.) 66, 123 (1825)).

 164. Trade Practices Comm'n v. Austl. Meat Holdings Pty Ltd., 83 A.L.R. 299 (Fed. Ct. Austl. Gen. Div. 1998) (Austl.).

 165. [1985] 1 A.C. 58, 79 (H.L. 1984).

 166. *Id.* at 79 (Diplock, L.J.). The House of Lords reversed an antisuit injunction preventing Laker from proceeding with its antitrust suit in U.S. court because the U.S. court was the only one that would be able to hear the claim.

 167. British Nylon Spinners, Ltd. v. Imperial Chem. Indus. Ltd., [1955] Ch. 37, 45 (1954) (Danckwerts, J.) ("The judge was applying an enactment of Congress, which has no application to the United Kingdom, of course . . . .").

 168. Old N. State Brewing Co. v. Newlands Services Inc., 58 B.C.L.R.3d 144 (B.C.C.A. 1998) (Can.). For further discussion of the Canadian Foreign Extraterritorial Measures Act, see *infra* note 247.

HeinOnline -- 43 Harv. Int'l L.J. 186 2002

Commentators have also widely assumed that courts will not enforce foreign antitrust law, either because it is penal,[169] or because it is public,[170] or without specifying a reason.[171] A notable dissenter from this orthodoxy is F.A. Mann, who has noted that under both the English and American *Huntington* decisions,[172] an action is not penal unless it seeks recovery on behalf of the state.[173] Mann thus states that there is "some doubt" about *Mitsui*'s dictum that foreign courts would refuse to enforce Sherman Act Claims and that "treble damages could, in a suitable case, be recovered in an English court, if damages are for the benefit of the private plaintiff."[174]

### 2. Securities

It is also commonly assumed that the courts of one nation will not enforce the securities laws of another, and a few courts have indeed refused to do so. In *Schemmer v. Property Resources Ltd.*,[175] an English court refused to appoint an American receiver to take possession of the assets of a defendant in a U.S. securities fraud suit. The court observed that "[t]he [Securities Exchange] Act of 1934 is . . . a penal law of the United States of America and, as such, unenforceable in our courts."[176] The court noted that the Privy Council in *Huntington v. Attrill*[177] had distinguished between suits brought by the government and suits by a private plaintiff in determining which suits were "penal," and the court said "it may possibly be that a private plaintiff who recovers a judgment in a federal court under the Act of 1934 can enforce it by action here."[178] This, however, was not that sort of case: "Mr. Schemmer comes before this court, in effect, as a public officer . . . ."[179]

---

169. *See* DICEY & MORRIS, *supra* note 141, at 93 n.25 ("[A]n action for treble damages under U.S. anti-trust law may be an action for a penalty, since the right to treble damages is granted so that private parties may act as 'private attornies-general' to vindicate the anti-trust law."); Otto Kahn-Freund, *English Contracts and American Anti-Trust Law—the Nylon Patent Case*, 18 MODERN L. REV. 65, 69 (1955) ("The jurisdiction of the Federal Courts under the Anti-Trust laws is a penal jurisdiction, no matter whether it is exercised in criminal or in equitable proceedings . . . . [I]t cannot be exercised against non-Americans with regard to acts done outside the United States.").

170. *See* DICEY & MORRIS, *supra* note 141, at 99 ("The public laws involved would include . . . anti-trust legislation.").

171. J. G. CASTEL, CANADIAN CONFLICT OF LAWS 169–70 (4th ed. 1997) ("[A]ntitrust . . . [and] securities legislation . . . may not always be recognized and enforced by Canadian courts.").

172. *See supra* notes 29–42 and accompanying text.

173. *See* Mann, *International Enforcement*, *supra* note 9, at 614.

174. *Id.* at 614–15 ("[E]ven where the legislative intent is to make the plaintiff a private law enforcement officer, the *plaintiff* is entitled to the damages."). In a revised version of the same article, incorporated as a chapter in his book, *Further Studies in International Law*, Mann waffles a bit, now stating that "there is force in [*Mitsui*'s] dictum," but adding that "[p]enalizing the defendant by the award of punitive damages to the plaintiff is . . . by no means unknown to the legal systems derived from English law, and if the plaintiff keeps the damage for himself, this, it is submitted may be decisive." MANN, FURTHER STUDIES, *supra* note 139, at 364.

175. [1975] 1 Ch. 273, 288 (1974).

176. *Id.* at 288.

177. [1893] A.C. 150 (P.C. 1892); *see supra* notes 40–42 and accompanying text.

178. *Schemmer*, [1975] 1 Ch. at 288.

179. *Id.*

The enforceability of a private judgment under U.S. securities laws was raised the following year in a Canadian case, *McIntyre Porcupine Mines Ltd. v. Hammond.*[180] The Ontario High Court of Justice refused to enforce a U.S. judgment for short-swing profits under § 16(b) of the Securities Exchange Act, asserting that "[t]he United States statute has no extraterritorial effect."[181] As a matter of U.S. law, that statement was obviously incorrect, or there would have been no U.S. judgment to enforce.[182] The court did not explain why a Canadian court should refuse to *recognize* the extraterritorial effect of the Securities Exchange Act, but it did suggest that the statute was penal, citing the decision in *Schemmer*: "*Prima facie* it has at least some of the characteristics of a penal statute. If it in fact is, that would be a further reason to refuse to countenance it in this jurisdiction."[183]

In *Nanus Asia,*[184] a Hong Kong court refused to recognize a U.S. order freezing the accounts of an insider trading defendant as a defense in a breach of contract action against a bank for refusing to transfer funds from those accounts. The SEC had sought disgorgement of more than $19 million in profits for the benefit of defrauded investors, and three times that amount as a civil sanction payable to the U.S. Treasury under the Insider Trading Act of 1984.[185] The court found that "the triple penalty is penal in nature."[186] The disgorgement proceedings presented the court with a closer question, since the amount sought was limited to the amount of the defendant's illegal profit and the funds were to be distributed to defrauded investors. The court concluded that the disgorgement proceedings, even if not "penal," were "public" and therefore would not be recognized.[187] The Canadian court in *U.S. Securities Exchange Commission v. Cosby*, on the other hand, distinguished between disgorgement and civil penalties and enforced a judgment for the former against assets in Canada.[188]

---

180. 119 D.L.R.3d 139 (Ont. H.C. 1975).

181. *Id.*

182. For discussion of the extraterritorial application of U.S. securities laws, see William S. Dodge, *Understanding the Presumption Against Extraterritoriality,* 16 BERKELEY J. INT'L L. 85 (1998) [hereinafter Dodge, *Presumption*].

183. *McIntyre Porcupine Mines,* 119 D.L.R.3d at 148 (citing Schemmer v. Property Resources Ltd., [1975] 1 Ch. 273, 288 (1974)).

184. [1988] H.K.C. 377 (Hong Kong H. Ct.).

185. *Id.* at 389–90.

186. *Id.* at 397.

187. *Id.* ("I hold that the United States statutory provisions relating to disgorgement form part of that State's public law.").

188. [2000] CarswellB.C. 677, at ¶¶ 25–26 (B.C.S.C.) ("I conclude that the default judgment of the United States Court [for disgorgement] is not a foreign penal judgment and that the plaintiff is able to take steps to enforce it in British Columbia . . . . The order imposing civil penalties, which the plaintiff does not seek to enforce in the proceeding at bar, would not be enforceable in British Columbia. The disgorgement order is."); *see also* SEC v. Shull, [1999] CarswellB.C. 1772, at ¶ 29 (B.C.S.C.) (dictum) ("[T]he disgorgement order is neither a penal sanction nor a taxation measure."); SEC v. Ong Congqin Bobby & Anor, [1999] 1 Sing. L. Rep. 310 (H. Ct.) (holding that civil penalties are penal but suit for injunctive relief is not and permitting the SEC to take evidence in Singapore for purposes of the latter).

Commentators have also generally assumed that courts will not enforce foreign securities law. Commenting on the *Schemmer* case, Andreas Lowenfeld has guessed that if a private plaintiff were to try to enforce a securities judgment in British court there is a "substantial chance" the court would deny enforcement.[189] Based on *McIntyre Porcupine Mines*, Jean-Gabriel Castel has written, "one must assume that a judgment rendered in the United States pursuant to the Securities and Exchange Act would not be enforced in Canada."[190] And F.A. Mann has observed cryptically that although the Securities Exchange Act "is not a penal statute . . . [it] did . . . create public rights."[191]

### 3. *"Penal," "Public," or "Private"?*

As a preliminary matter, one must acknowledge that U.S. antitrust laws and some provisions of U.S. securities law might be construed as not authorizing their application by a foreign court. Both the Sherman Act and the Clayton Act provide for suits to be filed in U.S. district court[192] and these provisions have been interpreted as creating jurisdiction exclusive of state courts.[193] The 1934 Securities Exchange Act expressly provides for exclusive federal court jurisdiction,[194] although the 1933 Securities Act provides for jurisdiction concurrent with state courts.[195] Where federal court jurisdiction is exclusive, a foreign court might well conclude that the Sherman Act or the Securities Exchange Act simply did not apply to a suit before it. Thus, Lord Diplock's conclusion in *British Airways v. Laker Airways* that there was "a single forum only that [was] of competent jurisdiction to determine the merits of [Laker's antitrust] claim"[196] may have been correct, although not for the reason he gave.[197] These exclusive jurisdiction provisions could not be construed as prohibiting foreign courts from enforcing antitrust or securities law *judgments* rendered in federal court. However, as we have seen, foreign courts have refused to enforce such judgments.[198] Thus, we must consider whether this refusal is justified under the rules discussed so far.

---

189. Lowenfeld, *supra* note 4, at 420.

190. J.G. Castel, Extraterritoriality in International Trade 114 (1988).

191. Mann, *International Enforcement, supra* note 9, at 607. Mann does not consider suits by private plaintiffs. For his comments on antitrust suits by private plaintiffs, see *id.* at 614–15.

192. *See* Sherman Anti-Trust Act, 15 U.S.C. § 4 (1994); Clayton Act, 15 U.S.C. § 4 (1994); *id.* § 26.

193. *See* Marrese v. Am. Acad. of Orthopaedic Surgeons, 470 U.S. 373, 379 (1985); Freeman v. Bee Mach. Co., 319 U.S. 448, 451 n.6 (1943); Gen. Inv. Co. v. Lake Shore & M.S. Ry., 260 U.S. 261, 287 (1922).

194. Securities Exchange Act of 1934 § 27, 15 U.S.C. § 78aa (1994).

195. Securities Act of 1933 § 22(a), 15 U.S.C. § 77v(a) (1994).

196. [1985] 1 A.C. 58, 80 (H.L. 1984).

197. *See supra* notes 165–166 and accompanying text.

198. *See, e.g.,* McIntyre Porcupine Mines Ltd. v. Hammond, 119 D.L.R.3d 139 (Ont. H.C. 1975) (Can.) (securities judgment); British Nylon Spinners Ltd. v. Imperial Chem. Indus. Ltd., [1955] Ch. 37 (1954) (Eng.) (antitrust judgment).

United States antitrust laws and securities laws provide for both criminal and civil enforcement. Thus, it is useful to distinguish three different scenarios: (1) criminal enforcement by the United States government;[199] (2) civil enforcement by the United States government; and (3) a civil suit for damages brought by a private party. The enforcement of criminal law lies at the heart of the prohibition against applying foreign penal law.[200] If a foreign court is not willing to enforce a civil judgment on an appearance bond,[201] it seems highly unlikely that a foreign court would be willing to enforce a criminal fine or prison sentence, at least in the absence of a treaty.[202]

Civil enforcement by the United States government should probably also be barred under the prohibition against applying foreign penal laws. The English and American *Huntington* decisions established that civil suits brought by the government for the purpose of punishing violations of the government's law are "penal" in the international sense.[203] Thus, where a monetary penalty "would accrue to the state,"[204] courts have quite properly applied the prohibition against enforcing foreign penal laws even where the proceeding itself was civil.[205]

A more difficult issue is raised where the government brings suit for the benefit of private parties, as it does when it seeks disgorgement of profits from insider trading, funds that are ultimately distributed to defrauded investors. In *Cosby*, the Canadian court held that such a judgment was not penal and could be enforced in Canada.[206] In *Nanus Asia*, by contrast, the Hong Kong court held that even if disgorgement proceedings were not penal they did involve the enforcement of "public law."[207] This aspect of *Nanus Asia* is wrong. First, as we have seen, the "public law" prohibition (if it exists) contains a requirement analogous to that of the penal law prohibition

---

199. *See, e.g.,* Sherman Antitrust Act, 15 U.S.C. §§ 1 & 2 (1994) (providing for fines and imprisonment for violations of the Sherman Act); *id.* § 77x (providing for fines and imprisonment for violations of the Securities Act); *id.* § 78ff (providing for fines and imprisonment for violations of the Securities Exchange Act). It is clear that U.S. courts may apply antitrust and securities laws extraterritorially in criminal as well as civil proceedings. *See, e.g.,* United States v. Nippon Paper Indus. Co., 109 F.3d 1 (1st Cir. 1997), *cert. denied,* 522 U.S. 1044 (1998) (upholding criminal indictment for price fixing abroad).

200. *See supra* notes 24–26 and accompanying text.

201. *See* United States v. Inkley, [1989] Q.B. 255 (Eng. C.A. 1988); *supra* note 50 and accompanying text.

202. For discussion of such treaties, see *infra* Part II.D. The prohibition against enforcing foreign criminal law is not very problematic, however, because of the possibility of extradition.

203. Huntington v. Attrill, 146 U.S. 657 (1892); Huntington v. Attrill, [1893] A.C. 150, 156 (P.C. 1892); *see supra* notes 29–42 and accompanying text.

204. Wisconsin v. Pelican Ins. Co., 127 U.S. 265, 299 (1888).

205. *See, e.g.,* Nanus Asia Co. & Anor v. Standard Chartered Bank, [1988] H.K.C. 377, 377–79 (H.K. H. Ct. 1988) (holding that triple penalty for insider trading payable to the U.S. treasury is penal); United States Sec. & Exch. Comm'n v. Cosby, [2000] CarswellB.C. 677, ¶ 26 (B.C.S.C.) ("The order imposing civil penalties . . . would not be enforceable in British Columbia.").

206. *Cosby,* [2000] CarswellB.C., ¶ 25.

207. *Nanus Asia,* [1988] H.K.C. at 378.

that the proceeding be for the benefit of the state.[208] Second, courts have held that the prohibitions against enforcing foreign penal and revenue laws should apply to suits by private parties, if the suit is for the ultimate benefit of the government.[209] It follows, therefore, that if a suit by a government is for the ultimate benefit of private parties, as in a disgorgement proceeding, then the rules against applying foreign penal, revenue, and public laws should not apply. In either case, application of these rules "must not depend merely on the form in which the claim is made."[210]

Civil suits by a private party to recover damages for their own benefit stand on a very different footing from suits brought by the government. Under the *Huntington* decisions, suits by private parties are not considered penal unless they are acting on behalf of the state as a common informer.[211] "Common informers" were members of the public who had no interest in the action itself, but were permitted by statute to bring suit on behalf of the state and to share in the recovery.[212] Such statutes were common in England and early America,[213] although the only one used much in the United States today is the False Claims Act.[214] Although private antitrust plaintiffs are often characterized as "private attorneys general,"[215] they are in no sense "common informers." First, antitrust plaintiffs must themselves have suffered an injury in order to bring suit and their damages (even if trebled) are measured by the amount of that injury. Second, they bring suit in their own names and not on behalf of the government. Third, they do not share their recovery with the government. It is for these reasons that the U.S. Supreme Court has characterized private antitrust suits for treble damages as primarily remedial.[216] The fact that such suits may also serve a public interest does not make them "penal." As the House of Lords observed in *Huntington*:

---

208. *See* Mann, *International Enforcement, supra* note 9, at 620; *supra* notes 151–160 and accompanying text.

209. *See* Peter Buchanan Ltd. v. McVey [1954] I.R. 89, 104–05 (Ir. H. Ct. 1950), *aff'd,* [1954] I.R. 108 (Ir. S.C. 1951) (applying revenue rule to suit by liquidator to recover taxes for the benefit of the Scottish government); Huntington v. Attrill, 146 U.S. 657, 673 (1892) (stating that prohibition against applying foreign penal laws would apply to suits by "common informers"); Huntington v. Attrill, [1893] A.C. 150, 157–58 (P.C. 1892) (appeal taken from Ontario).

210. *Peter Buchanan,* [1954] I.R. at 107.

211. *Huntington,* 146 U.S. at 673; *Huntington,* [1893] A.C. at 157–58.

212. *See* Marvin v. Trout, 199 U.S. 212, 225 (1905).

213. *Id.*

214. *See* False Claims Act, 31 U.S.C. § 3730 (1994). *See generally* Evan Caminker, Comment, *The Constitutionality of Qui Tam Actions,* 99 YALE L.J. 341 (1989).

215. *See, e.g.,* Illinois Brick Co. v. Illinois, 431 U.S. 720, 746 (1977) (noting "legislative purpose in creating a group of 'private attorneys general' to enforce the antitrust laws"). Securities law plaintiffs are only rarely so characterized. *But see* Fox v. Reich & Tang, Inc., 692 F.2d 250, 255 (2d Cir. 1982).

216. Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc., 429 U.S. 477, 485–86 (1977) ("Section 4 [of the Clayton Act] . . . is in essence a remedial provision. It provides treble damages to '(a)ny person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws . . . .' Of course, treble damages also play an important role in penalizing wrongdoers and deterring wrongdoing, as we also have frequently observed . . . . It nevertheless is true that the treble-damages provision, which makes awards available only to injured parties, and measures the awards by a multiple of the injury actually proved, is designed primarily as a remedy."); Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth,

> All the provisions of Municipal Statutes for the regulation of trade and trading companies are presumably enacted in the interest and for the benefit of the community at large . . . . Penalties may be attached to them, but that circumstance will not bring them within the rule, except in cases where these penalties are recoverable at the instance of the State, or of an official duly authorized to prosecute on its behalf, or of a member of the public in the character of a common informer.[217]

Nor does the fact that treble damages may be recovered for antitrust violations under the Clayton Act make such actions "penal." Justice Gray's opinion in *Huntington* noted with approval prior decisions holding that multiple damages were remedial rather than penal,[218] and subsequent cases have held that neither multiple nor punitive damages fall within the prohibition against enforcing foreign penal law.[219] Thus, one must conclude that those decisions suggesting that in a suit by a private party a court could properly refuse to apply foreign antitrust law[220] or refuse to enforce a foreign securities law judgment[221] on the grounds that such laws are "penal" are simply incorrect.[222]

For similar reasons, a court should not refuse to apply foreign antitrust or securities law or to enforce judgments rendered under that law on the grounds that it is "public law." Even if such a prohibition exists,[223] it applies only where the suit is brought on behalf of the state.[224] A private suit under antitrust or securities law is not such a suit, because the plaintiff sues in her

---

Inc., 473 U.S. 614, 635–36 (1985) ("Notwithstanding its important incidental policing function, the treble-damages cause of action . . . seeks primarily to enable an injured competitor to gain compensation for that injury.").

The Supreme Court has similarly characterized U.S. securities legislation as remedial. *See, e.g.,* U.S. Tcherepnin v. Knight, 389 U.S. 332, 336 (1967) ("The Securities Exchange Act quite clearly falls into the category of remedial legislation.").

217. Huntington v. Attrill, [1893] A.C. 150, 157–58 (P.C. 1892) (appeal taken from Ontario). *See also* Old N. State Brewing Co. v. Newlands Services Inc., 58 B.C.L.R.3d 144 (B.C.C.A. 1998) (Can.) (holding that judgment under North Carolina deceptive trade practices law was not penal because it was not "'in the nature of a suit in favour of the state whose law has been infringed'" (quoting *Huntington* [1893] A.C. at 157)).

218. Huntington v. Attrill, 146 U.S. 657, 668 (1893).

219. *See Old N. State Brewing,* 58 B.C.L.R.3d at 144 (enforcing U.S. judgment for treble and punitive damages under North Carolina deceptive trade practices statute); S.A. Consortium Gen. Textiles v. Sun & Sand Agencies, [1978] 1 Q.B. 279, 299–300 (C.A.) (Lord Denning) ("The word 'penalty' in the [Foreign Judgments (Reciprocal Enforcement) Act] means, I think, a sum payable to the state by way of punishment and not a sum payable to a private individual, even though it is payable by way of exemplary damages."); Rosencrantz v. Union Contractors Ltd., 23 D.L.R.2d 473, 475 (B.C.S.C. 1960) (holding that Washington usury law providing for penalty of twice usurious interest rate was enforceable).

220. Indus. Inv. Dev. Corp. v. Mitsui & Co., 671 F.2d 876, 891 (5th Cir. 1982), *vacated on other grounds* 460 U.S. 1007 (1983); British Airways Board v. Laker Airways Ltd., [1985] A.C. 58, 79 (H.L. 1984).

221. McIntyre Porcupine Mines Ltd. v. Hammond, 119 D.L.R.3d 139, 148 (Ont. H.C. 1975).

222. Thus, Dr. Mann appears to have been correct when he wrote that "treble damages could, in a suitable case, be recovered in an English court, if damages are for the benefit of the private plaintiff." Mann, *International Enforcement, supra* note 9, at 614.

223. *See supra* notes 142–150 and accompanying text.

224. Mann, *International Enforcement, supra* note 9, at 620; *supra* notes 151–160 and accompanying text.

own name, to redress injury to herself, and keeps the damages.[225] Thus, even if F.A. Mann is correct that the Securities Exchange Act "create[s] public rights,"[226] the public law taboo does not bar enforcement of those rights by a private plaintiff.

In short, courts are not foreclosed by existing doctrine from enforcing foreign antitrust and securities law and judgments in suits by private plaintiffs. The public law taboo should never have been extended to such suits in the first place, and (for reasons discussed in Part IV) courts should break the taboo in suits by private parties.

## II. Legislative and Diplomatic Responses to the Public Law Taboo

Although the rules against enforcing foreign penal and revenue laws were developed by courts, they are reflected both in legislation and in treaties providing for the recognition and enforcement of foreign judgments. In the United Kingdom, for example, the Foreign Judgments (Reciprocal Enforcement) Act of 1933 does not apply to "sum[s] payable in respect of taxes or other charges of a like nature or in respect of a fine or other penalty."[227] In the United States, the Uniform Foreign Money-Judgments Recognition Act, adopted in 29 states and the District of Columbia, excludes from its definition of foreign judgment "a judgment for taxes, [and] a fine or other penalty."[228] The Brussels Convention, which provides for the recognition and enforcement of judgments within the European Union, is limited to "civil and commercial matters" and does "not extend, in particular, to revenue, customs or administrative matters."[229] Although these statutes and conventions do not require the enforcement of public law judgments, neither do they prohibit such enforcement. Common law courts remain free to recognize such judgments if they see fit to do so.[230]

At the same time, the public law taboo has been whittled down by treaties—judgments treaties providing for the enforcement of antitrust judgments, tax treaties providing for the enforcement of tax judgments, prisoner exchange treaties providing for the enforcement of prison sentences, and mutual legal assistance treaties providing for the enforcement of criminal fines. These developments show both a willingness to abandon the public

---

225. *See supra* note 216 and accompanying text.

226. Mann, *International Enforcement, supra* note 9, at 607.

227. Foreign Judgments (Reciprocal Enforcement) Act, 1933, 23 Geo. 5, c. 13, § 1(2)(b) (Eng.).

228. Uniform Act, *supra* note 2, § 1(2).

229. Brussels Convention, *supra* note 8, Art. 1. The Lugano Convention, which applies between members of the European Union and the European Free Trade Association (Austria, Finland, Iceland, Norway, Sweden, and Switzerland), is similarly limited. *See* Convention on Jurisdiction and Enforcement of Judgments in Civil and Commercial Matters, Sept. 16, 1988, Art. 1, 1988 O.J. (L 319) 9, 28 I.L.M. 620 (1989) [hereinafter Lugano Convention].

230. As Part IV explains, courts should enforce foreign public law judgments in favor of private parties but not in favor of foreign governments.

law taboo when cooperation is beneficial and the usefulness of treaties to ensure reciprocity.

## A. *Enforcement of Judgments Acts*

A number of common law countries have adopted acts dealing with the enforcement (and sometimes the nonenforcement) of foreign judgments. These acts typically exclude judgments for taxes, fines, and penalties, but such exclusions are not endorsements of the public law taboo, and the acts do not prohibit courts from enforcing such judgments at common law. Several countries have laws providing for the nonenforcement of foreign antitrust judgments, but at least one court has read such an act to confirm that antitrust judgments are enforceable in cases where the act does not apply.[231]

### 1. *United Kingdom*

In 1933, Parliament passed the Foreign Judgments (Reciprocal Enforcement) Act.[232] Prior to the 1933 Act, the procedure for enforcing foreign judgments at common law was to file a new action in which the foreign judgment was conclusive.[233] Although this procedure was usually effective, continental European countries did not view it as affording their judgments conclusive effect because it differed from their own exequatur procedure and because its rules were not codified.[234] Many of these countries required reciprocity as a condition for enforcing foreign judgments, with the result that British judgments were rarely enforced, since "it has seldom (if ever) been possible for litigants relying on British judgments to convince the foreign courts that reciprocal treatment is accorded in the United Kingdom."[235] The 1933 Act was designed "to secure the recognition and enforcement of English judgments in foreign countries"[236] by codifying a method of enforcing foreign judgments analogous to exequatur, under which a foreign judgment registered with the High Court would have the same force and effect as if the judgment had been originally given by the registering court.[237] The Act applies only to countries that assure "substantial reciprocity of treatment" to United Kingdom judgments as directed by the Queen by Order in Coun-

---

231. *See* Old N. State Brewing Co. v. Newlands Services Inc., 58 B.C.L.R.3d 144 (B.C.C.A. 1998) ("[U]ntil the Attorney General of Canada invokes the provisions of the *Foreign Extraterritorial Measures Act*, treble damage awards based even on anti-trust laws are enforceable.")

232. Foreign Judgments (Reciprocal Enforcement) Act, 1933, 23 Geo. 5, c. 13. The 1933 Act had been preceded by the Administration of Justice Act, 1920, 10 & 11 Geo. 5, c. 81, Part II of which provided for the reciprocal enforcement of judgments within the British Empire.

233. *See* DICEY & MORRIS, *supra* note 141, at 474–75.

234. FOREIGN JUDGMENTS (RECIPROCAL ENFORCEMENT) COMMITTEE, REPORT, 1932, [Cmd. 4213], at 5, 10–11.

235. *Id.* at 10.

236. *Id.* at 17.

237. Foreign Judgments (Reciprocal Enforcement) Act, 1933, 23 Geo. 5, c. 13, § 2.

cil.[238] If the Act applies to a judgment, that judgment may only be enforced under the terms of the Act and may not be enforced at common law.[239] However, judgments falling outside the Act may still be enforced at common law by filing an action on the judgment.[240]

Section 1(2)(b) of the Act expressly provides that it shall not apply to "sum[s] payable in respect of taxes or other charges of a like nature or in respect of a fine or other penalty."[241] As the Committee Report noted, such judgments were not enforceable at common law[242] and the 1933 Act was not intended to make any substantive changes in the common law rules governing the enforcement of judgments.[243] However, the Act does not prohibit the enforcement of judgments for taxes and penalties, and judgments that fall outside the Act are still enforceable at common law.[244] Thus, it is the common law rules against enforcing penal and revenue laws that bar the enforcement of such judgments in the United Kingdom and not the provisions of the 1933 Act. This is apparent from the House of Lords' decision in *Government of India v. Taylor*, in which the Indian government sought to enforce a judgment for taxes in England.[245] Viscount Simonds noted that the revenue rule had been "recognized" by Parliament in the 1933 Act.[246] However, neither Simonds nor the other law lords felt that the 1933 Act precluded them from considering whether a foreign tax judgment should be enforceable at common law (if they had, the decision would have been much

238. *Id.* § 1(1). It was contemplated that the 1933 Act would be extended to those countries that had entered treaties with the United Kingdom providing for the reciprocal enforcement of British judgments. *See* FOREIGN JUDGMENTS (RECIPROCAL ENFORCEMENT) COMMITTEE, REPORT, 1932, [Cmd. 4213], at 11, 16. The Act currently applies to Austria, Belgium, Germany, France, Israel, Italy, the Netherlands, Norway, and Suriname, and to the Commonwealth jurisdictions of India, Pakistan, Australia, the Federal Court of Canada and the Canadian provinces (except Quebec), Tonga, Guernsey, Jersey, and the Isle of Man. It does not apply to the United States. *See* DICEY & MORRIS, *supra* note 141, at 537.

239. *See* Foreign Judgments (Reciprocal Enforcement) Act, 1933, 23 Geo. 5, c. 13, § 6; DICEY & MORRIS, *supra* note 141, at 486.

240. DICEY & MORRIS, *supra* note 141, at 476. Section 9 of the Act allows the Queen to direct by Order in Council that judgments of a foreign country shall not be enforced at common law if the treatment given to United Kingdom judgments by the courts of that foreign country is "substantially less favourable than that accorded by the courts of the United Kingdom to judgments" of the foreign country. Foreign Judgments (Reciprocal Enforcement) Act, 1933, 23 Geo. 5, c. 13, § 9(1). However, no such order has ever been made. DICEY & MORRIS, *supra* note 141, at 486.

241. Foreign Judgments (Reciprocal Enforcement) Act, 1933, 23 Geo. 5, c. 13, § 1(2)(b) (Eng.).

242. FOREIGN JUDGMENTS (RECIPROCAL ENFORCEMENT) COMMITTEE, REPORT, 1932, [Cmd. 4213], at 7, 60; *see* The Queen of Holland v. Drukker (*In re* Visser), [1928] 1 Ch. 877, 882 (tax claims); Huntington v. Attrill, [1893] A.C. 150 (P.C. 1892) (appeal taken from Ontario) (penal judgments); *supra* notes 40–42, 60–62 and accompanying text.

243. *See* FOREIGN JUDGMENTS (RECIPROCAL ENFORCEMENT) COMMITTEE, REPORT, 1932, [Cmd. 4213], at 6 ("[T]he change suggested by the Committee is one of procedure rather than substance."); *id.* at 17 ("[T]he existing principles of the common law should be followed in matters of substance.").

244. *See supra* note 240 and accompanying text.

245. [1955] A.C. 491 (P.C.); *see supra* notes 78–86 and accompanying text.

246. *Id.* at 506. ("For I see no other reason for the exclusion from the advantages of the Foreign Judgments (Reciprocal Enforcement) Act, 1933, of a judgment for 'a sum payable in respect of taxes or other charges of a like nature or in respect of a fine or other penalty' . . . except that it was regarded as axiomatic that the courts of one country do not have regard to the revenue laws of another and therefore will not allow judgments for foreign taxes to be enforced.")

briefer), and each of the three principal decisions relies primarily on prior judicial decisions rather than on the 1933 Act. In short, nothing in the 1933 Act precludes the courts of the United Kingdom from changing their minds and deciding to enforce foreign penal or tax judgments.

The same is not true of foreign judgments for multiple damages, and in particular antitrust judgments for treble damages, which, under the Protection of Trading Interests Act ("PTIA"), are not enforceable under the 1920 Act, the 1933 Act, or at common law.[247] The PTIA was enacted in response to the extraterritorial application of U.S. antitrust law,[248] although its provision prohibiting the enforcement of judgments for multiple damages is not limited to antitrust judgments.[249] It is worth noting, however, that neither the 1933 Act nor the PTIA prohibits British courts from applying foreign penal, revenue, or public law to decide the merits of a case before them (as opposed to enforcing a foreign judgment). The rules prohibiting them from doing so remain rules of common law and are subject to judicial modification.[250]

---

247. Protection of Trading Interests Act, 1980, c. 11 § 5, 21 I.L.M. 834, 837 (1982) [hereinafter PTIA]. Australia and Canada also have statutes providing that certain foreign judgments are not enforceable. In Australia's case the statute is limited to antitrust judgments and gives the Attorney General discretion to block enforcement entirely or to reduce the amount that will be enforced. Foreign Proceedings (Excess of Jurisdiction) Act, 1984, § 9, 23 I.L.M. 1038, 1041–42 (1984). In Canada's case, the statute is limited to antitrust judgments and judgments under the U.S. Helms-Burton Act, and gives the Attorney General discretion to block enforcement entirely or to reduce the amount that will be enforced. Foreign Extraterritorial Measures Act, R.S.C., c. F-29 (1985), amended by ch. 28, 1996 S.C., § 8 (Can.), 36 I.L.M. 111, 121–22 (1997). However, nothing in these statutes prohibits the enforcement of antitrust judgments in the absence of an order from the respective attorneys general, and a Canadian court has recently read the Canadian statute as confirming the enforceability of foreign antitrust judgments in the absence of such an order. Old N. State Brewing Co. v. Newlands Services Inc., 58 B.C.L.R.3d 144 (B.C.C.A. 1998).

248. For a discussion of the evolution of the PTIA, see A.V. Lowe, *Blocking Extraterritorial Jurisdiction: The British Protection of Trading Interests Act, 1980*, 75 Am. J. Int'l L. 257 (1981). *See also* Andreas F. Lowenfeld, *Sovereignty, Jurisdiction, and Reasonableness: A Reply to A.V. Lowe*, 75 Am. J. Int'l L. 629 (1981).

249. A judgment for multiple damages is defined as "a judgment for an amount arrived at by doubling, trebling or otherwise multiplying a sum assessed as compensation for the loss or damage sustained by the person in whose favour the judgment is given." PTIA § 5(3). It is not clear what effect this provision should have on the enforceability of punitive damages that are not determined by multiplying the amount of compensatory damages. Lord Denning held in *S.A. Consortium Gen. Textiles v. Sun & Sand Agencies*, [1978] 1 Q.B. 279 (C.A.), that the word "penalty" in the 1933 Act did not mean "a sum payable to a private individual, even though it is payable by way of exemplary damages." *Id.* at 299–300. But this case was decided before the PTIA was passed.

250. In 1995, the United Kingdom revised its choice of law rules for torts. *See* Private International Law (Miscellaneous Provisions) Act, 1995, ch. 42, pt. III (Eng.). Section 14(3)(a)(ii) states that "nothing in this Part . . . authorizes the application of the law of a country outside the forum . . . in so far as to do so . . . would give effect to such a penal, revenue or other public law as would not otherwise be enforceable under the law of the forum." But neither does the 1995 Act forbid the application of penal, revenue or public law, and section 14(2) states that "[n]othing in this Part affects any rules of law (including rules of private international law) except those abolished by section 10 above." Thus, the plain purpose of section 14 was neither to abolish nor to endorse the public law taboo, but simply to leave it alone.

### 2. *United States*

In the United States, the enforcement of foreign country judgments is governed by state law.[251] A majority of states have adopted the Uniform Money Judgments Recognition Act, which makes foreign money judgments "enforceable in the same manner as the judgment of a sister state which is entitled to full faith and credit."[252] However, the Uniform Act excludes from its coverage "a judgment for taxes, a fine or other penalty."[253] The Uniform Act was proposed by Professor Kurt Nadelmann,[254] who drafted it with assistance from Professor Willis Reese.[255] Like the British drafters of the 1933 Act,[256] Nadelmann's principal concern was to secure the enforcement of American judgments abroad, particularly in those civil law countries that made enforcement of foreign judgments depend on reciprocity.[257] There is no indication that Nadelmann favored the nonenforcement of foreign penal and tax judgments and Reese, in fact, opposed it.[258] What seems

---

251. *See* RESTATEMENT (THIRD) OF FOREIGN RELATIONS LAW § 481, cmt. a (1987) ("Since Erie v. Tompkins, . . . it has been accepted that in the absence of a federal statute or treaty or some other basis for federal jurisdiction, such as admiralty, recognition and enforcement of foreign country judgments is a matter of State law, and an action to enforce a foreign country judgment is not an action arising under the laws of the United States. Thus, State courts, and federal courts applying State law, recognize and enforce foreign country judgments without reference to federal rules."). *Cf.* Klaxon Co. v. Stentor Elec. Mfg. Co., 313 U.S. 487 (1941) (holding that federal courts sitting in diversity must apply state conflict-of-laws rules).

252. Uniform Act, *supra* note 2, § 2.

253. *Id.* § 1(2).

254. *See* NATIONAL CONFERENCE OF COMMISSIONERS ON UNIFORM STATE LAWS, *reprinted in* HAND-BOOK OF THE NATIONAL CONFERENCE OF COMMISSIONERS ON UNIFORM STATE LAWS AND PROCEED-INGS OF THE ANNUAL CONFERENCE MEETING IN ITS SIXTY-SIXTH YEAR 142–43 (1957) ("This sugges-tion came from Kurt H. Nadelmann, Esquire, of the Harvard Law School . . . ."); *see also* Kurt H. Nadel-mann, *Non-Recognition of American Money Judgments Abroad and What to Do About It*, 42 IOWA L. REV. 236, 258–59 (1957) (recommending "a Uniform Recognition and Enforcement of Foreign Judgments Act designed to codify the substantive rules on recognition for judgments from abroad").

255. *See* Documents, *Uniform Money-Judgments Recognition Act*, 11 AM. J. COMP. L. 412, 412 n.* (1962) ("Professor Kurt H. Nadelmann, Harvard Law School, acted as draftsman. He was assisted by Professor Willis L. M. Reese, Columbia University School of Law.").

256. *See supra* notes 232–237 and accompanying text.

257. Nadelmann observed that in those countries that required reciprocity, the United States was generally not viewed as affording foreign judgments recognition and enforcement with the result that these countries generally refused to enforce U.S. judgments. Nadelmann, *supra* note 254, at 251. He went on to observe that "[i]n relation to some nations at least, legislation in the states will do to secure reciprocal recognition and enforcement for money judgments." *Id.* at 258. Nadelmann's concern was shared by the Commissioners on Uniform State Laws, who noted that "American judgment creditors have found it difficult if not impossible to prove to the satisfaction of the foreign court the existence of reciprocity. Except in California and possibly, one or two other states, the law is not codified. . . . Even where decisions on the point exist, the courts in civil law countries, because of their lack of familiarity with the common law principle of *stare decisis*, often do not accept them as sufficient proof for a finding of existence of reciprocity . . . . The answer to this difficulty apparently is codification." REPORT OF SPECIAL COMMITTEE ON UNIFORM RECOGNITION OF FOREIGN JUDGMENTS ACT, *reprinted in* HANDBOOK OF THE NATIONAL CONFERENCE OF COMMISSIONERS ON UNIFORM STATE LAWS AND PROCEEDINGS OF THE ANNUAL CONFERENCE MEETING IN ITS SIXTY-SEVENTH YEAR 151, 151 (1958).

258. Willis L. M. Reese, *The Status in this Country of Judgments Rendered Abroad*, 50 COLUM. L. REV. 783, 797 (1950) (stating that American courts should not "adopt an arbitrary rule barring enforcement of any foreign judgment based upon a penal or revenue statute.").

to explain the exclusion of penal and tax judgments from the Uniform Act was the desire to achieve widespread adoption by the states in order to promote the reciprocal enforcement of American judgments abroad. Thus, the Act was deliberately conservative.[259]

Section 7 of the Uniform Act provided, however, that "[t]his Act does not prevent the recognition of a foreign judgment in situations not covered by this Act,"[260] and the prefatory note explained: "The Act makes clear that a court is privileged to give the judgment of the court of a foreign country greater effect than it is required to do by the provisions of the Act."[261] Still, some U.S. courts have mistakenly read the Act as a legislative endorsement of the common law prohibitions against enforcing foreign revenue and penal judgments. In *British Columbia v. Gilbertson*, the Ninth Circuit noted the exclusion of tax judgments from the Uniform Act, as enacted in Oregon, and observed: "The only conclusion which can be drawn from this specific exclusion is that the Oregon legislature continues to recognize the revenue rule."[262] In *Chase Manhattan Bank, N.A. v. Hoffman*,[263] the district court stated that Massachusetts' adoption of the Uniform Act "supersedes any common law action to enforce a money-judgment."[264] In light of Section 7 of the Uniform Act, this is simply wrong. The exclusion of penal and tax judgments from the Uniform Foreign Money-Judgements Recognition Act is no endorsement of the public law taboo, and Section 7 makes clear that courts are free to enforce at common law penal and tax judgments that are not covered by the Uniform Act.

### B. *Judgments and Conflicts Conventions*

In many countries, the enforceability of foreign judgments is not just the subject of domestic legislation but also of treaties. In Europe, the Brussels and Lugano Conventions provide for the reciprocal enforcement of judgments in "civil and commercial matters," and the draft Hague Judgments

---

259. As its prefatory note explains: "The Act states rules that have long been applied by the majority of courts in this country. In some respects the Act may not go as far as the decisions." Prefatory Note, Uniform Foreign Money-Judgments Recognition Act, *reprinted in* HANDBOOK OF THE NATIONAL CONFERENCE OF COMMISSIONERS ON UNIFORM STATE LAWS AND PROCEEDINGS OF THE ANNUAL CONFERENCE MEETING IN ITS SEVENTY-FIRST YEAR 242, 242 (1962).

260. Uniform Act, *supra* note 2, § 7.

261. Prefatory Note, *supra* note 259, at 242.

262. 597 F.2d 1161, 1165 (9th Cir. 1979). For further discussion of *Gilbertson*, see *supra* notes 92–95 and accompanying text.

263. 665 F. Supp. 73 (D. Mass. 1987).

264. *Id.* at 76. The statement was dictum because the court held that the Belgian judgment at issue was not a fine or penalty and thus was enforceable under the Uniform Act notwithstanding the fact that the damages judgment was rendered in the courts of a criminal proceeding. *Id.* at 75–76; *accord* Raulin v. Fischer, [1911] 2 K.B. 93, 97–98 (damages for criminal negligence awarded by criminal court may be "separated from the rest of the judgment" and enforced). The Supreme Judicial Court of Massachusetts endorsed the district court's interpretation of "fine or other penalty" in *Desjardins Ducharme v. Hunnewell*, 585 N.E.2d 321, 323–24 (Mass. 1992). The court did not comment on the district court's interpretation of the Uniform Act as preempting the common law.

Convention would extend such reciprocal enforcement to many non-European countries including the United States. There are also two treaties harmonizing the conflict-of-laws rules applicable to international contracts—the Rome Convention and the Inter-American Convention. None of these conventions prohibit the enforcement of foreign penal, tax, or other regulatory law. The Brussels Convention, in fact, appears to require the enforcement of private antitrust judgments, and an early version of the draft Hague Judgments Convention would have required the enforcement of antitrust judgments in favor of both private parties and governmental authorities.

### 1. The Brussels and Lugano Conventions

The Brussels Convention provides for the recognition and enforcement of judgments among the members of the European Union.[265] The Lugano Convention extends these rules to the members of the European Free Trade Association.[266] The scope of each convention is limited to "civil and commercial matters whatever the nature of the court or tribunal."[267] The phrase "civil and commercial" was not defined in the Brussels Convention as originally drafted, although the text makes clear that it applies to civil judgments rendered by criminal or administrative courts.[268] When the United Kingdom, Ireland, and Denmark acceded to the Convention in 1978, a sentence was added to Article 1 regarding revenue, customs, and administrative matters, so that this article now reads: "This Convention shall apply in civil and commercial matters whatever the nature of the court or tribunal. It shall not extend, in particular, to revenue, customs or administrative matters."[269]

---

265. Brussels Convention, *supra* note 8. Beginning on March 2, 2002, the Brussels Convention will be superceded by Council Regulation (EC) No. 44/2001 on Jurisdiction and the Recognition and Enforcement of Judgments in Civil and Commercial Matters, Art. 68(1), 2001 O.J. (L 12) 1, 14 [hereinafter Council Judgments Regulation]. Denmark did not participate in the adoption of the Council Judgments Regulation, and relations between Denmark and the other Member States will continue to be governed by the Brussels Convention. Council Judgments Regulation, *supra*, recitals 21–22, 2001 O.J. (L 12) at 2–3.

266. Lugano Convention, *supra* note 229.

267. Brussels Convention, *supra* note 8, art. 1; Lugano Convention, *supra* note 229, art. 1.

268. *See* P. Jenard, *Report on the Convention on Jurisdiction and the Enforcement of Judgments in Civil and Commercial Matters*, 1979 O.J. (C 59) 1, 9–10 [hereinafter Jenard Report]. *Compare* Raulin v. Fischer, [1911] 2 K.B. 93, 98 (enforcing judgment for damages by French criminal court) *with* Chase Manhattan Bank v. Hoffman, 665 F. Supp. 73, 75–76 (D. Mass. 1987) (enforcing judgment for damages by Belgian criminal court). For the original text of the Brussels Convention, see Convention on Jurisdiction and Enforcement of Judgments in Civil and Commercial Matters, Sept. 27, 1968, 1972 O.J. (L 299) 32, 8 I.L.M. 229 (1969).

269. Brussels Convention, *supra* note 8, art. 1. The reason for this specific exclusion was that "[i]n the United Kingdom and in Ireland the expression 'civil law' . . . is used mainly as the opposite of criminal law . . . . Constitutional law, administrative law and tax law are all included in 'civil law.'" Peter Schlosser, *Report on the Convention on the Association of the Kingdom of Denmark, Ireland and the United Kingdom of Great Britain and Northern Ireland to the Convention on Jurisdiction and the Enforcement of Judgments in Civil and Commercial Matters and to the Protocol on its Interpretation by the Court of Justice*, 1979 O.J. (C 59) 71, 82–83 [hereinafter Schlosser Report]. No specific exclusion for criminal matters was added because it seemed "obvious that criminal proceedings and criminal judgments of all kinds are excluded from the scope of

This revised version of Article 1 was in turn incorporated in the Lugano Convention.[270] Thus, it is clear that neither convention applies to judgments for penalties or taxes.

Whether the Brussels Convention applies to antitrust judgments is a closer question. The European Court of Justice has held that the phrase "civil and commercial" excludes cases in which a public authority is acting in the exercise of its governmental powers.[271] Thus, it seems fairly clear that judgments in favor of governmental authorities enforcing their own competition laws or Articles 81 and 82 of the E.C. Treaty[272] are not enforceable under the Brussels Convention.[273]

Private antitrust judgments, on the other hand, may fall within the Convention. In 1993, the European Commission stated that in its view, "competition judgments are already governed by [the Brussels] Convention where they are handed down in cases of a civil and commercial nature."[274]

Moreover, the Brussels Convention does not prohibit the recognition of foreign judgments that fall outside its scope.[275] Thus, in the United Kingdom for example, matters that fall outside the Brussels Convention are still enforceable under the 1933 Act or the common law.[276] In short, the exclu-

---

the [Brussels] Convention." *Id.* at 84. The Report adds: "This applies not only to criminal proceedings *strictu sensu.* Other proceedings imposing sanctions for breaches of orders or prohibitions intended to safeguard the public interest also fall outside the scope of civil law." *Id.* The new Council Judgments Regulation repeats the language of the Brussels Convention with respect to its scope. Council Judgments Regulation, *supra* note 265, art. 1, 2001 O.J. (L 12) at 3.

270. Lugano Convention, *supra* note 229, art. 1.

271. Case 814/79, The Netherlands v. Rüffer, [1980] E.C.R. 3807, 3820 (E.C.J.) (holding that a judgment for the costs of removing wreck from a public waterway was not enforceable under the Brussels Convention); Case 29/76, L.T.U. Lufttransportunternehmen GmbH v. Eurocontrol, [1976] E.C.R. 1541, 1551 (E.C.J.) (holding that a judgment to recover mandatory charges for providing air safety services was not enforceable under the Brussels Convention).

272. Consolidated Versions of the Treaty Establishing the European Community, arts. 81 & 82, 1997 O.J. (C 340) 173, 208–09 [hereinafter E.C. Treaty]. Prior to 1997, Articles 81 and 82 were numbered Articles 85 and 86, respectively. In eight out of the fifteen member states of the European Union, administrative authorities can directly apply Articles 81 and 82. *See* Application of Articles 85–86 in the Member States, http://europa.eu.int/comm/competition/antitrust/tabl_en.html.

273. *See* Notice on Cooperation Between National Courts and the Commission in Applying Articles 85 and 86 of the EEC Treaty ¶ 44, 1993 O.J. (C 39) 6, 11 [hereinafter Cooperation Notice] (stating that the European Commission would study the possibility of extending the Brussels Convention to competition cases assigned to administrative courts).

274. *Id.* at 11. *See also* Helene Gaudemet-Tallon, Les Conventions de Bruxelles et de Lugano 23 (2d ed. 1996) ("Si le litige s'élève entre deux personne privées, il relève de la Convention . . . quand bien même la règle de droit en cause serait une règle de droit public." [If the litigation arises between two private persons, it falls within the Convention even though the rule of law in the case is a rule of public law.]). Several members of the European Union permit private plaintiffs to recover damages for violations of Articles 81 and 82. *See* Dodge, *Hague*, *supra* note 7, at 381–82 & n.93. The new Council Judgments Regulation does not deal with this question. *See* Council Judgments Regulation, *supra* note 265.

275. Joined Cases 9 & 10/77, Bavaria Fluggesellschaft Schwabe and Germanair v. Eurocontrol, [1977] E.C.R. 1517 (E.C.J.). Neither does the new Council Judgments Regulation. *See* Council Judgments Regulation, *supra* note 265, arts. 34–35; 2001 O.J. (L12) at 10 (listing grounds for non-recognition).

276. *See* T. C. Hartley, Civil Jurisdiction and Judgments 10 (1984) ("Whether [a judgment outside the scope of the Brussels Convention] is enforceable at all will depend on the law in force before the Convention. This is the Foreign Judgments (Reciprocal Enforcement) Act 1933, where applicable,

sion of penal, revenue, and governmental antitrust judgments from the Brussels and Lugano Conventions does not prevent the courts of the member states from recognizing such judgments if they choose to do so.

## 2. The Draft Hague Judgments Convention

The Hague Conference on Private International Law is currently attempting to negotiate a multilateral judgments convention that would include not just the members of the European Union but a number of other countries, including the United States, Canada, and Australia.[277] Like the Brussels and Lugano Conventions, the interim text of the Hague Judgments Convention ("Interim Text") "applies to civil and commercial matters. It shall not extend in particular to revenue, customs or administrative matters."[278] Unlike the Brussels and Lugano Conventions, the Interim Text also proposes explicitly to exclude "anti-trust or competition claims" from the Convention, although the scope of this exclusion is not yet clear.[279] In an earlier draft, the Convention would have applied to antitrust suits brought by private parties and to civil suits filed by a government.[280] This application to antitrust cases was opposed by the United States and supported by most of the other parties to the Hague negotiations because it was thought that the Convention's provisions on personal jurisdiction would effectively limit the extraterritorial application of U.S. antitrust law,[281] and it appears that the U.S. position has now carried the day.

The negotiating history of the Hague Judgments Convention holds at least two lessons for the public law taboo. First, a large majority of the parties to the Hague negotiations were willing to break the public law taboo and expressly agree to enforce foreign antitrust judgments when they thought it was in their interests to do so. Second, the proposed exclusion of antitrust cases from the current Interim Text is not an endorsement of the public law taboo, and nothing in that text would prohibit the parties to a Hague Judgments Convention from enforcing foreign public law judgments if they so chose.[282]

---

and the common law.").

277. For background on the origins of the Convention, see Peter H. Pfund, *The Project of the Hague Conference on Private International Law to Prepare a Convention on Jurisdiction and the Recognition/Enforcement of Judgments in Civil and Commercial Matters*, 24 BROOK. J. INT'L L. 7 (1998).

278. Convention on Jurisdiction and Foreign Judgments in Civil and Commercial Matters, Interim Text, Jun. 6–20, 2001, art. 1(1), ftp://hcch.net/doc/jdgm2001draft_e.doc [hereinafter Interim Text].

279. *See id.* art. 1(2)(i) & n.6.

280. Dodge, *Hague, supra* note 7, at 375–76; *see* Preliminary Draft Convention on Jurisdiction and Foreign Judgments in Civil and Commercial Matters, http://www.hcch.net/e/conventions/draft36e.html.

281. Dodge, *Hague, supra* note 7, at 364.

282. *See* Interim Text, *supra* note 278, arts. 26 & 28, (setting forth grounds for non-recognition and non-enforcement).

### 3. The Rome and Inter-American Conventions

There are two conflicts conventions that permit (but do not require) the application of foreign mandatory rules. Mandatory rules are defined in the Rome Convention as "rules of . . . law . . . which cannot be derogated from by contract,"[283] which might include rules of criminal, antitrust, or securities law. Article 7(1) of the Rome Convention states that effect "may" be given "to the mandatory rules of law of another country with which the situation has a close connection, if . . . under the law of [that] country, those rules must be applied whatever the law applicable to the contract."[284] Article 11 of the Inter-American Convention on the Law Applicable to International Contracts similarly allows courts to apply foreign mandatory rules, stating that "[i]t shall be up to the forum to decide when it applies the mandatory provisions of the law of another State with which the contract has close ties."[285] The important aspect of these two conventions is that they recognize the *possibility* of applying foreign mandatory law,[286] and that they expressly leave that possibility open. Thus, courts in countries that are parties to these conventions would be free to apply foreign antitrust or securities law, for example, if they saw fit to do so.

### C. Tax Treaties

Several U.S. tax treaties—those with Canada, Denmark, France, the Netherlands, and Sweden—contain general collection assistance provisions that have chipped away at the revenue rule,[287] though historically such pro-

---

283. Rome Convention on the Law Applicable to Contractual Obligations, June 19, 1980, art. 3(3), 19 I.L.M. 1492, 1493 (1980).

284. *Id.* art. 7(1) at 1494. Under Article 22(1)(a), Contracting States may reserve the right not to apply Article 7(1), and Germany, Ireland, Luxembourg, and the United Kingdom have done so. Hartley, *supra* note 4, at 370. The effect that such a reservation has on the preexisting freedom of a court in one of these countries to apply foreign mandatory law is not clear. For an argument that English courts are still free to recognize illegality under foreign law as a defense to enforcement of a contract under preexisting English law, see *id.* at 403.

285. The Inter-American Convention on the Law Applicable to International Contracts, Mar. 19, 1994, art. 11, 33 I.L.M. 732, 735 (1994).

286. Research for this Article has not uncovered any cases applying foreign mandatory rules under Article 7(1). In two Dutch cases predating the Rome Convention's entry into force, the courts recognized the potential applicability of foreign mandatory rules, although neither case applied those rules. *See* Compagnie Europeenne des Petroles S.A. v. Sensor Nederland B.V., 22 I.L.M. 66 (1983) (Dist. Ct., The Hague 1983); The Alnati, HR 13 May 1966, NJ 16 (Neth.). For a discussion of these cases, see Hartley, *supra* note 4, at 356–59.

287. Revised Protocol Amending the Convention Between the United States and Canada with Respect to Taxes on Income and on Capital, Apr. 24, 1995, U.S.-Can., art. 15, S. Treaty Doc. No. 104-4 (1995); Convention on Double Taxation: Taxes on Income, May 6, 1948, U.S.-Den., art. XVIII, 62 Stat. 1730; Convention for the Avoidance of Double Taxation, Aug. 31, 1994, U.S.-Fr., art. 28, S. Treaty Doc. No. 103-32 (1994); Convention with the Netherlands, Dec. 18, 1992, U.S.-Neth., art. 31, S. Treaty Doc. No. 103-6 (1993); Convention for the Avoidance of Double Taxation, Sept. 1, 1994, U.S.-Swed., art. 27, Sen. Treaty Doc. No. 103-29 (1994). Other U.S. tax treaties contain only limited collection assistance provisions, which provide that "[e]ach of the Contracting States shall endeavor to collect on behalf of the other Contracting State such amounts as may be necessary to ensure that relief granted by the Convention from taxation imposed by that other State does not inure to the benefit of persons not entitled thereto."

visions have encountered stiff resistance from U.S. business.[288] In 1939, the United States and Sweden concluded a treaty that committed each country to assist the other in collecting taxes owed by nationals of the taxing country.[289] Shortly thereafter, the United States and France concluded a similar treaty, which broadened the assistance provision to cover taxes owed by the taxing country's nationals and nationals of third countries, but not nationals of the country from which assistance was requested.[290] World War II postponed ratification, however, and this treaty did not enter into force until 1945.[291]

In 1946, the United States concluded a new treaty with France, Article 12 of which extended the collection assistance provision to taxes owed by nationals of the country from which assistance was requested.[292] This meant that the United States would have been obliged to assist France in collecting French taxes from American citizens and corporations. The provision drew strong opposition from the U.S. business community, which argued that it would unconstitutionally deprive U.S. taxpayers of property without due process of law.[293]

---

United States Model Income Tax Convention of September 20, 1996, art. 26(4), *reprinted in* 1 Tax Treaties (CCH) ¶ 214 (Dec. 1999). For a discussion of both general and limited enforcement provisions in U.S. tax treaties, see Alan R. Johnson, Lawrence Nirenstein & Stephen E. Wells, *Reciprocal Enforcement of Tax Claims Through Tax Treaties*, 33 TAX LAW. 469, 472–81 (1980).

288. *See generally Convention with France on Double Taxation: Hearings Before a Subcomm. of the Senate Comm. on Foreign Relations*, 80th Cong. (1947) [hereinafter *1947 Hearings*]; *Conventions with South Africa, New Zealand, Norway, Ireland, Greece, and Canada on Double Taxation: Hearings Before a Subcomm. of the Senate Comm. on Foreign Relations*, 82d Cong. (1951) [hereinafter *1951 Hearings*].

289. Convention for the Avoidance of Double Taxation, Mar. 23, 1939, U.S.-Swed., 17 U.S.T. 958.

290. Convention for the Avoidance of Double Taxation, July 25, 1939, U.S.-Fr., 23 U.S.T. 988.

291. In the meantime, the United States negotiated tax treaties with Canada and the United Kingdom. *See* Convention for the Avoidance of Double Taxation, Mar. 4, 1942, U.S.-Can., 56 Stat. 1399; Convention with the United Kingdom, Apr. 16, 1945, U.S.-U.K., T.I.A.S. No. 1546. Neither of these treaties contained collection assistance provisions, however, because of opposition from the Canadian and British governments. *1947 Hearings*, *supra* note 288, at 23 (statement of Eldon P. King, Special Deputy Commissioner, Bureau of Internal Revenue).

292. *1947 Hearings*, *supra* note 288, at 33.

293. *See id.* at 45 (Memorandum from National Foreign Trade Council, Inc. (Feb. 1, 1947)) ("The primary reason for [deleting Article 12] is that it would probably be contrary to the provisions in the United States Constitution concerning the taking of property without due process of law to require our courts to enforce without review revenue claims of a foreign state, whether against citizens of the United States or of any foreign country which have been 'finally determined.'"); *id.* at 115 (Memorandum from National Foreign Trade Council, Inc. (Apr. 12, 1947)) ("Even if a taxpayer has been given or offered a hearing before a French tribunal, there is no proof that standards of justice acceptable in the foreign jurisdiction meet the American concept of due process of law."); *id.* at 167 (Statement of Ellsworth C. Alvord, Committee on Taxation, United States Associates, International Chamber of Commerce, Inc. (Apr. 1, 1947)) ("[T]o treat the foreign determination as final and not open to reexamination by our courts . . . might be acting contrary to our own concept of due process of law."). The revenue rule was not raised by any of the witnesses and was mentioned only in the written resolution adopted by the Taxation Committee of the International Chamber of Commerce submitted to the Senate subcommittee on the final day of the hearings. *See id.* (arguing that the United States should not "be placing our courts in the position of interpreting and administering foreign tax laws, a task which would not only be burdensome but possibly productive of international complications" and citing *Moore v. Mitchell*, 30 F.2d 600 (2d Cir. 1929)).

The Senate subcommittee asked the Internal Revenue Service ("IRS"), the Joint Committee on Internal Revenue Taxation, and the National Foreign Trade Council ("NFTC") to work out a compromise. They agreed to exclude nationals of the state from which assistance was requested from the collection provisions of the French treaty.[294] Similar collection assistance provisions (limited to taxes owed by nationals of the country assessing the taxes and of third countries) were incorporated into the treaties then being negotiated with Denmark and the Netherlands.[295] The business community again objected, however, when the United States tried to put general collection assistance provisions in new treaties with Greece, Norway, and South Africa,[296] relying this time not on the due process clause but on the authority of the revenue rule.[297] The IRS representative replied that the revenue rule was precisely the reason such treaty provisions were necessary.[298]

Ultimately, the Senate subcommittee recommended that the Greek, Norwegian, and South African tax treaties be ratified "subject to the understanding that each of the governments may collect the other's tax solely in order to insure that the exemptions or reduced rates of tax provided under the respective conventions will not be enjoyed by persons not entitled to such benefits."[299] The subcommittee did not give its reasons, other than to say that, "as a general rule, it is not believed wise to have one government collect the taxes which are due to another government."[300] The Senate con-

---

294. *See* Protocol to Convention on Double Taxation and Fiscal Assistance, Oct. 18, 1946, U.S.-Fr., art. I, T.I.A.S. No. 1982, at 31.

295. *See* Convention on Double Taxation: Taxes on Income, May 6, 1948, U.S.-Den., art. XVIII, 62 Stat. 1730, 1736; Convention on Double Taxation: Taxes on Income, Apr. 29, 1948, U.S.-Neth., art. XXII, 62 Stat. 1757, 1766; *1951 Hearings, supra* note 288, at 4 (statement of Eldon P. King, Special Deputy Commissioner, Bureau of Internal Revenue) ("[T]he principles of administrative cooperation finally adopted in the French treaty, after some protocol amendments . . . , were carried into the then pending Netherlands and Danish treaties.").

296. The NFTC representative testified that he thought the U.S. government had agreed to put only limited collected assistance provisions in future treaties. *1951 Hearings, supra* note 288, at 14–15 (statement of Mitchell B. Carroll, Special Tax Consultant, National Foreign Trade Council). For the distinction between general and limited assistance provisions, see *supra* note 287 and accompanying text.

297. *See, e.g., 1951 Hearings, supra* note 288, at 37 (statement of Mitchell B. Carroll, Special Tax Consultant, National Foreign Trade Council) ("[T]hese collection assistance provisions . . . are contrary to the established principles of British jurisprudence and American jurisprudence. And consequently they should be deleted from the conventions.").

298. *1951 Hearings, supra* note 288, app. at 69 (supplementary statement of Eldon P. King, Special Deputy Commissioner, Bureau of Internal Revenue) ("The point that under existing international law and rules of comity, fortified by court decisions, foreign and domestic, the United States cannot collect a tax imposed by a foreign government is readily conceded. Thus, to do so, it is necessary to incorporate collection aid in a treaty.").

299. S. Rep. No. 82-1, at 21 (1951).

300. *Id.* On the floor of the Senate, the subcommittee chairman, Senator George, elaborated somewhat:

> I may say that this was the view taken by the committee with respect to all these assistance provisions. It was simply deemed unwise to have our citizens in foreign countries subjected to the judicial procedures of those countries, and likewise it was deemed unwise to obligate our country to undertake the collection in our own courts of taxes due to the foreign countries dealt with in these

curred and ratified the treaties with these limitations.[301]

United States policy remained fixed in a position of non-cooperation for the next forty years. In 1967, when the French treaty was revised, its collection assistance provision was continued but the Senate Foreign Relations Committee was careful to note that "it approved this Article only because similar language is contained in the 1939 treaty with France, and it should not be considered as a precedent for future treaties."[302] In 1988, the OECD concluded the Convention on Mutual Administrative Assistance in Tax Matters, Article 11 of which requires its signatories to "take the necessary steps to recover tax claims of [other signatories] as if they were its own tax claims."[303] The United States ratified the Convention, but entered a reservation with respect to collection assistance under Article 11.[304] Although the Joint Committee on Taxation noted that "the United States may forego significant benefits under the convention by entering this reservation," the Administration thought the reservation advisable in light of past Senate opposition to such assistance and the fact that "the United States has not had extensive experience using the broad collection assistance provisions that are contained in four existing U.S. tax treaties."[305]

By 1995, however, the U.S. position had shifted. In that year, the United States and Canada concluded a protocol that added a provision on collection assistance to the existing Canada-U.S. tax treaty.[306] Like the provisions in the U.S. treaties with France, Denmark, and the Netherlands, the protocol with Canada does not require the United States to provide assistance where the taxpayer is a U.S. national,[307] but the protocol marks the first time since 1948 that the United States has been willing to extend such a provision to a new country.[308] Furthermore, instead of disclaiming the protocol's value as a precedent, the Joint Committee on Taxation's report to the Senate noted that

---

conventions. It will be recalled that in many instances, or perhaps all, the courts would be called upon to enforce very harsh civil penalties, and it was not deemed wise for our courts to undertake that particular job.
97 CONG. REC. 11,434 (1951) (statement of Sen. George); *see also id.* at 11,435 (statement of Sen. Smith) (noting that the subcommittee was "zealously careful of the rights of American citizens").

301. 97 CONG. REC. 11,445 (1951) (South Africa); *id.* at 11,452 (Norway); *id.* at 11,462 (Greece).

302. S. REP. No. 90-5, at 5 (1968).

303. 27 I.L.M. 1160, 1168 (1988).

304. STAFF OF JOINT COMM. ON TAXATION, 101ST CONG., EXPLANATION OF PROPOSED CONVENTION ON MUTUAL ADMINISTRATIVE ASSISTANCE IN TAX MATTERS 8 (Comm. Print 1990).

305. *Id.*

306. Revised Protocol Amending the 1980 Tax Convention, Apr. 24, 1995, U.S.-Can., art. 15, S. TREATY DOC. No. 104-4 (1995).

307. *Id.*

308. The United States quickly attempted to make use of the provision, requesting Canada's assistance in 1996 to enforce a tax judgment against Judy Chua. Chua v. Minister of Nat'l Revenue, [2001] 1 F.C. 641 (Fed. Ct. 2000). A Canadian court held that it was within Parliament's powers to agree to the collection assistance provision, *id.* ¶¶ 27–45, but that the retroactive application of the provision to Canadian citizens who were not citizens at the time the tax was assessed, but not to Canadian citizens who were citizens at the time the tax was assessed, violated the equal protection provision of Canada's Charter of Rights and Freedoms. *Id.* ¶¶ 46–70.

"[i]nclusion of the assistance in collection provision in the proposed Canadian protocol may lead to increased interest in the inclusion of similar provisions in protocols or treaties with other governments."[309]

### D. Criminal Law Treaties

The United States has also entered two kinds of treaties providing for the enforcement of foreign penal law: (1) prisoner transfer treaties; and (2) mutual legal assistance treaties (MLATs).[310] The United States entered its first prisoner transfer treaty with Mexico in 1976.[311] Since then, the United States has concluded seven additional bilateral prisoner transfer treaties,[312] and has joined both the Council of Europe Convention on the Transfer of Sentenced Persons (which applies to 48 countries)[313] and the Inter-American Convention on Serving Criminal Sentences Abroad (which applies to 10).[314] These treaties benefit U.S. nationals jailed abroad by allowing them to serve their sentences at home and ease the burden on the U.S. prison system of incarcerating foreign prisoners in the United States,[315] but they also require the United States to enforce foreign penal law.[316]

---

309. STAFF OF JOINT COMM. ON TAXATION, 104TH CONG., EXPLANATION OF PROPOSED PROTOCOL TO THE INCOME TAX TREATY BETWEEN THE UNITED STATES AND CANADA 43 (Comm. Print 1995).

310. For a discussion of U.S. statutes that recognize foreign criminal convictions for the purpose of statutory bars against double jeopardy, habitual offender statutes, and the exclusion of aliens from the United States, see A. Kenneth Pye, *The Effect of Foreign Criminal Judgments in the United States*, 32 U. Mo. (K.C.) L. REV. 114 (1964). However, these statutes are generally designed to further U.S. domestic interests rather than to enforce foreign penal law.

311. Treaty on the Execution of Penal Sentences, Nov. 25, 1976, Mex.-U.S., 28 U.S.T. 7399.

312. These seven treaties are with Canada, Bolivia, Panama, Turkey, Peru, France, and Thailand. For a discussion of such treaties, see 6 MICHAEL ABBELL & BRUNO A. RISTAU, INTERNATIONAL JUDICIAL ASSISTANCE 3–4 & n.3 (Supp. 1997) (listing bilateral treaties). Other countries have entered similar treaties. *See generally* MICHAL PLACHTA, TRANSFER OF PRISONERS UNDER INTERNATIONAL INSTRUMENTS AND DOMESTIC LEGISLATION: A COMPARATIVE STUDY (1993).

313. Council of Europe Convention on the Transfer of Sentenced Persons, Mar. 21, 1983, 35 U.S.T. 2867, 22 I.L.M. 530 [hereinafter Council of Europe Prisoner Convention]. The Council of Europe Prisoner Convention has been signed by Albania, Andorra, Armenia, Austria, Azerbaijan, Bahamas, Belgium, Bulgaria, Canada, Chile, Costa Rica, Croatia, Cyprus, Czech Republic, Denmark, Estonia, Finland, France, Georgia, Germany, Greece, Hungary, Iceland, Ireland, Israel, Italy, Latvia, Liechtenstein, Lithuania, Luxembourg, Macedonia, Malta, Netherlands, Norway, Panama, Poland, Portugal, Romania, Slovakia, Spain, Sweden, Switzerland, Tonga, Trinidad and Tobago, Turkey, Ukraine, and the United Kingdom in addition to the United States. *See* Cyprus Ratifies the Protocol to the Council of Europe's Convention on Transfer of Sentenced Persons (June 1, 2001), http://press.coe.int/cp/2001/386aa(2001).htm.

314. Inter-American Convention on Serving Criminal Sentences Abroad, June 9, 1993 (entered into force for the United States May 25, 2001), http://www.oas.org/juridico/english/treaties/A-57.htm [hereinafter Inter-American Prisoner Convention]. The Inter-American Prisoner Convention has been signed by Brazil, Canada, Chile, Costa Rica, Ecuador, Mexico, Panama, Paraguay, and Venezuela, in addition to the United States. *See id.*

315. 6 ABBELL & RISTAU, *supra* note 312, at 6–8.

316. Technically, U.S. law governs the execution of a foreign sentence following a transfer. *See* 18 U.S.C. § 4103 (1994) ("All laws of the United States, as appropriate, pertaining to prisoners, probationers, parolees, and juvenile offenders shall be applicable to offenders transferred to the United States, unless a treaty or this chapter provides otherwise."). However, the United States will give effect to foreign pardons, commutations, and amnesties that benefit the transferred prisoners. *Id.* § 4100(d). A foreign order that the transferred prisoner pay restitution or reparations "to the victim of the offense for

The United States has also entered a series of MLATs, primarily for the purpose of obtaining evidence for use in U.S. criminal proceedings.[317] Beginning with the Canada-U.S. MLAT in 1985,[318] however, the United States has sought to include a provision regarding assistance with forfeiture, restitution, and the collection of criminal fines. Article XVII(2) of the MLAT with Canada reads: "The Parties shall assist each other to the extent permitted by their respective laws in proceedings related to the forfeiture of the proceeds of crime, restitution to the victims of crime, and the collection of fines imposed as a sentence in a criminal prosecution."[319] Similar provisions have been included in MLATs with Argentina, Hungary, Mexico, Nigeria, the Philippines, the United Kingdom, and Uruguay.[320] Several other MLATs contain similar provisions but require dual criminality—that the offense be a crime under the laws of both countries.[321] Several more have provisions of more limited scope.[322] Although all of these provisions require assistance

---

damage caused by the offense . . . may be enforced as though it were a civil judgment rendered by a United States district court." *Id.* § 4115.

317. *See* 3 ABBELL & RISTAU, *supra* note 312, at 128–31. The first such treaty was concluded with Switzerland in 1973. Mutual Assistance in Criminal Matters, May 25, 1973, Switz.-U.S., 27 U.S.T. 2019.

318. Treaty on Mutual Legal Assistance in Criminal Matters, Mar. 18, 1985, Can.-U.S., S. TREATY DOC. No. 100-14 (1988), 24 I.L.M. 1092 (1985).

319. *Id.* art. XVII(2).

320. Treaty on Mutual Legal Assistance in Criminal Matters, Dec. 4, 1990, U.S.-Arg., art. 16(2), S. TREATY DOC. No. 102-18 (1991); Treaty on Mutual Legal Assistance in Criminal Matters, Dec. 1, 1994, U.S.-Hun., art. 17(2), S. TREATY DOC. No. 104-20 (1995); Mutual Legal Assistance Cooperation Treaty, Dec. 9, 1987, U.S.-Mex., art. 11(2), S. TREATY DOC. No. 100-13 (1988); Treaty on Mutual Legal Assistance in Criminal Matters, Sept. 13, 1989, U.S.-Nig., art. XVII(1), S. TREATY DOC. No. 102-26 (1992); Treaty on Mutual Legal Assistance in Criminal Matters, Nov. 13, 1994, U.S.-Phil., art. 16(2), S. TREATY DOC. No. 104-18 (1995); Treaty on Mutual Legal Assistance in Criminal Matters, May 6, 1991, U.S.-Uru., art. 22(2), S. TREATY DOC. No. 102-19 (1991). Each of these treaties is reproduced at 3 ABBELL & RISTAU, *supra* note 312, app. D.

321. *See* Treaty on Mutual Legal Assistance in Criminal Matters, June 12-Aug. 18, 1987, U.S.-Bah., arts. 14(2), 2(1), 2(2), S. TREATY DOC. No. 100-17 (1988) (requiring dual criminality and specifically excluding tax offenses); Treaty Concerning the Cayman Islands on Mutual Legal Assistance in Criminal Matters, July 3, 1986, U.S.-U.K., arts. 16(2), 19(3), 19(3)(a), S. TREATY DOC. No. 100-8 (1997) (requiring dual criminality and specifically excluding most tax offenses); Treaty on Mutual Legal Assistance in Criminal Matters, July 7, 1989, U.S.-Jam., arts. 20, 1(3), S. TREATY DOC. No. 102-16 (1991) (giving discretion not to comply if no dual criminality); Treaty on Mutual Legal Assistance in Criminal Matters, Apr. 11, 1991, U.S.-Pan., arts. 14(2), 2(1), 2(2), S. TREATY DOC. No. 102-15 (1991) (requiring dual criminality and specifically excluding tax offenses); Treaty on Mutual Legal Assistance in Criminal Matters, Nov. 11, 1990, U.S.-Spain, arts. 16(2), 1(3), S. TREATY DOC. No. 102-21 (1992) (requiring dual criminality). Each of these treaties is reproduced at 3 ABBELL & RISTAU, *supra* note 312, app. D.

322. Treaty on Mutual Legal Assistance in Criminal Matters, Jan. 28, 1988, U.S.-Belg., art. 12(1), S. TREATY DOC. No. 100-16 (1988) (providing for assistance with forfeiture and restitution only); Treaty on Mutual Legal Assistance in Criminal Matters, Nov. 9, 1982, U.S.-Italy, art. 18, S. TREATY DOC. No. 98-25 (1984) (providing assistance with forfeiture only); Treaty on Mutual Legal Assistance in Criminal Matters, Nov. 23, 1993, U.S.-Korea, art. 104-1 (1995) (providing assistance with forfeiture only); Treaty on Mutual Legal Assistance in Criminal Matters, Oct. 7, 1983, U.S.-Morocco, art. 12, S. TREATY DOC. No. 98-24 (1984) (providing for assistance with seizure of narcotic related assets only); Treaty on Mutual Legal Assistance in Criminal Matters, Mar. 19, 1986, U.S.-Thail., art. 15(2), S. TREATY DOC. No. 100-18 (1988) (providing for assistance with forfeiture only); Treaty on Mutual Legal Assistance in Criminal Matters, Jan. 6, 1994, U.S.-U.K., art. 16(1), S. TREATY DOC. No. 104-2 (1995) (providing for assistance with forfeiture and fines only). Each of these treaties is reproduced

only to the extent permitted by domestic law, these MLATs demonstrate a willingness to cooperate in the enforcement of foreign criminal law.

In both the prisoner transfer treaties and the MLATs, the United States and its treaty partners have agreed that they will help enforce foreign penal law, *The Antelope*[323] notwithstanding. This is clearly within the power of the political branches. As Chief Judge Kaufman wrote for the Second Circuit in rejecting a transferred prisoner's claim that the United States lacked authority to detain him:

> [N]othing in the doctrine enunciated by Marshall [in *The Antelope*] precludes a sovereign power from extending recognition to another's penal laws where it chooses to do so. Nor does Marshall's dictum suggest any principle limiting the power of sovereign nations to enter into mutual compacts or treaties obligating the signatories to honor and enforce the penal decrees of one another.[324]

## III. Reasons for the Public Law Taboo

Writing about the nonenforcement of penal and governmental claims in 1932, Robert Leflar observed: "One trouble about a rule of law which everyone takes for granted is that no judge ever bothers to state the reasons for it."[325] Of course, the early English decisions articulating the prohibition against foreign penal laws did state clearly that the prohibition rested on the territorial nature of criminal law.[326] Lord Hardwicke was also clear in *Boucher v. Lawson* that the revenue rule was based on a desire to promote trade.[327] The problem is that neither reason seems persuasive today. Even if criminal law is still properly considered territorial, it is no more territorial than property law. Nevertheless, we have seen that British and American courts willingly enforce foreign laws expropriating property within their borders,[328] so why not penal laws? A desire to promote trade does not explain the application of the revenue rule to modern taxes (or the fact that it is no longer applied in contract cases like *Boucher*[329]). Indeed, the current incarnation of the revenue rule seems to be not the result of reason but rather, as one author has put it, of "slavish repetition and indiscriminate application"[330] of Lord Mansfield's dictum.[331]

---

at 3 Abbell & Ristau, *supra* note 312, app. D.

323. 23 U.S. 66, 123 (1825) ("The Courts of no country execute the penal laws of another . . . ."); *see supra* notes 15–18 and accompanying text.

324. *See* Rosado v. Civiletti, 621 F.2d 1179, 1192 (2d Cir. 1980), *cert. denied*, 449 U.S. 856 (1980).

325. Leflar, *supra* note 9, at 196.

326. *See supra* notes 20–23 and accompanying text.

327. 95 Eng. Rep. 53, 55–56 (K.B. 1734); *see supra* notes 54–55 and accompanying text.

328. *See supra* Part I.C.

329. *See supra* Part I.B.4.

330. Albrecht, *supra* note 9, at 461.

331. Holman v. Johnson, 98 Eng. Rep. 1120, 1121 (K.B. 1775).

Judge Learned Hand, however, articulated a modern reason for the prohibitions against applying foreign penal and tax law as early as 1929—that one country's scrutiny of a foreign penal or tax law to determine whether the law was consistent with the public policy of the forum might "seriously embarrass its neighbor."[332] In *Government of India v. Taylor*,[333] the House of Lords added two more reasons for the rule: that enforcing foreign law would be difficult and burdensome;[334] and that enforcing the tax law of a foreign country would be an infringement of sovereignty.[335] In *British Columbia v. Gilbertson*, the U.S. Court of Appeals for the Ninth Circuit expanded the last of these, emphasizing that to enforce foreign tax law "would have the effect of furthering the governmental interests of a foreign country, something which our courts customarily refuse to do."[336] This customary refusal to further foreign interests might rest on notions of sovereignty, but might also be based on a desire to protect one's own nationals or to promote reciprocity, arguments which are addressed below. Today, then, one can say that the prohibitions against enforcing foreign penal, tax, and "public" law are generally justified with some combination of three basic arguments: (1) that enforcing foreign law is difficult; (2) that scrutinizing foreign law might cause offense; and (3) that courts should not further the governmental interests of foreign nations.

## A. *Difficulty of Applying Foreign Law*

In *Government of India v. Taylor*, Lord Somervell commented on the difficulty of applying foreign law: "If one considers the initial stages of the process, which may . . . be intricate and prolonged, it would be remarkable comity if State B allowed the time of its courts to be expended in assisting in this regard the tax gatherers of State A."[337] A number of authors have pointed to the complexity of foreign tax law as a reason for the revenue rule.[338] Some have also pointed out that it may be difficult for a court to

---

332. Moore v. Mitchell, 30 F.2d 600, 603–04 (2d Cir. 1929) (L. Hand, J., concurring), *aff'd on other grounds*, 281 U.S. 18 (1930); *see supra* notes 68–70 and accompanying text.

333. [1955] A.C. 491 (H.L.).

334. *Id.* at 514 (Lord Somervell).

335. *Id.* at 511 (Lord Keith).

336. 597 F.2d 1161, 1165 (9th Cir. 1979).

337. [1955] A.C. 491, 514 (H.L.) (Lord Somervell); *see also* United States v. Harden, 41 D.L.R.2d 721, 726 (Sup. Ct. 1963) (Can.) (quoting Lord Somervell).

338. *See, e.g.*, Baade, *supra* note 9, at 483 ("First, there is the difficulty of applying foreign tax law correctly. A mature tax system is likely to be a very intricate network of rules, regulations, and accounting practices, administered by a special bureaucracy under judicial supervision by a separate tax court hierarchy, aided by a specialized tax bar and accounting profession. The even-handed application of such a body of law by a foreign court of general jurisdiction is, to say the least, not easy."); Alan R. Johnson, Lawrence Nirenstein & Stephen E. Wells, *Reciprocal Enforcement of Tax Claims Through Tax Treaties*, 33 TAX LAW. 469, 485 (1980) ("Taxation (certainly in the United States and presumably elsewhere) has become an enormously complicated matter. To burden a court of another nation with trying to understand an entirely different system of taxation seems unfair to it as well as to both taxing authority and taxpayer, for the result reached may well be wrong."); Recent Case, *supra* note 56, at 1327 ("[O]ne of the difficulties

acquire the necessary evidence when a criminal or tax case is tried far from where the events at issue occurred.[339] Finally, even if such cases were not more difficult to try, enforcing foreign penal, tax, and public law might simply add to the caseload of an already overburdened national judiciary.

None of these arguments is particularly convincing. Certainly courts feel more comfortable applying familiar law, but conflict-of-laws rules require the application of foreign law in a wide variety of cases, and the Federal Rules of Civil Procedure expressly provide for the proof of foreign law.[340] As the South African court in *Commissioner of Taxes v. McFarland* put it, "[t]here may be difficulty in interpreting foreign revenue laws but such difficulties are met with in relation to other foreign laws with which the Courts have on occasion to grapple."[341] It is hard to imagine that any case involving the application of foreign penal, tax, or public law would be more difficult than the task facing the district court on remand from *Boosey & Hawkes Music Publishers v. Walt Disney*[342]—deciding copyright infringement claims under the laws of 18 different foreign countries. Yet Second Circuit held that the difficulty of that task was no excuse for dismissing the suit.[343]

Proving a case far from where the events occurred should generally be no more difficult in a penal, tax, or public law case than in a contract or tort case.[344] The United States has entered a series of MLATs[345] to help it gather evidence abroad in criminal proceedings, and while the Hague Evidence Convention is limited to "civil and commercial" matters,[346] foreign authori-

---

involved in enforcing a foreign tax claim is the notorious complexity of revenue laws generally and the corresponding difficulty of interpreting and applying a body of unfamiliar tax law."); *see also* Harold G. Maier, *Extraterritorial Jurisdiction at a Crossroads: An Intersection Between Public and Private International Law*, 76 AM. J. INT'L L. 280, 290 (1982) (noting "the practical difficulty of importing a foreign regulatory system").

339. *See* Lipstein, *supra* note 9, at 370–72.

340. Fed. R. Civ. P. 44(a)(2).

341. [1965] 1 SA 470, 473 (Witwatersrand Local Div.); *see also* Stoel, *supra* note 9, at 668 ("[I]t is not clear why difficulties in proving or interpreting foreign [penal] law would be any greater than in other civil suits involving foreign law."); Castel, *supra* note 9, at 296 ("The fact that local courts might be unfamiliar with the technicalities of foreign revenue laws is no more an obstacle to their enforcement than in the ordinary conflicts case where some other foreign law is applicable."); Albrecht, *supra* note 9, at 463 ("[T]he application of foreign law would not be a new experience for courts, since conflict of laws rules often require it."); Leflar, *supra* note 9, at 218 ("[C]ourts have undertaken equally difficult judicial problems before now.").

342. 145 F.3d 481 (2d Cir. 1998).

343. *Id.* at 491–92.

344. *See* Stoel, *supra* note 9, at 668 ("It is difficult to see why in 'penal' cases a defendant would be any more inconvenienced or proofs any more difficult than in any other civil suit where trial occurs far from the place of the alleged illegal act.").

345. *See supra* notes 317–322 and accompanying text.

346. Convention on the Taking of Evidence Abroad in Civil or Commercial Matters, Mar. 18, 1970, 8 I.L.M. 37 (1969). As of November 6, 2001, the following countries are parties to the Convention: Argentina, Australia, Barbados, Belarus, Bulgaria, China (including Hong Kong and Macau), Cyprus, Czech Republic, Denmark, Estonia, Finland, France, Germany, Israel, Italy, Latvia, Lithuania, Luxembourg, Mexico, Monaco, Netherlands, Norway, Poland, Portugal, Russian Federation, Slovakia, Slovenia, Singapore, South Africa, Spain, Sri Lanka, Sweden, Switzerland, Turkey, Ukraine, United Kingdom, United States, and Venezuela. Http://www.hcch.net/e/status/stat20e.html.

ties might be well disposed to assist in the gathering of evidence when it was their own law that was being enforced. Moreover, a defendant who felt that the possibility of misinterpreting foreign law or the difficulty in obtaining evidence would prejudice her could always consent to extradition to or to jurisdiction in the country whose law was being applied or in which the events occurred.

That enforcing foreign penal, tax, and public law might increase a court's caseload is difficult to deny, but the burden should be relatively equal among states assuming that the prohibitions were generally abolished.[347] Moreover, it is quite likely that the mere ability of a country to enforce its law in a foreign forum would be enough to bring many potential defendants into compliance with that law without the need for litigation. There is evidence of this dynamic in the enforcement of tax judgments. Testifying in favor of the collection assistance provision in the 1946 treaty with France, the IRS representative noted that during six years under the treaty with Sweden and two years under the prior treaty with France, only one suit had been filed in federal court for enforcement of a foreign tax judgment and that case was quickly settled.[348] "In matters involving cooperation in collection, the experience of the United States and many other countries having these provisions has been that practically all cases are settled or compromised out through direct dealings with the taxpayer."[349] In other words, the possibility of enforcing a judgment for taxes abroad, gave the government enough "added leverage"[350] in negotiations with the taxpayer to reach a settlement and avoid litigation.[351]

Finally, even if administrative difficulties support a rule against trying cases under foreign penal, tax, and public law, they cannot justify a rule against enforcing foreign judgments based on such laws.[352] When all that is

---

347. *See* Stoel, *supra* note 9, at 677 ("[T]he burden of hearing foreign tax claims should be relatively equal among States, if each State takes full advantage of the chance to have its own cases heard abroad.").

348. *See 1947 Hearings*, *supra* note 288, at 149–50 (statement of Eldon P. King, Special Deputy Commissioner, Bureau of Internal Revenue).

349. *Id.* at 86 (statement of Eldon P. King, Special Deputy Commissioner, Bureau of Internal Revenue).

350. *1951 Hearings*, *supra* note 288, at 59 (statement of Eldon P. King, Special Deputy Commissioner, Bureau of Internal Revenue).

351. The *Chua* case, in which a Canadian taxpayer successfully resisted U.S. efforts to enforce a tax judgment, does not disprove the point. *See* Chua v. Minister of Nat'l Revenue, [2001] 1 F.C. 641 (Fed. Ct. 2000). First, prior to the *Chua* court's ruling that Parliament had authority to agree to collection assistance provisions, *id.* ¶¶ 27–45, there was some doubt on that question. *See 1947 Hearings*, *supra* note 288, at 23 (statement of Eldon P. King, Special Deputy Commissioner, Bureau of Internal Revenue) (noting Canadian resistance to previous efforts to negotiate collection assistance provisions on the ground that the North American Act of 1867 reserved the collection of taxes to the provinces); *1951 Hearings*, *supra* note 288, at 66 (statement of Eldon P. King, Special Deputy Commissioner, Bureau of Internal Revenue). Second, Chua had an equal protection argument against enforcement, which many taxpayers will lack. *See supra* note 308. Despite the fact that the U.S. effort to collect its taxes was unsuccessful in *Chua*, one can expect the decision to make enforcement of U.S. tax judgments more routine in Canada.

352. *See* Lipstein, *supra* note 9, at 371–72 (suggesting that procedural difficulties would not bar enforcement of foreign criminal fines and judgments for taxes); Stoel, *supra* note 9, at 669 ("When a judgment has been rendered, . . . [d]ifficulties in proving or interpreting foreign law are . . . much reduced.");

sought is enforcement of a judgment, there is little need for the enforcing court to interpret foreign law or admit evidence. While permitting enforcement of such judgments might result in an increase in the sheer number of cases filed, the burden imposed by such cases will be slight. Even Lord Somervell acknowledged in *Government of India v. Taylor* that "once a judgment has been obtained and it is a question only of its enforcement the factor of time and expense will normally have disappeared."[353] If there is a valid reason for the refusal to enforce foreign penal, tax, and public law judgments, it must lie elsewhere.

## B. *Avoiding Offense to Foreign Nations*

In *Moore v. Mitchell*,[354] Judge Learned Hand suggested that the true basis for the prohibition against enforcing foreign penal and tax laws was that scrutinizing such laws to determine whether they violate the public policy of the forum might offend the foreign nation.[355] Hand began by noting that "[e]ven in the case of ordinary municipal liabilities, a court will not recognize those arising in a foreign state, if they run counter to the 'settled public policy' of its own."[356] He continued:

> This is not a troublesome or delicate inquiry when the question arises between private persons, but it takes on quite another face when it concerns the relations between the foreign state and its own citizens or even those who may be temporarily within its borders. To pass upon the provisions for the public order of another state is, or at any rate should be, beyond the powers of a court; it involves the relations between the states themselves, with which courts are incompetent to deal, and which are intrusted to other authorities. It may commit the domestic state to a position which would seriously embarrass its neighbor.[357]

Hand thought that this reasoning applied not just to penal laws but also to tax laws, for "they affect a state in matters as vital to its existence as its criminal laws."[358] In sum, the more important a law was to a foreign state, the more likely it was that a foreign state would be offended by a selective refusal to enforce that law, and the stronger the argument for a blanket re-

---

Albrecht, *supra* note 9, at 463 (noting that difficulty of applying foreign law "would not apply to the enforcement of judgments which have been rendered upon tax claims by courts of the taxing State and then sued upon in another State").

353. [1955] A.C. 491, 514 (H.L.) (Lord Somervell). However, Lord Somervell nonetheless denied enforcement of the Indian government's judgment for taxes, stating: "The principle remains. The claim is one for a tax." *Id.*

354. 30 F.2d 600 (2d Cir. 1929).

355. *See supra* notes 68–70 and accompanying text.

356. 30 F.2d at 604 (L. Hand, J., concurring).

357. *Id.*

358. *Id.*

fusal to enforce laws of that kind. Many courts have adopted Hand's rationale for the public law taboo.[359]

If the possibility of finding a foreign law contrary to the forum's public policy is the problem, that problem might be solved either by a rule against enforcing all such laws or by a rule requiring enforcement without "public policy" review, and Hand does not explain why the former rule is preferable to the latter. A rule requiring enforcement without "public policy" review is precisely what the Supreme Court adopted in *Sabbatino* with respect to foreign expropriations, for the same reasons Hand cites.[360] If amicable relations with other countries is the overriding concern, one might suppose that the better rule would be *Sabbatino*'s, requiring automatic enforcement of foreign law. I do not advocate such a rule however (and I know of no one who has) because there may well be instances in which enforcement of a particular foreign law would be obnoxious to the values of the forum. The "public policy" exception provides a necessary escape in such cases.[361]

The question, then, is whether from the point of view of maintaining amicable relations with other states a blanket rule refusing enforcement of foreign penal and tax law is preferable to a rule allowing enforcement of such laws except when they violate the public policy of the forum. Robert Leflar and others have argued persuasively that the possibility of holding a tax or penal law contrary to public policy "would seldom be more offensive than a flat refusal to permit any action at all."[362] Thomas Stoel has defended Hand's position as well as one can.[363] The advantage of Hand's rule, he argues, is that "all nations are treated alike. Under a new 'public policy' rule, *some* nations' penal laws would be discriminated against by being refused

---

359. *See* Peter Buchanan Ltd. v. McVey, [1954] I.R. 89, 105–106 (Ir. H. Ct. 1950); Government of India v. Taylor, [1955] A.C. 491, 511, 513 (H.L.) (Lord Keith); United States v. Harden, 41 D.L.R.2d 721, 724–25 (S.C. 1963) (Can.); British Columbia v. Gilbertson, 597 F.2d 1161, 1164 (9th Cir. 1979); Attorney-General (U.K.) v. Heinemann Publishers Australia Pty. Ltd., 165 C.L.R. 30, ¶ 27 (Austl. H. Ct. 1988). *But see* Commissioner of Taxes v. McFarland, [1965] 1 SA 470, 472–73 (Witwatersrand Local Div. 1964) (rejecting Hand's argument); *supra* notes 77–95 and accompanying text.

360. *See* Banco Nacional de Cuba v. Sabbatino, 376 U.S. 398, 428 (1964). Like Hand, Justice Harlan was concerned that declaring a foreign law invalid would "often be likely to give offense to the expropriating country." *Id.* at 432. Indeed, Justice Harlan went so far as to note that although "the rule against enforcement of foreign penal and revenue laws . . . presumes invalidity in the forum whereas the act of state principle presumes the contrary, *the doctrines have a common rationale.*" *Id.* at 437 (emphasis added). For further discussion, see *supra* notes 125–138 and accompanying text.

361. For the same reasons, *Sabbatino*'s rule requiring automatic enforcement of foreign expropriations seems misguided, although a full examination of *Sabbatino* and the Act of State doctrine is beyond the scope of this Article.

362. *See* Leflar, *supra* note 9, at 217; *see also* State *ex rel* Okla. Tax Comm'n v. Rodgers, 193 S.W.2d 919, 926 (Mo. Ct. App. 1946) ("Nor would a holding that a given foreign tax statute was invalid tend any more to the production of ill feeling than a refusal to permit an action at all."); Castel, *supra* note 9, at 296 ("The possibility of holding that a given foreign tax statute is invalid . . . is just as offensive to the taxing State as a flat refusal to permit any action at all . . . ."). *Cf.* P. B. Carter, *Rejection of Foreign Law: Some Private International Law Inhibitions*, 1984 Brit. Y.B. Int'l L. 111, 119 ("Toral refusal to enforce foreign revenue laws has, it must be readily conceded, one undoubted attraction—that of simplicity. This is a quality which it shares with many arbitrary and irrational phenomena.").

363. *See* Stoel, *supra* note 9, at 669–70, 678.

enforcement on public policy grounds, perhaps with some unavoidable characterization as 'unfair' or 'unjust,' while other nations' judgments would be enforced."[364] It is this discrimination that other nations are likely to find more offensive than a flat refusal to enforce their law.

Even with Stoel's refinement, however, Leflar clearly has the better of the argument. First, foreign tax, penal, and regulatory laws are not particularly likely to run afoul of the public policy exception. "After all, every State collects taxes, every State has a criminal law, and nearly every State regulates commerce in one way or another."[365] Not only does every State have such laws, the content of those laws grows increasingly similar. By and large, States today tend to tax the same kinds of things and one finds an increasing convergence in areas like antitrust as less developed countries follow the American or European models. As Andreas Lowenfeld has observed with respect to securities fraud, "[w]e are *not* concerned . . . about tyrannical exactions of Tsarist moguls, and it makes no sense to pretend that we are. We *are* concerned . . . about crooks avoiding their just obligations . . . ."[366]

Second, courts are already required to discriminate among different countries in applying the public policy exception to private law.[367] Hand's argument that such discrimination is more likely to give offense when the law is of particular importance to the foreign country is offset by the fact that a flat refusal to enforce foreign law is also more likely to give offense when the law is of particular importance. If one expected courts to have to declare foreign tax or penal laws in violation of public policy relatively often, the balance might tip in favor of denying enforcement of such laws altogether. It seems more likely, however, that courts would have to resort to this exception rarely, in which case the balance certainly tips the other way.

Finally, to the extent discrimination among nations occurs in the enforcement of their public law, it is likely to be discrimination against regimes like Castro's Cuba or Hitler's Germany. Why one should routinely

---

364. *Id.* at 670.

365. Lowenfeld, *supra* note 4, at 323.

366. *Id.* at 421. Indeed, if there is any group of foreign public laws that seem particularly likely to violate public policy it is foreign expropriatory laws which have often been directed against particular individuals or have discriminated against particular groups. *See, e.g.,* Banco de Vizcaya v. Don Alfonso de Borbon y Austria, [1935] 1 K.B. 140 (Spanish expropriation of former king's property); Republic of Iraq v. First Nat'l City Bank, 241 F. Supp. 567 (S.D.N.Y. 1965), *aff'd*, 353 F.2d 47 (2d Cir. 1965), *cert. denied*, 382 U.S. 1027 (1966) (Iraqi expropriation of former king's property); Banco Nacional de Cuba v. Sabbatino, 376 U.S. 398 (1964) (Cuban expropriation of Americans' property); Bernstein v. Van Heyghen Freres Societe Anonyme, 163 F.2d 246 (2d Cir. 1947) (German expropriation of Jews' property). This fact makes American courts' willingness to enforce foreign expropriations but not foreign tax and penal laws seem all the more strange.

367. Courts are also required to discriminate among foreign nations in applying the doctrine of forum non conveniens and in deciding whether enforcing a forum selection clause would deprive a plaintiff of a "meaningful day in court" under *M/S Bremen v. Zapata Off-Shore Co.*, 407 U.S. 1, 19 (1972). *See, e.g.,* McDonnell Douglas Corp. v. Islamic Republic of Iran, 758 F.2d 341, 345–46 (8th Cir. 1985) (enforcing forum selection clause requiring litigation in Iranian courts would deprive plaintiff of a meaningful day in court); Eastman Kodak Co. v. Kavlin, 978 F. Supp. 1078, 1082–87 (S.D. Fla. 1997) (holding that Bolivian courts were not an adequate alternative forum for purposes of forum non conveniens).

refuse to enforce British or Canadian tax judgments in order to avoid giving offense to such regimes is hard to fathom.[368]

### C. Refusal To Further Foreign Governmental Interests

Another reason given for the refusal to enforce foreign tax, penal, or public law is that to enforce such law "would have the effect of furthering the governmental interests of a foreign country, something which our courts customarily refuse to do."[369]

There seems to be some tension between the argument that courts should not further the governmental interests of a foreign country and Judge Hand's argument that courts should not risk offending foreign governments, although that tension did not prevent the *Gilbertson* court from relying on both to support its refusal to enforce a Canadian tax judgement.[370] Several courts and commentators have suggested that a refusal to further the interests of other governments makes little sense. "[N]o state can be said to have a legitimate policy against payment of its neighbor's taxes," Justice Stone wrote in *Milwaukee County v. M.E. White Co.*[371] As the New Zealand Court of Appeals observed in the *Spycatcher* case, "[i]t would seem anachronistic for the Courts to deny themselves any power to do what they can to safeguard the security of a friendly foreign State."[372] Nevertheless, there are at least three reasons why a nation might not wish its courts to further the interests of a foreign government: (1) to protect its own nationals; (2) to protect its own sovereignty; and (3) to encourage reciprocity.

### 1. Protection of Nationals

Perhaps the least commonly mentioned reason why one nation might not wish to further the governmental interests of another is that those interests might be furthered at the expense of the first nation's own citizens. The con-

---

368. *Cf.* Anne-Marie Burley, *Law Among Liberal States: Liberal Internationalism and the Act of State Doctrine*, 92 COLUM. L. REV. 1907 (1992) (arguing that the act of state doctrine should apply to nonliberal states and not to liberal states).

369. British Columbia v. Gilbertson, 597 F.2d 1161, 1165 (9th Cir. 1979); *see also* Banco Nacional de Cuba v. Sabbatino, 376 U.S. 398, 448 (1964) (White, J., dissenting) ("[O]ur courts customarily refuse to enforce the revenue and penal laws of a foreign state, since no country has an obligation to further the governmental interests of a foreign sovereign."); Maier, *supra* note 338, at 290 ("[T]he traditional attitude that one nation will not become another's political agent by giving effect to foreign governmental rights . . . .").

370. *Gilbertson*, 597 F.2d at 1164–65.

371. 296 U.S. 268, 277 (1935); *see also* Comm'r of Taxes v. McFarland, [1965] 1 SA 470, 473 (Witwatersrand Local Div. 1964) ("One would have thought that it is public policy that persons should pay their taxes and not evade such payment by escaping from the country which imposed them."); Castel, *supra* note 9, at 278 ("Why is it unlawful in Canada to evade local taxes and yet perfectly legitimate to refuse to pay foreign taxes?").

372. Attorney-Gen. for the U.K. v. Wellington Newspapers Ltd. [1988] 1 N.Z.L.R. 129, 174 (C.A.); *see also* Re Sefel Geophysical Ltd., 62 Alta. L.R. (2d) 193, 202 (Alta. Q.B. 1988) (Can.) (stating that refusal to recognize foreign tax claims in bankruptcy is inconsistent with "present trends of international comity in the recognition of foreign bankruptcy proceedings").

cern is not with protecting one's citizens against foreign laws that are repugnant to the forum's values—such concerns could be addressed by applying the traditional public policy exceptions to the enforcement of foreign laws and judgments. Rather, the forum might wish to shield its citizens from foreign laws, like tax and antitrust laws, that are similar to its own. In terms of narrow self-interest, such protectionism makes some sense. Enforcement of a foreign tax judgment against a U.S. citizen would result in a net reduction in the wealth of the United States and a net increase in the wealth of a foreign country. Enforcement of foreign competition law against an American monopolist might deter anticompetitive conduct that enriches Americans at the expense of foreign consumers.[373]

This justification for refusing to further foreign interests is rarely made explicit,[374] perhaps because it seems so much less noble than protecting one's sovereignty or seeking to ensure reciprocity. Nevertheless, it seems one of, if not the only, plausible explanation for exemptions for judgments against the enforcing country's own nationals found in all the current U.S. tax treaties providing for collection assistance.[375] In the end, however, a desire to protect one's own nationals cannot justify the public law taboo. First, it cannot support a refusal to enforce foreign law against defendants who are not one's nationals. Second, it ignores the gains to be had from cooperation. If every nation were willing to enforce every other nation's public law,[376] even against its own citizens, it would make every nation's tax and regulatory schemes more effective. This would benefit not just governments but also those citizens who do not evade their obligations. Money collected from taxpayers who flee the jurisdiction need not be collected from other taxpayers in the form of higher rates. Effective enforcement of antitrust law results in a more competitive market, which ultimately benefits all consumers in the form of lower prices, even if those consumers are not "direct purchasers" who might themselves bring an antitrust suit for damages. In short, founding the public law taboo on a desire to protect one's own nationals would make sense only if cooperation is not possible.

---

373. The non-enforcement of foreign law is simply another manifestation of the same strategy of self-interest that lies behind the decision to exempt from U.S. antitrust law anticompetitive conduct that causes its effects abroad. *See* Foreign Trade Antitrust Improvements Act of 1982, 15 U.S.C. §§ 6a & 45(a)(3) (1994); Export Trading Company Act of 1982, 15 U.S.C. §§ 4001–4021 (1994); Webb-Pomerene Act of 1918, 15 U.S.C. §§ 61–66 (1994). For discussion of these statutes, see William S. Dodge, *Extraterritoriality and Conflict-of-Laws Theory: An Argument for Judicial Unilateralism*, 39 HARV. INT'L L.J. 101, 154 (1998) [hereinafter Dodge, *Extraterritoriality*]. Other countries have similar exemptions from their competition laws. *Id.* at 154, n.313.

374. *Cf.* Carter, *supra* note 9, at 423 (suggesting that the revenue rule rests on "acceptance in the international context of a sporting theory of tax evasion").

375. *See* discussion *supra* Part II.C.

376. This willingness is, of course, a big "if" and will be the subject of Part IV.

HeinOnline -- 43 Harv. Int'l L.J. 216 2002

### 2. *Sovereignty*

A more frequently voiced reason for refusing to further the governmental interests of a foreign country is that it offends notions of sovereignty. In *Government of India v. Taylor*, Lord Keith reasoned "that enforcement of a claim for taxes is but an extension of the sovereign power which imposed the taxes, and that an assertion of sovereign authority by one State within the territory of another, as distinct from a patrimonial claim by a foreign sovereign, is (treaty or convention apart) contrary to all concepts of independent sovereignties."[377] *Dicey & Morris* calls this the "best explanation" of the public law taboo.[378]

The most prominent advocate of this sovereignty argument is F.A. Mann, who finds the rule compelled by public international law:

> The state that pursues penal, tax, or other public claims outside the confines of its own territory is attempting to invoke its sovereign rights within the territory of the forum state . . . . This fact involves the infringement of domestic jurisdiction or sovereignty and, accordingly, of public international law insofar as the consent of the forum state is lacking.[379]

There are two fundamental problems, however, with such a sovereignty argument. First, it has been clear since at least the Permanent Court of International Justice's decision in the *Lotus* case that public international law does not restrict a nation's jurisdiction to its own territory.[380] The *Restatement (Third) of Foreign Relations Law* recognizes that a nation may apply its law not just to persons and things within its territory[381] but to conduct outside its territory that causes effects within its territory and to its own nationals wherever located.[382] Additionally, it has been common for courts to apply their public law extraterritorially to foreign defendants acting abroad.[383] It

---

377. [1955] A.C. 491, 511 (H.L.); *see supra* note 81 and accompanying text.

378. DICEY & MORRIS, *supra* note 141, at 89; *see also* Comm'r of Taxes v. McFarland, [1965] 1 SA 470, 473 (Witwatersrand Local Div. 1964) (characterizing the sovereignty argument as "fundamental and unexceptionable").

379. Mann, *International Enforcement*, *supra* note 9, at 608 (also noting that "[t]he rationale of the rule relating to the unenforceability of foreign public rights . . . is to be found in the public international law doctrine of international jurisdiction.").

380. *See* S.S. Lotus (Fr. v. Turk.), [1927] P.C.I.J. (ser. A) No. 10, at 19 ("Far from laying down a general prohibition to the effect that States may not extend the application of their laws and the jurisdiction of their courts to persons, property and acts outside their territory, [international law] leaves them in this respect a wide measure of discretion which is only limited in certain cases by prohibitive rules; as regards other cases, every State remains free to adopt the principle which it regards as best and most suitable.").

381. RESTATEMENT (THIRD) OF FOREIGN RELATIONS LAW § 402(1)(a)–(b).

382. *Id.* §§ 402(1)(c) & 402(2).

383. *See, e.g.*, Hartford Fire Ins. Co. v. California, 509 U.S. 764, 796 (1993) (applying the Sherman Act to foreign defendants on the basis of substantial intended effects in the United States); Joined Cases 89, 104, 114, 116, 117 & 125-29/85, Åhlström Osakeyhtiö, [1988] E.C.R. 5193, 5242–44 (E.C.J.) (applying E.C. Treaty, art. 85, to foreign defendants on the basis of effects in the European Community and rejecting argument that extraterritorial jurisdiction on the basis of effects violates international law).

is simply not true that international law today prohibits one nation from seeking to enforce its law within the territory of another.[384]

Second, even if it were a violation of international law to pursue public law claims within the territory of another nation without its consent, international law does not prohibit the nation where enforcement is sought from giving such consent. P.B. Carter has noted that even though "public international law can place limits upon the entitlement of a State to require that its laws be accorded extra-territorial effect . . . [i]t does not follow that the courts of a State are enjoined by public international law from according effect to laws of another State in excess of that other State's entitlement."[385] The *Restatement (Third) of Foreign Relations Law* correctly observes that "[n]o rule of United States law or of international law would be violated if a court in the United States enforced a judgment of a foreign court for payment of taxes or comparable assessments,"[386] and a committee of the International Law Association concurs that "there is no general rule of public international law prohibiting the transnational recognition or enforcement of foreign public laws as such."[387]

To his credit, even Mann ultimately concedes that "[i]f the prosecution of public rights involves the violation of the forum state's jurisdiction, it is open to that state to give its consent in whatever manner its constitution permits."[388] What Mann really objects to is the possibility that such consent might be given by judges rather than by the political branches.[389] Mann defends his position by noting that "[j]udges who ignore the paramount

---

384. *See also* Baade, *supra* note 9, at 483 ("[Mann's] proposition is untenable . . . . [S]tates can and do exercise prescriptive tax jurisdiction over persons and events abroad. Whenever a state is trying to collect a tax, now past due, from one of its own resident nationals who later absconds to another country, it acts within the jurisdictional limits imposed on it by international law.").

385. Carter, *supra* note 9, at 427; *see also* Baade, *supra* note 9, at 483 ("It is also beyond dispute that the state of the present residence of such a tax evader can, if it so wishes, consent to the use of its judicial machinery for the collection of the tax thus evaded."); Lipstein, *supra* note 9, at 358, 359 (calling arguments about territoriality and sovereignty "useless" and noting that "[i]f the local law lets in foreign law . . . the choice is freely taken by the *lex fori*."); Chua v. Minister of Nat'l Revenue, [2001] 1 F.C. 641 (Fed. Ct. 2000) ("[I]f Canada implements a treaty in allowing another country to come and collect revenue by way of Canada itself making the claim within Canada, the sovereignty of Canada is protected by the conditions set out in the treaty."); Bank of Augusta v. Earle, 38 U.S. 519, 589 (1839) (Taney, C.J.) ("The comity thus extended to other nations is no impeachment of sovereignty. It is the voluntary act of the nation by which it is offered . . . .").

386. RESTATEMENT (THIRD) OF FOREIGN RELATIONS LAW § 483, cmt. a (1987).

387. ILA REPORT, *supra* note 10 at 751.

388. Mann, *International Enforcement*, *supra* note 9, at 610.

389. *See id.* at 608–09 ("No judge may permit the prosecution of such a claim or the concomitant excess of foreign jurisdiction. Such consent, which only the sovereign can give, invariably presupposes a treaty and, usually, legislation as well."); *see also* Comm'r of Taxes v. McFarland, [1965] 1 SA 470, 474 (Witwatersrand Local Div. 1964) ("To allow a foreign state, whether directly or indirectly to obtain a judgment for taxes . . . would be a judicial intervention in direct derogation of that country's territorial supremacy . . . . [S]uch an inroad can only be justified by custom or by some special agreement. The latter is the function of the executive power.").

rights of their sovereign deprive their sovereign of the opportunity to insist on reciprocity."[390]

### 3. Lack of Reciprocity

Both the protectionist argument and the sovereignty argument for the public law taboo lead ultimately to reciprocity. If reciprocal enforcement of a nation's penal, tax, and regulatory laws could be assured, then such cooperation would be more advantageous to both governments and their citizens than protectionism.[391] If nations may consent to whatever intrusion on their sovereignty the enforcement of foreign public law entails, then one must state a reason why courts should not give such consent—the need to ensure reciprocity being the most apparent.[392] Judges are caught in a "prisoner's dilemma." Even if they cooperate in the enforcement of foreign penal, tax, or regulatory law, they cannot ensure that their foreign counterparts will follow suit. The political branches, on the other hand, can ensure cooperation by entering treaties for reciprocal enforcement. If one can justify courts maintaining the public law taboo at all, it is only as a strategy for achieving more effective cooperation through international agreements. Part IV is devoted to this justification.

### IV. COOPERATION, RECIPROCITY, AND THE PUBLIC LAW TABOO

Courts are different from the political branches of government, and recognizing the distinction leads ultimately to the conclusion that courts should act differently from the political branches in enforcing foreign penal, tax, and regulatory law. The political branches ought to cooperate with other governments by entering treaties for the reciprocal enforcement of foreign public law because, as Section A explains, such cooperation is to their mutual advantage, even in areas where their policies diverge sharply.

Courts, on the other hand, should not cooperate when foreign governments bring suit, either directly or indirectly, to enforce their laws in the forum. Section B explains that courts are caught in a prisoner's dilemma, because courts have no way to ensure reciprocity. If country *A*'s courts cooperate and country *B*'s courts do not, *A* will be worse off than if *A* had not cooperated. Indeed, if *A*'s courts cooperate in the absence of a treaty for reciprocal enforcement, they may, ironically, undercut efforts by the political branches to negotiate such a treaty.

Section C argues, however, that things are different when a private party brings suit under foreign penal or regulatory law.[393] While governments can

---

390. Mann, *International Enforcement, supra* note 9, at 609.

391. *See supra* note 376 and accompanying text.

392. *See supra* notes 385–390 and accompanying text.

393. It is common for private parties to seek damages under foreign regulatory law, such as securities and antitrust law. It is less common but sometimes possible for private parties to seek damages under foreign criminal law. *See, e.g.,* Mexican Nat'l R.R. Co. v. Slater, 115 F. 593, 603–04 (5th Cir. 1902)

protect their interests by negotiating treaties for reciprocal enforcement, private plaintiffs cannot. Fairness requires that the interests of private parties seeking to enforce foreign law not be held hostage to the government's interest in promoting reciprocity. Moreover, non-enforcement of foreign penal and regulatory law in suits by private plaintiffs is probably not necessary to encourage negotiations for a treaty. Accordingly, courts should break the public law taboo where a private party brings suit under a foreign penal or regulatory law or seeks to enforce a foreign judgment based on such law, but courts should leave it to their governments to break the taboo for claims by foreign governments in order to promote the negotiation of treaties for reciprocal enforcement of penal, tax, and regulatory laws. Section D applies these principles to some recent disputes.

### A. The Advantages of Cooperation

It has long been recognized that governments would be better off if they could cooperate by enforcing each other's public laws. In 1834, Justice Story argued for the recognition of foreign revenue laws as "[a]n enlightened policy, founded upon national justice, as well as national interest."[394] More recently, Lord Templeman observed in *Williams & Humbert Ltd. v. W. & H. Trade Marks (Jersey) Ltd.* that the non-enforcement of foreign revenue laws allows "fraudulent practices which damage all states and benefit no state,"[395] and suggested modifying the rule with international conventions to prevent such practices.[396]

Tax judgments provide an illustration. In *United States v. Harden*, the Canadian Supreme Court refused to enforce a U.S. tax judgment against a Canadian resident.[397] In *British Columbia v. Gilbertson*, the U.S. Court of Appeals for the Ninth Circuit refused to enforce a Canadian tax judgment against U.S. citizens.[398] The U.S. and Canadian governments would both have been better off if they had both been willing to enforce each other's tax judgments. Those countries' citizens would likewise have benefited, because each instance of tax evasion necessarily increases the tax burden on those

---

(holding that suit for damages based on Mexican law of criminal negligence was not barred by prohibition against enforcing foreign penal law), *aff'd*, 194 U.S. 120 (1904); Raulin v. Fischer, [1911] 2 K.B. 93, 98–99 (damages for criminal negligence awarded by French criminal court may be "separated from the rest of the judgment" and enforced); Chase Manhattan Bank v. Hoffman, 665 F. Supp. 73, 75–76 (D. Mass. 1987) (applying Massachusetts Uniform Foreign Money-Judgment Recognition Act and holding award of civil damages enforceable despite the fact that the Belgian proceeding was primarily criminal). Because private parties cannot seek to enforce foreign tax laws for their own benefit, this argument does not apply to tax.

394. STORY, *supra* note 19, § 257.

395. [1986] A.C. 368, 428 (H.L. 1985).

396. *Id.* (concluding nevertheless that, until modified by international convention or by legislation, "the international rule with regard to the non-enforcement of revenue and penals [*sic*] laws is absolute.").

397. 41 D.L.R.2d 721 (Sup. Ct. 1963).

398. 597 F.2d 1161 (9th Cir. 1979). In fact, the Ninth Circuit cited Canada's denial of reciprocity in *Harden* as one reason for doing so. *Id.* at 1166.

taxpayers who cannot or do not evade their own obligations to pay taxes. Taxes lost to evasion must be made up through higher rates on others.

One might argue that a self-interested nation would still decline to cooperate in the enforcement of foreign tax law if the amount of taxes its own citizens could evade as a result of non-enforcement of foreign tax law would exceed the amount of taxes it could collect through foreign enforcement of its own tax law. Under those circumstances, a decision not to cooperate might increase national welfare, even though it did not increase (or even reduced) world welfare,[399] by maximizing the amount of money retained by the United States and its citizens. There are at least two reasons to reject such an argument. First, on average, each country will have an equal number of evaders of foreign taxes within it as evaders of its own taxes outside it, which means that on average cooperation is a break-even strategy.[400] Second, and more important, even in those instances where the number of nationals evading foreign taxes exceeds the number of foreigners evading national taxes so that non-cooperation may result in a net gain to "national welfare," the distribution of that gain will be quite uneven. The United States' refusal to enforce foreign tax law benefits relatively few U.S. taxpayers by a relatively large amount. Foreign refusal to enforce U.S. tax law, on the other hand, leads to a small increase in the tax burden on all U.S. taxpayers.[401] In other words, reciprocal non-enforcement allows those few U.S. taxpayers who are in a position to evade foreign taxes to reap a large windfall not just at the expense of foreign governments but ultimately at the expense of other U.S. taxpayers who find their own taxes marginally increased. This distributional effect alone is reason enough to reject a strategy of non-cooperation even in the case of a net gain in national welfare.

The potential gains from cooperation in the tax area are equally present in the case of penal and regulatory laws. Such laws are designed to prevent conduct that is considered harmful by the regulating country, but their effectiveness across borders is limited in three ways: (1) by limits on the extraterritorial application of national law; (2) by limits on the ability of national courts to exercise personal jurisdiction over foreign defendants; and (3) by limits on the enforceability of judgments.[402] The extent to which a country limits the application of its law is largely in its own hands and requires little

---

399. *See* Andrew T. Guzman, *Is International Antitrust Possible?*, 73 N.Y.U. L. REV. 1501, 1510–24 (1998) (comparing regulation that maximizes global welfare to regulation that maximizes national welfare); Eleanor M. Fox & Janusz A. Ordover, *The Harmonization of Competition and Trade Law—The Case for Modest Linkages of Law and Limits to Parochial State Action*, 19 WORLD COMP. 5, pt.2, at 14–16 (1995) (distinguishing between "national" and "world" welfare and noting that legislation may increase the former while decreasing the latter).

400. Every person seeking to evade taxes must have a home country whose taxes he seeks to evade and a foreign country where he goes to evade them. Thus, the sum of evaders *from* all countries must equal the sum of evaders *in* all countries.

401. *See supra* note 376 and accompanying text.

402. *See* Dodge, *Hague, supra* note 7, at 365–66, 380–89 (noting connections between the effectiveness of extraterritorial regulation and rules on personal jurisdiction and enforcement of judgments).

cooperation from others.[403] In theory, limits on personal jurisdiction are also largely in a country's own hands, although in the United States the Due Process Clause prevents courts and legislatures from expanding these limits at will.[404] When the Due Process Clause shields a foreign defendant from suit in a U.S. court, the effectiveness of U.S. law would be increased if foreign courts that have personal jurisdiction over the defendant were willing to apply U.S. law. Limits on the enforceability of judgments are largely out of a country's hands.[405] If a defendant does not have assets in the country rendering a judgment, the enforceability of that judgment (and thus the effectiveness of the law it represents) will depend on foreign law. Cooperation in the enforcement of judgments could make each country's law more effective by increasing the pool of assets against which judgments could be enforced and reducing opportunities for a defendant to avoid enforcement by moving assets to another jurisdiction.[406] In short, if countries *A* and *B* were to agree to apply each other's antitrust laws and enforce each other's antitrust judgments, each country's antitrust law would become more effective and consumers in each country would benefit from a reduction in anticompetitive conduct that could not otherwise be reached.

As in the tax context,[407] one might argue that noncooperation in the enforcement of foreign penal and regulatory law would be a good strategy if, for example, domestic monopolists could expect to extract more from foreign consumers than foreign monopolists could expect to extract from domestic consumers.[408] Such an argument should, however, be rejected for the same reasons. First, on average, there will be the same number of foreign monopolists avoiding domestic law as there are domestic monopolists avoiding foreign law. Second, as in the tax context, the distributional effects

---

403. As the Permanent Court of International Justice observed in the *Lotus* case,
>   Far from laying down a general prohibition to the effect that States may not extend the application of their laws and the jurisdiction of their courts to persons, property and acts outside their territory, [international law] leaves them in this respect a wide measure of discretion which is only limited in certain cases by prohibitive rules; as regards other cases, every State remains free to adopt the principles which it regards as best and most suitable.

S.S. Lotus (Fr. v. Turk.), [1927] P.C.I.J. (ser. A) No. 10, at 19. National legislatures have an incentive to regulate international business to prevent harmful effects only when their constituents feel such harmful effects and an incentive to permit activities that benefit domestic interests at the expense of foreign interests. Countries should therefore extend their laws extraterritorially to apply to conduct abroad that causes effects within their territories. *See* Dodge, *Extraterritoriality, supra* note 373, at 153–58; Dodge, *Presumption, supra* note 182, at 117–19.

404. *See* Int'l Shoe Co. v. Washington, 326 U.S. 310, 316 (1945) (holding that the Due Process Clause requires "minimum contacts" with the forum).

405. U.S. authorities will not enter a foreign country and seize property to satisfy a U.S. court judgment. *Cf.* United States v. Verdugo-Urquidez, 494 U.S. 259 (1990) (holding that seizure of Mexican citizen's property in Mexico did not violate Fourth Amendment).

406. Dodge, *Hague, supra* note 7, at 388.

407. *See supra* notes 399–401 and accompanying text.

408. *See generally*, Dodge, *Extraterritoriality, supra* note 373, at 153–54; Guzman, *supra* note 399, at 1510–25; Fox & Ordover, *supra* note 399, at 15.

are undesirable. Reciprocal nonenforcement of regulatory law benefits only a few at the rest of their compatriots' expense.

The case for reciprocal enforcement of regulatory laws is obviously least controversial in those areas where national legal systems generally agree that the conduct at issue should be prohibited—for example, price-fixing[409] or securities fraud.[410] Such enforcement is likely to be more controversial when the forum strongly disagrees with the regulatory policies of the foreign nation whose laws it is being asked to enforce. If the disagreement is extremely strong, the forum might refuse enforcement on public policy grounds. However, a fair number of cases lie between those foreign laws with which the forum generally agrees and those that would violate its public policy. The application of U.S. antitrust law to agreements among insurers and reinsurers, which was at issue in *Hartford Fire Insurance Co. v. California*,[411] is one such example. Under British law, such agreements were expressly exempted from rules on restrictive trade practices.[412] Another example is the provision of the U.S. Securities Exchange Act allowing a corporation to recover short-swing profits from its officers and directors without proof that they were benefiting from confidential information.[413] Ontario law allowed the recovery of such profits only where it could be shown that the officer or director was taking advantage of confidential information, and the Canadian court in *McIntyre Porcupine Mines v. Hammond* stressed this difference in declining to enforce a U.S. judgment for short-swing profits.[414]

Country *B* could simply refuse to enforce country *A*'s law in cases like these. Country *A* will then be unlikely to enforce those laws of country *B* with which it disagrees, and the effectiveness of both countries' laws will be somewhat reduced. Moreover, the reduction in effectiveness is unlikely to be symmetrical. Bigger countries,[415] like the United States, have relatively less need for cooperation to make their laws effective because potential defendants have relatively more contacts with bigger countries on which personal jurisdiction may be based and relatively more assets within their territories against which judgments may be enforced.[416] A better option would be for

---

409. *See* United States v. Nippon Paper Indus. Co. Ltd., 109 F.3d 1, 8 (1st Cir. 1997) (noting the illegality under both U.S. and Japanese law of the price-fixing with which defendant was charged).

410. *See* Allen v. Lloyd's of London, 94 F.3d 923, 929 (4th Cir. 1996) (noting that both U.S. and British law prohibit misrepresentation and fraud in the sale of securities).

411. 509 U.S. 764 (1993).

412. *See* In re Insurance Antitrust Litigation, 723 F. Supp. 464, 488 (N.D. Cal. 1989) (citing Restrictive Trade Practices (Services) Order 1976, S.I. 1976 No. 98, Schedule P 8), *rev'd*, 938 F.2d 919 (9th Cir. 1991), *aff'd in part and rev'd in part sub nom.* Hartford Fire Ins. Co. v. California, 509 U.S. 764 (1993).

413. Securities Exchange Act of 1934, § 16(b), 15 U.S.C. § 78p(b) (1994).

414. 119 D.L.R.3d 139, 145 (Ont. H. Ct. 1975).

415. A "bigger" country, in this context, is one with which more foreign companies do business or in which more foreign companies have assets. The United States is, in this sense, much "bigger" than China. Dodge, *Hague, supra* note 7, at 364 n.10.

416. I have previously suggested that the relatively greater ability of the United States to engage in extraterritorial antitrust enforcement may explain why the United States has long favored the extraterritorial application of antitrust law, while other countries have resisted it. *Id.* at 381.

country $B$ to enforce even those laws of country $A$ with which it strongly disagrees (so long as they do not violate public policy) and to negotiate either changes in those laws or limits on their application to defendants in country $B$. Reciprocal enforcement would tend to level the playing field between bigger and smaller countries, with the result that bigger countries should be more willing to consider changes in their substantive law or its extraterritorial application than they are currently.[417]

In short, Justice Story was right.[418] Governments would be better off if they could cooperate by enforcing each other's public laws because cooperation would make those laws more effective. Reciprocal enforcement of foreign tax, penal, and regulatory laws makes sense even where a nation strongly disagrees with those laws, because negotiations to limit objectionable laws are likely to be more effective under a regime of reciprocal enforcement.[419] The key word, however, is *reciprocal*: $A$ does not benefit from enforcing $B$'s public law unless $B$ responds by enforcing $A$'s. One must therefore consider whether reciprocal enforcement can be achieved by the courts or whether some sort of treaty is required.

## B. The Judge's Dilemma

In *Banco Nacional de Cuba v. Sabbatino*, Justice Harlan sought to determine whether U.S. courts should recognize foreign expropriations under the act of state doctrine by considering "the competency of dissimilar institutions to make and implement particular kinds of decisions in the area of international relations."[420] Obviously, courts cannot negotiate directly with other jurisdictions for reciprocal enforcement. Their only option would be to enforce foreign penal, tax, or regulatory law and hope that other jurisdictions will respond in kind.[421]

Here, however, courts face a dilemma. It is commonly known in game theory as the "prisoner's dilemma," but one may think of it in this context as the "judge's dilemma." If the judges of country $A$ and country $B$ cooperate in enforcing each other's law, both countries will be better off than if neither cooperates because each country's law will be more effective.[422] However, if the judges in country $A$ cooperate and those in country $B$ do not, country $A$ will be worse off than if neither had cooperated. This is easiest to see in the context of tax law—country $A$'s enforcement of country $B$'s tax law transfers wealth from country $A$ to country $B$. It is also true, though, with foreign penal and regulatory law. If judges in country $A$ enforce country $B$'s anti-

---

417. For a more in depth discussion, see *id.* at 380–89.

418. *See supra* note 394 and accompanying text.

419. *See supra* notes 409–417 and accompanying text.

420. 376 U.S. 398, 423 (1964).

421. *See* Dodge, *Extraterritoriality, supra* note 373, at 159–60 (making the same point about cooperation with respect to extraterritoriality).

422. *See supra* Part IV.A.

trust law, monopolists in country *A* can no longer enrich themselves (and country *A*) at the expense of country *B*'s consumers. If judges in country *B* do not reciprocate, monopolists in country *B* can still enrich themselves (and country *B*) at the expense of consumers in country *A*. The result is a net transfer of wealth from *A* to *B*. Because *A*'s judges cannot ensure that *B*'s judges will cooperate (and vice versa), the rational thing for them to do is not to cooperate.[423]

While Robert Axelrod has shown that cooperation can emerge if the parties play the game an indefinite number of times and adopt a "tit for tat" strategy,[424] the judicial role severely limits a judge's ability to adopt such a strategy.[425] For a judge, the decision whether to enforce foreign penal, tax, or regulatory law strongly resembles a single-play game.[426]

The way to escape the judge's dilemma is for the political branches to enter agreements with other governments for the mutual enforcement of each other's penal, tax, and regulatory laws. If judges cooperate by enforcing such laws in the absence of a treaty, however, they will tend to hinder such agreements for there will be little to encourage non-cooperating countries to come to the bargaining table. Russell Weintraub has made this point in a related context, noting that "if in fact a significant sacrifice of United States interests results from attempts to serve comity, international accommodation may . . . , ironically, be retarded rather than advanced. Our bargaining chips will have been given away before the political branches could use them."[427] This is also the point that F. A. Mann tried to make in defense of the public law taboo when he wrote that "[j]udges who ignore the paramount rights of their sovereign deprive their sovereign of the opportunity to insist on reciprocity."[428]

Recent developments show that the political branches of government can and do negotiate treaties providing for the reciprocal enforcement of public law. Since the mid-1970s, the United States has entered prisoner transfer treaties with a large number of countries under which each party has agreed to enforce foreign criminal sentences.[429] Since the mid-1980s, the United States has entered MLATs with a smaller, but still significant, number of

423. *See* Robert Axelrod, The Evolution of Cooperation 10 (1984) (noting that two self-interested parties playing the prisoner's dilemma game once will both choose to defect). The same analysis can be applied to judicial cooperation in conflict of laws, the enforcement of private law judgments, and extraterritoriality. *See* Larry Kramer, *Return of the Renvoi*, 66 N.Y.U. L. Rev. 979, 1022–23 (1991) (regarding judicial cooperation); Michael Whincop, *The Recognition Scene: Game Theoretic Issues in the Recognition of Foreign Judgments*, 23 Melb. U. L. Rev. 416, 418-28 (1999) (regarding enforcement of private law judgments); Antonio F. Perez, *The International Recognition of Judgments: The Debate Between Private and Public Law Solutions*, 19 Berkeley J. Int'l L. 44, 59-60 (2001) (regarding enforcement of private law judgments); *see* Dodge, *Extraterritoriality*, *supra* note 373, at 161–62 (regarding extraterritoriality).

424. *See* Axelrod, *supra* note 423, at 10–11, 13.

425. *See* Dodge, *Extraterritoriality*, *supra* note 373, at 161–62.

426. *See id.* at 162.

427. Russell J. Weintraub, *The Extraterritorial Application of Antitrust and Securities Laws: An Inquiry into the Utility of a "Choice-of-Law" Approach*, 70 Tex. L. Rev. 1799, 1817 (1992).

428. Mann, *supra* note 9, at 609.

429. *See supra* notes 310–314 and accompanying text.

countries providing for cooperation in the enforcement of criminal fines.[430] In 1995, the United States and Canada amended their tax treaty to provide assistance in the collection of tax judgments, signaling a renewed U.S. interest in such provisions after more than forty years of official hostility.[431] Such efforts seem likely to continue, as governments increasingly realize the limits of going it alone and the advantages of cooperation.

Thus, subject to one important qualification that will be discussed in Section C, judges should leave cooperation in the enforcement of foreign penal, tax, and regulatory law to the political branches of government. The only risk is that interest groups will be able to convince policy makers that the public law taboo reflects sound policy for the nation as a whole rather than sound policy for the judiciary based on its particular role and limitations. This is what happened with tax collection assistance provisions in 1951.[432] This Article has tried to guard against similar outcomes by showing that most of the reasons given to support the public law taboo are unconvincing[433] and that cooperation in the enforcement of public law makes sense.[434] It is simply that the best way to achieve such cooperation is for judges to follow the public law taboo.

### C. Distinguishing Between Private and Governmental Plaintiffs

One might say that the argument made in the preceding section applies to the enforcement of foreign public law regardless of whether the plaintiff is a private party or a governmental authority. Indeed, one might say that this argument applies equally to the enforcement of foreign private law and that courts should not apply any foreign law or enforce any foreign judgments in the absence of a treaty ensuring reciprocity.[435] Although reciprocity has not generally been required in the conflict of laws, many nations have imposed it as a condition for the enforcement of foreign judgments.[436] When the Supreme Court considered the recognition of foreign private law judgments in *Hilton v. Guyot*, it too adopted a reciprocity requirement.[437]

---

430. *See supra* notes 318–322 and accompanying text.

431. *See supra* notes 306–309 and accompanying text.

432. *See supra* notes 297–298 and accompanying text.

433. *See supra* Part III.

434. *See supra* Part IV.A.

435. The American Law Institute's International Jurisdiction and Judgments Project is considering whether to propose federal legislation to govern the enforcement of foreign judgments, either to implement the Hague Judgments Convention or even in the absence of such a convention. *See* American Law Institute, International Jurisdiction and Judgments Project, Report 2-4 (Apr. 14, 2000). The project's reporters, Andreas Lowenfeld and Linda Silberman, have raised the question whether such a federal statute should contain a reciprocity requirement, although they themselves are divided on the question. *Id.* at 25–26.

436. *See* Friedrich K. Juenger, *The Recognition of Money Judgments in Civil and Commercial Matters*, 36 Am. J. Comp. L. 1, 31 n.170 (1988) (noting that Czechoslovakia, Germany, Israel, Japan, Romania, Turkey, Venezuela, and several Swiss cantons require reciprocity). For older discussions of reciprocity in foreign jurisdictions, see Nadelmann, *supra* note 254; Ernest G. Lorenzen, *The Enforcement of American Judgments Abroad*, 29 Yale L.J. 188 (1919).

437. 159 U.S. 113, 227 (1895).

During the twentieth century, however, the reciprocity requirement for private law judgments was gradually abandoned by the states through a combination of judicial decisions and legislation. This Section argues that it was abandoned for at least one good reason, a reason that also applies to private plaintiffs seeking to enforce foreign public law.

In *Hilton*, a French glove manufacturer sued a U.S. buyer in French court for breach of contract. The U.S. buyer defended the suit and made counterclaims, but lost, and the French manufacturer then brought an action in federal court in New York to enforce its judgment.[438] By a vote of 5-4, the U.S. Supreme Court held that the French judgment was not entitled to conclusive effect because French courts did not give such effect to U.S. judgments.[439] Perhaps surprisingly, this aspect of *Hilton* had little impact on the American law of judgments. In the era before *Erie Railroad v. Tompkins*,[440] *Hilton* was binding only in federal court.[441] Since *Erie*, it has commonly been assumed that *Hilton* is not even binding on federal courts sitting in diversity, which must apply the judgments law of the state in which they sit.[442] The first *Restatement of Conflicts* provided that foreign judgments were conclusive without reciprocity,[443] and the *Restatement (Second) of Conflicts* and *Restatement (Third)*

---

438. *Id.* at 114–16.

439. *See id.* at 227 ("[J]udgments rendered in France, or in any other foreign country, by the laws of which our own judgments are reviewable on the merits, are not entitled to full credit and conclusive effect when sued upon in this country, but are prima facie evidence only of the justice of the plaintiff's claim."). *Hilton* seems to be limited to judgments against U.S. nationals rendered by foreign courts in favor of their own nationals, *see id.* at 170–71, 205–06, which is how most commentators have read it. *See, e.g.*, 2 JOSEPH H. BEALE, A TREATISE ON THE CONFLICT OF LAWS 1382 n.1 (1935); Reese, *supra* note 258, at 791–92; Comment, *Reciprocity and the Recognition of Foreign Judgments*, 36 YALE L.J. 542, 546 & n.16 (1927); Johnston v. Compagnie Generale Transatlantique, 152 N.E. 121, 123 (N.Y. 1926).

440. 304 U.S. 64 (1938).

441. *Johnston*, 152 N.E. at 123; *see also* Cowans v. Ticonderoga Pulp & Paper Co., 219 A.D. 120 (N.Y. App. Div. 1927) (declining to follow *Hilton* in suit to enforce judgment against U.S. national). The *Johnston* court also tried to characterize *Hilton*'s reciprocity requirement as a "magnificent dictum" because the case could have been decided the same way on grounds of fraud. *See Johnston*, 152 N.E. at 123. *Hilton*, however, rested squarely on reciprocity and expressly declined to reach the fraud issue. *See Hilton*, 159 U.S. at 210.

442. *See, e.g.*, Banque Libanaise Pour Le Commerce v. Khreich, 915 F.2d 1000, 1003–04 (5th Cir. 1990); Somportex, Ltd. v. Philadelphia Chewing Gum Corp., 318 F. Supp. 161, 164 (E.D. Pa. 1970); *see also* RESTATEMENT (THIRD) OF FOREIGN RELATIONS LAW § 481 cmt. a (1987) ("Since Erie v. Tompkins . . . it has been accepted that in the absence of a federal statute or treaty or some other basis for federal jurisdiction, such as admiralty, recognition and enforcement of foreign country judgments is a matter of State law, and an action to enforce a foreign country judgment is not an action arising under the laws of the United States. Thus, State courts, and federal courts applying State law, recognize and enforce foreign country judgments without reference to federal rules."). *Cf.* Klaxon Co. v. Stentor Elec. Mfg. Co., 313 U.S. 487 (1941) (holding that federal courts sitting in diversity must apply state conflict-of-laws rules). *Hilton* may still apply to the recognition of foreign judgments in federal question cases—for example the preclusive effect of foreign judgments in intellectual property cases. *See* Blonder-Tongue Labs., Inc. v. Univ. of Ill. Found., 402 U.S. 313, 324 n.12 (1971) (noting that *res judicata* effect of patent judgment is governed by federal law).

443. RESTATEMENT OF CONFLICT OF LAWS § 434 (1934). This conclusion was not particularly surprising, since its reporter, Joseph Beale, had criticized the reciprocity doctrine as "not only unsound in theory, but also in its practical aspects." 2 BEALE, *supra* note 439, at 1389.

*of Foreign Relations Law* have followed suit.[444] The Uniform Money Judgments Recognition Act makes foreign money judgments "enforceable in the same manner as the judgment of a sister state which is entitled to full faith and credit" regardless of reciprocity.[445] Of the thirty U.S. jurisdictions that have adopted the Uniform Act, only seven have inserted a reciprocity requirement.[446]

A number of criticisms have been leveled against the reciprocity doctrine, and some combination of them probably led to its decline in the United States.[447] An early commentator,[448] endorsed by Joseph Beale,[449] stated that there were three main arguments against reciprocity and for universal recognition of foreign judgments: "The first is that a judgment is a law governing private rights, and that it should be recognized as is foreign contract or property law. The second is that trade is thereby facilitated. The third is that much unnecessary litigation will thereby be prevented."[450] Others have argued that reciprocity is inappropriate for courts, either because it is too difficult to administer[451] or because it is too political.[452] Some have also sug-

---

444. RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 98 & cmt. e (1971); RESTATEMENT (THIRD) OF FOREIGN RELATIONS LAW § 481 & cmt. d (1987).

445. Uniform Act, *supra* note 2, § 3. The Act's two drafters were critical of the reciprocity doctrine. Nadelmann called it "harmful." Nadelmann, *supra* note 254, at 263. And Reese said that its "wisdom . . . seems open to serious question." Reese, *supra* note 258, at 793. For further discussion of the Uniform Act, see *supra* Part II.A.2.

446. In Georgia and Massachusetts, reciprocity is required. *See* GA. CODE ANN. § 9-12-114(10) (1993) ("A foreign judgment shall not be recognized if . . . [t]he party seeking to enforce the judgment fails to demonstrate that judgments of courts of the United States and of states thereof of the same type and based on substantially similar jurisdictional grounds are recognized and enforced in the courts of the foreign state."); MASS. GEN. LAWS ANN. ch. 235 § 23A (West 1996) ("A judgment shall not be recognized if . . . judgments of this state are not recognized in the courts of the foreign state."). In Florida, Idaho, North Carolina, Ohio, and Texas, the absence of reciprocity is a discretionary basis for non-enforcement. *See* FLA. STAT. § 55.605(2)(g) (2000) ("A foreign judgment need not be recognized if . . . [t]he foreign jurisdiction where judgment was rendered would not give recognition to a similar judgment rendered in this state."); IDAHO CODE § 10-1404(2)(g) (Michie 1998) ("A foreign judgment need not be recognized if . . . [j]udgments of this state are not recognized in the courts of the foreign state."); N.C. GEN. STAT § 1804(b)(7) (1999) ("A foreign judgment need not be recognized if . . . '[t]he foreign court rendering the judgment would not recognize a comparable judgment of this State.'"); OHIO REV. CODE ANN. § 2329.92(B) (2001) ("A foreign country judgment rendered in a foreign country that does not have a procedure for recognizing judgments made by courts of other countries and their political subdivisions . . . that is substantially similar to [Ohio's] . . . may be recognized and enforced . . . in the discretion of the court."); TEX. CIV. PRAC. & REM. CODE ANN. § 36.005(b)(7) (Vernon 1997) ("A foreign country judgment need not be recognized if . . . the foreign country in which the judgment was rendered does not recognize judgments rendered in this state that, but for the fact that they are rendered in this state, conform to the definition of 'foreign country judgment.'").

447. This Article is not the place for a comprehensive consideration of reciprocity, although such a review would be extremely useful and is long overdue. For an older work on the subject, see Arthur Lenhoff, *Reciprocity: The Legal Aspect of a Perennial Idea*, 49 NW. U. L. REV. 619 (1955).

448. Comment, *supra* note 439.

449. *See* 2 BEALE, *supra* note 439, at 1389 n.1.

450. Comment, *supra* note 439, at 547–48.

451. Lenhoff, *supra* note 447, at 778 ("[J]udicial examination of the observance of material reciprocity has proved clumsy, if not unworkable."); Reese, *supra* note 258, at 793 ("[T]he doctrine would obviously place an onerous burden on the courts, since it would frequently be difficult to determine the effect which the courts of a particular nation do in fact accord to the judgments rendered in this country.").

452. *See, e.g.*, Hilton v. Guyot, 159 U.S. 113, 234 (1895) (Fuller, C.J., dissenting) ("[I]t is for the government, and not for its courts, to adopt the principle of retorsion, if deemed under any circumstances

gested that the reciprocity doctrine is unfair.[453] A problem with several of these arguments is that they fail to explain why a rule of universal enforcement of foreign law is preferable to a rule of universal nonenforcement. A rule of nonenforcement in the absence of a treaty would similarly resolve the inconsistency in the treatment of judgments and conflicts, would do a better job of avoiding litigation, would be at least as easy for courts to administer, and would arguably be less "political" since it would put the political branches in the strongest position to negotiate for reciprocal enforcement.

The argument that the enforcement of judgments without reciprocity facilitates trade does justify a preference for enforcement over nonenforcement. As Antonio Perez has recently noted, "[t]raders seek the security provided by the enforcement of legal rights and the provision of an adequate remedy. Accordingly, without secure means by which that remedy may be given effect, exporters may undervalue the gains from trade."[454] The basic point is that the enforcement of judgments is necessary to make a legal system effective. The problem with this argument is that it does not distinguish public law from private law. Just as the enforcement of foreign judgments is necessary to make the legal rules that facilitate trade (primarily the rules of contract law) optimally effective, so too the enforcement of foreign judgments is necessary to make the rules that regulate trade to prevent harm (like antitrust and securities law) optimally effective.[455] If judges should nonetheless refuse to enforce foreign penal, tax, and regulatory law in order to facilitate cooperation by the political branches of government,[456] perhaps they should do the same with private law.

There is, however, one argument against the reciprocity doctrine that justifies a distinction between the public and the private—fairness.[457] In *Hilton*, Justice Gray wrote, "we do not proceed upon any theory of retalia-

---

desirable or necessary."); Wilson v. Marchington, 127 F.3d 805, 812 (9th Cir. 1997) ("The general rationale underlying rejection of the reciprocity requirement is that it is a matter of diplomacy, best negotiated by the executive and legislative branches."); HERBERT F. GOODRICH, HANDBOOK OF THE CONFLICT OF LAWS 606 (3d ed. 1949) ("[T]he effect of lack of reciprocity seems a political rather than a legal question . . . ."); GEORGE WILFRED STUMBERG, PRINCIPLES OF CONFLICT OF LAWS 129 (3d ed. 1963) ("The reciprocity doctrine is based upon an idea of retaliation, which as between nations should fall within the province of the department of foreign affairs.").

453. GOODRICH, *supra* note 452, at 607 ("[T]he doctrine enunciated by the court imposes an undue hardship on the judgment creditor."); 2 BEALE, *supra* note 439, at 1382 (calling *Hilton* "an anomaly in our law in that it makes the right of action of the plaintiff depend not on anything connected with his claim as such but upon the opinion of the court as to the action in other connections of another country"); Juenger, *supra* note 436, at 32 ("It seems unfair to penalize private litigants, who are neither to blame nor in a position to change matters, for the rendition state's lack of comity."); Reese, *supra* note 258, at 793 ("[T]he creditor is not to blame for the fact that the state of rendition does not accord conclusive effect to American judgments, and it might well be thought unfair to rob him on this account of the essential advantages of his judgment.").

454. Perez, *supra* note 423, at 44 (noting also that the same applies to importers).

455. *See supra* notes 402–406 and accompanying text.

456. *See supra* Part IV.B.

457. *Cf.* Louis Kaplow & Steven Shavell, *Fairness Versus Welfare*, 114 HARV. L. REV. 961 (2001) (arguing that fairness is inefficient).

tion upon one person by reason of injustice done to another,"[458] but that is, of course, precisely what the doctrine of reciprocity serves to do.[459] Willis Reese has put the counterargument most succinctly: "[T]he creditor is not to blame for the fact that the state of rendition does not accord conclusive effect to American judgments, and it might well be thought unfair to rob him on this account of the essential advantages of his judgment."[460] Fairness thus serves to explain why courts should enforce foreign contract judgments in the absence of a treaty but should generally not enforce foreign tax judgments. Governments that want their tax judgments to be enforced abroad can negotiate for such treatment; to put the argument in Reese's terms, they are "to blame" for the fact that foreign jurisdictions will not enforce such judgments. Private parties that want their contract judgments enforced abroad simply cannot negotiate for such treatment.

Fairness justifies a distinction between the public and the private, but the distinction it justifies is not between public and private law but between public and private plaintiffs.[461] A private party bringing an antitrust, securities, or criminal negligence suit has been harmed by the defendant no less than a private party bringing a contract or tort action.[462] Furthermore, a private antitrust, securities, or criminal negligence plaintiff—like her contract or tort counterpart—cannot negotiate with a foreign jurisdiction for the enforcement of her judgment. Fairness demands that the interests of private parties seeking to enforce foreign law not be held hostage to the government's interest in promoting reciprocity, and this is true whether the foreign law is for common law fraud or for securities fraud. It is worth noting that this distinction between public and private plaintiffs was also made in the *Huntington* cases in defining "penal" law,[463] and that private plaintiffs should already be allowed to enforce foreign antitrust and securities law if

---

458. *Hilton*, 159 U.S. at 228.

459. As Chief Justice Fuller pointed out in dissent, the defendants in *Hilton* "took the chances of a decision in their favor." *Id.* at 230 (Fuller, C.J., dissenting). "If [the U.S. parties] had succeeded in their cross suit and recovered judgment against [the French parties], and had sued them here on that judgment, [the French parties] would not have been permitted to say that the judgment in France was not conclusive against them. As it was, [the French parties] recovered, and I think [the U.S. parties] are not entitled to try their fortune anew before the courts of this country on the same matters voluntarily submitted by them to the decision of the foreign tribunal." *Id.* at 230–31.

460. Reese, *supra* note 258, at 793.

461. Distinguishing between public and private plaintiffs should also be somewhat easier than distinguishing between public and private law. U.S. antitrust law, for example, built upon the American common law of trade restraints. *See generally* 1 PHILLIP E. AREEDA & HERBERT HOVENKAMP, ANTITRUST LAW 61–94 (2d ed. 2000). The parties to the Hague Judgments Convention negotiations are currently facing this difficulty in trying to define an exclusion for antitrust claims. *See* Interim Text, art. 1(2)(j) & n.6, *supra* note 278 (noting agreement on excluding "actions against cartels, monopolisation, abuse of market dominance, horizontal or vertical restraints, mergers and acquisitions, price fixing or price discrimination" but that "words such as 'unfair competition'" might go "too far").

462. For further discussion of the remedial nature of U.S. antitrust and securities law, see *supra* notes 215–216 and accompanying text.

463. *See supra* notes 29–42 and accompanying text.

those decisions were properly applied.[464] The same fairness argument would support an exception to the revenue rule in those cases where its application would prejudice private parties—for example, where an administrator seeks the transfer of assets not for the benefit of both private and governmental creditors—which is, again, what courts have tended to do.[465]

I do not mean to suggest that the same problems of ensuring reciprocity are not present with private parties. Indeed, because private parties have had difficulty enforcing public law claims and judgments abroad,[466] it would be a good idea for governments to negotiate conflicts and judgments conventions to provide for this. It is simply that when the plaintiff is a private party, this problem of reciprocity is outweighed by fairness concerns; these concerns are not present when the plaintiff is a government. Finally, the nonenforcement of foreign penal and regulatory law in suits by private plaintiffs is probably not necessary to encourage treaty negotiations for the reciprocal enforcement of such law. Governments' incentives to cooperate are greatest where its interests are directly affected, and limiting the public law taboo to claims by governments themselves should be sufficient to encourage cooperation.[467]

## D. Some Recent Examples

Thus far, this Article has argued: (1) that courts should not enforce foreign penal, tax, or regulatory law in a suit by a foreign government, either by applying that law to decide a case or by enforcing a foreign judgment; (2) that courts should enforce foreign penal or regulatory law in a suit by a private party; and (3) that governments should negotiate treaties for the reciprocal enforcement of such laws in suits by both government authorities and private parties. This Section applies these principles to some of the recent disputes noted in the introduction.

---

464. *See supra* notes 211–226 and accompanying text.

465. *See, e.g.,* Ayres v. Evans, 39 A.L.R. 129, 131, 140 (Fed. Ct. 1981) (Austl.); Priestly v. Clegg, [1985] 3 SA 955, 959 (Transvaal Prov. Div.); *see also Re* Lord Cable, [1977] 1 W.L.R. 7, 23-26 (Ch. 1976) (refusing to enjoin trustees from remitting the proceeds of a trust to India in compliance with Indian exchange controls where failure to do so could result in serious penalties for the trustees); Re Reid, 17 D.L.R.3d 199, 205 (B.C.C.A. 1970) (Can.) (holding that executor who had paid English taxes on behalf of an estate was entitled to indemnification from assets of the estate in British Columbia); *supra* notes 98–99 and accompanying text.

466. *See, e.g.,* McIntyre Porcupine Mines Ltd. v. Hammond, 119 D.L.R.3d 139 (Ont. H. Ct. 1975) (Can.).

467. Whether fairness outweighs the need to ensure reciprocity is a close question, on which reasonable people might differ. If, however, one is of the view that private antitrust judgments should not be enforced to encourage reciprocity, one should probably take the same position with respect to private law judgments and abandon the trend in American law throughout the twentieth century of enforcing such judgments without insisting upon reciprocity.

### 1. *Private Antitrust Judgments*

If a U.S. court has rendered a judgment for treble damages against a Canadian corporation for violations of the Sherman Act in a suit brought by private parties, should a Canadian court enforce the U.S. judgment? A closely analogous case arose in 1998, involving treble damages under North Carolina's unfair trade practices statute.[468] The British Columbia Court of Appeal held that the U.S. judgment was enforceable.[469] It noted that the judgment was not penal under the Privy Council's *Huntington* decision because it was not in favor of the state,[470] and that the treble damages were not contrary to British Columbia's public policy.[471] Indeed, the court went so far as to suggest in dicta that "treble damage awards based even on anti-trust laws are enforceable" in Canada.[472] The *Old North State Brewing* decision, and particularly the line the court draws between public and private plaintiffs, is correct.

The *Old North State Brewing* decision alone, however, is not sufficient to ensure that private parties can enforce foreign regulatory law judgments. First, there are contrary Canadian precedents.[473] Second, in the antitrust area, the Foreign Extraterritorial Measure Act allows the Attorney General of Canada to block or limit the enforcement of foreign judgments by either private or public plaintiffs.[474] Third, there does not appear to be any precedent in Canada for allowing a plaintiff to bring suit under foreign regulatory law in Canadian court, yet such suits may be necessary to maintain the effectiveness of foreign regulatory laws in cases where the regulating state's courts lack personal jurisdiction.[475] Finally, there is no assurance that courts in other jurisdictions will follow British Columbia's lead. To overcome these difficulties, Canada, the United States, and other countries should negotiate a treaty or series of treaties providing for the reciprocal enforcement of foreign regulatory judgments, and the reciprocal application of foreign regulatory law in suits by private parties.

---

468. N.C. Gen. Stat. Ann. § 75-1.1(a) (2001) ("Unfair methods of competition in or affecting commerce, and unfair or deceptive acts or practices in or affecting commerce, are declared unlawful.").

469. Old N. State Brewing Co. v. Newlands Services Inc., 58 B.C.L.R.3d 144 (B.C.C.A. 1998) (Can.).

470. *Id.* ¶ 49.

471. *Id.* ¶ 53.

472. *Id.* ¶ 51.

473. *See* McIntyre Porcupine Mines Ltd. v. Hammond, 31 Q.R.2d 452, 461 (Ont. H. Ct. 1975) (Can.) (holding that a private party could not enforce a U.S. securities law judgment); *supra* notes 180–183 and accompanying text.

474. *See supra* note 247.

475. *See supra* notes 402–406 and accompanying text. One should remember that some U.S. laws like the Sherman Act may not authorize suit except in federal court. *See supra* notes 192–197 and accompanying text. Congress should consider amending such laws to permit foreign suits.

## 2. Public Securities Judgments

Where a U.S. court has rendered a judgment for civil penalties and disgorgement against a U.S. citizen for securities fraud under the Securities Exchange Act, should a Canadian court enforce the U.S. judgment against assets held by the defendant in Canada? Such a case arose in 2000, and a British Columbia court determined that, although the judgment for "civil penalties . . . would not be enforceable in British Columbia[,] [t]he disgorgement order is."[476] The *Cosby* court was correct to enforce the disgorgement order, for despite the fact that the SEC was technically the plaintiff, it was suing on behalf of defrauded investors who would ultimately receive these funds.[477] In applying the public law taboo, a court ought to look to the real party in interest, enforcing a judgment when the government sues on behalf of private parties and refusing to do so when a private party brings suit on behalf of the government.[478] The *Cosby* court was also correct to state that the judgment for civil penalties was not enforceable because that judgment was one in favor of the U.S. government suing on its own behalf to enforce its regulatory law, and a Canadian court could not be sure that a U.S. court would reciprocate in a similar suit by Canadian authorities.

Of course, U.S., Canadian, and other securities regulators would be able to do their jobs more effectively if both their disgorgement orders *and* their penalties were enforceable in each other's courts and if, where their own courts lacked personal jurisdiction, they could bring suit for violations of their own securities laws in foreign courts.[479] The solution, again, is to negotiate a treaty or series of treaties providing for the reciprocal enforcement of foreign regulatory judgments, and the reciprocal application of foreign regulatory law, in suits by government authorities.

## 3. Enforcement of Tax Law

Finally, if the government of Canada has been cheated out of tax revenues on cigarettes by smugglers operating from the United States and sues one of the alleged conspirators under RICO in U.S. district court, should the U.S. court hear the suit? In 2001, the Second Circuit correctly held that the revenue rule bars such a claim.[480] Looking to the "object" of the claim, the majority recognized that Canada was attempting to collect its unpaid taxes in

---

476. S.E.C. v. Cosby, [2000] B.C.R. 677, ¶ 26 (B.C.S.C.). *See also* Sec. Exchange Comm'n v. Ong Congqin Bobby & Anor, [1999] 1 Sing. L. Rep. 310 (H. Ct.) (holding that civil penalties are penal but suit for injunctive relief is not and permitting the SEC to take evidence in Singapore for purposes of the latter). *But see* Nanus Asia Co. & Anor v. Standard Chartered Bank, [1988] H.K.C. 377, at 397 (Hong Kong H. Ct.) (declining to enforce order in suit for disgorgement and penalties). *See generally supra* Part I.E.2. In *Cosby*, the SEC did not seek to enforce the judgement for civil penalties.

477. [2000] B.C.R. 677, ¶ 17.

478. *See supra* notes 207–210 and accompanying text.

479. *See supra* notes 402–406 and accompanying text.

480. Att'y Gen. of Canada v. R.J. Reynolds Tobacco Holdings, Inc., 268 F.3d 103, 109 (2d Cir. 2001).

U.S. court.[481] While "conceding the force" of many criticisms leveled at the revenue rule,[482] the Second Circuit emphasized the need for reciprocity and the possibility of treaty negotiations for the enforcement of such claims. "Declining to apply the revenue rule in this case would potentially allow Canada to obtain assistance it has not negotiated for and that would be greater than the assistance our government would likely receive as a litigant in Canada's courts."[483] This is precisely what the court should have done.[484]

It would benefit both the United States and Canada, however, to extend their cooperation beyond the limits contained in the 1995 Protocol.[485] They should extend the collection assistance provision to judgments against their own nationals and should provide for the reciprocal application of each other's tax laws (either directly or indirectly through statutes like RICO) to cover situations where domestic courts cannot exercise personal jurisdiction over the taxpayer.

## V. CONCLUSION

Why do courts refuse to enforce foreign public law when they routinely enforce foreign private law? The answer is to give their political branches an opportunity to ensure the reciprocal treatment of their own public law by negotiating treaties. Judges cannot ensure reciprocal treatment and their efforts to cooperate by enforcing foreign public law in the absence of a treaty will make their nation worse off in the short run and undercut the political branches' negotiations in the long run. This is the judge's dilemma.[486]

When the plaintiff is a private party, however, judges should enforce foreign public law without regard to reciprocity for the same reason that they

---

481. *Id.* at 131. In dissent, Judge Calabresi focused instead on the form of the action, reasoning "that Canada, in suing for damages resulting from the violation of a United States statute, neither is seeking to have non-Canadian courts enforce Canadian judgments, laws, or policies, nor is basing this action on the violation of the Canadian statute." *Id.* at 135 (Calabresi, J., dissenting). Historically, courts applying the revenue rule have looked to the real party in interest. *See supra* notes 96–97, 209–210 and accompanying text. This focus on the substance of the action is appropriate because, when the real party in interest is the government, courts must enforce the public law taboo in order to promote reciprocity. *See supra* Part IV.B. It is only when the real party in interest is private that fairness concerns require courts to break the taboo themselves. *See supra* Part IV.C.

482. *Reynolds*, 268 F.3d at 125.

483. *Id.* at 122.

484. In two other recent cases, the United States brought criminal wire fraud charges against the smugglers, who were charged with conspiring to defraud the Canadian government. The First Circuit reversed the convictions, while the Second Circuit allowed the prosecutions to continue. *See* United States v. Boots, 80 F.3d 580 (1st Cir. 1996); United States v. Trapilo, 130 F.3d 547 (2d Cir. 1997); *supra* notes 101–105 and accompanying text. The U.S. Attorneys may not have been wise to bring criminal prosecutions to help Canada enforce its tax laws in the absence of a treaty, for doing so may undercut Canada's incentives to agree to such a treaty. However, once the Executive Branch has determined that the prosecutions are in the best interests of the United States (perhaps because Canada has agreed to some sort of cooperation short of a formal treaty), the courts should not second-guess that decision by invoking the revenue rule. Thus, *Boots* was wrongly decided, and the *Reynolds* court correctly distinguished its decision from the decision in *Trapilo*. *See Reynolds*, 268 F.3d at 123.

485. For further discussion of the Protocol, see *supra* notes 306–309 and accompanying text.

486. *See supra* Part IV.B.

should enforce foreign private law without regard to reciprocity—because fairness requires that the private party not be penalized for its government's failure to negotiate a treaty. The line between public and private plaintiffs is the line that courts themselves have tended to draw, in the *Huntington* decisions and elsewhere,[487] providing ample precedent to break the public law taboo in private antitrust and securities cases. In enforcing this line, however, courts should be careful to determine the real party in interest. They should enforce foreign public law when the government brings suit to recover money for private parties,[488] and should deny enforcement when private parties bring suit to recover money for the government.[489]

Governments, on the other hand, should negotiate treaties to provide for the reciprocal enforcement of government claims under penal, tax, and regulatory law. They (and their citizens) have a great deal to gain from cooperation that makes their respective regulatory and tax systems more effective internationally.[490] Treaties providing for reciprocal enforcement would remove current limits on the ability of governments to regulate and tax transnationally, limits that have been imposed by restrictions on judicial jurisdiction and the enforcement of judgments. Apart from the need to ensure reciprocity, none of the reasons given to justify the public law taboo—the supposed difficulty of enforcing foreign law,[491] the desire to avoid giving offense to other nations,[492] the desire to shield one's own nationals from the reach of foreign law,[493] nor considerations of sovereignty[494]—withstand scrutiny. Because governments (as distinguished from courts) *are* in a position to ensure reciprocity, they should do so. They should break the public law taboo.

---

487. *See supra* notes 29–42, 98–99 and accompanying text.
488. *See, e.g.,* S.E.C. v. Cosby, [2000] CarswellB.C. 677 (B.C.S.C. 2000).
489. *See* Peter Buchanan Ltd. v. McVey, [1954] I.R. 89 (Ir. H. Ct. 1950).
490. *See supra* Part IV.A.
491. *See supra* Part III.A.
492. *See supra* Part III.B.
493. *See supra* Part III.C.1.
494. *See supra* Part III.C.2.

# Exhibit 33

## Statement of Stephen E. Shay

## Committee on Ways and Means, Subcommittee on Select Revenue Measures
## United States House of Representatives

## Hearing On Issues Involving Banking Secrecy Practices And Wealthy American Taxpayers

March 31, 2009

Mr. Chairman, Ranking Member Tiberi and Members of the Committee:

My name is Stephen Shay. I am a partner in the law firm Ropes & Gray in Boston. I specialize in U.S. international income taxation and was formerly an International Tax Counsel for the Department of the Treasury. I have advised U.S. custodian banks, foreign private banks, foreign governments and foreign investment funds with U.S. and non-U.S. sponsors, and occasionally foreign high net worth individuals, on cross-border income tax and withholding issues.[1] With the Chairman's permission, I would like to submit my testimony for the record and summarize my principal observations in oral remarks.

As stated in the notice for the hearing, the focus of today's hearing is "on limitations of the withholding taxes imposed by the United States on U.S.-source investment earnings received by foreign persons, the Qualified Intermediary ("QI") program established by the IRS to enforce those withholding taxes, the limitations of our tax treaties, and the extent to which these may have contributed to non-compliance by U.S. taxpayers."

I discuss below the law relevant to U.S. withholding on payments to foreign persons, including that governing the QI system, documentation and reporting, and information exchange under treaties. I also discuss the relationship of these cross-border withholding rules to the information reporting rules upon which we rely to encourage income tax reporting of investment income.[2] Understanding the different roles for information reporting and cross-border withholding and the context in which they apply is essential to evaluating their strengths and weaknesses in relation to the purposes for which they were adopted and their use in preventing offshore tax evasion by U.S. persons.

Because of the complexity of these rules and their interaction I have structured my testimony as follows. In the next part of my testimony, I provide some broader context to the

---

[1] I have attached a copy of my biography to this testimony. The views I am expressing are my personal views and do not represent the views of either my clients or my law firm. I would like to acknowledge with thanks the substantial assistance of Kathleen Gregor and Laura Damerville in the development of this testimony and of Jennifer Neilsson and Revital Bar Or in its preparation and review. Any errors are my own.

[2] This discussion is not intended to be comprehensive. As noted by William Burke, an examination of all of the elements of the information reporting rules applicable to cross-border transactions would require a treatise. William L. Burke, *Tax Information Reporting and Compliance in the Cross-Border Context*, 27 VA TAX REV. 399, 401 n. 5 (2007).

issues raised in this hearing and provide an overview of the major elements of my testimony. I then outline a series of short-term proposals and longer term options for change. Succeeding sections of the testimony include more detailed discussions of these topics. The technically minded may read the entire testimony; however, for those with shorter attention spans the key points I will make are as follows:

- The United States taxes very little U.S.-source investment income paid to foreign persons.

- The United States does not have jurisdiction to require foreign banks and financial institutions to report foreign accounts of U.S. persons that only earn foreign income and can only obtain information on these accounts through foreign financial institutions that act as QI withholding agents for U.S. investment income or through information exchange requests with treaty or TIEA partners.

- Because of the above, some U.S. persons are able to masquerade as foreign persons or hide behind foreign corporations without reporting their income (from unreported accounts or under controlled foreign corporation or passive foreign investment company rules).

- There are feasible ways to reduce the opportunities for U.S. tax evasion in this context:

  o Expand the responsibilities of QIs in relation to U.S. customers, whether or not they hold assets in a QI account.

  o Increase IRS enforcement resources devoted to cross-border enforcement, including resources to allow QIs to submit information electronically.

  o Consider prospective elimination of the foreign-targeted bearer obligation exception to beneficial owner documentation or QI reporting (but retain the portfolio interest exemption from withholding). This would effectively require that participants in the distribution and holding of foreign targeted debt be QIs.

  o Expand the network of treaties and TIEAs under which information may be exchanged with respect to U.S. persons' non-U.S. income and support collection and sharing of tax information subject to accepted taxpayer information confidentiality protections.

  o Support OECD initiatives to identify and promote best practices for electronic information exchange and procedures for implementing rate reductions at source.

At the end of my testimony I also discuss options for expanding source taxation of investment income that would require analysis and consultation with industry and governments, but which should at least be considered (whether accepted or rejected) in connection with any international tax reform.

I.    OVERVIEW OF ISSUES AND PROPOSALS

A.    Fiscal Policy, the Tax Gap and the International Tax Gap

We are in the midst of the most severe economic downturn in generations.  At the same time, we have made commitments at home and abroad that extend beyond the revenues raised under our current tax system.  The recently updated Congressional Budget Office (CBO) Budget and Economic Outlook projects Federal budget deficits under current laws and policies equal to 11.9% of Gross Domestic Product (GDP) for the 2009 fiscal year and 7.9% of GDP for next year and declining to 2% of GDP in 2012 to 2019,[3] before taking into account investments requested by President Obama in health care, the environment and other programs in his 2010 budget.

Large deficits are an appropriate prescription in these unusual times.  Although any decision regarding the amount we borrow as a country should be analyzed as would any financing decision,[4] we must anticipate that there is a limit to our ability to borrow without triggering inflation and a decline in confidence in the dollar.[5]  Moreover, government borrowing resulting from operating (as opposed to capital) deficits in particular merely postpones the need to raise taxes to pay the principal and interest arising from that borrowing.

While there is a widespread consensus that raising taxes would be unwise in the current economic environment, it also is clear that long-term economic health requires that we repair our Federal income tax system in order to be able to have the resources to meet the needs of present and future generations.  Taking steps to address the so-called tax gap, the difference between taxes due and taxes actually collected, is an important element of putting our fiscal house in order.[6]  Although there are no easy panaceas, there are cost effective steps that can be taken to reduce the tax gap even as we recognize that it can not be eliminated altogether.

---

[3] CONGRESSIONAL BUDGET OFFICE, A PRELIMINARY ANALYSIS OF THE PRESIDENT'S BUDGET AND AN UPDATE OF CBO'S BUDGET AND ECONOMIC OUTLOOK 1 (Mar. 2009).

[4] See Neil H. Buchanan, *Is It Sometimes Good to Run Budget Deficits? If So, Should We Admit It (Out Loud)?* 26 VA. TAX REV. 325 (2006).

[5] See, e.g., Alice M. Rivlin and Isabel Sawhill, *Growing Deficits and Why They Matter*, RESTORING FISCAL SANITY: HOW TO BALANCE THE BUDGET 10 (Jan. 2004), *available at* http://www.brookings.edu/es/research/projects/budget/fiscalsanity/full.pdf.

[6] The 2001 Internal Revenue Service's (IRS) tax gap estimate of $345 billion only reflects legal-source income. I.R.S. News Release, *I.R.S. Updates Tax Gap Estimate [for Tax Year 2001]*, IR-2006-28 (Feb. 14, 2006), *available at* http://www.irs.gov/newsroom/article/0,,id=154496,00.html.  The IRS defines "gross tax gap" as "the difference between the aggregate tax liability imposed by law for a given tax year and the amount that taxpayers pay voluntarily and timely for that year." ALAN PLUMLEY, I.R.S. OFFICE OF RESEARCH, 2005 IRS RESEARCH CONFERENCE: PRELIMINARY UPDATE OF THE TAX YEAR 2001 INDIVIDUAL INCOME TAX UNDERREPORTING GAP ESTIMATES 15 (June 2005), *available at* http://www.irs.gov/pub/irs-soi/05plumley.pdf. *See also* Burke, *supra* note 2; Leandra Lederman, Reducing Information Gaps to Reduce the Tax Gap: When Is Information Reporting Warranted? 2 (Feb. 2009) (unpublished abstract), *available at* http://ssrn.com/abstract=1347668.

The last comprehensive IRS estimate of the tax gap was for the 2001 fiscal year. The estimate, a gross gap of $345 billion and net gap of $290 billion,[7] did not include all unreported income from offshore activity. Indeed, there has been no IRS estimate to date of what the Treasury Inspector General for Tax Administration ("TIGTA") calls the "international tax gap," defined as "taxes owed -- but not collected on time -- from a United States (U.S.) person or foreign person[8] whose cross-border transactions are subject to U.S. taxation."[9]

The TIGTA included in its recent report estimates of the portion of the international tax gap attributable to offshore noncompliance of U.S. taxpayers ranging from $40 billion to $70 billion based on what are essentially back-of-the-envelope estimates (or educated guesses) by the IRS (for the low estimate dating from 2004) and Marty Sullivan (for 2004).[10] The TIGTA acknowledges in its report that the IRS has not developed an accurate and reliable estimate of the international tax gap based on empirical evidence.[11]

---

[7] The $345 billion estimate of the gross gap did not take into account taxes that were paid voluntarily, but late, and recoveries from IRS enforcement activities. According to former Treasury Assistant Secretary Eric Solomon, the "net tax gap" was an estimated $290 billion in tax year 2001. *Testimony before the Senate Finance Committee on Ways to Reduce the Tax Gap* (Apr. 18, 2007) (statement of Eric Solomon, Treasury Assistant Secretary for Tax Policy), *available at* http://www.treas.gov/press/releases/hp360.htm.

[8] For this purpose, U.S. person and foreign person are as defined in section 7701 of the Code. Unless otherwise indicated, section references are to the Internal Revenue Code of 1986, as amended (the "Code"), or to regulations thereunder.

[9] TREASURY INSPECTOR GENERAL FOR TAX ADMINISTRATION, OFFICE OF INSPECTIONS AND EVALUATIONS, A COMBINATION OF LEGISLATIVE ACTIONS AND INCREASED IRS CAPABILITY AND CAPACITY ARE REQUIRED TO REDUCE THE MULTI-BILLION DOLLAR U.S. INTERNATIONAL TAX GAP 1 (Jan. 27, 2009) (hereinafter TIGTA REPORT), *available at* http://www.treas.gov/tigta/iereports/2009reports/2009IER001fr.html. *See also* Martin A. Sullivan, *Economic Analysis: U.S. Citizens Hide Hundreds of Billions in Cayman Accounts,* 103 TAX NOTES 956 (May 24, 2004).

[10] TIGTA REPORT, *supra* note 9, at App. VI. These income amounts presumably included capital gains and foreign income not subject to U.S. withholding tax if paid by a U.S. person thinking they were paying to a foreign person. In other words, as discussed in the text below, amounts that are outside the U.S. withholding regime.

[11] TIGTA REPORT, *supra* note 9, at 4. While there is much to be done in attacking the international tax gap, these estimates are extremely uncertain and may be high. The findings of the Government Accountability Office ("GAO") in reviewing the disclosures of individuals participating in the IRS's 2003 Offshore Voluntary Compliance Initiative ("OVCI") include the following:

> The type and extent of individual taxpayers' illegal offshore activity varies. In 2004, we reviewed OVCI to provide information to Congress on the characteristics of taxpayers who came forward regarding their noncompliant offshore activities, and to understand how those taxpayers became noncompliant. According to IRS data, OVCI applicants were a diverse group, for instance with wide variations in income and occupation. In each of the 3 years of OVCI we reviewed, at least 10 percent of the OVCI applicants had original adjusted gross incomes (AGI) of more than half a million dollars, while the median original AGI of applicants ranged from $39,000 in tax year 2001 to $52,000 in tax year 2000. Applicants listed over 200 occupations on their federal tax returns, including accountants, members of the clergy, builders, physicians, and teachers (citations omitted).

*Tax Compliance: Offshore Financial Activity Creates Enforcement Issues for IRS* 2-3 (Mar. 17, 2009) (statement of Michael Brostek, Director, Government Accountability Office Strategic Issues Team, Committee on Finance, U.S.

### B. U.S. Residents' Offshore Tax Evasion

This hearing is about the potential for tax evasion by U.S. citizens and residents through use of foreign bank accounts and how the tax system should respond. There should be a shared sense of outrage that some U.S. citizens and residents would seek to evade their civic and legal responsibility to pay their fair share of taxes – whether by hiding money overseas or by intentionally failing to report income or by overstating deductions.[12] Those who would aid and abet others' failure to pay tax for their own gain, as well as those who do not pay their taxes, are equally culpable. These contributors to the tax gap cause Americans who pay their taxes to suffer higher rates, which is unfair and economically inefficient.

There are important reasons to attack offshore evasion and avoidance that are independent of the need for revenue, namely, that confidence in the fairness of our tax system is eroded and support for voluntary compliance is consequently undermined if we let U.S. citizens and residents evade their taxes by simply establishing an unreported foreign bank account to receive or earn unreported income. *But this is just as true for other elements of the tax gap.*

The Government does not have infinite resources and it is important that we be analytical in their allocation and target them at the greatest need.[13] In the international area, we should support cost-effective proposals, which the United States can adopt either directly or in cooperation with other countries, which would reduce international tax evasion by U.S. residents. A number of proposals are discussed below. Any such measures have to work in tandem with our withholding rules and procedures for payments to foreign persons in a manner that allows the United States to continue to benefit from foreign capital.

In considering these proposals, it must be emphasized that the objective of promoting voluntary compliance is undermined if we pursue the relatively easy targets of noncompliant foreign banks without also taking on "low hanging fruit" compliance measures at home. We also should actively analyze and pursue expanding information reporting on payments to Sub S corporations and partnerships and other cost effective proposals, as well as addressing cross-border payments.[14] To do otherwise invites cynicism.

---

Senate) (hereinafter Statement of Michael Brostek). It is clear that some of the largest evaders did not participate in the OVCI, as evidenced by the conviction of Mr. Olenicoff for evading taxes on approximately $200 million of income. Joann M. Weiner, *News Analysis: Disqualifying UBS From the QI Regime,* 121 TAX NOTES 1097, 1098 (Dec. 8, 2008). Nonetheless, realism requires recognition that we do not really know how large the problem is and we do know it is difficult to attack.

[12] The tax gap includes unintentional errors, which are common in a tax system as complicated as ours. The prescriptions for this portion of the tax gap is the tax law simplification and continued efforts by the IRS to provide excellent customer services to taxpayers.

[13] *See, e.g.,* Joseph Bankman, *Eight Truths About Collecting Cash From the Cash Economy,* 117 TAX NOTES 506 (Oct. 30, 2007); Lederman, *supra* note 6 (describing standards for when information reporting is cost effective).

[14] *See* NATIONAL TAXPAYER ADVOCATE'S 2007 ANNUAL REPORT TO CONGRESS 501, *available at* http://www.irs.gov/pub/irs-utl/arc_2007_vol_1_legislativerec.pdf (hereinafter NATIONAL TAXPAYER ADVOCATE'S 2007 ANNUAL REPORT TO CONGRESS); Lederman, *supra* note 6, at 12-16; Jay A. Soled, *Homage to Information Returns,* 27 VA. TAX REV. 371 (2007).

At the end of my testimony, I suggest that consideration be given to longer-term structural changes in source taxation of cross-border income that would require consultation and coordination with other countries. These options should be considered and accepted or rejected as part of a broader review of tax reform alternatives.

### C. Taxing U.S. Payments to Foreign Persons and Preventing Tax Evasion By U.S. Persons: Reconciling Conflicting Policies

According to the GAO, in 2003, $293 billion in U.S.-source fixed or determinable income potentially subject to withholding was paid to foreign persons.[15] U.S. payors with withholding responsibility were required to receive documentation of the payees' foreign status either in the form of a self-certification under penalties of perjury from the "beneficial owner" of the income or through a QI in a position to verify the identity and status of the beneficial owner (unless the source of the payments was bearer obligations targeted to foreign persons). Notwithstanding that these were payments of U.S.-source income, the vast majority were eligible for exemption or reduced rates of withholding. Of the $293 billion in 2003 payments, the amount withheld was approximately $5 billion.[16]

Under tax rules described in Part II below, the United States effectively exempts from U.S. tax most U.S. investment income paid to foreign persons.[17] This has broad implications relevant to this hearing:

(1) Because of the lack of potential tax revenue from cross-border withholding taxes, it is not cost-effective to devote disproportionate resources to enforcing the withholding tax on investment income paid to foreign persons.[18]

(2) Other countries, including most U.S. treaty partners, follow a similar practice of exempting much non-dividend investment income from source taxation with the result that there is substantial scope for tax evasion internationally.[19]

(3) Debt obligations issued in the global fixed-income markets assume no source taxation.[20]

---

[15] Of this amount, a relatively small portion, approximately 12.5% is reported to have been paid to QIs. Statement of Michael Brostek, *supra* note 11, at 10.

[16] U.S. GOV'T ACCOUNTABILITY OFFICE, REPORT TO THE COMMITTEE ON FINANCE, U.S. SENATE, TAX COMPLIANCE: QUALIFIED INTERMEDIARY PROGRAM PROVIDES SOME ASSURANCE THAT TAXES ON FOREIGN INVESTORS ARE WITHHELD AND REPORTED, BUT CAN BE IMPROVED 19 (Table 2) (Dec. 19, 2007) (hereinafter GAO QI REPORT), *available at* http://www.gao.gov/products/GAO-08-99.

[17] While dividends are subject to U.S. withholding tax, it is possible to hold non-dividend paying equities or to take steps such as trading around dividend dates or using appropriately designed and implemented notional principal contracts to avoid the withholding tax.

[18] Nonetheless, in December, the IRS LMSB Division established a new Tier 1 audit issue for "U.S. withholding agents' section 1441reporting and withholding on U.S. source FDAP income." Background may be found on the IRS web site at: http://www.irs.gov/businesses/corporations/article/0,,id=205415,00.html.

[19] It is not clear that the European Savings Directive has had a material effect on this fact. While change is occurring, it remains true that the "tax cultures" of many other countries generally do not support voluntary tax compliance to the same extent as in the United States.

(4) These facts encourage U.S. persons to masquerade as foreign persons.

What can and should be done about this? There are significant constraints. While the outer limits of its jurisdiction are not always clear, generally the United States does not have enforcement jurisdiction over a foreign financial institution that is not owned by a U.S. person and does not carry on a U.S. business (in the relevant entity).[21] Accordingly, it is possible for a U.S. person to have an account at a foreign financial institution that is not subject to U.S. third party information reporting. The rules for collecting withholding on payments to foreign persons are coordinated with the domestic information reporting and backup withholding rules, but these rules do not apply in a range of cases with respect to foreign accounts.[22] As discussed in succeeding paragraphs, the QI system performs an important withholding function and may be expanded to assist in this regard, but not every foreign bank is a QI and the determined evader can migrate to such a bank. The backstop to these systems is information exchange between countries. While specific information requests are indeed time consuming and manpower intensive, they are important both in uncovering information and as a prophylactic measure.[23] Below, I consider a set of proposals taking into account these constraints. There is no single silver bullet.

The actions of UBS that gave rise to and are described in the UBS deferred prosecution agreement[24] are seen by some as an indication of the failure of the qualified intermediary ("QI") program.[25] For reasons described below, the QI program is an essential part of the U.S. withholding system so long as the United States continues to have a patchwork of withholding tax exceptions and reduced rates. The development of the QI regime was an important advance in enhancing cross border compliance. While it needs to be strengthened in certain respects, it is important to understand the role it plays in the withholding system.

---

[20] Because of interest gross-up clauses, it is likely that the interest on such debt instruments would re-price if this were changed in relation to outstanding debt obligations.

[21] RESTATEMENT (THIRD) OF FOREIGN RELATIONS LAW §§ 411-13, 431 (1987),

[22] *See infra* note 72.

[23] The U.S. Treasury's Acting International Tax Counsel stated in testimony before the Senate Finance Committee Hearing on Offshore Tax Evasion that information obtained under a treaty led to at least two high-profile U.S. tax evasion convictions. *Testimony before the Senate Finance Committee on Offshore Tax Evasion* (May 3, 2007) (statement of John Harrington, Treasury Acting International Tax Counsel) (hereinafter Statement of John Harrington), *available at* http://ustreas.gov/press/releases/hp385.htm. One of these was the conviction of Walter C. Anderson, who was sentenced to 9 years in prison in 2007 for failing to report $365 million in income and trying to use offshore entities to evade U.S. federal and municipal taxes of over $200 million. *See* Carol D. Leonnig, *9-Year Sentence for Tax Evasion; Mogul Avoided Paying IRS, D.C. $200 Million*, WASH. POST, Mar. 28, 2007, at B1. The other conviction, in 2004, was that of Almon Glenn Braswell, who attempted to evade more than $10 million in corporate income taxes by using an offshore corporation and bank account, but his scheme was uncovered through requests made by the U.S. under the TIEA. *See* David Rosenzweig, *Man Whom Clinton Pardoned Enters Plea*, L.A. TIMES, Mar. 3, 2004, at B3.

[24] Deferred Prosecution Agreement, United States v. UBS, Case No. 09-60033-CR-COHN (S.D.Fla. Feb. 19, 2009)

[25] *See, e.g.* Lee Sheppard, *News Analysis: Don't Ask, Don't Tell, Part 4: Ineffectual Information Sharing*, 122 TAX NOTES 1411 (Mar. 23, 2009).

The payments made to QIs generally go through foreign clearing organizations, banks or other financial institutions that pool vast amounts of securities in the omnibus accounts that are an essential part of the efficiency of the domestic and global securities payments systems. Domestic information reporting and back-up withholding were designed from the outset with the understanding that the financial institution closest to the customer, whether a bank, broker or other such institution, would have the obligation to information report. The last payor in the chain would have the customer's name and taxpayer identification number and thereby be in a position to deliver a Form 1099 to the customer showing his income or gross proceeds and to file a copy with the IRS. Before development of the QI system in the 1990s, however, no analogous system for cross-border payments existed.

Until the development of the QI system a U.S. withholding agent has no realistic way to know whether the beneficial owner at the other end of a payments chain was a U.S. or foreign person or whether that person was entitled to treaty relief. It was an open secret that U.S. withholding agents were treating foreign banks as though they were the beneficial owners of omnibus accounts that they held for customers and that the withholding agents were failing to withhold tax contrary to regulations. In light of the reality of the financial payments systems for securities, accurately depicted in a GAO chart attached as an Appendix to this testimony, the regulation was totally unrealistic and went unobserved.[26]

The QI system was developed at the behest of U.S. custodian banks to reduce their exposure to the increasingly intolerable risk of withholding liability with respect to portfolio interest paid to foreign banks that were not in fact beneficial owners of the interest income. Working closely with the Internal Revenue Service over a period of several years, regulations were developed that allowed the U.S. withholding agents to rely on documentation received from QIs as well as direct customers unless they had a reason to know it was not correct. One of the key decisions made in those regulations was to follow traditional U.S. tax rules and respect a foreign corporation as a nontransparent beneficial owner without regard to whether it was owned by one or a few U.S. persons.[27] The QI system was an integral part of these regulations and in essence relied on a foreign bank with a direct relationship with a foreign customer to exercise normal banking "know-your-customer" disciplines in assuring that the documentation it received and relied upon was correct. The QI regime prescribed audits by the bank's external auditors to

---

[26] One reason that this issue was not focused on when the first regulations implementing portfolio interest were developed was because the repeal of the withholding tax on portfolio interest was driven by a desire of U.S. securities firms and the U.S. Treasury to be able to issue debt in the Eurobond market other than through the Netherlands Antilles treaty structure for Eurobonds. James P. Holden, Jr., Note and Comment, *Repeal of the Withholding Tax on Portfolio Debt Interest Paid to Foreigners: Tax and Fiscal Policies in the Context of Eurobond Financing*, 5 VA. TAX REV. 375, 367-77 (1985). A major point of contention was whether bearer obligations would be permitted to be targeted to foreign buyers. Having won this concession, the financial industry either did not anticipate problems arising from the beneficial owner documentation requirement or strategically determined not to address the issue.

[27] As discussed below, a closely held foreign corporation holding investment assets generally would be either a controlled foreign corporation or a passive foreign investment company as to U.S. shareholders. Consequently, the foreign corporation's income would be subject either to current inclusion or its rough economic equivalent in the income of its U.S. shareholders.

back stop the system.[28] As the GAO has recognized, the QI system improved the ability to identify U.S. persons:

> Compared to U.S withholding agents, IRS has additional assurance that QIs are properly withholding the correct amount of tax on U.S. source income sent offshore. Because QIs are in overseas locations, they are more likely to have personal contact with NRAs or other persons who may claim exemptions or treaty benefits than would U.S. withholding agents. This direct relationship may increase the likelihood that the QI will collect adequate account ownership information and be able to accurately judge whether its customers are who they claim to be.[29]

When it was first conceived, it was uncertain whether foreign banks would participate in the QI system. However, substantial IRS efforts to explain the new system persuaded foreign banks that if they did not participate they would face full 30% withholding on all interest and dividends if they did not provide individual customer documentation. Providing individual customer documentation, which would require disclosure of customer names to other banks and in many cases would be impractical. In 2005, there were over 5000 QIs.[30] An important question is how much burden and risk of liability can be placed on QIs without causing material participants to leave the QI system.[31]

The inability of a withholding agent to pierce through layers of payees also has prompted the banking industry to push for international adoption of rules that are structurally similar to the QI system.[32] Importantly, an informal business and governmental consultative group at the OECD is considering the practicality of procedures to surmount one of the criticisms of the QI regime, namely, that beneficial owner information is not made available to the source country and is not readily usable by the country in which the investor resides. This is an important project and deserves the strong support of the U.S. Government.

As noted above, the United States imposes little source taxation on investment income of nonresidents. The ability of nonresidents to invest in U.S. fixed income and non-dividend paying

---

[28] *See* I.R.S. Announcement 2008-98, 2008-44 I.R.B. 1087; I.R.S. Notice 2001-66; 2001-2 C.B. 396.

[29] GAO QI REPORT, *supra* note 16, at 12.

[30] *Testimony before the Senate Committee on Homeland Security and Governmental Affairs' Permanent Subcommittee on Investigations Hearing on Tax Haven Financial Institutions: Their Formation and Administration of Offshore Entities and Accounts for Use by U.S. Clients (July 17, 2008)* (statement of Douglas Shulman Commissioner of Internal Revenue) (hereinafter Statement of Douglas Shulman), at 6, available at http://hsgac.senate.gov/public/_files/STMTShulmanIRSREVISED.pdf.

[31] The GAO reports that 549 QI agreements have been terminated because of failures to satisfy agreed-upon procedure (AUP) requirements since inception of the program and that 5% of the QIs account for 90% of the withholding (based on data from the 2002 audit cycle, which may not be representative). GAO QI REPORT, *supra* note 16, at 26 – 27.

[32] *See* ORGANIZATION FOR ECONOMIC COOPERATION AND DEVELOPMENT, CENTRE FOR TAX POLICY AND ADMINISTRATION, REPORT ON POSSIBLE IMPROVEMENTS TO PROCEDURES FOR TAX RELIEF FOR CROSS-BORDER INVESTORS, *available at* http://www.oecd.org/dataoecd/34/19/41974569.pdf.

equities and earn returns free from U.S. tax without reliance on a treaty (and treatment of a foreign corporation as a beneficial owner), and the limits on enforcement jurisdiction over foreign financial institutions creates an incentive for U.S. citizens and residents to masquerade as foreign persons or invest through foreign corporations without reporting income under the CFC and PFIC rules. It is feasible and important to take additional steps to frustrate evasion by U.S. persons

After 10 years of experience with the QI system, it likely is possible to enhance the scope of responsibilities of a QI in relation to U.S. citizens and residents without causing foreign financial institutions to forego acting as QIs. It is necessary, however, to recognize that these institutions operate under the regulatory and legal regimes of their home countries. It will be important for the IRS and Treasury to consult with these institutions and their home country authorities to cause any new requirements to satisfy such laws. For example, it may be necessary for U.S. customers to make limited waivers of electronic privacy or banking confidentiality laws in order for the foreign bank to be able to provide information to the IRS.

The GAO Report highlights that substantial amounts of payments are made to unknown recipients in various countries by both U.S. withholding agents and QIs. One would expect that a substantial portion of these payments are made on foreign targeted "bearer" debt instruments as to which beneficial owner information in not required to be provided to a withholding agent or QI, as discussed further below. "Bearer paper" is an anachronism; traded debt obligations are recorded on book entry systems of clearing organizations and banks.[33] The rationale for the rules relating to bearer debt obligations, other than the fact that they have become embedded in the Eurobond offering system, is that the foreign targeting procedures are an adequate defense against U.S. tax evaders. These rules make it easier on banks and securities firms to deal with such securities and that such securities are marketed in the same manner as bearer securities were in the past. There is no government or QI related auditing of the processes designed to prevent U.S. owners who are not exempt recipients from obtaining such securities. In my experience foreign financial institutions' back offices seem to have little understanding of the rules relating to bearer debt obligations beyond the fact that that they must be disclosed in offering documents for foreign targeted issues and that special notice rules apply to sales to U.S. persons. It should be considered whether it is feasible to move these issues into the QI regime for registered obligations.

The best fallback is the ability to ask a treaty or TIEA partner for information. Information authorized to be exchanged from government to government under treaties and TIEAs is relatively unconstrained. With few exceptions, the U.S. practice has been to require that information be obtained by a treaty partner without regard to local bank secrecy or similar restrictions and be provided in a form admissible in court. When making requests of TIEA partners that do not have an income tax, it is important for the IRS to provide those governments with context for the information requests and explain what information is requested and why. In my experience, such communication materially facilitates the ability of the foreign government to assist.

---

[33] *See* NYSBA TAX SECTION REPORT ON ISSUES RELATING TO RESTRICTIONS IMPOSED ON OFFERS AND SALES OF BEARER BONDS BY THE TAX EQUITY AND FISCAL RESPONSIBILITY ACT OF 1982 ("TEFRA") 5-8 (Oct. 1, 2007).

With the preceding as background, I summarize several proposals for consideration that are discussed at greater length in Part IV of this statement.

D.  Summary of Proposals for Change

Certain proposals for reforming the U.S. reporting and withholding systems are set out here and are examined in greater detail in Part II below.  These proposals could be implemented in the shorter term, and would aid the IRS in enforcement and reduce the opportunity for evasion of taxes by U.S. persons.  These proposals include:

- Revising the QI system to require QI information reporting on all accounts over a reasonable threshold held by U.S. persons, including information reporting with respect to payments to a closely-held foreign corporation in which U.S. beneficial owners hold more than 10% of the company.

- Increasing IRS enforcement resources devoted to cross-border enforcement, including resources to allow QIs to submit information electronically.

- Considering prospective elimination of the foreign-targeted bearer obligation exception to beneficial owner documentation or QI reporting (but retain the portfolio interest exemption from withholding).  This would effectively require that participants in the distribution and holding of foreign targeted debt be QIs.

- Expanding the network of treaties and TIEAs under which information may be exchanged with respect to U.S. persons' non-U.S. income and support collection and sharing of tax information subject to accepted taxpayer information confidentiality protections.

- Supporting OECD initiatives to identify and promote best practices for electronic information exchange and procedures for implementing rate reductions at source.

Set out at the end of this testimony are long-term options for consideration as part of international tax reform.  These options are intended to take into account that technological advancement may make it feasible to implement source taxation on a much more sophisticated and nuanced basis than in the past.  These options represent an exploration of opportunities to increase the scope of source taxation of returns to capital in coordination with other countries in a manner that more closely approximates the taxation of net income that was possible historically.  While this likely would reduce the incentives and opportunities for evasion by U.S. persons, the primary purpose behind such options would be a broader collection of tax revenue from cross-border investment.  Those options, discussed at the end of this testimony, must be considered in light of economic conditions and ramifications for capital market and foreign relations, as well as the feasibility of incorporation into the existing international financial system.

*       *       *

II. Current Law Source Taxation of Nonresidents' U.S.-source Investment Income.

A. Overview of U.S. Residence Taxation

The United States taxes the worldwide income of its resident aliens, citizens, and domestic corporations. The United States then grants a credit against U.S. taxes, subject to limitations, on net foreign-source income on which the taxpayer has paid or deemed to have paid foreign income taxes. The general purpose of the credit system is to prevent double taxation, which is why the foreign tax credit is limited to the amount of tax the United States would have imposed on the taxpayer's foreign source income in the same category. The rules for determining the source of income are important under this regime.[34]

One of the many ways that a U.S. person can earn foreign source income is by owning shares, directly or through a transparent entity, of a foreign corporation (meaning an entity formed under foreign law and treated as a corporation for U.S. tax purposes). If the foreign corporation's income is not subject to one of the many anti-deferral rules, the income is not subject to U.S. taxation until it is repatriated. In other words, income from dividends and redemptions are included in a shareholder's income under the same timing mechanisms as for a domestic corporation unless an anti-deferral rule applies.[35]

Two of the main anti-deferral rules are subpart F (controlled foreign corporation (CFC) rules) and the passive foreign investment company (PFIC) rules. A CFC is a foreign corporation over half whose total combined voting power or total stock value is owned by one or more U.S. persons, each of whom is considered to own at least 10-percent of the total voting stock.[36] A CFC's "subpart F income"[37] is imputed to such shareholders as ordinary income. If the shareholder is a corporation owning at least 10-percent of the voting stock, then the shareholder can claim an indirect credit for foreign tax imposed on the CFC's income.[38]

A PFIC is a foreign corporation where 75-percent or more of its gross income is passive income or where 50-percent of its assets are classified as passive.[39] A U.S. shareholder of a PFIC must either make a qualified electing fund (QEF) election to be taxed currently on the

---

[34] *See* John P. Steines, Jr., International Aspects of U.S. Income Taxation 1 (2d ed. 2005); American Bar Association, Report of the Task Force on International Tax Reform, 59 Tax Law. 649, 692-672 (Spring 2006).

[35] *See* I.R.C. §§ 301, 302.

[36] *See* I.R.C. § 957.

[37] "Subpart F income includes . . . foreign base company income. The central elements of foreign base company income are (1) foreign personal holding company income, and (2) foreign base company sales and services income." *See* American Bar Association, *supra* note 34, at 699-700. Foreign personal holding income generally includes what is generally thought of as "passive" or investment income. *Id.* Generally, foreign base company sales and services income includes sales and service income "where relatively little activity is conducted . . . within the borders of a related base company's residence." Steines, *supra* note 34, at 521.

[38] *See* I.R.C. § 960.

[39] *See* I.R.C. § 1297.

PFIC's income on a flow-through basis,[40] or report gain on disposition of the stock as ordinary income with an interest charge designed to negate the benefit of deferral. Indirect foreign tax credits on PFIC income are available to corporate shareholders that own 10-percent or more of the PFIC.

### B. Taxation of Nonresidents' U.S.-source Income: FDAP and ECI.

The ability of the United States to tax the investment income of non-U.S. persons is constrained by the scope of its jurisdiction and its interest in attracting foreign capital to the United States. Because of the limitations on its jurisdiction, the United States taxes foreign persons only on U.S.-related income that has a U.S. source. Foreign persons that carry on a U.S. trade or business are taxed on the net income that is effectively connected with that trade or business (ECI). If a non-U.S. person is a resident of a country with which the United States has an income tax treaty, that person's income must be attributable to a so-called "permanent establishment" in the United States for it to be subject to U.S. taxation.

Non-U.S. persons earning income not connected with a U.S. trade or business are taxed on U.S.-source interest, dividends and other fixed or determinable, annual or periodical (FDAP) income with a U.S. source at a rate of 30% (or a lower treaty rate) on the gross amount of the income. Most gains on the sale of a security, other than a U.S. real property interest, are not considered FDAP and are not taxed by the United States. Generally, payments of interest on a debt obligation are deemed to have a U.S. source when the issuer of the debt is a U.S. tax resident or a U.S. corporation.[41] Dividends are deemed to have a U.S. source when they are paid by a domestic corporation.[42] Within the scope of its taxing authority, the United States has made a conscious decision to exempt broad categories of non-dividend payments to non-U.S. persons of U.S.-source investment income from taxation.

### C. U.S.-Source Interest.

The most significant of these exemptions for withholding are those for payments of bank deposit and portfolio interest and payments of interest to foreign governments.

#### 1. Bank Deposit, Short-Term and Portfolio Interest.

To encourage non-U.S. persons to use U.S. banks and savings institutions, the United States has exempted interest earned by such persons on U.S. bank deposits from taxation.[43] An important exemption also exists for interest payments to foreign persons on obligations payable

---

[40] See I.R.C. §§ 1293-1296.

[41] See I.R.C. § 861(a)(1).

[42] See I.R.C. § 861(a)(2). Dividends from a foreign corporation can also be deemed to have a U.S. source. See I.R.C. § 861(a)(2). For example, dividends of a foreign corporation are treated as having a U.S. source if a significant portion of the foreign corporation's income is treated as effectively connected with the conduct of a U.S. trade or business. See I.R.C. § 861(a)(2)(B).

[43] See I.R.C. §§ 871(i)(2)(A); 881(d); CHARLES H. GUSTAFSON, ROBERT J. PERONI & RICHARD CRAWFORD PUGH, TAXATION OF INTERNATIONAL TRANSACTIONS at ¶4035(a) (3d ed. 2006).

183 days or less from original issue.[44]  Similarly, a more general statutory exemption for interest payments on portfolio indebtedness received by non-U.S. persons makes lending to U.S. persons more attractive.[45]

In repealing the tax on portfolio interest, Congress was concerned that the unilateral exemption would facilitate tax evasion by U.S. persons.[46]  Congress included several restrictions on the portfolio interest exception in order to prevent such evasion that depended primarily on whether the interest was paid on a registered or bearer obligation.

### a)  Registered obligations.

As discussed in greater detail below, under those restrictions the payor of interest on a registered obligation[47] must receive a statement that the beneficial owner of the obligation is a non-U.S. person in order for the payment to qualify for the exemption from withholding for portfolio interest.[48]

### b)  Bearer obligations.

Payments of interest on an obligation that is not in registered form (that is in bearer form) are only exempt from taxation as portfolio interest if there are arrangements reasonably designed to prevent the sale or resale of the obligations to U.S. persons, interest on such an obligation is payable only outside the United States, and there is a statement on the face of the obligation to the effect that any U.S. person who holds the obligation will be subject to limitations under U.S.

---

[44] The exemption arises from a convoluted chain of statutory definitions.  *See* DAVID C. GARLOCK, FEDERAL INCOME TAXATION OF DEBT INSTRUMENTS ¶ 19056 (5th ed. 2007).

[45] This exemption is subject to several limitations.  For example, interest received by a 10% shareholder of the issuer is not exempt from taxation.  *See* I.R.C. § 871(h)(3).  The same is true for interest received by a controlled foreign corporation from a related person.  *See* I.R.C. § 881(c)(3)(C).

[46] My co-authors and I observed in 2002,

> [t]he exemptions for bank deposit and portfolio interest have traditionally been justified by the argument that the imposition of a tax on the gross amount of interest income in a liquid capital market with ready alternative investments would result in the burden of the tax being borne by U.S. borrowers (including the U.S. government) through higher interest rates.  Whether such an effect would arise with respect to non-U.S. persons resident in treaty countries who are already entitled to reduced rates of tax on interest payments without any statutory exception is not clear.  Nevertheless, this concern reflects a widespread international reluctance to tax interest from unrelated foreign payors.

Stephen E. Shay, J. Clifton Fleming & Robert J. Peroni, *The David R. Tillinghast Lecture "What's Source Got to Do With It?" Source Rules and U.S. International Taxation,* 56 TAX L. REV. 81, 122-23 (2002).

[47] A obligation is in registered form if (i) it is registered as to both principal and any stated interest with the issuer (or its agent) and transfer of the obligation may be effected only by surrender of the old instrument and either the reissuance by the issuer of the old instrument to the new holder to the issuance by the issuer of a new instrument tot he new holder; or (ii) the right to the principal of, and stated interest on, the obligation may be transferred only through a book entry system maintained by the issuer (or its agent); or (iii) the obligation is registered as to both principal and any stated interest with the issuer (or its agent) and may be transferred through both of the methods described in (i) and (ii) above.  Treas. Reg. § 5f.103-1(c)(1); *see also* I.R.S. Notice 2006-99, 2006-46 I.R.B. 907.

[48] *See* I.R.C. §§ 871(h)(2)(B)(ii); 881(d).

income tax laws.[49]  In addition, in enacting the portfolio interest exception, Congress gave the I.R.S. authority to exclude from that exception payments of interest to individuals resident in countries with which the United States has information exchange inadequate to prevent tax evasions by U.S. persons.[50]  Enforcement of the limitations on the portfolio interest exception has been difficult, as discussed below.

### 2. Investment income paid to foreign governments.

Foreign governments benefit from a special statutory exemption from taxation for income that is received from passive investments.[51]  This exemption goes beyond that available for portfolio interest.  Income that a foreign government receives from U.S. stocks, bonds or other securities, financial instruments held in the execution of governmental financial or monetary policy and bank deposit interest is generally exempt from the 30% (or lower treaty rate) tax on FDAP income.[52]  Like the exemption for portfolio interest, the foreign government exemption was enacted to encourage foreign investment in the U.S. at a time when the U.S. was in need of financing.[53]  The exemption for foreign governments is not required under principles of sovereign immunity, as such immunity has generally been limited "to cases where a foreign government (or a government-owned entity) is acting in a 'sovereign' capacity, as opposed to in a private or commercial capacity."[54]  Indeed, the foreign government exception does not apply to income derived from the conduct of any commercial activity that is received by or from a controlled commercial entity or that is derived from the disposition of any such entity.[55]  Foreign governments benefit from special investment and trading exceptions to the commercial activities rules, although "[t]hese important exceptions to the definition of 'commercial activities' generally are not available in respect of activities under taken as a dealer, or investments (including loans) made by a 'banking, financing or similar business."[56]  The exemption from gross taxation of passive investment income of foreign governments has facilitated the tremendous investment in the U.S. by foreign governments and sovereign wealth funds.[57]

---

[49] See I.R.C. §§ 871(h)(2)(A); 881(d); 163(f)(2)(B).

[50] See I.R.C. § 871(h)(6).  This authority has not been used and, in light of gross-up clauses in debt indentures, might have unforeseen consequences if exercised.

[51] See I.R.C. § 892.

[52] See id.

[53] See NEW YORK STATE BAR ASSOCIATION TAX SECTION, REPORT ON THE TAX EXEMPTION FOR FOREIGN SOVEREIGNS UNDER SECTION 892 OF THE INTERNAL REVENUE CODE 5 (June 2008), available at: http://www.nysba.org/Content/ContentFolders20/TaxLawSection/TaxReports/1157rpt.pdf.

[54] Id. at 4.

[55] See I.R.C. § 892(b).

[56] NEW YORK STATE BAR ASSOCIATION TAX SECTION, supra note 53, at 20 (citing Treas. Reg. § 1.892-4T(c)(1)(ii)); see also Treas. Reg. § 1.892-4T.

[57] The Chinese government, with approximately $1 trillion invested in U.S. Treasuries, is the largest holder of U.S. government debt.  See, e.g., Michael Wines, China's Leader Says He is 'Worried' Over U.S. Treasuries, NEW YORK TIMES (March 13, 2009).  Sovereign wealth funds have invested hundreds of billions of dollars in the U.S. See, e.g., NEW YORK STATE BAR ASSOCIATION TAX SECTION, supra note 53, at 23.

### D. U.S.-source portfolio dividends.

Payments of dividends to non-U.S. persons that are treated as income from sources within the United States are generally subject to the gross tax on FDAP income.[58]  Under most treaties, the tax is reduced from 30% to 15% on portfolio dividends.[59]

### E. Gains from personal property.

Although dividends paid by a U.S. corporation to a non-U.S. person are subject to taxation, the gain from the sale of securities in that U.S. corporation generally is not taxed if that gain is not effectively connected with a U.S. trade or business (or deemed to be if the stock is a U.S. real property interest).  Unlike the case with portfolio interest, which benefits from an exception to the gross tax on FDAP income, gains received by a non-U.S. person from the sale of personal property (other than U.S. real property interests) are generally not subject to U.S. federal income taxation because they are not treated as FDAP income in the first place.[60]  Thus, capital gains realized by foreign persons from the sale of U.S. stocks and securities that are not effectively connected with a U.S. trade or business are not subject to taxation.

The decision not to tax capital gains seems to rest largely on considerations of administrative feasibility as, absent knowledge of a taxpayer's basis, the United States would not be able to determine the correct amount of gain subject to taxation.[61]

### F. Notional principal contracts.

Just as the exemption of capital gains from treatment as FDAP income was the product of administrative concerns, the taxation of income from notional principal contracts ("NPCs"), commonly known as "swaps" reflects a similar compromise that is not necessarily related to the limitations on U.S. jurisdiction or the need for foreign investment.  Income from NPCs is not treated as FDAP subject to taxation because NPC payments generally are sourced according to the residence of the payee.[62]  Therefore, a payment on an NPC from a U.S. person to a foreign person is considered to have a foreign-source.  These sourcing rules do not reflect any clear policy regarding the sourcing of income, but rather reflect an administrative solution to the difficulty of determining the nature of the income arising from a swap.

---

[58] *See* I.R.C. § 871(a)(1)(A).  There are exceptions to this rule.  If a U.S. corporation receives at least 80% of its gross income from the active conduct of a foreign trade or business, a portion of dividends paid by that corporation will not be subject to taxation.  *See* I.R.C. § 871(i)(2)(B).

[59] Art. 10, U.S. Model Income Tax Convention on . . . (Nov. 2006).

[60] *See* Treas. Reg. § 1.1441-2(b)(2).

[61] The historical justification for excluding capital gains from the definition of FDAP is based largely on the practical difficulties of withholding tax on a net basis, not on notions of fairness or equality in our treatment of U.S. and non-U.S. payees.  Shay, Fleming & Peroni, *supra* note 46, at 122.

[62] *See* Treas. Reg. § 1.863-7(b)(1).

-16-

III. ADMINISTRATION OF RESIDENCE AND SOURCE TAXATION OF INVESTMENT INCOME.

A. Defending residence taxation of investment income.

The United States has two parallel systems for enforcing the payment of tax at the source by its residents and non-residents earning U.S.-source income. The enforcement of tax on non-wage income of U.S. residents focuses primarily on information reporting, with a backup withholding system designed to assure that the IRS obtains a correct TIN and therefore is able to match information on income paid to U.S. residents with their tax returns. Conversely, the basis of enforcement of tax on U.S.-source income of nonresidents focuses primarily on withholding at the source as a result of the United States' limited jurisdiction to enforce payment of tax by nonresidents. However, the withholding system for non-residents is strewn with exemptions (see below), and the interplay of the two systems in the context of international transactions and banking has presented opportunities for tax evasion by U.S. residents. As an initial matter, a brief summary of the two systems of enforcement in helpful in giving context to the problems and proposed solutions faced in this arena.

*1. Information reporting and exempt recipients.*

The purpose of the U.S. information reporting regime is to promote compliance with tax rules. Every person engaged in a trade or business in the U.S. must file certain information returns and payee statements with the IRS (these encompass both Forms 1099 and Forms W-2).[63] Payee statements are statements that must be given to the taxpayer to enable him to file his own income tax return accurately and timely.[64] Most information returns have a corresponding payee statement, and the data required to be provided on each is generally identical.

The largest exception to the information reporting requirements are for payments made to exempt recipients. Exempt recipients include corporations, exempt organizations, individual retirement plans, the U.S. government, a state or U.S. possession government, a foreign government, an international organization, a foreign central bank of issue, the Bank for International Settlements, or any wholly-owned agency or instrumentality of the above.[65] These rules exclude payments to corporations in general, regardless of their jurisdiction or beneficial ownership.

*2. Documentation and back-up withholding.*

In certain circumstances, payors of non-wage income must withhold against payments to U.S. persons under the backup withholding rules of section 3406. Congress adopted the backup withholding system largely to prevent domestic taxpayers from failing to pay taxes on certain types of income, such as dividends and interest.[66] In contrast to withholding on payments to foreign persons described above, section 3406 is not aimed at foreign taxpayers, but is instead meant to be a collection mechanism for domestic taxpayers.

---

[63] *See* I.R.C. § 6041; Treas. Reg. §§ 1.6041-1, 1.6041-2.

[64] *See* I.R.C. §§ 6041-6050T

[65] Treas. Reg. § 1.6041-3(p).

[66] *See* JOEL D. KUNTZ & ROBERT J. PERONI, U.S. INTERNATIONAL TAXATION ¶ C2.08 (1991 & Supp. 2008).

Backup withholding is required on certain "reportable payments" made to payees for whom an information return was filed which had either a missing (none provided by payee or has invalid characters such as alphas or hyphens) or an incorrect taxpayer identification number (name/number combination does not match IRS or SSA files). The rate for all backup withholding is currently 28%.[67]

A payor can eliminate the need for backup withholding by requiring that the payee furnish the payee's taxpayer identification number and, in the case of dividends and interest, certify that backup withholding does not apply because of prior underreporting.[68] This is typically achieved by obtaining an IRS Form W-9 from the payee. Alternatively, if a payee is a foreign person, the payee can provide documentation of foreign status as described below. Importantly, if a payor is subject to withholding obligations under section 1441 (or any other provision of the Code) backup withholding does not apply.[69]

The combination of information reporting and backup withholding is designed to ensure that U.S. persons pay an appropriate amount of tax on investment income, by giving the IRS sufficient information needed to audit payments or requiring collection of the tax at the time of payment.[70] Although designed for domestic taxpayers, backup withholding plays a role in certain international transactions.[71] U.S. payors and certain non-U.S. payors who are qualified intermediaries as described below must back-up withhold in circumstances where a person is considered a U.S. person. However, because the information reporting and backup withholding regimes are narrower in the case of transactions involving foreign financial institutions making payments outside the United States in respect of foreign accounts, certain U.S. persons have taken advantage of the divergence of application of these rules by using foreign accounts and other offshore arrangements to circumvent the U.S. reporting and backup withholding regimes.[72]

---

[67] *See* I.R.C. § 3406 (imposing a 28% withholding tax, calculated with reference to I.R.C. § 1(c)). Pursuant to the Economic Growth and Tax Relief Reconciliation Act of 2001, the withholding rate declined to 28% in 2006 and thereafter. *See* Pub. L. No. 107-16, § 101(c)(10), 115 Stat. 38, 44 Under the sunset provision of that act, the rate reverts to 31% (the rate before the 2001 Act went into effect) in 2011. *See* Pub. L. No. 107-16, § 901, 115 Stat. 38, 150.

[68] *See* I.R.C. §§ 3406(a)(1)(A), 3406(a)(1)(D).

[69] *See* I.R.C. § 3406(g)(2).

[70] *See* JOINT COMMITTEE ON TAXATION, SELECTED ISSUES RELATING TO TAX COMPLIANCE WITH RESPECT TO OFFSHORE ACCOUNTS AND ENTITIES, JCX-65-08 at 19-24 (2008).

[71] *See* Lynnley Browning, *Pressured by I.R.S., UBS Is Closing Secret Accounts*, N.Y. TIMES, Jan. 8, 2009, at B1.

[72] *See* JOINT COMMITTEE ON TAXATION, *supra* note 70, at 25-26. *See also* Cynthia Blum, *Sharing Bank Deposit Information With Other Countries: Should Tax Compliance or Privacy Claims Prevail?*, 6 FLA. TAX. REV. 579, 590-602 (2004) (describing tax evasion by U.S. persons through offshore arrangements). Backup reporting is not required if foreign source income is paid outside the United States by someone who is not a U.S. payor or middleman. Treas. Reg. § 1.6049-5(b)(6). For "backup" withholding, a U.S. payor or middleman includes (1) a foreign corporation that is a controlled foreign corporation, (2) a foreign partnership if, during its tax year, either U.S. persons hold more than fifty percent of the interest in its income or capital or it is engaged in the conduct of a trade or business in the United States to any extent, (3) a foreign person if fifty percent or more of its gross income for three tax preceding years is ECI, and (4) the United States branch of a foreign bank or foreign insurance company. Treas. Reg. § 1.6049-5(c)(5)(i). An amount will not be considered paid outside the United States for this purpose if the financial institution's customer has communicated with an agent, office, or branch of the financial

B. Overview of collecting tax on foreign persons at source by withholding.

As mentioned above, a separate enforcement regime has been developed to enforce payment of tax on U.S.-source FDAP income of non-U.S. persons. Sections 1441 and 1442 of the Code contain detailed rules for the collection of withholding tax at the rates described in Section II above. This internationally-accepted system of having the payor withhold a gross basis tax at source addresses directly the inability of the source country to collect the tax imposed on income of a nonresident.

*1. Who is a withholding agent.*

The Code adopts a broad definition of "withholding agent" for purposes of these rules. A withholding agent is any person, whether a U.S. or a foreign person, that has the control, receipt, custody, disposal, or payment of an item of income of a foreign person subject to withholding.[73] The term is defined to include every person in the chain of custody of a payment, not simply the last person to have control of a payment before it is paid to a foreign person. Generally, a person who has custody or control over income and is not acting on behalf of their own account is a potential withholding agent. This is true regardless of whether the person is a natural or legal person or is within or outside the United States.[74] Thus, the joint and several liability of the withholding agent for the tax to be withheld enables the United States to enforce source taxation of payments to those outside its jurisdiction.

*2. Income Subject to Withholding and Exceptions*

The non-resident alien withholding tax generally applies to all payments to foreign persons of U.S.-source FDAP income, as defined in Section II above.[75] This generally includes all U.S.-source income unless an exception applies. The withholding rules exclude several important items realized by nonresidents from U.S. investments. The exceptions for certain interest and gains apply to all non-residents regardless of their domicile or residency jurisdiction. Thus, no treaty or bilateral agreement is required before a non-U.S. person can take advantage of these broad exceptions if the non-U.S. person is the beneficial owner of the income and then establishes his or its foreign status. However, if a particular payee falls outside the statutory exemptions, the rate of withholding may vary depending on the residency of the payee, whether the payee can take advantage of reduced rates of withholding under a treaty, and the extent of reduction or exemption contained in the treaty.

---

institution from within the United States (including by mail, telephone, or electronic communication) concerning the account in more than "isolated and infrequent" circumstances. Treas. Reg. § 1.6049-5(e)(2).

[73] Treas. Reg. § 1.1441-7(a)(1).

[74] *See* MARNIN J. MICHAELS, INTERNATIONAL TAXATION: WITHHOLDING ¶2.10 (2008).

[75] *See id.* at ch. 2.

### 3. *Documentation.*

A withholding agent generally withholds tax on a payment unless the foreign person evidences its eligibility for relief from withholding tax.[76] The documentation required to prove foreign status or to qualify for the portfolio interest for accounts with U.S. financial institutions held directly by non-U.S. persons consists of a Form W-8 completed under penalties of perjury. For foreign accounts, regulations under section 1441 (1) shift the burden of investigating beneficial ownership from U.S. custodians to foreign financial institutions with actual customer interface, and (2) provide clear rules requiring withholding in the absence of documentation.[77] The centerpiece of these regulations is the QI regime described in Section C below.

## C. Addressing the realities of global capital markets: The QI Regime.

### 1. *Overview of custody and payments systems.*

The development of interlinked clearance, settlement and custodial systems adds to the complexity and interrelationships of financial institutions across national boundaries.[78] For example, many foreign financial institutions utilize local custodians to hold securities in a particular jurisdiction.[79] Many institutions will also aggregate client accounts by region, utilizing an omnibus account with a single custodian who then contracts with local custodians for each jurisdiction or region of the securities held in the omnibus account.[80] It is because of the system of omnibus accounts, tiered custodial relationships, and need for intermediary banks to execute cross-border transfers of assets, that the need for the QI regime arose.

---

[76] *See* I.R.C. § 1441(a); Treas. Reg. § 1441-1(b).

[77] *See* Treas. Reg. § 1. 1441-1(e)(5). Before the 1997 withholding regulations were finalized, the portfolio interest rules required that a Form W-8 be provided from the beneficial owner of the income. *See* Treas. Reg. § 35a.9999-5 (1997).

[78] For a general overview of the international payments, clearance and settlement systems, see HAL S. SCOTT, INTERNATIONAL FINANCE chs. 9-10 (14th ed. 2008). Although the U.S. systems of transfers, Fedwire and CHIPS play a key role in international financial transactions, other countries systems generally must be used in conjunction with U.S. systems, and, at a minimum, a transaction requires both an originating bank and a receiving bank. The receiving bank might be in the recipient's jurisdiction, or a regional banking center. If the latter, a second transfer is generally required, typically on a separate payments system. For example, a payment made by a payor in the United States to a recipient in France might proceed using an intermediary bank as follows: (i) a transfer is first made from the United States by the originating bank ("USBank") to the New York branch of a major European bank headquartered in London ("EuroBank"), using CHIPS; (ii) EuroBank makes an in-house or correspondent transfer on its internal system transferring the value to its London branch; and (iii) the London branch of EuroBank then transfers the funds to the recipient's local bank, ("ParisBank"), via the E.U. Interbank Funds Transfer Services. From a U.S. withholding tax perspective, there are three potential withholding agents, USBank, EuroBank, and ParisBank. Only ParisBank has direct access to the identifying information of the account holder, but it probably is outside the enforcement jurisdiction of the U.S.

[79] *See* SCOTT, *supra* note 78, at Ch. 10.

[80] *See id.*

2. *Overview of the QI system.*

The final withholding regulations implementing the QI regime effectively shifted the burden of documentation to foreign financial institutions wherever possible.[81]

a) Who qualifies?

Generally, a QI is a non-U.S. financial institution that is subject to know-your-customer rules that have been approved by the Service and has entered into a contractual agreement with the Service to report annually certain aggregate information concerning the beneficial owners of U.S.-source payments and to make any necessary tax payments.[82] The QI must agree to engage an external auditor to verify that it is in compliance with the QI agreement.[83] In return, the QI avoids the burden and competitive drawback of forwarding documentation with respect to each customer that is a beneficial owner of U.S. income subject to withholding to a U.S. withholding agent in order to claim reductions in the U.S. withholding tax. The QI, however, must identify U.S. customers that hold accounts covered by the QI agreement.[84] There are special rules permitting a QI that discovers a U.S. person in such an account to avoid disclosure of the person to the Service if back-up withholding is imposed with respect to the assets in the account (including on gross proceeds).[85]

---

[81] *See* T.D. 8734, 1997-44 I.R.B. 5. As my co-authors and I have described:

> [t]his situation was ignored for many years, in part because the U.S. custodian faced the unpalatable choice of either withholding a tax that in most cases would not be appropriate (because the vast preponderance of the foreign financial institution's customers were foreign) or losing the account to another custodian that would accept the Form W-8. The situation eventually became intolerable, even though the probability of attack by the Service was low, because the level of tax risk to the custodians far exceeded profits from the business. Significantly, the final regulations eventually provided rules for nonqualified intermediaries to be able to supply the required documentation in a manner that did not expose foreign customers to backup withholding if they did not disclose their identities. This significantly relaxed potential pressure on the intermediary financial institutions.

Shay, Fleming & Peroni, *supra* note 46, at 124 n. 160 (citing Stephen E. Shay, Leonard Terr, Thomas O'Donnell & Percy Woodard, *Proposal: Alternative Portfolio Documentation Procedures* 2-3 (July 8, 1992) (describing issues faced by U.S. custodial banks holding omnibus accounts for foreign financial institutions) (unpublished manuscript, on file with the Tax Law Review)).

[82] *See* Treas. Reg. § 1.1441-1(e)(5).

[83] *See* Rev. Proc. 2002-55, 2002-35 I.R.B. 435 (providing final audit guidelines for external audits of QI compliance with QI agreement documentation procedures).

[84] *See* Rev. Proc. 2000-12, 2000-1 C.B. 387 (Model Agreement § 2). A foreign financial institution that executes a QI agreement does not have to identify U.S. customers that hold accounts not covered by the QI agreement. *Id.* at § 6.04.

[85] *See id.*

### b) What accounts are covered?

The QI's responsibilities apply only to those accounts it has with a withholding agent and that it has designated as accounts for which it acts as a QI. A QI is not required to act as a QI for all accounts that it holds, but if it designates an account as one for which it will act as a QI, it must act as a QI for all payments made to that account.[86] As a practical matter, a QI that utilizes omnibus custodial relationships as described above may not be able to "opt-out" of QI treatment on an account by account basis, thus becoming a withholding agent with respect to both U.S. and non-U.S. account-holders held through a single omnibus account.

### c) What documentation is required?

In order to reap the benefits of the QI system, a financial institution must have the ability to reliably correlate reportable payments (or amounts) with documents substantiating of the identity of its account holders. Accordingly, a QI must collect, review and maintain documentation pursuant to section 5 of the Model Agreement and, in the case of direct account holders, in accordance with applicable know-your-customer rules.[87]

If the account holder provides a valid Form W-8 (other than Form W-8IMY) or valid documentary evidence that supports the account holder's status as a foreign person, a QI is permitted to treat a foreign account holder (including an account holder that is a collective investment vehicle) as the beneficial owner of a payment.[88] Such documentation enables a QI to treat a documented foreign account holder as entitled to a reduced withholding rate unless the account holder is a bank, broker, intermediary, or agent. As a result of these rules, if a direct foreign account holder is the beneficial owner of a payment, a QI can effectively shield the account holder's identity from U.S. custodians.[89]

### d) What are the QI's duties in relation to a QI account?

Depending on who the beneficial owner of assets is, the U.S. imposes one of the two types of withholding tax discussed above over which the QI must withhold (or arrange for another to withhold) and submit to the IRS: non-resident withholding tax for beneficial owners that are non-U.S. persons and backup withholding under section 3406 for certain improperly documented accounts of U.S. individuals or other presumed to be individuals.[90]

---

[86] *See id; see also* DENIS A. KLEINFELD & EDWARD J. SMITH, LANGER ON PRACTICAL INTERNATIONAL TAX PLANNING ch. 78 (4th ed. 2004 of Supp. 2007).

[87] For a detailed description of the documentation requirements of QIs, see Marnin J. Michaels, David M. Balaban, Philip Marcovici, Thomas A. O'Donnell & Peter J. Connors, *Nine Months of Working with The QI Agreement: What Has The IRS Wrought?* 11 J. INT'L TAX'N 4 (2000).

[88] "Valid documentary evidence" is defined as: (i) any documentation obtained under the appropriate know-your-customer rules, (ii) any documentation described in Treas. Reg. § 1.1441-6 that establishes entitlement to a reduced withholding rate under an income tax treaty, or (iii) any documentation described in Treas. Reg. § 1.6049-5(c) that establishes an account holder's status as a non-U.S. person for purposes of the Code. *See* Rev. Proc. 2000-12, 2000-1 C.B. 387 (Model Agreement, § 2.12).

[89] Michaels, Balaban, Marcovici, O'Donnell & Connors, *supra* note 87, at 9.

[90] *Id.* at 6.

The final withholding regulations contain at least three important concessions to limit the identification of the ultimate foreign account holders and the requirements for information reporting or disclosure.[91]  The concessions are meant to avoid administrative burdens and excess withholding (and the resulting need to for a foreign investor to file a U.S. tax return to claim a refund), and reflect the strength of the tension between the desire to assure relief is only granted where appropriate and the efficiency of capital markets.

> First, the regulations treat a foreign corporation as the beneficial owner of its income, irrespective of whether it is located in a tax haven, and its owner(s) need not be identified.[92]  Although this may seem a strange concept to many foreign bankers who view the shareholder as the beneficial owner under know-your-customer rules, it is consistent with U.S. tax principles. This was a significant decision by the Service to limit the extent to which the withholding tax rules would be used as a means to catch U.S. tax evaders (or to obtain information that could be exchanged with treaty partners regarding their residents' investments in U.S. securities through offshore entities).

> Second, the regulations employ so-called presumption rules to permit a withholding agent to presume that an investor is a foreign person and thereby avoid imposition of back-up withholding in the absence of documentation of foreign status.[93]  This permits a presumptively foreign payee to accept a 30% withholding tax on income (instead of 28% withholding on gross proceeds under the backup withholding regime) as the sole price for not providing withholding documentation.  The absence of exposure to backup withholding is a significant structural element of the withholding rules.  Non-U.S. investors seeking confidentiality (and presumably tax-evading U.S. investors as well) may use a foreign tax haven corporation as a private investment company to hold equity securities and thereby only

---

[91] See Shay, Fleming & Peroni, *supra* note 46, at 125-26.

[92] Treas. Reg. § 1.1441-1(c)(6).

[93] Treas. Reg. § 1.1441-1(b)(3)(iii)(D).  The final withholding tax regulations have carefully avoided applying back-up with-holding on gross proceeds in such a way as would compel disclosure of the identity of investors, whether U.S. or foreign, that are not direct payees.  For example, if a Cayman Islands limited partnership provides a withholding exemption foreign partnership certificate (generally on a Form W-8IMY) to a U.S. withholding agent without documentation from its partners, the U.S. withholding agent must presume that the undocumented investors are non-U.S. payees and withhold 30% of income subject to withholding if paid to a foreign person.  Treas. Reg. § 1.1441-5(d)(3).  The non-U.S. payee presumption, however, insulates that investor from back-up withholding on gross proceeds, which does not apply to payments to foreign persons.  See, e.g., Treas. Reg. § 1.6045-1(g)(1)(i) (and cross-references) for this conclusion.  The U.S. withholding agent must report to the Service on Form 1042-S the amount paid to an undocumented foreign payee.  See Treas. Reg. § 1.1461-1(c).  If a foreign partnership is organized in a tax haven and is not tax-resident in a country with a treaty with the United States, there is no way to relate the Form 1042-S information to the nondisclosed partners.

suffer 30% withholding tax on dividends in order to avoid disclosure of their identities to the Service.[94]  If the average dividend return on a broad range of equities is 3%, then the withholding tax is 90 basis points. The marginal cost of nondisclosure under these assumptions is only 45 basis points when the 30% withholding rate is compared with a treaty rate on dividends of 15%.[95]  The calculus for the confidentiality-minded investor would be dramatically different if the threatened withholding were 30% of gross proceeds from the sale of securities.

Third, as discussed above, the final withholding tax regulations provide that a foreign beneficial owner customer of a QI may claim exemption from withholding on interest without disclosing her identity to the Service (or the U.S. withholding agent).[96]

Even with these concessions, the introduction of the QI system and the new withholding regime took a first step towards defending against U.S. taxpayers taking advantage of source tax exemption.[97]

D.  Information Exchange Under Treaties and TIEAs.[98]

As discussed above, the QI regime is not the primary system that the United States uses to enforce its tax laws outside its borders – nor was it ever meant to be. Because of the limits of U.S. jurisdiction, international cooperation is necessary to the effective administration of U.S. tax law overseas. Such cooperation is achieved through two mechanisms: income tax treaties and tax information exchange agreements ("TIEAs"). Although other enforcement tools are available, they are often more cumbersome and less effective that tax treaties and TIEAs.[99]

---

[94] A U.S. tax evader resident in the United States might arrange with a fiduciary in a country with confidentiality protections to organize a corporation to hold investment assets. Although a U.S. tax evader resident outside the United States might be presumed to avoid contacts with treaty countries that could (and would) exchange information with the United States if requested, it is not beyond imagination that a U.S. citizen resident, but not ordinarily resident, in the United Kingdom (and therefore taxed on a remittance basis) would hold investments, including U.S. securities, through a corporation organized in a tax haven. In this case, the United Kingdom would not have information in its files to exchange with the United States that would link the U.S. citizen with the investments.

[95] OECD Model Tax Convention, n. 62, art. 10(2)(b), 1 Tax Treaties (CCH) P 10,507.

[96] Shay, Fleming & Peroni, *supra* note 46, at 125-27.

[97] *See id.* at 127.

[98] I would like to thank Luca Dell'Anese and Benjamin Rogers for their research regarding the issues discussed in this Section.

[99] One alternative is to request information under a Mutual Legal Assistance Treaty ("MLAT"). *See* I.R.S. Manual § 9.4.2.6. However, even if the U.S. has signed an MLAT with the country from which it wishes to request information, an MLAT only applies to U.S. criminal violations specifically listed in the MLAT. *See id.* Requests for information under an MLAT also must be approved by several IRS officials, and they must then go through the U.S. Department of Justice, as the U.S. Attorney General is the competent authority under MLATs. *See id.* U.S. tax

TIEAs and tax treaty requests usually go directly from U.S. tax authorities to the other country's competent authority. Most treaties and TIEAs bypass bank secrecy and apply at all stages of a civil or criminal tax case.

There are three types of tax information exchange that can occur under TIEAs or information exchange articles in tax treaties.

      *1.  Automatic exchange.*

The first, "automatic exchange of information," also known as "routine exchange of information," usually involves information about many individual cases of the same type transmitted between countries on a routine basis.[100] The information is normally about items of income arising in the country transmitting the information (typically interest, dividends, or royalties) as to which there is information reporting in that country.[101] Thus, for example, as discussed further below, the United States routinely exchanges information regarding interest, dividends and royalties paid to nonresidents reported on Form 1042-S with treaty partners.

      *2.  Specific exchange.*

The second, "exchange of information on request," also known as "specific exchange of information," occurs when the competent authority of one country requests particular information regarding specific taxpayers from the competent authority of the other country.[102]

      *3.  Spontaneous exchange.*

The third type of information exchange is "spontaneous exchange of information," which occurs when one country obtains information in administering its own tax laws, recognizes that the information will be of interest to a treaty or TIEA partner, and spontaneously transmits the information to that country.[103]

---

authorities can also use letters rogatory for gathering tax information from foreign countries. A letter rogatory, when used by the U.S. authorities, is a request made formally by a U.S. federal court to a foreign court asking the foreign court to summon and examine a witness and transmit the witness's testimony for use in a U.S. court proceeding. *See* I.R.S. Manual § 35.4.5.3.2. With a few exceptions, most foreign courts only will release evidence in response to letters rogatory in the post-indictment or post-complaint stage of a case. *See* I.R.S. Manual § 9.4.2.6.4. Foreign courts also may refuse to cooperate with a letter rogatory for a variety of reasons under local law, such as bank secrecy or a general policy of not honoring letters rogatory regarding tax or fiscal matters. *See* I.R.S. Manual § 35.4.5.3.2. Many countries also have varying requirements as to whether letters rogatory should be sent through diplomatic channels or directly from court to court. *See id.* A third alternative in civil tax cases is to use a letter of request under the Hague Evidence Convention. *See* Convention on the Taking of Evidence Abroad in Civil or Commercial Matters, July 27, 1970, 23 U.S.T. 2555, 847 U.N.T.S. 231. However, the difficulties of letters rogatory often remain for letters of request. Also, many jurisdictions are not signatories to the Hague Evidence Convention and many civil law countries that are signatories hold the view that tax matters are not within the scope of the convention. *See* I.R.S. Manual § 35.4.5.3.3.

[100] *See* I.R.S. Manual § 4.60.1; Statement of John Harrington, *supra* note 23.

[101] *See* I.R.S. Manual  § 4.60.1.

[102] *See id.*

[103] *Id.*

Both routine and spontaneous information exchanges normally are done on a reciprocal basis, that is, routine and spontaneous exchanges normally would not be made with a country that would not reciprocate or be in a position to reciprocate. Tax treaties generally permit all three types of information exchange, laying the groundwork for broad information exchange without limiting the form and manner in which such exchange can take place, while TIEAs often are limited in scope to exchange of information on request.

E. FBARs.

The importance of tax information exchange has only been highlighted by the recent experience with Report of Foreign Bank and Financial Accounts forms ("FBAR"). The FBAR is a form that is filed with the Department of Treasury separately from an individual's tax return. U.S. citizens and residents and persons in and doing business in the U.S. who have a financial interest in or signature or other authority over any foreign financial accounts are generally required to file an FBAR if the aggregate value of such accounts exceeds $10,000 at any time during a calendar year.[104] FBARs report foreign account numbers, types, and values.[105] The penalties for failing to file the FBAR are stiff: criminal penalties for willfully failing to file an FBAR include a maximum fine of $250,000 or 5-year imprisonment.[106] If the failure to file is in connection with a pattern of other illegal activity involving more than $100,000 in a 12-month period, the maximum fine goes up to $500,000 or 10-year imprisonment.[107] There are also criminal penalties for filing a false FBAR and civil penalties may apply. Although the number of FBARs received increased nearly 82% from 2001 through 2007, compliance as of 2002 was roughly estimated at less than 20%.[108] A review of applicants coming forward in the Offshore Voluntary Compliance Initiative ("OVCI"), which attempts to bring taxpayers hiding funds offshore into compliance, also indicates a high level of noncompliance, although some of that noncompliance may be due to confusion or a lack of awareness.[109]

\*       \*       \*

IV.    POLICY ISSUES AND RESPONSES

A. Short-Term Defenses Against U.S. persons Masquerading as Foreign Persons

In considering proposals that would affect the securities markets, it is important that the IRS follow its usual practice of consulting market participants to avoid actions that would disrupt markets. The criteria that should be used to evaluate these short-term proposals include an

---

[104] *See* TD F 90-22.1, Report of Foreign Bank and Financial Accounts (2008).

[105] *See id.*

[106] *See* 31 U.S.C. § 5322 (2006).

[107] *See id.*

[108] JOINT COMMITTEE ON TAXATION, *supra* note 70, at 19-20.

[109] U.S. GOV'T ACCOUNTABILITY OFFICE, TAX COMPLIANCE: OFFSHORE FINANCIAL ACTIVITY CREATES ENFORCEMENT ISSUES FOR IRS, GAO-09-478T 5 (2009).

evaluation whether the proposal: (i) will meaningfully affect compliance to an extent that justifies the additional burden for the Government and taxpayer or reporting entity, (ii) be capable of implementation on a cost effective basis; and (iii) allow the affected market to work in a reasonable manner without disruption? I have not considered whether legislation is required for these proposals and recommend allowing use of regulatory authority where it already exists.

The short-term proposals discussed below focus primarily on initiatives that will aid the IRS in enforcement of existing laws and expansions of the QI program to shut down existing opportunities for exploitation.

### 1. Expand obligations of QIs to provide information reports and identify U.S. persons.

By expanding the QI responsibilities to encompass a broader informational reporting responsibility with respect to U.S. persons, there would be fewer opportunities for U.S. taxpayers to evade their responsibilities. The first proposal is to require that QIs engage in information reporting on all accounts over a reasonable threshold where a U.S. person is the beneficial owner and the QI has more than a threshold number of accounts for U.S. persons. The second, related proposal is that QIs include U.S. persons holding more than 10% of a non-U.S. corporate entity or foreign trust in the new information reporting regime.

#### a) Require QIs to Identify U.S. Account Holders, and Submit Information Reports With Respect to Such Interests.

Expanding QIs' responsibilities to include information reporting has been suggested in the past, and concerns have generally focused on feasibility of such a system, and worries that additional responsibilities would discourage participation in the QI program.[110] However, the experience of the past 10 years suggests that the benefits of becoming a QI likely outweigh the burden of reasonably calibrated additional responsibilities.[111] Furthermore, the experience of domestic institutions with 1099 reporting has shown that economics of scale can greatly reduce (or at least spread the cost of) the burden of reporting.[112] For these reasons, the IRS should be authorized to require information reporting from QIs who have a certain minimum number of U.S. account-holders with respect to accounts above a certain value threshold.

---

[110] Several proposals have been made in recent months to expand QIs' responsibilities. *See* GAO QI REPORT, *supra* note 16, at 35; PERMANENT SUBCOMMITTEE ON INVESTIGATIONS, U.S. SENATE, TAX HAVEN BANKS AND U.S. TAX COMPLIANCE 16 (July 17, 2008) (hereinafter PSI TAX HAVEN REPORT), *available at* http://hsgac.senate.gov/public/_files/071708PSIReport.pdf; Stop Tax Haven Abuse Act, S. 506, 111th Cong. (2009). Additionally, Reuven S. Avi-Yonah, my co-panelist today, suggests that an expansion of QI responsibilities to include 1099 reporting and backup withholding when a QI believes or has reason to believe payments are being made to a U.S. person.

[111] This is shown by the number of banks participating in the QI system: over 5,000 QI agreement are currently in place. *See* Douglas Shulman, *supra* note 30 at 6.

[112] *See* U.S. Gov't Accountability Office, Report to the Committee on Finance, U.S. Senate, Tax Compliance: Costs and Uses of Third-Party Information Returns 3-5 (Nov. 2007), *available at* http://www.gao.gov/new.items/d08266.pdf.

The need for a minimum threshold is necessary not only to preserve participation in the QI program, but also to prevent discrimination against U.S. persons living abroad with legitimate needs for a bank account in a non-U.S. jurisdiction. Instituting an account value threshold, in addition to setting a minimum number of accounts, will enable banks to offer accounts to smaller holders, such as students and working expatriates, without triggering additional burdens.

The type and nature of information reporting should be determined through consultation with the IRS to ensure the ability to have electronic transmission and processing. Information gathered in non-electronic form, or without TINs, compromises the ability of the IRS to adequately utilize such information.[113]

> b) Information Reporting U.S Persons Holding More Than 10% of a Non-U.S. Corporate Entity or Foreign Trust

In addition to direct account holders, consideration should be given to requiring QIs to identify and provide the IRS with identifying information with respect to U.S. persons it has reason to know own more than 10% of a non-U.S. corporate entity or beneficial interest in a foreign trust holding an account with the institution. Setting a minimum ownership level at 10% will allow the IRS to coordinate the information with Form 5471 reporting with respect to foreign corporations.

> 2. *Other procedural measures:*

> a) Extend statute of limitations

Recent proposals for reform, such as a recently circulated discussion draft of a bill in the Senate,[114] have included an extension of the period of limitations on assessment of tax when a taxpayer failed to report a foreign bank account or underreported income from such an account. These proposals should be extended to include taxpayers failing to report income or interests held through non-U.S. corporate entities and trusts.

The original purpose of an extension of the normal three-year statute of limitations to six years was based on a principle of IRS notice.[115] Typically, where a taxpayer has substantially understated or omitted income, an extension of the statute of limitations to six years is appropriate, because the IRS would require additional time to identify such an omission.[116] This is supported by the defense granted to taxpayers where sufficient information and disclosure was made on a return to put the IRS on notice of the omitted income.[117]

---

[113] *See supra* Section III.D.

[114] *See* Discussion Draft, A Bill to Amend the Internal Revenue Code of 1986 to Improve Tax Compliance With Respect to Offshore Transactions, and for Other Purposes, S. 111th Cong. § 3 (as circulated Mar. 24, 2009).

[115] *See* Colony v. Comm'r, 357 U.S. 28, 36 (1958) (reviewing the predecessor to section 6501 and finding that "Congress was primarily concerned with providing for a longer period of limitations where returns contained relatively large errors adversely affecting the Treasury").

[116] *See* I.R.C. § 6501(e); Treas. Reg. § 301.6501(e)-1.

[117] *See* Treas. Reg. § 301.6501(e)-1(a)(1)(ii); *Colony*, 357 U.S. at 35-40.

The principles justifying an extended statute of limitations clearly apply in the context of foreign bank accounts held by U.S. persons, where the IRS must rely on even less information than with respect to purely domestic income and assets. To the extent that a U.S. person has failed to disclose income from a foreign bank account, regardless of the materiality of the omission, the six-year extension should apply to allow the IRS sufficient time to utilize international information resources, including requests for information under treaties and TIEAs. As noted above, information from TIEAs, treaties and QIs is currently not submitted electronically, and generally does not include any sort of identifying number. Allowing the IRS additional time would allow it to use unmatched information.

<div align="center">b)    Increase IRS audit resources; Electronic Submission of QI Information</div>

Any effort made to increase IRS enforcement resources devoted to cross-border enforcement, would better enable the IRS to track down individuals circumventing the U.S. domestic information reporting system. Included among any such initiatives would be creating IRS resources and systems to enable QIs to submit information electronically as well as initiatives for electronic information gathering from treaty partners discussed below.[118] This should be considered in conjunction with any increased informational reporting responsibilities placed on QIs.

<div align="center">*3. Prospectively eliminate (after 2010) the foreign-targeted bearer obligation exception to beneficial owner documentation or QI reporting.*</div>

Consideration should be given to prospectively treating all foreign targeted obligations that pay U.S.-source interest as or in the same manner as registered obligations. This would at require collection of the same beneficial owner withholding documentation as would be required for a QI.[119]

<div align="center">*4. Expand Treaty and TIEA Information Exchange.*</div>

The United States should continue to negotiate additional treaties and TIEAs as a means of expanding the scope of bilateral information exchange with other countries. In this regard, the IRS should adopt regulations expanding reporting of bank deposit interest by residents of countries in addition to Canada.[120] This was proposed in the Clinton Administration, but was not pursued during the Bush Administration.[121]

---

[118] A similar proposal was introduced in the GAO QI REPORT. *See* GAO QI Report, *supra* note 16, at 35.

[119] *See* NYSBA TAX SECTION, *supra* note 33, at 37-38 (commenting that a proposal to expand scope of the definition of registered security to encompass dematerialized securities may be problematic in certain jurisdictions where it is difficult to obtain W-8s from investors but concludes this should not be a significant concern in that context).

[120] Treas. Reg. § 1.6049-8.

[121] REG–126100–00, 66 Fed. Reg. 3925 (Jan. 17, 2001).

B. Longer term source taxation issues

A second set of options should be considered as part of a broader tax reform. These options would explore the opportunities to increase the scope of source taxation of returns to capital in coordination with other countries in a manner that more closely approximates taxation of net income than has been possible historically. The following options should be considered in relation to their economic effects, ramifications for capital markets and foreign relations, and feasibility for incorporation into the existing international financial system.

### 1. International Standards For Electronic Information Exchange.

The Treasury Department should strongly support initiatives at the OECD and bilaterally to permit international information exchange electronically that is coded in a manner that permits information recipient countries to match information with that in its master information files.[122] This would effectively enable the United States to institute matching programs for non-U.S. income earned by its residents. Matching information to tax returns is critical to the IRS's successful enforcement of existing tax laws and shutting down evasion techniques utilized by U.S. persons.

As with the development of increased information reporting by QIs, careful consultation with the IRS regarding how to most effectively share information should be considered. Without a numbering system to fully integrate the exchange with its existing matching system, the efficacy of information exchange is limited. However, the use of other matching systems, such as passport numbers or other local forms of identification may be able to be integrated with the IRS current information systems. It also will be essential to protect the confidentiality of taxpayer information that is exchanged.

### 2. Expansion of Source Taxation of Investment Income

Consideration could be given expanding the source taxation of capital income, except as relieved by treaties, in coordination with major trading partners. This would be a dramatic change in U.S. policy and would have to satisfy a high burden of to justify pursuit. The fundamental insight is that it should be possible with new technologies to move away from the excessive gross basis taxation and achieve a more reasonable net basis taxation. This is particularly true of gains, with the anticipated advent of basis reporting.

Concerns regarding the flow of capital to the United States would have to be addressed.[123] Given the current economic realities these concerns are real. An international tax

---

[122] *See, e.g.,* Press Release, U.S. Senate Committee on Finance, *Grassley, Baucus Call for Review Of IRS Use of Foreign-Source Income Information* (May 17, 2006) *available at* http://finance.senate.gov/press/Bpress/2005press/prb051706.pdf. The OECD also has begun investigating ways to increase compatibility and coherence of information shared across national boundaries. *See* Remarks by Angel Gurría, Secretary-General, OECD, Remarks at the G7 Finance Ministers Dinner (February 13, 2009), *available at* http://www.oecd.org/document/50/0,3343,en_2649_34487_42184370_1_1_1_1,00.html.

[123] As my co-authors and I noted in 2002:

> The exemptions for bank deposit and portfolio interest have traditionally been
> justified by the argument that the imposition of a tax on the gross amount of

reform in a country that continues to tax income, however, should consider the ramifications for tax evasion and avoidance of broad unilateral exemptions of withholding at source without identification of the income's beneficial owner.

<div align="center">*    *    *</div>

I would be pleased to answer any questions the Committee might have.

---

interest income in a liquid capital market with ready alternative investments would result in the burden of the tax being borne by U.S. borrowers (including the U.S. government) through higher interest rates. Whether such an effect would arise with respect to non-U.S. persons resident in treaty countries who are already entitled to reduced rates of tax on interest payments without any statutory exception is not clear. Nevertheless, this concern reflects a widespread international reluctance to tax interest from unrelated foreign payors.

Shay, Fleming & Peroni, *supra* note 46 at 122-23.

Stephen E. Shay
Ropes & Gray
One International Place
Boston, MA 02110-2624
(617) 951-7302 (direct dial)
(617) 951-7050 (facsimile)
Email: sshay@ropesgray.com

Mr. Shay is not appearing on behalf of any client or organization.

## Biography

Stephen E. Shay is a tax partner with Ropes & Gray in Boston, Massachusetts. Stephen has extensive experience in the international tax area, advising clients that include large and medium-sized multinational companies, financial institutions, and global investors on issues such as foreign tax credits, deferral of U.S. taxation, foreign currency gains and losses, withholding taxes and financial product issues. Stephen regularly advises clients on transfer pricing issues and has successfully resolved numerous transfer pricing controversies with the IRS. Stephen also works with Ropes & Gray's Private Client Group advising high net worth clients on cross-border income tax planning. Stephen has been recognized as a leading practitioner in *Chambers Global: The World's Leading Lawyers, Chambers USA: America's Leading Lawyers, The Best Lawyers in America,* Euromoney's *Guide to The World's Leading Tax Advisers* and Euromoney's, *Guide to The Best of the Best.*

Stephen has been a Lecturer in Law at the Harvard Law School in 2003 and in 2005 through 2008 teaching a course on international aspects of U.S. income taxation. Stephen was the Jacquin D. Bierman Visiting Lecturer in Taxation at Yale Law School in 2004. Stephen has served as Associate Reporter for the American Law Institute's Federal Income Tax Project on Income Tax Treaties with Reporters David R. Tillinghast and Professor Hugh Ault. He also is a Council Director of the American Bar Association Tax Section and has served as Chairman of the Tax Section's Committee on Foreign Activities of U.S. Taxpayers.

Before joining Ropes & Gray in 1987, Stephen was the International Tax Counsel for the United States Department of the Treasury. Prior to joining the Treasury Department as an Attorney Advisor in 1982, Stephen was associated with Reavis & McGrath and Coudert Brothers in New York City. Stephen received J.D. and M.B.A. degrees from Columbia University in 1976 and his B.A. from Wesleyan University in 1972.

Stephen has authored or co-authored numerous articles and has testified before Congress on international tax policy issues. Stephen's principal publications and testimony are set out below.

## Publications and Testimony

Testimony, Committee on Finance, U.S. Senate, Hearing on The Foundation of International Tax Reform: Worldwide, Territorial, and Something in Between (June 26, 2008)

Testimony, Committee on Ways and Means, U.S. House of Representatives, Hearing on Fair and Equitable Tax Policy for America's Working Families (September 6, 2007)

American Bar Association Tax Section, Task Force on International Tax Reform, "Report of the Task Force on International Tax Reform," 59 Lawyer 649 (2006) (principal draftsman)

Testimony, Subcommittee on Select Revenue Measures of the Ways and Means Committee, U.S. House of Representatives, Hearing on U.S. International Competitiveness (June 23, 2006)

Testimony, President's Advisory Panel on Federal Tax Reform, Panel on International Income Taxation (May 13, 2005)

"Exploring Alternatives to Subpart F," 82 TAXES 29 (Mar. 2004).

"The David R. Tillinghast Lecture: 'What's Source Got to Do With It?' Source Rules and U.S. International Taxation," 56 Tax Law Rev. 81 (2003) (co-authored with Robert J. Peroni and J. Clifton Fleming Jr.)

Testimony, Finance Committee, United States Senate, Hearing on International Competitiveness (July 16, 2003)

"Reform and Simplification of the U.S. Foreign Tax Credit Rules," 31 Tax Notes Int'l 1145 (September 29, 2003) and 101 Tax Notes 103 (October 6, 2003) (co-authored with Robert J. Peroni and J. Clifton Fleming Jr.)

"Notice 2002-41 Guidance for Withholding Foreign Partnerships," 31 Tax Mgmt Int'l J. 560 (November 8, 2002) (co-authored with Elaine B. Murphy)

Testimony, Ways & Means Committee, U.S. House of Representatives, Hearing on WTO Extraterritorial Income Decision (February 28, 2002)

"Fairness in International Taxation: The Ability-to-Pay Case for Taxing Worldwide Income," 5 Fla. Tax Rev. 299 (2001) (co-authored with J. Clifton Fleming, Jr. and Robert J. Peroni)

"An Alternative View of Deferral: Considering a Proposal to Curtail, Not Expand, Deferral," 20 Tax Notes Int'l 547 (January 31, 2000) (co-authored with J. Clifton Fleming, Jr. and Robert J. Peroni)

"Deferral: Consider Ending It, Instead of Expanding It," 86 Tax Notes 837 (Feb. 7, 2000) (co-authored with J. Clifton Fleming, Jr. and Robert J. Peroni)

"Taking Territorial Taxation to Task," 20 Tax Notes Int'l 1178 (April 17, 2000) (co-authored with Robert J. Peroni and J. Clifton Fleming, Jr.)

"Qualified Intermediary Status, Act III: Rev. Proc. 2000-12's Final Qualified Intermediary Agreement and Amendments to Final Withholding Rules," 29 Tax Mgmt. Int'l J. 403 (July 14, 2000) (co-authored with Susan C. Morse and Christopher J. Peters)

"Qualified Intermediary Status, Act II: Notice 99-8 and The Role of A Qualified Intermediary," 28 Tax Mgmt. Int'l J. 259 (May 14, 1999) (co-authored with Susan C. Morse)

"Getting Serious About Curtailing Deferral of U.S. Tax on Foreign Source Income," 52 SMU Law Rev. 455 (Spring 1999) (co-authored Robert J. Peroni and J. Clifton Fleming, Jr.)

"Qualified Intermediary Status: A New Withholding Role for Foreign Financial Institutions Under Final U.S. Withholding Regulations," 27 Tax Mgmt Int'l J. 3 (1998) (co-authored with Susan C. Morse)

"Selected International Aspects of Tax Reform Proposals," 51 U. Miami L. Rev. 1029 (1997), reprinted in American Bar Association Section of Taxation, Tax Systems Tax Force, "A Comprehensive Analysis of Current Consumption Tax Proposals" (1997) (co-authored with Victoria P. Summers)

"Revisiting U.S. Anti-Deferral Rules," TAXES (December, 1996)

"Chapter 6, Taxation Policy," co-authored with Elinore J. Richardson, Esq., in Pritchard, ed., Economic Development, Foreign Investment and the Law: Issues of Private Sector Involvement Foreign Investment and the Rule of Law in a New Era, (Kluwer 1996)

"IRS Makes Flip Transactions Taxable," 5 Int'l Tax Rev. 17 (July/August 1994)

"Re-examining Chapter 3 income tax withholding and the role of the withholding agent," Alpert and van Raad, eds., Essays on International Taxation (Kluwer 1993)

"Final Section 367(e) Regs. Improve on Temp. Regs., But Policy Concerns Remain," 4 J. Int'l Tax'n 244 (June, 1993)

"Final Dual Consolidated Loss Regs. Still Have Some High Hurdles," 4 J. Int'l Tax'n 52 (February, 1993) (co-authored with Rom P. Watson)

"Dispute Resolution Faces Numerous Obstacles," 3 Int'l Tax Rev. 15 (April, 1992)

The American Law Institute, Federal Income Tax Project - United States Income Tax Treaties (American Law Institute 1992) (Associate Reporter to Reporters David R. Tillinghast, Esq. and Professor Hugh J. Ault)

"Report on Legislative Proposal to Repeal Section 1491," American Bar Association Tax Section Committee on Foreign Activities of U.S. Taxpayers, Subcommittee on Section 367 and 1491 Transactions (principal draftsman with Frank R. Ortolani, Jr.)

"Comments on Proposed Regulations Under Section 367(e)," American Bar Association Tax Section Committee on Foreign Activities of U.S. Taxpayers, Subcommittee on Section 367 and 1491 Transactions (principal draftsman with Jay H. Zimbler)

"Section 864(e) and the Allocation of Expenses Under the Temporary Regulations," 18 Tax Mgmt. Int'l J. 239 (1989)

"The Post-TAMRA Treatment of U.S. Shareholders of PFICs: Part I," 70 J. Tax'n 296 (June, 1989)

"The Post-TAMRA Treatment of U.S. Shareholders of PFICs: Part II," 70 J. Tax'n 374 (June, 1989)

"Section 864(e) and the Allocation and Apportionment of Interest Expense Under the Proposed Regulations," 17 Tax Mgmt. Int'l J. 51 (February, 1988)

"The Controversial CFC Interest Netting Rule in the Proposed Interest Allocation Regulations," 17 Tax Mgmt. Int'l J. 25 (January, 1988)

# Exhibit 34

Checkpoint Contents
  Federal Library
    Federal Editorial Materials
      WG&L Federal Treatises
        Taxation of Special Industries
          Langbein: Federal Income Taxation of Banks & Financial Institutions
            Chapter 14: Tax Procedure
              ¶14.08. Withholding on Foreign Persons

# ¶ 14.08 Withholding on Foreign Persons

## ¶ 14.08[1] Withholding Requirements on Financial Institutions

Generally, foreign persons are subject to federal income tax only on income that is effectively connected with a U.S. trade or business and income having its source in the United States that is not effectively connected with a U.S. trade or business. The tax on U.S.-source income that is not effectively connected with a U.S. trade or business is generally collected by withholding at the source. Income that is covered under this withholding requirement includes interest, dividends, and annuities. **375** A notable exception to the withholding requirement is for interest earned on deposits with banks, savings and loans, and insurance companies. **376**

Because of the exceptions, the main focus of financial institutions on the withholding requirements as they relate to foreign persons is in the compilation of documentation to establish a recipient's right to claim an exemption from withholding. In October 1997, the Service issued final regulations that completely overhauled the reporting and withholding requirements for payments to foreign persons. **377**

The final regulations were to become effective beginning January 1, 1999; however, the Service delayed the effective date of the regulations until January 1, 2000, following concerns voiced by practitioners and the banking industry that more time was needed to implement the changes. **378** The Service announced that it will regard the 1999 calendar year as a transition period for the administration of the withholding tax system. Thus, when enforcing current withholding rules for 1999, the Service will take into account the extent to which withholding agents have made a good-faith effort to transform its information systems and business practices to comply with the final regulations. **379**

In **Notice 99-25** , **380** the Service extended the effective date of the new withholding regulations. As extended, the new provisions will apply to payments made after December 31, 2000. The Service stated that the year 2000 will be regarded as a transition period. During that period, the Service states that in enforcing compliance with current withholding rules, it will take into account the extent to which a

withholding agent makes a good faith effort to transform its business practices and information systems to comply with the final regulations.

The withholding rules permitted withholding agents to rely on documentation obtained under prior rules until December 31, 2000. **Notice 99-25** does *not* extend this effective date.

The final regulations set forth the general rule that a withholding agent must withhold 30 percent from applicable payments unless the agent has documentation substantiating that the beneficial owner of the income (1) is entitled to an exemption from withholding; (2) is entitled to a reduced rate of withholding; or (3) is a U.S. person. **381** The final regulations continue to impose the controversial requirement that the financial institution must obtain documentation from the payee before it is relieved from the withholding liability. **382**

The regulations effectively require that a withholding agent obtain either of the following documentation to avoid the backup withholding liability:

1. Form W-8 or other suitable documentary evidence from the foreign beneficial owner or
2. Form W-8 from a qualified intermediary. **383**

In *Amy Holding Co., et al. v. Dasyure Ltd.*, **384** the court held that a withholding agent is not permitted to overwithhold from future payments to a foreign payee in order to recoup amounts previously withheld. In that decision, the domestic payor had made payments to a foreign payee, believing the payments constituted principal. It thus did not withhold from the amounts. After bringing an interpleader action against the payee and the government, the domestic payor deposited future amounts with the court. The court granted the motion of the payee to release all amounts in excess of 30 percent of the funds deposited with the court.

The court relied on a provision of the new regulations that "[a] withholding agent may withhold from future payments made to a beneficial owner the tax that should have been withheld from previous payments to such beneficial owner…only…before the date that the Form 1042 is required to be filed (not including extensions) for the calendar year in which the under-withholding occurred." **385** It held that "once the due date for filing the necessary income tax return passes, the payor becomes liable to the extent of the tax that it failed to withhold for any tax due on the income that the payee fails to pay." In addition, it held that the taxpayer's attempted "over-withholding is not authorized under any statute or federal regulation presently in effect." **386**

## ¶ 14.08[2] Qualified Intermediaries

The regulations under **Section 1441** provide for a qualified intermediary (QI) procedure, which allows foreign branches of financial institutions (either U.S. or foreign) to certify their customers' foreign status without identifying the customer to the withholding agent. To obtain QI status, the foreign branch must enter into a withholding agreement with the Service. **387**

# ¶ 14.08[2][a] Guidelines for Applications for QI Status

The Service issued a revenue procedure setting forth the guidelines for entering into a withholding agreement under the QI procedure. **388** The revenue procedure applies only to foreign financial institutions, foreign clearing organizations, and foreign branches of U.S. financial institutions and U.S. clearing organizations. It does not apply to any other persons or entities that the Service may accept as QIs under the regulations. To apply for QI status and a withholding agreement, an eligible person must submit a written request to the Service. **389** The application must establish to the Service's satisfaction that the applicant has adequate resources and procedures to comply with the terms of the withholding agreement and must include the following information along with any other information or documentation requested by the Service: **390**

1. A statement that the applicant is an eligible person and that it requests a QI withholding agreement with the Service.

2. The applicant's name, address, and EIN, if any.

3. The country under whose laws the applicant was created or organized and a description of the applicant's business.

4. A list of the applicant's officers and directors, and a list of the employees who are responsible parties for performance under the agreement.

5. A list of the branches that the agreement will cover and their location.

6. An explanation and sample of the account opening agreements and other documents used to open and maintain the accounts at each location covered by the agreement.

7. The type of account holders (e.g., U.S., foreign treaty benefit claimant, or intermediary), the approximate number of account holders within each type, and the estimated value of U.S. investments that the QI-Form W-8 will cover.

8. An explanation of the applicant's "know your customer" practices and procedures (under its local money-laundering laws) for opening accounts and identifying and communicating with customers of each location covered by the agreement. The explanation should include whether law mandates the know-your-customer procedures and the manner in which local authorities verify compliance. The applicant should also describe the governmental or other supervisory authorities that regulate the "know your customer" procedures and the sanctions that apply under local law for failing to comply with the procedures. The applicant must include supporting documentation.

9. A list of assets in the United States from which amounts owed to the Service can be collected, if necessary.

10. A completed Form SS-4 (Application for Employer Identification Number) to apply for a QI Employer Identification Number (QI-EIN) to be used solely for QI reporting and filing purposes. An applicant must apply for a QI-EIN even if it already has another EIN.

11. A proposed QI withholding agreement drafted in accordance with the revenue procedure.

Although the applicant need not include all of its branches under the withholding agreement,

the Service may require that certain branches be included to ensure disclosure of certain U.S. account holders. **391** In any event, a withholding agreement cannot cover the U.S. branches of an eligible applicant. Under certain circumstances, an eligible person may request that the withholding agreement extend to its non-U.S. affiliates or unrelated account holders who act as nominees, custodians, or agents of beneficial owners. If the Service consents to extend the withholding agreement to such parties, each of them must be a signatory to the agreement.

# ¶ 14.08[2][b] Obligations of Qualified Intermediaries

Generally, a QI is not required to disclose the identity of the beneficial owners of the accounts. However, the QI must furnish a Form W-9 or acceptable substitute for each U.S. payee that is not an exempt recipient. **392**

The revenue procedure sets forth certain recordkeeping obligations of the QI. Generally, the withholding agreement must provide that the QI will maintain a record of the documentation obtained and reviewed under the agreement. The QI is required to keep the documentation for any account holder for a period of three years after its validity expires. The documentation must also be available for inspection by the Service or, if applicable, an approved external auditor. **393**

There are also certain withholding obligations that the QI must observe. A QI that assumes primary withholding responsibility must agree to withhold any amount due under **Section 1441** , **Section 1442** , or **Section 1443** in accordance with **Treasury Regulation Sections 1.1441-1(b)(1)** and **1.1443-1(b)** . If applicable, the QI must also agree to withhold any amount due under **Section 3406** . In addition, the QI must agree to deposit the withheld amounts pursuant to all relevant deposit obligations. Under the agreement, the Service may agree to special deposit procedures to facilitate remittances from a foreign country. A QI that does not assume primary withholding responsibility must agree to withhold if it knows that an amount should have been withheld from the payment and the full amount was not withheld. The QI must also agree to comply with withholding and deposit procedures in the same manner as a QI that assumes primary withholding responsibility for any amounts that are actually withheld. **394**

The QI is also subject to certain reporting obligations. Generally, every QI must file an annual Form 1042, and the form must include the following additional information:

> 1. A schedule listing the name, address, and EIN of each withholding agent from whom reportable amounts of income were received and the income type and rate of withholding. The schedule must also include information on the reportable amounts of income subject to withholding that the QI received during the calendar year.
> 2. Information regarding overpayments or balances due, adjustments under **Treasury Regulation Section 1.1461-2** , and an explanation for the over- or underwithholding.
> 3. A statement regarding the audit conducted by the QI's internal auditors under the audit guidelines specified in the agreement (i.e., that the QI is complying with the agreement in all

material respects or a description of the irregularities uncovered by the internal auditors and the actions undertaken to correct such irregularities).

4. A statement that an approved external auditor conducted an audit, when required, with a copy of the report of audit findings.

# ¶ 14.08[2][c] Withholding Agreements

Where appropriate, the withholding agreement may waive the obligation for a QI to report beneficial owner information to the Service on Forms 1042-S. **395** In place of beneficial owner information, the Service may require the QI to report by country and withholding pools. An appropriate case may exist if beneficial owner information is otherwise available to the Service, for example, pursuant to treaty exchange of information provisions, or if the Service decides that access to beneficial owner information is not necessary for compliance. Similarly, reporting by withholding pools may be sufficient for compliance purposes if the QI has agreed to adequate verification procedures. The required information may be reported on a Form 1042-S, as modified by the Service to adapt to the withholding pool reporting requirements, on magnetic media, by electronic means, or on any form to which the Service and the QI agree. The information must include the number of account holders in each pool. The type of withholding pool subdivisions that the Service may require includes the following:

1. Type of income;
2. Withholding rate;
3. Country of residence of account holder; and
4. Type of recipients (e.g., undocumented payees, U.S. payees).

The withholding agreement may modify or waive the obligation under **Treasury Regulation Section 1.1461-1(c)(1)(i)** that the QI furnish a statement to a beneficial owner or payee on a Form 1042-S and provide for alternative reporting procedures. **396**

The withholding agreement must include a provision that the QI agrees to give the Service, on request or on an annual basis, the names and addresses of its account holders that (1) received a reduced rate of withholding under a tax treaty; (2) have certified that they meet the Limitation on Benefits provision; and (3) derive the income receiving the benefit (within the meaning of **Treasury Regulation Section 1.894-1T[d]** ). The QI must also agree to disclose the names and addresses of account holders of any non-QI intermediary that has given the QI a Form W-8 or other documentation if the account holders have certified that they meet the Limitation on Benefits provision of a treaty and derive the income receiving the benefit. Generally, the Service will agree to limit disclosure to account holders that receive more than an agreed upon amount (not less than $100,000) of treaty-benefited income in their QI account. **397**

The term of a withholding agreement will be between three and six years and may be renewed for additional periods. Either the Service or the QI may terminate the agreement prior to its term upon thirty-day notice of termination to the other party. In the event of a default by the QI, the Service may

terminate the agreement after first serving a notice of default on the QI. The Service will not give notice of termination until thirty days after it has delivered a notice of default. The Service may also deliver a notice of default if there is a significant change in the circumstances of the QI, such as a merger, changes in the business or operations of the QI, or bankruptcy. **398**

A default will be deemed to have occurred if upon audit it is determined that the QI has failed to comply with the procedures required by the agreement in a way that (1) causes, or may cause, significant underwithholding, excessive refunds, or an excessive number of undocumented payees or (2) impedes, or may impede, the disclosure of the identity of persons who are required to be disclosed under the agreement. **399** The QI will also be deemed in default where there is a lack of cooperation by the QI or an approved external auditor in connection with an audit of the QI or with inquiries by the Service related to verifying compliance by the QI. The agreement will define when underwithholding or inadequate reporting is deemed to be significant. A default will also exist where (1) the QI makes material misrepresentations on its Form W-8; (2) the QI has actual knowledge at the time a payment is made that documentation regarding a significant number of account holders is lacking, incorrect, or unreliable; or (3) the QI fails to perform any other material duty or obligation required of it under the agreement. When a notice of default is served, the QI may respond by offering to cure the default within thirty days. The Service will accept or reject the offer to cure, or make a counter-proposal, within ten days. **400**

A withholding agreement may be renewed by submitting an application for renewal to the Service no earlier than one year after and no later than six months prior to the expiration of the agreement. In the application for renewal, the QI must update the information provided in the original application. Before approval of any renewal of the agreement, the Service will require an audit of the QI. **401**

Withholding agreements will be effective for all accounts opened on or after the date specified in the agreement. For accounts existing on the effective date of the agreement, the requirements to obtain documentation generally will not apply until expiration of the one-year period beginning on the agreement's effective date. Until the documentation is obtained for these accounts, the QI generally will be permitted to rely on any documentation or information in an existing account file. In the absence of any documentation or indication, or actual knowledge, the QI will be allowed to presume that an account holder is a foreign person based on the indicia of foreign status described in **Treasury Regulation Section 1.1441-1(b)(3)(iii)(A)** . However, the presumption is not be effective for purposes of obtaining the benefit of the portfolio interest exemption under **Section 871(h)** or **881(c)** or the benefit of a tax treaty. **402**

## ¶ 14.08[2][d] Model QI Agreement

The model agreement published by the Service in **Notice 99-8** is intended to form the basis for other country-specific models, which in turn are intended to form the basis for agreements with institutions within the various nations. The plan of the new regulations is to encourage foreign institutions to participate by providing simpler administrative requirements and the right to claim benefits on behalf of

customers. The institution parties to the agreements would be "qualified intermediaries."

The model's basic provision permits a qualified intermediary to rely on documentation other than a Form W-8 (W-8 BEN) to determine whether a beneficial owner is a U.S. person or treaty country resident. The documentation must reflect local know-your-customer procedures, which meet standards of reliability imposed by the Service. Among the requirements are the following:

- Recipients other than natural persons must supply either a Form W-8, or a statement containing three representations that
   1. They meet any requirements imposed under "limitation of benefits" provisions of income tax treaties;
   2. They "derive" the income within the meaning of the treaty and applicable regulations; and
   3. They are beneficial owners of the payment.
- TINs are required only for income on non-publicly traded securities as to which the recipient claims treaty benefits;
- Foreign governments and tax-exempt organizations must file Forms W-8 BEN to claim treaty benefits;
- Foreign partnerships and nonqualified intermediaries must file Forms W-8 IMY.

The model requires the qualified intermediary to disclose to the Service the identity of any U.S. person (other than a tax exempt recipient, to whom payment is made) and any foreign person, natural or juridical, who receives income in excess of $500,000. The term of a model agreement is generally six years.

Qualified intermediaries are required to file Forms 1042-S (Notice of Amount Withheld to Payees) in only limited circumstances:

- For payments made to nonqualified intermediaries;
- For payments made to customers of a nonqualified intermediary if the nonqualified intermediary provides documentation and income allocation information; and
- For payments to a foreign partnership that acts as a qualified intermediary.

The qualified intermediary is required to report income to the Service on a country-by-country basis, rather than according to the withholding rate to which the income was subject.

A qualified intermediary is required to submit to an external audit no less frequently than the second and fifth years of the agreement. The workpapers and reports of the auditor must be subject to Service examination, but the auditor is not required to disclose the identity of account holders. No internal audit is required.

# ¶ 14.08[3] Certification Requirements

The final regulations relating to the withholding requirements on certain payments to foreign persons

under **Sections 1441** , **1442** , and **1443** require the use of several new withholding certificates. In November 1998, the Service issued new Forms W-8 governing foreign withholding. The forms and their use are as follows:

```
W-8 BEN    Certificate of claim for exemption    Claim for reduced rates
under
                                                   treaty or other exemption
W-8 ECI    Effectively connected income          Claim for exemption because
                                                   income is subject to "net
                                                   basis" U.S. tax
W-8 EXP    Foreign government or organization    Claim for exemption for
                                                   foreign governments and
                                                   organizations
W-8 IMY    Foreign intermediary                  Claim by foreign governments
                                                   or exempt organizations of
                                                   special exemptions
```

The forms are required to be used after the 2000 effective date, but may be used immediately. **403**

The forms required by U.S. revenue authorities tend to be viewed as burdensome and intrusive by any foreign payees. Some of the forms require information in terms that may be unfamiliar to foreign persons (e.g., "hybrid entities"). All existing forms will expire, by virtue of the regulations, no later than the effective date of the new regulations, December 31, 1999. Financial institutions should understand that the task of collecting new forms from foreign customers may demand substantial administrative resources.

*Form W-8-BEN, Certificate of Foreign Status of Beneficial Owner for United States Tax Withholding.* Form W-8-BEN is to be provided to a withholding agent or payer by a beneficial owner of certain types of income to establish foreign status, to claim that such person is the beneficial owner of the income for which the form is being furnished and, if applicable, to claim a reduced rate of, or exemption from, withholding as a resident of a foreign country with which the United States has an income tax treaty.

*Form W-8-ECI, Foreign Person's Claim of Income Effectively Connected With the Conduct of a Trade or Business in the United States.* Form W-8-ECI is to be provided to a withholding agent or payer by a foreign person claiming that certain income is effectively connected with the conduct of a trade or business in the United States.

*Form W-8-EXP, Certification for United States Tax Withholding for Foreign Governments and Other Foreign Organizations.* Form W-8-EXP is to be provided to a withholding agent or payer by a foreign government, international organization, foreign central bank of issue, or foreign tax-exempt organization to claim that such organization is the beneficial owner of the income for which the form is being furnished and, if applicable, to claim a reduced rate of, or exemption from, withholding as a resident of a foreign country with which the United States has an income tax treaty.

*Form W-8-IMY, Certificate of Intermediary for United States Tax Withholding.* From W-8-IMY is to be provided to a withholding agent or payor by an intermediary either to make representations regarding the status of beneficial owners of the amount paid or to transmit appropriate documentation to the withholding agent.

Banks are required to provide the Service with information about payments made to a variety of different payees. The Service uses these information returns to determine whether payees have properly reported such payments on their income tax returns.

# ¶ 14.08[4] Transitional Relief for New Regulations

# ¶ 14.08[4][a] Notice 2001-4

In response to concerns expressed by the Institute of International Bankers (IIB), **404** in December 2000 the Service announced transitional relief with respect to the new regulatory regime scheduled to take effect January 1, 2001. This relief is described in **Notice 2001-4** .

# ¶ 14.08[4][b] QI Applicants Who Have Not Received Executed Agreements

The IIB had complained to the Treasury that the qualified intermediary (QI) application and approval process had not "progressed sufficiently to enable U.S. withholding agents and non-U.S. intermediaries in many cases to have the necessary systems in place by January 1st." **405** In response, the Service announced that it will permit a party that has submitted a QI application to represent on Form W-8IMY that it is a QI even if it is not in possession of a fully executed agreement. This permission extends to June 30, 2001, for applicants who filed prior to January 1, 2001.

Applicants who file after January 1, 2001, are permitted to represent that they are QIs for six months following the date of the application.

The Service states that it will issue notices that a QI may not make this representation until it receives a fully executed QI agreement in cases where an application is not substantially complete, or the Service has determined on a preliminary basis that it will not enter into a QI agreement with the applicant.

To make the representation, an application must include a complete statement of the information required by **Section 3** of **Revenue Procedure 2000-12** . **406** This includes a completed Appendix A (a list of countries in which the applicant will operate as a QI) and Appendix B (the list of auditors the QI may use and any private arrangement intermediaries of the QI to perform external audits). The Service does not require the applicant to attach the know-your-customer documentary evidence attachment for

particular countries, because the Service has standardized those attachments.

The Service states that it has instituted procedures to issue applicants a QI employer identification number (QI-EIN) upon receiving an application. Applicants are directed to include the QI-EIN on any Form W-8IMY they provide as a QI after receiving the number. If an applicant has provided a Form W-8IMY before it has received a number, it is directed to write "awaiting QI-EIN" on line 6 of Part I of the form. If an applicant provides an "awaiting QI-EIN" statement on a Form W-8IMY, the applicant is directed to provide the QI-EIN to its withholding agent as soon as practicable after the number is received. Applicants are directed to follow the same course if they have provided a Form W-8IMY before the date of this **Notice 2001-4** in anticipation of becoming a QI.

**Notice 2001-4** does not require the applicant to provide a newly executed Form W-8IMY with the QI-EIN after it receives the QI-EIN or after it receives a fully executed QI agreement provided all of the information on the original form remains valid. Applicants are permitted to furnish their QI-EINs to withholding agents in any manner agreed to by an applicant and its withholding agent.

Applicants that submitted their application before July 1, 2001, are permitted to apply all of the provisions of the QI agreement beginning January 1, 2001. Applicants that submitted their applications on or after that date are not permitted to apply the reporting or the collective credit or refund procedures of the QI agreement to any payments received prior to the effective date contained in its QI agreement. Thus, a QI that submits its application after June 30, 2001, must report all payments that it makes prior to the effective date of its QI agreement as a nonqualified intermediary.

The Service states that it will not assess any penalties for failure to make a deposit of withheld amounts prior to the date the QI receives its QI-EIN provided the QI makes a deposit of any amounts otherwise required within three days of receiving its QI-EIN. If a QI applies to enroll in the Electronic Federal Tax Payment System (EFTPS) within thirty days of receiving a QI-EIN, the Service will not assess a penalty for failure to deposit withheld amounts if any deposit otherwise required is made within three days of being enrolled in EFTPS.

# ¶ 14.08[4][c] Documentation Transition Rules

The IIB complained that financial institutions, both in the United States and abroad, were "experiencing an unacceptably low response rate to their requests for beneficial ownership forms from customers that will not become QIs and an unacceptably high rate of technically deficient forms being submitted." **407** In response, the Service announced that it would implement the audit provisions in a manner that will permit a QI to have a transition period for obtaining account holder documentation. Section 10.03 of the QI agreement provides that the QI shall have its external auditor conduct an audit of the second and fifth full calendar years that the agreement is in effect. The Service states that it will not request an external auditor to examine the first year of the QI agreement if the QI is in substantial compliance with all of the provisions of the QI agreement, including the documentation requirements, by the end of the second full

year. The Service will not impose failure-to-deposit penalties to the extent that the under-deposit is attributable solely to the failure to apply the presumption rules in the second full year of the agreement.

The Service will require a QI to pay the tax due from the second full year of the agreement if the amount actually withheld from an account holder is less than the amount supported by valid documentation on file by the end of the second full year. If there is no documentation on file, and the amount withheld was less than required under the presumption rules, the Service will require the QI to pay the tax due from the second full year of the agreement. No penalties will be assessed on underpaid tax, but interest will be charged on any tax due that is paid after the due date of the Form 1042 for the second full calendar year of the agreement.

This transition approach is not available to any QI the Service finds is not in substantial compliance with the QI agreement by the end of the second full year. In such cases, the Service may, in accordance with the terms of the QI agreement, request the external auditor to audit the first year of the QI agreement, and may assess the appropriate penalties for both the first and second years of the agreement.

## ¶ 14.08[4][d] Simple and Grantor Trusts

The IIB also expressed concern to the Treasury that there existed "inadequate and unworkable guidance regarding partnerships, trusts and other forms of collective investment vehicles." The Service responded by permitting QIs to treat the beneficiaries of foreign simple trusts or the owners of foreign grantor trusts as direct account holders under certain conditions.

Under Section 5.07 of the QI agreement, a QI is generally required to obtain a Form W-8IMY from a flow-through entity, together with appropriate documentation from the interest holders in the entity. Section 8.02(B) of the QI agreement provides that a QI must file a separate Form 1042-S for each interest holder in a flow-through entity that is not itself a nonqualified intermediary or flow-through entity. Thus, the pool basis reporting provisions of Section 8.03 of the QI agreement do not apply to payments made to beneficiaries or owners of foreign simple trusts and foreign grantor trusts.

The Service imposed three conditions on the authority of a QI to treat the beneficiaries or owners as direct account holders. First, applicable know-your-customer rules must require the QI to determine the identity of the beneficiaries or owners of foreign simple or foreign grantor trusts.

Second, the QI is required to obtain the type of know-your-customer documentation set forth in paragraph 4 of the appropriate know-your-customer attachment to the QI agreement. Obtaining a Form W-8 cannot satisfy this second requirement.

Third, the QI is required to obtain a valid Form W-8 from the beneficiary or owner of the trust. The Service will apply the documentation transition approach to these documentation requirements. The documentation may be provided to the QI directly rather than being attached to a Form W-8IMY, or it may be attached to a Form W-8IMY on which the trust represents that it is a foreign simple or foreign

grantor trust. If a Form W-8IMY is provided, it is not necessary for the trust to provide a withholding statement. In addition, if a Form W-8IMY is provided and the trust has five or fewer owners, the Service will not require the trust to provide the QI with a TIN.

In addition, the Service announced in **Notice 2001-4** that it will permit trust companies that are subject to know-your-customer rules that have been approved by the Service for purposes of the QI agreement to become a QI provided that the trust company agrees to the provisions of the QI agreement.

## ¶ 14.08[4][e] QI Proprietary Accounts

Section 1.01 of the QI agreement provides that a QI must act as a qualified intermediary for those accounts it designates as QI accounts with a withholding agent. The Service states in **Notice 2001-4** that it will permit a QI that is a member or shareholder of a clearing organization to include the assets for which the QI is the beneficial owner in the same account with those assets for which it acts as a qualified intermediary. This treatment is accorded only if the QI timely and accurately reports the income for which it is the beneficial owner by filing the appropriate Form 1042-S for each year showing itself as the recipient of the income for which it is the beneficial owner. Under no circumstances, however, may a QI maintain assets for which it acts as a QI in the same account as assets for which it acts as a nonqualified intermediary.

## ¶ 14.08[4][f] Foreign Partnerships

**Notice 2001-4** provides limited transitional relief with respect to payments to foreign partnerships. Because foreign partnerships are flow-through entities under the regulations and the QI agreement, they are required to provide withholding agents, including QIs, with a Form W-8IMY, together with documentation from each partner, and a withholding statement allocating a payment to each of the partners.

The Service announced that for calendar year 2001 it will permit a foreign partnership to provide a withholding agent, including a QI, with a Form W-8IMY together with a withholding statement that provides the withholding agent with information regarding withholding rate pools. **408** The foreign partnership is required to associate the documentation from each of its partners with the Form W-8IMY. If a partner is a foreign person or a U.S. exempt recipient, such as a domestic corporation, that documentation may be provided to the withholding agent at any time during calendar year 2001. A Form W-9 is required to be provided, however, with respect to any U.S. non-exempt recipient before a payment is made to a partnership.

A withholding agent, including a QI, is permitted to withhold in accordance with the withholding rate pool information provided by the foreign partnership. A withholding agent that is not a QI should report payments allocated to withholding rate pools, other than a withholding rate pool attributable to a U.S.

non-exempt recipient, on Form 1042-S as if the payment were made to the foreign partnership as a recipient. A QI should report such payments as if it were made to its general withholding rate pool. A withholding agent that is not a QI is required to report payments to U.S. non-exempt recipients. A withholding agent that is a QI is required to treat U.S. non-exempt recipients in accordance with the provisions of the QI agreement. Withholding agents that cannot allocate a payment to a withholding rate pool are required to apply the appropriate presumption rules.

# ¶ 14.08[4][g] Transitional Relief for U.S. Withholding Agents

The Service announced in **Notice 2001-4** that it will permit a U.S. withholding agent during calendar year 2001 to rely on old Form W-8, Form 1001, Form 1078, Form 4224, and Form 8709 obtained under the regulations in effect prior to January 1, 2001. The U.S. withholding agent must be able to demonstrate on audit that it has made good faith efforts to obtain Forms W-8BEN, W-8ECI, W-8EXP, W-8IMY, and W-9 from account holders required to provide those forms.

For an indefinite period, the Service will permit U.S. withholding agents to rely on Forms W-8 that contain a post office box as a permanent residence address. The new regulations prohibit the use of a post office box as a permanent residence address on Form W-8. **409** The withholding agent must not know, or have reason to know, that the person providing the form is a U.S. person or that a street address is available.

The final regulations prohibit a withholding agent from relying on a Form W-8 if the form has a U.S. mailing address or the withholding agent has a U.S. mailing address as part of its account information. **410** In **Notice 2001-4** , the Service announced that it will permit a withholding agent to rely on Forms W-8 for which there is a U.S. mailing address, provided the Form was received prior to December 31, 2001.

In no circumstances, however, is a U.S. withholding agent permitted to apply the so-called address rule for dividends paid after December 31, 2000. **411** Thus, a withholding agent is not permitted to treat dividends as paid to a foreign person, or as subject to a reduced rate of withholding under an income tax treaty, based solely on the address of the person to whom the dividends are paid.

Finally, a withholding agent is not permitted to rely on an old Form W-8 to treat a foreign financial institution as the beneficial owner of income if the withholding agent knows, or has reason to know, that the foreign financial institution is acting as an intermediary on behalf of others.

The Service also extended transition year treatment, given to 1999 **412** and 2000, **413** to 2001. This means that the Service will take into account in performing audits of the year 2001, the extent to which a U.S. withholding agent has made good faith efforts in 1999, 2000, and 2001 to transform its business practices and information systems to comply with the new withholding regulations.

The Service stated that it would regard the calendar years 1999 and 2000 as transition years. Calendar

year 2001 will similarly be regarded as a transition year for U.S. withholding agents by the Service in enforcing compliance for the administration of the withholding tax system. Thus, the Service will take into account whether a U.S. withholding agent has made reasonable efforts during 1999, 2000, and 2001 to (1) modify its account opening practices to conform to the new documentation requirements, (2) obtain new withholding certificates on existing accounts, and (3) make appropriate systems changes to comply with the new withholding regulations. The Service will also take into account whether or not a U.S. withholding agent has effectively implemented the new withholding regulations by January 1, 2002.

## ¶ 14.08[5] Withholding on Deemed Distributions

## ¶ 14.08[5][a] Deemed Distributions and Deemed Payments

In April 2016, the Treasury and Service issued proposed regulations governing withholding with respect to deemed distributions of stock. **413.1**

These regulations provide that a range of transactions are treated as distributions of stock to which **Sections 301** and **305(b)** apply if the transaction "increases a shareholder's proportionate interest in the assets or earnings and profits of the corporation deemed to make such distribution, and the distribution has the result described in **section 305(b)(2)** , **(3)** , **(4)** , or **(5)** ." **413.2** The transactions so treated include an "applicable adjustment, a change in redemption price, a difference between redemption price and issue price, a redemption that is treated as a distribution to which **section 301** applies, or any transaction (including a recapitalization) having a similar effect on the interest of any shareholder." **413.3** The proposed regulations define an "applicable adjustment" as an adjustment to a right to acquire stock, including

- With respect to a convertible instrument and a holder thereof-an increase in the conversion ratio or a reduction in the conversion price of such instrument;
- With respect to a warrant, subscription right, stock right, option, or other similar right and a holder thereof-an increase in the number of shares to be received by the holder upon exercise or a reduction in exercise price;
- With respect to a convertible instrument and a holder of actual stock into which such instrument may be converted-an increase in the conversion price or a reduction in the conversion ratio of such instrument;
- With respect to a warrant, subscription right, stock right, option, or similar right and a holder of actual stock into which such instrument is exercisable-an increase in the exercise price or a reduction in the number of shares to be received by the holder upon exercise; and
- An adjustment in the terms of a right to acquire stock having an effect similar to the effects of the adjustments described in any of the first four bulleted paragraphs "including, for example, an extension or reduction of the term during which a right to acquire stock may be exercised." **413.4**

The proposed regulations state that "[d]epending upon the facts presented," the distribution could be deemed to be made in shares of actual stock or in additional rights to acquire stock (which, in either case, may be common or preferred stock). **413.5**

The proposed regulations provide that an "applicable adjustment" to a right to acquire stock may be a deemed distribution either to a "deemed shareholder" or an "actual shareholder." They provide that such an adjustment is a deemed distribution to a deemed shareholder if the adjustment "has the effect of increasing a deemed shareholder's proportionate interest in the assets or earnings and profits of the corporation," and the increase "has the effect described in **section 305(b)(2)** , **(3)** , **(4)** , or **(5)** ." **413.6** They set forth an example of such an "applicable adjustment" as an increase, with respect to a convertible instrument, in the conversion ratio or the number of shares of stock to be received upon conversion or a reduction in the conversion price. **413.7**

The proposed regulations provide that such an "applicable adjustment," with respect to an actual shareholder, occurs if an adjustment "has the effect of reducing a deemed shareholder's proportionate interest in the assets or earnings and profits of the corporation and thereby increasing an actual shareholder's proportionate interest" and if the increase "has the effect described in **section 305(b)(2)** , **(3)** , **(4)** , or **(5)** ." They set forth an example of such an "applicable adjustment" as a reduction, with respect to a convertible instrument, in the conversion ratio or the number of shares of stock to be received upon conversion or an increase in the conversion price. **413.8**

The proposed regulations provide an exception for an "applicable adjustment that is made pursuant to a bona fide, reasonable adjustment formula (including but not limited to an applicable adjustment made to compensate for a distribution of stock to another shareholder) and that has the effect of preventing dilution of the proportionate interest of the holders of actual stock or rights to acquire stock." **413.9**

The proposed regulations provide that the amount of the deemed distribution that constitutes an applicable adjustment and is made to a deemed shareholder is the excess of the fair market value (FMV) of the right to acquire stock held by the deemed shareholder immediately after the applicable adjustment, over the FMV, determined immediately after the applicable adjustment, of the right to acquire stock as if no applicable adjustment had occurred. **413.10** For such a deemed distribution to an actual shareholder, the amount of the deemed distribution is the FMV of the stock deemed distributed. **413.10**

# ¶ 14.08[5][a][i] Deemed distribution to actual shareholder.

For a deemed distribution under **Sections 305(b)** and **305(c)** that is made to an actual shareholder and results from an applicable adjustment, the amount of the deemed distribution is the fair market value of the stock deemed distributed, determined in accordance with the methodology set forth in **Section 1.305-3(e), Examples 8** and **9** . The proposed regulations states that, in determining the FMV of a right to acquire stock, "[a]ny particular facts pertaining to the deemed shareholder, including the number of

rights or shares such deemed shareholder owns, will be disregarded" and that "[a]ny value or reduction in value attributable to the possibility of future applicable adjustments that may result from actual or deemed distributions will not be taken into account." **413.12**

The proposed regulations provide that, when an applicable adjustment is a deemed distribution, the deemed distribution occurs "at the time such applicable adjustment occurs, in accordance with the instrument setting forth the terms of the right to acquire stock, but in no event later than the date of the distribution of cash or property that results in the deemed distribution." They provide further that

> For such applicable adjustment relating to a right to acquire publicly-traded stock, if the instrument setting forth the terms of such right does not set forth the time the applicable adjustment occurs, the deemed distribution occurs immediately prior to the opening of business on the ex-dividend date for the distribution of the cash or property that results in the deemed distribution.

For an applicable adjustment relating to a right to acquire non-publicly traded stock, the proposed regulation states that "if the instrument setting forth the terms of such right does not set forth the time the applicable adjustment occurs, the deemed distribution occurs on the date that a holder is legally entitled to the distribution of cash or property that results in the deemed distribution."

The proposed regulations provide that a recapitalization, whether or not an isolated transaction, results in a deemed distribution if either of two conditions are met:

- It is pursuant to a plan to periodically increase a shareholder's proportionate interest in the assets or earnings and profits of the corporation, or
- A shareholder owning preferred stock with dividends in arrears exchanges his stock for other stock and, as a result, increases his proportionate interest in the assets or earnings and profits of the corporation. **413.13**

The proposed regulations provide that, for this purpose, "[a]n increase in a preferred shareholder's proportionate interest occurs in any case where the fair market value or the liquidation preference, whichever is greater, of the stock received in the exchange (determined immediately following the recapitalization), exceeds the issue price of the preferred stock surrendered." **413.14** In the case of recapitalizations in the second category, the proposed regulations provide that the amount of the distribution deemed to occur is the lesser of (x), the amount by which the FMV or the liquidation preference, whichever is greater, of the stock received in the exchange (determined immediately following the recapitalization) exceeds the issue price of the preferred stock surrendered, or the amount of the dividends in arrears. **413.15** The proposed regulations clarify that for purposes of applying these rules concerning recapitalizations with respect to stock issued before July 12, 1973, the term issue price of the preferred stock surrendered means the greater of the issue price or the liquidation preference (not including dividends in arrears) of the stock surrendered. **413.16**

The proposed regulations are to be effective on or after the date of publication of the Treasury decision adopting these rules as final regulations in the Federal Register, but taxpayers are permitted to rely upon

them for deemed distributions occurring prior to that date. They state that, for purposes of determining the amount of a deemed distribution to a deemed shareholder occurring prior to the date of publication, a taxpayer is permitted to determine the amount of the deemed distribution by treating such distribution either as a distribution of a right to acquire stock or as a distribution of the actual stock to which the right relates. **413.17**

The proposed regulations would amend the regulations governing the source rule for dividends to include the amount of any "deemed distribution," as defined by the proposed regulations, as "deemed payments" which constitute "substitute dividends" for purpose of the dividend sourcing rule. **413.18**

# ¶ 14.08[5][b] Withholding on Deemed Distributions

The proposed regulations limit the obligation of withholding agents to withhold with respect to deemed distributions and deemed payments, as defined by the proposed regulations. Under the withholding rules currently in effect, there is an exemption from the obligation to withhold unless the potential withholding agent both has "control over, or custody of, money or property owned by the recipient or beneficial owner from which to withhold an amount" as well as "knowledge of the facts that give rise to the payment" at some time between (x) the date that the obligation to withhold would arise (but for the provisions of this paragraph (d)) and (y) the due date (including extensions) for filing Form 1042 with respect to the calendar year in which the payment occurs. **413.19** The proposed regulations carve out the exception to this exception for any "distribution with respect to stock (including a deemed distribution (as defined in section 1.305-1(d)(7)) of stock or a right to acquire stock)." **413.20** The proposed regulations then set forth a limited exception from the obligation to withhold on a deemed distribution.

Under this exception, a party other than the issuer of a "specified security" is required to withhold in either of two circumstances. **413.21**

The first is where the issuer of the specified security "reports the information required under section 1.6045B-1 regarding the deemed distribution before the due date (not including extensions) for the withholding agent to file Form 1042 for the calendar year in which the deemed distribution or the deemed payment occurred." **413.22** The second is where the agent has actual knowledge of the deemed distribution before the due date (not including extensions) for it to file Form 1042 for the calendar year in which the deemed distribution or the deemed payment occurred. In this case, the requirements will not be considered to be met until January 15 of the year following the calendar year in which the deemed distribution or the deemed payment occurred. **413.23** The agent is required to withholding on the earliest of (x) the date on which a payment of cash is made with respect to the security or the securities lending or sales-repurchase transaction; (y) the date on which the security is sold, exchanged, or otherwise disposed of (including a transfer of the security to a separate account not maintained by the withholding agent or a termination of the account relationship); or (z) the due date (not including extensions) for the withholding agent to file Form 1042 for the calendar year in which the deemed distribution or the deemed payment occurred. **413.24**

A withholding may treat a foreign entity as having assumed primary withholding responsibility for a deemed distribution on a specified security or a deemed payment unless the withholding agent has provided the foreign entity a copy of the issuer statement furnished to nominees or certificate holders (under **Section 6045B(c)** ) within ten days of the issuer furnishing the statement to the holder of record (or its nominee), or the issuer has met the public reporting requirements permitted by **Section 6045B(e)** . The foreign entity has an obligation to withhold on the deemed distribution or the deemed payment (unless an exception to withholding under Section 1441 applies) if it receives a copy of the statement furnished holders, or the issuer has met the public reporting requirements by the due date (not including extensions) for filing Form 1042 with respect to the calendar year in which the deemed distribution or the deemed payment occurred. **413.25**

The proposed regulations provide that, for purposes of determining the amount of a deemed distribution, a withholding agent other than the issuer of a specified security is permitted to rely upon the information provided by the issuer under **Section 6045B** , unless the agent "knows that such information is incorrect or unreliable." **413.26** The proposed regulations clarify that any person that issues or holds directly or indirectly on behalf of a beneficial owner or a flow-through entity that owns directly or indirectly a security upon which a deemed distribution is made has custody of or control over the deemed distribution. **413.27** They provide that a withholding agent may reimburse itself for satisfaction of a withholding obligation with respect to a deemed distribution from "property that it holds in custody for the beneficial owner, property over which it has control, or additional contributions of property obtained directly or indirectly from the beneficial owner." They also provide that a withholding agent that adjusts its underwithholding under this procedure will not be subject to any penalties or additions to tax described if it timely deposits the amounts that it withholds from future payments, proceeds from the liquidation of property, or additional contributions of property obtained directly or indirectly from the beneficial owner. **413.28** The proposed regulations provide an exemption from FATCA withholding which parallel that the proposals create for Chapter 3 withholding to foreign persons. **413.29**

**375 IRC §§ 1441** , **1442** .

**376 IRC § 1441(c)** .

**377 TD 8734, 1997-44 IRB 5** .

**378** The Service acknowledged that significant changes to information systems and business practices would have to be made by entities subject to the new regulations, and that this comes at a time when many of the entities are dealing with changes necessitated by the year 2000 date change and the European Monetary Union currency conversion. **Notice 98-16, 1998-1 CB 847** .

**379 Notice 98-16, 1998-1 CB 847** .

**380 Notice 99-25, 1999-1 CB 1070** .

**381 Treas. Reg. § 1.1441-1** .

**382 Treas. Reg. § 1.1441-1** . This requirement, which was part of the proposed regulations, has been criticized as being inconsistent with **Sections 871(l)** and **881(d)** ; for more detailed discussion, see Lederman & Hirsh, "Final Regs. Revamp Withholding on Foreign Persons-Will the New Burdens Backfire?" 88 J. Tax'n 112 (Feb. 1998) .

**383** While the final regulations under **Section 1441** do not require that the withholding agent obtain a Form W-8 to avoid the withholding liability, Reg. § 1.649-5(d)(3)(iii) requires beneficial owner documentation on most bank deposits to avoid the backup withholding obligation. The regulations reverse the presumption that in the absence of documentation to the contrary, the beneficial owner is a U.S. individual. See Lederman & Hirsh, "Final Regs. Revamp Withholding on Foreign Persons-Will the New Burdens Backfire?" 88 J. Tax'n 112 (Feb. 1998).

**384 Amy Holding Co. v. Dasyure Ltd., 85 AFTR2d ¶ 2000-846 (ED La. 1999)** .

**385 Treas. Reg. § 1.1461-2(b)** .

**386 Amy Holding Co. v. Dasyure Ltd., 85 AFTR2d ¶ 2000-846 (ED La. 1999)** .

**387 Treas. Reg. § 1.1441-1(e)(5)** ; see also Lederman & Hirsh, "Final Regs. Revamp Withholding on Foreign Persons-Will the New Burdens Backfire?" 88 J. Tax'n 112 (Feb. 1998) .

**388 Rev. Proc. 2000-12, 2000-1 CB 387** .

**389** The request should be submitted to Ass't Comm'r (International), CP:IN:OO:WT, 95 L'Enfant Plaza South, SW, Washington, DC 20024. See **Rev. Proc. 2000-12, 2000-1 CB 387** .

**390 Rev. Proc. 2000-12, 2000-1 CB 387** .

**391 Treas. Reg. § 1.1441-1(e)(5)(iii)** .

**392 Rev. Proc. 2000-12, 2000-1 CB 387** .

**393 Rev. Proc. 2000-12, 2000-1 CB 387** .

**394 Rev. Proc. 2000-12, 2000-1 CB 387** .

**395 Rev. Proc. 2000-12, 2000-1 CB 387** .

**396 Rev. Proc. 2000-12, 2000-1 CB 387** .

**397 Rev. Proc. 2000-12, 2000-1 CB 387** .

**398 Rev. Proc. 2000-12, 2000-1 CB 387** .

**399 Rev. Proc. 2000-12, 2000-1 CB 387** .

**400 Rev. Proc. 2000-12, 2000-1 CB 387** .

**401 Rev. Proc. 2000-12, 2000-1 CB 387** .

**402 Rev. Proc. 2000-12, 2000-1 CB 387** .

**403 Rev. Proc. 2000-12, 2000-1 CB 387** . The forms are effective for the current year and three calendar years thereafter.

**404** See Letter from Lawrence R. Uhlick, Institute of International Bankers, to Hon. Jonathan Talisman, Assistant Secretary (Tax Policy), Department of the Treasury, and Hon. Charles O. Rossotti, Commissioner, IRS (Nov. 22, 2000), 2000 TNT 232-40 (Dec. 1, 2000).

**405** See Letter from Lawrence R. Uhlick, Institute of International Bankers, to Hon. Jonathan Talisman, Assistant Secretary (Tax Policy), Department of the Treasury, and Hon. Charles O. Rossotti, Commissioner, IRS (Nov. 22, 2000), 2000 TNT 232-40 (Dec. 1, 2000).

**406 Rev. Proc. 2000-12, 2000-1 CB 387** .

**407** See Letter from Lawrence R. Uhlick, Institute of International Bankers, to Hon. Jonathan Talisman, Assistant Secretary (Tax Policy), Department of the Treasury, and Hon. Charles O. Rossotti, Commissioner, IRS (Nov. 22, 2000), 2000 TNT 232-40 (Dec. 1, 2000).

**408** A withholding rate pool is a payment of a single type of income, determined in accordance with the categories of income reported on Form 1042-S or Form 1099, as applicable, that is subject to a single rate of withholding. The foreign partnership is required to provide a separate withholding rate pool for each U.S. non-exempt recipient partner (e.g., a U.S. individual, U.S. partnership, U.S. trust, or U.S. estate).

**409 Treas. Reg. § 1.1441-1(e)(2)(ii)** .

**410 Treas. Reg. § 1.1441-7(b)** .

**411** See Treas. Reg. §§ 1.1441-3(b)(3), 35a.9999-3, Q&A 36.

**412 Notice 98-16, 1998-1 CB 847** .

**413 Notice 99-25, 1999-1 CB 1070** .

**413.1** REG-133673-15, 81 Fed. Reg. 21,795 (Apr. 13, 2016).

**413.2 Prop. Reg. § 1.305-7(b)(1)** .

**413.3 Prop. Reg. § 1.305-7(b)(1)** .

**413.4** Prop. Reg. §§ 1.305-7(a)(1)-1.305-7(a)(5).

**413.5 Prop. Reg. § 1.305-7(b)(1)** .

**413.6 Prop. Reg. § 1.305-7(c)(1)** .

**413.7 Prop. Reg. § 1.305-7(c)(1)** .

**413.8 Prop. Reg. § 1.305-7(c)(2)** .

**413.9 Prop. Reg. § 1.305-7(c)(3)** . The proposed regulations also provide that an "applicable adjustment that is made to compensate for a cash or property distribution to another shareholder and that is taxable under **section 301** , **356(a)(2)** , **871(a)(1)(A)** , **881(a)(1)** , **852(b)** , or **857(b)** is not made pursuant to a bona fide adjustment formula described in the preceding sentence." **Prop. Reg. §**

**1.305-7(c)(3)** .

**413.10 Prop. Reg. § 1.305-7(c)(4)(i)** .

**413.10 Prop. Reg. § 1.305-7(c)(4)(ii)** . The regulations reflect a methodology for determining the FMV of the stock deemed distributed. **Prop. Reg. § 1.305-7(e), Examples 8** and **9** .

**413.12 Prop. Reg. § 1.305-7(c)(4)(iii)** .

**413.13 Prop. Reg. § 1.305-7(d)(1)** .

**413.14 Prop. Reg. § 1.305-7(d)(1)(ii)** .

**413.15 Prop. Reg. § 1.305-7(d)(2)** .

**413.16 Prop. Reg. § 1.305-7(d)(3)** .

**413.17 Prop. Reg. § 1.305-7(g)** .

**413.18 Prop. Reg. § 1.861-3(a)(6)** .

**413.19 Treas. Reg. § 1.1441-2(d)(1)** .

**413.20 Prop. Reg. § 1.1441-2(d)(1)(ii)(B)** . The regulations state that these exceptions apply "without a requirement that documentation be furnished to the withholding agent," although they caution that "may have to be furnished for purposes of the information reporting provisions under Chapter 61 of the Code and backup withholding under **section 3406** ." **Prop. Reg. § 1.1441-2(d)(1)(iii)** . They caution further that the exception from withholding "is not a determination that the amounts are not fixed or determinable annual or periodical income, nor is it an exception from reporting the amount under section 1.1461-1(b) and (c)." **Prop. Reg. § 1.1441-2(d)(1)(iv)** . They state that a withholding agent "does not lack control over money or property for purposes of this paragraph (d)(1) if the withholding agent directs another party to make the payment," and that "a withholding agent does not lack knowledge of the facts that give rise to a payment merely because the withholding agent does not know the character or source of the payment for U.S. tax purposes." **Prop. Reg. § 1.1441-2(d)(1)(v)** .

**413.21 Prop. Reg. § 1.1441-2(d)(4)(i)** . A "specified security" is defined by **Section 6045(g)(3)** to include "any share of stock in a corporation," "any note, bond, debenture, or other evidence of

indebtedness," and "any commodity, or contract or derivative with respect to such commodity, if the Secretary determines that adjusted basis reporting is appropriate for purpose of [ **Section 6045(g)** ]." The definition is amplified in the regulations. **Treas. Reg. § 1.6045-1(a)(14)** .

**413.22 Prop. Reg. § 1.1441-2(d)(4)(i)(A)** . **Section 6045B** , added by the Energy Improvement and Extension Act of 2008, **Pub. L. No. 110-343** , __ Stat. __, requires "any issuer of a specified security" to make a return describing "any organizational action which affects the basis of such specified security of such issuer." The return is to be filed as of the earlier of forty-five days after the date of the action, or January 15 of the year following the calendar year in which the action occurs. See Treas. Reg. §§ 1.6045B-1(a)(1)-1.6045B-1(a)(2). Under **Section 6045B(c)** and **Treas. Reg. 1.6045B-1(b)** , the issuer is required to furnish to any nominee or certificate holder of the security a written statement containing the information shown on the return, as required by regulations. Under **Section 6045B(e)** and **Treas. Reg. § 1.6045B-1(a)(3)** , the Secretary is authorized to waive the requirements of a return and furnishing a statement if the issuer "makes publicly available, in such form and manner as the Secretary determines necessary" the information required on the return. The Treasury has issued regulations implementing these provisions.

The deemed distribution withholding regulations simply state that an agent is required to withhold if the issuer "reports" the organizational action giving rise to the deemed distribution, without specifying which kind of reporting required by **Section 6045B** -the filing of a return, furnishing of information, or publication of information-constitutes such a "report." Presumably this condition would be satisfied by either publication of the information or furnishing of the information to recipients *if* the withholding agent is a person entitled to be furnished the information. If the agent is not such a person, and the issuer files without publication, it is questionable whether the agent should in those circumstances be required to withhold.

**413.23 Prop. Reg. § 1.1441-2(d)(4)(i)(B)** .

**413.24 Prop. Reg. § 1.1441-2(d)(4)(ii)** .

**413.25 Prop. Reg. § 1.1441-2(d)(4)(iii)** .

**413.26 Prop. Reg. § 1.1441-3(c)(5)** .

**413.27 Prop. Reg. § 1.1441-7(a)(4)** .

**413.28 Prop. Reg. § 1.1461-2(b)** .

**413.29 Prop. Reg. § 1.1471-2(a)(4)(i)(A)** .

© 2021 Thomson Reuters/Tax & Accounting. All Rights Reserved.

# Exhibit 35

Checkpoint Contents
  International Tax Library
    WG&L International Treatises
      Andersen: Analysis of United States Income Tax Treaties
        Chapter 1: General
          ¶1.01. Purpose of Income Tax Treaties

# ¶ 1.01 Purpose of Income Tax Treaties

In broad terms, income tax treaties may be considered to have two purposes. First, income tax treaties are intended to promote international trade and investment in several ways, the most important of which is by allocating taxing jurisdiction between the Contracting States so as to minimize the double taxation of income. Second, income tax treaties are intended to permit the Contracting States to better enforce their domestic tax laws so as to reduce tax evasion. These purposes are in fact incorporated in the title to most of the treaties.

Following a discussion of these purposes, an outline of the relationship of income tax treaties to certain other tax agreements is set forth. Throughout this treatise, frequent references are made to model bilateral income tax treaties published at various times by the U.S. Treasury Department (US Model), the Organisation for Economic Co-Operation and Development (OECD Model) and the United Nations (UN Model); although they have no independent legal authority, they provide significant insight (particularly through their associated commentaries) on the corresponding provisions of bilateral income tax conventions. Different versions of the full US Model were published in 1981, 1996, 2006 and 2016; of the OECD Model, in 1963, 1977 and 1992; and of the UN Model, in 1980, 2001 and 2017; less comprehensive amendments to each version are also issued from time to time. (References to any of these model treaties, unaccompanied by a specified year reference, applies to all versions or to the most recent one, as the context dictates.)

# ¶ 1.01[1] Promotion of International Trade and Investment

As the nations' economies have become more integrated and businesses are conducted across national boundaries with regularity, taxation has become an increasingly international endeavor. Most nations tax resident individuals and domestic corporations on their worldwide income and tax nonresident individuals and foreign entities on their income derived from domestic sources. Such a system often gives rise to potential double taxation. It is generally acknowledged that such double taxation impedes the free flow of international trade and investment, thereby causing international economic inefficiencies. It is conceivable that this problem could be resolved through international organizations like the United Nations (UN) or the Organisation for Economic Cooperation and Development (OECD), or by way of multilateral agreements similar to the General Agreement on Trade and Tariffs or the North American

Free Trade Agreement. **1** Significantly, in 2016 the OECD published a Multilateral Convention to Implement Tax Treaty Related Measures to Prevent Base Erosion and Profit Shifting, also known as the Multilateral Instrument (MLI); the MLI is designed to enable subscribing jurisdictions to modify the operation of their tax treaties so as to implement measures against multinational tax avoidance and to streamline the resolution of disputes. As of August 2021 nearly 100 jurisdictions (not including the United States) had adopted the MLI or had expressed an intent to do so. Nevertheless, most nations rely on bilateral income tax treaties (formally referred to as "conventions") as the primary means by which to remove tax barriers to international trade, precisely because the bilateral nature of such treaties affords treaty partners flexibility to allow for considerations of their special needs. **1.1**

Perhaps because until recently U.S. economic growth has been less dependent on cross-border transfers of goods, services, and capital than the economic growth of other major developed countries has been, the United States has a relatively small treaty network. The United States has about one half as many treaties as either the United Kingdom or France and about two thirds as many as Germany. **2**

Most U.S. tax treaty partners are other developed countries. The fact that the U.S. treaty network has not expanded to encompass many less-developed country partners has been attributed to the very divergent interests brought to the table by primarily capital importing and primarily capital exporting countries. **3**

At various times, the United States has concluded tax treaties with the scope limited to a single industry or category of income. A current example is the Bermuda Insurance Enterprise treaty.

The broad objective of promoting cross-border trade and investment may be broken down into more concrete objectives of (1) allocating taxing jurisdiction so as to avoid double taxation; (2) reducing source-State taxation; (3) prohibiting discrimination based on alienage, foreign organization, or foreign ownership; and (4) promoting resolution of situations in which the income taxable by one Contracting State as opposed to the other Contracting State is in question.

## ¶ 1.01[1][a] Allocation of Taxing Jurisdiction (Avoidance of Double Taxation)

As expressed by reference to taxation, the principal purpose of income tax treaties is the elimination of double taxation caused by multiple jurisdictions asserting taxing authority over the same income. **4** Since the League of Nations completed its model tax treaties in the 1920s, "classification and assignment" has been the principal method adopted in bilateral income tax treaties to avoid double taxation. Under the classification and assignment method, treaty partners classify different categories of income and assign the right to tax each category of income to one, the other, or both of the treaty partners. Treaty partners also mutually guarantee that such classification and assignment be given the intended effect of eliminating double taxation by way of provisions under domestic law.

The most common domestic law provisions guaranteeing the effectiveness of classification and assignment include the following methods:

1. **Exemption.** Under the exemption method, one Contracting State yields taxing authority to the other and provides an exemption for income that is subject to taxation by the latter. The most common form of country exemption calls for the residence Contracting State to exempt from taxation income of its residents that is sourced within the territory of the other Contracting State and permitted to be taxed on the basis of source. This method has been adopted by many European countries and is one of the alternatives adopted by **the OECD Model Treaty** and **the UN Model Treaty** . **5** Where appropriate, treaties also provide for the source Contracting State to exempt income earned by residents of the other Contracting State. For example, as noted below, the source Contracting State often will agree to reduce or eliminate withholding tax on interest, dividends, and royalties paid to a resident of the other Contracting State.

2. **Credit.** Under the credit method, a party to a treaty would not completely yield taxing authority over certain items of income to its treaty partner, but would permit its taxpayers to reduce their tax liabilities by the amount of taxes paid to the treaty partner. Typically, under this method, a residence Contracting State allows its taxpayers who have foreign-source income to credit foreign income taxes paid against their domestic income tax liabilities to the extent that the effective foreign tax rate does not exceed the effective domestic tax rate. This method is favored by the United States and is the other alternative provided in **the OECD Model Treaty** and **the UN Model Treaty** . **6**

3. **Deduction.** Under the deduction method, a Contracting State treats certain foreign taxes paid to a treaty partner as a deductible expense. **7** The most common form calls for the residence Contracting State to allow a deduction from income for taxes paid to the source country on income derived therein. This method provides only partial relief from double taxation since only a fraction (corresponding to the marginal domestic tax rate) of the foreign taxes paid would reduce the domestic tax liability.

A corollary of the objective to eliminate double taxation of income is that treaty relief may not be appropriate if the income in question is not subject to taxation in the residence State. The United States, for one, believes that the source State's agreement to cede taxation rights to the residence State "is predicated on a mutual understanding that the treaty partner is asserting tax jurisdiction over the income." **8** The fact that certain treaties may not have specific rules in this regard is not considered to detract from the basic principle that there should not be double nontaxation of income. **9**

# ¶ 1.01[1][b] Reduction of Taxation at Source

Income tax treaties can also promote international trade and investment by requiring treaty partners to reduce source-based taxes. Many States impose withholding taxes over investment income by nonresidents based on the gross amount of income, without allowance for expenses incurred in

producing the income. Such taxes can be extremely onerous, especially for taxpayers such as banks whose expenses (cost of funds) are high and profit margins narrow. Even though the cost may be reduced by foreign tax credits that some States permit their residents to claim against their domestic tax liability, such relief, which generally is limited to the tax that the residence State would have imposed on the income, often will not be adequate. Therefore, treaties often provide for reciprocal reduction or even total elimination of such taxes. **10**

In general, developed (capital-rich) nations desire to minimize the source-State withholding taxes on income from capital and technology and create exceptions to the definition of "permanent establishment" that are as broad as possible. Lesser developed (capital-poor) nations generally have the opposite objective.

## ¶ 1.01[1][c] Avoidance of Discrimination

Since foreign individuals and entities generally have only limited representation, if any, in domestic political processes, nations sometimes enact discriminatory taxes on them to obtain short-term revenue gains or to serve other political purposes. Such discriminatory taxes may even be enacted despite knowledge that they would impede international trade and investment and would be counterproductive in the long run, either because such measures are politically expedient or to retaliate against another country that has similar discriminatory measures. Since treaty partners generally have a desire to protect their residents against such discriminatory measures, most treaties contain a provision prohibiting discriminatory taxes. **11**

## ¶ 1.01[1][d] Competent Authority Resolution of Disputes

In addition, most income tax treaties, including the U.S., OECD, and UN Model Treaties, contain specific provisions in the Mutual Agreement Procedure article for the competent authorities of the Contracting States to deal with situations in which a taxpayer is arguably subject to taxation in a manner that is not consistent with the treaty's terms and resolve disputes as to the proper interpretation and application of specific treaty provisions. **12** As is discussed in Chapter 23, however, taxpayers cannot compel competent authorities of treaty partners to resolve treaty-related problems, and other shortcomings to the mutual agreement procedure exist. **13**

## ¶ 1.01[2] Information Exchange and Other Administrative Assistance

The U.S. tax system relies to a very large extent on voluntary compliance by taxpayers. Since such a system perforce leaves room for abuse, it is important that the United States be able to obtain from its treaty partners information about persons and activities subject to U.S. taxation. The treaty partners

generally are similarly motivated. The goal of preventing tax evasion has little to do with the other purposes of income tax treaties discussed above. Hence, it has been suggested that the United States enter into exchange of information treaties or mutual assistance treaties specifically designed to obtain information. **14** Nevertheless, this alternative has been found ineffective because the United States has not always been able to convince other jurisdictions to enter into such treaties. **15** Consequently, the income tax treaty is still considered the most expedient means of obtaining tax-related information.

Some U.S. treaty partners initially resisted provisions for exchange of information because the provisions conflicted with domestic bank secrecy laws. **16** As national economies have become more globalized and tax information possessed by one State has become more valuable to other States, however, exchange of information provisions have met with less resistance. Such provisions are found not only in the U.S. Model Treaties, but also in the OECD Model Treaties and **the UN Model Treaty** . **17**

Even though the United States has expressed a reluctance to collect taxes imposed by another State, **18** certain treaties contain such an obligation. For example, **the 1981 U.S. Model Treaty** would require treaty partners to endeavor to collect taxes on behalf of the other partner to the extent necessary to ensure that relief granted by the treaty from such taxes "does not enure [sic] to the benefit of persons not entitled thereto." **19**

# ¶ 1.01[3] Relationship to Other Tax Agreements

In addition to income tax treaties, the United States is also a party to other treaties that have an impact on taxes. The United States has entered into estate and gift tax treaties with a number of countries **20** and has also entered into mutual assistance agreements with Switzerland and exchange of information agreements with many of the Caribbean countries in order to obtain tax information. **21** The United States is a party to a number of reciprocal tax exemption agreements for international shipping and/or aviation income. **22** Moreover, the United States is a party to a number of bilateral social security totalization agreements. **23**

Ever since its founding, the United States has entered into treaties with foreign countries relating to such general subjects as friendship, commerce, and navigation (FCN treaties). **24** Among the many different topics typically covered in FCN treaties are certain traditional topics of income tax treaties, such as nondiscrimination **25** and most favored nation treatment of nationals of the treaty partners. **26**

The United States is a party to the multilateral World Trade Organization (WTO) Agreement, which absorbed the 1947 General Agreement on Tariffs and Trade in 1995. The WTO Agreement provides certain nondiscrimination (most-favored-nation) treatment to signatory countries. These rights generally are not intended to be curtailed by bilateral income tax treaties. Certain most-favored-nation provisions under the multilateral General Agreement on Trade in Services, on the other hand, are expressly made to yield to bilateral income tax treaties. **27**

Finally, as of August 2021, the United States is party to forty-one Bilateral Investment Treaties, **28** which

are agreements for the reciprocal encouragement and protection of investments. **29** The first such agreements were signed with Egypt and Panama based on a model presented in 1982. That model was revised slightly in 1983 and again in 1984. **30**

**1** Upon the effectiveness of the United States-Canada-Mexico Agreement (USCMA), all references in U.S. income tax treaties to the North American Free Trade Agreement (NAFTA) will be interpreted by the IRS as references to the USCMA. **Ann. 2020-6, 2020-23 IRB 911** (May 19, 2020).

**1.1** For general discussions of the function of income tax treaties, see Vogel, Shannon, & Doernberg, United States Income Tax Treaties, ¶¶ 1.1-1.2 (Kluwer) (hereafter Vogel, Shannon & Doernberg); American Law Inst., Federal Income Tax Project: International Aspects of United States: Income Taxation II-Proposals of the American Law Institute on United States Income Tax Treaties, pp. 1-11 (hereafter ALI Proposals); Rosenbloom, Current Developments in Regard to Tax Treaties, 40th annual NYU Institute on Taxation § 31.00 et al. (hereafter Rosenbloom).

For representative writings in the area, see Ballard and Bradley, "Beyond Tax Treaties: Status of Forces and USAID Agreements," 17 J. Int'l Tax'n. 52 (Apr. 2006).

**2** Cope, "U.S. Income Tax Treaties: Notes and Comments on Some Present and Future Policies," 71 Taxes 955 (Dec. 1993).

**3** Cope, "U.S. Income Tax Treaties: Notes and Comments on Some Present and Future Policies," 71 Taxes 955 (Dec. 1993).

**4** Indeed, avoidance of double taxation has been incorporated in the titles of model income tax treaties. See the 1977 OECD "Convention Between (State A) and (State B) for the Avoidance of Double Taxation With Respect to Taxes on Income and on Capital". While the title of **the 2005 OECD Model Treaty** was shortened to "Convention Between (State A) and (State B) With Respect to Taxes on Income and on Capital," a footnote thereto adds that "States wishing to do so may follow the widespread practice of including in the title a reference to either the avoidance of double taxation or to both the avoidance of double taxation and the prevention of fiscal evasion."

**5** See **2005 OECD Model Treaty, art. 23A** ; **1997 UN Model Treaty, art. 23A** . See also Rhoades & Langer, Income Taxation of Foreign Related Transactions §§ 90.23, 91.23.

**6 1996 U.S. Model Treaty, art. 23** , **2005 OECD Model Treaty, art. 23B** , 1992 UN Model Treaty, art. 23B.

**7** See 1992 OECD Model Treaty, art. 23(7), 1997 UN Model Treaty, art. 23(2).

**8 TD 8722** (Explanation of Provision), reprinted in Tax Analyst's Highlights & Documents, July 1, 1997, p.27.

**9 TD 8722** (Explanation of Provision), reprinted in Tax Analyst's Highlights & Documents, July 1, 1997, p.27.

**10** See **2005 OECD Model Treaty, arts. 10 - 13** ; **1997 UN Model Treaty, arts. 10** -13; **1996 U.S. Model Treaty, arts. 10** -13.

**11** See **2005 OECD Model Treaty, art. 24** , **1997 UN Model Treaty, art. 24** , **1996 U.S. Model Treaty, art. 24** .

**12** See **2005 OECD Model Treaty, art. 25** , **1997 UN Model Treaty, 1981, Art. 25** , **1996 U.S. Model Treaty, art. 25** . See Chapter 23.

**13** See ¶ 23.02[2][a][iii] . See also **Yamaha Motor Corp., U.S.A. v. United States, 779 F. Supp. 610 (DDC 1991)** (action to compel U.S. Government to stay assessment of tax and conduct competent authority proceedings dismissed for lack of jurisdiction).

**14** See, e.g., Hearings on Offshore Tax Havens, 96th Cong., 1st Sess. (1979), at 284-299; Hearings before the Subcommittee on Oversight of the House Ways and Means Committee on Income Tax Treaties, 96th Cong., 2d Sess. (1980), at 83.

**15** See Rosenbloom, Current Developments in Regard to Tax Treaties, 40th annual NYU Institute on Taxation § 31.00 et al, at 31-46-31-47.

**16** See Vogel, Shannon & Doernberg, United States Income Tax Treaties, ¶¶ 1.1-1.2 (Kluwer) Ch. 3.1.

**17** See **1996 U.S. Model Treaty, art. 26** , **2005 OECD Model Treaty, art. 26** , **1997 UN Model Treaty, art. 26** .

**18** See Treasury Technical Explanation, OECD Convention on Mutual Administrative Assistance in Tax Matters.

**19** 2005 U.S. Model Treaty, art. 26(4).

**20** **Australia (separate estate** and **gift tax treaties)** , **Austria (combined estate and gift tax treaty)** , **Denmark** (combined estate and gift tax treaty), **Finland** (estate tax treaty only), **France** (combined estate and gift tax treaty), **Germany** (combined estate and gift tax treaty), **Greece** (estate tax treaty only), **Ireland** (estate tax treaty only), **Italy** (estate tax treaty only), **Japan** (combined estate and gift tax treaty), **Netherlands** (estate tax treaty only), **Norway** (estate tax treaty only), **South Africa** (estate tax treaty only), **Switzerland** (estate tax treaty only), and **United Kingdom** (combined estate and gift tax treaty).

**21** As of August 2021, the United States had Exchange of Tax Information Agreements with the following countries: Argentina, the Cayman Islands, Costa Rica, Ecuador, Guernsey, Hong Kong, the Isle of Man, Jersey, Panama and Singapore. See Chapter 24.

**22** As of August 2021, the United States had Tax Exemption Agreements for International Shipping and/or Aviation Income (as distinguished from exemption articles in comprehensive tax treaties) with approximately forty countries. See Chapter 6.

**23** As of August 2021, the United States has such agreements with thirty countries. See Chapter 13.

**24** See, e.g., Convention to Regulate Commerce With the United Kingdom, entered into force July 3, 1815, 8 Stat. 228, TS 110 I Malloy 624; Convention of Navigation and Commerce With France, entered into force February 12, 1823, 8 Stat. 278, TS 87, I Malloy 521; Convention of Friendship, Commerce, and Extradition, entered into force November 8, 1855, 11 Stat. 587; TS 353, II Malloy 1763; Treaty of Friendship, Commerce, and Navigation With Japan, entered into force October 30, 1953, 4 UST 2063, TIAS 2863, 206 UNTS 143; Treaty of Friendship, Commerce, and Navigation With Germany, entered into force July 14, 1956, 7 UST 1839, TIAS 3593, 273 UNTS 3.

**25** See, e.g., Treaty of Friendship, Commerce, and Navigation With the Kingdom of the **Netherlands, art. XI** , entered into force December 5, 1957, 8 UST 2043; TIAS 3943; 285 UNTS 231.

**26** See, e.g., Treaty of Friendship, Commerce, and Consular Rights With Austria Articles I, VII, X, XI, XIII, entered into force May 27, 1931, 47 Stat. 1876, TS 838, 5 Bevans 341, IV Trenwith 3930, 118 UNTS 241; Treaty of Friendship, Commerce, and Navigation With Israel Articles V, VI, VII, entered into force April 3, 1954, 5 UST 550; TIAS 2948, 219 UNTS 237. For an example of the interplay between FCN treaties and tax treaties, see Park v. Comm'r, 136 TC 569 (2011) ("most-favored-nation" provisions of U.S.-Korea FCN treaty did not require the United States to exempt a Korean national's U.S.-source gambling winnings from the tax on NRAs simply because some tax treaties with other countries permitted such an exemption on a bilaterally negotiated basis).

**27** See ¶¶ **2.05[2][a]** , **2.05[2][b][ii]** .

**28** The treaty partner countries as of August 2021 are Albania, Argentina, Armenia, Azerbaijan, Bahrain, Bangladesh, Belarus (pending), Bolivia (scheduled to terminate in 2022), Bulgaria, Cameroon, Congo (both the Democratic Republic-formerly Zaire-and the Republic). Croatia, the Czech Republic, Ecuador (scheduled to terminate in 2028), Egypt, El Salvador (pending), Estonia, Georgia, Grenada, Haiti (pending), Honduras, Jamaica, Jordan, Kazakhstan, Kyrgyzstan, Latvia, Lithuania, Moldova, Mongolia, Morocco, Mozambique, Nicaragua (pending), Panama, Poland, Romania, Russia (pending), Rwanda, Senegal, Slovakia, Sri Lanka Trinidad and Tobago, Tunisia, Turkey, Ukraine, Uruguay and Uzbekistan (pending).

**29** Note, "The Bilateral Investment Treaty in ASEAN: A Comparative Analysis," 42 Duke LJ 679, 681 n.13 (1992).

**30** The United States is also party to another form of agreement (commonly referred to as an Investment Guarantee Agreement) with many countries, which is listed in the Department of State's Treaties in Force. These agreements address investment guarantees, including guarantees provided under the Mutual Security Act of 1954 and the Economic Cooperation Act of 1948.

© 2021 Thomson Reuters/Tax & Accounting. All Rights Reserved.

Checkpoint Contents
  International Tax Library
    WG&L International Treatises
      Andersen: Analysis of United States Income Tax Treaties
        Chapter 1: General
          ¶1.04. Entering, Modifying, and Terminating Treaties

# ¶ 1.04 Entering, Modifying, and Terminating Treaties

## ¶ 1.04[1] Process of Entering Into Treaty

The U.S. Constitution vests the power to enter into treaties with foreign countries in the President, with the advice and consent of the Senate by a two-thirds vote. **183** Therefore, the negotiation of income tax treaties, which can have substantial impact on revenues and revenue collection, has been conducted entirely by the executive branch of the U.S. Government. The House of Representatives plays no role in the process, even though the Constitution requires that all bills for raising revenue must originate in the House of Representatives. **184** One may speculate that this fact plays a role in the willingness of the House of Representatives to initiate and approve treaty overrides.

## ¶ 1.04[1][a] Pre-Ratification Process

The following discussion focuses on the treaty-making process from the U.S. standpoint.

## ¶ 1.04[1][a][i] Negotiations.

Negotiating treaties with foreign countries is usually within the jurisdiction of the U.S. State Department, but negotiations of income tax treaties are carried out by the Treasury. Within the Treasury, treaty negotiation is the responsibility of the Assistant Secretary for Tax Policy and the International Tax Counsel. Even though there is no formal role in the negotiation process for the Congress, the executive branch has, as a matter of practice, traditionally consulted with staff members of the Congressional tax writing and foreign relations committees and provided them with "briefings on current or prospective negotiations" "including explanations for expected departures from established policy and justifications for entering into new treaty relations." **185**

Prior to the commencement of any treaty negotiations, the Treasury traditionally has forwarded a copy of the currently operative U.S. Model Treaty to the potential treaty partner. **186** The U.S. Model Treaty thus traditionally has served as both a first offer of the United States and a basic draft for the first round of

negotiations. As in any negotiation, it might be questioned whether the best course is to start from the result that one hopes to achieve, as opposed to starting from a more favorable position, and whether a "one-size-fits-all" model document leads to a rigid approach to the negotiation that may not mesh with the facts and circumstances. However, the use of the U.S. Model Treaty as the starting point for negotiation does help to establish uniformity of basic concepts, structure, and terminology in U.S. income tax treaties.

The **Technical Explanation of the 1996 U.S. Model Treaty** emphasizes that the U.S. Treasury does not anticipate that any treaty it may negotiate with another country will resemble the U.S. Model in all respects. The Technical Explanation explains that the U.S. Treasury takes a number of variables into account, including the respective tax laws and economic situations of the countries, changes in U.S. statutory law, and changes in U.S. tax treaty policy. **187** The Technical Explanation of **the 2006 U.S. Model Treaty** does not contain that language, and therefore suggests a materially more "cookie-cutter" approach than its predecessor.

Upon reaching agreement on all points, the negotiators initial the treaty.

## ¶ 1.04[1][a][ii] Signing.

Once negotiations over the terms of an income tax treaty are completed, the President or his delegate signs the treaty on behalf of the United States. At this point, the treaty is first made available to the public in an officially published form. Next, the Departments of State and Treasury prepare a report to the President recommending that he transmit the treaty to the Senate for ratification. The President then forwards this report together with the treaty itself and a transmittal letter to the Senate.

## ¶ 1.04[1][a][iii] Advice and consent.

Before entry into force, the income tax treaty must receive the Senate's advice and consent to ratification. Even though the Senate Finance Committee has jurisdiction over tax legislation, jurisdiction over income tax treaties lies with the Senate Foreign Relations Committee. After receiving the signed treaty and the President's transmittal letter, the Senate Foreign Relations Committee schedules public hearings on the treaty and other pending treaties, at its discretion. A representative of the Treasury testifies at the hearing in support of ratification. The Treasury generally also presents to the Senate a Technical Explanation of each treaty submitted for advice and consent. The Staff of the Joint Committee on Taxation advise the Senate Foreign Relations Committee in its consideration of the pending treaty, prepare an Explanation of the treaty, and send a representative to testify at the hearing. In addition, other interested parties may also attend the hearing and testify. The Treasury's Technical Explanation, Joint Tax Committee Explanation, and Senate Foreign Relations Committee Report are often released only at or shortly before the public hearing on the treaty, which can hinder the ability of interested taxpayers to present comments regarding issues raised by the treaty or accompanying explanations and

reports.

Following committee action, the treaty is reported to the full Senate, which must advise and consent to its ratification by a vote of two thirds of the members present. Individual Senators may offer amendments, reservations, or understanding after the Senate has acted upon any amendments, reservations, or understandings proposed by the Committee on Foreign Relations. Any votes to be taken by the Senate on any amendments, reservations, or understandings require a majority with the exception of a motion to suspend consideration of the proposed tax treaty, which requires a two-thirds vote.

The Senate usually gives its advice and consent to tax treaties negotiated and signed by the executive branch. **188** Nevertheless, the participation of the legislative branch in the treaty process is often more extensive than the Constitutional prescription of advice and consent would indicate. **189** By refusing the two-thirds vote needed for approval, by entering a reservation on a particular treaty provision, or, on extremely rare occasions, by conditioning approval upon the enactment of certain legislation, the Senate can often exert substantial influence in the treaty negotiation process. **190**

If the Senate has approved the treaty with a reservation or amendment, it may be necessary to renegotiate portions of the treaty before the foreign country will ratify it. If the renegotiation is limited in scope, this ordinarily can be done in the form of a protocol. The Senate must approve ratification of a protocol by a two-thirds vote as if it were a separate treaty. An example of this situation is the 1975 U.K. income tax treaty, which was approved by the Senate in 1978 with a reservation. Because of the U.S. reservation, the United Kingdom refused to act on the ratification of the treaty until other modifications were made. A protocol incorporating these modifications was negotiated and transmitted to the Senate and the Parliament for approval.

The potential influence of the Senate in the treaty-making process can be illustrated by the following example. When deliberating the 1975 U.K. treaty, which included a provision-Article 9(4) **191** -prohibiting the states from using formulary apportionment in determining the state tax liability of U.K.-based multinationals, the Senate ratification was subject to the reservation "that the provisions of paragraph (4) of Article 9…shall not apply to any political subdivision or local authority of the United States." **192** The principal reason for the reservation was that some Senators objected to the executive branch's use of a tax treaty to "impose major changes in internal tax policy" by circumventing Congressional consideration of the states' use of formulary apportionment. **193** The reservation for all practical purposes eliminated the provision from the treaty, and the treaty partners subsequently entered into an exchange of notes removing the provision. **194**

# ¶ 1.04[1][b] Entry Into Force

If the Senate gives its advice and consent, the executive branch then prepares instruments of ratification. The President signs the treaty and the Statement of Ratification. Assuming a parallel process

is successfully completed under the laws of the prospective treaty partner, the treaty enters into force on the exchange of instruments of ratification **195** or, when each Contracting State has notified the other that its constitutional and statutory requirements for the treaty's entry into force have been completed. **196**

A treaty's provisions, however, generally do not take effect in respect of taxes immediately upon the treaty's entry into force. Rather, in the case of withholding taxes, the treaty's provisions generally apply to amounts paid or credited on or after the first day of the second month following the entry into force. Under certain treaties, however, this rule applies only if the treaty entered into force prior to July 1 of a year; if not, the treaty would not apply to such taxes until January 1 of the next year. **197** The withholding tax provisions of a few treaties have taken effect by their terms only for amounts paid or credited on or after January 1 of the year following the treaty's entry into force. **198** In the case of taxes not withheld at source, a treaty generally applies for taxable periods beginning on or after the January 1 next following its entry into force.

For example, **Article 29 of the 1981 U.S. Model Treaty** provided as follows:

> 1. This Convention shall be subject to ratification in accordance with the applicable procedures of each Contracting State and instruments of ratification shall be exchanged at ___ as soon as possible.
> 2. The Convention shall enter into force upon the exchange of instruments of ratification and its provisions shall have effect
>> a. in respect of taxes withheld at source, for amounts paid or credited on or after the first day of the second month next following the date on which the Convention enters into force;
>> b. in respect of other taxes, for taxable periods beginning on or after the first day of January next following the date on which the Convention enters into force.

**Article 28 of the 1996 U.S. Model Treaty** took a similar approach on effective dates but a somewhat different approach on entry into force. It provides as follows:

> 1. This Convention shall be subject to ratification in accordance with the applicable procedures of each Contracting State. Each Contracting State shall notify the other as soon as its procedures have been complied with.
> 2. The Convention shall enter into force on the date of the receipt of the later of such notifications, and its provisions shall have effect:
>> a. in respect of taxes withheld at source, for amounts paid or credited on or after the first day of the second month next following the date on which the Convention enters into force;
>> b. in respect of other taxes, for taxable periods beginning on or after the first day of January next following the date on which the Convention enters into force.

**Article 28 of the 2006 U.S. Model Treaty** introduced several procedural changes in both ratification and entry into force. It provides as follows:

1. This Convention shall be subject to ratification in accordance with the applicable procedures of each Contracting State. The Contracting States shall notify each other in writing, through diplomatic channels when their respective applicable procedures have been satisfied.

2. This Convention shall enter into force on the date of the later of the notifications referred to in paragraph 1 of this Article. The provisions of this Convention shall have effect:

> a. in respect of taxes withheld at source, for amounts paid or credited on or after the first day of the second month next following the date on which this Convention enters into force;

> b. in respect of other taxes, for taxable periods beginning on or after the first day of January next following the date on which this Convention enters into force.

**Article 29 of the 2016 U.S. Model Treaty** made still further changes, going back in some ways to the 1996 iteration. It provides as follows:

> 1. This Convention shall be subject to ratification in accordance with the applicable procedures of each Contracting State, and instruments of ratification will be exchanged as soon thereafter as possible.

> 2. The Convention shall enter into force upon the exchange of instruments of ratification and its provisions shall have effect

>> a. in respect of taxes withheld at source, for amounts paid or credited on or after the first day of the second month next following the date on which the Convention enters into force;

>> b. in respect of other taxes, for taxable periods beginning on or after the first day of January next following the date on which the Convention enters into force.

In the case of treaties that replace a prior treaty in effect between the two Contracting States, there typically are special transition rules. For example, **Article 37(2) of the U.S.-Netherlands treaty** , which entered into force on January 31, 1994, provided taxpayers the option to remain covered by the 1948 Treaty or elect to be covered by that treaty for the 1994 calendar year. Taxpayers could make their election on former IRS Form 1001; if no indication was made, the IRS treated the taxpayer as having elected to remain covered by the 1948 Treaty. **199** Similarly, **Article 27(4) of the U.S.-Russia treaty** provides:

> 4. Where any greater relief from tax would have been afforded to a person entitled to the benefits of the 1973 Convention under that Convention than under this Convention, the 1973 Convention shall, at the election of such person, continue to have effect in its entirety for the first taxable year with respect to which the provisions of this Convention would otherwise have effect under paragraph 2.

# ¶ 1.04[1][c] Proposals to Modify U.S. Treaty-Making Process

In 1992, the Tax Section of the American Bar Association prepared certain recommendations designed to improve the treaty-making process. These recommendations included the following: **200**

1. The Treasury should publish a new draft model treaty, with variations for treaties with "developing" or "new industrialized" countries. Alternatively, it should publish its working draft. (This recommendation was implicitly, and belatedly, adopted when Treasury issued a draft of **the 2016 U.S. Model Treaty** in 2015.)

2. Prior to the initiation of negotiations, the Treasury should announce to the public what issues are of particular concern to it in negotiating or renegotiating the treaty or protocol in question.

3. The Treasury should provide estimates of the revenue effect of a treaty, broken down in a meaningful way.

4. The Treasury should publish its Technical Explanation of any proposed treaty well in advance of any hearings before the Senate Foreign Relations Committee and the Senate Foreign Relations Committee should similarly publish its report in a timely manner. The hearings should not take place until at least six weeks after the reports have been made public.

Several commentators have suggested that because ratified tax treaties are equal in weight to national laws, the treaty-making process should be conducted with an openness more similar to that of the legislative process. **201** On the other hand, commentators have recognized factors that give some justification to the relatively restricted public access and participation in the treaty process. The two primary factors are as follows:

1. Other countries typically insist on some degree of confidentiality during the negotiation, and often their consent must be required before publicly discussing major issues and negotiating positions taken by them.

2. Disclosing U.S. negotiating positions and the priorities and reason attached to each would tend to undermine the U.S. negotiating position and generally prolong negotiations. **202**

One commentator **203** has proposed incorporating into the treaty-making process a system to solicit formal input from the House Ways and Means Committee of the House of Representatives before treaty negotiations end. The objective would be to make the House of Representatives more involved notwithstanding its Constitutional exclusion from the treaty-making process, **204** in an effort to make the House more reluctant to employ tax treaty overrides.

# ¶ 1.04[2] Bilateral Clarification and Modification

A number of procedures are available to the Contracting States for the purpose of clarifying or modifying income tax treaties.

# ¶ 1.04[2][a] Protocol

Protocols provide a means for treaty partners to modify or supplement a treaty that has either been

signed or ratified. For example, a protocol may be appropriate if the treaty is outdated in certain respects, such as where there have been changes in the tax law of either country since the existing treaty was negotiated. A protocol's entry into effect requires the same formalities as are required for treaties.

# ¶ 1.04[2][b] Exchange of Letters or Memorandum of Understanding

Sometimes called diplomatic notes, letters setting forth points agreed upon by the contracting states sometimes are exchanged at the time the treaty or protocol is signed. The letters contain clarification or explanation of the understanding of the treaty partners pertaining to certain provisions of the treaty or protocol. Alternatively, the treaty negotiators may agree to set forth their agreement on certain points, such as the manner in which a particular provision will be interpreted, in a memorandum of understanding accompanying the treaty. Typically, the letters or memorandum of understanding are sent to the U.S. Senate with the treaty or protocol and are approved along with the basic document.

# ¶ 1.04[2][c] Supplementary Convention

Supplementary conventions (supplementary treaties) are essentially protocols that contain extensive amendments to an existing treaty.

# ¶ 1.04[3] Unilateral Modification (Treaty "Overrides")

# ¶ 1.04[3][a] In General

In addition to bilateral modifications by way of protocols or supplementary conventions, treaty partners can, depending on their domestic law, also unilaterally modify treaty provisions by enacting or amending domestic statutes. A "treaty override" occurs when a Contracting State intentionally applies domestic law or regulation to accomplish specifically what a treaty forbids. [205] Although such unilateral modifications or overrides by way of domestic legislation are explicitly authorized under the domestic laws of numerous countries, they are generally perceived to be violations of the international law principle of *pacta sunt servanda*. [206]

The Vienna Convention on the Law of Treaties, [207] which embodies customary international law, is the primary international legal authority on the issue of the legality and propriety of unilateral treaty modifications by way of domestic legislation. [208] Article 26 of the Vienna Convention provides: "Every treaty in force is binding upon the parties to it and must be performed by them in good faith." Unilateral abrogation of a treaty by way of a domestic legislation, even if effective as a matter of domestic law, is a

violation of international law under the Vienna Convention **209** (although there is no prescribed or clearly effective sanction for such violations).

The OECD similarly stresses the priority of treaty obligations over domestic revenue laws. The OECD Committee on Fiscal Affairs has stated:

> [i]t can be said that under international law treaties have to be observed as long as they are valid, and unless they have been formally denounced. Domestic legislation (whether subsequent to signature or otherwise) or other reasons in no way affect the continuing existence of that treaty obligation. All other parties to a treaty are entitled to insist on compliance by a party not performing its obligation. **210**

The U.S. Congress has shown a readiness, despite protestations from the Treasury, to override U.S. treaty obligations to increase revenues, prevent perceived tax avoidance, and promote consistent treatment of all foreign persons in certain tax-sensitive areas. The U.S. law and policy relating to treaty overrides, and specific treaty overrides enacted by the United States, are discussed above. **211**

The American Law Institute's proposals in respect of U.S. income tax treaties (ALI Proposals) recommend against treaty overrides by U.S. legislative actions: "In recognition of its responsibilities under established principles of international law, the United States should not adopt a policy of implementing legislation in a manner that would constitute a breach of its obligations under income tax treaties." **212** The ALI Proposals suggest consultation with affected treaty partners before adopting legislation that conflicts with existing treaty obligations, and if adopted, rapid renegotiation, if possible, and otherwise, termination of the affected treaty or treaties. Moreover, the ALI Proposals recommend affirmative efforts to avoid conflicting legislation by tailoring substantive rules to avoid conflict, and incorporating into any conflicting legislation a provision that existing treaties prevail until they are modified or are terminated or, at least, postponing effective dates of any such legislation for a reasonable period during which affected treaties might be renegotiated. **213**

U.S. treaty partners have opposed recent treaty overrides by the United States. In 1987, the European Community Group of Six (Belgium, France, Federal Republic of Germany, Great Britain, Luxembourg, and the Netherlands) voiced strong objection to U.S. treaty overrides. Such overrides, according to the Group of Six, unilaterally impose standards that may be unrelated to economic realities pertaining in the Contracting States, undermine the basis of trust existing between the Contracting States, erode the certainty and security intended by international agreements, and ultimately pose the question whether a bilateral income tax treaty serves a useful purpose if it can be altered unilaterally at will. **214**

In 1989, the OECD Committee on Fiscal Affairs issued a report on tax treaty overrides criticizing intentional overrides enacted by domestic legislatures (using the FIRPTA as one example but without mentioning the United States by name). **215** The report recognized that Contracting States may change the meaning of a defined term used in the domestic tax law even if that also would change its meaning under a treaty. Nevertheless, the report adopted a firm position that Contracting States must abide by treaties under international law even though the treaty obligation may not be binding under domestic

law. The report noted that, if a Contracting State failed to abide by its treaty obligations, complete or at least partial termination of a treaty by the other Contracting State would be justified. The report recommended that all OECD member States not only avoid enacting legislation intended to override treaty obligations but also cooperate more closely in interpreting treaties. **216**

The domestic laws of major tax treaty partners of the United States have varying provisions with respect to the priority of treaty obligations over domestic law and the legality of treaty overrides.

The aggrieved treaty partner has limited remedies available to it in cases of legislative overrides. Besides the conveyance of a complaint through diplomatic channels, such as the memorandum of the Group of Six described above, the alternatives may be as few as entering into consultations with the treaty partner or seeking an International Court of Justice adjudication. Under international law, a State that has violated a legal obligation owed to another State may be required to terminate the violation and to make reparations, including, in appropriate circumstances, restitution or compensation for loss or injury. **217** Presumably, the relief sought in respect of a treaty override would be an injunction against the override and damages in the amount of any taxes attributable to the override. **218** That the violation may be "compelled or authorized by the State's domestic law" is not an acceptable defense. **219**

Under the Vienna Convention, a violation of a treaty may or may not be a material breach. A material breach occurs upon either an unsanctioned repudiation of the treaty or a violation of a provision "essential to the accomplishment of the object or purpose of the treaty." **220** An immaterial breach is more limited in its practical effect but nonetheless effects a result inconsistent with a provision of the treaty and conflicts fundamentally with a purpose of the treaty (i.e., engenders double taxation or inhibits exchanges of information that assist in the avoidance of tax evasion).

If a material breach has occurred the aggrieved treaty partner may terminate the treaty under its terms or suspend the operation of the treaty in whole or part. **221** The procedures for terminating a treaty in response to a material breach are set forth in articles 65, 66, and 67 of the Vienna Convention. Where the overridden provision does not convey an equal benefit to both parties, the aggrieved party may choose to suspend any other provision. **222** There is no reported instance of a partial termination in response to a material breach of an income tax treaty.

Under Article 45(b) of the Vienna Convention, a nonbreaching State cannot terminate or suspend a treaty if, by its own conduct, it acquiesced to the continued validity of the treaty. Consequently, a nonbreaching State must take timely action under Article 60 or lose the right to take action at all. As long as the nonbreaching party continues the process of contesting by means of official protest and negotiation, it neither acquiesces in the breach nor waives its rights under Article 60.

In 1992, the American Bar Association's Tax Section (ABA) made recommendations about how treaty overrides might be addressed by a treaty's arbitration procedure. The ABA recommended that (1) any arbitration provision should require that a formal complaint be filed within a specified period of time (e.g., ninety days) after the purportedly overriding legislation has been passed; (2) all actions must be initiated by government representatives; and (3) "complaints should be broad-based with determinations made

as to the effect of a law on all taxpayers in a treaty country rather than on taxpayers on an individual basis." **223** The ABA warned that granting individual taxpayers access to this forum to seek resolution of individual issues could render it virtually useless in resolving override disputes between the Contracting States. **224** The ABA further suggested that because the effect of an override may be difficult to analyze and quantify, the arbitration provision might provide only a general description of the remedies available, with broad discretion regarding the form and extent of the remedy allowed to the arbitrators. "Such remedies could include the suspension of a treaty provision or the implementation of a symmetrical provision to provide a commensurate amount of relief." **225**

Unfortunately, the arbitration provisions that have been included in U.S. income tax treaties likely would not permit disputes regarding a Contracting State's treaty-overriding legislation to be resolved by arbitration (see the treaties with France, Germany, Mexico, and the Netherlands, and the 1995 protocol with Canada). In each case, the "competent authorities will not generally accede to arbitration with respect to matters concerning the tax policy or domestic tax law" of either Contracting State. **226**

# ¶ 1.04[3][b] Renegotiation (Anti-Override) Provisions

A provision intended to address treaty overrides has been incorporated into a number of recent U.S. income tax treaties. While the exact wording and commitments differ slightly in each of the treaties, the override provisions generally provide that when a change in the domestic laws or policies of one Contracting State eliminates or significantly limits a treaty benefit, the competent authority of the other State may request consultations to modify the treaty with a view to restoring the balance of benefits. In connection with the **U.S.-Mexico treaty**, the Treasury has acknowledged that such a provision "was included at the request of Mexico to address the possibility of U.S. legislative provisions overriding one or more treaty provisions." **227**

A typical provision is Article 17 of the 1995 Canadian protocol, **228** which reads as follows:

> The appropriate authority of a Contracting State may request consultations with the appropriate authority of the other Contracting State to determine whether a change to the Convention is appropriate to respond to changes in the law or policy of that other State. Where domestic legislation enacted by a Contracting State unilaterally removes or significantly limits any material benefit otherwise provided by the Convention, the appropriate authority shall promptly consult for the purpose of considering an appropriate change to the Convention.

The U.S. treaties with, for example, Israel, Mexico, and the Netherlands each includes a similar article. **229**

**Article 29(6) of the U.S.-Netherlands treaty** requires the overriding party to enter into negotiations or consultations to modify the treaty within six months after receiving a request to do so because a legislative override has reduced the other party's treaty benefits. Article 20 of the 1992 **protocol to the**

**U.S.-Mexico treaty** requires consultations to begin within three months, and furthermore, if a modification satisfactory to both parties cannot be attained to restore the balance of benefits, the affected State may terminate the treaty in accordance with the procedures of the treaty, notwithstanding a provision that the treaty shall not be terminated with the initial five-year period after entering into force.

Although not motivated at the time by concerns about treaty overrides, Canada and the United States had agreed under the 1980 treaty to consult to amend their treaty should changes in domestic laws realign the existing balance of benefits. By a **side letter to the 1983 protocol to the 1980 treaty**, the parties agreed to promptly renegotiate the limit imposed by the treaty on the statutory rate of tax on natural resource royalties paid to non-residents should either party increase that rate by subsequent legislation. **230**

## ¶ 1.04[4] Extensions to Territories

**The current OECD Model Treaty** permits the extension of the treaty coverage to territories of a Contracting State. **231** Similarly, several early U.S. income tax treaties entered into in the post-World War II era, such as the treaties with Belgium, the Netherlands, and the United Kingdom, provided for extension to overseas territories of the U.S. treaty partner. **232** The 1948 Netherlands treaty was formally extended in 1955 to cover the Netherlands Antilles. **233** The 1948 Belgium treaty was extended in 1957 to cover former Belgian territories. **234** Similarly, the 1945 U.K. treaty was extended in 1958 to cover former British territories. **235** However, between 1983 and 1984, the United States terminated nearly all these treaty extensions as part of an effort to curb treaty shopping. **236**

As a general rule, U.S. tax treaties do not apply to U.S. overseas territories such as Puerto Rico, Guam, or the U.S. Virgin Islands. Since 1996 each U.S. model treaty has explicitly excluded such overseas territories from the definition of "United States." **237** Perhaps due to the fact that treaty extensions covering additional U.S. territories require Senate advice and consent under domestic U.S. law, the U.S. model treaties do not contain a provision permitting extension to U.S. territories.

## ¶ 1.04[5] Termination or Replacement

## ¶ 1.04[5][a] Treaty Language

U.S. income tax treaties usually provide for an indefinite duration as well as a mechanism for termination and a date as of which the treaty will cease to have effect if the termination provision is triggered. **Article 29 of the 1981 U.S. Model Treaty** provided as follows:

This Convention shall remain in force until terminated by a Contracting State. Either Contracting State may terminate the Convention at any time after 5 years from the date on which the Convention enters

into force, provided that at least 6 months prior notice of termination has been given through diplomatic channels. In such event, the Convention shall cease to have effect

> a) in respect of taxes withheld at source, for amounts paid or credited on or after the first day of January next following the expiration of the 6 months period;
> b) in respect of other taxes, for taxable periods beginning on or after the first day of January next following the expiration of the 6 months period.

The **1981 U.S. Model Treaty** was withdrawn on July 17, 1992, and **the 1996 U.S. Model Treaty** was released on September 20, 1996. As to termination, see Articles 29 of the 1996 and 2006 models (identical) and 30 of **the 2016 U.S. Model Treaty** (identical save for the addition of a statement that the Convention itself-as opposed to its effect on certain taxable events and periods-terminates immediately upon notification).

# ¶ 1.04[5][b] Commentary and Discussion of Legal Authorities

In general, treaties provide for their continuation for an indefinite duration, coupled with a mechanism for termination effective at a specified point following notice by either party.

For example, the 1949 Irish treaty, **238** 1939 Swedish treaty, **239** , and 1948 Netherlands treaty **240** provided for the early termination of the Dividends article, and the Belgian, Egyptian, and Norwegian treaties provide for the early termination of the Social Security article. **241**

Terminations of U.S. income tax treaties have included the termination of the extensions of the U.K., Belgian, and Dutch treaties to their respective territories. **242**

The 1987 termination of most of the provisions of the Netherlands treaty as extended to Aruba and the Netherlands Antilles **243** had an interesting history. Because of concern among U.S. officials about the widespread use of the Netherlands Antilles treaty by third-country investors seeking to avoid U.S. tax on real estate and securities investments and because the "portfolio interest" exception to interest withholding, which was enacted in 1984, made the Netherlands Antilles relatively obsolete as a route for U.S. issuers to borrow money overseas, the United States initially delivered a notice to the Netherlands on June 29, 1987, declaring the treaty (as so extended) to be terminated in its entirety effective January 1, 1988. **244** This termination notice permitted many U.S. issuers of debt obligations in the Eurodollar market to exercise call-rights under the obligations (calls were permitted in order to avoid a gross-up obligation). Because interest rate levels had fallen since many of the bonds had been issued, investors were extremely unhappy with this turn of events.

Responding to pressure, the United States modified the termination notice on July 10, 1987, to make it applicable only to the Interest article and ancillary provisions. **245** There was some uncertainty concerning the legal efficacy of this modification. The situation was resolved when, on September 5,

1987, the Governments of the United States, the Netherlands, Aruba and the Netherlands Antilles agreed that the treaty would be terminated effective January 1, 1988, for all provisions other than the Interest article and ancillary provisions, which would continue in force **246** until the last Eurobond issued prior to June 22, 1984, had expired and that the United States could not change its tax laws in a way that would adversely affect the revenue derived by the Netherlands Antilles from such Eurobonds. **247** Thus, under this arrangement, the Interest article under the treaties with the Netherlands Antilles and Aruba remained available for taxpayers, even with respect to new loans, for so long as any such Eurobond continued to be outstanding.

On September 15, 1995, the Treasury announced an agreement with the Netherlands Antilles concerning a protocol under which the Interest article exemption could continue to apply only to interest paid with respect to debt instruments issued on or before October 15, 1984, by a U.S. person to a related controlled foreign corporation that was in existence before that date, the principal purpose of which consisted of issuing debt obligations or holding short-term obligations and lending the proceeds to affiliates. **248** By its terms, the protocol was to enter into force on the later of June 30, 1986, or the exchange of instruments of ratification; the protocol in fact entered into force on December 30, 1996. The Treasury also announced on September 15, 1995, that it had notified Aruba that the United States intended to terminate the **U.S.-Aruba treaty** , effective January 1, 1997. **249**

The unilateral termination of the South African treaty by the United States raises an interesting question concerning the rules of the Senate and the executive branch of the government with respect to treaty terminations. On October 2, 1986, the Senate voted to override President Reagan's veto of the Comprehensive Anti-Apartheid Act. This legislation, among other things, required on its face that the Secretary of State terminate the South African treaty. On October 31, 1986, the State Department announced that notification had been given, and the treaty was terminated, pursuant to its terms, on July 1, 1987 (the July 1 following the end of a six-month period beginning with the official notification). **250** It is not clear whether the State Department could, if it had so determined, have declined to terminate the treaty on the theory that while the U.S. Constitution requires the advice and consent of the Senate for the ratification of a treaty, it might not permit Congress to unilaterally determine whether a treaty should be terminated. **251** On the other hand, under the Constitution, Congress is permitted to enact legislation that is inconsistent with and even expressly overrides treaty obligations; hence, it must be acknowledged that any distinction would be somewhat formalistic.

On November 16, 1995, the IRS announced that it was unilaterally terminating **the U.S.-Malta treaty** , effective January 1, 1997.

## ¶ 1.04[6] Lists of Currently Effective, Pending, and Terminated or Superseded Treaties

## ¶ 1.04[6][a] Treaties Currently in Force

As of May 1, 2020, income tax treaties (some with accompanying protocols or later protocols) between the United States and the following countries are in force:

| Country | Date Signed | Date of Most Recent Subsequent and/or Independent Protocol |
|---|---|---|
| **Australia** | August 6, 1982 | September 27, 2001 |
| **Austria** | May 30, 1996 | — |
| Bangladesh | September 26, 2004 | — |
| **Barbados** | December 31, 1984 | July 14, 2004 |
| **Belgium** | November 27, 2006 | — |
| **Bermuda** | July 11, 1986 | — |
| **Bulgaria** | February 23, 2007 | February 26, 2008 |
| **Canada** | September 26, 1980 | September 21, 2007 |
| **China** | April 30, 1984 | — |
| **Cyprus** | | |

                      March 19, 1984      —


**Czech Republic**
             September 16, 1993  —


**Denmark**
                  May 2, 2006        —


**Egypt**
                    August 24, 1980      —


**Estonia**
                  January 15, 1998    —


 **Finland**
                  March 6, 1970        —


**France**
                  January 13, 2009      —


**Germany**
                  June 1, 2006        —


**Greece**
                   February 20, 1950   April 20, 1953


**Hungary**
                  February 12, 1979   —

Iceland                    December 15, 2008     —


**India**
                   September 12, 1989  September 12, 1989

**Indonesia**

                July 11, 1988      July 11, 1988


 **Ireland**

                July 28, 1997    July 28, 1997  —


 **Israel**

                November 20, 1975   January 26, 1993


 **Italy**

                August 25, 1999    August 25, 1999


 **Jamaica**

                May 21, 1980      July 17, 1981


 **Japan**

                November 6, 2003    November 6, 2003 (entered into force August 30, 2019)


 **Kazakhstan**

                October 25, 1993   —


 **Korea (South)**

                June 4, 1976        —


 **Latvia**

                January 15, 1998    —


 **Lithuania**

                January 15, 1998   —


 **Luxembourg**

                April 3, 1996      ; September 20, 2019

**Malta**

              August 8, 2008       —

 **Mexico**

                         September 18, 1992  November 26, 2002

**Morocco**

                    August 1, 1977       —

**Netherlands**

                  December 18, 1992   October 13, 1993

**New Zealand**

                  July 23, 1982        December 1, 2008

**Norway**

                    December 3, 1971    September 19, 1980

**Pakistan**

                    July 1, 1957        —

**Philippines**

                  October 1, 1976      —

**Poland**

                    October 10, 1974    —

**Portugal**

                    September 15, 1994  September 15, 1994

**Romania**

December 4, 1973    —

**Russia**

June 17, 1992      June 17, 1992

**Slovak Republic**

October 8, 1993     —

**Slovenia**

June 21, 1999      —

**South Africa**

February 17, 1997   —

**Spain**

February 22, 1990   February 22, 1990; August 27, 2019

**Sri Lanka**

March 14, 1985      September 20, 2002

**Sweden**

September 1, 1994   —

**Switzerland**

October 2, 1996     October 2, 1996; September 20, 2019

**Thailand**

November 26, 1996   —

**Trinidad and Tobago**

January 9, 1970     —

**Tunisia**

June 17, 1985        October 4, 1989

**Turkey**

March 28, 1996       March 28, 1996

**Ukraine**

March 4, 1994        March 4, 1994

**Union of Soviet**

**Socialist Republics**

June 20, 1973          —

**United Kingdom**

July 24, 2002            —

**Venezuela**

January 25, 1999       —

The treaty with the former Soviet Union has been replaced, in the case of Russia, by the **U.S.-Russia treaty** , but remains in effect for the other former Soviet Republics. **252** Thus, the **U.S.-USSR treaty** remains in effect for the following countries: Armenia, Azerbaijan, Belarus, Georgia, Kyrgyzstan, Moldova, Tajikistan, Turkmenistan, and Uzbekistan. **253**

In addition, in the case of the treaty with the Netherlands Antilles, the Interest article and so much of the remainder of the treaty as is ancillary to such article (subject to a 1996 protocol) remain in force for certain pre-October 16, 1984 instruments, as discussed above.

On the heels of the enactment of the Foreign Account Tax Compliance Act, which introduced a 30 percent U.S. withholding tax on certain payments made to foreign financial institutions and other entities unless certain disclosures are made in respect of their owners and/or account holders, the United States has entered into a number of intergovernmental agreements (IGAs) designed to mitigate or eliminate that withholding under prescribed circumstances. As of September 1, 2019, IGAs had been signed or substantially agreed between the United States and the following countries:

Algeria
Angola

Anguilla

Antigua and Barbuda

Armenia

Australia

Austria

Azerbaijan

Bahamas

Bahrain

Barbados

Belarus

Belgium

Bermuda

Brazil

British Virgin Islands

Bulgaria

Cabo Verde (agreement in substance)

Cambodia

Canada

Cayman Islands

Chile (signed)

China (agreement in substance)

Colombia

Costa Rica (signed)

Croatia

Curaçao

Cyprus

Czech Republic

Denmark

Dominica

Dominican Republic

Estonia

Finland

France

Georgia

Germany

Gibraltar

Greece

Greenland

Grenada

Guernsey

Guyana

Haiti (agreement in substance)

Holy See

Honduras

Hong Kong

Hungary

Iceland

India

Indonesia (agreement in substance)

Iraq (agreement in substance)

Ireland

Isle of Man

Israel

Italy

Jamaica

Japan (in effect)

Jersey

Kazakhstan (signed)

Korea (South)

Kosovo

Kuwait

Latvia

Liechtenstein

Lithuania

Luxembourg

Macau (signed)

Malaysia (agreement in substance)

Malta

Mauritius

Mexico

Moldova

Montenegro

Montserrat

Netherlands

New Zealand

Nicaragua (agreement in substance)

Norway

Panama

Paraguay (agreement in substance)

Peru (agreement in substance)

Philippines (signed)

Poland

Portugal

Qatar

Romania

St. Kitts - Nevis

St. Lucia

St. Vincent and Grenadines

San Marino

Saudi Arabia

Serbia

Seychelles (signed)

Singapore (in force; superseding version signed)

Slovak Republic

Slovenia

South Africa

Spain

Sweden

Switzerland

Taiwan (signed between American Institute and Taipei Economic and Cultural Representative Office)

Thailand (signed)

Trinidad and Tobago

Tunisia

Turkey (signed)

Turkmenistan

Turks and Caicos Islands

Ukraine

United Arab Emirates

United Kingdom

Uzbekistan

Vietnam

# ¶ 1.04[6][b] Pending Treaties That Have Not Yet Come Into Force

The United States has also signed new income tax treaties or protocols with the following countries, which, as of May 1, 2020 are in the process of ratification:

*Country*        *Date Signed*

```
Chile (treaty)
        February 4, 2010


Finland (Treaty)
        February 4, 2010

Hungary (Treaty)          February 4, 2010

 Poland (treaty)      February 13, 2013
Vietnam (treaty and protocol)     July 7, 2015
```

As of May 1, 2020, income tax treaties (or protocols to existing treaties) between the United States and the following countries are understood to be or about to be under negotiation, with varying degrees of activity:

Algeria

Argentina

Armenia

Azerbaijan

Belarus ****

Brazil

Colombia

Croatia

Ireland

Israel

Korea

Kuwait

Kyrgyzstan

Luxembourg

Malaysia

Moldova

Netherlands

Norway

Pakistan

Romania

Singapore

Taiwan

Trinidad and Tobago

United Kingdom

Uzbekistan

# ¶ 1.04[6][c] Terminated Treaties (not replaced)

Income tax treaties between the United States and the following countries have been terminated:

| Country | Date Terminated | Effective Date |
|---|---|---|
| **Anguilla** | June 30, 1983 | January 1, 1984 |
| **Antigua and Barbuda** | February 26, 1983 | August 26, 1983 |
| **Aruba** | | |
| <a> | June 29, 1987 | January 1, 1988 |
| | September 15, 1995 | January 1, 1997 |
| **Belize** | July 1, 1983 | January 1. 1984 |
| **British Virgin Islands** | June 30, 1983 | January 1. 1983 |
| **Burundi** | February 26, 1983 | January 1. 1984 |
| **Dominica** | July 1, 1983 | January 1. 1984 |
| **Falkland Islands** | July 1, 1983 | January 1. 1984 |
| **Gambia** | July 1, 1983 | January 1. 1984 |

**Grenada**

     July 1, 1983     January 1. 1984

**Malawi**

     July 1, 1983     January 1. 1984

**Malta**

     November 16, 1995     January 1, 1997

**Montserrat**

     June 30, 1983     January 1. 1984

**Netherlands Antilles**

<a>  June 29, 1987     January 1. 1988
     September 15, 1995     December 30, 1996

**Rwanda**

     June 30, 1983     January 1, 1984

**St. Christopher-Nevis**

 June 30, 1983     January 1, 1984

**St. Lucia**

     June 30, 1983     January 1, 1984

**St. Vincent/Grenadines**

 June 30, 1983     January 1, 1984

**Seychelles**

     June 30, 1983     January 1, 1984

**Sierra Leone**

     June 30, 1983     January 1, 1984

**Zaire**                        June 30, 1983                 January 1, 1984

**Zambia**                       June 30, 1983                 January 1, 1984

_____

*Notes*  <a> Article VIII (Interest) remained in force after December 1, 1987. Effective September 15, 1995,

**Article VIII**
  was
further limited, applying only to interest paid to U.S.-owned companies on certain debt issued on or before October 15, 1984.  At the same time, Treasury announced the termination of the remaining provisions with Aruba.

Many of the above countries were former colonies or territories of Belgium, the Netherlands, and the United Kingdom. The treaties resulted from extensions of treaties with the parent countries, which were generally terminated by notice issued on June 30, 1983.

**183** "[The President] shall have power, by and with the advice and consent of the Senate to make treaties, provided two thirds of the Senators concur." U.S. Constitution, art. II, Section 2, Clause 2. See also Tribe, American Constitutional Law § 4-5 , § 4-5; American Law Inst., Federal Income Tax Project: International Aspects of United States: Income Taxation II-Proposals of the American Law Institute on United States Income Tax Treaties, pp. 15-25.

**184** "All bills for raising revenue shall originate in the House of Representatives, but the Senate may propose or concur with amendments as on other bills." U.S. Constitution, art. I, Section 7.

**185** Letter from Secretary of the Treasury Donald T. Regan to Chairman Rostenkowski, House Ways and Means Committee, dated February 22, 1982, cited in American Law Inst., Federal Income Tax Project: International Aspects of United States: Income Taxation II-Proposals of the American Law Institute on United States Income Tax Treaties, at 16, n.46.

**186** See **Senate Foreign Relations Committee Report** , S. Exec. Rep. No. 96-5, U.S.-U.K. treaty, 96th Cong., 1st Sess., Appendix C, Written Responses by Witnesses (Response to Question 5 to

Assistant Secretary for Tax Policy Donald C. Lubick). Various versions of the U.S. model have been in effect over the past several decades, notably those published in 1981, 1996, 2006 and 2016.

**187** See **Introduction to Technical Explanation, 1996 U.S. Model Treaty** .

**188** See generally Osgood, "Interpreting Tax Treaties in Canada, the United States, and the United Kingdom," 17 Cornell Int'l LJ 225 (1984).

**189** See Rosenbloom, Current Developments in Regard to Tax Treaties, 40th annual NYU Institute on Taxation § 31.02.

**190** Rosenbloom, Current Developments in Regard to Tax Treaties, 40th annual NYU Institute on Taxation, § 31.20 (referring to the Panama Canal treaties).

**191 Article 9(4) of the 1975 U.K. treaty** , as originally signed, read: "Except as specifically provided in this Article, in determining the tax liability of an enterprise doing business in a Contracting State, or in a political subdivision or local authority of a Contracting State, such Contracting State, political subdivision, or local authority shall not take into account the income, deductions, receipts, or outgoings of a related enterprise of the other Contracting State or of enterprise to any third State related to an enterprise of the other Contracting State." TIAS 9682, 31 UST 5670.

**192** 124 Cong. Rec. 18416 (1978).

**193** Remarks of Senator Frank Church (D. Idaho).

**194** See U.K. Diplomatic Notes, dated April, 13, 1976.

**195** See 1997 OECD Model Treaty (as amended through January 28, 2003), art. 30(2); **1996 U.S. Model Treaty, art. 28(2)** ; **2016 U.S. Model Treaty, art. 29(2)** .

**196** See, e.g., **1992 Mexico, art. 29(1)** .

**197** E.g., **Mexico, art. 29(2)(a)** .

**198** See **Portugal, art. 30(2)** .

**199** See Turro, "U.S. Residents Must Elect To Be Covered Under the New Netherlands Treaty for

1994," 9 Tax Notes Int'l. 1442 (May 30, 1994), citing IRS International Tax Forum, Spring 1994, Publication 1392, p. 6.

**200** American Bar Association Section of Taxation, Committee on U.S. Activities of Foreigners and Tax Treaties, "Issues Paper on the Tax Treaty Making Process," 46 Tax Law. 477, 482 (1993) (hereafter ABA Issues Paper).

**201** See, e.g., Karlin, "Diplomatic Silence: The Secrecy Shrouding Tax Treaty Making Should Be Lifted," 5 Tax Notes Int'l J. 93 (1992).

**202** Rosenbloom & Langbein, "United States Treaty Policy: An Overview," 19 Colum. J. Transnat'l L. 359, 405 (1981).

**203** Mendoza, "The U.S. and Mexico Tax Treaty: Long Overdue but Falling Short of Its Potential," 17 Hous. J. Int'l L. 27, 46 (1994) (hereafter Mendoza).

**204** See generally Henkin, "Treaties in a Constitutional Democracy," 10 Mich. J. Int'l L. 406 at 408-423 (1989) as cited in Mendoza, "The U.S. and Mexico Tax Treaty: Long Overdue but Falling Short of Its Potential," 17 Hous. J. Int'l L. 27, 46 (1994), at ns. 107, 108.

**205** The OECD Committee on Fiscal Affairs Report on Tax Treaty Overrides (1989), reprinted at 90 TNT 7-13 (1990), at 27-28, lists several other types of possible overrides, including interpretative, definitional, and inadvertent overrides, which may have the same effects as treaty overrides proper.

**206** See Restatement (Third) Foreign Relations Law of the United States (1987), §§ 115 cmt b, 311(3), 321 cmt a.

**207** Vienna Convention on the Law of Treaties, opened for signature May 23, 1969, 8 International Legal Materials 679, entered into force January 27, 1980. The U.S. Senate has never ratified the Vienna Convention, but the State Department nevertheless noted that "the Convention is already generally recognized as the authoritative guide to current treaty law and practice." S. Exec. Doc. L., 92d Cong., 1st Sess. (1971) p. 1.

**208** Vienna Convention, art. 27.

**209** Vienna Convention, art. 27.

**210** OECD Committee on Fiscal Affairs Report on Tax Treaty Overrides (1989), reprinted at 90 TNT

7-13 (1990).

**211** See ¶ **1.03[1][a][ii]** .

**212** See American Law Inst., Federal Income Tax Project: International Aspects of United States: Income Taxation II-Proposals of the American Law Institute on United States Income Tax Treaties, at 77.

**213** See American Law Inst., Federal Income Tax Project: International Aspects of United States: Income Taxation II-Proposals of the American Law Institute on United States Income Tax Treaties, at 73-78. An example of a deferred effective date was the FIRPTA legislation. See Foreign Investment Real Property Tax Act of 1980, Pub. L. No. 96-499, § 1125(c), amended, Pub. L. No. 97-34, § 831(h).

**214** Memorandum of the European Community Group of Six (Belgium, France, Federal Republic of Germany, Great Britain, Luxembourg, the Netherlands), reprinted at 36 Tax Notes 437.

**215** OECD Committee on Fiscal Affairs Report on Tax Treaty Overrides (1989), reprinted at 2 Tax Notes Int'l 25, 26 (1990), at 25.

**216** OECD Committee on Fiscal Affairs Report on Tax Treaty Overrides (1989), reprinted at 2 Tax Notes Int'l 25, 26 (1990) at 25. The chairman of the Finance Committee of the German Bundestag, Hans H. Gattermann, also wrote to express strong displeasure at recent U.S. treaty overrides. Gattermann, "U.S. Tax Treaty Overrides Are Unacceptable," 2 Tax Notes Int'l 1238 (1990). According to Mr. Gattermann, it is "unacceptable that by amending its national tax laws a nation overrides bilateral tax treaties it has concluded," because an act constitutes a serious act in contravention of a carefully balanced system of international taxation, a system necessary to ensure the predictability of the tax incidents on international trade and investment (at 1310).

**217** Restatement (Third) Foreign Relations Law of the United States (1987), § 901.

**218** See Doernberg, "Overriding Tax Treaties: The U.S. Perspective," 9 Emory Int'l L. Rev. 71, 121-127 (Spring 1995); Doernberg, "Legislative Override of Income Tax Treaties: The Branch Profits Tax and Congressional Arrogation of Authority," 42 Tax Law. 173 (1989). See also ¶ **1.03[1][a][iv]** .

**219** Restatement (Third) Foreign Relations Law of the United States (1987), § 901 cmt. a.

**220** Vienna Convention, art. 60(3).

**221** Vienna Convention, art. 60(1).

**222** Vienna Convention, art. 60(1); see, Kirgis, "Some Lingering Questions About Article 60 of the Vienna Convention on the Law of Treaties," 22 Cornell Int'l L.J. 549 at 563-564 for a discussion of the revision of Article 60 which previously contained a reference to pure reciprocity as a basis in cases of retaliatory partial suspension and the implications of its deletion. See also Doernberg, "Selective Termination or Suspension of Income Tax Treaty Provisions," available electronically at 91 TNT 2-28, LEXIS, Fedtax Library, TNI File (Jan. 9, 1991), for a discussion of parameters that ought to be considered to obtain a condition of proportionality in partial terminations.

**223** American Bar Association Section of Taxation, Committee on U.S. Activities of Foreigners and Tax Treaties, "Issues Paper on the Tax Treaty Making Process," 46 Tax Law. 477 (1993) , at 503-506.

**224** American Bar Association Section of Taxation, Committee on U.S. Activities of Foreigners and Tax Treaties, "Issues Paper on the Tax Treaty Making Process," 46 Tax Law. 477, 1993), at 504.

**225** American Bar Association Section of Taxation, Committee on U.S. Activities of Foreigners and Tax Treaties, "Issues Paper on the Tax Treaty Making Process," 46 Tax Law. 477, 1993), at 505.

**226** See, e.g., **Germany Exchange of Notes dated August 29, 1989** ; **Joint Committee on Taxation, Explanation of 1994 U.S.-France treaty** .

**227** Treas. Technical Explanation, U.S.-Mexico treaty.

**228** The referenced **Canadian protocol** has been ratified.

**229 Israel, art. 6(8)** ; **Mexico, 1992 protocol, art. 20; Netherlands, art. 29(6)** .

**230 Side Letter to 1983 Protocol, Treas. Dep't Release R-2207 (June 24, 1983)** .

**231** OECD Model Treaty (as amended through January 8, 2002), art. 28.

**232** See Rhoades & Langer, Income Taxation of Foreign Related Transactions, § 9.01(6).

**233 Netherlands (1948), protocol** signed June 15, 1955. The Extension was terminated effective January 1, 1982. Treas. Dept. News Release, B-1046, n. 2321 (July 10, 1987).

**234** See Rhoades & Langer, Income Taxation of Foreign Related Transactions, § 9.01[6].

**235** See Annex to the note from British Ambassador to the **U.S. Secretary of State dated August 19, 1957** , and reply in acceptance from the U.S. Secretary of State to the British Ambassador dated December 3, 1958.

**236** See Treas. Rel. R-2222 (July 1, 1983), available from Tax Notes Microfiche Data Base as Doc. 83-6378.

**237** 1996 U.S. Model Treaty, art. 3(l)(f); **2006 U.S. Model Treaty, art. 3(1)(i)** ; **2016 U.S. Model Treaty, art. 3(1)(i)** .

**238 Senate Foreign Relations Committee Report** , S. Exec. Rep. No. 96-5, U.S.-U.K. treaty, 96th Cong., 1st Sess., Appendix C, Written Responses by Witnesses (Response to Question 5 to Assistant Secretary for Tax Policy Donald C. Lubick).

See **art. VI** . The 1949 U.S.-Ireland treaty was replaced by the **1997 U.S.-Ireland treaty** .

**239** See **art. VIII** . The 1938 U.S.-Sweden treaty was replaced by the **1994 U.S.-Sweden treaty** .

**240** See **art. VII (1948)** . The 1948 U.S.-Netherlands treaty was replaced by the **1992 U.S.-Netherlands treaty** .

**241 Belgium (1970) art. 31(2) Egypt (1980), art. 32(2) Norway (1971), art. 32(2)** .

**242** Treas. Rel. R-2222, (July 1, 1983), available from Tax Notes Microfiche Data Base as Doc. 83-6378.

**243** Supplementary **protocol to U.S.-Netherlands treaty** , signed June 15, 1955, extending the treaty provisions to the Netherlands Antilles (Dutch West Indies). When Aruba was granted its independence from the Netherlands Antilles in 1986, the treaty was separately extended to Aruba.

**244** See Note from Abraham D. Sofaer, for the U.S. Secretary of State to Richard H. Fein, Ambassador of the Kingdom of the Netherlands, dated June 29, 1987, available electronically at 91 TNT 159-75, Lexis, Fedtax Library (July 30, 1991).

**245** See Note from Abraham D. Sofaer, for the U.S. Secretary of State to Richard H. Fein,

Ambassador of the Kingdom of the Netherlands, dated June 29, 1987, available electronically at 91 TNT 159-75, Lexis, Fedtax Library (July 30, 1991).

**246** See **Rev. Rul. 87-79, 1987-1 CB 334** .

**247** See Exchange of Notes between Richard H. Fein, Ambassador of the Kingdom of the Netherlands (Sept. 11, 1987) and George P. Shultz, U.S. Secretary of State (Oct. 2, 1987), available electronically at 91 TNT 159-75, Lexis, Fedtax Library (July 30, 1991).

**248** Treasury News Release RR-564, Sept. 15, 1995, available on Tax Analysts Microfiche as DOC 95-8600.

**249** Treasury News Release RR-564, Sept. 15, 1995, available on Tax Analysts Microfiche as DOC 95-8600.

**250** See Treasury Announcement, available electronically at 86 TNT 220-6, LEXIS, Fedtax Library, TNT File (Nov. 4, 1986).

**251** Accord 6 J. Ross Macdonald, Annotated Guide to U.S. Income Tax Treaties (P-H Law & Business 1993), at 5135.

**252** Treas. Dep't News Release LB-561 (Dec. 22, 1993).

**253** Ukraine, an additional former Soviet Republic to which the former U.S.-U.S.S.R. treaty applied before that country entered into its own treaty with the United States, was listed together with those appearing in the text in **Rev. Proc. 93-22A, 1993-2 CB 343** .

© 2021 Thomson Reuters/Tax & Accounting. All Rights Reserved.

Checkpoint Contents
  International Tax Library
    WG&L International Treatises
      Andersen: Analysis of United States Income Tax Treaties
        Chapter 2: Scope and General Rules
          ¶2.04. Undefined Terms

# ¶ 2.04 Undefined Terms

Nearly all U.S. income tax treaties include a provision concerning the interpretation of terms not defined in the treaty.

# ¶ 2.04[1] Treaty Language

**Article 3(2) of the 1981 U.S. Model Treaty** provided as follows:

> 2. As regards the application of the Convention by a Contracting State any term not defined therein shall, unless the context otherwise requires or the competent authorities agree to a common meaning pursuant to the provisions of Article 25 (Mutual Agreement Procedure), have the meaning which it has under the laws of that State concerning the taxes to which the Convention applies.

The treaty provisions in Table 2-19 are to similar effect (with significant variations noted).

# Table 2-19

Australia (art. 3(1)(k)(vi)(2)) <a>
**Austria (art. 3(2))**
**Bangladesh (arts. 3(2)**
**Barbados (art. 3(2))**
**Belgium (art. 3(2))** <d>
**Bermuda (art. 1(2))**
Bulgaria (art. 3(2)) <d>
**Canada (art. 3(2))** <d>
**China (art. 3(2))** <a>
**Cyprus (art. 2(2))** <b>
**Czech Rep. (art. 3(2))**
**Denmark (art. 3(2))** <d>
**Egypt (art. 2(2))** <b>

Estonia (art. 3(2)) <d>

Finland (art. 3(2))

France (art. 3(2))

Germany (art. 3(2))

Greece (art. II(2)) <a>

Hungary (art. 3(2))

Iceland (art. 3(2)) <d>

India (art. 3(2))

Indonesia (art. 3(2)) <b>

Ireland (art. 3(2))

Israel (art. 2(2)) <b>

Italy (art. 3(2)) <a>

Jamaica (art. 3(2))

Japan (art. 3(2)) <d>

Kazakhstan (art. 3(2)) <b>

Korea (art. 2(2)) <b>

Latvia (art. 3(2)) <d>

Lithuania (art. 3(2)) <d>

Luxembourg (art. 3(2))

Malta (art. 3(2)) <e>

Mexico (art. 3(2)) <a>

Morocco (art. 2(2)) <a>

Netherlands (art. 3(2))

Netherlands Antilles (art. 3(2)) <a>, <c>

New Zealand (art. 3(3)) <e>

Norway (art. 2(2)) <b>

Pakistan (art. II(2)) <a>

Philippines (art. 2(2)) <b>

Poland (art. 3(2)) <b>

Portugal (art. 3(2)) <a>

Romania (art. 2(2)) <b>

Russia (art. 3(2))

Slovak Rep. (art. 3(2))

Slovenia (art. 3(2)) <d>

South Africa (art. 3(2)) <d>

Spain (art. 3(2))

Sri Lanka (art. 3(2)(d))

Sweden (art. 3(2))

Switzerland (art. 3(2))

Thailand (art. 3(2))

Trinidad and Tobago (art. 2(2)) <b>

Tunisia (art. 3(2))

Turkey (art. 3(2))

Ukraine 1994 (art. (3)(2))

United Kingdom (art. 3(2)) <d>

Venezuela (art. 3(2))

*Notes:*

<a> No direct reference in competent authorities in the provision or no reference to "mutual agreement procedure" provision.

<b> Competent authorities may establish common meaning of undefined term "if the meaning of such a term under the laws of a Contracting State is different from the meaning of the term under the laws of the other Contracting State, or…is not readily determinable.…"

<c> Provision remains relevant only for purposes of Interest article for certain pre-1985 instruments.

<d> Treaty gives primacy of tax law definitions over non-tax law definitions, as in **1996 U.S. Model Treaty** discussed below.

<e> Provision adopts the **1996 U.S. Model Treaty** definition noted below.

Treasury changed its prior formulation in several respects in 1996. **Article 3(2) of the 1996 U.S. Model Treaty** (and of subsequent versions) provides as follows:

As regards the application of the Convention at any time by a Contracting State any term not defined therein shall, unless the context otherwise requires, or the competent authorities agree to a common meaning pursuant to the provisions of **Article 25** (Mutual Agreement Procedure), have the meaning which it has at that time under the law of that State for the purposes of the taxes to which the Convention applies, any meaning under the applicable tax laws of that State prevailing over a meaning given to the term under other laws of that State

The later language, unlike the 1981 version, provides guidance for cases in which a term is defined under both the tax and nontax laws of a Contracting State, granting the former primacy. Treasury's Technical Explanation characterizes this as a clarification. **443** Unlike the text of the Model Treaty itself, the Technical Explanation adds that, when more than one tax law definition exists, "the definition used for purposes of the particular provision at issue, if any, should be used." **444**

Unless this language is incorporated in the text of the treaty, however, it would not control the interpretation accorded by the other Contracting State. No guidance is provided for the case of conflicting tax law definitions when there is no definition for purposes of the particular provision.

The treaty with the former USSR (CIS) contains no equivalent provision. **The Treasury Technical Explanation of the treaty** , however, indicates that in accordance with generally accepted principles relating to the interpretation of the tax treaty, such a rule should be applied. **445** The **Technical**

**Explanation**, however, is not a part of the formal agreement with the treaty partner.

# ¶ 2.04[2] Commentary and Discussion of Legal Authorities

In theory, it would be preferable if there were an agreed treaty definition for as many terms as possible. As optimistically noted in the OECD Commentary with respect to the definition of "interest," a definition of the term "offers greater security from the legal point of view and ensures that conventions would be unaffected by future changes in any country's domestic laws." **446** The Commentary further suggests that references in the Model Treaty to domestic laws "should as far as possible be avoided." **447** Nevertheless, in the real world, many terms must necessarily go undefined.

All U.S. income tax treaties in force, other than that with the former USSR (CIS), contain an undefined terms paragraph directing each Contracting State, with respect to taxes of such State to which the treaty applies, to look to its internal law in ascertaining the meaning of terms not defined in the treaty, unless the context in which the term is used requires otherwise. Perhaps the most prominent instance under U.S. law in which this provision has been applied is the case of *Aiken Industries, Inc. v. Commissioner*, **448** in which the court invoked the provision to construe the words "received by" as used in the Interest article of the former U.S.-Honduras treaty.

The undefined terms provision in many of the treaties expressly provides that the competent authorities **449** of the Contracting States may agree on a common definition of a term rather than having each State apply its own law. Further, as discussed in Chapter 23, the Mutual Agreement Procedure articles of U.S. income tax treaties generally authorize the competent authorities of the respective Contracting States to agree on the interpretation of treaty provisions. **450** In any event, the right of the competent authorities to resolve interpretational issues by agreement should be considered implicit in each of the treaties to the extent that the resolution reached does not involve an unintended modification of the treaty that could not be accomplished by the competent authorities outside of the ratification process.

In determining whether a term is defined in a treaty, the treaty partners would take into account any clarifications to the treaty made, for example, by way of exchanges of letters. For example, the U.S. and Netherlands delegations exchanged letters contemporaneously with the negotiation and signing of the treaty in which certain terms used in the Relief From Double Taxation article were effectively defined.

As noted above, a term is not construed by reference to the domestic laws of the taxing State if "the context requires otherwise." Accordingly, the first step in applying the undefined terms provision is to determine whether the context in which the term in question is used mandates a particular meaning, even if that meaning is different than the meaning that would be arrived at by reference to the domestic law of the State. Only if it has been determined that the context does not require a particular meaning does such domestic law become relevant. Considerations that would be relevant in determining whether a certain meaning is required would include, in particular, whether double taxation or double non-taxation otherwise would result.

One circumstance in which the context may require, in order to avoid double taxation, that a term be construed otherwise than it would under the domestic law of the taxing State is entity classification. For example, it may be preferable from a policy standpoint for a source State to apply the law of the residence State and achieve consistent classification. **451**

In applying the undefined terms paragraph and in construing treaties generally, the IRS and U.S. courts generally look to various official documents prepared contemporaneously with the signing and ratification of the treaty (so-called treaty history). **452** The treaty history may shed light on a term's meaning so that it is not in fact undefined, or may support a conclusion that the context requires a particular meaning. From a U.S. standpoint, treaty history typically includes, for example, the Treasury's Technical Explanation, the Senate Foreign Relations Committee Report, and the Joint Committee on Taxation Explanation, all prepared in connection with the ratification process, and may include statements by persons involved in the treaty negotiations. Further, the Commentaries on the OECD Model Treaties generally are considered relevant; **453** although not part of U.S. law in a strict sense, the United States, as a member of the OECD, could justifiably consider the Commentaries to reflect its law to the extent it did not enter a reservation. A more expansive discussion of relevant items of treaty history and of the construction of treaty terms is contained in Chapter 1. **454**

A major issue that arises under the undefined terms paragraph is whether a term should be given the meaning it had under a Contracting State's internal law at the time the treaty entered into force (the so-called static approach) or the meaning the term had in the taxable year for which the term is being applied (the so-called ambulatory approach). The ambulatory approach would permit the tax authorities of a Contracting State to adapt the construction of treaty terms to legal developments. The IRS has published a ruling endorsing the ambulatory approach. **455** The static approach was adopted by the Canadian Supreme Court in a comparable situation. **456** It should be noted that even the ambulatory approach does not provide carte blanche to define a treaty term in a manner that is entirely different from the term's use in other contexts. **457**

In connection with the ratification of the **1967 U.S.-France treaty** , the U.S. Senate refused to permit the Treasury or IRS the power to adjust treaty terms to reflect changes in tax laws without Senate ratification. **Article 30(3) of the 1067 French treaty** authorizes the Contracting States to adjust provisions of the treaty "without affecting general principles" in order to reflect changes in the tax laws of the Contracting States. The **Report of the Senate Committee on Foreign Relations** expressed the reservation that any such adjustments "shall become effective for the United States only in accordance with the procedures set forth in Article II, Section 2, of the Constitution of the United States." **458**

**443** Treas. Tech. Explanation of 1996 U.S. Model Treaty, art. 3.

**444** Treas. Tech. Explanation of 1996 U.S. Model Treaty, art. 3.

**445 Treasury Technical Explanation, U.S.-USSR treaty** . The **1939 U.S.-Sweden treaty** also did

not contain such a provision, although Treasury regulations under that treaty so provided from the U.S. standpoint. Regs. § 520.103.

**446** OECD Commentary (as amended by through November 1, 1997) on art. 11, ¶ 21.

**447** OECD Commentary (as amended by through November 1, 1997) on art. 11, ¶ 21.

**448 Aiken Indus., Inc. v. Comm'r, 56 TC 925 (1971), acq, 1972-2 CB 1** .

**449** The "competent authority" of a Contracting State is that person designated by such State to perform certain administrative functions under the treaty. See **¶ 23.05** .

**450** See ¶ 23.03[1][b]

**451** See supra **¶ 2.01[5][b][ii]** .

**452** See, e.g., **United States v. Stuart, 489 US 353 (1989)** ; **Maximov v. United States, 299 F2d 565 (2d Cir. 1962)** ; **Xerox Corp. v. United States, 94-2 USTC ¶ 50,623 (Fed. Cir. 1994)** ; **Snap-On Tools, Inc. v. United States, 26 Cls. Ct. 1045, 92-2 USTC ¶ 50,425 (Cls. Ct. 1992), aff'd in unpublished op. (Fed. Cir. 1994)** ; **Crow v. Comm'r, 85 TC 376 (1985)** .

**453** See **Taisei Fire & Marine Ins. Co., Ltd. v. Comm'r, 104 TC 535, acq., AOD CC-1995-012. (1995)** ; **Rev. Rul. 75-131, 1975-1 CB 389** .

**454** See **¶ 1.05** .

**455** See **Rev. Rul. 80-243, 1980-2 CB 413** ; **Ltr. Rul. 7844008** .

**456** See The Queen v. Melford Devs., Inc., 1982 DTC 6281 .

**457** For example, the 1990 proposal to define "liquidating distributions" and "redemption distribution" as dividends for treaty purposes (see Foreign Tax Equity Bill of 1990, HR 4038; 101st Cong., 2d Sess. (Mar. 20, 1990) § 201(a) would, if enacted, have amounted to a treaty override. See ALI Proposals, supra note 76, at 42.

**458 Senate Foreign Relations Committee Report, S. Exec. Rep. No. 5** , 90th Cong., 2d Sess.

© 2021 Thomson Reuters/Tax & Accounting. All Rights Reserved.

Checkpoint Contents
  International Tax Library
    WG&L International Treatises
      Andersen: Analysis of United States Income Tax Treaties
        Chapter 9: Dividends
          ¶9.02. Dividends-Analysis of Treaty Provisions

# ¶ 9.02 Dividends-Analysis of Treaty Provisions

# ¶ 9.02[1] Reduction in Tax Rate at Source

# ¶ 9.02[1][a] Treaty Language

**Articles 10(1)** , **10(2)** and **10(4) of the 1981 U.S. Model Treaty** state as follows:

1. Dividends paid by a company which is a resident of a Contracting State to a resident of the other Contracting State may be taxed in that other State.

2. However, such dividends may also be taxed in the Contracting State of which the company paying the dividends is a resident, and according to the laws of that State, but if the beneficial owner of the dividends is a resident of the other Contracting State, the tax so charged shall not exceed.

(a) 5% of the gross amount of the dividends if the beneficial owner is a company which owns at least 10% of the voting stock of the company paying the dividends;

(b) 15% of the gross amount of the dividends in all other cases. This paragraph shall not affect the taxation of the company in respect of the profits out of which the dividends are paid.***

4. The provisions of **paragraph 2** shall not apply if the beneficial owner of the dividends, being a resident of a Contracting State, carries on business in the other Contracting State, of which the company paying the dividends is a resident, through a permanent establishment situated therein, or performs in that other State independent personal services from a fixed base situated therein, and the dividends are attributable to such permanent establishment or fixed base. In such case the provisions of **Article 7** (Business Profits) or **Article 14** (Independent Personal Services), as the case may be, shall apply.

The treaty provisions in Table 9-1 are to the same effect (with significant variations noted):

# Table 9-1

**Austria (arts. 10(1)-10(2)** , **10(4))** <a>, <o>, <p>

**Bangladesh (arts. 10(1), 10(2), 10(5))** <v>

**Barbados (arts. 10(1)-10(2)** , **10(4))** <a>

**Belgium (arts. 10(1)-10(2)** , 10(8)) <p>, <v>

Bulgaria (arts. 10(2), 10(6)) <a>, <c>, <o>, <v>

**Canada (arts. 10(1)-10(2)** , **10(4)** , **10(7))** ; amended by **2007 protocol, (art. 6))** <a>, <o>, <v>

**Czech Rep. (arts. 10(1)-10(2)** , **10(5))**

**Denmark (arts. 10(6))**

**Estonia (arts. 10(1)-10(2)** , **10(4))**

**Finland (arts. 10(1)-10(6)** )

**France (arts. 10(1)-10(3)** , **10(6))** <a, <j>, <o>, <v>, <w>

**Germany (arts. 10(1)-10(6)** )

Iceland (arts. 10(1), 10(2), 10(6)) <a>, <v>

**Ireland (arts. 10(1)-10(2)** , **10(4)** , **10(6))** , **protocol (art. 4))** <a>, <n>, <q>

**Japan (arts. 10(1)-10(2)** , **10(7))** <d>

**Kazakhstan (arts. 9(1)-9(2)** , **9(4))** , **protocol (art. 4))** <a>, <m>, <n>

**Latvia (art. 10(1)-10(2))** , **art. 10(4))**

**Lithuania (art. 10(1)-10(2))** , **10(4))**

**Luxembourg (art. 10(1)-10(2)** , **10(4))**

**Malta (arts. 10(1) - (2)** , 10(6))<o>,<v>,<w>

**Mexico (arts. 10(1)-10(3)** , **10(5))** <d>

**Netherlands (arts. 10(1)-10(2)** , **10(5))** <a>, <e>

**New Zealand (arts. 10(1) - (3)** , **10(6))** <o>, <v>

**Poland (arts. 11(1)-11(3))** <f>

**Portugal (arts. 10(1)-10(3)** , **10(6))** <a>, <l>

**Russia (arts. 10(1)-10(2)** , **10(4)** ) <a>, <d>, <g>, <m>

**Slovak Rep. (arts. 10(1)-10(2)** , **10(5))**

**Slovenia (arts. 10(1)-10(2)** , **10(6)** )

**South Africa (arts. 10(1)-10(2)** , **10(4)** ) <a>

**Sri lanka (arts. 10(1)-10(2))** <a>, <u>

**Sweden (arts. 10(1)-10(2)** , **10(5)** ) <a>

**Switzerland (arts. 10(1)-10(2)** , **10(5)** ) <a>, <r>

**Ukraine 1994 (art. 10(1)-10(2)** , **<t>(art. 10(4)** )

**United Kingdom (arts. 10(1)-10(2)** , **10(5)** )

**Venezuela (art. 10(1)-10(2)** , **(art. 10(6)** )

*Notes:*

<a> Dividends paid by U.S. RIC, U.S. REIT, or Dutch beleggingsinstelling (Dutch treaty) or French "société d'investissement à capital variable" (SICAV), "société d'investissement immobilier cotée" (SIIC), and "société de placement à prépondérance

immobilière à capital variable" (SPPICAV) (French treaty) or distributions on certificates of German investment trust (German treaty), are subject to special limitations, as discussed below. [See infra **¶ 9.02[3]** .]

<b> **Article 10(6) of German treaty** provides: "Notwithstanding the first sentence of **paragraph 2 of this Article** and **paragraph 1 of Article 11** (Interest), income from arrangements, including debt obligations, carrying the right to participate in profits (including in the Federal Republic of Germany income under a sleeping partnership (Stille Gesellschaft), 'partiarisches Darlehen,' 'Gewinnobligation,' or 'jouissance' shares or 'jouissance' rights) this is deductible in determining the profits of the payor may be taxed in the Contracting State in which it arises according to the laws of that State."

<c> Provision substitutes 10% for 15% rate. Under **Mexican treaty** , however, the 10% rate applies only to following five years after Dividend article takes effect. Paragraph 8(b) of protocol provides that, if the United States agrees in treaty with another country to impose lower rate on nonportfolio stock dividends than 5%, that lower rate shall apply under **U.S.-Mexico treaty** ; since **the 2001 U.S.-U.K. treaty** and the 2003 Australia protocol provide for a zero rate in some cases, **the Mexico treaty** was amended by protocol to do likewise. See **¶ 9.01[1]** .

<d> Memorandum of Understanding of U.S.-Netherlands treaty clarifies that beneficial owner of dividends who holds depository receipts or trust certificates evidencing beneficial ownership of shares in lieu of shares may claim 5% rate if otherwise entitled thereto. **Article 10(5)(b) of U.S.-France treaty** similarly clarifies that `dividends' includes dividends paid in respect of depository receipts.

<e> In the case of dividends paid by a U.K. resident corporation, tax credit is provided to U.S. recipient in coordination with U.K. imputation system as described below. [See infra **¶ 9.02[5]** .] In the event that United Kingdom ceases to provide tax credit to U.K. resident individuals in respect of dividends paid by U.K. resident corporation, this credit would cease to be paid, and 15% withholding tax rate would apply under treaty to all dividends. Article 10(7), which is quoted below, contains two tax-avoidance provisions.

<f> With respect to dividends paid by Russian company lacking voting stock, test for 5% rate is at least 10% of statutory capital.

<g> Article does not apply if dividends are paid as part of a 'conduit arrangement,' as defined in art. 3(1)(n).

<h> Nonportfolio rate conditioned on direct ownership of at least 10% of share capital (not voting stock); however, the Technical Explanation. equates the two concepts.

<i> For 1996, 6% rather than 5% rate applies. Also, article includes special provision quoted below, governing nonresident-owned Canadian investment companies.

<j> With respect to dividends paid by French resident company, 5% rate applies if at least 10% of the capital of the company is owned "directly or indirectly." With respect to dividends paid by U.S. resident companies, at least 10% of such company's voting stock must be owned "directly." A 15% rate is applicable in all other cases.

<k> Direct investment rate is (i) 10% with respect to dividends paid after December 31,

1996, and before January 1, 2000, and (ii) 5% (or, if greater, rate that Portugal may apply to dividends paid to residents of EC member states, with respect to dividends paid thereafter); in each case, at least 25% of "capital (capital social)" of payor corporation must be owned "directly."

<l> Protocol clarifies that tax may be withheld at domestic source rate and refunded on proper application.

<m> Paragraph (4) also refers to former permanent establishments and fixed bases ('carries on or carried on' and "performs or has performed"). Irish protocol expressly provides that deferred income may be attributable even if permanent establishment has ceased to exist.

<n> Subparagraph 2(a) specifies for 5% rate that beneficial owner must be a company *(other than a partnership)* that owns *directly* at least 10% of voting stock of payor.

<o> Paragraph 4 substitutes "the holding in respect of which the dividends are paid is effectively connected with" for "the dividends are attributable to' a permanent establishment."

<p> Paragraph 2 adds: "The competent authorities of the Contracting States shall by mutual agreement settle the mode of application of these limitations."

<q> In the case of dividends paid by an Irish resident company, a tax credit is provided to U.S. recipient in coordination with Irish imputation system. (See infra ¶ 9.02[4] .)

<r> Paragraph 1 reads: "Dividends derived and beneficially owned by a resident of a Contracting State may be taxed in that State."

<s> Nonportfolio rate conditioned on direct ownership of at least 10 percent of voting stock or, if none, authorized capital; adds requirement that, in the case of a Ukrainian corporation, nonresidents of Ukraine must own at least 20 percent of voting stock (or, if none, authorized capital).

<t> No reduced direct investment rate; all dividends taxable by source country at 15%.

<u> Direct investment rate under Bangladesh treaty is 10%.

<v> Provision does not reference independent personal services.

<w> With respect to dividends paid by a company resident in Malta to a beneficial owner that is a resident of the United States, subparagraph 2(b) limits the tax that may be charged by Malta to the Maltese tax chargeable on the profits out of which the dividends are paid.

Note that, under the current semi-integrated system of Mexican taxation, Mexico imposes no withholding tax on dividends. Hence, the reduced dividend withholding tax rates in the Mexican treaty are not of significance to U.S. investors other than in the event of a change in Mexican law. **22**

The first rule is designed to prevent transactions where a 10% stock interest in a corporation is acquired in order to obtain a distribution of accumulated earnings at a reduced rate of tax. The second rule, which was in **Article VIIA of the 1945 U.S.-U.K. treaty** , denies the benefits of the Dividend article to U.S. tax-exempt organizations if the dividends would have been subject to U.K. tax if they had been received by a U.K. exempt organization. This provision derives from the fact that, under U.K. law, if a U.K.

resident sells securities to a tax-exempt organization immediately before the payment of dividends, the organization is taxable on the dividends paid in respect to the securities if the transaction was designed to provide the initial seller a preferential rate of tax on his sale. **23**

**Article X(7)(a) of the U.S.-Canada treaty** provides an exception to the 5 percent rate as follows:

Dividends paid by a company that is a resident of Canada and a nonresident-owned investment corporation to a company that is a resident of the United States, that owns at least 10 per cent of the voting stock of the company paying the dividends and that is the beneficial owner of such dividends, may be taxed in Canada at a rate not exceeding 10 per cent of the gross amount of the dividends.…

This provision is intended to address the practice whereby a U.S. parent corporation contributes equity to a Canadian corporation qualifying as a nonresident-owned investment corporation (NRO) under Canadian law, which in turn loans the funds to a Canadian operating entity. The interest payments reduce the taxable income of the Canadian operating company and are subject to a 25% tax when received by the NRO, which tax, however, is fully refundable upon distribution by the NRO to the U.S. parent corporation. **23.1** The treaty provision has the effect of preserving Canadian withholding tax at the interest withholding rate rather than at the lower dividend withholding rate.

The treaties in Table 9-2 contain provisions similar to those in Table 9-1 but substitute a higher rate for the 5% and/or 15% rate (with significant variations noted):

## Table 9-2

**India (arts . 10(1)-10(2) , 10(4))** <b>, <c>, <d>,
**Indonesia (arts. 11(1)-11(3)** , as amended by **1996 protocol** <a>, <i>
**Jamaica (arts. 10(1)-10(2), 10(4)** , as amended by **1981 Protocol** <a>
**Spain (arts. 10(1)-10(2), 10(4))** <a>, <d>
**Thailand (arts. 10(1)-10(3), 10(5))** <a>, <d>
**Tunisia (arts. 10(1)-10(3), 10(5)** , as amended by **1989 protocol** <c>, <d>, <f>
**Turkey (arts. 10(1), 10(2), 10(5)** , as amended by **1996 protocol art. V)** <c>, <d>, <g>, <h>

*Notes:*

<a> Provision substitutes 10% rate for 5% rate.

<b> Provision substitutes 15% rate for 5% rate and 25% rate for 15%.

<c> Protocol clarifies that, if income is attributable to permanent establishment but its payment is deferred until permanent establishment has ceased to exist, income remains taxable by situs State.

<d> Dividends paid by RIC or REIT are subject to special limitations, as described below. [See infra **¶ 9.02[4]** .]

<e> Provision substitutes 20% for 5% rate and 25% for 15% rate.

<f> Tax rate shall not exceed 14% if the beneficial owner is a company (other than a

partnership) which owns at least 25% of the share capital the company paying the dividends, and otherwise 20%.

<g> Provision substitutes 15% for 5% and 20% for 15%.

<h> Fixed base carve-out from dividend withholding tax applies only in case of Turkish resident with U.S. fixed base, and not vice versa.

<i> For 10% rate, recipient must own at least 25% of voting stock of payor.

The treaties in Table 9-3 generally do not allow for a 5% rate, or any other special rate for a 10% or greater shareholder, and otherwise differ from **the 1981 U.S. Model Treaty** as noted:

## Table 9-3

**Australia (arts. 10(1)-10(2), 10(4))** <a>
**China (arts. 9(1)-9(2) , 9(4))**
**Norway (arts. 8(1)-8(3)** , as amended by **1980 protocol, art. 4)**
**Romania (arts. 10(1)-10(3))** <a>
**Sri Lanka (art. 10(1), 10(2), 10(4))**

*Notes:*

<a> Provision substitutes 10% rate for 15% rate.

Under certain treaties, a special nonportfolio rate applies only if the stock ownership threshold has been met for a certain period and a gross income test is met. For example, in order for the 5% rate, rather than a 15% rate, to apply under the treaty with France (1) the 10% voting stock ownership requirement must be met during the part of the paying corporation's taxable year that precedes the date of payment and the whole of its prior taxable year (if any), and (2) the paying corporation must meet a 25% gross income test. The relevant provisions (in **Article 12) of the U.S.-Iceland treaty** are as follows:

(1) Dividends derived from sources within one of the Contracting States by a resident of the other Contracting State may be taxed by both Contracting States.

(2) The rate of tax imposed by one of the Contracting States on dividends derived from sources within that Contracting State by a resident of the other Contracting State shall not exceed:

(a) 15% of the gross amount actually distributed; or

(b) When the recipient is a corporation, 5% of the gross amount actually distributed if:

(i) During the part of the paying corporation's taxable year which precedes the date of payment of the dividend and during the whole of its prior taxable year (if any), at least 10% of the outstanding shares of the voting stock of the paying corporation was owned by the recipient corporation, and

(ii) Not more than 25% of the gross income of the paying corporation for such prior taxable year (if any) consists of interests or dividends (other than interest derived from the conduct of a banking, insurance, or financing business and dividends or interest received from subsidiary corporations, 50% or more of the outstanding

shares of the voting stock of which is owned by the paying corporation at the time such dividends or interest is received).

(3) Paragraph (2) shall not apply if the recipient of the dividends, being a resident of one of the Contracting States, has a permanent establishment in the other Contracting State and the shares with respect to which the dividends are paid are effectively connected with such permanent establishment. In such a case, see paragraph (6)(a) of Article 8 (Business Profits).

The treaties in Table 9-4 contain provisions generally to the same effect (with significant variations noted):

## Table 9-4

**Cyprus (arts. 12(1)-12(3))** <a>
**Egypt (arts. 11(2), 11(4))** <b>
**1967 France (arts. 9(1)-9(3)** , as amended by **1988 protocol)**
**Israel (arts. 12(1)-12(3), 12(5)** , as amended by **1993 protocol)** <f>, <g>
**Italy (arts. 10(1)-10(2), 10(4))** <c>
**Korea (arts. 12(1)-12(3))** <d>
**Morocco (arts. 10(1)-10(3))** <d>
**Trinidad and Tobago (arts. 3(1)-3(2))** <e>

*Notes:*

<a> Rule in paragraph 2 above applies only with respect to dividends paid from U.S. sources. Article 12(1), concerning dividends derived by U.S. resident from sources in Cyprus, is quoted below.

<b> Rule in paragraph 2 above applies only with respect to dividends paid by a U.S. corporation. Provision with respect to dividends paid by Egyptian corporation is quoted below. Treaty also contains provision (Article 8(6)) clarifying generally when income is considered effectively connected with permanent establishment.

<c> Dividends paid by a company resident in Contracting State, rather than derived from sources within Contracting State, are covered. 5% rate requires ownership of more than 25% of voting stock of payor for twelve-month period ending on date dividend is declared; 15% rate is provided in all other cases.

<d> Maximum rates are 10% and 15% rather than 5% and 15%.

<e> Maximum rates are 10% and 25% rather than 5% and 15%.

<f> Maximum rates are 12.5% (or 15%) and 25% rather than 5% and 15%. Direct investment rate of 15%, rather than 12.5%, applies if dividend is paid from income derived during any period for which paying corporation is entitled to reduced tax rate applicable to approved enterprises under Israel's Encouragement of Capital Investments Law (1959). Under Article 12(3)(b), such rates are inapplicable to dividends paid by corporations the income of which is taxed as described in Sections 64 and 64A of Israeli

> Income Tax Ordinance, or in substantially similar manner; such dividends are taxable by Israel as business profits attributable to Israeli permanent establishment.
>
> <g> Dividends paid by U.S. RIC or U.S. REIT are subject to special limitations, as discussed below. [See infra ¶ 9.02[4] .]

As noted in Table 9-4, dividends paid to U.S. investors by Israeli companies taxed as pass-through entities under Sections 64 (house property companies) and 64A (family companies) of the Israeli Income Tax Ordinance, or in a substantially similar manner, are not eligible for reduced rates of Israeli tax at source. Examples of pass-through taxation under Israeli law include a corporation that is itself exempt from tax, with the shareholders taxable on their pro-rata shares of the corporation's income, or a corporation that is entitled to a deduction for dividends paid to shareholders. 24 Dividend income covered by this exception is treated as if the income were business profits from a permanent establishment in Israel, and therefore taxable on a net basis in Israel.

**Article 12(1) of the U.S.-Cyprus treaty** provides as follows with respect to dividends derived by a U.S. resident from sources within Cyprus:

> (1) Dividends derived from sources within Cyprus by a resident of the United States shall not be subject to any tax imposed by Cyprus in excess of the tax imposed with respect to the profits or earnings out of which such dividends are paid. An individual resident of the United States shall be entitled to a refund of any Cypriot tax imposed with respect to the profits or earnings out of which a dividend is paid to the extent that said tax exceeds the individual's tax liability in Cyprus.

This provision reflected Cyprus's integrated tax system as it existed prior to January 1, 1991. Cyprus subsequently introduced a classical system under which corporate income is subjected to corporate tax and also to withholding tax on distributions. In the case of distributions to nonresident corporations, however, as under the **U.S.-Cyprus treaty** , the withholding tax is fully refundable; in the case of distributions to a nonresident individual, the individual is entitled to repayment of the difference between the tax withheld and his personal tax liability to Cyprus. 25

**Article 11 of the U.S.-Egypt treaty** provides as follows with respect to dividends paid by an Egyptian corporation, or by a U.S. corporation the activities of which are principally in Egypt, or from profits of an Egyptian permanent establishment of a U.S. corporation:

> (3) Dividends paid by an Egyptian corporation to a resident of the United States shall in Egypt be subject (a) to the tax on income derived from movable capital, the defense tax, national security tax, war tax, the supplementary taxes on the foregoing, and substantially similar taxes enacted after the date of signature of this Convention (which taxes shall be deducted at source), provided that such dividends, if distributed out of the taxable profits of the same taxable year and not out of accumulated reserves or assets, shall be allowed as a deduction from the amount of the company's taxable income or profits subject to tax as industrial or commercial profits, and (b) when paid to a natural person, to the general income tax levied on net total income. However, the general income tax thus imposed shall in no case exceed an

average of 20% of the net dividends payable to such natural person. The dividends payable to a United States corporation shall not be subject to any taxes other than those described in subparagraph (a).***

(5) Dividends paid by a United States corporation whose activities lie solely or mainly in Egypt shall be treated in the manner provided by paragraph (3).

(6) Dividends deemed to be paid, according to the provisions of Egyptian taxation law, out of yearly profits by a permanent establishment maintained in Egypt by a United States corporation whose activities extend to countries other than Egypt shall in Egypt be treated in the manner provided by paragraph (3).

Under **Article 11(3) of the U.S.-Egypt treaty** , dividends paid by an Egyptian corporation are subject to the tax on movable capital plus the defense tax, the national security tax, the war tax, the supplementary tax on any of the above taxes (and any substantially similar taxes enacted after the treaty entered into force). These taxes are equivalent in the aggregate to the rate of corporate tax. **26** To the extent dividends are paid out of current earnings, the paying corporation is allowed a deduction from taxable income equal to the amount of the dividends, with the result that only the dividend taxes apply to such earnings. Distributions of accumulated earnings are not entitled to the deduction and hence are subject to both the corporate tax and the dividend tax. These provisions replicate the rules of Egyptian law that would apply absent a treaty. **27**

In the case of dividends paid by Egyptian corporations to individuals, the same rules apply, but, in addition, the general income tax imposed under Egyptian law may be levied. However, the average amount of general income tax imposed cannot exceed 20% of the net dividend payable for any year. (Dividends paid to U.S. corporations are not subject to the general income tax.)

**Paragraphs (5)** and **(6) of Article 11** of the treaty contain special rules for U.S. corporations that operate solely or mainly in Egypt and for branches of U.S. corporations that constitute permanent establishments in Egypt. Under **paragraph (5)** , a U.S. corporation the activities of which lie solely or mainly in Egypt (regardless of where its head or administrative office is located) is subject to the Egyptian taxes on industrial and commercial profits computed on its income after deducting the amount of current income distributed as dividends. The dividends are treated as income from sources within Egypt under **Article 4(1)(a)** and are subject to Egyptian withholding tax. These provisions are intended to avoid discrimination between Egyptian and foreign corporations by treating a foreign corporation, most of the activities of which are conducted through an Egyptian branch, as an Egyptian corporation for Egyptian tax purposes. The factors determining whether a foreign company's activities lie solely or mainly in Egypt are not specified in the treaty or in Egyptian statutory law; however, the Egyptian tax authorities take into account factors such as the corporation's charter, balance sheet, profit and loss statement, and ratio of profits from sources in Egypt to total profits. **28**

Under paragraph (6), the yearly profits attributable to an Egyptian permanent establishment of a U.S. corporation (other than a U.S. corporation specified in paragraph (5) are deemed distributed currently as a dividend under Egyptian tax law and are deductible for purposes of computing the income subject to

the taxes on industrial and commercial profits. Therefore, the profits are subject in Egypt only to the taxes on dividends specified in **Article 11(3)** . **29**

**Article IX of the treaty with Luxembourg** is similar in content to the treaty provisions listed in Table 9-4 but measures the dividend withholding rate on portfolio investments by reference to one half of the relevant statutory rate:

> (1) Dividends received from sources within one of the Contracting States by a resident or corporation of the other Contracting State not having a permanent establishment in the former State shall be subject to tax by the former State-
>> (a) at a rate which is equal to 50% of the statutory rate of tax otherwise imposed on such dividends by the former State, or,
>> (b) when the recipient is a corporation, at the rate of 5% if
>>> (i) during the part of the payer corporation's taxable year which precedes the date of payment of the dividend and during the whole of its prior taxable year, at least 50% of the voting stock of the payer corporation was owned by the recipient corporation either alone or in association with not more than three other corporations of the other State and at least 10% of the voting stock of the payer corporation was owned by each such corporation of the other State; and
>>> (ii) not more than 25% of the gross income of the payer corporation (other than a corporation the principal business of which is the making of loans) for such prior taxable year was derived from interest and dividends other than interest and dividends received from its subsidiary corporations.
>
> (2) The term statutory rate as used in this Article, means, in the case of United States tax, the rate of tax imposed by **section 871(a)** or **section 881(a)** , Internal Revenue Code of 1954, as in effect on January 1 of the year in which the instruments of ratification are exchanged, and, in the case of Luxembourg tax, the rate of tax imposed by Article 4 of Decree Law of August 7, 1945, as amended by Article 1 of the Law of November 27, 1952.
>
> (3) The term subsidiary corporation, as used in this Article, means any corporation of which at least 50% of the total voting power of all classes of stock entitled to vote, or of the total value of all classes of stock, is owned by the payer corporation. **29.1**

**Article VII(1) of the Swedish treaty** , as amended in 1963, **30** is substantially similar to **paragraphs (1)** and (3) of Article IX of the Luxembourg treaty, except that the Swedish treaty specifies 15 percent as the portfolio rate, and share value is not relevant to the definition of subsidiary corporation. **Article VII(2) of the Swedish treaty** also provides:

> 2. When a Swedish corporation or other entity derives dividends from a United States corporation or other entity the dividends thus derived shall be exempt from Swedish tax; provided that in accordance with the laws of Sweden the dividends would be exempt from tax if both corporations or entities had been Swedish corporations or entities.

Finally, the treaty with Denmark, as well as a number of other treaties that preceded the 1963 OECD

Draft Model treaty and that have since been superseded by more recent versions, conditions the 5% rate on meeting not only a stock ownership threshold and a 25% gross income test, but also a business purpose test. Thus, **Article VI(3) of the treaty with Denmark** provides:

> 3. It is agreed, however, that the rate of dividend tax at the source shall not exceed 5% if the shareholder is a corporation controlling, directly or indirectly, at least 95% of the entire voting power in the corporation paying the dividend, and if not more than 25% of the gross income of such paying corporation is derived from interest and dividends, other than interest and dividends received from its own subsidiary corporations. Such reduction of the rate of 5% shall not apply if the relationship of the two corporations has been arranged or is maintained primarily with the intention of securing such reduced rate. **30.1**

Article VI of the treaty with Pakistan provides for no reduction in the statutory taxes unless the shareholder owns more than 50% of the voting power of the corporation and then only for a 15% rate on dividends paid by a U.S. corporation. Article VI contains unique provisions regarding distributions from a Pakistan corporation:

> (1) The rate of United States tax on dividends paid by a United States corporation to a Pakistan company
>> (i) not having a permanent establishment in the United States and
>> (ii) owning shares carrying more than 50% of the voting power in the corporation paying such dividends shall not exceed fifteen percent.
>
> (2). Where a United States corporation
>> (i) has no permanent establishment in Pakistan, and
>> (ii) is a public company as defined in paragraph (4) of this Article, and
>> (iii) owns shares carrying more than 50% of the voting power of a company which is a resident of Pakistan and is engaged in an industrial undertaking of the classes specified in section 15B of the Income Tax Act, 1922 (XI of 1922),
>
> the rate of Pakistan super-tax otherwise payable with respect to dividends paid by such company to such corporation shall be reduced by 1 anna in the rupee.
>
> (3) The provisions of section 23A of the Income Tax Act, 1922 (XI of 1922) (relating to the distribution of company profits) shall not apply to the income of a company in which shares carrying more than 50% of the voting power are owned by a United States corporation constituting a public company, as defined in paragraph (4) of this Article, if the company is engaged in an industrial undertaking of the classes specified in section 15B of the Income Tax Act, 1922 (XI of 1922) and its profits are retained for the purpose of its industrial development and expansion in Pakistan.
>
> (4) In paragraphs (2) and (3) of this Article, the term public company means, in relation to any year of assessment
>> (a) A corporation which does not restrict the right to transfer its shares, which does not prohibit the issue of its shares or debentures to the public or the sale of its shares on a stock exchange and of which shares carrying more than 50% of the voting power were

not at any time during the previous year held by less than six persons; or

(b) A corporation all of whose shares were held at the end of the previous year by one or more public companies as defined in clause (a) of this paragraph.

The **Bermuda** , **Greek** , and **CIS (formerly, USSR) treaties** contain no Dividend article.

Most of the Dividend articles, especially in the case of more recent treaties, separately address dividends paid by a company that is a resident of a Contracting State and dividends paid by a nonresident company, without reference to the source of the dividends. The Dividend articles of the following treaties, however, address dividends paid from sources within a Contracting State:

> **Cyprus**
> **Egypt**
> **France**
> **Indonesia**
> **Korea**
> **Morocco**
> **Norway**
> **Philippines**

The difference is not per se significant. Similar substantive results typically are achieved under the treaties regardless of whether reference to source is made in the operative rules. By way of example, the treaties with **France** , **Indonesia** , **Luxembourg** , **Korea** , and **Japan** express the general rule under the Dividend article in terms of dividends from sources within a Contracting State, but elsewhere provide that dividends are sourced within a Contracting State only if the dividends are paid by a company resident in such State.

```
CHART 9-1

                                            Direct Investment Tax
Rate Conditions
----------------------------------------------------
Special       Zero
Rule          Rate
                         Portfolio      Stock      Passive      Imputation
for          for Parent-
                         Investment  Tax  Ownership   Income       Credit
RICs/  Subsidiary
Treaty            Article  Tax Rate  Rate  Threshold  Restriction  Available
REITs  DividendsAustralia

      10
        15%         0%        80%        No          No      Yes        No
```

Austria

**10(2)**
15%      5%      10%      No      No      Yes      No

Bangladesh

**10(2)**
15%      10%      10%      No      No      Yes      No

Barbados

**10(2)**
15%      5%      10%      No      No      Yes      No

Belgium

**10(2)**
15%      5%      10%      No      No      Yes      Yes

Bulgaria      10(2)      10%      5%      10%      No      No
Yes      No

Canada

**X(2)**
15%      5%      10%      No      No      Yes      No

China

**9(2)**
10%      10%      No      No      No      No

Cyprus

**12(1)**
,      15%<a>      5%<a>      10%      No
No      No      No

Czech Rep.

**12(2)**
,      15%      5%      10%      No      No      No      Yes

**10(3)**

Denmark

**10(2)**

| , | 15% | 5% | 10% | Yes | No | No | No |
|---|-----|----|----|-----|-----|-----|-----|

**10(3)**

Egypt

**11(2)**

| , | 15% | 5% | 10% | Yes | No | No | No |
|---|-----|----|----|-----|-----|-----|-----|

**11(3)**

Estonia

**10(2)**

| | 15% | 5% | 10% | No | No | No | No |
|---|-----|----|----|-----|-----|-----|-----|

Finland

**10(2)**

| | 15% | 5% | 10% | Yes | Yes | Yes | |
|---|-----|----|----|-----|-----|-----|-----|

No

France

**10(2)**

| | 15% | 5% | 10% | Yes | No | Yes | No |
|---|-----|----|----|-----|-----|-----|-----|

Germany

**10(2)**

| , | 15% | 5% | 10% | Yes | Yes | Yes | No |
|---|-----|----|----|-----|-----|-----|-----|

**10(3)**

,

**10(6)**

Greece        No Provision

Hungary

**9(2)**

| | 15% | 5% | 10% | No | No | No | No |
|---|-----|----|----|-----|-----|-----|-----|

Iceland

**12(2)**

| | 15% | 5% | 10% | Yes | No | No | No |
|---|-----|----|----|-----|-----|-----|-----|

India

**10(1)**
,    25%        15%        10%        No        No        No        Yes

              **10(2)**
Indonesia

      **11(2)**
        15%        10%        25%        No        No        No        No
Ireland

      **10(2)**
        15%        5%        10%        No        Yes        Yes        No
Israel

      **12**
        25%    12.5%/15%<b> 10%        Yes        No        Yes
No
Italy

        **10(2)**
        15%        5%        10%        No        No        Yes Yes
Jamaica

        **10(2)**
        15%        10%        10%        No        No        No
Japan

      **10(2)**
        10%        5%        10%        No        No        Yes        No
Korea

      **12(2)**
        15%        10%        10%        Yes        No        No        No
Latvia        10(2)        15%        5%        10%        No        No        No
No
Lithuania

      **10(2)**
        15%        5%        10%        No        No        No        No
Luxembourg

**10**
15%        5%        10%        No        No        No
Yes
Malta

**10(2)**
15%        5%<i>    10%        Yes        No        Yes    No
Mexico

**10**
10%        5%/0%    10%/80%    No        No        Yes        Yes
Morocco

**10(2)**
15%        10%        10%        Yes        No        No
No
Netherlands

**10(2)**
15%        5%        10%        Yes        No        Yes
No
New Zealand

**10(2)**
15%        15%                No        No        No    No
Norway

**8(2)**
15%        15%                No        No        No    No
Pakistan

**VI(1)-VI(3)**
15%        50%        No        No        No
No
Philippines

**11(2)**
25%        20%        10%        No        No        No
No
Poland

**11(2)**
15%        5%        10%        No        No        No    No
Romania

**10(2)**
    10%      10%             No        No       No      No
Russia

      **10(2)**
;    5%      10%     10%      No        No     Yes     No

       **protocol 2(a)**
Slovak Rep.

   **10(2)**
,    15%      5%      10%      No        No     Yes     No

      **10(3)**
Slovenia

    **10(2)**
    15%      5%      10%      No        No       No      No
S. Africa

    **10(2)**
    15%      5%      10%      No        No     Yes     No
Spain

     **10(1)**
,    15%      10%     10%      No        No     Yes     No

       **10(2)**
;

       **protocol 7(d)**
Sri Lanka

     **10(2)**
    15%    N/A     N/A     N/A     Yes     No      No
Sweden

      **10(2)**
    15%      5%      10%      No        No     Yes     No

Switzerland

**10(2)**
15%        5%      10%       No        No      Yes     No
Thailand

**10(2)**
15%       10%      10%       No        No      Yes
No
T. & Tobago

**12(1)**
25%       10%      10%      Yes        No      No
No
Tunisia

**10(1)-10(3)**
20%      14%      25%       No        No      No
Yes
Turkey

**10(2)**
20%      15%      10%       No       Yes      No
Ukraine

**10(2)**
,    15%        5%      10%       No        No     No
(20% aggregate

protocol 3                              foreign ownership)
No
UK

**10**
10%       5%/0%    10%/80%     No        No      Yes        Yes
USSR          No Provision
Venezuela

**10(2)**
15%        5%      10% (20% aggregate     No     Yes
foreign ownership)
No
_____
Notes:

```
  <a>  Only relevant to Cypriot (Maltese) recipient of U.S.-source
dividends, since credit is available to U.S. shareholders under integrated
tax system.
  <b>  See
```

¶ 9.02[1][a]

.

## ¶ 9.02[1][b] Commentary and Discussion of Legal Authorities

### ¶ 9.02[1][b][i] In general.

Nearly every income tax treaty contains a dividend article. The article generally permits the source State to tax the dividends on a gross basis, but only at a specified rate (most commonly, 15%). A lower rate (typically, 5%) applies in the case of dividends on nonportfolio investments (direct investments). Since the source State normally requires that the distributing corporation withhold the tax, the tax is referred to as a withholding tax. The residence State is permitted to tax the dividends in full, but must provide double taxation relief for the source-State tax.

Relief from the dividend withholding tax may be available under other treaty provisions. For example, **Article XXI of the Canadian treaty** permits a qualified pension fund of one Contracting State to receive dividends (and interest) from sources within the other Contracting State free of withholding tax. **31**

An estate beneficiary's share of U.S.-source dividends derived by the estate and distributed currently by it retains the character of dividends in the hands of the beneficiary **32** and is eligible for reduced withholding tax available under a treaty between the United States and the country in which the beneficiary is resident. **33** Similar treatment applies to a trust beneficiary's share of U.S.-source dividend income distributed currently. **34**

Certain issues that arise in connection with determining qualification for the reduced rates on dividends are discussed below.

## ¶ 9.02[1][b][ii] Beneficial ownership by treaty resident; compliance issues.

In order for a resident of a Contracting State to qualify for a reduced rate of dividend tax, beneficial ownership of the stock on which the dividend is paid must be held by such resident. Under U.S. tax

principles, beneficial ownership is distinguished from legal ownership, and the two do not necessarily coincide. In general, the beneficial owner of stock is the person who enjoys the benefits (i.e., rights to dividends, to vote, to appreciation in value, and to transfer rights of ownership) and bears the risk of loss with respect to the stock. For example, the Internal Revenue Service has ruled that the holder of American Depositary Receipts relating to shares of a Japanese corporation would be treated as owning the underlying shares directly. **35** A nominee or custodian is not the beneficial owner of stock.

A treaty country resident may be considered the beneficial owner of shares even if the shares are held by (and, presumably, voted by) the administrator of an estate. For example, the IRS has ruled under the former (1951) Austrian treaty that an Austrian resident who was a beneficiary of a U.S. estate was entitled to the 15% withholding tax rate on U.S.-source dividends distributed by the estate. **36**

Revised regulations under **Code section 1441** , intended to apply to payments after December 31, 1999, would eliminate the so-called address rule (discussed below), which entitles a withholding agent to assume that U.S.-source dividends paid to a foreign address are paid to a resident of the country of the address. In the case of U.S.-source dividends, the regulations provide that, in order to qualify for exemption from 31% backup withholding and qualify for a tax treaty reduction in the 30% section 1441 withholding tax, a withholding agent generally must obtain a Form W-8, evidencing the non-U.S. status of the beneficial owner. **36.1** Under the proposed regulations, the Form W-8 need not include a taxpayer identification number (TIN), and may be furnished by a "qualifying intermediary" (QI), if the dividends are paid on shares that are "actively traded" on an "established financial market" or, in general, on redeemable shares of public mutual funds. **36.2**

In the case of payments made outside the United States with respect to an offshore account, a withholding agent may, as an alternative to a Form W-8, rely on a certificate of residence or certain documentary evidence relating to the beneficial owner (and, if the beneficial owner is not an individual, the withholding agent must also obtain certain other certifications relating to (1) the owners's status under any applicable Limitation on Benefits article and (2) whether the income is properly treated as derived by a resident of the relevant treaty country). **36.2a** The withholding agent must review the documents and maintain them in its records. Other U.S.-source dividends are subject to the general rule under the regulations for treaty income, which requires the beneficial owner to itself obtain a TIN and provide it on the Form W-8 furnished by such owner to the withholding agent. **36.3**

In general, the Form W-8 may be provided by the beneficial owner or a QI on behalf of (and without disclosing the identity of) the beneficial owner. A QI is a financial institution or other specified person who has entered into a withholding agreement with the IRS. The regulations set out the general terms of the agreements. **36.4** Simultaneously with the issuance of the proposed regulations, the IRS issued a draft revenue procedure with respect to the procedures for qualification. **36.5** Following certain Treasury discussions with the competent authorities of treaty partners, a revised revenue procedure was issued. **36.6** The main purpose of the QI is to permit banks and other financial institutions to act for their customers in withholding tax matters. The regulations attempt to strike a balance between the need for appropriate withholding tax rules and the concern that those rules not deter foreign investment in publicly

held securities of U.S. issuers. **36.7**

Until the revised regulations become effective for dividend payments, the payor of U.S.-source dividends may rely on the address of the payee as evidencing the payee's country of residence, unless the payor has actual knowledge to the contrary. **37** IRS Form 1001 (applicable to certain U.S.-source payments eligible for treaty relief) is not required (and, on its face, is not even applicable) in such a situation. The address rule provides little or no assurance that the recipient of a dividend is a resident of the treaty country, and allows for a much more porous withholding tax system than what is required by other countries.

In the context of the address rule, the IRS has addressed circumstances under which a withholding agent may withhold at a reduced rate of tax with respect to shares held by a custodian or other nominee. **Revenue Ruling 68-230 38** involved a Dutch bank holding shares as custodian on behalf of French residents. The ruling states:

> In every case in which dividends pass through a bank or other custodian in the Netherlands to the actual owner whose residence is in France, the reduced rate of withholding may apply, but only if the actual owner of the dividend furnishes such bank or custodian an appropriate form or letter authorizing the bank or custodian to disclose to the revenue authorities of France either directly, or indirectly through the Internal Revenue Service, the name and address of the actual owner, and the name and address of the corporation paying such dividend and the amount thereof.

> The foreign bank or custodian must file with the United States withholding agent a copy of this authorizing form or letter in duplicate. The United States withholding agent may then withhold the tax at the reduced rate provided by the tax convention.

The condition in Revenue Procedure 68-230 that the beneficial owner provide to the nominee a form or letter authorizing disclosure **39** was impractical in many cases. Instead, the practice that was adopted and tolerated relied on "know your customer" rules.

The development from the address rule to the rule in the revised regulations (proposed in 1996) covered approximately fifteen years. In 1982, the U.S. Congress directed the Treasury to establish procedures to ensure that the benefits of treaty rate reductions inure only to eligible persons. Pursuant to that mandate, the IRS issued proposed regulations in 1984 that, if finalized, would have required the payee of U.S.-source dividends to file IRS Form 1001 and, in addition, file a Certificate of Residence issued by the competent authority of the payee's country of residence. In 1994 and early 1995, the Treasury undertook an initiative to require non-U.S. persons investing in the United States to obtain taxpayer identification numbers (TINs). The Treasury informally floated a proposal to measure the reaction of the financial community. Under that proposal, non-U.S. persons having U.S. investment accounts or receiving U.S.-source income would have been required to obtain permanent TINs and present documentary evidence of residence and such other information as might be required by the IRS in order to avoid U.S. withholding tax of 31% on U.S.-source interest and dividends and on the gross proceeds of sales of

securities.

A number of objectives were raised by the financial services community. First, it was suggested that many non-U.S. individual investors investing through non-U.S. financial institutions would simply discontinue investing in U.S. securities rather than provide the personal information requested to a foreign government. For example, a letter from the Swiss Bankers Association claimed that, if the TIN proposal were implemented, it would quickly eliminate customer interest in U.S. equities. [42] Second, it was noted that foreign investors have access to comparable alternative investments without procuring U.S. TINs, including non-U.S. equity and debt, bearer Eurobonds, offshore mutual funds, and derivative products that could track the performance of U.S. securities. Third, certain non-U.S. financial institutions would be prohibited by bank secrecy or other laws from participating in the TIN initiative. [43]

An alternative proposed on behalf of certain U.S. and non-U.S. financial institutions was to have the financial institution certify an investor's residence and/or nationality to the IRS, without disclosing the investor's identity.

Subsequently, the preamble accompanying certain proposed regulations concerning IRS individual taxpayer identification numbers [45] noted that the Treasury and IRS are "considering changes to the procedures that apply to withholding tax on payments to foreign persons in order to encourage compliance and reduce paperwork burden" and that they would "move very cautiously, particularly by considering the possible effect of changes in these procedures on investment decisions by foreign persons.…" What followed were the regulations under section 1441 proposed in April 1996.

# ¶ 9.02[1][b][iii] Treaty selection and risk of conduit attack.

In certain instances, a non-U.S. investor or investors may find it attractive to acquire ownership of shares of a U.S. corporation through a non-U.S. corporation resident in a third country with a favorable income tax treaty with the United States. For example, the investors may be resident in a country that does not have an income tax treaty with the United States or that has a treaty with less favorable dividend withholding rates. In recent years, the inclusion of Limitation on Benefit articles in U.S. income tax treaties has substantially reduced the choices available to investors. For example, in view of favorable treaties with the Netherlands (prior to 1995) and the Netherlands Antilles (prior to 1987), corporations formed under the laws of those jurisdictions were the investment vehicle of choice for many non-U.S. investors desirous of securing dividends from U.S. sources at a reduced rate of withholding while incurring very little tax in the corporation's country of residence.

Following negotiation of various treaties in the mid-1990s, tax advisors have been faced with more limited alternatives. As of April 1998 these alternatives included, in particular, a corporation qualifying under the U.K. treaty (which could be organized in any non-U.S. jurisdiction as long as it is managed and controlled in the United Kingdom), and a corporation qualifying under the 1962 Luxembourg treaty (which could be organized in any non-U.S. jurisdiction as long as its business management or seat is in

Luxembourg). While a new treaty with Luxembourg was signed in 1996 and contains a Limitation on Benefits article, the article is relatively generous in the case of EC shareholders and, in any event, has not been ratified as of April 1998. Provided the Limitation on Benefits article of the relevant U.S. income tax treaty can be satisfied, Austria, France, Germany, Ireland, the Netherlands and Switzerland are among other jurisdictions that may offer attractive holding company regimes depending on the circumstances. Under the U.K. treaty, attention must be paid to Article 10(7), restricting the benefit of rate reductions under the Dividends article in the case of 10 percent or greater shareholders with respect to certain dividends from pre-affiliation earnings. **47**

In 1991, the IRS indicated that it would assess whether a foreign corporation claiming a reduced rate of dividend withholding under a treaty might not qualify for such rate based on the conduit principles articulated in the 1984 revenue rulings- **Revenue Rulings 84-152** and **84-153** -addressing back-to-back loans. **48** In a memorandum prepared by its General Counsel's office, **49** the IRS referred to an earlier such memorandum, **50** which discussed the holding period required for a dividend paid by a U.S. corporation to its Netherlands parent corporation to be subject to the reduced rate of tax of 5% under Article VII(1)(b) of the 1948 Dutch treaty (as amended by the 1965 supplementary convention):

> To the extent that **GCM 37265** implies that the dividend paid by United States corporation would be subject to the reduced rate of tax on dividends if the time-period requirement of ownership was satisfied, without a consideration of the principles set forth in **Rev. Rul. 84-152, 1984-2 C.B. 381** and **Rev. Rul. 84-153, 1984-2 C.B. 383** , it is revoked for dividends paid on or after October 15, 1984. Under the facts of this G.C.M., the principles set forth in the 1984 revenue rulings were not considered in determining whether the Netherlands corporation had complete dominion and control over dividends received from the United States corporation.

For example, there was concern that, under the principles of **Revenue Rulings 84-152** and **84-153** , the IRS might scrutinize an arrangement in which a treaty country corporation held one or more U.S. stock investments if the dividends received were routinely paid out promptly in payment of indebtedness. Further, at least if the U.S. income tax treaty with respect to which the corporation qualified as a resident did not have a restrictive Limitation on Benefits article, there was speculation that the IRS might attempt to disallow a reduced rate of withholding tax on dividends paid to the corporation even if payments out of the corporation took the form of dividends rather than debt payments. A 1991 IRS technical advice memorandum so concluded in an analogous situation (with respect to the withholding tax on interest) on the facts involved. **51** The principles involved in the 1984 rulings and the technical advice memorandum are discussed in more detail in Chapter 10. **52**

In 1993, the U.S. Congress enacted **Code Section 7701(l)** , pursuant to which the Treasury is authorized to promulgate regulations under which one or more parties to a multiparty financing arrangement may be disregarded. Regulations were released under **Section 7701(l)** on August 10, 1995, effective for payments made on or after September 11, 1995. The regulations give the IRS district director the ability to disregard the participation of one or more persons (the "conduit entity") **53** in a

conduit financing arrangement under certain circumstances. **54** In general, a "financing arrangement" for this purpose means two or more "financing transactions" pursuant to which:

> 1. One person (the financing entity) advances money or other property to another person (the intermediate entity);
> 2. Another person (the financed entity) receives money or other property or rights to use property;
> 3. The advance and receipt are effected through one or more other persons (intermediate entities); and
> 4. If there is more than one intermediate entity, there is a chain of financing transactions linking the financing entity, each intermediate entity, and the financed entity. **55**

A "financing transaction" for purposes of the conduit financing regulations includes an advance of money or other property in, for example, a lending, leasing, or licensing transaction. In general, the regulations do not treat an advance of money or other property for common stock or ordinary perpetual preferred stock as a financing transaction. This represents a retreat from technical advice memorandum 9133004. However, an advance of money or other property in exchange for stock (or a similar interest in a partnership or trust) *is* treated as a financing transaction if **56**

> 1. The issuer is required to redeem the stock or similar interest at a specified time or the holder has the right to require the issuer to redeem the stock or similar interest or to make any other payment with respect to the stock or similar interest;
> 2. The issuer has the right to redeem the stock or similar interest, but only if, based on all the facts and circumstances as of the issue date, redemption pursuant to that right is more likely than not to occur; or
> 3. The owner of the stock or similar interest has the right to require a person related to the issuer (or any other person who is acting pursuant to a plan or arrangement with the issuer) to acquire the stock or similar interest or to make a payment with respect to the stock or similar interest.

A person is considered to have a right to cause a redemption or payment if the person has the right (other than rights arising, in the ordinary course, between the date that a payment is declared and the date that a payment is made) to enforce the payment through a legal proceeding or to cause the issuer to make a payment. Either a person must have such a right as of the issue date or, if not, it must be more likely than not as of the issue date that the person will receive such a right, whether through the occurrence of a contingency or otherwise. A person is not considered to have a right to force a redemption or a payment if the right is derived solely from ownership of a controlling interest in the issuer unless the control arises from a default or similar contingency under the instrument. The fact that the issuer does not have the legally available funds to redeem the stock or similar interest, or that the payments are to be made in a blocked currency, is not relevant to whether there is a redemption or payment obligation or right.

Under these rules, a normal call option in respect of stock apparently would not cause the advance of funds for the stock to be a financing transaction, provided it could not be said, as of the issue date, that

the option more likely than not would be exercised. A redemption right or put right in respect of stock, however, generally would cause an advance of funds for the stock to be a financing transaction.

The conduit financing regulations are discussed in greater detail in Chapter 10. **57**

# ¶ 9.02[1][b][iv] Special tests for nonportfolio stock rate.

***Direct ownership of specified percentage of voting stock.*** In order to qualify for the reduced rate for nonportfolio stock, the shareholder generally is required to hold at least a certain percentage of the voting stock of the paying corporation. **58** For this purpose, under U.S. law, "ownership" generally means direct rather than indirect ownership, even if the treaty does not expressly so provide. **59** In general, shares held by an affiliate of the shareholder cannot be counted towards this requirement. **60** For example, the IRS has ruled under the former treaty with the Netherlands that a parent corporation's ownership of voting shares of a U.S. corporation could not be considered ownership of such shares by the U.S. corporation's Dutch "sister" corporation. **61** On the other hand, the 1951 Swiss treaty referred to "direct or indirect control," and the IRS ruled that the 95% ownership threshold thereunder was met where the Swiss corporation owned 90% of a U.S. corporation directly, and the Swiss corporation's wholly owned foreign affiliate owned 10%. **62** If the 10% block had been owned by a Swiss corporation, however, that corporation would not have been entitled to the 5% rate, as per the general rule. **63**

Suppose that a corporation that qualifies as a resident of Germany is a 50% partner (equal sharing) in an entity treated as a partnership for purposes of both U.S. and German tax law, and the partnership holds shares representing 20% of the voting power of a domestic corporation. The German partner would qualify for a 5% dividend withholding tax rate in respect of its share of the dividends if the shares were held directly by it. The U.S. position is that the 5% rate would apply even though the shares are held in a partnership. **63.1** Complications may arise, however, where the partnership sharing is not as clear, such as where special allocations are involved.

The voting stock ownership requirement is construed as requiring that the shareholder own the specified% of the aggregate voting power of the corporation rather than such% of voting stock regardless of its voting power. **64** In testing voting power, U.S. law generally looks to the number of directors that the stock has the power to elect. **65**

The IRS has ruled under the **1967 U.S.-France treaty** that three related French corporations would be considered to directly own shares placed by them in a trust treated as a grantor trust under U.S. tax rules since, under U.S. law, the grantor of a grantor trust generally is considered to own the assets held by the trust. **66** The Memorandum of Understanding **67** accompanying the Netherlands treaty clarifies that the beneficial owner of shares may qualify for the 5% rate under that treaty even if such person's ownership of such shares is held in the form of depository receipts or trust certificates.

***Time of holding.*** The date of payment of a dividend that may be entitled to the nonportfolio stock rate could plausibly be viewed as any of three dates: (1) the date of declaration, (2) the record date, or (3)

the date of the actual distribution. Under the 1989 U.S.-Germany treaty, the IRS takes the view that the record date controls for purposes of determining whether the stock ownership requirement of **Article 10(2) of the treaty** is satisfied. **67.1**

***Nature of income.*** Under a few older treaties, no more than a certain percentage (generally, 25%) of the gross income of the paying corporation for a certain period (e.g., the year preceding the year in which the dividend in question is paid and, under certain treaties, the current year) may consist of dividends and interest, other than, generally, dividends and interest from 50% subsidiaries or, under certain treaties, from the active conduct of a banking, insurance, or financing business. **68** Even in the case of treaties that do not expressly provide for the treatment of interest from the active conduct of such a business as "good" income for this purpose, the IRS has reached the same result. **69**

In the case of, for example, the 1951 Swiss treaty, no testing period was specified and no definition of "subsidiary" was provided. Treaty regulations under the treaty provided for a three-year testing period, **70** which was construed to mean thirty-six months. **71** The IRS ruled that, in a case in which the corporation was in existence for a shorter period, that shorter period was the appropriate testing period. **72** The IRS also ruled that "subsidiary" means a corporation at least 50% of the shares of which are owned by the Swiss corporation. **73**

Significantly, the income test is made on a separate company basis and is a gross income test. Consequently, a holding company that has no income other than a small amount of interest from, for example, a bank account would not meet the test, even if its other assets consist solely of wholly owned operating subsidiaries. Management and financial service fees derived by the holding company would count as "good" income.

Further, it appears that dividends and interest from 50% subsidiaries are excluded only from the numerator of the fraction and not from the denominator, **75** thus permitting "good" income to be brought up through intragroup dividends or interest on loans. One exception, however, was the 60 percent gross income test that applied under the now-terminated Dividend article of the Netherlands Antilles treaty, as modified by the 1963 protocol thereto. **76** That test did not exclude dividends or interest from subsidiaries. **77**

It appears that the test is applied to the cumulative results for the testing period in question and that failure of the test in one year is not fatal if the cumulative results for the applicable testing period are positive. **78**

***Holding period.*** Under certain treaties, as noted, the requisite shares must be held not only at the time the dividend is paid but for the portion of the year in which such payment occurs that precedes the payment as well as the whole of the prior year. **79** The IRS has ruled that holding period "tacking" rules, which apply under U.S. domestic law in connection with certain nontaxable transfers, are not available for purposes of the treaty holding period requirements. **80** For example, in a case where a Swedish corporation's U.S. subsidiary that had been held for a number of years was merged "downstream" in a tax-free reorganization into a U.S. corporation recently purchased by it, dividends paid by the surviving

corporation did not qualify for the 5 percent rate under the 1963 protocol to the 1939 treaty because shares in the reorganized corporation were not owned for the required period. **81**

If the shareholder has held the required percent of shares for the required period and acquires additional shares, no separate holding period is required in respect of the additional shares. **82**

**Article 10(7)(a) of the U.K. treaty** contains a unique provision denying the benefit of any reduction under the Dividends article (not just the benefit of the 5% rate) to a person (whether or not a corporation) that owns 10 percent or more of the class of shares of the paying corporation to the extent that the dividend "can have been paid only out of profits which the corporation paying the dividend earned or other income which it received in a period ending 12 months or more before the relevant date," which is defined as "the date on which the beneficial owner of the dividend became the owner of 10% or more of the class of shares in question." Under Article 10(7), this rule does not apply if the beneficial owner of the dividend "shows that the shares were acquired for bona fide commercial reasons and not primarily for the purposes of securing the benefit" of the reduced treaty dividend withholding rate. This provision is intended to impede transactions involving the acquisition of a substantial share interest in order to obtain a distribution of past earnings of the corporation at the reduced treaty rates. Similar provisions are contained in a number of U.K. income tax treaties, including those with Australia, Canada, and Finland. It is not entirely clear how the twelve-month period should be determined. Since the provision refers simply to a "period" ending twelve months or more before, rather than, for example, a "fiscal period" or "taxable period," it is very possible that earnings ineligible for the reduced treaty rate would include those earned through the date that is the corresponding day of the twelfth-preceding calendar month. It could be argued, however, that earnings for a fiscal or taxable accounting period that ends during that twelve-month period would be eligible in their entirety, rather than just earnings derived during the portion of that period that falls within such twelve-month period.

*Business purpose.* The U.S.-Denmark treaty requires, as generally was the case with other pre-OECD treaties, a showing that the relationship between the payor and payee has not been arranged or maintained primarily with the intention of securing the reduced rate. The IRS has addressed this requirement on numerous occasions, often in the context of **the 1951 Swiss treaty 83** and the largely terminated **treaty with the Netherlands Antilles** , **84** but also under, for example, **the Danish treaty** , **85 the 1949 Irish treaty** , **86** and **the 1955 Italian treaty** . **87** It is probably accurate to characterize the IRS's level of inquiry since the mid-1980s as substantially more rigorous than prior to that time, when it sometimes required no more than the taxpayer's representation to issue a favorable ruling. **88** Apparently, the same forces that mitigate in favor of Limitation on Benefit articles are at work. The IRS seems to require a showing, based on a literal reading of the test, that the taxpayer must show not only that the relationship was not arranged primarily to secure the reduced rate, but also that, for the tax year or years in question, the relationship is not maintained primarily for that purpose. **89**

The IRS has ruled favorably with respect to the business purpose requirement in, for example, the following situations: (1) The corporation receiving the dividend could have been incorporated in a jurisdiction that would have entitled it to a rate at least as low as the one to which it was entitled under

the treaty; **90** (2) the corporation served as a holding company for operating companies in that same jurisdiction; **91** (3) all or almost all of the stock of the corporation was owned, directly or indirectly, by residents of the jurisdiction in which the corporation was incorporated; **92** and (4) the corporation was incorporated prior to the signing of the relevant treaty, the corporation serves as a holding company for subsidiaries that include same-country subsidiaries, the corporation has significant office facilities in that country and a majority of its employees (including officers) are residents of that country. **93**

The IRS issued an unfavorable ruling to a taxpayer asserting the following business purposes: (1) the political stability of the recipient country; (2) the lack of stability in alternative countries in which the recipient could have been established; (3) the country's close ties to various industries in the United States; (4) the country's close ties to other countries; (5) the country's geographical proximity to the United States. **94** Another negative ruling rejected the following business purposes: (1) the low effective tax rate of the Netherlands Antilles; (2) the real estate experience of the personnel there; (3) the ability to make a real property net election under the treaty; and (4) U.S. estate tax exposure if an investment were made directly by an individual. **95** The IRS also ruled that the following business purposes asserted by a commercial bank with respect to a Netherlands Antilles corporation formed to hold a U.S. Edge Act corporation were inadequate: (1) long-standing relationship with a local trust company; (2) time and cost savings; (3) excellent facilities; and (4) a stable government. **96** Negative rulings have been issued to numerous other taxpayers. **97**

In the case of treaties that do not impose a business purpose test, no such requirement has been implied. **98**

***Necessity for ruling.*** The Treasury regulations under the Swiss treaty on their face seem to mandate that a U.S. corporation intending to withhold at the 5% rate under that treaty file certain information with the IRS, in response to which the IRS must rule as to whether the 5% rate is available. **99** In connection with the business purpose requirement, Treasury regulations with respect to certain pre-OECD treaties provided a ruling procedure for taxpayers to secure the 5% dividend withholding tax rate. For example, the Treasury regulations under the Danish treaty on their face seem to mandate that a U.S. corporation intending to withhold at the 5% rate under that treaty file certain information with the IRS, in response to which the IRS must rule as to whether the 5% rate is available. **99.1** The treaty itself does not impose a ruling requirement, and it would seem that the IRS cannot add to the requirements set forth in the treaty. Certainly, the actual issuance of a favorable ruling could not be a substantive requirement, as the taxpayer should be free to have its qualification tested by the courts. Even a requirement that a request be filed seems to impose a compliance burden that does not seem justified by administrative requirements. The fact that the U.S. withholding agent, rather than the Swiss taxpayer, is instructed to file the request, as well as the uncertainty that sometimes could surround the business purpose requirement, suggests that the IRS intended the ruling procedure to assist taxpayers in determining whether withholding at the 5% rate could be made without risk of under withholding sanctions.

A similar requirement was set forth in the Treasury regulations under the Netherlands Antilles treaty. **100** The requirement was extended to the 15% rate by a Revenue Procedure. **101** Certain commentators,

who did not question the ruling requirement for the 5% rate, did question its extension to the 15% rate because the regulations were to the contrary. **102**

As noted, the **U.S.-Denmark treaty** , which is the only U.S. income tax treaty with a Dividends article in the pre- **OECD Model Treaty** form, continues to impose a business purpose test with respect to the 5% rate. Although a ruling should not technically be required in order to qualify for the 5 percent rate, a taxpayer may find it advantageous to seek a ruling. Revised **Section 1441** withholding tax regulations (effective for payments after December 31, 1999) provide, with respect to the tax-avoidance purpose condition in the treaty with Denmark that a domestic corporation "may treat this condition as satisfied" if, prior to the payment, a ruling request has been submitted to the IRS and the IRS either has issued a favorable ruling (that has not been reversed) or is considering the request. **102.1**

## ¶ 9.02[1][b][v] Dividends under Code Section 304.

In general, if a person controls 50% or more of each of two corporations and sells shares in one corporation to the other, the sale proceeds are treated under **Section 304(a)(1)** as a dividend for U.S. tax purposes to the extent of the earnings and profits of, first, the purchasing corporation and, second, the purchased corporation. **102.2** This deemed dividend is considered a dividend for treaty purposes. **103** "Control" for this purpose means ownership of 50% or more of the value or voting power of the corporation in question, giving effect to certain rules attributing ownership of stock between certain related parties. **104** Under **Section 304** , as amended in 1997, the seller is treated as transferring the transferred shares to the purchaser for newly issued shares of the purchaser corresponding to the payment to be received from the purchaser and as then receiving the payment in redemption of such shares (which redemption generally would be taxable as a dividend under the Code rules governing redemptions). Prior to the 1997 change, the seller was treated as making a capital contribution of the transferred shares to the purchaser and receiving the payment as a dividend directly from the purchaser to the extent of its earnings and profits and, if they were less than the amount of the payment, then as a dividend from the corporation transferred. **104.1** To the extent that the sale proceeds are considered a dividend of earnings and profits of a U.S. corporation and the seller is a non-U.S. person (which, under certain circumstances, can be the case if the corporation sold is a U.S. corporation even if the seller and purchaser are non-U.S. corporations), such sale proceeds generally are subject to U.S. 30% dividend tax (required to be withheld at the sources), except to the extent reduced by treaty.

As noted above, the deemed dividend is considered paid to the seller of the shares. The seller, however, may not actually own any shares in the corporation from which the dividend is deemed paid, and, prior to the 1997 change to **Section 304** , was not deemed to own shares (other than under attribution rules, which applied only for purposes of the **Section 304** control test). Nevertheless, the IRS has ruled that, if the seller is resident in a country with which the United States has concluded a treaty providing for a reduced dividend withholding rate, sale proceeds treated as a dividend from U.S. sources are eligible for the reduced withholding rate. Moreover, such a dividend generally would qualify for the special rate applicable to nonportfolio holdings, by reference to the shares actually or constructively owned under

attribution rules applicable for purposes of **Section 304** , which, by definition, must represent at least 50% of the total shares.

## Example

**105** *FP*, a corporation organized under the laws of foreign country *A*, owns all the stock of *DX*, a U.S. corporation, and *FX*, a corporation organized under the laws of foreign country *Z*. *FX* owns all the stock of *FY*, also a country *Z* corporation. As of the close of the 1991 taxable year, *DX* had earnings and profits of $90*x*, and *FY* had earnings and profits of $110*x*.

The United States and *A* have entered into a tax treaty that is identical to **the U.S. Model Treaty** . The United States also has entered into a tax treaty with *Z*, which is similar to the U.S.-*A* treaty except the U.S.-*Z* treaty provides higher withholding tax rates on dividends. The U.S.-*Z* income tax treaty limits U.S. tax to 10% of the gross amount of dividends paid by a domestic corporation to the foreign corporation that owns at least 10% of the voting stock of the paying corporation. Dividends paid to all other shareholders are taxed at 20%.

*FX* sold all the *FY* stock to *DX* for its fair market value of $200*x* on December 31, 1991.

These facts were addressed in **Revenue Ruling 92-85** (Situation 1). As discussed above, under **Section 304** , the proceeds of sale are considered a corporate distribution, potentially taxable as a dividend under U.S. domestic law. Since that distribution is treated as a dividend paid from *DX* to *FX* to the extent of *DX*'s $90*x* earnings and profits, the income tax treaty between the United States and *Z*, the country under whose laws *FX* was organized and is a resident, is the appropriate treaty for purposes of determining the rate of withholding tax on such portion of the deemed dividend. Because the U.S.-*Z* treaty is not more favorable than the treaty between the United States and *A*, *FP* is not using **Section 304** as an attempt to obtain any benefits under the Dividend article of the U.S.-*Z* treaty. The ruling notes that, on other facts, a different conclusion may be appropriate.

Under **Section 304** , as construed in **Revenue Ruling 92-85** , *DX* is treated as having made a dividend distribution to *FX* with respect to the *DX* stock considered owned by *FX* for **Section 304** purposes. Since, by definition, that must be 50% or more of the *DX* stock, the IRS concluded that *FX* will be considered to own at least 10% of the voting stock of *DX* for purposes of the U.S.-*Z* income tax treaty. Accordingly, the $90*x* deemed dividend from *DX* is subject to U.S. withholding tax at the reduced U.S.-*Z* treaty rate of 10%. **106**

Since the $200*x* sale proceeds exceeded the amount of *DX*'s earnings and profits ($90*x*), the proceeds would be treated under **Section 304(b)(2)** as a dividend from *FY* (the corporation sold to *FX* to the extent of *FY*'s earnings and profits ($110*x*)). Assuming *FY* has never been engaged in business in the United States, such deemed dividend would be from non-U.S. sources and hence not subject to U.S. tax.

Suppose that *FY*'s earnings and profits were $10*x* rather than $110*x*. In such case, the excess portion of the distribution over the total amount treated as a dividend ($100*x*) should be considered distributed by *DX* as a return of basis to the extent of the basis *FX* had in the *FY* shares prior to the sale and thereafter as capital gain. This result is clear for transactions following the effective date of the 1997 amendment to **Section 304** (June 8, 1997, subject to an exception for binding contracts), because, as amended, the statute treats the seller as receiving for a moment newly issued purchasing corporation shares, which would take a tax basis determined by reference to that of the shares sold, and then as receiving the purchase price in redemption thereof. (For transactions governed by pre-amendment **Section 304** , the return of basis was more clearly the result if *FX* actually took back certain *DX* shares to which *FX*'s former basis in the *FY* shares could attach, but the result should be the same even if no shares were taken back.) **107** Provided *DX* is not a "U.S. real property holding company" within the meaning of **Section 897(c)** , any gain realized would not be subject to U.S. tax.

**Revenue Ruling 92-85** extends the scope of the anticonduit rulings to cover intragroup sales. As noted, the IRS suggests in the ruling that, if *FX* would enjoy a lower U.S. withholding tax rate in respect of the deemed dividend than *FP* would have enjoyed in respect of an actual dividend from *DX*, the benefit of the lower rate might be disallowed. It is not clear whether this could only be the case if certain other tax avoidance factors are present.

A final factor that should be mentioned is that, in the real world, it generally will be difficult to determine the amount of *DX*'s (or *FY*'s) earnings and profits. The IRS takes the position that, absent an ability to definitively establish the amount of earnings and profits, withholding is required on the entire amount of a distribution. **108** The IRS cited this principle in **Revenue Ruling 92-85** . Thus, it may be difficult to know what portion of the sale proceeds is subject to withholding.

# ¶ 9.02[1][b][vi] Dividends attributable to permanent establishments.

The treaties generally expressly exclude from the scope of the Dividend article dividends that are attributable to or effectively connected with a permanent establishment of the shareholder in the source Contracting State. Such dividends are considered taxable under the Business Profits or Independent Personal Services articles.

The terms "attributable" to, which is used in the U.S. Model Treaties and "effectively connected" with, which is used in the OECD Model Treaties, generally **109** are not defined in U.S. income tax treaties. Therefore, their meaning generally must be determined in accordance with the law of the Contracting State imposing the tax. Nothing suggests that the two terms are intended to have different meanings under the treaties.

The Code and Treasury regulations define the terms "effectively connected" and "attributable" for analogous domestic law purposes, as discussed below. Although the definitions are not directly

applicable for treaty purposes, they may well provide the most useful basis to construe the terms from a U.S. standpoint for treaty purposes.

Under U.S. tax rules, income cannot be considered attributable to or effectively connected with a U.S. permanent establishment or fixed base unless the income is "effectively connected with the conduct of a trade or business within the United States." **110** Therefore, the requirements for a U.S. trade or business and for income to be effectively connected are in effect preconditions to whether income is attributable to a U.S. permanent establishment or fixed base. (This may be thought of as a specific application of the general principle that a taxpayer is entitled to rely on the treatment under the statutory law or a treaty, whichever is more favorable. **111** )

While the Code does not define the term "engaged in trade or business," it sets forth certain "safe harbors." **112** A non-U.S. person will not be considered to be engaged in a U.S. trade or business merely by reason of effecting transactions in stock or securities in the United States for its own account, even through a U.S. office or employees or agents resident in the United States, unless such person is a dealer in stock or securities. **113** For purposes of these exceptions, the Treasury regulations set forth ten factors that are relevant to whether a corporation's (or partnership's) principal office is in the United States. **115** These factors generally refer to ministerial functions that often can be readily performed at a location other than where investment decisions are made and trading conducted.

If, however, a non-U.S. corporation is considered engaged in a U.S. trade or business, the inquiry becomes whether the dividends are effectively connected with that trade or business. In the case of U.S.-source dividends, other than in the case of a banking, financing, or similar business, the dividends would be effectively connected with a U.S. trade or business under domestic law if the shares on which the dividends are paid are "used in, or held for use in, the conduct" of the U.S. trade or business (asset use test) or the activities of the U.S. trade or business were a "material factor in the realization of" the dividends (business activities test). **116** The asset use test covers, for example, income earned on funds held for working capital purposes. The business activities test covers, for example, interest and dividends derived by a dealer in stocks or securities. As amended in 1996, the effectively connected income regulations generally do not allow dividends to be effectively connected under the asset use test of the regulations. **117** The preamble to the proposed amendments **118** requested comments concerning the amendment's effect on stock portfolio investments of non-U.S. insurance companies, and this issue is reserved in the final regulations. **118.1** Such companies typically treat dividends on U.S. stock investments held as reserves as effectively connected income under either the asset use test or the business activities test.

In the case of non-U.S.-source dividends, other than in the case of dividends derived in a banking, financing, or similar business or in a life insurance business, dividends can be effectively connected under U.S. domestic law only if the taxpayer is a corporation the principal business of which is trading stocks or securities for its own account, *and* the dividends are attributable to an office or other fixed place of business in the United States (FPB) within the meaning of **Section 864(c)(5)** . **119** The second of these requirements, "attributable to" an FPB, is directly applicable in determining whether income is

effectively connected, but also may be considered to lend guidance on what "attributable to" a permanent establishment means. Under Treasury regulations, dividends are considered "attributable to" an FPB if the FPB is a "material factor in the realization" of the dividends, and the dividends are "realized in the ordinary course of the trade or business carried on through that [FPB]." **120** The first part of this test, the material factor condition, is met if the FPB "actively participates in soliciting, negotiating, or performing other activities required to arrange" the acquisition of the shares on which the dividends were paid or "performs significant services incident" to such acquisition. **121** The regulations proceed to state that an FPB shall not be considered to meet the material factor test merely because it (1) collects or accounts for the dividends; (2) exercises general supervision over the activities of the persons directly responsible for carrying on the activities or services; (3) performs merely clerical functions incident to the acquisition of the shares; or exchange, or (4) exercises final approval over the execution of such acquisition. **122**

In the case of a banking, financing, or similar business conducted in the United States, dividends (whether U.S.- or non-U.S.-source) can be effectively connected with such business under U.S. domestic law only if they are derived on stock held for distribution to the public (i.e., underwriting activities) or held to meet reserve requirements. **123** Even in those situations, the stock further must be "attributable to a U.S. office" of the taxpayer, which condition is met if such office "actively and materially participated in soliciting, negotiating or performing other activities required to arrange the acquisition" of the stock. **124** Stock is not considered to be attributable to a U.S. office merely because such office engages in collection, general supervisory, or clerical activities, exercises final approval over the acquisition of the stock, or holds or books the stock in the United States. **125** If dividends derived by an enterprise conducting a banking, financing, or similar business are not effectively connected with that business under this test, the dividends might nevertheless qualify as effectively connected with a U.S. business under the asset-use or business-activities tests described above (if U.S.-source dividends) or with a U.S. business of trading securities for the enterprise's own account (if foreign-source dividends).

In the case of a non-U.S. corporation's life insurance business conducted in the United States, non-U.S.-source income is considered effectively connected income under U.S. domestic law if it is attributable to the corporation's U.S. business. **126** No additional or specific guidance as to the meaning of "attributable" in this context is provided in the Treasury regulations.

A key point under the U.S. domestic rules for effectively connected income is that, in general, although more than one branch of the taxpayer may have performed material functions necessary to derive the income, *all* the income is taxable by the United States if a U.S. branch meets the relevant criterion in the regulations (e.g., the material factor test or the active and material participation test). Consequently, the U.S. domestic law concept of effectively connected income has a natural proclivity towards overinclusion, with the consequent risk of double taxation.

On the other hand, certain of the criteria for effectively connected income under the domestic law rules may be overly limiting. For example, auction preferred stock may be acquired by the U.S. branch of a non-U.S. bank in what commercially is a financing transaction but what from the standpoint of the

Treasury regulations is not a transaction giving rise to income effectively connected with a banking, financing, or similar business, although the income still might qualify as effectively connected with the bank's U.S. business under the generally applicable rules discussed above. If the dividends were not treated as effectively connected income, the bank would suffer gross-basis U.S. taxation in the case of U.S.-source dividends (generally at a 15% rate under typical treaties), without the ability to deduct its funding and other costs, and would be wholly exempt from U.S. tax in the case of foreign-source dividends. The U.S. branch of a bank resident in a treaty country generally should be able to treat such dividends as effectively connected with the branch under the treaty. (Note also that a contrary construction of the effectively connected/attributable standard of the treaty would be inconsistent with the permanent establishment clause of the Nondiscrimination article.)

## ¶ 9.02[1][b][vii] Force-of-attraction principle.

Certain U.S. income tax treaties in the pre- **OECD Model Treaty** form **127** purport to permit full source-State taxation of income, without reduction, if the payee has a permanent establishment there. This "force-of-attraction" principle was consistent with U.S. tax law at the time these treaties entered into force. **128** The United States in effect abandoned the force-of-attraction principle in 1966 with respect to certain types of income, including dividend income. **129** Consequently, such income is fully taxable by the United States only if it is effectively connected with a U.S. trade or business, regardless of the wording of the treaty. **130** For example, an investor residing in a country, such as Denmark, whose treaty with the United States provides a reduced dividend tax rate only if the investor does not have a U.S. permanent establishment may rely on that treaty with respect to dividends that are not effectively connected with a U.S. trade or business even if the investor also conducts business in the United States through a permanent establishment.

U.S. income tax treaties that have entered into force or have been amended since the United States abandoned the force-of-attraction principle incorporate the effectively connected concept. Although certain treaties use the term "effectively connected with" a permanent establishment, whereas others use the term "attributable to" a permanent establishment, these terms should be given the same meaning.

## ¶ 9.02[1][b][viii] Dividends on shares sold.

An issue that sometimes arises concerns the identity of the shareholder for purposes of the dividend withholding tax in the context of a sale of shares with a "ripe" dividend. For example, preferred shares may be sold with accrued unpaid dividends, or common or preferred shares may be sold following a declaration of dividends. The question may arise at any of three junctures as follows:

1. Sale between date dividend accrues, and date dividend is declared. This situation typically would involve preferred stock. In this situation, under U.S. law, the dividend is taxable to the

buyer. **131** Thus, the relevant treaty would be that available to the buyer, if any.

2. Sale between dividend declaration date and record date. In this situation, the board of directors of the corporation actually has declared the dividend, but made it payable to holders of record at a later date. (Note that an exchange-listed stock may go "ex-dividend" a few days before the record date for administrative reasons; nevertheless, it generally is possible to complete an off-exchange sale of the shares together with the right to the dividend between such date and the record date.) Under Treasury regulations, the dividend is "ordinarily" taxed to the buyer if the buyer is "entitled" to the dividend. **132** Certain authorities, however, have held that the dividend is taxable to the seller, where the facts involved certain related parties. **133** It appears that "entitled" for this purpose is tested by reference to the applicable corporate law, and not to contractual rights. Interesting questions may arise if the purchaser is eligible for a lower rate of dividend withholding tax than the seller, but is required to make a substitute payment to the seller.

3. Sale between record date and dividend payment date. In this situation, under U.S. law, the dividend would be taxable to the seller. **134**

In sum, under U.S. law, the record date is the pivotal date, although some uncertainty can arise in the case of sales between the declaration date and the record date (especially where transfers with tax-avoidance potential are involved).

## ¶ 9.02[1][b][ix] "Most favored nation" provision.

The protocol to the Mexican treaty **135** provides that, if the United States enters into a treaty with any other country that provides for a less-than-5-percent rate applicable to dividends on nonportfolio holdings, then such lower rate shall apply to such dividends under the **U.S.-Mexico treaty** . Mexico, which had unsuccessfully sought a zero% rate for such dividends in its treaty negotiations, accepted such a provision as the next-best alternative. Under the Mexican tax system (which is integrated), no withholding tax is imposed on dividends, so that the dividend withholding tax allowed under the treaty only benefits the United States.

An analogous provision running in favor of the United States is contained in the protocol to the New Zealand treaty. The provision states that if New Zealand enters into a treaty with another OECD member providing for lower withholding rates on dividends, interest, or royalties, the United States and New Zealand shall commence negotiations "with a view to providing the same treatment on a reciprocal basis."

## ¶ 9.02[2] Definition of "Dividends"

## ¶ 9.02[2][a] Treaty Language

**Article 10(3) of the 1981 U.S. Model Treaty** states as follows:

> 3. The term "dividends" as used in this Article means income from shares or other rights not being debt-claims, participating in profits, as well as income from other corporate rights, which is subjected to the same taxation treatment as income from shares by the laws of the State of which the company making the distribution is a resident.

The definitions of "dividends" in **Article 12(3) of the treaty with Trinidad and Tobago** and **Article 10(3) of the prior 1975 treaty with the United Kingdom** , respectively, simply refer back to the laws of the respective Contracting States, except that, in the case of the treaty with Trinidad and Tobago, the "term does not include any redeemable share capital or security issued by a corporation in respect of shares in the corporation otherwise than wholly for new consideration, or such part of any redeemable share capital or security so issued as is not properly referable to a new consideration."

The treaties with the following countries do not contain a definition of the term "dividend":

    Cyprus
    Ireland
    Israel
    Korea
    Morocco
    New Zealand
    Norway
    Pakistan
    Poland
    Romania
    Sweden
    Switzerland

# ¶ 9.02[2][b] Commentary and Discussion of Legal Authorities

## ¶ 9.02[2][b][i] In general.

The treaty definitions of "dividends" generally define the term most broadly as "income from shares" or other corporate rights participating in profits. Accordingly, the income-generating entity must be considered a corporation or company, **136** which invokes the treaty definition of "corporation" or "company." **137** In general, the income must be attributable to ownership of shares or other units of equity ownership carrying a right to participate in profits. **138 The OECD Commentary** clarifies that interest on a loan the repayment of which depends on the success or failure of the obligor, so that the obligee effectively shares the risks run by the obligor, can be considered dividends. **139 The**

**Commentary** lists as examples of the factors to be evaluated the following:

> 1. The loan very heavily outweighs any other contribution to the enterprise's capital (or was taken out to replace a substantial proportion of capital which has been lost) and is substantially unmatched by redeemable assets;
> 2. The creditor will share in any profits of the company;
> 3. Repayment of the loan is subordinated to claims of other creditors or to the payment of dividends;
> 4. The level or payment of interest would depend on the profits of the company;
> 5. The loan contract contains no fixed provisions for repayment by a definite date. **140**

It generally is left to each country to flesh out which distributions from shares or such other rights should be considered "income." The protocol to the Spanish treaty, **141** however, specifies that profits from liquidations distributions are treated as dividends.

For purposes of clarifying the term "dividends," and with respect to treaties that do not contain a definition of "dividends," the Contracting State imposing the tax looks, under the general rule of treaty construction, to its domestic law for the meaning of the term. In situations in which the United States is the taxing jurisdiction, under U.S. domestic law, dividend distributions are limited under **Section 316** to those out of "current" or "accumulated" "earnings and profits." "Earnings and profits," although referred to in the federal tax statutes since 1916, is not a defined term but rather refers to an amount derived by a series of adjustments to a corporation's taxable income that are considered appropriate in determining to what extent a distribution by the corporation should be taxable as a dividend. "Current" earnings and profits refers to the net positive earnings and profits for the year of the distribution, whether derived before or after the date of the distribution. **142** "Accumulated" earnings and profits, which are considered distributed only to the extent current earnings and profits for the corporation's tax year are less than total distributions during such year, means earnings and profits accumulated since February 28, 1913, and available on the date of the distribution, taking into account current-year positive or negative earnings and profits up to such date if current earnings and profits for the entire year of distribution are negative. **143**

The OECD Commentary observes that, "[n]ormally, distributions by a company which have the effect of reducing the membership rights, for instance, payments constituting a reimbursement of capital in any form whatever, are not considered dividends." **144** For example, under U.S. domestic law, distributions pursuant to a plan of liquidation of a corporation are not considered dividends but, rather, are considered made in exchange for the underlying shares. **145** (As noted above, a contrary result is provided under the Spanish treaty.) Similarly, distributions in redemption of shares generally are considered to give rise to exchange (i.e., generally capital gain) treatment rather than dividend treatment, provided that the shareholder experiences at least a meaningful reduction in his proportionate interest in the corporation, taking into account his share of the corporation's growth potential, its dividends and its voting rights. **146** Gain from an exchange of shares is taxable as capital gain so long as the shares are capital assets in the hands of the shareholders.

The principle of constructing undefined terms by reference to the law of the source State may have to be applied more than once in connection with a particular payment. For example, as discussed above, **147** the United States treats the proceeds of certain sales of stock between affiliates as dividend income under **Section 304** to the extent deemed paid from earnings and profits under **Section 316** .

The IRS has ruled that a distribution by a domestic limited partnership was properly considered a dividend to the extent made out of earnings and profits under **Section 316** , since the partnership was considered a domestic corporation under the treaty by reference to U.S. domestic law. **148**

The IRS has issued several private rulings involving "patronage dividends" paid by a U.S. marketing or purchasing cooperative taxable under Subchapter T of the Code. Such an entity is entitled to deduct from gross income patronage dividends and certain other amounts. **149** The IRS ruled under the Canadian treaty **150** and the Finnish treaty **151** that distributions by the cooperatives were taxable as dividends (to the extent paid out of earnings and profits as determined under **Section 316** ) and were eligible for the 15% treaty withholding rate.

The IRS has ruled that corporate profits distributed pursuant to an "investment contract" that was convertible into stock and was not separately transferable from the stock constituted dividends for U.S. federal income tax purposes as well as for treaty purposes. **152**

Dealings between a non-U.S. parent corporation and U.S. subsidiaries may not always be at arm's length. The IRS has ruled that, where an excessive royalty was paid by a subsidiary to its Swedish parent, the excess would be treated as a dividend under the treaty. **153** Similarly, the Tax Court has held that, in the absence of express wording requiring actual distribution of dividends as a condition to source state taxation, a constructive dividend (as determined under the domestic law of the source state) may be subject to withholding tax without violating a treaty. **153.1**

## ¶ 9.02[2][b][ii] Securities loans and "repo" transactions.

Loans of securities (which often are made in accordance with the rules of **Code Section 1058** so as to avoid recognition of any appreciation) are commonplace transactions in the securities industry. A substitute payment in connection with a securities lending transaction is a payment made by the securities borrower to the securities lender of an amount equivalent to the dividend distributions or interest payments that the lender would have received on the securities during the term of the loan. Securities loan payments are not considered interest on a loan; the U.S. Supreme Court has held that substitute payments for dividends on a loan of stock are not compensation for the use or forbearance of monies and thus are not interest. **154**

The Netherlands treaty permits a Contracting State to impose withholding tax on substitute payments for dividends that are from sources within that State. The Memorandum of Understanding provides that, where a person loans shares (or other rights the income from which is subject to the same taxation treatment as income from shares) and receives from the borrower an obligation to make a substitute

payment for any dividend distribution made with respect to the shares or other rights loaned during the term of the loan, the person will be treated as the beneficial owner of the dividend paid with respect to those shares or other rights for purposes of applying the Dividend article to the substitute payment.

More generally, regulations have been issued with respect to the source of substitute payments under **Section 861** , **155** and, in the case of such payments made from U.S. sources to foreign persons, the taxation of such payments. **156** These regulations address substitute payments made in a "securities lending transaction," which is defined as a transaction that is described in **Section 1058(a)** or a "sale-repurchase transaction." **157 Section 1058** and the proposed regulations thereunder provide for the nonrecognition of gain or loss upon the transfer of a security pursuant to an agreement that requires that (1) the borrower return to the lender securities that are identical to those borrowed; (2) the borrower make substitute payments to the lender during the term of the securities loan; and (3) the lender's risk of loss or opportunity for gain not be reduced (which the proposed regulations construe as mandating that the lender be able to terminate the loan upon notice of not more than five business days). **158** A "sale-repurchase transaction" is "an agreement under which a person transfers a security in exchange for cash and simultaneously agrees to receive substantially identical securities from the transferee in the future in exchange for cash."

Under the regulations on source of income, a substitute dividend payment or substitute interest payment received by a foreign person from a U.S. person (or received by a U.S. person from a foreign person) pursuant to a securities lending transaction is treated as having the same source and, in the case of foreign taxpayers, characterization for **Section 1441** withholding, foreign tax credit, and income tax treaty purposes as payments on the underlying security would have had if made directly to the securities lender. For example, substitute dividend payments to a foreign person with respect to corporate stock of a domestic corporation transferred in a cross-border securities lending transaction are treated as U.S.-source dividends for **Section 1441** withholding, foreign tax credit limitation, and income tax treaty purposes **159** (even if the substitute payments are paid by a foreign person). **160**

A look-through rule, to the extent it is valid in an income tax treaty context, (1) prevents a foreign securities lender of U.S. securities from avoiding U.S. withholding tax based on the business profits or other income provision of income tax treaties; (2) prevents a U.S. lender of U.S. securities to a foreign borrower from artificially increasing its non-U.S.-source income for purposes of the U.S. foreign tax credit limitations; and (3) permits a foreign lender in a nontreaty jurisdiction to lend foreign securities to a domestic borrower without withholding tax concerns.

Because the scope of **Section 1058** may not encompass many securities-lending transactions, the regulations cover transactions "substantially similar" to **Section 1058** transactions.

The preamble to the proposed regulations requested comments whether sale and repurchase (repo) agreements involving securities should be subject to the securities lending regulations as "substantially similar" transactions. Almost no substantive distinction appears to exist between most repo transactions, in which the purchaser may and regularly does dispose of the "purchased" securities and securities

loans. Consequently, prompted by certain commenters, **161** the final regulations treat repos having such terms in the same manner as securities loans.

The regulations became effective with respect to payments made after November 13, 1997. The preamble to the proposed regulations states that "[s]ource, character and income tax treaty treatment of substitute payments made prior to the effective date of [the] regulations will be determined under all the facts and circumstances of a particular transaction."

In the case of pre-effective date securities loans, look-through treatment may be the most appropriate treatment for substitute payments. Alternatively, a taxpayer may argue that such payments, as well as loan fees, should be sourced by reference to the location or place of use of the securities. Proposed regulations under **Section 1058** treat a substitute payment as fees paid by the borrower for the use of the securities. **162** (These proposed regulations do not address fees paid in a securities loan.) In the domestic context, this approach prevents multiple dividend received deductions and municipal bond interest exemptions with respect to the same income from the respective security. The approach taken under these proposed regulations apparently would relieve from withholding tax in certain cases (under the business profits or industrial or commercial profits **163** or other income **164** provisions of certain income tax treaties) payments made in substitution for otherwise taxable U.S.-source dividends. Thus, certain foreign lenders have effectively avoided U.S. withholding tax on dividends on stock of a domestic corporation by lending the stock to a domestic borrower in return for substitute payments (and may continue to avoid such tax with respect to, for example, dividend equivalent payments with respect to equity index swaps). Conversely, assuming securities loan payments are fixed or determinable annual or periodical income, this treatment could have subjected to U.S. withholding tax payments made in substitution for otherwise exempt U.S.-source portfolio interest where no treaty provision applied. The rule of proposed Treasury Regulation § 1.1058-1(d) is difficult to administer because the physical location of the transferred securities is subject to change and may have no relationship to the place where the securities actually are used by the borrower, and a borrower's use may take different forms and may be even more difficult to verify than the location of the securities.

## ¶ 9.02[2][b][iii] Equity swaps.

The preamble to the proposed regulations under **Section 861** addressing the source of substitute payments **164.1** requested comments concerning whether certain notional principal contracts that generate dividend equivalent payments should be covered by the regulations, using the example of an equity index swap structured to replicate the cash flows that would arise from an installment purchase of one or more equity securities. A more typical example would be where a "long" party pays on a periodic basis any increase in value of the notional principal amount deemed invested in one or more equities or an equity index, together with dividend equivalents, and a counterpart pays on the same periodic basis any decrease in value of such notional principal amount, together with an interest equivalent on such notional principal amount. Apart from reservations as to whether statutory authority for so extending the

regulations exists, it has been noted that it would be extremely difficult to draw lines between types of equity swaps. For example, payments on equity index swaps where the specified index is a broadly based U.S. equity index with respect to which other derivative contracts (such as regulated futures contracts) are actively traded are the "least compelling" case for imposition of a withholding tax. **165** This is because investment alternatives-regulated futures contracts and exchange-traded options, which are priced so as to reflect dividends during the term of the contract-are available without being subject to withholding. **166** On the other hand, if the contract relates to stock of a single issuer, and one party initially pays to the other the then-trading price of the stock in exchange for the right to payments in respect of all dividends and the right to terminate the contract at any time for a payment equal to the termination-date trading price of the stock, the rule of the proposed regulations (or at least, U.S. sourcing) is arguably correct policy result (although even in such cases no capital has been paid into the issuer).

## ¶ 9.02[2][b][iv] Hybrid entities.

In certain cases, an entity may be characterized as a corporation under the laws of one Contracting State and as a transparent (pass-through) entity under the laws of the other Contracting State. The OECD Commentary **167** suggests that distributions of profit by a partnership may be considered dividends if the partnership is subject, in the State where its place of effective management is located, **168** to tax treatment similar to that of a company limited by shares. The Commentary cites as examples the treatment under the laws of Belgium, Spain, and Portugal and, with respect to commanditaires and sociétés en commandite simple, France. **169** For example, the Danish Tax Council (Ligningradet) has concluded that income from a Spanish limited partnership was a dividend for purposes of Article 10(2) of the Denmark-Spain income tax treaty, but that the income did not qualify as a dividend under the Danish Corporate Tax Act. **170**

Under U.S. tax law, in most cases whether a business entity other than a domestic corporation is taxable as a corporation or treated as a partnership depends simply on which treatment is elected by the owners. **171** For example, a limited liability company (LLC) formed under U.S. law, such as the law of Delaware, typically is treated as a partnership for U.S. tax purposes, and yet the LLC often would be treated as a corporation under the laws of other Contracting States. Suppose, for example, that the LLC derives interest income but is not engaged in business in the United States. For U.S. domestic law tax purposes, distributions by the LLC would not be treated as dividends, but rather, the character of the company's underlying interest income would have passed through to the LLC's members. Prior to enactment of **Code section 894(c) in 1997** , this was attractive to non-U.S. investors if they were resident in a jurisdiction (such as Canada) that (1) treated the company as a corporation and (2) exempted dividends from foreign affiliates (and did not tax the underlying income under a controlled foreign corporation or similar regime).

Under **section 894(c)(1)** , effective August 5, 1997, a foreign person is not entitled under any U.S. income tax treaty to any reduced rate of U.S. withholding tax on an item of income derived through an

entity which is treated as a partnership (or is otherwise treated as fiscally transparent) for U.S. tax purposes if (1) such item is not treated for purposes of the taxation laws of the treaty country as an item of income of such person; (2) the treaty does not contain a provision addressing income derived through a partnership; and (3) the treaty country does not tax a distribution of such item of income from such entity to such person.

In addition, anticipating the grant of regulatory authority under **section 894(c)(2)** , the Treasury issued regulations on June 30, 1997, effective January 1, 1998, under which payments of U.S.-source income to an entity that is treated as fiscally transparent for U.S. federal income tax purposes (FTE) are only eligible for reduced tax rates under a tax treaty between the United States and another jurisdiction (the applicable treaty jurisdiction) (1) if the entity itself is a resident of the applicable treaty jurisdiction or (2) if, and only to the extent that, the interest holders of the entity (disregarding interest holders that themselves are FTEs) are residents of the applicable treaty jurisdiction *and* the entity is treated as fiscally transparent for purposes of the tax laws of *such* jurisdiction. **172** An entity is treated as "fiscally transparent" by a jurisdiction only if the jurisdiction requires interest holders in the entity to take into account separately their respective shares of the various items of income of the entity on a current basis *and* to determine the character of such items as if such items were realized directly from the source from which realized by the entity (for purposes of the tax laws of the jurisdiction). **172.1**

On the other hand, an LLC receiving foreign-source income can find that such income is taxable without the benefit of treaty rate reductions, on the basis that the foreign Contracting State does not view the LLC as a partnership and, when viewed as a nontransparent entity, the LLC would not meet the "liable to tax" requirement for treaty residence. For example, the U.K. Inland Revenue originally took this position, although it later changed course and decided as a matter of practice that, in order to relieve double taxation, it would accept claims for relief from U.K. taxation under the treaty to the extent that the income in question is subject to U.S. tax in the hands of the members of the LLC. **172.2** The FTE regulations described above seek to induce other Contracting States to respect the residence State's tax characterization of the entity for treaty purposes by conditioning U.S. treaty relief in parallel situations on reciprocal treatment. **172.3**

A number of IRS rulings address hybrid entities under U.S. law as it existed prior to the FTE regulations referred to above. In **Revenue Ruling 76-435** , **173** for example, the IRS held that a U.S. limited partnership was properly treated under U.S. tax principles as a corporation, and accordingly distributions from the partnership would be treated as dividends for purposes of the 1954 German treaty to the extent made from earnings and profits as determined under **Code Section 316** . Certain private rulings are to the same effect. **174** The IRS has treated a private German corporation GmbH engaged in business for the United States as a partnership for treaty purposes on several occasions, **175** with the consequence that distributions from the entity were not exempt from U.S. tax as dividends under **Article XIV of the 1954 German treaty** . In a number of other rulings, the IRS concluded that the GmbH involved was properly treated as a corporation for purposes of the 1954 German treaty, so that distributions by the entity were exempt from U.S. tax. **176**

# ¶ 9.02[2][b][v] Loans with profit participations ("equity kickers").

In certain cases, loan terms include a right to participate in certain profits that may be realized by the obligor. This approach has been particularly prevalent in the context of real estate loans. The OECD Commentary indicates that, generally, and assuming the obligor is not thinly capitalized, the income on such loans, including the profit participation, is governed by the Interest article and not by the Dividend article. **177**

In general, U.S. judicial authorities have been fairly relaxed about allowing certain performance-related payments on a loan, often referred to as "equity kickers," to be respected as interest even though not the payments are measured by a fixed rate or floating rate based on an objective index. **178** In certain instances, however, equity kickers have instead been treated as a participation in profits of the obligor either by recharacterizing the purported debt instrument as equity **179** or by bifurcating the debt instrument into debt and equity components. **180** In such an instance, if the obligor is a corporation, the instrument may, depending on the facts, be characterized in whole or part as stock, and profits thereon may be characterized in whole or part as dividends.

As indicated in Table 9-4, **180.1** the definition of "dividends" in a number of recent treaties encompasses income from debt obligations carrying the right to participate in profits. The effect of this provision is to permit the source Contracting State to impose dividend withholding tax on apparently the entire interest paid on a loan with an equity kicker. **181** The Joint Committee on Taxation's Explanation of the Netherlands treaty notes that the understanding of the United States is that, as regards interest on profit participation debt obligations derived by a U.S. corporation from a Dutch corporation, no Section 902 (indirect) foreign tax credit need be granted even if the Dutch authorities treat the interest as a dividend. **182**

# ¶ 9.02[3] Limitations on Dividends From Investment Companies (Regulated Investment Companies, Real Estate Investment Trusts, and Certain Similar Entities)

# ¶ 9.02[3][a] Treaty Language

Certain treaties deny the benefit of the reduced rates on dividends in certain cases involving dividends paid by a RIC or REIT as those terms are defined under the U.S. tax laws. For example, **Article 10(2) of the treaty with Barbados** provides, in pertinent part, as follows:

Subparagraph (a) [5% rate] shall not apply in the case of dividends paid by a United States Regulated

Investment Company or Real Estate Investment Trust. Subparagraph (b) [15% rate] shall apply in the case of dividends paid by a Regulated Investment Company. In the case of dividends paid by a Real Estate Investment Trust, subparagraph (b) shall apply if the beneficial owner of the dividends is an individual holding a less than 10% interest in the Real Estate Investment Trust; otherwise the rate of tax applicable under domestic law shall apply.

The treaties listed in Table 9-5 contain a provision to the same effect (with significant variations noted):

## Table 9-5

**Austria (art. 10(3))** <d>
Belgium (art. 10(6)) <j>
Bulgaria (art. 10(3))
**Canada (art. 10(7))** , as amended by ( **2007 protocol)**
**Czech Rep. (art. 10(3))**
**Denmark (arts. 10(4))** <d>
**Estonia (art. 10(2))**
**Finland (art. 10(4))**
**France (arts. 10(2), 10(8))** <k>
**Germany (art. 10(4))** <a>, <j>
Iceland (art. 10(3)) <f>, <j>
**India (art. 10(2))**
**Ireland (art. 10(4))**
**Israel (art. 12(3)(a))**
Italy (art. 10(9))
**Japan (art. 10(6))**
**Kazakhstan** ( protocol art. 2(a)) <d>
**Latvia (art. 10(2))**
**Lithuania (art. 10(2))**
**Luxembourg (art. (10(3))** <b>, <d>
**Malta (art. 10(4))** <k>
**Mexico** ( **1992 protocol, art. 8)**
**Netherlands (art. 10(2))** <b>, <c>
**New Zealand (art. 10(4))**
**Portugal (art. 10(4))** <c>
Sri Lanka (art. 10(2)) <i>
**Russia** ( **protocol, art. 2(a))** <d>
**Slovak Rep. (art. 10(3))**
**Slovenia (arts. 10(3))** <e>
**South Africa (art. 10(2))**

**Spain** ( **protocol, art. 7(d))** <e>
**Sweden (art. 10(3))**
**Switzerland (art. 10(2))**
**Thailand (art. 10(3))** <c>, <f>
**Tunisia (art. 10(3))** , as amended by ( **protocol art. 4)** <d>
**Turkey (art. 10(2))** <g>
**Ukraine 1994 (art. 10(5))** <d>, <h>
**United Kingdom (art. 10(10))**
**Venezuela (art. 10(5))** <d>

*Notes:*

<a> Distributions on certificates of German investment trust (Kapitalanlagegesellschaft) treated identically as RIC distributions.

<b> Dividends paid by Dutch company that is "beleggingsinstelling" under Article 28 of Netherlands Corporation Tax Act are treated identically as RIC distributions. Second, REIT dividends paid to Dutch company that is beleggingsinstelling also are eligible for 15% rate. Third, in the case of Dutch company that is beleggingsinstelling and that invests in real property to same extent as REIT, dividends paid to U.S. resident, other than individual holding less than 25% interest in Dutch company and other than RIC or REIT, are subject to tax at rate applicable under domestic law of Netherlands.

<c> Individual REIT shareholder must hold less than 25% of REIT to qualify for reduced rate.

<d> No exception for less than 10% individual shareholder of REIT. In **1999 Denmark treaty** , 15% rate is also available for dividends on publicly traded REIT stock paid to a 5% owner and for dividends paid by a diversified public or private REIT to a 10% owner, in each case whether or not the owner is an individual.

<e> Protocol to Spanish treaty contains analogous rules for certain Spanish investment vehicles, as described below.

<f> Rules also will apply to dividends paid by companies resident in Thailand that are similar to RICs and REITs, with similarity determined by mutual agreement of competent authorities.

<g> Reduced rate (treaty portfolio dividend rate) is 20% of gross amount of dividends. Rates similar to those for RICs/REITs also apply to Turkish Securities Investment Corporation, Securities Investment Fund, Turkish Real Estate Investment Corporation, and Real Estate Investment Fund.

<h> Ukraine treaty specifies that remittances from Ukrainian joint venture to foreign participants are dividends.

<i> Sri Lanka treaty does not provide for 5% rate and allows 5% rate on REIT dividend for an individual owning less than 10% of the REIT, if the dividends are paid on a publicly traded class of stock of which the recipient owns no more than 5%, or for a beneficial owner of no more than 10% of the REIT if no single asset of the REIT represents more

than 10% of the REIT's total assets.

<j> Belgium treaty allows 15% rate on dividends paid by a REIT for (1) an individual (or pension fund) beneficial owner of no more than a 10% interest in the REIT; (2) if the dividends are paid on a publicly traded class of stock of which the recipient owns no more than 5% of any class of REIT stock; or (3) the beneficial owner of the dividends is a person holding an interest of not more than 10% in the REIT and the REIT is diversified. For purposes of this provision, a REIT shall be diversified if no single interest in real property exceeds 10% of its total interests in real property.

<k> The first sentence of subparagraph 5(b) provides that the 15% maximum rate of withholding tax of subparagraph 2(b) applies to dividends paid by RICs or SICAVs.

The second sentence of subparagraph 5(b) provides that the 15% rate of withholding tax also applies to dividends paid by a REIT, a SIIC, or a SPPICAV, provided that one of the three following conditions is met. First, the beneficial owner of the dividends is an individual or a pension trust or other organization maintained exclusively to administer or provide retirement or employee benefits that is established or sponsored by a resident, in either case holding an interest of not more than 10% in the REIT, SIIC, or SPPICAV. Second, the dividends are paid with respect to a class of stock that is publicly traded and the beneficial owner of the dividend is a person holding an interest of not more than 5% of any class of the REIT, SIIC, or SPPICAV's shares. Third, the beneficial owner of the dividends holds an interest in the REIT, SIIC, or SPPICAV of not more than 10% and, in the case of a REIT, the REIT is "diversified." The Malta and New Zealand treaties contain similar language.

**Paragraph 7 of the protocol to the Spanish treaty** provides as follows with respect to dividends from certain types of Spanish entities:

b) Subparagraph a) of paragraph 2 shall not apply to income attributable, whether distributed or not, to shareholders of the Spanish corporations and entities referred to in Article 12.2 of Law 44/1978 of 8 September 1978 and Article 19 of Law 61/1978 of 27 December 1978 or successor statutes, as long as said income is not subject to the Spanish corporation tax.

c) Subparagraph a) of paragraph 2 shall not apply in the case of dividends paid by a Spanish investment institution which is subject to tax in Spain according to Article 34 or Article 35 of Law 46 of December 26, 1984 or successor statutes. Such dividends shall be taxable in Spain at the rate provided by subparagraph b) of paragraph 2.

The entities referred to in paragraph (b) are taxed in a manner similar to REITs and RICs. **183**

The advice and consent given by the U.S. Senate to the 1988 protocol to the French treaty was subject to the understanding that "the Treasury Department will effect the negotiation of a new protocol in an expeditious manner with the objective of modifying the dividend rates specified in paragraph 2 of Article 9 (Dividends) to deny inappropriate relief from taxation at source on dividends paid by Regulated Investment Companies, Real Estate Investment Trusts, and any other U.S. corporations that essentially

receive conduit treatment for U.S. income tax purposes." As of mid-1994, no implementing Protocol has been signed.

As of mid-1995, the other U.S. income tax treaties did not contain special rates for RIC or REIT dividends.

# ¶ 9.02[3][b] Commentary and Discussion of Legal Authorities

Beginning in 1989, U.S. treaties have included provisions denying, at least under certain circumstances, the benefit of reduced source-State taxation of dividends paid by a RIC or REIT. The rationale for these provisions is that, since RICs and REITs generally pay dividends out of untaxed earnings and profits, the benefit of reduced rates with respect to such dividends should be circumscribed. In particular, the Treasury Department was motivated to include these provisions by concern that nonresident corporations could invest in U.S. real estate or in a portfolio of securities and derive income therefrom subject to only a 5% withholding tax. In the case of REITs, this was considered inconsistent with the notion that the situs Contracting State should have primary taxing jurisdiction over real property. [184] In the case of RICs, it was considered inappropriate that the foreign corporation could enjoy the 5% rate with respect to dividend income from securities even though the foreign corporation would hold, through the RIC, only a portfolio interest in the securities. [185]

The objective of the rates adopted in the treaties with respect to REITs and RICs is to approximate the rates that would be applicable if the underlying assets were owned directly. [186] Since the REIT dividends correspond to net income, the appropriate comparison is with U.S. net income tax rates; on this basis, the rates stipulated for REIT dividends are generally 30% (15% for individuals holding less than a specified amount). [187] It must be noted, however, that certain REITs (so-called mortgage REITs) invest almost exclusively in loans secured by real property. In general, if a non-U.S. person were to invest directly in a real property loan paying noncontingent interest, such interest would be exempt from U.S. withholding tax under the so-called portfolio interest exception of the Code. If such investor acquired shares of a mortgage REIT, however, dividends paid out of such interest income would be subject to tax at the rates provided in the Dividend article.

On October 7, 1997, Kenneth Kies, then Chief of Staff of the Joint Committee on Taxation, announced in testimony before the Senate Committee on Foreign Relations the intention to modify U.S. treaty policy regarding the treatment of REIT dividends. The change in policy was precipitated by lobbying efforts by the REIT industry, which resulted in negotiations among Treasury, the Senate Finance Committee, the Joint Committee on Taxation and the REIT industry. Under the new policy:

> 1. A reduced withholding rate of 15% is intended to apply to REIT dividends if the treaty country resident beneficially holds an interest of 5% or less in each class of the REIT's stock and such dividends are paid with respect to a class of stock that is publicly traded.

2. The 15% rate would apply to REIT dividends if the treaty country resident beneficially holds an interest of 10% or less and the REIT is diversified. A REIT would be considered diversified if the value of no single interest in real property held by the REIT exceeds 10% of the REIT's total real property interests. (Mortgages and foreclosure properties would not be considered interests in real property, and thus a REIT that only owns mortgages would be considered diversified.)

3. The current treatment of individual shareholders (eligibility for 15% or other portfolio dividend rate provided ownership of less than, typically, 10% of REIT's shares) will remain unchanged.

This policy change will be incorporated into **the U.S. model treaty** . The Treasury intends to negotiate protocols to the Austrian, Irish, and Swiss treaties to incorporate the new policy. In the case of Luxembourg, it was recommended that the new policy be implemented by means of a reservation to the pending treaty, and that this reservation include a special rule for existing investments in REITs by Luxembourg residents. **187.1**

As a general rule, RICs can hold debt or equity securities. To the extent that RICs hold equity securities, the profits derived therefrom have already been subject to a level of U.S. tax; hence, unlike in the case of REIT dividends, the maximum tax rate that would be appropriate under a treaty is that applicable to portfolio stocks. In order to avoid the possibility that a corporation might enjoy the lower rate applicable to nonportfolio holdings with respect to dividends from portfolio holdings of a RIC, the special rule mandates the portfolio rate. However, as in the case of dividends from REITs, the dividend withholding tax can be blatantly unfair in certain circumstances. For example, while interest on most debt securities generally would qualify for the portfolio interest exemption from U.S. withholding tax if held directly by non-U.S. investors, such interest earned by a RIC would be transmuted into dividends subject to U.S. withholding tax. A similar phenomenon occurs with respect to short-term capital gains realized by a RIC.

Under domestic law, long-term capital gain realized by a REIT or RIC, if designated (or, in the case of a REIT, deemed designated) as a capital gain dividend, is taxed as if realized directly by the shareholder, rather than as a dividend. Distributions by a REIT attributable to gain realized from the disposition of a U.S. real property interest are, at least in the view of the United States, **188** subject to regular U.S. income tax in the same manner as any gain from U.S. real property. **189**

# ¶ 9.02[4] Integrated Shareholder-Corporate Tax Systems

Several treaty countries have adopted systems of taxation that integrate, at least to some extent, the corporate and individual levels of tax on corporate earnings. Integration is generally accomplished by providing the individual shareholder with a tax credit (sometimes referred to as an "imputation" tax credit) for all or part of the corporate level tax paid with respect to distributed profits. In such an integrated system, an individual shareholder would pay personal income tax on the amount of dividend received, but would reduce such tax by the amount of the credit.

In general, the availability of the imputation tax credit is limited by statute to residents of the taxing jurisdiction. As a result, absent treaty relief, foreign investors in corporations resident in countries with integrated tax systems may bear a higher tax burden than resident investors. Cognizant of the inequality in treatment, the United States has sought in treaty negotiations to obtain for U.S. resident investors the benefits of a treaty partner's imputation tax credit.

Under current U.S. treaties with France and Germany, some or all of the benefit of the imputation tax credit offered under the respective integrated tax systems of such countries are extended to certain U.S. investors. As a general matter, a partial benefit is afforded U.S. investors under the treaties with Germany and, depending on the type of investor, a partial or full benefit is provided under the **U.S.-France treaty**. The benefit is generally treated as an additional dividend to the recipient, subject to withholding in the jurisdiction of the payor at the applicable treaty rates and includible in the taxable income of the recipient for U.S. income tax purposes, with a foreign tax credit available for the tax withheld on the deemed dividend.

The integrated tax systems of France and Germany and the treaty protection provided to U.S. residents, are discussed in the following paragraphs.

## ¶ 9.02[4][a] France

The **U.S.-France treaty** has provisions addressing both the précompte and the avoir fiscal.

## ¶ 9.02[4][a][i] Précompte.

Article 10(4)(h) of the U.S.-France treaty provides as follows:

> (h) Where a resident of the United States that derives and beneficially owns dividends paid by a company that is a resident of France is not entitled to the payment from the French Treasury referred to in subparagraph (a), such resident may obtain a refund of the prepayment (precompte) to the extent that it was actually paid by the company in respect of such dividends. Where such a resident is entitled to the payment from the French Treasury referred to in subparagraph (e), such refund shall be reduced by the amount of the payment from the French Treasury. The gross amount of the prepayment (precompte) refunded shall be deemed to be a dividend for the purposes of the Convention. It shall be taxable in France according to the provisions of paragraph 2.

The précompte is a form of equalization tax. It is payable when the distribution qualifying for the avoir fiscal (tax credit) is deemed to have been made from profits that have not borne corporate tax at the full 34 percent rate (i.e., distributions from income taxed at a reduced rate, exempted income, or income on which taxation has been deferred), or profits earned more than five years before the year of distribution.

**191**

The précompte is equal to the amount of the avoir fiscal attached to the distribution, which is 50% of the amount actually paid by the distributing company. **192** For the distributing company, the tax is equal to one third of the total portion of the distribution deemed made from accounts giving rise to the précompte. **193**

If the qualifying conditions are satisfied, the précompte is normally due even if the recipient is not domiciled in and has no registered office in France and is not, therefore, entitled to the corresponding avoir fiscal. **194** The précompte may be reimbursed, however, to companies or individuals having their domicile or registered office in a country with which France has concluded a double tax treaty or in the Overseas Departments and former French Community member states. **195** Reimbursement is not permitted, however, for nonresidents entitled to the avoir fiscal. **196**

Article 10(4)(h) of the U.S.-France treaty (which is similar to a provision that was contained in the prior treaty) **196.1** provides for reimbursement of the precompte to U.S. shareholders who are not eligible for the avoir fiscal. Such shareholders would include shareholders holding 10% or more of the French corporation's voting stock. The amount of précompte reimbursed would be subject to French dividend withholding tax at the applicable treaty rate.

# ¶ 9.02[4][a][ii] Avoir fiscal.

**Article 10(4) of the U.S.-France treaty** provides in pertinent part as follows:

1. (a) A resident of the United States who derives and is the beneficial owner of dividends paid by a company that is a resident of France that, if received by a resident of France, would entitle such a resident to a tax credit ("avoir fiscal") shall be entitled to a payment from the French Treasury equal to such tax credit ("avoir fiscal"), subject to deduction of the tax provided for in subparagraph (b) of paragraph 2.

(b) The provisions of subparagraph (a) shall apply only to a resident of the United States that is

(i) an individual or other person (other than a company); or

(ii) a company that is not a regulated investment company and that does not own, directly or indirectly, 10% or more of the capital of the company paying the dividends; or

(iii) a regulated investment company that does not own, directly or indirectly, 10% or more of the capital of the company paying the dividends, but only if less than 20% of its shares is beneficially owned by persons who are neither citizens nor residents of the United States.

(c) The provisions of subparagraph (a) shall apply only if the beneficial owner of the dividends is subject to United States income tax in respect of such dividends and of the payment from the French Treasury.

(d) Notwithstanding the provisions of subparagraphs (b) and (c), the provisions of subparagraph (a) shall also apply to a partnership or trust described in subparagraph (b)(iv) of

paragraph 2 of Article 4 (Resident), but only to the extent that the partners, beneficiaries, or grantors would qualify under subparagraph (b)(i) or (b)(ii) and under subparagraph (c) of this paragraph.

(e) (i) A resident of the United States described in subparagraph (ii) that does not own, directly or indirectly, 10% or more of the capital of a company that is a resident of France, and that derives and beneficially owns dividends paid by such company that, if derived by a resident of France, would entitle such resident to a tax credit ("avoir fiscal"), shall be entitled to a payment from the French Treasury equal to 30/85 of the amount of such tax credit ("avoir fiscal"), subject to the deduction of the tax provided for in subparagraph (b) of paragraph 2;

   (ii) The provisions of subparagraph (i) shall apply to:

      (a) a person described in subparagraph (b)(i) of paragraph 2 of Article 4 (Resident), with respect to dividends derived by such person from the investment of retirement assets;

      (b) a pension trust and any other organization described in subparagraph (b)(ii) of paragraph 2 of Article 4 (Resident); and

      (c) an individual, with respect to dividends beneficially owned by such individual and derived from investment in a retirement arrangement under which the contributions or the accumulated earnings receive tax-favored treatment under U.S. law.

(f) The gross amount of a payment made by the French Treasury pursuant to subparagraph (a), (d), or (e) shall be deemed to be a dividend for the purposes of this Convention.

(g) The provisions of subparagraphs (a), (d), and (e) shall apply only if the beneficial owner of the dividends shows, where required by French tax administration, that he is the beneficial owner of the shareholding in respect of which the dividends are paid and that such shareholding does not have as its principal purpose or one of its principal purposes to allow another person to take advantage of the provisions of this paragraph, regardless of whether that person is a resident of a Contracting State.

Under the French tax system, corporations are generally subject to tax on their earnings and individual shareholders are subject to tax on their receipt of dividend distributions out of such earnings. The effects of double taxation are partially mitigated, however, by granting French residents who are shareholders in French corporations (excluding, for example, certain "personal" corporations) the avoir fiscal, equal to 50% of the amount of the dividend. At the time the integrated system was adopted in 1965, the corporate tax rate was 50% and the tax credit was based on a fiction that the shareholders paid one-half the corporate tax. **198** Measurement by reference to 50% of the dividend has not been changed even though the tax rate has fallen several times. **199** The corporate tax rate as of 1995 was 33.33%, so that the avoir fiscal available with respect to a distribution of after-tax corporate profits exactly equaled the corporate tax.

When a French shareholder receives a dividend entitling it to the avoir fiscal, the amount of the credit is treated as an additional dividend and tax must be computed based on the total, grossed-up dividend. After determining the total tax liability, the French shareholder claims the avoir fiscal as a credit against such liability. If the amount of the credit exceeds the tax liability of the shareholder, a refund would be

available.

## Example

*A*, a French corporation, distributes $200 to *B*, a French resident shareholder. The amount of the avoir fiscal is 50% of $200, or $100. *B* computes his personal income tax on a grossed-up dividend of $300 and claims a credit of $100 against his French tax.

In contrast, unless an applicable treaty provides otherwise, a nonresident shareholder in a French corporation is not entitled to the avoir fiscal. Additionally, dividend distributions to a nonresident shareholder are subject to French withholding tax at a 25% statutory rate, unless the tax is reduced by a treaty. As a result, assuming the income tax rate imposed in the shareholder's jurisdiction of residence is roughly equal to that imposed on a French counterpart, the nonresident shareholder bears a substantially higher total tax burden than the French shareholder. **201**

The 1978 protocol to the **1967 U.S.-France treaty** added paragraph 6 to Article 9 of the treaty, thereby providing certain U.S. shareholders in French corporations with the benefit of the avoir fiscal. Such benefit was continued in **Article 10(4) of the current U.S.-French treaty** . Under Article 10(4)(a), a U.S. resident receiving a dividend from a French corporation is entitled to a refund from the French government equal to the amount of the avoir fiscal to which a French shareholder would be entitled with respect to such dividend. However, for all tax purposes, the refund is deemed to be an additional dividend from the corporation and is subject to withholding at the 15% treaty rate for dividends.

Under Article 10(4)(b), refund of 100% of the avoir fiscal is available to U.S. individuals and other noncorporate entities and to U.S. corporations (and entities treated as corporations for U.S. tax purposes) owning less than 10% of the outstanding voting stock of the French corporation. In addition, in the case of a "RIC," as defined in **Section 851** , more than 80% of its shareholders must be U.S. citizens or residents. While corporations owning 10% or more of the voting stock of a French corporation are thus not eligible for the refund, it should be remembered that such a corporation is generally entitled to a 5 percent rate of dividend withholding tax under the treaty and to a reimbursement, less applicable withholding tax, of its share of any précompte. (The corporation also can claim the "indirect" foreign tax credit for U.S. tax purposes.) Nevertheless, the ineligibility of such shareholders for the avoir fiscal credit may be viewed as an instance of discriminatory treatment of the sort that the Nondiscrimination article was intended to proscribe. **202**

Article 10(4)(e) of the 1994 U.S.-France treaty introduced a partial payment of avoir fiscal to certain retirement plans. U.S. residents are entitled to a credit equal to 30/85 of the "avoir fiscal" available to a French resident shareholder in the case of dividends derived and beneficially owned by: (1) the United States, a state or local authority of the United States, or any agency or instrumentality of such a governmental body, from the investment of retirement assets; (2) a pension trust, retirement or employee benefit organization, or tax-exempt organization described in subparagraph (b)(ii) of Article 4

(Resident); or (3) an individual, from investments in a retirement arrangement under which either the contributions are deductible for U.S. tax purposes or U.S. tax on the accumulated earnings is deferred. These categories are intended to cover all investments by U.S. pension plans or other arrangements described in **Code sections 401(a)** , **403** , **408** , and **457** . Moreover, a plan or arrangement described in **Code section 414(d)** , and any other plan or arrangement that satisfies the requirements of Article 10(4)(e), thereunder, even if it is not a qualified plan under U.S. domestic law, will be entitled to the avoir fiscal provided under Article 10(4)(e). **202.1**

Refunds are not available for dividends paid with respect to stock in a French corporation that are effectively connected with a French permanent establishment of the U.S. shareholder or with a fixed base in France from which independent personal services are rendered by the U.S. shareholder.

For U.S. tax purposes, the U.S. shareholder is subject to tax on the grossed-up dividend amount (i.e., the actual dividend plus the amount of the refund, unreduced by French withholding taxes). Subject to the limitations in **Section 904 of the Code** , the withholding taxes incurred with respect to both the actual dividend and the refund will be eligible for the foreign tax credit.

### Example

Disregarding foreign currency considerations, **203** if *A*, a French corporation, declares a $200 dividend to *X*, a less than 10% U.S. shareholder, then *X* will be entitled to a $100 refund from the French Treasury. After French withholding at a 15% rate, *X* will actually receive $170 from the French corporation and an $85 refund from the French Treasury (generally in two different tax years). On *X*'s U.S. tax returns, *X* will report the 200 grossed-up dividend and $100 grossed-up refund as income and claim a foreign tax credit (or deduction) in the amounts of $30 and $15, respectively.

The procedure for obtaining the refund provided in **Article 10(4)** is outlined in **Revenue Procedure 73-34** . **204** In general, application must be made with the relevant authorities in France on designated forms (French Form RF-1A EU) in a timely manner. Apparently, the French Treasury will not pay avoir fiscal refunds before January 15 of the year following the calendar year in which the dividend giving rise to the refund was distributed, even if the necessary steps for obtaining the refund were taken in the earlier year. **205** Consistently with the deemed dividend characterization, the amount of such avoir fiscal refund, plus withholding tax, is reportable as income (and the tax withheld is creditable) in the year the refund was actually received by the U.S. shareholder, not an earlier year in which such shareholder became entitled to the refund. **206** The refund, plus withholding tax, is properly reported on IRS Form 1099-DIV for the year in which it is paid, not for the earlier year of the dividend. **207**

## ¶ 9.02[4][b] Germany

**Article 10(3) of the treaty with Germany** provides as follows:

(3) As long as a natural person resident in the Federal Republic of Germany is entitled under German law to a tax credit (Anrechnung der Körperschaftsteuer) in respect of dividends paid by a company that is a resident of the Federal Republic of Germany, the following rules shall apply to dividends paid by such company:

(a) the beneficial owner of dividends subject to paragraph 2b) shall be entitled to a further relief of tax of 5% of the gross amount of the dividends; and

(b) for United States income tax purposes (including for the purposes of credit for foreign taxes paid) the benefit resulting from the application of subparagraph a) shall be treated as a dividend paid to a beneficial owner resident in the United States.

The provisions of this paragraph shall not apply to distributions on certificates of an investment trust.

Paragraph 8 of the protocol to the treaty supplements these provisions as follows:

For United States income tax purposes, the United States shareholder shall be treated as if it had received as a dividend a refund of German tax equal to 5.88% of the dividend actually paid, determined before the German withholding tax on such dividend. The sum of this refund and such actual dividend shall be deemed to have been subject to German withholding tax at the rate prescribed in paragraph 2 b) of Article 10.

Under the German tax system, complete integration is achieved through a combination of split corporate tax rates and imputation credits at the shareholder level. **208** In general, corporate earnings are subject to tax at a statutory rate of 45%, but a 15% credit is allowed upon the distribution of earnings, reducing the corporate tax burden on distributed earnings to 30%. **209** Upon receipt of a dividend, resident shareholders are then allowed a credit equal to 42.86% of the amount of the dividend, representing the remaining 30% of corporate tax paid with respect to the dividend (30 ÷ (100 # 30) = 42.86%). **210** The shareholder must compute income tax on the grossed-up dividend (i.e., total of the dividend and the tax credit) and then claim the tax credit against such liability, with a refund available if the credit exceeds the shareholder's total tax liability.

As under the French system, the failure to provide the imputation tax credit to nonresidents can result in a higher tax burden being imposed on foreign investors in German corporations. Accordingly, **Article 10(3) of the U.S.-German treaty** provides relief to certain U.S. investors in German corporations. However, unlike the French treaty, the German treaty does not grant to U.S. investors comparable tax credits, but instead offers a 5%age point reduction in the withholding rate on dividends, from 15% to 10 percent.

Pursuant to **Article 10(3)(b)** , the benefit resulting from the reduced withholding is treated as a deemed dividend for U.S. income tax (and foreign tax credit) purposes. Mechanically, under paragraph 8 of the protocol, the amount of the deemed dividend (i.e., the gross-up) is 5.88 percent of the gross dividend paid to the shareholder. This% is derived by dividing the% (90) representing the net distribution of the

reduced 10% treaty withholding rate by the% (85) representing the net distribution that would have resulted at the regular 15% treaty withholding rate (0.90 ÷ 0.85 = 1.0588). The shareholder is treated as having received a dividend in an amount, 85% of which equals 90% of the actual gross dividend. For purposes of the U.S. foreign tax credit under **Section 901** , the shareholder is treated as having paid German tax at the 15% portfolio dividend withholding rate with respect to the grossed-up dividend.

## Example

*A*, a German corporation, derives pre-tax profits of $100 and distributes all after-tax profits currently to its sole U.S. shareholder, *X*. *A* pays a corporate level tax of $30 and has $70 remaining for distribution to *X* . If the reduced treaty rate of 10% applies, *X* incurs German withholding tax of $7, resulting in a total German tax burden of $37. For U.S. tax purposes, the $70 dividend must be grossed-up by 5.88% to $74.12. Assuming a 36% tax rate, the U.S. tax is $26.68, which may be offset by the amount of German withholding tax that would have been paid at the 15% rate on the grossed-up dividend, or $11.10 (74.12 × 15%), for a net U.S. liability of $15.58. The total tax burden with respect to such shareholder is then $52.58 on $100 of pre-tax corporate profits.

The benefit provided by the lower withholding rate is not as great as would result from receipt of a tax credit comparable to that provided German shareholders. The Senate Foreign Relations Committee's comments on the treaty indicate that the United States resisted making demands for equal treatment for two reasons. First, all shareholders in German corporations, regardless of where they reside, derive benefit from the split-rate aspect of the German integration system. Second, the overall tax burden to a U.S. shareholder after consideration of the reduced rate approximated (or was less than) (1) the total tax imposed on U.S. individual investors in domestic corporations and (2) the top marginal rate for German individuals. **211** This remains the case as of 1994, following rate changes in both the German and the U.S. tax regimes.

As under the French treaty, the relief afforded U.S. beneficial owners of dividends is generally limited to portfolio investors (i.e., noncorporate investors and domestic corporations owning less than 10% of the German corporation's voting stock). However, the treaty withholding rate with respect to corporate shareholders owning at least 10% of the German corporation's voting stock is limited to 5% under Article 10(2)(a). Nevertheless, concerns about discriminatory treatment may be appropriate. **212**

As described in the treaty, all U.S. beneficial owners entitled to the 15 percent withholding rate pursuant to Article 10(2)(b) are eligible for the additional 5% reduction. Accordingly, shareholders of RICs and members of partnerships or similar pass-through entities generally would be eligible for the reduced rate. U.S. beneficial owners in a German investment trust, however, are not entitled to the reduced rate with respect to distributions from such trust.

Dividends paid with respect to stock in a German corporation that are attributable to a German permanent establishment of the U.S. shareholder (including a fixed base in Germany from which

independent personal services are rendered by the U.S. shareholder) will not be entitled to treaty relief.

## ¶ 9.02[4][e] Ireland

The Irish tax system is an imputation system under which shareholders are entitled to a tax credit in respect of dividends paid by an Irish-resident company. **Article 10(3) of the U.S.-Ireland treaty** provides special rules with respect to such a credit received by a U.S. shareholder.

3. However, as long as an individual resident in Ireland is entitled under Irish law to a tax credit in respect of dividends paid by a company resident in Ireland, the following provisions of this paragraph shall apply to dividends paid by a company resident in Ireland instead of the provisions of paragraphs 1 and 2 of this Article:

(a)

(i) Dividends paid by a company which is a resident of Ireland to a resident of the United States may be taxed in the United States.

(ii) Where a resident of the United States is entitled to a tax credit in respect of such a dividend under subparagraph (b) of this paragraph, tax may also be charged in Ireland and according to the laws of Ireland on the aggregate of the amount or value of that dividend and the amount of that tax credit at a rate not exceeding 15%.

(iii) Except as provided in subparagraph (a) (ii) of this paragraph, dividends paid by a company which is a resident of Ireland and which are beneficially owned by a resident of the United States shall be exempt from any tax in Ireland which is chargeable on dividends.

(b) A resident of the United States who receives dividends from a company which is a resident of Ireland shall, subject to the provisions of subparagraph (c) of this paragraph and provided he is the beneficial owner of the dividends, be entitled to the tax credit in respect thereof to which an individual resident in Ireland would have been entitled had he received those dividends and to the payment of any excess of that tax credit over his liability to Irish tax. Any such tax credit shall be treated for United States foreign tax credit purposes as a dividend.

(c) The provisions of subparagraph (b) of this paragraph shall not apply where the beneficial owner of the dividend (being a company) is, or is associated with, a company which either alone or together with one or more associated companies controls directly or indirectly 10% or more of the voting power in the company paying the dividend. For the purpose of this subparagraph, two companies shall be deemed to be associated if one is controlled directly or indirectly or indirectly by the other or both are controlled directly or indirectly by a third company.

## ¶ 9.02[5] Dividends Paid by Corporation Not Resident in Source State (Secondary Withholding)

**Article 10(5) of the 1981 U.S. Model Treaty** states as follows:

> 5. A Contracting State may not impose any tax on dividends paid by a company which is not a resident of that State, except insofar as
>
>> (a) the dividends are paid to a resident of that State,
>>
>> (b) the dividends are attributable to a permanent establishment or a fixed base situated in that State, or
>>
>> (c) the dividends are paid out of profits attributable to one or more permanent establishments of such company in that State, provided that the gross income of the company attributable to such permanent establishment constituted at least 50% of the company's gross income from all sources.
>
> Where subparagraph (c) applies and subparagraphs (a) and (b) do not apply, the tax shall be subject to the limitations of paragraph 2.

The treaty provisions listed in Table 9-6 are to the same effect (with significant variations noted): **226.1**

## Table 9-6

**Australia (art. 10(5))** <a>

**Austria (art. 10(3))**

**Bangladesh (arts. 10(3))**

Belgium (art. 10(9)) <c>

Bulgaria (art. 10(7)) <c>

**Canada (art. 10(5))** <c>

**Cyprus (arts. 6(1)** , **12(4))** <d>, <e>

**Denmark (art. 10(7))** <c>

**Egypt (arts. 4(1)(b)** , **12(1))** <b>, <e>

**Hungary (art. 9(5))** <b>

**Japan (art. 10(5))**

**Luxembourg (art. 10(6))**

**Norway (art. 8(4)** , as amended by ( **1980 Protocol art. 4)** <e>, <h>

**Philippines (arts. 4(1)(b)** , **11(3))**

**Sri Lanka (art. 10(2))**

**Trinidad and Tobago (arts. 5(1)(b)** , **12(4))** <i>

**United Kingdom (art. 10(4))** , **(art. 10(10))** <f>

**Venezuela (art. 10(3))**

*Notes:*

<a> Provision requires that no branch profits tax be imposed by taxing State.

<b> Fifty percent test in clause (c) basis for taxation is applied over three-year base period.

<c> Provision also prohibits tax on undistributed profits. [See ¶¶ **2.02[1][a][ii]** , ¶ 2.02[2][b][ii]]. In the 2006 Belgium, **1999 Denmark** , and **1999 Venezuela treaties** , clause (c) is omitted. The 2007 Canada protocol modified the treaty to exclude the fixed base language. The Bulgaria treaty similarly limits the exception to dividends attributable to a permanent establishment and excludes the fixed base language.

<d> Clause (c) basis for taxation only applies to Cypriot corporation with U.S. permanent establishment. Rate limitations do not apply to dividends taxable on such basis.

<e> Relies on sourcing provision in treaty for clause (c) basis of transaction.

<f> U.K. treaty refers to "pooled investment vehicles."

<g> [Reserved]

<h> Instead of clause (c), treaty with Philippines permits source State to tax dividends that are from source-State sources provided that Philippines tax may not be imposed on dividends paid by U.S. corporation, if additional 20% branch tax described in Article 11(6) has been paid with respect to earnings distributed.

<i> Instead of clause (c), treaty with Trinidad and Tobago permits taxation of dividends that are from sources within Contracting State of paying corporation under Article 5 of treaty, which includes similar concept.

More recent provisions dealing with the secondary dividend withholding tax have typically not included a right of the source State to impose such a tax based on income derived in the source State. For example, **Article 10(6) of the treaty with Mexico** (before it was amended by **Article 2 of the 2002 U.S.-Mexico Protocol** ) provided as follows:

(6) When a company which is a resident of a Contracting State derives profits or income from the other Contracting State, that other State may not impose any tax on dividends paid by a company which is not a resident of that State, except insofar as the dividends are paid to a resident of that State or the dividends are attributable to a permanent establishment or a fixed base situated in that State.

The provisions in Table 9-7 are to this effect (with significant variations noted):

## Table 9-7

**Austria (art. 10(5))**

**Barbados (art. 10(6)** , as amended by **protocol art. 3(b))** <a>

**Belgium (art. 10(5))** <a>

**China (art. 9(5))** <b>

**Czech Rep. (art. 10(7))**

**Estonia (art. 10(6))**

**Finland (art. 10(7))**

**France (art. 10(8))** <b>

**Germany (art. 10(8))**

Iceland (art. 10(6)) <b>

India (art. 10(5)) <b>

Indonesia (arts. 7(1) , 11(1)) <a>, <c>

Israel (art. 12(4)) <d>

Italy (art. 10(5)) <b>

Jamaica (art. 10(6))

Japan (arts. 10(8))

Korea (arts. 6(1) , 12(1)) <a>, <c>

Latvia (art. 10(6))

Lithuania (art. 10(6))

Luxembourg (art. 10(5))

Mexico (art. 10(6))

Morocco (art. 10(4))

Netherlands (art. 10(6)) <b>

Portugal (art. 10(7))

Slovak Rep. (art. 10(7))

Slovenia (arts. 10(6)

South Africa (art. 10(5))

Spain (art. 10(5))

Sweden (art. 10(6))

Tunisia (art. 10(6))

United Kingdom (arts. 10(6))

Venezuela (art. 10(7)) <c>

*Notes:*

<a> No protection for nonresidents of Contracting State of which corporation is resident (see **Treas. Dep't Technical Explanation, U.S.-Japan income tax treaty** ).

<b> Provision also prohibits tax on undistributed profits subject to same conditions (see **¶¶ 2.02[1][a][ii]** , **2.02[1][b][ii]** ).

<c> Provision relies on sourcing provision, combined with savingclause.

<d> Provision omits permanent establishment/fixed base clause.

<e> **Article 10(6)** prohibits tax on undistributed profits if U.K. resident individuals (other than U.S. nationals) control, directly or indirectly throughout last half of tax year, more than 50 percent of corporation's entire voting power (see **¶¶ 2.02[1][a][ii]** , **2.02[1][b][iii]** ).

A few treaties in the pre- **OECD Model Treaty** form prohibit the taxation of dividends paid by a corporation of one Contracting State to a recipient that is not a resident or corporation of such State, even if the dividends are paid from profits attributable to a permanent establishment in the first Contracting State and, on the face of the provision, regardless of whether the dividends are attributable to a permanent establishment of the recipient. **227** Further, on the face of certain of these provisions, a third-country resident could claim relief from source-State taxation. **228** For example, **Article XIV of the**

**treaty with Austria** provides as follows:

> (1) Dividends and interest paid by an Austrian corporation (other than a United States corporation) shall be exempt from United States tax where the recipient is a nonresident alien or a foreign corporation.
>
> (2) Dividends and interest paid by a United States corporation shall be exempt from tax by Austria where the recipient is not a resident or an Austrian corporation.

The provisions listed in Table 9-8 are generally to this effect (with significant variations noted) (all since superseded):

## Table 9-8

> **1956 Austria (art. XIV)**
> **1950 Greece (art. IX) <a>**
> **1949 Ireland (art. XV)**
> **1951 Switzerland (art. XIV) <b>**

<p align="center">***Notes:***</p>

> <a> No provision exempting interest paid by U.S. corporation from Greek (Netherlands) tax.
>
> <b> No third-country beneficiaries permitted; exemption from U.S. tax only if recipient is nonresident alien of United States who is resident in Switzerland or Swiss corporation not having U.S. permanent establishment, and exemption from Swiss tax only if recipient is U.S. resident or corporation not having Swiss permanent establishment.

As of mid-2004, the following treaties both prohibited (in the case of a qualified resident) a branch profits tax and prohibited a secondary withholding tax based on the distributing corporation's income attributable to business activities in the source State:

> China
>
> Greece
>
> Iceland
>
> Ireland
>
> Italy
>
> Jamaica
>
> Japan
>
> Korea
>
> Morocco

The branch profits tax, including the onerous requirements for qualified resident status, are described in Chapter 8.

**22** See Castillo, Solano & Podrasky, "U.S.-Mexico Income Tax Treaty: Practical Implications and

Planning Opportunities for U.S. Investors," 23 Tax Mgmt. Int'l J. 128, 134 (1994).

**23** S. Exec. Rep. No. 18, 95th Cong., 2d Sess, **U.S.-U.K. treaty** .

**23.1** Note that the refund is available even if the interest is paid in stock of the NRO. Because U.S. tax rules generally do not tax the receipt of stock dividends on common stock, an interest deduction against Canadian operating profits can be obtained at the cost of Canadian withholding tax at a reduced rate without inclusion of income for U.S. tax purposes.

**24** Staff of Joint Comm. on Taxation, Explanation of **U.S.-Israel treaty** (JCS-14-93).

**25** Price Waterhouse, Doing Business in Cyprus 124 (1991).

**26** S. Exec. Rep. No. 27, 97th Cong., 1st Sess., **U.S.-Egypt treaty** .

**27** S. Exec. Rep. No. 27, 97th Cong., 1st Sess., **U.S.-Egypt treaty** .

**28** S. Exec. Rep. No. 27, 97th Cong., 1st Sess., **U.S.-Egypt treaty** .

**29** S. Exec. Rep. No. 27, 97th Cong., 1st Sess., **U.S.-Egypt treaty** .

**29.1** Article VII(1) of the former (1939) Swedish treaty, as amended in 1963 (Supplementary Convention of Oct. 22, 1963, art. I(a)), was substantially similar to paragraphs (1) and (3) of **Article IX of the Luxembourg treaty** , except that the Swedish treaty provided 15% as the portfolio rate, and share value was not relevant to the definition of "subsidiary corporation." Article VII(2) of the former Swedish treaty also provided for an exemption from Swedish tax on dividends from U.S. corporation if the dividend would have been exempt if from a Swedish corporation.

**30** Supplementary Convention of Oct. 22, 1963, art. I(a).

**30.1** Substantially similar provisions were contained in the 1956 treaty with Austria (art. VI), the 1949 treaty with Ireland (arts. VI(1), II(2)), and the 1951 treaty with Switzerland (art. VI). With respect to dividends derived by U.S. resident from Irish sources, Article VI(2) (in conjunction with Article II(2)) exempted such dividends from Irish surtax provided recipient was subject to U.S. tax thereon and had no Irish permanent establishment.

**31** E.g., **Ltr. Rul. 8525024** . See also **Ann. 2021-11, 2021-23 IRB 1196** (Switzerland).

**32 IRC § 662(b)** .

**33** E.g., **Ltr. Ruls. 8943058** (Austria), **7852060** (Sweden).

**34 Ltr. Ruls. 8023050** (U.K.), **7936033** (U.K.).

**35 Rev. Rul. 65-218, 1965-2 CB 566** . Accord **Rev. Rul. 72-271, 1972-1 CB 369** (for purposes of since-repealed interest equalization tax). The IRS has ruled privately that a U.K. company that had previously contributed its stock in a U.S. corporation to a wholly owned U.K. subsidiary was the beneficial owner of dividends declared by the U.S. corporation where the U.K. subsidiary had validly elected to be a disregarded entity under the "check-the-box" regulations. **PLR. 200626009** (Jun. 30, 2006).

**36 Ltr. Rul. 8943058** . Accord **Ltr. Rul. 7852060** (Sweden).

**36.1** Regs. §§ **1.1441-6(b)(1)** , **1.1441-1(e)(1)(ii)(A)** , **1.1441-1(e)(2)(ii)** .

**36.2 Regs. § 1.1441-6(b)(2)** . "Actively traded" is defined in **Regs. § 1.1092(d)-1(b)** .

**36.2a Regs. § 1.1441-6(b)(2)** . The certificate of residence, documentary evidence, and other certifications are as described in **Regs. §§ 1.1441-6(c)(3)** , **1.1441-6(c)(4)** , and **1.1441-6(c)(5)** , respectively.

**36.3** Regs. § 1.1441-6(b)(1).

**36.4** Regs. § 1.1441-1(e)(5).

**36.5 Announcement 96-23, 1996-18 IRB 7** .

**36.6 Rev. Proc. 98-27, IRB 98-15 (Mar. 27, 1998)** , accompanying **Notice 98-16** , IRB 98-15 (Mar. 27, 1998).

**36.7** For example, a QI may be permitted to rely on documentary evidence in its files (based on "know your customer" procedures acceptable to the IRS), instead of having to obtain Forms W-8 regarding customers who are beneficial owners of publicly traded stock. Also, a QI would be able to provide a streamlined, single certification in respect of an omnibus account. However, a QI would still have to

obtain from non-QI nominee accounts (and retain) appropriate certifications, including Forms W-8, from the ultimate beneficial owners (but would not have to forward copies of these forms to anyone). A QI must permit the IRS to verify compliance by the QI (which, in appropriate cases, might include IRS reliance on audits performed by the QI's external auditors), and possibly might need to post a bond with the IRS.

**37** See Regs. § 35a.9999-3, Q&A 36; **Regs. §§ 1.1441-6(c)(1)** , 1.1441-3(b)(3); IRS Form 1001 Instructions; see also **Rev. Rul. 68-173, 1968-1 CB 626** (addressing dividend payments covered by 1942 Canadian treaty); **Rev. Proc. 67-24, 1967-1 CB 625** (addressing dividend payments covered by 1954 German treaty).

**38 Rev. Rul. 68-230, 1968-2 CB 629** .

**39** This requirement also was contained in an earlier private ruling involving a Dutch custodial bank acting on behalf of Canadian and Norwegian residents. See **Ltr. Rul. 6009144480A** .

**42** Letter from Swiss Bankers Association to Michael Danilack, Assistant to the Commissioner, IRS (dated Nov. 23, 1994). Accord letter from Hans Baer and Harry Bop, Bank Julius Baer, to Michael Danilack, Assistant to the Commissioner, IRS (dated Dec. 2, 1994) (proposal would "lead to the almost total elimination of foreign customer interest in U.S. equities").

**43** For example, under Swiss law, Article 47 of the Bank Act imposes criminal penalties for violations of customers' privacy rights, unless those rights have been waived. Article 271 of the Swiss Criminal Code imposes criminal sanctions on a Swiss person who takes any official action on behalf of a foreign sovereign, which could include leving backup withholding tax and processing TIN applications.

**45** Taxpayer Identifying Numbers, INTL-0024-94 (proposing amendments to Regs. § 301.6109-1), reprinted in 37 Highlights & Documents 3749 (June 8, 1995).

**47** See infra ¶ **9.02[1][b][iv]** (holding period).

**48** These rulings are discussed at ¶ **10.02[2][a][ii]** .

**49 GCM 39850** .

**50 GCM 37865** .

**51** Tech. Adv. Mem. 9133004.

**52** See ¶ **10.02[2][a]** .

**53 Regs. § 1.881-3(a)(2)(iii)** .

**54 Regs. § 1.881-3(a)** .

**55 Regs. § 1.881-3(a)(2)(i)** .

**56 Regs. § 1.881-3(a)(2)(ii)(B)** .

**57** See ¶ **10.02[2]** . A provision of the Code that has rarely been asserted by the IRS in a treaty context but theoretically could be is **Section 269** . **Section 269** provides in effect that, if a person acquires control of a corporation with the principal purpose of obtaining for the corporation or itself a tax benefit that person otherwise would not have had, the IRS may disallow the benefit. The IRS apparently has felt that it could not meet the "principal purpose" standard in the context of treaty country holding companies. The IRS apparently would concede that some reduction of withholding tax is permissible. See, e.g., **Ltr. Rul. 8110024** (Switzerland).

**58** See, e.g., **Ltr. Ruls. 8431036** , **8331092** , **8217104** , **8134174** , (all under 1965 protocol to **1948 Dutch treaty** ), **8125130** (U.K.).

**59** See **Rev. Rul. 84-21, 1984-1 CB 11** (France; treaty did not define "owned"); **GCM 38166** (Netherlands).

**60 Ltr. Rul. 8311010** (France).

**61 Rev. Rul. 81-132, 1981-1 CB 603** ; **GCM 38166** (Netherlands).

**62 Rev. Rul. 74-172 1974-1 CB 68** . Accord **Ltr. Rul. 7928089** .

**63** See **Ltr. Rul. 7928089** .

**63.1 Treas. Technical Explanation, U.S. Model Treaty** . Accord **Regs. §§ 1.1441-1(c)(6)(ii)(A)** , 1.1441-6(b)(4) (implication only). Compare **Rev. Rul. 71-141, 1971-1 CB 211** (same for Code section 902 indirect foreign tax credit).

**64** See, e.g., **Ltr. Rul. 8309057** (France; taxpayer owned none of voting preferred stock, but more than 10% of combined voting power).

**65** See, e.g., **Rev. Rul. 69-126, 1969-1 CB 218** ; **GCM 34795 (1972)** .

**66 Ltr. Rul. 8416010** , supplemented by **Ltr. Ruls. 8516073** , **8749069** , **8922005** .

**67** Netherlands, Memorandum of Understanding, ¶ VI.

**67.1 Ltr. Rul. 200048011** (TAM).

**68** See, e.g., the following rulings under the French treaty: **Ltr. Ruls. 8638059** , **8619031** , **8618058** , **8508018** , **8416010** .

**69** See, e.g., **Rev. Rul. 65-78, 1965-1 CB 630** (1945 U.K. treaty; distributive share of interest from banking partnership was excluded from term "interest," but apparently counted as gross income, to further intent of treaty); **Ltr. Rul. 8521085** ( **1951 Swiss treaty** ); **Ltr. Rul. 6008236130A** ( **1945 U.K. treaty** ).

**70** Regs. § 509.2(b).

**71 GCM 35669** .

**72 Rev. Rul. 74-275, 1974-1 CB 376** ; **GCM 35669** (underlying **Rev. Rul. 74-275** ).

**73 Rev. Rul. 67-143, 1967-1 CB 425** (single class of stock outstanding).

**75** See, e.g., Regs. § 514.21(a)(3)(iii)(e) (France); **Ltr. Rul. 8206154** (France); **Ltr. Rul. 8042082** (same result even though subsidiaries filed consolidated return with parent).

**76** Under the 1963 protocol, in order for dividends paid by a U.S. corporation to a Netherlands Antilles corporation to qualify for either the 5% or the 15% withholding rate, less than 60% of the U.S. corporation's gross income for the three-year period immediately preceding the taxable year in which the dividend was paid could be derived from interest (unless the corporation's principal business was making loans), dividends, royalties, rents from real property, or gain from the sale or other disposition of stock, securities, or real property. For this purpose, three years was construed as thirty-six months. **Rev. Rul. 77-435, 1977-2 CB 491** . The requirement did not have to be met if the Netherlands Antilles

corporation elected under Article 8A of the Territorial State Ordinance on Profit Tax (1940) to be subject to Netherlands Antilles tax on its net dividend income from U.S. sources at a 15% rate and on its other net income from U.S. sources at rates of 24% to 30% (rather than of 2.4% to 3% in each case) and arranged for the Office of the Inspector of Taxes of the Netherlands Antilles to issue the appropriate certificate (Form VS 3). See **Rev. Rul. 65-16, 1965-1 CB 626** ; **Ltr. Rul. 7815026** . See generally **Rev. Proc. 79-40, 1979-2 CB 504** , modified, **Rev. Proc. 89-53, 1989-2 CB 633** .

**77** See **Rev. Rul. 77-435, 1977-2 CB 491** , clarified, **Rev. Rul. 89-110, 1989-2 CB 275** ; **GCM 37200** (dividends received by domestic corporation from its domestic subsidiary counted for purposes of 60% passive gross income test of Article I(2)(a) of 1963 protocol since such interpretation made it harder to qualify under Article VII).

**78** See **Ltr. Rul. 6602186090A** .

**79** See, e.g., **Ltr. Rul. 8904031** (U.K.).

**80 Rev. Rul. 81-132, 1981-1 CB 603** ; **GCM 37865** .

**81 Ltr. Rul. 8111097** .

**82** See, e.g., **Ltr. Rul. 8904031** (Netherlands).

**83** E.g., **Ltr. Ruls. 8845032** , **8438077** , **8338077** , **8230091** , **8151023** , **8110024** .

**84** E.g., **Ltr. Ruls. 8004030** , **7933057** , **7931011** , **7919046** .

**85 Ltr. Rul. 8335055** .

**86 Ltr. Ruls. 9513013** , **9309011** , **7911086** .

**87 Ltr. Rul. 8539063** .

**88** See, e.g., **Ltr. Ruls. 8539063** , **8539014** , **8335055** , **7911086** .

**89** See, e.g., **Ltr. Rul. 9306019** (Switzerland).

**90 Ltr. Rul. 8504073** , supplementing **Ltr. Rul. 8452148** ; **Ltr. Rul. 8124038** .

**91 Ltr. Ruls. 8124038** , 8110004.

**92 Ltr. Ruls. 8747028** , **8521085** .

**93 Ltr. Rul. 9306019** (Switzerland).

**94 Ltr. Ruls. 8125026** , **8121084** .

**95 Ltr. Ruls. 8133079** , **8121084** .

**96 Ltr. Rul. 8731036** .

**97** See, e.g., **Rev. Rul. 79-65, 1979-1 CB 458** (taxpayers did not present information concerning business purpose required for 5% ruling under Netherlands Antilles treaty), modified to reflect treaty termination, **Rev. Rul. 89-110, 1989-2 CB 275** ; Ltr. Ruls. 8702008 (Netherlands Antilles), **8510056** (Switzerland), **8420005** , supplemented, **8438011** (Switzerland), **8108107** (Barbados).

**98** See, e.g., **Rev. Rul. 75-118, 1975-1 CB 390** (on facts, however, business purpose of avoiding Canadian tax was present); **GCM 35904** (underlying **Rev. Rul. 75-118** ); **Ltr. Rul. 8250028** (Argentine citizens and residents owned Netherlands Antilles corporation which owned Dutch corporation that held shares in U.S. corporation).

**99** See Regs. § 509.2(b). Accord, Prop. Regs. § 1.1441-6(f) (1984 proposed regulations would require a ruling for availability of 5% rate under any treaty that conditions such rate on a satisfactory business purpose from the ownership arrangement).

**99.1** Regs. § 521.2(b). Accord, e.g., Regs. § 509.2(b) (1951 Swiss treaty); former Prop. Regs. § 1.1441-6(f) (1984 proposed regulations would have required a ruling for availability of 5% rate under any treaty that conditions such rate on a satisfactory business purpose from the ownership arrangement.

**100** Regs. § 505.302(c).

**101 Rev. Proc. 66-40, 1966-2 CB 1245** , superseded by Rev. Proc. 79-90, 1979-2 CB 504, § 2.02(1)(c), modified by **Rev. Proc. 89-53, 1989-2 CB 633** .

**102** See Vogel, Bernstein & Nitsche, "Inward Investments in Securities and Direct Operations Through the British Virgin Islands: How Serious a Rival to the Netherlands Antilles Island Paradise?" 34 Tax L. Rev. 323, 361 (1979).

**102.1 Regs. § 1.1441-6(e)** .

**102.2** As a result of a 1997 amendment, if the purchasing corporation is foreign, the only earnings and profits of such corporation that are taken into account are that portion thereof that is (1) attributable to stock of such corporation held by a holder of at least 10% of the voting stock who is a U.S. person and is either the transferor or a related person and (2) accumulated during periods for which such stock was owned by such person while the corporation was a "controlled foreign corporation" under Code **Section 957(c)** .

**103 Rev. Rul. 92-85, 1992-2 CB 69** .

**104 IRC § 304(c)** .

**104.1** See **Rev. Rul. 70-496, 1970-2 CB 74** ; **Rev. Rul. 92-85, 1992-2 CB 69** .

**105** Adapted from **Rev. Rul. 92-85, 1992-2 CB 69** .

**106** The IRS cited HR Conf. Rep. No. 861, 98th Cong., 2d Sess. 1223 (1984), 1984-2 CB 477; **Rev. Rul. 91-5, 1991-1 CB 114** ; **Rev. Rul. 92-86, 1992-2 CB 199** .

**107** Under **Section 304(a)(1)** , *FX* would be considered to contribute the *FY* shares to the capital of *DX*.

**108 Rev. Rul. 72-87, 1972-1 CB 274** (current earnings and profits not determinable).

**109** Exceptions include Article 8(6) of the treaties with Egypt and Israel, respectively, which refer to a material factor test.

**110 IRC § 894(b)** .

**111** See **¶ 2.05[2]** .

**112** See **IRC § 864(b)** .

**113** IRC § 864(b)(2)(ii), as amended by Pub. L. No. 105-34. For tax years beginning before January 1, 1998, a corporation or partnership (a) the principal office of which was in the United States, (b) the principal business of which was trading in stock or securities, and (c) which did not meet a closely held ownership test also was, like a dealer, ineligible for the statutory safe harbor. **Regs. § 1.864-2(c)(2)** . For purposes of this exception, the Treasury regulations set forth ten factors that are relevant to whether a corporation's (or partnership's) principal office was in the United States. Regs. § 1.862-2(c)(2)(iii). These factors generally refer to ministerial functions that often could be readily performed at a location other than where investment decisions were made and trading conducted.

**115 Regs. § 1.864-2(c)(2)(iii)** .

**116 Regs. § 1.864-4(c)** .

**117 Regs. § 1.864-45(c)(2)(iii)** .

**118** Proposed Amendments to the Regulations on branch profits tax and on effectively connected income, IL-03-92, reprinted in 26 Highlights & Documents 4199 (Sept. 11, 1992).

**118.1 TD 8657** , "Explanation of the Provision," reprinted in Daily Tax Report, No. 44, 3-6-96 at L-5.

**119 IRC § 864(c)(4)** . Note, however, that dividends from certain related foreign corporations and dividends constituting "subpart F income" derived by a controlled foreign corporation can never be effectively connected income. **IRC § 864(c)(4)(D)** .

**120 Regs. § 1.864-6(b)(1)** .

**121 Regs. § 1.864-6(b)(2)(ii)(A)** .

**122 Regs. § 1.864-6(b)(2)(ii)(A)** .

**123 Regs. §§ 1.864-4(c)(5)(ii)** , **1.864-5(b)(2)(i)** .

**124 Regs. § 1.864-4(c)(5)(iii)(A)** .

**125 Regs. § 1.864-4(c)(5)(iii)(B)** .

**126** IRC § 864(c)(4)(C) ; **Regs. § 1.864-5(c)** .

**127** Treaties with Denmark, Luxembourg, and Pakistan. Numerous former U.S. income tax treaties, including those with Austria, Ireland, Sweden, and Switzerland, contained a similar rule.

**128** See generally **Samann v. Comm'r, 36 TC 1011 (1961), aff'd, 313 F2d 461 (4th Cir. 1963)** (permanent establishment at any time during year made treaty benefit unavailable).

**129** See **IRC §§ 864(c)(2)** , **894(b)** ; **Ltr. Rul. 7847085** (Switzerland).

**130** IRC § 894(b) ; see **Rev. Rul. 79-56, 1979-1 CB 459** (Switzerland); **Rev. Rul. 75-454, 1975-2 CB 512** (Switzerland); **Rev. Rul. 71-302, 1971-2 CB 267** (1945 U.K. treaty); **Rev. Rul. 74-63, 1974-1 CD 374** (Switzerland); **GCM 35472** (underlying **Rev. Rul. 74-63** ); **Ltr. Rul. 8047098** (German branch of bank organized, managed, and controlled in United Kingdom and having U.S. permanent establishment was exempt from U.S. tax under U.K. treaty in respect of interest on U.S. bonds held by German branch).

**131** Regs. § 1.61-9(c) ; **Rev. Rul. 69-131, 1969-1 CB 94** (redemption).

**132** Regs. § 1.61-9(c) . Accord **Caruth v. United States, 865 F2d 644 (5th Cir. 1989)** (taxing dividends to buyer based on Texas and federal law); **Rev. Rul. 69-130, 1969-1 CB 93** (redemption).

**133** See **Estate of Smith v. Comm'r, 292 F2d 478 (3d Cir. 1961)** (intrafamily assignment, applying New Jersey law); **Bay Ridge Operating Co. v. Comm'r, 29 TCM 58 (1970)** (constructive receipt case).

**134** Regs. § 1.61-9(c) ; **Rev. Rul. 82-11, 1982-1 CB 51** ; **Silco, Inc. v. United States 779 F2d 282 (5th Cir. 1986)** .

**135** Protocol, ¶ 8(b).

**136** See **1992 OECD Commentary on art. 10, ¶ 24** .

**137** See **¶ 2.01[5]** and infra **¶ 9.02[2][b][iv]** .

**138** See **1992 OECD Commentary on art. 10, ¶ 24** .

**139 1991 OECD Commentary on art. 10, ¶ 25** .

**140 1991 OECD Commentary on art. 10, ¶ 25** .

**141** Spain, protocol, ¶ 7(a).

**142 Regs. § 1.316-2(b)** .

**143 Regs. § 1.316-2(b)** .

**144 1991 OECD Commentary on art. 10, ¶ 28** .

**145 IRC § 331** .

**146 IRC § 302** .

**147** See supra **¶ 9.02[1][b][iv]** .

**148 IRC § 302** ; accord, e.g., **Ltr. Rul. 8309062** .

**149 IRC § 1382(b)** . See generally Clark & Erikson, "Taxation of Cooperatives," 229-2d Tax Mgmt. Portfolios (BNA) A-8.

**150 Ltr. Ruls. 8715037** , **7918105** .

**151 Ltr. Rul. 8131059** .

**152** See **Ltr. Rul. 9337017** .

**153** Ltr. Rul. 6306285590A.

**153.1** Framatone Connectors USA, Inc. v. Comm'r, 118 TC 3 (2002) (1994 U.S.-France treaty).

**154 Deputy v. DuPont, 308 US 488 (1940)** . Accord **Rev. Rul. 80-135, 1980-1 CB 18** (not interest for **Section 103** purposes). An interest notion, however, underlies **Section 246A(d)(3)(B)** .

**155** Regs. §§ **1.861-2(a)(7)** , **1.861-3(a)(6)** .

**156** Prop. Regs. §§ 1.864-5(b)(2)(ii), 1.871-7(b)(2), 1.881-2(b)(2), 1.894-1(c), 1.1441-2(b)(4). The regulations were issued under the authority of **Section 7805** rather than under **Section 863** in order to characterize the substitute payments as "dividends" or "interest" (rather than simply U.S.-source) to avoid exemptions for "other income" under certain income tax treaties. Query whether such authority sanctions the redefinition of such basic concepts?

**157** Prop. Regs. §§ 1.861-2(a)(7), **1.861-3(a)(6)** .

**158 Prop. Regs. § 1.1058-1(b)** .

**159** Accordingly, for example, under the regulations, such payments received by a U.K. resident could not be treated as "other income" and, hence, are exempt under **Article 22 of the U.K. income tax treaty** , or as "business profits," which are exempt under Article 7 of that treaty, although the payments would be eligible for a reduced rate of withholding under the dividend provisions of that treaty. It is not clear, however, whether the IRS has the authority to promulgate regulations that on their face appear to conflict with the definition of "dividend" under this (and certain other) treaties. It also is not clear whether the regulations are valid even in the case of those treaties that refer generally to the laws of the country imposing the tax, since the definitions of "dividend" and "interest" contained therein were not the law when the treaties were ratified. Further, the terms are not so defined for U.S. tax purposes generally. The Explanation of Provisions accompanying the final regulations, however, maneuvers around these concerns by describing the regulations as addressing "the identity of the owner of dividend and interest income for treaty purposes as opposed to the character of the payments received under varying treaty definitions," and citing conduit principles, including **Section 7701(*l*)** , as authority. **TD 8735** , reprinted in Highlights & Documents, October 7, 1997, at 334, 335.

**160** Guidance on foreign-to-foreign payments, designed to avoid duplicate withholding, is provided in **IRS Notice 97-66, 1997-48 IRB 1** . Under the regulations as initially proposed, the payor had to be a U.S. person, which would have meant that, for example, substitute dividend payments made on a securities loan of U.S. stock by a Swiss corporation to a Kuwaiti corporation could avoid withholding tax at the nontreaty rate. Note also that the substitute payments on loans of securities between U.S. persons are not affected by the regulations other than in respect of source of income.

**161** New York State Bar Ass'n Tax Section, Report on Proposed Regulations on Certain Payments Made Pursuant to Securities Lending Transactions (July 7, 1992), reprinted in 26 Highlights & Documents 1393, 1407 (July 27, 1992). In situations in which the purchaser may not and does not dispose of the collateral, however, such as the situations addressed in certain rulings by the IRS (

**Rev. Rul. 79-108, 1979-1 CB, 75** ; **Rev. Rul. 77-59, 1977-1 CB 59** ; **Rev. Rul. 74-27, 1974-1 CB 24** ), the Bar Association would not apply the rule of the proposed regulations.

**162 Prop. Regs. § 1.1058-1(d)** .

**163** In **Letter Ruling 8822061** , the IRS ruled that for purposes of applying U.S. income tax treaties, securities loan fees were "industrial and commercial profits" in the hands of a foreign securities lender that engaged in the life insurance business. The IRS reasoned that, since the securities lending was undertaken to maximize the lender's return on its investment portfolio in order to permit it to meet future claims, the fee income was derived in the active conduct of the lender's insurance business. However, the ruling expressly did not address the character or source of fees.

**164** E.g., **United Kingdom, art. 22** .

**164.1 Regs. §§ 1.861-2(a)(7)** , **1.861-3(a)(6)** .

**165** New York State Bar Ass'n Report, supra note 161 at 1400-1401 & n.45. Further, substitute dividend components of equity swaps may be measured by expected or historical dividends, may be subject to a cap and/or floor; and so forth. Id. at 1401.

**166** New York State Bar Ass'n Report, supra note 161 at 1400-1401 & n.45. No withholding would be imposed because gain would be taxable as gain from the sale of property under **Sections 1234** , **1234A** , and **1256(a)(3)** .

**167 1992 OECD Commentary on art. 10, ¶ 27** .

**168** The OECD Model Treaties base residence of entities on place of management. See **1992 OECD Commentary on art. 4, ¶ 22** . The equivalent from a U.S. standpoint is the State under the laws of which the partnership is organized.

**169 1992 OECD Commentary on art. 4, ¶ 22** .

**170** Decision of Feb. 22, 1993 of the Tax Council (99/93-4061-00142), reported in 33 Highlights & Documents 2860 (June 1, 1994).

**171 Regs. § 301.7701-3(a)** .

**172** Temp. Regs. § 1.894-1T(d)(1). These temporary regulations were simultaneously proposed as final regulations.

**172.1** Temp. Regs. § 1.894-1T(d)(4)(ii).

**172.2** Inland Revenue Bulletin, June 1997. The Netherlands Ministry of Finance has taken a similar position. Resolution of March 17, 1997.

**172.3** Temp. Regs. § 1.894-1T(d)(5).

**173 Rev. Rul. 76-435, 1986-2 CB 490** .

**174 Ltr. Ruls. 8338069** , **8132043** , **7821139** , **7813117** , **7804058** .

**175 Ltr. Ruls. 8309062** , **8012063** , **7935019** .

**176 Ltr. Ruls. 8114095** (reserving, however, on whether GmbH was juridical person under German law), **7937054** , **7908004** .

**177** 1992 OECD Commentary on art. 10, ¶ 24; 1992 OECD Commentary on art. 11, ¶ 19.

**178** See, e.g., **Dorzback v. Collison, 195 F2d 69 (3d Cir. 1952)** (annual payments of 25% of borrower's net profits were interest); **Kena, Inc. v. Comm'r, 44 BTA 217 (1941)** (kicker amounts to 80% of net profits); **New England Lime Co. v. Comm'r, 13 TC 799, 804 (1949)** (3 percent fixed interest plus 3% payable out of income).

**179** See, e.g., **John Kelly Co. v. Comm'r, 326 US 521 (1946)** (interest payable out of earnings at rate of between 2% and 10%); **Portage Plastics Co., Inc. v. United States, 486 F2d 632 (7th Cir. 1972)** (interest was 5% of net profits).

**180** See, e.g., **Farley Realty Corp. v. Comm'r, 279 F2d 701 (2d Cir. 1960)** (shared appreciation mortgage bifurcated); **Richmond Fredericksburg & Potomac RR v. Comm'r, 528 F2d 917 (4th Cir. 1975)** (participating preferred stock bifurcated). But see **GCM 36702 (1976)** (impractical to bifurcate).

**180.1** Table 9-4, notes d and g.

**181** See Joint Comm. on Taxation, Explanation of **U.S.-Netherlands treaty** (JCS-15-93).

**182** Intentionally omitted.

**183** See Treas. Dep't Technical Explanation, U.S.-Spain treaty.

**184** See Treas. Dep't Technical Explanation, U.S.-Netherlands treaty.

**185** Treas. Dep't Technical Explanation, U.S.-Netherlands treaty.

**186** See Treas. Dep't Technical Explanation, U.S.-Spain treaty.

**187** Treas. Dep't Technical Explanation, U.S.-Spain treaty.

**187.1** Testimony of the Staff of the Joint Committee on Taxation before the Senate Committee on Foreign Relations, Hearing on Tax Treaties and Protocols with Eight Countries, Oct. 7, 1997 (JCX-53-97), reprinted in Highlights and Documents, Oct. 9, 1997, at 619-620.

**188** See Joint Comm. on Taxation, Explanation of **U.S.-Netherlands treaty** (JCS-15-93).

**189** See ¶ **5.02[2][b][ii]** .

**191** Campbell, Philippart, Delsouiller & Bonnet, "Business Operations in France," 961 Tax Mgmt. Portfolio (BNA) at A-60.

**192** Campbell, Philippart, Delsouiller & Bonnet, "Business Operations in France," 961 Tax Mgmt. Portfolio (BNA) at A-60.

**193** Campbell, Philippart, Delsouiller & Bonnet, "Business Operations in France," 961 Tax Mgmt. Portfolio (BNA) at A-60.

**194** Campbell, Philippart, Delsouiller & Bonnet, "Business Operations in France," 961 Tax Mgmt. Portfolio (BNA) at A-60.

**195** Campbell, Philippart, Delsouiller & Bonnet, "Business Operations in France," 961 Tax Mgmt. Portfolio (BNA) at A-60.

**196** Campbell, Philippart, Delsouiller & Bonnet, "Business Operations in France," 961 Tax Mgmt. Portfolio (BNA) at A-60.

**196.1** France (1967, as amended by 1978 protocol), art. 9(5).

**198** S. Exec. Rep. No. 19, 92d Cong., 1st Sess., **U.S.-France treaty** , 1970 protocol.

**199** See Campbell et al., supra note 191, at A-59.

**201** Appendix to Report of the Senate Foreign Relation Committee on the 1970 Protocol, Statement of Edwin S. Cohen, Ass't Secretary of the Treasury.

**202** See Exchange of letters dated November 24, 1978, between George S. Vest, Assistant Secretary of State for European Affairs, and Francois de Laboulaye, Ambassador of France. See **¶ 20.02[4][b][ii]** .

**202.1** Treas. Dep't Technical Explanation, U.S.-France treaty.

**203** The actual dividend, presumably in French francs, would be included in income by a U.S. taxpayer in an amount equal to the U.S. dollar equivalent translated at the spot rate for the date the dividend is received or made available to the taxpayer. See **IRC §§ 986(b)** , **989(b)** ; **Regs. § 1.301-1(b)** .

**204 Rev. Proc. 73-34, 1973-2 CB 489** , as amended by Amendment I, 1974-2 CB 465 (addressing Article 9(6) of the prior treaty).

**205** See **Ltr. Rul. 9416041** .

**206** See **Ltr. Rul. 9416041** .

**207 Ltr. Rul. 9416041** .

**208** S. Exec. Rep. No. 27, **U.S.-German treaty** .

**209** S. Exec. Rep. No. 27, **U.S.-German treaty** .

**210** S. Exec. Rep. No. 27, **U.S.-German treaty** .

**211** S. Exec. Rep. No. 27, supra note 208.

**212** See supra note 202 and accompanying text.

**226.1** Prior to its termination, e.g., **U.S.-Malta treaty** also was in this category.

**227** As discussed below, the latter aspect of these provisions has been disregarded by the IRS and a U.S. court. See infra note 234 and accompanying text.

**228** See generally Clary, "Income Tax Treaty Source-Of-Income Rules: How They Are Applied?" 28 J. Tax'n 12 (1968).

© 2021 Thomson Reuters/Tax & Accounting. All Rights Reserved.

Checkpoint Contents
  International Tax Library
    WG&L International Treatises
      Andersen: Analysis of United States Income Tax Treaties
        Chapter 24: Information Exchange and Administrative Assistance
          ¶24.03. Other Administrative Assistance

# ¶ 24.03 Other Administrative Assistance

# ¶ 24.03[1] Income Tax Treaties

# ¶ 24.03[1][a] Conducting Interviews and Reviewing Books and Records

# ¶ 24.03[1][a][i] Treaty language.

Article XXVII(7) of the Canadian treaty **207** provides:

> 7. The requested State shall allow representatives of the requesting State to enter the requested State to interview individuals and examine books and records with the consent of the persons subject to examination. The treaty provisions in Table 24-4 are substantially similar (with significant variations noted).

# Table 24-4

Belgium (art. 25(10)) <a>
Canada (art. XXVII(7), as amended by 2007 protocol)
**Estonia (art. 26(7))** <b>
**France (art. 27(4)(c)** , as amended by 2009 protocol) <b>, <c>
Iceland (art. 25(6)) <d>
Ireland (art. 27(4)) <b>
Latvia (art. 27(7)) <b>
Lithuania (art. 27(7)) <b>
Malta (art. 26(7))
**New Zealand (art. 25(8)** , as amended by 2008 protocol)
South Africa (art. 26(7))

United Kingdom (art. 27(5)) <d>

*Notes:*

<a> Interview or examination must take place under the conditions and within the limits agreed upon by the competent authorities of the States.

<b> Competent authorities must consent to interview or examination.

<c> Contracting States must agree in exchange of diplomatic notes to allow such inquiries on reciprocal basis. Any inquiry may not be considered an audit for French domestic law purposes.

<d> Competent authority intending to send official must notify other competent authority.

# ¶ 24.03[1][a][ii] Commentary and discussion of legal authorities.

A few treaties expressly authorize representatives of the requesting State to enter the requested State to interview individuals and examine books and records with the consent of the persons subject to examination. About half the treaties containing such a provision require the competent authorities to consent to any interview or examination. The treaties with Iceland and the United Kingdom provide that the competent authority of the requesting State must notify the competent authority of the requested State prior to entering the State to conduct interviews and examinations. Under the Belgian treaty, any interview or examination must take place under the conditions and within the limits as determined by the competent authorities.

# ¶ 24.03[1][b] Collection of Tax

Many treaties address assistance in the collection of tax of a Contracting State. The provision(s) may be part of the Exchange of Information article or in a separate article, such as in the Canadian treaty, dedicated to assistance in collection procedures.

# ¶ 24.03[1][b][i] Treaty language.

Articles 26(4) and 26(5) of the German treaty provides as follows:

4. Each of the Contracting States shall endeavor to collect on behalf of the other Contracting State such amounts of tax as may be necessary to ensure that relief granted by this Convention from taxation imposed by that other State does not inure to the benefit of persons not entitled thereto.

5. Paragraph 4 shall not impose on either of the Contracting States the obligation to carry out administrative measures that are of a different nature from those used in the collection of its own taxes, or that would be contrary to its sovereignty, security or public policy.

The treaty provisions in Table 24-5 are to the same effect (with significant variations noted).

## Table 24-5

**Australia (art. 25(5)** ) <a>
**Belgium (art. 26** )
**Cyprus (art. 29** ) <a>, <b>
**Egypt (art. 29** ) <a>, <b>
**Estonia (arts. 26(4)-26(5))**
**Finland (art. 26(7)** , as amended by 2006 protocol)
**Germany (arts. 26(4) -26(5)** )
Greece (art. XIX)
Hungary (1979 exchange of letters)
Iceland (art. 25(5))
Indonesia (art. 29) <b>, <c>
**Italy (1999 protocol, (art. 6)**
**Jamaica (arts. 27(4) -27(5)** ) <d>
**Japan (art. 27** ) <b>, <e>
Korea (art. 30) <a>, <b>
Latvia (arts. 27(4)-27(5))
Lithuania (arts. 27(4)-27(5))
**New Zealand (art. 25(7)** , as amended by 2008 protocol)
**Norway (art. 29** ) <b>, <c>
**Philippines (art. 27** ) <a>, <b>
**Romania (art. 26** ) <a>, <b>
South Africa (arts. 26(4)-26(5))
**Sri Lanka (arts. 27(4)-27(5))**
**Trinidad and Tobago (art. 25** ) <b>, <c>, <e>
United Kingdom (art. 27(5))

*Notes:*

<a> Article omits exception for practices contrary to sovereignty, security or public policy.

<b> Collection assistance shall not impose obligations to carry out measures at variance with "the laws, administrative practices or public policy of" (Cyprus, Japan, Korea), "the laws or administrative practices of" (Egypt, Philippines, Romania) or "the regulations and practices of" (Indonesia, Norway, Trinidad and Tobago) either Contracting State.

<c> Competent authorities may consult or communicate directly concerning collection.

<d> Collection assistance also shall not impose administrative measures that are contrary to domestic law.

<e> The collecting State shall be responsible to the other state for the amount collected.

Article 26(2) of the U.S.-Switzerland treaty is similar to the **Article 26(4) of the German treaty** , except it only refers to exemption or reduced rate of tax granted under the Dividends, Interest, Royalties and Pensions articles.

The treaties with Austria and Luxembourg each contain a more elaborate provision that states the general support principle and lists obligations of the Contracting States. For example, **Article 28(4) of the treaty with Luxembourg** provides:

> 4. The Contracting States undertake to lend each other support and assistance in the collection of taxes to the extent necessary to ensure that relief granted by the present Convention from taxation imposed by a Contracting State does not inure to the benefit of persons not entitled thereto. With respect to a specific request for collection assistance:
> (a) the requesting State must produce a copy of a document certified by its competent authority specifying that the sums referred to it for the collection of which it is requesting the intervention of the other State, are finally due and enforceable;
> (b) a document produced in accordance with the provisions of this paragraph shall be rendered enforceable in accordance with the laws of the requested State;
> (c) the requested State shall effect recovery in accordance with the rules governing the recovery of similar tax debts of its own; however, tax debts to be recovered shall not be regarded as privileged debts in the requested State; and
> (d) appeals concerning the existence or amount of the debt shall lie only to the competent tribunal of the requesting State.

The provisions of this paragraph shall not impose upon either Contracting State the obligation to carry out administrative measures that would be contrary to its sovereign, security public policy or its essential interests.

**Article 25(7) of the Austrian treaty** is virtually identical except it provides that, in Austria, documents delivered must be rendered enforceable by the Regional Finance Directorates and judicial execution must be requested by the Finanzprokuratur or by the finance office delegated to act on his behalf.

A few treaties (those with Canada, Denmark, France, the Netherlands and Sweden) include slightly different procedures in the Assistance In Collection article. According to **Article 28 of the U.S.-France treaty 208** :

> 1. The Contracting States undertake to lend assistance and support to each other in the collection of the taxes to which this Convention applies (together with interest, costs, and additions to the taxes and fines not being of a penal character) in cases where the taxes are definitively due according to the laws of the State making the application.
> 2. Revenue claims of each of the Contracting States which have been finally determined will be accepted for enforcement by the State to which application is made and collected in that State in accordance with the laws applicable to the enforcement and collection of its own taxes.

3. The application will be accompanied by such documents as are required by the laws of the State making the application to establish that the taxes have been finally determined.

4. If the revenue claim has not been finally determined, the State to which application is made will take such measures of conservancy (including measures with respect to transfer of property of nonresident aliens) as are authorized by its laws for the enforcement of its own taxes.

5. The assistance provided for in this Article shall not be accorded with respect to citizens, companies, or other entities of the Contracting State to which application is made.

The French treaty is unique in that it requires a State to take measures of conservancy where a revenue claim has not been finally determined.

**Article 27 of the Swedish treaty** is similar to the French Assistance in Collection article, except it (1) does not carve out amounts of a penal character, (2) permits assistance with respect to citizens, companies or other entities of the State to which the application is made to ensure the exemption or reduced rate of tax to such citizens, companies or other entities is not enjoyed by persons not entitled to such benefits, and (3) provides that the provision shall not impose an obligation on either Contracting State to carry out administrative measures which are of a different nature from those used in collection of its own tax or would be contrary to its sovereignty, security or public policy.

Article 27 of the Danish treaty is similar, with the following additions:

9. Each of the Contracting States shall endeavor to collect on behalf of the other Contracting State such amounts as may be necessary to ensure that relief granted by the Convention from taxation imposed by that other State does not inure to the benefit of persons not entitled thereto.

12. The requested State shall not be obliged to accede to the request of the applicant State:

a) if the applicant State has not pursued all appropriate collection action in its own jurisdiction; or

b) in those cases where the administrative burden for the requested State is disproportionate to the benefit to be derived by the applicant State.

Article 31 of the Dutch treaty is similar to the French Assistance in Collection article, except the Dutch treaty (1) expressly provides the State to which application is made is not required to enforce executory measures for which there is no provision in the law of the State making the application and (2) permits assistance with respect to citizens, corporations and other entities in the State to which application in cases where the exemption or reduced rate of tax has, according to mutual agreement between the competent authorities of the States, been enjoyed by persons not entitled to such benefits. Paragraph 30 of the Memorandum of Understanding accompanying the **U.S.-Netherlands treaty** provides that, in applying the Assistance in Collection article, the following shall be taken into account:

1. The requested State shall not be obliged to accede to the request of the applicant State:

(a) if the applicant State has not pursued all appropriate collection action in its own jurisdiction;

(b) in those cases where the administrative burden for the requested State is disproportionate to the benefit to be derived by the applicant State.

2. The request for administrative assistance in the recovery of a tax claim shall be accompanied by:

(a) an official copy of the instrument permitting enforcement in the applicant State;

(b) where appropriate, certified copies of any other document required for recovery;

(c) a certification by the competent authority of the applicant State that, under the laws of that State, the revenue claim has been finally determined.

For the purposes of this Article, a revenue claim is finally determined when the applicant State has the right under its internal law to collect the revenue claim and all administrative and judicial rights of the taxpayer to restrain collection in the applicant State have lapsed or been exhausted.

3. A revenue claim of the applicant State that has been finally determined may be accepted for collection by the competent authority of the requested State and, subject to the provisions of paragraph 7, if accepted shall be collected by the requested State as though such revenue claim were the requested State's own revenue claim finally determined in accordance with the laws applicable to the collection of the requested State's own taxes.

4. Where an application for collection of a revenue claim in respect of a taxpayer is accepted:

(a) by the United States, the revenue claim shall be treated by the United States as an assessment under United States laws against the taxpayer as of the time the application is received; and

(b) by the Netherlands, the revenue claim shall be treated by the Netherlands as an amount payable under appropriate Netherlands law, the collection of which is not subject to any restriction.

5. Nothing in this Article shall be construed as creating or providing any rights of administrative or judicial review of the applicant State's finally determined revenue claim by the requested State, based on any such rights that may be available under the laws of either State. If, at any time pending execution of a request for assistance under this Article, the applicant State loses the right under its internal law to collect the revenue claim, the competent authority of the applicant State shall promptly withdraw the request for assistance in collection.

6. Subject to this paragraph, amounts collected by the requested State pursuant to this Article shall be forwarded to the competent authority of the applicant State. Unless the competent authorities of the States otherwise agree, the ordinary costs incurred in providing collection assistance shall be borne by the requested State and any extraordinary costs so incurred shall be borne by the applicant State.

7. The requested State may allow deferral of payment or payment by installments, if its laws or administrative practice permit it to do so in similar circumstances, but it shall first inform the applicant State. Any interest received by the requested State as a result of the allowance of a deferral of payment or payment by installments will be transferred to the competent authority of the applicant State.

8. A revenue claim of an applicant State accepted for collection shall not have in the requested

State any priority accorded to the revenue claims of the requested State.

9. The competent authorities may under this Article grant assistance in collecting any tax deferred by operation of paragraph 8 of Article 14 (Capital Gains).

10. The competent authorities of the States shall agree upon the mode of application of this Article. The competent authorities of the States may further agree to modify or supplement these procedures, however, they shall continue to be bound by the general principles established herein.

Article XXVI A of the U.S.-Canada treaty, **209** which includes several of the provisions in the Assistance in Collection articles above, is more robust in terms of setting forth the circumstances under which a State shall lend assistance and support in collection of tax:

1. The Contracting States undertake to lend assistance to each other in the collection of taxes referred to in paragraph 9, together with interest, costs, additions to such taxes and civil penalties, referred to in this Article as a "revenue claim".

2. An application for assistance in the collection of a revenue claim shall include a certification by the competent authority of the applicant State that, under the laws of that State, the revenue claim has been finally determined. For the purposes of this Article, a revenue claim is finally determined when the applicant State has the right under its internal law to collect the revenue claim and all administrative and judicial rights of the taxpayer to restrain collection in the applicant State have lapsed or been exhausted.

3. A revenue claim of the applicant State that has been finally determined may be accepted for collection by the competent authority of the requested State and, subject to the provisions of paragraph 7, if accepted shall be collected by the requested State as though such revenue claim were the requested State's own revenue claim finally determined in accordance with the laws applicable to the collection of the requested State's own taxes.

4. Where an application for collection of a revenue claim in respect of a taxpayer is accepted

(a) By the United States, the revenue claim shall be treated by the United States as an assessment under United States laws against the taxpayer as of the time the application is received; and

(b) By Canada, the revenue claim shall be treated by Canada as an amount payable under the Income Tax Act, the collection of which is not subject to any restriction.

5. Nothing in this Article shall be construed as creating or providing any rights of administrative or judicial review of the applicant State's finally determined revenue claim by the requested State, based on any such rights that may be available under the laws of either Contracting State. If, at any time pending execution of a request for assistance under this Article, the applicant State loses the right under its internal law to collect the revenue claim, the competent authority of the applicant State shall promptly withdraw the request for assistance in collection.

6. Subject to this paragraph, amounts collected by the requested State pursuant to this Article shall be forwarded to the competent authority of the applicant State. Unless the competent authorities of the Contracting States otherwise agree, the ordinary costs incurred in providing collection assistance shall be borne by the requested State and any extraordinary costs so

incurred shall be borne by the applicant State.

7. A revenue claim of an applicant State accepted for collection shall not have in the requested State any priority accorded to the revenue claims of the requested State.

8. No assistance shall be provided under this Article for a revenue claim in respect of a taxpayer to the extent that the taxpayer can demonstrate that

(a) Where the taxpayer is an individual, the revenue claim relates either to a taxable period in which the taxpayer was a citizen of the requested State or, if the taxpayer became a citizen of the requested State at any time before November 9, 1995 and is such a citizen at the time the applicant State applies for collection of the claim, to a taxable period that ended before November 9, 1995;

(b) Where the taxpayer is an entity that is a company, estate or trust, the revenue claim relates to a taxable period in which the taxpayer derived its status as such an entity from the laws in force in the requested State.

9. Notwithstanding the provisions of Article II (Taxes Covered), the provisions of this Article shall apply to all categories of taxes collected, and to contributions to social security and employment insurance premiums levied, by or on behalf of the Government of a Contracting State.

10. Nothing in this Article shall be construed as:

(a) Limiting the assistance provided for in paragraph 4 of Article XXVI (Mutual Agreement Procedure); or

(b) Imposing on either Contracting State the obligation to carry out administrative measures of a different nature from those used in the collection of its own taxes or that would be contrary to its public policy (ordre public).

11. The competent authorities of the Contracting States shall agree upon the mode of application of this Article, including agreement to ensure comparable levels of assistance to each of the Contracting States.

The Bermuda treaty does not contain provisions expressly addressing collection of taxes. Article 5 of the treaty, however, does require the competent authorities "to provide assistance as appropriate in carrying out the laws of the respective Covered Jurisdictions relating to the prevention of tax fraud and the evasion of taxes." Although the diplomatic notes exchanged at the signing of the U.S.-Bermuda treaty refer only to information exchanges, the language of Article 5 arguably is broad enough to encompass collection of taxes.

# ¶ 24.03[1][b][ii] Commentary and discussion of legal authorities.

Under the doctrine of "revenue rule," one country will not assist in collecting another country's taxes or enforcing tax assessments or judgments of another country. [210] The revenue rule "has long been treated as a corollary of the rule that" the courts of one country shall not execute the penal laws of another. [211] The rule, which developed as an analogy between the foreign penal laws and revenue

laws, "first drew that inference in a line of cases prohibiting the enforcement of tax liabilities of one sovereign in the courts of another sovereign, such as a suit to enforce a tax judgment." **212**

In accordance with this doctrine, except as agreed upon in the Exchange of Information article or Assistance in Collection article of a U.S. income tax treaty, or under the 2011 Multilateral Convention, the United States typically does not assist another country in the collection of taxes. **213**

Subject to the restriction in certain treaties that a Contracting State is not obligated to carry out administrative measures different than those used to collect its own taxes or contrary to its sovereignty, security or public policy, U.S. income tax treaties containing assistance in collection provisions mandate that each Contracting State to make efforts to collect tax on behalf of the other State. With regard to those treaties that do not contain provisions limiting a State's obligation, these provisions are arguably contrary to the revenue rule.

The majority of these provisions is designed to provide reciprocal assistance in collecting taxes in order to ensure that unintended beneficiaries do not enjoy exemptions and reduced tax rates provided by the treaties. Such provisions, which are of anti-abuse nature, generally may be invoked in respect of covered taxes owed by any person, including citizens or entities of the requested State.

The provisions generally do not cover taxes not otherwise covered by the treaty. The **U.S.-Canada treaty** , however, applies to all categories of taxes collected, and to contributions to social security and employment insurance premiums levied, by or on behalf of the U.S. or Canadian government.

Five income tax treaties to which the United States is a party more broadly provide for recognition of foreign tax claims and judgments under certain circumstances. The treaties with Canada, Denmark, France, the Netherlands and Sweden provide that each Contracting State will collect taxes covered by the treaty (and, in the case of Canada, additional taxes described above) plus interest, costs, and nonpenal additions to taxes and fines.

Under each of these treaties, in general, the requesting State much accompany its request for assistance by submitting documents that show that the requesting State's taxes have been finally determined. In general, final determination should mean that all opportunities to contest a tax claim, such as through normal administrative or judicial processes, must be exhausted or must no longer be available due to the expiration of periods for appeals. **214** Such a definition is reflected in Article XXVI A(2) of the U.S.-Canada treaty, Article 27(2) of the Danish treaty and paragraph 30(2) of the U.S.-Netherlands Memorandum of Understanding.

A qualification to the final determination requirement exists under the treaty with France if the laws of the requested State permit conservancy of assets prior to the time of a final determination. Under this provision, a Contracting State could be requested to freeze a taxpayer's assets until a final determination of tax liability in the requesting State. Similar provisions are contained in Article 12 of the 2011 Multilateral Convention.

Under each of these five treaties, requests for enforcement must be accepted and the tax collected by

the requested State in accordance with the laws applicable to the enforcement and collection of its own taxes. In addition, under the treaty with the Netherlands, the requested State is not required to enforce executory measures for which there is no provision in the laws of the requesting State, even if such measures exist under the laws of the requested State.

Each of the five treaties prohibits collection against citizens (nationals) or corporations or other entities of the requested State, except (other than in the case of the Canadian and French treaties) to ensure that treaty benefits to not inure to the benefit of ineligible persons.

Prior to the 1995 protocol to the U.S.-Canada treaty, such broad collection provisions were relatively unusual in U.S. income tax treaties. The Assistance in Collection article in the 1995 protocol represented a deviation from U.S. treaty policy, providing for expanded collection assistance under a treaty that had no historical antecedent for such provisions. The Treasury's Technical Explanation disclosed that this resulted from "the confluence of several unusual factors," including the close similarity of the legal and procedural protections afforded by Canada and the United States to their respective citizens and residents (including in tax collection proceedings) and the "close cooperation" and "extensive working experience" between the U.S. and Canadian tax authorities, which would permit agreed procedures to be "administered appropriately, effectively and efficiently." **215** At the time the 1995 protocol was signed, the Staff of the Joint Committee on Taxation noted that whether the United States agrees to include similar provisions in future treaties generally will depend on each case on an analysis of the substantive and procedural elements of the other government's taxes and on policy issues, such as the relative compatibility of the legal systems and individual protections of the two countries. **216** Following the 1995 protocol, a similarly expansive provision was included in the **U.S.-Denmark treaty** , which entered into force March 1, 2000, and in the 2007 protocol to the U.S.-Canada treaty.

# ¶ 24.03[1][c] Notification of and Consultation Concerning Changes in Law

## ¶ 24.03[1][c][i] Treaty language.

**Article 2(4) of the 2016 U.S. Model Treaty** provides, in pertinent part:

> 4. ***The competent authorities of the Contracting States shall notify each other of any significant changes that have been made in their taxation or other laws that relate to the application of this Convention.

The treaty provisions in Table 24-6 are to the same effect (with significant variations noted).

# Table 24-6

**Australia (art. 2(2)** , as amended by 2001 protocol)
**Austria (art. 2(3))** <a>
Bangladesh (art. 2(3))
Barbados (art. 2(3)) <a>
**Belgium (art. 2(4)** )
Bulgaria (art. 2(4))
**China (art. 2(2)** )
**Cyprus (arts. 28(5) -28(6)** ) <a>
**Czech Rep. (art. 2(2))** <a>
**Denmark (art. 2(2)** ) <a>
**Egypt (arts. 1(4) -1(5)** ) <a>
**Estonia (art. 2(2))** <a>
**Finland (art. 2(2)** ) <a>
**France (art. 2(2)** ) <a>
**Germany (art. 2(2)** )
**Hungary (art. 2(3))** <a>
**India (art. 2(2)** ) <a>
Indonesia (art. 26(5)) <a>
**Ireland (art. 2(2)** ) <a>
**Israel (arts. 1(4) -1(5)** ) <a>
**Italy (art. 2(2)** ) <a>
**Jamaica (art. 2(3)** ) <a>
**Japan (art. 2(2)** )
**Kazakhstan (art. 2(2)** ) <a>
Korea (arts. 28(6)-28(7)) <a>, <b>
Latvia (art. 2(2)) <a>
Lithuania (art. 2(2)) <a>
**Luxembourg (art. 2(2)** ) <a>
**Malta (art. 2(4)** )
**Mexico (art. 2(4)** ) <a>
Morocco (arts. 26(4)-26(5)) <a>, <b>
**Netherlands (art. 2(2)** )
**New Zealand (art. 2(4)** , as amended by 2008 protocol)
**Norway (arts. 28(4) -28(5)** ) <a>, <b>
**Philippines (arts. 1(3) -1(4)** ) <a>, <b>
**Poland (art. 2(5)** ) <b>
**Romania (art. 1(4)** ) <b>
**Russia (art. 2(2)** ) <a>
**Slovak Rep. (art. 2(2))** <a>
Slovenia (art. 2(2)) <a>
South Africa (art. 2(2)) <a>

Spain (art. 2(2) ) <a>
Sri Lanka (art. 2(3)) <a>
Sweden (art. 2(2) ) <a>
Switzerland (art. 2(3))
Thailand (art. 2(2)) <a>
Trinidad and Tobago (art. 27 ) <a>, <b>
Tunisia (art. 2(3))
Turkey (art. 2(3) )
Ukraine (art. 2(2)) <a>
USSR (art. XII)
United Kingdom (art. 2(4) )
Venezuela (art. 2(2)) <a>

*Notes:*

<a> Competent authorities shall also notify each other of any published material concerning the application of the treaty, including explanations, regulations, rulings or judicial decisions.
<b> Notification must occur "at least once a year."

A number of treaties contain provisions that require the competent authorities or, in certain cases, other appropriate authorities, to consult concerning the impact of changes in domestic law. For example, Article 29(6) of the U.S.-Netherlands treaty provides the following:

6. If the competent authority of one of the States becomes aware that the law of one of the States is or may be applied in a manner that may impede the full implementation of this Convention, that competent authority shall inform the competent authority of the other State in a timely manner. At the request of one of the States, the competent authorities shall consult with each other with a view to establishing a basis for the full implementation of this Convention. The consultations described in this paragraph should begin within six months of the date on which the competent authority of the first-mentioned State informed the competent authority of the other State.

Paragraph 9 of the protocol to the U.S.-Kazakhstan treaty is essentially similar, but also refers expressly to a right to terminate the treaty if negotiations are unsuccessful.

When the competent authority of one of the Contracting States considers the law of the other Contracting State is or may be applied in a manner that eliminates or significantly limits a benefit provided by the Convention, that State shall inform the other Contracting State in a timely manner and may request consultations with a view to restoring the balance of benefits of the Convention. If so requested, the other State shall begin such consultations within three months of the date of such request.

If the Contracting States are unable to agree on the way in which the Convention should be modified to restore the balance of benefits, the affected State may terminate the Convention in accordance with the

procedures of paragraph 1 [of Article 25], notwithstanding the five year period referred to in that paragraph, or take such other action regarding this Convention as may be permitted under the general principles of international law.

To the same effect as the Dutch provision, **Article 6(8) of the U.S.-Israel treaty 217** provides as follows:

> 8. The appropriate authority of either Contracting State may request consultations with the appropriate authority of the other Contracting State to determine whether amendment to the Convention is appropriate to respond to changes in the law or policy of either Contracting State. If those consultations determine that the effect of the Convention or its application have been unilaterally changed by reason of domestic legislation enacted by a Contracting State such that the balance of benefits provided by the Convention has been significantly altered, the authorities shall promptly endeavor to amend the Convention to restore an appropriate balance of benefits.

Similar, briefer provisions are contained in the protocols to the treaties with Mexico and Spain.

In 2015 the Treasury Department proposed a new draft Article 28 to read as follows:

Article 28

SUBSEQUENT CHANGES IN LAW

> 1. If at any time after the signing of this Convention, the general rate of company tax applicable in either Contracting State falls below 15 percent with respect to substantially all of the income of resident companies, or either Contracting State provides an exemption from taxation to resident companies for substantially all foreign source income (including interest and royalties), the provisions of Articles 10 (Dividends), 11 (Interest), 12 (Royalties) and 21 (Other Income) may cease to have effect pursuant to paragraph 4 of this Article for payments to companies resident in both Contracting States.
>
> 2. If at any time after the signing of this Convention, the highest marginal rate of individual tax applicable in either Contracting State falls below 15 percent with respect to substantially all income of resident individuals, or either Contracting State provides an exemption from taxation to resident individuals for substantially all foreign source income (including interest and royalties), the provisions of Articles 10, 11, 12 and 21 may cease to have effect pursuant to paragraph 4 of this Article for payments to individuals resident in either Contracting State.
>
> 3. For purposes of this Article:
>
>> a) The allowance of generally available deductions based on a percentage of what otherwise would be taxable income, or other similar mechanisms to achieve a reduction in the overall rate of tax, shall be taken into account for purposes of determining the general rate of company tax or the highest marginal rate of individual tax, as appropriate; and
>>
>> b) A tax that applies to a company only upon a distribution by such company, or that

applies to shareholders, shall not be taken into account in determining the general rate of company tax.

4. If the provisions of either paragraph 1 or paragraph 2 of this Article are satisfied by changes in law in one of the Contracting States, the other Contracting State may notify the first-mentioned Contracting State through diplomatic channels that it will cease to apply the provisions of Articles 10, 11, 12 and 21. In such case, the provisions of such Articles shall cease to have effect in both Contracting States with respect to payments to resident individuals or companies, as appropriate, six months after the date of such written notification, and the Contracting States shall consult with a view to concluding amendments to this Convention to restore an appropriate allocation of taxing rights.

# ¶ 24.03[1][c][ii] Commentary and discussion of legal authorities.

Except for the **U.S.-Canada treaty** and the treaties that antedate **the 1963 OECD Model Treaty** (i.e., Greece and Pakistan), every U.S. income tax treaty contains provisions requiring a Contracting State to notify the other State of changes in the tax laws of the first State. The majority of these notification provisions require notification of any significant changes in the taxation laws in each country and of any "official published materials" concerning the application of the treaty. Certain treaties, however, like **the 2016 U.S. Model Treaty** , do not extend the notification requirement to relevant published materials.

The earliest provision contemplating renegotiation of the treaty in the event of changes in law is **Article 29(6) of the U.S.-Netherlands treaty** . This provision was "apparently intended to obligate the United States to engage in consultations in the event of future internal U.S. legislation that conflicts with and overrides provisions in the [Dutch] treaty." **218** It is unlikely to be invoked by the United States, as the Netherlands is constitutionally barred from overriding a treaty by internal legislation. **219**

Somewhat differently worded, but with a similar purpose, is **Article 6(8) of the U.S.-Israel treaty** . Article 20 of the protocol to the Mexican treaty (as well as article 20 of the protocol to the Spanish treaty) likewise calls for consultation when one country's laws have changed in a way that alters the overall balance of treaty benefits. Ironically, in view of the U.S. Government's history of overriding treaty provisions, the 1993 Senate Foreign Relations Committee Report on the **U.S.-Mexico treaty** and protocol **220** states: "Moreover, because a change in one country's tax laws may undermine the basic assumptions on which the treaty was negotiated, it would be the U.S. Government's position, even in the absence of explicit provisions in the treaty, that changes in Mexico's tax laws can trigger consultation and renegotiation." Like the U.S.-Kazakhstan protocol, the protocol to the Mexican treaty further provides that if such renegotiation is not able to restore the balance of benefits, the affected State may terminate the treaty expeditiously.

The provision to notify the treaty partner of changes in tax law may extend beyond laws that immediately concern taxes. Any law that is inconsistent with assumptions made by the negotiators and that would

result in treatment that is inconsistent with the purposes of the treaty should be the subject of notification. For example, Article 24(10) of the Limitations on Benefits article of the **U.S.-Luxembourg treaty** refers to a company organized under a particular statute. When Luxembourg enacted legislation creating a participation privilege, it apparently was required to apprise U.S. tax authorities of that fact.

The U.S. Tax Court has considered, in the context of the prior 1942 Canadian treaty and the contemporaneous protocol, whether a provision requiring consultation in the event of significant changes in the fiscal laws of either State could prohibit a change in internal law from having effect if competent authority negotiations with regard to such change did not occur. **221** The court held for the IRS that such a requirement to consult did not mandate negotiations or treaty revisions.

# ¶ 24.03[2] Convention on Mutual Administrative Assistance in Tax Matters

## ¶ 24.03[2][a] Collection of Taxes

Articles 11 through 16 of the 2011 Multilateral Convention require Contracting States to provide broad collection assistance at the request of other Contracting States. This is in contrast with certain U.S. income tax treaties that direct a country to assist in tax collection only to the extent necessary to ensure that treaty relief from internal income tax laws of the other country does not inure to the benefit of persons not entitled thereto. **222**

If an applicant State so requests, the 2011 Multilateral Convention provides that a requested State must take the necessary steps to recover tax claims of the applicant State as if they were the tax claims of the requested State, subject to the time limit and priority provisions discussed below. **223** This provision applies only to tax claims that may be enforced in the applicant State and, unless the applicant State and the requested State otherwise agree, are not contested. The provision may apply to a person who is a nonresident of the applicant State, unless the applicant State and the requested State otherwise agree. **224**

The law of the applicant State determines the time limit beyond which a tax claim cannot be enforced. **225** The applicant State must provide information on the applicable time limit to the requested State as part of the request for assistance. **226** If the requested State takes action to recover a tax claim that, under the laws of the requested State, suspends or interrupts this time limit, then the time limit is suspended or interrupted with respect to the tax claim of the applicant State. **227** The requested State must inform the applicant State of any such actions. In no event is the requested State required to comply with a request for assistance that is submitted to it more than fifteen years after the date of the original official document permitting enforcement. **228**

The applicant State's tax claim does not have any priority that may be accorded to taxes in the

requested State, even if the collection procedures used by the requested State are procedures applicable to its own taxes. **229**

## ¶ 24.03[2][b] Service of Documents

Article 17 of the 2011 Multilateral Convention governs service of documents. Article 17 of the Convention provides that, if the applicant State so requests, the requested State shall serve documents on the addressee such documents, including those relating to judicial decisions, of the applicant State that relate to a tax covered by the Convention. **230** The requested State need not furnish a translation of the served document; however, the requested State shall arrange for its translation (or a summary drafted) in one of its official languages if the requested State determines the addressee cannot understand the language in which the document is written. **231** The requested State is to serve the documents by a method prescribed by its internal laws for the service of substantially similar documents, or, to the extent possible, by the method requested by the applicant State (or the closest method available under the laws of the requested State). **232** A party may serve documents through the mails on a person within the territory of another party. **233** Nothing in the service of documents provision is intended to invalidate any service of documents by the requested State in accordance with its laws. **234**

## ¶ 24.03[3] Mutual Legal Assistance Treaties

MLATs, discussed above in connection with exchange of information, **235** also provide for various other administrative assistance measures in the context of criminal cases. For example, MLATs provide that Contracting States shall assist each other to locate persons, execute search and seizure of property, arrange for the appearance of witnesses, and secure extradition of criminals.

**207** As amended by art. 23 of the 2007 protocol.

**208** As amended by Art. XII of the 2009 protocol.

**209** Article 15 of the 1995 protocol added Article XXVI A to the treaty. In **Dewees v. United States, 123 AFTR 2d 2019-1454 (D.C. Cir. Apr. 9, 2019)** , the court held that the Canada treaty's collection assistance provision authorizing Canadian tax authorities to hold taxpayer's refund until satisfaction of outstanding penalties under **Section 6038(c)** is not constitutionally infirm.

**210** See, e.g., Holman v. Johnson, 98 Eng. Rep. 1120 (K.B. 1775) .

**211 Pasquantino v. United States, 125 S. Ct. 1766 (2005)** .

**212 Pasquantino v. United States, 125 S. Ct. 1766, 1774-1775 (2005)** ..

**213** See Timokhov, "Enforcing Tax Judgments Across Borders: How Collection Assistance Can Overcome Limitations of the 'Revenue Rule' (Part I)," 14 U. Int'l Tax'n 34, 38 (June 2003).

**214** See **IRC § 1313(a)** ; **Regs. § 1.1313(a)-1** .

**215** Treas. Technical Explanation, U.S.-Canada treaty, 1995 protocol.

**216** Staff, Joint Comm. On Taxation, Explanation of 1995 Protocol to U.S.-Canada Treaty.

**217** Article 6(8) was added by the 1993 protocol.

**218** Staff of Joint Comm. on Taxation, Explanation, **U.S.-Netherlands treaty** (JCS-15-93).

**219** Treas. Technical Explanation, **U.S.-Netherlands treaty** .

**220** Senate Foreign Relations Committee Report, S. Exec. Rep. No. 20, 103d Cong. 1st Sess.

**221 Crow v. Comm'r, 85 TC 376 (1985** ).

**222** See supra **¶ 24.03[1][c][i]** , Table 24-5.

**223** 2011 Multilateral Convention, art. 11(1).

**224** 2011 Multilateral Convention, art. 11(2).

**225** 2011 Multilateral Convention, art. 14(1).

**226** 2011 Multilateral Convention, art. 14(1).

**227** 2011 Multilateral Convention, art. 14(2).

**228** 2011 Multilateral Convention, art. 14(3).

**229** 2011 Multilateral Convention, art. 15.

**230** 2011 Multilateral Convention, art. 17(1).

**231** 2011 Multilateral Convention, art. 17(5).

**232** 2011 Multilateral Convention, art. 17(2).

**233** 2011 Multilateral Convention, art. 17(3).

**234** 2011 Multilateral Convention, art. 17(4).

**235** See supra ¶ 24.01[2][j][iv].

© 2021 Thomson Reuters/Tax & Accounting. All Rights Reserved.

# Exhibit 36



## Interest Withholding Requirement Repealed

*An article from CQ Almanac 1983*

☐ Save to Favorites

**Document Outline**

Lobby Pressure
Final Provisions
Initial Senate Action (S 144)
House Action
Senate Action on HR 2973
Conference

Bowing to months of intense public pressure, Congress July 28 cleared legislation (HR 2973 — PL 98-67) repealing a new law requiring 10 percent withholding of taxes on interest and dividend income.

Enacted in 1982 as part of the Tax Equity and Fiscal Reponsibility Act (PL 97-248), the withholding requirements came under fire almost as soon as they became law. By the start of 1983, members of Congress began to feel the pressure of one of the most massive mail-in campaigns in Capitol Hill history. *(Tax bill background, 1982 Almanac p. 29)*

Leading the fight were banks and other financial institutions, which were required to withhold interest and dividend taxes starting July 1. The banks charged that the new law would be both an administrative and financial nightmare for them and their customers, as well as an invasion of customer privacy.

They challenged administration claims that withholding was needed to catch tax cheats and to raise much-needed revenues for the federal government.

While many members of Congress were willing to capitulate to the growing public demand for repeal, the administration and leadership in both houses remained firm, decrying the sometimes heavy-handed tactics of the banking lobby.

President Reagan vowed repeatedly to veto any repeal legislation.

Congressional leaders, including House Speaker Thomas P. O'Neill Jr., D-Mass. and Senate Finance Committee Chairman Robert Dole, R-Kan. used their legislative powers to block repeated attempts to bring the issue up for floor votes.

They feared not only that repeal of withholding might unravel further moves to raise revenues through improved tax compliance, but that capitulating to the powerful banking lobby might set a bad legislative precedent.

## Lobby Pressure

Back to Top ▲

But the pressure became too much, with literally millions of letters demanding repeal pouring into congressional offices.

Withholding opponents in the Senate brought the issue up on bill after bill, threatening to bog down much of the year's legislative activity. House opponents, using the one legislative tool at their disposal, garnered enough signatures on a "discharge" petition to force a repeal bill to the floor.

Faced with such odds, the leadership agreed to a compromise bill that repealed withholding, but also beefed up compliance and reporting measures. These compliance provisions, as well as attachment of the administration's Caribbean Basin Initiative to the bill, ensured President Reagan's approval. The legislation was signed Aug. 5. *(Caribbean Basin Initiative, p. 252)*

The new compliance requirements were expected to yield $2.4 billion for fiscal 1983–88, assuming $300 million in offsetting appropriations for the Internal Revenue Service (IRS) to beef up its compliance capabilities.

The original withholding law had been expected to raise about $13.4 billion in uncollected tax revenues through 1988.

## Final Provisions

Back to Top ▲

As signed into law Aug. 5, HR 2973 (PL 98-67):

### Withholding

- Repealed provisions of the 1982 tax-increase law that required banks and other financial institutions to withhold for income taxes 10 percent of all interest and dividend payments as of July 1, 1983.

- Waived penalties for taxpayers who underpaid estimated taxes in the first two quarters of 1983, if the estimated tax payment was reduced to reflect amounts expected to be withheld by banks or financial institutions.

- **Compliance.** Required backup withholding at a rate of 20 percent on interest and dividend payments for all taxpayers who either had interest and dividend income and failed to file a return, or under-reported interest and dividend income by a certain threshold amount. Backup withholding was to take effect Jan. 1, 1984.

- Required IRS to set a secret threshold amount of under-reported income that would trigger backup withholding. Once the threshold was determined, IRS would identify those individuals under-reporting or failing to report and notify institutions to begin the backup withholding process.

   The threshold would not be known to the taxpayer or the financial institution.

   IRS would base the threshold on the amount of funding available to implement backup withholding. The more money appropriated to the IRS for compliance activities, the lower the threshold IRS would set.

- Required that four notices be sent to an individual asking for an explanation of his under-reporting or failure to report. If the taxpayer did not comply within 120 days, backup withholding would start.

- Continued backup withholding, once it began, until the end of the year. Exemptions were provided for special hardship cases.

   **IRS Payments.** Stated the sense of Congress that $300 million should be appropriated each year for the IRS to implement backup withholding. However, the conferees said in their report that they would prefer a $600 million annual appropriation.

   The money would be used to hire new personnel to complete matching and analysis of returns prior to contacting taxpayers, and for increased computer capacity.

   **Penalties.** Made banks and financial institutions subject to civil liability for misuse of backup withholding information.

- Established a $500 penalty for any intentional failure by a retail broker to provide an individual with a tax identification number (TIN) or backup withholding status report.

- Provided that civil and criminal penalties for false backup withholding or TIN certificates would be the same as those for false wage withholding certificates.

- Made taxpayers who under-reported interest and dividend income subject to stricter negligence penalties than under current law.

   Taxpayers would not be required to attach to their tax returns duplicate 1099 forms they received from financial institutions that reported their interest and dividend income. However, banks and financial institutions would be required to send a 1099 form to the taxpayer with a note warning that interest and dividend income was taxable.

## Initial Senate Action (S 144)

Back to Top ▲

Amid mounting public concern over the new law, the Senate voted 91–5 on April 21 to delay interest and dividend withholding at least until 1987, and probably forever.

The Senate leadership agreed earlier to allow the repeal vote on an unrelated trade "reciprocity" bill (S 144) in an effort to derail attempts to bog down important jobs (HR 1718) and Social Security (HR 1900) legislation with the controversial withholding issue. *(Social Security, p. 219; jobs, p. 447)*

The face-saving delay — designed to avoid outright repeal of the new law — was attached to S 144 with the leadership's blessings after it became apparent that the leadership did not have sufficient votes to prevent repeal. The trade measure was passed later by voice vote. *(Vote 62, p. 15-S; trade bill details, p. 259)*

Opponents of withholding were clearly pleased with the so-called "compromise." Besides almost guaranteeing repeal of withholding, it called for new interest and dividend reporting requirements, and greater penalties for non-compliance.

Although few expected the House to consider the legislation directly — S 144 was a revenue bill originating in the Senate in violation of the Constitution — repeal proponents felt the vote would send a strong message to the House leadership to allow a similar vote in the House.

To keep the issue from tying up the jobs bill, Senate leaders agreed in March that repeal proponent Bob Kasten, R-Wis. would be allowed to offer an amendment to repeal withholding when S 144 reached the floor.

Senate Finance Committee Chairman Robert Dole, R-Kan. a strong supporter of withholding, planned to filibuster Kasten's amendment but agreed to accept the compromise plan April 19 after discovering he had only 28 votes — not enough to prevent cloture on the amendment or to uphold an expected presidential veto.

Although almost a majority of members had been against withholding for some time, leadership aides said the votes for repeal mounted after members heard from angry constituents during the Easter congressional recess.

"It seemed to me that we had two ways to go: to go ahead and make the fight, and lose… or to try to work out some compromise where we could preserve most of the revenue," Dole told colleagues on the Senate floor.

The Senate compromise was expected to raise between $6.3 billion and $8.2 billion for fiscal years 1983–88, depending on whether or not withholding went into effect in 1987. The withholding law was expected to raise about $13.4 billion over that same period, according to Treasury Department estimates.

But another factor in the agreement was Republican concern that the intra-party fight would hurt the majority's chances for unity on critical upcoming votes on both defense and the budget.

Kasten added that the Senate action also gave President Reagan some "wiggle room" so he would not have to face an embarrassing veto override.

### Senate Compromise

The Senate measure would delay withholding until July 1, 1987, and implement it then only if the General Accounting Office (GAO) found that interest and dividend tax-cheating had not been cut down substantially and if both houses of Congress affirmed the GAO findings.

To help beef up compliance, the Senate measure would require individuals to submit with their annual tax returns the 1099 forms they received from financial institutions reporting their interest and dividend income. Under existing law, individuals were not required to submit such forms, although institutions were required to send the information to the Internal Revenue Service.

In addition, the compromise called for higher penalties for tax cheating and non-compliance, and "backup" withholding at a rate of 20 percent on those who failed to file a proper tax return or who under-reported interest and dividend income by more than $50.

Institutions also would be required to submit interest and dividend income information to the IRS on computer tape to help the service track down cheaters by matching up the taped information with individual returns.

Withholding would not go into effect in 1987, under the plan, if the GAO found that these new measures boosted taxpayer compliance on interest and dividends to at least 95 percent by 1985.

However, even if the GAO found that compliance was lower than 95 percent, it still would take affirmative votes by both houses of Congress to implement withholding — a requirement that virtually guaranteed that withholding would never go into effect.

### Floor Debate

Dole — with the help of liberal Democrats Edward M. Kennedy, Mass., and Howard M. Metzenbaum, Ohio — began a hearty defense of the withholding law April 18, criticizing the banks and financial institutions for waging what it called a deceptive lobbying campaign.

But it was quickly apparent that defenders of the law would not be able to fight back the repeal effort.

With a cloture vote pending on Kasten's amendment, the Senate leadership attempted to adjourn early April 19 to avoid defeat. But the adjournment motion, made by Majority Whip Ted Stevens, R-Alaska failed by a vote of 31–63 and forced both sides into a lengthy closed-door negotiating session. *(Vote 56, p. 14-S)*

Hours later, with a tentative agreement in hand, Kasten asked his backers to vote against cloture, allowing him to offer the "Kasten-Dole" compromise plan. Two subsequent cloture votes failed, 34–53 and 39–59. *(Votes 57, 58, p 14-S)*

But while key players on the Republican side had agreed to the compromise plan, Democrats were not eager to help the majority party wiggle out of its intra-party dispute.

Russell B. Long, D-La. made Republican leaders nervous by calling for a straight up-or-down vote on withholding repeal after the compromise had been reached by Dole and Kasten. But Long's amendment was tabled by a vote of 55–40. *(Vote 61, p. 15-S)*

The only Republican to vote against the final compromise, John C. Danforth, Mo., also made an unsuccessful attempt to block the withholding change, criticizing his colleagues for "crumbling" under the pressure of a well-financed lobbying campaign.

Danforth raised a point of order against the bill, claiming that it violated the revenue-raising requirements of the fiscal 1983 budget resolution. However, a subsequent motion by Majority Leader Howard H. Baker Jr., R-Tenn. to waive the Budget Act for the bill was passed by a vote of 94–3. *(Vote 60, p. 14-S)*

Cleared of obstacles, the compromise plan was then approved. Besides Danforth, Democrats Kennedy, Metzenbaum, Alan Cranston, Calif., and Frank R. Lautenberg, N.J., voted against the measure.

### House Action

Back to Top ▲

Buoyed by Senate repeal of withholding, House opponents of the law won a key victory May 4 when a majority of House members signed a discharge petition forcing a repeal bill (HR 500) out of the Ways and Means Committee and onto the floor.

Success of the discharge petition, a rarely used device to circumvent the will of the leadership or a strong committee chairman, was a major blow to the House leadership which had kept the bill bottled up in committee for almost four months.

Speaker O'Neill, a supporter of the withholding law, conceded defeat shortly after the necessary 218 signatures were received on the petition. "There's no question there's a clear desire out there to have action on the bill," he said.

Along with the administration and the Senate leadership, he had defended withholding as a law necessary to clamp down on tax cheats. But bombarded with anti-with-holding mail, rank-and-file members not only refused to follow the party line, but actively called for repeal.

With a majority of House members signing the petition, the Ways and Means Committee had seven legislative days to report out a repeal bill or face a floor vote "discharging" the committee from its responsibilities on HR 500. The petition was filed in the House in March by Rep. Norman E. D'Amours, D.N.H., sponsor of HR 500.

D'Amours said shortly after the 218th signature was placed on the petition that he would try to substitute the Senate-passed compromise on withholding for his repeal bill to facilitate final passage of the measure through both houses.

The rapid success of D'Amours' petition was unusual. Since they were first allowed in 1910, discharge petitions had been used to force bills to the floor only 26 times. Other petitions were signed by a majority of members, but were invalidated by committee action before the petition could be considered on the floor.

While D'Amours' petition had gathered signatures fairly steadily since it was filed on March 17, the effort appeared to pick up steam after an announcement by Ways and Means Committee Chairman Dan Rostenkowski, D-Ill. April 28 that he would not hold hearings on withholding until June 2.

Some proponents of repeal, including the American Bankers Association, charged that the June 2 date was too late to prevent many financial institutions from investing in the large start-up costs for implementing the new law by July 1. They claimed the Ways and Means scheduling was an effort to diffuse opposition to the law.

### Committee Action

The Ways and Means Committee reluctantly cleared the way May 12 for a House vote on repeal of withholding by reporting its own repeal measure (HR 2973 — H Rept 98–120).

While the committee agreed to report the bill, it did so "without recommendation" to indicate its reluctance to comply with the discharge petition's mandate.

Democrats on the panel blasted the banking groups that had lobbied extensively to repeal the law. Thomas J. Downey, D-N.Y. said the committee's capitulation to the banking interests would relay a message that members of Congress were "patsies for every well organized group of lobbyists in America."

In addition, Committee Chairman Rostenkowski warned that new tax revenues would have to be found to make up for the estimated $13.4 billion cost, through 1988, of repealing the withholding tax compliance measure.

Committee Democrats refused to consider a compromise plan by Republicans and the Treasury Department to repeal withholding but beef up certain tax enforcement measures. That plan, similar to one adopted by the Senate, would have raised an estimated $4.9 billion over the next five years.

Rostenkowski argued that any effort by the committee to report out a bill other than straight repeal could be seen as a sign that the Democratic leadership was trying to thwart the will of the House.

But Democrats also hoped privately that passage of a straight repeal bill would mean an embarrassing confrontation between congressional Republicans and President Reagan, who had pledged to veto such a measure.

### Floor Action

As predicted by backers of HR 2973, the House voted overwhelmingly May 17 to repeal the controversial interest and dividend withholding law. The measure was approved 382–41.

The vote left it up to the Senate to decide whether it would accept outright repeal or try to work out some compromise that would avoid an embarrassing veto confrontation with President Reagan.

Reagan indicated at a May 17 press conference that he might be willing to consider something short of outright repeal.

The House refused to consider a compromise plan approved earlier by the Senate and attached to an unrelated trade measure, S 144. It voted instead to return that bill untouched to the Senate on grounds that the Constitution required such revenue measures to originate in the House.

In floor debate May 17, Rostenkowski defended withholding as "the most effective means of collecting" taxes and argued that without it new tax revenues would have to be found.

Others charged that the banking industry had deceived the American public by portraying withholding as a new tax.

But opponents of withholding insisted that the repeal effort was a grass-roots reaction against unneeded government interference. D'Amours, sponsor of the discharge petition, said the millions of individuals who had sent mail to Congress calling for repeal were "not the mindless robots that they have been painted to be…."

Voting for repeal were 157 Republicans and 225 Democrats. Nine Republicans and 32 Democrats voted against repeal. *(Vote 115, p. 40-H)*

The measure was brought to the floor under suspension of the rules, which required a two-thirds vote for passage and prohibited any amendments. The step was taken by the House leadership in part to ensure that the bill would be passed with enough votes to show that a presidential veto could easily be overridden. Such action required a two-thirds majority in both houses.

## Senate Action on HR 2973

Back to Top ▲

The Senate Finance Committee agreed May 25 to a compromise plan — similar to one approved by the full Senate April 21 — to prevent interest and dividend tax withholding from going into effect July 1.

But it loaded down the package with a number of unrelated amendments, some of which were intended to make the bill more palatable to the administration.

The committee voted 11–8 along straight party lines to repeal the withholding law, but also agreed to new tax reporting and compliance measures that would raise about $4.9 billion of the $13.4 billion withholding was expected to raise over

the following six years.

In addition, the committee voted to attach to the measure several controversial bills, including the administration's Caribbean Basin and "enterprise" zone initiatives, a trade bill and extension of tax-exempt mortgage revenue bonds.

Ranking committee Democrat Russell B. Long, La. — a strong proponent of repeal — complained that the additions would turn the repeal measure into a "Christmas Tree" tax bill that would die before it reached a House-Senate conference.

He vowed to push instead for Senate approval of the House-passed measure, calling for simple repeal of withholding. Long already had prevented HR 2973 from being referred to the Finance Committee when it came over from the House, so that the measure would go directly to the Senate floor.

The package approved by the Finance Committee was to be offered as an amendment to HR 2973 when it was brought up for consideration, according to Committee Chairman Dole.

The committee amendment would repeal the new law, but also would provide for so-called "back-up withholding" of 20 percent for individuals who under-reported interest and dividend income by more than $50 or who failed to file a tax return.

The package also would increase fines for financial institutions that did not provide accurate interest and dividend income information to the Internal Revenue Service and for taxpayers who attempted to avoid paying taxes on such income.

Unrelated — and potentially troublesome — additions to the committee withholding plan included:

- A portion of the administration's Caribbean Basin Initiative.

- The trade "reciprocity" measure (S 144) that was sent back from the House unconsidered.

- The administration's enterprise zone plan (S 863), approved by the Finance Committee May 17. *(Reagan message, p. 14-E; background, 1982 Almanac p. 68)*

- A controversial measure to make permanent an existing law allowing for tax-exempt mortgate revenue bonds, set to expire at the end of the year. *(Story, p. 276)*

### Floor Action

The Senate June 16 approved the Finance Committee's withholding repeal package, which was offered on the floor as a committee substitute to the House-passed bill. After adopting the amendment, 48–41, the Senate went on to pass HR 2973 by an overwhelming 86–4 vote. *(Votes 156, 157, p. 29-S)*

To help smooth approval of the Senate measure, Treasury Secretary Donald T. Regan announced before the final passage vote that the administration would delay implementation of the new law 30 days if the Senate approved more than straight repeal.

The biggest challenge to the Senate withholding package came from ranking Finance Democrat Long, who argued that the extraneous provisions, many of which were opposed in the House, could drag down the entire bill in conference. But Republicans, in a face-saving gesture to the president, blocked Long's motion to table the committee amendment on an almost straight party-line vote of 46–51. *(Vote 154, p. 28-S)*

An amendment by David Pryor, D-Ark. to strip everything except the withholding provisions from the committee amendment was tabled, 50–40. *(Vote 155, p. 28-S)*

### Conference
Back to Top ▲

A House-Senate conference agreement (H Rept 98–325) was reached July 27 when a deadlock was broken over an extraneous Senate provision dealing with mortgage revenue bonds.

The House July 28 approved the conference report on the bill by a vote of 392–18. The Senate adopted the report the same day by a vote fo 90–7. *(Vote 263, p. 80-H; vote 224, p. 38-S)*

The way toward final passage was opened when holdout conferee Sen. Lloyd Bentsen, D-Texas agreed to drop Senate language that would have made permanent a tax exemption for mortgage revenue bonds. Conferees had been deadlocked over the issue for almost a week.

Fearful that the haggling over the revenue bond provision would delay passage of withholding repeal, Treasury Secretary Regan granted a further extension of the effective date for the new law until Aug. 5 so financial institutions would be spared unecessary start-up costs.

Conferees accepted compliance provisions, less stringent than those passed by the Senate, as well as the tax incentives for Caribbean nations. But they dropped other extraneous Senate provisions, including those involving enterprise zones and trade reciprocity.

Conferees worked under the assumption that President Reagan, who had earlier vowed to veto withholding repeal, would sign the legislation if it included the tougher compliance provisions and his Caribbean Basin Initiative.

The compliance provisions finally adopted were somewhat different from those adopted by the Senate. Conferees agreed to a compliance compromise offered by Rep. Barber B. Conable Jr., R-N.Y. after House members insisted they

would not accept the stiff fines in the Senate provisions.

The conferees dropped the trade reciprocity provisions after House Ways and Means leaders agreed to take them up later in the year.

Back to Top ▲

**Document Citation**
"Interest Withholding Requirement Repealed." In *CQ Almanac 1983*, 39th ed., 261-64. Washington, DC: Congressional Quarterly, 1984. http://library.cqpress.com/cqalmanac/cqal83-1198852.

**Document ID:** cqal83-1198852
**Document URL:** http://library.cqpress.com/cqalmanac/cqal83-1198852

©2021, CQ Press, an Imprint of SAGE Publishing. *CQ Almanac* is a registered trademark of CQ-Roll Call, Inc. All copyright rights in the *CQ Almanac Online Edition Series* are the property of CQ-Roll Call, Inc. CQ Press is a registered trademark of Congressional Quarterly Inc. All Rights Reserved.
2455 Teller Road • Thousand Oaks, CA 91320 • 1-800-818-7243
General Terms of Service | Copyright Notice and Takedown Policy | Privacy Policy

# Exhibit 37

Storm over withholding still rumbling - CSMonitor.com



**1** *of* **3** stories this month  >  **Help fund Monitor journalism**



Your subscription makes our work possible.

*We want to bridge divides to reach everyone.*

Subscribe

# Storm over withholding still rumbling

March 24, 1983

**By Julia Malone**, Staff correspondent of The Christian Science Monitor

WASHINGTON

F oes of tax withholding on interest and dividends have tried twice within a week to keep the practice from going into effect, and twice they've failed. But if the first battles are lost, the war is not over on Capitol Hill, which has been barraged by the heaviest load of constituent mail on any issue in history.

Congressional leaders and the White House have been able to stave off efforts to attach the repeal to either a jobs and recession relief bill or the social security reform legislation. But more than half of the members of both chambers now cosponsor bills to cancel the withholding plan, due to begin next July.

"I think the repeal will be enacted into law," said Sen. John Melcher (D) of Montana this week after he saw his withholding amendment set aside on the Senate floor by a procedural vote.

This website uses cookies to improve functionality and performance. By continuing to browse the site you are agreeing to our use of cookies.    Close

But first the repeal forces will have to defeat Senate Finance Committee chairman Robert Dole (R) of Kansas, who has dug in his defenses, even while acknowledging the unprecedented mail on the other side.

Senator Dole has repeatedly lashed out at the American Bankers Association and the bankers lobby, which he blames for stirring up opposition by telling banking customers that it is a new tax.

More billions for Treasury

The withholding tax provision is part of a $98 billion revenue bill that passed last year with Senator Dole's leadership. It would withhold 10 percent of interest and dividend income for income taxes, thus making it easier to catch tax evaders who do not report such income. Wages have long been subject to withholding, but until now unearned income has been exempt.

According to the Treasury Department, the provision would bring in $22.7 billion to the US over the next five years because of speeding up payments and forcing better compliance with tax law. Banks, credit unions, and savings institutions, however, would have to foot the bill for computer technology for withholding the funds from their customers. And many customers would lose a portion of compounded interest under the new tax collection system.

While Dole and the White House lambast the bankers for trying to strong-arm Congress, the opposition holds that they are fighting for a "people's issue."

"I'm not much influenced by the banking lobby," says Senator Melcher, who adds that the bankers from his state come to Washington only once a year. "I don't think in our state they've circulated all this mail. They can't get people to write that many letters."

This website uses cookies to improve functionality and performance. By continuing to browse the site you are agreeing to our use of cookies.    Close

For its part, the American Bankers Association has countered that "our involvement has been greatly exaggerated by those who wish to create a tactical diversion to avoid the real issue, which is congressional debate of withholding repeal."

Some on Capitol Hill see the real issue lying between the two opposing sides.

"You get so tired of backing down to the banks," Sen. Dave Durenberger (R) of Minnesota, who is siding with Dole, said in a recent interview. "It galls me" he said, criticizing banks whose advertisements say "highest interest rates allowed by law" when bankers themselves sought the legal ceilings on interest.

A people's issue, or a banker's?

But Senator Durenberger asserts that the withholding debate is not just a bankers' issue. "The fear is there on the part of the people," he said, especially because of the recession. "What the banks have done is play on that fear."

"It was an issue created by banks to prevent additional expenditure," says a House leadership aide.

Key points in the withholding debate:

Cost to banks. The Treasury Department sets the expense at $600 million to $ 700 million based on an admittedly limited study. Bankers put their cost at $3 billion. However, the US has offered to give the financial institutions use of the withheld funds for 30 days or longer to offset these costs.

Cost to taxpayers. According to Treasury Department figures, a bank customer who invested $1,000 at 9 percent for one year would lose only 50-cents in interest compounding. Moreover, banks would be permitted to withhold the 10 percent for taxes at the end of the year, instead of quarterly.

This website uses cookies to improve functionality and performance. By continuing to browse the site you are agreeing to our use of cookies.    Close

Interest/Dividend withholding stirs lobbying - CSMonitor.com

Opponents charge that withholding costs taxpayers money, discourages savings, and amounts to government intrusion.

Exemptions. Most of the elderly, low-income persons, and savings accounts that accumulate $150 or less in interest annually would not be subject to withholding. Taxpayers would have to file an exemption form that asks for name, address, account number, and social security number for each account.

The opposition charges that the requirement multiplies red tape and that many of the elderly will be deterred by the new form required for every account.

## Related stories

- Swiss bank accounts are only the tip of tax-evasion iceberg

- Lies, damned lies, and LIBOR: Barclays, Diamond, and a devalued benchmark

- Tax dodgers, beware: 77,000 foreign banks agree to share tax info with IRS

ISSN 2573-3850 (online)

Follow us:



© The Christian Science Monitor. All Rights Reserved. Terms. Privacy Policy.

This website uses cookies to improve functionality and performance. By continuing to browse the site you are agreeing to our use of cookies.    Close

# Exhibit 38

S. Hrg. 110–778

# DIVIDEND TAX ABUSE: HOW OFFSHORE ENTITIES DODGE TAXES ON U.S. STOCK DIVIDENDS

# HEARING

BEFORE THE

## PERMANENT SUBCOMMITTEE ON INVESTIGATIONS

OF THE

## COMMITTEE ON HOMELAND SECURITY AND GOVERNMENTAL AFFAIRS UNITED STATES SENATE

OF THE

ONE HUNDRED TENTH CONGRESS

SECOND SESSION

—————

SEPTEMBER 11, 2008

—————

Available via http://www.gpoaccess.gov/congress/index.html

Printed for the use of the
Committee on Homeland Security and Governmental Affairs



# DIVIDEND TAX ABUSE: HOW OFFSHORE ENTITIES DODGE TAXES ON U.S. STOCK DIVIDENDS

S. Hrg. 110–778

# DIVIDEND TAX ABUSE: HOW OFFSHORE ENTITIES DODGE TAXES ON U.S. STOCK DIVIDENDS

# HEARING

BEFORE THE

## PERMANENT SUBCOMMITTEE ON INVESTIGATIONS

OF THE

## COMMITTEE ON HOMELAND SECURITY AND GOVERNMENTAL AFFAIRS UNITED STATES SENATE

OF THE

ONE HUNDRED TENTH CONGRESS

SECOND SESSION

———

SEPTEMBER 11, 2008

———

Available via http://www.gpoaccess.gov/congress/index.html

Printed for the use of the
Committee on Homeland Security and Governmental Affairs



U.S. GOVERNMENT PRINTING OFFICE

45–575 PDF                    WASHINGTON : 2008

———

For sale by the Superintendent of Documents, U.S. Government Printing Office
Internet: bookstore.gpo.gov   Phone: toll free (866) 512–1800; DC area (202) 512–1800
Fax: (202) 512–2104   Mail: Stop IDCC, Washington, DC 20402–0001

## COMMITTEE ON HOMELAND SECURITY AND GOVERNMENTAL AFFAIRS

JOSEPH I. LIEBERMAN, Connecticut, *Chairman*

| | |
|---|---|
| CARL LEVIN, Michigan | SUSAN M. COLLINS, Maine |
| DANIEL K. AKAKA, Hawaii | TED STEVENS, Alaska |
| THOMAS R. CARPER, Delaware | GEORGE V. VOINOVICH, Ohio |
| MARK PRYOR, Arkansas | NORM COLEMAN, Minnesota |
| MARY L. LANDRIEU, Louisiana | TOM COBURN, Oklahoma |
| BARACK OBAMA, Illinois | PETE V. DOMENICI, New Mexico |
| CLAIRE McCASKILL, Missouri | JOHN WARNER, Virginia |
| JON TESTER, Montana | JOHN E. SUNUNU, New Hampshire |

MICHAEL L. ALEXANDER, *Staff Director*
BRANDON L. MILHORN, *Minority Staff Director and Chief Counsel*
TRINA DRIESSNACK TYRER, *Chief Clerk*

———

## PERMANENT SUBCOMMITTEE ON INVESTIGATIONS

CARL LEVIN, Michigan, *Chairman*

| | |
|---|---|
| THOMAS R. CARPER, Delaware | NORM COLEMAN, Minnesota |
| MARK L. PRYOR, Arkansas | TOM COBURN, Oklahoma |
| BARACK OBAMA, Illinois | PETE V. DOMENICI, New Mexico |
| CLAIRE McCASKILL, Missouri | JOHN WARNER, Virginia |
| JON TESTER, Montana | JOHN E. SUNUNU, New Hampshire |

ELISE J. BEAN, *Staff Director and Chief Counsel*
ROBERT L. ROACH, *Counsel and Chief Investigator*
ROSS K. KIRSCHNER, *Counsel*
MARK L. GREENBLATT, *Staff Director and Chief Counsel to the Minority*
TIMOTHY R. TERRY, *Counsel to the Minority*
MARY D. ROBERTSON, *Chief Clerk*

(II)

# CONTENTS

———

|  | Page |
|---|---|
| Opening statements: | |
| Senator Levin | 1 |
| Senator Coleman | 6 |

WITNESSES

THURSDAY, SEPTEMBER 11, 2008

| | |
|---|---|
| Reuven S. Avi-Yonah, Irwin I. Cohn Professor of Law, University of Michigan School of Law, Ann Arbor, Michigan | 8 |
| Joseph M. Manogue, Treasurer, Maverick Capital, Ltd., Dallas, Texas | 16 |
| Richard Potapchuk, Director of Treasury and Finance, Highbridge Capital Management, LLC, New York, New York | 19 |
| Gary I. Wolf, Managing Director, Angelo, Gordon & Co., New York, New York | 20 |
| John DeRosa, Managing Director and Global Tax Director, Lehman Brothers Inc., New York, New York | 31 |
| Matthew Berke, Managing Director and Global Head of Equity Risk Management, Morgan Stanley & Co., New York, New York | 34 |
| Andrea Leung, Global Head of Synthetic Equity Finance, Deutsche Bank AG, New York, New York | 35 |
| Hon. Douglas Shulman, Commissioner, Internal Revenue Service, Washington, DC | 50 |

ALPHABETICAL LIST OF WITNESSES

| | |
|---|---|
| Avi-Yonah, Reuven S.: | |
| Testimony | 8 |
| Prepared statement | 59 |
| Berke, Matthew: | |
| Testimony | 34 |
| Prepared statement | 88 |
| DeRosa, John: | |
| Testimony | 31 |
| Prepared statement with an attachment | 80 |
| Leung, Andrea: | |
| Testimony | 35 |
| Manogue, Joseph M.: | |
| Testimony | 16 |
| Prepared statement | 67 |
| Potapchuk, Richard: | |
| Testimony | 19 |
| Prepared statement | 70 |
| Shulman, Hon. Douglas: | |
| Testimony | 50 |
| Prepared statement | 94 |
| Wolf, Gary I.: | |
| Testimony | 20 |
| Prepared statement | 75 |

APPENDIX

| | |
|---|---|
| Staff Report entitled "Dividend Tax Abuse: How Offshore Entites Dodge Taxes on U.S. Stock Dividends" | 101 |

IV

EXHIBITS

1. *How Offshore Entities Dodge Taxes on U.S. Stock Dividends: Swaps* ......... 189

DOCUMENTS RELATING TO MAVERICK CAPITAL, LTD

2. UBS email, dated November 2004, re: *Dividend Enhancement Flow.* (Attaching *Dividend Enhancement.doc*) ................................................................. 190

3. *Dividend Enhancement Transactions, DRAFT—AS OF 4/26/99,* prepared by Maverick Capital .......................................................................................... 193

4. *Description of Dividend Enhancement Transactions,* dated December 12, 2006, prepared by Maverick Capital ................................................................ 195

5. *Maverick Capital, Dividend Enhancement Transactions Memo,* dated June 30, 2005 ...................................................................................................... 197

6. Maverick Capital emails, dated November 2004, re: *Microsoft strategy on capturing the $3.00 dividend for non-US holders only. (Jim has been working on this for the last 2 months and he got UBS to match the more aggressive offers we were getting from the Street. For LDC only— we lent the stock out and will get 97 percent of the dividend.)* .................... 200

7. Maverick Capital emails, dated June 2007, re: *FIN 48 Tax Positions— DRAFT memos* .......................................................................................... 203

8. Maverick Capital/Ernst & Young emails, dated February 2007, re: *AMTD Dividend* ................................................................................................ 211

9. *Domestic Dividend Enhancements,* undated document prepared by Maverick Capital ................................................................................................ 213

10. Excerpts from UBS Documents regarding UBS Cayman Ltd. (UBSCL) ..... 216

DOCUMENTS RELATING TO HIGHBRIDGE CAPITAL MANAGEMENT, LLC

11. Lehman email, dated November 2004, re: *Highbridge Utility Fund—Electronic Execution into CFD. (. . . also in discussions with them around yield enhancement on their long positions by using a CFD. This service involves tax risk for the firm which would be reduced if we can route their electronic trades direct to CFD instead of their PB account.)* ................... 217

12. Lehman email, dated November 2004, re: *Highbridge LPS Basket. (. . . I would like to move the positions back to their PB account. . . . Would hate to do this and find out down the road that HB owe withholding tax on the dividends.)* .......................................................................................... 218

DOCUMENTS RELATING TO ANGELO, GORDON & CO

13. Angelo Gordon email, dated August 2004, re: *CFDs. (a cfd is used to circumvent the tax.)* .......................................................................................... 220

14. Angelo Gordon email, dated July 2006, re: *Notes from last meeting with Anthony Harpel. (Contracts for Difference—used mostly in offshore fund— so we don't have dividend withholding CFD is probably about 20 percent of portfolio)* ............................................................................................ 221

15. Lehman email, dated December 2004, re: *Bloomberg internal message sent from PATRICK RYAN. (. . . it tuns out the majority have partial withholding so need to stay in CFD. TYPICAL!)* ........................................... 222

16. Lehman emails, dated May 2002, re: *SWAPS FOR ANGELO GORDON. (rich, I agree . . . if the positions are for longer term we can pay 100 percent. * * * I think we have to do this to keep AG's business)* .................... 223

DOCUMENTS RELATING TO LEHMAN BROTHERS INC

17. *Equity Finance Yield Enhancement,* presentation document prepared by Lehman Brothers Inc ................................................................................. 225

18. Lehman Brothers/Highbridge Capital email, dated July 2004, re: *CFD Presentation. (The CFD is usually used for yield enhancement purposes. . . .)* ........................................................................................................ 228

19. *EFG US Dividend Exposures, February 2005, Lehman Brothers* presentation ........................................................................................................ 229

20. Lehman Brothers email, dated September 2005, re: *MCIP. (HB looking for Yield Enhancement on a large position.)* ...................................................... 237

21. Lehman Brothers emails, dated October 2004, re: *Trade Confirm. (fyi, the only reason for HB to SWap is for yield enhancement.)* ......................... 238

22. Lehman Brothers letter to Maverick Capital, dated April 24, 2001, *(Dividend Enhancement Solutions—We have a variety of solutions using swap and securities lending vehicles for achieving yield enhancement.)* ............... 242

V

Page

23. Lehman Brothers emails, dated January/February 2004, re: *Long Trans-fers. (. . . tell them about doing long swap/cfd business around record date items so that they get enhanced div treatment on us stocks. . . .)* ....... 248
24. Lehman Brothers emails, dated June 2003, re: *US Cayman 70 percent trade* .................................................................................................................. 250
25. Lehman Brothers emails, dated January 2005, re: *Conclusions of US div meeting. (Are all the major competitors in the yield enhancement game? * * * Borrow via Cayman is considered by Tax dept to be lower risk than CFD in LBIE. . . .)* ........................................................................... 254

*DOCUMENTS RELATING TO MORGAN STANLEY & CO*
26. Morgan Stanley email, dated July 2004, re: *MSFT Total Return Swaps. (Here are the main points regarding total return equity swaps on MSFT: . . . Morgan Stanley can enhance the dividend payout from 70 percent or 100 percent through a total return equity swap.)* ..................................... 256
27. Morgan Stanley email, dated August 2004, re: *CRM (MOORE CAP-ITAL)—Microsoft total return equity swap/Moore Capital* ........................... 259
28. Morgan Stanley email, dated July 2004, re: *MSFT div timing* .................. 261
29. *MSDW Equity Finance Services (Cayman) Limited ("Cayco"), Outline operating procedures,* undated Morgan Stanley document .............................. 262

*DOCUMENTS RELATING TO DEUTSCHE BANK AG*
30. Deutsche Bank email, dated October 2004, (. . . *LOOKING FOR A WAY TO MAINTAIN EXPOSURE TO MSFT BUT AVOID THE DIVIDEND PAYMENT.)* ......................................................................................................... 264
31. Deutsche Bank emails, dated September 2004, re: *Extraordinary Dividend Rules and Microsoft One-Time Dividend* ............................................. 265
32. *PROJECT: DBIL Rehypothecation,* February 2007 Deutsche Bank document ................................................................................................................. 267
33. *New Product Application, dated January 2005, Deutsche Bank International Limited ("DBIL") Equity Finance alternative structure* ................. 268
34. *New Product Application, dated December 2003, Deutsche Bank International Limited, Jersey ("DBIL") Securities Borrowing and Lending—NPA Support document* ..................................................................................... 275
35. Correspondence from Maverick Capitol, dated September 30, 2008, to the Senate Permanent Subcommittee on Investigations, supplementing Maverick's testimony of September 11, 2008 .............................................. 300
36. Supplemental information provided by the Internal Revenue Service regarding Notice 97–66 ................................................................................... 304
37. Additional documents regarding Citigroup, Inc ....................................... 305
38. Additional documents regarding Deutsche Bank ..................................... 308
39. Additional documents regarding Goldman Sachs Group .......................... 321
40. Additional documents regarding Lehman Brothers Holdings, Inc .............. 342
41. Additional documents regarding Maverick Capital Management LLC .......... 396
42. Additional documents regarding Merrill Lynch ........................................ 398
43. Additional documents regarding Morgan Stanley ..................................... 414
44. Additional documents regarding UBS Investment Bank .......................... 416
45. Documents relating to Footnotes found in the Staff Report, *Dividend Tax Abuse: How Offshore Entities Dodge Taxes on U.S. Stock Dividends,* prepared by the Minority and Majority Staff of the Permanent Subcommittee on Investigations in conjunction with the Subcommittee hearing held on September 11, 2008: [Note: Footnotes not listed are explanatory, reference Subcommittee interviews for which records are not available to the public, or reference a widely available public document.] .......... 431

\* SEALED EXHIBITS retained in the files of the Subcommittee.

Footnote No. 50, *See Attachment* ................................................................. 431
Footnote No. 51, *See Footnote No. 50 (above)* ........................................... 431
Footnote No. 52, SEALED EXHIBIT ........................................................... *
Footnote No. 63, *See Attachment* ................................................................. 433
Footnote No. 64, *See Footnote No. 63 (above)* ........................................... 433
Footnote No. 65, *See Attachment* ................................................................. 458
Footnote No. 68, *See Hearing Exhibit No. 19 (above)* ................................. 229
Footnote No. 69, *See Hearing Exhibit No. 17 (above)* ................................. 225
Footnote No. 70 and 71, *See Hearing Exhibit No. 18 (above)* ..................... 228
Footnote No. 72, *See Hearing Exhibit No. 13 (above)* ................................. 220
Footnote No. 73, *See Attachment* ................................................................. 462
Footnote No. 74 and 75, *See Footnote No. 73 (above)* ................................ 462

VI

Page

Footnote No. 76–79, *See Hearing Exhibit No. 12 (above)* .............................. 218
Footnote No. 80, *See Attachment* ................................................................ 463
Footnote No. 81–83, *See Footnote No. 80 (above)* ....................................... 463
Footnote No. 84, *See Attachment* ................................................................ 465
Footnote No. 85, *See Attachment* ................................................................ 467
Footnote No. 86, *See Hearing Exhibit No. 21 (above)* .................................. 238
Footnote No. 87, *See Attachment* ................................................................ 469
Footnote No. 88, *See Attachment* ................................................................ 471
Footnote No. 89, *See Hearing Exhibit No. 20 (above)* .................................. 237
Footnote No. 90, *See Hearing Exhibit No. 22 (above)* .................................. 242
Footnote No. 91–93, *See Hearing Exhibit No. 23 (above)* .............................. 248
Footnote No. 94, *See Attachment* ................................................................ 474
Footnote No. 95, *See Footnote No. 94 (above)* ............................................. 474
Footnote No. 96, *See Hearing Exhibit No. 16 (above)* .................................. 223
Footnote No. 97, *See Attachment* ................................................................ 475
Footnote No. 98, *See Attachment* ................................................................ 478
Footnote No. 99, *See Attachment* ................................................................ 481
Footnote No. 100–102, *See Hearing Exhibit No. 24 (above)* .......................... 250
Footnote No. 103, *See Attachment* .............................................................. 483
Footnote No. 104, *See Footnote No. 88 (above)* ........................................... 471
Footnote No. 105, *See Attachment* .............................................................. 485
Footnote No. 106 and 107, *See Hearing Exhibit No. 19 (above)* ..................... 229
Footnote No. 108, *See Attachment* .............................................................. 487
Footnote No. 109, *See Attachment* .............................................................. 489
Footnote No. 110, *See Hearing Exhibit No. 17 (above)* .................................. 225
Footnote No. 111, *See Attachment* .............................................................. 492
Footnote No. 112 and 113, *See Hearing Exhibit No. 19 (above)* ..................... 229
Footnote No. 114, *See Attachment* .............................................................. 494
Footnote No. 122, *See Attachment* .............................................................. 497
Footnote No. 123, *See Footnote No. 122 (above)* ......................................... 497
Footnote No. 124, *See Hearing Exhibit No. 3 (above)* ................................... 193
Footnote No. 125, *See Attachment* .............................................................. 507
Footnote No. 126, *See Footnote No. 125 (above)* ......................................... 507
Footnote No. 127, *See Attachment* .............................................................. 510
Footnote No. 128, *See Attachment* .............................................................. 511
Footnote No. 129–130, *See Footnote No. 128 (above)* .................................. 511
Footnote No. 132–134, *See Hearing Exhibit No. 26 (above)* .......................... 256
Footnote No. 135, *See Hearing Exhibit No. 28 (above)* .................................. 261
Footnote No. 136, *See Attachment* .............................................................. 514
Footnote No. 137–141, *See Footnote No. 136 (above)* .................................. 514
Footnote No. 142, *See Attachment* .............................................................. 518
Footnote No. 143, *See Footnote No. 142 (above)* ......................................... 518
Footnote No. 144, *See Attachment* .............................................................. 520
Footnote No. 146, *See Hearing Exhibit No. 29 (above)* .................................. 262
Footnote No. 147, *See Attachment* .............................................................. 521
Footnote No. 148, SEALED EXHIBIT .............................................................. *
Footnote No. 149 and 150, *See Hearing Exhibit No. 3 (above)* ....................... 193
Footnote No. 151, *See Hearing Exhibit No. 4 (above)* ................................... 195
Footnote No. 152, *See Attachment* .............................................................. 530
Footnote No. 153, *See Footnote No. 152 (above)* ......................................... 530
Footnote No. 154, *See Attachment* .............................................................. 531
Footnote No. 155, *See Footnote No. 154 (above)* ......................................... 531
Footnote No. 159, *See Attachment* .............................................................. 534
Footnote No. 161, *See Attachment* .............................................................. 535
Footnote No. 162, *See Footnote No. 147 (above)* ......................................... 521
Footnote No. 163, *See Footnote No. 148 (above), SEALED EXHIBIT* .......... *
Footnote No. 169, SEALED EXHIBIT .............................................................. *
Footnote No. 170, *See Attachment* .............................................................. 536
Footnote No. 171 and 172, *See Footnote No. 170 (above)* ............................. 536
Footnote No. 177, *See Hearing Exhibit No. 3 (above)* ................................... 193
Footnote No. 178, *See Hearing Exhibit No. 31 (above)* .................................. 265
Footnote No. 179, *See Attachment* .............................................................. 540
Footnote No. 180, *See Attachment* .............................................................. 541
Footnote No. 181, *See Attachment* .............................................................. 542
Footnote No. 182, *See Attachment* .............................................................. 543
Footnote No. 183 and 185, *See Hearing Exhibit No. 34 (above)* ..................... 275

VII

Page

Footnote No. 186 and 187, *See Hearing Exhibit Nos. 33 and 34 (above)*.................................................................................. 268, 275

Footnote No. 188 and 189, *See Footnote No. 169 (above), SEALED EXHIBIT* ................................................................................ *

Footnote No. 190, *See Attachment and SEALED EXHIBIT* .............. 544, *

Footnote No. 191, *See Footnote No. 181 (above)* ........................... 542

Footnote No. 192, *See Footnote No. 127 (above)* ........................... 510

Footnote No. 199, *See Attachment* ................................................. 702

Footnote No. 200, *See Footnote No. 199 (above)* ........................... 702

Footnote No. 201, *See Attachment* ................................................. 706

Footnote No. 202–204, *See Footnote No. 201 (above)* .................... 706

Footnote No. 205, *See Hearing Exhibit No. 2 (above)* .................... 190

Footnote No. 206, *See Attachment* ................................................. 707

Footnote No. 207, *See Attachment* ................................................. 709

Footnote No. 208, SEALED EXHIBIT ............................................... *

Footnote No. 209, *See Footnote No. 208 (above), SEALED EXHIBIT* ......... *

Footnote No. 210–213, *See Hearing Exhibit No. 2 (above)* ............. 190

Footnote No. 214, *See Attachment* ................................................. 717

Footnote No. 215, *See Footnote No. 214 (above)* ........................... 717

Footnote No. 220, SEALED EXHIBIT ............................................... *

Footnote No. 221, *See Attachment* ................................................. 722

Footnote No. 222, *See Footnote No. 127 (above)* ........................... 510

Footnote No. 229, *See Attachment* ................................................. 724

Footnote No. 230–233, *See Footnote No. 229 (above)* .................... 724

Footnote No. 234, *See Attachment* ................................................. 728

Footnote No. 235, *See Footnote No. 234 (above)* ........................... 728

Footnote No. 236, *See Attachment* ................................................. 732

Footnote No. 237, *See Footnote No. 236 (above)* ........................... 732

Footnote No. 238, *See Attachment* ................................................. 735

Footnote No. 239–241, *See Footnote No. 238 (above)* .................... 735

Footnote No. 242, *See Attachment* ................................................. 736

Footnote No. 243, *See Attachment* ................................................. 742

Footnote No. 244, *See Footnote No. 127 (above)* ........................... 510

Footnote No. 245, *See Attachment* ................................................. 743

Footnote No. 246–248, *See Footnote No. 245 (above)* .................... 743

Footnote No. 249, *See Attachment* ................................................. 774

Footnote No. 250–254, *See Footnote No. 249 (above)* .................... 774

Footnote No. 255, *See Attachment* ................................................. 793

Footnote No. 256, *See Footnote No. 255 (above)* ........................... 793

Footnote No. 257, *See Attachment* ................................................. 800

Footnote No. 258, *See Attachment* ................................................. 838

Footnote No. 259–261, *See Footnote No. 258 (above)* .................... 838

Footnote No. 262, *See Attachment* ................................................. 843

Footnote No. 263, *See Attachment* ................................................. 845

Footnote No. 264–268, *See Footnote No. 263 (above)* .................... 845

Footnote No. 269, *See Attachment* ................................................. 848

Footnote No. 270, *See Attachment* ................................................. 853

Footnote No. 271, *See Attachments (2)*.................................. 854, 864

Footnote No. 272 and 273, *See Footnote No. 271 (above)* ....... 854, 864

Footnote No. 274, *See Footnote No. 271 (above)* .................... 854, 864

Footnote No. 276, *See Footnote No. 249 (above)* ........................... 774

Footnote No. 277, *See Footnote No. 263 (above)* ........................... 845

Footnote No. 278, *See Footnote No. 243 (above)* ........................... 742

Footnote No. 279, *See Footnote No. 127 (above)* ........................... 510

Footnote No. 280, *See Footnote No. 221 (above)* ........................... 722

Footnote No. 285, *See Attachment* ................................................. 875

Footnote No. 286 and 287, *See Footnote No. 285 (above)* .............. 875

Footnote No. 289, *See Attachment* ................................................. 881

Footnote No. 290, *See Footnote Nos. 285 and 289 (above)*.......... 875, 881

Footnote No. 291–298, *See Footnote No. 289 (above)* .................... 881

Footnote No. 299, *See Attachment* ................................................. 903

Footnote No. 300, *See Attachment* ................................................. 907

Footnote No. 302, *See Attachments (2) and Footnote No. 300 (above)* ................................................................ 909, 911, 907

Footnote No. 303, *See Footnote No. 299 (above)* ........................... 903

Footnote No. 304, *See Footnote No. 289 (above)* ........................... 881

# DIVIDEND TAX ABUSE: HOW OFFSHORE ENTITIES DODGE TAXES ON U.S. STOCK DIVIDENDS

————

### THURSDAY, SEPTEMBER 11, 2008

U.S. SENATE,
PERMANENT SUBCOMMITTEE ON INVESTIGATIONS,
OF THE COMMITTEE ON HOMELAND SECURITY
AND GOVERNMENTAL AFFAIRS,
*Washington, DC.*

The Subcommittee met, pursuant to notice, at 9:10 a.m., in Room 106 of the Dirksen Senate Office Building, Hon. Carl Levin, Chairman of the Subcommittee, presiding.

Present: Senators Levin and Coleman.

Staff Present: Elise J. Bean, Staff Director and Chief Counsel; Robert L. Roach, Counsel and Chief Investigator; Ross K. Kirschner, Counsel; Mary D. Robertson, Chief Clerk; Mark L. Greenblatt, Staff Director and Chief Counsel to the Minority; Timothy R. Terry, Counsel to the Minority; Alexandra Brodman, Intern; Tesia Schmidtke, Intern; and Mark LeDuc (HSGAC/Senator Collins).

### OPENING STATEMENT OF SENATOR LEVIN

Senator LEVIN. Good morning everybody. The Subcommittee will come to order.

One of the problems that this Subcommittee has tackled in recent years is the stunning fact that the United States loses perhaps $100 billion in tax revenues each year to offshore tax havens that aid and abet corporations and wealthy individuals dodging payment of taxes owed to Uncle Sam.

Since 2001, this Subcommittee has examined this problem from multiple angles, exposing the ways that people use tax havens to hide their assets and income, and how tax havens have created a whole industry to help them exercise control over their offshore assets and use those assets and the revenues they produce for their own benefit, often sneaking funds back into the United States without paying the taxes owed. Just 2 months ago, in July, this Subcommittee held a hearing showing how banks in offshore tax havens have knowingly helped U.S. clients hide billions of dollars in secret bank accounts never reported to the IRS.

Today, our spotlight is on another facet of tax haven abuses; we call it dividend tax abuse. And the focus today is not on U.S. citizens, but on non-U.S. citizens who are supposed to be paying taxes on the dividends they receive from U.S. corporations but do not. They do not pay those taxes because major financial institutions

(1)

2

like Lehman Brothers, Morgan Stanley, Deutsche Bank, UBS, Merrill Lynch, Citigroup, and others have created financial gimmicks whose primary purpose is to enable clients to dodge U.S. taxes owed on U.S. stock dividends, but which are dressed up with phrases like "dividend enhancement," "yield enhancement," and even "dividend uplift." Using stock swaps, stock loans, and exotic financial instruments, the financial institutions have built a series of financial black boxes, surrounded by mind-numbing complexity, designed to keep their clients' money tax free.

Foreigners who invest in the United States already enjoy a minimal tax burden. For example, non-U.S. persons who deposit money with a U.S. bank or securities firm pay no U.S. taxes on the interest earned. They pay no U.S. taxes on capital gains. U.S. citizens do pay taxes on that income, but the tax code lets foreign investors operate without tax in an effort to attract foreign investment.

But there is one tax on the books that even foreign investors are supposed to pay. If they buy stock in a U.S. company and that stock pays a dividend, the non-U.S. stockholder is supposed to pay a tax on the dividend. The general tax rate is 30 percent, unless their country of residence has negotiated a lower rate with the United States, typically 15 percent.

In addition, to make sure those dividend taxes are paid, U.S. law requires the person or entity paying a stock dividend to a non-U.S. person to withhold the tax owed Uncle Sam before any part of the dividend leaves the United States. If the "withholding agent" fails to retain and remit the dividend tax to the IRS, and the tax is not paid by the dividend recipient, the tax code makes the withholding agent equally liable for the unpaid taxes.

That is the law. But the reality is that many non-U.S. stockholders never pay the dividend taxes that they owe. In 2003, the latest year for which data is available, the Government Accountability Office determined that about $42 billion in dividend payments were sent abroad, but less than 5 percent, or $2 billion, was sent to the IRS. In other words, billions of dollars left the country untaxed.

The Subcommittee's investigation has determined that part of the reason for unpaid dividend taxes is that, for more than 10 years, U.S. financial institutions have been helping non-U.S. clients dodge payments.

Now, listen to this roll call of well-known financial institutions. Morgan Stanley enabled its clients to dodge payment of $300 million in U.S. dividend taxes from 2000 to 2007. Lehman Brothers estimated that in 1 year alone, 2004, it helped clients dodge perhaps $115 million in U.S. dividend taxes. For UBS, the figure is $62 million in unpaid dividend taxes over a 4-year period, from 2004 to 2007. One hedge fund adviser, Maverick Capital, calculated that from 2000 to 2007, its offshore funds used so-called dividend enhancement products from multiple firms to escape dividend taxes totaling nearly $95 million. In 2007, Citigroup surprised the IRS by paying $24 million in unpaid dividend taxes on a select group of swap transactions from 2003 to 2005, where no dividend taxes had been paid.

Who were the clients? Hedge funds organized offshore, often by Americans; tax haven banks; and a host of sophisticated foreign in-

3

vestors with the means and the know-how to engage in financial transactions beyond the reach of ordinary folks. But that is not the whole story. Some of those foreign investors begin to look a lot less foreign once you take a closer look.

I am referring in particular to the so-called offshore hedge funds. When the Subcommittee began contacting them, all of their key personnel turned out to be here in the United States. The so-called offshore hedge funds' main offices were here in the United States; their key decisionmakers were here; their investment professionals and technical people live here. Most of these offshore hedge funds claim to be located in the Caymans. The Cayman Islands, in fact, has 10,000 hedge funds, more than any other country in the world. But the Cayman hedge funds we examined did not operate in any meaningful sense from the Caymans. Instead, their physical presence often amounted to little more than a Cayman post office box or a plaque on the wall of the infamous Ugland House, that small white building where more than 18,000 companies maintain a Cayman address.

Hedge funds run by Americans and invested in the U.S. stock market often create a shell of a presence in tax havens, presumably in part to avoid paying U.S. taxes. Then, when confronted by the one U.S. tax imposed on foreign investors receiving U.S. stock dividends, they turn to financial gymnastics to escape paying that tax as well. It adds insult to injury when hedge fund managers who live in the United States, enjoy all its benefits, protections and prosperity and use U.S. markets to make money, arrange tax dodges so their offshore hedge funds escape the minimal U.S. tax obligations they are supposed to pay.

Hedge funds and other offshore entities could not perform their dividend tax escape act without the cooperation and assistance of financial institutions. It is those financial institutions that devise the abusive transactions and send the U.S. dividend payments offshore to their clients in the form of dividend equivalent or substitute dividend payments, without remitting any taxes to the U.S. Treasury. Their own emails show that they took these actions knowingly to attract and retain clients and to profit from the fees. With their assistance, billions of dollars in U.S. dividends flowed out of this country, and few taxes were withheld.

Now, let me just explain briefly two of the most common schemes used to dodge dividend taxes. They involve swaps and stock loans. In both cases, financial sleight of hand is used to recast taxable dividend payments as untaxable transfers offshore.

First consider swaps. Swaps sound complicated, but they are essentially a financial bet, in this case a bet on the future of a stock price.

If we take a look at a chart,[1] it shows an offshore hedge fund in blue, which is controlled by a U.S. investment manager in green. The financial institution, shown in red, tells the hedge fund—which owns U.S. stock—that it can escape the 30-percent withholding tax on an upcoming stock dividend by purporting to sell the stock to the financial institution and simultaneously entering into a swap with the financial institution tied to the price of that stock.

---

[1] See Exhibit No. 1, which appears in the Appendix on page 189.

4

Under the swap, the financial institution promises to pay the hedge fund an amount equal to any appreciation in the stock price and the amount of any dividend paid during the term of the swap. The payment reflecting the dividend is called a "dividend equivalent." In return, the hedge fund agrees to pay the financial institution an amount equal to any depreciation in the stock price. The financial institution hedges its risk by holding the physical shares of stock that were "sold" to it by the hedge fund. It also charges a fee, which usually includes a portion of the tax savings that the hedge fund will obtain by dodging the withholding tax.

The swap gives the hedge fund the same economic risks and rewards that it had when it owned the physical shares of the stock. So why do it? Because under the tax code, dividend payments are taxed, but dividend equivalent payments made under a swap are not.

Dividend equivalent payments made under a swap are tax free, because in 1991, the IRS issued a series of regulations to determine what types of income will be treated as coming from the United States and, therefore, taxable. These so-called source rules treat U.S. stock dividends as U.S. source income because the money comes from a U.S. corporation. But, the 1991 regulation takes the opposite approach with respect to swaps. It deems swap agreements to be "notional principal contracts" and says that the "source" of any payment made under that contract is to be determined, not by where the money comes from, but by where it ends up. In other words, the payment's source is the country where the payment recipient resides.

That approach turns the usual meaning of the word "source" on its head. Instead of looking at the source or origin of the payment to determine its source, the IRS swap rule looks to its end point—who receives it. That source is not really a source by any known definition of the word. It is the opposite—not the point of origin but the end point.

The result is that when a financial institution makes a dividend equivalent payment to an offshore client under a swap agreement, the payment is deemed under the tax code as being from an offshore source. And then under that interpretation, the swap payment is free of any U.S. tax.

In our example, the U.S. financial institution makes the swap payment to the offshore hedge fund, minus the fee, and stiffs Uncle Sam for the amount of taxes that should have been sent to the IRS. The swap is then terminated, and the stock is "sold" back to the hedge fund. And the sham nature of that sale is disclosed. And, under this gimmick, the hedge fund ends up in the same position as before the swap, as a stockholder, except it has pocketed a dividend payment without paying any tax.

Now, stock loans are also used to dodge dividend taxes, and these transactions pile a stock loan on top of a swap to achieve the same, or are intended to achieve the same, tax-free result. And for the sake of time I am going to put my explanation of this transaction in the record.[1]

---

[1] Stock Loan. Stock loans are also used to dodge dividend taxes. These transactions pile a stock loan on top of a swap to achieve the same tax-free result.

5

Suffice it to say that it is complex and relies on another gimmick, and this gimmick is that the parties claim that the substitute dividend is tax free by invoking the wording of IRS Notice 97–66, which was never intended to be applied to this situation. That notice says that when two parties in a stock loan are outside of the United States and subject to the same dividend withholding rate, they do not have to pay the dividend tax when passing on a substitute dividend. But the assumption is that the tax was already paid by another party in the lending transaction. Some tax lawyers have seized on the wording to claim that this IRS, which was intended to prevent overwithholding, could be used to eliminate dividend withholding entirely, so long as one offshore party passes on a substitute dividend to another offshore party subject to the same dividend tax rate. The IRS has told this Subcommittee that Notice 97–66 was never intended to be interpreted that way, but in the 10 years since it was issued and abusive stock loans have exploded, the IRS has never put that in writing.

The end result in our example is that the client pockets a substitute dividend payment—minus the financial institution's fee—without paying any tax. The stock loan is terminated, and the stock is returned to the client. The big advantage of this approach over a swap is that the client does not have to explain why he got his stock back after the transaction. The stock was, after all, only on loan.

Tax avoidance was clearly the economic purpose of the two transactions just described. The client owned U.S. stock both before and after each transaction. Neither the swap nor the stock loan altered the client's market risk. The only risk involved in either transaction was that Uncle Sam would catch on and assess the dividend taxes that should have been paid but were not.

To make it harder for Uncle Sam to catch on and prove what is going on, financial institutions have added more complexity, more bells and whistles, to these transactions. But the purpose of the transactions remains the same—to enable clients to escape paying the taxes that they owe.

And it is clear that the participants knew their transactions were little more than tax dodging. In one email exchange about a proposed stock loan, a potential client informed Merrill Lynch that its tax counsel had said "the transaction works, as I said, once, maybe twice," but "repeated use, coincidentally around dividend payment time, would provide a strong case for the IRS to assert tax evasion." Another client explaining a Lehman Brothers swap transaction to a colleague wrote that the swap "is used to circumvent the tax." That is the unvarnished truth.

---

The first step is that the client with an upcoming dividend loans its stock to an offshore corporation controlled by the financial institution. This offshore corporation promises, as part of the loan agreement, to forward any dividend payments back to the client.

The next step is that offshore corporation enters into a swap with the financial institution that controls it, referencing the same type of stock and number of shares that is the subject of the stock loan. Essentially, two related parties are placing a bet on the stock, which makes no economic sense except, once that stock pays the dividend, the swap arrangement allows the financial institution to send it as a tax-free dividend equivalent payment to the offshore corporation it controls. The offshore corporation then forwards the same amount to the client. Because the payment is sent to the client as part of a stock loan agreement, it is called a "substitute dividend." The tax code treats substitute dividends in the same way as the underlying dividend. So if the underlying dividend came from a U.S. corporation, the substitute dividend would normally be taxed as U.S. source income.

6

The participants in these transactions also took steps to limit their exposure in case the IRS stepped in. Some of the financial institutions, for example, set an annual limit on the amount of unpaid dividend taxes that they would facilitate through their transactions to limit their exposure as withholding agents. Some of the clients demanded that the financial institutions indemnify them against any tax liability. A few financial institutions, such as UBS, Merrill Lynch, and Morgan Stanley, have stopped offering the most blatantly abusive transactions, while others have continued doing as many deals as ever.

Now, some may claim that by exposing this tax dodge and being determined to end it, we are trying to discredit structured finance or the financial markets. I support financial transactions that are used for legitimate purposes, including swaps and stock loans that facilitate capital flows, reduce capital needs, or spread risk. What I oppose is the misuse of financial transactions to undermine the tax code, rob the U.S. Treasury, and force honest Americans to shoulder the country's tax burden. And what I oppose are transactions whose patent economic purpose is tax dodging.

For the last 10 years, as dividend tax dodging took hold and became an open secret among market insiders, the U.S. Treasury Department and the IRS sat on their hands. When firms began claiming they could turn taxable dividend payments into untaxed dividend equivalents under swaps, Treasury and the IRS said nothing. When firms began claiming that the 1997 IRS notice designed to cure overwithholding could eliminate all withholding in offshore stock loans, Treasury and the IRS failed to issue corrective guidance. When firms openly advertised so-called dividend enhancement products to clients, Treasury and the IRS saw nothing, heard nothing, and took no enforcement action.

The government's failure to act does not in any way excuse the actions of the financial institutions or their clients. They are not saved from their own abusive conduct by the failure of regulators to stop them, any more than going through a red light is OK if you are not caught. Nonetheless, the silence and inaction of the Treasury and the IRS in the face of rampant dividend tax dodging has encouraged and continues to encourage financial institutions to offer their clients financial concoctions designed to enable them to dodge U.S. dividend taxes. It is past time to end that silence, to end that inaction, and to get those concoctions off the market. It is also past time for Congress to take on this billion-dollar offshore tax abuse and, like so many others, enact the legislation needed to put a stop to it.

I want to thank my Ranking Member, Senator Coleman, for his support of this investigation, for the support of his staff, and now invite him to make opening remarks.

### OPENING STATEMENT OF SENATOR COLEMAN

Senator COLEMAN. Thank you, Senator Levin.

I want to begin by thanking Chairman Levin for initiating this investigation, and I want to commend his longstanding commitment to identifying institutions and individuals who facilitate the inappropriate avoidance of legitimate taxes through complex offshore schemes.

7

Today, we turn our attention to the findings of another bipartisan inquiry, which the Chairman has just described: That some U.S. financial institutions have been structuring equity swap and loan transactions to assist their offshore clients in avoiding U.S. taxes on stock dividends. The factual findings at issue today and identified in this Subcommittee's bipartisan Staff Report are compelling. They raise valid concerns that demonstrate the need to re-evaluate the wisdom and effectiveness of tax laws and policies respecting the treatment of specific equity swap and loan transactions.

For a foreign investor, there is a significant difference in the United States withholding tax consequences between investing synthetically through an equity swap versus directly in physical U.S. equities. This difference in treatment has led to certain abuses. While the activities may not rise to the level of criminal tax evasion, there is no doubt that some institutions have taken advantage of ambiguities in U.S. tax law and pushed the tax-avoidance envelope too aggressively.

I want to be clear. Our target here today is neither derivatives generally nor equity swaps specifically. Derivatives serve many purposes critical to the health and dynamism of American markets, as well as the U.S. economy, writ large. Swaps, in particular, often offer superior leverage, accounting treatment, market access, and transactional efficiency, all of which—including the preferential tax treatment afforded to swaps under current law—are legitimate factors that may influence the decision to trade in swap form.

That said, a swaps transaction with no business purpose other than the avoidance of withholding tax is a bridge too far. For the most part, I am talking about a subset of aggressively structured dividend enhancement trades that are short-lived; clustered around dividend record dates; involve so-called crossing in just prior to the dividend date; and feature the reacquisition of the physical shares after the completion of the synthetic transaction.

During the course of our investigation, we have seen these aggressive schemes executed far too often, and, frankly, some of the more egregious fact patterns that we have examined reflect a shameless and cynical abuse of U.S. tax policy.

While there is no doubt that certain financial institutions and hedge funds have crossed the line, as the Chairman has noted, the conditions for these abuses were largely created by Treasury and the IRS. The reality is that the state of the tax law here is muddled; the Treasury and the IRS have known about these ambiguities and have done woefully little to clarify the situation, failing to offer taxpayers clear guidance and direction. Therefore, while some financial institutions undoubtedly raced to the bottom, Treasury and the IRS bear some responsibility as well.

We are not just in the blame business, however. We are in the problem identification and problem-solving business. The Chairman has done a good job in identifying the problem. How do we fix this problem?

In light of the Subcommittee's findings, we need a comprehensive and in-depth analysis of the potential legislative or regulatory responses to these abuses. The relevant Executive Branch agencies, the congressional committees of jurisdiction, and experts on tax law

8

and policy should engage in a deliberative process to evaluate the various possible responses and determine the most appropriate path.

I strongly urge, however, that any response to these abuses be clearly defined and carefully targeted to preserve the integrity and efficiency of our capital markets and avoid unintended consequences. In particular, any response should avoid negatively impacting foreign investment in the United States. Such investments are critical to job growth and opportunity expansion and are undeniably necessary for the economic well-being of our citizens.

Which brings me perhaps to the most important issue: As I have said many times before—most recently in the Subcommittee's hearings on tax cheats and tax shelters—inappropriate tax avoidance by a privileged few forces millions of honest American taxpayers to shoulder a disproportionate share of the tax base, to dig deeper to maintain investment in crucial areas like health care, homeland security, and education. That tax loss sits like a millstone around the neck of honest American taxpayers, who are struggling with high taxes, ever-increasing gas prices, and rising health care costs. Those honest taxpayers are the real victims here.

Thank you, Mr. Chairman.

Senator LEVIN. Thank you, Senator Coleman.

And now let me call our first witness to this morning's hearing: Professor Reuven Avi-Yonah, who is the Irwin I. Cohn Professor of Law at the University of Michigan Law School in Ann Arbor.

Professor Avi-Yonah, I would like to welcome you back to the Subcommittee, having testified at the Subcommittee in August 2006 on tax haven abuses. We appreciate your sharing your experience in international tax law and your attendance at today's hearing. We look forward to your testimony and your perspective on this dividend tax issue.

Before we begin, pursuant to Rule VI, all witnesses who testify before the Subcommittee are required to be sworn, and so at this time I would ask you, Professor, if you would please stand and raise your right hand. Do you swear that the testimony you are about to give before this Subcommittee will be the truth, the whole truth, and nothing but the truth, so help you, God?

Mr. AVI-YONAH. I do.

Senator LEVIN. We will use the usual timing system today, and about a minute before the red light comes on, you will see the light change from green to yellow, giving you an opportunity to conclude your remarks, and your entire testimony and the testimony of all of our witnesses will be printed in the record. We ask you, if you would, to limit your oral testimony to no more than 8 minutes.

Professor Avi-Yonah, please proceed with your statement.

## TESTIMONY OF REUVEN S. AVI-YONAH,[1] IRWIN I. COHN PROFESSOR OF LAW, UNIVERSITY OF MICHIGAN SCHOOL OF LAW, ANN ARBOR, MICHIGAN

Mr. AVI-YONAH. Thank you very much, Chairman Levin and Ranking Member Coleman, and the whole Committee and Subcommittee for inviting me to testify today on dividend tax abuse.

---

[1] The prepared statement of Mr. Avi-Yonah appears in the Appendix on page 59.

9

There are three basically economically equivalent ways of investing in U.S. stock and receiving dividend or dividend equivalent payments. The first is simply to invest in a physical stock. A foreign buyer buys stock of a U.S. corporation, receives a dividend, and that, as you have indicated, Mr. Chairman, is subject to a 30-percent or sometimes a 15-percent withholding tax. That is what our law says.

The second alternative is to engage in an equity swap. This is a type of transaction in which you enter into an agreement with a financial institution, a U.S. financial institution, under which you will at the end of the swap receive the appreciation or pay the depreciation in the value of the stock, and during the course of the swap, you will receive dividend equivalents every time that the underlying stock pays a dividend.

And the third one is a stock loan, where you have the stock, you lend it to a U.S. institution, and in exchange you receive dividend substitute payments.

As their names indicated, dividend equivalents are equivalent to dividends, and dividend substitutes are substitutes for dividends. And, economically, the foreign investor is in the same position in all three transactions. In all of them, they are exactly at the same level at risk for the depreciation of the stock; they have the up side of the appreciation of the stock; and they receive the full amount of the dividends minus any fees that they have to pay for the financial institutions arranging the transaction.

However, for tax purposes, as was mentioned, these transactions are not treated alike. The actual dividend is subject to a dividend withholding tax per the code. The dividend substitutes are also subject to a dividend withholding tax; they are treated as dividends based on a regulation issued, proposed by the Treasury Department in 1992 and finalized in 1997. But dividend equivalents on the swaps are tax free because of the source rule that was mentioned in the introduction.

So when you have a situation like that where three identical, economically identical equivalent transactions are taxed differently, there is an open invitation to taxpayers to try to avoid the taxed ones and convert them or use the only tax-free one. And that is an invitation to abuse, and the abuse occurs, for example, as was mentioned, when a foreign taxpayer actually holds a stock, sells it just before the record dividend date, receives a dividend equivalent, and then it reacquires the stock back. And sometimes, as was mentioned, even sells it to the financial institution with which it enters the equity swap and receives the dividend equivalent from that financial institution. That is really the most extreme example, but I would say that even if they buy and sell the stock in the market, it does not matter, as long as they hold the actual stock before the record date and receive it back, buy it back after the record date and receive the dividend equivalent, that is a dodge as well. That is an abusive transaction, in my opinion.

Now, Treasury has been aware of this problem for a long time. They first issued the—they created the loophole, as it were. They issued the regulation that made dividend equivalents under swaps tax free in 1991, as was mentioned. Already in the preamble to the proposed 1992 regulations on stock loans, they voiced concerns

10

about this, and, again, in another preamble to another regulation in 1998, they repeated their concerns. But it has now been 16 years since the first time they voiced a concern, and they have not really done anything.

Moreover, in 1997, they issued Notice 97–66, which has had the effect, as interpreted by taxpayers, of making dividends subject to payments also tax free because of what I regard as a blatant misinterpretation of the language of the notice. But because the notice did not say explicitly that the condition for not withholding on dividend substitutes from one foreign payer to another is that there will be an actual dividend withholding somewhere in the chain, because the notice was, as was mentioned, intended to prevent overwithholding, taxpayers have used this to structure transactions involving stock loans and try to avoid the dividend withholding tax this way.

Now, in my opinion, the solution is to make the three equivalents the same; that is, dividend equivalents should be taxed the same way the dividend substitutes are, and the dividend substitutes are treated as dividends, so all three should be treated as dividends. Moreover, because of the risk that it will be possible to structure transactions involving baskets of stock, for example, that behave equivalently to a single stock from an economic perspective, I think we should use the substantially similar or related property standard, which is already well established and well developed in regulations that is addressed to these kind of transactions. That is, we should tax dividend equivalents whenever they are either dividend equivalents or a single stock or in a basket of stocks that is substantially similar or relates property to a single share of stock.

Moreover, the IRS should clarify Notice 97–66 to make clear that it never intended, as it states, to apply that notice to the situation where the taxpayer cannot show that the dividend has actually been collected anywhere in the process.

Basically, the policy issue here is, if you step back for a moment, there is an argument—and I think it is a valid argument, although I do not ultimately agree with it. The argument is that we do not, as was mentioned, withhold taxes and interest payments typically with foreigners, and we do not withhold taxes typically by treaty and royalty payments, and those payments are deductible. Why should we, as a policy matter, withhold taxes on dividends when dividends are not deductible so we already collect the corporate-level tax?

However, there is an argument that this policy is OK because dividends represent investments in unique U.S. taxpayers. For example, you cannot find many Microsofts in the world, and when Microsoft pays a dividend, foreign taxpayers would want to get that dividend, and they do not have an alternative investment opportunities like they have in the case of interest. But in any case, even if you disagree with the policy analysis and think that dividends should not be subject to withholding, that is a matter for Congress changing the law, and for the Senate, for example, to ratify treaties maybe that we reduce the dividend withholding to zero.

A lot of taxpayers over the years and a lot of tax policy people have lobbied and have argued for a portfolio dividend exemption, just like we have a portfolio interest exemption. But, in my opinion,

11

as long as they are not persuasive, as long as they have not managed to persuade Congress to change the law, it is inappropriate for taxpayers to try to use dividend equivalents or dividend substitutes to achieve a result that they have not been able to get Congress or the Senate to change by way of the code or the treaty. And, moreover, it is inappropriate for Treasury and the IRS to turn a blind eye because one way of explaining their behavior is to say they do not really believe in the withholding tax on dividends, and, therefore, they allow this kind of dodge to take place. And I think that is an inappropriate approach. It is up to Congress to determine whether there should be withholding on dividends, and as long as that is the law, it is up to Treasury and the IRS to make sure the dividend withholding is, in fact, enforced.

Thank you very much.

Senator LEVIN. Thank you very much, Professor. That was very clear testimony, as always.

Financial institutions selling these financial products to their non-U.S. clients to enable them to dodge U.S. dividend taxes, would you agree has just become an accepted way of doing business?

Mr. AVI-YONAH. Yes, exactly. I think that this was identified as a problem as early as 1992 by the Treasury and as early as 1993 in the literature. And since then, numerous articles have been written about it, but basically what is happening in the last 10 years is that the scope of it has really exploded, probably because of the growth of the hedge funds, and probably because—I once heard a tax lawyer describe this as an "approved loophole." That was the language that was used.

The interpretation of the inaction by the Treasury and the IRS has been that this must be an OK way of doing business.

Senator LEVIN. Now, take a look at Exhibit 6,[1] if you would, which is an email between two employees of Maverick Capital, which runs a number of offshore hedge funds. The email is from 2004. It describes a Microsoft special dividend announced that year to pay $3 on every Microsoft share for a total of $32 billion.

On the second page of the email, it says the following: "Jim has been working on this for the last 2 months, and he got UBS to match the more aggressive offers we were getting from the Street. For LDC only, we lend the stock out and will get 97 percent of the dividend."

Would you say that these hedge funds pressuring financial firms, playing one off against the other to get dividend enhancement products to relieve them of having to pay a 30-percent dividend tax rate, that it has gotten to the point where financial institutions have to offer dividend enhancement products to be competitive, even if there is a tax risk?

Mr. AVI-YONAH. I believe that is the case. And, in fact, one thing that is interesting about this is that if you watch it over time, the fees keep declining, so that in the beginning you can charge 15 percent and in the end you can charge 3 percent or 2 percent or 1 percent. And that is because there is so much competition, and the hedge funds can go from one financial firm to the other.

---

[1] See Exhibit No. 6, which appears in the Appendix on page 200.

12

Senator LEVIN. And, that percentage that you gave was a percentage of the dividend. Is that correct?

Mr. AVI-YONAH. That is a percentage of the dividend. So anything above 70 precent is good from the taxpayer's perspective because 70 percent is what they get if they pay the full tax. So if they get 85 percent, it is good. But, of course, if they can get 97 or 98 percent, it is even better.

Senator LEVIN. Now, there is no hard data on how much the Treasury loses based on these gimmicks, these tax avoidance approaches to these dividends, the way these payments are avoided. Would you estimate that this loss to the Treasury involved billions of dollars?

Mr. AVI-YONAH. Yes, certainly. I mean, the only hard data is the one that I believe you cited, and that is the GAO report based on 2003 data. What they say is that in that year, $42 billion in dividends were paid to non-U.S. corporate holders. They do not specify non-corporate holders. And of that, only less than $2 billion was collected as withholding tax.

What is striking to me about that number is that it is less than 5 percent, and 5 percent is typically the rate that by treaty we collect on direct dividends, that is, dividends paid to foreign parents of U.S. subsidiaries.

So my conclusion from that is that essentially there is no withholding tax on portfolio dividends at all, dividends paid on people who do not own 10 percent or more by vote of the shares. And the reason for that is that nobody except the hopelessly uninformed would engage in direct dividend bearing stock investment into the United States.

What everybody does is what we have been talking about, namely, they get dividend equivalents, and we do not have data as to the size of dividend equivalents being paid to foreigners because no tax is collected, so nobody has the data.

But I am convinced that billions are lost, and, in fact, the data that the Subcommittee has collected shows that for each bank it is hundreds of millions, or at least tens of millions, sometimes hundreds of millions. And over time, of course, it adds up to billions.

Senator LEVIN. We have lost a lot of income to the Treasury, you estimate billions. I agree with that. What distortions to the market result when this occurs? You have dividends taxed, but dividend equivalents not taxed, substitute dividends not taxed.

Mr. AVI-YONAH. The obvious distortion is that people engage in the transactions that are not taxed and do not engage in the transactions that are taxed. So sometimes as an economic matter or as a business matter, they would prefer to have the actual stock, the physical stock, or they would prefer to engage in a direct stock loan into the United States. And since both of these transactions are taxed, instead what they do is that they engage in a swap, which is economically equivalent in terms of their returns, but the terms of it and the precise business terms may be different. Or they would engage in transactions that are really meaningless in order to avoid the tax, like inserting an artificial foreign entity into a stock loan transaction so that the stock loan will be foreign-to-foreign benefit from Notice 97–66; whereas normally they would do the stock loan directly into the United States.

13

So I think the main distortions are the distortion between the three forms of transactions, but also just useless and wasted transaction costs when there are transactions that are engaging only for the purpose of avoiding taxes, all of the other transactions are just a burden on the economy.

Senator LEVIN. Now, these problems have been known for 10 or more years. What in your judgment is the reason that the IRS and the Treasury have not taken this issue on and corrected it? Is it because there is a debate over the policy? Or is it because there is a debate over, whether that interpretation is clearly wrong? What is the reason?

Mr. AVI-YONAH. I do not think there is a debate on the interpretation or the fix because we know they know how to fix it because that is what they did with dividend substitutes. They issued the dividend substitute rule. They proposed it in 1992. They finalized it in 1997. They knew how to fix that. I mean, before that rule, dividend substitute also could be arguably tax free.

They made the mistake with Notice 97-66. I do not think that was deliberate. I think they were duped, essentially, into thinking there was an overwithholding problem that did not really exist, and they did not think about the ways—they did this very fast, within a month of issuing the final regulations, so they did not really think about the way the notice could be abused.

Fundamentally, I do think—or at least this is my surmise—that on some level it is a policy debate. I have had this discussion with, for example, former Clinton Administration tax officials who told me that fundamentally the issue is whether there should be withholding on dividends, and they do not fundamentally believe there should be withholding on dividends because the corporate tax is already paid and dividends are not deductible and because we have a portfolio interest exemption and, arguably, it is possible to convert dividends to interest and vice versa. So, therefore, why should they try to enforce the law in this particular regard? And as I said, I think that is inappropriate.

Senator LEVIN. Now, if we decide—and I hope we do—that the clear intent of the law is that dividends or these foreign distributions of dividend amounts be taxed, that is the clear intent of the law, if we decide that, how do we enforce the law? Do we need to amend the law, particularly as it relates to swaps? As it relates to the loans? If the Treasury refuses to clarify their regulation, do we pass a law? Assuming that we want to enforce the policy, which is clearly intended currently, how do we do that?

Mr. AVI-YONAH. Well, in principle, since this is all regulatory, it is either regulations or even just a notice, Treasury can tomorrow, at least certainly prospectively, amend its regulations and clarify the notice.

Senator LEVIN. On both swaps and——

Mr. AVI-YONAH. Yes, on both swaps and——

Senator LEVIN. And if they refuse to do this, as they have——

Mr. AVI-YONAH. Then I think——

Senator LEVIN [continuing]. For 10 years, then what?

Mr. AVI-YONAH. Then I think legislation is appropriate, and I think the legislation should say that dividend equivalents on single stock swaps and on economically equivalent baskets of stocks

14

should be treated like dividend substitutes and that dividend substitutes should be subject to withholding if there is no showing that there was an actual withholding somewhere in the chain. I think that would be appropriate.

Senator LEVIN. Thank you. Senator Coleman.

Senator COLEMAN. Thank you. Thank you, Mr. Chairman.

In some ways, this is complex. But in many ways, it is actually pretty simple. And yet your testimony took a very complex issue and made it very simple. There is a form of transaction here involving dividend-paying U.S. securities, and the Treasury and IRS have set it up so that it is very easy to avoid the tax consequences of these transactions. And folks have known about that for years. And the Chairman asked the $64,000 question: Why have we not acted on this? Your response confirms what I have been reflecting on.

Our tax policies are such that they favor foreign investment. We want foreign investment in this country. Is that correct?

Mr. AVI-YONAH. Yes.

Senator COLEMAN. So non-U.S. persons who deposit money with a U.S. bank or securities firm do not pay tax on interest earned or capital gains, and it almost seems to me that this situation exists because Congress has failed to clarify this one way or the other.

Mr. AVI-YONAH. Well, there are policy issues going in both directions. The argument for interest is pretty clear, and that is why since 1984 we have not been withholding on interest, and that is that interest is simply money lent, and money can be lent anywhere in the world, and the interest rate is basically determined on the global market. And if we impose, try to impose withholding taxes on interest, then either the money will simply go somewhere else, and instead of coming here, it will go to another one; or maybe more likely because we are a big market, the interest cost will simply be shifted forward to American borrowers, and they will have to bear it. And that is not particularly good either because it increases the cost of capital. That is the argument for interest.

And the other one for royalties, for example, which are exempt by treaty, is that because we have a lot of intangibles in this country developed, we benefit more from foreigners not taxing royalties coming to us than we do by excusing royalties paid to them. So as a revenue matter, it is a gain.

Now, dividends are different, though, because dividends are an investment in U.S. companies. So if you take Microsoft, which is a prominent company in these examples because it pays very big dividends out after—the dividend tax was reduced in 2003—$32 billion, as was mentioned. Now, that particular stock represents a unique investment opportunity. There is no other Microsoft in the world. They have what the economists call "rents"; that is, they have unique intangibles that they develop—Windows software and all the rest of it—and that is the only company that has it and the only company where you can make that particular money.

So, in my opinion, even if we tax the dividend on Microsoft and tax dividend equivalents on Microsoft stock, the foreigners will still come, and they will still invest in Microsoft because of this unique opportunity. And my judgment is that in most situations that is the case.

15

In addition, one thing that needs to be investigated on the policy level is what is the policy of our trading partners on dividends and dividend equivalents? And at least in one case—namely, the U.K.—I know that they tax dividends and what they call manufactured dividends, which is dividend equivalents, etc.

Senator COLEMAN. If I can follow up on that question about whether the folks would simply accept the 30-percent haircut in order to get Microsoft, are there close, overseas alternatives, areas where the investors would simply shift their capital?

Mr. AVI-YONAH. Yes.

Senator COLEMAN. What are they?

Mr. AVI-YONAH. Well, there are, I would imagine, American companies where you can—I mean, if you are looking at an investment at, let's say, General Motors or Toyota or Volkswagen, maybe they are equivalent enough so that if we tax GM, they would shift to Toyota or shift to Volkswagen, or Daimler or whatever. And in those kind of industries where American companies do not have a unique competitive advantage, there would be a risk of imposing a tax that you would be shifting the investment elsewhere. So that is the policy debate about whether we should be taxing dividends or not.

Senator COLEMAN. And that is a legitimate policy. One part of the concern I have here—and the Chairman has done a tremendous job of identifying the problem is: What is the solution? I am not sure I am there yet. But one of the solutions could simply be let's not tax dividends, treat them like capital gains, treat them like interest, and then what you do is you take a lot of folks out of the business, but you no longer have the ambiguity and you no longer have agencies involved in turning a blind eye to something that we all see going on.

Mr. AVI-YONAH. Yes, and I think that is a legitimate argument for Congress to have. The problem is that this argument has been made to Congress for many years, and they have not acted. And as long as they have not acted, I do not think it is appropriate for taxpayers to avoid the actual dividend tax that we have in place. Nor is it appropriate for Treasury and the IRS to close a blind eye to these transactions.

Senator COLEMAN. I do not disagree with that assertion, Professor. Thank you, Mr. Chairman.

Senator LEVIN. Thank you. I think that is exactly the issue. The IRS here is not the policymaker. They are supposed to be enforcing the law. The law is that these dividends are supposed to be taxable. I do not think there is any doubt about the intent of this law. The IRS, indeed, I think knows that is the intent. And so even though you may have a policy debate going on in the IRS, which may be a perfectly appropriate debate, that is not the issue before us. The issue before us is we have a tax law, and it is being avoided and evaded by these kinds of gimmicks which clearly are intended to avoid what is the clear intent of the law. And the IRS, knowing that, is doing nothing. And that is unacceptable in terms of any kind of a separation of powers.

Mr. AVI-YONAH. Yes.

Senator LEVIN. You cannot have the IRS become the policymaker. They can recommend changes in policy if they want to, and

16

that is a perfectly fair issue. But what they cannot do is not enforce the law because that opens up the kind of lawlessness which we have seen on these offshore tax havens, which have resulted in a loss of literally, we think, of $100 billion a year. I am determined to stop that. That is the remedy that, one way or another, I am going to fight to get established: Enforce the tax laws. And if we want to change them, change them. But do not evade them, do not avoid them, do not ignore them, do not circumvent them with the use of these transactions and concocted structures which have as their purpose getting around the clear intent of our tax laws. This is where we have got to fight back, and we need the IRS to help us in that fight.

You have been very helpful in terms of clarifying what the issues are and then distinguishing between the policy issues and the enforcement issues.

Senator Coleman, do you have anything else?

Senator COLEMAN. No.

Senator LEVIN. Again, let us thank you for all you have done here.

Mr. AVI-YONAH. Thank you very much.

Senator LEVIN. Now, our second panel of witnesses today are Joseph Manogue—who is the Treasurer of Maverick Capital of Dallas, Texas; Richard Potapchuk, the Director of Treasury and Finance at Highbridge Capital Management of New York; and Gary Wolf, who is the Managing Director of Angelo, Gordon & Co., of New York.

If you could come and stand and raise your right hands, please. Do you swear that the testimony you are about to give before this Subcommittee will be the truth, the whole truth, and nothing but the truth, so help you, God?

Mr. MANOGUE. I do.

Mr. WOLF. I do.

Mr. POTAPCHUK. I do.

Senator LEVIN. Thank you so much. Thank you for being here. I think you heard me describe the timing system before, so I will not repeat that.

Mr. Manogue, we will have you go first. Am I pronouncing your name correctly?

Mr. MANOGUE. Yes, you are.

Senator LEVIN. Thank you. And then you will be followed by Mr. Potapchuk. Am I pronouncing your name correctly?

Mr. POTAPCHUK. Yes, you are, Chairman.

Senator LEVIN. Thank you. And then Mr. Wolf, and then after hearing from all of you, we will then turn to questions.

So, Mr. Manogue, please.

### TESTIMONY OF JOSEPH M. MANOGUE,[1] TREASURER, MAVERICK CAPITAL, LTD., DALLAS, TEXAS

Mr. MANOGUE. Thank you. Members of the Permanent Senate Subcommittee, my name is Joseph Manogue, and I am the Treasurer of Maverick Capital, Ltd. I submit this statement as Maverick's representative in response to the invitation that we received

---

[1] The prepared statement of Mr. Manogue appears in the Appendix on page 67.

late last week from the Subcommittee in order to assist the Subcommittee in its review of certain industry practices that have been commonly referred to as "dividend enhancement transactions."

Maverick is an investment advisor that manages client capital primarily through hedging strategies based on long and short positions in U.S. and foreign equity securities. To that end, Maverick undertakes typical industry transactions, including the purchase and sale of stocks, shorting stocks, and borrowing and lending stocks.

Investors in Maverick managed funds include both U.S. and foreign institutions and individuals, and our funds include both domestic and foreign entities in structures that are typical for our industry. I would like to note in particular that our structures and policies provide for investment by U.S. taxpayers in domestic partnerships that are subject to full Internal Revenue Service return and information reporting requirements that typically apply in a domestic context.

In 1994, Maverick made the decision to register as an investment adviser under the Investment Advisers Act of 1940, and thereby voluntarily submitted to periodic review and inspection by the Securities and Exchange Commission. Our company prizes above all its reputation for client service and the highest ethical standards.

In the course of its operations, Maverick utilizes the services of a variety of prime brokerage firms that support implementation of its trading strategy on behalf of Maverick's client funds. These firms are among the most well-established institutions on Wall Street. Beginning in the late 1990s and through the subsequent years, the services offered by these firms included dividend enhancement programs.

The proposal was as follows: U.S. tax laws subjected dividends paid by U.S. companies to foreign stockholders to a 30-percent withholding tax. Under the relevant tax regulations, however, foreign investors who received equivalent payments under total return swaps and foreign stockholders of U.S. companies who received substitute dividend payments from many foreign stock borrowers were not subject to the 30-percent withholding tax.

Maverick's financial institution service providers offered to help Maverick enter into total return swap transactions that involved Maverick's Cayman funds selling the U.S. company stock eligible for an expected dividend to the financial institution for a price and negotiated fees that would be substantially equivalent to getting the value of the dividend. Alternatively, they suggested that Maverick's Cayman Island funds should consider lending the U.S. company stock to a Cayman affiliate of the service provider. In consideration for the loan, the financial institution's Cayman affiliate would pay to the Maverick Cayman fund an amount that was somewhat less than the dividend but exceeded the amount that it would have received had it received the dividend net of the tax.

Maverick's tax personnel considered these proposals and examined the tax regulations that applied to these transactions. Taking into account their compliance with the rules, the number of different blue chip firms offering the services, and their assurances that the transactions had been thoroughly vetted, there seemed to be little cause for concern that they were legitimate.

18

Of the alternatives presented, however, those requiring that the Maverick Cayman funds enter into swaps directly presented greater complexity relating to variable transaction terms and operational considerations than those providing for simple stock loans. Moreover, IRS Notice 97–66 appeared to provide express confirmation that "substitute dividend payments" received with respect to stock loans to a borrower located in the same jurisdiction as the lender would not be subject to the withholding tax.

Thus, in 1999, Maverick began engaging in dividend enhancement stock loans in reliance on Notice 97–66. On a case-by-case basis, a Maverick employee would ask one of the financial institutions that had offered to provide dividend enhancement services whether it wished to borrow a particular security. If the financial institution did wish to borrow that security, Maverick would negotiate terms with that institution. We did not engage in swaps or other cross-border transactions for purposes of dividend enhancement, and we did not participate in any subsequent transactions involving the borrowed shares that may have been undertaken by the borrowers.

We engaged in these transactions through various financial institutions until 2007. In 2007, however, the business press published a number of reports about these programs and suggested that the IRS was taking a close look at their legitimacy. Understandably, the financial institutions involved suspended the services until any questions about the industry practices could be resolved. Maverick estimates that its Cayman funds received approximately $63 million in substitute dividend payments beyond the amount that they would otherwise have received as a result of participation in dividend enhancement stock loan transactions since 2000.

When the staff of this Subcommittee issued a request for information earlier this year, our counsel promptly complied by producing thousands of pages of documents. We have made our personnel available to assist the staff in understanding industry practices in this area and, on the basis of numerous discussions over the past several months, believe we have developed a candid and cooperative relationship. I am hopeful that they have conveyed consistent impressions of Maverick to you.

The regulation and taxation of financial transactions such as those under discussion today are complex and evolving subjects. As I have indicated, we believe we have acted in accordance with the governing legal precedents and existing guidance, but understand that those precedents may be subject to further interpretation or revocation on the basis of further policy review such as the one you are conducting here. Maverick will conform to any new laws and regulations that result from this review.

Thank you very much.

Senator LEVIN. Thank you. And we also want to acknowledge the cooperation of your company. You have indeed cooperated with the Subcommittee. We very much appreciate it, and we are not the least bit reluctant to thank you for that.

Mr. Potapchuk.

19

**TESTIMONY OF RICHARD POTAPCHUK,[1] DIRECTOR OF TREAS-
URY AND FINANCE, HIGHBRIDGE CAPITAL MANAGEMENT,
LLC, NEW YORK, NEW YORK**

Mr. POTAPCHUK. Thank you, Mr. Chairman and Members of the
Subcommittee and staff. I want to thank you first for this oppor-
tunity to appear before you at this hearing. My name is Richard
Potapchuk. I am the Director of Treasury and Finance at
Highbridge Capital Management, LLC.

Highbridge is New York-based investment adviser that manages
a group of investment vehicles more commonly known as "hedge
funds." We currently have $27 billion under our management.

Over a period of many years reaching back into the 1990s,
Highbridge has used financial instruments known as "total return
swaps" for a variety of different investment purposes. One such
purpose, which is the subject of today's hearing, is to gain financial
exposure to U.S. dividend-paying securities on behalf of non-U.S.
investors in a manner that does not subject certain of those dis-
tributions to these non-U.S. investors to a dividend withholding tax
of 30 percent. Highbridge's position on this subject is set out in
more detail in my written testimony which has been submitted to
you earlier.

In these opening remarks, I would like to highlight three points.

First, Highbridge does not design investment strategies solely to
profit from the tax status of payments received under total return
swap agreements. Our investment decisions were and continue to
be guided by our analysis of the securities to which we want to
gain economic exposure. Once these investment decisions are made,
like any other prudent investment manager or investor, we choose
a form of investment, among other things, that is both lawful and
minimizes our costs.

Second, we believe the transactions in which we engaged are
lawful. In entering into these transactions, we have prudently
sought tax advice, legal advice, and we are mindful of the legal con-
sensus about the transactions. In light of this consensus, total re-
turn swap transactions have been widely used in the financial in-
dustry for many years, as you well know.

Third is the question of whether changes in the tax treatment of
certain total return swap payments are appropriate and/or desir-
able? This question is a very complicated one and has no simple
or easy answer. And, of course, it is a decision really for you, the
lawmakers and the authors of the tax code. Highbridge will be
happy to provide any information or insight that it can to help ad-
dress this question.

I am pleased, of course, to answer any questions you may have
on any of these subjects. And, again, I thank you very much.

Senator LEVIN. Thank you very much, Mr. Potapchuk, and we
want to also acknowledge the cooperation of your company. We ap-
preciate that very much.

Mr. Wolf.

---

[1] The prepared statement of Mr. Potapchuk appears in the Appendix on page 70.

20

## TESTIMONY OF GARY I. WOLF,[1] MANAGING DIRECTOR, ANGELO, GORDON & CO., NEW YORK, NEW YORK

Mr. WOLF. Thank you, Mr. Chairman. My name is Gary Wolf. I am a Managing Director at Angelo, Gordon & Co., a Delaware limited partnership and an SEC-registered investment adviser.

Angelo, Gordon & Co. was founded in 1988 and currently manages with its affiliates in excess of $19 billion. We seek to achieve attractive risk-adjusted returns while preserving capital primarily through investments in non-traditional strategies. Angelo, Gordon & Co. manages capital across four principal lines: Distressed debt and par loans; real estate; private equity; and hedged strategies. Our client base is global and is comprised of institutions including corporations, public funds, endowments, foundations, and high-net-worth individuals. We have associated offices in London, Amsterdam, Hong Kong, Seoul, Tokyo, Singapore, and Mumbai.

I joined the firm in 1993 and have been a convertible securities research analyst and portfolio manager during the past 15 years. Since 1995, I have been the head of the firm's convertible securities department.

The Subcommittee has asked me to testify about one investment product which has been offered by investment banks for many years. The use of this product, often referred to as a "swap" or a "CFD," has been common practice in the financial world and was marketed to Angelo, Gordon & Co. by many of the largest, most sophisticated investment banks in the world. The investment banks offering these products represented to Angelo, Gordon & Co. that the structure of these transactions, including the tax implications, had been cleared by their legal advisers, a position which was confirmed by our own legal advisers. Angelo, Gordon & Co. did not construct or market these swap products but, rather, these products were created and marketed by the investment banks.

While the specific products offered by different investment banks varied in particular aspects, this product in general is one in which the investor is not the actual owner of the security but, rather, enters into a contract with the investment bank to receive or to make payments which mirror the performance of the referenced security. The investment banks, which is the counterparty to the contract, may or may not actually hold or own the security. If the price of the security rises, the investment bank is obligated under the contract to pay an amount equal to that increase. If the price of the security falls, the investor must pay the bank an amount equal to the decline. Under the contract, an amount equal to some or all of the value of any dividend paid to stockholders during the contract period is paid to the investor by the investment bank.

Depending on the specific circumstances of a given transaction, sometimes the best way to maximize returns for our investors was to engage in a swap transaction. While I am not a tax expert, it is my understanding that while the person or entity actually owning the security and receiving the actual dividend payment may be subject to the Federal tax on dividends, the tax treatment of a payment received under a contract is determined by other provisions of the tax code. At times, this tax treatment of swaps will provide

---

[1] The prepared statement of Mr. Wolf appears in the Appendix on page 75.

21

a tax benefit resulting in a higher total yield on the investment for a foreign investor. This benefit was a central aspect of the marketing pitches that were made to us by the investment banks.

While the tax consequences were a significant factor considered in deciding whether to enter into a swap transaction, this was far from the only consideration. In fact, there were other significant economic realities that factored into the decision to enter into a swap transaction, including increased leverage and competitive transparency benefits. While swap transactions do have a significant number of positive benefits, including those related to leverage, transparency, and tax, there are a number of potential negative consequences or risks associated with such transactions. There was the economic reality that since we would not be the actual owner of the security, we would not have the normal stockholders role in the control of the company. Also, there were often significant transaction costs associated with swap transactions, including the fees for leverage. In addition, unlike those situations where we held the actual security under a swap contract, we were exposed to the risk that our counterparty would not make the payments called for by the contract. Recent events have demonstrated that counterparty risk is real.

We were told by the investment banks, as well as by our own legal advisers, that this form of investment offered a legal way for us to enhance or maximize our total return since we would be receiving contract payments and not actual dividend payments. The investment strategies we pursue are not designed around dividends but, rather, focus on movement in the price of the equity. While the value of any dividends paid during the time we held a position in a company would be, we hoped, minor compared to what we would realize from the movement of the price of the security, we were attracted to a form of investment that resulted in lower rather than higher taxes for our investors. Just as an individual deciding between renting and homeownership is well advised to consider the tax consequences of each approach, it is incumbent on financial firms and institutions to also consider the tax consequences, among many other factors, inherent in a given transaction.

The tax advantage of these products was certainly one of the primary considerations that made them attractive when they were marketed to us by the investment banks. But the tax advantage was not the only substantive aspect of these contracts. During the time period when Angelo, Gordon & Co. was active in swap transactions, leverage was also a considerable factor driving such decisions. In fact, often one of the most important negotiation points when entering into a swap transaction was the amount of leverage that could be obtained. Leverage was deemed to be so critical to investment decisions that the prime brokerage arms of investment banks would compete for business on the basis of the amount of leverage that could be offered.

Another significant benefit associated with swap transactions relates to competitive transparency. When Angelo, Gordon & Co. holds a security in swap, it prevents other competing investors from tracking and either mirroring or undermining our positions.

Given the myriad of benefits and positive economic results that can be realized through swap transactions, Angelo, Gordon & Co.

22

engaged in such transactions on a global level, and this activity was not simply limited to U.S. dividend-paying securities. In fact, Angelo, Gordon & Co. has entered into swap transactions for securities ranging from U.S. convertible bonds to bank debt to foreign securities—none of which would be subject to the U.S. withholding tax even if owned directly. And this has been the case with both our domestic and foreign funds.

My understanding is that some of the recent media discussion regarding swap transactions has centered on the practice of acquiring a position in a security shortly before dividend date and then exiting that position shortly after the dividend date, often referred to as "bracketing" a dividend. Not only did Angelo, Gordon & Co. not engage in bracketing dividends, but such a practice runs counter to Angelo, Gordon & Co.'s core investment philosophy of focusing on well-researched, longer-term investments. Almost always, Angelo, Gordon & Co. would hold the security in swap for at least 9 months, and sometimes as long as 2 years. In only a handful of instances did Angelo, Gordon & Co. hold a security in swap for less than 30 days.

Finally, due to economic and business realities in the marketplace, and at Angelo, Gordon, and Co. the firm currently engages in very few swap transactions, and the number of swap transactions engaged in has decreased significantly over time. Given the decrease in opportunities in the marketplace, Angelo, Gordon & Co.'s dedicated convertible securities funds, which used to engage in such swap transactions, closed in late 2006. Angelo, Gordon & Co.'s real estate securities funds, which also used to engage in such swap transactions, closed in late 2007. Notably, the significant decrease in swap transactions has had no relationship to any change in the tax treatment of dividend-based payments but, rather, is based on other economic and business realities.

I hope my testimony has aided the Subcommittee in understanding these issues, and I will do my best to answer any questions you might have.

Senator LEVIN. Thank you very much, Mr. Wolf, and thank you and your company for your cooperation also with the Subcommittee.

Mr. Manogue, let me start with some questions to you. You have engaged in the stock loan transactions with financial institutions to enhance dividends for some time. Is that correct?

Mr. MANOGUE. That is correct.

Senator LEVIN. What was the purpose of those transactions?

Mr. MANOGUE. The purpose of the transactions was to enhance dividends.

Senator LEVIN. And how long would a typical transaction last?

Mr. MANOGUE. Over the years, that has been negotiated, so it has been different time periods. But it ranged from 30 days down to 15 days.

Senator LEVIN. And then after the 15 days or 30 days, or whatever the period was, the stock would be returned?

Mr. MANOGUE. That is correct.

Senator LEVIN. Now, when you say that the purpose of these transactions, loan transactions, was for dividend enhancement—and we appreciate your candor on that—the dividend itself was not

23

enhanced, as I understand it, but rather the amount of the dividend was not enhanced. The enhancement came through the tax not being paid. Is that correct?

Mr. MANOGUE. Through the substitute dividend payment, yes, correct.

Senator LEVIN. And that not being taxable.

Mr. MANOGUE. Correct.

Senator LEVIN. Is that why that particular technique was pitched to you by the financial institution, in order to enhance the dividend through its not being taxable? Was that the basis of the pitch to you from whatever financial institution was——

Mr. MANOGUE. Correct. That was the premise. And I just want to clarify one point. I am not a tax expert, so I am not sure that a substitute dividend is not necessarily taxable.

Senator LEVIN. All right. But the payment that you received was not taxable.

Mr. MANOGUE. Correct.

Senator LEVIN. OK. Now, Mr. Wolf, I wonder if you would take a look at Exhibit 16 in the book that is in front of you.[1] If you look at page 2 of that exhibit where it says that Gary Wolf called regarding the swap that was discussed?

Mr. WOLF. Yes, sir.

Senator LEVIN. And he said that he—"Gary Wolf called regarding the swap that was discussed on his prefs."

Mr. WOLF. Yes.

Senator LEVIN. "Prefs," what is that?

Mr. WOLF. Preferred securities.

Senator LEVIN. "And he said that he is being quoted by other brokers on the street 100-percent dividend doing it via a total return swap as opposed to the 92 percent that we offer. He said he would be looking to do this on a more long-term position as opposed to ones that he knows they will be getting out of." Is that accurate? Do you remember that phone call?

Mr. WOLF. Vaguely.

Senator LEVIN. All right. And to the extent that you remember it, was the return on that swap important to you?

Mr. WOLF. Sure.

Senator LEVIN. The transactions that you engaged in there were aimed at enhancing your dividend. Is that correct?

Mr. WOLF. That was one of the significant factors in entering into a total return swap or a CFD.

Senator LEVIN. Was that, would you say, a significant factor? Is that the way you would phrase it?

Mr. WOLF. Well, I would say it is a very significant factor—in fact, a primary factor; but not the only economic substance to the transaction.

Senator LEVIN. All right. And, Mr. Potapchuk, let me ask you the question. Did you engage in the transactions that we are discussing here to enhance the dividend?

Mr. POTAPCHUK. We do engage and have engaged for quite some time, back into the 1990s, in transactions involving taking exposure to securities in the form of total return swap, yes. With re-

---

[1] See Exhibit No. 16 which appears in the Appendix on page 223.