# Exhibit 52

# OPERATING AGREEMENT

## OF

## ROADCRAFT TECHNOLOGIES LLC

(A Delaware Limited Liability Company)

CONFIDENTIAL

WH_MDL_00029161

**OPERATING AGREEMENT**

**OF**

**ROADCRAFT TECHNOLOGIES LLC**

This OPERATING AGREEMENT is entered into as of the 16th day of June, 2014, by and among the parties executing this Agreement on the following terms and conditions:

Article One

**ORGANIZATION**

1.1.    Formation.  The Company has heretofore been formed under the laws of the State of Delaware as of June 16, 2014 with the filing of the Certificate of Formation with the Delaware Secretary of State, the parties hereby form a Delaware limited liability company pursuant to the provisions of the Act and upon the terms and conditions set forth in this Agreement.

1.2.    Company Name.   The name of the Company shall be Roadcraft Technologies LLC and all business of the Company shall be conducted in such name.  The Company shall hold all of its property in the name of the Company and not in the name of any Member.

1.3.    Purpose.  The purpose of the Company is to invest in property of any kind, domestic or foreign, real, personal, mixed or choses in action, and including but not limited to stocks, bonds, commodities, precious metals, mutual funds, common trust funds, coins and currency, by any method including but not limited to puts, calls, strips, straddles, short sales, futures, margin or by the exercise of options of any sort irrespective of any statute, case rule or custom limiting the investment of Company funds.

1.4.    Agent for Service; Registered Office.   The name and address of the registered agent for service of process on the Company in the State of Delaware shall be Vcorp Services LLC, 1811 Silverside Road, Wilmington, County of New Castle, Delaware 19810 or such other agent as may be designated from time to time by the Company Manager.  The address of the registered office of the Company in the State of Delaware is c/o Vcorp Services LLC, 1811 Silverside Road, Wilmington, County of New Castle, Delaware 19810 or such other location as the Company Manager may designate from time to time.  Vcorp Services LLC shall forward any service of process received to the registered office of the Company at c/o Michael Ben-Jacob, Kaye Scholer LLP, 425 Park Avenue, New York, New York, 10022.

1.5.    Principal Office.  The Company's principal office shall be at such location as may be designated by the Manager from time to time.

1.6.    Term.  The term of the Company shall commence upon the effective date of formation of the Company as provided in the Act and shall continue until liquidated pursuant to the terms of ARTICLE TEN.

ROADCRAFT TECHNOLOGIES LLC - Operating Agreement

1.7.    _Independent Activities_. Each Member and Manager may, notwithstanding this Agreement, engage in whatever activities they choose, whether the same or competitive with the Company or otherwise, without having or incurring any obligation to offer any interest in such activities to the Company or any Member.   Neither this Agreement nor any activity undertaken pursuant hereto shall prevent any Member or Manager from engaging in such activities, or require any Member or Manager to permit the Company or any Member to participate in any such activities. As a material part of the consideration for the execution of this Agreement by each Member, each Member hereby waives, relinquishes and renounces any such right or claim of participation.

1.8.    _Capitalized Terms_.  Unless otherwise defined herein, capitalized words and phrases used in this Agreement have the meaning set forth in APPENDIX A attached to this Agreement.

Article Two

**CAPITAL**

2.1.    _Initial Ownership_.  The names, Percentage Interests and types of Interests of each of the Members are as set forth on the Ownership Schedule attached to this Agreement. The Manager shall update the Ownership Schedule from time to time to reflect changes in the information set forth on the Ownership Schedule.

2.2.    _Capital Contributions_.  Unless otherwise provided in this Agreement, any other agreements among the Members or applicable state law, a Member shall be liable only to make his Capital Contributions and shall not be required to lend any funds to the Company or, after his Capital Contributions have been paid, to make any additional contributions to the Company.

2.3.    _Return of Capital Contributions_.    Except as otherwise provided in ARTICLE TEN and elsewhere in this Agreement, no Member shall demand or receive a return of his Capital Contributions from the Company.  Under circumstances requiring a return of any Capital Contributions, no Member shall have the right to receive property other than cash except as may be specifically provided herein.

2.4.    _Member Compensation_.  No Member shall receive any interest, salary or drawing with respect to his Capital Contributions or his Capital Account or for services rendered on behalf of the Company or otherwise in his capacity as a Member, unless otherwise provided in this Agreement.

2.5.    _Member Liability_.  Unless otherwise provided in this Agreement, no Member shall be liable for the debts, liabilities, contracts or any other obligations of the Company.

2.6.    _Partition_. Each Member waives its rights to have any Property partitioned, or to file a complaint or to institute any suit, action or proceeding at law or in equity to have any Property partitioned. Each Member, on behalf of itself, its successors and its assigns, hereby waives any such right.

CONFIDENTIAL                                                                      WH_MDL_00029163

2.7.  <u>Transactions Between a Member and the Company</u>.  Except as otherwise provided by applicable law, any Member or Manager may, but shall not be obligated to, lend money to or borrow money from the Company, act as surety for the Company and transact other business with the Company, and has the same rights and obligations when transacting business with the Company as a Person who is not a Member.  A Member may also be an employee or be retained as an agent of the Company.  The existence of these relationships and acting in such capacities will not result in the Member being deemed to be participating in the control of the business of the Company or otherwise affect the limited liability of the Member.

Article Three

## PROFITS AND LOSSES

3.1.  <u>Profits and Losses</u>.  After giving effect to the special and regulatory allocations set forth in <u>APPENDIX B</u> attached to this Agreement, Profits and Losses of any Fiscal Year shall be allocated among the Members in proportion to their Percentage Interests.

3.2.  <u>Other Allocation Rules</u>.

(a)  For purposes of determining the Profits, Losses or any other items allocable to any period, Profits, Losses and any such other items shall be determined on a daily, monthly or other basis, as determined by the Manager using any permissible method under Code Section 706 and the Regulations thereunder.

(b)  Except as otherwise provided in this Agreement, all items of Company income, gain, loss, deduction and any other allocations not otherwise provided for shall be divided among the Members in the same proportions as they share Profits or Losses, as the case may be, for the Fiscal Year.

(c)  The Members are aware of the income tax consequences of the allocations made by <u>this Section</u> and hereby agree to be bound by the provisions of this <u>ARTICLE THREE</u> and <u>APPENDIX B</u> in reporting their shares of Company income and loss for income tax purposes.

Article Four

## DISTRIBUTIONS

4.1.  <u>Distributions</u>.  Distributions shall be made to the Members at such times and in such amounts as the Manager shall reasonably determine, guided by the reasonable business needs of the Company determined by reference to, among other things, the present and anticipated investment opportunities, business goals, expenses, liabilities and contingencies of the Company.  If the Manager determines to make a distribution (or is required to make a distribution pursuant to <u>ARTICLE TEN</u>), any such amount shall be distributed in the following order of priority:

(a)  First, to the Members with positive Capital Accounts in proportion to, and to the extent of, their respective Capital Accounts; and

ROADCRAFT TECHNOLOGIES LLC - Operating Agreement

CONFIDENTIAL

WH_MDL_00029164

(b)    Second, to all Members, in proportion to their Percentage Interests.

Article Five

**MANAGEMENT**

5.1.    <u>Managers; Number; Identity</u>.

(a)    The Company shall initially have one (1) Manager who shall be Ronald Altbach.

(b)    The number of Managers may be altered by the Members from time to time pursuant to <u>Section 6.3(c)</u>.

(c)    A Manager shall remain in office during his lifetime until removed or replaced in accordance with the provisions of <u>Section 6.3</u> or until such Manager resigns upon thirty (30) days written notice to all of the Members.  Pursuant to <u>Section 6.3</u>, the Members may remove and replace a Manager for any reason whatsoever, in their sole and absolute discretion, by delivering to the Company their written statement designating the Manager to be removed and/or replaced and designating the successor Manager.  In the event any Manager dies, resigns, is unable to serve as such or is removed from office, the Members shall promptly designate a successor to such Manager in accordance with the provisions of <u>this paragraph</u> and <u>Section 6.3</u>.

(d)    Each Manager shall have one (1) vote.  Except as otherwise provided in this Agreement, the Managers shall act by the affirmative written approval of a majority of the total number of Managers, except where there are fewer than three Managers, in which case unanimous written approval is required.  In the event of a deadlock between the Managers on any issue, such issue shall be decided by a vote of the Members pursuant to <u>Section 6.3</u>.

(e)    The Manager shall have the power to delegate authority to such committees of Managers, officers, employees, agents and representatives of the Company as the Managers may from time to time deem appropriate.  Any delegation of authority to take any action must be approved in the same manner as would be required for the Manager to approve such action directly.

(f)    Unless otherwise provided by this Agreement, after adoption by the required consent of the Manager pursuant to <u>Section 5.1(d)</u>, all documents, contracts, agreements or other written instruments may be exercised by the signature of the Manager.

5.2.    <u>Authority of the Manager</u>.  Except as otherwise provided in <u>Section 6.3</u> and <u>Section 6.4</u> for acts requiring a vote of the Members, all powers to control and manage the business and affairs of the Company shall be exclusively vested in the Manager, who may exercise all powers of the Company and do all such lawful acts as are not by statute, the Certificate of Formation or this Agreement directed or required to be exercised or done by the Members, and in so doing shall have the right and authority to take all actions which the Manager deems necessary, useful or appropriate for the management and conduct of the Company's business.

ROADCRAFT TECHNOLOGIES LLC - Operating Agreement

4

5.3.    Duties and Obligations of the Manager.

(a)    The Manager shall take all actions which may be necessary or appropriate (i) for the continuation of the Company's valid existence as a limited liability company under the Act and the laws of each jurisdiction in which such existence is necessary to protect the limited liability of the Members or to enable the Company to conduct the business in which it is engaged and (ii) for the accomplishment of the Company's purposes.

(b)    The Manager shall cause the Company to conduct its business and operations separate and apart from that of any Member or Manager, including, without limitation, (i) segregating Company Property and not allowing funds or other Property of the Company to be commingled with the funds or other assets of, held by or registered in the name of, any Member or Manager, (ii) maintaining books and financial records of the Company separate from the books and financial records of any Member or Manager and (iii) causing the Company to conduct its dealings with third parties in its own name and as a separate and independent entity.

(c)    The Manager owes the fiduciary duties of loyalty, care, good faith and fair dealing to the Company and to the Members.  A Person who so performs his duties shall not have any liability by reason of being or having been a Manager of the Company.

5.4.    Indemnification of the Manager.    The Company shall indemnify, hold harmless and pay all judgments and claims against any Manager relating to any liability or damage incurred by reason of any act performed or omitted to be performed by any Manager in the manner described in Section 5.3(c), including reasonable attorneys' fees and expenses incurred by the Manager in connection with the defense of any action based on any such act or omission, which attorneys' fees and expenses may be paid as incurred.

5.5.    Reimbursements.    The Company shall reimburse the Members and Manager for all expenses incurred and paid by any of them in the organization of the Company and as authorized by the Company, in the conduct of the Company's business.

5.6.    Right to Rely on the Manager.  Any Person dealing with the Company may rely (without duty of further inquiry) upon a certificate signed by the Manager as to:

(a)    The identity of the Manager and/or the Members;

(b)    The existence or nonexistence of any fact or facts which constitute(s) a condition precedent to acts by the Manager or which is (are) in any other manner germane to the affairs of the Company;

(c)    The Manager who is (are) authorized to execute and deliver any instrument or document of the Company; or

(d)    Any act or failure to act by the Company or any other matter whatsoever involving the Company or any Member.

ROADCRAFT TECHNOLOGIES LLC - Operating Agreement

5

Article Six

## ROLE OF MEMBERS

6.1.    <u>Rights or Powers</u>.  Except as provided in <u>Section 6.3</u> and <u>Section 6.4</u>, the Members shall not have any right or power to take part in the management or control of the Company or its business and affairs or to act for or bind the Company in any way.

6.2.    <u>Voting Rights</u>.  No Member has any voting right except as specifically set forth in this Agreement and as required in the Act.  Ownership rights in the Company are reflected in Voting Interests and Non-Voting Interests, if any, as reflected on the Ownership Schedule attached to this Agreement.  On any matter subject to a vote or consent of the Members, except as otherwise provided herein, only those Members who own Voting Interests in the Company shall have the right to vote.  Except as otherwise provided herein, ownership of Non-Voting Interests, to the extent any such interests are issued, in the Company shall not entitle such Member to vote.

6.3.    <u>Acts Requiring Super Majority of Voting Interests</u>.  No action may be taken by the Company (whether by the Managers, or otherwise) in connection with any of the following matters without the written consent of Members holding a Super Majority of the Voting Interests (as defined in <u>APPENDIX A</u> below):

(a)    Consent to the Transfer of an Interest in the Company or to the conversion of a Permitted Transferee to a substituted Member (such vote to be calculated after excluding the Voting Interest, if any, of the Member proposing the Transfer or substitution) upon the terms provided in <u>ARTICLE EIGHT</u>;

(b)    Consent to the withdrawal of a Member upon the terms provided in <u>Section 9.1</u>;

(c)    Remove and/or replace a Manager or alter the number of Managers upon the terms provided in <u>Section 5.1</u>; and

(d)    Confess a judgment against the Company.

6.4.    <u>Acts Requiring Super Majority of Voting Interests and Non-Voting Interests</u>.  No action may be taken by the Company (whether by the Manager, or otherwise) in connection with any of the following matters without the written consent of Members holding a Super Majority of the Voting Interests and by Members holding a Super Majority of the Non-Voting Interests:

(a)    Any act in contravention of this Agreement;

(b)    Any act which would make it impossible to carry on the ordinary business of the Company, except as may otherwise be provided in this Agreement;

(c)    Dissolve or liquidate the Company;

ROADCRAFT TECHNOLOGIES LLC - Operating Agreement

6

          WH_MDL_00029167

(d)     Merge or consolidate the Company with any other entity; and

(e)     Amend this Agreement.

6.5.   <u>Meetings of the Members</u>.

(a)     Meetings of the Members may be called upon the written request of any Member eligible to vote at such proposed meeting. Notice of any such meeting shall be given in the form required pursuant to <u>Section 11.1</u> to all Members eligible to vote at such meeting, such that it is received at least five (5) business days prior to the date of such meeting. Each such notice shall state (i) the time, date and place (which shall be at the principal office of the Company unless otherwise agreed to by all Members eligible to vote) and (ii) the purpose of the meeting to be so held; provided, however, that if any Member eligible to vote objects to the date or time of such proposed meeting, another date and/or time shall be set which is agreeable to all Members eligible to vote, but no later than ten (10) days beyond the original date. The provisions of <u>Section 11.2</u> shall apply with respect to all meetings of the Members.

(b)     Each Member may authorize any Person or Persons to act for it by proxy on all matters in which a Member is entitled to participate, including waiving notice of any meeting, or voting or participating at a meeting. Every proxy must be signed by the Member or its attorney-in-fact. No proxy shall be valid after the expiration of eleven (11) months from the date thereof unless otherwise provided in the proxy. Every proxy shall be revocable at the pleasure of the Member executing it.

Article Seven

<b>RECORDS AND ACCOUNTING</b>

7.1.   <u>Records and Accounting</u>.

(a)     The Company will maintain proper and complete records and books of account of the business of the Company at a location chosen by the Manager. All books and records of the Company shall be kept on the method of accounting followed by the Company for Federal income tax purposes.

(b)     The Company will maintain the Company Records at a location chosen by the Manager. All Members shall have access to the Company Records during the Company's regular business hours. The Manager may impose additional reasonable conditions and restrictions on Members' access to the Company Records, including specifying the amount of advance notice a Member must give and the charges imposed for copying.

7.2.   <u>Reports</u>. As soon as practicable after the end of each Fiscal Year or more frequently as agreed, the Company shall deliver to all Members an unaudited financial report of the Company.

7.3.   <u>Tax Information</u>. Within ninety (90) days after the end of each Fiscal Year or prior to the day on which the Company's tax return for such Fiscal Year is filed, whichever is sooner, the Company will cause to be delivered to each Person who was a Member

ROADCRAFT TECHNOLOGIES LLC - Operating Agreement

7

at any time during such Fiscal Year all information necessary for the preparation of such Member's Federal income tax return, including a statement showing such Member's distributive share of the Company's income, gains, losses, deductions, credits and tax preferences for the taxable year of the Company ending within or with such Member's taxable year for Federal income tax purposes, and the amount of any distribution made to or for the account of such Member pursuant to this Agreement.

7.4.  <u>Tax Returns</u>.  The Manager shall cause all required Federal, state and local information and tax returns for the Company to be prepared and timely filed with the appropriate authorities.

7.5.  <u>Accounting Decisions</u>.  All decisions as to accounting principles used for financial reporting and tax accounting purposes shall be made by the Manager on a basis that is acceptable to the Company's accountants notwithstanding any other provisions to the contrary contained in this Agreement.

7.6.  <u>Tax Elections</u>.  The Manager may, from time to time, make the tax elections deemed necessary or appropriate, in the Manager's sole discretion, to carry out the business of the Company or the purposes of this Agreement.  In the event of a Transfer of all or part of the Interest of a Member in the Company by sale or exchange or on the death of a Member, the Manager may cause the Company to elect, pursuant to Code Section 754, to adjust the basis of Company Property as provided by the Code.

Article Eight

<strong>TRANSFERS OF INTERESTS BY MEMBERS</strong>

8.1.  <u>Restriction on Transfers</u>.  Except as provided in <u>Section 8.2</u>, no Member may Transfer all or any portion of his Interest in the Company.  Any Transfer of an Interest in the Company in violation of this <u>ARTICLE EIGHT</u> is void.

8.2.  <u>Permitted Transfers</u>.  Subject to the conditions of <u>Section 8.3</u>, a Member may Transfer all or any portion of his Interest in the Company, alternatively, pursuant to <u>Section 8.2(a)</u>, <u>(b)</u> or <u>(c)</u>:

(a)  <u>Related Parties</u>.  At any time and without the consent of the Manager or Members, a Member may Transfer all or any portion of his Interest to:

(i)  Any member of such Member's family;

(ii)  A trust for the benefit of such Member and/or any one or more of such Member's family;

(iii)  Such Member's executor, administrator, trustee, personal representative or other such successor in interest by reason of such Member's death;

(iv)  Any other Member, who shall possess all rights and privileges and undertake all obligations of such Member; or

ROADCRAFT TECHNOLOGIES LLC - Operating Agreement

8

(v)    A corporation, partnership, limited liability company or other entity which is controlled by such Member or any of the Persons described in Section 8.2(a)(i) through (iv).

For purposes of this Section 8.2(a), "family" shall mean a Member's spouse, children and grandchildren.

(b)    Consent Transfers.  A Member may Transfer all or any portion of his Interest to any Person with the consent of the Members pursuant to Section 6.3.

(c)    Bona Fide Purchaser.  At any time and without the consent of the Manager or Members, a Member may transfer all or any portion of his Interest (the "Offered Interest") to any Person from which such Member (the "Selling Member") receives a bona fide offer for purchase of such Interest, provided that the Selling Member first gives the Company and the other Members (the "Offerees") the option of purchasing the Offered Interest pursuant to the terms of this paragraph.  The Selling Member must give written notice of such bona fide offer to the Company and the Offerees.  Such notice must be accompanied by a true copy of the bona fide offer.  The Offerees shall have ninety (90) days from receipt of the notice to purchase the Offered Interest at the same price and on the same terms as set forth in the bona fide offer.  The Company shall have the first opportunity to purchase all or any portion of the Offered Interest.  The Members, other than the Selling Member, shall then have the opportunity to purchase any remaining Offered Interest.  If more than one Member elects and has the opportunity to purchase all or any portion of the Offered Interest, each such electing Member shall have the right to purchase a pro rata portion of such remaining Offered Interest in such proportion as such electing Member's Interest in the Company bears to the combined Interests in the Company of all such electing Members.  If neither the Company nor the Members exercise their option to purchase the Offered Interest and in the event the Offered Interest is not sold to the Person making the bona fide offer under the terms and conditions therein set forth within one hundred twenty (120) days after such bona fide offer was first received by such Member, no sale shall be permitted hereunder unless the offer is again submitted to the Offerees which shall again have the option to purchase on the terms provided in this paragraph.

(d)    Any Transfer permitted pursuant to Section 8.2(a), (b) or (c) shall be referred to as a "Permitted Transfer" and any Person with respect to whom an Interest in the Company may be Transferred shall be referred to as a "Permitted Transferee." A Permitted Transferee shall become a substituted Member under the terms of this Agreement only upon satisfying the applicable conditions of Section 8.3, and, until satisfying such conditions, such Permitted Transferee shall have only those rights of an assignee pursuant to Section 8.4.

CONFIDENTIAL                                                                 WH_MDL_00029170

8.3.    Substituted Members.

(a)    A Permitted Transferee of an Interest Transferred pursuant to Section 8.2(a), (b), or (c) shall become a substituted Member under the terms of this Agreement only if:

(i)    The Permitted Transferee executes and delivers to the Company such documents and instruments of conveyance as may be necessary or sufficient in the opinion of counsel to the Company to effect such Permitted Transfer;

(ii)    The Permitted Transferee accepts and adopts the terms and provisions of this Agreement in form satisfactory in the opinion of counsel to the Company;

(iii)    The Permitted Transferee furnishes the Company with his taxpayer identification number, sufficient information to determine his initial tax basis in the Interest Transferred and any other information reasonably necessary to permit the Company to file all required Federal, state and local tax returns and other legally required information statements or returns.  Without limiting the generality of the foregoing, the Company shall not be required to make any distribution otherwise provided for in this Agreement with respect to any Transferred Interest until it has received such information;

(iv)    The Permitted Transferee assumes the obligations of the transferor Member under this Agreement with respect to the Interest to be Transferred; and

(v)    The Permitted Transferee reimburses the Company for all costs and expenses that it reasonably incurs in connection with such Transfer.

(b)    A Permitted Transferee of an Interest Transferred pursuant to Section 8.2(c) shall become a substituted Member under the terms of this Agreement only upon satisfying the requirements of Section 8.3(a) and obtaining the Members' consent to such substitution pursuant to Section 6.3.

(c)    Upon obtaining the necessary consents, executing such documents and fulfilling such obligations as may be required pursuant to Section 8.3(a) (b), or (c) as applicable, the Permitted Transferee shall become a substituted Member and shall thereafter possess all rights and obligations of the transferor Member with respect to the Interest Transferred and the transferor Member shall be released from all such assumed obligations except those obligations or liabilities of the transferor Member arising out of a breach of this Agreement and those obligations or liabilities of the transferor Member based on events occurring, arising or maturing prior to the date of Transfer.

8.4.    Permitted Transferees That Are Not Substituted Members.  Unless and until all of the requirements set forth in Section 8.3 are satisfied with respect to a Permitted Transferee, such Permitted Transferee's Interest shall:

(a)    Be strictly limited to the transferor's rights to allocations and distributions as provided by this Agreement with respect to the transferred Interest;

ROADCRAFT TECHNOLOGIES LLC - Operating Agreement

10

                                                                                    WH_MDL_00029171

(b)      Notwithstanding any other provision of this Agreement, have no right to vote and such former Member's consent shall not be required in any matter requiring vote or consent by the Members, whether holding Voting Interests or Non-Voting Interests;

(c)      Have no right to otherwise participate in the management of the Company; and

(d)      Have only those rights allowed to an assignee under the Act

8.5.    Prohibited Transfers.

(a)      If the Company is required to recognize a Transfer of an Interest not permitted by Section 8.2, the transferee of such Interest (the "Prohibited Transferee") shall have only those rights set forth in Section 8.4(a) through (d), and the Prohibited Transferee shall have no right to become a substituted Member.

(b)      In the case of a Transfer or attempted Transfer of an Interest in the Company that is not permitted by Section 8.2, the Member engaging or attempting to engage in such Transfer shall indemnify, defend and hold harmless the Company and the other Members from all cost, liability and damage (including, without limitation, incremental tax liability and attorney's fees and expenses) that any of such indemnified Members may incur as a result of such Transfer or attempted Transfer and efforts to enforce the indemnity granted hereby.

8.6.    Distributions and Allocations in Respect of Transferred Interests.  If any Interests are Transferred during any Fiscal Year in compliance with the provisions of this ARTICLE EIGHT, Profits, Losses, each item thereof and all other items attributable to the Transferred Interests for such Fiscal Year shall be divided and allocated between the transferor and the transferee by taking into account their varying Percentage Interests during the Fiscal Year in accordance with Code Section 706(d), using any conventions permitted by law and selected by the Manager.  All distributions on or before the date of such Transfer shall be made to the transferor, and all distributions thereafter shall be made to the transferee.  Solely for purposes of making such allocations and distributions, the Company shall recognize such Transfer not later than the end of the calendar month in which the applicable conditions of Section 8.3 are satisfied.  Neither the Company nor any Member shall incur any liability for making allocations and distributions in accordance with the provisions of this Section, whether or not any Manager or the Company has knowledge of any Transfer of ownership of any Interest.

Article Nine

**WITHDRAWAL OF MEMBERS**

9.1.    Generally.  No Member shall be permitted to withdraw from the Company without the consent of the Members pursuant to Section 6.3.

9.2.    Permitted Withdrawals.    In the event the Members consent to the withdrawal of a Member pursuant to Section 6.3, such withdrawing Member shall be deemed a "Former Member" as of the date such consent is obtained (the "Withdrawal Date") and shall:

ROADCRAFT TECHNOLOGIES LLC - Operating Agreement
11

(a)    Be strictly limited to the transferor's rights to allocations and distributions as provided by this Agreement with respect to the transferred Interest;

(b)    Notwithstanding any other provision of this Agreement, have no right to vote and such Former Member's consent shall not be required in any matter requiring vote or consent by the Members, whether holding Voting Interests or Non-Voting Interests;

(c)    Have no right to otherwise participate in the management of the Company;

(d)    Have only those rights allowed to an assignee under the Act; and

(e)    Have no right to become a substituted Member.

9.3.    <u>Purchase of Former Member's Interest</u>.

(a)    The Company shall purchase all of a Former Member's Interest in the Company at the price established in <u>Section 9.3(b)</u> (the "Purchase Price") and upon the terms set forth in <u>Section 9.3(c)</u> and <u>(d)</u>.

(b)    The Purchase Price shall be the fair market value of such Former Member's Interest as determined by an appraiser, mutually agreeable to the Company and the Former Member, by reference to the price at which the Former Member's Interest would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or to sell and both having reasonable knowledge of the relevant facts. The Purchase Price shall bear interest from the Withdrawal Date at the Short Term Applicable Federal Rate of Code Section 1274(d) in effect for the month in which consent to withdrawal was obtained.

(c)    At the Company's complete and sole discretion, the Purchase Price, and accrued interest thereon, may be paid in cash or in Property, or in any combination thereof, and need not consist of a pro rata percentage of each item of Property.

(d)    The closing shall take place at a time and place mutually agreeable to the Company and the Former Member, but in no event less than one hundred seventy (170) days nor more than one hundred ninety (190) days from the Withdrawal Date.

(e)    At the closing,

(i)    the Former Member shall deliver to the Company such documents and instruments of conveyance as may be necessary or sufficient in the opinion of counsel to the Company to transfer, convey and assign to the Company good and marketable title in the Former Member's Interest, free from mortgage, pledge, lien, encumbrance or rights of others therein; and

(ii)    the Company shall pay the Purchase Price, plus accrued interest thereon, to the Former Member.

ROADCRAFT TECHNOLOGIES LLC - Operating Agreement
12

    WH_MDL_00029173

Article Ten

## DISSOLUTION AND LIQUIDATION

10.1.    <u>Termination</u>.  The Company shall continue until the occurrence of one or more of the following events:

(a)     The decision by the Members to dissolve the Company pursuant to <u>Section 6.4</u>; or

(b)     The entry of a decree of judicial dissolution with respect to the Company pursuant to the terms of the Act.

10.2.    <u>Death of a Member</u>.  The death of a Member or the occurrence of any other event that terminates the continued membership Interest of any Member in the Company <u>shall not</u> cause the Company to be dissolved or its affairs wound up and, upon the occurrence of any such event, the Company shall continue without dissolution.

10.3.    <u>Accounting</u>.  Upon the dissolution of the Company in accordance with the provisions of this Agreement, the Company shall immediately commence winding up its affairs and the Manager shall cause the Company to file a notice of dissolution or cancellation in accordance with the provisions of this <u>ARTICLE TEN</u>.  The proceeds from liquidation of Property shall be distributed and applied as set forth in <u>Section 10.5</u>.

10.4.    <u>Winding-up of Affairs</u>.  The winding-up of the affairs of the Company and the distribution of its Property shall be conducted by the Manager.  Without limiting the generality of the foregoing, the Manager, in carrying out such winding-up and distribution, shall have full power and authority to sell all or any of the Property or to distribute the same in kind to the Members.  Any Property distributed in kind shall be subject to all operating agreements or other agreements relating thereto which shall survive the dissolution and liquidation of the Company.

10.5.    <u>Liquidating Distributions</u>.

(a)     Upon termination of the Company, the affairs of the Company shall be wound up and all of its debts and liabilities discharged in the order of priority as provided by law.  The fair market value of the respective remaining Property shall then be determined, with the fair market value of any Property other than cash being determined by an independent appraiser selected by the Manager.  For purposes of such allocation only, it shall be assumed that the Property other than cash had been sold for an amount equal to its fair market value as determined above, and that the Profits or Losses from such sale had been allocated in accordance with <u>ARTICLE THREE</u>.

(b)     The proceeds of liquidation and any unliquidated Property of the Company shall be distributed to the Members as provided in <u>Section 4.1</u>.  Each Member shall receive his share of the Property in cash or in kind, and the proportion of such share that is received in cash may vary from Member to Member.  If such distributions are insufficient to return to any Member the full amount of his Capital Contributions, he shall have no recourse

ROADCRAFT TECHNOLOGIES LLC - Operating Agreement
13

against the Company or any other Member. Any reserves established by the Manager in the course of such distribution shall be held for so long as the Manager shall deem necessary in a special account maintained by the Manager for the Company for the purpose of paying contingent or unforeseen liabilities or obligations. At the time the Manager determines that there is no longer a need for the reserve, the distribution of the reserve shall commence where the initial distribution of the Property ended. For purposes of this paragraph, expenses of dissolution and liquidation shall be treated as debts and obligations of the Company.

Article Eleven

**MISCELLANEOUS**

11.1.  Notices; Approvals.  All notices, consents, approvals, requests, demands or other communications ("notices") which any of the parties to this Agreement (or the Company) may desire or be required to give hereunder, shall be in writing and shall be deemed properly given when (i) hand delivered or (ii) sent by Federal Express, DHL or other private or public mail carrier which provides evidence of delivery to the address specified in the Company Records.

11.2.  Meetings.

(a)  Any Member may waive notice of any meeting in writing before, at or after such meeting. The attendance of a Member at a meeting shall constitute a waiver of notice of such meeting, except when a Member attends a meeting for the express purpose of objecting to the transaction of any business because the meeting was not properly called.

(b)  Any action required to be taken at a meeting of the Members, or any action that may be taken at a meeting of the Members, may be taken at a meeting held by means of video and/or telephone conference. Participation in such a meeting shall constitute presence in person at such meeting.

(c)  Notwithstanding anything to the contrary herein, the Members may take without a meeting any action that may be taken by the Members under this Agreement if such action is approved by the unanimous written consent of the Members entitled to vote on such action.

11.3.  Binding Effect.  Except as otherwise provided in this Agreement, every covenant, term and provision of this Agreement shall be binding upon and inure to the benefit of the Members and their respective heirs, legatees, legal representatives, successors, transferees and assigns.

11.4.  Construction.  Every covenant, term and provision of this Agreement shall be construed simply according to its fair meaning and not strictly for or against any Member.

11.5.  Time.  Time is of the essence with respect to the parties' obligations under this Agreement.

ROADCRAFT TECHNOLOGIES LLC - Operating Agreement
14

11.6.   Headings.  Section and other headings contained in this Agreement are for reference purposes only and are not intended to describe, interpret, define or limit the scope, extent or intent of this Agreement or any provision hereof.

11.7.   Severability.   Every provision of this Agreement is intended to be severable.  If any term or provision hereof is illegal or invalid for any reason whatsoever, such illegality or invalidity shall not affect the validity or legality of the remainder of this Agreement.

11.8.   Incorporation by Reference.  Every exhibit, schedule and other appendix attached to this Agreement and referred to herein is hereby incorporated in this Agreement by reference.

11.9.   Further Action.  Each Member hereby agrees to execute and deliver to the Company within five (5) days after receipt of a written request therefore, such other and further documents and instruments, statements of interest and holdings, designations, powers of attorney and other instruments and to take such other action as the Manager deems necessary, useful or appropriate to comply with any laws, rules or regulations as may be necessary to enable the Company to fulfill its responsibilities under this Agreement.  Each Member and Manager shall execute, and shall promptly file and record (or cause to be filed and recorded) and shall publish, if required by law, such other and further certificates or other instruments as may be necessary or desirable under the laws of any state in which the Company does business and so as to preserve the limited liability of the Members.

11.10.  Variation of Pronouns.  All pronouns and any variations thereof shall be deemed to refer to masculine, feminine or neuter, singular or plural, as the context may require.

11.11.  Governing Law.  The laws of the State of Delaware shall govern the validity of this Agreement, the construction of its terms and the interpretation of the rights and duties of the Members and Managers.

11.12.  Counterpart Execution.  This Agreement may be executed in any number of counterparts with the same effect as if all of the Members had signed the same document.  All counterparts shall be construed together and shall constitute one agreement.

11.13.  Arbitration.  Any controversy, claim or breach arising out of or relating to this Agreement shall be submitted for settlement to a panel of three (3) arbitrators.  Each party shall select an arbitrator and the two thus chosen shall select a third.  The decision of a majority of the arbitrators shall be final and binding on the parties.  If the two arbitrators cannot agree upon a third arbitrator, the American Arbitration Association will be requested to appoint an arbitrator.  Such arbitration shall be held in accordance with the rules and practices then pertaining to the location having jurisdiction thereof, and the judgment upon the award rendered shall be entered by consent in any court having jurisdiction thereof.

CONFIDENTIAL                                                                      WH_MDL_00029176

IN WITNESS WHEREOF, the party has entered into this Agreement as of the date and year first above set forth.

_____

Ronald Altbach, Manager and Member

CONFIDENTIAL

# APPENDIX A

## DEFINITIONS

Capitalized words and phrases used in this Agreement have the following meanings:

A.1.    "Act" means the Delaware Limited Liability Company Act as set forth in §18-101 to §18-1109, inclusive, of Title 6 of the Delaware Code Annotated, as amended from time to time (or any corresponding provisions of succeeding law).

A.2.    "Adjusted Capital Account Deficit" means, with respect to any Member, the deficit balance, if any, in such Member's Capital Account as of the end of the relevant Fiscal Year, after giving effect to the following adjustments:

(a)    Credit to such Capital Account for any amounts which such Member is obligated to restore pursuant to any provision of this Agreement or is deemed to be obligated to restore pursuant to the penultimate sentence of Regulations Section 1.704-2(g)(1) or Section 1.704-2(i)(5); and

(b)    Debit to such Capital Account for the items described in Regulations Sections 1.704-1(b)(2)(ii)(d)(4), 1.704-1(b)(2)(ii)(d)(5) and 1.704-1(b)(2)(ii)(d)(6). The foregoing definition of Adjusted Capital Account Deficit is intended to comply with the provisions of Regulations Section 1.704-1(b)(2)(ii)(d) and shall be interpreted consistently therewith.

A.3.    "Agreement" or "Operating Agreement" means this Operating Agreement, as may be amended from time to time.  Words such as "herein", "hereinafter", "hereto" and "hereunder" refer to this Agreement as a whole, unless the context otherwise requires.

A.4.    "Capital Account" means, with respect to any Member, the Capital Account maintained for such Member in accordance with the following provisions:

(a)    To each Member's Capital Account there shall be credited such Member's Capital Contributions, such Member's distributive share of Profits and any items in the nature of income or gain which are specially allocated pursuant to Appendix Section B.1, and the amount of any liabilities of the Company assumed by such Member or which are secured by any Property distributed to such Member;

(b)    To each Member's Capital Account there shall be debited the amount of cash and the Gross Asset Value of any Property distributed to such Member pursuant to any provision of this Agreement, such Member's distributive share of Losses and any items in the nature of expenses or losses which are specially allocated pursuant to Appendix Section B.1, and the amount of any liabilities of such Member assumed by the Company or which are secured by an property contributed by such Member to the Company;

ROADCRAFT TECHNOLOGIES LLC - Operating Agreement

17

(c)    In the event all or a portion of an Interest in the Company is Transferred in accordance with the terms of this Agreement, the transferee shall succeed to the Capital Account of the transferor to the extent it relates to the transferred Interest; and

(d)    In determining the amount of any liability for purposes of Appendix Sections A.4(a) and (b), there shall be taken into account Code Section 752 and any other applicable provisions of the Code and Regulations.

The foregoing provisions of this Section and the other provisions of this Agreement relating to the maintenance of Capital Accounts are intended to comply with Regulations Section 1.704-1(b) and Section 1.704-2 and shall be interpreted and applied in a manner consistent with such Regulations.  In the event the Manager shall determine that it is prudent to modify the manner in which the Capital Accounts, or any debits or credits thereto (including, without limitation, debits or credits relating to liabilities which are secured by contributed or distributed property or which are assumed by the Company or the Members) are computed in order to comply with such Regulations, the Manager may make such modification, provided that it is not likely to have a material effect on the amounts distributable to any Member pursuant to ARTICLE TEN.  The Manager also shall (i) make any adjustments that are necessary or appropriate to maintain equality between the Capital Accounts of the Members and the amount of Company capital reflected on the Company's balance sheet, as computed for book purposes, in accordance with Regulations Section 1.704-1(b)(2)(iv)(q) and (ii) make any appropriate modifications in the event unanticipated events might otherwise cause this Agreement not to comply with Regulations Section 1.704-1(b) or Section 1.704-2.

A.5.    "Capital Contributions" means, with respect to any Member, the amount of money and the initial Gross Asset Value of any property (other than money) contributed to the Company with respect to the Interest in the Company held by such Member.

A.6.    "Code" means the Internal Revenue Code of 1986, as amended from time to time (or any corresponding provisions of succeeding law).

A.7.    "Company" means the limited liability company governed by this Agreement.

A.8.    "Company Records" means those records that the Act gives Members the right to inspect and copy, subject to reasonable standards as may be set forth in the Operating Agreement, for purposes related to the Member's Interest in the Company, including:  (1) a current list, set forth in alphabetical order, of the name and last known mailing address of each Manager; (2) a current list, set forth in alphabetical order, of the name and last known mailing address of each Member, together with the contribution and the share of Profits and Losses of each Member or information from which such share can be readily derived; (3) a copy of the Articles of Organization and all amendments thereto or restatements thereof, together with executed copies of any powers of attorney pursuant to which any certificate or amendment has been executed; (4) a copy of the Operating Agreement, together with any amendments thereto or restatements thereof; and (5) a copy of the Company's Federal, state and local income tax or information returns and reports, if any, for the three most recent Fiscal Years.

CONFIDENTIAL

A.9.   "Depreciation" means, for each fiscal year or other period, an amount equal to the depreciation, amortization or other cost recovery deduction allowable with respect to an asset for such year or other period, except that if the Gross Asset Value of an asset differs from its adjusted basis for Federal income tax purposes at the beginning of such year or other period, Depreciation shall be an amount which bears the same ratio to such beginning Gross Asset Value as the Federal income tax depreciation, amortization or other cost recovery deduction for such year or other period bears to such beginning adjusted tax basis; provided, however, that if the Federal income tax depreciation, amortization or other cost recovery deduction for such year is zero, Depreciation shall be determined with reference to such beginning Gross Asset Value using any reasonable method selected by the Members.

A.10.   "Fiscal Year" means the calendar year.

A.11.   "Gross Asset Value" means, with respect to any asset, the asset's adjusted basis for Federal income tax purposes, except as follows:

(a)     The initial Gross Asset Value of any asset contributed by a Member to the Company shall be the gross fair market value of such asset, as determined by the contributing Member and the Manager;

(b)     The Gross Asset Values of all Company assets shall be adjusted to equal their respective gross fair market values, as determined by the Manager, as of the following times:  (a) the acquisition of an additional Interest in the Company by any new or existing Member in exchange for more than a de minimis Capital Contribution; (b) the distribution by the Company to a Member of more than a de minimis amount of Property as consideration for an Interest in the Company; and (c) the liquidation of the Company within the meaning of Regulations Section 1.704-1(b)(2)(ii)(g);

(c)     The Gross Asset Value of any Company asset distributed to any Member shall be the gross fair market value of such asset on the date of distribution; and

(d)     The Gross Asset Values of Company assets shall be increased (or decreased) to reflect any adjustments to the adjusted basis of such assets pursuant to Code Section 734(b) or Code Section 743(b), but only to the extent that such adjustments are taken into account in determining Capital Accounts pursuant to Regulations Section 1.704-1(b)(2)(iv)(m) and Appendix Section B.1; provided, however, that Gross Asset Values shall not be adjusted pursuant to this paragraph to the extent the Manager determines that an adjustment pursuant to Appendix Section A.11(b) above is necessary or appropriate in connection with a transaction that would otherwise result in an adjustment pursuant to this paragraph.

If the Gross Asset Value of an asset has been determined or adjusted pursuant to Appendix Section A.11(a), (b) or (d), such Gross Asset Value shall thereafter be adjusted by the Depreciation taken into account with respect to such asset for purposes of computing Profits and Losses.

A.12.   "Interest" or "Percentage Interest" means an ownership interest in the Company by a Member, including any and all benefits to which the holder of such an Interest may be entitled as provided in this Agreement, together with all obligations of such Member to

ROADCRAFT TECHNOLOGIES LLC - Operating Agreement
19

comply with the terms and provisions of this Agreement. Interests are further subdivided into Voting Interests and Non-Voting Interests, the respective rights of which are described in ARTICLE SIX.

A.13. "Manager" means those one or more persons designated as such in the manner provided for in this Agreement.

A.14. "Member" means any Member (i) whose name is set forth as such in Schedule A attached hereto or who has become a Member pursuant to the terms of this Agreement and (ii) who has not ceased to be a Member. "Members" mean all such Members.

A.15. "Person" means any individual, partnership, corporation, trust or other entity.

A.16. "Profits" and "Losses" means, for each Fiscal Year or other period, an amount equal to the Company's taxable income or loss for such year or period, determined in accordance with Code Section 703(a) (for this purpose, all items of income, gain, loss or deduction required to be stated separately pursuant to Code Section 703(a)(1) shall be included in taxable income or loss), with the following adjustments:

(a) Any income of the Company that is exempt from Federal income tax and not otherwise taken into account in computing Profits or Losses shall be added to such taxable income or loss;

(b) Any expenditures of the Company described in Code Section 705(a)(2)(B) or treated as Code Section 705(a)(2)(B) expenditures pursuant to Regulations Section 1.704-1(b)(2)(iv)(i), and not otherwise taken into account in computing Profits or Losses, shall be subtracted from such taxable income or loss;

(c) In the event the Gross Asset Value of any Company asset is adjusted, the amount of such adjustment shall be taken into account as gain or loss from the disposition of such asset for purposes of computing Profits or Losses;

(d) Gain or loss resulting from any disposition of Property with respect to which gain or loss is recognized for Federal income tax purposes shall be computed by reference to the Gross Asset Value of the property disposed of, notwithstanding that the adjusted tax basis of such property differs from its Gross Asset Value;

(e) In lieu of the depreciation, amortization and other cost recovery deductions taken into account in computing such taxable income or loss, there shall be taken into account Depreciation for such fiscal year or other period; and

(f) Notwithstanding any other provision of this Section, any items which are specially allocated pursuant to Appendix Section B.1 shall not be taken into account in computing Profits and Losses.

A.17. "Property" means all real and personal property acquired by the Company and any improvements thereto, and shall include both tangible and intangible property.

ROADCRAFT TECHNOLOGIES LLC - Operating Agreement
20

WH_MDL_00029181

A.18.  "Regulations" means the income tax regulations promulgated under the Code, as such regulations may be amended from time to time (including corresponding provisions of succeeding regulations).

A.19.  "Super Majority" shall mean Members whose combined Interests represent more than two-thirds of the Voting Interests or the Non-Voting Interests in the Company then held by all Members, as the context shall indicate.  For purposes of clarity, the Members do not intend any decision of the Members under this Operating Agreement to be based upon a vote of the simple majority.

A.20.  "Transfer" means, as a noun, any voluntary or involuntary transfer, whether by operation of law (including, but not limited to, the death of a Member) or otherwise, sale, pledge, hypothecation or other disposition and, as a verb, regardless of tense, voluntarily or involuntarily to transfer, sell, pledge, hypothecate or otherwise dispose of.

CONFIDENTIAL                                                                                           WH_MDL_00029182

## APPENDIX B

## SPECIAL, REGULATORY AND TAX ALLOCATIONS

B.1.    <u>Special and Regulatory Allocations</u>.  The following special and regulatory allocations shall be made in the following order:

(a)    <u>Adjusted Capital Account Deficit</u>.  The Losses allocated to each Member pursuant to <u>Section 3.1</u> shall not exceed the maximum amount that may be allocated to such Member without causing such Member to have an Adjusted Capital Account Deficit at the end of any Fiscal Year.  In the event that the Losses that would, but for <u>this paragraph</u>, be allocated to the Members pursuant to <u>Section 3.1</u> would cause some, but not all, of the Members to have an Adjusted Capital Account Deficit, the limitation set forth in <u>this paragraph</u> shall be applied on a Member by Member basis such that each Member is allocated the maximum amount of Losses that may be allocated to such Member under Regulations Section 1.704-1(b)(2)(ii)(d).  If any Losses are specially allocated to a Member, or Members, pursuant to <u>this paragraph</u>, then such Member, or Members, shall receive a priority allocation of Profits, as soon as possible, to the extent of, and in proportion to, such Losses allocated pursuant to <u>this paragraph</u>.  Any Losses in excess of the limitation set forth in <u>this paragraph</u> for all Members shall be allocated among the Members in proportion to their Percentage Interests.

(b)    <u>Minimum Gain Chargeback</u>.  Except as otherwise provided in Regulations Section 1.704-2(f), notwithstanding any other provision of <u>Section 3.1</u>, <u>3.2</u> and <u>Appendix B</u>, if there is a net decrease in Company Minimum Gain during any Fiscal Year, each Member shall be specially allocated items of Company income and gain for such Fiscal Year (and, if necessary, subsequent Fiscal Years) in an amount equal to such Member's share of the net decrease in Company Minimum Gain, determined in accordance with Regulations Section 1.704-2(g).  Allocations pursuant to the <u>previous sentence</u> shall be made in proportion to the respective amounts required to be allocated to each Member pursuant thereto.  The items to be so allocated shall be determined in accordance with Regulations Sections 1.704-2(f)(6) and 1.704-2(j)(2).  This paragraph is intended to comply with the minimum gain chargeback requirement in Regulations Section 1.704-2(f) and shall be interpreted consistently therewith. "Company Minimum Gain" shall have the meaning set forth in Regulations Sections 1.704-2(b)(2) and 1.704-2(d).

(c)    <u>Member Minimum Gain Chargeback</u>.  Except as otherwise provided in Regulations Section 1.704-2(i)(4), notwithstanding any other provision of <u>this paragraph</u>, if there is a net decrease in Member Non-Recourse Debt Minimum Gain attributable to a Member Nonrecourse Debt during any Fiscal Year, each Member who has a share of the Member Nonrecourse Debt Minimum Gain attributable to such Member Nonrecourse Debt, determined in accordance with Regulations Section 1.704-2(i)(5), shall be specially allocated items of Company income and gain for such Fiscal Year (and, if necessary, subsequent Fiscal Years) in an amount equal to such Member's share of the net decrease in Member Nonrecourse Debt Minimum Gain attributable to such Member Nonrecourse Debt, determined in accordance with Regulations Section 1.704-2(i)(4).  Allocations pursuant to the <u>previous sentence</u> shall be made in proportion to the respective amounts required to be allocated to each Member pursuant thereto.  The items to be so allocated shall be determined in accordance with Regulations

ROADCRAFT TECHNOLOGIES LLC - Operating Agreement

CONFIDENTIAL

Sections 1.704-2(i)(4) and 1.704-2(j)(2). This paragraph is intended to comply with the minimum gain chargeback requirement in Regulations Section 1.704-2(i)(4) and shall be interpreted consistently therewith. "Member Nonrecourse Debt Minimum Gain" shall mean an amount, with respect to each Member Nonrecourse Debt, equal to the Company Minimum Gain that would result if such Member Nonrecourse Debt were treated as a Nonrecourse Debt in accordance with Regulations Section 1.704-2(i). "Member Nonrecourse Debt" shall have the meaning set forth in Regulations Section 1.704-2(b)(4).

(d)    Nonrecourse Deductions. Nonrecourse Deductions for any Fiscal Year shall be specially allocated to the Members in accordance with their Percentage Interests. "Nonrecourse Deductions" shall have the meaning set forth in Regulations Section 1.704-2(b)(2).

(e)    Member Nonrecourse Deductions. Any Member Nonrecourse Deductions for any Fiscal Year shall be specially allocated to the Member who bears the economic risk of loss with respect to the Member Nonrecourse Debt to which such Member Nonrecourse Deductions are attributable in accordance with Regulations Section 1.704-2(i)(1). "Member Nonrecourse Deductions" shall have the meaning set forth in Section 1.704-2(i) of the Regulations.

(f)    Qualified Income Offset. In the event any Member unexpectedly receives any adjustments, allocations or distributions described in Regulations Sections 1.704-1(b)(2)(ii)(d)(4), 1.704-1(b)(2)(ii)(d)(5) or 1.704-1(b)(2)(ii)(d)(6), items of Membership income and gain shall be specially allocated to each such Member in an amount and manner sufficient to eliminate, to the extent required by the Regulations, the Adjusted Capital Account Deficit of such Member as quickly as possible, provided that an allocation pursuant to this paragraph shall be made only if and to the extent that such Member would have an Adjusted Capital Account Deficit after all other allocations provided for in Section 3.1, 3.2 and Appendix B have been tentatively made as if this paragraph were not in the Agreement.

(g)    Gross Income Allocation. In the event any Member has an Adjusted Capital Account Deficit at the end of any Fiscal Year of the Company, each such Member shall be specially allocated items of income and gain in the amount of such excess as quickly as possible, provided that an allocation pursuant to this paragraph shall be made only if and to the extent that such Member would have an Adjusted Capital Account Deficit after all other allocations provided for in Section 3.1, 3.2 and Appendix B have been made as if Appendix Section B.1(f) and this paragraph were not in the Agreement.

(h)    Section 754 Adjustments. To the extent an adjustment to the adjusted tax basis of any Company asset pursuant to Code Section 734(b) or Code Section 743(b) is required, pursuant to Regulations Section 1.704-1(b)(2)(iv)(m), to be taken into account in determining Capital Accounts, the amount of such adjustment to the Capital Accounts shall be treated as an item of gain (if the adjustment increases the basis of the asset) or loss (if the adjustment decreases such basis) and such gain or loss shall be specially allocated to the Members in a manner consistent with the manner in which their Capital Accounts are required to be adjusted pursuant to such section of the Regulations.

ROADCRAFT TECHNOLOGIES LLC - Operating Agreement

(i)  Curative Allocations.  The allocations set forth in Appendix Sections B.1(a) through (g) (the "Regulatory Allocations") are intended to comply with certain requirements of the Regulations.  Notwithstanding any other provision of this Appendix Section B.1 (other than the Regulatory Allocations), the Regulatory Allocations shall be taken into account in allocating other Profits, Losses and items of income, gain, loss and deduction among the Members so that, to the extent possible, the net amount of such allocations of other Profits, Losses and other items and the Regulatory Allocations to each Member shall be equal to the net amount that would have been allocated to such Member if the Regulatory Allocations had not occurred.

B.2.  Tax Allocations; Code Section 704(c).  In accordance with Code Section 704(c) and the Regulations thereunder, income, gain, loss and deduction with respect to any property contributed to the capital of the Company shall, solely for tax purposes, be allocated among the Members so as to take account of any variation between the adjusted basis of such property to the Company for Federal income tax purposes and its initial Gross Asset Value.

In the event the Gross Asset Value of any Company asset is adjusted, subsequent allocations of income, gain, loss and deduction with respect to such asset shall take account of any variation between the adjusted basis of such asset for Federal income tax purposes and its Gross Asset Value in the same manner as under Code Section 704(c) and the Regulations thereunder.

Any elections or other decisions relating to such allocations shall be made by the Manager in any manner that reasonably reflects the purpose and intention of this Agreement. Allocations pursuant to this Section are solely for purposes of Federal, state and local taxes and shall not affect, or in any way be taken into account in computing, any Member's Capital Account or share of Profits, Losses, other items or distributions pursuant to any provision of this Agreement.

ROADCRAFT TECHNOLOGIES LLC - Operating Agreement

CONFIDENTIAL

ROADCRAFT TECHNOLOGIES LLC

OWNERSHIP SCHEDULE

Dated as of June 16, 2014

| Member | Percentage of Voting Interests | Capital Contribution |
|--------|--------------------------------|----------------------|
| Ronald Altbach | 100% | $100 |

ROADCRAFT TECHNOLOGIES LLC - Operating Agreement

CONFIDENTIAL                                                                  WH_MDL_00029186